**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON WAYS AND MEANS,
UNITED STATES HOUSE OF REPRESENTATIVES,
1102 Longworth House Office Building
Washington, D.C. 20515,

                                    *Plaintiff*,

            v.

UNITED STATES DEPARTMENT OF
THE TREASURY,
1500 Pennsylvania Avenue, N.W.
Washington, D.C. 20220,

INTERNAL REVENUE SERVICE,                          Case No. 1:19-cv-1974
1111 Constitution Avenue, N.W.
Washington, D.C. 20224,

STEVEN T. MNUCHIN,
in his official capacity as Secretary of the
United States Department of the Treasury,
1500 Pennsylvania Avenue, N.W.
Washington, D.C. 20220,

CHARLES P. RETTIG,
in his official capacity as Commissioner of the
Internal Revenue Service,
1111 Constitution Avenue, N.W.
Washington, D.C. 20224,

                                    *Defendants*.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      The Committee on Ways and Means of the United States House of

Representatives (Ways and Means or Committee) brings this action against Defendants United

States Department of the Treasury (Treasury or Treasury Department), the Internal Revenue Service (IRS), Treasury Secretary Steven T. Mnuchin, and IRS Commissioner Charles P. Rettig to seek relief from Defendants' refusal to produce tax return information concerning President Donald J. Trump in response to the Committee's valid oversight requests.

2.      Section 6103(f) of the Internal Revenue Code, 26 U.S.C. § 6103(f), requires in mandatory terms that Treasury "shall furnish" the Committee with "any" requested tax return information.  Enacted in 1924, in the wake of Congressional attempts to investigate agency wrongdoing in the Teapot Dome corruption scandal, Section 6103(f) was intended to provide the Committee with unfettered access to tax return information necessary to carry out its broad mandate to oversee Treasury, the IRS, and the Nation's tax laws.  Since its passage, the Committee has routinely used Section 6103(f) for these purposes, and the Executive Branch has met its duty to comply with those requests.

3.      Defendants have now—for what the Committee believes is the first time ever— denied a Section 6103(f) request in order to shield President Trump's tax return information from Congressional scrutiny.  In refusing to comply with the statute, Defendants have mounted an extraordinary attack on the authority of Congress to obtain information needed to conduct oversight of Treasury, the IRS, and the tax laws on behalf of the American people who participate in the Nation's voluntary tax system.

4.      Nothing in Section 6103(f) requires the Committee to explain to Treasury its reasons for seeking tax return information.  But the Committee's need for the materials requested here is evident.  The Committee is investigating the IRS's administration of various tax laws and policies relating to Presidential tax returns and tax law compliance by President Trump, including whether the IRS's self-imposed policy of annually auditing the returns of sitting

Presidents is working properly, even though it has not been updated in decades.  Indeed,

President Trump himself has repeatedly questioned the integrity of the process by which the IRS

audits his tax returns, complaining that his returns are under "continuous audit" and that the

IRS's policy of annually auditing Presidential returns is "extremely unfair."  The President has

also publicly theorized that the IRS audits him because of his assertedly strong Christian faith.

5.      These complaints by President Trump underscore the appropriateness of the

Committee's review of IRS audits of Presidential returns, including those of President Trump.

6.      Thus far, however, the Committee has been unable to evaluate President Trump's

claims about the audit program or investigate its other concerns because the President has

declined to follow the practice of every elected President since Richard Nixon of voluntarily

disclosing their tax returns.  Without reviewing the requested return materials, the Committee

cannot ensure that the IRS's audit process is functioning fairly and effectively, understand how

provisions of the tax code are implicated by President Trump's returns, or exercise its legislative

judgment to determine whether changes to the code may be warranted.

7.      Not only have Defendants improperly denied the Committee's Section 6103(f)

request, they have also refused to comply with the Committee's duly authorized subpoenas for

nearly identical information.  For each refusal, Defendants cited advice from the Office of Legal

Counsel of the Department of Justice (OLC), which concluded that Defendants correctly

disregarded the statutory command in Section 6103(f) as well as the Committee's subpoenas

because OLC has purported to detect a "political" motive for these requests.

8.      But Defendants, abetted by OLC, gravely misunderstand the operative law:  The

Committee's power to conduct oversight and investigations is firmly rooted in Congress's

Article I legislative authority.  And courts have long recognized that Congress's "power of

inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative

function."[1]  It is not for the Executive or the Judiciary to examine the Committee's motivations

for its oversight inquiries.  Nor does the Executive's disdain for the Committee's investigation

provide any basis for the denial of the Committee's Section 6103(f) request.

9.      Defendants' continued refusal to produce the requested materials—in violation of

Section 6103(f), the Committee's Article I subpoena power, and the Administrative Procedure

Act—is depriving the Committee of information necessary to complete its time-limited

investigation, thereby impeding its most basic constitutional functions.  To redress these injuries,

the Committee asks this Court to order Defendants to comply with Section 6103(f) and the

subpoenas by producing the requested information immediately.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361.  The

Committee's claims arise under Article I of the U.S. Constitution and various federal statutes, 5

U.S.C. §§ 702, 704, 706; 26 U.S.C. § 6103; 28 U.S.C. §§ 2201, 2202; and 28 U.S.C. § 1361.

11.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (e), and 5

U.S.C. § 703.

## PARTIES

12.      Plaintiff Committee on Ways and Means is a standing committee of the United

States House of Representatives that, among other things, conducts Congressional oversight of

Treasury, the IRS, and the administration of our Nation's tax laws.

13.      Defendant United States Department of the Treasury is a federal agency

headquartered in Washington, D.C.  It is the Executive Branch agency responsible for

---

[1] *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927).

administering and enforcing the Nation's tax laws and determining tax policy for the Executive Branch.

14.     Defendant Internal Revenue Service is a bureau of the Treasury Department headquartered in Washington, D.C.  It is responsible for assessing and collecting internal revenue in the United States and for processing and determining the accuracy of income tax returns, including, where appropriate, by auditing returns.

15.     Defendant Steven T. Mnuchin is sued in his official capacity as Secretary of the Treasury Department.

16.      Defendant Charles P. Rettig is sued in his official capacity as Commissioner of the IRS.

17.     Defendants have possession, custody, and control over the information sought by the Committee.

## ALLEGATIONS

## I.   LEGAL FRAMEWORK

### A.  The Committee's Constitutional Authority to Investigate Tax-Related Matters and Conduct Oversight of Treasury and the IRS

18.     Article I of the Constitution vests Congress with "[a]ll legislative Powers."[2] These powers include the authority to inquire into and investigate matters relating to subjects within Congress's broad legislative purview; conduct oversight of Executive Branch agencies; examine whether those agencies are faithfully, effectively, and efficiently executing the laws; and determine whether changes to federal law are necessary and proper.

---

[2] U.S. Const., Art. I, § 1.

19.     The Origination Clause of the Constitution provides that "[a]ll Bills for raising Revenue shall originate in the House of Representatives," granting the House primary authority regarding most federal income tax-related legislation.[3]

20.     The Constitution expressly commits to each chamber of Congress the authority to "determine the Rules of its Proceedings."[4]  Pursuant to this authority, the 116th Congress adopted the Rules of the House of Representatives (House Rules), which govern the House during the current two-year term.[5]  The House Rules establish various standing committees, including Ways and Means, and delegate "jurisdiction and related functions" to each.[6]  Ways and Means's jurisdiction includes "Revenue measures generally," "Deposit of public monies," "Tax exempt foundations and charitable trusts," and "National social security."[7]

21.     As a standing committee, Ways and Means also possesses "general oversight responsibilities."[8]  It thus is charged "on a continuing basis" with reviewing "the application, administration, execution, and effectiveness of laws and programs" within its jurisdiction, as well as "the organization and operation of [the] Federal agencies and entities" responsible for administering these laws and programs.[9]  The Committee must determine whether such laws are being "implemented and carried out in accordance with the intent of Congress" and if there are "any conditions or circumstances that may indicate the necessity or desirability of enacting new

---

[3] U.S. Const., Art. I, § 7, cl. 1.

[4] U.S. Const., Art. I, § 5, cl. 2.

[5] *See* H. Res. 6, 116th Cong. (2019) (adopting House Rules for 116th Congress).

[6] Rule X.1, Rules of the U.S. House of Representatives (116th Cong.), https://tinyurl.com/116thHouseRules.

[7] House Rule X.1(t)(3), (6), (8), (9).

[8] House Rule X.2(a).

[9] House Rule X.2(b)(1).

or additional legislation."[10]  The House Rules further mandate that "[a]ll bills, resolutions, and other matters relating to" subjects within the Committee's jurisdiction be referred to the Committee for its consideration.[11]

22.     The House Rules empower the Committee to "conduct at any time such investigations and studies as it considers necessary or appropriate" of the matters within its jurisdiction.[12]  To aid with these inquiries, it may issue subpoenas for testimony and documents—a power that, as permitted by House Rule XI, the Committee has delegated to its Chairperson.[13]

### B. The IRS's Nearly Century-Old Mandatory Duty to Provide Tax Return Information to the Committee

23.     To facilitate the Committee's legislative, investigative, and oversight responsibilities, Congress has imposed a mandatory duty on Treasury—codified in the tax code for close to a century—to provide the Committee with a broad array of tax return and related information.

24.     Section 6103 of the Internal Revenue Code generally prohibits the disclosure of tax return information by Treasury, absent an explicit statutory exception.[14]  One such exception, Section 6103(f), *requires* in clear and mandatory terms that the agency disclose such information upon the request of the Chairman of any of the three Congressional committees with jurisdiction

---

[10] *Id.*

[11] House Rule X.1, XII.2.

[12] House Rule XI.1(b)(1).

[13] *See* House Rule XI.2(m)(1)(B); House Rule XI.2(m)(3)(A)(i); Rule 15, Rules of the Committee on Ways and Means for the 116th Congress (Jan. 24, 2019), https://tinyurl.com/WaysMeansRules (Committee Rules).

[14] 26 U.S.C. § 6103(a).

over federal tax issues—specifically, the House Committee on Ways and Means, the Senate

Committee on Finance, and the Joint Committee on Taxation.[15]

25.     Section 6103(f)(1) provides in full:  "Upon written request from the chairman of

the Committee on Ways and Means of the House of Representatives, the chairman of the

Committee on Finance of the Senate, or the chairman of the Joint Committee on Taxation, the

Secretary shall furnish such committee with any return or return information specified in such

request, except that any return or return information which can be associated with, or otherwise

identify, directly or indirectly, a particular taxpayer shall be furnished to such committee only

when sitting in closed executive session unless such taxpayer otherwise consents in writing to

such disclosure."[16]

26.     Congress has further defined the term "return" to mean "any tax or information

return, declaration of estimated tax, or claim for refund required by, or provided for or permitted

under" the tax code, including "any amendment or supplement thereto, including supporting

schedules, attachments, or lists which are supplemental to, or part of, the return so filed."[17]

27.     Congress has also broadly defined "return information" to encompass "a

taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions,

exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies,

overassessments, or tax payments," including whether a particular return "was, is being, or will

be examined or subject to other investigation or processing, or any other data, received by,

recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return," or

---

[15] *Id.* § 6103(f)(1).

[16] *Id.*

[17] *Id.* § 6103(b)(1).

if there has been a determination of "liability" for "any tax, penalty, interest, fine, forfeiture, or other imposition, or offense"[18]—that is, "virtually any information collected by the Internal Revenue Service regarding a person's tax liability."[19]

28.     Thus, "[u]pon written request" from the Chairman of the Committee on Ways and Means, Treasury "*shall furnish* such committee with *any* return or return information specified in such request."[20]

29.     Section 6103(f) contains no exception to Treasury's obligation to furnish return or return information to the Committee upon written request, nor does it authorize Treasury to refuse such a request, including on the purported basis that the Committee lacks a proper legislative purpose for its request.

30.     Treasury's mandatory duty to release tax return information to the Committee reflects Congress's abiding concern that it have ready access to this information for its legislative and oversight functions.  Congress initially codified the Committee's broad right of access in 1924, in the wake of various matters involving attempted Congressional oversight of alleged Executive Branch wrongdoing.

31.     Before 1924, authority to order that tax returns be inspected outside of Treasury generally resided with the President.[21]  As part of its investigation of alleged bribery of high-

---

[18] *Id.* § 6103(b)(2).

[19] *Landmark Legal Found. v. IRS*, 267 F.3d 1132, 1135 (D.C. Cir. 2001) (citation and internal quotations omitted).

[20] 26 U.S.C. § 6103(f)(1) (emphasis added).  *See also In re U.S. v. NorCal Tea Party Patriots*, 817 F.3d 953, 961 (6th Cir. 2016) ("[T]he IRS *must* disclose returns and return information to Congressional committees upon written request." (citing 26 U.S.C. § 6103(f)) (emphasis added)).

[21] Revenue Act of 1918, ch. 18, § 257, 40 Stat. 1057, 1086-87; Revenue Act of 1921, ch. 136, § 257, 42 Stat. 227, 270.

ranking federal agency officials in exchange for no-bid leases at the Teapot Dome oil field, the

Senate sought from then-President Calvin Coolidge the tax returns of those allegedly involved—

a request that President Coolidge initially resisted.[22]

32.     During this same period, a Congressional committee likewise sought tax return

information in connection with an investigation of the Bureau of Internal Revenue, the IRS's

predecessor.  Among other things, lawmakers questioned whether Treasury Secretary Andrew

Mellon had improperly maintained ownership interests in certain businesses while at Treasury

and whether the Bureau of Internal Revenue had given preferential treatment to Mellon and his

businesses during Mellon's tenure at Treasury.[23]

33.     Congress recognized that, in addition to facilitating these oversight inquiries,

unrestricted access to tax return information was critically important to its legislative

responsibilities:  "If Congress had access to such data, it could more intelligently draft a

corporation income tax law."[24]

34.     Responding to these concerns, Congress, in 1924, enacted a statute—the

precursor to Section 6103(f)—providing that the "Committee on Ways and Means . . . shall have

the right to call on the Secretary of the Treasury" for tax return information and it "shall be the

---

[22] *See* S. Res. 180, 68th Cong., 65 Cong. Rec. 3299 (1924) (requesting the returns); 65 Cong. Rec. 3699-3702 (1924) (setting out President Coolidge's initial response).

[23] *See, e.g.*, 65 Cong. Rec. 6196 (1924) (Statement of Sen. Reed (D-MO)) (explaining that the committee inquired into Mellon's tax information because "if it should be found that he had discriminated in favor of himself it would have immediately afforded reason for a demand that he should be ousted from [his] office"); *id*. at 6196-97 (Statement of Sen. McKellar (D-TN)) (questioning whether Mellon had appropriately disposed of his stock before taking office).

[24] 65 Cong. Rec. 2919 (1924) (Statement of Rep. Jacobstein  (D-NY)).  *See also, e.g., id.* at 2953 (Statement of Rep. Frear (R-WI)) (Congress "ought to have information on which to draw bills and fix rates."); *id.* at 7677 (Statement of Sen. Norris (R-NE)) (access to tax returns would "enable [Congress] to legislate correctly and to finally get a law without loopholes").

[Secretary's] duty to furnish . . . any data of any character contained in or shown by the returns."[25]

35.       In 1976, Congress overhauled the confidentiality provisions of the tax code following revelations of wrongdoing by President Nixon and other White House officials.[26]  It restricted the President's control over access to tax returns and enacted the current version of Section 6103, which provides that tax return information "shall be confidential," unless one of 13 exceptions applies.[27]

36.       In Section 6103(f), Congress specifically retained the mandatory disclosure obligation that it had imposed on Treasury a half-century earlier:  "Upon written request," from the Chairman of the Committee on Ways and Means, the agency "shall furnish such committee with any return or return information specified in such request."[28]  Congress kept its right to obtain tax return information intact to ensure that the committees with jurisdiction over tax-related issues, and ultimately Congress itself, could "carry out its legislative responsibilities."[29] As even OLC recognized at the time, in so amending the Internal Revenue Code, Congress was "very much aware of its own needs" for tax return information.[30]

---

[25] Revenue Act of 1924, ch. 234, § 257(a), 43 Stat. 253, 293.  *See also McGrain*, 273 U.S. at 175 (explaining, in a case also arising out of the Teapot Dome investigation, that "[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information—which not infrequently is true—recourse must be had to others who do possess it").

[26] *See* Tax Reform Act of 1976, Pub. L. No. 94-455, 90 Stat. 1520; *Elec. Privacy Info. Ctr. v. IRS*, 910 F.3d 1232, 1235 (D.C. Cir. 2018).

[27] 26 U.S.C. §§ 6103(a), (c)-(o).

[28] *Id.* § 6103(f)(1).

[29] S. Rep. No. 94-938 (Part I), at 319 (1976).

[30] Cong. Access to Tax Returns—26 U.S.C. § 6103(f), 1 Op. O.L.C. 85, 86 (1977).

**C. The Committee's Long History of Oversight on Tax-Related Matters in Pursuit of Legislative Solutions**

37.     Consistent with its constitutional and statutory authority, the Committee conducts ongoing and robust oversight of all aspects of the IRS and its administration of the tax code.  The Committee routinely investigates the operations of the IRS, including collection, auditing, enforcement, taxpayer assistance, and activities during the tax filing season.  It also examines the existing tax code and its implementation—including the IRS's treatment of tax-exempt organizations, the "tax gap" between taxes owed and taxes actually paid, and tax law compliance by individuals and entities—to ensure that federal tax laws are being followed and fairly administered and to identify legislative improvements.[31]

38.     To further these inquiries, the Committee regularly conducts hearings and requests documents from Treasury, the IRS, and other government agencies.  It also frequently relies on its authority under Section 6103(f) in a variety of oversight settings where access to tax return information is necessary for the Committee's work.  For example, the Committee must make a request under Section 6103(f) for Committee Members and their staff to visit IRS facilities where return information is housed.  Section 6103 authorization is likewise necessary for the U.S. Government Accountability Office to provide certain reports and materials to assist the Committee in its oversight of IRS operations and tax-related matters.

39.     Over the last 30 years, the Committee has used its Section 6103(f) authority to examine tax return information for individual, business, and other taxpayers in a wide range of

---

[31] *See, e.g.*, Authorization and Oversight Plans for all House Committees, H. Rep. No. 116-40, at 233-35 (2019); Report on the Legislative and Oversight Activities of the Committee on Ways and Means, H. Rep. No 110-934, at 66-67, 74-79 (2009).

circumstances.  For example, the Committee has employed Section 6103(f) to access and review

tax return information of:

- individuals, estates, and other taxpayers owing over $100 million in taxes, when

  questions pertaining to tax law enforcement and the soundness of IRS tax

  administration came to the Committee's attention;

- individuals with unpaid tax liabilities, where the Committee was investigating the

  IRS's use of private debt collectors to collect unpaid federal tax;[32]

- individuals and businesses contracting with the Federal Government, where the

  Committee was reviewing the IRS's failure to implement procedures to seize

  contract payments even though the agency possessed the authority to do so;[33]

- nonprofit organizations whose applications for tax-exempt status were subject to

  heightened scrutiny allegedly based on their political affiliations, during the

  Committee's investigation of the processing of these applications by the IRS;[34]

- foreign-owned distributors within the U.S. of automobiles, motorcycles, and

  electronics equipment, where the Committee was investigating the IRS's

  international enforcement program and international tax-avoidance schemes;[35]

- more than 200 large, tax-exempt organizations, where the Committee was

  investigating the IRS's audit and enforcement process for these organizations and

---

[32] *See* 26 U.S.C. § 6306.

[33] *See id.* § 6050M.

[34] *See id.* § 501(c).

[35] *See id.* § 482.

the salaries of their top executives;

- individuals who made cash payments of more than $10,000 to purchase automobile and consumer goods, as well as the merchants involved, as part of the Committee's review of the IRS's administration of tax laws related to the filing of returns connected to business transacted in cash;[36]

- companies, including banks and automotive manufacturers, that received funds from Treasury's Troubled Asset Relief Program, where the Committee was investigating unpaid federal income or employment taxes of program recipients;

- individuals engaging in tax refund fraud, where the Committee was investigating IRS procedures to detect and prevent such fraud;

- small businesses, where the Committee was investigating the IRS's use of civil procedures to seize bank accounts of such businesses believed to be structuring their deposits to avoid Bank Secrecy Act reporting requirements; and

- a municipal government, where the Committee was investigating the IRS's administration of rules related to the withholding and remitting of employment taxes to the IRS.[37]

40.     The Committee is not aware of any instance—other than its request for President Trump's tax return information (*see infra* II.C.-D.)—in which either Treasury or the IRS has failed to comply with the plain meaning of Section 6103(f) and provide information requested by the Committee.

---

[36] *See id.* § 6050I.

[37] *See id.* § 3401 *et seq.*; 42 U.S.C. §§ 401-434.

41.     In the Committee's experience, Section 6103(f) requests are fulfilled by the IRS as a matter of course.[38]

### D.  The IRS's Internal Guidelines for Auditing Presidential Tax Returns

42.     As part of its program for auditing taxpayer returns, IRS internal guidelines specify that the individual returns of Presidents and Vice Presidents are subject to a mandatory audit while they are in office.[39]  This policy was adopted in 1977 in the aftermath of an investigation by the Joint Committee on Internal Revenue Taxation concluded that President Nixon had filed erroneous tax returns while in office.[40]  The Joint Committee made these findings despite the fact that President Nixon had been audited by the IRS and even commended by the agency for the care taken in preparing his returns.[41]

43.     The IRS observed at the time that converting to the automatic audit procedure for Presidential returns would "remove[] from any particular employee of the IRS the necessity of having to make a decision as to whether to audit the particular returns involved."[42]  Then, as now, the relevant Presidential audit procedures were not codified as part of the Internal Revenue

---

[38] The Internal Revenue Manual, a compilation of guidelines for IRS employees on tax-related topics, states that a committee request under Section 6103(f) "must receive high priority" and the requested return information should be "furnished expeditiously."  *Processing Requests for Disclosure,* I.R.M. 11.3.4.4 (May 20, 2005).

[39] *Processing Returns and Accounts of the President and Vice President,* I.R.M. 4.2.1.15 (Apr. 23, 2014).

[40] *See Legislative Proposals and Tax Law Related to Presidential and Vice-Presidential Tax Returns: Hearing Before the Subcomm. on Oversight of the H. Comm. on Ways and Means*, 116th Cong. (2019) (statement of Joseph J. Thorndike, Director, Tax History Project), https://tinyurl.com/PresidentialTaxLawHearing (Ways and Means Hearing Transcript); Staff of the Joint Committee on Taxation, JCX-3-19, *Background Regarding the Confidentiality and Disclosure of Federal Tax Returns* 23-26 (2019), https://tinyurl.com/JCTReport (JCT Report).

[41] *See* JCT Report at 25.  *See also* Ways and Means Hr'g Tr. at 17.

[42] JCT Report at 21 (quoting IRS spokesperson Leon Levine).

Code but instead are set forth in the IRS's Internal Revenue Manual (Manual), a compilation of internal guidelines for IRS employees on a broad range of tax-related topics, including how to process returns, assess penalties, and conduct an audit.[43]  Procedures in the Manual do not have the force of law and are not binding on either the IRS or taxpayers.[44]

44.     In relevant part, the Manual provides that the "individual income tax returns for the President and Vice President are subject to mandatory [audit] examinations" and that "[r]elated returns, including estate and gift tax returns, will be handled in accordance with procedures relating to all taxpayers."[45]  The Manual also generally prescribes the process for the review and handling of these returns, directing that there be "expeditious handling at all levels to ensure prompt completion" of the audit, "that IRS personnel, including specialists, will be assigned to the examination as appropriate,"[46] and that returns filed as part of a "blind trust" (a financial arrangement frequently used by high-ranking elected officials) be treated with "extreme caution."[47]

45.     The Manual, however, leaves numerous critical details of the Presidential audit process either ambiguous or unaddressed.  For example, the Manual does not specify the scope,

---

[43] *See IRM Standards,* I.R.M. 1.11.2.2 (Oct. 11, 2018).

[44] *See also Elec. Privacy Info. Ctr.*, 910 F.3d at 1244-45 ("It is well-settled . . . that the provisions of the [M]anual are directory rather than mandatory, are not codified regulations, and clearly do not have the force and effect of law.") (quotation marks omitted).

[45] *Processing Returns and Accounts of the President and Vice President*, I.R.M. 4.2.1.15(1), (6).  *See also Mandatory Examination,* I.R.M. 3.28.3.4.3(1) (Jan. 1, 2019).

[46] *Processing Returns and Accounts of the President and Vice President,* I.R.M. 4.2.1.15(5), (3)(b).  *See also, e.g.*, I.R.M. 4.2.1.15(5) ("The returns must be assigned within 10 business days of receipt in the group."); I.R.M. 4.2.1.15(7) ("The returns should be kept in an orange folder at all times" and "not be exposed to viewing by other employees").

[47] *Blind Trust Income Tax Returns Filed by Presidential Appointees*, I.R.M. 4.2.1.16 (April 23, 2014).

length, or depth of the IRS's examination of the returns (including, whether the audit extends to entities connected to the President or Vice President, open tax years, or ongoing audits), whether more than one IRS agent is responsible for conducting the audit, or how that agent interacts with the President during the audit.

## II.  FACTUAL ALLEGATIONS

46.     The Committee is currently exercising its oversight and investigative powers to examine pressing matters concerning the IRS's administration of various tax laws and policies relating to Presidential tax returns and tax law compliance, including the annual audit of those returns, to determine whether to legislate.  Defendants' refusal to provide the return information requested by the Committee contravenes the mandatory statutory duty in Section 6103(f) and impairs the ability of the Committee to exercise its essential powers, responsibilities, and functions pursuant to Article I of the Constitution.

### A.  President Trump's Statements and News Reports About His Tax Returns and Audits Raise Questions

47.     President Trump's tax returns and their examination by the IRS have been the subject of significant attention.  Both as a candidate and once elected, President Trump has frequently attacked the integrity of the IRS's audit program.  Candidate Trump stated that he "unfairly get[s] audited,"[48] is "audited when I shouldn't be audited," and that, "I tell my people: Why is it that every single year, I'm audited, whereas other people that are very rich, people are never audited[?]"[49]  The reason for the frequent auditing, candidate Trump surmised, is "because

---

[48] Donald Trump (@realDonaldTrump), Twitter (Feb 27, 2016, 7:12 AM), https://tinyurl.com/27Feb2016Tweet.

[49] Jenna Johnson, *Donald Trump Says IRS Audits Could Be Tied to Being a 'Strong Christian'*, Wash. Post (Feb. 26, 2016), https://tinyurl.com/TrumpAudits.

of the fact that I'm a strong Christian, and I feel strongly about it and maybe there's a bias."[50]

Once elected, President Trump has continued to express disdain for the IRS's audit system,

including for the agency's Presidential audit procedures. As Former White House Press

Secretary Sarah Huckabee Sanders stated in October 2018, "The President and First Lady filed

their taxes on time and as always they are automatically under audit, which the President thinks

is extremely unfair."[51]

48.     At the same time, numerous investigative reports have revealed that President

Trump, through the complex arrangements of his personal and business finances,[52] has engaged

in multiple aggressive tax strategies and decades-long tax avoidance schemes, including taking a

questionable $916 million deduction,[53] participating in and using a grantor trust to control

assets,[54] manipulating tax code provisions pertaining to real estate taxes,[55] and extensively using

---

[50] *Id.*

[51] Arden Farhi, *Trump Files 2017 Taxes Following 6-month Extension,* CBS News (Oct. 17, 2018), https://tinyurl.com/Trump2017TaxExtension.

[52] *See, e.g.*, David Barstow et al., *Trump Engaged in Suspect Tax Schemes as He Reaped Riches From His Father*, N.Y. Times (Oct. 2, 2018), https://tinyurl.com/TrumpTaxSchemes. *See also* Letter from Sheri A. Dillon and William F. Nelson, Tax Partners, Morgan Lewis, to Mr. Donald J. Trump, Founder, The Trump Organization, Re: Status of U.S. federal income tax returns 1 (Mar. 7, 2016) (noting the President's operation of the more than 500 entities in the Trump Organization through sole proprietorships and/or closely held partnerships means "your personal federal income tax returns are inordinately large and complex for an individual"), https://tinyurl.com/TrumpTaxAuditLetter (Dillon Letter).

[53] *See, e.g.*, David Barstow et al., *Donald Trump Tax Records Show He Could Have Avoided Taxes for Nearly Two Decades, The Times Found*, N.Y. Times (Oct. 1, 2016), https://tinyurl.com/TrumpTaxDeduction.

[54] *See, e.g.*, David Barstow et al., *Trump Engaged in Suspect Tax Schemes as He Reaped Riches From His Father,* N.Y. Times (Oct. 2, 2018), https://tinyurl.com/TrumpTaxSchemes.

[55] *See, e.g.*, Steve Eder and Megan Twohey, *Donald Trump Acknowledges Not Paying Federal Income Taxes for Years*, N.Y. Times (Oct. 10, 2016), https://tinyurl.com/TrumpFederalIncomeTaxes. *See also* Russ Buettner and Susanne Craig, *Decade in the Red: Trump Tax Figures Show Over $1 Billion in Business Losses*, N.Y. Times (May 8, 2019), https://tinyurl.com/TrumpTaxLoss; Paul Sullivan, *How Loopholes Help Trump*

"pass through" entities.[56]   Media reports have also revealed that President Trump benefited from

massive conservation easements[57] and that certain of his golf courses failed to properly account

for wages paid to employees (raising questions about compliance with payroll and Social

Security tax laws).[58]   In response to one such story, President Trump's personal attorney said

"the headline should have been, 'Donald Trump takes advantage of legal provisions in the tax

code.'"[59]   For his part, President Trump has taken pride in "brilliantly" maneuvering the tax laws

to his personal benefit.[60]   Even as he was championing what would become the Tax Cuts and

---

*and Other Real Estate Moguls Avoid Taxes*, N.Y. Times (May 10, 2019), https://tinyurl.com/TrumpRealEstateLoopholes.

[56] *See, e.g.*, Jean Eaglesham et al., *How Donald Trump's Web of LLCs Obscures His Business Interests*, Wall St. J. (Dec. 8, 2016), https://tinyurl.com/TrumpPassThroughs.

[57] *See, e.g.*, Richard Rubin, *Donald Trump's Donations Put Him in Line for Conservation Tax Breaks*, Wall St. J. (Mar. 10, 2016), https://tinyurl.com/WSJEasements; Richard Rubin, *Donald Trump Got a Big Break on 2005 Taxes*, Wall St. J. (Mar. 17, 2016), https://tinyurl.com/WSJ2005TaxBreak.  *See also* Peter Elkind, *The Billion-Dollar Loophole*, Fortune (Dec. 20, 2017), https://tinyurl.com/FortuneLoophole.

[58] *See, e.g.*, Miriam Jordan, *Making President Trump's Bed: A Housekeeper Without Papers*, N.Y. Times (Dec. 6, 2018), https://tinyurl.com/MakingTrumpsBed.  *See also* Joshua Partlow and David A. Fahrenthold, *At Trump Golf Course, Undocumented Employees Said They Were Sometimes Told to Work Extra Hours Without Pay*, Wash. Post (April 30, 2019), https://tinyurl.com/TrumpGolfCourse.

[59] *See* Julia Zorthian, *Surrogates Say Donald Trump Is a 'Genius' If He Didn't Pay Income Tax*, Time (Oct. 2, 2016), https://tinyurl.com/TimeTax-Genius.  The White House acknowledged that President Trump "has always scoffed at the tax system."  Russ Buettner and Susanne Craig, *Decade in the Red: Trump Tax Figures Show Over $1 Billion in Business Losses*, N.Y. Times (May 8, 2019), https://tinyurl.com/TrumpTaxLoss.

[60] *See* Lisa Hagen, *Trump Says He Has 'Brilliantly' Used Tax Laws to His Advantage*, The Hill (Oct. 3, 2016), https://tinyurl.com/BrilliantTaxAvoidance.  *See also* Donald J. Trump, (@realDonaldTrump), Twitter (May 8, 2019, 3:56 AM), https://tinyurl.com/TrumpTaxSport ("You always wanted to show losses for tax purposes….almost all real estate developers did – and often re-negotiate with banks, it was sport."); Eileen Sullivan, *Trump Defends $1.17 Billion in Losses as Just for 'Tax Purposes'*, N.Y. Times (May 8, 2019), https://tinyurl.com/TrumpDefendsTaxLoss.

Jobs Act of 2017, President Trump referred to the tax code as "riddled with loopholes" for "special interests, including myself."[61]

49.     Congress and the Committee, however, have thus far been unable to evaluate the President's claims about the IRS's audit process or to assess if and how President Trump has been able to take inappropriate advantage of the tax laws.  That is because, both as a candidate and as President, President Trump has refused to disclose his tax returns.  President Trump has repeatedly claimed that he cannot disclose his returns because his taxes are under "very continuous audit."[62]  President Trump's tax attorneys have likewise stated that his personal returns are "inordinately large and complex" and have been under "continuous" audit since 2002.[63]  While his attorneys have represented that his returns from 2002 to 2008 have been "closed administratively," the audit of his post-2009 returns, which include items attributable to transactions that were reported on earlier returns, was said to be "ongoing."[64]

50.     President Trump has stated on more than one occasion that, but for the IRS's ongoing audit of his returns, he would be willing to disclose them to the public.  "[A]s soon as

---

[61] *Remarks by President Trump on Tax Reform*, White House (Nov. 29, 2017, 2:22 PM), https://tinyurl.com/TrumpRemarksRiddle.

[62] *See, e.g.*, *Remarks by President Trump in Press Conference After Midterm Elections*, White House (Nov. 7, 2018, 11:57 AM), https://tinyurl.com/PressConferenceAfterMidterms.  Defendant Rettig has cast doubt on President Trump's explanation that an ongoing audit prevents him from releasing his returns, testifying before the House Appropriations Subcommittee that there is "no rule that would prohibit the release of a tax return because it's under audit."  Orion Rummler, *IRS Commissioner: No Rule Against Releasing Trump's Tax Returns While Under Audit*, Axios (Apr. 10, 2019), https://tinyurl.com/IRSCommissionerTrumpAudit.

[63] Dillon Letter at 1.

[64] *Id.*

the audit's finished," candidate Trump stated, his tax returns "will be released."[65]  With respect

to disclosing his returns to Congress, President Trump stated as recently as April 2019 that he

"would love to give [his returns to Congress], but I'm not going to do it while I'm under

audit.  It's very simple."[66]

### B.  The 116th Congress Commences with Multiple Legislative Proposals Relating to Presidential Tax Returns

51.     Since the start of the 116th Congress, the House has pursued legislative and

oversight efforts relating to Presidential tax returns.  On January 4, 2019, for example, H.R. 1

was introduced in the House.  That bill proposed to require the President, the Vice President, and

certain major party candidates to disclose their tax returns for the last 10 years to the Federal

Election Commission (FEC) and to amend Section 6103 to provide for Treasury disclosure to the

FEC upon written request.[67]  If enacted, H.R. 1 would require the FEC Chairman to make such

returns "publicly available," after redacting "such information as the Federal Election

Commission and the Secretary [of Treasury] jointly determine is necessary for protecting against

identity theft, such as social security numbers."[68]

52.     Numerous similar bills related to Presidential tax returns or other tax compliance

issues that could be implicated by President Trump's returns have also been introduced in the

---

[65] *September 26, 2016 Debate Transcript*, Commission on Presidential Debates, https://tinyurl.com/SepDebate.  *See also, e.g.*, *CNN: The Situation Room*, CNN (September 7, 2016) (President Trump stating, "When the audit is complete, I will release my returns.  I have no problem with it."), https://tinyurl.com/CNNSitRoom; *Meet the Press*, NBC News (May 8, 2016) (President Trump stating, "I have no problem releasing the tax returns" and "I'll do it as fast as the auditors finish"), https://tinyurl.com/TrumpMTP.

[66] *Remarks by President Trump Before Marine One Departure*, White House (Apr. 10, 2019, 9:28 AM), https://tinyurl.com/TrumpMarineOne.

[67] For the People Act of 2019, H.R. 1, 116th Cong. § 10001.  The bill passed the House on March 8, 2019.  *See* 165 Cong. Rec. H2602 (daily ed. Mar. 8, 2019).

[68] For the People Act of 2019, H.R. 1, 116th Cong. § 10001(c)(1).

House and referred, pursuant to House Rules X.1 and XII.2, to the Committee for its consideration.  These include:

- Tax Transparency Act of 2019, H.R. 1489, 116th Cong. (2019) (amending the Internal Revenue Code to require public disclosure of seven years of individual tax returns of the President, Vice President, Members of Congress, and candidates for these offices, with redactions for "any Social Security number, any financial account number, the name of any individual under age 18, or any home address of any individual (other than the city and State in which such address is located)");

- Presidential Allowance Modernization Act of 2019, H.R. 1496, 116th Cong. (2019) (amending the Former Presidents Act of 1958, which provides a monetary allowance to former Presidents, to prohibit a former President from receiving a monetary allowance unless he or she discloses tax return information requested by the Secretary of the Treasury for the purpose of properly calculating the taxes owed by the former President);

- RIGHT Act of 2019, H.R. 1028, 116th Cong. (2019) (amending the Ethics in Government Act of 1978 and the Internal Revenue Code to require candidates for President or Vice President to provide the Office of Government Ethics with individual tax return information for the previous 19 taxable years, along with other financial disclosures, and providing that the Treasury Secretary may issue regulations "authorizing the redaction of personal information as the Secretary deems necessary to prevent identity theft or physical danger from disclosure of tax returns"); and

- Charitable Conservation Easement Program Integrity Act of 2019, H.R. 1992, 116th Cong. (2019) (amending the Internal Revenue Code to limit the maximum deduction that can be claimed by a partner in a partnership that donates certain conservation easements).

53.    On February 7, 2019, the Committee's Subcommittee on Oversight convened a hearing entitled, "Legislative Proposals and Tax Law Related to Presidential and Vice-Presidential Tax Returns."[69]  Subcommittee Chairman John Lewis opened the hearing with two questions the Subcommittee was exploring in its consideration of H.R. 1 and other legislation on Presidential tax returns:  (1) "Does the public have a need to know that a person seeking or holding the highest office in our country obeys the tax laws?" and (2) "[I]s it fair to expect the IRS to enforce Federal tax law against the President who is the head of the executive branch and has final control of the agency?"[70]

54.    Academics and tax experts testified at the February 7, 2019, hearing about legislative reforms pertaining to Presidential tax returns, including requiring disclosure of business and personal returns by Presidents and Vice Presidents and codifying the provisions that govern the annual audits of Presidential and Vice-Presidential returns.[71]

---

[69] *See* Ways and Means Hr'g Tr.

[70] *Id.* at 8 (Statement of Rep. John Lewis).  Subcommittee Chairman Lewis further explained in a press statement that the hearing would inform the Committee's consideration of "the voluntary release of tax returns by presidents and others; the federal tax laws that protect taxpayer information; recent bills—including H.R. 1—that would require presidents and vice-presidents to disclose their tax return; and Internal Revenue Service audits of tax returns filed by presidents and vice-presidents."  Press Release, Comm. Ways and Means, Rep. John Lewis, *Lewis Opening Statement at Hearing on Legislative Proposals and Tax Law Related to Presidential and Vice-Presidential Tax Returns* (Feb. 7, 2019), https://tinyurl.com/LewisOpeningStatementPR.

[71] Ways and Means Hr'g Tr.

55.     Several witnesses testified at length both orally and in written reports about important information that could be gleaned from President Trump's tax return information, and how this data could assist the Committee in its oversight of the IRS.  The President's tax return information, one witness explained, would "enhance[] the ability of Congress to oversee the executive branch," because Congress could "use tax information to evaluate the fairness of IRS audits"—specifically, information contained in "business and trust returns" as well as "IRS audit work papers."[72]  He further explained in written testimony that, given the President's "sprawling business empire" and claimed long-running audits, only by reviewing the President's actual returns could the Committee understand "whether the returns are being properly reviewed" by the IRS and "how any disputes have been resolved, which is essential to overseeing the fair administration of our tax system."[73]  Finally, the returns would "shed light on exactly how [President Trump] and his businesses will be affected by the massive tax legislation he championed last year"[74] and help the Committee identify specific portions of the tax code implicated by President Trump's businesses—including those related to real-estate tax

---

[72] *Id.* at 23 (Statement of Steven M. Rosenthal, Sr. Fellow, Tax Policy Ctr.).

[73] Steven M. Rosenthal, *The Value of Presidential and Vice-Presidential Tax Returns to the Public and Congress*, Tax Policy Ctr. 2, 6 (Feb. 7, 2019) (written statement for the hearing before the Subcommittee on Oversight of the House Committee on Ways and Means), https://tinyurl.com/RosenthalHearingStatement.

[74] Ways and Means Hr'g Tr. at 25 (Statement of Noah Bookbinder, Exec. Dir., Citizens for Responsibility and Ethics in Wash.).  *See also* Lisa Gilbert and Susan Harley, *Public Citizen Statement for the Record in Support of Disclosure of Presidential and Vice Presidential Tax Returns*, Public Citizen (Feb. 7, 2019) (until it gains access to President Trump's "individual and business returns, [the Committee] will be unable to provide proper legislative oversight into exactly how he personally financially gained by pushing for those changes and signing the bill into law") (written statement for the hearing before the Subcommittee on Oversight of the House Committee on Ways and Means), https://tinyurl.com/PubCitizenWrittenTestimony.

preferences, trusts, complex partnerships, and limited liability companies (LLCs) organized as "pass through" entities—that may need to be improved.[75]

### C. The Committee's Oversight Investigation and Efforts to Obtain President Trump's Tax Return Information

56.     On March 1, 2019, as required by House Rule X.2, the Committee submitted its "Oversight plan" for the 116th Congress.  The Committee laid out its program for "[o]versight of the major Internal Revenue Service programs, including enforcement, collection, taxpayer services, returns processing, and information systems."[76]  Among the matters listed under the Committee's tax jurisdiction is:  "Tax Returns.  Oversight of legislative proposals and tax law related to Presidential and Vice-Presidential tax returns."[77]

### a.  The Committee's Initial Section 6103(f) Request

57.     Consistent with the Committee's oversight plan and its long-standing practice of using its authority under Section 6103(f) to obtain tax returns and return information, the Committee requested, by letter dated April 3, 2019, tax return information (including the

---

[75] *See* William Rice, *The Case for Congress Obtaining Trump's Tax Returns, Americans for Tax Fairness* (Dec. 2018) (submitted to and accepted by Subcommittee during the hearing before the Subcommittee on Oversight of the House Committee on Ways and Means (Ways and Means Hr'g Tr. at 79-80)), https://tinyurl.com/AmericansTaxFairness.  *See also, e.g.*, *id.* at 5 (understanding President Trump's use of real estate depreciation deductions could "provide the factual basis for a more informed policy discussion by the committee about whether and how this tax preference should be restricted to increase tax fairness"); *id.* at 6 (same, for President Trump's use of complex business structures, which "could provide important information on how some wealthy taxpayers may be using opaque business ownership, offshore activities, or other devices to frustrate or impede enforcement of our tax laws" and "could help identify specific weaknesses or gaps in the tax code which, if corrected, could strengthen tax enforcement").

[76] H. Rep. No. 116-40, at 233-35 (April 12, 2019) (Authorization and Oversight Plans for all House Committees).

[77] *Id.* at 235.

"administrative files") for President Trump and eight related entities for tax years 2013 through 2018.[78]

58.     Although the Committee need not recite a reason for a Section 6103(f) request, it has multiple oversight and legislative purposes for seeking to review this material, including: (1) evaluating the IRS's Presidential audit program and its application to President Trump; (2) assessing the IRS's review of President Trump's tax law compliance; and (3) considering whether legislation is warranted on Presidential tax audits, tax return transparency, or other tax code provisions implicated by President Trump's returns, including through numerous already pending bills (*see supra* ¶¶ 51-52).  Indeed, as summarized by Committee Chairman Richard Neal in the April 3, 2019 request and in a public statement issued at the same time:  "[T]he Committee is considering legislative proposals and conducting oversight related to our Federal tax laws, including, but not limited to, the extent to which the IRS audits and enforces the Federal tax laws against a President."[79]

59.     The Committee's Section 6103(f) request furthers these oversight and legislative aims.  The Committee sought six years of tax return information, including "administrative files," for President Trump and eight related entities.  The Committee's review of this specific material is critical for it to meaningfully evaluate the IRS's implementation of the Presidential

---

[78] *See* Exhibit A, Letter from the Hon. Richard E. Neal, Chairman, Comm. on Ways and Means, to the Hon. Charles P. Rettig, Comm'r, IRS (Apr. 3, 2019).  The Committee requested that this information be produced by April 10, 2019.  *Id.* at 2.

[79] *Id.* at 1.  *See also* Exhibit B, Press Release, Comm. on Ways and Means, Neal Statement on Requesting President Trump's Tax Returns (Apr. 3, 2019), https://tinyurl.com/NealStatement ("The Ways and Means Committee in particular has a responsibility to conduct oversight of our voluntary Federal tax system and determine how Americans—including those elected to our highest office—are complying with those laws. It is also our duty to evaluate the operation of the Internal Revenue Service in its administration and enforcement of the tax laws.").

audit program, including its scope, quality, and application to the returns of President Trump.

Only review and study of both the individual and entity returns will enable the Committee to

understand whether the audit program encompasses both types of returns as well as returns that

are already under or open for audit at the time a President takes office—and, as noted above (*see*

*supra* ¶ 49), the President's lawyers have stated that this universe of returns is, and remains,

under audit.  The requested "administrative files," where IRS agents and their managers record

notes about their findings, are also necessary for the Committee to assess the extent of the audit

and the discretionary decisions made by IRS personnel regarding what has, and has not, been

examined.  Because so "little is known about the effectiveness of this program," Chairman Neal

explained, the Committee "must determine . . . whether these audits are conducted fully and

appropriately,"[80] including by assessing "the scope of any such [audit] examination and whether

it includes a review of underlying business activities required to be reported on the individual

income tax return."[81]

60.     Consistent with the Committee's regular practice with respect to Section 6103(f),

the entities selected include those about which questions have been raised before the Committee

and in the press.  The Committee expects that its review of these particular entity returns will

inform its examination of the sufficiency of the IRS's review of tax compliance issues—

including, but not limited to, income not subject to third-party reporting; employment taxes and

Social Security reporting and withholding; tax code provisions pertaining to real estate, tax

credits, and other preferences; trusts; partnerships and the partners therein; and conservation

easements.

---

[80] Ex. B.

[81] Ex. A at 1.

61.     Review of this set of returns is also necessary for the Committee to exercise its legislative judgment regarding the various bills mandating disclosure of Presidential and candidate returns that have been referred to the Committee for consideration.  Because these bills require disclosure for different time periods and allow for different types of redactions (*see supra* ¶¶ 51-52), reviewing the requested returns will assist the Committee in understanding the portions of candidate and officeholder tax returns that should or should not be released (particularly in complex tax situations like that of President Trump) and over what period.

### b.   The White House Responds:  The Committee Will "Never" Get the Tax Materials

62.     On April 5, 2019, private counsel for President Trump and the entities whose tax return information the Committee requested wrote to Treasury's General Counsel arguing that, while Section 6103(f) generally "allows Ways and Means to obtain tax returns and return information," in this instance "Chairman Neal cannot legally request—and the IRS cannot legally divulge—this information."[82]  The letter also urged that IRS "refrain from divulging the requested information until it receives a formal legal opinion from the Justice Department's Office of Legal Counsel."[83]

63.     Appearing on *Fox News Sunday* two days later, Acting White House Chief of Staff Mick Mulvaney confirmed that the Committee would "never" receive President Trump's tax returns.[84]

---

[82] Exhibit C, Letter from William S. Consovoy to Brent J. McIntosh, Gen. Counsel, Dep't of Treasury, at 1 (Apr. 5, 2019).

[83] *Id.* at 3.

[84] *Exclusive: Mick Mulvaney on President Trump's Border Security Push, Growing Tensions with House Democrats*, Fox News (Apr. 7, 2019), http://tinyurl.com/MulvaneyFoxNews.

64.     On April 10, 2019—the day the Committee had asked that the Section 6103(f)

material be produced—Secretary Mnuchin responded to the Committee's letter to Commissioner

Rettig declaring that the agency would not meet the deadline.[85]  Secretary Mnuchin added that,

due to the "seriousness" of the issues raised by the Committee's request, the agency had "begun

consultations with the Department of Justice to ensure that [its] response is fully consistent with

the law and the Constitution."[86]

### c.   The Committee Reiterates the Section 6103(f) Request

65.     On April 13, 2019, the Committee reiterated its Section 6103(f) request in another

letter to Commissioner Rettig.[87]  The Committee explained the importance of obtaining the

Section 6103(f) material for the Committee's consideration of "legislative proposals and

oversight related to our Federal tax laws, including, but not limited to, the extent to which the

IRS audits and enforces the Federal tax laws against a President."[88]  Stressing that "the statutory

language of section 6103(f) is unambiguous," the Committee also explained why the concerns

raised by Treasury were unfounded and set a new deadline of April 23, 2019, for the agency to

provide the requested information.[89]

---

[85] *See* Exhibit D, Letter from the Hon. Steven T. Mnuchin, Sec'y, Dept. of Treasury, to Chairman Neal, at 1 (Apr. 10, 2019).

[86] *Id.* at 2.  That same day, President Trump claimed that there is "no law" requiring disclosure of his returns to Congress:  "I would love to give them, but I'm not going to do it while I'm under audit. It's very simple."  *Remarks by President Trump Before Marine One Departure*, White House (Apr. 10, 2019) (9:28 AM), https://tinyurl.com/TrumpMarineOne.

[87] *See* Exhibit E, Letter from Chairman Neal to Comm'r Rettig (Apr. 13, 2019).

[88] *Id.* at 1.

[89] *Id.* at 1-2.

### d. President Trump's Private Counsel Urges Treasury Not to Release the Information

66.     On April 15, 2019, private counsel for President Trump and the entities whose tax return information the Committee requested wrote once more to Treasury's General Counsel, stating his view that the Committee's Section 6103(f) request was "illegal" and not made "in good faith" and applauding Treasury's decision to consult with the Department of Justice prior to responding.[90]

### e. Treasury Declines to Act on the Section 6103(f) Request, Impugning the Committee's Motivations

67.     Secretary Mnuchin responded to the Committee on April 23, 2019, noting that because Treasury was continuing to confer with the Department of Justice on the "serious constitutional questions" raised by the request, it "cannot act upon your request unless and until it is determined to be consistent with law."[91]

68.     Despite the Committee's long history of using Section 6103(f) to obtain both individual and entity tax return information from the IRS without objection, Secretary Mnuchin questioned the Committee's expressed purpose for requesting this material, claiming that "the Committee's stated interest in 'the extent to which the IRS audits and enforces the Federal tax laws against a President' is difficult to accept on its face."[92]  Secretary Mnuchin insisted that the Committee's real purpose was not to further its legislative and oversight interests, but to release the President's returns "for the sake of exposure."[93]

---

[90] Exhibit F, Letter from William S. Consovoy to Brent J. McIntosh, at 1-2 (Apr. 15, 2019).

[91] Exhibit G, Letter from Sec'y Mnuchin to Chairman Neal, at 1 (Apr. 23, 2019).

[92] *Id.* at 4.

[93] *Id.* at 3.

69.     Secretary Mnuchin concluded with an acknowledgement that "the Executive Branch and Legislative Branch have an obligation to work together to accommodate their respective legitimate needs and interests."[94]  Although Secretary Mnuchin did not offer to work with the Committee to attempt to narrow or otherwise negotiate the scope of the request, he conceded that the Committee's oversight interest in the IRS's Presidential audit procedures was valid, noting that the Committee could have "genuine oversight purposes" for studying "how the IRS audits and enforces the Federal tax laws against a President" and that the IRS would "accommodate that interest by providing additional information on the mandatory audit process."[95]

70.     The IRS responded to the Committee the same day.[96]  Commissioner Rettig explained that Treasury had referred the matter to the Department of Justice and, accordingly, the IRS was "awaiting further guidance and direction on legal issues external to the internal revenue laws before [responding]."[97]

### f.   Treasury Refuses to Provide the Section 6103(f) Materials

71.     On May 6, 2019, Secretary Mnuchin provided the Committee with Treasury's final decision.  While offering the Committee only general information on the Presidential audit program, Secretary Mnuchin wrote:  "In reliance on the advice of the Department of Justice, I have determined that the Committee's request lacks a legitimate legislative purpose, and pursuant to section 6103, the Department is therefore not authorized to disclose the requested

---

[94] *Id.* at 5.

[95] *Id.*

[96] *See* Exhibit H, Letter from Comm'r Rettig to Chairman Neal (Apr. 23, 2019).

[97] *Id.*

returns and return information."[98]  Commissioner Rettig wrote to the Committee the same day to "concur" with Treasury's "conclusion."[99]

### g.  *The Committee Issues Subpoenas for the President's Tax Materials*

72.     With Treasury and the IRS refusing to comply with the Committee's Section 6103(f) request, and pursuant to the Committee's authority under House Rule XI.2(m)(3)(A)(i) and applicable Committee rules, Chairman Neal authorized, issued, and served subpoenas on Secretary Mnuchin and Commissioner Rettig, directing each to produce return information nearly identical to what the Committee had sought unsuccessfully under Section 6103(f).[100]  The subpoenas included a return date of May 17, 2019.

73.     In a public statement issued with the subpoenas, Chairman Neal explained that the Committee was continuing its "investigation into the mandatory audit program at the IRS in an effort to assess the extent to which the IRS audits and enforces the federal tax laws against a sitting President and to determine if those audits need to be codified into federal law."[101] Chairman Neal also reaffirmed the Committee's legislative interest in the return materials as "a necessary piece of the [C]ommittee's work."[102]

74.     In a letter to Commissioner Rettig and Secretary Mnuchin accompanying the subpoenas, Chairman Neal further detailed the Committee's oversight investigation and

---

[98] Exhibit I, Letter from Sec'y Mnuchin to Chairman Neal (May 6, 2019).

[99] Exhibit J, Letter from Comm'r Rettig to Chairman Neal (May 6, 2019).

[100] *See* Exhibit K, Subpoena from Committee to Sec'y Mnuchin, Dept. of Treasury (May 10, 2019); Exhibit L, Subpoena from Committee to Comm'r Rettig, IRS (May 10, 2019).

[101] *See* Exhibit M, Press Release, Neal Issues Subpoenas to Treasury Sec'y and IRS Comm'r (May 10, 2019).

[102] *Id.*

responded to the Secretary's prior letters.[103]   Chairman Neal focused, in particular, on the

Committee's examination of whether to codify the IRS's Presidential audit procedures:  "Among

other considerations, the Committee wants to be sure that IRS employees who determine the

scope of the President's audit, or who determine whether to continue previously-initiated audits,

are protected in the course of their work."[104]   Addressing Secretary Mnuchin's concerns that the

Committee's investigation of the Presidential audit program was improperly limited to the

President's returns, Chairman Neal explained that the "tax issues raised by the current President

are unique" because President Trump "has stated repeatedly that his returns are under routine

audit, and, in 2016, his tax attorneys reported that his returns have been under continuous

examination since 2002 and involve transactions and activities reported on returns in 2008 and

earlier."[105]   Chairman Neal then specified at least three ways in which this President's tax

auditing picture is "markedly different" from his predecessors whose returns were examined

under the IRS's Presidential audit procedures: "[t]he continuous audit and activities from 2008

and before, the use by the President of a grantor trust controlling hundreds of businesses, and the

volume of his tax returns."[106]

### h. *Treasury and the IRS Refuse to Comply with the Subpoenas*

75.   On May 17, 2019, Secretary Mnuchin and Commissioner Rettig separately

responded by letter notifying the Committee that neither Treasury nor the IRS would comply

---

[103] *See* Exs. K; L.

[104] *Id.* at 2.

[105] *Id.* (footnotes omitted).

[106] *Id.* (footnote omitted); *see supra* ¶ 49 (explaining returns of President Trump are "inordinately large and complex").

with the subpoenas.[107]

76.     Without offering to negotiate an option for partial compliance with the subpoenas,

Secretary Mnuchin responded with the same absolutist position as he had to the Section 6103(f)

request:  "In reliance on the advice of the Department of Justice, we have determined that the

Committee's request lacks a legitimate legislative purpose, and pursuant to section 6103, the

Department is therefore not authorized to disclose the requested returns and return

information."[108]

77.     Commissioner Rettig similarly responded that the IRS was "precluded by law

from providing the requested returns and return information."[109]  Commissioner Rettig's letter

did, however, refer to some publicly available information on the Presidential audit program that

strongly underscored the Committee's need for the requested documents.  For example,

Commissioner Rettig highlighted the fact that the "scope and depth of the examination is

determined by the revenue agent [assigned to the audit], based on established risk protocols."[110]

These "risk protocols," in turn, provide that the extent of an audit should be determined based on

a mix of "experience, judgment, and objective analysis," and that an audit may be closed mid-

stream if the IRS agent assigned to the matter finds it is "not in the government's best interest to

continue."[111]  In addition, according to Commissioner Rettig, the Presidential audit "can be

expanded to include related or prior year returns," but only "where warranted."[112]

---

[107] *See* Exhibit N, Letter from Sec'y Mnuchin to Chairman Neal, at 1 (May 17, 2019);
Exhibit O, Letter from Comm'r Rettig to Chairman Neal (May 17, 2019).

[108] Exhibit N.

[109] Exhibit O at 1.

[110] *Id.* at 1-2 (citing *Risk Analysis*, I.R.M. 4.10.3.2.).

[111] *Risk Analysis*, I.R.M. 4.10.3.2. (Feb. 26, 2016).

[112] Exhibit O at 2 (citing I.R.M.).

78.     Rather than allay the Committee's concerns about the scope and effectiveness of the Presidential audit process or the capacity of that process to handle highly complex returns, Commissioner Rettig's statements indicated that the IRS's Presidential audit program is subject to a high degree of discretion (for example, the revenue agent can cut an audit short where the agent finds it is "not in the government's best interest to continue"), and may not be suited to the singularly complicated audit issues presented by this President's tax returns.

79.     At the same time that Treasury and the IRS were refusing to respond to the Section 6103(f) request and the subpoenas, the Committee—through various investigative means—uncovered additional information indicating that the mandatory Presidential audit program might not be functioning effectively, in part, because of the absence of safeguards to protect IRS employees and the audit process itself from improper influence.

### i.    *Treasury and the IRS Brief the Committee on the Presidential Audit Program, Raising Additional Questions and Concerns*

80.     On June 10, 2019, a bipartisan group of Committee staff members met with Treasury and IRS officials to discuss the Presidential audit program.  None of the Treasury or IRS officials at the meeting had ever been involved in an actual Presidential audit.  The officials declined to discuss any tax return information pertaining either to President Trump or to any of the other Presidents dating back to 1977 whose returns Committee staff inquired about in an effort to understand how the Presidential audit procedures are implemented by the IRS.  Instead, the officials gave Committee staff a basic overview of the applicable provisions in the Manual, while bluntly admitting that these provisions were outdated and diverged in numerous respects from current practice.

81.     The limited information communicated raised more questions for the Committee about the Presidential audit program and whether it should be codified into law in some

appropriate form. For example, Treasury and IRS officials stated that, generally, a single IRS agent determines the scope, depth, and direction of each Presidential audit based on the agent's own personal discretion. Although the identity of that individual is largely secret within the IRS, it is known to the President or the President's representative—because the IRS agent is required to meet with one or both at the start of the audit—heightening concerns as to whether the individual IRS agent tasked with auditing the President is adequately shielded from undue political interference and pressures. In addition, the briefing confirmed that there are no special procedures in the Presidential audit program for handling highly complex returns or for a grantor trust, even though President Trump has reportedly used a grantor trust to organize his businesses, eschewing the blind trust arrangement explicitly provided for by the Manual as part of the Presidential audit program.

### j. Chairman Neal Notifies Treasury and the IRS of "Serious Concerns"

82.     Following the June 10, 2019 briefing, and in response to a request from Treasury during the briefing, Committee staff sent to Treasury and the IRS a list of nearly 300 questions about the Presidential audit program, the vast majority of which had not been answered at the briefing. On June 28, 2019, Chairman Neal notified Secretary Mnuchin and Commissioner Rettig by letter that the briefing raised "serious concerns" for the Committee and "reinforced the Committee's need to review the actual return information as part of our oversight duties."[113] Reiterating the Committee's examination of the "IRS's administration of the mandatory Presidential audit process and the application of that audit process to the tax returns of President

---

[113] Exhibit P, Letter from Chairman Neal to Sec'y Mnuchin and Comm'r Rettig, at 2 (June 28, 2019).

Trump and certain related entities"[114] as well as "the IRS's review of particular provisions of the [tax code] that testimony before the Oversight Subcommittee has indicated may be relevant to President Trump's returns,"[115] Chairman Neal explained that review of the returns and audit-file information was necessary for the Committee to "evaluate the accuracy of the President's claims about the audit system, assess the fairness and effectiveness of the audit program and the scope of the audits being performed on the President's returns,"[116] and "understand how particular provisions of the [tax code] are being enforced as part of the IRS's review."[117]  Chairman Neal closed by reminding Secretary Mnuchin and Commissioner Rettig of their "legal obligation" to provide the requested information to the Committee.[118]

### D.  OLC Issues an Opinion on the Committee's Access to President Trump's Tax Return Information

83.     Weeks after Secretary Mnuchin and Commissioner Rettig provided the Committee their final refusal to comply with the Section 6103(f) request and the Committee's subpoenas, OLC published an opinion that attempts after the fact to provide the justification for that earlier refusal.[119]

84.     The OLC opinion recognized that "courts have expressed reluctance to probe congressional motivations,"[120] and that "the federal courts are not well equipped to second-guess

---

[114] *Id.* at 2.

[115] *Id.*

[116] *Id.*

[117] *Id.*

[118] *Id.* at 3.

[119] Congressional Committee's Request for the President's Tax Returns Under 26 U.S.C. § 6103(f), Op. O.L.C., 2019 WL 2563046 (June 13, 2019).

[120] *Id.* at 23.

the action of the political branches by close scrutiny of their motivations."[121]  Moreover, OLC

conceded that the Supreme Court has made clear that "[s]o long as Congress acts in pursuance of

its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives

which spurred the exercise of that power."[122]

85.    Despite these concessions, OLC asserted that, unlike the Judiciary, the Executive

Branch has the authority to supervise Congress as it carries out investigations linked to

legislative purposes.  Although OLC recognized that Section 6103(f) "does not require a tax

committee to provide any purpose" for seeking tax return information,[123] it contended that

Treasury must scrutinize the underlying basis for the Congressional request to "confirm" for

itself whether that basis is legitimate, just as it supposedly must do with a subpoena.[124]

According to OLC, Treasury's power to do so stems from the Executive's claimed role in

"implement[ing]" Section 6103(f) and its constitutional obligation to faithfully execute the laws

"to protect the Executive against legislative encroachments."[125]

86.    Admitting, as Treasury had, that the Committee's oversight interest in the

Presidential audit program was valid, OLC further opined that Secretary Mnuchin nonetheless

was "required" to withhold the information requested by the Committee under Section 6103(f)

because Treasury unilaterally determined the Committee's "true aim" to be political in nature,[126]

---

[121] *Id.* at 25.

[122] *Id.* (emphasis and quotation marks omitted).

[123] *Id.* at 16.

[124] *Id.* at 3; *accord id.* at 20.

[125] *Id.* at 21.

[126] *Id.* at 3.

and because releasing the information could have incurred criminal liability.[127]

### E.  Injury to the Committee

87.     The Committee has been injured, and will continue to be injured, by Defendants' unlawful actions.

88.     As the Supreme Court has confirmed numerous times, the Constitution vests the House with a power of inquiry commensurate with its Article I legislative authority.  In other words, the House can inquire into and investigate any matter on which Congress could legislate. The House, accordingly, is empowered to issue subpoenas to gather the information required for its work.

89.     Certain investigative and legislative powers have been assigned by House Rule and statute to the Committee with respect to tax policy and oversight of Treasury and the IRS.

90.     As explained above, the Committee requested tax return information pertaining to President Trump and certain entities to determine, among other things, whether the IRS is fairly and effectively administering its Presidential audit program; whether the IRS's audit of President Trump is being properly conducted and is fair and adequate in light of his unique situation; and if legislation is required to strengthen the procedures protecting the integrity of the IRS's Presidential audits, to mandate transparency of Presidential tax returns, or to amend portions of the tax code implicated by the President's returns.

91.     The Committee plainly cannot evaluate the fairness and effectiveness of the Presidential audit program or engage in fully informed consideration of related legislative proposals without seeing the actual returns that are being audited and considered for audit as well as a record of the decisions made by the auditors in the course of the examinations.  The

---

[127] *Id.* at 22.

Committee is particularly disadvantaged in its present inquiry because President Trump is the first President in modern times that has not made his returns public.

92.     The Committee has been, and will continue to be, injured by Defendants' refusal to comply with the requests for information under Section 6103(f) and the Committee's subpoenas.  Defendants' refusal has impeded the Committee and, by necessary extension, the House as a whole from understanding the effectiveness of the IRS's Presidential audit program, determining whether IRS (and Treasury) personnel have been appropriately shielded from political pressure, and confirming whether legislation on the subject of Presidential tax audits, tax return transparency, or other tax code provisions implicated by the President's returns is warranted.  Defendants' refusal to comply with the Section 6103(f) request and the subpoenas therefore undermines the House's unique role in the separation of powers structure that is fundamental to our system of constitutional governance.

93.     The injury to the Committee is grave.  Defendants' conduct interferes with the House's institutional prerogative to compel compliance with duly issued Congressional subpoenas.  Courts have recognized that the House's power to obtain the production of papers and testimony from witnesses through compulsory process is integral to its constitutional mandate to legislate and to oversee the Executive.  Permitting Defendants to impede the House's subpoena power would imperil the separation of powers essential to the Constitution's structure of lawful governance.

94.     Defendants' refusal to comply with the Section 6103(f) request likewise interferes with the Committee's statutorily mandated right of access to tax return information—a right that is essential to its oversight of the IRS and Treasury and, accordingly, to its Article I functions.

95.     This injury is irreparable because the House is not a continuing body, so the Committee's oversight investigation will necessarily end on January 3, 2021.  Even assuming a future Committee were to decide to continue the investigation, about which there is no guarantee, it will have to reissue similar requests and subpoenas, thus resulting in unnecessary and harmful delay to and interference with the Committee's ability to pursue its inquiries.  If this Court does not redress Defendants' noncompliance quickly, the Committee will be unable to fulfill its essential role of overseeing the Executive Branch or to carry out its constitutional obligation to legislate on issues of paramount national importance before the current Congress ends.

96.     The need for Defendants' compliance with the Committee's Section 6103(f) request and subpoenas is also urgent because much of the tax legislation under consideration would govern the next Presidential election.  Multiple pending bills, if enacted, would mandate return disclosures by candidates for office during the fast-approaching 2020 election, and central to the contemplated legislation regarding the Presidential audit procedures set forth in the IRS's Manual is the question of whether these procedures are sufficient to guarantee effective enforcement of the tax laws on the Chief Executive.  By stonewalling the Committee's information gathering, Defendants therefore are unlawfully impeding a legislative process that must proceed now for it to have its full intended effect.

97.     An order from this Court requiring Defendants to provide the requested tax return information would cure the Committee's injury.

98.     Pursuant to House Rule II.8(b) and as confirmed by H. Res. 430, the Bipartisan Legal Advisory Group voted to authorize the Committee on Ways and Means to initiate this

litigation.[128]  This House Leadership group "speaks for, and articulates the institutional position of, the House in all litigation matters"[129] and its vote "to authorize litigation and to articulate the institutional position of the House in that litigation is the equivalent of a vote of the full House of Representatives."[130]

### CLAIMS FOR RELIEF

### COUNT I
### SUBPOENA ENFORCEMENT

99.     The Committee incorporates by reference and re-alleges the preceding paragraphs, as if set forth fully herein.

100.     The Committee's subpoenas were duly authorized, issued, and served.

101.     The Committee's subpoenas required, and still require, Defendants to produce the documents set forth in Schedule A of the subpoenas.

102.     The subpoenas were issued as part of the Committee's investigation of matters squarely within its legislative and oversight jurisdiction and pursuant to the Committee's legitimate legislative purpose.

103.     The Committee has been, and will continue to be, injured as a result of Defendants' refusal to produce the documents.

104.     Accordingly, Defendants are legally obligated to produce the subpoenaed documents to the Committee.

---

[128] The Bipartisan Legal Advisory Group comprises the Honorable Nancy Pelosi, Speaker of the House, the Honorable Steny H. Hoyer, Majority Leader, the Honorable James Clyburn, Majority Whip, the Honorable Kevin McCarthy, Republican Leader, and the Honorable Steve Scalise, Republican Whip.  *See* House Rule II.8(b).  The Republican Leader and Republican Whip dissent from this filing.

[129] House Rule II.8(b).

[130] H. Res. 430, 116th Cong. (2019).

## COUNT II

## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(1)

105.    The Committee incorporates by reference and re-alleges the preceding paragraphs, as if set forth fully herein.

106.    The Administrative Procedure Act (APA) requires this Court to "compel agency action unlawfully withheld."[131]

107.    Defendants' refusal to provide the tax return information requested under Section 6103(f) is final agency action, reviewable under the APA.

108.    In Section 6103(f), Congress imposed a mandatory, non-discretionary duty on Defendants to furnish the Committee with tax return and related information upon written request.

109.    Because Defendants have refused to provide the Committee with the requested information, they are currently in contravention of that statutory duty and have therefore unlawfully withheld agency action.

110.    As a result of that refusal, the Committee has been, and will continue to be, adversely affected and injured by Defendants' action.

## COUNT III

## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(A)

111.    The Committee incorporates by reference and re-alleges the preceding paragraphs, as if set forth fully herein.

112.    The APA requires this Court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[132]

---

[131] 5 U.S.C. § 706(1).

[132] 5 U.S.C. § 706(2)(A).

43

113.    Defendants' refusal to provide the tax return information requested under Section 6103(f) is final agency action, reviewable under the APA.

114.    Defendants' refusal to provide tax return and related information is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in violation of the APA, in at least the following ways:

  i.    Defendants acted in direct contravention of the mandatory statutory duty in Section 6103(f) by refusing to furnish the requested tax return information;

  ii.    Defendants relied on factors Congress did not intend to be considered in refusing to furnish the requested tax return information;

  iii.    Defendants relied on an erroneous view of the law in refusing to furnish the requested tax return materials; and

  iv.    Defendants' explanation for their refusal to furnish the requested tax return information runs counter to the evidence before them.

115.    As a result, the Committee has been, and will continue to be, adversely affected and injured by Defendants' action.

## COUNT IV
## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §706(2)(B)

116.    The Committee incorporates by reference and re-alleges the preceding paragraphs, as if set forth fully herein.

117.    The APA requires this Court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity."[133]

---

[133] 5 U.S.C. § 706(2)(B).

118.    Defendants' refusal to provide the tax return information requested under Section 6103(f) is final agency action, reviewable under the APA.

119.    Defendants' refusal to provide the tax return and related information requested under Section 6103(f) is contrary to the Committee's constitutional powers, in violation of the APA because Defendants, among other things:

      i.    denied the Committee the information necessary for it to discharge its constitutional obligations of overseeing the IRS's operations and legislating on matters of tax policy and administration; and

      ii.    infringed the Committee's power of inquiry and investigation, by refusing to comply with the Committee's Section 6103(f) request, thereby diminishing the House's institutional legitimacy as a branch of government co-equal to the Executive.

120.    As a result, the Committee has been, and will continue to be, adversely affected and injured by Defendants' action.

## COUNT V
## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §706(2)(C)

121.    The Committee incorporates by reference and re-alleges the preceding paragraphs, as if set forth fully herein.

122.    The APA requires this Court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction [or] authority."[134]

123.    Defendants' refusal to provide the tax return information requested under Section 6103(f) is final agency action, reviewable under the APA.

---

[134] 5 U.S.C. § 706(2)(C).

124.    Defendants' refusal to provide the tax return and related information requested under Section 6103(f) is *ultra vires* and in excess of statutory authority, in violation of the APA, because Section 6103(f) commands that "[u]pon written request from the chairman of the Committee on Ways and Means of the House of Representatives, . . . the Secretary shall furnish such committee with any return or return information specified in such request."[135]   The statute does not authorize the Secretary to deny a duly filed and facially valid request from the Committee's chairman because of a purported insufficiency of the request's legislative purpose, an alleged ulterior motive, or on any other ground.

125.    As a result, the Committee has been, and will continue to be, adversely affected and injured by Defendants' action.

## COUNT VI
## MANDAMUS

126.    The Committee incorporates by reference and re-alleges the preceding paragraphs, as if set forth fully herein.

127.    Section 6103(f) establishes a non-discretionary duty on the part of Defendants to the Committee, namely, to provide tax return and related information upon written request by the Committee.

128.    The Committee provided Defendants with such a written request for tax return information, yet Defendants have refused to perform that duty to the Committee.

129.    By failing to provide the Committee with the requested information, Defendants have failed to carry out the non-discretionary requirement of Section 6103(f).

---

[135] 26 U.S.C. § 6103(f).

130.     As a result, the Committee has been, and will continue to be, injured by Defendants' action.

## COUNT VII
### VIOLATION OF 26 U.S.C. § 6103(f)

131.     The Committee incorporates by reference and re-alleges the preceding paragraphs, as if set forth fully herein.

132.     Section 6103(f) establishes a non-discretionary duty on the part of Defendants to the Committee, namely, to provide tax return and related information upon written request by the Committee.

133.     The Committee provided Defendants with such a written request for tax return information, yet Defendants have refused to perform that duty to the Committee.

134.     By failing to provide the Committee with the requested information, Defendants have violated Section 6103(f).

135.     As a result, the Committee has been, and will continue to be, injured by Defendants' action.

## COUNT VIII
### NON-STATUTORY REVIEW OF *ULTRA VIRES* ACTION BY DEFENDANTS

136.     The Committee incorporates by reference and re-alleges the preceding paragraphs, as if set forth fully herein.

137.     The Committee has a non-statutory right of action to enjoin and declare unlawful official action that is *ultra vires*.

138.     Section 6103(f) establishes a non-discretionary duty on the part of Defendants to the Committee, namely, to provide tax return and related information upon written request by the Committee.

139.    Defendants' refusal to provide the requested information patently violates Section 6103(f).

140.    As a result, the Committee has been, and will continue to be, injured by Defendants' action.

## PRAYER FOR RELIEF

WHEREFORE, the Committee respectfully prays that this Court:

A.    Enter declaratory and injunctive relief as follows:

    (i)    declare that Defendants are legally obligated to produce the documents listed in Schedule A to the May 10, 2019 subpoenas;

    (ii)    declare that Defendants' refusal to produce the documents requested under Section 6103(f) violates the APA, 26 U.S.C. § 6103(f), is unlawful *ultra vires* action, and warrants relief in the nature of mandamus;

    (iii)    order Defendants to produce the documents listed in Schedule A of the subpoenas; and

    (iv)    order Defendants to produce the documents requested under Section 6103(f).

B.    Retain jurisdiction to review any disputes that may arise regarding Defendants' compliance with this Court's orders.

C.    Grant the Committee such other and further relief as may be just and proper under the circumstances.

Respectfully submitted,

*/s/ Douglas N. Letter*
Douglas N. Letter (D.C. Bar No. 253492),
    *General Counsel*
Todd B. Tatelman (VA Bar No. 66008),
    *Deputy General Counsel*
Megan Barbero (MA Bar No. 668854),
    *Associate General Counsel*
Josephine Morse (D.C. Bar No. 1531317),
    *Associate General Counsel*
Brooks M. Hanner (D.C. Bar No. 1005346),
    *Assistant General Counsel*
Sarah E. Clouse (MA Bar No. 688187)
    *Attorney*

OFFICE OF GENERAL COUNSEL[*]
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
Telephone: (202) 225-9700
Douglas.Letter@mail.house.gov

*Counsel for Plaintiff the Committee on Ways and*
    *Means, U.S. House of Representatives*

July 2, 2019

---

[*] Attorneys for the Office of General Counsel for the U.S. House of Representatives are "entitled, for the purpose of performing the counsel's functions, to enter an appearance in any proceeding before any court of the United States or of any State or political subdivision thereof without compliance with any requirements for admission to practice before such court."  2 U.S.C. § 5571.  The Office of General Counsel wishes to acknowledge the assistance of law clerks Lily Hsu, a student at The George Washington University Law School, and Nate King, a student at The Catholic University of America, Columbus School of Law, in preparing this complaint.