# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMMITTEE ON WAYS AND MEANS,
UNITED STATES HOUSE OF
REPRESENTATIVES,

*Plaintiff*,

vs.

UNITED STATES DEPARTMENT OF THE
TREASURY, *et al.,*

*Defendants.*

Case No. 1:19-cv-01974-TNM

**PLAINTIFF COMMITTEE ON WAYS AND MEANS'**
**STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

1.      The Committee on Ways and Means (Committee) is a standing committee of the U.S. House of Representatives (House) to which the House has delegated broad legislative, investigative, and oversight authority over "[r]evenue measures generally," and the "[d]eposit of public monies," which encompass the Department of the Treasury (Treasury), the Internal Revenue Service (IRS), and all aspects of the Nation's tax laws and their administration, *see* H. Res. 6, 116th Cong. (2019) (adopting Rules of 116th Congress); Rules X.1(t)(3),(6), X.2(a),(b), Rules of the U.S. House of Representatives (116th Cong.), https://tinyurl.com/116thHouseRules.

2.      The auditing process for Presidents' returns is not currently codified in the Internal Revenue Code; instead, it is set forth in the Internal Revenue Manual (Manual), a compilation of internal guidelines for IRS employees.  *See IRM Standards*, I.R.M. 1.11.2.2 (Oct. 11, 2018), https://tinyurl.com/I-R-M-1-11-2.

3.      The Manual specifies that the individual returns of a sitting President and Vice President are subject to a mandatory audit.  *Processing Returns and Accounts of the President and Vice President*, I.R.M. 4.2.1.15 (Apr. 23, 2014), https://tinyurl.com/I-R-M-4-2-1-15.

4.      The Manual provides that the "individual income tax returns for the President and Vice President are subject to mandatory [audit] examinations" and that "[r]elated returns, including estate and gift tax returns, will be handled in accordance with procedures relating to all taxpayers."  I.R.M. 4.2.1.15(1), (6); *see also Mandatory Examination*, I.R.M. 3.28.3.4.3(1) (Jan. 1, 2019), https://tinyurl.com/I-R-M-3-28-3-4-3.

5.      The Manual generally prescribes the process for the review of these returns, and emphasizes the need for expedition and sensitive handling, but the Manual does not specify the scope, length, or depth of the IRS's examination of the returns.  *See, e.g.*, I.R.M. 4.2.1.15(5), (3)(b); I.R.M. 4.2.1.15(5) ("The returns must be assigned within 10 business days of receipt in

the group."); I.R.M. 4.2.1.15(7)(a), (b) ("The returns should be kept in an orange folder at all times" and "not be exposed to viewing by other employees").

6.      Since the start of the 116th Congress, the House has pursued legislative efforts relating to Presidents' tax returns.  Several bills related to Presidents' tax returns or other tax compliance issues have been introduced in the House and referred to the Committee for its consideration.[1]

7.      As required by House Rule X.2(d)(1), the Committee prepared an "Oversight plan" for the 116th Congress, which lists "Oversight of legislative proposals and tax law related to Presidential and Vice-Presidential tax returns" as one topic for Committee investigation.  H.R. Rep. No. 116-40, at 235 (2019) (Authorization and Oversight Plans for House Committees).

8.      On February 7, 2019, the Committee's Subcommittee on Oversight held a hearing on legislative proposals related to Presidents' tax returns.  Ex. KK to the Declaration of Todd B. Tatelman (Tatelman Decl.) (*Legislative Proposals and Tax Law Related to Presidential and Vice-Presidential Tax Returns: Hearing Before the Subcomm. on Oversight of the H. Comm. on Ways and Means*, 116th Cong. (Feb. 7, 2019)).

---

[1] *See, e.g.*, Presidential Tax Transparency Act, H.R. 162, 116th Cong. (2019) (requiring the IRS to make publicly available tax returns and return information for certain candidates for President and Vice President); Tax Transparency Act of 2019, H.R. 1489, 116th Cong. (requiring public disclosure of seven years of individual tax returns of President, Vice President, Members of Congress, and candidates for these offices, with certain redactions); Presidential Allowance Modernization Act of 2019, H.R. 1496, 116th Cong. (prohibiting former Presidents from receiving monetary allowance unless he or she discloses tax return information requested by the Secretary of the Treasury); RIGHT Act of 2019, H.R. 1028, 116th Cong. (requiring candidates for President or Vice President to provide the Office of Government Ethics with individual tax return information for the previous 19 taxable years); Charitable Conservation Easement Program Integrity Act of 2019, H.R. 1992, 116th Cong. (limiting maximum deduction that can be claimed by a partner in a partnership that donates certain conservation easements).

9.     Subcommittee Chairman John Lewis explained that the Subcommittee was exploring, among others, two issues: "Does the public have a need to know that a person seeking or holding the highest office in our country obeys the tax laws?" and "[I]s it fair to expect the IRS to enforce Federal tax law against the President who is the head of the executive branch and has final control of the agency?"  Tatelman Decl. Ex. KK at 8, 9.

10.     Subcommittee Chairman Lewis further explained in a press statement that the hearing would inform the Committee's consideration of "the voluntary release of tax returns by presidents and others; the federal tax laws that protect taxpayer information; recent bills— including H.R. 1—that would require presidents and vice-presidents to disclose their tax return; and Internal Revenue Service audits of tax returns filed by presidents and vice-presidents." Tatelman Decl. Ex. LL (Rep. John Lewis, *Lewis Opening Statement at Hearing on Legislative Proposals and Tax Law Related to Presidential and Vice-Presidential Tax Returns* (Feb. 7, 2019), https://tinyurl.com/LewisOpeningStatementPR).

11.     Scholars and tax experts testified about possible legislative reforms pertaining to Presidents' tax returns, such as requiring disclosure of Presidents' returns and codifying IRS guidelines on audits of those returns, and several witnesses testified about important information that could be gleaned from President Trump's tax return information that could assist the Committee in its oversight of the IRS and its consideration of possible legislation.  Tatelman Decl. Ex. KK.

12.     One witness explained that the President's return information would "enhance[] the ability of Congress to oversee the executive branch," because Congress could "use tax information to evaluate the fairness of IRS audits"—specifically, information contained in

"business and trust returns" as well as "IRS audit work papers."  Tatelman Decl. Ex. KK at 23

(statement of Steve Rosenthal, Sr. Fellow, Tax Policy Ctr.).

13.     That witness further explained that only by reviewing the President's actual

returns could the Committee understand "whether the returns are being properly reviewed" by

the IRS and "how any disputes have been resolved, which is essential to overseeing the fair

administration of our tax system."  Tatelman Decl. Ex. MM at 6 (Steven M. Rosenthal, *The*

*Value of Presidential and Vice-Presidential Tax Returns to the Public and Congress*, Tax Policy

Center (Feb. 7, 2019) (written statement for the hearing before the Subcommittee on Oversight

of the House Committee on Ways and Means), https://tinyurl.com/RosenthalHearingStatement).

14.     Another witness explained that the returns would help the Committee identify

particular tax code provisions implicated by President Trump's businesses—including those

related to real-estate tax preferences, trusts, complex partnerships, and limited liability

companies (LLCs) organized as "pass through entities"—that should possibly be revised.

Tatelman Decl. Ex. NN at 2, 3-7 (William Rice, The Case for Congress Obtaining Trump's Tax

Returns, Americans for Tax Fairness (Dec. 2018) (submitted to and accepted by Subcommittee

during hearing; Tatelman Decl. Ex. KK at 79-80), https://tinyurl.com/AmericansTaxFairness).

15.     In response to an inquiry from a member of the Subcommittee, one witness

suggested that, to guard against political pressures on IRS agents auditing Presidents' tax returns,

the procedures for auditing those returns be codified in a statute rather than handled through

internal IRS policies.  Tatelman Decl. Ex. KK at 40.

16.     On April 3, 2019, the Committee, through Chairman Richard Neal, sent a letter to

IRS Commissioner Charles A. Rettig, pursuant to 26 U.S.C. § 6103(f)(1), requesting that the IRS

provide it the tax returns and related return information of President Trump and eight related

entities for tax years 2013 through 2018.  Tatelman Decl. Ex. A (Letter from Chairman Neal to

Comm'r Rettig (Apr. 3, 2019)).

17.     The Committee requested that this information be produced by April 10, 2019.

Tatelman Decl. Ex. A at 2.

18.     The April 3, 2019 request stated that "the Committee is considering legislative

proposals and conducting oversight related to our Federal tax laws, including, but not limited to,

the extent to which the IRS audits and enforces the Federal tax laws against a President."

Tatelman Decl. Ex. A at 1.

19.     On April 3, 2019, Chairman Neal issued a press release about the request for

President Trump's tax returns and return information.  Tatelman Decl. Ex. B (Press Release,

Ways & Means Committee, Neal Statement on Requesting President Trump's Tax Returns (Apr.

3, 2019), https://tinyurl.com/NealStatement).

20.     In the press release, Chairman Neal explained:

Congress, as a co-equal branch of government, has a duty to conduct oversight of
departments and officials.  The Ways and Means Committee in particular has a
responsibility to conduct oversight of our voluntary Federal tax system and determine
how Americans – including those elected to our highest office – are complying with those
laws. It is also our duty to evaluate the operation of the Internal Revenue Service in its
administration and enforcement of the tax laws.

The IRS has a policy of auditing the tax returns of all sitting presidents and vice-
presidents, yet little is known about the effectiveness of this program. On behalf of the
American people, the Ways and Means Committee must determine if that policy is being
followed, and, if so, whether these audits are conducted fully and appropriately. In order
to fairly make that determination, we must obtain President Trump's tax returns and
review whether the IRS is carrying out its responsibilities. The Committee has a duty to
examine whether Congressional action may be needed to require such audits, and to
oversee that they are conducted properly.

Tatelman Decl. Ex. B at 1.

21.     On April 10, 2019, the date the Committee had asked that the information be produced, Treasury Secretary Steven T. Mnuchin—rather than Commissioner Rettig, to whom the Committee had sent its request—responded that Treasury would not meet the deadline because it had "begun consultations with the Department of Justice to ensure that [its] response is fully consistent with the law and the Constitution."  Tatelman Decl. Ex. D at 2 (Letter from Sec'y Mnuchin to Chairman Neal (Apr. 10, 2019)).

22.     On April 13, 2019, Chairman Neal reiterated the Committee's Section 6103(f) request in another letter to Commissioner Rettig.  Tatelman Decl. Ex. E (Letter from Chairman Neal to Comm'r Rettig (Apr. 13, 2019))

23.     The Committee explained the importance of the material for the Committee's consideration of "legislative proposals and oversight related to our Federal tax laws, including, but not limited to, the extent to which the IRS audits and enforces the Federal tax laws against a President" and set a new response deadline of April 23, 2019.  Tatelman Decl. Ex. E. at 1, 2.

24.     On April 23, 2019, Secretary Mnuchin informed the Committee that Treasury was continuing to confer with the Department of Justice.  Tatelman Decl. Ex. G at 1 (Letter from Sec'y Mnuchin to Chairman Neal (Apr. 23, 2019)).

25.     Secretary Mnuchin noted that "the Committee's stated interest in 'the extent to which the IRS audits and enforces the Federal tax laws against a President' is difficult to accept on its face," and that the Committee's real purpose was not to further its legislative and oversight interests, but to release the President's returns "for the sake of exposure."  Tatelman Decl. Ex. G. at 3, 4.

26.     Commissioner Rettig responded to the Committee the same day.  Tatelman Decl. Ex. H (Letter from Comm'r Rettig to Chairman Neal (Apr. 23, 2019)).

27.     He stated that the Department of Justice was considering issues "beyond the scope of the internal revenue laws" and the IRS was awaiting guidance on "legal issues external to the internal revenue laws."  Tatelman Decl. Ex. H.

28.     On May 6, 2019, Secretary Mnuchin wrote to Chairman Neal with Treasury's final decision.  According to the Secretary, "[i]n reliance on the advice of the Department of Justice, I have determined that the Committee's request lacks a legitimate legislative purpose, and pursuant to Section 6103, the Department is therefore not authorized to disclose the requested returns and return information."  Tatelman Decl. Ex. I (Letter from Sec'y Mnuchin to Chairman Neal (May 6, 2019)).

29.     On May 6, 2019, Commissioner Rettig sent a letter to Chairman Neal echoing Secretary Mnuchin's denial of the Committee's request.  Tatelman Decl. Ex. J (Letter from Comm'r Rettig to Chairman Neal (May 6, 2019)).

30.     On May 10, 2019, Chairman Neal, on behalf of the Committee, issued subpoenas to Secretary Mnuchin and Commissioner Rettig, directing each to produce information virtually identical to what the Committee had sought under Section 6103(f).  Tatelman Decl. Ex. K (Letter & Subpoena from Committee to Comm'r Rettig (May 10, 2019)); Tatelman Decl. Ex. L (Letter & Subpoena from Committee to Sec'y Mnuchin (May 10, 2019)).

31.     In letters to the Secretary and Commissioner accompanying the subpoenas, Chairman Neal explained that, "[a]mong other considerations, the Committee wants to be sure that IRS employees who determine the scope of the President's audit, or who determine whether to continue previously-initiated audits, are protected in the course of their work."  Tatelman Decl. Exs. K & L at 2.

32.     Chairman Neal explained how the "tax issues raised by the current President" are "markedly different" from his predecessors: "[t]he continuous audit and activities from 2008 and before, the use by the President of a grantor trust controlling hundreds of businesses, and the volume of his tax returns."  Tatelman Decl. Exs. K & L at 2.

33.     On May 10, 2019, Chairman Neal stated publicly that the Committee was continuing its "investigation into the mandatory audit program at the IRS in an effort to assess the extent to which the IRS audits and enforces the federal tax laws against a sitting President and to determine if those audits need to be codified into federal law."  Tatelman Decl. Ex. M at 1 (Press Release, Neal Issues Subpoenas to Treasury Sec'y and IRS Comm'r (May 10, 2019)).

34.     On May 17, 2019, Secretary Mnuchin and Commissioner Rettig separately responded that they would not comply with the subpoenas.  Tatelman Decl. Ex. N (Letter from Sec'y Mnuchin to Chairman Neal (May 17, 2019)); Tatelman Decl. Ex. O (Letter from Comm'r Rettig to Chairman Neal (May 17, 2019)).

35.     Secretary Mnuchin stated that, "[i]n reliance on the advice of the Department of Justice, we have determined that the Committee's request lacks a legitimate legislative purpose, and pursuant to [S]ection 6103, the Department is therefore not authorized to disclose the requested returns and return information.  For the same reasons, [the Department is] unable to provide the requested information in response to the Committee's subpoena."  Tatelman Decl. Ex. N.

36.     Commissioner Rettig similarly responded that the IRS was "precluded by law" from providing the information.  Tatelman Decl. Ex. O.

37.     Commissioner Rettig's May 17, 2019 letter responds to Chairman Neal's concern that "IRS employees could be subject to undue influence when conducting mandatory audits of a President's tax returns" by stating "[t]hat concern is unfounded."  Tatelman Decl. Ex. O.

38.     Commissioner Rettig's May 17, 2019 letter highlighted that the "scope and depth of the examination is determined by the revenue agent [assigned to the audit], based on established risk protocols," and that a Presidential audit, "where warranted, . . . can be expanded to include related or prior year returns."  Tatelman Decl. Ex. O at 1-2.

39.     The "risk protocols" provide that the extent of an audit should be determined based on a mix of "experience, judgment, and objective analysis," and that an audit may be closed mid-audit if the IRS agent assigned to the matter finds it is "not in the government's best interest to continue."  *Risk Analysis*, I.R.M. 4.10.3.2; Mid-Audit Decision Point (50% Rule), I.R.M. 4.10.3.2.2(4) (Feb. 26, 2016), https://tinyurl.com/I-R-M-4-10-3-2-2.

40.     On June 10, 2019, Treasury and IRS officials met with bipartisan Committee staff to discuss the IRS audit program.  Tatelman Decl. Ex. P at 1 (Letter from Chairman Neal to Sec'y Mnuchin and Comm'r Rettig (June 28, 2019)).

41.     None of the officials who attended had ever been involved in auditing a President's return; they declined to answer questions relating to the actual audits of any Presidents; and they acknowledged that the Manual's provisions on audits of Presidents' returns are outdated and diverge from current practice.  Tatelman Decl. Ex. P. at 1.

42.     On June 28, 2019, Chairman Neal notified Secretary Mnuchin and Commissioner Rettig that the briefing had "reinforced the Committee's need to review the actual return information as part of our oversight duties."  Tatelman Decl. Ex. P. at 2.

43.     Chairman Neal explained:

[T]he briefing highlighted the substantial discretion a single IRS revenue agent possesses in conducting an audit of a President's tax returns, raising serious concerns about the absence of safeguards protecting both the individual auditor as well as the entire audit process from improper influence. The briefing also raised concerns uniquely and directly relevant to the thoroughness of the Presidential audit process as applied to this President, including how related-entity returns and returns previously under audit have been considered and how highly complex returns are examined. The officials at the briefing reported that there are no specific mandatory audit procedures for a President's grantor trusts.  The Committee is charged with conducting oversight of precisely these types of questions, and the answers can only be determined by reviewing the returns and audit file information that the IRS and Treasury have thus far refused to provide.

The limited information conveyed at the briefing is not a replacement for the actual return and return information that the Committee requested under section 6103(f) and now has subpoenaed. As I have explained in our prior correspondence, the Committee is conducting oversight of the IRS's handling of Presidential tax returns and enforcement of tax laws involving the President. As part of that investigation, the Committee is examining the IRS's administration of the mandatory Presidential audit process and the application of that audit process to the tax returns of President Trump and certain related entities.  Indeed, the President himself repeatedly has called into question the integrity of the IRS's audit system, including by criticizing the mandatory audit process as "extremely unfair."  The Committee is also considering the adequacy of the IRS's review of particular provisions of the Code that testimony before the Oversight Subcommittee has indicated may be relevant to President Trump's returns.

Without studying the returns and the documentation of the agent's decisions that were requested, the Committee cannot evaluate the accuracy of the President's claims about the audit system, assess the fairness and effectiveness of the audit program and the scope of the audits being performed on the President's returns, or understand how particular provisions of the Code are being enforced as part of the IRS's review. Each of these will inform the Committee's legislative judgment of whether and how to amend the Code to respond to issues concerning the audit process or that are otherwise implicated by the President's returns.

Tatelman Decl. Ex. P. at 2.

44.     On July 24, 2019, the House adopted a resolution expressly ratifying investigations and subpoenas issued by any standing committee, including the Committee on Ways and Means, pursuant to its jurisdiction concerning "the President" and "his business entities and organizations"—specifically including "tax information."  *See* H. Res. 507, 116th Cong. (2019); H. Res. 509, 116th Cong. (2019).

45.     On July 25, 2019, Chairman Neal sent a Memorandum to Members of the

Committee regarding the historical use of the Committee's authority to obtain confidential tax

information.  Tatelman Decl. Ex. OO (Memorandum from Chairman Richard E. Neal to the

Members of the Committee on Ways and Means, Re: Historical Use of Authority to Obtain

Confidential Tax Information. (July 25, 2019)).

46.     The Committee has employed Section 6103(f) to review returns and return

information of the following:

- A Member of Congress;

- Multiple individual taxpayers related to IRS gift tax examinations;

- Individuals, estates, and other taxpayers owing more than $100 million in taxes,
  when questions pertaining to tax law enforcement and the soundness of IRS tax
  administration came to the Committee's attention;

- Individuals with unpaid tax liabilities, where the Committee was investigating the
  IRS's use of private debt collectors to collect unpaid federal income tax;

- Individuals and businesses contracting with the federal government, where the
  Committee was reviewing the IRS's failure to implement procedures to seize
  contract payments even though the agency possessed the authority to do so;

- Nonprofit organizations whose applications for tax-exempt status were subject to
  heightened scrutiny allegedly based on their political affiliations, during the
  Committee's investigation of the processing of these applications by the IRS;

- Foreign-owned distributors within the U.S. of automobiles, motorcycles, and
  electronics equipment, where the Committee was investigating the IRS's
  international enforcement program and international tax-avoidance schemes;

- More than 200 large, tax-exempt organizations, where the Committee was investigating the IRS's audit and enforcement process for these organizations and the salaries of their top executives;

- Individuals who made cash payments of more than $10,000 to purchase automobile and consumer goods as well as the merchants involved, as part of the Committee's review of the IRS's administration of tax laws related to the filing of returns connected to business transacted in cash;

- Companies, including banks and automotive manufacturers, that received funds from Treasury's Troubled Asset Relief Program (TARP), where the Committee was investigating unpaid federal income or employment taxes of program recipients;

- Individuals engaging in tax refund fraud, where the Committee was investigating IRS procedures to detect and prevent such fraud; and

- Small businesses, where the Committee was investigating the IRS's use of civil procedures to seize bank accounts of such businesses believed to be structuring their deposits to avoid Bank Secrecy Act reporting requirements.

Tatelman Decl. Ex. OO at 4-5.

47.     On July 29, 2019, the Committee received an unsolicited communication from a federal employee setting forth credible allegations of "evidence of possible misconduct"—specifically, potential "inappropriate efforts to influence" the mandatory audit program. Tatelman Decl. Ex. QQ at 4 (Letter from Chairman Neal to Sec'y Mnuchin (Aug. 8, 2019)).

48.     On August 8, 2019, Chairman Neal wrote to Secretary Mnuchin, asking him to produce records relating to that concern by August 13, 2019.  Tatelman Decl. Ex. QQ at 4.

49.     On August 13, 2019, Secretary Mnuchin did not produce any records.  He stated that the Treasury Department had no responsive records "covered under section 6103(f)" and suggested that Chairman Neal direct his concerns to the Treasury Inspector General for Tax Administration.  Tatelman Decl. Ex. RR (Letter from Sec'y Mnuchin to Chairman Neal (Aug. 13, 2019)).

Respectfully submitted,

*/s/ Douglas N. Letter*
Douglas N. Letter (D.C. Bar No. 253492),
    *General Counsel*
Todd B. Tatelman (VA Bar No. 66008),
    *Deputy General Counsel*
Megan Barbero (MA Bar No. 668854),
    *Associate General Counsel*
Josephine Morse (D.C. Bar No. 1531317),
    *Associate General Counsel*
Brooks M. Hanner (D.C. Bar No. 1005346),
    *Assistant General Counsel*
Sarah E. Clouse (MA Bar No. 688187)
    *Attorney*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
Telephone: (202) 225-9700
douglas.letter@mail.house.gov

*Counsel for Plaintiff Committee on Ways and Means, U.S. House of Representatives*

August 20, 2019