**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON WAYS AND MEANS,
UNITED STATES HOUSE OF
REPRESENTATIVES,

*Plaintiff*,

vs.

UNITED STATES DEPARTMENT OF THE
TREASURY, *et al.,*

*Defendants*.

Case No. 1:19-cv-01974-TNM

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

STATEMENT ........................................................................................................................3

A.    The Committee's Need For President Trump's Tax Returns ............................................3
      1.    Tax Compliance Issues Relating To President Trump's Returns ...........................3
      2.    IRS Procedures For Auditing Presidents' Tax Returns .........................................5
      3.    Legislative Proposals Relating To Presidential Tax Returns..................................6

B.    The Committee's Requests Under Section 6103(f)(1)......................................................9
      1.    The Committee's Right To Receive Tax Returns From Treasury...........................9
      2.    The Committee's Requests And Defendants' Refusals .......................................14
      3.    The Committee's Subpoenas ..............................................................................16

C.    Concerns About The Presidential Audit Program ........................................................17

SUMMARY OF ARGUMENT ..............................................................................................19

STANDARD OF REVIEW ...................................................................................................21

ARGUMENT .......................................................................................................................21

I.    THE COMMITTEE HAS STANDING TO BRING THIS ACTION .............................................21

II.   THE COMMITTEE IS ENTITLED TO THE REQUESTED TAX RETURNS AND RETURN
      INFORMATION ............................................................................................................25

      A.    The Committee Is Entitled To The Requested Tax Returns And Return
            Information Under 26 U.S.C. § 6103(f)(1) ...........................................................25
      B.    The Committee Is Entitled To The Requested Tax Returns And Return
            Information Under Article I Of The Constitution....................................................28
            1.    The Committee Has Broad Authority To Conduct Investigations Related
                  To Any Of Its Legitimate Legislative Functions ......................................28
            2.    The Committee's Requests And Subpoenas Relate To Legitimate
                  Legislative Purposes ...............................................................................31
            3.    The Committee's Requests And Subpoenas Did Not Overstep Any
                  Constitutional Constraints On Congress's Investigative Authority..........38
            4.    Defendants' Methods Of Second-Guessing The Committee's Requests
                  And Subpoenas Underscore The Impropriety Of Doing So .....................44

III.  THE COMMITTEE IS ENTITLED TO JUDICIAL RELIEF .........................................................47

      A.    The Committee Is Entitled To Enforcement Of Its Duly Authorized
            Subpoenas ...........................................................................................................47

B.      The Committee Is Entitled To Judicial Relief Under The Administrative
        Procedure Act And The Mandamus Statute............................................................48

C.      The Committee Is Also Entitled To Relief Either Directly Under Section
        6103(f)(1) Or As A Matter Of Nonstatutory Review ...........................................50

CONCLUSION ....................................................................................................................53

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Aguiar v. DEA,*
  865 F.3d 730 (D.C. Cir. 2017) ..........................................................................21

*American Bar Ass'n v. U.S. Department of Education,*
  370 F. Supp. 3d 1 (D.D.C. 2019) .......................................................................21

*American Hospital Ass'n v. Burwell,*
  812 F.3d 183 (D.C. Cir. 2016) ..........................................................................25

*Arizona State Legislature v. Arizona Independent Redistricting Commission,*
  135 S. Ct. 2652 (2015) ................................................................................21, 25

*Arizona v. United States,*
  567 U.S. 387 (2012) ..........................................................................................51

*Armstrong v. Exceptional Child Center, Inc.,*
  135 S. Ct. 1378 (2015) ......................................................................................51

*Baptist Healthcare System v. Sebelius,*
  646 F. Supp. 2d 28 (D.D.C. 2009) ....................................................................48

\* *Barenblatt v. United States,*
  360 U.S. 109 (1959) ...............................................................28, 30, 32, 45, 47

*Bowen v. Georgetown University Hospital,*
  488 U.S. 204 (1988) ..........................................................................................49

*Chamber of Commerce of U.S. v. Reich,*
  74 F.3d 1322 (D.C. Cir. 1996) ..........................................................................52

*Committee on Judiciary, United States House of Representatives v. Miers,*
  558 F. Supp. 2d 53 (D.D.C. 2008) ...............................................................24, 47

*Committee on Oversight and Government Reform v. Holder,*
  979 F. Supp. 2d 1 (D.D.C. 2013) ..............................................................24, 47, 48

*Council of and for the Blind of Delaware County Valley, Inc. v. Regan,*
  709 F.2d 1521 (D.C. Cir. 1983) (en banc) ........................................................50

*DCH Regional Medical Center v. Azar,*
  925 F.3d 503 (D.C. Cir. 2019) ..........................................................................52

\*   *Eastland v. United States Servicemen's Fund,*
    421 U.S. 491 (1975)..................................................23, 28, 29, 30, 32, 34, 42

*Electric Privacy Information Center v. IRS,*
    910 F.3d 1232 (D.C. Cir. 2018) ...................................................6, 11

*EPA v. EME Homer City Generation, L.P.,*
    572 U.S. 489 (2014)...........................................................25

*Ex parte Daugherty,*
    299 F. 620 (S.D. Ohio 1924) ....................................................43

*Ex parte Young,*
    209 U.S. 123 (1908)...........................................................51

*FEC v. Akins,*
    524 U.S. 11 (1998)............................................................22

*Fletcher v. Peck,*
    10 U.S. (6 Cranch) 87 (1810).....................................................45

*Hutcheson v. United States,*
    369 U.S. 559 (1962) (opinion of Harlan, J.) ......................................45

*In re Chapman,*
    166 U.S. 661 (1897)........................................................28, 32, 33

*In re Debs,*
    158 U.S. 564 (1895)...........................................................51

*In re United States,*
    817 F.3d 953 (6th Cir. 2016) ...................................................25

*Kilbourn v. Thompson,*
    103 U.S. 168 (1881)........................................................32, 38, 39

*Leedom v. Kyne,* 358 U.S. 184 (1958) ...............................................52

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,*
    523 U.S. 26 (1998)............................................................25

*Marbury v. Madison,*
    5 U.S. (1 Cranch) 137 (1803).....................................................47

*McCulloch v. Maryland,*
    17 U.S. (4 Wheaton) 316 (1819)..................................................44

\*   *McGrain v. Daugherty,*
    273 U.S. 135 (1927).......................................................23, 28, 29, 32, 33, 43

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) ...................................................................................48

*NLRB v. Nash-Finch Co.*, 404 U.S. 138 (1977) ...................................................................................51

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) ...............................................................................49, 50

*Public Employees for Environmental Responsibility v. Beaudreau*, 25 F. Supp. 3d 67 (D.D.C. 2014) ......................................................................21

*Quinn v. United States*, 349 U.S. 155 (1955) ...............................................................................28, 30

*Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974) (en banc) ..........................................................24

*Shoshone Bannock Tribes v. Reno*, 56 F.3d 1476 (D.C. Cir. 1995) ..................................................................50

*Sierra Club v. Thomas*, 828 F.2d 783 (D.C. Cir. 1987) .....................................................................50

*Transohio Savings Bank v. Director, Office of Thrift Supervision*, 967 F.2d 598 (D.C. Cir. 1992) ..........................................................................49

*Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006) ............................................................................52

*Trump v. Committee on Oversight and Reform of U.S. House of Representatives*, 380 F. Supp. 3d 76 (D.D.C. 2019) ..................................................................42

*United States House of Representatives v. Mnuchin*, 379 F. Supp. 3d 8 (D.D.C. 2019), *appeal pending*, No. 19-5176 (D.C. Cir.)....................25

*United States House of Representatives v. United States Department of Commerce*, 11 F. Supp. 2d 76 (D.D.C. 1998) ..................................................22

*United States v. American Telephone & Telegraph Co.*, 551 F.2d 384 (D.C. Cir. 1976) ........................................................................24

*United States v. Arlington County*, 669 F.2d 925 (4th Cir. 1982) ...........................................................................51

*United States v. Comstock*, 560 U.S. 126 (2010)........................................................................................45

*United States v. Republic Steel Corp.*,
    362 U.S. 482 (1960)......................................................................................51

*Virginia House of Delegates v. Bethune-Hill*,
    139 S. Ct. 1945 (2019)..................................................................................24

\* *Watkins v. United States*,
    354 U.S. 178 (1957).............................................23, 30, 32, 38, 39, 41

*Williamson v. Lee Optical Co.*,
    348 U.S. 483 (1955)..................................................................................34, 35

*Wyandotte Transportation Co v. United States*,
    389 U.S. 191 (1967)......................................................................................51

## OFFICE OF LEGAL COUNSEL OPINIONS

*Congressional Committee's Request for the President's Tax Returns Under 26*
    *U.S.C. § 6103(f)*, 43 Op. O.L.C. ---, slip op. (June 13, 2019) (2019 OLC
    Slip Op.), https://www.justice.gov/olc/file/1173756/download ...............38, 42, 44, 46, 47

*Response to Congressional Requests for Information Regarding Decisions Made*
    *Under the Independent Counsel Act*, 10 Op. O.L.C. 68 (1986)........................................48

## CONSTITUTIONS, STATUTES, RULES, AND REGULATIONS

U.S. Constitution,
    art. I..................................................................20, 23, 28, 47, 48, 49, 52
    art. I, § 5.........................................................................................23
    art. I, § 7, cl. 1....................................................................................5
    art. I, § 8, cl. 18.................................................................................51

Administrative Procedure Act (APA) 5 U.S.C. ch. 5, subch. I § 500 et seq. ........20, 21, 48, 50, 52
    5 U.S.C. § 706.....................................................................................48
    5 U.S.C. § 706(1)........................................................................21, 49, 50
    5 U.S.C. § 706(2)(B)...............................................................................49
    5 U.S.C. § 706(2)(C)...............................................................................49
    5 U.S.C. § 706(A)(2)...............................................................................48

\* Internal Revenue Code Section 6103.................................................................*passim*
    26 U.S.C. § 6103(a)(1), (d)(1), (2) (1970).......................................................37
    26 U.S.C. § 6103(a)..............................................................................9, 11
    26 U.S.C. § 6103(c)-(o)...........................................................................11
    26 U.S.C. § 6103(f).............................................................................*passim*
    26 U.S.C. § 6103(f)(1).........................................................................*passim*
    26 U.S.C. § 6103(f)(3)............................................................................26
    26 U.S.C. § 6103(g)(2)............................................................................26
    26 U.S.C. § 6103(i)(3)(B)(i), (ii) ...............................................................26

28 U.S.C. § 1361 ...................................................................................................21, 48, 50

National Labor Relations Act (NLRA) of 1935, 29 U.S.C. § 151-169 .........................51

Revenue Act of 1918, ch. 18, § 257, 40 Stat. 1057 .....................................................10

Revenue Act of 1921, ch. 136, § 257, 42 Stat. 227 ......................................................10

Revenue Act of 1924, Pub. L. 68-176, § 257(a), 43 Stat. 253.................................11, 26

Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, 131 Stat. 2054............................4

Tax Reform Act of 1976, Pub. L. No. 94-455, 90 Stat. 1520 .......................................11

Fed. R. Civ. P. 56(a) ....................................................................................................21

## LEGISLATIVE MATERIALS

65 Cong. Rec. 2919 (1924) ..........................................................................................11

65 Cong. Rec. 2953 (1924) ..........................................................................................11

65 Cong. Rec. 3299 (1924) ..........................................................................................10

65 Cong. Rec. 3699-3702 (1924)..................................................................................10

65 Cong. Rec. 6196 (1924) ..........................................................................................11

65 Cong. Rec. 7677 (1924) ..........................................................................................11

For the People Act of 2019, H.R. 1, 116th Cong. § 10001 ....................................6, 7, 8

Presidential Tax Transparency Act, H.R. 162, 116th Cong. (2019)................................7

RIGHT Act of 2019, H.R. 1028, 116th Cong. (2019) ...................................................7

Tax Transparency Act of 2019, H.R. 1489, 116th Cong. .............................................7

Presidential Allowance Modernization Act of 2019, H.R. 1496, 116th Cong.
      (2019)...................................................................................................................7

Charitable Conservation Easement Program Integrity Act of 2019, H.R. 1992,
      116th Cong............................................................................................................7

H. Res. 6, 116th Cong. (2019) ......................................................................................5

H. Res. 430, 116th Cong. (2019) ................................................................................25

H. Res. 507, 116th Cong. (2019) ..........................................................................17, 25

H. Res. 509, 116th Cong. (2019) ...........................................................................17

S. Res. 180, 68th Cong., 65 Cong. Rec. 3299 (1924) ............................................10

H.R. Rep. No. 116-40 (2019)...................................................................................7

S. Rep. No. 94-938 (1976).....................................................................................26

Staff of the Joint Committee on Taxation, JCX-3-19, *Background Regarding the
Confidentiality and Disclosure of Federal Tax Returns* 23-26 (Feb. 4,
2019) ...........................................................................................................37

Joint Committee on Internal Revenue Taxation, *Examination of President Nixon's
Tax Returns for 1969 Through 1972*, S. Rep. No. 93-768, 93d Cong., 2d
Sess. (1974) ("Joint Tax Committee Nixon Report")....................27, 36, 37, 40

*Inquiry into the Matter of Billy Carter and Libya: Hearings Before the
Subcommittee to Investigate the Activities of Individuals Representing the
Interests of Foreign Governments*, Vol. III-Appendix, 96th Cong., 2d
Sess., Serial No. 96-8, at 1666-1701 (1981) ........................................13

Rules of the U.S. House of Representatives (116th Cong.)
Rule II.8(b)..................................................................................................25
Rule X.1(t)(3),(6) ....................................................................................5, 24
Rule X.2(a),(b)...............................................................................................5
Rule X.2(d)(1) ...............................................................................................7
Rule XI.1(b)(1) ...........................................................................................29
Rule XI.2(m)(1)(B)................................................................................24, 29
Rule XI.2(m)(3)(A)(i) ................................................................................16

## OTHER AUTHORITIES

Internal Revenue Manuals, https://www.irs.gov/irm
I.R.M. 1.11.2.2 (Oct. 11, 2018), https://tinyurl.com/I-R-M-1-11-2...................................6
I.R.M. 3.28.3.4.3(1) (Jan. 1, 2019), https://tinyurl.com/I-R-M-3-28-3-4-3................6, 18
I.R.M. 4.2.1.15 (Apr. 23, 2014), https://tinyurl.com/I-R-M-4-2-1-15..........................5, 18
I.R.M. 4.2.1.15(1), (6) (Apr. 23, 2014), https://tinyurl.com/I-R-M-4-2-1-
15..............................................................................................................6
I.R.M. 4.2.1.15(3)(b) (Apr. 23, 2014), https://tinyurl.com/I-R-M-4-2-1-15 ....................6
I.R.M. 4.2.1.15(7)(a), (b) (Apr. 23, 2014), https://tinyurl.com/I-R-M-4-2-
1-15 ...........................................................................................................6
I.R.M. 4.10.3.2.2(4) (Feb. 26, 2016), https://tinyurl.com/I-R-M-4-10-3-2-2 .................17
I.R.M. 4.10.3.2 (Feb. 26, 2016), https://tinyurl.com/I-R-M-4-10-3-2 ............................17
I.R.M. 11.3.4.4(4) (May 20, 2005), https://tinyurl.com/I-R-M-11-3-4-4 .........................14

*Exclusive: Mick Mulvaney on President Trump's border security push, growing
tensions with House Democrats*, Fox News (Apr. 7, 2019, 12:01),
http://tinyurl.com/MulvaneyFoxNews...............................................................14

Hasia Diner, *Teapot Dome 1924*, *in* Congress Investigates: A Documented
    History 1792-1974, Vol. IV (Arthur M. Schlesinger, Jr. & Roger Bruns
    eds., 1975).................................................................................................................43

Jimmy Carter, *Remarks at a Campaign Rally for Democratic Candidates for State
    Office, September 24, 1977 in* 2 Pub. Papers of the Presidents of the
    United States 1655 (1978) ...........................................................................................41

# INTRODUCTION

The Committee on Ways and Means of the House of Representatives (Committee) has brought this action because Defendants have refused to comply with their legal obligation to furnish information to the Committee.  The Committee is considering legislation and conducting an oversight investigation of the process by which the Internal Revenue Service (IRS) audits the tax returns of the President of the United States—and in particular, the returns of President Trump, who has claimed on several occasions that the IRS treats him unfairly and whose complicated tax returns raise questions of IRS administration and policy.  The Committee is also investigating whether President Trump, whose financial affairs are complex and abstruse, has taken inappropriate advantage of the tax laws, and whether revisions to the tax code are warranted to promote public confidence in the enforcement of our tax laws.  The extent to which the President properly complies with, or abuses to his personal advantage, the Internal Revenue Code is a matter that falls squarely within the Committee's legislative and oversight jurisdiction.

The Committee has requested—as it is authorized to do by federal law, 26 U.S.C. § 6103(f)(1)—that Defendants furnish it with tax "return [and] return information" of President Trump, including his individual returns and the returns of several related entities.  The Committee has also issued subpoenas seeking virtually identical information.  Defendants have refused to comply—but not on the ground that Section 6103(f) or some other federal statute allows them to do so.  Rather, Defendants have unilaterally concluded that the Committee—and Congress—have *no* legitimate reason for seeking the requested information.  They assert that the Committee's articulated reasons are pretextual and that the true reasons are purely political and therefore illegitimate.  And they claim, as Executive Branch officials, to be justified in rejecting facially valid Congressional demands for information because of Congress's purported motives

1

behind seeking that information—even while they acknowledge that *courts* have no authority to make such a ruling.

Defendants' defiance is an extraordinary departure from established principles of law. Defendants, notably, have *not* claimed that the requests and subpoenas at issue impermissibly interfere with the functioning of the Executive Branch (by, for example, intruding on matters covered by executive privilege). Nor have Defendants disputed that the taxes of the President are differently situated from those of private individuals. Rather, Defendants have refused to comply because they assert that the Committee's requests are motivated by political considerations. If sustained, that position would allow Executive Branch agencies to disregard all manner of Congressional requests for information—requests that, for two centuries, have been regarded as within the heartland of Congress's legislative and investigatory powers.

The Committee is entitled to judicial relief as a matter of law. The subpoenas served on Defendants are valid on their face. Section 6103(f)(1) independently gives the Committee an unqualified right to obtain the tax returns and return information it has sought, and—unlike some neighboring provisions—does not give Defendants any discretion in deciding whether to produce that information. Defendants' noncompliance with the Committee's requests and subpoenas is therefore unlawful, and Defendants should be directed to comply.

**STATEMENT**

**A.    The Committee's Need For President Trump's Tax Returns**

**1.    Tax Compliance Issues Relating To President Trump's Returns**

Both as a candidate and once elected, President Trump has frequently attacked the

integrity of the IRS's audit process.  Candidate Trump stated that he "unfairly get[s] audited,"

and asked, "Why is it that every single year, I'm audited, whereas other people that are very rich,

people are never audited[?]"  Candidate Trump surmised that he is frequently audited "because

of the fact that I'm a strong Christian, and I feel strongly about it and maybe there's a bias."[1]  As

President, he has continued to express skepticism about the integrity of the IRS's audit system.

The White House Press Secretary stated in October 2018 that "[t]he [P]resident and First Lady

filed their taxes on time and as always, they are automatically under audit, which the [P]resident

thinks is extremely unfair."[2]

At the same time, numerous investigative reports have revealed that President Trump,

through the complex arrangements of his personal and business finances,[3] has engaged in

aggressive tax strategies and decades-long tax avoidance schemes, including taking a

---

[1] Donald Trump (@realDonaldTrump), Twitter (Feb 27, 2016, 7:12 AM), https://tinyurl.com/27Feb2016Tweet, attached hereto as Exhibit Q to the Declaration of Todd B. Tatelman (Tatelman Decl.); Tatelman Decl. Ex. R (Jenna Johnson, *Donald Trump says IRS audits could be tied to being a 'strong Christian,'* Wash. Post (Feb. 26, 2016), https://tinyurl.com/TrumpAudits).

[2] Tatelman Decl. Ex. S (Brendan Cole, *Trump Files 2017 Tax Return, Claims Automatic IRS Audit is 'Extremely Unfair,'* Newsweek (Oct. 10, 2018), https://tinyurl.com/Newsweek2017Return).

[3] *See, e.g.*, Tatelman Decl. Ex. T (David Barstow et al., *Trump Engaged in Suspect Tax Schemes as He Reaped Riches From His Father*, N.Y. Times (Oct. 2, 2018), https://tinyurl.com/TrumpTaxSchemes). *See also* Tatelman Decl. Ex. U (Letter from Sheri A. Dillon and William F. Nelson, Tax Partners, Morgan Lewis, to Mr. Donald J. Trump, Founder, The Trump Organization, Re: Status of U.S. federal income tax returns (Mar. 7, 2016) (President's operation of more than 500 entities in Trump Organization through sole proprietorships and/or closely held partnerships means "your personal federal income tax returns are inordinately large and complex for an individual"), https://tinyurl.com/TrumpTaxAuditLetter).

questionable $916 million deduction,[4] using a grantor trust to control assets,[5] manipulating tax code provisions pertaining to real estate taxes,[6] and extensively using pass through entities.[7] Media reports have also revealed that President Trump benefited from massive conservation easements,[8] and that certain of his golf courses failed to properly account for wages paid to employees, raising questions about compliance with payroll and Social Security tax laws.[9] President Trump has taken pride in "brilliantly" maneuvering the tax laws to his personal benefit.[10]  Even as he was championing the Tax Cuts and Jobs Act of 2017, President Trump

---

[4] Tatelman Decl. Exhibit V (David Barstow et al., *Donald Trump Tax Records Show He Could Have Avoided Taxes for Nearly Two Decades, The Times Found*, N.Y. Times (Oct. 1, 2016), https://tinyurl.com/TrumpTaxDeduction).

[5] Tatelman Decl. Ex. T.

[6] Tatelman Decl. Ex. W (Russ Buettner and Susanne Craig, *Decade in the Red: Trump Tax Figures Show Over $1 Billion in Business Losses*, N.Y. Times (May 8, 2019), https://tinyurl.com/TrumpTaxLoss); Tatelman Decl. Ex. X (Paul Sullivan, *How Loopholes Help Trump and Other Real Estate Moguls Avoid Taxes*, N.Y. Times (May 10, 2019), https://tinyurl.com/TrumpRealEstateLoopholes).

[7] Tatelman Decl. Ex. Y (Jean Eaglesham, Mark Maremont, and Lisa Schwartz, *How Donald Trump's Web of LLCs Obscures His Business Interests*, Wall St. J. (Dec. 8, 2016), https://tinyurl.com/TrumpPassThroughs).

[8] Tatelman Decl. Ex. Z (Peter Elkind, *The Billion-Dollar Loophole*, Fortune (Dec. 20, 2017), https://tinyurl.com/FortuneLoophole); Tatelman Decl. Ex. AA (Richard Rubin, *Donald Trump's Donations Put Him in Line for Conservation Tax Breaks*, Wall St. J. (Mar. 10, 2016, 10:41 PM), https://tinyurl.com/WSJEasements); Tatelman Decl. Ex. BB (Richard Rubin, *Donald Trump Got a Big Break on 2005 Taxes*, Wall St. J. (Mar. 17, 2016, 5:25 PM), https://tinyurl.com/WSJ2005TaxBreak).

[9] Tatelman Decl. Ex. CC (Miriam Jordan, *Making President Trump's Bed: A Housekeeper Without Papers*, N.Y. Times (Dec. 6, 2018), https://tinyurl.com/MakingTrumpsBed); Tatelman Decl. Ex. DD (Joshua Partlow and David A. Fahrenthold, *At Trump golf course, undocumented employees said they were sometimes told to work extra hours without pay*, Wash. Post (Apr. 30, 2019, 5:06 pm), https://tinyurl.com/ExtraHoursWithoutPay).

[10] Tatelman Decl. Ex. EE (Lisa Hagen, *Trump says he has 'brilliantly' used tax laws to his advantage,* The Hill (Oct. 3, 2016, 5:06 PM), https://tinyurl.com/BrilliantTaxAvoidance). *See also* Tatelman Decl. Ex. FF (Donald J. Trump (@realDonaldTrump), Twitter (May 8, 2019, 3:56 AM), https://tinyurl.com/TrumpTaxSport ("You always wanted to show losses for tax purposes ... almost all real estate developers did – and often re-negotiate with banks, it was sport.")); Tatelman Decl. Ex. GG (Eileen Sullivan, *Trump Defends $1.17 Billion in Losses as Just for 'Tax Purposes'*, N.Y. Times (May 8, 2019), https://tinyurl.com/TrumpDefendsTaxLoss).

referred to the tax code as "riddled with loopholes" for "special interests—including myself."[11]

These reports raise matters squarely within the purview of the House of Representatives, where all "Bills for raising Revenue shall originate," U.S. Const. art. I, § 7, cl. 1, and of the House's Committee on Ways and Means, a standing committee to which the House has delegated broad legislative, investigative, and oversight authority over "[r]evenue measures generally," and the "[d]eposit of public monies," which encompass the Treasury, the IRS, and all aspects of the Nation's tax laws and their administration, *see* H. Res. 6, 116th Cong. (2019) (adopting Rules of 116th Congress); Rules X.1(t)(3),(6), X.2(a),(b), Rules of the U.S. House of Representatives (116th Cong.), https://tinyurl.com/116thHouseRules.  But the Committee has thus far been unable to evaluate whether President Trump's claims about the IRS's audit process are accurate, or to assess whether he has taken advantage of the tax laws in a way that warrants changes in those laws.  Unlike all of his predecessors for almost 40 years, President Trump has refused to disclose his tax returns, purportedly because they are under "continuous audit."[12]

## 2. IRS Procedures For Auditing Presidents' Tax Returns

IRS guidelines specify that the individual returns of a sitting President and Vice President are subject to a mandatory audit.[13]  The auditing process for Presidents' returns is not currently codified in the Internal Revenue Code; instead, it is set forth in the Internal Revenue Manual

---

[11] Tatelman Decl. Ex. HH (*Remarks by President Trump on Tax Reform*, White House (Nov. 29, 2017, 2:22 PM), https://tinyurl.com/TrumpRemarksRiddle).

[12] Tatelman Decl. Ex. II (*Remarks by President Trump in Press Conference After Midterm Elections*, White House (Nov. 7, 2018, 11:57 AM), https://tinyurl.com/PressConferenceAfterMidterms).  Defendant Rettig has cast doubt on President Trump's explanation that an ongoing audit prevents him from releasing his returns, testifying before the House Appropriations Subcommittee that there is "no rule that would prohibit the release of a tax return because it's under audit."  Tatelman Decl. Ex. JJ (Orion Rummler, *IRS commissioner: No rule against releasing Trump's tax returns while under audit*, Axios (Apr. 10, 2019), https://tinyurl.com/IRSCommissionerTrumpAudit).

[13] *Processing Returns and Accounts of the President and Vice President,* I.R.M. 4.2.1.15 (Apr. 23, 2014), https://tinyurl.com/I-R-M-4-2-1-15.

(Manual), a compilation of internal guidelines for IRS employees.[14]   The Manual provides that

the "individual income tax returns for the President and Vice President are subject to mandatory

[audit] examinations" and that "[r]elated returns, including estate and gift tax returns, will be

handled in accordance with procedures relating to all taxpayers."[15]   The Manual generally

prescribes the process for the review of these returns, and emphasizes the need for expedition

and sensitive handling,[16] but it leaves numerous aspects of the audit process either ambiguous,

unaddressed, or up to an auditor's discretion.   It does not specify the scope, length, or depth of

the IRS's examination of the returns (for example, whether the audit extends to business or

related entities connected to the taxpayer, open tax years, or ongoing audits).   Nor does it set out

the makeup or decision-making structure of the IRS's audit team, or how the IRS agents

conducting the audit should interact with the President and those representing him.

### 3.      Legislative Proposals Relating To Presidential Tax Returns

Since the start of the 116th Congress, the House has pursued legislative efforts relating to

Presidents' tax returns.   For example, H.R. 1, introduced on January 4, 2019, would, if enacted,

require the President, the Vice President, and certain major party candidates to disclose their tax

returns for the last ten years to the Federal Election Commission (FEC), and would amend

Section 6103 to provide for Treasury disclosure of those returns to the FEC, which would then

---

[14] *See IRM Standards,* I.R.M. 1.11.2.2 (Oct. 11, 2018), https://tinyurl.com/I-R-M-1-11-2.
*See also Electric Privacy Info. Ctr. v. IRS*, 910 F.3d 1232, 1244-1225 (D.C. Cir. 2018) ("It is
well-settled ... that the provisions of the [M]anual are directory rather than mandatory, are not
codified regulations, and clearly do not have the force and effect of law.").
     [15] I.R.M. 4.2.1.15(1), (6).   *See also Mandatory Examination,* I.R.M. 3.28.3.4.3(1) (Jan. 1,
2019), https://tinyurl.com/I-R-M-3-28-3-4-3.
     [16] I.R.M. 4.2.1.15(5), (3)(b).   *See also* I.R.M. 4.2.1.15(5) ("The returns must be assigned
within 10 business days of receipt in the group."); I.R.M. 4.2.1.15(7)(a), (b) ("The returns should
be kept in an orange folder at all times" and "not be exposed to viewing by other employees").

make them publicly available (with redactions).[17]   Several other bills related to Presidents' tax

returns or other tax compliance issues have been introduced in the House and referred to the

Committee for its consideration.[18]

The Committee is also charged by the Rules of the House with conducting oversight of

the IRS's administration and enforcement of the Nation's tax laws.  As required by House Rule

X.2(d)(1), the Committee prepared an "Oversight plan" for the 116th Congress, which lists

"Oversight of legislative proposals and tax law related to Presidential and Vice-Presidential tax

returns" as one topic for Committee investigation.[19]   On February 7, 2019, the Committee's

Subcommittee on Oversight held a hearing on legislative proposals related to Presidents' tax

returns.[20]   Subcommittee Chairman John Lewis explained that the Subcommittee was exploring,

among others, two issues: "Does the public have a need to know that a person seeking or holding

the highest office in our country obeys the tax laws?" and "[I]s it fair to expect the IRS to

---

[17] *See* For the People Act of 2019, H.R. 1, 116th Cong. § 10001.  The bill passed the House on March 8, 2019.

[18] *See, e.g.*, Presidential Tax Transparency Act, H.R. 162, 116th Cong. (2019) (requiring the IRS to make publicly available tax returns and return information for certain candidates for President and Vice President); Tax Transparency Act of 2019, H.R. 1489, 116th Cong. (requiring public disclosure of seven years of individual tax returns of President, Vice President, Members of Congress, and candidates for these offices, with certain redactions); Presidential Allowance Modernization Act of 2019, H.R. 1496, 116th Cong. (2019) (prohibiting former Presidents from receiving monetary allowance unless he or she discloses tax return information requested by the Secretary of the Treasury); RIGHT Act of 2019, H.R. 1028, 116th Cong. (2019) (requiring candidates for President or Vice President to provide the Office of Government Ethics with individual tax return information for the previous 19 taxable years); Charitable Conservation Easement Program Integrity Act of 2019, H.R. 1992, 116th Cong. (limiting maximum deduction that can be claimed by a partner in a partnership that donates certain conservation easements).

[19] H.R. Rep. No. 116-40, at 235 (2019) (Authorization and Oversight Plans for House Committees).

[20] Tatelman Decl. Ex. KK (*Legislative Proposals and Tax Law Related to Presidential and Vice-Presidential Tax Returns: Hearing Before the Subcomm. on Oversight of the H. Comm. on Ways and Means*, 116th Cong. (Feb. 7, 2019) (Oversight Tr.)).

enforce Federal tax law against the President who is the head of the executive branch and has final control of the agency?" [21]

Scholars and tax experts testified about possible legislative reforms pertaining to Presidents' tax returns, such as requiring disclosure of Presidents' returns and codifying IRS guidelines on audits of those returns.  Several witnesses testified about important information that could be gleaned from President Trump's tax return information that could assist the Committee in its oversight of the IRS and its consideration of possible legislation.  The President's return information, one witness explained, would "enhance[] the ability of Congress to oversee the executive branch," because Congress could "use tax information to evaluate the fairness of IRS audits"—specifically, information contained in "business and trust returns" as well as "IRS audit work papers."[22]  That witness further explained that only by reviewing the President's actual returns could the Committee understand "whether the returns are being properly reviewed" by the IRS and "how any disputes have been resolved, which is essential to overseeing the fair administration of our tax system."[23]  Another witness explained that the returns would help the Committee identify particular tax code provisions implicated by President Trump's businesses—including those related to real-estate tax preferences, trusts, complex

_____

[21] *Id.* at 8, 9 (statement of Rep. John Lewis).  Subcommittee Chairman Lewis further explained in a press statement that the hearing would inform the Committee's consideration of "the voluntary release of tax returns by presidents and others; the federal tax laws that protect taxpayer information; recent bills—including H.R. 1—that would require presidents and vice-presidents to disclose their tax return; and Internal Revenue Service audits of tax returns filed by presidents and vice-presidents."  Tatelman Decl. Ex. LL (Rep. John Lewis, *Lewis Opening Statement at Hearing on Legislative Proposals and Tax Law Related to Presidential and Vice-Presidential Tax Returns* (Feb. 7, 2019), https://tinyurl.com/LewisOpeningStatementPR).

[22] Tatelman Decl. Ex. KK (Oversight Tr. at 23 (statement of Steve Rosenthal, Sr. Fellow, Tax Policy Ctr.)).

[23] Tatelman Decl. Ex. MM (Steven M. Rosenthal, *The Value of Presidential and Vice-Presidential Tax Returns to the Public and Congress*, Tax Policy Center, at 6 (Feb. 7, 2019) (written statement for the hearing before the Subcommittee on Oversight of the House Committee on Ways and Means), https://tinyurl.com/RosenthalHearingStatement).

partnerships, and limited liability companies (LLCs) organized as "pass through entities"—that should possibly be revised.[24]  And in response to an inquiry from a member of the Subcommittee, one witness suggested that, in order to guard against political pressures on IRS agents auditing Presidents' tax returns, the procedures for auditing those returns be codified in a statute rather than handled through internal IRS policies.[25]

### B.      The Committee's Requests Under Section 6103(f)(1)

#### 1.      The Committee's Right To Receive Tax Returns From Treasury

Without access to President Trump's tax returns—which he has refused to disclose—as well as IRS records showing how those returns are being audited, the Committee cannot assess whether the IRS's audit process is functioning properly, understand which tax code provisions are implicated by President Trump's returns, or determine whether certain revisions to the tax code are warranted.  The Committee therefore invoked a provision of federal law that it has frequently used to obtain return information from the IRS, an agency of the Treasury Department.  Section 6103(a) of the Internal Revenue Code, 26 U.S.C. § 6103(a), prohibits the disclosure of taxpayer returns and return information, absent an explicit statutory exception.  One such exception, Section 6103(f)(1), *requires* in clear and mandatory terms that the Secretary of the Treasury produce such information, upon written request, to any of the three Congressional committees with jurisdiction over federal tax issues, including the House Committee on Ways and Means.  Section 6103(f)(1) provides:

---

[24] *See* Tatelman Decl. Ex. NN (William Rice, The Case for Congress Obtaining Trump's Tax Returns, Americans for Tax Fairness (Dec. 2018) (submitted to and accepted by Subcommittee during hearing; Oversight Tr. at 79-80), https://tinyurl.com/AmericansTaxFairness).

[25] Tatelman Decl. Ex. KK at 40 (Rep. Del Bene: "Dr. Thorndike, given the current pressures on the IRS and what happened with Nixon, should the IRS requirement to audit tax returns of Presidents and vice presidents be codified?"; Mr. Thorndike: "As with the disclosure requirements, I think that these would be better off codified than handled through the internal policies of the IRS.")

> Upon written request from the chairman of the Committee on Ways and Means of the House of Representatives, the chairman of the Committee on Finance of the Senate, or the chairman of the Joint Committee on Taxation, the Secretary *shall furnish* such committee with any return or return information specified in such request, except that any return or return information which can be associated with, or otherwise identify, directly or indirectly, a particular taxpayer shall be furnished to such committee only when sitting in closed executive session unless such taxpayer otherwise consents in writing to such disclosure.

26 U.S.C. § 6103(f)(1) (emphasis added).  Section 6103(f)(1) contains no exception to Treasury's obligation to furnish returns or return information to the Congressional tax committees upon written request.

Treasury's mandatory duty to furnish tax return information to the Committee reflects Congress's longstanding concern that it have access to that information for its legislative and oversight functions.  Congress initially codified the Committee's broad right of access in 1924, in the wake of obstacles hampering Congressional oversight of alleged Executive Branch wrongdoing.  Before 1924, the law permitted the inspection of individual tax returns by order of the President and under rules prescribed by the Treasury Secretary.[26]  As part of its investigation of alleged bribery of high-ranking federal officials in exchange for no-bid leases at the Teapot Dome oil field, the Senate sought from President Coolidge the tax returns of those allegedly involved—a request that President Coolidge initially resisted.[27]  During that time, a Congressional committee likewise sought tax return information in connection with an investigation of the Bureau of Internal Revenue, the IRS's predecessor.  Lawmakers questioned whether Treasury Secretary Andrew Mellon had improperly maintained ownership interests in certain businesses while at Treasury and whether the Bureau of Internal Revenue had given

---

[26] *See* Revenue Act of 1918, ch. 18, § 257, 40 Stat. 1057, 1086-1087; Revenue Act of 1921, ch. 136, § 257, 42 Stat. 227, 270.

[27] *See* S. Res. 180, 68th Cong., 65 Cong. Rec. 3299 (1924) (requesting the returns); 65 Cong. Rec. 3699-3702 (1924) (setting out President Coolidge's initial response).

preferential treatment to Mellon and his businesses.[28]  Congress also recognized that access to

tax return information would assist its legislative responsibilities.  As Senator George Norris

explained, access to tax returns would "enable [Congress] to legislate correctly and to finally get

a law without loopholes."[29]

   In 1924, therefore, Congress passed and President Coolidge signed the precursor to

Section 6103(f), which provided that the Congressional tax committees "shall have the right to

call on the Secretary of the Treasury" for tax return information and that it "shall be [the

Secretary's] duty to furnish[] any data of any character contained in or shown by the returns."[30]

As detailed below, pp. 36-38, *infra*, Congress used that provision (as later codified in Section

6103(f) of the Internal Revenue Code) when it investigated the tax returns of President Nixon.

   In 1976, following revelations of wrongdoing by President Nixon and White House

officials, Congress overhauled the tax code's confidentiality provisions.[31]  Congress restricted

the President's control over access to tax returns and amended Section 6103 to provide that

taxpayer returns "shall be confidential," unless one of thirteen exceptions applies.  26 U.S.C.

§ 6103(a), (c)-(o).  In Section 6103(f), Congress specifically retained the mandatory disclosure

obligation that it had imposed on Treasury a half century earlier.

---

[28] *See, e.g.,* 65 Cong. Rec. 6196 (1924) (statement of Sen. Reed) (explaining that the committee inquired into Secretary Mellon's tax information because "if it should be found that he had discriminated in favor of himself it would have immediately afforded reason for a demand that he should be ousted from [his] office"); *id.* at 6196-97 (statement of Sen. McKellar) (questioning whether Secretary Mellon had appropriately disposed of stock before taking office).

[29] 65 Cong. Rec. 7677 (1924).  *See also, e.g., id.* at 2919 (statement of Rep. Jacobstein) ("If Congress had access to such data, it could more intelligently draft a corporation income tax law."); *id.* at 2953 (statement of Rep. Frear) (Congress "ought to have information on which to draw bills and fix rates.").

[30] Revenue Act of 1924, Pub. L. 68-176, § 257(a), 43 Stat. 253, 293.

[31] *See* Tax Reform Act of 1976, Pub. L. No. 94-455, 90 Stat. 1520; *Electric Privacy Info. Ctr.*, 910 F.3d at 1235.

The Committee has frequently relied on Section 6103(f) to obtain information relevant to its legislative and oversight functions—including tax returns and return information concerning specific individuals and entities.  For example, the Committee has employed Section 6103(f) to review returns and return information of the following:[32]

- A Member of Congress;

- Multiple individual taxpayers related to IRS gift tax examinations;

- Individuals, estates, and other taxpayers owing more than $100 million in taxes, when questions pertaining to tax law enforcement and the soundness of IRS tax administration came to the Committee's attention;

- Individuals with unpaid tax liabilities, where the Committee was investigating the IRS's use of private debt collectors to collect unpaid federal income tax;

- Individuals and businesses contracting with the federal government, where the Committee was reviewing the IRS's failure to implement procedures to seize contract payments even though the agency possessed the authority to do so;

- Nonprofit organizations whose applications for tax-exempt status were subject to heightened scrutiny allegedly based on their political affiliations, during the Committee's investigation of the processing of these applications by the IRS;

- Foreign-owned distributors within the U.S. of automobiles, motorcycles, and electronics equipment, where the Committee was investigating the IRS's international enforcement program and international tax-avoidance schemes;

---

[32] *See* Tatelman Decl. Ex. OO (Memorandum from Chairman Richard E. Neal to the Members of the Committee on Ways and Means, Re: Historical Use of Authority to Obtain Confidential Tax Information. (July 25, 2019)).

- More than 200 large, tax-exempt organizations, where the Committee was investigating the IRS's audit and enforcement process for these organizations and the salaries of their top executives;

- Individuals who made cash payments of more than $10,000 to purchase automobile and consumer goods as well as the merchants involved, as part of the Committee's review of the IRS's administration of tax laws related to the filing of returns connected to business transacted in cash;

- Companies, including banks and automotive manufacturers, that received funds from Treasury's Troubled Asset Relief Program (TARP), where the Committee was investigating unpaid federal income or employment taxes of program recipients;

- Individuals engaging in tax refund fraud, where the Committee was investigating IRS procedures to detect and prevent such fraud; and

- Small businesses, where the Committee was investigating the IRS's use of civil procedures to seize bank accounts of such businesses believed to be structuring their deposits to avoid Bank Secrecy Act reporting requirements.[33]

The Committee is not aware of any instance other than the current one in which either Treasury or the IRS has failed to comply with the plain language of Section 6103(f)(1) and failed to disclose to the Committee return information it requested.[34]

---

[33] The Senate Finance Committee, the Joint Committee on Taxation, and committees specifically authorized pursuant to Section 6103 have also acquired returns and return information of particular individuals and organizations pursuant to Section 6103(f). *See, e.g.*, *Inquiry into the Matter of Billy Carter and Libya: Hearings Before the Subcomm. to Investigate the Activities of Individuals Representing the Interests of Foreign Gov'ts*, Vol. III-Appendix, 96th Cong., 2d Sess., Serial No. 96-8, at 1666-1701 (1981) (describing use of Section 6103 to gain access to returns and return information of sitting President's brother).

## 2.     The Committee's Requests And Defendants' Refusals

On April 3, 2019, the Committee, through Chairman Richard Neal, requested that the IRS provide it the tax returns and related information of President Trump and eight related entities for tax years 2013 through 2018.[35]  Although the Committee is not required by Section 6103(f) to provide a reason for a request, Chairman Neal explained that "the Committee is considering legislative proposals and conducting oversight related to our Federal tax laws, including, but not limited to, the extent to which the IRS audits and enforces the Federal tax laws against a President."[36]

Defendants' unwillingness to comply with these lawful requests was evident from the beginning.  On April 7, 2019, Acting White House Chief of Staff Mick Mulvaney announced that the Committee would "never" receive President Trump's tax return information.[37]  On April 10, 2019, the date the Committee had asked that the information be produced, Treasury Secretary Mnuchin—rather than Commissioner Rettig, to whom the Committee had sent its request—responded that Treasury would not meet the deadline because it had "begun consultations with

---

[34] The Internal Revenue Manual states that a committee request under Section 6103(f) "must receive high priority" and the requested return and return information should be "furnished expeditiously."  *Processing Requests for Disclosure*, I.R.M. 11.3.4.4(4) (May 20, 2005), https://tinyurl.com/I-R-M-11-3-4-4.

[35] Tatelman Decl. Ex. A (Letter from Chairman Neal to Comm'r Rettig (Apr. 3, 2019)).

[36] *Id.* at 1. *See also* Tatelman Decl. Ex. B (Press Release, Ways & Means Committee, Neal Statement on Requesting President Trump's Tax Returns (Apr. 3, 2019), https://tinyurl.com/NealStatement ("The Ways and Means Committee in particular has a responsibility to conduct oversight of our voluntary Federal tax system and determine how Americans—including those elected to our highest office—are complying with those laws. It is also our duty to evaluate the operation of the Internal Revenue Service in its administration and enforcement of the tax laws.")).

[37] *Exclusive: Mick Mulvaney on President Trump's border security push, growing tensions with House Democrats*, Fox News (Apr. 7, 2019, 12:01), http://tinyurl.com/MulvaneyFoxNews.

the Department of Justice to ensure that [its] response is fully consistent with the law and the Constitution."[38]

On April 13, 2019, the Committee reiterated its Section 6103(f) request in another letter to Commissioner Rettig.  The Committee explained the importance of the material for the Committee's consideration of "legislative proposals and oversight related to our Federal tax laws, including, but not limited to, the extent to which the IRS audits and enforces the Federal tax laws against a President," and set a new deadline of April 23, 2019.[39]  On that date, Secretary Mnuchin informed the Committee that Treasury was continuing to confer with the Department of Justice.  Secretary Mnuchin claimed that "the Committee's stated interest in 'the extent to which the IRS audits and enforces the Federal tax laws against a President' is difficult to accept on its face," and that the Committee's real purpose was not to further its legislative and oversight interests, but to release the President's returns "for the sake of exposure."[40]

On May 6, 2019, Secretary Mnuchin wrote to Chairman Neal with Treasury's final decision.  According to the Secretary, "[i]n reliance on the advice of the Department of Justice, I have determined that the Committee's request lacks a legitimate legislative purpose, and pursuant to [S]ection 6103, the Department is therefore not authorized to disclose the requested returns and return information."[41]

---

[38] Tatelman Decl. Ex. D (Letter from Sec'y Mnuchin to Chairman Neal, at 2 (Apr. 10, 2019)).  That same day, President Trump claimed that there is "no law" requiring disclosure of his returns, and stated, "I would love to give them, but I'm not going to do it while I'm under audit.  It's very simple."  Tatelman Decl. Ex. PP (*Remarks by President Trump Before Marine One Departure*, White House (Apr. 10, 2019), https://tinyurl.com/TrumpMarineOne).

[39] Tatelman Decl. Ex. E (Letter from Chairman Neal to Commissioner Rettig (Apr. 13, 2019)).

[40] Tatelman Decl. Ex. G (Letter from Sec'y Mnuchin to Chairman Neal, at 3-4 (Apr. 23, 2019)).  Commissioner Rettig responded to the Committee the same day in similar fashion.  *See* Tatelman Decl. Ex. H (Letter from Comm'r Rettig to Chairman Neal (Apr. 23, 2019)).

[41] Tatelman Decl. Ex. I (Letter from Sec'y Mnuchin to Chairman Neal (May 6, 2019)).

### 3.      The Committee's Subpoenas

In light of Defendants' refusals, and pursuant to the Committee's authority under House Rule XI.2(m)(3)(A)(i), Chairman Neal issued subpoenas to Secretary Mnuchin and Commissioner Rettig, directing each to produce information virtually identical to what the Committee had sought under Section 6103(f).[42]  In letters to the Secretary and Commissioner accompanying the subpoenas, Chairman Neal explained that, "[a]mong other considerations, the Committee wants to be sure that IRS employees who determine the scope of the President's audit, or who determine whether to continue previously-initiated audits, are protected in the course of their work."[43]  Chairman Neal also explained how the "tax issues raised by the current President" are "markedly different" from his predecessors: "[t]he continuous audit and activities from 2008 and before, the use by the President of a grantor trust controlling hundreds of businesses, and the volume of his tax returns."[44]  Chairman Neal also stated publicly that the Committee was continuing its "investigation into the mandatory audit program at the IRS in an effort to assess the extent to which the IRS audits and enforces the federal tax laws against a sitting President and to determine if those audits need to be codified into federal law."[45]

On May 17, 2019, Secretary Mnuchin and Commissioner Rettig separately responded that they would not comply with the subpoenas.[46]  Secretary Mnuchin stated that, "[i]n reliance on the advice of the Department of Justice, we have determined that the Committee's request lacks a legitimate legislative purpose, and pursuant to Section 6103, the Department is therefore

---

[42] Tatelman Decl. Exs. K and L (Subpoenas from Committee to Sec'y Mnuchin and Comm'r Rettig (May 10, 2019)).

[43] Tatelman Decl. Exs. K and L (Letters from Chairman Neal to Comm'r Rettig and Sec'y Mnuchin, at 2 (May 10, 2019)).

[44] *Id.* (footnote omitted).

[45] Tatelman Decl. Ex. M (Press Release, Neal Issues Subpoenas to Treasury Sec'y and IRS Comm'r (May 10, 2019)).

[46] Tatelman Decl. Ex. N (Letter from Sec'y Mnuchin to Chairman Neal (May 17, 2019)); Tatelman Decl. Ex. O (Letter from Comm'r Rettig to Chairman Neal (May 17, 2019)).

not authorized to disclose the requested returns and return information."[47]  Commissioner Rettig

similarly responded that the IRS was "precluded by law" from providing the information.[48]

### C.    Concerns About The Presidential Audit Program

Commissioner Rettig's May 17 letter included comments about the IRS's audits of

Presidents' tax returns that only underscored the Committee's need for the requested documents.

For example, Commissioner Rettig highlighted that the "scope and depth of the examination is

determined by the revenue agent [assigned to the audit], based on established risk protocols."[49]

Those "risk protocols," in turn, provide that the extent of an audit should be determined based on

a mix of "experience, judgment, and objective analysis," and that an audit may be closed mid-

audit if the IRS agent assigned to the matter finds it is "not in the government's best interest to

continue."[50]  In addition, according to Commissioner Rettig, an audit of a President's return,

"where warranted … can be expanded to include related or prior year returns."[51]  Commissioner

Rettig's statements thus indicate that the IRS audit program is subject to a high degree of

discretion and may not be suited to the complicated issues presented by this President's tax

returns.

On June 10, 2019, upon the Committee's acceptance of the Secretary's offer of a

briefing, Treasury and IRS officials met with a bipartisan group of Committee staff to discuss the

IRS audit program.  None of the officials who attended had ever been involved in a mandatory

---

[47] Tatelman Decl. Ex. N.

[48] Tatelman Decl. Ex. O at 1.  On July 24, 2019, the House adopted a resolution expressly ratifying investigations and subpoenas issued by any standing committee, including the Committee on Ways and Means, pursuant to its jurisdiction concerning "the President" and "his business entities and organizations"—specifically including "tax information."  *See* H. Res. 507, 116th Cong. (2019); H. Res. 509, 116th Cong. (2019).

[49] Tatelman Decl. Ex. O at 1-2 (citing *Risk Analysis*, I.R.M. 4.10.3.2 (Feb. 26, 2016), https://tinyurl.com/I-R-M-4-10-3-2).

[50] *Risk Analysis*, I.R.M. 4.10.3.2; Mid-Audit Decision Point (50% Rule), I.R.M. 4.10.3.2.2(4) (Feb. 26, 2016), https://tinyurl.com/I-R-M-4-10-3-2-2.

[51] Tatelman Decl. Ex. O at 2.

Presidential audit.  They declined to answer all questions relating to the actual audits of any

Presidents, including basic questions such as how long those audits generally take or whether

there have ever been any assessments made to Presidential returns.[52]  The officials acknowledged

that the IRS Manual's provisions on audits of Presidents' returns are outdated and diverge from

current practice.[53]

The briefing raised more concerns for the Committee about the IRS audit program.  For

example, the officials reported that the program lacks procedures for handling a President's

grantor trust, the financial instrument President Trump has reportedly used to organize his assets

(eschewing the blind trust arrangement Presidents typically use and that the Manual explicitly

contemplates).[54]  The officials also stated that a single IRS agent generally has substantial

discretion in auditing a President's tax returns, raising concerns about the absence of safeguards

to protect the audit process from improper political influence.[55]   The Committee's concerns are

particularly acute because the Manual calls for contact between the IRS agent and the President's

representative at the beginning of the examination.  *See, e.g.*, I.R.M 3.28.3.4.3; 4.2.1.15.

On June 28, 2019, Chairman Neal notified Secretary Mnuchin and Commissioner Rettig

that the briefing had "reinforced the Committee's need to review the actual return information as

part of our oversight duties."[56]  Chairman Neal explained that review of the returns and audit-file

information was necessary to "evaluate the accuracy of the President's claims about the audit

system, assess the fairness and effectiveness of the audit program and the scope of the audits

---

[52] Tatelman Decl. Ex. P at 1-2 (Letter from Chairman Neal to Sec'y Mnuchin and Comm'r Rettig (June 28, 2019)).
    [53] *Id.* at 1.
    [54] *Id.* at 2.
    [55] *Id.*
    [56] *Id.*

being performed on the President's returns,"[57] and "understand how particular provisions of the [tax code] are being enforced as part of the IRS's review."[58]

Since that time, the Committee has received additional information reinforcing its concern that the process for auditing Presidents' tax returns may be subject to improper influence.  On July 29, 2019, the Committee received an unsolicited communication from a federal employee setting forth credible allegations of "evidence of possible misconduct"— specifically, potential "inappropriate efforts to influence" the mandatory audit program.[59]  On August 8, 2019, Chairman Neal wrote to Secretary Mnuchin, asking him to produce records relating to those allegations by August 13.[60]  On August 13, Secretary Mnuchin did not produce any records, but rather stated that Treasury had no responsive records "covered under section 6103(f)" and suggested that Chairman Neal direct his concerns to the Treasury Inspector General for Tax Administration.[61]

## SUMMARY OF ARGUMENT

I.     The Committee has standing to bring this suit because Defendants' noncompliance with the Committee's lawful requests and subpoenas has deprived the Committee of information to which it is entitled and which is necessary to perform its legislative and investigatory functions.  These informational and institutional injuries are directly traceable to Defendants' unprecedented refusal to comply with the Committee's valid requests and subpoenas.

---

[57] *Id.*

[58] *Id.*

[59] Tatelman Decl. Ex. QQ (Letter from Chairman Neal to Sec'y Mnuchin (Aug. 8, 2019)).

[60] *Id.*

[61] Tatelman Decl. Ex. RR (Letter from Sec'y Mnuchin to Chairman Neal (Aug. 13, 2019)).  The Committee is prepared, upon order of the Court, to submit to the Court *ex parte* and *in camera* the materials that led to Chairman Neal's request of August 8.

II.    The Committee is entitled to the requested tax returns and return information as a matter of law, for several reasons.  *First*, 26 U.S.C. § 6103(f)(1) explicitly requires the Secretary to provide tax return information upon request of the Committee.  There is no room in the plain language of the statute for the Secretary to conduct his own assessment of the validity of the Committee's request.  The statute is mandatory and unequivocal.

*Second*, Article I of the Constitution vests Congress with broad investigatory powers. Essential to the power to investigate is the power to use compulsory process—including subpoenas—to obtain the information Congress and its committees may need in carrying out their functions.  Defendants have no authority under Section 6103(f) or otherwise to refuse to comply with a validly issued request based on their determination that the Committee lacks a legitimate legislative purpose.  In any event, the Committee has amply demonstrated that the information it seeks is vital to numerous legislative and oversight purposes.  Defendants' objections based on the supposed lack of "fit" between the Committee's purposes and the materials sought and on their assessment that the Committee's true motive is "exposure for the sake of exposure" are baseless.

III.   The Committee's constitutional authority to subpoena the requested information entitles it to declaratory and injunctive relief to enforce its validly issued subpoenas.  The Administrative Procedure Act (APA) also entitles the Committee to relief.  Defendants' refusal to comply with the Committee's Section 6103(f) request was contrary to law and arbitrary and capricious in numerous ways.  Defendants' conclusion that the Secretary was authorized to refuse a facially valid Congressional request relied on an erroneous view of the law—that the Secretary could inquire into any alleged ulterior motives forming the basis of the Committee's request and refuse to comply on that basis.  And Defendants' noncompliance with the

Committee's Section 6103(f) request and subpoenas was both in excess of Defendants' statutory

jurisdiction or authority and contrary to the Committee's constitutional powers and rights

because it impeded the Committee's ability to discharge its constitutional obligations relating to

lawmaking and agency oversight.  For similar reasons, the Secretary is entitled to the requested

information under Section 706(1) of the APA and the mandamus statute, 28 U.S.C. § 1361,

because the Secretary had a clear, nondiscretionary duty to provide the Committee with the

information.  Finally, the Committee is entitled to non-statutory review of Defendants' flouting

of Section 6103, based on the well recognized principle that Congress expects the courts to grant

relief when an executive agency violates statutory commands.

## STANDARD OF REVIEW

Summary judgment is warranted when there is "no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." *Aguiar v. DEA*, 865 F.3d 730, 734

(D.C. Cir. 2017) (quoting Fed. R. Civ. P. 56(a)).  When agency action is at issue, "[s]ummary

judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is

supported by the administrative record and consistent with the APA standard of review." *Public

Emps. for Envt'l. Responsibility v. Beaudreau*, 25 F. Supp. 3d 67, 94 (D.D.C. 2014) (internal

quotation marks and citation omitted).  In a case involving review under the APA, the district

court "is to determine whether or not as a matter of law the evidence in the administrative record

permitted the agency to make the decision it did." *American Bar Ass'n v. U.S. Dep't of Educ.*,

370 F. Supp. 3d 1, 17 (D.D.C. 2019) (internal quotation marks omitted).

## ARGUMENT

## I.    THE COMMITTEE HAS STANDING TO BRING THIS ACTION

The Committee has standing to seek enforcement of its Section 6103(f) requests and

subpoenas.  To establish its right to sue, the Committee must show that it has suffered a

"concrete and particularized" injury "fairly traceable to the challenged action" and "redressable by a favorable ruling." *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2663 (2015). Those requirements are easily satisfied here.

*First*, Defendants' refusal to comply with the Committee's Section 6103(f) request has injured the Committee by depriving it of information to which it is legally entitled. As the Supreme Court has made clear, "[a] plaintiff suffers an 'injury in fact' when the plaintiff fails to [receive] information which must be … disclosed pursuant to a statute." *FEC v. Akins*, 524 U.S. 11, 21 (1998). Section 6103(f)(1) grants the Committee a right to obtain returns and return information from the Treasury Secretary "[u]pon written request from the [Committee's] chairman." 26 U.S.C. § 6103(f)(1). On April 3, 2019, the Committee's chairman requested the relevant returns and return information in accordance with Section 6103(f). Defendants have refused to comply. Their refusal has harmed and continues to harm the Committee, by depriving it of information to which it is statutorily entitled, and without which its exercise of its legislative and oversight functions are impeded. *See U.S. House of Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76, 85 (D.D.C. 1998) (House of Representatives had standing to challenge action that would deprive it of information to which it was entitled by statute).

For instance, as set forth above, *see supra* at p. 15, the Committee is currently "considering legislative proposals and conducting oversight related to our Federal tax laws, including, but not limited to, the extent to which the IRS audits and enforces the Federal tax laws against a President."[62] The Committee needs the requested information to evaluate the integrity of the IRS's existing program for auditing Presidents' tax returns—a need only heightened by the Committee's receipt of whistleblower allegations about improper influence in that program, *see*

---

[62] Tatelman Decl. Ex. A.

p. 19, *supra*—as well as whether changes should be made to existing law on several topics, including possible codification of that audit program, whether Presidents' tax returns should be required by law to be publicly disclosed, and whether various tax provisions that President Trump might have used improperly to his advantage should be revised, *see* pp. 3-6, *supra*.  The Committee's injury—being deprived of that information—is directly traceable to Defendants' refusal, and a ruling affirming the validity of the Committee's requests and directing Defendants to comply will redress the Committee's injuries.

*Second*, Defendants' refusal to comply with the Committee's subpoenas has inflicted institutional injuries on the Committee and, by extension, on the House by preventing them from carrying out their constitutionally assigned legislative and oversight responsibilities.  Article I of the Constitution grants each House of Congress the power to use compulsory process to obtain information from third parties, including Executive Branch officials, that may aid it in carrying out its legislative and oversight responsibilities.  As the Supreme Court has observed, that power is essential if Congress is to fulfill its constitutional duties to legislate effectively and to serve as a check on the Executive Branch.  *See McGrain v. Daugherty*, 273 U.S. 135, 175 (1927).  Each House of Congress has broad authority to "obtain the facts needed for intelligent legislative action," and all citizens have an "unremitting obligation to respond to subpoenas" and "to testify fully" in response to congressional demands.  *Watkins v. United States*, 354 U.S. 178, 187-88 (1957).

Each House of Congress may exercise this power directly or may delegate it to its committees.[63]  Pursuant to its rulemaking authority, the House of Representatives conferred on

---

[63] *See* U.S. Const., art. I, § 5 ("Each House may determine the Rules of its Proceedings."); *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 505 (1975) ("[T]he subpoena power may be exercised by a committee acting, as here, on behalf of one of the Houses.").

the Committee jurisdiction over "[r]evenue measures generally," and the "[d]eposit of public

monies," encompassing the Treasury, the IRS, and all aspects of the Nation's tax laws and their

administration; the House also delegated it express authority to subpoena information that may

further its legislative and oversight functions within that domain.  *See* House Rules X.1(t)(3),(6),

XI.2(m)(1)(B).  Exercising that authority, the Committee subpoenaed the relevant returns and

return information to aid its oversight of the IRS and its consideration of tax code reforms.

Defendants' noncompliance has harmed the Committee and the House by impeding the

exercise of its constitutional functions.  The D.C. Circuit and judges of this Court have

recognized that in such a circumstance, a House of Congress or its committee may sue to enforce

a subpoena.[64]

The Supreme Court's decision in *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct.

1945 (2019), does not suggest a different result.  There, the Court held that "a single House of a

bicameral [state] legislature lacks capacity to assert interests belonging to the legislature *as a*

*whole*"—in particular, the interest in sustaining the constitutionality of its enacted legislation.  *Id.*

at 1953-54 (emphasis added).   But this case involves an injury to interests held by each body of

Congress and its committees *separately*—the statutory right to obtain information under Section

6103(f), and the constitutional power to investigate and gather facts.  Under these circumstances,

the House, or a duly authorized committee, may sue to vindicate its institutional interests.  *See*

---

[64] *See United States v. American Tel. & Tel. Co.*, 551 F.2d 384, 390-91 (D.C. Cir. 1976)
("[T]he House as a whole has standing to assert its investigatory power."); *Senate Select Comm.*
*on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 727 (D.C. Cir. 1974) (en banc)
(reaching the merits in a suit brought by the Senate Select Committee on Presidential Campaign
Activities to enforce a subpoena); *Committee on Judiciary, U.S. House of Representatives v.*
*Miers*, 558 F. Supp. 2d 53, 71 (D.D.C. 2008) (House committee had standing to seek
enforcement of a subpoena based on "both the loss of information to which [the committee was]
entitled and the institutional diminution of [the committee's] subpoena power"); *see also*
*Committee on Oversight and Government Reform v. Holder*, 979 F. Supp. 2d 1, 10-11 (D.D.C.
2013) (similar).

*also Arizona State Legislature*, 135 S. Ct. at 2664 (state legislature had standing to sue as "an

institutional plaintiff asserting an institutional injury").[65]

## II.   THE COMMITTEE IS ENTITLED TO THE REQUESTED TAX RETURNS AND RETURN INFORMATION

### A.   The Committee Is Entitled To The Requested Tax Returns And Return Information Under 26 U.S.C. § 6103(f)(1)

Section 6103(f) is clear:  "Upon written request from the chairman of the Committee on

Ways and Means of the House of Representatives, … the Secretary *shall furnish* such committee

with any return or return information specified in such request."   26 U.S.C. § 6103(f)(1)

(emphasis added).  Courts ordinarily interpret the use of the word "shall" as imposing a

mandatory duty on the subject.[66]  Thus, Section 6103(f)'s mandatory language imposes a

nondiscretionary duty on the part of the Secretary to furnish such records when requested.  *See In*

*re United States*, 817 F.3d 953, 961 (6th Cir. 2016) (under Section 6103(f), "the IRS *must*

disclose returns and return information to Congressional committees upon written request"

---

[65] This Court recently concluded that the House of Representatives lacked standing to challenge the Executive Branch's use of certain funds to build a wall along the United States' border with Mexico.  *See U.S. House of Representatives v. Mnuchin*, 379 F. Supp. 3d 8 (D.D.C. 2019), *appeal pending*, No. 19-5176 (D.C. Cir.).  In so doing, the Court expressly distinguished the subpoena-enforcement context and observed that "the House's power to investigate has been enforced with periodic help from federal courts."  *Id.* at 16-17.

This lawsuit has been authorized by the House, acting through its Bipartisan Legal Advisory Group (BLAG).  *See* House Rule II.8(b) ("Unless otherwise provided by the House, the [BLAG] speaks for, and articulates the institutional position of, the House in all litigation matters."); *see also* H. Res. 430, 116th Cong. (2019).

In addition, on July 24, 2019, the House voted to "ratif[y] and affirm[]" the investigations and related subpoenas for "tax information related to the President, his immediate family, and his business entities and organizations" that are "concerning or issued directly or indirectly to … any Federal [government entity] seeking information involving, referring, or related to" either "the President in his personal or official capacity" or his "business entities, or organizations."  H. Res. 507.

[66] *See EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 509 (2014) (use of "shall" indicates that the "statute speaks without reservation"); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("the mandatory 'shall' … normally creates an obligation impervious to judicial discretion"); *American Hosp. Ass'n v. Burwell*, 812 F.3d 183, 190 (D.C. Cir. 2016) ("[A]s to clear duty, the statute uses the typically mandatory 'shall.'").

(emphasis added)).[67]  Moreover, Section 6103(f)(1) does not require the Committee to state any purpose when requesting tax returns or return information; rather, the Secretary is required to produce the information to the Committee upon the Chairman's written request, with no other prerequisites.

Section 6103(f)(1) stands in contrast with other provisions in Section 6103, some of which—purposefully using the term "may" rather than "shall"—grant the Secretary *discretion*, but do not impose an *obligation*, to disclose tax returns and return information in certain circumstances.  *See, e.g.,* 26 U.S.C. § 6103(g)(2) (Secretary "*may* disclose … return information" to certain officials if individual is being considered for appointment to federal office), § 6103(i)(3)(B)(i), (ii) (Secretary "*may* disclose return information" to prevent death, physical injury, or flight from federal prosecution) (emphases added).  It also contrasts with other provisions that require the Secretary to produce information to Congressional committees but, unlike Section 6103(f)(1), also require those committees to state their purpose for requesting the information.  *See, e.g.,* 26 U.S.C. § 6103(f)(3) (Secretary must provide tax return information to Congressional committees (other than the tax committees) upon a resolution that "*shall specify the purpose* for which the return or return information is to be furnished[.]" (emphasis added)).

The statutory context of Section 6103(f)(1) therefore makes clear that the Committee is not required to state a purpose for requesting tax returns and return information and that the Secretary has no authority to refuse such a request.  The mandatory nature of Section 6103(f) has

_____

[67] The statute has always spoken in such mandatory terms.  *See* Revenue Act of 1924, ch. 234, Pub. L. No. 68-176, § 257(a), 43 Stat. 253, 293 ("Committee on Ways and Means … shall have the right to call on the Secretary of the Treasury" for tax return information and it is the Secretary's "duty to furnish" such information).  In 1976, when Congress revised the tax code's confidentiality provisions, it specifically retained the mandatory disclosure obligation under Section 6103(f).  Congress kept its right to obtain tax return information intact to ensure that Congress could "carry out its legislative responsibilities."  S. Rep. No. 94-938, pt. 1, at 319 (1976).

been borne out in practice; the Committee is not aware of a single instance—other than the one

at issue here—in which Treasury or the IRS has failed to comply with a Section 6103(f) request

by the Committee.[68]

In refusing to comply with the Committee's Section 6103(f) request, the Secretary

asserted that a request for returns and return information of a President is "unprecedented."[69]

The Secretary is mistaken.  As further detailed below, pp. 37-39, in 1973 and 1974, the Joint

Committee on Taxation undertook an investigation of President Nixon's tax returns for the years

1969 to 1972, and of the IRS's auditing of those returns.[70]  Although President Nixon voluntarily

disclosed his returns for those years to the Joint Committee, the Joint Committee used its

authority under a prior version of Section 6103 to obtain from the IRS many other documents

subject to Section 6103's confidentiality restrictions, including certified copies of the President's

returns filed with the IRS, the President's returns from prior years, material used in the audit of

the President's returns, and returns of Nixon family members.[71]  Far from the Committee's use

of Section 6103 being novel, it is the Secretary's refusal to comply that is unprecedented.

---

[68] *See* Tatelman Decl. Ex. SS (House Committee on Ways and Means, Frequently Asked Questions, Chairman Neal's Section 6103 Request, at 4 (Apr. 3, 2019)).

[69] Tatelman Decl. Ex. G at 2.

[70] *See* Joint Committee on Internal Revenue Taxation, *Examination of President Nixon's Tax Returns for 1969 Through 1972*, S. Rep. No. 93-768, 93d Cong., 2d Sess. (1974) ("Joint Tax Committee Nixon Report").

[71] *See* Tatelman Decl. Ex. OO (attaching letters from Thomas A. Barthold, Chief of Staff, Joint Comm. on Taxation, to Chairman Neal (July 23, 2019); and attachments to second Barthold Letter: (i) highlighted excerpts from Joint Tax Committee Nixon Report at 3-4, 10-12, 41-42, 113, 118, 155, 209; (ii) Letter from Laurence N. Woodworth, Chief of Staff, Joint Comm. on Internal Revenue Taxation, to Hon. Donald C. Alexander, Comm'r, IRS (Dec. 13, 1973); (iii) Letter from Donald C. Alexander, Comm'r, IRS, to Laurence N. Woodworth, Chief of Staff, Joint Comm. on Internal Revenue Taxation (Dec. 13, 1973); (iv) Letter from Laurence N. Woodworth, Chief of Staff, Joint Comm. on Internal Revenue Taxation, to Hon. Donald C. Alexander, Comm'r, IRS (Jan. 31, 1974); (v) Letter from Donald C. Alexander, Comm'r, IRS, to Laurence N. Woodworth, Chief of Staff, Joint Comm. on Internal Revenue Taxation (Feb. 11,

**B.** **The Committee Is Entitled To The Requested Tax Returns And Return Information Under Article I Of The Constitution**

**1.** **The Committee Has Broad Authority To Conduct Investigations Related To Any Of Its Legitimate Legislative Functions**

a. The Constitution vests Congress with broad investigative powers. As the Supreme Court has held on numerous occasions, Congress's "power of inquiry … is an essential and appropriate auxiliary to the legislative function." *McGrain*, 273 U.S. at 174. "[T]he power to investigate is inherent in the power to make laws," and "the scope of [Congress's] power of inquiry … is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 & n.15 (1975) (internal quotation marks omitted); *see In re Chapman*, 166 U.S. 661, 669 (1897).

Since the Nation's founding, Congress has employed its powers of inquiry "over the whole range of the national interests concerning which Congress might legislate or decide upon due investigation not to legislate." *Barenblatt v. United States*, 360 U.S. 109, 111 (1959); *see McGrain*, 273 U.S. at 161 (noting House's 1792 appointment of a select committee to investigate a failed military expedition and authorization of the committee to "send for necessary persons, papers and records"). The Supreme Court has emphasized that "[t]here can be no doubt as to the power of Congress, by itself or through its committees, to investigate matters and conditions relating to contemplated legislation." *Quinn v. United States*, 349 U.S. 155, 160 (1955). And in exercising that power, a committee need not be considering particular bills or legislative proposals, but may inquire into any "subject … on which legislation could be had." *McGrain*, 273 U.S. at 177.

---

1974); Letter from Laurence N. Woodworth, Chief of Staff, Joint Comm. on Internal Revenue Taxation, to Sen. Carl T. Curtis (Mar. 30, 1974)).

An essential component of the Congressional power of inquiry is the power to use compulsory process—including subpoenas—to obtain information that may aid Congress in exercising its legislative and oversight functions.  As the Supreme Court recognized long ago, those possessing information relevant to Congress's functions may not be willing to provide it voluntarily, and Congress's ability to exercise its powers cannot be stymied by obstruction:

> A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information—which not infrequently is true—recourse must be had to others who do possess it.  Experience has taught that mere requests for such information often are unavailing, and also that information which is volunteered is not always accurate or complete; so some means of compulsion are essential to obtain what is needed.

*McGrain*, 273 U.S. at 175.

Each House of Congress possesses this investigative power separately, and each may delegate that power to committees and subcommittees.  *See Eastland*, 421 U.S. at 505.  As relevant here, the House has empowered the Committee to "conduct at any time such investigations and studies as it considers necessary or appropriate in the exercise of its responsibilities."  House Rule XI.1(b)(1).  To ensure that the Committee may exercise those functions fully, the House has further authorized the Committee to "require, by subpoena or otherwise, … the production of such books, records, correspondence, memoranda, papers, and documents as it considers necessary."  House Rule XI.2(m)(1)(B).  The Committee is therefore vested with the House's full constitutional authority to require Executive Branch officials to furnish it with any information that may assist the Committee in legislating or conducting oversight with respect to tax policy and administration.

b.   Although Congress's investigative power is extensive, it is not unlimited, and the

Supreme Court has articulated several principles defining the narrow circumstances in which

parties may lawfully refuse to comply with Congressional demands for information:

*First*, Congress's "'far-reaching'" powers of investigation extend at least to two "broad"

areas of inquiry: (i) "[any] subject … 'on which legislation could be had,'" *Eastland*, 421 U.S. at

504 n.15, and (ii) the conduct of Executive Branch officials and employees in their

"administration of existing laws," *Watkins*, 354 U.S. at 187.

*Second*, the investigatory powers of Congress and its committees are subject to

limitations derived from the Constitution.  The Supreme Court summarized those constraints in

*Quinn v. United States*:

> [T]he power to investigate … [i] cannot be used to inquire into private affairs
> unrelated to a valid legislative purpose.  [ii] Nor does it extend to an area in which
> Congress is forbidden to legislate.  [iii] Similarly, the power to investigate must
> not be confused with any of the powers of law enforcement; those powers are
> assigned under our Constitution to the Executive and the Judiciary.  [iv] Still
> further limitations on the power to investigate are found in the specific individual
> guarantees of the Bill of Rights, such as the Fifth Amendment's privilege against
> self-incrimination.

349 U.S. at 162.

*Third*, the Supreme Court has emphasized that, even when the propriety of a

Congressional inquiry is challenged, "a solution to our problem is not to be found in testing the

motives of committee members for this purpose. … Their motives alone would not vitiate an

investigation which had been instituted by a House of Congress if that assembly's legislative

purpose is being served."  *Watkins*, 354 U.S. at 200; *see Barenblatt*, 360 U.S. at 132-33.  This

principle applies to the Executive Branch no less than to the Judiciary.

A straightforward application of these principles demonstrates that Defendants' defiance

of the Committee's requests and subpoenas was unlawful.  The record in this case—whether the

record of official Congressional documents related to the Committee's investigation that may be properly considered by the Court, or even the compilation of political and media commentary contrived by Defendants to justify their refusals—demonstrates that the Committee's requests and subpoenas serve purposes the Supreme Court has repeatedly approved as legitimate and did not overstep any constitutional limitations on legislative investigations.

But Defendants' actions were unlawful for yet another reason.  The methods they employed to question the legitimacy of the Committee's requests were themselves improper. Rather than confining themselves—as due respect for Congress's investigative role and judicial precedent requires—to the appropriate Congressional sources for assessing the legislative purposes for an investigation, Defendants ranged widely, and inappropriately, to gather material that, in their view, ascribes a political motivation to the investigation and thus rationalizes their noncompliance.  In so doing, Defendants departed dramatically from the proper function of an Executive Branch agency that receives facially valid requests for information from Congress and usurped to themselves a role of second-guessing legislative motivation that does not belong to them.  Far from justifying their noncompliance, Defendants' rationales for rejecting the Committee's requests were themselves contrary to law.

### 2. The Committee's Requests And Subpoenas Relate To Legitimate Legislative Purposes

a.  The Committee's requests and subpoenas are designed to advance numerous legitimate purposes with respect both to possible legislation and to oversight of how Executive Branch officials—here, in the IRS and Treasury—are carrying out their responsibilities under current law.

It bears emphasis, again, that the Supreme Court has repeatedly admonished courts not to look beyond the official record of a Congressional investigation to determine whether the

investigation was impelled by an illicit motive.  Rather, the Court has emphasized, courts should

consider whether the investigation was one that Congress or a committee had the *power* to

undertake:

> Nor can we accept the further contention that this investigation should not be
> deemed to have been in furtherance of a legislative purpose because the true
> objective of the Committee and of the Congress was purely "exposure."  So long
> as Congress acts in pursuance of its constitutional power, the judiciary lacks
> authority to intervene on the basis of the motives which spurred the exercise of
> that power.

*Barenblatt*, 360 U.S. at 132; *see also Eastland*, 421 U.S. at 508.  In determining whether an

investigation was in pursuit of a legitimate legislative purpose, the Court has considered such

materials as House rules and resolutions authorizing the committee's inquiry, statements made

by committee members in issuing the requests for information, and remarks by committee

members and testimony by witnesses at related hearings.[72]  Those materials demonstrate that the

Committee's inquiry here is legitimate.

    As noted above (p. 5), the Rules of the House give the Committee broad jurisdiction over

the federal tax code and investigative and oversight authority respecting the IRS's administration

of it.  In making his request pursuant to Section 6103(f), Chairman Neal explained that,

"[c]onsistent with its authority, the Committee is considering legislative proposals and

conducting oversight related to our Federal tax laws, including, but not limited to, the extent to

which the IRS audits and enforces the Federal tax laws against a President."[73]  Chairman Neal

---

[72] *See Kilbourn v. Thompson*, 103 U.S. 168, 192 (1881) ("looking to the preamble and resolution under which the committee acted"); *Chapman*, 166 U.S. at 668 ("According to the preamble and resolutions"); *McGrain*, 273 U.S. at 170 ("for the purpose of determining the essential character of the inquiry recourse may be had to the resolution or order under which it is made"); *Watkins*, 357 U.S. at 208-14 (referring to "the several possible indicia of the 'question under inquiry'" and then looking to the authorizing resolutions, House Rules, and statements at the hearing at which the witness was called).

[73] Tatelman Decl. Ex. A at 3.

elaborated on the same points in his letter accompanying the subpoenas, stressing that "the Committee … is considering legislative proposals and conducting oversight related to our Federal tax laws, including, but not limited to, the extent to which the IRS audits and enforces the Federal tax laws against a President," and that "the Committee wants to be sure that IRS employees who determine the scope of the President's audit, or who determine whether to continue previously-initiated audits, are protected in the course of their work."[74]   The Committee's legislative and oversight concerns were also set out in a hearing held by the Committee's Subcommittee on Oversight on February 7, 2019.  *See* pp. 7-9, *supra*.

Consistent with these concerns, several bills have been introduced and referred to the Committee, and additional proposals for reform were suggested at the Subcommittee's hearing and in written testimony submitted to it.[75]   Those proposals address, among other things, whether Presidents or presidential candidates should be required to disclose their tax returns; whether the IRS's program for auditing Presidents' tax returns should be codified into statute and structured to ensure independence when the returns audited are those of the person who heads the Executive Branch;[76] and whether some of the aggressive tax strategies President Trump has employed—and the difficulties apparently experienced by the IRS in auditing them—suggest the wisdom of reforms either in the IRS auditing process or in the tax code.  Witnesses also explained how access to President Trump's returns and return information could assist the Committee in carrying out its legislative and oversight efforts.

---

[74] Tatelman Decl. Exs. K and L at 1-2.

[75] There was no need for the Committee to identify specific legislation that it might consider adopting as a result of its inquiry.  *See Chapman*, 166 U.S. at 670 ("[I]t was certainly not necessary that the resolutions should declare in advance what the Senate meditated doing when the investigation was concluded."); *McGrain*, 273 U.S. at 178.

[76] The Committee's concerns about the political independence of the IRS audit process have been accentuated by recent whistleblower allegations it has received and reported to Treasury.  *See* p. 22, *supra*.

These materials from the legislative record demonstrate that the Committee's request and subpoenas are designed to assist it in carrying out legislative and oversight efforts that lie at the core of the Committee's jurisdiction and well within Congress's constitutional powers.

b.   In his letters rejecting the Committee's request and subpoenas, Secretary Mnuchin failed to acknowledge nearly all of these materials.  Instead he condemned the Committee's demands for information as improper because they were, in his judgment, underinclusive.  In his April 23 letter, Secretary Mnuchin claimed that "the terms of the Committee's request do not fit the Committee's asserted purpose in several respects."[77]  He then identified two areas he believes the Committee should have asked about but did not: the evolution of the IRS's procedures for audits of Presidents' tax returns since 1976, and the tax returns or return information of Presidents other than President Trump.[78]  Secretary Mnuchin's objections are far wide of the mark—as both doctrine and experience show.[79]

As for doctrine, no legal principle requires a Congressional committee conducting an investigation to explore issues in combination, separately, or in any particular sequence.  Even as to legislation, "the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind."  *Williamson v. Lee Optical Co.*, 348 U.S. 483, 489 (1955).  That is also true for investigations, for "[t]he very nature of the investigative function—like any research—is that it takes the researchers up some 'blind alleys' and into nonproductive enterprises.  To be a valid legislative inquiry there need be no predictable end result."  *Eastland*, 421 U.S. at 509.  A Congressional committee need not begin its

---

[77] Tatelman Decl. Ex. G at 4.

[78] *Id*.

[79] They are also undercut by the fact that at the June 10 staff briefing, "the IRS and Treasury declined to answer *any* questions asked by Committee staff related to the actual audits of multiple prior Presidents across both parties."  Tatelman Decl. Ex. P.

investigation of a subject by making the broadest possible inquiries, and it need not examine how

a particular program operated decades ago or "whether those policies and procedures have

changed over time,"[80] in order to investigate how well it is operating today.  The Committee

could sensibly reject the investigative strategy recommended by the Secretary because it is

already informed about the program's earlier history, because it has limited resources and wants

to focus initially on the agency's recent conduct, or because it wants to investigate situations

raising the greatest risk of wrongdoing or failures by agency personnel.  "Evils in the same field

may be of different dimensions and proportions, requiring different remedies."  *Williamson*, 348

U.S. at 489.

Moreover, the Committee has no need to request the returns of prior Presidents.  The six

Presidents who preceded President Trump—three Republicans and three Democrats—voluntarily

made their returns publicly available.  By doing so, they also made them available for

accountants, tax lawyers, journalists, and others to scrutinize for possibly improper deductions or

other tax strategies—improper conduct that if not caught by the IRS in its audits might have

suggested weaknesses in the IRS's audit program or the need for legislative revisions.  It is

perfectly sensible for the Committee to focus on the one President whose returns have apparently

been under continuous audit for many years, who has criticized the IRS's auditing of his returns

as unfair, and whose returns raise various compliance issues (such as use of a grantor trust) that

are red flags—as journalists and tax experts have documented.[81]

---

[80] *Id.*

[81] Chairman Neal made a number of these points in his May 10, 2019 letters
accompanying the subpoenas.  He noted:

> Treasury takes issue with the fact that the Committee seeks tax
> information related to only the current President.  This concern is
> misplaced and ignores the fact that the tax issues raised by the current

Just as doctrine and logic show that Congress has the power to focus on one sitting President whose tax returns raise serious questions of tax policy, administration, and compliance, history and experience reveal that Congress has done exactly that in the past.  As noted above, in 1973-1974, the Joint Committee on Taxation undertook a detailed investigation of President Nixon's tax practices and the IRS's auditing of President Nixon's tax returns.  The Joint Committee's investigation shows that, far from being unprecedented, as Secretary Mnuchin mistakenly asserted (p. 27, *supra*), the Committee's effort to review President Trump's tax returns and the IRS's auditing of those returns follows a path already trodden by another of the Congressional tax committees.

In 1973, journalists and tax lawyers raised concerns about the propriety of the very large deduction President Nixon had taken on his 1969 tax returns for his donation of his Vice-Presidential papers to the National Archives.[82]  In response, President Nixon disclosed to the Joint Committee copies of his returns for 1969 to 1972, and requested that the Joint Committee examine two transactions that had been called into question.[83]  The papers disclosed by President Nixon included a note from the Baltimore District Director of the IRS complimenting him on

---

President are unique. … The continuous audit and activities from 2008 and before, the use by the President of a grantor trust controlling hundreds of businesses, and the volume of his tax returns make this President markedly different from previous Presidents or Vice Presidents examined under the IRS's mandatory audit procedures.

Tatelman Decl. Exs. K and L at 2 (footnote omitted).

[82] *See* Tatelman Decl. Ex. TT (Nick Kotz, *Nixon Gift Raises Questions*, Wash. Post (June 10, 1973)); Tatelman Decl. Ex. UU (Ira L. Tannenbaum, *Income Tax Treatment of Donation of Nixon Pre-Presidential Papers*, Tax Notes (July 30, 1973)).

[83] Joint Tax Committee Nixon Report at 1.

"the care shown in the preparation of … [his] tax returns."[84]   That note only increased public concern about the adequacy of the IRS's auditing of the President's returns.

The Joint Committee "decided not to confine its examination to the two items mentioned by President Nixon," but "rather to examine all tax items for the years 1969 through 1972."[85] Nor did the Joint Committee limit itself to the materials provided by the President.   The Joint Committee requested and received numerous additional materials from the IRS, including certified copies of the returns President Nixon had voluntarily disclosed, his returns for additional years, and returns of the President's daughter and son-in-law.[86]   Just as the Committee has done in this case, the Joint Committee requested the tax returns and return information of those individuals under a statutory proviso to the otherwise-governing rule of confidentiality for taxpayer information that required the IRS to provide such information to Congressional tax committees upon written request.   *See* 26 U.S.C. § 6103(a)(1), (d)(1), (2) (1970).

The Joint Committee's investigation yielded a public report of more than 1,000 pages, including copies of President and Mrs. Nixon's tax returns for 1969-1972.[87]   The report found numerous deficiencies in the IRS's auditing of the Nixons' returns and recommended that the Nixons pay roughly $476,000 in response to those deficiencies.[88]   In the wake of the Joint Committee's report, the IRS reformed its processes for auditing Presidents' tax returns and established the first written guidelines governing those audits.[89]   The Nixon case shows that,

---

[84] Tatelman Decl. Ex. VV (William D. Samson, *President Nixon's Troublesome Tax Returns* (Apr. 11, 2005), https://tinyurl.com/TroublesomeTaxReturns).

[85]   Joint Tax Committee Nixon Report at 2.

[86]   *See* Tatelman Decl. Ex. OO, described at *supra* note 71.

[87]   Joint Tax Committee Nixon Report at 211-1008

[88]   *Id*. at 4-7.

[89]   *See* Tatelman Decl. Ex. KK at 15-18 (statement of Joseph J. Thorndike, Director, Tax History Project); Staff of the Joint Committee on Taxation, JCX-3-19, *Background Regarding the Confidentiality and Disclosure of Federal Tax Returns* 23-26 (Feb. 4, 2019),

contrary to the Secretary's contention, the use by a tax committee of its Section 6103 power to

gather tax returns and return information of a sitting President is not unprecedented.  It also

shows that a Congressional committee's investigation of the returns of a sitting President is a

highly valuable oversight tool.

### 3.     The Committee's Requests And Subpoenas Did Not Overstep Any Constitutional Constraints On Congress's Investigative Authority

The principal ground on which Secretary Mnuchin claimed that the Committee's requests

and subpoenas were unconstitutional is that they sought "to expose for the sake of exposure."[90]

Likewise, the Department of Justice's Office of Legal Counsel (OLC), which endorsed

Defendants' actions in a *post hoc* opinion, has asserted that the Committee's "true aim" was not

to pursue legislation or oversight but "to make the President's tax returns public," and thereby

further its political opposition to the President.[91] Those asserted justifications for Defendants'

noncompliance are flawed.  Defendants (and OLC) misread the relevant Supreme Court

decisions.

On two occasions, the Supreme Court has suggested that a Congressional inquiry would

not serve a legitimate legislative purpose if it were undertaken solely to expose the private affairs

of a private citizen.  In *Kilbourn v. Thompson*, 103 U.S. 168 (1881), the Court ruled that a House

committee could not hold in contempt the owner of a bankrupt financial company based on his

refusal to answer certain questions and produce certain papers.  The Court explained that the

Congressional investigation was improper because it concerned purely private rights that could

---

https://tinyurl.com/JCTReport.  The Joint Committee's investigation also led to two successful
prosecutions.  *See* Tatelman Decl. Ex. VV; Tatelman Decl. Ex. WW (William E. Farrell,
*Literary Appraiser Guilty in Backdating Nixon Files*, New York Times (Nov. 13, 1975),
https://tinyurl.com/GuiltyinBackdating).

[90] Tatelman Decl. Ex. G at 3 (quoting *Watkins*, 357 U.S. at 187).

[91] *See Congressional Committee's Request for the President's Tax Returns Under 26
U.S.C. § 6103(f)*, 43 Op. O.L.C. ---, slip op. 3, 29-31 (June 13, 2019) (2019 OLC Slip Op.),
https://tinyurl.com/2019OLCSlip.

be adjudicated only by the Judiciary—"the private affairs of individuals who hold no office under the government." *Id.* at 195; *see Watkins*, 357 U.S. at 194 ("[T]he subject matter of the inquiry was 'in its nature clearly judicial and therefore one in respect to which no valid legislation could be enacted.'"). *Kilbourn* is far removed from this Committee's inquiry, which concerns matters of public administration, not purely private rights, and obviously involves someone who "hold[s] an office under the government," *see Kilbourn*, 103 U.S. at 195.

In *Watkins*, the Court, reviewing a conviction for criminal contempt arising out of a Cold War loyalty investigation that involved "broad-scale intrusion into the lives and affairs of private citizens," stated that exposure "for the sake of exposure" was not a valid purpose for a Congressional investigation. 354 U.S. at 195, 199-200. Expressing concerns about the capacity of Congressional investigations to intrude into constitutionally protected domains, the Court cautioned that "[a]buses of the investigative process may imperceptibly lead to abridgment of protected freedoms. The mere summoning of a witness and compelling him to testify, against his will, about his beliefs, expressions or associations is a measure of governmental interference." *Id.* at 197. But no such danger is present here; the Committee has not summoned either President Trump or his tax returns to explore his "beliefs, expressions or associations," which he has made well known. And the *Watkins* Court made clear that it was "not concerned with the power of the Congress to inquire into and publicize corruption, maladministration or inefficiency in agencies of the Government." 354 U.S. at 200 n.33; *see id.* at 200 ("The public is, of course, entitled to be informed concerning the workings of its government.").

*First*, unlike in *Kilbourn* and *Watkins*, this Committee's inquiry does concern "the workings of [the public's] government." The President has assertedly refused to release his tax returns because they are under audit, but the Committee is entitled to inquire, at a minimum, if

they actually are and why that is still so:  Does the IRS lack the resources to handle such

complex returns?  Has the IRS treated President Trump unfairly, as he has charged?  Are IRS

auditors under political pressure not to complete their audits to allow the President to claim

justification for his delay?  These are among the questions the Committee may use the requested

information to address.

Moreover, decades of experience—including the Joint Committee's review of President

Nixon's tax returns—demonstrates the strong public interest in ensuring that the President pays

his taxes fairly and honestly, as the Government demands that all citizens do, and that the IRS's

review of a sitting President's taxes is fair, efficient, and unpolluted by political considerations.

The Joint Committee explained that it had not limited itself to the two particular deductions

President Nixon had asked it to review because "so many questions have been raised about the

tax returns of the President for these years that the committee believed the general public can

only be satisfied by a thorough examination of the President's taxes.  From the standpoint of the

tax system alone, this confidence of the public is essential since ours is basically a voluntary

assessment system which has maintained its high level of effectiveness only because the general

public has confidence in the basic fairness of the system."[92]

The Joint Tax Committee's judgment that there is an important public interest in knowing

whether a sitting President has financial conflicts of interest that might affect the administration

of the laws, including the tax laws, has been shared by at least the last six Presidents, as reflected

in their disclosure of their tax returns.  As President Carter explained in making his tax filings

public:

> I think it's important that this be done, because it lets the people know what is the
> origin of a person's income, what obligations do they have, what stocks do they

---

[92] Joint Tax Committee Nixon Report at 2.

hold, what possible conflicts might arise.  And even for the most honest man or
the most honest woman seeking office, it's a constraint on us to be sure we're not
tempted to vote a certain way because we've got stock in a certain company.[93]

*Second*, as the Court explained in *Watkins*, the principle that Congressional committees

may not seek exposure for its own sake rests primarily on a concern that the inquiry may

improperly invade a private citizen's constitutional rights—above all, the First Amendment

rights to freedom of speech and association.   Yet neither the Secretary nor OLC identifies how

the President's First Amendment rights would be invaded by the Committee's inquiries.  Nor

could they.  Unlike the factory workers, teachers, and Hollywood figures hauled before

Congressional committees investigating subversion during the Cold War, President Trump's

political "beliefs, expressions and associations" are freely expounded by him.  *See Watkins*, 354

U.S. at 197.  And unlike the political associations that some witnesses in loyalty-subversion

hearings sought to keep private, which could have subjected some of them to criminal

prosecution, President Trump's political "beliefs, expressions and associations" do not risk

similar jeopardy.  *Id.*

*Third*, the Secretary and OLC have misconstrued the media clippings that they compiled

to argue that the true and sole purpose of the Committee's inquiry is to expose President Trump's

tax returns.  Dozens of those statements show that the speaker's interest was *not* exposure for the

sake of exposure, but rather matters of public concern that unquestionably lie within Congress's

competence to explore—such as whether the President has business entanglements that might

create conflicts of interest or otherwise influence his proper execution of his responsibilities.

Many of those matters are subjects of active investigation by various Congressional committees

(not just the Ways and Means Committee), and so it is hardly surprising that legislators might

---

[93] Jimmy Carter, *Remarks at a Campaign Rally for Democratic Candidates for State Office, Sept. 24, 1977 in* 2 Pub. Papers of the Presidents of the United States 1655 (1978).

have suggested that the President's tax returns would assist those inquiries.[94]  Exhibit XX to the

Tatelman Declaration accompanying this brief shows how the very evidence the Secretary and

OLC invoke—in several cases through selective excerpts—in fact shows interest in legitimate

subjects of inquiry.[95]

> *Finally*, by arguing that the Committee's motivation is improperly partisan, the Secretary

and OLC appear to suggest that the Constitution bars Congress from using its investigative

powers in a manner that is "political."[96]  If there were any such principle, few Congressional

investigations in the Nation's history could have withstood the test.  That is one of the key

reasons, the Supreme Court has explained, that courts may not scrutinize legislative motives in

assessing the validity of congressional inquiries.  "[I]n determining the legitimacy of a

congressional act we do not look to the motives alleged to have prompted it. . . . 'In times of

political passion, dishonest or vindictive motives are readily attributed to legislative conduct and

as readily believed.'  The wisdom of congressional approach or methodology is not open to

judicial veto."  *Eastland*, 421 U.S. at 508-09 (citations omitted).  The same rule applies to

attempted executive vetoes as well.

---

[94] *See, e.g.*, *Trump v. Comm. on Oversight and Reform of U.S. House of Reps.*, 380 F. Supp. 3d 76, 82 (D.D.C. 2019).

[95] Of the more than 90 statements the Secretary or OLC cites, more than half mention concern about foreign influence with particular reference to Russia; another eight mention foreign influence without specifying Russia; more than 35 question possible conflicts of interest, such as personal benefit from the tax reform law the Administration championed; approximately a dozen raise concerns about the IRS's auditing or the President's tax compliance; and three refer to other specific pieces of possible legislation.

Tatelman Decl. Ex. XX lists in order the sources for the statements cited in Secretary Mnuchin's April 23, 2019 Letter and the OLC Opinion in their effort to show the purportedly pretextual character of the Committee's purposes.  In order to show the often misleadingly selective way in which the Secretary and OLC have cited these materials, the Exhibit includes fuller excerpts, with omitted language shown in italics.  References to investigatory purposes are further highlighted in bold text.

[96] *See* Tatelman Decl. Ex. G at 3; 2019 OLC Slip Op. 6; *see also* Tatelman Decl. Ex. C (Letter from William Consovoy to Brent J. McIntosh, at 2, 3 (Apr. 5, 2019)).

Criticisms of Congressional investigations as politically motivated are nothing new.  In

1922-1924, a Senate committee investigated what became known as the Teapot Dome scandal,

which involved Secretary of the Interior Albert Fall giving sweetheart contracts to two oil

companies in exchange for bribes and the failure of Attorney General Harry Daugherty to pursue

the wrongdoers.  *See generally* Hasia Diner, *Teapot Dome 1924* at 1-169, *in* Congress

Investigates: A Documented History 1792-1974, Vol. IV (Arthur M. Schlesinger, Jr. & Roger

Bruns eds., 1975).  Like many other Congressional investigations, the Teapot Dome

investigation provoked howls of protest that the investigators were driven by improper partisan

motives.  Defenders of the Harding Administration accused the Democratic chairman of a

committee investigating its officials of "blatantly partisan behavior."  *Id.* at 16-17.

A district judge shared such concerns.  In granting habeas corpus to Malley Daugherty,

the Attorney General's brother, the judge stated:

> The extreme personal cast of the original resolutions; the spirit of hostility
> towards the then Attorney General which they breathe; that it was not avowed that
> legislative action was had in view until after the action of the Senate had been
> challenged; and that the avowal then was coupled with an avowal that other action
> was had in view—are calculated to create the impression that the idea of
> legislative action being in contemplation was an afterthought.

*Ex parte Daugherty*, 299 F. 620, 638 (S.D. Ohio 1924) (internal quotation marks omitted).  But

the Supreme Court reversed, and after quoting the district judge's reasoning, firmly rejected it.

"Plainly," the Supreme Court held, "the subject [of the investigation] was one on which

legislation could be had," *McGrain*, 273 U.S. at 177, and when an investigation could aid

Congress's exercise of its legitimate legislative powers, "the presumption should be indulged

that this was the real object," and courts are "bound to presume that the action of the legislative

body was with a legitimate object, if it is capable of being so construed."  *Id.* at 178 (internal

quotation marks omitted).  Exactly the same is true here.

### 4.      Defendants' Methods Of Second-Guessing The Committee's Requests And Subpoenas Underscore The Impropriety Of Doing So

The impropriety of Defendants' efforts to ascribe an improper motive to the Committee's requests and subpoenas—even though those inquiries fall squarely within Congress's and the Committee's legislative and oversight power—is made even more apparent by the way that they did so.  Defendants' principal objection—as summarized by OLC—is that "the lack of fit between the requested documents and the proffered reasons" shows that the Committee's articulated reasons for seeking the documents are pretextual.  *Congressional Committee's Request for the President's Tax Returns Under 26 U.S.C. § 6103(f)*, 43 Op. O.L.C. ---, slip op. 3, (June 13, 2019) (2019 OLC Slip Op.), https://www.justice.gov/olc/file/1173756/download; *see id.* at 27 ("we agree with the Secretary that the Committee's request does not objectively 'fit' the stated purpose").  To show that purported lack of fit, Defendants (and OLC) engaged in a free-ranging review of statements by various political figures, all supposedly demonstrating that the true motives behind the Committee's investigation were improperly partisan.  *See id.* at 7-11.

As explained above (pp. 42-43 and Tatelman Decl. Ex. XX), Defendants' anthology shows no such thing.  More fundamentally, however, Defendants' assertion of the power to scrutinize the lack of "fit" between the Committee's means and asserted ends to determine whether the Committee's actions were improperly motivated has no foundation in our constitutional system.  As the Supreme Court stated 200 years ago, "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional."  *McCulloch v. Maryland*, 17 U.S. (4 Wheaton) 316, 421 (1819).  As long as Congress's choice of approach rationally advances its proffered objective, therefore, a supposed lack of proportionality between means and ends provides no basis to deem it unlawful.

*See United States v. Comstock*, 560 U.S. 126, 134 (2010).  Nor does any supposed partisan

motivation behind the inquiry provide a basis for invalidating it, for as Chief Justice Marshall

also made clear, "[if] the legislature might constitutionally" undertake an action, then "a court,

sitting as a court of law, cannot sustain a suit … founded on the allegation that the act is a nullity,

in consequence of the impure motives which influenced certain members of the legislature."

*Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 131 (1810).

For these reasons, the Supreme Court has made clear that courts may not, when presented

with a challenge to the propriety of a Congressional inquiry, do exactly what Defendants and

OLC did here: wander outside the record of the Committee's investigation to question whether it

was motivated by an improper purpose.  *See* p. 30, *supra*.  As the Court stated in *Barenblatt*,

"[s]o long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority

to intervene on the basis of the motives which spurred the exercise of that power."  360 U.S. at

132.  That principle reflects the recognition, rooted in the Constitution's separation of powers,

that "just as the Constitution forbids the Congress to enter fields reserved to the Executive and

Judiciary, it imposes on the Judiciary the reciprocal duty of not lightly interfering with Congress'

exercise of its legitimate powers."  *Hutcheson v. United States*, 369 U.S. 559, 622 (1962)

(opinion of Harlan, J.).  Consistent with the off-limits character of legislators' motives, the

Supreme Court has made clear that, in assessing the legitimacy of a Congressional

investigation's purposes, the courts should look only to the legislative record—above all, rules

and authorizing resolutions (where available); the statements of members of the committee made

in conjunction with requests or questions at issue; and statements by members and witnesses at

hearings pertinent to the requests.  *See* p. 32, *supra*.

The Secretary's (and OLC's) justifications for Defendants' refusals to comply with the Committee's request and subpoenas doubly contravene the Supreme Court's approved methodology. On the one hand, Defendants and OLC virtually disregard the materials in which the Committee set out its purposes—Chairman Neal's letters and the statements of members and witnesses at the February subcommittee hearing devoted to the exact subjects of the Committee's inquiry.[97] On the other hand, they roam far and wide in extra-record materials, cobbling together a tale based largely on statements made by legislators who are not members of the Committee and statements made before the current session of Congress began.[98] The Supreme Court's decisions have cautioned against such an approach, and this Court should reject it.

The Office of Legal Counsel, though apparently recognizing the force of these principles, strangely contends that they constrain only the Judiciary, not the Executive Branch. "These … limitations," OLC contends, "do not apply to the Executive Branch, which operates as a politically accountable check on the Legislative Branch." 2019 OLC Slip Op. 25-26. OLC offers no authority for that novel position—which would place the Executive Branch above both the Legislature and the Judiciary in the constitutional structure—and there is none. The Supreme Court's admonition against scrutinizing Congressional enactments for improper motives reflects respect for Congress's position and responsibility in the constitutional order, not any lack of competence on the part of the Judiciary. And political accountability can hardly entitle Executive Branch officials to reject a Congressional inquiry as unconstitutional on a ground—

---

[97] To take just one characteristic example, OLC mentions the Subcommittee's hearing only once in its 30-page opinion. It then quoted only two statements, one of which was a statement not made at the hearing but instead made to the press by a Representative who is not a member of the Subcommittee. See 2019 OLC Slip Op. 12 & n.21.

[98] See Tatelman Decl. Ex. XX. Of the more than 90 statements cited by the Secretary or OLC, only 10 were made since the current session of Congress began on January 3, 2019. Of those 10, only eight were made by members of the Committee.

improper motive—that the Judiciary would be forbidden to consider.  OLC's assertion of that power would give the Executive greater power than the Judiciary "to say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).  And in any event, OLC has recognized (correctly) that "the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power."  2019 OLC Slip Op. 25 (quoting *Barenblatt*, 360 U.S. at 132 (emphasis in OLC opinion omitted)).  That acknowledgement resolves this case:  Where, as here, Congress has the *power* to require information from the Executive Branch, the courts' inquiry is at an end.

## III.    THE COMMITTEE IS ENTITLED TO JUDICIAL RELIEF

### A.    The Committee Is Entitled To Enforcement Of Its Duly Authorized Subpoenas

As other judges of this Court have recognized, Congressional committees validly exercising their investigative authority are entitled to judicial enforcement of their duly authorized subpoenas.  In *Committee on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008), the court held that the House Committee on the Judiciary was entitled to sue Executive Branch officials over their failure to comply with subpoenas for information about the resignations of nine U.S. Attorneys.  In a persuasive and thorough opinion, Judge Bates explained that the Committee had a right to seek judicial relief under both the Declaratory Judgment Act and Article I.  *See id.* at 88, 94.  In *Committee on Oversight and Government Reform v. Holder*, 979 F. Supp. 2d 1 (D.D.C. 2013), Judge Berman Jackson similarly concluded that the House Committee on Oversight and Government Reform was entitled to sue Attorney General Holder to challenge his invocation of executive privilege in response to a subpoena for information about the Department of Justice's "Fast and Furious"

operation.  *See id.* at 22.  OLC has likewise expressly recognized that Congress may file a civil suit to aid in enforcement of its subpoenas.[99]

The House has delegated to the Committee the authority to conduct investigations related to the Nation's tax laws and tax administration.  Pursuant to that authority, the Committee issued duly authorized subpoenas.  The House has expressly ratified the Committee's use of the subpoenas in this case.  *See supra* note 65.  And the House has, through its Bipartisan Legal Advisory Group, authorized this lawsuit.  *See id.*  The Committee is therefore entitled to a declaration affirming the validity of its subpoenas and to an injunction mandating Defendants' compliance.

B.     **The Committee Is Entitled To Judicial Relief Under The Administrative Procedure Act And The Mandamus Statute**

Defendants' refusal to comply with the Committee's requests and subpoenas violated Section 6103(f) and Article I of the Constitution.  The Committee is therefore also entitled to relief under several provisions of the APA, 5 U.S.C. § 706, and the mandamus statute, 28 U.S.C. § 1361.  The reasons why Defendants have violated those provisions are largely overlapping and reflect the discussion above (pp. 28-48, *supra*).

1.  Defendants' actions are "contrary to law," 5 U.S.C. § 706(A)(2), for at least two reasons.  Agency action should be set aside when the agency "has relied on factors which Congress has not intended it to consider," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), or when "[the] agency decision … is 'based on an erroneous interpretation of the law,'" *Baptist Healthcare Sys. v. Sebelius*, 646 F. Supp. 2d 28, 31 (D.D.C. 2009).  Defendants' refusal to produce President Trump's tax returns and return information

---

[99] *See Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act*, 10 Op. O.L.C. 68, 83 (1986) (House may file a civil suit "seeking declaratory enforcement of [a] subpoena").

materials is predicated on their conclusion that the Committee lacked a legitimate purpose to request them.  But Defendants had no lawful basis in either Section 6103(f) or the Constitution to reject the Committee's articulation of its reasons for its facially valid requests.

2.  Defendants' actions are "in excess of [their] statutory jurisdiction [or] authority," in violation of 5 U.S.C. § 706(2)(C).  "It is axiomatic that an administrative agency's power … is limited to the authority delegated by Congress," *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988), and "[a]gency actions beyond delegated authority are '*ultra vires*' and courts must invalidate them," *Transohio Sav. Bank v. Director, Office of Thrift Supervision*, 967 F.2d 598, 621 (D.C. Cir. 1992).  As explained above, neither Section 6103(f)(1) nor the Constitution authorizes Defendants to inquire into alleged ulterior motives for the Committee's request and subpoenas.  Section 6103(f) does not require the Committee to articulate, and neither the statute nor Article I authorizes Defendants to second-guess, the Committee's stated purposes.

3.  Defendants' actions are "contrary to constitutional right, power, privilege, or immunity," in violation of 5 U.S.C. § 706(2)(B).  By arrogating to themselves the right to determine whether the Committee has acted with a legitimate legislative purpose, Defendants have prevented Congress from exercising its constitutionally assigned powers to conduct oversight of the Executive Branch and to legislate.  By improperly rejecting the Committee's purposes as illegitimate, Defendants have abridged the Committee's (and by extension the House's) legislative powers under Article I.

4.  Defendants' refusals to provide the information sought constitute "agency action unlawfully withheld," in violation of 5 U.S.C. § 706(1).  An agency violates Section 706(1) when it refuses to undertake a "discrete agency action" that is "'non-discretionary.'"  *Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 64 (2004).  Those requirements are clearly satisfied

here:  Section 6103(f) imposes upon the Secretary a clear, nondiscretionary duty to comply with the Committee's request.  His failure to do so constitutes agency action unlawfully withheld.

5.  For essentially the same reasons, the Committee is entitled to mandamus under 28 U.S.C. § 1361.  Relief under Section 1361 is available if "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff."  *Council of and for the Blind of Del. Cty. Valley, Inc. v. Regan*, 709 F.2d 1521, 1533 (D.C. Cir. 1983) (en banc).  The standards for compelling agency action under Section 706(1) and mandamus are essentially the same.[100]

The Committee's right to relief is plain.  Section 6103(f)(1) establishes the Committee's right to receive tax returns and return information upon request, and the Secretary has a nondiscretionary duty to provide such information to the Committee.  The Secretary thus "failed to take a *discrete* … action that [he was] *required to take.*"  *See Norton*, 542 U.S. at 64.  Because the Committee has a clear right to the requested information and the Secretary has demonstrated "'recalcitrance … in the face of a clear statutory duty,'" this Court should "order the agency to act to carry out its substantive statutory mandates."  *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987) (ellipsis in original).

## C.  The Committee Is Also Entitled To Relief Either Directly Under Section 6103(f)(1) Or As A Matter Of Nonstatutory Review

Even if the APA and Section 1361 did not directly afford the Committee a right of action here, the Court may and should compel Defendants to comply with the Committee's requests and subpoenas, either directly under Section 6103 or under principles of nonstatutory judicial review.

---

[100] *See Norton*, 542 U.S. at 63-64; *Shoshone Bannock Tribes v. Reno,* 56 F.3d 1476, 1480 n.3 (D.C. Cir. 1995) (court would "reach the same result whether we label the relief sought as mandamus or as a mandatory injunction [under the APA].").

1. Section 6103 itself entitles the Committee to equitable relief to enforce Defendants' mandatory duty under Section 6103(f) to furnish it with the requested information. Congress enacted Section 6103(f) in an exercise of its full constitutional powers. *See* U.S. Const. art. I, § 8, cl. 18 (Congress has the power to "make all laws which shall be necessary and proper for carrying into execution" the federal government's powers). Defendants' flouting of Section 6103(f)'s directive threatens to thwart those powers, and the Committee is entitled to equitable relief vindicating its authority. As the Supreme Court has made clear on numerous occasions, even absent an express statutory cause of action, courts are empowered to issue injunctive relief to ensure that the proper exercise of governmental authority is not stymied by obstruction.[101] Moreover, as the Supreme Court recently reaffirmed, "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015); *see Ex parte Young*, 209 U.S. 123 (1908). That principle is directly applicable here, where Defendants have wrongly asserted an authority to second-guess a Congressional committee's articulated reasons for

---

[101] *See, e.g.*, *In re Debs*, 158 U.S. 564, 584 (1895) ("Every government, intrusted, by the very terms of its being, with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of one and the discharge of the other[.]"); *Wyandotte Transp. Co v. United States*, 389 U.S. 191, 204 (1967) (federal court could issue relief against obstruction of navigable waters); *see also Arizona v. United States*, 567 U.S. 387, 415 (2012) (on challenge by United States, enjoining state immigration restrictions preempted by federal law); *NLRB v. Nash-Finch Co.*, 404 U.S. 138, 142 (1977) (NLRB, "though not granted express statutory remedies, may obtain appropriate and traditional ones to prevent frustration of the purposes" of NLRA); *United States v. Republic Steel Corp.*, 362 U.S. 482, 492 (1960) (approving public right of action for injunctive relief "even though Congress had not given specific authority" where "the United States had an interest to protect or defend"); *United States v. Arlington Cty.*, 669 F.2d 925, 929-930 (4th Cir. 1982) (in suit brought by United States, enjoining violation of international law by local jurisdiction).

seeking information and issuing a subpoena—a position that threatens to abridge Congress's

powers under Article I.

2.  Alternatively, the Committee is entitled to non-statutory review of Defendants' refusal

to comply with Section 6103(f).  Courts have applied a "general presumption of reviewability"

when a plaintiff is unable to challenge executive action based on a statute.  *Chamber of*

*Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327-1328 (D.C. Cir. 1996) (tracing development of

non-statutory review).  "The message of this line of cases is clear enough:  courts will ordinarily

presume that Congress intends the executive to obey its statutory commands and, accordingly,

that it expects the courts to grant relief when an executive agency violates such a command."  *Id*.

at 1328 (internal quotations marks omitted).[102]

To obtain non-statutory review, three requirements must be met:  "(i) the statutory

preclusion of review is implied rather than expressed; (ii) there is no alternative procedure for

review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers

and contrary to a specific prohibition in the statute that is clear and mandatory."  *DCH Reg'l*

*Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019).  No statute expressly precludes judicial

review of the Defendants' refusal to follow Section 6103(f)'s mandatory directive.  If the Court

were to find that the Committee cannot obtain relief under the APA, mandamus, or Section

6103(f), then the second requirement for non-statutory review would be satisfied.  As to the third

requirement, it is clear that Defendants have acted contrary to Section 6103(f)'s specific

command that "the Secretary *shall* furnish" (emphasis added) the Committee with the returns

---

[102] *See also Trudeau v. FTC*, 456 F.3d 178, 189-190 (D.C. Cir. 2006) ("[J]udicial review is favored when an agency is charged with acting beyond its authority, even where Congress is understood generally to have precluded review[.]" (internal citations, quotations, and alterations omitted)); *Leedom v. Kyne*, 358 U.S. 184, 190 (1958) ("This Court cannot lightly infer that Congress does not intend judicial protection of rights it confers against agency action taken in excess of delegated powers").

and return information requested, and have moreover "plainly" misconstrued their authority to question the legitimacy of the Committee's purpose in seeking such information.

* * * * *

The Secretary and OLC repeatedly assert that the Committee's inquiries in this case are unprecedented. But as the discussion above shows, it is not the Committee that is the innovator in this dispute. Rather, it is Defendants who are breaking new ground—and dramatically so. Never before has the IRS refused to comply with a request from a Congressional tax committee for tax returns and return information under Section 6103(f)(1). Never before has the Treasury Secretary been involved in responding to a request for tax returns under section 6103 of the tax code. And never before has the Treasury Department formally considered whether there is a legitimate legislative purpose behind a Section 6103(f) request. Defendants' positions, if adopted, would upend two centuries of constitutional law. The correct legal principles, governing law and the record demonstrate that the Committee's requests and subpoenas are related to legitimate legislative purposes and breach no constitutional limits on Congress's investigative powers. Defendants' refusal to comply is therefore unlawful.

## CONCLUSION

The Court should grant Plaintiff's motion for summary judgment and direct Defendants to comply with Plaintiff's subpoenas and requests for information under Section 6103(f).

Respectfully submitted,


/s/ Douglas N. Letter
Douglas N. Letter (D.C. Bar No. 253492),
    *General Counsel*
Todd B. Tatelman (VA Bar No. 66008),
    *Deputy General Counsel*
Megan Barbero (MA Bar No. 668854),
    *Associate General Counsel*
Josephine Morse (D.C. Bar No. 1531317),
    *Associate General Counsel*
Brooks M. Hanner (D.C. Bar No. 1005346),
    *Assistant General Counsel*
Sarah E. Clouse (MA Bar No. 688187)
    *Attorney*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
Telephone: (202) 225-9700
douglas.letter@mail.house.gov

*Counsel for Plaintiff Committee on Ways and*
*Means, U.S. House of Representatives*

August 20, 2019