**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE ON WAYS AND MEANS, UNITED STATES HOUSE OF REPRESENTATIVES, *Plaintiff*, vs. UNITED STATES DEPARTMENT OF THE TREASURY, *et al.*, *Defendants*. | Case No. 1:19-cv-01974-TNM |

# Exhibit Z

# FORTUNE

HOME  SUBSCRIBE 

**SPONSORED CONTENT**
The Future of Smart Homes
by Qingdao Haier

**POLITICS**
Israel Will Allow Entry to Rep. Rashida Tlaib—But She's Not Going

**POLITICS**
Trump's Oil Sanctions Leave Russian Exporters $1 Billion Richer

**POLITICS**
Does Trump Really Want to Buy Greenland?

FEATURES • TAX CODE

# The Billion-Dollar Loophole

By Peter Elkind   December 20, 2017



*This article is a collaboration between* Fortune *and* ProPublica, *a nonprofit investigative news organization.*

**For all the talk of reform, the Republican tax plan leaves many of the biggest tax-avoidance schemes untouched. Inside the unlikely—and audacious—cottage industry that's cashing in on one of them.**

**FORTUNE**    HOME  SUBSCRIBE  

| SPONSORED CONTENT<br>**The Future of Smart Homes**<br>by Qingdao Haier | POLITICS<br>**Israel Will Allow Entry to Rep. Rashida Tlaib—But She's Not Going** | POLITICS<br>**Trump's Oil Sanctions Leave Russian Exporters $1 Billion Richer** | POLITICS<br>**Does Trump Really Want to Buy Greenland?** |

allowed groups of hikers, birders, and plant enthusiasts to visit. He sometimes greeted them with glasses of wine from the family's vineyard. Since Mead's death, his daughter has kept the property available to the public.



*In California's Napa Valley, a former biology professor named Giles Mead agreed not to develop 1,318 hilltop acres in 1983 and got a deduction in return. The property, Mead Ranch, features vernal pools and rare and endangered plants. Courtesy of Land Trust of Napa County*

COURTESY OF LAND TRUST OF NAPA COUNTY



**SPONSORED CONTENT**
**How Disney Uses Spontaneity to Make Customers Feel Like...**
By Disney Institute

A growing number of recent easement donations, however, are driven by a more commercial reward—an outsize tax deduction for wealthy investors. Known as "syndications" (or "syndicated partnerships," since they're typically offered in that structure), they're deals orchestrated by middlemen with the goal of big payoffs for all of the participants, many of whom have never visited the land in question.

One example: the former Millstone golf course outside Greenville, S.C. Closed back in 2006, it sat vacant for a decade. Abandoned irrigation equipment sat on the driving range. Overgrowth shrouded rusting food and beverage kiosks. The land's proximity to a trailer

# FORTUNE

HOME  SUBSCRIBE 

**SPONSORED CONTENT**
The Future of Smart Homes
by Qingdao Haier

**POLITICS**
Israel Will Allow Entry to Rep. Rashida Tlaib—But She's Not Going

**POLITICS**
Trump's Oil Sanctions Leave Russian Exporters $1 Billion Richer

**POLITICS**
Does Trump Really Want to Buy Greenland?



*Through a syndicated transaction valuing the property at $41 million, 185 acres outside Greenville, S.C., is now under a conservation easement. The course closed in 2006 and sat vacant for a decade. Courtesy of Ethos*

COURTESY OF ETHOS

Such transactions are booming today, transforming an incentive for charitable gifts into a windfall for the wealthy looking to save big on their taxes. The provision they're exploiting is the single most generous charitable deduction in the tax code, according to experts.

The use of syndicated easement deductions has exploded in recent years, according to Brookings Institution economist Adam Looney, who began researching the subject while serving as a top tax official in the Obama Treasury Department. They cost the Treasury between $1.2 billion and $2.1 billion, he estimates, in lost tax revenue last year.

That's a negligible sum for the federal government—but it's a proxy for a bigger, more systemic problem. There are plenty of other flawed provisions in the tax code, creating opportunities for abuse, says Bill Hutton, an emeritus tax-law professor at the University of California Hastings College of the Law. They often take years to surface—and many more to shut down. "The tax shelter advisers' mentality just seems to live forever," he says. "Shelters keep coming back."

FORTUNE                                                                HOME  SUBSCRIBE 

SPONSORED CONTENT        POLITICS                              POLITICS                                     POLITICS
The Future of Smart Homes   Israel Will Allow Entry to Rep.      Trump's Oil Sanctions Leave Russian    Does Trump Really Want to Buy
by Qingdao Haier            Rashida Tlaib—But She's Not Going    Exporters $1 Billion Richer            Greenland?



*In 2016 a pair of promoters, along with investors, purchased the former Millstone golf course outside Greenville, S.C., and with the help of a private appraiser, declared it to be worth $41 million, nearly eight times its purchase price. Photograph by Melissa Golden for Fortune*

PHOTOGRAPH BY MELISSA GOLDEN FOR FORTUNE

That makes the treatment of syndicated easements a telling prism through which to view the tax system at a moment in which Congress has been frantically redrafting the tax laws. It's also a case study in how difficult it can be to turn the rhetoric about draining Washington's swamps into reality. Even as Republicans scrambled to find revenue to underwrite their tax cut—legislation that they claimed would reform and simplify the system—they permitted syndicated easements to survive intact.

The 1,000-page bill is likely to open up costly new loopholes, according to experts. "It clearly is going to create artificial incentives to engage in transactions that have no economic purpose other than to reduce taxes," says Looney. "The abuses in the new tax bill are going to make the costs of conservation easements seem trivial in comparison."

Conservation easements have generated controversy in the past, particularly when it came to light that private golf course owners were taking the deduction. Indeed, the nation's current President has availed himself of such write-offs in large quantities. In 2005, Donald Trump took a $39 million deduction on his private golf course in Bedminster, N.J. In 2014, he donated an easement on an 11.5-acre driving range in Los Angeles. (In both cases, he pledged not to build houses on the property.) All told, Trump has made at least five easement gifts, generating more than $100 million in write-offs.

**FORTUNE** HOME SUBSCRIBE 

| SPONSORED CONTENT<br>**The Future of Smart Homes**<br>by Qingdao Haier | POLITICS<br>**Israel Will Allow Entry to Rep. Rashida Tlaib—But She's Not Going** | POLITICS<br>**Trump's Oil Sanctions Leave Russian Exporters $1 Billion Richer** | POLITICS<br>**Does Trump Really Want to Buy Greenland?** |



*Donald Trump at his Bedminster, N.J., golf club in 2006. He took a $39 million tax deduction on the property under the conservation easement law. Photograph by Vincent Laforet*

PHOTOGRAPH BY VINCENT LAFORET

But Trump's deductions are relatively tame compared with the aggressive strategies employed by others in recent years. A change in tax laws allowed enterprising promoters to reap deductions many times the size of the investment, on behalf of investors who hadn't previously owned the properties in question. A preliminary IRS analysis of syndicated partnerships this summer showed investors claimed an average of $9 in tax deductions for every dollar they invest.

People have accomplished that by exploiting a giant loophole: The size of the tax deduction is based on a claim about how much the land's value is diminished by the promise not to develop it. By law, that estimate is delivered by an appraiser hired by the taxpayer. The appraiser is free to assert that the donated land is actually worth many times what investors paid for it, often just months before. That, in turn, inflates the deduction. The process is abetted by law firms, brokers, and accountants who pocket millions in fees.

"They're bogus," says tax expert Steve Small of syndicated easements. Small helped write the charitable-gift rules at the IRS and is now a tax attorney in Cambridge, Mass. "They're tax shelters masquerading as conservation easement transactions, based on highly inflated appraisals. Someone's using a charitable contribution provision of the tax code to make a profit. That's not what any charitable contribution is designed to do." Former Montana Sen. Max Baucus, a sponsor of the legislation that updated the easement write-off, agrees. "Unfortunately, people have taken advantage of the code in ways that were not intended," he says. "These things should not be legal."

**FORTUNE**  HOME  SUBSCRIBE 

| SPONSORED CONTENT | POLITICS | POLITICS | POLITICS |
| --- | --- | --- | --- |
| **The Future of Smart Homes** by Qingdao Haier | **Israel Will Allow Entry to Rep. Rashida Tlaib—But She's Not Going** | **Trump's Oil Sanctions Leave Russian Exporters $1 Billion Richer** | **Does Trump Really Want to Buy Greenland?** |



*The former Millstone golf course near Greenville, S.C., whose value rose by a factor of eight when it was donated as a conservation easement.Courtesy of Ethos*

COURTESY OF ETHOS

One reason abuses have multiplied is that a surprising amount of the oversight consists of the honor system. The genteel guardians of the old-line conservation community pledged to try to keep practitioners in line. But they've been unable to rein in the syndicators, whose rise they have watched with growing horror.

The traditionalists are embodied by the Land Trust Alliance, a Washington, D.C., association whose dues-paying membership includes the vast majority of the nonprofit trusts that, by law, administer conservation easements. (See sidebar.) The Alliance has long been the most important advocate for the tax break.

The Alliance's leadership now fears that public outrage over profiteering will jeopardize the deduction altogether. "These need to be shut down," says the organization's president, Andrew Bowman. "These few bad actors are going to give us a bad name." Bowman's predecessor, Rand Wentworth, calls syndications "large-scale, multimillion-dollar tax fraud."

As views harden among the traditionalists, a schism has occurred. A splinter group of land trusts has sided with the syndicators, providing a home for their deals. Most prominent among the renegade land-trust leaders: Robert Keller, a brash conservation biologist in Georgia who has built an empire through syndicated easements.

FORTUNE        HOME  SUBSCRIBE 

SPONSORED CONTENT | POLITICS | POLITICS | POLITICS
The Future of Smart Homes | Israel Will Allow Entry to Rep. Rashida Tlaib—But She's Not Going | Trump's Oil Sanctions Leave Russian Exporters $1 Billion Richer | Does Trump Really Want to Buy Greenland?
by Qingdao Haier



Robert Keller (center) with his technical team. He defends syndicated easements, calling them a "wonderful conservation ploy." Photograph by Melissa Golden for Fortune

PHOTOGRAPH BY MELISSA GOLDEN FOR FORTUNE

Unable to stop syndicators through moral suasion, the Alliance has increasingly prodded the IRS to take action. The IRS has policing power, and it wields that clout chiefly by auditing the returns of those who take the deductions. But that's a torturously slow process and one that so far has yielded minimal results. The speed at which the syndications have increased has left the resource-starved agency looking like a befuddled mall cop lurching off his chair and trying to figure out which of the dozen teenagers simultaneously grabbing candy bars to chase down.

The IRS announced a broader crackdown in December 2016. It took the rare step of branding syndicated easement deals as "listed transactions," subject to special reporting and scrutiny. Such IRS moves usually scare off audit-wary investors. But this time, the action appears to have had little, if any, effect.

The syndicators, arguing that the profit motive produces big environmental benefits, have fought back with a million-dollar public relations and lobbying offensive. That campaign produced a move to eliminate the funding for the IRS crackdown—one of multiple fronts on which a legislative battle is being waged.

It might sound like an arcane matter. Yet there's a lot at stake for all Americans: billions in tax revenue and a system that protects 56 million acres of U.S. land from being turned into resorts and Walmarts. How has a widely derided abuse—almost universally criticized by tax experts—managed to survive repeated attempts to fix it?

---

Not so many years ago, conservation easements seemed to be approaching extinction. Starting in 2003, investigative reports in the *Washington Post* generated clouds of scandal

# FORTUNE

HOME  SUBSCRIBE  

| SPONSORED CONTENT | POLITICS | POLITICS | POLITICS |
| --- | --- | --- | --- |
| **The Future of Smart Homes**<br>by Qingdao Haier | **Israel Will Allow Entry to Rep. Rashida Tlaib—But She's Not Going** | **Trump's Oil Sanctions Leave Russian Exporters $1 Billion Richer** | **Does Trump Really Want to Buy Greenland?** |

But the Land Trust Alliance lobbied hard, promising it would do more to prevent misuse of the deduction. Prominent conservationists chimed in with support for easements. And another constituency with a mom-and-apple-pie appeal also weighed in: Farmers and ranchers, often rich in land but poor in cash, argued that the provision helped keep them in business, producing the nation's food.



*An unnamed tributary of the Saluda River runs through the old Millstone golf course property, now under easement, near Greenville, S.C. Courtesy of Ethos*

COURTESY OF ETHOS

As a result, rather than eliminating the easement deductions, in 2006 Congress expanded them. The updated law raised the maximum annual write-off from 30% to 50% of taxable income; farmers and ranchers were allowed to deduct 100% of what they make. All were given 16 years to use their full write-off.

As for enforcement, Congress adopted a stance that could mostly be called "trust but don't verify." It accepted the industry's promises to reform, which included a voluntary accreditation program that would set best practices for land trusts. Meanwhile, the law did mandate new training requirements for appraisers.

It was left to the IRS to police misconduct through case-by-case audits, with stiffer penalties for those found to have violated the rules. That method would prove woefully inadequate to combat the coming wave.

**FORTUNE**   HOME  SUBSCRIBE 

| SPONSORED CONTENT | POLITICS | POLITICS | POLITICS |
| --- | --- | --- | --- |
| **The Future of Smart Homes** by Qingdao Haier | **Israel Will Allow Entry to Rep. Rashida Tlaib—But She's Not Going** | **Trump's Oil Sanctions Leave Russian Exporters $1 Billion Richer** | **Does Trump Really Want to Buy Greenland?** |

events. They include a small-town conservation biologist and a couple of big-city ex-bankers who met after the easements law was changed—at a moment in the wake of the real estate crisis when investors began looking for ways to salvage value from land whose price had plummeted.

The small town was Jasper, Ga., pop. 3,684 (about 60 miles north of Atlanta), and the biologist was Robert Keller. In the world of land trusts, no one embraces and enables syndicated deals quite like he does. Keller, 60, is CEO of the Atlantic Coast Conservancy (ACC), where he has built a conservation empire. By his estimate, ACC oversees 80,000 acres of conserved land in 11 states.

Despite the IRS's recent crackdown, Keller expects to accept more than 80 easements in 2017. He did 79 in 2016. Like most land trusts, Atlantic Coast Conservancy doesn't report the total value of its donors' conservation deductions. But a sampling of deal documents suggests it took easements and land donations responsible for as much as $1 billion in write-offs in 2017.



Keller in his office in Jasper, Ga. Photograph by Melissa Golden for Fortune

PHOTOGRAPH BY MELISSA GOLDEN FOR FORTUNE

Keller accepts more syndications than anyone, and he's utterly unapologetic. "They call me a rogue land trust," he says. "I'm sick of people pointing an accusatory finger. I'm putting aside to the tune of about 12,000 acres a year that will never be developed. *Ever*. If I can do

# FORTUNE

HOME  SUBSCRIBE 

SPONSORED CONTENT
**The Future of Smart Homes**
by Qingdao Haier

POLITICS
**Israel Will Allow Entry to Rep. Rashida Tlaib—But She's Not Going**

POLITICS
**Trump's Oil Sanctions Leave Russian Exporters $1 Billion Richer**

POLITICS
**Does Trump Really Want to Buy Greenland?**

Keller's story—and a close look at some of the deals he's embraced—explains a lot about the battle over syndicated conservation easements. For starters, in a world of nonprofit land trusts, Keller is a proud capitalist. His direct compensation from the nonprofit he heads totaled $156,750 in 2015, tax returns show. But that's dwarfed by the $602,432 he made from Environmental Research and Mapping Facility, a side business he operates that works exclusively for his land trust.

Keller served in the Navy for a decade before earning a doctorate in conservation biology at Wake Forest. He then worked as an assistant professor at the University of Tennessee at Chattanooga for seven years. He left in 2006 to become the executive director of the Mountain Conservation Trust, a tiny outfit in Jasper, where, says Keller, "land conservation moved at a glacial pace." Keller's stock in trade, he says, was the expertise he'd picked up in the Navy about satellite-based global information systems, which allows him to survey land sites virtually anywhere in the U.S. "I wanted to expand and do more things," he says. "They wanted to putter along."



*Binders of paperwork related to easements all over the Southeast are seen in Keller's Atlantic Coast Conservancy offices in Jasper, Ga. Photograph by Melissa Golden for Fortune*

PHOTOGRAPH BY MELISSA GOLDEN FOR FORTUNE

Keller's ambitions didn't find the right vehicle until about 2009, when two former Wachovia bankers rolled into Jasper from Atlanta. They pitched Keller on the idea of exploiting the devastated real estate market by urging developers and lenders to recoup some of their losses through partnerships donating "monetized easements" (Keller's preferred term). Notes Keller: "Most of these people would never have talked to a

FORTUNE                                                                HOME  SUBSCRIBE  

SPONSORED CONTENT          POLITICS                                    POLITICS                                      POLITICS
The Future of Smart Homes  Israel Will Allow Entry to Rep.             Trump's Oil Sanctions Leave Russian           Does Trump Really Want to Buy
by Qingdao Haier           Rashida Tlaib—But She's Not Going           Exporters $1 Billion Richer                   Greenland?

adds, "It's something we didn't want to do as a board." (Keller denies the allegation and blames the move on "a personality conflict.")

In 2010, Keller set up Atlantic Coast Conservancy and began to accept "monetized" easements. By then, the Georgia syndication industry had begun to flourish. It touted itself with the get-rich-quick appeal of an infomercial. "Thinking about tax deductions for this year?" began one marketing email from a promoter. "Contact us right now for more information on how you can facilitate a conservation easement and get incredible tax benefits for doing so."

For the promoters, the deals were lucrative, often generating $1 million or more in fees per transaction. New entrants rushed in from careers in banking, real estate, law, and accounting. In Georgia, they included a former lieutenant governor and even a practicing dentist.

The new syndication businesses typically had earth-friendly names: ForEverGreen, EvrGreen, EcoVest, Webb Creek. They set up websites featuring images of forests, waterfowl, and mountain streams. Their text proclaimed their principals' deep concern about the fate of the earth. For example, Frank Schuler, president of Ornstein-Schuler, among the most active promoters, describes a personal epiphany that he says spurred his move into the conservation-easement business after a decade in Atlanta commercial real estate. In an interview, Schuler recalls driving with his toddler son past a large residential development where the site had been bulldozed. "Every square foot was going to be paved. There were no trees. My son said, 'Dad, that's pollution!'" Says Schuler: "The importance of conserving land for him and future generations really pushed me to this point … That's why today I'm so passionate about conservation."

But returns were front and center in marketing pitches. Eco Terra's website, for example, offered the motto "Be Green, Make Green." The website for a law firm that handles easements displayed a chart listing its clients' high-end demographics: It said 92.5% had a net worth over $10 million. A 2015 summary for one fund reported that it was on track to deliver a return of 89% for the year.

## The Basics of Conservation Easements

*To be eligible for a deduction, land needs to meet at least one of four broadly defined "conservation purposes." These include protecting "relatively natural" habitats; historic sites or buildings; land for public recreation or education; and open space (including farms, ranches, and forests).*

FORTUNE   HOME  SUBSCRIBE

SPONSORED CONTENT
The Future of Smart Homes
by Qingdao Haier

POLITICS
Israel Will Allow Entry to Rep. Rashida Tlaib—But She's Not Going

POLITICS
Trump's Oil Sanctions Leave Russian Exporters $1 Billion Richer

POLITICS
Does Trump Really Want to Buy Greenland?

*must accept and administer the easement. The trust negotiates the development limits with the landowner and enforces them in perpetuity.*

*Sixteen states sweeten the pot by offering state income tax credits too.*

---

The Land Trust Alliance became alarmed about the growing syndication-easement movement, fearing it would generate a fresh wave of scandal and congressional outrage. But syndications also posed a ticklish internal situation for the Alliance. Some of its members were an essential part of the chain that made the deals possible.

In 2010, Russ Shay, the Alliance's public policy director, privately urged IRS officials to crack down on the syndicators through more aggressive action than individual audits—perhaps by issuing a public advisory. But the IRS remained silent. (The agency declined to make officials available for on-the-record interviews for this article.)

To be sure, the agency was auditing dozens of easements; they were among the most litigated issues in federal tax court. But the case-by-case enforcement had limited impact. And given the time it took to pursue a case, says Shay, the result "is they were solving yesterday's problem." He adds, "They did not seem interested in solving the problem of the present—which we told them was much bigger."

Budget cuts left the IRS with limited resources for the costly task of disputing an appraisal, which often required hiring outside experts. "The IRS is outgunned," says Small, the ex-IRS attorney. "They don't have the budget or personnel to audit a fraction of these transactions."

The IRS also lost some key battles. In one challenge to a $30.6 million golf-course deduction taken in 2002—but not resolved until 2009—a tax court judge allowed 94% of the write-off. Claud Clark III, a folksy Alabamian who had appraised the coastal property and defended the deduction in court, became the syndicators' star expert. Marketing materials hailed him as the man who beat the IRS.

Promotional documents for syndicated deals always acknowledge the risk of an IRS audit, which can result in an assessment for back taxes, interest, and stiff penalties. Recent Ornstein-Schuler marketing materials, for example, say the firm assumes "all partnerships will be audited," but that it trusts its "conservative, defensible valuations…" It noted: "As of 3/13/17, approximately 11% of the partnerships have been audited and none of the valuations have ever been reduced as a result of an IRS examination or review."

**FORTUNE**

HOME  SUBSCRIBE  

SPONSORED CONTENT | POLITICS | POLITICS | POLITICS
**The Future of Smart Homes** | **Israel Will Allow Entry to Rep. Rashida Tlaib—But She's Not Going** | **Trump's Oil Sanctions Leave Russian Exporters $1 Billion Richer** | **Does Trump Really Want to Buy Greenland?**
by Qingdao Haier

Keller sought accreditation from the Land Trust Alliance, but the organization expressed concern about the syndications he was doing. So Keller dropped his application and moved forward without the Alliance's imprimatur.

This didn't seem to hurt the Atlantic Coast Conservancy's business, as syndicators rejected by other land trusts brought even more deals to him. Their easements have protected "gorgeous land," says Keller. "It turned out to be this wonderful conservation ploy…For me, as a conservation biologist, this is the best."

In a typical syndicated deal, the investor partnership has acquired the property within the past year or two, presumably from a seller determined to get what it's worth. How, then, can an appraiser conclude its value has suddenly multiplied eight or 10 times?

Under federal regulations, an appraisal must offer an opinion of the land's fair market value—the price a knowledgeable buyer would pay a knowledgeable seller when neither is desperate to make a deal. But when it comes to conservation easements, syndication appraisers typically claim there are no comparable area sales. So they use a more subjective approach (albeit one that often includes reams of complex projections and reports): They try to estimate what the land would be worth if put to its most profitable legal use—as, say, a development of resort homes. Under court rulings, this transformation is supposed to be "reasonably probable" to occur in the "reasonably near future," and not rely on "mere speculation and conjecture."

Based on a skeletal development plan, studies commissioned by the promoter, and an array of optimistic assumptions, the appraiser then projects the development costs and income for the imagined business. On syndicated deals this invariably results in a sky-high valuation—a calculation of what the investors are giving up and can thus claim as a deduction—that makes everyone a hefty profit.



"A farce and a travesty and an abuse of the system."

Commercial broker Dean Saunders on the valuation increase in one Florida deal

As time went on, syndicators became more audacious. They began basing their projections on the view that isolated tracts could be used as sites for resorts or shopping malls—or even that mining riches lay beneath them. And they became more confident and aggressive

FORTUNE                                                         HOME  SUBSCRIBE   

SPONSORED CONTENT              POLITICS                                    POLITICS                                         POLITICS
The Future of Smart Homes      Israel Will Allow Entry to Rep.             Trump's Oil Sanctions Leave Russian              Does Trump Really Want to Buy
by Qingdao Haier               Rashida Tlaib—But She's Not Going           Exporters $1 Billion Richer                      Greenland?

address as a dropbox at a Lakeland, Fla., UPS store, then donated easements to Keller's land trust in December 2015. Eleven new partnerships followed a similar pattern in 2016.

In a matter of weeks, the land's value jumped from $3,500 and $6,500 per acre (its listing prices before the syndicators bought the land in two pieces) to about $20,000 an acre (the price at which the syndicators resold it to their investors) to more than $200,000 an acre (the claimed easement deduction). Once all that was accomplished, most of the partnerships gave away the land, earning one final, much smaller, deduction on its residual value.

The valuations defy common sense, say mining experts, who rejected the stated claims that the parcels could each be developed into highly profitable limestone mines. Dean Saunders, a commercial broker who listed the County Line Ranch for years, says a previous owner tried to sell it in 2008 as a potential mining site for $10,000 an acre, but found no takers. He "realized the economics didn't justify trying to mine," says Saunders. He calls the $200,000 per acre appraisal "a farce and a travesty and an abuse of the system." (Schuler defends the transaction, saying his company relied on "qualified, independent experts" who concluded that "profitable limestone mining operations were feasible.")

For his part, Keller calls it a "heck of a project." He says the area's avian and amphibian diversity is "amazing" and that the land will also help protect the endangered Florida grasshopper sparrow. "If I can provide habitat for that… I think I'm doing a heck of a good job."

As Keller's syndication business mushroomed, so did his conflict with the Land Trust Alliance. Keller blamed the group for growing aversion to the promoters within the conservation community. In 2015, he tried to persuade Chuck Roe, a former Land Trust Alliance executive whom he'd hired as a consultant, to launch a rival trade association. Roe declined. Roe says he recognized that it would be an advocate for syndications, which he calls "horrifying."

By the end of the year, Congress once again addressed easements. The 2006 law that expanded the deduction had actually been temporary and had been renewed periodically since then. But in December 2015, even as concern mounted about syndications, Congress decided to make the enhanced deduction permanent.

In August 2016, the Land Trust Alliance barred all accredited land trusts—and later, all of its members—from accepting syndicated easements. It urged avoidance of deals that are managed by a paid promoter, involve land acquired within the past 36 months, and claim deductions of more than 2.5 times the property's acquisition cost.

**FORTUNE**   HOME  SUBSCRIBE  

| SPONSORED CONTENT<br>**The Future of Smart Homes**<br>by Qingdao Haier | POLITICS<br>**Israel Will Allow Entry to Rep. Rashida Tlaib—But She's Not Going** | POLITICS<br>**Trump's Oil Sanctions Leave Russian Exporters $1 Billion Richer** | POLITICS<br>**Does Trump Really Want to Buy Greenland?** |



"A smear campaign... something the land trust alliance made up."

Robert Keller on criticism of easement appraisals and the efforts to outlaw syndications

Last December, the IRS finally took a more systematic step. It issued a formal notice branding virtually all profit-generating syndicated deals as abusive. Anyone who had served as a promoter or material adviser on any deal dating back to January 2010 was required to file special forms, allowing the IRS to red-flag and scrutinize the transactions. This was intended to deter such deals and to lay the groundwork for future punitive action. The IRS has "listed" just two such tax-avoidance transactions since 2009.

The syndicators have punched back. A few months before the IRS announcement, Frank Schuler had formed the rival advocacy group Keller had contemplated, calling it the Partnership for Conservation ("permanently conserving important lands in the U.S."). It has spent $650,000 on lobbyists since its inception. EcoVest Capital—the single most prolific syndicator—has invested another $1.13 million on lobbyists. Those riches bought the services of top-tier advocates, such as former deputy Treasury secretary Stuart Eizenstat.

In the months that followed, the industry persuaded Georgia Congressman Tom Graves, whose district includes the syndication hotbed of Rome, to slip a rider into the federal appropriations bill that would bar the IRS from spending money to enforce the listing notice. (A spokesperson for Graves said via email that constituents had expressed concerns that the IRS notice would have a "chilling effect" on conservation.) The provision passed in the House but has not been voted on yet in the Senate.

The next legislative volley, months later, came from the traditionalists: In November, two representatives introduced a separate bill to kill syndications.

In the final months of 2017, all attention turned to the tax bill. Again, the syndicators emerged unscathed—the easement rules were untouched—and it doesn't appear to have been a close call.

The anti-syndications contingent may still ultimately prevail. Yet every time the issue has reached Congress so far, the result has been to preserve or strengthen the deduction. It