# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMMITTEE ON WAYS AND MEANS,
UNITED STATES HOUSE OF
REPRESENTATIVES,

*Plaintiff*,

vs.

UNITED STATES DEPARTMENT OF THE
TREASURY, *et al.*,

*Defendants*.

Case No. 1:19-cv-01974-TNM

# Exhibit KK

# Hearing on Legislative Proposals and Tax Law Related to Presidential and Vice-Presidential Tax Returns

—————————————————————

## HEARING

BEFORE THE

### SUBCOMMITTEE ON OVERSIGHT

OF THE

## COMMITTEE ON WAYS AND MEANS

## U.S. HOUSE OF REPRESENTATIVES

ONE HUNDRED SIXTEENTH CONGRESS

FIRST SESSION

—————————————————————
—————————————————

FEBRUARY 7, 2019

—————————————————

### Serial No.  116-3

—————————————————

**COMMITTEE ON WAYS AND MEANS**

RICHARD E. NEAL, Massachusetts, CHAIRMAN

| | |
|---|---|
| JOHN LEWIS, Georgia | KEVIN BRADY, Texas, Ranking Member |
| LLOYD DOGGETT, Texas | |
| MIKE THOMPSON, California | DEVIN NUNES, California |
| JOHN B. LARSON, Connecticut | VERN BUCHANAN, Florida |
| EARL BLUMENAUER, Oregon | ADRIAN SMITH, Nebraska |
| RON KIND, Wisconsin | KENNY MARCHANT, Texas |
| BILL PASCRELL, JR., New Jersey | TOM REED, New York |
| JOSEPH CROWLEY, New York | MIKE KELLY, Pennsylvania |
| DANNY K. DAVIS, Illinois | GEORGE HOLDING, North Carolina |
| LINDA SÁNCHEZ, California | JASON SMITH, Missouri |
| BRIAN HIGGINS, New York | TOM RICE, South Carolina |
| TERRI A. SEWELL, Alabama | DAVID SCHWEIKERT, Arizona |
| SUZAN DELBENE, Washington | JACKIE WALORSKI, Indiana |
| JUDY CHU, California | DARIN LaHOOD, Illinois |
| GWEN MOORE, Wisconsin | BRAD R. WENSTRUP, Ohio |
| DAN KILDEE, Michigan | JODEY ARRINGTON, Texas |
| BRENDAN BOYLE, Pennsylvania | DREW FERGUSON, Georgia |
| DON BEYER, Virginia | RON ESTES, Kansas |
| DWIGHT EVANS, Pennsylvania | |
| BRAD SCHNEIDER, Illinois | |
| TOM SUOZZI, New York | |
| JIMMY PANETTA, California | |
| STEPHANIE MURPHY, Florida | |
| JIMMY GOMEZ, California | |
| STEVEN HORSFORD, Nevada | |

BRANDON CASEY, *Staff Director*
GARY J. ANDRES, *Minority Chief Counsel*

**SUBCOMMITTEE ON OVERSIGHT**

JOHN LEWIS, Georgia, *Chairman*

| | |
|---|---|
| SUZAN DELBENE, Washington | MIKE KELLY, Pennsylvania |
| LINDA SÁNCHEZ, California | JACKIE WALORSKI, Indiana |
| TOM SUOZZI, New York | DARIN LaHOOD, Illinois |
| JUDY CHU, California | BRAD R. WENSTRUP, Ohio |
| GWEN MOORE, Wisconsin | |
| BRENDAN BOYLE, Pennsylvania | |

**Hearing on Legislative Proposals and Tax Law Related to Presidential and Vice-Presidential Tax Returns**

U.S. House of Representatives,
Subcommittee on Oversight,
Committee on Ways and Means,
Washington, D.C

_____

## WITNESSES

**Joseph J. Thorndike**
Director of the Tax History Project, Tax Analysts
Witness Statement

**George K. Yin**
Edwin S. Cohen Distinguished Professor of Law and Taxation, University of Virginia School of Law
Witness Statement

**Steve Rosenthal**
Senior Fellow, Urban-Brookings Tax Policy Center
Witness Statement

**Noah Bookbinder**
Executive Director, Citizens for Responsibility and Ethics in Washington
Witness Statement

**Kenneth J. Kies**
Managing Director, Federal Policy Group
Witness Statement

_____



# HOUSE COMMITTEE ON WAYS & MEANS
## CHAIRMAN RICHARD E. NEAL

# *ADVISORY*

## FROM THE COMMITTEE ON WAYS AND MEANS

FOR IMMEDIATE RELEASE                                       CONTACT: (202) 225-3625
January 31, 2019
No. OV-1

### Chairman Lewis Announces Oversight Subcommittee Hearing on Legislative Proposals and Tax Law Related to Presidential and Vice-Presidential Tax Returns

House Ways and Means Oversight Subcommittee Chairman John Lewis announced today that the Subcommittee will hold a hearing, entitled "Legislative Proposals and Tax Law Related to Presidential and Vice-Presidential Tax Returns," on Thursday, February 7, 2019, at 2:00 p.m., in room 1100 of the Longworth House Office Building.

In view of the limited time available to hear witnesses, oral testimony at this hearing will be from invited witnesses only.  However, any individual or organization not scheduled for an oral appearance may submit a written statement for consideration by the Committee and for inclusion in the printed record of the hearing.

**DETAILS FOR SUBMISSION OF WRITTEN COMMENTS:**

Please Note: Any person(s) and/or organization(s) wishing to submit written comments for the hearing record must follow the appropriate link on the hearing page of the Committee website and complete the informational forms.  From the Committee homepage, http://waysandmeans.house.gov, select "Hearings."  Select the hearing for which you would like to make a submission, and click on the link entitled, "Click here to provide a submission for the record."  Once you have followed the online instructions, submit all requested information.  ATTACH your submission as a Word document, in compliance with the formatting requirements listed below, **by the close of business on Thursday, February 21, 2019.**  For questions, or if you encounter technical problems, please call (202) 225-3625.

**FORMATTING REQUIREMENTS:**

The Committee relies on electronic submissions for printing the official hearing record.  As always, submissions will be included in the record according to the discretion of the Committee.  The Committee will not alter the content of your submission, but reserves the right to format it according to guidelines.  Any submission provided to the Committee by a witness, any materials submitted for the printed record, and any written comments in response to a request for written comments must conform to the guidelines listed below.  Any submission not in compliance with these guidelines will not be printed, but will be maintained in the Committee files for review and use by the Committee.

All submissions and supplementary materials must be submitted in a single document via email, provided in Word format and must not exceed a total of 10 pages.  Witnesses and submitters are advised that the Committee relies on electronic submissions for printing the official hearing record.

All submissions must include a list of all clients, persons and/or organizations on whose behalf the witness appears. The name, company, address, telephone, and fax numbers of each witness must be included in the body of the email.  Please exclude any personal identifiable information in the attached submission.

Failure to follow the formatting requirements may result in the exclusion of a submission.  All submissions for the record are final.

The Committee seeks to make its facilities accessible to persons with disabilities. If you require special accommodations, please call (202) 225-3625 in advance of the event (four business days' notice is requested).  Questions regarding special accommodation needs in general (including availability of Committee materials in alternative formats) may be directed to the Committee as noted above.

**Note**: All Committee advisories and news releases are available at
http://www.waysandmeans.house.gov/

###

LEGISLATIVE PROPOSALS AND TAX LAW RELATED TO PRESIDENTIAL
AND VICE-PRESIDENTIAL TAX RETURNS

Thursday, February 7, 2019

House of Representatives,

Subcommittee on Oversight,

Committee on Ways and Means,

Washington, D.C.

The subcommittee met, pursuant to call, at 3:16 p.m., in Room 1100, Longworth House Office Building, Hon. John Lewis [chairwoman of the subcommittee] presiding.

Chairman <u>Lewis.</u>  The subcommittee will come to order.  I regret in the delay.
We had some votes on the floor.

Good afternoon to everybody.  Let me begin by congratulating the ranking
member, Mr. Kelly, on his appointment to this subcommittee.  I hope that we will
continue the good and thoughtful work on behalf of the American taxpayers.  We
have been called.  We have been chosen to lead at this time in our history.

I would also like to welcome the new and returning members of the
Oversight Subcommittee.  I look forward to working with each and every one of you
in the 116th Congress.

During today's hearing, we will examine a topic of great interest to the
American people.  We will review whether a President, vice president, or any
candidate for these office should be required by law to make their tax return
available to the public.  In other words, we will ask the question:  Does the public
have a need to know that a person seeking or holding the highest office in our
country obeys the tax laws?

To help inform our thinking, we will review the voluntary release of tax return
by Presidents and others.  The Federal tax laws that protect taxpayer's information
recent bill, including H.R. 1, that would require Presidents and vice presidents to
disclose their tax return, an Internal Revenue Service tax return filed by President
and vice president.

This afternoon, I am reminded that over 45 years ago, we were in a situation
that is not much different than today.  Many of you are old enough to remember
when President Nixon faced questions about his Federal income taxes.  During a
press conference call for review by Congress of his return, he said, In all of my years
of public life, I have never profit, never profit from public service.  And in my many

years of public life, I welcome this kind of examination, because people have got to know whether or not their President is a crook.

He concluded by saying, Well, I am not a crook, even though the IRS wrote him a letter stating his return were correct.  The investigation by Congress found that he owed almost $480,000 in tax and interest.

The question that arose then and remain today are, first, should the public know whether a person who is running for the office or who is currently leading our Nation paid the correct amount of tax?  In the case of Nixon, the answer was yes.

Second, is it fair to expect the IRS to enforce Federal tax law against the President who is the head of the executive branch and has final control of the agency?  In the case of Nixon, the answer was no.

These and other grave questions require thoughtful and serious consideration.  We have to do the right thing.  We are called to do the right thing. We have been selected.  We have been chosen.

I thank our experts for joining us today, and I look forward to their testimony.

Now I am pleased to recognize the ranking member for his opening statement, Mr. Kelly.

[The statement of Chairman Lewis follows:]

Mr. Kelly.  Thank you, Mr. Chairman, and thanks for holding this hearing today.

As this is my first hearing as Republican leader on the Oversight Committee, I want to start by saying that I very much look forward to working together with you, as well as other members of the subcommittee, specifically on issues of bipartisan concern.

Personally, I must say that when I found out we would be serving together on this committee, I was particularly delighted.  I so fondly remember our time in Alabama as we walked across the Edmund Pettus Bridge with my grandson back in March of 2015 to mark the 50th anniversary of the Selma to Montgomery march.  At that time, George was 8 years old, and you were so gracious with him.  We have many pictures of the two of us talking with George.

And one of the things that George and I talked about, I said, Georgy, you and I are going to come back for the 100th anniversary of the bridge and we are going to walk across together.  He said, well, Grandpa, how old are you now?  I said, I am 65. He said, Grandpa, you are going to really be old.  And I said, well, maybe you can push me across the bridge.

But you took time to spend with that little 8-year-old, and he still has those pictures and those memories to go with it.  So serving with you on this committee is phenomenal.

And I know that you and Chairman Jenkins had a good working relationship, particularly with things like the bill to redesign the IRS.  And I would like to continue to build upon that foundation in this Congress also.

The primary role of this subcommittee, I believe, Government Oversight, is an important role for every Member of Congress, because we are the taxpayers'

watchdogs here in Washington as well as being legislators.  Government oversight is critical to the protection of taxpayers and the safety of all Americans.

As Senator Grassley once said, oversight is about keeping faith with the taxpayers and giving people confidence that the government plays by the rules or is held accountable.  That is a role I hope to play on this committee, and I look forward to serving with you in this capacity, Mr. Chairman.

Now, for today's hearing, I want to start by stating the obvious.  All Americans, every single American has a right to the privacy and of the personal information contained in their tax return.  That is why we have a statute in law, 6103, that covers every American from the President to your next-door neighbor and your family.  It mandates that the Federal Government must keep tax returns and tax return information private.

Congress enacted taxpayer protections that are embedded in section 6103 of the Tax Code to ensure every American's privacy and to prevent the use of taxpayer information from being made public.  Americans should be able to trust that the Federal Government or some unelected bureaucratic in Washington is not going to publicly release their tax returns without the taxpayer's consent.

Tax returns can have a lot of sensitive information in them.  It is not just all income, expenses, and deductions.  There is information on where you live, what you do for a living, what kind of car you drive, information on your bank account, which cell phone is yours, whether you have health insurance, and the names and Social Security numbers of your spouse and all of your children.

Keeping this information confidential is critical to the integrity of the U.S. tax system, which is only functional because taxpayers voluntarily pay their taxes. According to the National Taxpayer Advocate, 98 percent of all tax revenue paid by

American taxpayers is paid voluntarily.  That means that only a small, percentage, 2 percent of taxes are collected through audits and enforcement.  Ninety-eight percent is voluntarily paid.  Ninety-eight percent of anything is a lot.

So I have to take a closer look and ask why.  I believe this is because of the trust the American taxpayers have in our system and that  privacy is at the foundation of that trust.

Now, some of my colleagues on the other side of the aisle have suggested using this committee as an avenue to obtain and release the President's tax returns in the name of transparency.  As leaders of the Ways and Means Committee, I don't believe we have to choose between protecting privacy and promoting transparency among public officials.  To begin with, Congress is prohibited by law from examining and making public the private tax returns of Americans for political purposes.  Such an abuse of power would open a Pandora's box, and it would be tough to get a lid back on.  It would set a very dangerous precedent.

And the question is where does it end?  What about the tax returns of the Speaker, the Members of Congress, or Federal employees or, for that matter, any political donors?  There is no end in sight for those whose tax information may be in jeopardy.

Thankfully, violating taxpayer privacy is not the only option for increasing transparency.  I support the current ethics review in place which ensure that Presidents and vice presidents are held accountable to taxpayers.  My colleagues on the other side of the aisle have voiced the need to have experts review the President's tax return with a fine-tooth comb.  But isn't that the exact reason why the IRS, the agency with just that level of expertise, conducts mandatory audits of the President and vice president every year?  Yes, that's right, the IRS audits the

President and the vice president every single year, whether he or she is a Republican or a Democratic.  I don't think most Americans know that is the case.  I certainly didn't know it until I started doing some research myself and inquiring.

In addition to IRS audits, there are also financial disclosures required.  If my colleagues have a valid concern with the financial disclosure requirements, then let's come together to legislate a thoughtful solution to require additional disclosures.  If there are challenges in obtaining required documents for disclosure, then let's look at how we can make that process better and more transparent.  But the reckless sharing of a taxpayer's private information for political purposes would be unprecedented and completely outside the bounds of Congress' role as a legislative body.

Our role is oversight and certainly not overreach.  And we can and must do better.  Therefore, I look forward to hearing from our witnesses on how to do that better, that is, how to best protect our American taxpayers.

Thank you, Mr. Chairman.  It is great to be with you.

[The statement of Mr. Kelly follows:]

Chairman <u>Lewis.</u>  Well, thank you, Mr. Kelly.  And thank you for your wonderful comments about our trip to Alabama with your grandson George.

Mr. <u>Kelly.</u>  Yes, with George.

Chairman <u>Lewis.</u>  Without objection, all members' opening statements will be made part of the record.

Now we will hear from our panel.  I ask that each of you limit your testimony to 5 minutes.  I know you have been so patient.  You have been waiting for a long time.  So you can, you know, cut it as short as possible.  We will not object.  Without objection, your entire statement will be included in the record.

It is now my pleasure to introduce the director of the Tax History Project, Mr. Joseph Thorndike.

You may begin, sir.

**STATEMENT OF JOSEPH J. THORNDIKE, DIRECTOR OF THE TAX HISTORY PROJECT,**

**TAX ANALYSTS**

Mr. <u>Thorndike.</u>  Good afternoon, Chairman Lewis, Ranking Member Kelly.

Chairman <u>Lewis.</u>  I should have said Dr. Thorndike.

Thank you, Doctor.

Mr. <u>Thorndike.</u>  Thank you.

It is an honor and privilege to be here today to talk about the long voluntary

tradition of tax return disclosure by American Presidents, vice presidents, and major

party nominees.

As has been said, I am Joseph Thorndike, director of the Tax History Project at

Tax Analysts, a nonprofit, nonpartisan provider of tax information.  As part of my job,

I am the curator of a collection -- an electronic collection of Presidential tax returns.

I speak today on my own behalf, not for any organization.

I will be making two main points.  First, for more than 40 years, American

Presidents have been making substantial voluntary disclosures of personal tax

information.  Since 1977, those disclosures have been annual, with each sitting

President releasing a complete tax return.  Disclosures by vice presidents have been

nearly as consistent.  And major party nominees, while generally restricting their

disclosures to campaign years, have also released at least one complete tax return

and sometimes many more.

This unbroken string of disclosures ended in 2016 when first candidate and

then President Donald Trump declined to release any personal tax information.

Second, this tradition of voluntary tax disclosure is fragile.  By its nature, a

tradition can lack clear standards and procedures.  It tends to vary and change and

perhaps to even weaken over time.  Some political leaders have resisted or dragged their feet about disclosure.  Until 2016, all ultimately chose to comply.  But absent clear, binding, bright-line requirements, the nature of that compliance has varied considerably.  That variability has underscored the vulnerability of the tradition itself.

Let me talk just briefly about origins, which the chairman has already mentioned.  Rarely does the hand of history weigh quite so heavily on current policy as it does around this topic.  Over the past four decades, American politicians have been releasing their personal tax returns because President Nixon chose to release his personal tax returns, albeit under some duress.

Nixon's tax troubles came to light in a lawsuit that happened to mention a large deduction he had taken for the donation of his vice presidential papers to the National Archives.  That revelation gave rise to months of speculation and ultimately a leak from within the IRS.  To help quell the scandal, Nixon released 4 years of personal returns and invited the Joint Committee on Internal Revenue Taxation, as it was then called, to examine those returns.  It is worth noting that Nixon made this release while already under audit by the Internal Revenue Service.

Beginning with Jimmy Carter, every President through Barack Obama has opted to release a complete tax return during each year in which he has held office.  The same is true for vice presidents since Walter Mondale, including Vice President Pence.

Similarly, beginning in 1976 and continuing through 2012, every major party nominee and his or her running mate has made at least one significant disclosure.  From 1980 do 2012, these have included at least one complete tax return and sometimes as many as 30.

While Presidents, vice presidents, and major party nominees have generally

observed the tradition of disclosure, there have been occasional issues, especially around the disclosure of tax returns filed by candidate spouses, some of which have included partnership and business returns that those spouses were disinclined to release.

In addition, the 2016 election featured numerous incomplete tax disclosures with candidates from both parties opting to release just the Form 1040 rather than a complete return.  It bears notice that if Nixon had released only his Form 1040 in 1973, investigators would have been unable to discover the most serious problems with his returns.

I would like to turn briefly to the subject of these Presidential audits that have already been mentioned.  In 1977, the IRS established new procedures, still in force, requiring an annual audit for every President and vice president while in office.  According to IRS officials at the time, the policy was established in light of, quote, everything that has happened.

The past in question was Nixon's, and the Nixon returns had actually been audited twice, the second audit finding numerous serious problems.  The first had found none and it instead concluded with a commendation for the President from the IRS for the care shown in the preparation of his returns.  A routine politeness maybe, but one that was disconcerting in retrospect.

And indeed, that episode underscored a key question both at the time and now:  Can we rely on the IRS to fairly and vigorously enforce the tax laws when applied to a President?  Doubts about the answer to that question are what prompted Nixon to make his release essentially allowing for what we would today call a crowdsourced backstop to the IRS audit.  And until recently, that backstop remained in place.

In conclusion, I believe that the four-decade tradition of return disclosure is clearly imperiled most seriously by President Trump's refusal to release his returns, but also by the growing popularity of these partial disclosures.  I believe we would all be better off, candidates, the news media, historians, and public, if this informal tradition were transformed into something more substantial, well-defined, and legally binding.

Absent clear standards and procedures, a tradition can be interpreted, manipulated, and ultimately diminished by anyone reluctant to observe it.  And the indeterminacy of a tradition is also an invitation to endless begging, pleading, and shaming, none of which is good for the body public.

I am happy to answer anybody's questions.

[The statement of Mr. Thorndike follows:]

Chairman <u>Lewis.</u>  Thank you very much.

And now we will hear from a distinguished professor of law, Professor Yin, from the University of Virginia.


**STATEMENT OF GEORGE K. YIN, EDWIN S. COHEN DISTINGUISHED PROFESSOR OF LAW AND TAXATION, UNIVERSITY OF VIRGINIA SCHOOL OF LAW**


Mr. <u>Yin.</u>  Thank you, Mr. Chairman, Ranking Member Kelly, other members of the subcommittee and committee.  I am a law professor at the University of Virginia and a former chief of staff of the Joint Committee on Taxation.  My testimony concerns the existing authority of the committee to obtain and disclose the tax return information of any taxpayer, including the President, vice president, and any business that they own.  I have three points to make.

First, the chairman of the committee may request the tax return information of any taxpayer from the Treasury Secretary, who is obligated to furnish it.  I don't see any wiggle room in this statute for the Secretary to refuse a request.  I believe Congress drafted the authority without conditions, to match the unrestricted right of the President at the time to access and disclose any tax return.

Should the Secretary refuse, we would be in unchartered territory.  The authority appears to have been rarely invoked since its creation in 1924, and I know of no instance when a request has been refused.  If a court were to become involved, it might look to precedents involving congressional enforcement of a subpoena. Those cases generally indicate that Congress must act with a legitimate purpose, meaning, generally, a purpose consistent with its constitutional responsibilities.  The chairman, therefore, would be well advised to request tax return information only if

he has a legitimate purpose.

Second, if it has a legitimate purpose, the committee may submit any tax return information to the House.  The present statute places no condition on this authority.  But as originally passed in 1924, the committee could submit only, "relevant or useful", information to the House, words that were removed by technical amendment in 1976.

In recent research, I examined the meaning of these words very closely and concluded that they require the committee to have, at a minimum, a legitimate purpose for submitting tax return information to the House.  I also concluded that the meaning did not change even after the removal of the words in 1976.  I believe the amendment in 1976 was a mere technical drafting change with no substantive effect.

In short, the committee must have a legitimate purpose to submit tax return information to the House.  Since the submission might result in public disclosure, the committee should act only if it has a legitimate purpose to disclose the tax information to the public.

Finally, since 1976, the tax committee authority to obtain and submit tax return information is the sole means by which Congress can make public disclosures of such information.  The authority, therefore, should be interpreted in a manner that does not frustrate Congress' informing function with respect to such information.

I provide an example in my testimony of why the legitimate purpose for tax committees to act should not be limited only to purposes within the specific legislative jurisdiction of the committee.  Rather, a permissible purpose should include any responsibility given to Congress under the Constitution.

Congress, in effect, placed tax return information in a locked safe in 1976, but it preserved one key for purposes of disclosing the information to the public.  It gave that key to the tax committees.  The law, therefore, should be interpreted to enable the tax committees to use that key in appropriate and necessary circumstances.

Thank you very much.

[The statement of Mr. Yin follows:]

Chairman <u>Lewis.</u>  Thank you very much, Professor Yin, for your testimony.

Now, it is my pleasure to present Steven Rosenthal, a senior fellow at the Tax Policy Center.

You may begin, sir.


**STATEMENT OF STEVE ROSENTHAL, SENIOR FELLOW, URBAN-BROOKINGS TAX POLICY CENTER**


Mr. <u>Rosenthal.</u>  Chairman Lewis, Ranking Member Kelly, members of the subcommittee, and other members of the Ways and Means Committee, thank you for inviting me to speak today on disclosing Presidential and vice presidential tax returns.  My name is Steve Rosenthal.  I am a senior fellow at the Tax Policy Center.  I am speaking only on my own behalf, and my views should not be attributed to any other organization or person.

I would like to highlight three points for my testimony.  First, disclosing tax returns of Presidents, vice presidents, and candidates for these offices is important because it increases public confidence in the government in support for our voluntary tax system.  As Ranking Member Kelly observed, our tax system is based on self-assessment.  For it to work properly, taxpayers must be confident that it is fair.

In my view, disclosure of tax returns to the public can help.  Tax returns reveal effective tax rates, which is the amount of taxes divided by taxable income.  Effective tax rates are useful to measure whether a taxpayer makes a fair share payment of taxes.  Tax returns also show to the dollar the source and nature of income, losses, and deductions.

Second, tax return information and other tax information of Presidents and vice presidents enhances the ability of Congress to oversee the executive branch, which is critical to our checks and balances.  Congress may, for example, use tax information to evaluate the fairness of IRS audits, investigate potential financial conflicts, or to develop new tax legislation or other legislation.

Third, there are two paths to obtain tax information on Presidents and vice presidents.  As Professor Yin has observed, existing law, section 6103(f) of the Tax Code, permits the Committee on Ways and Means to request tax information on Presidents or vice presidents that is held by the IRS.  And new legislation, like H.R. 1, would require Presidents and vice presidents to disclose a minimum number of years of tax returns.  Both paths are important, in my view.

The existing Tax Code permits the committee to request tax returns and other information held by the IRS.  The scope of the committee's request would be based on its purpose for the tax information.  Some information, such as IRS audit work papers, would help the committee evaluate the fairness of an IRS audit.  Other information, such as related business and trust returns, would help identify potential financial conflicts.  After reviewing the information, the committee could exercise its discretion to determine whether and how to release it.

Now, new legislation such as H.R. 1 can require Presidents and vice presidents to disclose publicly a minimum number of years of tax returns, but Congress cannot anticipate all of the information to require in the future.  It may not foresee how a future President will make his or her income or what potential conflicts may arise.  But Congress could still use section 6103(f) to obtain extra years of returns or wider information on a President or vice president, if appropriate.

In summary, the public would benefit from the disclosure of tax returns of Presidents and vice presidents and candidates for these offices.  Congress would help fulfill its oversight responsibilities by obtaining tax information, and of presidents and vice presidents as appropriate.  And there are two paths to obtain the tax information:  One in existing law and one in proposed legislation.  And in my view, both are important.

I am happy to take any questions.  Thank you.

[The statement of Mr. Rosenthal follows:]

Chairman Lewis.  Thank you for your testimony.

Now it is my pleasure to present Mr. Noah Bookbinder.  Thank you for being here.  I think I remember in another time, another period, your father.

Thank you for being here.

**STATEMENT OF NOAH BOOKBINDER, EXECUTIVE DIRECTOR, CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON**

Mr. Bookbinder.  Chairman Lewis, Ranking Member Kelly, members of the committee, thanks so much for the opportunity to appear before you today to talk about key reforms included in H.R. 1, the For the People Act.

My organization, Citizens for Responsibility and Ethics in Washington, or CREW, focuses on reducing the negative influence of money in politics, promoting ethics in government, and increasing transparency in our institutions.  In all of these respects, the For the People Act is a vital first step in restoring trust in our democratic systems.

I am here today to speak to one aspect of this important legislation:  the need for transparency in Presidential and vice presidential tax returns.  As others on the panel have explained, President Trump's continuing refusal to release his tax returns is a departure from the practice of candidates and Presidents of both parties over the last 40 years.  The For the People Act would codify this commonsense principle of good governance for Presidents and vice presidents.

There are a number of important things the public can learn from a President's or vice president's tax return.  For example, the President could be concerned with whether the President, vice president, or a candidate paid his or her

fair share of taxes.  And if this seems like a far-fetched consideration, it is worth recalling the recent blockbuster report that President Trump's family appears to have engaged in an elaborate decades-long tax avoidance scheme.  Or the public could want to know more about how a President or vice president approaches charitable giving.  In the case of President Trump, the public would be able to build on CREW's work and the subsequent work of New York's attorney general investigating how the President may have misused his now defunct charitable foundation.

However, I would like to highlight one critical function of Presidential and vice presidential tax transparency:  to identify and publicly expose potential financial conflicts of interest.  If not addressed, these conflicts cast doubt on every aspect of a President's job.  The past 2 years have demonstrated this in vivid detail.  The public cannot currently have confidence in President Trump's decisions because his finances remain opaque.  We cannot know if his decisions are made in the public's interest or in his own financial interest because we don't know what his financial interests are.  These unknowns are particularly troubling given President Trump's decision to maintain ownership of his businesses while serving as President.

Understanding President Trump's financial interests could, for example, shed light on exactly how he and his businesses will be affected by the massive tax legislation he championed last year.  It could help us understand whether he is receiving funds from foreign sources, be they Russian, Saudi Arabian, Chinese, or otherwise.  Or we could learn other things about his finances that we haven't even thought to ask yet.  Ultimately, tax transparency would open the public's eyes to investigative threads that could lead to greater accountability for the occupants of our Nation's highest offices.

The example of President Trump's tax returns demonstrates one way in

which the current provisions in H.R. 1 should actually go further. Simply obtaining the President's individual tax returns will not necessarily shine light onto the hundreds of distinct corporations he owns under the umbrella of the Trump organization. It is equally, if not more important, to obtain the President's business tax returns, something that this legislation does not currently require. I would be happy to work with the committee to update the legislation to include such a requirement.

One justification President Trump has provided for not disclosing his tax returns is that his returns are under audit. As many have noted, this did not stop others in the past, including even President Nixon, from releasing their tax returns. But more importantly, Congress should consider whether the existing requirement that the IRS audit every President's and vice president's tax returns can realistically serve its purpose. Congress must question whether we can have full confidence in the IRS, which is overseen by a Presidential appointee, to thoroughly review the President's taxes.

Public disclosure of the President's and vice president's tax returns can substantially mitigate these concerns. If the public can ultimately see what is filed, the IRS can be protected against charges that it was too easy or too hard on the President. Public review also has the added benefit of giving the American people a greater ability to evaluate the decisions made by the President and any conflicts that may affect these decisions, something an IRS audit cannot provide.

I will close by reiterating an important point. By ensuring the transparency of Presidential and vice presidential tax returns, H.R. 1 would not only impact this current President, it would force every President and vice president and every major candidate for these positions in the future, regardless of party, to publicly disclose

this information.  This provision is nonpartisan.

We must ensure the transparency we need at the highest levels of government in order to restore faith that our leaders are acting in the interest of the American people, not in their own interest.  For all of these reasons, Congress should implement and indeed strengthen the tax return provision in H.R. 1.

Thank you for the opportunity to address the subcommittee today.  I am happy to answer any questions members may have.

[The statement of Mr. Bookbinder follows:]

Chairman <u>Lewis.</u>  Thank you very much, Mr. Bookbinder.  Good to see you.

Now it is my pleasure to welcome a gentleman back to the committee who is not a stranger, Mr. Ken Kies, the managing director of the Federal Policy Group.

You may begin, sir.


**STATEMENT OF KENNETH J. KIES, MANAGING DIRECTOR, FEDERAL POLICY GROUP**


Mr. <u>Kies.</u>  Thank you.  Thank you.

Chairman Lewis, Ranking Member Kelly, and distinguished members of the subcommittee, and also members of the Ways and Means Committee, I am the managing director of the Federal Policy Group.  Thank you for inviting me to speak on tax law related to Presidential and vice-presidential tax returns.

During my time in governmental service as chief of staff of the Joint Committee on Taxation, as well as when I was the chief Republican tax counsel of Ways and Means, I have had the occasion to review the law surrounding the handling and disclosure of tax return information, as well as to advise Members of Congress with respect to thereto.  And my comments today are informed by this experience.

Section 6103(a) of the Internal Revenue Code specifically provides, quote, returns and return information shall be confidential, and except as authorized by this title, no officer or employee of the United States shall disclose any return or return information obtained by him in any manner in connection with his service as such an officer or employee or otherwise under the provisions of this section.

The code provision has sometimes been described as a general prohibition on the disclosure of tax returns and tax return information.  While I agree that the

provision does prohibit disclosure, I note that the characterization of this rule as a general restriction is somewhat misleading.  Instead, I would describe the provision as a blanket rule against disclosure by any authorized recipient of returns, with disclosure allowed in some limited situations that I will describe later.

For purposes of this hearing, an even more relevant aspect of the blanket restriction as it pertains to Members of Congress and their staff is that the prohibition rule explicitly refers to returns obtained, quote, in any manner with any Member of Congress or employed by one, including returns that were obtained under the provisions of this section.  This is a crucial point to remember when considering how the blanket rule against disclosure of returns relates with the limited exceptions provided in this section.

Just because a Member of Congress or employee of such Member is entitled to have returns disclosed to him or her, that Member or employee is still prohibited from then disclosing the returns to another, unless further disclosure is explicitly allowed by reason of this section.  To willfully do otherwise is to commit a felony punishable by up to 5 years in prison.

As for the exception that is relevant to Members of Congress and their staff, I read the plain language of section 6103(f) and find no comfort whatsoever that any public disclosure of tax returns is clearly permitted.  A sentence in section 6103(f) does refer to one of the three listed committees submitting returns it has received to the Senate or House or both.  This sentence explicitly says nothing about permitting disclosure to the public.  It likewise says nothing about public disclosure being permitted when Members have a valid legislative purpose and does not say that the permissive disclosure to the Senate or House overrides the blanket restrictions.

Thus, since every disclosure of returns is prohibited unless it is explicitly

allowed, the only conclusion I could feel safe adopting is the disclosure can be made by a listed committee to the House or Senate members generally but that such disclosure can go no further unless permitted by some other section of which there is no relevant part.

Further, while I acknowledge the existence of a colorable argument that the so-term speech and debate clause of the U.S. Constitution could prevent prosecution of a Member of Congress or staff member for a violation of the tax return confidentiality rules so long as the act was undertaken in furtherance of the performance of their legislative tasks, I would observe that this clause has never been tested or applied by the Supreme Court in the context of a felony violation under section 6103. Thus, if I were advising a Member of Congress and any of their staff, I would tell them I could provide them no firm comfort on what this clause actually allows them to do with respect to tax returns when they have legally received them under section 6103. In my mind, the risk to such Members and staff is grave when one considers the potential penalties.

Given everything I have briefly described above, I would never feel comfortable advising a client that he or she could safely disclose, let alone make public, any tax return in a manner that was not unequivocally enumerated in section 6103. In my capacity as chief of staff of the Joint Committee on Taxation, I never did so nor would I have counseled any of my staff, any Member of Congress, or any congressional staff to ever do so.

That concludes my formal remarks.  I thank the subcommittee for this attention, and I welcome any questions.

[The statement of Mr. Kies follows:]

Chairman <u>Lewis.</u>  Thank you very much, Mr. Kies, for being here.

I want to thank each member of the panel for being concise.  And we want you to continue to give a short answer.

The hearing is now open for questions.  I ask that each member follow the 5-minute rule.  And all members should have an opportunity to ask and answer questions, if we follow the 5-minute rule.  That is for the panel also.  Okay?

Professor Yin, does the tax law provide any basis for the Secretary of the Treasury to refuse a request for tax information from the committee?

Mr. <u>Yin.</u>  The statute provides no basis for a refusal.

Chairman <u>Lewis.</u>  Furthermore, Professor Yin, can a person release his or her tax return while under audit?

Mr. <u>Yin.</u>  I know of no restriction that would prevent a taxpayer from disclosing information even if it is under audit.

Chairman <u>Lewis.</u>  Well, we have heard some people say, I have been audited and I cannot release any information.

Mr. <u>Yin.</u>  Well, I think that if I were advising a client and my client's return were under audit, I may well want to have the client not share the information very broadly.  And I would provide that advice to the client.  But if the question is: there anything under the law that would prevent a taxpayer from disclosing information that is under audit, the answer is I don't know of any such prohibition.

Chairman <u>Lewis.</u>  Thank you very much, Professor.

I now yield my remaining time to Mr. Pascrell.  You have been a leader in this effort.

Mr. <u>Pascrell.</u>  Thank you, Mr. Chairman.  Thanks for holding the hearing, and thanks for your courtesies.

Every President should release his or her tax returns to the public as a matter of course.  And when we have cause for concern over conflicts of -- or tax violations, we have every reason to use the authority given to this committee.  The law is on our side.  6103 is very clear.  6103(f) is even clearer, that section of it, of what we have the responsibility to do.  For 2 years, I have been highlighting this committee's authority to do so.

We introduced the Presidential Tax Transparency Act along with Representative Anna Eshoo of California.  Our bill would require every Presidential and vice presidential candidate to release their tax returns to the public.  I am pleased our proposal is part of H.R. 1, the first bill introduced by Democratic members of the House in this Congress.

This committee has oversight over our Nation's tax system and laws.  In fact, the Ways and Means Committee has oversight over IRS.  Our tax system requires honesty from taxpayers and from the IRS.

The element of good faith is implicit to a functioning tax system.  If a President is cheating the system or evading taxes or otherwise violating the tax laws of our country, why should any citizen feel compelled to comply?  No one is above the law.

I want to get into questions, because we have great witnesses who have laid it out better than I can.  But before I do, I want to enter into the record, Mr. Chairman, with your approval, three specific articles that I think go to the very center, the very heart of this issue.  And we're introducing them now.

I ask unanimous consent to enter into the record the chronology of actions taken by this committee and by the full House by using 6103 to obtain the President's tax returns so that the record has that.  The record illustrates the broad

support.

Mr. Rosenthal --

Chairman Lewis.  Without objection.

[The information follows:]

Mr. Pascrell.  Thank you.

-- have you ever looked at a President's tax returns?  And if so, what did you find, since you participated in that expose last summer in the New York Times, to some degree?  What did you find, Mr. Rosenthal?

Mr. Rosenthal.  So I have worked at the Tax Policy Center for 7 years.  I have been through two Presidential cycles.

Mr. Pascrell.  Could you speak up, please.

Mr. Rosenthal.  I have worked at the Tax Policy Center for 7 years.  I have been through two Presidential cycles.  I have been asked many a questions about what has been released by candidates and officeholders.

With respect to, say, President Trump, I have seen or at least believe to have seen his 2005 and 1995 returns which, in my judgment, showed some aggressive tax planning.  I spent a lot of time with The New York Times and other media helping to translate what you see when you find glimpses of an officeholder's tax returns.  And we have been able to determine, in some instances using other court documents and the like, for instance, the most likely source of the $916 million of losses that the President generated in the 1990s and could have eliminated his taxes for a couple of decades.

So I have seen a lot, and I have published my findings in various periodicals, and there is a lot to find.

Mr. Pascrell.  Mr. Chairman, thank you for yielding, and I appreciate it very much.  We will be back later.

Chairman Lewis.  Thank you very much.

I understand now that Mr. Kelly would like to defer till later.

I now recognize the gentlelady from Indiana for 5 minutes.

Mrs. <u>Walorski.</u>  Thank you, Mr. Chairman.  Thank you to you experts that are here.  We so much appreciate it.  I am grateful for the information you bring with you.

I would like to direct my question to Mr. Thorndike.  Are Presidential candidates required to release their tax returns?

Mr. <u>Thorndike.</u>  No, they are not.

Mrs. <u>Walorski.</u>  In your experience researching the history of Presidential returns, is there a set of rules that governs what Presidential candidates do and do not have to release?

Mr. <u>Thorndike.</u>  There are no written rules.  There are norms, but that is hard to describe them as, like, well defined.

Mrs. <u>Walorski.</u>  Or required.  Right.

So Presidential candidates can choose what tax return information, if any, to release.  Isn't that correct?

Mr. <u>Thorndike.</u>  Yes.  And, indeed, they have, which is why they have varied quite so dramatically over time.

Mrs. <u>Walorski.</u>  So, Mr. Thorndike, how many years of returns is typical for a Presidential candidate to release?

Mr. <u>Thorndike.</u>  It is really not possible to answer that word typical -- with anything.  I mean, it ranges from 1 to 33.

Mrs. <u>Walorski.</u>  So there is no set number.

Mr. <u>Thorndike.</u>  And there is not even, really, a trend.  I mean, there are some single releases in the beginning.  There are a couple recently that released only two.  But Jeb Bush released 33 this last time around.

Mrs. <u>Walorski.</u>  Right.  There is no set number.

Mr. <u>Thorndike.</u>  There is no obvious trend.

Mrs. <u>Walorski.</u>  Right.  Then in the 40-plus years of Presidents and Presidential candidates releasing their returns, have they ever released the returns of businesses in which they have some form of involvement, that you are aware?

Mr. <u>Thorndike.</u>  So I cannot answer that question definitively, because we don't actually have a lot of those returns which were released as part of a campaign but are not archived anywhere, so we don't know where they are anymore.

Senator Romney did -- when he ran, he did release returns for some of his family trusts.  Those are the only ones that I am certain about.

There are a few times when candidates or, more specifically, the spouses of candidates have refused to release tax returns related to trusts or other businesses. Once Geraldine Ferraro's husband and then again Senator Kerry's wife.

Mrs. <u>Walorski.</u>  But to summarize your responses, Mr. Thorndike, Presidential candidates are not required to release their returns.  There is no standardized process for releasing Presidential returns.  The level of disclosure varies widely, and business income tax returns have not been a part of the disclosure process.

So, really, Mr. Thorndike, what we are talking about here, and I believe you called this voluntary disclosures, what we are talking about here is an informal tradition.  It is not a law.

Mr. <u>Thorndike.</u>  It is not a law.  And it is an informal tradition, a long one, but as I say in my testimony, I think those sorts of traditions are not the way to handle these sorts of issues.  If we believe that this kind of disclosure is important enough that we want them to do it, then we should require it.  If we don't think it is that important, then we don't need to require it.  I don't think we should let a tradition handle it.

Mrs. <u>Walorski.</u>  And yet we are holding this hearing today under the guise of an academic discussion when in reality this is all about weaponizing our tax laws to target a political foe.  Doing this, I believe, sets a dangerous precedent, eroding the very laws put in place to protect the private tax return of each and every American.

Privacy and civil liberties should still matter in this country.  And I, for one, am here to protect those, every single individual in this country, every single American.

And with that, Mr. Chairman, I yield back.

Chairman <u>Lewis.</u>  Pursuant to the committee rule 14, and based on the members in attendance, we will question the witness two Democrats to one Republican.

The chair now recognizes Ms. DelBene.

Ms. <u>DelBene.</u>  Thank you, Mr. Chairman.  And thanks to all our witnesses for taking your time to be with us today.

I want to start with you, Mr. Kies.  Given your testimony, would you have advised committee Republicans to release taxpayer information in 2014?

Mr. <u>Kies.</u>  No, I would not have advised them to do that.

Ms. <u>DelBene.</u>  Thank you.  Also, current policy requires that Presidential tax returns be automatically reviewed, but I am concerned that the IRS may not have the ability to accurately and fairly carry this out free from political pressure.

So, Professor Yin, according to the report on the impeachment hearing, President Nixon reportedly received a letter from the IRS stating, quote, our examination of your income tax returns for the years 1971 and 1972 reveal that they are correct.  I want to compliment you on the care shown in the preparation of your return, end quote.

Upon exam, a congressional investigation found that President Nixon actually

owed nearly $480,000.  What does this show about the ability of the IRS to impartially review the President's tax returns?

Mr. Yin.  Congresswoman DelBene, I can't comment on the impartiality.  I think it is suggestive that there was a problem.  Whether it is simply incompetence or partiality, I don't know.

In fact, what happened in that instance is, after the Congress -- the Joint Committee did its determination, the IRS went back and actually audited again and essentially confirmed the Joint Committee's determination and reversed its own first determination.  So there was obviously a problem with the first audit, but I can't tell you whether it was out of a feeling of partiality or whether there was undue influence or simply some people weren't doing the job they were supposed to be doing.

Ms. DelBene.  But by allowing others to review those documents, we were able to find out that they were not actually correct.

Mr. Yin.  Well, I think it certainly raises an issue that might be worthy of the committee's concern, which is that if a very high-ranking official is being audited, whether it is the President or the Treasury Secretary or somebody of that nature who has a supervisory role over the auditors, it seems to me that it might be a good policy for the committee to double check that type of situation.

Ms. DelBene.  Thank you.

Dr. Thorndike, given the current pressures on the IRS and what happened with Nixon, should the IRS requirement to audit tax returns of Presidents and vice presidents be codified?

Mr. Thorndike.  As with the disclosure requirements, I think that these would be better off codified than handled through the internal policies of the IRS.  And to

just -- I just wanted to add that, during that Nixon episode, there was very real debate and real concern about the sufficiency of an IRS audit.  And there were calls for outside auditors.  Or what that even meant, they weren't sure.  And eventually their answer was the joint committee could be that outside auditor.  But there was real concern that the IRS had missed this the first time through.  Part of the explanation is that they actually had a change of commissioner in the middle of that, and the new commissioner, I think, took a much more vigorous approach to this.

But I think it is quite reasonable for people now to worry based on the actual experience in the Nixon administration that the IRS may not be able to really vigorously enforce the law relative to the President.  I think they try very hard.  I don't mean to slander the IRS.  I see this as a structural problem, not as a criticism of the IRS itself.

Ms. DelBene.  Thank you.

Professor Yin, I will go back to you.  The committee must make a written request to receive a return.  Is there any limitation on what returns or return information can be requested?

Mr. Yin.  No, there is no limitation.  The committee can ask for anything it wants.  I think good practice would suggest that the committee be somewhat targeted in its request simply because it would take a lot of time if the requests were very broad.

Ms. DelBene.  Thank you.  Thanks to all of you.

And I yield back, Mr. Chairman.

Chairman Lewis.  The chair now recognizes for 5 minutes Ms. Sanchez.

Ms. Sanchez.  Thank you, Mr. Chairman.  And to our witnesses, your testimony has informative as we work through this very important issue, so I want to

thank you, first and foremost, for being with us.

I think it is long past time for this committee to do its constitutional duty and operate as a coequal branch of government.  And I can say that I have been proud to be part of the committee and House floor efforts to properly exercise our authority.  Because as Members of Congress, we take an oath to uphold and defend the Constitution.  And when we swear that oath, we recognize our responsibility and our duty to uphold the integrity of this institution.  Holding the executive branch accountable is a bear minimum step, I think, in fulfilling that constitutional duty.

To me, here the facts are pretty simple.  The American people deserve a full picture of potential conflicts of interest for those who have the privilege of holding the highest elected offices in our country or those who aspire to hold them.

Transparency is a pretty good thing.  The American people have the right to know the financial interests of those that are crafting policy that affect them.  And hearings like this and passage of legislation like H.R. 1 will move our country forward, not backward, in the issue of transparency.

Since this administration began, we have seen countless examples of why this information should have been disclosed, like in every other Presidential candidate in modern history has done before for the last several decades.

From tax reform to dealing with foreign entities and individuals, the American people deserve to know exactly whether their executive stands to personally benefit or be unduly influenced.  The personal business endeavors of the leader of the free world should be held to very high standards indeed.

Dr. Thorndike, you previously mentioned that you would like to see the release of tax returns codified.  Are you worried that this tradition, because it is just a tradition right now, is being eroded?

Mr. Thorndike.  I am concerned that it may, in fact, be completely broken. And I think that we can't count on traditions.

Again, if we believe that this sort of transparency is important, and I do, then we can't really depend on a tradition to get the job done.  And, I mean, just as an example of that, let's think about the -- maybe the most hallowed tradition in American politics, which was the two-term Presidency which was revered by everyone until it wasn't.  And when Franklin Roosevelt broke that tradition, Congress responded by actually making it a law -- or the Nation responded by making it a part of the Constitution.

I think if things are important enough, and I believe that transparency is one of those things, we should, in fact, require them legally, rather than just hectoring people to try to get them to do what we want them to do.

Ms. Sanchez.  I happen to agree.

And, Mr. Thorndike, if Presidential hopefuls' tax returns are released, they are redacted so that sensitive information like Social Security numbers and other important information is not released to the public.  Is that correct?

Mr. Thorndike.  Yes.  Social Security numbers have been blacked out for a long time.  They were not originally.  I think this was before the era of rampant identity theft.  But they have been now, and they are routinely.  I mean, Presidents have been blacking them out for 40 years.

Ms. Sanchez.  Thank you.

Professor Yin, you just heard Mr. Kies' testimony.  Do you have any comments with respect to his testimony?

Mr. Yin.  Yes, I do.  I think a few words of history would help to clarify the misunderstanding that Mr. Kies seems to have on this point.

In 1924, when Congress began thinking about the law that is before us today, Secretary Mellon vigorously objected and was concerned specifically about the potential disclosure of the tax return information to the public.  And he urged over on the Senate side in a Senate hearing two changes.  One is, he said, any committee that receives the information must do it in closed session.  And, second, if any of the information goes to the full House or full Senate, it also must be done out of public eye with nothing included in the Congressional Record.

Congress in 1924 agreed with the first step, which is why, if you were to seek information today, you would need to do it in closed session.  But it specifically rejected the second step.  And the reason was that it was inconsistent with the congressional goal in 1924, which was, as a coequal branch of government, it wanted to give itself the exact same rights as the President. The President at the time had the ability to obtain and disclose anybody's tax returns.

Fast-forward to 50 years later, the same issue arose in 1976.  And what Congress did is they took away the ability of nontax committees to make disclosures, but they did not take away the tax committee right.

If I could add one final point, which is that some of you may be wondering, well, why does the statute, as Mr. Kies suggests, the statute only says you may "submit" and not make a public disclosure?  And although I don't find anything specific in the historical record on that point, I think there is a very easy explanation.  And it goes to the fact that in the mid 1920s, party affiliation was not nearly as important as it is today.  There were a lot of progressive Republicans who tended to vote with Democrats on issues like this one, issues of disclosure, investigations, and so forth.

Meanwhile, Congress was controlled by the old guard Republicans.  The

leaders of Congress did not want a single committee to make the determination of

whether something is disclosed to the public or not, because they didn't know what

the specific makeup of that committee might be.  It might have a number of

progressive Republicans on it who would vote in favor of disclosure.  They wanted

the full House or the full Senate to make that determination, and that is why they

developed this procedure where all the committee can do is to submit --

      Chairman <u>Lewis.</u>  Thank you, Professor.

      Mr. <u>Yin.</u>  -- to the House and Senate.

      Ms. <u>Sanchez.</u>  Thank you.  I am sorry.  My time is expired.

      But, Mr. Chairman, I would ask unanimous consent to submit a letter from

the former acting director of the Office of Government Ethics, Don Fox, in support of

Title X of H.R. 1.

      Chairman <u>Lewis.</u>  Without objection.  Thank you very much.

      [The information follows:]

Ms. Sanchez.  Thank you, Mr. Chairman.

Chairman Lewis.  The chair now recognizes for 5 minutes Mr. LaHood.

Mr. LaHood.  Thank you, Mr. Chairman, I want to thank the witnesses for your testimony here today.

In a prior career, I was honored to serve as a Federal prosecutor and a State prosecutor. I appeared before many grand juries.  Section 6103 under the statute allows the Federal grand jury to subpoena tax records.

I guess as I look at this issue, obviously, it is not a surprise to anybody, we have an ongoing independent counsel investigation, a grand jury that has been impaneled for over 18 months.  Out of that grand jury investigation have been a number of indictments related to tax fraud.

Clearly under this grand jury, the independent counsel, as with others over the last 40 years, there is the broad authority to go after tax records, look at criminal violations, and look at civil violations.  I have no doubt that is ongoing today.

I guess as I look at this, I am a little perplexed and confused on why we would give the authority or why we would have the chairman of the Ways and Means Committee ask the Department of Treasury for the President's tax records.

As I look at the last 40 years of the independent counsel investigation statute, I have been trying to figure out whether there has been another example of this.  I have not seen any so that causes me some real concern.

I guess, Professor Yin, you are the historian.  Can you provide the committee with an example of where the chairman of the Ways and Means Committee has asked the executive branch for their taxes when there is an ongoing Department of Justice independent counsel investigation?

RPTR DEAN

EDTR ZAMORA

[4:17 p.m.]

Mr. Yin.  Congressman LaHood, I can't think of an example off the top of my head, but I think it is important to understand --

Mr. LaHood.  Thank you.  Reclaiming my time.

Would it surprise you to learn that one does not exist?

Mr. Yin.  Well, again, I can't think of one off the top of my head.  The authority itself has been rarely invoked, so --

Mr. LaHood.  Thank you.

Mr. Yin.  -- it is clearly just a handful of situations.

Mr. LaHood.  Thank you.

Dr. Thorndike, can you provide the committee with an example of where the chairman of the Ways and Means Committee has asked for the President's tax records when there is an ongoing independent counsel Department of Justice investigation?

Mr. Thorndike.  No.

Mr. LaHood.  Do you have any evidence to support that that has been done in the past?

Mr. Thorndike.  I am not aware of anyone having requested the President's tax returns in the past.

Mr. LaHood.  While there is an ongoing independent counsel investigation?

Mr. Thorndike.  Yeah, I mean -- I mean, I -- but has there ever been any -- have they ever requested one?

Mr. LaHood.  Again, would it surprise you to learn that that in fact has not

happened?

Mr. Thorndike.  No.

Mr. LaHood.  Okay.  Mr. Rosenthal, same question to you. Can you provide the committee with an example of when that has occurred?

Mr. Rosenthal.  I am unaware of a historical record on this point.

Mr. LaHood.  Thank you.

Mr. Bookbinder?

Mr. Bookbinder.  I guess I would say that I believe the Presidents have voluntarily disclosed their tax returns while under independent counsel investigation.  So I am not sure the issue would have come up.

Mr. LaHood.  So let me ask you on that point, Whitewater was an independent council investigation, correct?  During that time, do you know if the Ways and Means chairman asked for the President's tax records?

Mr. Bookbinder.  I don't know, but I believe the President voluntarily disclosed them.

Mr. LaHood.  So President Clinton voluntarily disclosed them.  Is that your testimony today?

Mr. Bookbinder.  You know, I would really defer to the historians, but my sense is that for 40 years, Presidents routinely have voluntarily disclosed tax records.

Mr. LaHood.  Would you be surprised to learn that the chairman of the Ways and Means Committee has never asked for that with an ongoing independent counsel investigation?

Mr. Bookbinder.  I don't have any reason to think differently than the historians on this panel.

Mr. LaHood.  Well, thank you for that.

I guess going back to my original thoughts on this, as I look at it, we have had approximately 30 independent investigations by DOJ.  The broad authority that they have, like this independent counsel has, is real.  So to think that this committee would want to be engaged in asking the Department of Treasury for the President's tax records again is confusing to me.  It has never been done.  And as I look at what this committee should be based on, this seems to me like a waste of time of resources and energy here.

As we talked, Professor Yin, you did a great job talking about the legitimate purpose for why this should be used.  I look at the legitimate purpose and the legal purpose on this and I do not see it.  I go back to what a number of my colleagues said on weaponizing the Tax Code and setting a precedent that has never been done.  We should all be concerned about that.

Thank you.  I yield back.

Mr. <u>Lewis.</u>  The chair now recognizes for 5 minutes Mr. Suozzi.

Mr. <u>Suozzi.</u>  Thank you, Mr. Chairman.  Thank you so much for conducting this hearing.  And thank you to the witnesses for your time and for your expert opinions.

Dr. Thorndike, I was going to ask this question, but just in response to my friend Mr. LaHood's questions, did President Clinton voluntarily disclose his tax returns?

Mr. <u>Thorndike.</u>  Yes, every year that he was in office and while running.

Mr. <u>Suozzi.</u>  So there would be no need for the chairman of Ways and Means to ask for his tax returns despite the fact there was an investigation going on because they were disclosed publicly?

Mr. <u>Thorndike.</u>  Yeah.  I mean, more generally, there would have been no need to request any President's tax returns in the last 40 years because they have all

been a matter of public record.

Mr. Suozzi.  Okay.  I really want to focus on H.R. 1 and the conflict of interest questions.  That is the thing that I am most concerned about.  We have a duty here to try and protect the American people and to make sure that we are doing our jobs.  This can't be a partisan thing; it has got to be something we are doing to follow our duties under the Constitution to make sure that the public has the information that they need.

Mr. Thorndike, you told me earlier that your doctorate is in history of 20th century politics in America.  So what would be examples of conflicts of interest that someone might have had throughout history or maybe something that was uncovered in some of these disclosures that have taken place?  Or if you can't think of a specific instance of something that has been discovered, what would you speculate could be a potential type of conflict?  Give us, like, real type of examples.

Mr. Thorndike.  Well, I mean, I am not aware of there ever being any discovery of financial conflicts of interest involving an American President.  They may have been there and not revealed.  Most Presidents have put their assets in blind trusts, so it is not clear whether or not the President would even be aware of what those conflicts might be.

I mean, you know, one could imagine that any piece of legislation, if it is going to change the Tax Code in a way that benefits the President, might be of relevance to the President.  Is that a conflict of interest?  I mean, that is hard to know.

Mr. Suozzi.  Well, it is really the appearance of a conflict of interest is what we are most concerned about, isn't it?

Mr. Thorndike.  Yes.

Mr. Suozzi.  For example, President Johnson had a lot of business interest, for

example.  Would there be potential conflicts of interest based upon your knowledge of his history?

Mr. Thorndike.  I would imagine so.  I mean, this was before Presidents with releasing their tax returns, so we wouldn't know exactly what they are.

Mr. Suozzi.  So, Mr. Bookbinder, you talked about different types of conflict of interest that could potentially exist.  What are the ones that you are concerned about most?

Mr. Bookbinder.  Well, I would just first of all say that a part of the reason why it is hard to find a historical example is because no President has retained massive global business interests the way that President Trump has previously.  So we are really in unchartered territory here.  But I would be very interested in the most basic conflicts kinds of questions in terms of how would the President's own tax interests be affected by the changes to the tax law he has made.

And then we have also seen that this President has had extensive business dealings with foreign interests.  That is something we could learn more about from -- potentially from tax returns.  That could be incredibly --

Mr. Suozzi.  How would we find them in a tax return, you know, if it is his individual tax returns?  Would the individual tax returns be sufficient or would you need to see his business tax returns as well?

Mr. Bookbinder.  I mean, of course it is hard to know exactly what would be in his tax returns.  It may well be that if he is receiving foreign income, that he would be disclosing that.  But certainly with the kinds of very complex business interests with literally over 500 different interrelated companies that this President has, it points out the importance of getting those business tax returns, which are going to give a lot more -- potentially a lot more information about where the money is

coming from and what --

Mr. <u>Suozzi.</u>  So it doesn't have to be specific to President Trump, but could you give an example of a foreign interest in a business that would be a conflict for a chief executive?

Mr. <u>Bookbinder.</u>  I mean, certainly -- really almost -- for instance, if there were -- if a President had an LLC or some other kind of company which had a foreign -- which had a partner that was a foreign company, potentially --

Mr. <u>Suozzi.</u>  So an investor could be someone from a foreign country that you could have undue influence?

Mr. <u>Bookbinder.</u>  Exactly.

Mr. <u>Suozzi.</u>  What would be a type of businesses that a President could have an interest in that, if money was brought in through that business, would potentially impact the President's decision or vice president?

Mr. <u>Bookbinder.</u>  Well, for instance, a lot of foreign governments have very extensive funds that invest in businesses.  And so if there was a sovereign fund that was putting money into, say, a construction project, if there was a Saudi fund or a UAE fund, that could affect the way the President looks at any decision that involves that country, conceivably.

Mr. <u>Suozzi.</u>  Okay.  My time is about to expire.

I yield back, Mr. Chairman.  Thank you.

Mr. <u>Lewis.</u>  Thank you very much.

Now that you are recognized for 5 minutes, Ms. Chu.

Ms. <u>Chu.</u>  Mr. Yin, I understand that the chair of Ways and Means has the authority to ask for the President's tax returns.  Then Ways and Means can vote to submit it to the House, and then the House can vote to make the returns public.  Mr.

Kies made a startling assertion when he said that if the committee votes to release any tax return information to the full House, it would risk a criminal violation.  In fact, he talked about a felony that would be worth 5 years in prison.  Based on your expertise, do you agree with his interpretation?

And I would like to also ask, do we indeed have the legal authority to obtain these tax returns and to submit it to the House to make it public?  And why is it that we have had this authority for 100 years?

Mr. Yin.  Thank you, Congresswoman Chu.  I don't agree with his view.  I think that the historical record is very clear as to what the intention of Congress was in creating this authority for the tax committees, and it was to allow the potential of a public disclosure.  I think that to think otherwise right now would require us to believe that Congress forfeited its ability to exercise its informing function with respect to tax return information.  That is, nobody could ever inform the public about any matter of importance to the government if it involved the disclosure of tax return information without suffering a criminal penalty.  I don't believe that is the case.  That would be an inconceivable outcome, in my view.

And I would further add that in the few instances where this authority has been used, in every single instance, there has been a public disclosure at the end of that exercise of the authority.  And I just commend to you the floor statement of former Ways and Means chairman, Wilbur Mills, in 1974 when he submitted the Nixon report to the House and he explained in just a few paragraphs exactly his understanding of what he was doing and why he was doing it.  And it is exactly consistent with the idea that he was doing it so that the report could become public.

Ms. Chu.  Mr. Bookbinder, some opponents of requiring the disclosure of Presidential tax returns as written in H.R. 1 argue that candidates are already

required to file a financial disclosure form or OGE Form 287e.  Can you explain the primary differences between the information found on the disclosure form and the information found on a tax return and why it would be critical, in fact, to have a tax return involve a financial disclosure?

Mr. Bookbinder.  Sure.  There are a number of differences.  One of the most stark ones is that, for instance, for income on a financial disclosure, any income over $5 million is simply a box that says over $5 million.  So somebody could be making $6 million or $600 million and we wouldn't know the difference looking at their financial disclosure form.  Obviously, a tax return is going to be much more precise.  There are a lot of areas from loans to investment partners where we are likely to get very different information from the tax returns than we get from the personal financial disclosure form.

Ms. Chu.  How about the issue of whether the candidate has paid taxes or has avoided taxes?

Mr. Bookbinder.  Absolutely.  And the personal financial disclosures are not going to provide any information about what taxes somebody paid, they are not going to give any information about charitable giving.  And those are things that are potentially very important for the American public in evaluating a candidate and evaluating a President.

Ms. Chu.  And, Mr. Rosenthal, you said -- you discussed when it would be appropriate to submit a request under section 6103, for instance, when there has been a refusal by the office holder to divest financial interests in a large empire or a refusal to transfer their interests in a blind trust.  Why is it important for Congress to obtain the office holder's tax returns and other tax information?

Mr. Rosenthal.  Well, in my written testimony, I described the unusual

circumstances in which the committee might seek information from tax returns, one of which being if the President has not divested his financial interests in a sprawling business or transferred to a blind trust.  In that circumstance, the possibility of the President having income from many different sources is pretty likely.  And so to see those partnership returns and the business returns could be pretty important.  I would point out, as Congressman Suozzi was asking the other witness here about partnership returns, I could tell you line 16 of the partnership return asks: "does the partnership have any foreign partners."  Line 20 of the partnership return asks: "enter number of partners that are foreign governments."

And so when there is a sprawling global economic empire that is comprised of LLCs and partnerships around the world, there are just a lot of questions to be asked.  The 1040 is merely the collector of composite information without disclosing the kinds of detail you might like to have.

Mr. <u>Suozzi.</u>  Mr. Chairman, let the record reflect that my name is Suozzi, not Suozzi.

Mr. <u>Rosenthal.</u>  I apologize.

Ms. <u>Chu.</u>  I yield back.

Mr. <u>Lewis.</u>  Thank you.

The chair now recognizes for 5 minutes Dr. Wenstrup.

Mr. <u>Wenstrup.</u>  Thank you, Mr. Chairman.  I appreciate that.

Let me start with you, Mr. Kies.  What is the purpose of the IRS?

Mr. <u>Kies.</u>  To collect the revenue to fund the Federal Government.

Mr. <u>Wenstrup.</u>  What is the purpose of an audit conducted by the IRS?

Mr. <u>Kies.</u>  To hopefully make sure that people, when they are voluntarily complying, are actually -- are complying with the statues of which are, in some cases,

quite complex, but that is the purpose of audits.

Mr. <u>Wenstrup.</u>  And the President and vice president get audited every year?

Mr. <u>Kies.</u>  Correct, according to law now.

Mr. <u>Wenstrup.</u>  Okay.  So, Mr. Pascrell, you said something before that really hit home.  You said no one is above the law, and I agree with you 100 percent.

Is it the law that the President or vice president bring forward their tax returns to the American people?

Mr. <u>Kies.</u>  Is it the law that what?

Mr. <u>Wenstrup.</u>  Is it a law that the President or vice president bring their tax returns forward to the American people?

Mr. <u>Kies.</u>  As I think we have confirmed --

Mr. <u>Wenstrup.</u>  We have seen testimony on that.  That is not the law.

Mr. <u>Kies.</u>  That is correct.

Mr. <u>Wenstrup.</u>  And no one is above the law.  But at the same time, no one should be forced to violate a law that maintains their privacy.  You know, as a doctor, I think about what we go through to make sure we understand HIPAA and the privacy of our patients and how important that is.  And is there for a reason.  That privacy is there for a reason for patients to be protected from disclosure their private information and especially about their healthcare or other personal information. Why is that?  In part, because people can take something from their health record and possibly use it for nefarious means or for political purposes, if they so choose. That is the purpose of that, whether it is an innocent part of your healthcare record or not.

So I kind of look at this the same way. I also want to bring up, maybe any of you can tell me, and I know in the past, some Presidents have put forth their health

record, and given the results of their entire physical.  Is that true?  Can anyone attest to that?  I know you are mostly tax experts, but is that true?

Mr. Kies.  And some have not.

Mr. Wenstrup.  And that should be their choice.  That should be their privacy.  We have the checks and balances in place.  We have the audits in place.  But people, every American, deserves their privacy.  I compare the two.  Let's take an example.  And I was not around to necessarily know, but America did not know that President Roosevelt could not stand.  My guess is maybe he wanted to keep that private so it wasn't used against him for nefarious purposes.

I think of the privacy of American citizens at every level, whether it is their healthcare or their tax returns. There are other checks and balances in place for the President and vice president, and they have their rights, just like each and every one of us.

With that, I would like to yield the balance of my time to Mr. Kelly.

Mr. Kelly.  Thank you, Doctor.

Just while you are all there, I am trying to understand this, is there anybody that doubts that the President or the vice president's tax returns are not being audited by the IRS?

Mr. Pascrell.  Right here.

Mr. Kelly.  Doctor?  Dr. Thorndike?

Mr. Thorndike.  I don't doubt that they are being audited.

Mr. Kelly.  Professor Yin?

Mr. Yin.  I really don't have any knowledge on that.

Mr. Kelly.  Oh, yes, but you do.  You are the historian.  Are you are telling me that you don't know that the President and the vice president's taxes are FFbeing

audited?

Mr. Yin.  I know what is in the IRM, but I don't know whether in fact that is being carried out.  I have no knowledge of that.

Mr. Kelly.  Okay.

Mr. Rosenthal.

Mr. Rosenthal.  Like Professor Yin, I have read the Internal Revenue Manual which calls for --

Mr. Kelly.  So the fact that we all know that they get audited to the fact that you weren't there to see the audit, makes you wonder if it actually is being done?

Mr. Rosenthal.  Whether the President is being audited or not is tax return information and cannot be disclosed, and so to ask --

Mr. Kelly.  Not until we had this meeting tonight.

Mr. Rosenthal.  Not until a law were passed.

Mr. Kelly.  Okay.  I get it.  I get it.

Mr. Bookbinder.

Mr. Bookbinder.  No, the same.  We certainly don't know what manner of audit was done, assuming it was done.

Mr. Kelly.  Okay.

Mr. Kies.

Mr. Kies.  I think it is highly unlikely that the IRS is not auditing the President and vice president, given what their own Internal Revenue Manual says.  I find that inconceivable.

Mr. Kelly.  I think we all know that, especially if I was a historian that studied this, I would have pretty good idea of what is taking place.

So the only difference tonight is we are talking about the ability to make this

President, this duly-elected President's tax returns public.

Thank you.  I yield back.

Mr. <u>Lewis.</u>  The chair now is pleased to recognize for 5 minutes Ms. Moore.

Ms. <u>Moore.</u>  Thank you so much, Mr. Chairman.  And I am, again, so pleased to be a member of this subcommittee and appreciate the witnesses for their patience today.

I just came off of the Financial Services Committee to -- on this body, and one of the things that we were looking at was the unusual lending pattern of Deutsche Bank to the President of the United States.  Deutsche Bank had a subsidiary called VTB -- I can't say the Russian name, so VTB.  And at some point -- I am just giving you background for my question -- Donald Trump had borrowed $600 million and owed another $300 million, and they had called for a $40 million payment and he said, as a result of an act of God, the financial meltdown in 2007, 2008, that he shouldn't have to pay it back.  He was in court in New York.  Didn't want to pay Deutsche Bank back.  Suddenly, he left the commercial real estate division of Deutsche Bank and went to the private wealth fund, VTB Bank, a bank that certainly had many Russian oligarchs who invested in that.  Suddenly, his debt was paid off and they offered him an additional $25 million.

VTB Bank also is associated with this spy that was just -- the sanctions removed and so on and so forth.  So other banks couldn't believe it, they said are you F'ing, kidding when Donald Trump was given this loan by Deutsche Bank.

So we have a letter here from our distinguished ranking member saying if there are valid concerns with financial disclosures, then let's come together to legislate a thoughtful solution to require additional disclosures.  And this has been quoted a lot by members here.  And so I am wondering, will -- he goes on to say that

we ought to improve our ethics laws.  Are there any ethics laws or any audits that

will help us get to this unusual lending activity under Deutsche Bank that any of you

on the panel can think of?  Dr. Thorndike, Dr. Yin, Mr. Bookbinder.

If we want to look at the business transactions, the line, line -- did you say

line 40 on the 1040, that is going to give us the information that we need regarding

these business partnerships, relationships, and loans.

Yes, sir.

Mr. Yin.  Just a quick comment.  I think that tax return information may

provide useful leads for additional inquiries along the lines that you are describing.  I

am not suggesting that the tax return information in and of itself would find some

smoking gun that would satisfy your inquiry.  But there may well be useful leads that

you could pick up from the tax return information that, with additional inquiries --

Ms. Moore.  Do you think IRS audits would give us that lead, or voluntary

disclosures of just the front page of the 1040 versus the attachments?

Mr. Yin.  No.  I am sorry, Congresswoman Moore.  I am talking about if the

committee were to seek information, they would then have whatever return

information that they sought.  And from that information, that there may well be

helpful leads along the lines of your inquiry.

Ms. Moore.  Do any of you -- Mr. Bookbinder, the distinguished ranking

member said that we ought to strengthen our ethic laws.  What ethic laws is he

referring to that we could strengthen in order to clear up this mystery about

Deutsche Bank's relationship with Trump and the Trump organizations?  By the way,

Trump Tower was supposed to be built by VTB, the subsidiary of Deutsche Bank.  Can

you just tell us what ethic laws we could strengthen that would give us this

information versus these tax returns?

Mr. <u>Bookbinder.</u>  Well, I do certainly think there is room to make the financial disclosure forms more rigorous than they currently are.  I also think, especially with a President and a vice president where conflicts of interest are so important, you really need all the information you can get.  And tax returns are going to provide more information on this kind of question than probably you would ever be able to get in a financial disclosure form that all government -- all senior government officials have to fill out.

Ms. <u>Moore.</u>  And just reclaiming my last 10 seconds.  You know, I just would appeal to my colleagues to not accuse us of lazy legislating to ask for these tax returns when we have such a conflicted President.

And with that, I yield back.

Mr. <u>Lewis.</u>  The chair now recognizes for 5 minutes Mr. Boyle.

Mr. <u>Boyle.</u>  Thank you, Mr. Chairman and Mr. Ranking Member, and I thank the witnesses.

Under the Constitution and our system of checks and balances, Congress has not just the right, but the responsibility to oversee whether our laws are faithfully executed by the executive branch.  In accordance with this duty, almost a century ago, Congress explicitly enumerated this committee's right to review any return or return information in the aftermath of two crises of public trust; two scandals, incidentally, which have remarkable parallels to the present day and this President.

One was the Teapot Dome scandal where senior officials in the Harding administration granted public oil field leases in exchange for bribes.  And the other involved, as was previously referenced, Treasury Secretary Andrew Mellon, who continued to own many business interests while serving in government.  Sounds familiar.  Some believe the Bureau of Internal Revenue, as it was then called, gave

him and his businesses preferential treatment.

So, again, the parallels between the scandals of a century ago that gave birth to this 1924 law and the present day are really remarkable.  For example, President Trump maintains a sprawling business empire, which he refuses to transfer to a blind trust.  According to multiple published reports, the President, through his businesses, derives income from foreign governments and their lobbyists, which also may violate the Constitution's prohibition against emoluments.

The President reportedly intervened personally to block the FBI from moving its headquarters, and thus, opening up for commercial development a site just a few blocks from his downtown Washington hotel.  The President reportedly paid little or no tax for many years, in part because of aggressive tax planning and in part, perhaps, tax evasion.

Finally, his foundation and inaugural committee are currently under criminal investigation.

So I would open it up really to any one of you to comment on what I have had to say about the historical precedent that gave birth to this important law and the current facts as we know them.  Professor Yin and then Mr. Rosenthal.

Mr. Yin.  I would just say briefly that I completely agree with your point of the parallels of what happened almost 100 years ago that caused this law to be developed and the current time.  I think the parallels really are very close.

Mr. Rosenthal.  Congressman, I would just add that the use of 6103(f) authority is use designed to further a legislative purpose, the checks and balance of our constitutional system.  I do not believe the use by this committee to try to reaudit the President is what this committee would be pursuing.  Of course, it is your purposes and goals that would need to be achieved.  However, the conflicts that we

are discussing, the conflicts with respect to the execution of the Office of the President, the conflicts with respect to whether audits are being run correctly, the conflicts with respect to whether or not the President is running the country for his benefit or for ours, those are all conflicts that are within the purview of the legislative branch to determine with respect to the executive branch.

Remember, in my view, the legislative branch oversees the executive branch, not the other way around, and we have one President who runs it.

Mr. Boyle.  Well, it is not just your view, it is also explicit in the United States Constitution, so I obviously agree.

Mr. Kies.  Can I --

Mr. Boyle.  One final kind of specific in-the-weeds point on this.  The distinction between personal returns and business returns.  In your view, would also looking at the business returns be necessary in order to address some of the questions that we have?

Mr. Rosenthal.  So, yes.  Let me quote the current IRS commissioner who during the campaign said:  To fully understand the financial status of Trump, one would need to see his returns from multiple years, the work papers for the individual returns, and the returns for numerous related entities.

If you look to the President's own lawyers who wrote a letter describing whether his tax returns reflected Russian entanglements, they said that, and they looked at the 500, business entities that were listed on President Trump's financials and are linked and the income flows through to his returns, I don't think there is any question, but if you want answer some of the questions that have been raised at this hearing, you would have to have business returns.

Mr. Boyle.  Thank you.  I am out of time.  I yield back.

Mr. <u>Lewis.</u>  Thank you so much.  I thank all of the members for your participation.

The chair now recognizes for 5 minutes Mr. Arrington.

Mr. <u>Arrington.</u>  Thank you, Mr. Chairman.  And Mr. Kies -- and thank you, witnesses.

Mr. Kies, you look like you might want to comment on that last question and dialogue.

Mr. <u>Kies.</u>  Well, the only comment I was going to point out is that there clearly are ways in which the financial disclosure rules could be modified to make them much more useful and much more informative without getting tax returns.  But this issue of whether or not the current statute is a consequence of what happened back in the 1920s I think is misguided.  It is more a function of what happened in the 1970s.  In fact, when Congress rewrote section 6103 in 1976, it was because they were concerned that Richard Nixon and his White House were handing out tax return information all over the place.  And that is why Congress, this committee, wrote as tight a provision as section 6103 as it exists today.

And contrary to what my friend George Yin suggested as my misunderstanding, I don't have a misunderstanding of the statute.  I encourage all the members of the committee to actually read the statute.  It is unequivocal in terms of what it says.

Mr. <u>Arrington.</u>  Are you trying to tell me that in the 1970s, there were actually petty, self-serving, politically motivated people in this line of business?

Mr. <u>Kies.</u>  It is hard to believe, but yes.  That is correct.

Mr. <u>Arrington.</u>  And that is why we tightened up the restrictions, so that we wouldn't open up people's tax returns to political abuse of power?

Mr. Kies.  The difference between the 1976 rules, which is basically what we have today, versus pre-1976 was fundamental.  It referred to tax returns prior to 1976 as public property, public information.  The 1976 act, which basically is what we have today, tightened those rules down immeasurably, and it is reflected in 6103(a), which is the only provision of section 6103 that contains a substantive penalty for failure to comply with it.  The rest of 6103 is a bunch of procedural rules.

And with all due respect to my friend George Yin, he is looking at 1920s legislative history to try and inform us as to what this provision means today.  I strongly encourage every member of the committee to actually read the statute.

Mr. Arrington.  Mr. Kies, I am surprised that with a panel of experts, tax experts, experts on this issue, that when asked if they believed that the IRS was fulfilling its duty to execute on mandatory annual audits for the President, that there was great uncertainty.  It seems like we have a very distrustful panel, but I would give them the opportunity again if they believe in fact that those mandatory audits are going on.

But before that, if they are going on -- and I am going to assume that the IRS is doing its job in auditing this President -- would the issues like effective tax rates and whether the President is paying his taxes or if he is evading them or sources of income loss and deduction, those things that Mr. Rosenthal mentioned, would those not be discovered in an audit?  If there were problems with that, would those not be flags, red flags that would come up in such an audit?  Yes or no.

Mr. Kies.  Certainly, all of those things would be information which the IRS could get.  And I guess I would say in response to the issue of whether or not people believe that the President and vice president are being adequately audited, I will say, for me personally, and I would speak for everybody in this room, I don't think you

want to have done to you what probably is being done in the form of the audits to the President and vice president.  I suspect they are pretty intense.

Mr. Arrington.  So nobody up here is against improving transparency and identifying information where it would present a better picture of potential conflict of interest?  I think of financial disclosure forms, ethics forms, there are plenty of other ways that we can do this without opening up such abuse that occurred in the 1970s. Abuses which then transpired into more restrictions to prevent that abuse of power.

Mr. Rosenthal, do you have confidence in the American people's judgment when it comes to this issue of disclosure of people's tax returns, the President's in particular?

Mr. Rosenthal.  Well, I have seen polls --

Mr. Arrington.  Do you trust the judgment on this issue?

Mr. Rosenthal.  I have seen polls that more than 60 percent of the American public believe the President should, you know, disclose his tax returns.  Those have been almost constant since the campaign.

Mr. Arrington.  Mr. Rosenthal, did you see the election results?  Because this was an issue during the Presidential election.  If I recall, this was an issue in the primary, it was an issue in the general when candidate Hillary Clinton disclosed her tax returns.  So the American people were well aware of this.  And I have got a whole lot more confidence in the American people than they have in this body to conduct themselves in an objective and fair manner when it comes to these sorts of issues.

I am very concerned with giving this body politic more power to abuse, not only this President, but potentially the American people.

Mr. Chairman, I yield back.

Mr. Rosenthal.  I would just say I don't know what to make as a matter of policy from the election.  The American people may have expected the legislative branch to continue to oversee vigorously the executive branch and may have expected further oversight.

Mr. Lewis.  Thank you very much.

The chair now recognizes for 5 minutes Mr. Gomez.

Mr. Gomez.  Mr. Chairman, thank you so much.  Thank you for having this important hearing.

I find it interesting on a couple of things.  First, on the question of is it required by law.  It is not required by law that a Presidential candidate submit their taxes, to reveal them.  But as a matter of custom and practice, that is what has been done since the early 1970s.  And it is oftentimes somebody who comes along and rips apart that custom that then the body politics, the legislative branch or the public itself has to take action to codify that custom and practice.  We do that all the time here in the House where there was unwritten rules, our custom and practice and then somebody breaks them, and then the House takes action to codify those.  This is just another example of taking that step, as part of H.R. 1 to take that step to require all Presidential candidates and vice president candidates to reveal their tax returns.

You had a good historical point where I was actually thinking the same thing regarding the two term.  A lot of things over time in our history of government were custom and practice and somebody came along and broke it, and then we passed a law to fix it.  So on that issue, let's set that one aside.

On the issue of excuses.  First, the President when he was a candidate said his tax returns were under audit, he couldn't return them.  Now, the gentlemen on the

other side of the aisle are saying that it is under investigation by the special counsel. Sooner or later, I am going to hear that a dog has eaten his tax returns, and I don't know even if this President has a dog.  So we hear one excuse after excuse.  And our responsibility is to see if there is a reason to go after, a legitimate reason.

Mr. -- just to kind of clarify some of the rule and authority of this committee. Mr. Yin, you mentioned -- there was a discussion on post-1976 rule.  What facts give you the understanding that we do have that authority and we continue to still have that authority today?

Mr. Yin.  Thank you, Congressman Gomez.  I completely agree that the 1976 act was designed to strengthen taxpayer privacy.  That was the overriding goal, without any question.  But it should be noted that in 1976, Congress specifically took away the ability of nontax committees to submit information to the House or the Senate and to have a public release of it.  They amended the statute to say that any submission could only take place while the full House and the full Senate are sitting in closed executive session.

Importantly, even though they obviously had the ability to put the same condition on the tax committee submission, they did not.  And my reading of that is that Congress wanted to keep at least one vehicle open to preserve its informing function relative to tax return information.  If it had imposed the same restriction on the tax committees, then, in effect, Congress would have said nobody ever has an opportunity to inform the public if it relates to tax return information.  And I find that result completely inconceivable.

And so I believe that the history of this provision, which was unchanged in 1976 relating to the tax committees, prevails in explaining exactly what the authority of the committee is.

Mr. Gomez.  And just to reiterate, to really kind of focus in, why is Congress so committed to retaining that authority?

Mr. Yin.  Well, I think Congressman Boyle said it very correctly, which is that one of the principles, if not the most important responsibility of Congress, is to make sure that the laws are being faithfully executed by the agencies and by the high-ranking officials -- that serve the country.  And so it is important then to have the ability to inquire about whether those laws are being faithfully executed, and to the extent that Congress were to find that there has been a violation, it certainly is the congressional responsibility to inform the public of that.  That seems like a very foundational responsibility of Congress.

Mr. Gomez.  That is the basis of our government, right?  Checks and balances.  And without that ability to do that, then we don't have a check on the executive branch.

Mr. Yin.  Exactly right.

Mr. Gomez.  I yield back.

Mr. Lewis.  The chair is pleased to recognize Mr. Pascrell for 5 minutes.  And I apologize for passing you over.

Mr. Pascrell.  No problem, Mr. Chairman.

Mr. Chairman, I want to enter into the record the articles How a Simple Tax Rule Let Donald Trump Turn $916 Million Loss Into a Plus; second, Trump Engaged in Suspect Tax Schemes as He Reaped Riches From His Father; number three, Trump Foundation Will Dissolve, Accused of "Shocking Pattern of Illegality."  I didn't mention those articles, now I mention those articles.  Put them in the record.  My request.  Thank you.

[The information follows:]

[The information follows:]

[The information follows:]

[The information follows:]

Mr. Pascrell.  Mr. Chairman, I can't -- I must be -- it is going to take time for my questions.  Thank you.  About hypocrisy, hypocrisy.  So we want to protect the privacy of the President, and I would too, but we don't want to follow law.  When I said no one is above the law, I mean, no one is above the tax law.  And in this case, the tax law is 6103.  It is the law of the land.  When Democrats and Republicans feasted on scandal and bribery.  That is the law of the land.

So he is not above the President of the United States.  President Trump is not above 6103.  And it pertains to everybody in the executive branch of government, not just the President.  Because Secretary Fall, who was the Secretary of the Interior at the time, is the one who put this scheme together, and went after him back in 1923.  Okay.  That is what happened.

So, Mr. Kies, thank you for joining all these great people like yourself.  I have read your stuff.  We don't agree on some things and we do agree on some things. What do you know about that?

So, Mr. Kies, do you believe -- this is a different part of the question.  Do you believe committee Republicans violated the law in 2014 when they released taxpayer information, over 50 taxpayers, and they found nothing?  Do you believe they violated the law?

Mr. Kies.  Absolutely.

Mr. Pascrell.  Thank you very much, Mr. Kies.  Thank you for your honesty. That is what I expected.

So let me have a question here for Mr. George Yin, Professor Yin.  Some on this committee have claimed that releasing the tax returns of the President under 6103, that authority to be a political abuse of power.  By the way, we sent numerous letters to Mr. Brady when he was the chairman of the committee saying let's do this

together so it is not partisan.  Bull to what they are saying today.

Professor Yin, you have written about this committee's use of 6103, this committee, to obtain and release the tax information of more than 50 taxpayers in 2014.  That happened along partisan lines.  Republicans voted to release the information, Democrats are opposed.  Can you explain your thoughts on the committee's use of 6103 in 2014?

Mr. Yin.  Congressman Pascrell, I would be happy to.  In that instance, the committee did release the tax return information of, by my count, 51 separate organizations, with almost half of them having multiple pieces of tax return information disclosed.  And I looked very closely at that whole situation.  Forty-one of the organizations had absolutely nothing to do with the specific committee investigation and allegations relating to Lois Lerner and the IRS and the purported discrimination by the agency against right-leaning exempt organizations.  They had absolutely nothing to do with it.  And so the release of those the information for those 41 seemed to me to be a clear violation.

The other 10 organizations, which were all right-leaning exempt organizations, the committee's allegations with respect to them were that they weren't processed quickly enough.  The allegations did not go to the substance of the actual applications themselves.  And so it seemed to me that if the committee wanted to publish a letter indicating the objection as to how it viewed the IRS and Ms. Lerner's treatment, they there was absolutely no reason to name the organizations and to reveal any tax return information.  They could have made exactly the same point as the Treasury Inspector General had made just a few months earlier in bringing the matter up to the attention of the committee by referring to 10 right-leaning exempt organizations or 10 Tea Party type organizations,

or whatever name would be appropriate, to provide the general sense without necessarily naming and revealing any tax return information.  So I concluded all 51 disclosures were a violation of the law.

Mr. Pascrell.  Mr. Chairman, thank you for your courtesies and your indulgence.  This is a very critical issue for the American people who are interested in this subject.  We are not interested in getting someone; we are interested in following the law.  Period.  That is it.  Give us the chance to do that.  Give us a chance -- what am I saying?  Give us a chance to follow the law, and that is what we are doing, and we will not stop.  Thank you.

Mr. Lewis.  Thank you, Mr. Pascrell.

The chair is now pleased to recognize Mr. Ferguson, 5 minutes.

Mr. Ferguson.  Thank you, Mr. Chairman.  And I would like to yield as much time as he may consume to my colleague, Mr. Rice.

Mr. Rice.  Mr. Pascrell said that we need to follow the law, right?  We need to follow the law.

Mr. Thorndike, can you cite any statutory authority as a law that requires the President to disclose his tax returns?

Mr. Kies.  There is no requirement that the President --

Mr. Rice.  Mr. Yin?

Mr. Yin.  Nothing in the law right now.

Mr. Rice.  Okay, thank you.

Mr. Rosenthal?

Mr. Rosenthal.  None to my knowledge.

Mr. Rice.  Mr. -- I can't read it.  I am sorry.

Mr. Bookbinder.  Bookbinder.

Mr. Rice.  -- Bookbinder.

Mr. Bookbinder.  No current law, though there is a bill that you are discussing --

Mr. Rice.  Mr. Kies, what is the statutory requirement?

Mr. Kies.  There is none.

Mr. Rice.  There is none.  So we are following the law.  And, you know, why would we want the President to be required to disclose his tax returns?  I mean, it has been real clear from the testimony of all of the witnesses here that we want to check for conflicts.  I mean, really that is the primary reason, right?  We want to see personal benefit or conflicts.  So why hadn't we thought about that till now?  Oh, wait, we have.

Doesn't the President have to make disclosures, Mr. Thorndike, Dr. Thorndike?

Mr. Thorndike.  In what sense, disclosures --

Mr. Rice.  Doesn't he have to make financial disclosures?

Mr. Thorndike.  Yes, but that is not -- those are not -- that is not necessarily what we are talking about, I don't think.

Mr. Rice.  Well, I mean, the Ethics in Government Act of 1978 requires personal financial disclosure forms by the President and all Members of Congress as well, right?

Mr. Thorndike.  It is true, but if the President --

Mr. Rice.  And it is very detailed about what we have to disclose.  I mean, we have to disclose -- I am a CPA, I am a tax lawyer.

Mr. Thorndike.  It is true --

Mr. Rice.  We have to disclose a lot more information than you have to

disclose on a tax return about ownership, about percentages, about -- you know, in fact, Ms. Moore was asking, she would like to know more about the President's loans at Deutsche Bank.  I just pulled up the President's forms, it is 108 pages long.  The loan to Deutsche Bank is listed right there, the rate, when the loan matures, the amount of the loan.

Could you look at the President's tax return, Mr. Kies, and determine what the rate was on his Deutsche Bank loan?

Mr. Kies.  I think it is probably unlikely.

Mr. Rice.  Yeah.  And would you even know he borrowed the money from Deutsche Bank if you were looking at his tax return?

Mr. Kies.  It is unlikely.  Probably the only way you would know these things is by, and as has been pointed out by some of the other witnesses --

Mr. Rice.  Now, if Congress thought, you know, if the government thought that disclosing tax returns should be required, Mr. Rosenthal, could we not have required that in the ethics acts of 1976?

Mr. Rosenthal.  At the time, there were voluntary disclosures going on, it may not have been viewed as necessary.

Mr. Rice.  Could we have required that, Mr. Bookbinder?  Yes or no.

Mr. Bookbinder.  Yes.

Mr. Rice.  Yeah, of course we could -- but we didn't think it was sufficiently important to require it.  We don't think it is sufficiently important unless it is our political enemy.

Mr. Pascrell was talking about hypocrisy.  I will tell you, the Democrats are about anything hypocritical.  They love to weaponize the IRS, a/k/a Lois Lerner and now going after the President's tax returns.

I think in the STOCK Act , we recently reviewed this ethics disclosure, and we tightened it up, what, 2 or 3 years ago.  So this is something that is not new.  This is something that has been considered over and over again.  It has been tightened more and more.  And, you know, in our zeal, in the zeal of my friends across the aisle to attack this President, to weaponize agencies of the Federal Government, including the FBI and the DOJ and now the IRS, to pursue him with any means possible, now they want to go after his tax returns when it is not required, it has never been required.  We could have required it any time we thought it was appropriate.  We could have passed the law.

There is a prospective bill put out there now that may be considered at some point and, hell, maybe it will pass, but there is nothing that requires the President to disclose his tax returns.  To say that the President is not complying with the law is an abject falsehood.  It is an abject falsehood.

One more time.  Mr. Kies, is the President required to disclose his tax returns?

Mr. Kies.  No.

Mr. Rice.  Thank you, Mr. Chairman.  I yield back.

Mr. Lewis.  The chair is pleased now to recognize the gentleman from Texas, Mr. Doggett.

Mr. Doggett.  Thank you very much Mr. Chairman.

We, today, pursue two issues.  One is how to address with new legislation a situation where a future President might decide to reverse himself or herself the way President Trump did and not make available tax returns as all recent candidates for President have done.  And the second is to look at the basis and the process under a law that is almost a century old that gives the chairman of this committee the

authority to review tax returns, and if this committee so decides, that it is in the public interest for this committee to vote to send that information to the House where it can eventually be made a matter of public interest.

I, seeing the President's reversal, his entanglement with interest abroad and at home, seeing reports that he and his family may have benefited in excess of $1 billion from the tax bill that he forced through here without a single person from his administration coming to testify in favor of it or explain it, seeing all that, I moved on six different occasions in this committee over the last 2 years to use 6103 to obtain the President's tax returns.  And each time, there were excuses and coverup from our Republican colleagues as they obstructed and protected the President.

Now, the President apparently had enough concern about this that he did have a review made of his tax returns.  The review was made by the President's own lawyers; in fact, from a firm that proudly declares that it was the Russia law firm of the year that made the review of his returns, noting not only that he had personal returns, but more than 500 separate entities, entities that stretch from Azerbaijan to Panama.  And they gave him an all clear, this personal law firm, of that.  And I suppose that is a kind of review, but it is not one that inspires public confidence.

The Commissioner of the Internal Revenue Service, Charles Rettig, before he was appointed, said that, quote:  For wealthy individuals, individual tax returns sometimes only provide a brief financial overview linked to numerous other conclusions and entities.  To fully understand the financial status of Trump, one would likely need to see returns from multiple years, the work papers for the individual returns, and the returns for numerous related entities.

Mr. Rosenthal, do you agree with that statement?

Mr. Rosenthal.  Yes, I do.

Mr. <u>Doggett.</u>  And while having a President with such a sprawling business empire may be unprecedented, we know there are others.  Some have already announced as possibilities as independents or Democrats for the 2020 election. Every President, vice president, and candidate for the future, I think, should be held to the same standard that we would apply to President Trump.

Mr. Bookbinder, do you believe that H.R. 1 should be strengthened to include a requirement that all candidates disclose their business entities?

Mr. <u>Bookbinder.</u>  Yes.  I think recent events make clear that that is really important.

Mr. <u>Doggett.</u>  And, Mr. Rosenthal, might such information inform how much weight is given to a given policy of the President of the United States?

Mr. <u>Rosenthal.</u>  Yes.  Those type of disclosures would inform Congress' weight and deference to executive action.

Mr. <u>Doggett.</u>  We know that the President plays a central role in tax policy, that his Office of Management and Budget offers a review of tax regulations that he lobbies for and influences and signs legislation, that the Treasury Department that he appoints plays a big role.

With these multiple roles that the President plays on tax policy, is it essential, Mr. Rosenthal, that we have his returns to review the impact on those policies?

Mr. <u>Rosenthal.</u>  Yes.  I believe the regulatory process and the discretion the President has with that process, warrant the Congress and this committee understanding what financial interests he might yet have.

Mr. <u>Doggett.</u>  Thank you.

And, Professor Yin, an important point, while our focus in this committee is the tax system and the public confidence in that system and whether this President

is using his office for personal gain, the responsibilities when you talk about the legitimate purpose for using 6103, doesn't that extend to many other issues, such as his possible violation of the emoluments clause, his entanglement with Russians and Saudis and others who he may be doing business with or for?  Because this committee has a responsibility broader than just its own jurisdiction over the tax cut.

Mr. Yin.  Congressman Doggett, I believe you are right, and that is simply because Congress right now has delegated, exclusively to the tax committees this ability to inform the public about tax return information.  So I believe that the legitimate purpose for the Ways and Means Committee would extend to a constitutional responsibility of Congress and not be limited to the legislative jurisdiction of the committee.

Mr. Doggett.  And just one final one, Mr. Chairman.

And, Professor Yin, is it also not true that this committee, should it decide to make these records public, has powers that even the special counsel, Mr. Mueller, does not have?

Mr. Yin.  Yes.  That is a very valid point.  And that is, again, another issue down the road, which is that the special counsel can disclose tax return information only in limited circumstances, such as a judicial or administrative proceeding.  If he were to issue a report, it is not clear whether tax return information that might be critical to his conclusion in the report could, in fact, be revealed to the public, even assuming the Attorney General were to allow the report to be revealed at all.  So that is another issue.

Mr. Doggett.  Thank you, Mr. Chairman.  And I just would ask unanimous consent to include in the record a -- the testimony of Public Citizen concerning its support for the disclosure of Presidential and vice presidential tax returns, and the

important report of Americans for Tax Fairness, The Case for Congress Obtaining

Trump's Tax Returns.

Mr. <u>Lewis.</u>  So ordered.

[The information <u>follows</u>:]

[The information <u>follows</u>:]

Mr. <u>Doggett.</u>  Thank you for your tolerance.

RPTR ALLDRIDGE

EDTR ZAMORA

[5:16 p.m.]

Chairman Lewis.  Now it is my pleasure to recognize the gentleman from California, Mr. Panetta.

Mr. Panetta.  Thank you, Mr. Chairman.  I appreciate this opportunity, and thank you for letting me sit in on this hearing.  I appreciate that.

Gentlemen, thank you very much for being here today as well as your preparation for your testimony today too.

As you heard from one of my colleagues, and as you know well, there is no law requiring a taxpayer to turn over the tax returns to this committee, correct, Mr. Yin?

Mr. Yin.  You are referring to the President?

Mr. Panetta.  Yes.

Mr. Yin.  There is no law that requires that, that is correct.

Mr. Panetta.  But there is a law saying that this committee can obtain those tax returns, correct?

Mr. Yin.  That is correct.

Mr. Panetta.  Okay.  And that is 6103, subdivision F, subdivision 1, correct?

Mr. Yin.  That is correct.

Mr. Panetta.  And it actually says that any taxpayer shall furnish the tax returns to the committee, correct?

Mr. Yin.  It says the Treasury Secretary shall furnish the requested information to the committee.

Mr. Panetta.  Exactly.  So that is not a should or a could have or a would have.

It is a shall.  It must if we ask for that, correct?

Mr. Yin.  That is correct.

Mr. Panetta.  Okay.  Great.

And, Mr. Yin, I am going to focus on you.  Gentlemen, please excuse me, but I am going to focus on Mr. Yin, if that is okay.

In your testimony, Mr. Yin, you basically talk about -- on page 2, you talk about -- this is your formal written testimony -- you talk about the situation where there would be a refusal to turn over these tax returns in this situation that we have been talking about and that most likely you say that it would lead to the courts.  It would be a potential judicial resolution, as you say, correct?

Mr. Yin.  It might.  It depends on how the Congress reacts to that refusal.  Obviously, Congress could simply say, well, okay, that is too bad.  Or Congress could try to enforce its request, and that might end up in court.

Mr. Panetta.  Understood.  And if it went to a court, what is your -- how do you think these courts would look at that situation?  What would they use?

Mr. Yin.  Well, again, as I indicated in the testimony, I think we are in unchartered territory, because I don't think the specific issue has ever arisen before, at least I am not familiar with it.  But there is a little bit of law about enforcing congressional subpoenas, and this would be somewhat analogous to that.  And the law generally says that Congress must act with a legitimate legislative purpose.

Mr. Panetta.  And in regards to the case law that talks about a legitimate purpose, can you go into a little bit more detail behind those words?

Mr. Yin.  Yes, I would be happy to.  So the foundational case was an 1880 case, the Kilbourn v. Thompson case.  And that involved a situation where Congress was making an investigation relating to a bankruptcy.  And there was a settlement,

and there was a particular company that was affected by it.  And the congressional inquiry essentially went to the nature of that.

The party that was being subpoenaed refused, and so this eventually went to the Supreme Court.  And the court found that it could not find any legislative purpose for this inquiry.  The court said there is no legislation envisioned in this conflict that has arisen.  And, in fact, the court said, we can't even imagine how there would be any legislation relating to it.  It said, essentially, if this is a conflict, it is a conflict for the courts.  It is a conflict for the judicial branch to resolve, not the legislative branch to resolve.  And in that instance, the court concluded that the legislative inquiry was not going to be enforced.

Mr. <u>Panetta.</u>  Okay.

Mr. <u>Yin.</u>  There are other examples, obviously, I can give you.

Mr. <u>Panetta.</u>  Please, in regards to any that have been enforced.

Mr. <u>Yin.</u>  Yes.  Certainly.  Well, so in 1927, there was another Supreme Court court case, the McGrain v. Daugherty case.  Daugherty, in this particular case, was the brother of the former attorney general, Harry Daugherty.  Harry Daugherty had been one of the principals allegedly involved in some of the Teapot Dome matters.

And in this instance, Congress was seeking testimony and documents from the brother of Harry Daugherty to, again, complete the investigation of this.  And the brother refused.  So this also went to the Supreme Court.  And in that case, the court made it very clear that there was an appropriate legislative purpose to investigate the possible wrongdoing in the executive branch and, therefore, did enforce that request.

Mr. <u>Panetta.</u>  And these are the types of cases you believe that courts will look at for precedence, correct?

Mr. <u>Yin.</u>  Well, again, it is speculation on my part.  But it would be -- I would think, if I were a judge or the clerk for the judge, that would be certainly an area that I would direct the attention to.

Mr. <u>Panetta.</u>  Thank you.

I yield back my time.  Thank you again, Mr. Chairman.

Chairman <u>Lewis.</u>  Thank you.

The chair now recognizes for 5 minutes Mr. Reed.

Mr. <u>Reed.</u>  Thank you, Mr. Chairman.

This has been a very insightful panel, and I appreciate the testimony of the witnesses.

But as I venture down my questioning, I just want to make sure we are clear. I have heard from each one of the witnesses that there is a right-to-privacy issue here based on the historical review of the documents from each of their testimony. Does anyone disagree with the issue or concern that is legitimate being raised on the rights of privacy of individuals under 6103 or this proposed law, and that we need to take that into consideration?  Does anyone disagree with that?  Mr. Yin.

Mr. <u>Kies.</u>  One thing I would say in response to that, and it is something that no one on the committee has asked about yet, but I think it is an important piece of information.  6103 has never ever been used to request taxpayer information by the Ways and Means chairman, the Finance Committee chairman, or the chief of staff of the joint committee that has been released publicly.

Professor Yin referred to the Nixon situation.  Nixon had agreed to let his return.

When I was chief of staff of the joint committee in 1985, we requested individual income tax returns in connection with our study of why wealthy Americans

were giving up their citizenship.  That return information was never released to the public.

So we can debate whether or not the authority exists, but what is not in debate is it will be unprecedented if that authority is used to release taxpayer information.

Mr. <u>Reed.</u>  And, Mr. Yin, so do you disagree that there is no --

Mr. <u>Yin.</u>  Yes, I -- so I disagree with that response --

Mr. <u>Reed.</u>  No, not with -- I have limited time.

Are you concerned about the right of privacy that is being raised here?  Do you think there is no right of privacy to anyone?

Mr. <u>Yin.</u>  Yes.  I believe there is a balancing between the right of privacy of individuals and the right of the public to know.  And it is up to the Congress to determine how to strike that proper balance.

Mr. <u>Reed.</u>  How to strike that, right?  And that is exactly what we are wrestling with.

So the issue I have, because when I heard you testify to, I think it was John Kerry's wife, Geraldine Ferraro's husband who was concerned about their privacy, they didn't run for public office, right?  They didn't venture down this public domain path that their husbands or spouses did, wives did.

So the question I have for you is that if you get a Presidential return that shows the President having a relationship with Mrs. Jones down the street, Mrs. Jones' privacy right needs to be respected, correct?  She has a privacy right, that her information that because she happened to do business with an individual who happens to run for President, unbeknownst to her, 10, 20, 30 years, 10 years down the road, 5 years down the road, her right needs to be respected in this

conversation, correct?

Does anybody disagree with that?

Mr. Rosenthal. I agree. Yes, her rights should be respected.

Mr. Reed. Yes. So the issue that I am wrestling with here is, is there a better way to do this? Because, Mr. Bookbinder, you are very familiar with our financial disclosure statements. You offered testimony that said, you know, what we can't find from this financial disclosure, if it is a $6 million deal or a $600 million deal, that is potentially a conflict of interest. But isn't that irrelevant?

The fact on the financial disclosure, it discloses the relationship upon which the conflict arises. So if the financial disclosure shows that, regardless if it is a dollar or a trillion dollars, it is still a conflict that can be investigated, and that information is out there. Isn't that correct?

Mr. Bookbinder. I think that is correct. But there are likely to be relationships that are going to be shown in the tax returns that are not shown in the financial disclosures. And certainly, when -- privacy is incredibly important. But when somebody chooses to run for President, they give up lots of pieces of their right to privacy.

Mr. Reed. So, Mr. Bookbinder, you just teed up exactly what I think may be a wiser course for this committee to pursue, is if there is a concern about the financial disclosure and the information that that President or that vice presidential candidate, or any candidate who runs, if that individual chooses to do that, isn't that the more appropriate vehicle for us to be considering legislation to say, look, if you are running for President, we want your own form under the financial disclosure information, we want you to fill out all of these issues? Rather than run the risk of some Mrs. Jones' privacy being violated because someone wants to get a tax return.

I don't challenge Mr. Neal's integrity in regards to his authority to use 6103. He is a gentleman.  I respect him.  But I am concerned about the next Ways and Means chairman or the next political battle that is -- chooses to utilize this weapon that could potentially be abused by a future chairman or any chairman.

So shouldn't we focus our time on what actually could potentially bring members like me from the other side to say let's amend the financial disclosure reforms, target the information to that form for that individual, and at the same time we respect the privacy of individuals that had nothing to do with running for President or vice president?

I will let you ponder that.

And with that, I yield back.

Chairman <u>Lewis.</u>  The chair now recognizes for 5 minutes Mr. Kelly.

Mr. <u>Kelly.</u>  Thank you, Chairman.  And, again, thanks for holding the hearing. All the panelists, thanks for coming in today.

I want to go back to what Mr. Reed said, Mr. Bookbinder, would you clarify for me,  so when somebody runs for President, they give up their expectations of privacy?  Is that what --

Mr. <u>Bookbinder.</u>  Well, I think anyone who runs for President expects to have a lot less privacy than most individuals.

Mr. <u>Kelly.</u>  Okay.  So anybody that is a candidate for President or serves in the office is an American citizen.  Is that correct?

Mr. <u>Bookbinder.</u>  Yes.

Mr. <u>Kelly.</u>  Okay.  So are we saying if you reach a certain level, even though you are an American citizen, you are subject to greater scrutiny than anybody else? And then my next question would be:  So at what point do people say are you

kidding me?  Why would I ever run for any of these offices?  It makes no sense.

I don't want you to even answer that because I know what the answer is.  But I want to really be clear.  And I want each of you to say, and I want an answer.  I am not -- this may be -- and I really appreciate your opinions.  But you know what, may doesn't answer the question, because every time we ask you a question, well, this may be what happened, that may be what happened.

Do the President and the vice president, not undergo the scrutiny of having their tax returns audited by the IRS?

Mr. Thorndike, Dr. Thorndike.  It is just a yes or no.

Mr. Thorndike.  Yes.

Mr. Kelly.  Okay.  They do.

Professor Yin.

Mr. Yin.  The internal revenue manual --

Mr. Kelly.  The question is -- it is a yes or no, Doctor.  I appreciate that, but we are going to run out of time.

They are audited, are they not?  Are not the President and the vice president audited for tax returns?

Mr. Yin.  The internal revenue manual does require it.  Whether they in fact --

Mr. Kelly.  Okay.  I know you don't sit on it, so you can't be sure.  But you know what the answer is.

Mr. Rosenthal.

Mr. Rosenthal.  I have the same response.

Mr. Kelly.  You don't know either.  Okay.

Mr. Bookbinder.

Mr. Bookbinder.  I believe so, but I don't think it addresses all the issues --

Mr. Kelly.  Okay.  Mr. Kies.

Mr. Kies.  Yes.

Mr. Kelly.  Okay.  Thank you.  I am glad we had experts here that could maybe know but couldn't really know.

I just want to be clear on this.  Listen, this would not be taking place if we were not about a duly elected President by the name of Donald Trump sitting in that office.  This is an incredible overreach.  This is an oversight committee.  Our very role is to be the watchdogs to make sure that American citizens are protected.

Now, if I were to go home to my hometown and walk up to somebody and say, I don't know that you realize it, but you know what, this 6103 is something right now that we really have to look at.  And they are going to look at me, like, I have absolutely no idea what you are talking about.  I would say in too many cases we have absolutely no idea what we are talking about or what we are leading to.  This, I said earlier, is a Pandora's box.  You take the lid off this, and you make anybody subject to this type of scrutiny.

And it is hard for me to believe that since the mid 1970s when we had the Watergate fiasco, that the changes to the IRS then, especially what happened under President Nixon, that we are saying today, that this many years later, that we are just not sure that the IRS really knows how to do their job.

I can remember not too many years ago -- Mr. Reed, you sat here with me, whenever we talked about Lois Lerner.  We questioned whether we thought the IRS was doing the right job of what was happening and the weaponizing of the IRS.  We were told, listen, are you telling us you don't believe the IRS knows what they are doing.  Now, that was not done by our side of the aisle, by the way.  It was the other side of the aisle that said you can't possibly question the integrity of the IRS, and I do

not question their integrity.

Look, if there is better ways to do things, I think Mr. Reed hit on so many.  I mean, this isn't the financial disclosures.  If there are loopholes, if it is too wide, why not narrow it down?

And one of the members said this is not lazy legislation what we are doing. Well, if it is not lazy legislation, I guess we can find some other term for it.  It sure as heck is not doing our job as legislators.  If there is some confusion, then we need to straighten it out.

There are better ways to do it.  I understand that.  As far as the trust and the faith the American people have, each one of us got elected for this very purpose, to protect their freedoms and liberties and their privacy.  It is not to go after a political person that we just don't care for.

Mr. Kies, am I missing something here tonight?  I mean, you answered things pretty explicitly.  And I know you all have this great deal of background.  But when you can't say you know for sure that the IRS knows how to do an audit or if they are doing the audit, that is troubling to me.  What else would you do?  What else could we do to make this process better?

Mr. Kies.  Well, I actually think what Mr. Bookbinder has talked about is a more productive route of identifying the kind of information that you really want here, which is a more vigorous financial disclosure for people running for President. And you can steer clear of having to delve into releasing individual tax returns, which has never ever been done under section 6103.  And it is not a route that I think you should think about going down unless you are very, very careful.  And, frankly, I think if there is other ways to get the information, it is much better to go in that direction.

Mr. Kelly.  Okay.

Dr. Yin, you had something to say.

Mr. Yin.  I would just like to correct the record on that, because Mr. Kies has made the statement twice.  He seems to have forgotten that both in 2014 and in 2015, 2014 in the House Ways and Means Committee, 2015 in the Senate Finance Committee, there was the use of exactly the authority we are talking about now combined with a public disclosure in each instance.

Mr. Kelly.  That was during a criminal investigation.  Is that right?

Mr. Yin.  It was --

Mr. Kelly.  Yeah.  Okay.  It was.  Thank you.

Listen, I wish we had more time.  I would really love this could go on for a long time.  I know I share the same feelings as the chairman.  Thank you so much for giving us your time and your expertise in weighing in on this.

Let's make sure as we leave this room today, we are the oversight committee.  Our main role is to protect the privacy and the rights of every individual American citizen, of which our President happens to be.

Mr. Kies.  I would just add one thing.  I agree with what George just said.  What I would say is it has never been legally used.  George and I both agree that what was done in 2014 and 2015 was inconsistent with 6103.  This committee and -- has never legally released an individual tax return under the authority of section 6103.

Mr. Kelly.  It sounds like you and George get together a lot and discuss this.  So thank you so much for your time.

Chairman Lewis.  Let me just say to the ranking member, my friend, Mr. Kelly, it is my strong belief that the American people have a right to know.  We live in a democratic society.  We should know people running for office, the office of

President and vice president, how they earn their money and what conflicts they have.  So the hearing -- this is not the end.  This is just the beginning.

I want to thank each member of the panel for your participation, for your contribution.

Please be advised that members have 2 weeks to submit written questions to be answered later in writing.  Those questions and your answers will be made part of the formal hearing record.

With that, the Subcommittee on Oversight stands adjourned.  And thank you again.

[Whereupon, at 5:34 p.m., the subcommittee was adjourned.]

Submissions for the Record follow:

The Honorable Anna G. Eshoo, Statement

The Center for Fiscal Equity, Statement

Public Citizen, Statement

Americans for Tax Fairness, Statement