**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON WAYS AND MEANS,
UNITED STATES HOUSE OF
REPRESENTATIVES,

                    *Plaintiff*,

vs.

UNITED STATES DEPARTMENT OF THE
TREASURY, *et al.*,

                    *Defendants*.

Case No. 1:19-cv-01974-TNM

# Exhibit MM



# THE VALUE OF PRESIDENTIAL AND VICE-PRESIDENTIAL TAX RETURNS TO THE PUBLIC AND CONGRESS

Steven M. Rosenthal*

Senior Fellow

Urban-Brookings Tax Policy Center

before the

Committee on Ways and Means, Subcommittee on Oversight

United States House of Representatives

Hearing on Legislative Proposals and Tax Law Related to Presidential and Vice-Presidential Tax Returns

February 7, 2019

*The views expressed are my own and should not be attributed to the Urban Institute, the Brookings Institution, the Tax Policy Center, their trustees, or their funders.

Chairman Lewis, Ranking Member Kelly, distinguished Members of the Subcommittee, and other Members of the Ways and Means Committee:

Thank you for inviting me to share my views on the need for presidents, vice presidents, and candidates for these offices to disclose their tax returns. The views expressed here are my own, and should not be attributed to any organization I am affiliated with, their trustees, or their funders. In this testimony, I discuss (i) the importance of publicly disclosing the tax returns of current and potential presidents and vice presidents; (ii) the need for new legislation, such as H.R. 1, to ensure presidents, vice presidents, and candidates for these offices cannot avoid this valuable service; and (iii) the existing authority of the Committee on Ways and Means (the "Committee") to request tax information from the Internal Revenue Service (the "IRS")—authority that is critical to our legislative checks and balances, whether or not new legislation is enacted.

Publicly disclosed tax returns would reveal valuable information on effective tax rates, the sources and nature of income and deductions, and potential conflicts of interest, which is particularly important for presidents, vice presidents, and candidates for these offices. That is why I believe Congress should enact legislation, such as H.R. 1, that requires presidents, vice presidents, and major party candidates for these offices to disclose their tax returns (and associated schedules and information returns).

But, in some circumstances, Congress may need more detailed information on a president or vice president. New legislation cannot foresee how a future president or vice president will make their income—or what potential conflicts may arise. So, it cannot predict in advance all information to require: A one-size-fits-all approach will not work.

Fortunately, this Committee is already authorized to request, confidentially, additional tax information on a sitting president or vice president under sec. 6103(f) of the Internal Revenue Code (the "Code"). It can ask for tax information on the president or vice president—and on entities in which they hold financial interests, either directly or indirectly. The Committee also can ask for any IRS audit work papers, if that information is relevant.

A 6103(f) request by the Committee gives Congress flexibility to deal with officeholders' tax information case by case. In my view, such a request is appropriate and critical when a president or a vice president (1) refuses to release his or her tax returns, (2) acknowledges many years of open audits by the IRS, and (3) refuses to divest financial interests in a sprawling business empire—or to transfer the interests to a blind trust. In these circumstances, the Committee should seek tax returns and other tax information on the president or vice president to fulfill its oversight and other legislative responsibilities. It could decide, after its review of any 6103(f) tax information, whether and how to disclose that information publicly.

# THE PUBLIC SHOULD SEE THE TAX RETURNS OF PRESIDENTS, VICE PRESIDENTS, AND CANDIDATES FOR THESE OFFICES

In 1978, in the aftermath of Watergate, Congress required the president, the vice president, and candidates for these offices to disclose financial information.[1] This includes, within broad ranges, information about income, assets, and liabilities. Congress enacted these financial disclosure provisions to monitor and deter possible conflicts of interest.[2] But Congress did not require presidents, vice presidents, or candidates for these offices to disclose their tax returns. That step may have been considered unnecessary because, a few years earlier, President Nixon had voluntarily released his returns after allegations that he had avoided paying his taxes.[3]

I expect the public disclosure of tax returns, like the disclosure of financial reports, would help the public and Congress monitor and deter conflicts of interest. A solid majority of the public now would like to see President Trump's tax returns, presumably to learn more about his business dealings and financial background.[4]

But disclosure of a president's or vice president's tax returns offers more to the public than a check on his or her business dealings. Our income tax system is based on self-assessment. We rely on taxpayers to calculate, declare, and pay their taxes before any assessment by the authorities.

As a general matter, a citizen will comply with government mandates (including taxpaying) "if she perceives government as trustworthy and she is satisfied other citizens are also engaging in ethical reciprocity."[5] Ethical reciprocity means that other citizens are complying with their portion of the responsibility—that is, are also paying their taxes.

Disclosure of a president's and vice president's tax returns—and the impression that others, especially public servants, are complying with their tax obligations—would bolster the public's faith in our tax system.[6] It could demonstrate that,

---

[1] Title I of the Ethics in Government Act of 1978, as amended, 5 U.S.C. app. 4 §§ 101-111.

[2] "Policies Underlying Disclosure," US House of Representatives Committee on Ethics, https://ethics.house.gov/financial-dislosure/policies-underlying-disclosure. The legislative history in the Senate listed five rationales for public finance disclosure: (1) increase public confidence in the government, (2) demonstrate the high level of integrity of the vast majority of government officials, (3) deter conflicts of interest from arising, (4) deter some persons who should not be entering public service from doing so, and (5) better enable the public to judge the performance of public officials (Sen. Rep. No. 95-170, p. 21).

[3] The IRS had acquiesced: Baltimore district director William D. Walters wrote President Nixon that the IRS examination of his returns for 1971 and 1972 revealed they were correct. He added: "Accordingly, these returns are accepted as filed. I want to compliment you on the care shown in the preparation of the returns." Joseph J. Thorndike, *JCT Investigation of Nixon's Tax Returns* (Falls Church, VA: Tax Analysts, 2016), https://uschs.org/wp-content/uploads/2016/02/USCHS-History-Role-Joint-Committee-Taxation-Thorndike.pdf. The Joint Committee on Taxation later found that Nixon owed the government $476,431 in unpaid taxes and accrued interest.

[4] Joshua Gillin, "Trump Wrong That Americans Don't Care about His Tax Returns," Politifact, January 11, 2017, (describing several polls that showed large majorities of the public would like to see Trump's tax returns); https://www.politifact.com/truth-o-meter/statements/2017/jan/11/donald-trump/trump-wrong-reporters-are-only-ones-who-care-about/. The latest polling shows 6 in 10 Americans think Congress should obtain and release Trump's tax returns. ABC News/Washington Post poll, January 21–24, 2019, available at https://www.washingtonpost.com/page/2010-2019/WashingtonPost/2019/01/27/National-Politics/Polling/release_540.xml?uuid=a7vIaCHwEemnWSuFQbu-IA.

[5] Margaret Levi, *Consent, Dissent, and Patriotism* (New York: Cambridge University Press, 1997), p. 19.

[6] Of course, if an officeholder's tax returns demonstrated tax evasion, tax morale might be diminished. But the potential disclosure of tax returns might deter those people who evade their tax responsibilities from entering public service or running for office.

contrary to the words of the late Leona Helmsley (owner of a New York real estate fortune), taxes are not just for the "little people."[7]

Our experience with President Nixon also demonstrated that failure to disclose a president's tax returns could damage confidence:

> "The president can reduce his own taxes by fraudulent means and put pressure on the IRS, which may lack the will to properly audit the president. Confidentiality of tax returns enabled the conflict of interest to develop into abuse....[T]he public's faith in the tax system and in the government was shattered."[8]

Tax returns of major-party candidates for president and vice president also can help voters make informed choices. They could reveal whether, for example, a candidate would benefit from his or her tax proposals. They could anticipate potential conflicts that would arise after the candidate takes office or from being head of an executive branch that includes the IRS. Disclosing the president's and vice president's tax returns only after they are inaugurated may be too late.

## CONGRESS SHOULD REQUIRE PRESIDENTS AND VICE PRESIDENTS, AND CANDIDATES FOR THESE OFFICES, TO DISCLOSE THEIR TAX RETURNS PUBLICLY

After President Nixon's disclosures, President Carter, and every subsequent president until President Trump, voluntarily disclosed his returns to the public.[9] What's more, every major party nominee for president and vice president until candidate Trump voluntarily disclosed their returns. Also, after its Nixon experience, the IRS automatically audits the returns of the president and vice president, and presumably that includes President Trump and Vice President Pence.[10] But a norm is not enough: legislation is needed to require public disclosure of tax returns.

Congress should now enact legislation to *require disclosure of tax returns* for the president and vice president and candidates for these offices. Congress could set uniform requirements in the new legislation, including the number of years of tax returns to disclose and the scope of information required. (In addition, Congress might consider formalizing the IRS's audit of the president's and vice president's returns.)

H.R. 1, for example, requires the disclosure of 10 years of tax returns, including the associated schedules and information returns. Ten years is a little long, as many taxpayers only keep three or six years of returns.[11] More critically, H.R. 1 seeks only personal returns and the associated schedules and information returns. Because the legislation does not seek business returns of related entities, it might miss important information. Congress should weigh the value of

---

[7] John J. Goldman, "Leona Helmsley Sentenced to 4 Years in Prison: Taxes," *Los Angeles Times,* March 19, 1993, http://articles.latimes.com/1992-03-19/news/mn-5943_1_leona-helmsley-sentenced.

[8] William D. Samson, "President Nixon's Troublesome Tax Returns," *Tax Notes,* April 11, 2005, http://www.taxhistory.org/thp/readings.nsf/ArtWeb/F8723E3606CD79EC85256FF6006F82C3?OpenDocument.

[9] President Gerald Ford opted to release a summary of his returns rather the returns themselves. See "Presidential Tax Returns," Tax Analysts, http://www.taxhistory.org/www/website.nsf/Web/PresidentialTaxReturns?OpenDocument.

[10] Internal Revenue Manual § 4.2.1.11, "Processing Returns and Accounts of the President and Vice President," https://www.irs.gov/irm/part4/irm_04-002-001#d0e1091.

[11] Taxpayers can obtain their tax returns from the IRS for seven years from filing if requested with Form 4506. The statute of limitations generally is three years, or six years if a taxpayer omits a substantial amount of income. Sec. 6501(a) and (e) of the Code.

expanding H.R. 1 to require tax returns of related entities, such as those directly or indirectly managed or controlled by the officeholder or candidate, against exposing the tax information of people other than the officeholder or candidate and possibly infringing on other people's privacy.[12]

True, public disclosure of tax returns of presidents, vice presidents, and candidates for these offices will infringe on their personal and commercial privacy interests (beyond the existing disclosure of financial information). But the president and the vice president oversee the entire executive branch, and the execution of their duties affects all of us. Moreover, they choose to seek these offices—and to serve. In my view, the public's interest in disclosure far outweighs the additional privacy concerns of a president, or a vice president, or a candidate for these highest offices in our country.

### *What the Public Learns from Tax Returns*

The public would glean substantial information from tax returns that is not available in financial disclosures. For example, tax returns show both income and losses.[13] Tax returns reveal precise taxable income and the amount of taxes paid, which determines the officeholder's or candidate's effective tax rate. Effective tax rates are useful to measure whether a taxpayer pays a "fair share" of taxes.

Is the officeholder's or candidate's effective tax rate lower than the average American's? Is the low tax rate attributable to legal tax avoidance, or illegal tax evasion, or something in between? Any tax shelters? Any amended returns, perhaps as part of an amnesty program, like the one for unreported foreign accounts?

The public would also learn the sources and nature of income and deductions. How much salaries or wages? Any consulting income? How much business income? Investment income? Foreign-source income and foreign taxes? Any charitable contributions? Any state taxes?[14]

Tax filings might reveal foreign financial relationships. In recent years, Congress has required taxpayers to disclose detailed information on foreign assets and foreign accounts. The public could see whether a box for a foreign financial account was checked on Form 1040, Schedule B, which requires filing the FinCEN Form 114 (aka FBAR, foreign bank account report). The public could also see whether a Form 8938 was filed for foreign financial assets.

Of course, tax returns may not answer all potential questions. For example, the identity of a lender is not typically reported on either personal or business tax returns. But any tax return information released publicly might complement information from other sources—financial disclosures, corporate filings, court filings, and so on—and could give a fuller picture.

---

[12] Congress also might require presidents, vice presidents, and candidates to disclose their state income tax returns, to accomplish similar policy goals. But Congress should first consider whether this would strike the right balance in federal and state oversight responsibilities.

[13] Financial disclosures show only income.

[14] President Nixon initially did not pay state income taxes to California or Washington, DC; he was a citizen without a state. Samson, "President Nixon's Troublesome Tax Returns," p. 6.

In addition, some presidents, vice presidents, or candidates have complicated financial arrangements. But plenty of experts could help unravel the returns and explain the issues they raise.[15]

# THE WAYS AND MEANS COMMITTEE COULD, UNDER EXISTING LAW, REQUEST PRESIDENTIAL AND VICE-PRESIDENTIAL RETURNS

Our Constitution authorizes Congress to enact legislation and oversee whether the legislation is faithfully executed, a critical part of our checks and balances.[16] Regardless of whether new legislation is enacted, existing authority permits the Committee to request tax returns and other tax information. That authority is important to retain because new legislation cannot anticipate all future circumstances.

In 1924, Congress enacted a road map for tax returns, sec. 6103(f) of the Code, in response to two controversies: (1) the Teapot Dome scandal, where senior officials in the Harding Administration granted public oil field leases in exchange for bribes; and (2) allegations stemming from Treasury Secretary Andrew Mellon's retention of business interests while serving in government. Some believed the Bureau of Internal Revenue, the precursor to the IRS, showed favoritism to the secretary and his businesses.[17]

Similar questions and concerns are swirling today. President Trump maintains a sprawling business empire that he has not transferred to a blind trust.[18] Also, according to President Trump, his returns are open for audit by the IRS and have been "for many years."[19] Without seeing these returns, the Committee cannot tell whether the returns are being properly reviewed.[20] The Committee also cannot understand how any disputes have been resolved, which is essential to overseeing the fair administration of our tax system.

Sec. 6103(f) provides, upon written request of the Chairman of the Committee, the Treasury Secretary "***shall*** furnish such committee with ***any*** return or return information specified in such request" (emphasis added). Returns and return information are defined expansively in Code sec. 6103(b)(1) and (2). The Chairman may follow up with additional requests, based on the information received.

---

[15] As noted earlier, the Joint Committee on Taxation investigated and reported on President Nixon's tax returns, and nongovernment experts helped the investigation (Thorndike, *JCT Investigation*).

[16] Todd Garvey, *Congress's Contempt Power and the Enforcement of Congressional Subpoenas: Law, History, Practice, and Procedure* (Washington, DC: Congressional Research Service, 2017), available at https://fas.org/sgp/crs/misc/RL34097.pdf.

[17] George K. Yin, "Preventing Congressional Violations of Taxpayer Privacy," *Tax Lawyer* 69, no. 103 (2015), available at https://ssrn.com/abstract=2628193.

[18] President Trump created a revocable trust, not a blind trust. Susanne Craig and Eric Lipton, "Trust Records Show Trump Is Still Closely Tied to His Empire," *New York Times,* February 3, 2017, https://www.nytimes.com/2017/02/03/us/politics/donald-trump-business.html.

[19] Brett Samuels, "Trump Says He Will Refuse to Release Tax Returns as Long as They Are Under Audit," *The Hill,* November 7, 2018, https://thehill.com/homenews/administration/415526-trump-says-he-will-refuse-to-release-tax-returns-as-long-as-they-are.

[20] The Committee, at a minimum, should seek the returns of the entities that President Trump listed in his financial disclosures. Trump's lawyers acknowledged that his personal federal income tax returns reflected both the income earned by more than 500 separate entities and the interest paid or received by these entities. Matthew Yglesias, "Here's the 'Certified' Letter Saying Trump Has No Russian Debts or Investors," Vox, May 12, 2017, https://www.vox.com/2017/5/12/15630378/trump-russia-letter.

The Secretary may not redact any of the information requested. However, the Secretary must furnish any information associated with a particular taxpayer to the Committee in a closed executive session. After receiving the information, the Committee may designate or appoint examiners or agents to inspect the information "at such time and in such matter" as the Chairman determines. The Committee, in its discretion, may later share part of or all the tax information, or a report based on the information, with the full House.

### *What the Committee Learns from Tax Returns and Other Return Information*

President Trump's business arrangements are complex. As now IRS Commissioner Charles Rettig explained during the last presidential campaign, "To fully understand the financial status of Trump, one would likely need to see returns for multiple years, the work-papers for the individual returns and the return for numerous related entities," which Mr. Rettig predicted would be unlikely to happen.[21]

The tax code is crystal clear that the Committee is authorized to request the above tax information, and more, from the Secretary (who "shall" provide it). Congress should tailor its request based on its purpose for the returns, and many purposes are legitimate and derive from Congress' express and implied powers under our Constitution.[22] For convenience, I place some of these purposes into three groups:

**Overseeing the IRS:** The Committee could investigate whether the IRS is properly auditing the president, and entities related to him, and whether the IRS is resolving these audits fairly. The Committee would need a wide scope of tax information from returns audited or open for audit during his time in office (or six years from filing, whichever is longer).[23] The Committee would need both personal and business returns and, perhaps, trust (including his revocable business trust) and foundation returns associated with the president. It could seek any associated schedules and taxpayer work papers in the possession of the IRS. The Committee also could request IRS work papers, notices of deficiencies, closing agreements, and so on to evaluate the fairness of the audits.

Requesting the information would not suggest that the Committee lacks confidence in the professionals at the IRS who audit the returns of the president and vice president. It would simply reflect the reality that the IRS is part of the executive branch, which is headed by the president, and that Congress should ensure the executive branch is faithfully executing the law.

**Investigating conflicts:** Congress must know whether the president and executive branch are acting solely in the national interest—or are influenced by personal interest. The president and executive branch recommend policies to Congress and wield tremendous power over policy through executive actions. Did the president benefit from last year's tax

---

[21] Charles Rettig, "No Ordinary Audit: Donald Trump Is Facing the IRS 'Wealth Squad'," *Forbes*, February 28, 2016, https://www.forbes.com/sites/irswatch/2016/02/28/no-ordinary-audit-donald-trump-is-facing-the-irs-wealth-squad/#346ob2804d71.

[22] The Chairman need not spell out the purposes in the request for the Secretary. He could simply state that the request is being made "In order to conduct oversight on matters within the Committee's jurisdiction, including the administration of federal tax law, and to obtain information necessary as a basis for such legislative action as the House may deem necessary and appropriate." See, for example, 2-page letter from Chairman Dave Camp to Daniel Werfel, Acting Commission of the IRS, dated September 20, 2013, available on page 19 of https://www.congress.gov/113/crpt/hrpt414/CRPT-113hrpt414.pdf.

[23] A return is open for six years if substantial taxable income is omitted (Code sec. 6501(e)).

legislation, or from regulations implementing that legislation? Would the president benefit from his new tax proposals? The answers to these questions might help the Committee evaluate prior or new tax legislation.

In addition, are the president's trade, tariffs, and sanctions policies potentially influenced by his business interests at home or overseas? A more complete picture of the president's finances, including the disclosure of foreign accounts and gifts from foreigners (which must be reported on a Form 3520), could help inform the Committee and Congress. Some of the Committee's findings may be relevant to other committees as well (e.g., Foreign Affairs).

**Developing legislation:** A review of the president's taxes might suggest reforms to current law. For example, it might reveal better ways to report financial relations with foreign entities—and, perhaps, larger penalties for failing to report them. If the president is not paying the appropriate amount of taxes, it might reveal other areas of the tax law to reform, such as real estate taxation or payroll tax compliance.

The tax information could inform Congress on whether new legislation, like H.R. 1, is needed and how to design it, including its appropriate scope. The Committee could use the president's tax returns to evaluate what transpires without disclosure. For example, are conflicts more rampant? What type? Finally, by reviewing the president's return in executive session, the Committee could better evaluate claims that disclosure would infringe upon his legitimate privacy interests. In my view, the public's interest in seeing the tax returns of the president would likely outweigh any countervailing privacy interest, but the Committee could evaluate those arguments better with the president's returns in hand.

## CONCLUSION

I believe Congress should enact new legislation to require presidents, vice presidents, and candidates for these offices to disclose their tax returns. Whether or not Congress enacts new legislation, I believe the Committee should, confidentially, obtain President Trump's tax returns using its authority under existing sec. 6103(f) of the Code. After reviewing the information, the Committee could exercise its discretion to determine whether, and how, to release the information.