**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON WAYS AND MEANS,
UNITED STATES HOUSE OF
REPRESENTATIVES,

*Plaintiff*,

vs.

UNITED STATES DEPARTMENT OF THE
TREASURY, *et al.*,

*Defendants*.

Case No. 1:19-cv-01974-TNM

# Exhibit OO



## HOUSE COMMITTEE ON WAYS & MEANS
### CHAIRMAN RICHARD E. NEAL

# Memo

**To:**        Members of the Committee on Ways and Means

**From:**      Chairman Richard E. Neal

**Date:**      July 25, 2019

**Re:**        Historical Use of Authority to Obtain Confidential Tax Information

---

The Committee on Ways and Means ("Committee") met in closed executive session today to consider materials related to the historical use of authority given to the three Congressional tax committees to request and receive confidential return and return information ("taxpayer information") pursuant to section 6103 of the Internal Revenue Code.

The importance of section 6103 to the oversight and legislative work of the Committee, the Senate Committee on Finance ("Senate Finance"), and the Joint Committee on Taxation ("JCT") has long been recognized by the Chairmen in both parties.  Therefore, I believed it was necessary for the entire Committee to be aware of the same facts and materials regarding the historical use of this authority by the three committees.  To convey relevant, confidential information of which I recently became aware, I convened Committee Members in closed executive session.

Since a Committee vote to go into closed executive session was necessary for this matter to proceed, I did not provide this memorandum in advance of today's action.  The information herein is provided in follow-up for background.

### Background

As you are aware and as I have noted publicly, the Committee is considering legislative proposals and conducting oversight related to our Federal tax laws, including, but not limited to, the extent to which the IRS audits and enforces the Federal tax laws against a President. Accordingly, on April 3, 2019, I made a request to the Internal Revenue Service ("IRS") for relevant, confidential taxpayer information pursuant to section 6103(f).  The IRS and Department of the Treasury ("Treasury") refused to provide the requested materials, calling the Committee's

request "unprecedented" and citing incorrect arguments about purported limits on the Committee's authority under section 6103.

IRS and Treasury, however, did offer to brief Committee staff, on a bipartisan basis, on the mandatory Presidential audit process described in the Internal Revenue Manual.  In anticipation of the June 10 briefing, Committee staff prepared hundreds of questions for the IRS and Treasury, including many questions about how the mandatory audit process has been applied to Presidents, both current and former.  To facilitate a meaningful meeting, pursuant to the Committee's section 6103 authority, I designated all Majority and Minority staff present at the briefing as my agents for purposes of receiving confidential taxpayer information.  Despite this designation, IRS and Treasury officials declined to answer specific questions about actual audits, again pointing to the same purported limits on the Committee's authority under section 6103.

**Additional Efforts to Obtain Information**

In the absence of historical information from Treasury and the IRS, the Committee has looked to other sources for information about past Presidential audits, as well as about Congress's prior use of section 6103.  Given the confidential treatment of taxpayer information, the Committee has limited means for this purpose.  However, the following avenues have yielded helpful information (which is summarized in the next section):

- To the Committee's knowledge, there is only one President for whom information about the audit of his returns is publicly available—President Richard Nixon.  Also, according to an IRS memorandum provided to Committee staff during the June 10 briefing, the IRS implemented procedures for the handling of Presidential returns because of issues that arose regarding President Nixon.  Therefore, in furtherance of the Committee's ongoing work concerning the Presidential audit process, I, as Chairman of the Committee, asked the Chief of Staff of JCT to review JCT files of its investigation of President Nixon's returns.  In particular, I asked whether JCT sought and received confidential taxpayer information directly from the IRS under section 6103.  Though I asked the Chief of Staff to share his findings with me, I did not request to see any tax returns provided to JCT by the IRS.

- Concurrently, Committee staff reviewed files from prior Congresses to better understand the Committee's own use of section 6103(f).  Due to the confidential treatment of return and return information, Committee staff only found information concerning investigations of which they had personal knowledge.  Despite this limitation, Committee staff was able to catalog multiple instances over the last three decades where the Committee sought and received confidential taxpayer information under section 6103(f).

- Recently, Senator Ron Wyden, Ranking Member of Senate Finance, asked the IRS for information about section 6103(f) requests made by either the Committee or Senate Finance since 2000.  In response, Treasury provided some historical examples, but noted that "it was not until 2005 that the IRS began tracking the committees' requests in a manner that can be relied upon for completeness, so the IRS does not have a record of the information [sought]."  Treasury also stated that the "best source of this information

would likely be the committees' own archives."  Under section 6103(p), enacted in 1976, the IRS is required to maintain a permanent system of standardized records of all requests made for the inspection or disclosure of taxpayer information; consequently, this response was concerning.

As a result of this work, the Committee now has a better understanding of how the three Congressional tax committees historically have used section 6103 to request and receive confidential taxpayer information.

## Conclusions

In light of Treasury's challenge to the Committee's authority, I believe it would be instructive for Committee Members to be made aware of staff findings.  Specifically, Committee staff concluded the following:

- **The Congressional tax committees regularly make requests to the IRS for confidential taxpayer information under section 6103.**  These requests are made for specific circumstances (*e.g.*, Congressional visits to IRS facilities), to conduct oversight, or to obtain information for use in the legislative work of a committee.

- **Section 6103 has been used to obtain the tax returns and return information of a sitting President.**  In researching my request, JCT staff confirmed that, in 1973 and 1974, the JCT Chief of Staff made various requests to the IRS for confidential taxpayer information of President Nixon and others.  The current JCT Chief of Staff concluded, based on his review of materials, that "the Joint Committee staff sought and received, under its legal authority, confidential information directly from the Internal Revenue Service that was used in the analysis presented in the [1974] report." (*See Attachment*)

  Earlier today, the Committee voted, in closed executive session, to submit to the House materials pertaining to JCT's requests in 1973 and 1974 for President Nixon's tax returns and related return information.  While it is true that President Nixon voluntarily disclosed his returns for tax years 1969 through 1972, JCT additionally sought from the IRS: (1) President Nixon's returns for tax years 1964 through 1968, (2) certified copies of the returns voluntarily disclosed, and (3) returns for additional taxpayers.  Where records were available, the IRS complied with JCT's requests without delay or objection.  As evidenced by the materials submitted, JCT received from the IRS copies of the President's returns for tax years 1966 through 1972.  (*See Attachment*)

- **In the past three decades, the Congressional tax committees have used section 6103(f) to examine taxpayer information for individual, business, and other taxpayers in a wide range of circumstances.**  For example, section 6103(f) has been used to access and review taxpayer information of:

  o  A Member of Congress;
  o  Multiple individual taxpayers related to IRS gift tax examinations;

- o  Individuals, estates, and other taxpayers owing over $100 million in taxes, when questions pertaining to tax law enforcement and the soundness of IRS tax administration came to the Committee's attention;
- o  Individuals with unpaid tax liabilities, where the Committee was investigating the IRS's use of private debt collectors to collect unpaid Federal tax;
- o  Individuals and businesses contracting with the Federal Government, where the Committee was reviewing the IRS's failure to implement procedures to seize contract payments even though the agency possessed the authority to do so;
- o  Nonprofit organizations whose applications for tax-exempt status were subject to heightened scrutiny allegedly based on their political affiliations, during the Committee's investigation of the processing of these applications by the IRS;
- o  Foreign-owned distributors within the U.S. of automobiles, motorcycles, and electronics equipment, where the Committee was investigating the IRS's international enforcement program and international tax-avoidance schemes;
- o  More than 200 large, tax-exempt organizations, where the Committee was investigating the IRS's audit and enforcement process for these organizations and the salaries of their top executives;
- o  Individuals who made cash payments of more than $10,000 to purchase automobile and consumer goods, as well as the merchants involved, as part of the Committee's review of the IRS's administration of tax laws related to the filing of returns connected to business transacted in cash;
- o  Companies, including banks and automotive manufacturers, that received funds from Treasury's Troubled Asset Relief Program, where the Committee was investigating unpaid Federal income or employment taxes of program recipients;
- o  Individuals engaging in tax refund fraud, where the Committee was investigating IRS procedures to detect and prevent such fraud;
- o  Small businesses, where the Committee was investigating the IRS's use of civil procedures to seize bank accounts of such businesses believed to be structuring their deposits to avoid Bank Secrecy Act reporting requirements; and
- o  A municipal government, where the Committee was investigating the IRS's administration of rules related to the withholding and remitting of employment taxes to the IRS.

**Attachment**

1.  Correspondence between Chairman Neal and the Joint Committee on Taxation

RICHARD E. NEAL, MASSACHUSETTS, CHAIRMAN

JOHN LEWIS, GEORGIA
LLOYD DOGGETT, TEXAS
MIKE THOMPSON, CALIFORNIA
JOHN B. LARSON, CONNECTICUT
EARL BLUMENAUER, OREGON
RON KIND, WISCONSIN
BILL PASCRELL, JR., NEW JERSEY
DANNY K. DAVIS, ILLINOIS
LINDA T. SANCHEZ, CALIFORNIA
BRIAN HIGGINS, NEW YORK
TERRI A. SEWELL, ALABAMA
SUZAN DELBENE, WASHINGTON
JUDY CHU, CALIFORNIA
GWEN MOORE, WISCONSIN
DAN KILDEE, MICHIGAN
BRENDAN BOYLE, PENNSYLVANIA
DON BEYER, VIRGINIA
DWIGHT EVANS, PENNSYLVANIA
BRAD SCHNEIDER, ILLINOIS
TOM SUOZZI, NEW YORK
JIMMY PANETTA, CALIFORNIA
STEPHANIE MURPHY, FLORIDA
JIMMY GOMEZ, CALIFORNIA
STEVEN HORSFORD, NEVADA

BRANDON CASEY,
MAJORITY STAFF DIRECTOR

## U.S. House of Representatives

COMMITTEE ON WAYS AND MEANS

1102 LONGWORTH HOUSE OFFICE BUILDING
(202) 225-3625

Washington, DC 20515-0348

http://waysandmeans.house.gov

KEVIN BRADY, TEXAS,
RANKING MEMBER

DEVIN NUNES, CALIFORNIA
VERN BUCHANAN, FLORIDA
ADRIAN SMITH, NEBRASKA
KENNY MARCHANT, TEXAS
TOM REED, NEW YORK
MIKE KELLY, PENNSYLVANIA
GEORGE HOLDING, NORTH CAROLINA
JASON SMITH, MISSOURI
TOM RICE, SOUTH CAROLINA
DAVID SCHWEIKERT, ARIZONA
JACKIE WALORSKI, INDIANA
DARIN LAHOOD, ILLINOIS
BRAD R. WENSTRUP, OHIO
JODEY ARRINGTON, TEXAS
DREW FERGUSON, GEORGIA
RON ESTES, KANSAS

GARY ANDRES,
MINORITY STAFF DIRECTOR

July 23, 2019

Mr. Thomas A. Barthold
Chief of Staff
Joint Committee on Taxation
502 Ford House Office Building
Washington, D.C. 20515

Dear Mr. Barthold:

In 1973 President Richard Nixon released to the public copies of his tax returns for the years 1969, 1970, 1971, and 1972, along with other financial information. In a letter to Wilbur D. Mills, the Chairman of the Joint Committee on Internal Revenue Taxation ("the Joint Committee"), the President described certain transactions and tax positions that had raised controversy. He requested that "the Joint Committee on Internal Revenue Taxation ... examine both of these transactions and ... inform me whether, in its judgment, the items have been correctly reported to the Internal Revenue Service." The Joint Committee decided to conduct a comprehensive examination of the President's income tax returns for the years 1969 through 1972, not limited to only the two issues identified by President Nixon. The Joint Committee directed its staff to undertake the investigation and prepare a report. The Joint Committee voted to submit the staff report to the Congress.

While President Nixon made a public disclosure of his tax returns for the years 1969 through 1972, I would like to know if, in addition to the publicly disclosed information, the Joint Committee staff sought information, as necessary, directly from the Internal Revenue Service under its legal authority under the Internal Revenue Code ("the Code"). I request that you review available records and files of the Joint Committee related to the investigation and report whether you can state that the Joint Committee staff sought and received, under its legal authority, confidential information directly from the Internal Revenue Service. If documentation of any Joint Committee request or any correspondence from the IRS acknowledging such Joint Committee request(s) exists, I respectfully request a copy of such materials.

Sincerely,

The Honorable Richard E. Neal, *Chairman*

116TH CONGRESS, 1ST SESSION

HOUSE
RICHARD NEAL, MASSACHUSETTS,
CHAIRMAN
JOHN LEWIS, GEORGIA
LLOYD DOGGETT, TEXAS
KEVIN BRADY, TEXAS
DEVIN NUNES, CALIFORNIA

SENATE
CHUCK GRASSLEY, IOWA,
VICE CHAIRMAN
MIKE CRAPO, IDAHO
MICHAEL B. ENZI, WYOMING
RON WYDEN, OREGON
DEBBIE STABENOW, MICHIGAN

THOMAS A. BARTHOLD
CHIEF OF STAFF
ROBERT P. HARVEY
DEPUTY CHIEF OF STAFF

**Congress of the United States**

JOINT COMMITTEE ON TAXATION
502 FORD HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-6453
(202) 225-3621
http://www.jct.gov

**JUL 2 3 2019**

Honorable Richard Neal
Committee on Ways and Means
1102 Longworth House Office Building
Washington, DC 20515

Dear Chairman Neal:

In response to your request of July 23, 2019, my colleagues and I have reviewed certain Joint Committee on Taxation's file materials relating to the report: Joint Committee on Internal Revenue Taxation, *Examination of President Nixon's Tax Returns for 1969 through 1972* (JCS-9-74), April 3, 1974 ("Joint Committee staff report").[1] Based on this review, I can state that the Joint Committee staff sought and received, under its legal authority, confidential information directly from the Internal Revenue Service that was used in the analysis presented in the report.

I enclose two sets of documents in support of my conclusion. Selected pages from a public copy of the Joint Committee staff report comprise the first set of documents. President Nixon had made public his tax returns for the years 1969, 1970, 1971, and 1972, and certain other financial information. I have highlighted pertinent statements from the Joint Committee staff report indicating that the staff reviewed return information for tax years and taxpayers beyond that included in the publicly released material.

- On pages 3 and 4, the Joint Committee staff report states "[I]t was necessary to consider a limited number of items relating to prior years' returns."

- On pages 10, 11, and 12, the Joint Committee staff report specifically refers to use of information from President Nixon's return for the year 1968 in reference to the staff's analysis of the charitable deduction claimed for the gift of certain pre-presidential papers.

- On pages 41 and 42, the Joint Committee staff report specifically refers to use of information from President Nixon's return for the year 1968 in reference to the staff's analysis of the charitable deduction claimed for the gift of certain pre-presidential papers.

---

[1] The Joint Committee on Internal Revenue Taxation voted to submit the Joint Committee staff report to the House of Representatives and to the Senate. On April 4, 1974, Congressman Wilbur Mills submitted the Joint Committee staff report to the House of Representatives and Senator Russell Long submitted the Joint Committee staff report to the Senate.

**Congress of the United States**
JOINT COMMITTEE ON TAXATION
Washington, DC 20515-6453

Honorable Richard Neal
U.S. House of Representatives

Page 2

- On page 113, the Joint Committee staff report states, "For example, on his 1968 return, the President deducted …"

- On page 118, footnote 13, the Joint Committee staff report states, "The staff has examined the President's tax returns and/or the accountant's work papers for the years 1964 through 1968 …"

- On page 155, the Joint Committee staff report refers to tax positions taken by Patricia Nixon Cox and her husband Edward Cox, suggesting that the staff had examined return information related to these individuals.

- On page 209, the Joint Committee staff report states, "The staff has examined Patricia [Nixon]'s tax returns and confirmed this information."

The second set of documents is copies of certain Joint Committee staff correspondence. This material includes return information that is subject to the confidentiality restrictions of section 6103 of the Internal Revenue Code and its attendant civil and criminal penalties for unauthorized disclosure. Briefly described the enclosures are:

- A letter dated December 13, 1973, from the Joint Committee's Chief of Staff, Laurence N. Woodworth to the Commissioner of the Internal Revenue Service, Donald Alexander, and Commissioner's reply (without the enclosure provided by the Commissioner).

- A letter dated January 31, 1974, from the Joint Committee's Chief of Staff, Laurence N. Woodworth to the Commissioner of the Internal Revenue Service, Donald Alexander, and Commissioner's reply (without the enclosure provided by the Commissioner).

# Congress of the United States
## JOINT COMMITTEE ON TAXATION
### Washington, DC 20515–6453

Honorable Richard Neal                                                    Page 3
U.S. House of Representatives

- A letter dated March 30, 1974 from the Joint Committee's Chief of Staff, Laurence
  N. Woodworth to Senator Carl Curtis, a member of the Joint Committee on Internal
  Revenue Taxation.

Sincerely,

*Thomas A. Barthold*

Thomas A. Barthold

Enclosures

helpful in the staff examination of the President's returns, and they have supplied most of the information requested.[1]

In its examination of the President's tax returns, the staff conducted approximately 30 interviews with persons involved in different aspects of the President's tax matters. In a number of cases, this represents more than one interview with the same person. In addition, the staff has made contact with numerous other possible sources of information, has on two occasions sent staff members to California to consider various tax issues, and on another occasion has sent staff personnel to New York to carry out the examination. This is in addition to information the staff received through numerous investigations made by the Internal Revenue Service personnel. Finally, the staff has employed experts to help it appraise the value of the San Clemente property—an engineering firm and an appraisal firm, both in California. The staff believes that it has conducted an extensive examination.

As is true in any examination of a tax return, however, it is not possible to give assurance that all items of income have been included. The staff report contains recommendations on two categories of income which it believes should have been included but were not; namely, improvements made by the Government to the San Clemente and Key Biscayne properties which the staff believes primarily represent personal economic benefits to the President, and economic benefits obtained by family and friends from the use of Government aircraft for personal purposes.

The staff did not examine the President's income tax returns for years prior to 1969. In the course of its examination of the returns for 1969–1972, however, the staff found that because of interrelationships of prior years' returns it was necessary to consider a limited number of items relating to prior years' returns, since they affect the

---

[1] The exceptions are listed here. (1) The Chairman of the Joint Committee requested information on flights taken by the President and his family on Government airplanes. This information was supplied only with respect to flights where the family were passengers but the President was not. The President's counsel responded to Chairman Long's letter on April 1, 1974, that this information would not be furnished and indicated the reasons. The response is shown in the Appendix in Exhibit XII–3.

(2) Because of the absence of the normal contact with the taxpayer, toward the end of its investigation the staff also submitted a series of questions for consideration by the President. The questions submitted relate to issues still not fully answered after many interviews were conducted with other persons involved in one way or another with the President's tax matters. These questions are shown in the Appendix Exhibit XII–1. The staff recognizes that these questions were submitted late in the examination period and that this may well account for the fact that the staff has not yet received an answer. It is still hoped, however, that answers will be forthcoming and that these can be made public.

(3) The staff also requested information from the President's representatives with respect to a so called "Special Projects Fund." The staff was made aware that certain expenditures out of this fund possibly had been made for personal items of the President relating to his San Clemente residence. For this reason, the staff requested a statement from the President's representatives on which of the expenditures made out of that fund were for the President's personal benefit. The staff's letter to the President's representatives on this matter is shown in Exhibit XII–2. On April 1, 1974, the President's counsel responded to this request and indicated that on the basis of an investigation there was found only one possible occasion on which a personal expense of President Nixon was paid out of the Special Projects Fund. This was for $6.30, which was a reimbursement for an expenditure for light bulbs at San Clemente. The staff has no way to verify whether these were all the expenditures made other than the letter. The letter is shown in Exhibit XII–4.

4

==returns for the years in question.== In addition, the staff has limited its
recommendations to income tax matters, although in this examination
it found instances where the employment taxes were not paid and gift
tax returns not filed.

The staff has made no attempt in this report to draw any conclu-
sions whether there was, or was not, fraud or negligence [2] involved
in any aspect of the returns, either on the part of the President or
his personal representatives. The staff believes that it would be in-
appropriate to consider such matters in view of the fact that the
House Judiciary Committee presently has before it an impeachment
investigation relating to the President, and that members of the Joint
Committee on Internal Revenue Taxation, along with members of the
House and Senate, may subsequently be called upon to pass judgment
on any charges which may be brought as a result of that investigation.
The staff believes that neither the House nor the Senate members of
the Joint Committee would want to have pre-judged any issue which
might be brought in any such proceedings.

The staff in preparing this report recognizes that an examination
by a committee staff, possibly with the publication of the recommenda-
tions does not retain for the taxpayer his usual rights of review which
are available to him under the appellate procedure in the Internal
Revenue Service and through the courts. For this reason, the staff has
attempted to examine matters with great care before making a recom-
mendation which will result in greater tax payments. At the same time,
however, the staff has attempted to follow the standards which it be-
lieves, under the law, are required to be applicable to taxpayers
generally, and the staff has not withheld recommendations because of
the office of the taxpayer involved. The staff, in any case, believes it
should be emphasized that this is a report only. It is not a demand for
payment of taxes. Any tax payment is a matter for consideration by
the taxpayer and the Internal Revenue Service.

## SUMMARY OF RECOMMENDATIONS

The report which follows is divided into ten separate parts. Each
of these deals with one or more major questions with respect to the
tax returns of the President. In most cases the report indicates first
the scope of the examination and then presents an analysis of points
of law which may be involved. This is followed by a summary of staff
recommendations, and finally the staff presents an analysis of these
recommendations.

The staff recommendations would make the following increases in
the President's taxes for the years involved:

| Year | Proposed Deficiency | Interest [1] | Deficiency plus interest |
|---|---|---|---|
| 1969 | $171, 055 | ([2]) | [2] $171, 055 |
| 1970 | 93, 410 | $16, 638 | 110, 048 |
| 1971 | 85, 667 | 10, 547 | 100, 214 |
| 1972 | 89, 890 | 5, 224 | 95, 114 |
| Total | $444, 022 | $32, 409 | $475, 431 |

[1] Interest to April 3, 1974.
[2] Since 1969 is a closed year and any payment by the President would be voluntary, the staff did not include an interest
payment for the deficiency in this year. However, if interest were to be included, the amount would be $40,732.

[2] The addition to tax for negligence itself, of course, is not a fraud issue, and applies
when there is no intent to defraud (see I.R.C. section 6653(a)).

10

The staff has also looked into the events relating to the deed. In addition, questions have been raised about certain restrictions on access to the papers that were imposed in the deed. On this latter point, the question arises whether the restrictions are such that the gift should be treated as a gift of a future interest, which would not be deductible under the tax laws regardless of when the gift was made.

In its examination of this matter, the staff has interviewed the representatives of the President who were involved in the gift, including White House staff, the President's attorneys (both former and present), and the President's accountants (both former and present). In addition, the staff has interviewed personnel at the National Archives, the General Services Administration, and all other individuals who (as best the staff can determine) had some involvement in this matter. In some cases witnesses have submitted written statements of their recollections following their staff interviews.

In the discussion set forth in this report, the staff has made use of all the memoranda, letters, and other data furnished to it, and in addition has reproduced the relevant documents in full in the appendix so that the public will have the opportunity to form its own impressions from seeing the entire document rather than from relying on the staff's summary of the document.

## 2. 1968 Gift of Papers

President Nixon made his first gift of papers to the United States at the end of 1968 and took a charitable contribution deduction for this gift on his tax return filed for 1968. The 1968 tax return indicates that this gift consisted of personal papers, manuscripts, and other materials; that the date of the gift was December 30, 1968; and that the market value at the time of the gift was $80,000. The tax return also indicated that there were no restrictions on the gift and that the gift was free and clear, with no rights remaining in the taxpayer. The amount of the gift was in excess of the maximum charitable contribution deduction available to President Nixon on his 1968 tax return and consequently a portion of the amount was available as a carryover to future years.

The following is a brief summary of the manner in which President Nixon made his 1968 gift of papers and a discussion of what was done by those involved. This is important to the staff examination relating to the 1969–1972 returns for two reasons. First, it is necessary to see the procedures followed for the 1968 gift since this indicates what information the people handling the President's personal finances had about gifts of papers in early 1969. In the absence of information to the contrary, it is reasonable to assume that the intended procedure for a 1969 gift would be similar to that for the 1968 gift. This is suggested, for example, by the fact that on the President's tax return the gift of papers claimed in 1969 was viewed as a second installment of President Nixon's pre-Presidential papers. The second reason for interest in the 1968 gift is that, since a carryover of the charitable contribution deduction taken on the 1968 tax return is available for future years (up to 1973), the staff must review the 1968 gift to determine if the amount available for carryover from 1968 is deductible for tax purposes for the years under examination by the Joint Com-

11

mittee. The Joint Committee staff did not examine the tax returns of
the President for the years prior to 1969 except to review the effect
any of the items on the prior years' returns may have on the tax
returns under examination.

The following is a summary of those procedures followed by Presi-
dent Nixon's representatives for his gift of papers in 1968. A full
discussion of the staff view on whether this gift is deductible for tax
purposes is discussed in Section 5 of this report.

*Procedures followed for 1968 gift*

*First consideration of 1968 gift.*—According to public statements
made by President Nixon, at a meeting he had with President Johnson
after the election in late November or early December 1968, President
Johnson told him that he could obtain tax deductions for his
papers. John Ehrlichman told the staff that President Johnson gave
President-elect Nixon the name of an appraiser, Ralph Newman,
whom he had used.[2]

*People assigned to work on gift.*—Richard Ritzel, President Nixon's
former law partner at what is now Mudge, Rose, Guthrie & Alexander,
told the staff that on December 15 or 16, 1968, he was asked by
President-elect Nixon to look into the possibility of making a gift
of papers in 1968. Mr. Ehrlichman told the staff that he was also
asked by Mr. Nixon to look into the desirability of making a gift
of papers, and Mr. Ehrlichman assigned Edward L. Morgan and Egil
Krogh of his staff to this task.

*Decision to make a gift.*—Mr. Ritzel told the staff that on December
22, 1968, he met with President-elect Nixon and reported that it
was feasible to make a gift but that, since it was close to the end of
the year, time would be a problem. Mr. Nixon told him to go ahead.

*Determination of amount of gift.*—Mr. Ritzel told the staff that an
accountant with the firm handling Mr. Nixon's taxes at that time
called him and said that they would need approximately $60,000 to
use up the maximum deduction allowable for 1968 (30 percent of
Mr. Nixon's adjusted gross income). Mr. Ritzel said that he came up
with a figure of $80,000 for the size of the gift because he wanted to
make sure that they had enough for the maximum deduction. Mr.
Ritzel said that a decision was made not to make a larger gift with a
larger carryover at that time because Mr. Nixon was thinking of
assigning to charity income from certain royalties which he believed
might not be appropriate for him to receive while serving as President.
Mr. Ritzel said that for this reason, and because of the short time
period during which they had to make the arrangements for the gift,
they decided only to make a gift slightly larger than that needed to
use up the maximum deduction for 1968 and to wait for the future
for other gifts.

*Segregation of material for gift.*—The pre-Presidential Nixon papers
were stored in a warehouse near the offices of Mudge, Rose in New
York. During the week of December 23, 1968, a number of boxes of
these papers were transported from the warehouse to the offices of
the law firm. On December 26 and 27, the boxes of papers were
reviewed to isolate those that were sensitive in any way. Those who

[2] A full discussion of the practices of President Johnson and his staff on his pre-Presidential papers is set forth in Section 8.

worked on this included Loie Gaunt, who had been with Mr. Nixon most of the time since 1951 and was the person most familiar with the boxes of papers, since she had been involved in organizing his files and had a list of the contents of the boxes; Messrs. Morgan and Krogh of Mr. Ehrlichman's staff; and James P. (Pat) Tannian, a member of the Mudge, Rose firm who assisted Mr. Ritzel with the papers. On December 29 (Sunday), Ralph Newman, an appraiser, arrived and was told by Mr. Ritzel the amount needed for the gift. Mr. Newman told the staff that he worked with the group reviewing the material to remove the more sensitive papers and then proceeded to identify sufficient material to cover the required amount that was to be included in the gift. He said he identified the boxes by putting Roman numerals on them and made an estimate of the value of each box.

*1968 deed.*—Mr. Ritzel told the staff that on or about December 26, 1968, he drafted two deeds of gift, one containing restrictions on access and the other without restrictions. He said that his associate, Pat Tannian, came to Washington to meet with Sheldon Cohen, the Commissioner of Internal Revenue, on December 28, and that Mr. Cohen assured Mr. Tannian that either version of the deed would be acceptable for a tax-deductible gift. (Mr. Cohen has told the staff that he met with Mr. Tannian but did not give this opinion, and Mr. Tannian has told the staff that he does not recall that he, in fact, showed the deeds to Mr. Cohen.) Mr. Ritzel said that Mr. Tannian also went to the General Services Administration to have them review the deed and that they requested an additional provision in the deed with restrictions to allow employees of the Archives to catalog the papers. Mr. Ritzel said that President-elect Nixon was unhappy with the language of the unrestricted deed, so he signed the one with the restrictions. Mr. Ritzel said Mr. Krogh, who had taken the deeds to Key Biscayne for signing, came back immediately so that the gift with the deed could be finalized. The 1968 deed is Exhibit I–1 in the Appendix.

*Delivery of papers.*—On December 30, 1968, a representative of the National Archives, Peter Iacullo, who had been authorized by Lawson Knott, the Administrator of General Services, accepted the gift by writing "accepted" and countersigning the deed on the last page opposite Mr. Nixon's signature. The papers were picked up at this time by the General Services Administration and were transferred to the Federal Records Center in New York.

*Treatment of gift on tax returns.*—Ralph Newman valued President Nixon's 1968 gift at $80,000. Of this, $70,552.27 was deducted on the President's 1968 tax return and $9,447.73 was available for carryover to future years. The treatment of this available carryover to 1969 is discussed in Section 5 below.

### 3. Documents on the Second Gift of Papers Furnished the Joint Committee by President Nixon's Representatives

President Nixon's representatives have released to the public or submitted to the Joint Committee three documents setting forth facts and legal opinions on the validity of the charitable contribution deduction taken by President Nixon on his 1969 tax return for the

41

them. In addition, the restrictions apply to all donated papers even though President Nixon has no common law copyright in many of the papers. For example, a sizable portion of the "General Correspondence File" donated in 1969 and all of the "Children's Letters" collection donated in 1968 consist of letters received by the President. The common law copyright to these letters belongs to the writers of the letters, not to the President. (This point is discussed in detail in the analysis of Professor L. Hart Wright, which is set out in Exhibit I–4.) In these cases, the restrictions on access and the rights retained by the President must relate to the tangible personal property since the restrictions in fact apply to these letters and since the President has no intangible property rights in the letters. For these reasons, the staff believes that the gifts of 1968 and 1969 are gifts of future interests in tangible personal property for which section 170(a)(3) prevents an income tax deduction until the end of Mr. Nixon's presidency.

*Deduction for gift of papers in 1969*

As indicated above, the staff believes that a valid gift of papers was not made prior to July 25, 1969, and, therefore, recommends denial of the charitable contribution deduction for 1969 and the carryovers in subsequent years. Also, the staff believes that a deed is necessary for this gift because of the restrictions and that since delivery of the deed conveying title of the papers to the United States, was not made until after April 10, 1970, the gift was not valid before July 25, 1969. But, even if the staff believed that a valid gift had been made before July 25, 1969, it believes that the gift represents a gift of a future interest in property and, therefore, that the charitable contribution deduction would in any event not be allowable for 1969 and subsequent years.

*Carryover of excess deduction for gift of papers in 1968*

The staff did not examine President Nixon's tax returns for any year prior to 1969 for any purpose other than to determine the effect certain items on prior tax returns had on the tax returns under examination by the staff. The charitable contribution deduction taken with respect to the gift of papers in 1968, however, was in excess of the maximum amount deductible in that year; consequently, an amount (the excess was $9,447) was available as a carryover to 1969 and the four succeeding taxable years. This amount was not taken as a deduction in 1969 or in the subsequent years because the deduction claimed by the President on his 1969 tax return was large enough to cover the maximum amount available in 1969 and in the succeeding years since then. Since the staff believes that the charitable contribution deduction for the gift of papers in 1969 should be disallowed, this would have the effect of making the carryover of the excess deduction from the 1968 tax return available in 1969. It is for this reason that the staff believed it was necessary to make a recommendation with respect to the 1968 gift.

Because the staff believes that the restrictions contained in the 1968 chattel deed make the gift a gift of a future interest in property, it also believes that the carryover, which would otherwise be available for 1969 (since the deduction for the gift of papers in 1969 is disallowed), is not available.

42

*Statement on tax return on restrictions of gift*

The Internal Revenue Service's regulations require anyone taking an income tax deduction for a gift of property to a charity to include on the tax return certain information, including any restrictions that may be attached to the gift. The President's tax return for 1969 had an information sheet consistent with what was required by the regulations, setting forth a brief description of the relevant information about the gift. As to any restrictions, it was stated on the tax return:

"None. The gift was free and clear with no rights remaining the taxpayer."

This is essentially the same statement that was contained in the 1968 tax return relating to the gift of papers in that year.

The staff believes that this statement on the tax return is inaccurate. The staff has no conclusive evidence, however, that the statement was made intentionally by those preparing the President's tax returns or any evidence that the President was aware of this statement on his tax return.

This statement on the 1969 return was prepared primarily by Frank DeMarco, according to his statements and the statement of Arthur Blech, the President's accountant, to the Joint Committee staff. Mr. DeMarco states that he knew of the 1969 deed and its contents at the time the statement was prepared, but that since the 1968 deed contained similar restrictions and the 1968 tax return contained the statement of no restrictions, he believed that a similar statement was appropriate on the 1969 return.

## 6. Staff Analysis of Facts Relating to the Second Gift of Papers Apart From the Deed

### A. INTENTIONS OF PRESIDENT NIXON TO MAKE A GIFT IN EARLY 1969

During the course of its investigation into the validity of the deduction for the second gift of papers, the staff made an effort to determine whether President Nixon intended to make a gift of his papers in the early part of 1969 and the amount of the intended gift, including whether the thinking at this time was to make a bulk gift (that is, one large enough to permit a carryforward) or a one-year gift for tax purposes. The staff discussed this issue with several members of President Nixon's staff who were handling his personal finances in early 1969, other individuals who were involved in President Nixon's legal and financial matters at that time, and personnel at the National Archives who were involved in the discussions and arrangements with the White House staff relating to the gift. The following discussion of intentions is based on the information the staff has received in the interviews with these people and in the various items of correspondence and memoranda that the staff obtained. The staff has specifically asked the President's counsel to furnish all materials which may in any way provide information on the intent to make a gift in the early part of 1969, but as yet at least, the staff has not received any information other than what is summarized below. During our interviews, there were references to other internal White House memoranda not referred to below, but the staff has not been furnished copies of them.

113

basis in the New York property, the President failed to take account of certain downward adjustments in his basis in that property which are required under the law.

The President's 1969 tax return contained a statement that both his new and old properties were used as a principal residence and that no part of either residence was "rented or used for business purposes at any time." As discussed below, these statements are subject to serious challenge.

*Business use of the old and new property.*

The statement on President Nixon's 1969 return that no rooms in either the old residence or the new residence were used for business purposes at any time is inconsistent with other statements made and deductions taken on the 1969 return and on earlier and later returns. For example, on his 1968 return, the President deducted 25 percent of the maintenance costs (other than real estate taxes and mortgage interest) on his New York City cooperative apartment. The amount deducted in that year was $3,231. The deduction was for use of the apartment for business purposes.[3] Similar amounts were deducted for the New York City apartment in earlier years at least as far back as 1965.

The committee staff has no authority to examine the appropriateness of these deductions and has no reason to question them. If the deductions were correctly taken, they indicate that approximately one-quarter of the New York City apartment was used for business purposes. Thus, the gain from the sale of the apartment attributable to that portion of the property cannot qualify for nonrecognition treatment under section 1034.[4]

Furthermore, the statement on the President's 1969 tax return that none of the San Clemente property was used for business purposes is inconsistent with deductions taken on that same return. On the 1969 tax return, a deduction was claimed for 25 percent of the maintenance costs of the San Clemente residence as "expenses incurred in connection with the use of residences for official government functions." Depreciation was taken on 25 percent of the building on the property because a similar business use was claimed.[5]

Obviously, the statement on the President's 1969 tax return that neither the New York nor the San Clemente residences were used for business purposes is not correct since deductions were taken for business use of the New York apartment in prior years and for business use of the San Clemente residence in 1969.

The President's representatives explain the discrepancy on the President's 1969 tax return with respect to the business use of the San Clemente property by stating that the property was, in fact, used for business purposes and by admitting that the statement to the contrary on the return was incorrect. They state that this misrepresentation with respect to the property was a mistake on their part and was not made intentionally. Mr. Blech, the President's accountant in

---

[3] If the deduction is correct, the President could also have deducted depreciation on approximately twenty-five percent of his apartment. In fact, the President did not take this deduction.

[4] As discussed earlier in text, the regulations under section 1034 clearly state that if the old residence is used only partially for residential purposes, "only that part of the gain allocable to the residential portion is not to be recognized under this section . . ." (Regs. § 1.1034-1(c)(3)(ii)). The legislative history of this provision is to the same effect. H. Rept. 586, 82d Cong., 1st Sess. (1951), p. 109; S. Rept. 737 (Part 2) 82d Cong., 1st Sess. (1951), p. 32.

[5] At another point in this report, the staff does question the validity of the 1969 deductions taken with respect to the San Clemente property.

occupancy requirement. There are certain exceptions under section 1034, but these have been carefully specified in the statute. For example, in cases where the taxpayer begins construction of his new residence within the required one-year period, the statute allows him 18 months in which to occupy the property (sec. 1034(c)(5)). Also, members of the Armed Forces who serve on extended active duty are allowed a 4-year period under the statute in order to comply with the purchase and occupancy requirements (sec. 1034(h)).

In the most relevant case (cited by the President's counsel on this point), *United States* v. *Sheahan*, 12 AFTR 2d 5654, 323 F. 2d 383 (5th Cir. 1963), the court held that the taxpayer was not entitled to nonrecognition treatment. There the taxpayer, a civilian Army doctor, sold his home in Missouri in anticipation of his retirement from his Army post. The Army told him that he would be free to leave as soon as a replacement physician could be found. The taxpayer then purchased a residence in Atlanta, Georgia. He did not occupy the premises within the required period, however. Although the court did not question the taxpayer's good faith and intent to occupy the property, it held that this was not enough to override the clear statutory mandate concerning occupancy.[12] See also Rev. Rul. 69–434, *supra* (where the taxpayer's failure to comply was not excused even though he was prevented from occupying his new property because he was on a 2-year assignment in another city).

*Basis adjustment for "allowable" depreciation*

The President reported $142,912 of gain from the sale of his New York apartment on his 1969 tax return (then seeking nonrecognition treatment of this gain). This figure was based on the sales price for his cooperative apartment of $312,500 less $169,588, consisting chiefly of the President's acquisition cost of the stock, the costs of certain improvements to the apartment and miscellaneous items. There were no downward adjustments made to this basis because of depreciation resulting from the claimed partial trade or business use of the property.

As discussed above, for the years from 1963 through and including 1968,[13] the President deducted a portion (approximately one-fourth) of the maintenance expenses of the apartment as trade or business deductions. Thus, the President was entitled to deduct an allowance for depreciation based on approximately one-fourth of the value of the apartment and its improvements (under sec. 167 of the Code).[14]

In fact, the President did not claim a deduction for depreciation in 1968 or earlier years. Nonetheless, the allowable depreciation must reduce the President's basis in his stock and other property. Section 1016(a)(2) of the Code provides for an adjustment to basis for depreciation and amortization to the extent that such depreciation and amorti-

---

[12] At least part of the delay in occupying the new residence was caused by the fact that the taxpayer was not released from his Army post as quickly as he had expected. The taxpayer apparently did not rely on this argument, but the court was aware of this fact when it made its decision.

[13] The staff has examined the President's tax returns and/or the accountant's work papers for the years 1964 through 1968 and has confirmed or is satisfied that maintenance expenses were taken as business deductions for each of them years. The staff has asked for the tax return and/or the accountant's work papers for the taxable year 1963 (in which the cooperative apartment was purchased by the President), but have not been furnished either of them. Based on what the staff has examined for the taxable years 1964 through 1968 and from its interview with the President's accountant, the staff has no indication that a similar deduction for business use of the apartment was not taken in 1963 and, accordingly, has used this year as well in recomputing the allowable depreciation.

[14] This result is not changed because the President held the apartment through means of stock in a co-operative housing corporation since section 216(c) of the Internal Revenue Code allows a pass-through of otherwise allowable depreciation to the tenant-stockholder of a cooperative housing unit, in this case the President.

155

ment was before the sale, or at the time of the sale. Again, because of the lack of evidence and the need to have clear evidence in intrafamily transactions, the staff believes this issue must be resolved against President Nixon. Consequently, the staff concludes that President Nixon should report all of the gain realized on the sale of the Cape Florida lots in 1972 as his income. There is a question whether he should report the transfer to Patricia Nixon Cox (less $20,000 plus 6 percent per annum from July 1, 1967, to the date of payment) as a gift to her. (President Nixon, of course, would be entitled to a deduction for the interest paid in the year 1973.)

*Tax adjustment*

The President reported on his 1972 Federal tax return that $11,616.59 was the allocated portion of profit from the installment sale of the Cape Florida lots due his daughter Patricia. (The staff understands, however, that President Nixon did not distribute any of this gain to Patricia in 1972 although he did receive $39,150 as an initial down payment.) The staff believes that the $11,616.59 allocated to Patricia should have been reported by the President as his gains, thus increasing his total gain on this installment sale from $17,424.88 to $29,041.47.

The staff believes that the remaining gain on the installment sale of the Cape Florida lots, amounting to $82,228.38, should be treated as taxable income to the President on his 1973 tax return. On this basis, Patricia and her husband (with whom she filed a joint return for 1972) should file an amended Federal income tax return for 1972 and eliminate the capital gain relating to the installment sale of the Cape Florida lots. Additionally, the Federal income tax return of Patricia and her husband for 1973 should not include any income from the installment sale from the Cape Florida lots.

The President's note to Patricia, which amounted to $20,000 and which called for an interest payment of 6 percent per annum, was liquidated on March 12, 1973. Patricia, should, therefore, report interest income from that note which was paid to her in 1973.

Finally, on this same basis, because the President's payment to Patricia was in the amount of $65,000 and she loaned the President $20,000, she may have received a gift from the President in 1973 amounting to $45,000, less interest on the note at 6 percent per annum from May 1967 to March 1973. Accordingly, the question arises whether President Nixon should also file a gift tax return for 1973 for this gift to Patricia.

209

refused to accept income due them from an employer, the courts have held that no taxable income should be attributed to the employee, *Commissioner* v. *Giannini*, 129 F.2d 638 (9th Cir. 1942). On these grounds the staff believes that the President's agreement did not give rise to taxable income to him.

### 2. *Dependency exemption for Patricia Nixon*

In 1969 and 1970, President Nixon claimed his daughter Patricia as a dependent. Under sections 151 (e) and 152 of the Internal Revenue Code, he was entitled to do this if he supplied more than half of Patricia's support and if she either had gross income of less than $600 in 1969 ($625 in 1970) or if she was a student or was less than 19 years of age.

Arthur Blech informed the staff that Patricia's income was less than $600 in 1969 and less than $625 in 1970. The staff has examined Patricia's tax returns and confirmed this information. Therefore, the President was entitled to a dependency exemption for her in those years.

### 3. *Sale of stock in Fisher's Island, Inc.*

The December 8, 1973, White House statement on President Nixon's personal finances states the following about the sale of his stock in Fisher's Island, Inc.:

> "The only stock that President Nixon owned upon taking office was in Fisher's Island, Inc. Fisher's Island, Inc. is a corporation in Florida formed in 1957 for the purpose of acquiring and developing Fisher's Island in Biscayne Bay. Mr. Nixon bought 199,891 shares in the company in 1967 and prior years for $199,891. After he became President, Mr. Nixon decided to limit his investments to real estate, Government bonds, and cash or its equivalent. President Nixon transferred 14,000 shares for $13,000 net to fulfill options given by him to others in 1967. He sold 185,891 shares of Fisher's Island stock back to the company on May 22, 1969 for $371,782. His 1969 Federal income tax return shows a capital gain from that sale of $184,891 and tax paid on that amount."

The staff has examined this transaction and verified the amounts stated. It finds nothing improper with the way President Nixon reported the transaction on his 1969 tax return.

### 4. *Deductions on Whittier property*

President Nixon claimed losses totalling $24,050 between 1969 and 1972 in connection with a house in Whittier, California, which he owns and rents out at a nominal rent. The staff believes this property was treated correctly on the President's tax returns. Under section 212 of the Code, expenses of maintaining property held for investment purposes can be deducted even though the amount of income received from the property is less than total expenses. Since the staff believes that President Nixon holds the property for investment purposes, it views these deductions as properly taken.

### 5. *Treatment of expense allowances*

President Nixon included his $50,000 expense allowance as income and deducted his employee business expenses as itemized deductions. Under section 62(2)(A) of the Internal Revenue Code, trade and busi-

# Congress of the United States
## JOINT COMMITTEE ON INTERNAL REVENUE TAXATION
### Washington, D.C.   20515

OCT. 1 8 1973

Honorable Donald C. Alexander
Commissioner
Internal Revenue Service
Washington, D.C.

Dear Mr. Commissioner:

The Joint Committee on Internal Revenue Taxation
has recently agreed to a request from the President of
the United States to examine his tax returns for the
years 1969 through 1972.  In view of this, I would like
to request from you copies of his returns for the years
1968 through 1972.  These should be authenticated copies,
and we would like any other material which you may have
which bears on this subject.  Included in this, if
possible, should be a copy of the material sent to you
by Senator Weicker relative to the President's charitable
contribution deduction.

I am requesting the 1968 return on the President
not because we intend to examine it as such but because
it seemed appropriate to see what relationship this return
might have to his 1969 and later returns.

If the Internal Revenue Service is reexamining any
of the returns I have referred to above, I would appreciate
the opportunity of having a conference with the agents
assigned to such examinations.

Sincerely yours,

Laurence N. Woodworth

LNW/ew 12/13/73

Department of the Treasury / **Internal Revenue Service** / Washington, D.C. 20224

# Commissioner

December 13, 1973

Dr. Laurence N. Woodworth, Chief of Staff
Joint Committee on Internal Revenue Taxation
1015 Longworth House Office Building
Washington, D. C.  20515

Dear Larry:

Attached, in response to your December 13, 1973, request, are true copies of the original joint federal income tax returns filed by Richard M. and Patricia R. Nixon for the taxable years ending December 31, 1968, through December 31, 1972.  Also attached is a photocopy of a letter dated December 10, 1973, addressed to me by Lowell Weicker, Jr., United States Senator, together with a 16-page memorandum that accompanied that letter, which is referred to on its face as a Summary of Facts Re Income Tax Deduction by Richard M. Nixon.

At such time as the conference referred to in the last paragraph of your letter is held you may review other materials in the hands of the Revenue Agents assigned to the examination of these returns.  Should you desire copies of any or all of that material we can make them available to you at that time.

With best wishes,

Sincerely,

Donald C. Alexander

Attachments

*[handwritten annotation: Investigation Nixon]*

# Congress of the United States
## JOINT COMMITTEE ON INTERNAL REVENUE TAXATION
### Washington, D.C.   20515

JAN 31 1974

Honorable Donald C. Alexander
Commissioner
Internal Revenue Service
Washington, D. C.

Dear Mr. Commissioner:

In connection with the Joint Committee on Internal
Revenue Taxation's examination of the tax returns of
the President of the United States, I had previously
requested copies of his returns for the years 1968
through 1972. I would like to request from you at this
time copies of his returns for the years 1963 through
1967. As indicated in my request for the 1968 return
of the President, we do not intend to examine these
prior returns as such but believe it is appropriate to
review these returns to determine what relationship, if
any, they might have to his 1969 and later returns.

I would also like to request the tax returns filed
by Tricia Nixon and, after her marriage, the returns
filed by her and her husband, Edward Cox, for the years
1968 through 1972. We do not intend to examine these
returns except to determine what relationship, if any,
they might have in connection with our examination of
the President's returns.

Sincerely yours,

(Signed) Laurence N. Woodworth

Laurence N. Woodworth

BS:jsp 1/19/74

COPIES

February 11, 1974

Dr. Laurence N. Woodworth
Chief of Staff
Joint Committee on Internal
  Revenue Taxation
1015 Longworth House Office Building
Washington, D. C.   20515

Dear Dr. Woodworth:

In accordance with your request, I am enclosing certified copies of the income tax returns of Richard M. and Patricia R. Nixon for the calendar years 1967 and 1966.

We do not have the taxpayers' returns for years earlier than 1966.  I understand that these returns have been destroyed, in accordance with our regular procedures.

We are taking steps to obtain the tax returns that you requested for Patricia (Tricia) and for herself and her husband, Edward Cox.

Sincerely yours,

/s/ Donald C. Alexander

Donald C. Alexander

Enclosures 2

**Congress of the United States**
JOINT COMMITTEE ON INTERNAL REVENUE TAXATION
**Washington, D.C.** 20515

March 30, 1974

Honorable Carl T. Curtis
United States Senate
Washington, D. C.

Dear Senator Curtis:

Re:  Attached material

I am giving you the enclosed factual material to
be included in the report on the President's returns
at the direct instruction of Chairman Long.

No one else is receiving the material at this
time (although the President's attorneys will
probably receive it Monday).  This material is
confidential and not to be seen by anyone other than
the attorneys you consult according to my instructions
from Chairman Long.

This material is preliminary and subject to change
although I do not believe it will be changed in any
substantive way.

This contains material taken from a taxpayer s
return and therefore its unauthorized release would be
subject  to penalties of law.  This is being given to
you only to aid you in the committees executive session
discussion as authorized by law with respect to tax
returns.

Sincerely yours,

Laurence N. Woodworth

LNW/jm
3/30/74