**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE ON WAYS AND MEANS, UNITED STATES HOUSE OF REPRESENTATIVES,<br><br>*Plaintiff*,<br><br>vs.<br><br>UNITED STATES DEPARTMENT OF THE TREASURY, *et al.*,<br><br>*Defendants*. | Case No. 1:19-cv-01974-TNM |

# Exhibit TT

**Nixon Gift Raises Questions: 1969 Donation of Papers Got 1 More Tax Break**
By Nick Kotz Washington Post Staff Writer
*The Washington Post, Times Herald (1959-1973);* Jun 10, 1973;
ProQuest Historical Newspapers: The Washington Post
pg. A1

# Nixon Gift Raises Questions

## 1969 Donation of Papers Got 1 More Tax Break

By Nick Kotz
Washington Post Staff Writer

Throughout most of 1969, Congress was considering elimination of an obscure tax break in which both Lyndon B. Johnson and Richard M. Nixon had a large personal financial stake.

The stake was big enough that both men took a personal interest in the legislation. Attorneys and aides of both former President Johnson and President Nixon lobbied Congress in 1969 to write the law in such a way that their clients could get at least one more tax break before the new law went into effect.

Mr. Nixon succeeded, to the tune of at least $250,000 in savings on his federal income taxes.

The 1969 legislation involved eliminating the tax writeoffs permitted famous public figures, artists and writers when they donate their valuable public papers, manuscripts and art to the United States or to universities and libraries.

Recent American Presidents had been major beneficiaries of this tax benefit. Presidents Eisenhower and Johnson and, in 1968, President-elect Nixon, had already saved hundreds of thousands of dollars in taxes by periodically giving their public papers to the country.

However, Congress was debating in 1969 whether public officials should be permitted to reap financial gains merely by giving the government papers that in the first place had been prepared by government employees at government expense.

The problem that Lyndon Johnson and Richard Nixon faced in 1969 was how they could obtain a grace period to make one more round of tax-deductible gifts of their public papers before the looming new law eliminated the tax benefit.

A battle ensued in Congress over whether the law should be made retroactive to stop all gift tax advantages after 1968 or whether its effective date should allow a grace period, sought by Johnson and Nixon.

The 1969 law, as finally enacted in December, 1969, as part of a nine-month struggle over an omnibus tax bill, cut off tax benefits

See PAPERS, A9, Col. 1

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

# Questions Raised on Nixon Donation

PAPERS, From A1

for any gifts given after July 25, 1969.

As matters turned out, President Nixon claimed one more deduction for a gift given earlier in the year, but President Johnson made no last-minute gifts. According to his advisors, Johnson decided not to attempt a gift of his presidential papers, which would have been worth millions in tax writeoffs, while the debate on the bill was in progress.

The manner in which President Nixon managed to make his 1969 tax deductible gift raises a number of questions about the handling of this gift to the United States, including the question of whether the gift was made before July 25, 1969, the cutoff date for the tax break.

The circumstances of this Nixon gift varied significantly from the handling of the earlier gifts. The deed of gift was not signed by the President; the Archives didn't receive the deed until more than a year after it was signed; officials at the Archives refused to acknowledge receipt of the deed since it didn't contain the President's signature; and some officials at Archives contend that the items actually gifted to the country were not selected until November or December, 1969.

A high White House official, serving as an official spokesman for the President, told The Washington Post that President Nixon did take a deduction from his 1969 income taxes on a gift to the country of papers which the spokesman said "were appraised at somewhat over $500,000."

This gift, according to the White House spokesman, was made on March 27, 1969, and consisted of 1,176 boxes of papers, including Mr. Nixon's general correspondence as Vice President, his foreign trips as Vice President, and the visit of Nikita S. Khrushchev to the United States. The papers are now in the National Archives.

Several tax attorneys said in interviews that the President's gift of papers valued at $500,000 would have saved him a minimum of $250,000 in income taxes over the period 1969-73. If the President had additional income above his $200,000 annual salary, then the tax experts say that the saving could be substantially more than $250,000 in taxes.

The tax deduction process works as follows:

First, Ralph Newman, a Chicago manuscript appraiser who appraised papers of President Eisenhower, Johnson and Nixon, placed a value on the papers. The value would be determined, for example, by what a commercial purchaser would pay for the original manuscript of Mr. Nixon's famous "Checkers" speech in 1952.

Then comes the tax deduction process.

Under the old law, the President could take a gift tax deduction on one-half of his gross income. If his income was $200,000, the President could deduct $100,000 of it as a tax deductible gift. A person with $200,000 income in 1969 was in the 50 per cent tax bracket or higher, so he could eliminate $50,000 in 1969 taxes. The law permitted him to use up his gift tax deduction over a 5-year period, so Mr. Nixon could deduct $50,000 from his taxes in 1969 and additional sums of $50,000 in each of the next four years.

President Johnson also took such tax savings in the years 1965, 1966, 1967 and 1968 by each year giving part of his papers from earlier in his career to the Archives.

This process worked smoothly for Presidents and others of means through 1968.

For example, in a deed dated Dec. 30, 1968, President-elect Nixon gave the country 41,206 items, including papers from his 1960 Presidential campaign and the manuscript for his book "Six Crises."

As income tax time approached in the spring of 1969, Mr. Nixon's staff worked toward assuring that the 1968 gift was in shape for preparation of the President's income tax return.

On March 13, 1969, Edward L. Morgan, then deputy counsel to the President, wrote Daniel J. Reed, assistant archivist for presidential papers, seeking assurance "that the indexing and cataloging [of the 1968 gift] will be complete by April 1 in order that Mr. Newman may complete his appraisal for tax purposes."

Newman duly inspected and appraised the 1968 gift, which Mr. Nixon then used as a deduction against his 1968 income taxes.

Two other chains of events were being pursued in 1969 both by the White House, preparing for a 1969 Nixon tax deductible gift, and by Congress, many of whose members wanted to stop all further such tax benefits.

The legislative history, in short, went as follows: The House Ways and Means Committee approved in midsummer and the House approved soon after a provision that would have prevented such tax deductions as of Dec. 31, 1969. The Senate Finance Committee, however, prodded by then-Sen. John Williams, approved in October a provision that would ban the gift tax deductions retroactively to Dec. 31, 1968. The full Senate concurred. If Williams had succeeded, both Mr. Nixon and Johnson would be out of luck on further gifts.

Williams made clear his reasons for seeking a retroactive date in a July 23 Senate speech in which he noted reports "that ex-President Johnson may be planning to deduct the value of certain materials he is deeding to his presidential library" and that the items exceeded 20 million in summer.

Said Williams:

"One of the things that bothers me about getting special tax benefits through the gift of official papers is that the parties doing this are making a profit from the 'charitable' giving of what are really official papers, which, in my opinion, properly belong to the government and not to them as individuals. I am sure that in many cases many of the papers are just plain junk, but to the extent they do have value, they were developed by government officials on government time with the aid of government staff personnel, were typed by government secretaries on government paper and were even stored in government files."

The Washington Post was told by three different informed sources that all sides of the President, including Bryce Harlow, and advisers to former President Johnson lobbied the Congress to withhold the effective date of the law until Dec. 31, so further gifts could be made in 1969. These sources report that President Nixon and former President Johnson personally discussed together their interest in the tax provision.

A House-Senate conference committee, meeting in December, finally decided to backdate the effective date of the law to July 25, 1969.

The events surrounding President Nixon's 1969 gift of papers, at a time Congress was considering the legislation, are quite complicated.

The White House spokesman says that the facts are as follows:

The President had shipped, on March 28 and March 27, 1969, to the Archives for storage and custody all of his remaining pre-presidential papers, which consisted of 1,217 cubic feet of boxes.

Edward L. Morgan, deputy counsel to the President, signed a chattel deed dated March 27, 1969, making a gift to the United States of certain presidential papers which the deed states are listed in an attached schedule. "The President's name is typed in at the appropriate place for his signature, but he did not sign it.

Appraiser Newman examined all the material sent to the Archives sometime in April and selected 392 cubic feet of records as the 1969 gift, leaving the remaining 825 feet in the custody of the Archives. (The custody procedure was a normal one, President Johnson, for example, shipped huge amounts of material to Archives for storage. Then, annually, with help from appraiser Newman and his tax lawyers, he deeded some of it to the government.)

Appraiser Newman prepared the list of gifts which was then attached in April to the March 27 deed. The document then was notarized on April 21, 1969, by Frank DeMarco Jr., who handled President Nixon's tax work in the California law firm of Kalmbach, DeMarco, Knapp and Chillingworth.

According to this White House account, the precise gift of papers was made well before the July 25, 1969, cutoff date that eliminated the tax deduction.

However, records of the General Services Administration made available to The Washington Post, statements of GSA administrator Arthur Sampson, and the unusual procedures followed in the 1969 gift all raise questions about the White House account, if not contradict it.

At the least, the 1969 gift was not carried out in the same manner as the President's December, 1968, gift, which followed the same procedure followed earlier by Presidents Johnson and Eisenhower. Namely, the December, 1968, deed of gift is executed in a document which is signed by Mr. Nixon and includes language accepting the gift by a GSA official, who also signed the deed of gift.

GSA records confirm the White House account that a large amount of Nixon papers, one-third of which eventually constituted the gift, were transported to the Archives building for storage and sorting on March 26 and March 27, 1969.

However, GSA Administrator Sampson said repeatedly in two separate interviews last week that the actual papers in the March 27 gift were not finally selected by appraiser Newman until November, 1969, or later—months after the July 25 law cutting off the tax benefits.

"This piece of paper (the itemized schedule of the gift) could not have been prepared until November or December, 1969," said Sampson. "There is no way it could have been prepared in March, 1969. At that time, the records were scrambled.

"What the President decided to give was not decided until later. The appraiser (Newman) and the President's attorney (DeMarco) decided what to give after examining the papers first in April, 1969, and on into December. The other documents are still in our custody. They haven't been given to the government."

Sampson said the first official word received by the Archives of the exact papers President Nixon wanted to donate in 1969 was not known by the GSA or Archives until a March 27, 1970, letter from appraiser Newman to Mary Livingston, an assistant archivist who handled the Nixon papers.

In that March, 1970, letter, Newman said he was enclosing "a general description of the 1,176 boxes of manuscript material which were designated as a gift by President Nixon in 1969."

Explaining why he was enclosing the list, Newman said: "this is being done to be certain that my records correspond with yours and that this material is being kept separated from the balance of the Nixon papers."

The list enclosed in Newman's March 27, 1970, letter is identical in content and format to the schedule which Morgan attached and DeMarco attested to in the March 27, 1969, deed of trust.

Sampson is saying, in short, that the agenda of the gifts could not have been known until considerably after the March 27 deed of trust.

Appraiser Newman, in an interview, confirmed part of the White House story, but disagreed with the dating of the document listing the gifts made in 1969.

Newman said that in early April, 1969, he told Nixon tax attorney DeMarco which papers should be given as a gift in 1969. He said these papers included virtually all of the pre-presidential Nixon papers except for 17 boxes and a collection of trophies, badges and such.

However, Newman said that his detailed list of the items to be given was not prepared until early in 1970, by which time the material had been sufficiently organized.

Newman's statement conflicts with the March 27, 1969, deed, signed by Morgan and attested to by DeMarco. This deed contains the schedule of gifts which Newman says he could not have prepared until late in 1969 or early in 1970.

Another relevant document concerning the history of the Nixon papers is a May 27, 1969, memorandum by Sherrod East, a consultant at Archives who helped sort the Nixon papers after their arrival in late March, 1969.

East reported that preliminary sorting of the records had been made, but that more work needed to be done. He noted that only the 1968 papers had been deeded to the Archives, so that time remained to do further work on the rest.

Sampson said that the first knowledge anyone at GSA or Archives had of a 1969 deed came sometime in April, 1970.

He noted a scrawled memorandum on Newman's letter to Livingston. The memo, dated April 16, 1970, said "Ed Morgan says there is a chattel deed—now in California. Will furnish copy."

Later in April, Sampson said that someone brought the deed signed by Morgan to the Archives.

However, Sampson said that officials at the Archives declined to sign the deed, accepting the gift for the United States, on grounds that the deed was not signed by the President, as had been customary procedure. He said this issue is still unresolved.

Questioned how, then, did GSA know that President Nixon planned to make a 1969 gift, Sampson replied: "We were told by Morgan and others that preparations were being made for a gift."

Sampson said that prior to answering a reporter's questions he had met at the White House with the President's counsel, Leonard Garment, who talked by telephone to attorney DeMarco.

Sampson said that DeMarco had said the gift was a legal one, even though the President had not signed the deed, even though GSA had not formally accepted the gift in the accepted procedure, and even though the actual document listing the items gifted was not prepared until later in the year.

He said it was DeMarco's legal opinion that the deed signed by Morgan was sufficient legal basis for the gift, and established that the gift had been made prior to July 25, 1969, after which time the presidential papers would have little value as a tax writeoff.

Under the new law, presidential papers, for gift tax purposes, are only worth their physical value at the time the papers originated. For example, President Nixon's manuscript draft of his book "Six Crises" could only be valued at the cost of the paper the draft was written on. No longer could the President value the manuscript at whatever appreciated price such a historic document might bring in a commercial sale to individuals or libraries that buy historic papers.

The following are replies made by the official White House spokesman about why different procedures were followed than the usual ones in deeding presidential documents to the country.

The White House spokesman said the President hadn't signed the deed because his signature wasn't necessary.

He said the signature still wasn't necessary, and as there was no need for the President to sign it even after Archives requested the signature as a prerequisite to formal acceptance of the papers.

Asked why no one had presented the deed to the Archives until more than a year after the deed was dated, the White House spokesman replied, "Because it wasn't necessary."

The spokesman said he flatly denied any allegation that the March 27, 1969, deed had actually been signed at a later time and then been backdated to March 27, 1969.

As proof of the validity of the date, he said that DeMarco affixed his notary seal to the deed on April 21, 1969, at a time both DeMarco and Morgan were attending a meeting of the Nixon Foundation in California.

One fact is clear. President Nixon's handling of the deed for the 1969 gift was carried out in a way that precluded anyone but his closest associates from knowing during 1969 that the President actually had made such a gift. If the deed had been executed and sent to the Archives at the time it was signed, then officials at Archives would have had official knowledge that a gift was being made. Congress, as it debated the bill, had no way of knowing Mr. Nixon made a gift that would be affected by the outcome.

President Nixon's White House staff has continued to be concerned about how his presidential papers will affect the value of his estate, if he should die.

Former White House Counsel John Ehrlichman revealed this White House work in the course of a deposition taken from him in the civil suit brought by the Democratic National Committee against the Committee to Re-elect the President.

Asked how he had met another presidential assistant, Gordon Strachan, Ehrlichman replied: "He was on the White House staff and, apparently, had been there for some time, and he became actively involved in the planning for the disposition of the presidential papers, and I became acquainted with him in the development of the estate plan relating to that subject. ... We were trying to develop a comprehensive estate plan for the President (if he died) and the family which would take into account the fact he had an interest in the presidential papers."

Ehrlichman's remarks may refer to the estate tax consequences of how a President's papers are handled. In a community property state such as California, which is the President's legal residence, the value of presidential papers can still be handled to the financial advantage of his heirs.

The legal handling of presidential papers has had a long and stormy history. Since the time of George Washington, Presidents have considered their official papers to be their personal property.

President Franklin D. Roosevelt died without providing for disposition of his papers. After a court case, it was decided that the papers belonged to the country and would be housed at Hyde Park.

The handling of presidential papers became more systematized following a 1955 law providing for government assistance in establishing presidential libraries to house such papers.

Another problem occurred at the time of the death of President John F. Kennedy. His 1957 will did not provide for disposition of presidential papers.

President Kennedy's heirs faced a potential estate tax problem in having to pay taxes on the value of the papers. However, the President's family decided the papers to the country in 1964, and the Internal Revenue Service decided that the gift could be considered made at the time of his death. Therefore, the papers were not taxed in Kennedy's estate.

Blocked due to copyright. See full page image or microfilm.

President Nixon giving his famous 1952 "Checkers Speech." The original manuscript would have to be appraised for gift, income tax and estate purposes.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.