**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE ON WAYS AND MEANS, UNITED STATES HOUSE OF REPRESENTATIVES,<br><br>                    *Plaintiff*,<br><br>vs.<br><br>UNITED STATES DEPARTMENT OF THE TREASURY, *et al.*,<br><br>                    *Defendants*. | Case No. 1:19-cv-01974-TNM |

# Exhibit UU

# 40 YEARS OF TAX NOTES

tax notes®

(C) Tax Analysts 2012. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

# Income Tax Treatment of Donation Of Nixon Pre-Presidential Papers

**By Ira L. Tannenbaum**

In 2012 *Tax Notes* will celebrate the 40th anniversary of its inaugural issue, published on September 18, 1972. In recognition of that milestone and to show its appreciation for your continued readership, *Tax Notes* will be republishing select archived articles from each of the past 40 years. *Tax Notes* hopes that readers will enjoy these valuable contributions from prominent members of the tax community on issues that were and are of central importance to the field. Readers are invited to submit their own recommendations for our retrospective to taxnotes@tax.org, along with a short explanation for why the article has been recommended.

This article was originally published on July 30, 1973. At the time of its publication, Ira L. Tannenbaum was the director of Tax Advocates, the litigation and administrative law arm of Tax Analysts and Advocates. After leaving Tax Analysts, Tannenbaum served on the Senate Budget Committee staff, was deputy general counsel and acting general counsel of the Federal Home Loan Bank Board, and was a partner in the Washington office of K&L Gates LLP.

In 1969 President Nixon transferred pre-presidential papers to the National Archives and claimed a substantial charitable tax deduction. Tannenbaum analyzes the transfer, concludes that it did not qualify for the deduction, and suggests that the IRS initiate an investigation into the deduction.

## Table of Contents

I.   1969 Tax Reform Amendment .......... 313
II.  Facts Assumed Concerning the 1969 Transfer Of Papers ......................... 314
III. The Application of Section 170(E)(1)(A) Requires the Denial of a Charitable Contribution Deduction for the Appraised Value of the Presidential Papers ........ 315
     A. No Valid Gift Was Made as a Result of The Chattel Deed ................... 316
     B. No Valid Gift Was Made Because of a Lack Of Delivery ..................... 316
     C. No Valid Gift Was Made Because of a Lack Of Acceptance ................... 317
IV.  Additional Issues .................... 318
V.   Collection of the Tax ................ 319

The following is a legal analysis of whether the 1969 transfer to the National Archives by President Nixon of pre-Presidential papers as described in a June 1973 *Washington Post* series of articles by Nick Kotz qualifies for the tax deduction available for charitable gifts of papers and memoranda made on or before July 25, 1969. The Kotz series, an example of thorough investigative journalism, pursued many facets of the transfer of papers, but did not analyze or report any views of independent legal experts whether the Nixon transfer, in fact, qualified for the substantial tax deductions reportedly taken by the President. This analysis is provided by Tax Analysts and Advocates in response to numerous requests for a legal analysis of this question. However, it is not based upon firsthand examination of relevant documents which would be available to the Internal Revenue Service or at trial. The basis for actual tax liability would be contingent, of course, upon a finding that the true facts are substantially similar to those as reported in the *Washington Post*.

## I. 1969 Tax Reform Amendment

Prior to the 1969 Tax Reform Act, a taxpayer who contributed property which at the time the gift was made had a fair market value in excess of his cost, was allowed a charitable contribution deduction for the full fair market value of the property, while no tax was imposed on the donor in connection with the increase in value of the contributed property. By comparison, if, instead of donating appreciated property directly to the charity, a donor had sold the property and then given the proceeds to charity, he would have been subject to tax on the gain recognized on the sale of the property, in addition to qualifying for a charitable contribution equal to the fair market value of the property at the time of the gift.

These rules applied to contributions of property which constituted a capital asset in the hands of the donor as well as property the sale of which by the donor would have resulted in ordinary income.

Such latter property included inventory and artistic works, letters and memoranda produced by the donor.

Gifts of Presidential papers to the Federal Government qualified as deductible charitable contributions even though this rule was often criticized on the grounds that Presidential donors were benefiting from donations of what in some instances were papers written as part of performing governmental functions and, thus, arguably belong to the Federal Government, or else became valuable because of their holding an office which was viewed as a public trust.

Thus, under prior law, if a United States President donated private papers he had written to the National Archives which were worth substantial sums to collectors of Presidential memorabilia, he could deduct the full estimated market value of the papers to reduce Federal income tax on his Presidential salary, while never having to treat the value of the papers as taxable income to him even though their value for purposes of the charitable deduction resulted from his labors. The tax saving resulting from the failure to tax the income element of the papers was at the taxpayer's top marginal rate. This benefit, coupled with the tax saving of the charitable deduction also at the donor's top marginal rate, was so great it often would be more profitable for a Presidential donor or other high-salaried taxpayer to make a gift of his papers or other ordinary income property than to sell them, pay the tax on the gain, and keep the proceeds.

In order to eliminate the excessive benefits stemming from the contribution of appreciated property, the 1969 Tax Reform Act provided that the appreciation element in gifts of such property is to be taken into account. In the case of a gift of letters and memoranda produced by a President or other donor, under the new law, section 170(e)(1)(A), the amount of the charitable deduction resulting from a gift is the fair market value of the papers at the time of the gift reduced by the full amount of appreciation in value, i.e., the excess of the fair market value at the time of the gift over the donor's costs, which generally would be only the cost of the paper on which the documents were produced. This new rule applied to contributions of letters and memoranda made after July 25, 1969. As a result, only if President Nixon made a gift of Presidential documents in 1969 before this date could he qualify for a charitable contribution deduction for any amount in excess of the cost of the paper on which the documents were written.

Charitable contributions of Presidential papers made before 1970 could result in a maximum deduction in the year of the gift of 30 percent of adjusted gross income. Deductions in excess of this ceiling could be applied against adjusted gross income to reduce tax liability in the five years following the year of the gift. Under another provision of the 1969 Tax Reform Act, while the five-year carry-forward principle was maintained, the 30 percent annual ceiling on charitable contributions was raised to 50 percent of adjusted gross income for future years. The Internal Revenue Regulations (reg. section 1.170A-10(b)) make it clear that a charitable contribution of Presidential papers made in 1969 was subject to the 30 percent ceiling for purposes of the President's 1969 tax return, but that any excess deductions carried forward to the subsequent five taxable years would be subject to the 50 percent ceiling in each of these years until the carry forward was exhausted.

### II. Facts Assumed Concerning the 1969 Transfer of Papers

The *Washington Post* series reported a high White House official as having told the *Post* that President Nixon did, in fact, take a deduction from his 1969 income taxes on the gift of papers described below. Elsewhere in the series, the independent appraiser, Ralph Newman, reportedly indicated he valued the papers in question for tax purposes at $570,000. It is assumed that President Nixon has treated the transfer of these papers as having resulted in a charitable contribution of $570,000, that this amount was greatly in excess of the 30 percent ceiling then in effect, thus resulting in a substantial carry forward, and that the excess was utilized by the President to reduce his tax liability to the maximum extent possible in each of the successive three taxable years or until the contribution was exhausted.

The following facts, as reported in the *Washington Post* series, are assumed to be true for purposes of analyzing the deductibility of the gift under the pre-July 29, 1969, law:

1. 1,217 cubic feet of Nixon pre-Presidential papers were transferred from the White House to the National Archives in March 1969.

2. Edward L. Morgan, Deputy Counsel to the President, signed a chattel deed in April 1969, which was back-dated to March 1969, purporting to make a gift to the United States of those Presidential papers which the deed stated were listed in an attached schedule. The President's name was typed in at the appropriate place in the deed for his signature, but he did not sign it. The only schedule referred to in the deed which was, in fact, attached to the deed throughout 1969 stated solely that the gift consisted of "private pre-Presidential papers of Richard Nixon of the approximate value of $500,000 delivered to the National Archives on March 27, 1969. A detailed schedule to be

(C) Tax Analysts 2012. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

attached hereto upon final sorting, classification and appraising." The deed imposed restrictions on the use of the papers during the Nixon Presidency, retained in the President the exclusive right to use the papers for writing books, and indicated the papers eventually were to go to a Nixon Presidential library.

3. The deed was kept continuously in the California office of President Nixon's private attorney, Mr. Ralph DeMarco, until April 1970 when it was sent to the National Archives.

4. 392 cubic feet of records were selected from the 217 cubic feet initially transferred to the Archives by appraiser Ralph Newman as the 1969 Presidential gift of papers. There is a factual dispute as to the time the documents actually selected as the 1969 gift were chosen. The White House spokesman asserted in the *Post* series that the documents were selected by Mr. Newman in April 1969; the head of the General Services Administration has asserted the documents were selected by Mr. Newman in November 1969 or later. Mr. Newman said that in April 1969 he made preliminary recommendations to Mr. DeMarco concerning which papers generally should be given as a gift, but that his detailed list of the items to be given was not prepared until early in 1970, and that in April 1969, Mr. Newman had no way of knowing the papers he generally recommended for a gift would eventually be appraised at $570,000. We will assume Mr. Newman's recollection to be correct.

5. The first official word received by the Archives of the exact papers President Nixon wanted to donate in 1969 was in a March 27, 1970, letter from Mr. Newman to an assistant archivist. The first knowledge the General Services Administration had of the existence of a deed for the 1969 gift was in April 1970.

6. On December 30, 1968, President Nixon had signed a deed for the donation of 41,300 specific papers which constituted his 1968 gift of pre-Presidential papers.

7. To this date, the General Services Administration has refused to sign the deed transferring title to the papers transported to the Archives in 1969.

### III. The Application of Section 170(E)(1)(A) Requires the Denial of a Charitable Contribution Deduction for the Appraised Value of the Presidential Papers

Section 170(a)(1) of the Internal Revenue Code provides in relevant part, "There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year." Section 170(c) states that, "For purposes of this section, the term 'charitable contribution' means a contribution or gift to or for the use of" enumerated entities including the United States. The Code contains no additional language to elucidate when a payment is deemed to be made so as to result in a charitable contribution deduction.

The regulations that apply to contributions paid in 1969,[1] the year of the Nixon papers transfer, provide only general guidance on this question, stating only that, "Ordinarily a contribution is made at the time delivery is effected. In the case of a check, the unconditional delivery (or mailing) of a check which subsequently clears in due course will constitute an effective contribution on the date of delivery (or mailing)." Reg. section 1.170-1(b).

Section 170(a)(1) and the regulation set forth above are consistent with the common law of gifts. For determining under section 170(a)(1) and the regulation thereunder whether in fact a deductible charitable contribution has been made, when a gift is deemed to be delivered, and whether an exception was proper to the general rule that a contribution is made at the time of delivery, courts have applied either explicitly or implicitly the basic principles of the common law of gifts. *A. W. Mellon*, 36 B.T.A. 977 (1938); *Nehring v. Commissioner*, 131 F.2d 790 (7th Cir. 1943); *Jordan v. United States*, 297 F. Supp. 1326 (W.D. Okla. 1969); *Pauley v. United States*, 459 F.2d 624 (9th Cir. 1972); *L. A. Gagne*, 16 T.C. 498 (1951).

These principles of common law were enunciated in *Edson v. Lucas*, 40 F.2d 398 (8th Cir. 1930), in the following terms:

> There must be a donor competent to make the gift, a clear and unmistakable intention on his part to make it, a donee capable of taking the gift, a conveyance, assignment or transfer sufficient to vest the legal title in the donee, without power of revocation at the will of the donor, and a relinquishment of dominion of the gift by delivery to the donee.... A statement frequently found in the decisions is: "To constitute a valid gift inter vivos, there must be a gratuitous and absolute transfer of the property from the donor to the donee, taking effect immediately and fully executed by a

---

[1]Although new regulations have been issued to incorporate numerous changes made in the 1969 Tax Reform Act concerning charitable contributions, these regulations, which apply to gifts made after 1969, are basically unchanged with respect to these basic aspects of section 170.

(C) Tax Analysts 2012. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

delivery of the property by the donor, and acceptance thereof by the donee." [40 F.2d 398, 404.]

The acknowledged leading legal text on the common law of gifts of personal property, *Brown on Personal Property* (2nd Ed. 1955), formulates these judicial requirements into the following three general requisites necessary for the making of a valid gift:

> The first of these is that there must be either a deed by the donor transferring the property in question, or in the more common case of the parol gift, a delivery of the subject matter by the donor to the donee, or some other act or course of conduct on the part of the donor, which is accepted by the courts as equivalent thereto. The second requirement is that the donor must possess the intent to give. And the third is that the donee must accept. [*Brown* at 84.]

Where a charitable contribution is in the form of property, as contrasted to money, "payment" for purposes of the statutory language of section 170(a) occurs at the time a completed gift is made. *Pauley v. United States*, 459 F.2d 624, 626 (1972). A completed gift occurs when the subject matter of the gift is "placed beyond the dominion and control of the donor." *Pauley v. United States*, 459 F.2d at 626; *Estate of Sanford v. Commissioner*, 308 U.S. 39, 42-43 (1939).

In order for the transfer of President Nixon's papers to the National Archives to have been a charitable contribution which avoided the application of section 170(e), these common law requirements for a valid gift all must have been met on or before July 25, 1969.

### A. No Valid Gift Was Made as a Result of the Chattel Deed

Although gifts of personal property generally are made by a physical transfer of the subject matter to the donee, coupled with a relinquishment of dominion and control, a gift can also be accomplished by a written instrument. *Cochrane v. Moore*, L.R. 25 Q.B.D. 57 (1890).

With respect to the possibility that a gift had been accomplished through the making of the chattel deed by Deputy Counsel to the President Edward Morgan, it is significant that the deed apparently remained in Mr. DeMarco's office in California at all times throughout 1969, and was not transmitted to the National Archives until sometime in 1970. In order to have a valid gift by deed, the instrument of transfer must be physically delivered to the donee and outside the control of the donor or his agents. *Monaghan v. Monaghan*, 320 Mass. 367, 69 N.E.2d 476 (1946); *In re Estate of Gosman*, 83 N.Y.S.2d 81 (1948); *In re Estate of Reist*, 158 Pa. Super. 281, 44 A.2d 847 (1945). Otherwise, if the donor maintained physical control over the deed, and the making of the deed constituted the making of the gift, the gift simply could be annulled by the destruction of the instrument at any time by the donor. Since the chattel deed transferring title to the Nixon papers in question was controlled by the President and his agents throughout 1969, no gift could be deemed to have been made on or before July 25, 1969, as a result of the execution of the deed in April of that year.

### B. No Valid Gift Was Made Because of a Lack of Delivery

As related previously, a principal requirement for a valid gift not accomplished through a writing is delivery, which Brown describes in the following terms:

> From the objective viewpoint the thing given must pass from the possession, that is, from the dominion and control, of the donor into that of the donee. If after the alleged delivery the donor still retains the power to manage, use, or control the thing given, there is no gift. [*Brown* at 89.]

*Brown* subsequently states that:

> The mere fact of the delivery of possession does not therefore, standing alone, prove a gift, but the donor must also have intended gratuitously to pass the title to the donee. The alleged donor may have intended simply to constitute the deliveree his agent or bailee to have custody and possession of the thing delivered, but not to exercise over it the right of ownership. Unless, therefore, the intent to give title be proven clearly, the transaction will not be sustained as a gift. [*Brown* at 129-130.]

Therefore, it is clear that mere physical transfer of property to a potential donee is not itself determinative of delivery. Rather, delivery requires relinquishment of dominion and control over the property, which may or may not be contemporaneous with physical transfer of the subject matter from the donor to the donee.

**1. The physical transfer of papers did not create a binding gift.** With respect to whether there was delivery of the Nixon papers, it is important that the National Archives traditionally functions as both a bailee of documents stored there by important American figures, and also receives gifts of such documents over which it also maintains physical possession. Thus, the mere physical transfer of a large volume of papers by President Nixon to the Archives, by itself, does not constitute relinquishment of dominion and control over the papers so as to constitute delivery. Additional evidence of relinquishment of dominion and control is necessary to

(C) Tax Analysts 2012. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

show the purportedly donated papers no longer were within Presidential control. However, no relevant evidence on this point has been mentioned by the White House other than the invalid deed and the schedule attached to it. By comparison, President Nixon had signed a deed in December 1968 for the donation of 41,300 specific papers which constituted his 1968 gift of pre-Presidential papers.

The Ninth Circuit Court of Appeals recently expressed its interpretation of the dominion and control requirements in the following terms:

> Dominion and control, the retention of which by a donor will render a gift incomplete for purposes of tax deduction, is dominion and control exercisable against the donee; the retention by the donor of power to direct the disposition or manner of enjoyment of the subject of the gift. [*Pauley v. United States*, 459 F.2d 624, 627 (1972).]

In this context, by merely sending papers to the Archives without a deed, when the Archives accepts papers both for storage and as gifts, the President retained at least throughout 1969, a residual power to dispose of the papers in any manner he desired. This ability of the President after July 25, 1969, to determine which, if any, of the papers transferred previously would be given to the Archives constituted a clear retention of dominion and control over the papers. A mere physical transfer of papers implying an intention to make a gift in the future is not a substitute for delivery.[2]

**2. The undelivered deed indicated the president could still control those among the transferred papers which would constitute the gift.** Moreover, as noted earlier, the schedule attached to the undelivered 1969 deed indicated that the purported gift consisted of private pre-Presidential papers of the approximate value of $500,000 to be selected, after actual appraisal, from among all those papers delivered to the National Archives on March 27, 1969. According to the appraiser, the exact items constituting the gift were not selected until early 1970. The fact that the documents constituting the gift had not even been selected as of July 25, 1969, constitutes an additional basis for the conclusion that on this date the President still retained dominion and control over the papers. He and his agents could control those papers which would be given and those which would not. The President did not make delivery of any papers for purposes of section 170(a) until he or his agents had selected specifically those among the papers to be donated, and had committed himself to the Archives so that he no longer could reclaim these papers if he changed his mind. As of July 25, 1969, none of the papers were so definitively beyond his control.

**3. The undelivered deed indicated the president could control the use of the papers ultimately chosen as the gift.** Moreover, according to Mr. Nixon's attorney, the undelivered deed was drafted in connection with Mr. Nixon's gift in order to restrict use of the papers during Mr. Nixon's presidency, to retain his exclusive right to use the papers for writing books, and to show that the papers should eventually go to a Nixon Presidential library. These very substantial conditions constitute evidence that, in addition to not having given up dominion and control because the gift had not been made specific or binding, the President may not have given up dominion and control of the documents in the sense that he may have retained authority under the language of the Ninth Circuit in the *Pauley* case quoted above, "to direct . . . the manner of the enjoyment of the subject of the gift." Although the deed never was delivered to the donee in 1969, and therefore did not by itself result in a valid gift in that year, it indicates that the President, depending upon the specific nature of the conditions contained in the deed, may have intended to control so closely the use of the papers after the Archives obtained possession of them as to constitute retention of dominion and control over the documents.

### C. No Valid Gift Was Made Because of a Lack Of Acceptance

A second important element of a valid common law gift of personal property was as absent on July 25, 1969, as the requirement of delivery — namely the requirement that by that date, the gift must have been accepted by the donee. There is a well-established general principle in property law that when a gift is beneficial, it is presumed to be accepted by the donee. However, if the donee is

---

[2]In *Johnson v. United States*, 280 F. Supp. 412 (N.D.N.Y. 1967), a taxpayer told officers of a charitable community association in 1956 that he would donate land and building materials to the association if its members would erect on the land a building to be the association's headquarters. Construction started in the fall of 1956 and was completed by the spring of 1957. On July 16, 1957, the plaintiff executed a deed to the land and delivered it to the association, which by resolution of its board of directors had accepted it the day before. Although the Government challenged the charitable contribution taken by plaintiff on his 1957 return under Section 170 for the gift of the land and materials on the ground that the gift was made in 1956, the Court concluded the gift was made in July 1957 when the deed was delivered. The Court said that, "Although by that time the building had already been erected on the land, it belonged to plaintiffs until they delivered the deed." *Johnson v. United States*, 280 F. Supp. at 414.

Similarly, in the case of the Presidential papers, even though the donee had physical possession of the property to be donated before July 25, 1969, the donor had not given up dominion and control over any of the papers, and retained the legal right to have regained possession of any or all of them throughout 1969.

(C) Tax Analysts 2012. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

cognizant of the gift and has an opportunity to either accept or reject, actual acceptance is required before the gift can take effect.[3]

Although reg. section 1.170-1(b) indicates, in the case of a contribution by check, *unconditional* delivery of the check will constitute an effective contribution on the date of delivery without regard to the time of actual acceptance, this rule does not apply where a potential gift is made subject to conditions imposed by the donor. In the case of *Gagne v. Commissioner*, 16 T.C. 498 (1951), the Tax Court held that where conditions are imposed on the making of a gift by check, the check is deemed to be paid for purposes of the deduction at the time of actual acceptance.

In that case, on December 31, 1942, the taxpayer drew a check for $50,000 to the order of "Creedin Fickel & Trustees Carlisle Hospital," which was handed on that date to Fickel, a doctor on the staff of the hospital. At the time the donor handed over the check, he indicated orally that it be delivered to the Carlisle Hospital upon the conditions that the proceeds be used for research and special work in venereal disease and be administered under the direction and supervision of a three-man board of which the donor was to be a member.

On January 1, 1943, the doctor offered the check to the superintendent of the hospital, and discussed with her the purpose of the gift. She refused the check, stating she had no authority to accept, but the next day she accepted it tentatively upon the advice of the President of the Board of Trustees of the hospital. On January 12, 1943, the Board of Trustees passed a resolution accepting the gift, after having heard an explanation of the purpose of, and the conditions attached to, the gift. The Tax Court held that:

> The gift in the instant case was not given absolutely but was given subject to substantial conditions which the donee did not agree to comply with until January 12, 1943. Until that date there was no delivery and payment of the gift, and petitioner is, therefore, entitled to deduct the amount of the contribution from his net income for the taxable year 1943. [16 T.C. at 502-503.]

The Tax Court distinguished the taxpayer's situation from those of persons making contributions by check without conditions. With respect to the transfer of pre-Presidential papers, as noted previously, according to Mr. DeMarco, a deed was drafted in connection with Mr. Nixon's gift in order to restrict use of the papers during Mr. Nixon's presidency, to retain his exclusive right to use the papers for writing books, and to show that the papers eventually should go to a Nixon Presidential library. These are all substantial conditions imposed in connection with the purported Presidential gift. As a result, even assuming there was a valid delivery of the Nixon papers to the Archives on or before July 25, 1969, no presumption of acceptance upon delivery should apply, but that, as in the *Gagne* case, the gift should be deemed to be made only when it is actually accepted by the National Archives.

As noted previously, to this date, the General Services Administration has refused to sign the deed sent by Mr. DeMarco in 1970 from California, which would transfer title to the 1969 Nixon papers to the Archives. Moreover, the first official word apparently received by the Archives of the conditions imposed on the use of donated papers was when the deed was sent from California sometime in 1970, and work of the exact papers President Nixon intended to donate in 1969 was received by the Archives in a March 27, 1970 letter from Mr. Newman to an assistant archivist. In effect, the Archives cannot reasonably be said to have accepted on or before July 25, 1969, any of the Nixon papers transferred to it in March 1969.

### IV. Additional Issues

The analysis presented in the foregoing section is determinative that no gift was made before July 25, 1969. Therefore, either section 170(e) applies to the transfer which would reduce the amount of the permissible deduction to a negligible amount, or no valid gift has been made at all. As a result, it would be of little value to fully analyze other aspects of the law relevant to the transfer which could also result in the denial of a full charitable contribution deduction for the transfer of the papers. However, in the interest of completeness, the most prominent of these should be noted in passing.

First, it is possible that the President retained such control over the use that could be made of the transferred papers by the National Archives and third persons that the transfer was that of a future interest in the papers which would become a present interest only when the control over the use of the papers was relinquished. If this were the case, section 170(a)(3) would apply to deny any deduction for the contribution of the papers until such time as the Archives and persons other than the President and his family and agents had "all . . . rights to the . . . enjoyment of the property."[4]

---

[3] *Brown* at 147-148.

[4] Section 170(a)(3), enacted initially in 1964 as section 170(f) of the Internal Revenue Code, provides in relevant part:

**(Footnote continued on next page.)**

(C) Tax Analysts 2012. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.

Second, the foregoing analysis assumed the President had the requisite intent to make a valid gift of the papers in 1969. From available information, any such intent must be based solely upon the actions of persons ostensibly acting as his authorized agents. In such a case, in order to have a valid gift, the donor must show persons acting on his personal behalf were authorized agents. It is not clear whether such a showing of authorized agency and donative intent generally can be made in the present situation.[5]

### V. Collection of the Tax

Under section 6501(a) of the Internal Revenue Code, in the absence of fraud, the Internal Revenue Service has three years after a tax return was due to be filed to start proceedings to assess and collect tax by making an assessment, recording the taxpayer's liability, and mailing a deficiency notice to the taxpayer.[6]

Thus, the IRS is barred now by the statute of limitations from challenging a charitable contribution deduction taken by President Nixon on his 1969 tax return in connection with the donation of papers made in 1969, since that return was due on April 15, 1970. However, if, as is almost certainly the case, the 1969 gift constituted a contribution in excess of the then-applicable 30 percent of adjusted gross income maximum deduction, and the President carried over the excess to reduce his tax liability on his 1970 return, a deficiency notice could be filed by the Government for 1970 taxes at any time until April 15, 1974, three years after the 1970 return had to be filed on April 15, 1971. Similarly, if any excess deductions were carried forward and used to reduce gross income on the tax return of the donor for 1971 or 1972, deficiencies could still be set up to challenge these deductions.

Based upon the information and analysis contained in this memorandum, a thorough investigation should be made, either by the Internal Revenue Service itself or independent auditors retained by the IRS, of the facts and applicable law related to the charitable contributions taken by President Nixon as a result of the transfer of his pre-Presidential papers to the National Archives in 1969.

In the normal course of events, if IRS agents determined, as we have, based upon the preliminary evidence available, that full charitable contribution deductions taken in 1970 and subsequent years, stemming from the 1969 purported gift of Presidential papers, were not justified because of the application of section 170(e) of the Internal Revenue Code, a thorough audit of the tax returns in question would be made. On audit, if the facts were determined to be as generally set forth above, the Internal Revenue Service would file a notice of deficiency. However, it is obvious that Internal Revenue Service agents and their superiors throughout the Internal Revenue Service would be extremely reluctant to audit the tax returns of the President of the United States as if he were an ordinary taxpayer. Or even if the IRS were willing to conduct such an audit, in view of the fact that the IRS Commissioner is responsible to the President, the results of such an IRS audit would be questioned as to whether they were reached in the proper disinterested manner, We have no knowledge whether any previous incumbent presidents have been subject to Internal Revenue Service audits.

In view of the foregoing, the retention of special independent auditors would appear to be preferable to an ordinary IRS investigation to evaluate the correctness of President Nixon's personal tax returns for those years in which charitable contribution deductions were taken for the papers transferred to the National Archives in 1969.

The value in subjecting the President's tax returns to such an audit obviously is not in merely attacking in an additional manner a man a number of whose actions currently are subject to criticism and investigation. Rather, there is an important need to make clear to the American public that income taxes of Americans in positions of power and high visibility are being assessed correctly, and that the tax laws are being applied fairly to their. If clear cases of apparent noncompliance, such as permitting charitable deductions for the 1969 donation of Nixon papers, are permitted to occur without challenge by the Internal Revenue Service, the Service will run a substantial risk of greater noncompliance with the tax laws by average taxpayers. American taxpayers are willing to pay their fair share under our self-assessment tax system only if they believe other more visible taxpayers are also paying their legal share.

---

(3) FUTURE INTERESTS IN TANGIBLE PERSONAL PROPERTY. — For purposes of this section, payment of a charitable contribution which consists of a future interest in tangible personal property shall be treated as made only when all intervening interests in, and rights to the actual possession or enjoyment of, the property have expired or are held by persons other than the taxpayer or those standing in a relationship to the taxpayer described in section 267.

[5]See quotation from Brown at 129-130 found on page 8 supra.

[6]If the collection of taxes were believed by the IRS to be jeopardized because a time-consuming audit was being done close to the end of the three-year period, a jeopardy assessment could be made under section 6861 of the Code.

(C) Tax Analysts 2012. All rights reserved. Tax Analysts does not claim copyright in any public domain or third party content.