**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE ON WAYS AND MEANS, UNITED STATES HOUSE OF REPRESENTATIVES,<br><br>      *Plaintiff*,<br><br>vs.<br><br>UNITED STATES DEPARTMENT OF THE TREASURY, *et al.*,<br><br>      *Defendants*. | Case No. 1:19-cv-01974-TNM |

# Exhibit VV

**President Nixon's Troublesome Tax Returns**

**Date:** Apr. 11, 2005

Full Text Published by taxanalysts

President Nixon's Troublesome Tax Returns

William D. Samson is the Roddy-Garner Professor of Accounting in the Culverhouse School of Accountancy at the University of Alabama at Tuscaloosa.

Tax Analysts' Tax History Project Web site (http://www.taxhistory.org) contains an archive of presidential tax returns that have become available under the Freedom of Information Act. Among the returns in the collection are those filed by President Richard M. Nixon for 1969, 1970, 1971, and 1972. Samson finds access to these returns exciting, but also recalls the troubling issues surrounding the president's aggressive (fraudulent) positions regarding his own income taxes. Those returns also dredge up reminders of national and personal turmoils, Samson says.

This article examines the Nixon tax returns in the Tax History Project archive and describes the "rest of the story" of the returns when their content was slowly revealed to the public at the same time that the Watergate scandal unfolded.

\* \* \* \* \*

**The Tax History Project Archive**

The collection of presidential tax returns at Tax Analysts's Tax History Project Web site includes those of Franklin D. Roosevelt, Richard M. Nixon, Gerald Ford, Jimmy Carter, Ronald Reagan, George H.W. Bush, Bill Clinton, and George W. Bush as well as recent presidential candidate John Kerry. This archive is a tax historian's dream. The most interesting tax returns, because of the controversies surrounding them, the man, and the times, are those of Nixon. The archive misidentifies the content by labeling the returns "1969," when in fact the file contains the Nixon tax returns for 1969, 1970, 1971, and 1972. The identification also understates what those returns represent. There is no indication that the returns represent tax evasion by the taxpayer, the president, and no indication of the turmoil that occurred when information was slowly revealed about the content of those returns in 1973 and 1974. Thus, it would seem appropriate that a warning note be placed with the returns, indicating that there were major problems associated with the reported amounts and that led to controversy for the president in later years as the Watergate scandal was unfolding.

In the sections that follow, the 1969-1972 tax return data are presented and examined. The analysis is followed by the story of the turmoil that unfolded from the returns. The final sections focus on conclusions and policy implications of public disclosure of leaders' income taxes.

**An Analysis of Nixon's 1969-1972 Tax Returns**

Nixon's 1969-1972 returns are handwritten, making it difficult to read the exact figures. Photocopying has further increased the difficulty in reading them; only with patience and detective work can the numbers be determined with a degree of accuracy. Having a tax background and a long experience with the tax laws does help in the reconstruction of the information. Therefore, rather than trying to reproduce bad copies for this article, summary tables of the returns are presented as exhibits. To improve the analysis of the information, the returns are presented in a side-by-side comparison along with the aggregated amounts for the four years. The presentation in the exhibits follows the tax return format, with the overview in the first exhibit (gross income, total itemized deductions, exemption amounts, taxable income figures, and the tax amounts are given). The details of other income and the composition of the itemized deductions are shown in successive exhibits.

What is striking is how little income tax was paid, even in 1969 (the "high" tax year of the four), relative to the total income amount. The reported total income during those four years (line marked A in Exhibit 1) was more than $1 million; however, Nixon paid only $72,682 in the highest tax year (1969), making the average tax rate on reported gross income slightly more than 22 percent for 1969. For 1970, 1971, and 1972 the income tax amounts (line marked J in Exhibit 1) were a pittance relative to the reported gross income. The four-year average of tax-to-gross income was only 7 percent.

The small tax burden, contrasted with the large ability to pay, raises the question of why Nixon was not audited by the IRS. In fact, at least a half dozen other red-flag issues are apparent on the returns. Those issues appear for 1969 and 1970, and, for the most part, the issues continue on the succeeding years' returns. The issues are:

   1. In 1969, Nixon did not recognize the $142,912 of gain on the sale of his New York City residence. (See B in Exhibit 3.) He reported that he had rolled over the proceeds into a new personal residence, the $1.5 million property he purchased two months later in San Clemente, Calif. Given his prominent address -- The White House (which he even used on the tax returns) -- the obvious issue was that such a tax-free rollover of gain would be disallowed because the San Clemente property would not qualify as his principal residence.

   2. A related problem arises on the 1970 tax return when Nixon sold off part of the San Clemente acreage to friends. The amount he received covered 80 percent of the $1.5 million he paid to get the house and land. That sale, for $1,249,000, was reduced by exactly $1,249,000 of basis so that no gain was recognized. [See C in Exhibit 3.] That left the remaining acreage and house with about $250,000 of basis. That overallocation of basis to the acres sold certainly could have been easily challenged.

   3. The deduction for the charitable contribution of Nixon's vice-presidential papers in 1969 raised an obvious and basic issue: valuation. Despite having an appraisal for $576,000, the valuation of property donated to charity is normally red-flag issue. With a deduction of almost $600,000, an IRS challenge would be certain for the average taxpayer. [See D in Exhibit 2 and Exhibit 4.]

   4. No state income tax deduction appears on Nixon's 1970, 1971, and 1972 tax returns. The 1969 state income tax deduction was for taxes paid to New York. [See E in Exhibit 2.] The 1969 move to California should have meant that Nixon paid state income tax to California (if that was his true residence) or to the District of Columbia, both jurisdictions having high income tax rates. Nixon apparently did not pay any state or D.C. income tax after 1969. While the issue shows up on the federal returns, certainly state tax officials should have questioned why no state or local income tax was being paid.

   5. From 1969 through 1972, Nixon deducted the costs of his Florida house (500 Bay Lane). He claimed use of the house related to his job as president. The costs that were being deducted include depreciation, utilities, and insurance. The obvious question was whether the Florida house was used for personal or business purposes. [See line F in Exhibit 2.]

 6. A series of deductions from 1969 through 1972 relate to the fact that Nixon also deducted 25 percent of the cost of the San Clemente home as a deduction related to his job as president. [See line G in Exhibit 2.] The 25 percent allocation figure seems arbitrary. The costs that were deducted include depreciation, utilities, insurance, maintenance, wages of household help, and related payroll taxes. Again, the issue that the IRS is good in raising is whether these are personal items. Certainly, deductions related to a personal residence become highly scrutinized in an audit.

Two other related issues seem to be present in the Nixon tax returns, although they might not have generated an audit on their own given the tax law at the time. Those issues would cause problems today for the taxpayer, and might have been challenged back then during a thorough audit. First, the rental property generated modest rent while creating deductions that are several times larger.

 7. The property produced losses all four years. [See line H in Exhibit 3.] Certainly, the tax shelter aspect of the investment could be challenged and excess deductions disallowed. Today, the passive activity loss rules would preclude those deductions.

Second, the interest expense seems out of line with the interest income figure.

 8. There is no indication that the interest being paid was for a home mortgage, although some of the debt was likely to have been incurred for the California or Florida properties. With the annual amounts varying, it is doubtful that the interest paid was all mortgage interest. The problem is that the interest (if not for a home mortgage) exceeded interest income. Today's rules would preclude a deduction for excess investment interest payments. In the early 1970s, an IRS audit might very well have challenged and disallowed part of the interest deductions. [See line I in Exhibit 2.]

**The Controversy Over Nixon's Returns**

During his first term in office, Nixon had relied on the IRS to review his tax returns, which the Service did not challenge. However, Nixon also asked the staff of the Joint Committee on Internal Revenue Taxation (JCT) to review the 1968 sale of his New York City apartment -- the proceeds of that sale were used as the down payment for his San Clemente "Western White House" -- to see if he could meet the test to defer the gain on the sale of a principal residence. The JCT staff was not as awestruck as the IRS when examining the president's financial affairs. The staff determined that despite extensive use of the San Clemente home, it was the White House that had become Nixon's principal residence. Therefore, the gain on the sale of the New York property was taxable because Nixon had not reinvested the proceeds in a new principal residence (Bittker, pp. 44-61).

On September 5, 1973, Nixon gleefully announced that he had been audited for tax years 1971 and 1972, and that no additional tax was owed (*The Wall Street Journal (WSJ),* Sept. 6, 1973). In a press conference, Nixon claimed that after a "full field review or audit," the IRS "didn't order any change." He said that because no additional tax was assessed, the IRS had agreed with his treatment of some previously undisclosed issues. Nixon also said that he had not recognized gain when he had sold part of his San Clemente estate to his two friends, C.B. "Bebe" Rebozo and Robert Abplanalp. Abplanalp had also been the lender of the money for the San Clemente purchase in 1969. Nixon said that if the IRS had found a deficiency, "he would have paid the tax." He concluded that "this is good news for people who wonder if presidents are exempt from what the IRS does." An IRS spokesman at the news conference only related the IRS policy of confidentiality and said, "We can't comment on anybody's tax affairs. We can't even confirm or deny that an audit was done."

The press conference had many historical ironies. It proved to be the tip of the iceberg as the story unfolded. Public concern had been raised. It caused newspaper reporters to dig more deeply for answers to the tax questions that were being raised; their stories resulted in a congressional investigation. Why Nixon held a press conference about his audit success can be understood only in the historical setting, politics, and presidential crisis of the time.

The background of the tax announcement began with Nixon's reelection campaign. As the 1972 presidential election campaign was beginning, Washington police arrested burglars leaving the offices of the Democratic National Committee offices in the Watergate complex. Those burglars had been sent by members of the White House staff to uncover Democratic campaign secrets by placing electronic microphones and transmitting devices in the office. However, the connection of the break-in to White House advisers and eventually to Nixon took two years to unfold. While Nixon won the 1972 election by a landslide, questions were raised by the press about White House involvement in the crime. As a way of quieting the public outcry, Nixon had appointed Archibald Cox as a special prosecutor to the Justice Department to lead a probe into official wrongdoing. In the investigation, it was disclosed that Nixon and his staff had been orchestrating a coverup. It was further revealed that Nixon had been taping all of his meetings, and that the extent of his involvement could be disclosed by the tapes. Nixon fought release of the tapes. He raised constitutional challenges to Archibald Cox's acquiring them as evidence.

While the revelations about Watergate were emerging, Vice President Spiro T. Agnew became involved in a separate scandal. In August 1973 the news broke that since April the Justice Department's federal prosecutor in Baltimore had been conducting an investigation into bribery and extortion in 1967 and 1968 while Agnew was governor of Maryland (*WSJ*, Aug. 7, 1973). Agnew was charged with tax fraud for failing to report the bribes on his tax returns. Agnew criticized the charges, calling them "damned lies" (*WSJ*, Aug. 9, 1973).

By August 10, newspapers were describing the relationship between Nixon and Agnew as "strained" because of the bribe investigation (*WSJ*, Aug. 10, 1973). Agnew held a news conference that made Nixon look less than forthcoming about the Watergate questions.

Thus, Nixon made the September 5 announcement about the results of the IRS audit as a way of presenting some good news to show the public that his taxes and finances were beyond reproach because an investigation by the IRS had found nothing. By inference, he was trying to say that a Watergate investigation would also be a waste of time because he had nothing to hide.

On October 10, 1973, one month after Nixon's tax audit press conference, Agnew pleaded guilty to one count of tax evasion. He resigned as vice president. (*WSJ*, Oct. 11, 1973.) Agnew was also fined $10,000 and put on probation, but he avoided both a jail sentence and further charges related to bribery and extortion.

In the months that followed the Agnew resignation, a more aggressive press began to demand more details about Nixon's taxes. The press revealed Nixon's 1970 return showed a presidential salary of $200,000, yet federal income tax was less than $1,000. *The Wall Street Journal* reported on December 10, 1973, that the Nixon tax returns from 1969 through 1972 had the following adjusted gross incomes and taxes:

| Year | Adjusted Gross Income | Federal Income Tax |
|---|---|---|
| 1969 | $328,161 | $72,682 |
| 1970 | $262,942 | $792 |
| 1971 | $262,384 | $878 |
| 1972 | $268,777 | $4,298 |

The disparity between the income and tax figures was initially attributed to large deductions of interest on the loan to buy the San Clemente residence and to the charitable contribution of his vice- presidential papers. With a top federal income tax rate of 70 percent at the time, many were amazed how someone with such an enormous ability to pay tax could almost completely escape taxation. With the Watergate story unfolding, American confidence in government again was shaken. A *Wall Street Journal* editorial on November 13 spoke to the heart of the issue:

> It does seem unseemly that the President of the United States should almost completely escape taxation. Since he is in some way supposed to set a national example, a case can be made that he ought to bend over backward to make sure his taxes are not too low.

The editorial then called for a strengthening of the minimum tax to close loopholes. The editorial concluded with:

> There is a great deal to be said for it [the minimum tax] on the basis of simple equity. Considering what the average citizen pays, a President earning $200,000 should pay more than a few hundred dollars in tax. And so should anyone else earning $200,000.

The Nixon tax matter would not die. On December 5, 1973, *The Wall Street Journal* reported the rumor that the IRS was again auditing his returns, particularly because of questions of legality of the charitable deduction for the vice-presidential papers gift. The article said that lawyers familiar with the IRS handling of presidential returns were speculating that the previous audit completed in Nixon's first term, as well as the one in 1973, were unlikely to have been "thorough."

The same *Wall Street Journal* article reported, "Presidential returns are kept in a locked safe a few steps from the commissioner's office in Washington." The report then concluded:

> How vigorously the IRS would move if it decided Nixon owed more tax is questionable. Some well-connected lawyers feel the Watergate scandal makes the position of the new commissioner, Donald Alexander, stronger than his recent predecessors (*WSJ*, Dec. 5, 1973).

All the speculations proved to be true as the Nixon tax scandal unfolded faster than revelations from the Watergate investigation.

On December 9, Nixon disclosed more about his previous returns as a way of reducing the press speculation, the criticism, and the public pressure for impeachment (*WSJ*, Dec. 10, 1973). Following the path that he had taken at the beginning of his first administration, Nixon again asked that the JCT rule on two of the controversial items on his tax returns: the gift of vice-presidential papers and the exclusion of the gain on the sale of a portion of the San Clemente property.[1]

Most embarrassing for the IRS, Nixon produced a letter, dated June 1, 1973, from a district director of the IRS that praised Nixon in "the care shown in the preparation of . . . [his] tax returns," referring to the IRS examination for the 1971 and 1972 tax returns (*WSJ*, Dec. 10, 1973).

In another December 10, 1973, *Wall Street Journal* story about Nixon's tax return disclosure, Fred Zimmerman concluded that Nixon's tax returns "make fascinating reading. They add up to a picture of a man taking nearly every legal deduction his high priced tax experts can find for him." Zimmerman then cited the smallest of the deductions including $1.24 in interest from a department store bill. Perhaps equally embarrassing and certainly less than leadership standards would dictate, was the meagerness of Nixon's contributions to charity (only $295 in 1972).

The revelation that Nixon had paid less than $6,000 in federal income tax while earning more than $790,000 of aggregate income during 1970, 1971, and 1972 caused a public outcry. Nixon's taxes were an issue that average citizens readily understood as compared to the constitutional issues raised by the Watergate investigation. Most taxpayers -- with far less income than Nixon -- had paid more federal income tax than the president.

To add to the credibility problems of the administrative branch, *The Wall Street Journal* on December 12, 1973, wrote a report criticizing how the IRS, in auditing Nixon, had been negligent and far less questioning than it would have been for any other taxpayer. It cited not only the IRS's acceptance of Nixon's contention that the San Clemente sale did not produce a taxable gain, but also the IRS's blithe agreement with the taxpayer's valuation for the donation of the vice presidential papers. The *Journal* revealed that no one from the IRS had checked with the General Service Administration (GSA) for any information about the gift. Nor had the IRS even sought information from the papers' appraiser, Ralph Newman, to try to learn how the $576,000 value for the charitable gift had been calculated. As the *Journal* noted, the IRS typically resolves tax questions in favor of the government and places the burden on the taxpayer for proving the Service wrong. Thus, while other taxpayers found the IRS anything but compliant, taxpayer Nixon had indeed undergone a very friendly audit of his tax returns.

The *Journal* article said that the JCT, headed by Wilbur Mills, would be taking a hard look at all items on Nixon's tax returns, not merely the two issues that the president had requested. The *Journal* reported that Mills wanted to avoid any criticism that this investigation was a coverup. The committee's findings would be based on the facts determined by the committee's staff, which had a reputation for being tough but fair.

More revelations came out at this time. First, Nixon had not been paying income tax to either California or to Washington, D.C. -- thus he apparently was a citizen without a state. Americans found that hard to understand. Also, the president's 1970 "no taxable gain on sale" of part of the San Clemente property was calculated by the accountant by simply allocating much of the cost paid for the entire property to the sold portion to reduce the profit to zero. Thus, the cost allocated to the sold portion equaled the sale price. The result left the real estate that Nixon retained (and which had been improved since he acquired it) with a lower remaining basis than the price he had paid per acre. The upshot was that Nixon had relied on an appraisal that had valued the improved retained acreage at a lower per acre amount than the unimproved acres that had been sold.

A *Wall Street Journal* editorial on December 14, 1973, summarized its opinion:

> It is one thing for Richard Nixon, Wall Street lawyer, to take marginal deductions and let the IRS auditors correct him if they want. It is quite another thing for Richard Nixon, President of the United States, to take the same attitude. A President ought to know that since the IRS is part of his branch of government it cannot really be expected to give his return the same kind of scrutiny it would give any other.
>
> Obviously, the Nixon tax returns were not prepared with this thought in mind, which seems to us a mistake in judgment and an insensitivity to the standards a President ought to follow.

On December 19, the *Journal* revealed even more. In a front-page story, it compared the IRS's audit of an ordinary taxpayer who had claimed a portion of his

residence as a deductible business expense to the treatment Nixon had received for the same issue, which was more egregious. Nixon had been deducting depreciation and maintenance for 25 percent of the San Clemente estate, claiming that the percentage represented the portion of time that the property was used for business versus the total time spent there. In the ordinary taxpayer situation, the IRS would have required that the percentage be based on the number of business days used to 365, rather than business days to days spent at San Clemente. Thus, as an ordinary taxpayer, Nixon would have found the business-day percentage and the deduction amount drastically reduced from his (and the IRS auditor's accepted) numbers. As the *Journal* noted, the IRS had not challenged Nixon's figures, even though other taxpayers with a business deduction for their personal residences typically were challenged, and those deductions usually were denied. Only by prevailing in a court trial would an ordinary citizen be allowed similar deductions for a personal residence.

In a January 2, 1974, *Journal* editorial, more revelations were made public. Nixon, since 1970, had paid $22,000 for tax advice while paying only $5,979 in income tax. As the editorial noted, that $22,000 had been a very good investment. The editorial said the tax returns were full of items that the IRS should have challenged. First, the $576,000 valuation of the donation of presidential papers seemed excessive, and the IRS typically employed its own appraisers for large noncash gifts to charity. Second, Nixon had excluded on his 1969 tax return the gain from the sale of his New York apartment. That gain could only have been excluded only if the proceeds had been reinvested in a principal personal residential property, purchased and occupied within the specified time after the sale. Because the White House, not San Clemente, was Nixon's principal residence during the years after the apartment sale, the gain seemed taxable.

As previously noted, the sale of part of the San Clemente property to Nixon's friends who had helped finance the property should have caused a taxable gain of at least $117,000, rather than the reported zero amount. The editorial argued that even the $117,000 amount understated the gain, because the property's basis was presumed to have been reduced by the gain on the sale of the New York apartment. Thus, the combined result of the New York apartment and San Clemente property sales should have caused a taxable gain of $234,000.

Further, the deduction for the office at San Clemente was grossly overstated, not only by the miscalculation of the number of days in the denominator but also by the second required percentage allocation: the number of business rooms (space) to total residence rooms (space). The article described several other errors that an otherwise dutiful IRS auditor would have caught. The writer concluded that Nixon's tax for 1970-1972 should have been $71,000, rather than $5,979. Yet even the $71,000 was small -- less than a 10 percent average tax rate on Nixon's large income during those years.

On January 3, 1974, the IRS announced that it would reaudit some of Nixon's returns. In making the announcement, it was clear that publicizing that a taxpayer would be audited was very unusual for the IRS. And it was clear that the IRS was making the announcement only after receiving permission from Nixon (who was in no political position to object). The IRS was embarrassed over the publicity about the previous audit of the Nixon returns. The IRS felt that public confidence in the federal tax system was falling drastically, and it was hoped that another audit of Nixon's returns would correct its previous errors and restore public confidence.

In the middle of January 1974, the Nixon tax return crises seemed to have become centered on the $576,000 deduction for the donation of vice-presidential papers. Because the deduction was so large, it exceeded Nixon's 1970 gross income. That deduction, along with other deductions, reduced his taxable income to zero for 1970. The unused charitable contribution also carried over and offset income in 1971 and 1972. The income tax paid by Nixon in 1970 ($792) came from the newly implemented alternative minimum tax. Ironically, Nixon may have been the first AMT taxpayer.

Several issues of controversy surrounded the deduction for the contribution of Nixon's vice-presidential papers. First was when the transfer had taken place. Congress had set July 25, 1969, as the cutoff for contributions of papers by officials because of its concern over abuse of the deduction by previous presidents -- Lyndon B. Johnson, in particular. Apparently, on March 27, 1969, the vice- presidential papers had been physically transferred to the National Archives, which was under the supervision of the GSA. However, because Nixon intended to have those papers housed in the Nixon Presidential Library that would be built after he left office (as had been done by his predecessor), he wanted to ensure that such a retransfer would actually be carried out in the future. Therefore, Nixon had his lawyers draft an agreement with GSA officials. Drafting and signing delayed the agreement and the deed for a year. It was later discovered that the deed and other papers had been backdated to indicate that the title had been transferred before the cutoff for the deductions. Edward L. Morgan, a presidential aide and lawyer, had prepared and signed the documents. In testimony in January 1974 to the JCT, Morgan said he now believed that he did not have the power of attorney to sign for the president (*WSJ*, Jan. 21, 1974). Morgan failed to mention the backdating. Instead, he lied in his testimony and said that the paperwork was signed on April 21, 1969, a month after the vice-presidential papers had been delivered and before the deadline that ended those deductions. Contemporaneously with his testimony, Morgan unexpectedly resigned as assistant Treasury secretary. Less than a year later, Morgan received a four- month jail sentence after he pleaded guilty to falsifying documents (*WSJ*, Dec. 20, 1974).

While the issue of backdating documents, when eventually revealed, became a worse political problem for Nixon than the technical issue of when the donation had legally occurred, it was the second issue -- on the valuation of the donated papers -- that crystallized the Nixon tax controversy. That value would be the amount of the tax deduction. Nixon's appraiser, Ralph Newman, was certainly controversial in other valuations that seemed to favor the person paying the appraisal fee. The reputation of Newman and inclination of appraisers to benefit those who had hired them were topics thoroughly described in a January 16, 1974, *Wall Street Journal* editorial. The $576,000 value assigned to the collection of vice- presidential papers seemed high to many observers. Because the IRS had not challenged the valuation with their own appraisals raised great concern about the special treatment that the IRS seemed to have accorded Nixon.

The third issue, which seems to have been ignored, was whether the transfer of papers to the GSA's National Archives really constituted a gift. Since Nixon was stipulating a future transfer to his presidential library, it seems reasonable to conclude that the National Archives was merely acting as a storage facility for papers belonging to Nixon. Because the donation would actually occur when the library was built, the transfer to the archives was therefore a gift of a future interest. Further, because of the cutoff deadline, the subsequent contribution to the Nixon library would also not be deductible.

The issue of ownership also was not raised. The vice- presidential papers had come to Nixon because of the office he held and were not personal correspondence. It therefore could have been argued that the papers belonged to the federal government and not to the officeholder, and that the officeholder should not be allowed to deduct the value after removing the papers from the government and then returning them to the public domain via their library.

As both the tax and the Watergate investigations moved slowly forward, news leaks indicated that the JCT would find that Nixon owed at least $300,000 in back taxes (*WSJ*, Mar. 11, 1974). Mills, vice chair of the JCT, even predicted that the findings about the president's taxes would force Nixon to resign. To diffuse the issue from being part of the call for impeachment, Nixon said publicly on several occasions his willingness to pay any tax amount for which the committee found him deficient (*WSJ*, April 1, 1974).

In early April 1974, the JCT reported its findings: Nixon owed $476,451 in back taxes and interest (*WSJ*, Apr. 4, 1974). Instead of paying that amount as agreed, Nixon announced that he was paying $465,000, the sum from the second IRS audit. The amount of back taxes was caused not only by the disallowance of $482,018 of the $576,000 charitable contribution deduction (for the donation of the vice presidential papers) and by the $268,836 gain on the sales of the New York apartment and San Clemente property, but also by $92,298 of income from government-paid improvements on the Florida (Key Biscayne) and San Clemente properties (which were mostly for Nixon's personal benefit) and by $27,015 in income from the use of government planes for transporting family and friends. Other deductions disallowed included $5,391 for the cost of food, beverages, decorations, and rental for Tricia Nixon's 1969 masked ball and a $22 deduction for cleaning Mrs. Nixon's bathroom rug. Further disallowed deductions included much of the $85,399 of business-use expense related to the San

Clemente property's depreciation and maintenance. The JCT report also stated that Nixon should have reported a $11,617 capital gain from the 1972 sale of a lot in Florida.

Nixon's greatest concern with the IRS audit and the JCT investigation was that fraud might be charged, thereby imposing a civil fraud penalty of 50 percent of the tax deficiency, increasing his chances for impeachment. Amazingly, fraud was not mentioned either by the IRS or by the committee report. However, the House Judiciary Committee, which was considering the impeachment of Nixon, stated that it might investigate the possibility of tax fraud.

By agreeing to pay $465,000, Nixon's wealth was reduced to half of the previous $988,522. One White House spokesman stated that Nixon was "almost totally wiped out" by the agreement (*WSJ*, Apr. 5, 1974). However, Nixon was fortunate to have had $433,000 in liquid assets to pay the tax deficiency.

After paying the deficiency, Nixon's tax problems were by no means over. California assessed the president $5,302 for back income taxes, penalties, and interest, based on the federal adjustments (*WSJ*, Apr. 5, 1974). New York's Tax Department also began investigating Nixon for unpaid New York taxes based on the unreported gain on the New York apartment sale.

Perhaps the most disturbing news about Nixon and the tax system came not from the investigations of his tax returns, but from the Watergate investigation itself. After Nixon had agreed to pay the $465,000 deficiency, the news shifted to revelations that the Nixon White House had used IRS-provided tax information about Nixon's "enemies" and had attempted to use the agency to audit and harass those who had been adversaries of the Nixon administration. On April 7, 1974, Alexander, the IRS commissioner, pledged that his agency would do a better job of auditing presidential tax returns in the future and that the president would be treated like any other taxpayer. He admitted that the IRS, under his predecessor, had been remiss in the early Nixon audits (*WSJ*, Apr. 8, 1974). However, one comment in his statement was little noticed at the time: that the IRS *would no longer be* furnishing the White House with tax information involving certain individuals. This bomb exploded in late May 1974 when the Watergate hearings revealed that the White House had been using the IRS to harass political opponents (*WSJ*, May 29, 1974). The harassment had taken the form of IRS investigations and audits in the fall of 1972 of people closely involved in George McGovern's presidential campaign. The revelation came from the testimony of former White House Counsel John Dean and H.R. Haldman to the Senate Watergate Committee. Furthermore, the House Judiciary staff believed that Nixon's complicity in trying to use the IRS to attack his enemies was on the Watergate tapes.

Despite considerable White House pressure, the IRS had resisted and had not been involved in auditing Nixon's "enemies." No doubt, the Nixon administration was angered by this lack of obedience to orders. In all, 490 names had been targeted, many contributors to the McGovern campaign, (*WSJ*, May 30, 1974). The names had been given to the IRS commissioner, Johnnie M. Walters. George Schultz, the secretary of the Treasury, had ordered Walters not to follow through with the White House mandate audits; thus, no one was actually victimized by the White House power play. However, the revelation of just what the Nixon administration had been attempting caused even more public concern and eroded public confidence.

**Disclosure of Presidents' Tax Returns**

With public confidence at a low ebb because of scandals, President Ford set about restoring citizens' faith in government. Of particular concern was the perception that presidents were given special tax treatment by the IRS and, therefore, were not burdened by the income tax like other citizens. Public cynicism was a new phenomenon that threatened the self-assessed U.S. income tax system. On April 20, 1976, with the presidential campaign beginning, President Gerald Ford publicly disclosed his 1975 tax return information (*The New York Times*, Apr. 21, 1976). The contrast between his return and Nixon's tax disclosure could not have been greater. Almost all of Ford's income was from the presidential salary and expense allowance, with only $2,000 of income from property. Furthermore, his deductions were modest. Most striking, Ford paid $94,569 in federal income tax in 1975 on taxable income of $204,606 (for gross income of $251,991). Thus, the tax paid by Ford was certainly large -- especially compared to Nixon's 1970-1972 income tax amounts.

**Policy Implications**

The power of the office in overseeing the administration of the tax system puts the president in a position of potential conflict of interest; the president can reduce his own taxes by fraudulent means and put pressure on the IRS, which may lack the will to properly audit the president. Confidentiality of tax returns enabled the conflict of interest to develop into abuse. On being revealed that a president had not paid much income tax, the public's faith in the tax system and in the government was shattered.

The current practice of public disclosure by presidents of their tax return information has increased public confidence and helped restore trust in government. Also, it has helped allay fears that only fools are paying their share of taxes and that the smart and the powerful are cheating. Publicity that presidents pay large amounts of income tax and are as burdened as most citizens, has increased confidence in the self-assessment system. As in other situations, public scrutiny has certainly dampened inclinations of presidents to cheat on their tax returns. Thus, since 1976, presidents seem to have lived up to the trust of the public that they pay taxes as do other citizens. Indeed, presidents have been role models during the last 20 years. It is arguable whether presidents would have lived up to the expectations of their leadership roles in tax if the practice of public disclosure of the presidents' tax returns had not evolved. At a minimum, without that revelation, presidents would not be able to serve as tax role models, even when paying large amounts of tax, because the public would be unaware of their voluntary compliance with the tax system.

The inference drawn from the history of presidents as taxpayers is for greater disclosure (even nonvoluntary disclosure) of tax and financial information about more citizens. Which citizens and how much disclosure can be debated, yet it would seem at a minimum that governors, members of Congress, and federal judges should report publicly their tax returns. Arguably, the candidates and officeholders of all national, state, and even local office should also reveal their tax returns. Perhaps federal, state, and local employees (principals of schools, superintendents of water departments, college professors, etc.) should meet such an annual requirement. Certainly, revelation that those leaders are complying and paying taxes, and a great deal of tax at that, will convince more citizens that the self-assessment system does work and that they are not being made fools for paying their shares of tax voluntarily.

Finally, disclosure and scrutiny certainly are inducements for a leader to live up to the responsibilities of his role and office. Again the record of presidents shows that, without disclosure, even presidents do not act as they should; with disclosure, presidents become role models. As the Justice Department press release about its conviction of a prominent Massachusetts legislator, the former state house speaker stated: "Truthful compliance with the tax laws is a basic duty of all citizens. This is especially important when the taxpayer is a public official. Scheming to beat the IRS cheats every honest taxpayer." (Hartigan, August 19, 1996, *The Wall Street Journal*.)

As the history of the tax behavior of presidents reveals, the policy of tax confidentiality should be examined and weighed against the benefits of public disclosure of return information. Given the presidents' histories, public disclosure offers great benefits, and perhaps the practice should be extended to other taxpayers as well.

**References**

Bittker, Boris I., *Federal Taxation of Income, Estates and Gifts*, Volume 2 (Warren, Gorham and Lamont: Boston) 1981.

*The Wall Street Journal*, "A New Watergate?" August 7, 1973, p. 1.

_____, "Agnew Denies He Took Kickbacks," August 9, 1973, p. 2.

_____, "Indictment of Agnew Is Far More Likely Than He Asserts, Insiders Suggest," August 10, 1973.

_____, "President Says IRS Audited His Returns, Didn't Raise Taxes," September 6, 1973, p. 3.

_____, "Agnew Resigns, Is Fired for Tax Evasion Put on Probation; Other Charges Dropped," October 11, 1973. p. 3.

_____, "Avoiding a Dilemma," November 13, 1973, p. 26.

_____, "Tax Report" -- Is the IRS Auditing Nixon?" December 10, 1973, p. 1, c. 5.

_____, "Nixon Is Likely to Be Aided by Disclosure of Finances, But Most Key Charges Remain," Fred Zimmerman, December 10, 1973, p. 2, c. 3.

_____, "Tax Report," December 12, 1973, p. 1, c. 5.

_____, "The President's Finances," December 14, 1973, p. 12, c. 1.

_____, "Tax Report," December 19, 1973, p. 1, c. 5.

_____, "Second-Guessing Mr. Nixon's 1040," Michael R. Skigen, January 2, 1974, p. 6, c. 4.

_____, "IRS Reauditing Some of Nixon's Tax Returns," January 3, 1974, p. 4.

_____, "Mr. Newman's Sense of Values," Joseph M. Winski, January 16, 1974, p. 12, c. 4.

_____, "Nixon Tax Deduction for Papers Is Periled by Former Aide's Doubt About His Own Role," Timothy D. Schellhardt, January 21, 1974, p. 4, c. 2.

_____, "One Step Closer? -- Watergate Indictments Put Pressure on House to Impeach President," March 11, 1974, p. 1, c. 1.

_____, "White House Moves to Diminish Impact of Any Findings That Nixon Owes Taxes," Albert R. Hunt, April 1, 1974, p. 5, c. 1.

_____, "Nixon States He'll Pay About $465,000 in Taxes, Interest IRS Says He Owes," Albert H. Hunt and Fred L. Zimmerman, April 4, 1974, p. 5, c. 1.

_____, "Nixon Is Almost 'Wiped Out' Financially by Decision to Pay Tax Bill, Aide States," April 5, 1974, p. 5, c. 3.

_____, "IRS Was Lax in Checking Nixon Returns, Chief Says; Future Precautions Promised," April 8, 1974, p. 2, c. 2.

_____, "Nixon Is Assessed $5,302.89 by California for Back Income Taxes, Interest, Penalty," April 25, 1974, p. 10, c. 1.

_____, "Jaworski Says Evidence Indicates IRS Was Directed to Audit, Harass 'Enemies'," May 29, 1974, p. 2, c. 2.

_____, "Playing Hardball With Tax Returns," Arlen J. Large, May 30, 1974, p. 22, c. 4.

_____, "Former White House Aide Gets Jail Term for Helping to Falsify Nixon's Tax Data," December 20, 1974, p. 5, c. 2.

```
    Exhibit 1. The Tax Returns of Richard M. Nixon, 1969-1972

                              1969           1970           1971
Number of Exemptions (line 10)   3              3              2
 Wages, Salary, etc.       $236,468.86    $250,000.00    $250,000.00
  Interest (I)               3,913.79      10,250.56      17,733.04
  Other Income              87,778.87       2,692.00       5,348.97
  Total Income (A)        $328,161.52    $262,942.56    $262,384.07
- Itemized Deductions      178,535.10     307,181.92     255,676.69
- Exemptions          3x$600 1,800.00 3x$625 1,875.00 2x$675 1,350.00
Taxable Income            $147,826.42             $0       $5,357.38
Tax
 Regular (and Surcharge)   $72,682.03             $0         $878.03
 Minimum                                      792.81           ____
 Total Income Tax (J)      $72,682.03        $792.81         $878.03
```

```
                    [Table Continued]
                                          Four-Year
                              1972         Totals
Number of Exemptions (line 10)   2
 Wages, Salary, etc.        $250,000.00    $986,468.86
  Interest (I)               16,292.94      48,190.33
  Other Income               2,484.60       87,606.50
  Total Income (A)          $268,777.54  $1,122,265.69
- Itemized Deductions        247,569.77     988,903.48
- Exemptions          2x$750 1,500.00       6,525.00
Taxable Income              $19,707.77    $172,891.57
Tax
 Regular (and Surcharge)     $4,298.17     $77,858.23
 Minimum                                      792.81
 Total Income Tax (J)        $4,298.17     $78,651.04
```
Data taken from the 1969-1972 tax returns of Nixon found at Tax Analysts' Tax Museum at http://www.taxhistory.org.

```
    Exhibit 2. Tax Returns of Richard M. Nixon, 1969-1972: Schedule of
                         Itemized Deductions

                              1969           1970           1971
Medical Expense:
 1/2 health insurance         $150.00        $150.00          --
```

```
                                                                   
Taxes                                                              
 Property                      $12,500.36    $27,074.79   $17,654.18
 Sales Taxes                     2,528.50        650.00       450.00
 State Gasoline Tax                 73.00         73.00        49.00
 State Income Tax                7,351.50       -- (E)       -- (E)
 Total Taxes                   $22,453.36    $27,797.79   $18,153.18

Interest (I)                                                       
 Banks and Financial                                               
  Institutions                  22,594.32     13,054.19    13,958.13
 Individuals: Manual Arca         3,000                            
  John Elmore                                 6,000.00             
  Robert Abplanalp                           15,000.00    15,000.00
  Cotton Ogden                               75,000.00    38,045.12
 Total Interest                 25,594.32    109,054.19    67,003.25

Charitable Contributions                                           
 Cash                            3,150.00      7,512.00     2,524.00
 Property (V.P. Papers) (D)    576,000.00    480,105.55   356,241.27
 Total                         579,150.00    487,617.55   358,765.27
 Deduction, Limited by AGI      98,448.45    131,471.28   131,192.37

Miscellaneous Itemized Deductions                                  
 Tax Return and Tax Advice Fees      --       13,432.60     4,115.00
 Appraisal Fee (for V.P. papers) 3,762.05      2,811.50     6,209.09
 President's employee-                                             
  related expense               16,603.87      7,130.32    11,544.28
 Other expenses of Office                                          
  of President                     237.38      1,369.86     1,091.73
 (G) San Clemente home -- (25%)  4,699.62      7,808.49    10,237.40
 (F) 500 Bay Lane home (100%)    6,586.05      6,155.89     6,130.39

Total Miscellaneous             31,888.97     38,708.66    39,327.89

Total Itemized Deductions     $178,535.10   $307,181.92  $255,676.69
_____

                            [Table Continued]
_____
                                             Four-Year
                                    1972      Totals
_____
Medical Expense:
 1/2 health insurance                --      $300.00
Taxes

 Property                      $24,064.77    $81,294.10
 Sales Taxes                       550.00      4,178.50
 State Gasoline Tax                 49.00        244.00
 State Income Tax                 -- (E)       7,351.50
 Total Taxes                   $24,663.77    $93,068.10

Interest (I)
 Banks and Financial
  Institutions                  11,403.71     61,010.35
 Individuals: Manual Arca                      3,000
  John Elmore                                  6,000.00
  Robert Abplanalp              26,883.30     56,883.30
  Cotton Ogden                  17,437.38    130,482.50
 Total Interest                 55,724.39    257,376.15

Charitable Contributions
 Cash                              295.00     13,481.00
 Property (V.P. Papers) (D)    279,073.90    576,000.00
 Total                         279,368.90    577,348.00
 Deduction, Limited by AGI     134,388.77    495,500.87

Miscellaneous Itemized Deductions
 Tax Return and Tax Advice Fees  4,250.00     21,797.60
 Appraisal Fee (for V.P. papers)    --        12,782.64
 President's employee-
  related expense               12,316.24     47,594.71
 Other expenses of Office
  of President                     889.47      3,588.44
 (G) San Clemente home -- (25%)  9,422.35     32,167.86
 (F) 500 Bay Lane home (100%)    5,914.78     24,787.11

Total Miscellaneous             32,792.84    142,718.36

Total Itemized Deductions     $247,569.77   $988,963.48
_____


_____
  Exhibit 3. Tax Returns of Richard M. Nixon, 1969-1972: Schedule of
                             Other Income
_____

                              1969        1970        1971
_____
Schedule E
(H) Rental Income --
    Whittier House
 Rents                       $700.00     $650.00     $600.00
 Expenses                  <6,399.16>  <6,837.90>  <6,315.34>
 Net Loss                 <$5,699.16> <$6,187.90> <$5,715.34>
 Trust Income From
  Mother's Estate             322.29       --          --
 Book Royalties               710.24    8,879.90      367.05
 Total Income <Loss>      <$4,666.63>  $2,692.00  <$5,348.29>
                          Fisher Island
Schedule D                    Stock
Gain Realized              $184,191.00
x 50% Long-Term Capital Gain     50%
Taxable Gain                $92,445.50
                                        Sale of
                                        California
                                        Lots (C)
                          Sale of NYC  (Purchased
                          Residence (B)   1969)
Selling Price              $312,500.00
```

```
less lawyer fee         2,737.45
amount realized         $309,772.55    $1,249,000.00
less basis              <166,860.32>   <1,249,000.00>
gain realized           142,912.23            $0
Purchase of San
 Clemente Property
July 15, 1969    Cost:  $1,499,222.05
Gain Recognized               $0             $0
Total Other Income      $87,778.87     $2,692.00       <$5,348.29>
_____
                      [Table Continued]
_____
                                        Four-Year
                         1972            Total
_____
Schedule E
(H) Rental Income --
Whittier House
Rents                   $450.00         $2,400.00
Expenses                <6,898.42>      <26,450.82>
Net Loss                <$6,448.42>     <$24,050.82>
Trust Income From
 Mother's Estate           --              322.29
Book Royalties           220.58          10,177.77
Total Income <Loss>     <$6,227.84>     <$13,550.76>

Schedule D              Fla. Lot (60%)
Gain Realized           $17,424.88
x 50% Long-Term Capital Gain    50%
Taxable Gain            $8,712.44       $101,157.94
Selling Price
less lawyer fee
amount realized
less basis
gain realized
Purchase of San
 Clemente Property
July 15, 1969    Cost:   $
Gain Recognized                                $0
Total Other Income      $2,484.60       $87,607.18
_____

_____
   Exhibit 4. Appraisal: Donation of the Papers of Richard M. Nixon
_____
I.   General Correspondence
     as Vice President
              1953-1961        828 Boxes    414,000 items
II.  Appearance File
              1948-1962        173 Boxes     87,000 items
III. Correspondence --
     Invitations and Turn-Downs
              1954-1961         56 Boxes     27,000 items
IV.  Foreign Trip Files
     as Vice President
              1953-1961        116 Boxes     57,000 items
V.   Visit of Nikita S. Khruschev
         1959 -- Visit to U.S.   3 Boxes     15,000 items

Appraisal: Fair Market Value -- $576,000 (D)

Taken from Nixon's 1969 tax return located at the Tax Analysts' Tax
Museum, http://www.taxhistory.org.
_____
```

**FOOTNOTE**

[1] Nixon's original tax accountant, Arthur Blech, had calculated that no gain was due on the sale. However, Nixon later hired Coopers & Lybrand to audit his finances. The firm concluded that a capital gain of $117,370 should have been reported on Nixon's 1970 return. Coopers & Lybrand's audit also revealed that Nixon's net worth was $988,522.

**END OF FOOTNOTE**