# EXHIBIT A

Mr. ROGERS. Mr. Speaker, I ask unanimous consent to extend my remarks at this point in the RECORD.

The SPEAKER. Is there objection to the request of the gentleman from Colorado?

There was no objection.

Mr. ROGERS of Colorado. Mr. Speaker, in pursuance of my colloquy with the gentleman from New Jersey [Mr. RODINO], I submit the following brief for the RECORD:

Subject: Unavailability of declaratory judgment in New York Port Authority matter.

INTRODUCTION

In connection with an inquiry into the activities of the Port of New York Authority by Subcommittee No. 5 of the House Committee on the Judiciary (hereinafter "Committee" and "Subcommittee"), certain officers and directors of the port authority refused to comply with subpenas issued and served upon them by order of the subcommittee.[1] It has been suggested by certain officials of New York and New Jersey and by the General Counsel of the port authority, and may yet be further suggested by others, that the serious constitutional issues involved in this inquiry should be resolved by a competent judicial tribunal prior to the institution of contempt proceedings.[2] The attorney general of New Jersey specifically recommended a suit for a declaratory judgment:

"I recommend that * * * the procedure followed should be an action by way of declaratory judgment brought by this committee or some other agency of the Federal Government to determine what are the boundary lines between the matters properly exclusively within the domain of the States and what are the matters which Congress can ferret out and investigate."[3]

This memorandum is directed to the question whether the Declaratory Judgment Act[4] might have been invoked in the manner and for the purpose suggested by the attorney general of New Jersey. Since that suggestion implies that the committee should have initiated the proceeding, the principal query is whether the committee or its members might maintain such an action under the Declaratory Judgment Act. It may in addition be instructive to determine whether the port authority might have sought such relief.[5]

---

[1] See inquiry before Subcommittee No. 5 of the House Committee on the Judiciary, "Return of Subpenas—Port of New York Authority Inquiry," 86th Cong., 2d sess. (1960) (hereinafter cited as "Inquiry").

[2] Statement of Louis J. Lefkowitz, attorney general of New York, Inquiry, 56, 58 ("I am reasonably satisfied that * * * there must and should be a way where * * * this important question can be tested before a tribunal which can have decision to do it"); statement of D. C. Furman, attorney general of New Jersey, Inquiry, 59, 60; statement of Sidney Goldstein, General Counsel of Port of New York Authority, Inquiry, 61, 68.

[3] Inquiry, 60.

[4] 28 U.S.C. 2201 (1958). The act provides: In a case of actual controversy within its jurisdiction, except with respect to Federal taxes, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of final judgment or decree and shall be reviewable as such.

[5] The record does not reveal that the port authority has instituted any action for a declaratory judgment although committee counsel invited their general counsel to file action to test the validity of the subpenas.

I. ACTION INITIATED BY COMMITTEE

A. Does the committee, or do its members, collectively or separately, have authority to sue under the Declaratory Judgment Act?

The earnest suggestion that the committee might obtain a declaration of rights from a competent tribunal hardly gets off the ground, for under the doctrine of *Reed* v. *Board of County Commissioners of Delaware County, Pennsylvania* (277 U.S. 376 (1927)), neither the committee nor its members nor representatives are empowered to seek judicial relief without an explicit authorization from Congress. Such authorization has not been granted to the committee, to its chairman, nor to any of its members. In *Reed*, the Senate of the 69th Congress had by resolution created a special committee to investigate methods employed in influencing nominations for the office of U.S. Senator.[6] In 1927, the Senate, by further resolution, authorized the special committee to take and preserve certain ballot boxes, ballots, and other records used in connection with a senatorial election then subject to contest.[7] On behalf of the committee, its counsel, Mr. South, demanded possession of the boxes, ballots, and records, then in the custody of the commissioners and certain other officers of the county. The demand was refused, and the Senators constituting the special committee, together with South, brought suit in a U.S. district court to obtain possession of the material under section 24 of the Judicial Code.[8] The district court dismissed the suit for lack of jurisdiction,[9] and the court of appeals affirmed per curiam.[10]

The Supreme Court, in affirming the decree dismissing the suit, held that neither the special committee, nor "its members, collectively or separately," possessed the authority to invoke the power of the Judicial Department and hence, were not persons "authorized by law to sue" under section 24 of the Judicial Code. The plaintiffs had pointed to no act of Congress authorizing them to sue. R.S. 101–104,[11] it was noted, had been passed to facilitate congressional investigation, but these provisions embodied no license conferring upon the Federal courts jurisdiction over a suit by the committee. Hence, the Court decided, the suit could be maintained only if authority therefor could be gleaned from the enabling resolutions,[12] a process which proved fruitless:

"The power is not specifically granted by either resolution * * *. The Resolutions are

---

[6] S. Res. 195, 69th Cong., 1st sess. (1926).

[7] S. Res. 324, 69th Cong., 2d sess. (1927).

[8] 36 Stat. 1091 (1911), vested original jurisdiction in Federal district courts of all suits of a civil nature "brought by the United States, or by any officer authorized by law to sue." The present provision, 62 Stat. 933 (1948), 28 U.S.C. 1345 (1958), confers on the district courts jurisdiction "of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by act of Congress."

[9] 21 F. 2d 144 (E.D. Pa., 1927).

[10] 21 F. 2d 1018 (3d Cir., 1927).

[11] 2 U.S.C. 191–194 (1958) deal with the admission of oaths to witnesses (sec. 191), the refusal of witnesses to testify or produce documents (sec. 192), privileges of witnesses (sec. 193), and certification of failure to testify (sec. 194). Section 194 now provides that where a witness fails to produce required documents and such failure is reported to either House, the case must be certified to the appropriate U.S. Attorney, who must bring the matter to the attention of a grand jury. Thus, the statute establishes a well-defined procedural route for raising questions involved in a committee's assertion of its powers.

[12] Resolution 195 empowered the special committee to "require by subpena or otherwise the attendance of witnesses, the pro-

to be construed having regard to the power possessed and cutomarily exerted by the Senate. * * * It has been customary for the Senate * * * and the House as well * * * to rely on its own power to compel * * * production of evidence in investigations made by it or through its committees. * * * Petitioners have not called attention to any action of the Senate and we know of none that supports the construction for which they contend. In the absence of some definite indication of that purpose, the Senate may not reasonably be held to have intended to depart from its established usage. Authority to exert the powers of the Senate to compel production of evidence differs widely from authority to invoke judicial power for that purpose."[13]

With respect to its authority to invoke the power of the Judiciary, the present Committee is in much the same position as the special committee in *Reed*. There is no new act of Congress which would provide such authority,[14] and the resolutions under which the Committee operates are couched in language even more restricted, for these purposes, than that of the resolutions involved in *Reed*.[15] Hence, it is clear that the doctrine of *Reed* v. *Board, supra,* applies to the Committee and that it or its members are not "authorized by act of Congress to sue" under 28 U.S.C. 1345.[16]

It follows that the committee and subcommittee lack capacity and authority to seek a declaration of rights under the Declaratory Judgment Act. Judicial authorities are in agreement that that act did not expand the scope of Federal jurisdiction and did not provide a new peg upon which litigants, otherwise lacking a basis for Federal jurisdiction, might hang their hats. As Judge Fee of the ninth circuit observed: "The Declaratory Judgment Act merely enlarges the range of remedies available in Federal courts. It does not afford an independent basis for Federal jurisdiction."[17] Thus, in *Mashunkashey* v. *U.S.,* an action for a declaratory judgment by the United States as guardian of certain Indians, the court pointed out that the act created no new rights and that the right of the Government to maintain the action must be found "in the general law."[18] In the case of this committee, the "general law," (in other words, the law outside the Declaratory Judgment Act), is as declared by the highest court of the land in *Reed* v. *Board, supra.* Neither the committee nor any of its members therefore have capacity to sue

---

duction of books, papers, and documents, and to do such other acts as may be necessary in the matter of said investigation."

[13] 277 U.S. at 388, 389.

[14] Since 1927, the Legislative Reorganization Act of 1946, 60 Stat. 812, has been enacted. Secs. 133 and 134 of that act, 60 Stat. 831–2, set forth committee procedures and powers. No power to sue or be sued in any court is granted.

[15] H. Res. 27, 86th Cong., 1st sess., as amended by H. Res. 530, 86th Cong., 2d sess. (set forth in inquiry 13, 14), which directs the Committee on the Judiciary, acting as a whole or by subcommittee, to conduct investigations relating to, inter alia, activities and operations of interstate compacts, provides: "For the purposes of carrying out this resolution the committee or subcommittee is authorized to * * * require by subpena * * * the production of such books * * * as it deems necessary." Note that this resolution omits the broad clause of the resolution involved in *Reed* permitting the special committee there "to do such other acts as may be necessary." See also House rule XI(1).

[16] See note 8, supra.

[17] *Fletes-Mora* v. *Brownell*, 231 F. 2d 579 (9th Cir., 1955). See also *Atlantic Meat Co.* v. *R.F.C.*, 166 F. 2d 51 (1st Cir., 1948).

[18] 131 F. 2d 288 (10th Cir., 1942), cert. den., 318 U.S. 764.

under the Declaratory Judgment Act, and the suggestion by the attorney general of New Jersey that it might have done so lacks merit as a matter of law.[19]

II. HAS CONGRESS POWER TO CONFER UPON THE COURTS JURISDICTION TO RENDER DECLARATORY JUDGMENTS CONCERNING THE AUTHORITY OF CONGRESSIONAL INVESTIGATING COMMITTEES?

Since it becomes clear that under *Reed v. Board*, supra, the committee presently lacks authority to sue for a declaratory judgment, further discussion of the suggestion of the attorney general of New Jersey would seem superfluous. But in the interests of preparing a thorough response to proponents of the declaratory judgment suggestion, it may be appropriate to speculate as to whether Congress might validly grant such authority to the committee should it choose to do so.[20] This question was left open by the Supreme Court in Reed, although it intimated that one House of Congress alone would not have power to invest its committees with the power of suit.[21] The district court in the Reed case, however, touched upon the question when it held that Congress lacked power to confer upon the district courts jurisdiction to determine the authority of the special committee, when the limits of that authority could be subsequently adjusted by the Senate alone.[22] The district court cited the ancient precedent of *Hayburn's Case*,[23] which had held that Congress could not assign to the courts any but judicial duties, and the landmark case, *Muskrat v. U.S.*[24] which had followed it. In Muskrat, the court had denied Congress power to confer jurisdiction upon the Court of Claims over suits to determine the constitutional validity of certain prior acts of Congress, such suits not involving a "case" or "controversy" within the meaning of the Constitution.[25]

Whether a congressional grant to a committee of power to seek a declaratory judgment concerning its authority would be valid under Muskrat is open to serious question. The Muskrat court saw in the statute before it an attempt to cast it in a role which it has stoutly resolved to avoid, that of an "adviser" on constitutional matters.

Quite likely, congressional authorization to the committee to follow the procedures suggested by the attorney general of New Jersey would appear to the court a bold attempt to place it in just such a role vis-a-vis the grave constitutional issue raised in the port authority investigation.[26]

Moreover, one is compelled to wonder just when a "case" or "controversy" comes into play in connection with the movements leading up to a conviction for contempt of Congress for refusal to comply with a subpena.[27] Surely not before the subpena has been issued and the recipient has voiced his disinclination to honor it. But even then the controversy is still "inchoate," for the person subpenaed may decide to comply without benefit of sanction. Once there is a formal refusal to comply, the subcommittee, committee, or Congress may refrain from instructing the Attorney General to institute contempt proceedings. At any rate, at this stage there seems little to be gained by raising the legal questions in a declaratory judgment rather than the contempt proceeding.[28]

It is thus difficult to conjure up a fixed notion of the "timing" of such a suit. Its status as a "case" or "controversy" would rest on shaky foundation. Hence, in view of Muskrat, the power of Congress to provide the necessary authorization for a declaratory judgment proceeding at the behest of the committee, *Reed v. Board*, supra, is subject to serious doubt.

III. EVEN IF CONGRESS COULD AUTHORIZE THE COMMITTEE TO SUE FOR A DECLARATORY JUDGMENT, WOULD THE COURTS BE LIKELY TO ENTERTAIN SUCH A SUIT ON ITS MERITS?

Even granting, for the sake of argument, that Congress possessed the bare power to authorize the committees to sue for a declaratory judgment in connection with the port authority inquiry, it does not follow that a Federal court would entertain such a suit on its merits. For such a suit would be far from an ordinary "garden variety"

action for a declaratory judgment;[29] it would seek resolution of "grave questions of constitutional propriety."[30] The Supreme Court, which is loathe to decide constitutional issues unless absolutely necessary[31] and, as has been seen, scorns attempts to foist upon it constitutional litigation through nonadversary, "friendly" proceedings,[32] cannot be expected to warmly embrace this proposed suit for declaratory judgment requesting determination of novel and fundamental questions of Federal jurisdiction. It is well known that the court has developed a complicated system of judicial machinery by which it limits constitutional decision whenever possible. The tenets of this code of judicial self-restraint were painstakingly summarized by Mr. Justice Brandeis concurring in *Ashwander v. T.V.A.*[33] The suggestion of the attorney general of New Jersey appears to violate a good number of them.

In the first place, for reasons already stated, plaintiff in such a suit would seek adjudication of constitutional issues before decision thereon is absolutely necessary.[34] Even after the refusal of those subpenaed persons to produce the requested documents, the necessity for a judicial decision does not arise until the House finally decides to certify the matter to a U.S. attorney and trial is begun.[35] Only then does resolution of the constitutional issues become a matter of "last resort," rendering such decision "legitimate."[36]

Second, the proceeding is implicitly a request for "advice" in a "friendly" suit, a kind of request which the court has steadfastly denied.[37] Indeed, the Attorney General of New Jersey could hardly have chosen an epithet less likely to inspire the court with confidence in the "adversary" nature of such a suit than his description of it as "a reasonable approach by reasonable men."[38] It would be surprising if the court did not view this as a challenge to find some grounds of "nonjusticiability."

Third, it does not require extensive citation to discover that the type of suit sug-

---

[19] The suggestion that "some other" agency of the United States might seek a declaratory judgment in the port authority inquiry fails for the same reason. No agency now possesses such authority and the committee is no more authorized to direct "some other agency" to invoke the Declaratory Judgment Act on its behalf than it is to sue itself. Compare 2 U.S.C. sec. 194 which expressly authorizes the committee to take steps leading to the institution of proceedings by the attorney general. Nor, for the same reason, is any member of the Committee authorized to importune State officials to bring suit in the State courts in order to raise the constitutional issues involved in the inquiry.

[20] As a matter of policy, such a grant might be unwise. The present contempt provisions in title 2 of the United States Code were designed to expedite congressional investigations by deterring contumacy. Once the mechanics for a declaratory judgment were provided, reluctant witnesses would apply pressure for such action. If a committee chose not to seek such a judgment, an unsympathetic press might chastise it for being "unreasonable" in failing to "amicably" settle differences. Even if such suits were entertained by the courts, delays in obtaining a judgment might be interminable. In brief, serious disruption of the process by which Congress informs itself would take place.

[21] 277 U.S. 388.

[22] 21 F. 2d. 144, 151, 152.

[23] 2 U.S. (2 Dall.) 409 (1792).

[24] 219 U.S. 346 (1910).

[25] Art. IV, sec. 2.

[26] See the text of the attorney general's suggestion and the unprecedently broad scope of the judicial determination which he envisages, supra, p. 1.

[27] See R.S. 192–194, discussed supra, note 11.

[28] In addition, while purgation of contempt by compliance with the request of the congressional committee is no defense to a prosecution for contempt of Congress, *U.S. v. Brewster*, 154 F. Supp. 126 (D.C. 1957), reversed on other grounds, 225 F. 2d 899 (C.A.D.C., 1958), certiorari denied, 358 U.S. 842; Cf. *Clark v. U.S.*, 289 U.S. 1, 19 (1932); *Sawyer v. Dollar*, 190 F. 2d 623 (C.A.D.C. 1951), vacated as moot, 344 U.S. 806 (1952) (Government officials and others adjudged guilty of civil contempt of court, under 18 U.S.C. 401, could purge themselves of such contempt by withdrawing contumacious advice and instructions), there is always the possibility that compliance with the subpena will result in suspension of sentence. This possibility must certainly be borne in mind in connection with the peculiar circumstances of the port authority inquiry where officers who refused to comply with the subpena claimed to be acting pursuant to orders of Governors of New Jersey and New York. Cf. *Sawyer v. Dollar*, supra (Government officials were acting on advice of Department of Justice in refusing to comply with Court order). Hence, questions of the scope of the committee's jurisdiction over the port authority may, after all, be resolved against the noncomplying port authority officers without imposition of sanctions. In effect, the contempt procedure, followed by the committee, would fulfill the role of the declaratory judgment proceeding suggested by the attorney general of New Jersey.

[29] *American Machine & Metal, Inc. v. DeBothezat Impeller Co.*, 166 Fed. 2, 535 (2d Cir.) (1948). (Action for declaratory judgment nor involving constitutional issues "justiciable" for purposes of Declaratory Judgment Act when plaintiff must make an irrevocable decision which may place him at the peril of legal damages.)

[30] See letter of June 25, 1960, from Nelson Rockefeller, Governor of New York, to S. Sloan Colt, Inquiry 39.

[31] See e.g., *Burton v. United States*, 196 U.S. 283, 295 (1905) ("It is not the habit of the court to decide questions of constitutional nature unless absolutely necessary to a decision of a case."); cf. *Blair v. United States*, 250 U.S. 273, 279. (1919).

[32] *Muskrat v. United States*, 219 U.S. 346 (1910).

[33] 297 U.S. 288, 341 (1936).

[34] Cf. Brandeis rule 1, Ashvander, supra note 33, at 347.

[35] Even if a court did decide the issues in declaratory judgment proceeding, adverse to the port authority, the House for independent reasons might decide not to certify the matter to the Attorney General. Cf. *Reed v. Board*, 21 F. 2d 144 (1927); supra, pp. 5 and 6. Moreover, in Federal courts, a declaration of the validity of penal legislation may not be obtained without a threat of official prosecution. See *Halco Products v. McNutt*, 137 F. 2d 881 (D.C. Cir. 1943); cf. *San Francisco Lodge v. Forrestal*, 58 F. Supp. 466 (N.D. Cal. 1944).

[36] *Chicago & Grand Trunk Ry. v. Wellman*, 143 U.S. 339, 345 (1892).

[37] See Brandeis rule 1, Ashvander, supra, note 33, at 346; *Muskrat v. United States*, supra, note 32.

[38] Inquiry 60.

gested here simply does not ring true. In constitutional litigation the plaintiff is attacking the constitutional validity of some statute or action, the operation of which will cause injury to him. Indeed, one of the Court's basic "justiciability" rules has it that standing to raise constitutional issues necessarily involves an element of prejudice to the challenger-plaintiff.[39] Thus, in *Massachusetts* v. *Mellon*,[40] the Supreme Court refused to consider the merits of a suit brought by Massachusetts on its own behalf and that of its citizens attacking the validity of a Federal enactment, because that State was not prejudiced by the statute in its own right and could not claim standing as a benevolent parent of its citizens. The instant situation is an a fortiori case. Here, it is suggested that the committee, as plaintiff, institute a declaratory judgment proceeding, to defend, not attack, the constitutional validity of its own authority, in order to protect, not itself, but officers of an association which it is investigating, from the peril of a contempt action which it would set in motion. The committee thus would not only be unable to show that it might be injured from the operation of what it was attacking, it could not even show that it was attacking anything. Hence, the committee or "some other agency" of the Federal Government would lack standing to sue for a declaration of its authority to proceed with the port authority investigation.

Fourth, it is suggested that a judicial determination of "what are the boundary lines between the matters properly exclusively within the domain of the States and what are the matters which Congress can ferret out and investigate" be requested. The very terms of this "recommendation" are so broad as to convince the Court that it was being asked to decide an "abstract," vague and ill-defined question of constitutional law, a request which the Court has consistently turned down.[41]

Finally, the declaratory judgment action has not engendered the enthusiasm of the Court as a vehicle for constitutional litigation. Even prior to 1934, the year the Declaratory Judgment Act was passed, the Court was resisting attempts to obtain its advice on broad, abstract questions of constitutional interpretation through suits for declaration of rights. Thus, in *New Jersey* v. *Sargent*[42] a bill by a State for a judicial declaration against Federal officers that certain parts of the Federal Power Act were unconstitutional was rejected as not justiciable. After reviewing a long line of "justiciability" cases, including Muskrat, supra, the Court declared: "On reading the present bill we are brought to the conclusion * * * that its real purpose is to obtain a judicial declaration * * * that Congress exceeded its own authority."[43]

With the advent of the Declaratory Judgment Act, the Court was alert to warn that the new 1 nedy had not opened the door for advisory opinions or altered the "justiciability" rules. Significantly, one of the early cases was brought by the United States against West Virginia, in which the Federal Government sought, inter alia, a declaration of its right to control and use a certain stream.[44] The United States did not even attempt to sustain its bill under the Declaratory Judgment Act, so that the Court had merely to note that the Act "does not purport to alter the character of controversies which are the subject of the judicial power under the Constitution."[45] In dismissing the bill, the Court further characterized the suit not as one seeking protection against the invasion of any property right but merely an attempt to gain an authoritative resolution of a "difference of opinion between the officials of the two governments * * * whether there is power and authority in the Federal Government to control [the navigation of the rivers]."[46] In this context, it should be borne in mind that neither Congress nor the United States can claim any "invasion" of its rights from the action of the port authority. The port authority is not threatening to take any affirmative action. On the contrary, it is merely threatening to refrain from doing something which the committee wants it to do in order that the committee may execute its legitimate functions. The logical legal procedure for the committee to follow, in this case, is not to seek a declaration of rights but to seek a judicial remedy which will vindicate the authority of the committee.[47]

Finally, the Court put the matter to rest in the Ashwander case, supra, declaring:

"The act of June 14, 1934, providing for declaratory judgments, does not attempt to change the essential requisites for the exercise of judicial power. By its terms, it applies to 'cases of actual controversy,' a phrase which must be taken to connote a controversy of a justiciable nature, thus excluding an advisory decree upon a hypothetical state of facts."[48]

IV. SUIT BY PORT AUTHORITY FOR DECLARATORY JUDGMENT

It may be suggested that another mode of securing a declaratory judgment in the port authority matter would be for the port authority to bring suit for such relief. Although the attorney general of New Jersey did not recommend such a course of action at the outset, one wonders why the authority or the officers served with the subpenas did not even attempt to institute proceedings, if the declaratory judgment seemed to them such a marvelous panacea. The port authority has capacity to sue,[49] and, moreover, it would seem to have some standing to raise constitutional issues since it could claim that it would be prejudiced by the action of the committee which it would challenge as invalid.[50] However, a suit by the port authority would meet several effective roadblocks.

*1. Legislative immunity*

A suit by the port authority may fail for want of a proper defendant. A suit by the port authority which named the committee

---

[39] Brandeis rule 5, *Ashwander*, supra note 33, 347; See *Columbus & Greenville, Ry.* v. *Miller*, 283 U.S. 96, 101 (1931) (constitutional guaranty does not extend to the mere interest of an official, as such, who has not been injured).

[40] 262 U.S. 447 (1923).

[41] See *United States* v. *West Virginia*, 295 U.S. 463, 474, 475 (1934).

[42] 269 U.S. 328 (1926).

[43] Id. at 334.

[44] *United States* v. *West Virginia, supra*, note 41.

[45] 295 U.S. at 475.

[46] Id. at 475.

[47] Although civil, rather than criminal, contempt is normally the procedural route followed by the Courts when enforcement of a request rather than vindication of authority is the objective, there is no "civil" contempt of the House under the statute, 2 U.S.C. 192, 194. However, the same effect is achieved where, after conviction is upheld by all appellate courts, defendants purge their contempt by complying with the subcommittee's order and the Court then suspends sentence. This was the procedure followed in *U.S.* v. *Goldfine*, D.C., Dist. of Colum., Crim. No. 1158–58 (1959).

[48] 297 U.S. at 325; Accord *Coffman* v. *Breeze, Corp.* 323 U.S. 316 (1945); *Electric Bond & Share Co.* v. *SEC.,* 303 U.S. 419, 443 (1938). See also *Public Service Commission* v. *Wycoff Co.,* 344 U.S. 237 (1952).

[49] Port authority compact.

[50] Compare discussion of committee's standing to sue, above.

and/or its members as defendants might be rejected under the doctrine that legislators are to be free from civil process for what they do or say in legislative proceedings. U.S. Constitution, article I, section 6;[51] *Tenney* v. *Brandhove,* 341 U.S. 367 (1951); see *Kilbourn* v. *Thompson,* 103 U.S. 168 (1880).

In *Tenney* v. *Brandhove, supra,* the plaintiff brought a civil action against Tenney and other members of a committee of the California legislature investigating un-American activities. The action was based on 8 U.S.C. 43, 47(3) imposing civil liability on persons who, under color of law, deprive another of his constitutional rights of freedom of speech and petition. Brandhove alleged that the committee had denied him due process, and he sought damages in the amount of $10,000. The Supreme Court held that no cause of action against the committee and its members could be based on the statute by virtue of the doctrine of legislative immunity.

However, the Court pointed out that it was not holding that Congress could act outside its legislative role and defined the judicial function vis-a-vis congressional activity as follows: "The courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province."[52] Mr. Justice Black, concurring, thought that "today's decision indicates that there is a point at which a legislator's conduct so far exceeds the bounds of legislative power that he may be held personally liable under the Civil Rights Act."[53] At the same time, Black pointed out that Court, in denying the committee's amenability to suit, had not held its conduct legal. He suggested that the plaintiff Brandhove might still have plenty of room to contest the constitutionality of the committee's action in a proceeding instituted by the committee to fine or imprison him.

An older case, *Kilbourn* v. *Thompson,* 103 U.S. 168 (1880) strongly indicates that, notwithstanding any doubts about *Tenney* v. *Brandhove, supra,* neither the committee nor its members could be subjected to a suit by the port authority, even assuming arguendo, that the Court felt that the committee was exceeding its legislative jurisdiction in investigating the port authority. In Kilbourn, the plaintiff, who has been imprisoned by order of the House for contempt in refusing to supply one of its committees with certain material, brought suit to recover damages against the Sergeant at Arms, who had executed the imprisonment, and certain Members of the House, who had caused him to be brought before that body. The Supreme Court was convinced that the House resolution authorizing the investigation in which Kilbourn was asked to testify was in excess of the power conferred upon the House by the Constitution, and that the House and its committee were acting beyond their authority in requiring Kilbourn to testify and ordering him to prison.[54] It held that the Sergeant at Arms was liable, his having acted pursuant to the orders of the House being no defense. However, the Court refused to hold the defendant Members of the House liable. As to them, the protections of article I, section 6 of the Constitution, the immunity provision,[55] applied. The Court noted that these defendant Members had initiated the

---

[51] Art. I, sec. 6, of the Constitution, provides: "The * * * representatives * * * shall in all cases * * * be privileged from arrest during their attendance of the sessions of their respective Houses * * * and for any speech or debate in either House, they shall not be questioned in any other place."

[52] 341 U.S. at 378.

[53] Id. at 379.

[54] 103 U.S. at 192–196.

[55] See supra, note 51.

proceedings under which the plaintiff was arrested and had reported his refusal to testify to the House. In deciding that congressional immunity protected the Members, the Court in effect suggested that article I, section 6 might extend to all the official legislative acts in connection with the matter. Moreover, the protection was afforded even though, as the Court had observed, the acts were done in pursuance of legislative investigation which the House was not constitutionally authorized to conduct.[56] Thus, *Kilbourn* v. *Thompson, supra,* seems weighty precedent against a suit by the port authority. Certainly *Tenney* v. *Brandhove, supra,* did not purport to overrule Kilbourn.

The case most nearly in point, *Fishler* v. *McCarthy,* 117 F. Supp. 643 (S.D.N.Y.), 1954, affirmed, 218 F. 2d 164 (2d Cir., 1954), fully supports the position that a declaratory judgment action by the port authority would be dismissed as contrary to fundamental principles of constitutional government. In Fishler, plaintiffs were or had been employees of the Department of the Army. They were subpenaed to appear before the Permanent Subcommittee on Investigations of the Senate Committee on Government Operations in connection with an inquiry it was conducting. At the hearings before the Subcommittee the plaintiffs, then still under subpena, were asked to produce certain documents. They refused and were directed to comply by December 7, 1953. On December 8, 1953, they brought suit to enjoin Senator McCarthy as chairman of the subcommittee from forcing them to produce the documents. The complaint also sought a declaratory judgment declaring "the rights, powers, and duties of the plaintiffs herein, and with respect to the defendant herein, and with respect to plaintiff's obligations to the Department of the Army." In addition, the complaint sought to quash or modify the demand and subpena previously served on plaintiffs. The district court per Judge Irving Kaufman refused a motion for an injunction pendente lite and granted a cross motion to dismiss the action.

After noting that there were defects in venue and jurisdiction, Judge Kaufman concluded that the nature of the relief sought compelled dismissal of the complaint. "It is entirely clear," he wrote, "that neither this nor any other court may prescribe the subjects of congressional investigation. Were a court empowered to limit in advance the subjects of congressional investigations, violence would be done to the principle of separation of powers upon which our entire political system is based." (648) He then quoted from Justice Brandeis to emphasize the dangers to free government arising from judicial disregard of the doctrine of separation of powers by encroachment upon the powers of the legislature.

The court then suggested how the question of congressional authority might properly be presented:

"Of course the courts may require the performance of a purely ministerial act by a member of another branch of the Government. *Noble* v. *Union River Logging R. Co.,* 1892, 147 U.S. 165, 13 S. Ct. 271, 37 L. Ed. 123. And if the plaintiffs in fact refuse to comply with the subpena (which is not the case presented here) and are cited for contempt,

---

[56] The Court could not resist the temptation to offer a gratuitous remark: "It is not necessary to decide here that there may not be things done in the one House or in the other, of an extraordinary character, for which the Members who take part in the act may be held legally responsible." However, Mr. Justice Miller, who wrote the opinion, indicated that he was thinking in terms of such extremes as the House setting itself up to mete out capital punishment, as the French Assembly had done during the French Revolution (103 U.S. at 204, 205).

or comply and are faced with prosecution for violating military regulations, a justiciable controversy would then exist for determination. But, as I have indicated, it is quite clear that the question presented here has not 'ripened' for litigation, and restraints upon the defendant, if any, are at this time within the province of the Congress which established the subcommittee" (at 649).

Finally, as to the effect of the Declaratory Judgment Act, the Court declared:

"(T)he very first clause of the Declaratory Judgment Act limits its application to 'case(s) of actual controvers(ies) within its (the Court's) jurisdiction,' 28 U.S.C. 2201, and this controversy is beyond the jurisdiction of this Court because it seeks to enjoin the operation of a committee of another branch of the Government. There is no taking of property or infliction of punishment now before this Court. There is at best an allegation that the ramifications of the legislative act, once completed, may injure the plaintiffs. It would, as we have observed, be entirely proper for a court to consider the validity of the legislative act when and if its effect was in fact to injure the plaintiffs, as, for example, by prosecution for contempt. But the legislature cannot be compelled to submit to the prior approval and censorship of the judiciary before it may ask questions or inspect documents through its investigating subcommittees, or even before it enacts legislation, *New Orleans Water-Works Co.* v. *City of New Orleans,* 1896, 164 U.S. 471, 17 S. Ct. 161, 41 L. Ed. 518; *Hearst* v. *Black,* 1936, 66 App. D.C. 313, 87 F. 2d 68; *Alpers* v. *City and County of San Francisco,* C.C.N.D. Cal. 1887, 32 F. 503 any more than the judiciary can be compelled by the legislature to submit its rulings or decisions for legislative approval" (at 649, 650).

It is obvious that this case is clearly in point and that it disposes of any suggestion that the port authority might sue Mr. CELLER for a declaratory judgment in connection with the port authority inquiry.

*2. Doctrine of separation of powers*

Lower Federal courts have stoutly resisted attempts by litigants to seek their aid in curbing the actions of congressional committees through suits for injunctions on yet another ground, the doctrine that courts should not prematurely enjoin legislative action, even though unconstitutional. Thus, in *Hearst* v. *Black,* 87 F. 2d 68 (D.C. Cir., 1936), a publisher brought suit to enjoin a special Senate committee and the FCC from copying and using certain telegraphic messages in the possession of telegraph companies sent to him by his employees in the conduct of his business. The committee had subpenaed the messages from the companies and had asked the assistance of the FCC in securing compliance with the subpenas. The district court refused to grant the injunction, and the Court of Appeals affirmed. While deeming the action of the FCC illegal in making the contents of the messages available to the committee, the court held that it could not restrain the committee from using them. The court said:

"We are, therefore, of the opinion that the court below was right in assuming jurisdiction as to the commission, and if the bill had been filed while the trespass was in process it would have been the duty of the lower court by order on the commission or the telegraph companies or the agents of the committee to enjoin the acts complained of." [57]

In delivering itself of this dictum, the court in no way inferred that the members of the committee could be enjoined. The "agents" of the committee are not its members. Cf. *Kilbourn* v. *Thompson, supra.*

---

[57] 87 F. 2d at 71.

On the contrary, the court held that it had no power to enjoin action of the congressional committee and inferred that this would be so even if the committee were acting ultra vires the Constitution:

"The prayer of the bill is that the committee be restrained from keeping the messages or making any use of them or disclosing their contents. In other words, that if we find that the method adopted to obtain the telegrams was an invasion of appellant's legal rights, we should say to the committee and to the Senate that the contents could not be disclosed or used in the exercise by the Senate of its legitimate functions. We know of no case in which it has been held that a court of equity has authority to do any of these things. On the contrary, the universal rule, so far as we know it, is that the legislative discretion in discharge of its constitutional functions, whether rightfully or wrongfully exercised, is not a subject for judicial interference." [58]

The court relied upon the doctrine of separation of powers, and quoted several Federal court decisions for the proposition that the Judiciary lacks power to enjoin the enactment of even unconstitutional measures.[59]

In *Mins* v. *McCarthy,* 209 F. 2d 307 (D.C. Cir., 1953) the Court of Appeals held per curiam that where a committee of the Congress has issued a subpena ad testificandum to a witness to appear at a hearing, without defining the questions to be asked, "the judicial branch of Government should not enjoin in advance the holding of the hearing or suspend the subpena."

More recently in *Methodist Federation for Social Action* v. *Eastland,* 141 F. Supp. 729 (D.C. 1956), a three-judge court, including Judges Elgerton and Prettyman, dismissed a complaint in an action by a religious social action organization against members of the Senate Internal Security Subcommittee and others seeking a declaration that a certain congressional resolution directing publication of a certain Senate Document was unconstitutional, and an order enjoining defendants from printing and distributing the document. The court held that it lacked power to prevent the publication, since the document was ordered printed pursuant to resolution of both House and Senate, even if the document falsely declared that the organization was a communist front. It deemed article I, section 6, of the Constitution applicable. It also cited and relied upon the Hearst case, supra, in deciding that a judgment for the plaintiff would invade the constitutional doctrine of separation of powers. As to the members of the Senate subcommittee, the complaint was dismissed for lack of jurisdiction; as to the other defendants, the Public Printer and Superintendent of Documents, was dismissed for failure to state a claim on which relief could be granted.

Thus, it seems reasonably clear that the doctrine of legislative immunity or the doctrine of separation of powers, contained in the Constitution and the precedents discussed above would lead a court to dismiss a suit brought by the port authority against the committee, subcommittee, or members thereof on the grounds of congressional immunity.

*Waiver of Immunity*

It may be, although it has not yet been, suggested by adherents of the port authority that members of the committee might facilitate a declaratory judgment action by the

---

[58] Id. at 71.
[59] *McChord* v. *Louisville Ry.,* 183 U.S. 483 (1902); *New Orleans Waterworks Co.* v. *New Orleans,* 164 U.S. 471 (1896); *Alpars* v. *San Francisco,* 32 F. 503 (C.C. —) (not within competence of court to enjoin exercise of legislative power by legislative body, even though legislative action threatened may be unconstitutional).

port authority by waiving their immunity provided by article I, section 6, of the Constitution. It is submitted that this suggestion lacks merit.

In the first place, the congressional immunity doctrine is not the sole legal bar to a suit by the port authority, if it is a bar at all. In *Hurst v. Black, supra,* the Court in dismissing the action relied primarily on the doctrine that Judiciary lacks power to enjoin congressional activity under the doctrine of constitutional separation of powers. Application of this doctrine by a court is, of course, beyond the power of any member of the committee to control.

Second, it is very doubtful whether a Congressman could independently waive his immunity in order to open the way for a suit of this nature. It is well known that Representatives must secure the authorization of the House to even appear in a judicial proceeding when served with process. It would seem then that a resolution of the House, if not an act of Congress, would be required to authorize a Member of Congress to waive his immunity.[60] Carrying the matter even one step further, it is not even clear that Congress could constitutionally authorize a waiver of immunity. The Constitution provides that Senators and Representatives "shall not be questioned in any other place" for "any speech or debate in either House." Notwithstanding this provision, can one House of Congress provide that a Representative shall be so questioned?

Third, even if a waiver could be successfully executed, a court might feel that such a waiver of immunity had been motivated by a desire to obtain from the court an "advisory" opinion on the constitutional issues involved. It therefore might exercise its discretion to dismiss the suit on grounds of "justiciability."

### 3. Other objections

Assuming, for the sake of argument, that the port authority managed to get its foot in the door of a court in a declaratory judgment suit against the members of the committee, its troubles would not be over. It would still have to secure a decision from the lower court and it would ultimately have to convince the Supreme Court to take the case up on its merits. The same principles of "justiciability," which have been discussed in this memorandum in outlining the problems of a suit by the committeee, would obtain in a suit by the port authority. It is true that the port authority might have "standing" to raise the constitutional issues involved, where the committee did not possess such standing, because the port authority could show that it would be prejudiced by operation of the committee's action. However, the port authority would still have to show that constitutional adjudication was necessary as a last resort, that the suit was not one for "advice," that "abstract questions" were not being pressed, and that the suit was truly "adverse." As has been suggested earlier, any attempt by the committee to "cooperate" in such a suit (might not only be deemed collusive) it might also convince the Supreme Court that premature "advice" on broad constitutional questions was being asked.

### CONCLUSIONS

When all is said and done, one is still left with the question: If the port authority thought there was any possibility for a successful action for a declaratory judgment, why did it not bring such a suit itself? It at least could have established the applicability of the doctrine of congressional immu-

---

[60] See 7 Cannon's Precedents, sec. 2162 (1936).

nity to its case; perhaps it might have somehow succeeded in gaining a decision of a lower Federal court. While, as has been stressed in this memorandum, the rules of "justiciability" of the Supreme Court may well have blocked such a suit, those rules, after all, are informal rules of practice, and one cannot predict with certainty their application. Instead, the port authority has self-righteously proposed that the committee should initiate declaratory judgment proceedings and has insinuated that it was the committee's fault that such proceedings could not be implemented. It has been the purpose of this memorandum to determine whether this suggestion had any legal merit and whether the committee might have, if it so choose, instituted or implemented such an action.

One is left with some doubt as to whether this suggestion was preceded by grave and considerable reflection.

1. The committee presently lacks authority to sue for any judicial judgment, whether declaratory or otherwise (*Reed v. Board of Commissioners of Delaware County, supra*).

2. This proposition alone should dispose of the suggestion. But, in an effort to explore all possibilities, it has also been demonstrated that grave doubt exists even as to whether Congress might constitutionally authorize the committee to seek such a declaratory judgment at this state of the port authority inquiry. It is not clear at what stage a "case" or "controversy" exists, and Congress cannot ask the courts to take jurisdiction over a matter which does not involve a "case" or "controversy" (*Muskrat v. United States*).

3. Putting that question aside, this memorandum further strongly suggests that even if the committee was legally authorized to seek a declaratory judgment, the Supreme Court, whose decision of course would ultimately be sought, would reject such a suit on its merits by applying one or a number of the rules of justiciability, which the Court keeps on hand to avoid unnecessary constitutional decision. Concurring opinion in *Ashwander v. TVA*, supra.

In this connection, it is noted that the committee appears to lack standing to sue, for it cannot claim that it was being injured by the assertion of its own authority, *Massachusetts v. Mellon*, supra. The suit moreover seems to involve many elements of a nonadversary, friendly, request for advice, which the Court so firmly rejects. Finally, constitutional decision on the issues is not absolutely necessary until the House decides to cite for contempt.

Therefore, it is submitted that the suggestion the committee might institute and maintain a declaratory judgment proceeding lacks merit as a matter of law, as well as being fundamentally deficient as a matter of policy. For the Supreme Court's attempt to limit decision on constitutional questions is not a matter of caprice or indolence. It is an integral, and a highly desirable tenet of constitutional government. To interfere with that policy of the Supreme Court or to take a position adverse to it should not be the function of the Judiciary Committee of the House of Representatives.

4. Furthermore, the port authority cannot maintain a suit against the members of the committee because under the doctrine of congressional immunity, and/or the doctrine of separation of powers, no court would have jurisdiction over such a suit. *Tenney v. Brandhove, supra; Kilbourn v. Thompson, supra; Hearst v. Black, supra; Mins v. McCarthy, supra; Methodist Federation v. Eastland, supra; Fishler v. McCarthy, supra*.

In view of the foregoing considerations and authorities, it is concluded that there is no legal merit in the suggestion that a suit for declaratory judgment might be brought in connection with the port authority inquiry.

### ADDENDUM

In suggesting the declaratory judgment proceeding, the attorney general of New Jersey may have been inspired by a New Jersey case in which he, as deputy attorney general of New Jersey, participated on brief for plaintiff-appellant. *Morss v. Forbes*, 24 N.J. 341, 132 A. 2d 1 (1957). There, a New Jersey county prosecutor was served with a subpena duces tecum issued by a committee of the State legislature requiring him to produce certain records. He refused to do so and instituted an action in the State courts against members of the committee for an injunction and declaratory judgment. The lower court (superior court, chancery division) assumed jurisdiction and decided against plaintiff. On appeal by the plaintiff, the Supreme Court of New Jersey declined to pass on the jurisdictional aspects of the case and determined to render a decision on the merits since the defendant committee members had withdrawn their objections to the jurisdiction and joined in the petition that the constitutionality of certain challenged State statutes be tested. However, the court warned that it was by no means opening its doors to such suits on a regular basis:

"We shall therefore adjudicate the validity of the last-cited statute, but this is by no means to be considered a precedent establishing a procedure whereby anyone who feels he might be 'put upon' by the subpena or questions of a legislative committee can turn to the courts for a declaratory judgment vindicating his surmise." (132 A. 2d 6.)

In view of this language, it is highly doubtful that even the New Jersey Supreme Court, before which the attorney general of New Jersey practices, would take jurisdiction over a suit for a declaratory judgment brought by the port authority against members of the committee, assuming that somehow venue and service in New Jersey could be obtained. Such a suit, as distinguished from the action in *Morss v. Forbes, supra*, would involve a challenge to the validity of the action of Congress, not the New Jersey Legislature, and would call for resolution of Federal constitutional issues. Moreover, as has been pointed out, the Federal courts and in particular the Supreme Court of the United States, have generally established far stricter standards of justiciability than the State courts. Hence, *Morss v. Forbes, supra*, would hardly convince the Federal courts to abandon their normal attitude as expressed, for example, in *Fishler v. McCarthy*, toward a suit seeking to nip congressional action in the bud.

The SPEAKER. The time of the gentleman from New Jersey [Mr. RODINO] has expired.

Mr. GROSS. Mr. Speaker, despite all the charges that have been leveled against the Port of New York Authority I have yet to hear an acceptable answer to my question as to why the Legislature of New York or the Legislature of New Jersey, or both, have taken no action.

And if the legislatures have failed it is difficult to believe that the Justice Departments of either or both of the two States and their attorneys general have been completely remiss in their duties and responsibilities.

It is my contention that the Judiciary Committee of the House of Representatives should have insisted that the legislative bodies of the two States, together with their justice departments, take forthright action to correct any wrongdoing that exists in the administration of the Port of New York Authority be-

fore calling upon all the Members of the House of Representatives to support such drastic action as the citing of certain officials for contempt.

It should be remembered that Congress granted the compact; it did not create the authority.

It should also be kept clearly in mind that Congress has granted many other compacts throughout the Nation. Does this action open the door to further invasions by Congress of other State administrations of authorities growing out of federally sanctioned compacts?

Mr. Speaker, it is difficult for me to believe that the States of New York and New Jersey are so irresponsible that it is necessary for the Federal Government to move in and put their public affairs in order.

It is difficult for me to believe that the citizens of those two States are so lacking in their sense of public responsibility that they would not insist that their officials resolve their difficulties in this respect.

To vote for these contempt citations is, in my opinion, an indictment not only of the public officials of the States of New York and New Jersey, but also an indictment of the millions of citizens.

I refuse to believe, without the benefit of documented evidence, that the Port of New York Authority is in the nature of a supergovernment which cannot be held accountable by the governments and the people of two great States.

I cannot and will not support the contempt citations until convincing evidence is provided that these States are incompetent through their governments to manage their own affairs.

Mr. CELLER. Mr. Speaker, I move the previous question.

The previous question was ordered.

The SPEAKER. The question is on the resolution.

The question was taken; and upon a division (demanded by Mr. LINDSAY) there were—ayes 190, noes 60.

So the resolution was agreed to.

A motion to reconsider was laid on the table.

MESSAGE FROM THE SENATE

A message from the Senate by Mr. Carrell, one of its clerks, announced that the Senate disagrees to the amendment of the House to the bill (S. 2633) entitled "An act to amend the Foreign Service Act of 1946, as amended, and for other purposes," requests a conference with the House on the disagreeing votes of the two Houses thereon, and appoints Mr. FULBRIGHT, Mr. SPARKMAN, Mr. MANSFIELD, Mr. HICKENLOOPER, and Mr. CAPEHART to be the conferees on the part of the Senate.

AMENDMENT OF FOREIGN SERVICE ACT OF 1946

Mr. HAYS. Mr. Speaker, I ask unanimous consent to take from the Speaker's table the bill (S. 2633) to amend the Foreign Service Act of 1946, as amended, and for other purposes, with a House amendment thereto, insist on the House amendment, and agree to the conference asked by the Senate.

CVI——1089

The Clerk read the title of the bill.

The SPEAKER. Is there objection to the request of the gentleman from Ohio? The Chair hears none, and appoints the following conferees: Mr. HAYS, Mrs. KELLY, Mr. FARBSTEIN, Mr. BENTLEY, and Mrs. BOLTON.

PROCEEDINGS AGAINST S. SLOAN COLT

Mr. CELLER. Mr. Speaker, I send to the desk a privileged report (Rept. No. 2120) from the Committee on the Judiciary in relation to the conduct of S. Sloan Colt.

The SPEAKER. The Clerk will read the report.

The Clerk read as follows:

PROCEEDINGS AGAINST S. SLOAN COLT

Subcommittee No. 5 of the Committee on the Judiciary, as created and authorized by the House of Representatives through the enactment of Public Law 601, section 121, of the 79th Congress, and under House Resolution 27 and House Resolution 530, both of the 86th Congress, caused to be issued a subpena duces tecum to S. Sloan Colt, chairman, board of commissioners of the Port of New York Authority, 111 Eighth Avenue, New York, N.Y. The subpena directed S. Sloan Colt to be and appear before Subcommittee No. 5 of the Committee on the Judiciary, at 10 a.m. on June 29, 1960, in their chamber in the city of Washington, and to bring with him from the files of the Port of New York Authority certain specified documents, and to testify touching matters of inquiry committed to the subcommittee.

The subpena was duly served as appears by the return made thereon by counsel for the committee who was duly authorized to serve the subpena.

S. Sloan Colt, pursuant to the subpena duly served upon him, appeared before Subcommittee No. 5 of the Committee on the Judiciary on June 29, 1960, to give testimony as required by Public Law 601, section 121, of the 79th Congress, and by House Resolutions 27 and 530 of the 86th Congress. However, S. Sloan Colt, having appeared as a witness and having complied in part with the subpena duces tecum served upon him by bringing with him part of the documents demanded therein, (1) failed and refused to produce certain other documents in compliance with the subpena duces tecum, which documents are pertinent to the subject matter under inquiry, and (2) failed and refused to produce certain documents as ordered by the subcommittee, which documents are pertinent to the subject matter under inquiry.

At those proceedings the subcommittee chairman explained in detail the authority for the subcommittee's inquiry, the purpose of the inquiry, and its scope. The subcommittee also gave to the witness a lengthy and detailed explanation of the pertinence to its inquiry of each category of documents demanded in the subpena served upon the witness. Notwithstanding these explanations and notwithstanding a direction by the subcommittee to produce the documents required by the subpena, S. Sloan Colt contumaciously refused to produce the following categories of documents under his control and custody:

(1) Internal financial reports, including budgetary analyses, postclosing trial balances, and internal audits; and management and financial reports prepared by outside consultants;

(2) All agenda of meetings of the board of commissioners and of its committees; all reports to the commissioners by members of the executive staff; and

(3) All communications in the files of the Port of New York Authority and in the files of any of its officers and employees including correspondence, interoffice and other memorandums, and reports relating to:

(a) The negotiation, execution, and performance of construction contracts; negotiation, execution, and performance of insurance contracts, policies, and arrangements; and negotiation, execution, and performance of the public relations contracts, policies, and arrangements;

(b) The acquisition, transfer, and leasing of real estate;

(c) The negotiation and issuance of revenue bonds;

(d) The policies of the authority with respect to the development of rail transportation.

The subcommittee was thereby deprived by S. Sloan Colt of information and evidence pertinent to matters of inquiry committed to it under House Resolutions 27 and 530, 86th Congress. His persistent and illegal refusal to supply the documents as ordered deprived the subcommittee of necessary and pertinent evidence and places him in contempt of the House of Representatives.

Incorporated herein as appendix I is the record of the proceedings before Subcommittee No. 5 of the Committee on the Judiciary on the return of the subpenas duces tecum served upon S. Sloan Colt and others. The record of proceedings contains, with respect to Mr. Colt:

(1) The full text of the subpena duces tecum (appendix, pp. 21–22);

(2) The return of service of the subpena by counsel for the committee, set forth in words and figures (appendix, p. 26);

(3) The failure and refusal of the witness to produce documents required by the subpena issued to and served upon him (appendix, pp. 23–25);

(4) The explanation given to the witness as to the authority for, purpose and scope of, the subcommittee's inquiry (appendix, pp. 1–20);

(5) The explanation given the witness of the pertinence of each category of requested documents (appendix, pp. 48–52);

(6) The subcommittee's direction to the witness to produce the required documents (appendix, pp. 52–53);

(7) The failure and refusal of the witness to produce the documents pursuant to direction (appendix, pp. 53–54);

(8) The ruling of the chairman that the witness is in default (appendix, p. 55).

OTHER PERTINENT COMMITTEE PROCEEDINGS

At the organizational meeting of the Committee on the Judiciary for the 86th Congress, held on the 27th day of January 1959, Subcommittee No. 5 was appointed and authorized to act upon matters referred to it by the chairman. On June 8, 1960, at an executive session of Subcommittee No. 5 of the Committee on the Judiciary, at which Chairman Emanuel Celler, Peter W. Rodino, Jr., Byron G. Rogers, Lester Holtzman, Herman Toll, William M. McCulloch, and George Meader were present, Subcommittee No. 5 formally instituted an inquiry into the activities and operations of the Port of New York Authority under the interstate compacts approved by Congress in 1921 and 1922. At that meeting the subcommittee also unanimously resolved to request the following specified items from the files of the Port of New York Authority by letter and to subpena the same documents from the appropriate officials in the event this information was not voluntarily supplied:

(1) All bylaws, organization manuals, rules, and regulations;

(2) Annual financial reports; internal financial reports, including budgetary analyses, postclosing trial balances, and internal