## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMITTEE ON WAYS AND MEANS, UNITED STATES HOUSE OF REPRESENTATIVES, )<br><br>*Plaintiff*, )<br><br>v. )<br><br>UNITED STATES DEPARTMENT OF THE TREASURY, *et al.*, )<br><br>*Defendants*, )<br><br>and )<br><br>DONALD J. TRUMP, *et al.*, )<br><br>*Defendant-Intervenors.* ) | No. 1:19-cv-1974-TNM |

## DECLARATION OF FREDERICK W. VAUGHAN

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1.      I serve as Deputy Assistant Secretary for Legislative Affairs at the U.S. Department of the Treasury (the "Department" or "Treasury"), a position I have held since February 4, 2019, when I first joined the Department. In this capacity, I am responsible for managing the Department's engagement with Congress on all congressional oversight requests. My responsibilities since joining the Department include engaging with the Congress on this and other issues to accommodate the Congress's interest in obtaining information related to its legislative objectives.

2.      I submit this declaration in support of the Defendants' motion to dismiss the above-captioned case. The statements made herein are based on my personal knowledge and on information made available to me in the course of carrying out my duties and responsibilities as Deputy Assistant Secretary for Legislative Affairs.

3.      Before I joined the Department, it was widely reported that Members of the 116th Congress would prioritize obtaining and making public copies of the tax returns of the President of the United States, Donald J. Trump, and would seek to do so by means of a request to the Secretary of the Treasury from the Chairman of the Committee on Ways and Means of the U.S. House of Representatives, Richard E. Neal, invoking section 6103(f) of the Internal Revenue Code, 26 U.S.C. § 6103(f).

4.      On March 14, 2019, before any request for the President's tax returns invoking 26 U.S.C. § 6103(f) had been made, I accompanied Treasury Secretary Steven T. Mnuchin to a Ways and Means Committee hearing at which the Secretary was to testify. (A copy of the hearing transcript, which also is publicly available on the Committee's website, is attached as Exhibit A.)  During the course of the hearing, multiple members of the Committee spoke of their interest in Congress obtaining President Trump's tax returns. (See Exhibit A at pp. 22-24, 40-41, 87-88.)  They asked the Secretary how the Department would respond to the request for the President's tax returns that they expected would be forthcoming. (See, e.g., Exhibit A at pp. 22-24.)

5.      Secretary Mnuchin repeatedly declined to speculate at the hearing about a hypothetical request and instead testified that if Treasury were to receive a request for the President's tax returns, the Department would review the legality of the actual request and follow the law. (See, e.g., Exhibit A at p. 22.)  The Secretary also expressed his willingness to accept

any such request for review that day if one had already been prepared by the Committee. (See Exhibit A at p. 24.)

6.      At the hearing, none of the 42 Members of the Ways and Means Committee asked the Secretary any questions about the process by which the Internal Revenue Service (IRS) audits and enforces the Federal tax laws against a President. The Secretary was, however, asked during the hearing how Congress can know whether President Trump benefited from the Tax Cuts and Jobs Act, Pub. L. 115-97, "without seeing [the President's] tax returns."   (See Exhibit A at pp. 40-41.)

7.      On the afternoon of April 3, 2019, three months after the 116th Congress had convened, I was informed that a letter from Chairman Neal had been delivered to IRS Commissioner Charles P. Rettig requesting copies of the confidential tax returns of President Trump and eight related business entities, as well as "[a]ll administrative files (workpapers, affidavits, etc.)" for each return. Chairman Neal's April 3 letter requested the tax returns and related return information of the President and his companies going back to tax year 2013 and requested that all of this information be provided within one week of the request.

8.      A copy of Chairman Neal's April 3, 2019, letter, which the Ways and Means Committee made publicly available that same day, is attached as Exhibit B.

9.      So far as I am aware, prior to April 3, 2019, neither Treasury nor the IRS had received, at any time since the 116th Congress had convened, a request from Chairman Neal, from any other member of the Ways and Means Committee, or from anyone on the Committee's staff for information about the process by which the IRS audits and enforces the Federal tax laws against a sitting President.

10.     Upon receiving a copy of Chairman Neal's April 3 letter to Commissioner Rettig, Treasury began a review to determine whether the Department could lawfully disclose the tax returns and return information of the President and his companies that the Chairman had requested.

11.     On April 10, 2019, I transmitted a letter from Secretary Mnuchin to Chairman Neal via electronic mail to the Staff Director of the Ways and Means Committee. A copy of my transmittal e-mail and the April 10 letter are attached as Exhibit C.

12.     The Secretary's April 10 letter stated that the Department "[would] not be able to complete its review of [Chairman Neal's] request" within the one week period identified by Chairman Neal. The Secretary explained that the Department could not meet this deadline for several reasons, including that, because of the legal implications of the request, Treasury had "begun consultations with the Department of Justice to ensure that [its] response is fully consistent with the law and the Constitution."  Secretary Mnuchin also explained that although Chairman Neal had directed his request to the IRS, a bureau of Treasury, the Secretary would appropriately "supervise the Department's review of the Committee's request to ensure that taxpayer protections and applicable laws are scrupulously observed, consistent with [the Secretary's] statutory responsibilities."

13.     On April 13, 2019, Chairman Neal sent another letter to Commissioner Rettig, a copy of which the IRS forwarded to Treasury. A copy of the Chairman's April 13 letter is attached as Exhibit D. In his April 13 letter, Chairman Neal requested that the IRS respond to his April 3 request for the tax returns and return information of the President and his companies by 5:00 p.m. on April 23, 2019, and stated that any failure to do so "will be interpreted as a denial of [his] request."

14.     On the afternoon of April 23, 2019, Secretary Mnuchin spoke with Chairman
Neal to convey the status of the Department's review of the Chairman's April 3 request and to
advise him that, as stated in a letter Treasury would send that day, the Department expected to
provide a final decision on the Committee's request by May 6, 2019. The Secretary made clear
that the projected time frame for the response was based on the time necessary to receive the
required legal advice.

15.     Shortly after this conversation on April 23, I sent an e-mail to the Staff Director of
the Ways and Means Committee attaching (i) a second letter from Secretary Mnuchin to
Chairman Neal concerning the Chairman's request, and (ii) two appendices to the letter. Copies
of my April 23 transmittal e-mail, the April 23 letter, and the accompanying appendices are
attached as Exhibit E.

16.     The April 23 letter provided an update on the Department's review of the
Committee's request and explained some of the legal concerns and potential consequences for
taxpayer privacy that prompted the Department to consult with the Department of Justice about
the request. Specifically, the Secretary explained that in light of widespread public evidence that
the purpose of the request is the public release of the President's tax returns, and that the request
lacked a legitimate legislative purpose as the Constitution requires, the Department was
concerned that the Chairman's request may have exceeded the scope of Congress's authority
and, therefore, that section 6103(f) would not authorize disclosure of the requested information.

17.     As also explained in the letter, the appendices provide (i) in Appendix A, a
summary of the public record demonstrating that the animating purpose of the Committee's
request was and remains exposure of the President's private tax information, and (ii) in

Appendix B, an additional catalogue of statements concerning efforts to obtain the President's tax returns that culminated in the April 3 request.

18.     In addition, in his April 23 letter Secretary Mnuchin offered that "[t]o the extent the Committee wishes to understand, for genuine oversight purposes, how the IRS audits and enforces the Federal tax laws against a President, we would be happy to accommodate that interest by providing additional information on the mandatory audit process."

19.     On May 6, 2019, in accordance with the Secretary's commitment to Chairman Neal, I sent a third letter on this issue from Secretary Mnuchin to Chairman Neal, as well as updated copies of the two appendices provided on April 23, via an e-mail to the Staff Director of the Ways and Means Committee. Copies of my May 6 transmittal e-mail, the May 6 letter, and the accompanying updated appendices are attached as Exhibit F.

20.     The Secretary's May 6 letter informed Chairman Neal that "[i]n reliance on the advice of the Department of Justice," Treasury had concluded that "the Department [was] not authorized to disclose the requested returns and return information."

21.     The Secretary's May 6 letter also renewed Treasury's "previous offer," as stated in the Secretary's April 23 letter, "to provide information concerning . . . how the IRS conducts mandatory examinations of Presidents . . . [i]f the Committee is interested[.]"

22.     The Department received its next communication from the Committee on May 10, 2019—in an e-mail sent to me by the Staff Director for the Subcommittee on Oversight of the Ways and Means Committee, Karen McAfee, asking me to call her to discuss the delivery of unspecified documents to the Secretary.

23.     Shortly after I received her e-mail, I telephoned Ms. McAfee, and she informed me that the Committee intended to serve Secretary Mnuchin with a subpoena and asked if I would waive in-person service and receive the subpoena on his behalf. I confirmed that I would.

24.     I then received an e-mail attaching a letter from Chairman Neal to Secretary Mnuchin and Commissioner Rettig with a subpoena addressed to Secretary Mnuchin seeking the same tax returns and related return information of the President and his companies that the Chairman had requested on April 3. A copy of this e-mail and the enclosed letter and subpoena are attached hereto as Exhibit G. An identical letter and subpoena were also sent to Commissioner Rettig.

25.     In his May 10 letter accompanying the subpoena, the Chairman expressed "appreciat[ion]" for "Treasury's offer of a briefing" but remarked that "[a] briefing … is not a substitute for the requested tax returns and return information."

26.     Treasury responded to the Chairman's May 10 letter and the Committee's subpoena on May 17, 2019. On that date, I transmitted the fourth letter on this issue from Secretary Mnuchin to Chairman Neal via an e-mail to Committee staff. A copy of that e-mail and the letter is attached as Exhibit H.

27.     The Secretary's May 17 letter explained that the Department was unable to provide the requested tax returns and return information in response to the Committee's subpoena for the same reasons that it could not provide that information in response to the Chairman's April 3 request. Specifically, the Secretary reiterated that "[i]n reliance on the advice of the Department of Justice, we have determined that the Committee's request lacks a legitimate legislative purpose, and pursuant to section 6103, the Department is therefore not authorized to disclose the requested returns and return information."

28.     Secretary Mnuchin's May 17 letter also again offered to accommodate the Committee's stated interest in the mandatory audit process by providing information regarding that process.

29.     On May 17, Commissioner Rettig responded to Chairman Neal in a separate letter, which provided certain information relevant to the Committee's stated concerns pertaining to the mandatory audit process and offered to provide additional information on that process. A copy of this letter is attached as Exhibit I.

30.     On May 22, 2019, Treasury and IRS staff received an e-mail from Ms. McAfee inquiring—for the first time since the Committee requested the President's tax returns nearly two months earlier—about the proposal made in the several earlier letters from Secretary Mnuchin and Commissioner Rettig to provide the Committee additional information on the mandatory audit process.

31.     The e-mail from Ms. McAfee did not include a request from Chairman Neal, pursuant to 26 U.S.C. § 6103(f), that the briefing specifically include return information protected from disclosure by section 6103(a).

32.     To my knowledge, the May 22 e-mail was the first time the Committee expressed to Treasury or IRS any interest in any information regarding the mandatory audit process other than the specific tax returns and return information requested by Chairman Neal on April 3 and May 10 pertaining to the President and his companies.

33.     On May 24, 2019, I responded to the Committee staff's request for additional information on the mandatory audit process. I explained that the Department would be "happy to provide a detailed briefing to the Committee on the mandatory audit process" but "want[ed] to make sure that we have the right experts available to provide the information you're interested

in." To that end, I requested that staff "[p]lease let us know what particular aspects of the audit process you would like the briefing to focus on."

34.     Ms. McAfee responded that day: "We would like to speak to the experts that are involved with the audits. We want to understand exactly what happens from the moment the returns enter the mail to the IRS through the time that the audit is completed. Our questions go beyond what is outlined in the [Internal Revenue Manual (IRM)]."

35.     The Committee did not explain in what respect its questions went beyond what is provided in the IRM. Nor did the Committee explain in any way the aspects of the audit process that the Committee hoped would be explained during the briefing. A copy of the e-mail chain reflecting these communications, going back to Ms. McAfee's May 22 e-mail, is attached at Exhibit J.

36.     After further emails pertaining to scheduling, a briefing was scheduled for June 10, 2019, at 9:00 a.m. Treasury and IRS staffs committed to stay as long as necessary to complete the briefing and provide answers to the Committee's questions. A copy of an e-mail exchange confirming the briefing is attached as Exhibit K.

37.     Because the Committee had provided no indication of any specific aspects of the Presidential audit process it wanted the briefing to cover, IRS and Treasury staff worked collaboratively to ensure that the briefing included experts on the mandatory audit process and that it thoroughly covered the process from the moment a return is delivered to the IRS through the time that the audit is completed, including details about the process that are not explicitly set forth in the IRM.

38.     As noted above, Committee staff's May 22 and May 24 messages concerning information the Committee sought on the mandatory audit process did not indicate that it sought

return information protected by 26 U.S.C. § 6103(a). On the evening of Friday, June 7, 2019—the last business day before the briefing was scheduled to occur at 9:00 a.m. on Monday, June 10—Ms. McAfee sent two letters (dated June 4 and 5) from Chairman Neal via e-mail to the IRS for the stated purpose of providing blanket authorization for certain Committee staff members to receive unspecified confidential returns and return information protected under 26 U.S.C. § 6103(a) related to IRS audits of a President and enforcement of the Federal tax laws against a President. Copies of these e-mails and the attached letters, as forwarded to me on Saturday, June 8, 2019, are attached as Exhibit L.

39.     The staffs for Treasury, IRS, and the Ways and Means Committee had previously exchanged at least 14 e-mails concerning the briefing between May 22 and the evening of June 7. To my knowledge, none of this correspondence stated or suggested that the Committee wanted the briefing to include confidential information protected by 26 U.S.C. § 6103(a).

40.     More broadly, and to my knowledge, prior to June 7 the Committee staff had not communicated to anyone at Treasury or the IRS involved in coordinating or preparing for the briefing that the Committee staff expected the briefing to include such information.

41.     On June 10, two other Treasury officials and I accompanied the following IRS officials to the scheduled briefing:

    a.   Kirsten Wielobob, Deputy Commissioner for Services and Enforcement

    b.   Diane Grant, Senior Advisor to the Office of the Commissioner

    c.   Michael Desmond, IRS Chief Counsel

    d.   Thomas Cullinan, Counselor to the Commissioner and Chief Counsel

    e.   Robert Chapman, Analysis, Legislative Affairs, IRS

42.     The briefing began a few minutes after 9:00 a.m., conducted initially by Ms. Wielobob and Ms. Grant. Ms. Wielobob oversees the divisions responsible for conducting any mandatory audit of a covered officeholder. Ms. Grant has served in the IRS Office of the Commissioner through multiple administrations and has extensive historical knowledge of the mandatory audit process and IRS processes more generally. Committee staff for the majority and minority were present for the briefing, but neither Chairman Neal nor any other Member of the Ways and Means Committee attended.

43.     Consistent with the direction provided by Committee staff on May 24, the presentation provided by Ms. Wielobob and Ms. Grant was comprehensive, focusing on how the mandatory audit process operates from the moment a return is delivered to the IRS through the time that the audit is completed.

44.     Although no information protected by 26 U.S.C. § 6103 was provided (or legally could have been provided) during the briefing, Ms. Wielobob and Ms. Grant presented a set of 34 slides explaining in detail how the mandatory audit process works.

45.     The prepared presentation covered the following areas: (i) an overview of the process; (ii) special processing procedures for the returns of covered officeholders; (iii) how the returns of officeholders are assigned for mandatory examination; (iv) processes for ensuring the impartiality of the mandatory examination; (v) the mandatory examination process itself, including how the audit is planned, contact that occurs with an officeholder's representative, information gathering by the IRS, and exam determinations and potential responses; (vi) potential consideration by the IRS Office of Appeals; and (vii) when judicial review may be required. Also included as part of the presentation were examples of documentation that is related to the mandatory audit process.

46.     The presentation by Ms. Wielobob and Ms. Grant lasted approximately one hour, after which the IRS officials present at the briefing spent a total of approximately two hours addressing more than 150 questions asked by Committee staff. The IRS officials answered the majority of questions from Committee staff that did not seek privileged information or implicate information that, as the IRS officials explained at the time, is or may be protected by 26 U.S.C. § 6103(a).

47.     Numerous questions posed by Committee staff at the briefing or in pre-written materials submitted afterward sought protected return information relating to President Trump. This included items bearing on the content of President Trump's returns, such as how the IRS verified wages/salary, whether any income issues had been examined, and what deductions had been examined for all tax returns filed by President Trump while in office. Similarly, Committee staff asked what the sources of income were and whether any assessments had been issued for presidential tax returns in the past two years. The Committee also sought details about the physical location of copies of returns and related IRS work papers, as well as the identities of individuals having access to return information.

48.     The briefing concluded at approximately 12:40 p.m., with Treasury and IRS officials having made themselves available to the Committee staff for more than three and a half hours.

49.     Following the briefing, I sent to Chairman Neal a June 10, 2019, letter confirming that senior officials from the IRS had provided to Committee staff a briefing on the process by which the IRS audits and enforces the Federal tax laws with respect to Presidents of the United States. In my June 10 letter I also reaffirmed the Department's commitment to continuing to address the Committee's stated interest in this process within the limits of the law.

50.     Additionally, in my e-mail transmitting this letter, I provided a copy of the slides that had been prepared by IRS officials and the exhibits referenced by those slides. I invited the Committee staff to share any follow-up questions that they had. A copy of the e-mail transmitting my June 10 letter and these materials (the slides and exhibits accompanying them) is attached as Exhibit M.

51.     On June 13, 2019, Ms. McAfee responded to my e-mail and attached a list of 291 questions that the Committee staff had prepared prior to the briefing. A copy of this June 13 e-mail and the list of prepared questions is attached as Exhibit N.

52.     Recognizing that many of the questions on the list provided after the briefing had been asked and answered at the briefing, I sent an e-mail to Ms. McAfee on June 21, 2019, thanking her for sharing the list of prepared questions, noting that many were answered at the briefing, and asking which of the outstanding questions on the list the Committee staff would like Treasury and the IRS to prioritize in preparing responses. I also informed her that some of the requested information could take time to track down. A copy of my June 21 e-mail is attached as Exhibit O.

53.     On June 25, 2019, Ms. McAfee responded to my June 21 e-mail in a message that read in its entirety:  "You are welcome. The authorization letters are sufficient. Please feel free to provide the answers on a rolling basis." A copy of this e-mail is attached as Exhibit P. No further clarification or guidance was provided.

54.     Three days later, on June 28, 2019, I received an e-mail from Committee staff transmitting a letter from Chairman Neal to Secretary Mnuchin and Commissioner Rettig. A copy of this e-mail and accompanying letter are attached as Exhibit Q.

55.     The Chairman's letter began by observing that the tax returns and return information covered by the Committee's May 10 subpoena had not been provided and then asserted that "the information conveyed at the [June 10] briefing," which the Chairman described as "limited," "is not a replacement for the actual return and return information that the Committee requested under section 6103(f)."

56.     Two business days later, on July 2, 2019, the Committee on Ways and Means filed suit in federal district court, seeking to compel production of the Presidential tax returns and return information requested by Chairman Neal on April 3 and to enforce the Committee's May 10 subpoena.

57.     To date, no one from the Committee has identified which of the 291 questions on the list that was transmitted to me following the June 10 briefing are a priority to the Committee, identified which of the questions the Committee believes remain unanswered, or inquired about the status of Treasury's responses to any of the questions.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September _6_, 2019.

Frederick W. Vaughan

FREDERICK W. VAUGHAN

14

# EXHIBIT A

# Hearing on The President's 2020 Budget Proposal

_____

## HEARING

BEFORE THE

## COMMITTEE ON WAYS AND MEANS

## U.S. HOUSE OF REPRESENTATIVES

ONE HUNDRED SIXTEENTH CONGRESS

FIRST SESSION

_____

March 14, 2019

_____

## Serial No.   116-14

_____

| COMMITTEE ON WAYS AND MEANS | |
|---|---|
| RICHARD E. NEAL, Massachusetts, Chairman | |
| JOHN LEWIS, Georgia | KEVIN BRADY, Texas, Ranking Member |
| LLOYD DOGGETT, Texas | DEVIN NUNES, California |
| MIKE THOMPSON, California | VERN BUCHANAN, Florida |
| JOHN B. LARSON, Connecticut | ADRIAN SMITH, Nebraska |
| EARL BLUMENAUER, Oregon | KENNY MARCHANT, Texas |
| RON KIND, Wisconsin | TOM REED, New York |
| BILL PASCRELL, JR., New Jersey | MIKE KELLY, Pennsylvania |
| JOSEPH CROWLEY, New York | GEORGE HOLDING, North Carolina |
| DANNY K. DAVIS, Illinois | JASON SMITH, Missouri |
| LINDA SÁNCHEZ, California | TOM RICE, South Carolina |
| BRIAN HIGGINS, New York | DAVID SCHWEIKERT, Arizona |
| TERRI A. SEWELL, Alabama | JACKIE WALORSKI, Indiana |
| SUZAN DELBENE, Washington | DARIN LAHOOD, Illinois |
| JUDY CHU, California | BRAD R. WENSTRUP, Ohio |
| GWEN MOORE, Wisconsin | JODEY ARRINGTON, Texas |
| DAN KILDEE, Michigan | DREW FERGUSON, Georgia |
| BRENDAN BOYLE, Pennsylvania | RON ESTES, Kansas |
| DON BEYER, Virginia | |
| DWIGHT EVANS, Pennsylvania | |
| BRAD SCHNEIDER, Illinois | |
| TOM SUOZZI, New York | |
| JIMMY PANETTA, California | |
| STEPHANIE MURPHY, Florida | |
| JIMMY GOMEZ, California | |
| STEVEN HORSFORD, Nevada | |
| g | |

**Hearing on The President's 2020 Budget Proposal**

U.S. House of Representatives,
Committee on Ways and Means,
Washington, D.C

————————————————

**WITNESS**

The Honorable Steven T. Mnuchin, Secretary, United States Department of the Treasury

_____



# HOUSE COMMITTEE ON WAYS & MEANS
## CHAIRMAN RICHARD E. NEAL

# *ADVISORY*

## FROM THE COMMITTEE ON WAYS AND MEANS

FOR IMMEDIATE RELEASE                                    CONTACT: (202) 225-3625

March 7, 2019

No. FC-7

**Chairman Neal Announces a Hearing on The President's Fiscal Year 2020 Budget Proposal with U.S. Secretary of the Treasury Steven Mnuchin**

House Ways and Means Chairman Richard E. Neal announced today that the Committee will hold a hearing, entitled "The President's Fiscal Year 2020 Budget Proposal with U.S. Secretary of the Treasury Steven Mnuchin" on Thursday, March 14, 2019 at 9 a.m. in room 1100 Longworth House Office Building.

In view of the limited time available to hear witnesses, oral testimony at this hearing will be from invited witness only.   However, any individual or organization not scheduled for an oral appearance may submit a written statement for consideration by the Committee and for inclusion in the printed record of the hearing.

**DETAILS FOR SUBMISSION OF WRITTEN COMMENTS:**

Please Note: Any person(s) and/or organization(s) wishing to submit written comments for the hearing record can do so here: WMdem.submission@mail.house.gov.

Please ATTACH your submission as a Word document, in compliance with the formatting requirements listed below, by the close of business on Thursday, March 28, 2019.

For questions, or if you encounter technical problems, please call (202) 225-3625.

**FORMATTING REQUIREMENTS:**

The Committee relies on electronic submissions for printing the official hearing record.  As always, submissions will be included in the record according to the discretion of the Committee.  The Committee will not alter the content of your submission, but reserves the right to format it according to guidelines.  Any submission provided to the Committee by a witness, any materials submitted for the printed record, and any written comments in response to a request for written comments must conform to the guidelines listed below.  Any submission not in compliance with these guidelines will not be printed, but will be maintained in the Committee files for review and use by the Committee.

All submissions and supplementary materials must be submitted in a single document via email, provided in Word format and must not exceed a total of 10 pages.  Witnesses and submitters are advised that the Committee relies on electronic submissions for printing the official hearing record.

All submissions must include a list of all clients, persons and/or organizations on whose behalf the witness appears. The name, company, address, telephone, and fax numbers of each witness must be included in the body of the email.  Please exclude any personal identifiable information in the attached submission.

Failure to follow the formatting requirements may result in the exclusion of a submission.  All submissions for the record are final.

The Committee seeks to make its facilities accessible to persons with disabilities. If you require special accommodations, please call (202) 225-3625 in advance of the event (four business days' notice is requested).  Questions regarding special accommodation needs in general (including availability of Committee materials in alternative formats) may be directed to the Committee as noted above.

**Note**: All Committee advisories are available [here].

###

THE PRESIDENT'S 2020 BUDGET PROPOSAL

Thursday, March 14, 2019

House of Representatives,

Committee on Ways and Means,

Washington, D.C.

The committee met, pursuant to call, at 9:01 a.m., in Room 1100, Longworth

House Office Building, Hon. Richard E. Neal [chairman of the committee] presiding.

Chairman Neal.   The meeting will come to order.   Good morning, and we want to

welcome our witness, the U.S. Secretary of the Treasury, Mr. Steven Mnuchin.   Today we

will discuss President Trump's proposal to cut more than $1.4 trillion from core programs

that help American families.   The President's fiscal year 2020 budget cuts to healthcare,

Medicare, Medicaid, threatening Social Security, and undermining many critical programs

for parents and other caregivers will be in front of us this morning for discussion.

It is no coincidence that this administration, as they simultaneously look to cut

3 -- trillions of dollars from these important initiatives come barely a year after supporting

unpaid tax cuts for the wealthiest amongst us, totaling $2.3 trillion of the Nation's debt.

Now, in this budget, the President wants to pay for those cuts on the backs of working

families.

I want to be clear that these cuts have not had the miraculous-- these tax cuts have

not had the miraculous economic effect that we have been told to believe.   Yes, by some

measures, the economy is doing well, and we continue to understand that the broad

economic recovery has now been underway for more than 100 months, which would

include the efforts of President Obama.

But at best, the tax cuts were a short-term sugar high.   Credible and independent forecasters put long-term economic growth at about 1.8 percent, a far cry from the promised indefinite growth above 3 percent and nowhere near the 6 percent that the President suggested could happen.

Tellingly, I have heard from many of those in Massachusetts who haven't seen the $4,000 pay raise that they were promised under the tax law.   They can't afford medications.   They struggle to keep up with basic expenses.   And they are being hit with the surprise of owing taxes in this filing season.   This has been confusing and surprising to these filers.   For taxpayers with a balance due question, such as those finding that they owe taxes for the first time, the IRS answered only 15 percent of their calls, and the average wait time was 1 hour.

As the IRS works to implement the new tax law and recover from the work backlog caused by the government shutdown, we need to ensure that it has the resources to fully assist with and resolve taxpayer issues.   That means supporting the agency's taxpayer services and reversing a decade of declining funds for the IRS.

Before I turn it over to my colleague, Ranking Member Brady, I want to underscore, Mr. Secretary, that while we have some differences of opinion, I know that we agree that no one can beat American workers and businesses when they compete on a level playing field.   I want to note your staff's good work at the OECD on digital taxation issues.   That work has the potential to affect a wide range of U.S. businesses and taxpayers and the U.S. tax base.   I intend to pay close attention to these developments, especially in light of France's recent unilateral imposition of a digital services tax.   I encourage you to stay in close contact with us.

I also encourage you to continue to reach out on the basis of staff work through our

shared priorities.   At the top of this list is infrastructure.   Your comments have been very encouraging.   The President's comments have been very encouraging on the issue of infrastructure.   Repairing our aging roads and bridges, investing in the 21st century infrastructure system is a win for everyone: workers, consumers, businesses, and the economy as a whole.   I know and expect that we can count on you to partner with me and my colleagues on this very important initiative as well as other ways to grow the economy and increase opportunities for the middle class.

And, with that, I want to recognize Ranking Member Mr. Brady for his opening statement and point out that Mr. Brady and I are in full agreement on St. Patrick's Day.

[The statement of Chairman Neal follows:]

Mr. Brady.   Absolutely.   Thank you, Chairman Neal.

And thank you, Secretary Mnuchin, for being here with us to discuss the President's recent budget proposal.

Mr. Secretary, 2 years ago, you sat in that very chair and discussed the President's initial budget proposal.   You told us your number one priority was growth, that tax reform and balanced regulations could unleash the economic potential of America.

You had plenty of skeptics.   Experts told us there was a new normal in America: sluggish 2 percent growth for as far as the eye could see.   They said we had to simply accept that paychecks would remain flat, jobs would keep going overseas, and U.S. manufacturing jobs were gone, unless, of course, you wield a magic wand.

Larry Summers scoffed that we believed in tooth fairies, and then Leader Nancy Pelosi famously declared it would be Armageddon for America.   Man, were they wrong.

Thanks to a new modern Tax Code and balanced regulation, we have launched a new era of prosperity for America where workers have first claim over their earnings. Small business and manufacturing is back, and American companies can compete and win anywhere in the world, especially here at home.   America's economy is growing 50 percent faster than predicted by the Obama White House.   Local businesses are investing four times faster than the last year of the prior administration.   U.S. manufacturing is no longer losing jobs but growing six times faster than President Obama's last few years.   Blue collar employment is surging.   The unemployment rate is at historically good rates for those who were left behind in the past: Hispanics, African Americans, Asian Americans, women, teenagers, those without a high school degree, and our neighbors with disabilities.

Paychecks, stagnant for far too long, are growing at their fastest rate in a decade

and even faster among those with low incomes who need it most.   Today, median household income rose above $61,000 for the first time since 1999, and hardworking Americans haven't felt this optimistic about their financial future in a long time.

New business starts are skyrocketing, and small business along Main Street are the most optimistic on record with historically high job openings, plans to hire more workers, higher paychecks, and growing profits.

Here is what makes me optimistic:   Nearly 5 million Americans have been lifted off food stamps since President Trump was elected.   The poverty rate for Hispanics and African Americans has improved dramatically and is now the lowest on record.   Maybe that is why American

consumer confidence reached an 18-year high recently.

With investment and jobs coming back from oversees, millions of workers with higher paychecks, bonuses, and larger nest eggs, local businesses no longer saddled with billions of dollars of Washington red tape, U.S. energy now the largest producer in the world, and America once again the most competitive economy in the world, that optimism makes sense.

But we must not go back to the bad old days by repealing the tax cuts and harming the very Americans who need help the most.   Rather than wasting time in Congress on a rush to impeachment, Democrats and Republicans need to work together to grow the economy.   America needs more customers and more workers.   This means improving the new modernized U.S.-Mexico-Canada trade agreement this year so we can reach more customers, create more jobs, and sell more Made in America products to our two best trading partners.

It means working together on the number one economic challenge facing America today: our workforce.   Lack of qualified workers is holding down economic growth across

the country and will slow growth even more in the future.

And it means working together to ensure America remains competitive internationally by challenging France's recent proposal to tax cross-border digital services. This is a naked revenue grab that targets U.S. companies, double taxes our businesses, and violates longstanding norms.   I am hopeful that together we can work on other shared priorities, like increasing retirement security for our workers and families, reforming the IRS, and growing America's infrastructure.   Mr. Secretary, there are many good pro-growth proposals in the President's budget for Congress to consider.   We thank you for being here.

And, with that, Mr. Chairman, I yield back.

Chairman <u>Neal.</u>   I thank the ranking member, Mr. Brady.

Without objection, all members' opening statements will be made part of the record, and a reminder that we will adhere to the Gibbons rule, meaning when one was seated as the gavel came down.

Welcome, Mr. Secretary.   I appreciate your presence here this morning.   We have received your written testimony, and I ask that you summarize those remarks in 5 minutes, and then we will begin the questioning.   Please proceed.

**STATEMENT OF THE HONORABLE STEVEN T. MNUCHIN, SECRETARY, U.S. DEPARTMENT OF THE TREASURY**

Secretary <u>Mnuchin.</u>   Thank you.   Chairman Neal, Ranking Member Brady, and members of the committee, it is good to be here with you today.

I am pleased to report that President Trump's economic program of tax cuts, regulatory relief, and improved trade deals is working for the American people.   During 2018, real GDP increased by 3.1 percent measured from the fourth quarter of 2017 to the fourth quarter of 2018.   This is the highest growth rate since 2005.   The unemployment rate remains historically low at 3.8 percent, and earnings rose by over 3 percent in 2018, the highest nominal increase in a decade.   More Americans are entering the workforce because of a renewed sense of optimism.

The World Economic Forum's most recent competitiveness report announced that the United States is the number one most competitive economy in the world, receiving the top ranking for the first time in more than 10 years.   Companies are investing hundreds of billions of dollars in new and expanding business operations in the United States.   This is in large part because the Tax Cuts and Jobs Act made our tax rates competitive, moved us from a worldwide system towards a territorial system of taxation, and allowed immediate expensing of capital expenditures.   For hardworking families, it also cut rates across the board, doubled the standard deduction, and expanded the child tax credit.

I would also like to highlight opportunity zones, a key component of TCJA. Opportunity zones will ensure that more Americans benefit from economic expansion and a robust job market.   They provide capital gains tax relief to encourage investments in businesses located in distressed communities.   This policy has generated a great deal of

enthusiasm.

These measures are fueling growth.   Along with our efforts to provide regulatory relief, in our trade negotiations, we are aiming to break down barriers to markets around the world.

As you know, China has gained many advantages through unfair trade practices. This administration is committed to rebalancing our trading relationship in order to level the playing field for hardworking Americans.   We are negotiating with China on structural reforms to open their economy to our companies and protect America's critical technology and intellectual property.

The administration is also prioritizing the U.S.-Mexico-Canada agreement, USMCA.   It is the most comprehensive trade agreement ever negotiated and will modernize our trading relationship across North America.   The USMCA will create the highest standards to protect intellectual property rights, support small and mid-size businesses, open markets for agricultural products, spur manufacturing.   I encourage all Members of Congress to support its passage because it will have a positive impact for American workers, business owners, farmers, and families.

In addition to enhancing overall growth prospects, I want to note the positive impact that the administration's economic agenda will have on our country's debt and deficits going forward.   During the last administration, analysts predicted that 2 percent growth was the highest America could achieve and that it was the new normal.   We have already shown that we can and will do better.   An extra 1 percent of GDP growth per year means trillions of dollars of additional economic activity and more revenue to the government.

Turning to the budget, the policies and priorities in the President's fiscal year 2020 budget will continue to foster stronger economic growth, reduce spending, and create a

more sustainable fiscal outlook for our country by reducing the deficit as a share of GDP. Of special interest to this committee, the Treasury portion of the 2020 budget includes $290 million for business system modernization account funding, which is foundational for a new 6-year IRS IT modernization plan.   Investment in modernization of IRS information technology systems and infrastructure will protect the integrity of our tax system and improve customer service for taxpayers.

I am pleased to continue working with you on policies and especially, Mr. Chairman, as you noted, infrastructure that will help to create jobs and increase wages for the American people.   Thank you very much.

[The statement of Secretary Mnuchin follows:]

Chairman <u>Neal.</u>   Thank you, Mr. Secretary.

And, without objection, each member will be recognized for 3 minutes to question our witness today so that we may ensure that all members have an opportunity to inquire before the Secretary's schedule requires that he leave.   And I will begin by recognizing myself.

Mr. Secretary, as you know, the debt limit was reinstated at the beginning of this month, and your department has started extraordinary measures.   Thank you for your response to my January letter and the shared commitment that we have to addressing the debt ceiling to protect the full faith and credit of the United States.

We have seen what brinksmanship does on the debt ceiling question.   Last year, it led us to a shutdown.   We got a shutdown.   The American taxpayer suffered during the longest shutdown in history.   And similar brinksmanship on the debt ceiling is not only dangerous, it is reckless and irresponsible.

Do you support, Mr. Secretary, raising a clean debt ceiling extension sooner rather than later?

Secretary <u>Mnuchin.</u>   I do, Mr. Chairman, and I encourage Congress to do that sooner rather than later, as you said.

Chairman <u>Neal.</u>   Thank you.

Mr. Secretary, we have had many encouraging conversations about infrastructure, and the system that we recognize in America today is suffering from years of underfunding and neglect.   I believe we have an opportunity to make a meaningful, sustained investment that will lay the foundation for economic growth for years to come and create thousands of good-paying jobs.   We must be ready to put real Federal dollars behind this commitment and maintain the traditional 80/20 split between Federal and State spending.

The President campaigned on a $1.5 trillion infrastructure package, and he mentioned infrastructure again in this year's State of the Union.   Are you and the President still committed to the $1.5 trillion bold infrastructure package that you have previously outlined?

Secretary <u>Mnuchin.</u>   Mr. Chairman, the President and I are fully committed to that. I have appreciated the opportunity that you and I have spoken on the phone and had the opportunity to meet and talk about this, and we very much look forward to working with Congress on a bipartisan basis to pass infrastructure quickly.

Chairman <u>Neal.</u>   Another encouraging note where I think there is an opportunity for cooperation here is on the multi-employer pension plan dilemma that the country is about to face.   Do you have any immediate plans to address that issue?   Based on conversations I have recently had with many of the stakeholders, they have said that the words of the administration have been encouraging.   This is a huge problem.   It conceivably could take down the Pension Benefit Guaranty Trust, and I think working on this sooner rather than later also makes good sense.   Is that still the administration's position?

Secretary <u>Mnuchin.</u>   It is, Mr. Chairman.   As you know, both as my role as Secretary of the Treasury and my role as a member of the board of the PBGC, this is very important to us.   I have had the opportunity to meet with workers who are impacted by this.   I know there is a bipartisan group that is working on this, and we look forward to supplying you help and work with that.

Chairman <u>Neal.</u>   The legislation that I have proposed on this issue has many Republican cosponsors, and I would hope that other Republicans would sign up.   I think just about every member of the Democratic Party in the House in the past session signed the legislation.   I think it is a good starting point in the conversation for hopefully getting

something done before the problem really gets out of hand.

And, with that, let me recognize Ranking Member Brady for 3 minutes.

Mr. <u>Brady.</u>   Thank you, Mr. Chairman.

When I think of the work, Mr. Secretary, that you did with President Trump and the Republican Congress on tax reform, I think of Russell Marine back home.   They gave their workers $1 million in bonuses, raised everyone's pay 10 percent.   They bought millions of dollars of new equipment they couldn't afford before, and they green-lighted a new company office because the building I was in was plenty old.

I think of The Lone Pint Brewery in Magnolia, Texas.   Christi and Trevor Brown started this craft brewery a number of years ago.   They told me, because of tax reform, they now can give all 10 of their workers full healthcare, vision and dental, some of which their kids have never had before.   And the back porch we were standing on was going to be their new cold room because of the savings they had from the tax cut.

And I think of the two new manufacturing plants I toured a couple of weeks ago in the poorest part of my district in east Texas, built in part because now businesses can write off that new equipment and machinery the very year they buy it.

But when I am back home, people tell me that I think the silliest thing they hear is that tax refunds are down, so tax increases must be up.   And while that claim has been fact-checked as misleading and nonsensical, the media covered it like it was life discovered on Mars.   As we know, your refunds have zero to do with your tax bill.   It merely reflects what you overpaid the IRS last year.   And we know that 95 percent of Americans either got a tax cut or their tax bill stayed the same.

So we also know refunds vary from year to year and even within the tax season. And the truth is the new Tax Cuts and Jobs Act was designed to help families who live paycheck to paycheck to make sure they got their help each month when they needed it

rather than to have that relief delayed for a year.

Can you give us the latest update on the tax filing season and where refunds stand today?

Secretary <u>Mnuchin.</u>   Mr. Brady, thank you very much, and I personally want to thank you for your incredible work that you did on the tax act.   I think, as you have known, based upon the most recent data, tax refunds are flat on last year.   Now, let me just give you an example.   For an average married couple with one job and two children under the age of 17, their taxes would go down from approximately $3,800 to $1,700, or a reduction of $2,000.   If they had been properly withheld, their withholding -- their refund would have gone down 55 percent as well as their taxes.   So the fact that refunds are on average the same means, in essence, people did not adjust their holding enough to take advantage of the tax act.   We have encouraged people to use the calculator, but I would just emphasize, because taxes are down, refunds should be down.

Mr. <u>Brady.</u>   All right.   Thank you, sir.

Chairman <u>Neal.</u>   Thank you, Mr. Brady.

With that, let me recognize the gentleman from Georgia, Mr. Lewis, to inquire.

Mr. <u>Lewis.</u>   Thank you very much, Mr. Chairman.

Thank you, Mr. Secretary, for being here.   Mr. Secretary, there were 11 billion disclosures of tax records last year under section 6103 of the Tax Code.   Mr. Secretary, did you personally sign a form to release any of these 11 billion tax records?

Secretary <u>Mnuchin.</u>   I am sorry.   I don't understand the question, Mr. Lewis. Could you just repeat it?

Mr. <u>Lewis.</u>   Well, I will do my very best to make it plain and simple.   There were 11 billion disclosures of tax records last year under section 6103 of the Tax Code.   Did you personally sign the form to release any of these 11 billion tax records?

Secretary <u>Mnuchin.</u>   I don't believe I did, but I could check with my team.   I am not aware of that, Mr. Lewis.

Mr. <u>Lewis.</u>   Well, you don't have any idea who approved?

Secretary <u>Mnuchin.</u>   I have been advised that that is not something I would normally sign.   It would be something that the IRS Commissioner would sign off on.

Mr. <u>Lewis.</u>   Is there a representative of the IRS Commissioner present today?

Secretary <u>Mnuchin.</u>   No, he is not, but I would be more than happy to follow up with you in your office and get back to you on the specific facts on that.

Mr. <u>Lewis.</u>   Well, let me just ask you, Mr. Secretary.   Didn't you prohibit the IRS director from meeting with us?

Secretary <u>Mnuchin.</u>   I believe we made available the IRS' team of experts that are available, and I believe at the appropriate time, the IRS Commissioner will come and testify, as I am doing.

Mr. <u>Lewis.</u>   And when is the time right?   When will the time be right?

Secretary <u>Mnuchin.</u>   I would be more than happy to follow up with the chairman and schedule it at a mutually available time.

Mr. <u>Lewis.</u>   Thank you.

Mr. Chairman, I ask unanimous consent to submit a statement from veterans groups against this budget.

Chairman <u>Neal.</u>   Without objection.

[<u>The information follows</u>:]

Mr. Lewis.   Thank you.   I yield back, Mr. Chairman.

Chairman Neal.   The chair will recognize the gentleman from Florida,

Mr. Buchanan, to inquire.

Mr. Buchanan.   Thank you, Mr. Chairman.

And I want to thank the Secretary for his leadership in terms of the Tax Cuts and

Jobs Act that we put together, but one of the big issues is on growth.   For 50 years, as you

know, or the last 10 years, it has been the slowest growth that we have had in the last

50 years, so the impact that this has had is very clear when you look at -- if you want to

look at it from a report card standpoint.

Optimism is at an all-time high.   That makes a big difference for people that are in

business to invest going forward.   Wages at 3.1 percent in terms of growth.   Consumer

confidence at an 18-year all-time high.   Unemployment is lower in terms of the last

50 years, and 7 million, they claim, job openings available today for folks across the

country.   So, to me, when you look at the report card, there is no question the impact that

the jobs and tax act -- has made a huge difference.

Let me ask you.   The Fed is looking at -- they have been raising rates.   A lot of

people think this is kind of throwing a cold blanket somewhat on the economy going

forward.   What are your thoughts?   And I know, in this last go around, they backed off of

that a little bit, but it seems a lot of people feel, why don't we have the opportunity to

realize the full potential of this economy going forward?   So I just wanted to get your

comments in terms of the Fed's actions on raising rates.

Secretary Mnuchin.   Well, first, let me just comment on the growth, as you have

mentioned, and I do agree that the growth has led to tremendous opportunities for

hardworking Americans.

I think, as you know, I meet with the Fed Chair on a regular basis.   We do discuss the economy and other issues on a weekly basis.   It would be inappropriate for me as Treasury Secretary to comment on specific Fed actions in the future.

Mr. Buchanan.   Thanks.

And, with that, I yield back.

Chairman Neal.   I thank the gentleman.

I thank the Secretary for that answer, incidentally.   Thank you.

With that, let me recognize the gentleman from Texas, Mr. Doggett, to inquire.

Mr. Doggett.   Thank you, Mr. Chairman.

And, Mr. Mnuchin, I must say I am a little surprised to see you here.   During the time that the massive tax breaks for those at the top and the multinationals were being forced here, neither you nor any member of the administration had the courage to come and be questioned about the contradictions in that move.   You refused to be questioned in public about the special deal that you cut on the enterprises for Putin's buddy Deripaska. You ignored Chairman Neal's letter to permit a reasonable time for congressional review of this shady deal, even after Congress voted to stop it here in the House.   You continue to deny every request for documents from multiple congressional committees about this wrong.

You did show up one time here and insisted, like today, that questioning of you be limited to a few minutes.   And then, with Mr. Brady's very effective protection, you managed to give no oral answer to the questions that I posed but instead agreed that you would supply written questions -- answers to those questions in writing that I still don't have more than a year later.

Let me just ask you directly:   Since you are fully aware that section 6103(f)(1) of the Internal Revenue Code reads, quote, upon written request from the chairman of the

Committee on Ways and Means, the Secretary shall furnish such committee with any return or return information specified, end quote, are you willing to provide and fulfill the command of the statute and your mandatory duty to properly release any personal and business tax returns of President Trump that you are requested to provide?

Secretary Mnuchin.   Well, Mr. Congressman, let me first comment on the first part of that.

Mr. Doggett.   Well, I just want to be sure I get an oral answer to my question.

Secretary Mnuchin.   I will make sure -- I will make sure I answer the end, but let me just make sure I answer the first part, which I think is highly unfair, okay.   First of all, I did come and give a classified briefing.

Mr. Doggett.   Yes, sir, which the Speaker called a waste of time.

Secretary Mnuchin.   That is your -- that is your view.   I came with --

Mr. Doggett.   That is her view shared by me.

Secretary Mnuchin.   -- I came with experts from Treasury --

Mr. Brady.   Mr. Chairman, if the witness could be allowed to answer.

Mr. Doggett.   Well, let me ask you, Mr. Secretary.   You can give any explanation in the time that the chairman and Mr. Brady will provide, but will you comply with the command of the statute and provide the returns under 6103?   Yes or no?

Secretary Mnuchin.   I am going to answer that, but --

Mr. Doggett.   Would you just answer it now?   You have got 30 seconds.

Secretary Mnuchin.   The answer is I will -- if I receive a request, which I presume from what I have read in the press I will receive, I will consult with the Legal Department within Treasury, and I will follow the law.   That is my answer, Mr. Congressman, but I would like to answer the previous part, which I think --

Mr. Doggett.   You are welcome to do so.   Have you received any instruction or

guidance from anyone regarding how to handle these requests?

Secretary <u>Mnuchin.</u>   I am more than happy to answer your question --

Mr. <u>Doggett.</u>   Thank you.

Secretary <u>Mnuchin.</u>   -- but in due respect, I would like to just finish my previous answer, which is, Mr. Chairman, I think I have worked with you on a mutual date.   I was not aware of that the committee didn't think they had enough time today.   I would be more than happy to stay an extra half an hour if that is necessary so that people feel like they have the proper amount of time to answer -- ask me questions, and I believe that we have accommodated all requests from the committee.   And if there are open requests on documents or anything else, Mr. Chairman, we would be more than happy to work with you and Mr. Brady.

Now, I think -- was there a second part of the question I didn't answer --

Mr. <u>Doggett.</u>   Yes, sir.

Secretary <u>Mnuchin.</u>   -- on the tax returns?

Mr. <u>Doggett.</u>   There was --

Chairman <u>Neal.</u>   Well, let me just say something.   By precedent here, the witness is always allowed to finish their answer.

Mr. <u>Doggett.</u>   Well, not last time.   When I asked a question, there was no answer given.

Chairman <u>Neal.</u>   Would the --

Mr. <u>Doggett.</u>   -- provided.

Secretary <u>Mnuchin.</u>   I want to make sure I have answered all your questions.   Is there anything else I didn't answer?

Mr. <u>Doggett.</u>   Yes, sir.   Have you received any instruction or guidance of any kind about how to handle --

Mr. <u>Brady.</u>   He just answered that question, Mr. Doggett.

Secretary <u>Mnuchin.</u>   I am sorry.   From whom?

Chairman <u>Neal.</u>   Let the witness finish the questioning.

Mr. <u>Doggett.</u>   Have you received any instruction or guidance of any kind about how to handle congressional requests for President Trump's tax returns, and if so, from whom?

Secretary <u>Mnuchin.</u>   I have -- because I have read this in the press, so, first of all, I haven't received the request.   If you have the request for me today, I am happy to accept it. If not, when -- if you decide in the future to deliver this, we will receive it.   I can't speculate on the request until I see it.   I have discussed with the Legal Department in the Treasury that we will most likely receive this request.   As I have said, based upon the request, we will examine it, and we will follow the law.

Mr. <u>Doggett.</u>   Thank you.

Secretary <u>Mnuchin.</u>   I would expect that we would -- I am not aware that there has ever been a request for an elected official's tax return, but we will follow the law, and we will protect the President as we would protect any individual taxpayer under their rights.

Chairman <u>Neal.</u>   Thank you.

Mr. <u>Doggett.</u>   Are you seeking advice on the meaning of the word "shall"?

Chairman <u>Neal.</u>   With that, let me recognize Mr. Smith to inquire.

Mr. <u>Smith of Nebraska.</u>   Thank you, Mr. Chairman.

And certainly thank you, Mr. Secretary, for appearing before the committee today. I know that time is short, so I will try to be brief.

I want to thank you for ensuring that the final regulation implementing section 199(A) appropriately recognizes businesses which physically hold, store, and transport commodities, such as grain elevators and energy services firms, are eligible for the

deduction and not lumped in with paper traders.   Both of these industries are economically important to my State of Nebraska, and this was an important issue that was addressed.

At the same time, I do continue to hear concerns regularly about implementation of many other provisions of the TCJA, particularly the international provisions.   As you know, our goals for tax reform included simplifying compliance, modernizing international taxation, and ensuring as many taxpayers as possible benefited from tax relief.   I do continue to hear concerns that regulations implementing provisions known or called GILTI and BEAT are not easy to comply with and in many cases are capturing longstanding legitimate transition actions which no reasonable person would consider tax-avoidance strategies as newly taxable events, which is not and certainly was not our goal.

Could you provide us with some insight on why this seems to be happening regularly as the regulations are produced, and can you assure us that TCJA is being implemented as intended by those of us who were so involved in its passing and being signed into law?

Secretary Mnuchin.   I can assure you it is being implemented as intended.   We reach out to try to make sure we have the proper interpretations of these issues.   I will tell you:   I want to thank the hardworking people at the IRS and at the tax group within Treasury.   We meet on a daily basis.   There were very many regulations, as you know, that were left to us to draft.   We want to make sure that we do this carefully in a way to protect companies and implement the law, and we have gone through an extensive period of reaching out to affected people.   I personally met with many companies, and we will go through a comment period on these issues.   So, as you said, the GILTI and BEAT issues are things we are looking at very carefully.

Mr. Smith of Nebraska.   Okay.

Secretary Mnuchin.   Thank you for the comment on the commodities.   We

worked hard on that.

Mr. <u>Smith of Nebraska.</u>   Very well.   Thank you, Mr. Secretary.

I now yield time to Mr. Brady.

Mr. <u>Brady.</u>   Mr. Secretary, you were asked about an $11 billion request for 6103 provisions.   Seems like a lot.   Turns out $9 billion of that is routine request from States as they verify their State income.   Other is to comply with the Affordable Care Act and those requirements passed by our Democrat friends.   GAO and Joint Tax also make routine requests so that Congress can be provided information about the impact of policies, and of course, the Census makes those requests.   Here is the key number:   Zero of those requests are for purely partisan reasons that weaponize the Tax Code.

I yield back.

Chairman <u>Neal.</u>   I thank the gentleman.

With that, let me recognize the gentleman from California, Mr. Thompson, to inquire.

Mr. <u>Thompson.</u>   Thank you, Mr. Chairman.   I would like to ask unanimous consent to submit this article into the record that reads -- the headline reads "Trump vowed to eliminate the debt in 8 years.   He's on track to leave it at least 50 percent higher."

Chairman <u>Neal.</u>   Without objection.

[The information follows:]

Mr. <u>Thompson.</u>   Thank you, Mr. Secretary, for being here this morning.

When the President and the Republicans pushed through their tax cut last Congress, the warning from Democrats and outside experts was very clear:   If you pass an irresponsible $2.3 trillion tax bill that explodes our national debt and deficit to benefit the richest Americans and large corporations, it will inevitably be working families and our Nation's most vulnerable who end up paying the bill.   This President's budget, unfortunately, could not be clearer in bringing that warning to reality as this budget reads like a laundry list of cuts to our country's essential programs:   $500 million in cuts to Medicare, $1.5 trillion from Medicaid, cuts to CHIP, food stamps, affordable housing. The list goes on.   All while the very same budget would make permanent a reduced top rate, an over $11 million estate tax exemption, and a host of other loopholes benefiting the richest 1 percent of Americans.

And as disturbing as these cuts are, as harmful as they are to children and to seniors, the President's budget will add $1.1 trillion to our deficit next year.   And that, I might add, is based on numbers that most experts don't see as real, the 3.2 percent economic growth, far above the 2.3 growth that CBO says that we should be expecting which, by the way, drops in the outyears in 2019 to 1.8 percent.

Secretary Mnuchin, could you please explain to us, to the children and the seniors across the country who are going to be expected to pay for these tax cuts to the richest Americans, why they should be paying for them?

Secretary <u>Mnuchin.</u>   Thank you very much.   So, first, let me just comment on the tax cuts themselves.   As I have said in the past, I do think with additional growth, the tax cuts --

Mr. <u>Thompson.</u>   Excuse me, Mr. Secretary.   We have very limited time.   We

know what the tax cuts did, but this budget makes children and seniors pay for the tax cuts that the richest people are going to receive.   Can you please justify that?

Secretary Mnuchin.   I don't believe that it is paying for the tax cuts as you have said.   I believe that the tax cuts will pay for themselves through previous growth.   What I would say is that --

Mr. Thompson.   That has never happened.   You know it, and I know it, and the budget is very explicit.   The cuts are right there in black and white.   We have all read them.

Secretary Mnuchin.   Mr. Chairman, can I answer the question or --

Chairman Neal.   By precedent, the witness can answer the question.

Secretary Mnuchin.   So, again, I just want to separate the two issues.   The previous tax cuts, okay, which were $1.5 trillion, okay, the difference between policy and baseline is $250 billion.   That takes it down to a billion 250.   Based upon growth last year alone, that will bring this down to 850, which this is simple math.   If we do get the growth we expect, they will pay for themselves.

Now, as it relates to the budget going forward, we have not cut those programs. We have reduced the rate of growth on those programs.

Chairman Neal.   Thank you.

With that, let me recognize the gentleman from Texas, Mr. Marchant, to inquire.

Mr. Marchant.   Thank you, Mr. Secretary.

Thank you for being here today, and thanks to your team for working through all of these difficulties in interpreting some technical aspects of the tax reform bill.   Many businesses in my district have called me, and I have assured them that the Treasury is really working hard on trying to correct them.

One of the big issues that I am hearing from my constituents and small businesses

in my district that have over the years paid their taxes on time, withheld the proper amount, et cetera, but in this year of transition, many of them, whether they got bad advice from their HR Department or whether they just guessed wrong or were too optimistic, some of them did not have enough withheld, and they are now faced with a penalty for the first time in their lives.   They have never paid a penalty, and it is creating a hardship.

And my ask today is will the Treasury, will you consider -- I know that you have said that you would lower the penalty from 90 percent to 85 percent, the penalty -- before you fell into the penalty, but would you consider 80 percent because we believe that there is some confusion, some genuine confusion out there?   I think it would be a good-faith effort on the part of us to our hardworking constituents, not the ones that are trying to con the system or, you know, calculate how much they can get by with, but just normal people that are trying to do the right thing.

Secretary <u>Mnuchin.</u>   Well, as you have noted, we did reduce it from 90 to 85 to try to take into account many hardworking people who were caught in that, and yes, we will consider 80, and I will go back and review that with my team.

Mr. <u>Marchant.</u>   Thank you, Mr. Secretary.

Mr. Secretary, the other thing that I would like with my remaining time to ask you to consider, the 800,000 people in my district in Texas value the integrity of the IRS and the Treasury Department.   They do not want their tax returns -- they do not want to go to bed at night thinking that there might be some possibility that the IRS or the Treasury could view their tax return and make that tax return public to anybody, not somebody on this committee, to anybody.   So, as a Member of Congress to you, before you make that kind of decision, please take that into consideration.

Secretary <u>Mnuchin.</u>   Thank you.

Chairman <u>Neal.</u>   I thank the gentleman.

With that, let me recognize the gentleman from Oregon, Mr. Blumenauer, to inquire.

Mr. <u>Blumenauer.</u>   Thank you, Mr. Chairman.

Mr. Secretary, I appreciate you joining us again.   I am encouraged by some of the conversation we have talked about in terms of infrastructure.   I would like to turn to that for a moment, but I would like to submit a written request to you for the Department to help clarify some of the activities going forward dealing with the financial status of the cannabis industry and how it is going to be treated in terms of banking and Treasury.   If I could submit that to you for your consideration.

Secretary <u>Mnuchin.</u>   I would be more than happy for you to submit it.   I think you know we are struggling with these issues of Federal law versus State law.   You know, putting on my IRS hat for the moment, it is not in our interest for people to bring in hundreds of thousands of dollars of cash into IRS locations where we have to build safes.

Mr. <u>Blumenauer.</u>   Agreed.   And I will submit that to you in writing and appreciate further clarification.

[The information follows:] – LINK TO QFRS

Mr. <u>Blumenauer.</u>   I would like to turn, though, to the infrastructure question.   We had a very encouraging hearing with the leadership that has been invited by our chairman, the head of that AFL-CIO, the head of the U.S. Chamber, the head of the trucking association talking about the need to invest in our infrastructure.   It is a priority for us. The President in the course of his campaign talked about a trillion dollars.   This has been a -- a trillion and a half.   And I appreciated the encouraging comments a little moment ago between you and the chairman.

However, the budget that is submitted calls for only $200 billion in infrastructure. And in the past, that was paired with cuts to infrastructure spending by the Federal Government.   Can you tell the committee how you propose to finance a trillion and a half if that is the goal for infrastructure funding?

Secretary <u>Mnuchin.</u>   Well, thank you very much for bringing up infrastructure, and I would just emphasize that anything we do on infrastructure needs to be done on a bipartisan basis.   So, whether it is the issue of how we spend the money, how we work with the States, how we pay for it, we very much look forward to working with you and the committee on this to see if we can reach an understanding.

Mr. <u>Blumenauer.</u>   And I agree with that.   I am trying to get a sense of what the administration will support.   The President in the past has talked about a 25 cent gas tax increase.   Is that in the realm of possibility?   Do you have specific proposals that we could work with on a bipartisan basis to fund the trillion and a half dollars without further adding to the deficit?

Secretary <u>Mnuchin.</u>   I have heard the President talk about the gas tax.   I don't think any decision has been made.   I have also heard the CEO of UPS and FedEx basically tell me that they would be in favor of increasing it if the money were spent on roads.

Again, I would just emphasize, because this needs to be done on a bipartisan basis, this is something we want to sit down and listen to your ideas and work with you and the rest of the committee on this.

Mr. <u>Blumenauer.</u>   Thank you very much.

Chairman <u>Neal.</u>   I thank the gentleman.

With that, let me recognize the gentleman from New York, Mr. Reed, to inquire.

Mr. <u>Reed.</u>   Thank you, Mr. Chairman, and thank you, Mr. Secretary, for being here and, as always, for making yourself accessible to our office and to work with you.

I want to narrow in on an issue that is directly related to my home State of New York State, and there has been a lot of conversation and a lot of public statements by my Governor, Governor Cuomo of New York, that says the State and local tax deduction cap of $10,000 that many of us here worked very hard to get into the tax cut bill hurts, quote/unquote, low- and middle-class income workers.   I believe that statement is blatantly false.   Why do I say that?   I look at the Tax Policy Center, often an expertise -- experts in the field of taxation relied upon by many of my colleagues on the other side of the aisle to support their criticisms or objection of tax policy here in D.C. And as they concluded, the benefit, if you restore the full State and local tax deduction, goes to -- 56 percent of that benefit goes to the top 1 percent income earners.   The top 1 percent income earners are $755,000 per year taxpayers.   Ninety-six percent of the benefit goes to those in the top one-fifth of the income earners.   Those people are making approximately $153,000 per year.

Mr. Secretary, first of all, do people making $755,000 per year or $153,000 per year, is that a definition of a low-and middle-income worker, from your perspective?

Secretary <u>Mnuchin.</u>   I don't believe so.

Mr. <u>Reed.</u>   So is Governor Cuomo's assertion, then, that the State and local tax

deduction cap of $10,000 hurts low and middle-class workers true or false, in your opinion?

Secretary Mnuchin.   Mr. Reed, I think it is false.   We worked very closely with you and others and Mr. Brady on the $10,000 to make sure that most people -- now, I will tell you there is no question that wealthy people in New York have been impacted by this. I can tell you I personally pay taxes in New York and California, and my tax rate did go up because I no longer have the SALT deduction.

Mr. Reed.   And one area of agreement I will agree with our Governor on, and that is because people are mobile, especially on the upper income level, those making $750,000 and higher, correct?   So people respond to increased taxes by avoiding those taxes.   That seems to me to be human nature.   Would you agree that higher taxes causes people to react to that situation?

Secretary Mnuchin.   I have read, I am sure as you have, that people are leaving New York and going to Florida because of the differential of tax rates, although I am not an expert on human nature in this area.

Mr. Reed.   Well, I have 11 older brothers and sisters.   I try to -- you know, it is a commonsense type of thing.   The issue I would have, then, is people are leaving because of tax policy, high taxes on their income.

So, with that.   I yield back.

Chairman Neal.   The gentleman's time has expired.

With that, let me recognize the gentleman from Wisconsin to inquire, Mr. Kind.

Mr. Kind.   Thank you, Mr. Chairman.

Mr. Chairman, I ask unanimous consent to have included in this record at this time an article entitled "Trump's Budget hinges on economic growth numbers no one believes. 'It's a fake forecast.'"

Chairman <u>Neal.</u>   Without objection.

[The information follows:]

Mr. <u>Kind.</u>   Mr. Secretary, you give me or any member on this dais an opportunity to write $2.3 trillion worth of hot checks, and we will give you the illusion of short-term growth and prosperity in this country.

This administration, complicit with the other side, jammed through a major reform to the Tax Code a little over a year ago in 51 days without one hearing, with no appropriate feedback, riddled with mistakes and errors and unintended consequences and now, according to most budget forecasts, when you include interest on the debt, will increase our debt by $2.3 trillion over the next 10 years.   Eighty-three percent of the benefit, by the way, goes to large corporations and the wealthiest 1 percent, and now it appears as if the sugar high is ending.

You know, in the last 2 years of the Obama administration, they had stronger job growth and higher wage growth than the first 2 years of this administration.   And yet my friends on the other side are like the rooster that crows and takes credit for the sun rising. But my fear now with the debt that this administration has embraced is when things do turn sour, and they will again, there will be another economic downturn because we are not going to have the monetary or even the fiscal tools with which to combat that because of this huge debt that has been racked up.   And I will tell you what won't fly with hundreds of thousands of seniors and families in Wisconsin is this President's budget that calls for $845 billion worth of cuts to Medicare and another $241 billion worth of cuts to Medicaid, our BadgerCare program, which will affect the healthcare that those families receive in Wisconsin.   Clearly, this is an attempt to pay for those tax cuts on the backs of those seniors and families that rely on those programs for the healthcare needs back home in Wisconsin.

But let me pivot real quick on a subject that we do agree on.   I was one of the

authors of the opportunity zone legislation, along with my friend Pat Tiberi on this committee along with Senators Scott and Booker on the Senate side.   We still think that holds great promise and opportunity in those overlooked areas of our country trying to get that early stage capital in.   But I want to make sure it works the way it was intended, and we are going to need your help because, right now, there is no accountability or data reporting requirements as far as where these investments are going, nor is there government data at this time tracking the number and characteristics of the qualified opportunity funds because it is all just self-certifying at the time of tax filing.   Could you tell me what Treasury is doing to try to bring more transparency and accountability to this program?   And can you let us know what you can do on your own or what you might need legislatively to put this in place so we have a good accountability system?

Secretary <u>Mnuchin.</u>   Mr. Kind, thank you very much.   First of all, I appreciate your words on the opportunity zones, which I share are going to be an important issue. And let me just say, on data accountability, we agree with you.   So, if there are specific things that you think we should be collecting, please send us a letter, and we will take that into consideration.   Our view has been that we want to implement this quickly.   So the self-certification was to get this up and running.   We do intend that there will be data accountability, and whether it comes out immediately or it comes out in the next 6 months, we do intend to collect data, and we appreciate your input on that.   Thank you.

Mr. <u>Kind.</u>   Yeah.   We will follow up.

Thank you, Mr. Chairman.

Chairman <u>Neal.</u>   I thank the gentleman.

With that, let me recognize the gentleman from Pennsylvania, Mr. Kelly, to inquire.

Mr. <u>Kelly.</u>   Thank you, Mr. Chairman.

And, Mr. Secretary, thanks for being here.

You know, this discussion today reminds me of something that I read a long time ago.   It's called "A Tale of Two Cities."   Really, this is the tale of two parties.   It was the best of times.   No, it was the worst of times.   It was the age of wisdom.   No, it was the age of foolishness.   It was the epic of belief.   No, it was the epic of incredulity.   It was the season of light.   No, it was the season of darkness.   It was the spring of hope.   No, it is the winter of despair.

The sugar high is not a sugar high.   And if it is a sugar high, I have got to tell you, the people back in my district love it.   They are doing so much better today than they have done in so many decades, and nobody can deny the economic growth that came out of the Tax Cuts and Jobs Act.   It is undeniable.   It may not be unacceptable, depending on which side of the aisle you sit, but I have got to tell you.   For people back home, it is an incredible lift.

And one of the towns that I represent, the city of Erie has done exceptionally well with opportunity zones.   We have eight opportunity zones in Erie.   Mr. Kind talked about this.   The Erie Downtown Development Corporation is led by a guy named John Persinger, who is a good friend of mine, and another good friend named Matt Wachter. These guys have put together a piece that is available to everybody in the country because they are out on top of it right now.   They are out and moving, and we are looking again at growth, growth, growth, and more growth and investment in places that nobody would have invested in before.   But because of the Tax Cuts and Jobs Act, it is bringing vitality and a dynamic economy back to these areas.

The one thing, though, that I would just ask you, if you could:   It comes down to trying to put together all the different ideas that we have to do and basically the second tranche of regulations.   It just comes down to -- so the Office of Information and Regulatory Affairs.   There is some confusion on the regulations, and do you know how

soon we will be able to come out with other regulations?   I have got to tell you.   In the understanding of it, listen.   I have never seen anything like this in my life when it comes to growth, economic growth.   And when we talk about the acceleration in debt, I was here also.   I was actually alive in 2008 and 2009 and 2010, and I saw that debt go from $9 trillion up to over $20 trillion.   At that time, there wasn't much of a murmur or even a whisper about it.   It was okay.   I have got to tell you:   I appreciate everything you have done, but when it comes to the regulations, that second tranche coming out -- it is like the Erie Downtown Corporation, the development corporation.   When can people like that see?

And, also, I would just like to ask you:   If you ever have a chance, would you please come to Erie, Pennsylvania, and walk with me through the opportunity zones and see what it is like to put life back into a community because of tax policy that was done right here in this room?   This has been phenomenal.

Secretary <u>Mnuchin.</u>   Mr. Kelly, I would be happy to find the time to go with you to Erie.   I would look forward to that.   I think the opportunity zones are important, and I want to visit the specific areas.

The additional regulations are going through an internal clearance process at the moment, and we are very much trying to get them out on an expedited basis, so thank you.

Mr. <u>Kelly.</u>   Well, thank you because the poorest ZIP Code in Pennsylvania is in that town.   Thank you.

Chairman <u>Neal.</u>   I thank the gentleman.

With that, let me recognize the gentleman from New Jersey to inquire, Mr. Pascrell, and from here on, we will proceed to 2 to 1 in terms of ratio.   And members are advised that there is likely to be a vote on the House floor at 10 o'clock, but it is the chair's intention to proceed with the hearing.   So that means members on the first row or those at

the end of the dais might want to go and vote and come back immediately.   There will only be one vote.

Mr. Pascrell.

Mr. Pascrell.   Thank you, Mr. Chairman.

Good morning, Mr. Secretary.   The Federal tax laws should be administered in an impartial and nonpartisan manner.   What firewalls or safeguards have been put in place at the IRS to guard against political interference in the decision to disclose tax records pursuant to a congressional inquiry under section 6103(f)(1)?   We made this famous in February of 2017.   No one -- most people never heard of 6103 of this Tax Code.   What have you done?

Secretary Mnuchin.   Well, first, let me just say I agree with you completely.   The IRS' job is to protect taxpayers and --

Mr. Pascrell.   What have you done, Mr. Secretary?   Time is awaiting us.

Secretary Mnuchin.   Well, when you are referring to 6103, are you referring to your potential request for the President's tax return or the normal operations?

Mr. Pascrell.   I didn't mention one time in what my question was, so don't think what I am thinking.   I am asking you what you are thinking about my question.

Secretary Mnuchin.   Well, as it relates to --

Mr. Pascrell.   You are wasting our time.

Secretary Mnuchin.   As it relates to the normal operation of 6103, that is done by the IRS.   I believe they do it on an impartial basis.   And as it relates to any potential requests, I said we will review it at the time.

Mr. Pascrell.   Let me ask you this question:   Mr. Trump claimed that he would -- President Trump, he would not personally benefit from the tax cuts in the tax bill of December of 2017.   How can we know without seeing his tax returns?   Can you tell

me that?

Secretary <u>Mnuchin.</u>   Well, I am not aware of the President's financial situation other than what I read in the paper --

Mr. <u>Pascrell.</u>   Apparently nobody is.

Secretary <u>Mnuchin.</u>   -- but I would just -- I would just comment that I assume that that comment is that he has properties in New York and other places that are impacted by the SALT deduction.

Mr. <u>Pascrell.</u>   Well, it is happening, and it is coming, so be prepared.

In September 2017, you promised:   Not only will this tax plan pay for itself, it will pay down debt.

You said that.   I didn't say that.

You also claimed that, for the highest earners, their taxes won't go down, which they obviously did in the final bill.   So do you agree that those statements have been proved false?

Secretary <u>Mnuchin.</u>   No, I don't.   So, on the first part, I would say --

Mr. <u>Pascrell.</u>   Then let me ask you this question.

Secretary <u>Mnuchin.</u>   Well, can I answer or --

Mr. <u>Pascrell.</u>   Well, you answered yes or no, but go ahead.   I will give you 2 minutes -- 2 seconds.

Secretary <u>Mnuchin.</u>   So, as I have said before, on whether it will pay down debt, that will depend upon the growth over the period of time.   It has worked so far.

As it relates to -- the top wealthiest people used to pay 19.3 percent of taxes; they now pay 19.8 percent of taxes.   So it --

Mr. <u>Pascrell.</u>   Is it true that your tax -- is it true that your tax bill used the SALT cap to pay for the tax cut for top earners?   Yes or no.

Secretary <u>Mnuchin.</u>   No.

Mr. <u>Pascrell.</u>   Do you know how much you gained from that in terms of revenue?

Chairman <u>Neal.</u>   I thank the gentleman.

Secretary <u>Mnuchin.</u>   I do.

Mr. <u>Pascrell.</u>   How much?

Secretary <u>Mnuchin.</u>   Again, it gained money, but it was offset by a majority of those people who paid the AMT --

Mr. <u>Pascrell.</u>   I yield back.

Secretary <u>Mnuchin.</u>   -- so it was in the number of a couple of hundred --

Mr. <u>Pascrell.</u>   -- not going to get a --

Chairman <u>Neal.</u>   I thank the gentleman.

With that, let me recognize the gentleman from Illinois to inquire, Mr. Davis.

RPTR MOLNAR

RPTR MOLNAR

EDTR SECKMAN

[10:01 a.m.]

Mr. <u>Davis.</u>   Thank you very much, Mr. Chairman.

I am deeply troubled that the Trump administration is prioritizing or allowing policies that allow 501(c)(3) tax-exempt organizations to discriminate against Jews, Catholics, Muslims, multiple groups of Protestants, and the LGBTQ families, while worsening the shortage of individual families who would be willing to serve as mentors to foster children.   And so do you support that policy?

Secretary <u>Mnuchin.</u>   Mr. Davis, I don't support discrimination in any kind, any place whatsoever.   Let me be clear of that.   If there are specific issues that relate to 501(c)(3)s, I would be more than happy to follow up with your office.

Mr. <u>Davis.</u>   We would be delighted to do that.

I am also concerned that there are severe cuts to the most vulnerable members of our population, cuts in the Department of Labor's training programs by 7 percent, cuts in child welfare, $4 billion, cuts to the most vulnerable groups in our society, to enhance the ability of the rich to continue to benefit from the tax cuts that we have seen.   How do you justify what I call those draconian cuts in terms of the vulnerable population groups, who would benefit from these funds, and we have no money at all in the budget for paid family leave, individuals to take care of sick relatives, parents, and even children?   Could you --

Secretary <u>Mnuchin.</u>   Well, Mr. Davis, let me just say we look forward to working with Congress on the allocation of and appropriations of specific programs, but let me just comment in general that, in 2020, the President's nondefense budget is $567 billion.   That is up from 518 in 2016.   So it is up substantially.

And as it relates to mandatory spending, we project that that goes from $2.8 billion

in 2020, to $4.3 billion in 2029.   So -- and that doesn't include, obviously, what was in the last several years, over $100 billion of money that went to special issues domestically for wildfires and hurricanes and other things.   So we look forward to working with you and Congress on specific programs.

Mr. Davis.   Thank you very much, and I yield back.

Chairman Neal.   I thank the gentleman.

And, with that, the chair would recognize the gentleman from North Carolina, Mr. Holding, to inquire.

Mr. Holding.   Thank you, Mr. Chair.

And, Mr. Secretary, thank you for your efforts on the proposed BEAT regulations. I look forward to working with you as we work through the remaining issues that are being brought up by the stakeholders in the comment period, and hopefully we can get those implemented quickly in a good way.

I want to switch gears and talk about pension plans.   As you know, hitting those rates of return, you know, is very important, and, unfortunately, often pension plans don't do so.   In North Carolina, where I am from, the retirement system posted a negative 1.47 percent return, making it the 21st year in a row that it has failed to hit a 7-percent target.

But the biggest bright spot in many pension portfolios has been investing in private equity.   Even when North Carolina's retirement system lost money in the stock market last year, investments in private equity earned a significant 18.3 percent return.   So it seems pension plans are understandably looking for more and more in the private equity markets to generate these needed returns.

For instance, in California's public employment retirement system, it is looking to double its investment in private equity and expects private equity to be the only asset capable of meeting its 7 percent target rate of return over the next decade.

So, in your capacity as a member of the board of the directors of the Pension Benefit Guaranty Corporation, how important is it for pension plans to hit their target rates of return, and what will happen if they continue to fail to do so?

Secretary Mnuchin.   Well, Mr. Holding, let me just first comment that it is up to individual pensions to determine what their appropriate return is and their investment allocation on a prudent basis.   I would just say, notwithstanding your pitch for private equity, public equities are up over 35 percent since the President was elected.   Over long periods of time, they tend to be tremendous investment opportunity for pension funds and have workers participate in that.   But I share your view on the importance of pensions and making sure that they protect the workers.

Mr. Holding.   And if private equity and real estate investments are some of the best rates of return, increasing additional tax burdens on those investments would obviously result in a lessening opportunity for pension plans who invest in such things, to hit their return rates.   I assume you would agree with that.

Secretary Mnuchin.   I think that is just factually correct.

Mr. Holding.   Thank you.

I yield back.

Chairman Neal.   I thank the gentleman.

With that, let me recognize the gentlelady from California, Ms. Sanchez, to inquire.

Ms. Sanchez.   Thank you, Mr. Chairman.

Mr. Secretary, on September 26, 2017, I sat with the President, you, and several members of this committee in a meeting at the White House where the President stated that both you and he would not personally benefit from the Republican tax bill.   Since we are now in our first tax filing season after the Republican bill has become law, I have a few questions for you regarding that meeting.

Do you recall, first of all, the President making that statement?

Secretary <u>Mnuchin.</u>   I do recall the comment although not all the specifics of it.

Ms. <u>Sanchez.</u>   Okay.   You were also quoted in the press during the fall of 2017 making similar statements.   Do you recall making similar statements to that?

Secretary <u>Mnuchin.</u>   I am sure you are correct.   If it is in the press, I did say those things at the time.

Ms. <u>Sanchez.</u>   Okay.   Mr. Secretary, did you personally benefit from the new tax law?

Secretary <u>Mnuchin.</u>   So I can tell you I did not personally benefit.   As I say --

Ms. <u>Sanchez.</u>   Did your individual tax rate go down?

Secretary <u>Mnuchin.</u>   My individual tax rate did not go down.

Ms. <u>Sanchez.</u>   Did not go down?

Secretary <u>Mnuchin.</u>   Oh, when it went -- just to be clear, my combined individual tax rate of State and Federal did not go down.

Ms. <u>Sanchez.</u>   No.   Your individual tax rate at the Federal level, did that drop?

Secretary <u>Mnuchin.</u>   Again, when I --

Ms. <u>Sanchez.</u>   Because the upper income earners received a tax --

Secretary <u>Mnuchin.</u>   Again, I think most --

Ms. <u>Sanchez.</u>   -- a reduction in their tax rate, did they not?

Secretary <u>Mnuchin.</u>   Again, most taxpayers look at their overall tax burden, so I was referring to the combination of what I pay in total taxes.

Ms. <u>Sanchez.</u>   I asked if your individual tax rate went down at the Federal level. Simple yes-or-no question.

Secretary <u>Mnuchin.</u>   I would have to look at that because --

Ms. <u>Sanchez.</u>   Okay.   To the best of your knowledge, did the President benefit --

Secretary <u>Mnuchin.</u>   -- because I believe --

Ms. <u>Sanchez.</u>   -- from the new tax law?

Secretary <u>Mnuchin.</u>   -- I believe, because I have --

Ms. <u>Sanchez.</u>   I am moving on.   I am moving on.   You can get me --

Secretary <u>Mnuchin.</u>   You are not allowing me to answer.

Ms. <u>Sanchez.</u>   -- the information later.

Did the President's individual tax rate go down?

Secretary <u>Mnuchin.</u>   I am not aware of the President's tax situation as you --

Ms. <u>Sanchez.</u>   In that meeting, the President also stated that the Republican tax bill would create up to 6 percent growth in our economy.   Has the economy seen a 6-percent growth since the tax bill passed?

Secretary <u>Mnuchin.</u>   I don't recall that statement, but I have been consistent in saying that our objective has been 3 percent or higher, which again, at 3.1, we have hit so far.

Ms. <u>Sanchez.</u>   I bet there are a lot of witnesses that are here on this committee that were in that meeting that could say the President guaranteed a 6-percent growth in the economy, and we have not seen that yet.

Mr. Secretary, I want to move on.   The 1998 IRS Restructuring Act created 10 violations that result in the termination of an IRS employee.   The seventh violation is willful misuse of section 6103 for the purpose of concealing data from a congressional inquiry.   This is defined by the Treasury Inspector General of Tax Administration -- and I am quoting here -- as, quote, actual knowledge that section 6103 did not preclude access to information by Congress or reckless disregard of the statutory provisions for disclosing information in response to a congressional inquiry, end quote.   Thus, an IRS employee that misuses 6103 to obstruct a congressional inquiry can be fired.

Mr. Secretary, should this apply to Treasury employees as well?

Secretary <u>Mnuchin.</u>   There is an awful lot of interest in 6103 here today.   Again, as I have said --

Ms. <u>Sanchez.</u>   If an IRS employee can be fired for not providing information under congressional inquiry, don't you think a Treasury employee should as well?

Secretary <u>Mnuchin.</u>   You are asking me a hypothetical question, which, again, we will review with our lawyers.

Ms. <u>Sanchez.</u>   I yield back.

Chairman <u>Neal.</u>   I thank the gentlelady.   And I was there.   The gentlelady is correct.   The President did note 6 percent growth.

With that, let me recognize the gentleman from New York to inquire, Mr. Higgins.

Mr. <u>Higgins.</u>   Mr. Secretary, I just want to, for the record, correct you that tax cuts do not pay for themselves, and you should know that.   The President just gave us four consecutive trillion-dollar deficits, proving that these tax cuts do not pay for themselves. The President's own budget projects that the debt will hit $22.8 trillion in 6 years.   That is more than 50 percent higher than when the President took office.   So these tax cuts do not pay for themselves.

Candidate Trump said that he will save Medicare, Medicaid, and Social Security without cuts ever.   He further said:   I am not going to cut Medicaid or Medicare.

President Trump's budget, because these tax cuts don't pay for themselves, cuts Medicare by $845 billion, cuts Medicaid by $241 billion, cuts Social Security by $25 billion.

The President gave us an infrastructure bill that nobody took seriously.   He had a Republican House and a Republican Senate, and there wasn't one bill to support the President's bill -- plan toward implementing an infrastructure bill.   In fact, the President

billed this as a $1.5 trillion infrastructure plan with only $200 billion of Federal money. That is equivalent to the amount of money that we spent rebuilding the roads and bridges over the last 10 years in Iraq and Afghanistan.   So this is not an infrastructure bill.

My hope is that, given the failed attempt by the President to initiate an infrastructure bill, that the administration will work with this House, that has sound ideas, as to how to fund properly an infrastructure bill because, Mr. Secretary, unlike tax cuts, infrastructure does pay for itself.

For every dollar that you give away in a corporate tax cut, the best-case scenario is that you can recapture 32 cents.   You are an investment banker.   That is a loss on investment of 68 percent.

On infrastructure, conservatively, for every dollar you spend, you can recapture about $2, and I have seen $3 and $4 as well.   So my hope is that you will take seriously our offer to work together on an infrastructure bill.

Secretary <u>Mnuchin.</u>   Mr. Higgins, I can assure you, we will take seriously your efforts to work with us on infrastructure, and we look forward to that.   And, again, let me just comment on whether the tax cuts pay for themselves or not will be simple math. Thirty-five basis points of additional growth over the 10-year period is what it takes, and we are way ahead of that, but we will see.   So time will tell.

Mr. <u>Higgins.</u>   I yield back.   Thank you.

Chairman <u>Neal.</u>   I thank the gentleman.

With that, let me recognize the gentleman from Missouri, Mr. Smith, to inquire.

Mr. <u>Smith of Missouri.</u>   Thank you, Mr. Chairman.

Secretary, thank you for being here.   Listening to the questions that I have heard, I might should ask a couple that are just as ridiculous, like, do you breathe oxygen?

Secretary <u>Mnuchin.</u>   What was that?

Mr. <u>Smith of Missouri.</u>   Do you breathe oxygen?

Secretary <u>Mnuchin.</u>   Yes, I breathe oxygen.

Mr. <u>Smith of Missouri.</u>   Are you a U.S. citizen?

Secretary <u>Mnuchin.</u>   Yes, I am.

Mr. <u>Smith of Missouri.</u>   That is how ridiculous these questions have been today.   I mean, everyone knows these questions, but it is just trying to make their political points.

But I do want to say to you, Secretary, is thank you, thank you and President Trump and this Republican Congress for turning our economy around.   For the first time in 13 years, our GDP is at 3.1 percent last year.   That is amazing.

And when I go to southeast Missouri, where the folks that I represent, their median income is $40,000 a year, and they tell me about how they have benefited from the Tax Cuts and Jobs Act, I don't listen to this political debate and jargon saying that it only helped the wealthy because I can take you to countless individuals in southeast Missouri where they came up to me and they were like:   You tell President Trump thank you for my thousand dollar bonus that I got at the AT&T Call Center in Cape Girardeau, Missouri, because of his tax cut bill.

I am, like:   No, I helped write it.   The President didn't write it.   I was one of the 23.

But he is like:   Thank you.

Or the young lady who had two broken car seats at Lowe's in Rolla, Missouri, and she said:   Because of the benefits from the Tax Cuts and Jobs Act, I was able to buy new car seats.

So I want you to not have a doubt how successful the economy is going, and how well the Tax Cuts and Jobs Act are affecting real Americans who don't think a thousand dollars are crumbs.   They know it is a couple months' rent.   They know it is a couple car

payments, and they know it will put food on the table.

So, Mr. Secretary, I do want to make a point that is in the budget of something that I really care about.   One, the elimination of the electric tax credit, the President proposed that in the budget.   We know that 80 percent of the people that benefit from the electric tax credit for electric cars, they get $7,500 on purchase of a new car.   Eighty percent of those people make more than $100,000 a year.   How many electric cars do you think are in southeast Missouri?

Secretary <u>Mnuchin.</u>   I don't know how many are there, but I do know that I own a Tesla, and I didn't need the $7,500 tax credit --

Mr. <u>Smith of Missouri.</u>   Well, I want to take it away, and I am glad the President does as well.   And I could say so much more, but thank you for being here, thank you for the job you are doing, and thanks for putting up with all this.

Chairman <u>Neal.</u>   We thank the gentleman.

With that, let me recognize the gentlelady from Washington State, Ms. DelBene, to inquire.

Ms. <u>DelBene.</u>   Thank you, Mr. Chairman, and thank you, Mr. Secretary, for being with us today.

When the Tax Cuts and Jobs Act was being drafted, Republicans sold the passthrough deduction as a provision that would benefit small businesses.   However, a recent Joint Committee on Tax Publication on the passthrough deduction found that two-thirds of the benefit goes to households making above the income threshold.   That threshold is $157,500 for individual filers and $315,000 for joint returns, meaning that taxpayers above those income thresholds, who only represent 5 percent of taxpayers claiming the deduction, will reap 66 percent of the benefits from the deduction.

Another report from the Joint Committee on Taxation finds that more than half the

benefit of the passthrough deduction will be claimed by taxpayers with income in the top 1 percent.   Are you concerned that a provision that was supposed to benefit small businesses is largely benefiting the wealthy?

Secretary Mnuchin.   Well, let me just comment that in -- in passthroughs, there is one level of taxation as opposed to two levels of taxation.   The idea of the passthrough discount was to create businesses that are passthroughs, to make them competitive with corporations and to eliminate a lot of what would have been the switching costs had people made those as corporations.   So --

Ms. DelBene.   But our small businesses are not receiving that benefit.

Secretary Mnuchin.   Again, I would just say I don't have the specifics and will try to get back to you on this, but the idea was that no different than corporations would pass on significant part of those benefits to workers and investment that passthroughs would as well, and we will try to get back to you with some statistics on that.

Ms. DelBene.   Well, I think you should read the report from the Joint Committee on Taxation because it has that detail.   And it is very concerning --

Secretary Mnuchin.   I have read the report.

Ms. DelBene.   -- when the tax bill was -- because when Republicans were talking about a tax bill, they talked about how it was going to benefit middle-class families and small businesses.   This is yet another proof point that says that that has not been true.

Finally, Mr. Chairman, I would like to enter into record, a letter sent to Secretary Mnuchin on November 29th, 2018, requesting documents related to the ACA.   The documents have not been produced to the committee, and I ask for unanimous consent to enter it into the record.

Chairman Neal.   Without objection.

Ms. DelBene.   Thank you.   I yield back.

Secretary Mnuchin.   And we will look into that and get back to you.   I am not aware of why it hasn't been followed up on.

Ms. DelBene.   Thank you.

Chairman Neal.   I thank the gentlelady.

With that, we will recognize the gentlelady from California, Ms. Chu, to inquire.

Ms. Chu.   Secretary Mnuchin, earlier, Mr. Marchant from Texas, from the other side of the aisle, raised the issue of taxpayers facing a penalty because they did not withhold enough.   I am so glad he did because it shows that this is not a partisan issue. And I would like to reiterate as to why this is so important.   The 2017 tax law was the first law overhaul in this country and its taxpayers, the first in 30 years.   Because of the sweeping changes made in a very short period of time, including the elimination of personal exemptions and capping of the State and local tax deduction, many are still working to understand its impact on their families and on their tax refunds.

Constituents in my district have told me this is the first year in decades that they have not received a refund and are facing the reality of owing taxes and underpayment penalties.

Now, the last time the Tax Code was overhauled in 1986, the drafters included a waiver of penalties for underpayments caused by the change in the tax law.   I believe this provision was included because they knew taxpayers would face the same withholding challenges that families are facing today.

While Congress did not include such a waiver this time around, I understand that the IRS did announce it will waive the usual underpayment penalties as long as taxpayers paid at least 85 percent of the tax they owe.   This is a step in the right direction, but it is ultimately inadequate.   Since that announcement, experts and practitioners believe further relief is needed.

In fact, the American Institute of CPAs, a nonpartisan organization that represents over 430,000 accountants and experts across the country, have determined that further relief is needed to protect the taxpayers this filing season, and would like it to be lowered to 80 percent.

And that is why I introduced H.R. 1300, the Taxpayer Penalty Protection Act which follows this recommendation to the 80 percent level.   I believe this bill is in the best interest of taxpayers across the country, and that this should not be a partisan issue.   Filing season impacts all of our constituents.

So, Mr. Secretary, I heard you say earlier to Mr. Marchant, that you will consider providing further penalty relief through administrative actions.   My question is about that and also about the time schedule because people are filing now, and we have only 1 month to go before April 15th.   Taxpayers need the certainty now.   So will you confirm that you will consider further penalty relief, and what is the timeframe?

Secretary Mnuchin.   Well, first of all, again, I appreciate your feedback, and this isn't a partisan issue, as it was brought up earlier.   I appreciate you bringing it up.   We will review it very quickly.   I would normally tell you I would review it this afternoon, but I am testifying at the Senate this afternoon.   So I will look at it tomorrow, and we will try to make a decision within the next week on this.

Ms. Chu.   Thank you so much.   I yield back.

Ms. Sewell.   [Presiding.]   Thank you.

The chair will recognize Mr. Rice from South Carolina.

Mr. Rice.   Thank you, Madam Chair Lady, and thank you Secretary for being here.

I want to tell you a story, Mr. Secretary.   In 2008, when Barack Obama was campaigning for President, he drove down I-95, and he stopped in a little county in my district, and it is one of the poorest areas in South Carolina.   Three counties there, they

call it the corridor of shame.   They were very heavily invested in textiles and tobacco 40 years ago, and you can imagine what happened to them.   And when the President stopped there, he put a little girl on his knee and decried the poverty and said that we needed to do something.

It was a beautiful speech, but guess what, nothing happened in the 8 years of his Presidency.   I want to tell you that Marion County, right next to that, is the poorest county in South Carolina.   Fifty-seven percent African American.   Twenty-eight percent live in poverty, twice the South Carolina average.   This is a real story for real people.   When President Barack Obama left office in December 2016, 9.6 percent unemployment in Marion County.   Eighteen months later, a year and a half after President Trump took office, and we had passed this Tax Cuts and Jobs Act, and we had the opportunity zones, and we had a new piece of infrastructure in Dillon County, the unemployment rate in Marion County dropped from 9.6 percent to 4.8 percent.   That is half -- half -- in 18 months.   That is a remarkable success for people who desperately, desperately needed it.

At this point, we have more jobs open than we have people to take them.   People who have suffered generational poverty, who never believed that this land of opportunity provided opportunity for them, now are coming back into the workforce, and everyone who does is a win.   They recognize -- they are recognizing that they have a chance at the American Dream.   We are engaging educators and pastors to bring people together, to help them see that opportunity is for them.   Barack Obama gave a great speech.   Donald Trump is fixing the problem.   Thank you, Mr. Secretary.

Now, we can't stay where we are.   I believe that the reason why American workers suffered for so long is because our economy and our economic policies were not competitive.   We have made our Tax Code competitive.   We have got to fix our unbalanced trade agreements that are balanced against American workers.   Please keep

pushing for the revised NAFTA and a new deal with China.   We need infrastructure.   Our workers, if they are going to compete on the world stage, they have got to have world-class infrastructure.

And we need to shift from family-based to skill-based immigration.   If we can get these things done, we will see upward movement in GDP growth for a sustained period and a sustained, golden age of opportunity for American workers.   Thank you, Mr. Secretary.

Ms. Sewell.   The chair now recognizes myself for 3 minutes of questioning.

Mr. Secretary, I wanted to follow up on the line of questioning regarding the opportunity zones.   I think that we are all agreed that it presents a wonderful opportunity for us to invest in distressed communities.   Mr. Kelly asked about the second tranche of rules and regulations, and you didn't give a specific timeframe.   And I was wondering if you could give us a thought as to when we can get finalized rules.

There are several opportunity zones in my district that we would love to take advantage of, but many of the private investors want to know specifically how they are going to, you know, how opportunity zones -- the credits will actually benefit them.   So can you actually talk a little bit when we can get final rules so that people can have more specificity?

Secretary Mnuchin.   So, first of all, thank you for your focus on this, and I can assure you, I am as focused on this as you.   I ask my team every day:   Where are they?

As I said, the next tranche is going through a review.   I hope this is a matter of weeks that we can get these out.   So --

Ms. Sewell.   I just want to stress that I think that this is a tremendous bipartisan opportunity to really affect communities -- vulnerable communities in our Nation, and people really want more specifics before they actually invest.

Secretary <u>Mnuchin.</u>   Thank you very much, and I can assure you this is on the top of my list --

Ms. <u>Sewell.</u>   Okay.

Secretary <u>Mnuchin.</u>   -- when we have tax meetings every day.

Ms. <u>Sewell.</u>   And the other thing is that I know that, in January, my colleagues and I sent a bipartisan, bicameral letter raising a number of issues about the opportunity zones programs that remain unsettled.   One was about data accountability, and that was addressed a little bit by Mr. Kind and your response.   I just want to make sure that we -- that the focus is on having metrics that will actually get to whether or not communities -- those communities actually benefited, the impact of the investment on the communities.   In particular, unemployment, but also the -- what do you call it -- the ancillary things that actually can spawn from economic development.

So I will work with my colleague, Mr. Kind, in helping to draft a letter of the kinds of metrics and the kinds of data accountability I think that would be necessary in order to make this really a win-win for the community, as well as for the investors.

Secretary <u>Mnuchin.</u>   Good.   And let me just assure you that the only reason why those haven't come out is because we didn't want to rush through them.   We want to have the proper reporting.   And those aren't critical for people starting investments.   So whether those come out next week or in 6 months --

Ms. <u>Sewell.</u>   True, but you know how investors are.   They like to get more --

Secretary <u>Mnuchin.</u>   -- we have time to get it right.   But we will work with you very closely.

Ms. <u>Sewell.</u>   Thank you.

Secretary <u>Mnuchin.</u>   Thank you.

Ms. <u>Sewell.</u>   The other question I had that has been asked of me, is there an

opportunity to examine whether or not we can do additional designations since the Governors had to designate prior to actually the rules coming out?   Have you -- has there been any thought as to whether or not additional areas could be designated?

Secretary Mnuchin.   We don't believe we have any legal authority to allow for additional designations at this time, but if that is something that is important, we would obviously work with you and the committee to pass appropriate legislation and be supportive of that.

Ms. Sewell.   Thank you.

The next -- we will go to Mr. Schweikert of Arizona.

Mr. Schweikert.   Thank you, Madam Chairwoman, I appreciate it, just because of the -- having to run back and forth and vote on the floor.

I am going to run through just a couple things.   First, opportunity zones, this is as much for the staff.   For those of us from Arizona, with our Tribal communities, you can't end up with having ownership of the underlying lands.   So you have leasehold interest.   It does make some of the mechanisms a little trickier, maybe having to use tax book basis. So I appreciate you listening to our concerns on that.

Thank you for hopefully moving us away from the bad old days of what we used to refer to around here as Operation Choke Point.   For some of my border communities, you had a Hispanic surname.   You felt you were being treated differently if you were doing trade back and forth across the border.

Debt management, there is a number of us who -- we basically look at our demographics, and that is one of the frustrations you hear in these discussions here if you actually go 2008 to 2028, 91 percent of all the spending increases are going to be interest, Social Security, healthcare entitlements.   It is our demographics that are driving our debt. And if you actually look in the next 30 years, I hope the Treasury is thinking of either/also

instruments, the trills concept from Dr. Shiller, some of these other things as ways to manage our future debt that is being driven.   Many of us get a little nervous when we look at the subscription rates of some of the sovereign offerings.

Last thing -- and this is actually where the question sort of comes -- CBO actually put out the 5 months -- you know, the first 5 months' fiscal revenue is in.   And it looked as if actual revenues were pretty much identical to the previous fiscal year's first 5 months. But the $142 billion of debt looks like it almost solely came from our Bipartisan Budget Act.

When Treasury is doing some of their documents, do they have the -- is there a more elegant way to sort of say, look, revenues actually are -- under the new tax reform, look pretty stable, it is Congress' spending policies that are actually driving up your need to go and issue more and more debt?

Secretary Mnuchin.   Thank you.   Let me just comment, the way we designed the Tax Act was there were incentives for people to do automatic expensing and other things, which cost tax revenues in the first few years and raise revenues going forward.   So, when we say it has paid for itself or it has generated revenues, that is true, despite -- because we are looking at it over the window.

Now, let me just comment:   We can't spend the growth twice.   So growth that we are using to pay for tax cuts, we got to be careful and not also use for increasing expenses. And that is the reason why we have adjusted the budgets accordingly.

Chairman Neal.   [Presiding.]   I thank the gentleman.

Mr. Schweikert.   Thank you, Mr. Chairman.

Chairman Neal.   Thank you.

With that, let me recognize the gentleman from Pennsylvania, Mr. Evans, to inquire.

Mr. Evans.   Thank you, Mr. Chairman.

Mr. Secretary, you mentioned -- you talked about the word "poverty," and that is been a huge concern obviously in the State of Pennsylvania, particularly in the city of Philadelphia.   I want to raise a question about utilizing low-income housing tax credit and private activity bonds to fund low-income housing.   I would like to know your thoughts on fixing the low-income housing tax credit at 4 percent while either removing the cap on private activity bonds or having expired cap funds go back into the pool.

Secretary Mnuchin.   Mr. Evans, I would be happy to follow up with you and your office to go through the specifics and your ideas of what we should do on that.   We would be open-minded to looking at your suggestions.

Mr. Evans.   Okay.   Second question, I wanted to kind of follow up a little bit on the issue regarding opportunity zones.   You know, obviously, that is a great concept. However, it appears, and understanding that although well intended, wealthy investors often benefit the most because benefits are limited to capital gains.   Investors are not always focused on the best use.   So how can we make it so that we can see more benefits target to the areas which was originally intended to benefit opportunity zones?

Secretary Mnuchin.   Well, Mr. Evans, I think, as I have said before, we are very excited about opportunity zones and particularly areas where we think there is going to be a lot of interest, not only in real estate, but more importantly, companies starting and companies growing in those areas.   So we look forward to working with you on appropriate areas in your area.   But we think there will be a lot of money that is incentivized and we look forward to working with you.

Mr. Evans.   Would you also see, around the issue of the opportunity zones, being able to have a direct benefit towards housing in any way?

Secretary Mnuchin.   I think that housing is a very appropriate area that will benefit

from it.

Mr. <u>Evans.</u>   You also talked about the element of -- mentioning the aspect of poverty, which I totally agree that we need to do -- I think that is absolutely the challenge that we face in this country, sort of like the two tiers of communities that we have.   So I want you to go back a little bit.   In a very specific way, from this administration, you mentioned the tax package, you mentioned trade.   Any other kind of specific ways that you have specifically on addressing the question around poverty?

Secretary <u>Mnuchin.</u>   Well, I think, within Treasury, we are looking at a lot of issues around financial literacy, opportunities within communities.   We have different advisory groups.   Yesterday, I met with many people on this issue.   We look forward to working with you and getting your ideas on how we can address it.   It is a very important issue.

We also think that making sure within these communities we address the appropriate regulation and the appropriate opportunity for job creation.

Mr. <u>Evans.</u>   Thank you, Mr. Chairman.

Chairman <u>Neal.</u>   And, with that, as the gentlelady takes her seat, we will recognize Ms. Moore from Wisconsin to inquire.

Ms. <u>Moore.</u>   Thank you so much, Mr. Chairman.

And welcome back, Secretary Mnuchin.   I just wanted to make sure that I heard your testimony correctly.   You say that this tax cut has really put families on a great path. We have doubled the standard deduction, that businesses are creating new jobs, and there has been great economic growth.   Is that your testimony?

Secretary <u>Mnuchin.</u>   I believe that is correct.

Ms. <u>Moore.</u>   All right.   Well, I just want to ask unanimous consent to enter into the record some of the media stories compiled by the Americans for Tax Fairness, and do

I -- can I --

Chairman Neal.   Without objection, those will be entered into the record.

Ms. Moore.   Thank you so much.

Secretary Mnuchin, I am wondering, we have doubled the standard deduction. You know, your claim is that families are going to be better off, but you mentioned in your testimony that the budget is going to continue to push our economy forward.   So I am wondering how the cuts in Medicaid, Medicare, cuts in Social Security, to disabled people who are trying to work, the elimination of the social services block grant fund, huge cuts, how will the doubling the standard deduction, eliminating Medicaid expansion, how will a struggling family of taxpayers benefit with the combination of the tax cut, which gave them double the standard deduction, and the elimination of these other safety net initiatives?   How do you see that working with your theory of families being better off?

Secretary Mnuchin.   Well, I think families are better off.   Because of the tax cuts, they have more money in their pockets.   They have --

Ms. Moore.   -- excuse me, my time.

Secretary Mnuchin.   -- growing wages --

Ms. Moore.   They have tax cuts --

Secretary Mnuchin.   Can I at least finish?

Ms. Moore.   -- like $20 extra.

Secretary Mnuchin.   Again, the example that I gave you before -- and everybody is different, okay -- is, in a family that makes $75,000, had their taxes cut 55 percent.   I believe the average tax across the board was lower than that, but --

Ms. Moore.   Reclaiming my time, sir, I am not talking about a family making $75,000 a year.   I want to talk about the families that are struggling in the middle class. How does cutting these other benefits they might need, ObamaCare, how will they benefit

from this tax cut?

Secretary Mnuchin.   I am going to respect your reclaiming your time because the last time I got into a video on that.

Ms. Moore.   That is exactly right.   That is how it started.

Secretary Mnuchin.   But let me just emphasize:   We are not cutting programs. We are lowering the rate of growth on programs, as I mentioned --

Ms. Moore.   You are cutting Social Security, Medicare, and Medicaid.   You are eliminating the social services block grant fund.

Chairman Neal.   The gentlelady --

Ms. Moore.   And thank God my time has concluded, right, Secretary, and you didn't have to answer.   Okay.

Chairman Neal.   I thank the gentlelady.

With that, let me recognize the gentleman from Illinois, Mr. LaHood, to inquire.

Mr. LaHood.   Thank you, Mr. Chairman.

And thank you, Mr. Secretary, for being here and for your service to our country.

Secretary Mnuchin.   I just want to say I didn't mean to say yes to -- I was -- that your time was over.   I was saying yes to my reclaiming my time thing.   So I apologize for that.

Mr. LaHood.   Mr. Secretary, I appreciate you being here, and I would just start off, in my district, in central and west central Illinois, I look at the effect that the Tax Cuts and Jobs Act has had on my district, and probably the number one complaint that I hear in my district as I travel around, is:   We don't have enough workers to fill the jobs.

We have 7.3 million unfilled jobs in this country.   And I look at my district, and whether it is truck drivers, whether it is mechanics, whether it is welders, whether it is nurses, technicians, we can't fill the jobs that we have, as a direct result of the Tax Cuts and

Jobs Act that was passed by this Congress.   And that is a positive thing.   I also look at recent Gallup Poll, U.S. small business owners optimism, the highest in 10 years.   Look at the fact a Gallup poll, just last month, in the middle class, 70 percent are more optimistic this year than they were last year.

And so, by every measure, you look at the optimism in the economy as a result of the Tax Cuts and Jobs Act; it is working.

And so, question for you on filling that jobs gap out there, skilled labor, career technical education, can you talk a little bit about what the administration is looking at so that we can fill these jobs and educate folks for -- so that we can keep this economy moving?

Secretary Mnuchin.   Thank you.   I think there are really two important issues. One is worker training and to make sure that, as you said, there are as many open jobs as there are workers, so that we train people for those jobs.   And, two, we need to have legal immigration growth to increase our economy.   So I know this is something that the President continues to be focused on and working with Congress on, but we need more workers.

Mr. LaHood.   Switching gears to trade, can you give us a little update on where we are at with China?   I know you and Ambassador Lighthizer have been very engaged with the Chinese, and we are at a critical point with those negotiations.   And, specifically, if you could comment on -- we heard a lot about the enforcement mechanism that we are trying to put in place to change the behavior of China as it relates to making them comply, making them abide by what every other industrialized country in the world does, and whatever that structural change is, is going to be important moving forward.   Can you talk a little bit about that?

Secretary Mnuchin.   Yes.   So I think, as you know, President Trump has been

focused on this issue of trade with China for the last 2 years, since the first meeting at Mar-a-Lago, between the two Presidents.   He made very clear, and they agreed, that the trade deficit had to be reduced and that they had to create more opportunities for U.S. companies and protect our technology and stop forced joint ventures.

Ambassador Lighthizer and I have worked very close together.   We had a call with the Vice Premier as recent as last night.   We are working diligently.   There is over 150-page document that we are working on.   It will have, if we reach an agreement, a very clear enforcement provision, and as the President said yesterday, we want to get the agreement right.   That is more important than the exact timing.   But I expect it is something we will resolve in the near future.

Mr. LaHood.   Thank you, Mr. Secretary.

Chairman Neal.   I thank the gentleman.

And, with that, let me recognize the gentleman from Virginia, Mr. Beyer, to inquire.

Mr. Beyer.   Mr. Chairman, thank you very much.

Mr. Secretary, pleased -- thank you for being with us.

Mr. Chairman, without objection, I would like to offer for the record an article from this morning's Wall Street Journal entitled "Steve Wynn Met With Treasury Officials About Opportunity Zones After Stock Sale."

Chairman Neal.   Without objection.

[The information follows:]

Mr. <u>Beyer.</u>   And I also note that FOIA requests about these meetings have been pending since last September, and the Treasury Secretary -- and I urge the Treasury Secretary to make these FOIA requests a priority.

Secretary Mnuchin, in contrast to the rest of the nondefense budget, the President's budget does request an increase in funding for the IRS.   This signals a recognition of the problem but doesn't go nearly far enough to address a decade of underfunding on the IRS workforce and its mission.   Much of the funding is addressed on new initiatives, like the technology, that, while worthy, don't address some of the main problems we have seen arise during a decade of underfunding.   The IRS enforcement budget is 23 percent below where it was in 2010, and this even -- in 2010, there was a tax gap of almost half a trillion dollars.   We have talked a lot about the budget deficit.   That half a trillion dollars per year would go a long way.   And that is just 2010 numbers.

From 2011 to 2017, audits of the wealthy fell at an alarming 75 percent, a much higher rate than the audits fell for poor and middle-class taxpayers.   And this comes at a time when wealthy tax evaders are using ever more complex schemes, including a proliferation of global LLCs designed to hide assets.   The IRS has many talented and dedicated employees, many of them are my constituents, but they simply can't keep up.

And there is concrete evidence that the wealthy enjoy widespread immunity, not just to practice aggressive tax-avoidance schemes, but to engage in fraud and evasion as well.   Some wealthy people clearly share that belief.   That is why tax-deductible donations for fraudulent charities, and bribes to get their kids into college, or aggressively and illegally undervaluing real estate assets to avoid tax liabilities.   So this not only undermines Federal revenues but also just confidence in our democracy and the rule of law.   So, Mr. Secretary, what steps are you taking to reduce the tax gap and increase

public confidence in the IRS?

Secretary <u>Mnuchin.</u>   Thank you very much.   So, first, let me just comment on your first issue on Mr. Wynn.   We will be happy to follow up with the FOIA request.

Mr. <u>Beyer.</u>   Thank you very much.

Secretary <u>Mnuchin.</u>   I can confirm there was a meeting with the experts who deal with opportunity zones.   We had meetings with lots of people.   I think I stopped in for literally 2 minutes to say hello.   That was not a meeting that was scheduled with me, but I can assure you this was a normal meeting like we meet with other people.

Now, in regards --

Mr. <u>Beyer.</u>   -- the tax --

Secretary <u>Mnuchin.</u>   In regards to the IRS funding, I very much appreciate, a major priority for me is technology and upgrading the technology.   I think, as you know, we had an issue this year on tax day with the technology.   We make big investments in lots of other things that are important to the government.   The IRS needs technology to bring it into the modern age.   And compliance in shrinking the tax gap, in my opinion, updated technology is the number one way for us to accomplish that.   So I very much support the IRS' plan.   I appreciate the bipartisan support for the IRS, and again, IRS technology is on my top 10 list to get done.

Chairman <u>Neal.</u>   I thank the gentleman.

With that, let me recognize the gentleman from Illinois, Mr. Schneider, to inquire.

Mr. <u>Schneider.</u>   Thank you, Mr. Chairman, for holding this hearing.

Thank you to the Secretary for being here.

I would like to focus on a topic we have touched on already, the State and local tax deduction, the cap on that.   The last tax package put a cap at $10,000.   We had this earlier discussion of, does that affect middle-class families?   Well, in my State of Illinois, it does

affect middle-class families.   In my district, roughly 42 percent of all tax filers are impacted by this, and the average in Lake County, one of the counties I represent, is more than $18,000 in State and local taxes because Lake County has a reputation of comparatively high property taxes.

This is affecting working middle-class families who are struggling to make ends meet.   I take it a step further and say that it is double taxation.   They are being taxed on the taxes they are already paying to fund their schools, their local communities, the operations of our State.

Eleven million households nationwide are affected by this.   As I mentioned, in Illinois, this is a disproportionate impact.   I hear from constituents everywhere I go that this is really having a harmful effect on their ability to make ends meet and take care of their families.

So my question for you is basically this:   What do you say to these middle-class families who were promised a tax break by the President, but who are, in fact, experiencing a tax increase, reduction in their refunds, et cetera?

Secretary Mnuchin.   Well, Mr. Schneider, first of all, let me acknowledge, okay, we are carefully looking at the impact on SALT on the appropriate States, as to what the impact is on these economies because these economies are a large component of U.S. growth.   So it is something that we are monitoring carefully.   I won't get into a debate as to what is the middle class and what -- who is exactly being impacted, but I will acknowledge we do have certain concerns we are monitoring on these economies.   I think you know the President has made some recent comments on this, that he is aware of it.   So I do want to just say we do understand it, and we look forward to working with you specifically to understand the impact in your areas.

Mr. Schneider.   Thank you.   And I will say that a young family that is making,

say, $75,000 to $125,000, which defines a big portion of my district, families that

are start -- couples that are starting their families, moving to the district, buying their first

home, and getting hit with not just the impact of the cost of starting a family, but then a

double tax on their State and local taxes they are paying for funding their kids' schools, is a

real burden on these families.

So I look forward to working with you.   This is something that I think we need to

address and give relief to these families that were promised a tax break.

And, with that, I yield back.

Chairman Neal.   Thank you.   The chair would exercise a prerogative here.   I

think that the President did note that he was open to a discussion about the SALT

deduction?

Secretary Mnuchin.   I will comment yes.   I was just referring to the President is

aware of this, and as I said, we are carefully monitoring the impact on these parts of the

economy, which I want to acknowledge is a very important part of the U.S. economy.

Chairman Neal.   I thank the gentleman.

With that, Dr. Wenstrup is recognized to inquire.

Mr. Wenstrup.   Thank you, Mr. Chairman.

Thank you, Mr. Secretary for being here today.

I can say throughout my district in some areas where they were really struggling,

there is a lot more optimism than we had a couple of years ago, and we are also seeing a

great increase in the capabilities and needs being filled through our community colleges

and our vocational schools.

You know, through this process -- you know, we are a great country that provides

safety nets, and we never want to let those go away.   But they are sometimes very

challenging for people.   Well, you have an opportunity right now with growth and more

jobs available, enhancing the lives of blue-collar workers and their families.

But in addition, I want to take a moment here to talk about those that are in poverty and the opportunities for them.   And one of the things that I am finding -- and I want to hear what the Treasury Department feels about this and how we can do things better -- but for those that find themselves in poverty, our fellow Americans that, you know, are making every effort they can, one of the problems that they find all the time is they have to go one place for their housing, another place for their nutrition, and another place for their healthcare.   And too often, as they start to succeed and make their way, they are penalized. They are penalized for making too much.   They suddenly get into a higher level of income, and their kids lose their Medicaid.   That is a real scenario that I think both sides of the aisle recognize, at least I hope they do.

But how is that affecting you at Treasury, and maybe what recommendations might you make that we do so that people aren't stymied in the process of trying to come out of poverty?

Secretary Mnuchin.   Well, I think you have raised some very important issues.   I look forward to sitting down with you and other people on a bipartisan basis on the committee to look at this issue.   I think clearly we want to have incentives for people to work.   So we want to put people back to work.   The best way to get them out of poverty is to have them have jobs, and we look forward to addressing some of the issues that you have raised.

Mr. Wenstrup.   Yeah, and I am talking about Americans that are very incentivized to work, and they are working, and they are given a greater opportunity at work, but they can't take it because of what we have in place here.   What we are telling them is:   Well, now your kids will no longer have healthcare because you are going to make $5 an hour more, or something like that.   So I think we have to do some math here.

Secretary <u>Mnuchin.</u>   I understand it, and I hope this is something that Republicans and Democrats can look at together on the committee.

Mr. <u>Wenstrup.</u>   And I want to applaud the focus on customer service with the IRS. And I think that -- I met with the Commissioner the other day, and I think that he gets it, and hopefully we are going to be on the right track there.   Thank you.

Secretary <u>Mnuchin.</u>   And thank you for noting that.   And let me just say we can always do better.   One of the things we are focused on, again with technology, is automated callbacks.   There is no reason why, in this day and age, hardworking Americans need to stay on the phone on hold for long periods of time.   So this is a priority for us with technology.

Mr. <u>Wenstrup.</u>   Thank you.

Chairman <u>Neal.</u>   I thank the gentleman.

With that, let me recognize the gentleman from New York, Mr. Suozzi, to inquire.

Mr. <u>Suozzi.</u>   Thank you, Mr. Chairman.

Thank you, Mr. Secretary for being here today.

I didn't want to talk about this, but I am going to.   You know, you have talked about it a little bit.   SALT is awful for my district.   The SALT cap is awful for my district.   It is bad for all of New York -- at least downstate New York.   In fact, every Democrat and every Republican in New York City on Long Island and the downstate suburbs voted against the tax bill because it is bad for the people of the area I represent. And I know that you are from New York as well.   That is correct?

Secretary <u>Mnuchin.</u>   That is, and I can assure you I hear it from plenty of people in New York all the time.

Mr. <u>Suozzi.</u>   And you know that New York is the largest net donor to the Federal Government of any State in the United States of America.   We send more than $36 billion,

maybe as much as $48 billion a year to the Federal Government than we get back in tax returns.   Are you aware of that fact?

Secretary <u>Mnuchin.</u>   I am.   Although I would just comment on the net donor issue, it happens to be because it also has a predominant portion of the wealthy people.

Mr. <u>Suozzi.</u>   And we are subsidizing the rest of the country more than any other place in the country.   Maybe because we have wealthy people in New York City and other places, we also have middle-class people.   The country is different from place to place. You would argue that, wouldn't you?

Secretary <u>Mnuchin.</u>   I would, and again, let me acknowledge, I appreciate the issue.   The SALT issue, as I have said --

Mr. <u>Suozzi.</u>   So, if somebody is making $150,000 in some places in the country, they are doing great, but if they are making $150,000 between a husband and a wife in my district, you are actually facing a tough time because of your high cost of your home value, because of the high cost of your property taxes, the cost of living.   You understand that, based upon your personal experience, don't you?

Secretary <u>Mnuchin.</u>   I do, indeed.

Mr. <u>Suozzi.</u>   Okay.   So we have got to try and address that.

Now, Mr. Secretary, in June of last year, you said the new postcard-size Form 1040 is designed to simplify and expedite filing tax returns, providing much needed relief to hardworking taxpayers.   This is a copy of the postcard that was used for a lot of the press that the Republicans and the administration were using, saying how much easier it was going to be for people.   Now, we have asked for a report, the staff of Ways and Means has asked for a report that has been issued about how well the postcard is working out, and we haven't been able to get that report.   Do you think we can get that report from you?

Secretary <u>Mnuchin.</u>   So, again, I understand from my staff that we sent you back a

response yesterday.

Mr. <u>Suozzi.</u>   Was it a response or the comments?   We want the actual report.

Can we get that report?

Secretary <u>Mnuchin.</u>   I am aware of -- you do want the report.   We are getting the

report to you.   Quickly, the report is in draft.   Our preference would be to wait until --

Mr. <u>Suozzi.</u>   We would like to see the draft of the report.

Secretary <u>Mnuchin.</u>   I believe that we are accommodating that.   We are working

with the chairman on that, but I understand the request.   I understand that --

Mr. <u>Suozzi.</u>   Let me just point out, Mr. Secretary -- thank you so much.   Nina

Olson, who is the National Taxpayer Advocate, gave testimony a week or two ago, and

said there is a 200-percent increase -- a 200-percent increase -- in the errors that taxpayers

are filing.   Are you aware of that?

Secretary <u>Mnuchin.</u>   I am not aware of that statistic, no.

Mr. <u>Suozzi.</u>   -- 200 -- this is an independent person who has been working for 18

years as an independent person.   She says there is a 200-percent increase in the errors in

taxpayers' forms.

Secretary <u>Mnuchin.</u>   I understand who she is, and I look forward to hearing the --

Mr. <u>Suozzi.</u>   She also testified that people have to wait 17 minutes before someone

picks up the phone, and only 18 percent of taxpayers' calls are actually answered.   Are you

aware of that fact?

Secretary <u>Mnuchin.</u>   I am, and as I just noted, okay, I want to work on the issue.

And, again, we should have ways that taxpayers can communicate electronically so they

don't have to sit on --

Mr. <u>Suozzi.</u>   So the IRS has been picked on for many, many years.   It is getting

worse under these new tax laws --

Chairman <u>Neal.</u>   The gentleman will wind -- the gentleman will wind down his --

Mr. <u>Suozzi.</u>   Thank you, Mr. Chairman.

Do you agree that things have gotten worse under the new --

Chairman <u>Neal.</u>   I thank the gentleman.   His time has expired.

With that, we will recognize --

Secretary <u>Mnuchin.</u>   No, I don't.

Chairman <u>Neal.</u>   -- from California, Mr. Panetta?

Mr. <u>Panetta.</u>   Thank you, Mr. Chairman.

Mr. Secretary, thank you for being here.   I appreciate your time and your patience.

I wanted to -- I was going to talk about this, but you brought it up, and I really appreciate you bringing this up:   immigration reform, basically immigration and how that is a crucial part of the economy.

And we are going to -- it is very important in my district on the central coast of California.   The number one industry is agriculture.   Therefore, an ag-labor bill will be coming to the administration hopefully.   It is going to come out of the House, hopefully get through the Senate, and I would hope that because of the importance that you just stressed on immigration and immigration reform, that you would be an advocate to outweigh the anti-immigration reform elements in this administration, showing the President how important it is, not just for my district but for districts across this country. Can I get your commitment to being that advocate for that type of immigration reform?

Secretary <u>Mnuchin.</u>   I don't know the specifics of the bill, but I am an advocate for legal immigration reform.   I think you know the President very much supports agriculture and the hardworking farmers.   I am familiar with your district, and you know, this is an issue we need to address, not only for farmers but for skilled people as well.   There are way too many people that come here, study in the U.S., get Ph.D.s, can't stay here to work.

So legal immigration reform is something I think is very important for Congress to work on.

Mr. <u>Panetta.</u>   Exactly.   And I would also mention that a lot of the work that my farm workers do, on the central coast, I would call skilled labor.   There is a reason why the domestic workforce is not filling those jobs because it is very difficult to do, and, therefore, that is why we have people coming into this country to do it, thankfully for my community, our economy, and our agriculture.

I want to mention something in regards to the budget that came out just a couple days ago.   Part of the Budget Committee, we had OMB Acting Director Vought come and talk about it.   It claims to reduce the debt as a percent of GDP to 71 percent by 2029.   However, according to the nonpartisan Committee for a Responsible Federal Budget, without the growth assumptions in the budget, it would show debt reaching roughly 87 percent of the GDP by 2029, our adding $2.2 trillion to the budget, more than the budget claims.   Do you have any -- does the administration have any independent or nonpartisan estimates of your policies that justify the 3-percent growth rate?

Secretary <u>Mnuchin.</u>   So the 3-percent growth rate is done by the combination of the Troika, the Council of Economic Advisers, our economics group, and OMB.   But let me just comment, you know, we look at 10-year budgets, okay?   I encourage it as something -- we are not making a 10-year commitment on spending.   And I do think the right way to look at debt is a percentage of relative to GDP.   And I encourage Congress to look at over the next 10 years:   If we have the growth, we will spend the money.   If we don't have that type of growth, Congress doesn't have to make the commitment to spend the money.

Mr. <u>Panetta.</u>   Thank you, Mr. Secretary.

Thank you, Mr. Chairman.

Chairman <u>Neal.</u>   I thank the gentleman.

With that, let me recognize the gentleman from Texas, Mr. Arrington, to inquire.

Mr. <u>Arrington.</u>   Thank you, Mr. Chairman.

Thank you, Mr. Secretary, for your leadership.   Thank you for working with us to put pro-growth, free market, pro-ag, pro-energy, pro-small business, pro-American worker policies in place, and they are working.   They are working because our job-creator-in-chief, like many of us, believe that if you get off the backs and out of the way of our entrepreneurs, our innovators, our job creators, they will do the work; they will create growth.

Jobs are up and wages are up, and the performance is really unprecedented.   I mean, this is an economic renaissance.   This is a great American comeback, and I am so proud to be a part of it.   And not only are those things up, that I mentioned, but the American spirit is up.   There is hope for a better future, and I can tell you this, in rural America, they feel like their best days are yet to come, now, now that we have with taken off the shackles of high taxes and regulations.   These are working families, middle-class families, farmers and ranchers, and community banks, and rural hospitals.   These are the guys that bear a disproportionate brunt of big government, and now there is hope.

Let me give you some examples.   Happy State Bank, little community-relationship bank, the employees are happier than they have ever been.   A million dollars distributed in pay increases in bonuses for nonexecutives.   Forty of their employees have had an increase of 50 percent.

Mike Lambert, my buddy from Idalou, who runs Feed and Thangs, he has now been able to give guaranteed benefits to three of his full-time and four of his part-time workers.   And he said he has got a hundred new -- he had a hundred new customers in the first quarter of 2018, compared to 2017, and he said:   Please tell Ms. Pelosi those aren't

crumbs to us out here in Idalou, Texas.

And then there is the gal from Post, Texas, and she was facing, unfortunately, because her parents died this last year, both, in 1 year, she had a ranch that was in the family since 1900.   They worked hard.   They paid their taxes.   They played by the rules, and she was facing millions of dollars in the most unfair, most un-American double tax in the death tax.   But because of tax reform -- Mr. Ranking Member, thank you for your leadership -- she wasn't having to be forced, because of government policies, to sell that ranch.   This is what she said.   She said:   People in D.C. have no idea how hard we work. We wake up at the crack of dawn to feed cattle.   That is no glamourous job, especially to do it alone as a single female.   These taxes ruin families and their long-lasting memories working on the farm together.

Now, I have heard people say this is a sugar high, Mr. Secretary.   Is this a sugar high, or is this just a strong response from a healthier and freer market that was sick and in the ICU from too much government?   Would you answer that question for me, please?

Secretary <u>Mnuchin.</u>   I don't believe it is a sugar high.

Chairman <u>Neal.</u>   I thank the gentleman.

With that, let me recognize the gentlelady from Florida, Mrs. Murphy, to inquire.

RPTR MERTENS

EDTR SECKMAN

[10:58 a.m.]

Mrs. Murphy.   Thank you, Mr. Chairman.

Mr. Secretary, when it comes to fiscal discipline, the hypocrisy in the administration's budget is almost too much to bear.   You know, the President says the budget builds on the tremendous progress we have made to bring Federal spending and debt under control and that we must protect the future generations from Washington's habitual deficit spending.   I co-chair the Blue Dog Democrats, and we have been urging fiscal discipline out of both parties because of the threat that excessive debts and debt poses to our economy, our security, and our children's future.   And yet, in 2017, the Republican Congress passed and the President signed a tax law that CBO projected would increase deficits by $1.5 trillion over the next decade.

On a side note, the signature Democratic law, the Affordable Care Act, was projected to reduce deficits by $143 billion over the decade.

I put a chart up on the screens, a little bit of an eye chart, but I am sure you are familiar with this.   This is a CBO chart about the Federal receipts and outlays, deficit, and debt.   It basically summarizes our fiscal situation.   And what I see when I look at this chart is deficits rising, hitting a trillion dollars by 2022.   These are CBO's projections. Yours are even worse, projecting a trillion dollars of deficit during the current fiscal year. And you said in response to a previous question that we should look at debt as a percentage of GDP.   And when I look at debt as a percentage of GDP here, I see it rising there as well.   That percentage is projected to exceed 80 percent by 2022, the highest percentage since 1948.

So my question to you is this:   Can you explain to me where anywhere on this chart you see evidence of the tremendous progress in bringing debt under control that President Trump cited?   Point to just a single number or a trend that you think is positive, and please don't pivot to GDP.   I want to hear about deficits and debt.

Secretary Mnuchin.   Well, first of all, I think I can see the chart, although it is a little bit far.   And, first, let me just comment:   I do think, on a bipartisan basis, this is something that people should be looking at, so I appreciate your concerns, debt as a percent of GDP and what we look at the debt over time.   I would just comment on a couple of things.   First of all, you see on the upper part of the chart where the deficit is a percent of GDP, if I can see, this is kind in the 7, 8, 9, 10 type of range which is quite concerning.   I would also just highlight, in 2017, a major reason for the deficit in 2017 was the fact that Congress passed a very large spending increase, which I think, as you know, the President felt like we needed to make an investment in military, and the Democrats required us to have a big increase in nonmilitary spending.   But, really, the tax bill has really not had a material impact on these numbers on the chart.   As I said, it will over the next 10 years one way or another, but I would just encourage people on a bipartisan basis to look at the spending issue.

Mrs. Murphy.   Thank you, and I yield back.

Chairman Neal.   I thank the gentlelady.

With that, let me recognize the gentleman from Nevada, Mr. Horsford, to inquire.

Mr. Horsford.   Thank you very much, Chairman Neal, and to the ranking member.

Mr. Secretary, it is good to have you here today.   I am very honored to serve on this committee and as one of the members also on the Budget Committee, and so I have a perspective to see the proposal from the President from both committees.   And there are a number of discrepancies and really flat out contradictions in both areas, in my view, and I

would like to ask a couple of areas.

For example, the fantasy economic projection for growth.   The fact that we say that there is no impacts to preexisting conditions when it specifically eliminates access to care.   The President in his State of the Union address talked about eradicating HIV and AIDS, but yet it cuts $1.2 billion to the Centers for Disease Control and to NIH.

Another area is infrastructure.   I know you answered the chairman's question about what you feel like the level of funding should be around infrastructure at the $1.5 trillion level.   However, the President's budget called for only $200 billion investment for infrastructure, which is inadequate to cover the Nation's infrastructure needs.

And in a study of contradictions, I understand other parts of the budget make cuts as well, such as cuts to the highway trust fund after 2021, approximately $150 billion.   So I guess my overall question specifically around infrastructure is, the $200 billion net of cuts, or is it new money?   Where does this money come from, and where is it going? And has the administration prioritized infrastructure investments in its budget?

Secretary Mnuchin.   Well, let me just comment on the $1.5 trillion, which we very much support for infrastructure, but I just want to be clear.   That doesn't have to be all Federal spending.   That can be a combination of various different things.

Now, again, we look forward to working with Congress on infrastructure. Obviously, how it is paid for is a major component.   So we didn't put bigger numbers on infrastructure in the budget because this is something we know that needs bipartisan consensus.

Mr. Horsford.   And in the areas where, again, the President is speaking in one way that he is preserving and protecting while making cuts to Medicare, Medicaid, SNAP assistance, food assistance for children, and needy seniors.

Secretary Mnuchin.   Well, I would just comment:   The overall budget is going up

considerably over time, and the President and we look forward to working with Congress on how that money is allocated between different programs.   The President is not cutting these programs on an absolute basis but, in many cases, is lowering the rate of growth of expense.

Mr. Horsford.   Thank you, Mr. Chairman.   I yield back.

Chairman Neal.   I thank the gentleman.

And, with that, let me recognize the gentleman from Kansas, Mr. Estes, to inquire.

Mr. Estes.   Thank you, Mr. Chairman.

And thank you, Secretary, for joining us today.

Mr. Chairman, I would like to submit for the record an article from AEI entitled

"Wages Rising:   The U.S. economy is now working best for lower wage workers" where it

talks about wage growth has picked up sharply for the bottom half of the wage scale.

Chairman <u>Neal.</u>   Without objection.

[The information follows:]

Mr. <u>Estes.</u>   As you mentioned in your testimony, Mr. Secretary, the economy is growing at historic levels, you know.   In addition to the highest GDP in the last 14 years, we have seen wages grow.   We have seen unemployment rates near a 50-year low.   We have more job openings than job seekers.   And following that progress over the last few years, to jump-start the economy, you know, with all of the regulatory reform and all of the Tax Cuts and Jobs Act benefit, we can't deny that those changes are making benefits for millions of Americans.   And the growth really helped the country, helped us move on a better footing, and there are some of things that we need to keep moving forward.

You know, I represent Wichita, the air capital of the world.   Obviously, trade is a big issue for us, both from an aviation standpoint but also from agriculture as well, and I am hopeful that Congress moves forward quickly with the USMCA and ratifies that because it is such a boon for not just our country but also countries throughout the world to see a strong economy in North America.   You know, as we continue that progress, I want to make sure that we then have the opportunity to move forward with China and other countries and other regions to make sure we have good trade agreements with them as well.

Another area we need to address is our deficit and our debt, and like many people on this committee, I ran because I am concerned about that.   I want to make sure we leave the country better off for our children and grandchildren.   And I want to thank you for addressing that on the President's behalf with this budget and some of the focus that you are putting on making sure that that moves forward.   And I am hopeful that the combined effort that we are making with our economic growth and making sure that we are doing appropriate government spending, that we can help achieve that goal.

There is one quick question I want to talk about.   We have seen some recent

proposals, particularly coming from France, about taxing particularly technology companies, you know, companies, like Amazon and Apple and Google and Facebook, who have really used new technology to provide great innovation for our country and for the world.   How is the best approach that we kind of attack that misguided approach?   Is it a direct contact with a country like France, or is it more multilateral with the EU?

Secretary <u>Mnuchin.</u>   So let me just comment.   I was in Europe last week.   I had the opportunity to meet with the Finance Minister, Bruno Le Maire, as well as President Macron.   This was one of the specific issues I brought up.   It is also an issue in the U.K. I had the opportunity to speak to Philip Hammond about that -- the Chancellor of Exchequer there.

We have been discussing this at the G7, and we have made it very clear that digital taxes aimed at U.S. companies are unfair, and we won't put up with that.   We are working very closely at the OECD with them and others, and I am hopeful we can come up with a G7 view that can then be moved through the rest of the world.   So I am cautiously optimistic.   We need a combined solution on that.

Mr. <u>Estes.</u>   Thank you, Mr. Secretary.

I yield back.

Chairman <u>Neal.</u>   I thank the gentleman.

With that, the chair will recognize the gentleman from Michigan, Mr. Kildee, to inquire.   Oh.   I am sorry.   Well, Mr. Kildee, would you go ahead?   And we will come right back to Mr. Gomez.   Please.   I recognized you first.   We will come right back to Mr. Gomez.

Mr. <u>Kildee.</u>   Thank you, Mr. Chairman.

And thank you, Secretary Mnuchin, for being here.

I represent a string of older industrial communities in Michigan:   Saginaw,

Michigan; Bay City, Michigan; my hometown of Flint.   These are communities that have

been significantly negatively affected by long-term economic trends, particularly by trade

policy that has really expedited the offshoring of manufacturing jobs.   Because of that,

they are communities that are, unfortunately, uniquely not in a position to take full

advantage of even significant infrastructure investment unless there is a recognition of the

particular needs that they face.   So I was really troubled by what feels like an

infrastructure plan that disproportionately puts the burden of that investment on State and

local governments.

I don't know what the particular plans for the $1.5 trillion investment would be, but

it was not a good signal with the initial plan that we saw that 80 percent of the money

would have to come from those States and local governments, which to be honest with

you, Mr. Secretary, if they had the 80 percent, they would be spending it right now.   There

has to be significantly more investment.

So the one thing before I ask another question that I would ask is if the

administration would be willing to work with those of us who represent those particularly

distressed communities to make sure their unique needs are comprehended as an

infrastructure plan goes forward and not simply take the position that one size fits all.

Even if we got together around a more rational apportionment of the investment, even in

that circumstance, communities with really limited capacity and very little excess capital

are not going to be able to take advantage of this.   I would just ask that you make a

commitment to work with some of us who represent those particularly distressed

communities.

Secretary Mnuchin.   I will.   Let me just comment.   I had the opportunity to visit

Flint, Michigan, during the campaign with the President, and I must say I appreciate

personally seeing it and the difficulties in that community, and we look forward to working

with you.   And, again, I look forward to working with Chairman Neal and the rest of the committee on a bipartisan basis.   We will sit down and listen to your views and try to get a combination of the administration, the House, and the Senate on a bipartisan basis --

Mr. <u>Kildee.</u>   I appreciate it.

Secretary <u>Mnuchin.</u> -- to try to pass legislation this year.

Mr. <u>Kildee.</u>   I appreciate that.   I would ask that the President answer my letter and designate someone to work with me on Flint's recovery.   The only person he ever mentioned that was our point of contact was Omarosa, and she left about a day after that appointment was made.

If I could just make one final point, you know, the notion that tax cuts create growth and then reduce the deficit is one that I understand, but I would suggest that particularly investments also can have the effect of reducing the deficit.   I think it is unconscionable that this budget would reduce National Institutes of Health research into cancer research, for example, when the cure to these debilitating diseases would not only have a moral value but could potentially reduce healthcare costs into the future, and I would ask you to look at that.

I yield back.

Chairman <u>Neal.</u>   I thank the gentleman.

Secretary <u>Mnuchin.</u>   If you could send my office a copy of the letter that you sent to the President, I will personally speak to him and make sure it got to him and we have someone in the White House that can work with you on that.   Again, I know he personally appreciates that community and what they have gone through.

Mr. <u>Kildee.</u>   Thank you.

Chairman <u>Neal.</u>   With that, let me recognize the gentleman from California, Mr. Gomez, to inquire.

Mr. Gomez.   Thank you, Mr. Chairman.

Mr. Secretary, thank you for being here.   I am going to back to a line of questioning from earlier.   In 2017, there were 151 million disclosures of tax records under section 6103(f).

Mr. Secretary, have you ever denied a request for tax records under 6103(f) by the Ways and Means Committee or the Senate Finance Committee?

Secretary Mnuchin.   I think I understand what people are trying to get me to address, but again, let me just say that the use of 6103, and I believe it is 9 billion of disclosures, not 11 billion, okay, has to do with sharing of information, whether it is with States, whether it is with the Department of Education.   This is a bulk issue.   This is different than what I read about in the press, is the committee chair requesting any specific individual tax return, which, again, I am not aware of that having been done in the past, especially on an elected official.

Mr. Gomez.   So there has never been a request denied?

Secretary Mnuchin.   I am not going to answer that because I don't know whether there has been a request denied or not, but equating --

Mr. Gomez.   Okay.   Thank you.

Secretary Mnuchin.   -- the 9 billion of disclosures on 6103 --

Mr. Gomez.   Mr. Secretary, I am reclaiming my time real quick because I am running out of time.

Mr. Secretary, has President Trump ever asked you to intervene or ignore the coming request for his tax returns?

Secretary Mnuchin.   He has not.

Mr. Gomez.   Have you ever discussed the topic of President Trump's tax returns with the President or anyone in the White House?

Secretary <u>Mnuchin.</u>   I have not discussed with anybody in the White House the issue of his tax returns or the request of his tax return.

Mr. <u>Gomez.</u>   Anybody outside the White House?

Secretary <u>Mnuchin.</u>   Again, I am not at liberty to make comments about people outside the White House I discuss things with one way or another.

Mr. <u>Gomez.</u>   So you might have discussed this with his attorneys?

Secretary <u>Mnuchin.</u>   I have had no discussions with his attorneys, but again, I am not continuing to go down this, again, of you asking me 20 questions on this.

Mr. <u>Gomez.</u>   That is what we do here.   We ask questions.   I, at least, ask questions.

Secretary <u>Mnuchin.</u>   Actually, with all due respect, I take that back.   You can ask the questions, and I will try to answer them, but I think what --

Mr. <u>Gomez.</u>   Thank you.   I appreciate that.

Secretary <u>Mnuchin.</u>   Keep going.

Mr. <u>Gomez.</u>   Thank you.   I appreciate your responses.

Mr. Chairman, I yield back.

Chairman <u>Neal.</u>   Thank you, gentleman.

With that, let me recognize the gentleman from California, Mr. Nunes, to inquire.

Mr. <u>Nunes.</u>   Thank you, Mr. Chairman.

Secretary, welcome.   Thank you for being here.

I don't think anyone has talked about the pending agreement with the United States, Mexico, and Canada.   The administration has completed that agreement.   Where do we stand now in terms of getting that agreement approved by Congress?

Secretary <u>Mnuchin.</u>   Thank you for bringing that up.   I think this is one of the most important economic issues that is on the table.   This agreement is a big step in the

right direction that protects everything from workers to farmers to intellectual property to currency.   This is the strongest currency provisions.   I know that Ambassador Lighthizer has been up here.   I would urge Congress -- I see no reason why this Congress cannot take this up quickly.   So I would urge the chairman working with the leader and others to bring this to the floor as quickly as possible.   The sooner that this is passed, the better this will be for the U.S. economy.   And I can tell you from having been at a bipartisan meeting of Governors at the White House recently, there is enormous support from the Governors on this legislation.   So I look forward to the chairman working with Ambassador Lighthizer and others on this.

Mr. Nunes.   Thank you, Mr. Secretary.

Because, as you know, NAFTA was outdated.   It needed to be updated.   And as far as I can tell from the agreement, many sectors of the economy will have dramatically improved trade capability with Mexico, with Canada so that we can export more of our products, especially agricultural products, to both Canada and Mexico.   Is that correct?

Secretary Mnuchin.   Yeah.   This is very important to our farmers, both in selling things to Canada and Mexico, and again, I would just urge Congress to take this up as soon as possible.

Mr. Nunes.   I agree with you, and I hope that we can get this done sooner rather than later.

Just to finish up here, Mr. Secretary, a lot of discussion about your budget, and you are up here talking about the administration's budget.   Have you compared that yet to the House budget, the House of Representatives budget?

Secretary Mnuchin.   I haven't done a line-by-line basis.   I have been working on our budget, to be honest with you.

Mr. Nunes.   Well, it is a trick question a little bit because the House of

Representatives doesn't have a budget yet.   And I am not sure -- I guess from what I understand is that the majority is not going to have a budget this year.   So budgets are oftentimes never followed, but at least it is a pathway for what the administration believes is the appropriate approach for budgeting over the next 15 years, and the House of Representatives should have a budget also.

Secretary Mnuchin.   I would just commend the House on the new rules associated with the debt ceiling on the budget in the House, so I look forward to if they can pass that or pass a clean debt ceiling quickly.

Mr. Nunes.   Perfect.

Thank you, Mr. Chairman.   I yield back.

Chairman Neal.   I thank the gentleman.   And the chair is prepared to acknowledge that, from time to time, there are trick questions that take place here.

With that, let me recognize the gentleman from Connecticut, Mr. Larson.

Mr. Larson.   I assure you there will be no trick question here --

Secretary Mnuchin.   Thank you.

Mr. Larson.   -- Mr. Secretary, and thank you for both your patience and perseverance today.   We appreciate the time you have afforded us and look forward to coming back and further exchange as well whether it is in the form of a briefing or otherwise.

Your continued emphasis on bipartisanship is clearly welcome here, especially noting what Chairman Neal said before, the need for us to get after pension reform, the opportunity that it presents us, and the timeliness.   Also, you mentioned it again, repeated it, and I thank Mr. Nunes as well, to get a clean vote on a debt ceiling and get that taken care of so that we don't end up into a protracted stall would be important as well.   What you had to say on infrastructure, both to the chairman and your exchange with

Mr. Blumenauer, I think is also extraordinarily helpful.

I think what you see here is the rub that Democrats have based on the juxtaposition of a $2 trillion tax cut and then looking at a budget that cuts to the heart of Medicare and Medicaid.   And what I think where the rub is here is that those oftentimes, especially Medicare and Social Security, being labeled as entitlements.   They are, of course, the insurance that people have paid for.   Give President Trump credit.   When 16 other Republicans on the stage tried to corner him and say that it was an entitlement, he said: No.   It is a benefit they earned, and I will not cut it.

And so I think that is the further rub that people on our side have.

But we look forward, in our committee, Subcommittee on Social Security is working bipartisanly to achieve these goals, and so I further appreciate what you had to say there.   And I would point out that, in 1983, the last time that we did anything constructive with Social Security, Ronald Reagan was the President.   Tip O'Neill was Speaker. Howard Baker was the Senate majority leader.   It is not different today with Nancy Pelosi and also with Mitch McConnell, except this:   President Trump -- Ronald Reagan was opposed to Social Security.   President Trump has defended this, and it is something that the administration, I think, should take credit for and work bipartisanly because I think you can bring along many moderate Republicans that believe, as the President does, that these are not entitlements, and we need to reform these in a way to take care of those American people who solely relied on this because they know it is the full faith and credit of the United States Government.

I thank you for your service, and I hope you will pass that message along to the President, and we can continue to work with you.

Secretary Mnuchin.   I will, and thank you very much, and as trustee of the Social Security trust funds, I take this responsibility very seriously, so I look forward to meeting

with you and other members of the committee as appropriate to get your ideas.

Mr. <u>Larson.</u>   Thank you.   I look forward to meeting with you.

Secretary <u>Mnuchin.</u>   We will follow up and try to schedule that.

Mr. <u>Larson.</u>   Please do.   Thank you.

Chairman <u>Neal.</u>   I thank the gentleman.

With that, we will recognize, I believe, the last point of inquiry from the gentleman

from Pennsylvania, Mr. Boyle.

Mr. <u>Boyle.</u>   Thank you.

And thank you for being here, Mr. Secretary.   I wanted to follow up.

At the very beginning, Chairman Neal had asked you about the debt limit, the debt

ceiling.   I was very happy to hear you say you are supportive of a clean raise.   So I

wanted to follow up on that and actually go to the next step.

The concept of the debt ceiling and the constant crisis it creates through repeated

threats of not being raised is completely unnecessary and achieves nothing, in my view.   It

is no wonder that only a handful of countries around the world even follow this disruptive,

arbitrary, and restrictive fiscal practice.   When you receive your credit card statement at

the end of the month, you can't decide, well, I will pay this, but I won't pay that.

Our current process -- and we came most close up to the brink in 2011, but there

have been other subsequent times.   Our constant process of playing chicken with the debt

ceiling achieves nothing, and God forbid, one day we might actually risk the full faith and

credit of the United States.   So, last Congress, I introduced resolution H.R. 3693 that

would simply and cleanly abolish the debt ceiling once and for all.   I wanted to know what

your opinion was on whether my specific legislation or just the concept of eliminating the

debt ceiling altogether and not having that potential danger lurking out there.

Secretary <u>Mnuchin.</u>   Well, let me just comment:   I share your concern about going

to the brinksmanship and risking the credit of the U.S. Government.   Obviously, this is something we can never let occur.

I am not familiar with your specific legislation.   I will look at it.   My own opinion is that when we approve spending, we should approve raising the debt ceiling.   So I am not sure we need to get rid of it, but like any other business, when you approve spending, you have a plan how to finance that spending.   And if we want to cut spending, we should cut spending, but that is the time to deal with it.   We should make sure that if we approve funding -- we approve spending, we approve the necessary funding as well.

Mr. Boyle.   Correct.   And I am in agreement, and I would point out that, in 2011, even though we ultimately raised the debt ceiling, just the fact we came close and created that uncertainty in the markets led to the first ever downgrade of the credit of the United States.

Briefly, in the time remaining, could you describe some of the things that would happen, given your role as Secretary of Treasury, if we were to ever fail, now or a future Congress, to raise the debt ceiling?

Secretary Mnuchin.   I can't imagine that this Congress or any other Congress would ever let the U.S. Government fail.   So I don't even want to go speculate on what the implications would be.   Honoring the full faith and credit of the United States Government is one of the most important issues, and as Treasury Secretary, I will do everything in my power to make sure that we honor the full faith and credit.

Mr. Boyle.   I yield back.

Chairman Neal.   I certainly appreciate the Secretary's commentary as he concluded his presence today, and I thank the gentleman for that line of inquiry as well.

Let me thank you for your participation today, Mr. Secretary.

Please be advised that members have 2 weeks to submit written questions to be

answered later in writing.   Those questions and your answers will be made part of the formal hearing record.

With that, the committee stands adjourned.

[Whereupon, at 11:25 a.m., the committee was adjourned.]

Questions for the Record follow:


Questions can be found here.

Responses to the Questions for the Record

# EXHIBIT B

RICHARD E. NEAL,
MASSACHUSETTS,
CHAIRMAN

JOHN LEWIS, GEORGIA
LLOYD DOGGETT, TEXAS
MIKE THOMPSON, CALIFORNIA
JOHN B. LARSON, CONNECTICUT
EARL BLUMENAUER, OREGON
RON KIND, WISCONSIN
BILL PASCRELL JR., NEW JERSEY
DANNY K. DAVIS, ILLINOIS
LINDA T. SÁNCHEZ, CALIFORNIA
BRIAN HIGGINS, NEW YORK
TERRI A. SEWELL, ALABAMA
SUZAN DELBENE, WASHINGTON
JUDY CHU, CALIFORNIA
GWEN MOORE, WISCONSIN
DAN KILDEE, MICHIGAN
BRENDAN BOYLE, PENNSYLVANIA
DON BEYER, VIRGINIA
DWIGHT EVANS, PENNSYLVANIA
BRAD SCHNEIDER, ILLINOIS
TOM SUOZZI, NEW YORK
JIMMY PANETTA, CALIFORNIA
STEPHANIE MURPHY, FLORIDA
JIMMY GOMEZ, CALIFORNIA
STEVEN HORSFORD, NEVADA

BRANDON CASEY,
MAJORITY STAFF DIRECTOR

# Congress of the United States

## U.S. House of Representatives

COMMITTEE ON WAYS AND MEANS

1102 LONGWORTH HOUSE OFFICE BUILDING

(202) 225–3625

### Washington, DC 20515–0348

http://waysandmeans.house.gov

KEVIN BRADY,
TEXAS,
RANKING MEMBER

DEVIN NUNES, CALIFORNIA
VERN BUCHANAN, FLORIDA
ADRIAN SMITH, NEBRASKA
KENNY MARCHANT, TEXAS
TOM REED, NEW YORK
MIKE KELLY, PENNSYLVANIA
GEORGE HOLDING, NORTH CAROLINA
JASON SMITH, MISSOURI
TOM RICE, SOUTH CAROLINA
DAVID SCHWEIKERT, ARIZONA
JACKIE WALORSKI, INDIANA
DARIN LAHOOD, ILLINOIS
BRAD R. WENSTRUP, OHIO
JODEY ARRINGTON, TEXAS
DREW FERGUSON, GEORGIA
RON ESTES, KANSAS

GARY ANDRES,
MINORITY STAFF DIRECTOR

April 3, 2019

The Honorable Charles P. Rettig
Commissioner
Internal Revenue Service
1111 Constitution Avenue, NW
Washington, D.C. 20224

Dear Commissioner Rettig:

The Committee on Ways and Means ("Committee") has oversight and legislative authority over our Federal tax laws. With this authority comes a responsibility to ensure that the Internal Revenue Service ("IRS") is enforcing the laws in a fair and impartial manner.

Consistent with its authority, the Committee is considering legislative proposals and conducting oversight related to our Federal tax laws, including, but not limited to, the extent to which the IRS audits and enforces the Federal tax laws against a President. Under the Internal Revenue Manual, individual income tax returns of a President are subject to mandatory examination, but this practice is IRS policy and not codified in the Federal tax laws. It is necessary for the Committee to determine the scope of any such examination and whether it includes a review of underlying business activities required to be reported on the individual income tax return.

Pursuant to my authority under Internal Revenue Code section 6103(f), for each of the tax years 2013 through 2018, I request the following return and return information:

1. The Federal individual income tax returns of Donald J. Trump.

2. For each Federal individual income tax return requested above, a statement specifying: (a) whether such return is or was ever under any type of examination or audit; (b) the length of such examination or audit; (c) the applicable statute of limitations on such examination or audit; (d) the issue(s) under examination or audit; (e) the reason(s) the return was selected for examination or audit; and (f) the present status of such examination or audit (to include the date and description of the most recent return or return information activity).

3. All administrative files (workpapers, affidavits, etc.) for each Federal individual income tax return requested above.

Commissioner Rettig
April 3, 2019
Page 2

4.  The Federal income tax returns of the following entities:

- The Donald J. Trump Revocable Trust;
- DJT Holdings LLC;
- DJT Holdings Managing Member LLC;
- DTTM Operations LLC;
- DTTM Operations Managing Member Corp;
- LFB Acquisition Member Corp;
- LFB Acquisition LLC; and
- Lamington Farm Club, LLC d/b/a Trump National Golf Club—Bedminster.

5.  For each Federal income tax return of each entity listed above, a statement specifying: (a) whether such return is or was ever under any type of examination or audit; (b) the length of such examination or audit; (c) the applicable statute of limitations on such examination or audit; (d) the issue(s) under examination or audit; (e) the reason(s) the return was selected for examination or audit; and (f) the present status of such examination or audit (to include the date and description of the most recent return or return information activity).

6.  All administrative files (workpapers, affidavits, etc.) for each Federal income tax return of each entity listed above.

7.  If no return was filed for the tax year requested, a statement that the entity or individual did not file a return for such tax year.

This document is a record of the Committee and is entrusted to the IRS only for use in handling this matter. Additionally, any documents created by the IRS in connection with a response to this Committee document, including (but not limited to) any replies to the Committee, are records of the Committee and shall be segregated from agency records and remain subject to the control of the Committee. Accordingly, the aforementioned documents are not "agency records" for purposes of the Freedom of Information Act. Absent explicit Committee authorization, access to this document and any responsive documents shall be limited to IRS personnel who need such access for the purpose of providing information or assistance to the Committee.

Please provide the requested return and return information by April 10, 2019. Thank you for your prompt attention to this matter.

Sincerely,

The Honorable Richard E. Neal, *Chairman*

EXHIBIT C

**Vaughan, Frederick**

| | |
|---|---|
| **From:** | Vaughan, Frederick |
| **Sent:** | Wednesday, April 10, 2019 6:21 PM |
| **To:** | 'brandon.casey@mail.house.gov' |
| **Cc:** | 'gary.andres@mail.house.gov'; LegAffairs |
| **Subject:** | Treasury correspondence |
| **Attachments:** | 6103 Letter to Neal.pdf |

Attached is a letter to Chairman Neal.  As a courtesy, I wanted to let you know that the letter will be made public, consistent with the Committee's approach to its request.

We note that your letter directs the Department not to create any "agency records" related to the request and further directs that any document created in connection with your request "shall be segregated from agency records and shall remain subject to the control of the Committee."  The Department does not intend to abide by that directive.  It is our understanding that no committee of Congress has the authority to issue such a directive to an Executive Branch agency.

--
**Frederick W. Vaughan**
**Deputy Assistant Secretary**
**Legislative Affairs**
**U.S. Department of the Treasury**
**1500 Pennsylvania Avenue, N.W.**
**Washington, D.C. 20220**
**202-622-2678**



## DEPARTMENT OF THE TREASURY
### WASHINGTON, D.C.

SECRETARY OF THE TREASURY

April 10, 2019

The Honorable Richard E. Neal
Chairman
Committee on Ways and Means
U.S. House of Representatives
Washington, DC 20515

Dear Chairman Neal:

I write in response to the Committee's April 3 letter to the Commissioner of Internal Revenue requesting private tax return information under 26 U.S.C. § 6103(f). The Committee requests the materials by April 10, but the Treasury Department will not be able to complete its review of your request by that date.[1]

We begin with an awareness of Congressional concerns already raised regarding this inquiry. In the last Congress, the Committee on Ways and Means issued a formal report concerning a House resolution of inquiry seeking information substantially similar to the information you request. The Committee determined that such a request would be an "abuse of authority" and "set a dangerous precedent by targeting a single individual's confidential tax returns and associated financial documents for disclosure" for political reasons.[2] The Committee recognized that section 6103(f) may not be used "for purposes of embarrassing or attacking political figures of another party."[3] Noting a similar concern in a recent floor speech, the Chairman of the Senate Finance Committee—who shares the same section 6103(f) authority as you—described the April 3 request as lacking the requisite "legitimate legislative purpose" and as "Nixonian to the core."[4]

You too have acknowledged the unprecedented nature of this request. As you stated in October 2018 with respect to this long-planned inquiry, "[t]his has never happened before, so you want to be very meticulous."[5] We share that caution, and we agree that this is not a routine section 6103(f) request. The Committee's request raises serious issues concerning the

---

[1] Although the letter attempts to instruct the Commissioner to strictly limit access to the letter to "IRS personnel" only, the Committee promptly released the letter on Twitter and its website.

[2] H. Comm. on Ways & Means, H. Rept. No. 115-309, at 2, 3 (2017), https://www.congress.gov/115/crpt/hrpt309/CRPT-115hrpt309.pdf.

[3] *Id.* at 3.

[4] 165 Cong. Rec. S2258-02 (Apr. 4, 2019) (statement of Sen. Charles Grassley).

[5] R. Rubin, *Wall Street Journal* (Oct. 3, 2018) (quoting then-Ranking Member Neal), https://www.wsj.com/articles/trumps-tax-returns-in-the-spotlight-if-democrats-capture-the-house-1538575880.

constitutional scope of Congressional investigative authority, the legitimacy of the asserted legislative purpose, and the constitutional rights of American citizens. The legal implications of this request could affect protections for all Americans against politically-motivated disclosures of personal tax information, regardless of which party is in power. Given the seriousness of these issues, which bear no connection to ordinary tax administration, we have begun consultations with the Department of Justice to ensure that our response is fully consistent with the law and the Constitution. For the same reasons, I intend to supervise the Department's review of the Committee's request to ensure that taxpayer protections and applicable laws are scrupulously observed, consistent with my statutory responsibilities.[6]

The Department respects Congressional oversight, and we intend to review your request carefully.

Sincerely,

Steven T. Mnuchin

cc:     The Honorable Kevin Brady, Ranking Member, Committee on Ways and Means

---

[6] *See* 26 U.S.C. § 6103(f) (entrusting responsibility to "the Secretary"); *see also* 26 U.S.C. § 7801(a)(1) ("Except as otherwise expressly provided by law, the administration and enforcement of this title shall be performed by or under the supervision of the Secretary of the Treasury."); 31 U.S.C. § 321(c) ("Duties and powers of officers and employees of the Department are vested in the Secretary….").

# EXHIBIT D

RICHARD E. NEAL,
MASSACHUSETTS,
CHAIRMAN

JOHN LEWIS, GEORGIA
LLOYD DOGGETT, TEXAS
MIKE THOMPSON, CALIFORNIA
JOHN B. LARSON, CONNECTICUT
EARL BLUMENAUER, OREGON
RON KIND, WISCONSIN
BILL PASCRELL JR., NEW JERSEY
DANNY K. DAVIS, ILLINOIS
LINDA T. SÁNCHEZ, CALIFORNIA
BRIAN HIGGINS, NEW YORK
TERRI A. SEWELL, ALABAMA
SUZAN DELBENE, WASHINGTON
JUDY CHU, CALIFORNIA
GWEN MOORE, WISCONSIN
DAN KILDEE, MICHIGAN
BRENDAN BOYLE, PENNSYLVANIA
DON BEYER, VIRGINIA
DWIGHT EVANS, PENNSYLVANIA
BRAD SCHNEIDER, ILLINOIS
TOM SUOZZI, NEW YORK
JIMMY PANETTA, CALIFORNIA
STEPHANIE MURPHY, FLORIDA
JIMMY GOMEZ, CALIFORNIA
STEVEN HORSFORD, NEVADA

BRANDON CASEY,
MAJORITY STAFF DIRECTOR

## Congress of the United States

### U.S. House of Representatives

COMMITTEE ON WAYS AND MEANS

1102 LONGWORTH HOUSE OFFICE BUILDING
(202) 225–3625

### Washington, DC 20515–0348

http://waysandmeans.house.gov

KEVIN BRADY,
TEXAS,
RANKING MEMBER

DEVIN NUNES, CALIFORNIA
VERN BUCHANAN, FLORIDA
ADRIAN SMITH, NEBRASKA
KENNY MARCHANT, TEXAS
TOM REED, NEW YORK
MIKE KELLY, PENNSYLVANIA
GEORGE HOLDING, NORTH CAROLINA
JASON SMITH, MISSOURI
TOM RICE, SOUTH CAROLINA
DAVID SCHWEIKERT, ARIZONA
JACKIE WALORSKI, INDIANA
DARIN LAHOOD, ILLINOIS
BRAD R. WENSTRUP, OHIO
JODEY ARRINGTON, TEXAS
DREW FERGUSON, GEORGIA
RON ESTES, KANSAS

GARY ANDRES,
MINORITY STAFF DIRECTOR

April 13, 2019

The Honorable Charles P. Rettig
Commissioner
Internal Revenue Service
1111 Constitution Avenue, NW
Washington, D.C.  20224

Dear Commissioner Rettig:

On April 3, 2019, pursuant to my authority under section 6103(f) of the Internal Revenue Code ("IRC"), I requested that the Internal Revenue Service ("IRS") furnish certain return and return information by April 10, 2019.  As I explained in my earlier letter, that request is in furtherance of consideration by the Committee on Ways and Means ("Committee") of legislative proposals and oversight related to our Federal tax laws, including, but not limited to, the extent to which the IRS audits and enforces the Federal tax laws against a President.

I am aware that concerns have been raised regarding my request and the authority of the Committee.  Those concerns lack merit.  Moreover, judicial precedent commands that none of the concerns raised can legitimately be used to deny the Committee's request.

*First*, it bears noting that the statutory language of section 6103(f) is unambiguous and raises no complicated legal issues that warrant supervision or review by the Department of the Treasury ("Treasury") or the Department of Justice ("Justice").  Section 6103(f) commands that "[u]pon written request from the chairman of the Committee on Ways and Means of the House of Representatives . . . the Secretary *shall* furnish such committee with any return or return information specified in such request."  26 U.S.C. § 6103(f)(1) (emphasis added).  It is a well-established principle of statutory interpretation that words that are neither terms of art nor statutorily defined be given their ordinary meaning.  Here, the statute's use of the "mandatory 'shall' . . . creates an obligation impervious to judicial discretion."  *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998); *see also, e.g., EPA v. EME Homer City Generation*, 572 U.S. 489, 509 (2014); *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461-62 (2002) (courts "must presume that a legislature says in a statute what it means and means in a statute what it says there." (internal quotation marks omitted)).

*Second*, there is no valid basis to question the legitimacy of the Committee's legislative purpose here.  The Supreme Court has instructed that Congress's power to investigate is "broad"

Commissioner Rettig
April 13, 2019
Page 2

and "encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes." *Watkins v. United States*, 354 U.S. 178, 187 (1957).

It is not the proper function of the IRS, Treasury, or Justice to question or second guess the motivations of the Committee or its reasonable determinations regarding its need for the requested tax returns and return information. Indeed, the Supreme Court has consistently noted that the motivations underlying Congressional action are not to be second guessed, even by the courts. *Eastland v. U.S. Servicemen's Fund,* 421 U.S. 491, 509 (1975) ("The wisdom of congressional approach or methodology is not open to judicial veto."); *Watkins,* 354 U.S. at 200 ("But a solution to our problem is not to be found in testing the motives of committee members for this purpose. Such is not our function."); *Barenblatt v. United States*, 360 U.S. 109, 132 (1959) ("So long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power.").

Courts have held that, where "a rational legislative purpose is present for investigating a particular person, organization, or institution[,] [t]here is no requirement that every piece of information gathered in such an investigation be justified before the judiciary." *McSurely v. McClellan*, 521 F.2d 1024, 1041 (D.C. Cir. 1975); *see also Townsend v. United States*, 95 F.2d 352, 361 (D.C. Cir. 1938). "A legislative inquiry may be as broad, as searching, and as exhaustive as is necessary to make effective the constitutional powers of Congress." *Townsend*, 95 F.2d at 361. Furthermore, the Supreme Court has expressly recognized that "[t]o be a valid legislative inquiry there need be no predictable end result." *Eastland*, 421 U.S. at 509.

*Third*, concerns about what the Committee may do with the tax returns and return information are baseless. As my April 3rd letter noted, this request falls squarely within the Committee's oversight authority. It is well-established law in the D.C. Circuit that "[t]he presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007) (citation omitted); *Exxon Corp. v. FTC*, 589 F.2d 582, 589 (D.C. Cir. 1978) ("committees of Congress will exercise their powers responsibly and with due regard for the rights of affected parties."). In other words, the IRS, Treasury, and Justice must assume that the Committee Members, like all government officials, will act properly in the conduct of their official duties.

To date, the IRS has failed to provide the requested return and return information despite an unambiguous legal obligation to do so under section 6103(f). I expect a reply from the IRS by 5:00 p.m. on April 23, 2019. Please know that, if you fail to comply, your failure will be interpreted as a denial of my request.

Thank you for your prompt attention to this matter.

Sincerely,

The Honorable Richard E. Neal, *Chairman*

# EXHIBIT E

**Vaughan, Frederick**

| | |
|---|---|
| **From:** | Vaughan, Frederick |
| **Sent:** | Tuesday, April 23, 2019 4:57 PM |
| **To:** | 'Casey, Brandon' |
| **Cc:** | Andres, Gary |
| **Subject:** | Treasury correspondence |
| **Attachments:** | Secretary Mnuchin Response to Chairman Neal.pdf; Secretary Mnuchin Response to Chairman Neal, Appedix B.pdf |

Please see the attached correspondence from Secretary Mnuchin to Chairman Neal.

Best, Fritz

--
**Frederick W. Vaughan**
Deputy Assistant Secretary
Legislative Affairs
U.S. Department of the Treasury
1500 Pennsylvania Avenue, N.W.
Washington, D.C. 20220
202-622-2678



**DEPARTMENT OF THE TREASURY**

WASHINGTON, D.C.

SECRETARY OF THE TREASURY

April 23, 2019

The Honorable Richard E. Neal
Chairman
Committee on Ways and Means
U.S. House of Representatives
Washington, DC  20515

Dear Chairman Neal:

I write in response to your April 13 letter to the Commissioner of Internal Revenue concerning your April 3 request to obtain the confidential tax returns (and other return information) of President Trump and related business entities for 2013 through 2018.  As explained in my April 10 letter, the Department of the Treasury shares your view that the Committee's request is unprecedented.[1] Accordingly, the Department cannot act upon your request unless and until it is determined to be consistent with law.

Due to the serious constitutional questions raised by this request and the serious consequences that a resolution of those questions could have for taxpayer privacy, the Department is consulting with the Department of Justice.  Although federal law establishes no deadline for a response to your request, we expect to provide the Committee with a final decision by May 6, after receiving the Justice Department's legal conclusions.[2]

As you know, the overwhelming majority of requests for tax return information from the Congressional tax committees seek statistical data to inform the drafting of tax legislation.  That is wholly appropriate, and we remain committed to promptly providing information to assist the committees in their legislative work.  Your April 3 request is categorically different.  It seeks the returns of a single individual taxpayer for an asserted purpose that is at odds with what you and many others have repeatedly said is the request's intent:  to publicly release the President's tax returns.  The Supreme Court has made clear that exposure for the sake of exposure is never a permissible purpose of Congressional inquiries,[3] and this principle is all the more important when private and legally protected tax information is at stake.

---

[1] *See* Robert Rubin, *Trump's Tax Returns in the Spotlight if Democrats Capture the House*, Wall St. J., Oct. 3, 2018 ("'This has never happened before, so you want to be very meticulous,' Mr. Neal said.").

[2] Unlike other provisions in section 6103, subsection (f) imposes no deadline for action on the Committee's request. *Compare* 26 U.S.C. § 6103(f) *with, e.g., id.* at (g)(5).  In the absence of a statutory deadline, agencies are entitled to a reasonable time to evaluate a requested action.  While the Committee's April 3 letter was received three months after the beginning of the current Congress, we expect to provide the Committee with a final decision in substantially less time.

[3] *See Watkins v. United States*, 354 U.S. 178, 200 (1957).

History demonstrates that private tax return information is susceptible to abuse for partisan purposes—regardless of which party is in power. Unless carefully restrained by law, this risk threatens the privacy of all taxpayers. Millions of Americans are required to entrust their personal financial information to the IRS every year, and they rightly expect that their information will be used only for legitimate governmental purposes. The Department takes this public trust seriously. IRS employees are forbidden from accessing return information unless the information is necessary to perform their bona fide job responsibilities. Accessing private tax returns for any other purpose is prohibited, and intentionally disclosing tax return information for political purposes would be an egregious violation of the trust that American taxpayers place in the IRS. Any IRS employee who does so could face criminal penalties, in addition to termination.

Your request presents the question whether there are any legal limits on the ability of a Congressional tax-writing committee to obtain an individual's private tax returns from the IRS and disclose them publicly. Your April 13 letter indicates that the Committee believes there is only one: the Committee need simply recite a legislative purpose, after which the Department must ignore all evidence in the public record, however overwhelming, that the asserted purpose is pretext for a constitutionally suspect one. We have concerns about that view of the law because it appears to neglect our respective constitutional duties. The Committee's request presents the legal question especially starkly because the public record surrounding the request indicates an impermissible purpose that is impossible to ignore. The resolution of this issue could set a precedent that will reverberate for years to come—again, regardless of which party is in power.

Out of respect for the Committee on Ways and Means, this letter explains some of the legal concerns that have prompted the Department to consult the Department of Justice.

The Constitutional Limits

Our concerns begin with common ground. Based on your April 13 letter, the Committee appears to agree that a request under 26 U.S.C. § 6103(f)—like any government action—must comply with the Constitution. The Committee's authority under section 6103(f) cannot, of course, exceed Congress's powers under Article I. Consequently, parsing the language of section 6103(f) alone cannot resolve the legal issues raised by your request.

It is also common ground that Congress's investigative power is not unlimited. Article I grants Congress no express power to investigate. The Supreme Court has explained that Congress's investigative power exists as an "auxiliary to the legislative function," and so "the only legitimate object" of this power is "to aid [Congress] in legislating."[4] As the authorities cited in your letter establish, Congressional committee requests for information must be pertinent to an investigation within the jurisdiction of the committee and must reasonably serve a legitimate legislative purpose.

---

[4] *McGrain v. Daugherty*, 273 U.S. 135, 174, 178 (1927).

The Supreme Court has made clear that "[n]o inquiry is an end in itself; it must be related to, and in furtherance of, a legitimate task of the Congress."[5]  The Court has also made clear what is illegitimate, expressing "no doubt that there is no congressional power . . . to expose for the sake of exposure."[6]

<u>The Committee's Asserted Purpose</u>

The Committee's April 3 letter requests President Trump's tax returns ostensibly to conduct "oversight" of "the extent to which the IRS audits and enforces the Federal tax laws against a President."  But an honest assessment of the Committee's purpose must start with a recognition that the Committee's letter is not the beginning of the story.

The Committee's April 3 request is the culmination of a long-running, well-documented effort to expose the President's tax returns for the sake of exposure.  This effort arose from the presidential election campaign of 2016.  After the President took office, this effort continued throughout the previous Congress with what you and Representative Pascrell described in a committee report as the Committee Democrats' "steadfast . . . pursuit" to use section 6103(f) "to have [President Trump's] individual tax returns disclosed to the public."[7]  Then-Leader Pelosi and senior Ways and Means Committee members repeatedly acknowledged that the purpose of requesting the President's tax returns was to "make those tax returns public."[8]  Indeed, the chief architects of the April 3 request also served as original cosponsors of a House resolution of inquiry that sought to force the immediate public release of the President's tax returns.[9]

Although those efforts failed in the last Congress, Leader Pelosi made clear that exposing the President's tax returns would remain a top priority in the current Congress, describing it as "one of the first things we'd do—that's the easiest thing in the world."[10]  With the new majority in place, the Committee took up Speaker Pelosi's charge and, in your own words, "constructed" a "case" to obtain the President's tax returns.[11]  The public record demonstrates that the animating purpose of this effort

---

[5] *Watkins*, 354 U.S. at 187.

[6] *Id.* at 200.

[7] H.R. Rep. No. 115-73, Dissenting Views, at 8 (Mar. 30, 2017), https://www.congress.gov/115/crpt/hrpt73/CRPT-115hrpt73.pdf ("Committee Democrats remain steadfast in our pursuit to have [President Trump's] individual tax returns disclosed to the public.").

[8] Transcript, House Democratic Leadership Press Conference at 2017 Issues Conference (Feb. 8, 2017), https://www.speaker.gov/newsroom/282017/ (hereinafter Issues Conference).

[9] H. Res. 186, 115th Cong. (Mar. 9, 2017).

[10] John Wildermuth, *Pelosi: Trump's tax returns are fair game if Democrats win House*, S.F. Chron., Oct. 11, 2018, https://www.sfchronicle.com/politics/article/Pelosi-Trump-s-tax-returns-are-fair-game-if-13297954.php (quoting Leader Pelosi).

[11] Sunlen Serfaty, et al., *Republicans Warn Trump Tax Request 'Sets A Dangerous Standard' and Accuse Dems Of Weaponizing IRS*, CNN, Apr. 5, 2019, https://www.cnn.com/2019/04/04/politics/trump-tax-returns-request-republicans-congress/index.html ("[W]e wanted to make sure that the case that we constructed was in fact one that would stand up under the critical scrutiny of the federal courts.").

was and remains exposure of a political opponent's private tax information. A chronology of this public record is attached to this letter as Appendix A.[12]

No doubt aware of the public record showing that the Committee's constructed case is a pretext for exposure, the Committee has urged the Department to "not . . . question or second guess" the motives behind the legislative purpose the Committee now invokes. But it is not questioning or second-guessing the Committee to credit its Chairman's and Members' own public statements as to the purpose of their request, or to credit similar statements by the Speaker of the House.

Even if those public statements could be ignored, the Committee's stated interest in "the extent to which the IRS audits and enforces the Federal tax laws against a President" is difficult to accept on its face. As an objective matter, the terms of the Committee's request do not fit the Committee's asserted purpose in several respects. To start, the Committee does not inquire about the IRS's procedures for presidential audits. Although the IRS has conducted mandatory examinations of Presidents' tax returns since 1976, the Committee does not request additional information about those policies or ask whether those policies and procedures have changed over time.[13] Nor does the Committee ask for any information about the extensive protections that ensure such audits are conducted with extreme confidentiality and without improper interference.

In addition, the request seeks tax information related only to the current President. The Committee's exclusive focus on a single taxpayer cannot be explained by the public availability of past Presidents' tax returns; to the best of our knowledge, much of the tax information that the Committee requests for President Trump, including all IRS audit files, has never been publicly released with respect to any past President.

Further, any genuine assessment of the effectiveness of a specific taxpayer audit requires reviewing the outcome of the audit—revisions in liability, settlements, and other resolutions. But rather than request completed audit files on past Presidents, the Committee seeks the returns of the only President for whom the audit process necessarily remains ongoing, as sitting Presidents are subject to mandatory examinations under IRS rules.[14]

On the other hand, the Committee's request is perfectly tailored to the other purpose that you have repeatedly and publicly stated: to obtain and expose the President's tax returns. *See* App. A.

The Department's Concerns

The Committee has not denied that the stated purpose of its April 3 letter is a constructed pretext. Instead, it has maintained that the veracity of its stated purpose is irrelevant as a matter of law. As noted, the Committee's April 13 letter asserts that "the motivations underlying Congressional action

---

[12] Appendix B, also attached to this letter, catalogues additional statements concerning the Committee's purpose and the efforts culminating in the Committee's April 3 request.

[13] *See* IRM § 3.28.3.1; *see also* Joint Committee on Taxation, Background Regarding the Confidentiality and Disclosure of Federal Tax Returns (JCX-3-19) (Feb. 4, 2019), https://www.jct.gov/publications.html?func=startdown&id=5159.

[14] *See* IRM § 3.28.3.4.3 ("Individual income tax returns for the President and Vice President are subject to mandatory examinations.").

are not to be second guessed." It is not clear to us that the Executive Branch must always accept a pretextual legislative justification as constitutionally adequate, in the face of widespread, contemporaneous acknowledgment by the Committee Chairman and other key Members that the actual objective is to use the IRS as a means to expose the tax returns of a political opponent. Nor do we share your confidence that there is no limit to the willingness of the courts to accept obviously pretextual legislative justifications for information demands—particularly when private tax information is at risk.

We emphasize that the Department's concerns with the legality of the Committee's request extend far beyond its particulars. Taxpayer confidentiality is the linchpin of our tax system of self-assessment and voluntary compliance. The IRS promises to "administer the disclosure provisions of the Internal Revenue Code . . . according to the spirit and intent of these laws, ever mindful of the public trust."[15] This trust would be eroded if government officials could obtain the tax returns of any person they dislike solely for the sake of exposure, to achieve partisan political aims, or for other impermissible purposes—merely by constructing a pretextual case and demanding all other government actors blindly defer to that pretext. If that were so, nothing could stop a committee chairman from obtaining the tax returns of any politically disfavored individual—whether it be the head of a civil rights organization, an executive of a major corporation, a political donor, or a local activist. In all of these cases, a committee chairman would need only assert, as here, that he wants the returns of a particular individual in order to review the adequacy of the IRS's process of auditing that individual.

The Department recognizes that the Executive Branch and Legislative Branch have an obligation to work together to accommodate their respective legitimate needs and interests. To the extent the Committee wishes to understand, for genuine oversight purposes, how the IRS audits and enforces the Federal tax laws against a President, we would be happy to accommodate that interest by providing additional information on the mandatory audit process. I would encourage the Committee to defer its unprecedented request and revisit this issue after it has the opportunity to work together with the Department to meets its stated legislative needs.

Although the Committee has asserted that any response from the Department other than production of the requested materials will be "interpreted as a denial," that would be a misinterpretation. The Committee's request has not been denied or granted at this time. The Department expects to take final action on the Committee's request by May 6, after receiving the Justice Department's legal conclusions.

Sincerely,

Steven T. Mnuchin

Steven T. Mnuchin

---

[15] IRS Pub. 1075, Tax Information Security Guidelines for Federal, State and Local Agencies, at 1, https://www.irs.gov/pub/irs-pdf/p1075.pdf.

# APPENDIX A

## Chronology

### The 2016 Election

The effort to expose President Trump's tax returns began during the 2016 election. The Democratic candidate for President urged then-candidate Trump to release his returns. When he declined to do so, the Democratic candidate sought to generate political pressure to force their release, repeatedly criticizing his decision and expressing her belief that public exposure of the returns would be politically damaging to her opponent.[1]

### Representative Neal's Advocacy for Exposure

When President Trump took office after the election, the House Minority Leader and senior Democratic members of the Committee on Ways and Means (including Ranking Member Neal) took up their party's election season demands in Congress. Their chosen tool was section 6103(f). The stated rationales have shifted over time, but the objective remained constant:  Use section 6103(f) to obtain the tax returns and make them public.

As Ranking Member of the Committee, Representative Neal immediately began urging the Committee to obtain President Trump's tax returns for the purpose of releasing them. In February 2017, he explained his desire for a public opportunity to "see the tax forms" and for "the media to sift and sort" them.[2] In March 2017, Ranking Member Neal and other Members urged Chairman Kevin Brady to submit a section 6103(f) request "for copies of the President's federal tax returns for the last ten years."[3] They explained that the Committee should "then vote . . . to submit the President's federal tax returns to the House of Representatives and Senate—thereby, if successful, making them available to the public."[4] In April 2017, Ranking Member

---

[1] *See, e.g.*, *The Lead with Jake Tapper* (CNN television broadcast May 11, 2016) ("[W]hy doesn't he want to release them?  Yes, well, we're going to find out."), http://www.cnn.com/TRANSCRIPTS/1605/11/cg.01.html; *New Day* (CNN television broadcast Aug. 2, 2016) ("We would like to see those tax returns, wouldn't we?"),
http://www.cnn.com/TRANSCRIPTS/1608/02/nday.03.html; *The Situation Room* (CNN television broadcast Aug. 12, 2016) ("He refuses to do what every other presidential candidate in decades has done and release his tax returns."), http://www.cnn.com/TRANSCRIPTS/1608/12/sitroom.01.html; *Erin Burnett OutFront* (CNN television broadcast Sept. 6, 2016) ("He said that the American people don't care about his tax returns, and in fact, he's also said that it's none of our business.  I just think he's dead wrong."),
http://www.cnn.com/TRANSCRIPTS/1609/06/ebo.01.html; *The Situation Room* (CNN television broadcast Sept. 7, 2016) ("He clearly has something to hide."), http://www.cnn.com/TRANSCRIPTS/1609/07/sitroom.02.html; *Newsroom* (CNN television broadcast Sept. 27, 2016) ("Maybe he doesn't want the American people, all of you watching tonight, to know that he's paid nothing in Federal taxes. . . ."),
http://www.cnn.com/TRANSCRIPTS/1609/27/cnr.03.html.

[2] Press Conference, Rep. Richard Neal, C-SPAN Video, at 19:10-20:19 (Feb. 14, 2017), https://www.c-span.org/video/?424013-1/house-democrats-call-investigation-wake-michael-flynns-resignation.

[3] Letter from Hon. Bill Pascrell, Jr., et al., to Hon. Orrin Hatch, Chairman, S. Comm. on Finance, & Hon. Kevin Brady, Chairman, H. Comm. on Ways & Means (Mar. 2, 2017).

[4] *Id.*

Neal recalled the 2016 election and asserted that President Trump was "supposed to" have made these returns available to the public as a candidate.[5]

Ranking Member Neal also served as an original cosponsor of a resolution of inquiry, H. Res. 186, providing that "the Secretary of the Treasury is directed to furnish to the House of Representatives, not later than 10 days after the adoption of this resolution, the full tax returns of Donald J. Trump for tax years 2006 through 2015."[6]  Ranking Member Neal explained that the resolution was designed to force the immediate public exposure of those returns.[7]

On March 30, 2017, the Committee voted down H. Res. 186 and issued a report condemning the resolution as an "abuse of authority."[8]  In dissenting views included in the committee report, Ranking Member Neal reiterated his "steadfast" objective of exposing the President's tax returns to the public:

> Committee Republicans continue to block our requests for this Committee to exercise its authority under Section 6103 of the Internal Revenue Code to obtain, examine, *and make available to the public* President Trump's federal tax returns. . . . *Committee Democrats remain steadfast in our pursuit to have [President Trump's] individual tax returns disclosed to the public.*[9]

Ranking Member Neal's dissenting views made no mention of any interest in understanding how the IRS audits and enforces the Federal tax laws against a President, as the Committee's April 3 letter now asserts.

Other Senior House Democrats' Advocacy for Exposure

Leader Pelosi and other senior Ways and Means Committee members also repeatedly stated that the purpose of requesting President Trump's tax returns was to "make those tax returns public."[10]  Leader Pelosi explained that requesting the returns would satisfy the public's "right to know"[11] and complained that Republicans "won't join us in the release of the President's tax returns."[12]

---

[5] "This is not about the law, this is about custom and practice.  It's a settled tradition . . . candidates reach the level of expectation that they're supposed to release their tax forms."  Press Conference, Minority Leader Nancy Pelosi, Demanding a Vote Requiring President Trump to Release Tax Returns (Apr. 5, 2017), https://www.speaker.gov/newsroom/4517/ (remarks of Ranking Member Richard Neal).

[6] H. Res. 186, 115th Cong. (Mar. 9, 2017).

[7] *See id.*; H.R. Rep. No. 115-73, Dissenting Views, at 8 (Mar. 30, 2017), https://www.congress.gov/115/crpt/hrpt73/CRPT-115hrpt73.pdf (hereinafter Ways & Means Report).

[8] Ways & Means Report, at 3.

[9] Ways & Means Report, Dissenting Views, at 7-8 (emphasis added).

[10] Transcript, House Democratic Leadership Press Conference at 2017 Issues Conference (Feb. 8, 2017), https://www.speaker.gov/newsroom/282017/ (hereinafter Issues Conference).

[11] 163 Cong. Rec. H2498 (daily ed. Mar. 28, 2017) (statement of Rep. Pelosi), https://www.congress.gov/115/crec/2017/03/28/CREC-2017-03-28-house.pdf.

[12] Press Conference, Minority Leader Nancy Pelosi (July 13, 2017), https://www.speaker.gov/newsroom/71317-8/.

Exposure for the sake of exposure was the one constant purpose that drove the requests that Ranking Member Neal and other senior Committee members advocated throughout the previous Congress.  In addition, Congressional leaders offered a wide variety of evolving rationales and speculation about what, if anything, might be found in the tax returns upon their exposure. Before the conclusion of the Special Counsel's investigation, a common theory was that the President's tax returns would show "the President's relationship with Russia," "disruption of our [2016] election," and "any personal embarrassment to the President." [13]  Leader Pelosi speculated: "We think [the returns] will show us some connection that will be useful in the investigation of what do the Russians have on Donald Trump . . . ."[14]

Another theory offered by the lead sponsor of H. Res. 186, Representative Pascrell, was that exposure of the President's tax returns would help "make sure the President and his family are not hiding financial ties that could cause conflicts in decision making."[15]  Representative Pascrell also thought it was "imperative for the public to know" the President's "self-reported net worth,"[16] and Ranking Member Neal thought they should know "just how extensive [his] overseas investments have been," based on the tax returns[17]

In yet another theory, Ranking Member Neal's dissent in support of H. Res. 186 explained that the President's tax returns would give the "clearest picture" of the President's "financial health" and inform the consideration of tax reform legislation (which was enacted in December 2017).[18]

Other theories included speculation that the tax returns would expose the President's "emoluments";[19] would show his "charitable donations" or "tax loopholes";[20] would reveal whether he had a "Chinese connection";[21] or would "maybe . . . be a path to some other

[13] Issues Conference, *supra* note 10; Press Conference, Minority Leader Nancy Pelosi (Mar. 8, 2017), https://www.speaker.gov/newsroom/382017-2/.

[14] Press Conference, Minority Leader Nancy Pelosi (Apr. 6, 2017), https://www.speaker.gov/newsroom/4617-4/.

[15] Press Conference, House Democrats (Feb. 14, 2017) (statement of Rep. Bill Pascrell, Jr.), http://www.cq.com/doc/newsmakertranscripts-5142259?0&search=fDVxTm49.

[16] Letter from Hon. Bill Pascrell, Jr., to Hon. Kevin Brady, Chairman, H. Comm. on Ways & Means (Feb. 1, 2017), https://pascrell.house.gov/news/documentsingle.aspx?DocumentID=2195.

[17] Press Conference, Rep. Richard Neal, C-SPAN Video, at 19:46 (Feb. 14, 2017), https://www.c-span.org/video/?424013-1/house-democrats-call-investigation-wake-michael-flynns-resignation.

[18] Ways & Means Report, Dissenting Views, at 7.

[19] Letter from Hon. Elijah E. Cummings, Ranking Member, H. Comm. on Oversight & Gov't Reform, et al., to Hon. Paul Ryan, Speaker, U.S. House of Reps., at 2,6 (Jan. 12, 2017), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/2017-01-12.Ranking%20Members%20to%20Speaker%20Ryan%20Re.Trump_.pdf; *see also* Amendment offered by Rep. Doggett to the Authorization and Oversight Plan of the H. Comm. on Ways & Means (Feb. 14, 2017), https://gop-waysandmeans.house.gov/wp-content/uploads/2017/02/20170214-Doggett-Amendment.pdf.

[20] *See, e.g.*, 163 Cong. Rec. H4212 (May 16, 2017) (statement of Rep. Pascrell), https://www.congress.gov/congressional-record/2017/05/16/house-section/article/H4212-1.

[21] Press Conference, Minority Leader Nancy Pelosi, Demanding a Vote Requiring President Trump to Release Tax Returns (Apr. 5, 2017), https://www.speaker.gov/newsroom/4517/.

questions."[22]  At other times, Leader Pelosi simply explained that exposure of the President's tax returns would "fulfill" a campaign "promise," or would "honor tradition." [23]

Although the efforts to force the public release of President Trump's tax returns in the previous Congress failed (despite numerous letters, committee amendments, resolutions, and other attempts),[24] Leader Pelosi made clear that the effort would continue if Democrats took the House in 2018. The *San Francisco Chronicle* reported in October 2018 that Leader Pelosi "told the [paper's] editorial board" that "demanding the president's tax returns 'is one of the first things we'd do—that's the easiest thing in the world.'"[25]

The Committee's Construction of a Pretextual Purpose

With a new Democratic majority in the House, the Committee pressed ahead in the effort to obtain and release the President's tax returns.  Chairman Neal had recognized the unprecedented nature of the Committee's planned request: "This has never happened before, so you want to be very meticulous."[26]

In January 2019, the Committee spokesperson explained the plan to "force" the disclosure of the President's returns: "'[Chairman Neal] wants to lay out a case about why presidents should be disclosing their tax returns before he formally forces [the President] to do it.'"[27]

Because Congress may only conduct investigations to further a legitimate legislative purpose, Congressional investigations ordinarily begin with a legislative purpose, and that purpose defines the scope of the documents that are pertinent to the Committee's investigation.[28]  But here, by the Committee's own admission, the Committee's investigation began in the opposite direction. The Committee started with the documents it planned to obtain and release (the President's tax returns), and then it sought—in Chairman Neal's words—to "construct[]" a "case" for seeking the documents that would appear to be in furtherance of a legitimate legislative purpose.[29]

---

[22] Press Conference, Minority Leader Nancy Pelosi (June 2, 2017), https://www.speaker.gov/newsroom/6217-4/.

[23] Blog Post, Minority Leader Nancy Pelosi, Where are President Trump's Tax Returns?, (June 20, 2017), https://www.speaker.gov/newsroom/where-are-president-trumps-tax-returns/.

[24] *See* Rep. Bill Pascrell, *President Trump's Tax Returns*, https://pascrell.house.gov/issues/president-trumps-tax-returns/ (last visited Apr. 23, 2019).

[25] John Wildermuth, *Pelosi: Trump's tax returns are fair game if Democrats win House*, S.F. Chron., Oct. 11, 2018 (quoting Leader Pelosi), https://www.sfchronicle.com/politics/article/Pelosi-Trump-s-tax-returns-are-fair-game-if-13297954.php.

[26] Robert Rubin, *Trump's Tax Returns in the Spotlight if Democrats Capture the House*, Wall St. J., Oct. 3, 2018.

[27] Brian Faler, *Incoming Democratic Tax Chairman Won't Make Quick Grab For Trump's Returns*, Politico, Jan. 2, 2019 (quoting Committee Spokesperson), https://www.politico.com/story/2019/01/02/congress-trump-tax-returns-richard-neal-1056839.

[28] *See* 163 Cong. Rec. S2260 (daily ed. Apr. 4, 2019) (statement of Sen. Grassley), https://www.congress.gov/116/crec/2019/04/04/CREC-2019-04-04-senate.pdf.

[29] Sunlen Serfaty, et al., *Republicans Warn Trump Tax Request 'Sets A Dangerous Standard' and Accuse Dems Of Weaponizing IRS*, CNN, Apr. 5, 2019, https://www.cnn.com/2019/04/04/politics/trump-tax-returns-request-

The Committee knew that exposure for the sake of exposure would not be a legitimate purpose, and so the Committee could no longer rely upon prior statements to that effect. At the same time, the Committee lacked jurisdiction to rely upon other frequently cited public justifications for the request—such as interest in "the Russian connection"[30] and the President's alleged financial conflicts of interest. Other House committees might have tried to make 6103(f) requests based upon such justifications, but no other House committee would have the authority to publicly release the tax returns after obtaining them. As the Committee was advised by the former Chief of Staff of the Joint Committee on Taxation, there is "one key for purposes of disclosing the information to the public" and the statute "gave that key to the tax committees."[31] To use this key, the Committee on Ways and Means had to make the request, and the other justifications that might have been offered by other committees had to be discarded.

Thus, the Committee with the key to publicly disclose the tax returns, in Chairman Neal's words, "constructed" a "case" to justify its request.[32] The result was the Committee's letter of April 3, asserting a single legislative interest in "the extent to which the IRS audits and enforces the Federal tax laws against a President," and requesting the tax returns and related documents of just one of them—President Trump.[33]

---

republicans-congress/index.html ("[W]e wanted to make sure that the case that we constructed was in fact one that would stand up under the critical scrutiny of the federal courts.").

[30] Press Conference, Minority Leader Nancy Pelosi, Demanding a Vote Requiring President Trump to Release Tax Returns (Apr. 5, 2017), https://www.speaker.gov/newsroom/4517/.

[31] Transcript, *Legislative Proposals and Tax Law Related to Presidential and Vice-Presidential Tax Returns: Hearing before Subcomm. on Oversight, H. Comm. on Ways & Means*, 116th Cong. (Feb. 7, 2019) (statement of Joseph K. Yin, Professor, Univ. of Virginia Law School),
https://waysandmeans.house.gov/sites/democrats.waysandmeans.house.gov/files/documents/Transcript%20-%20Final.pdf.

[32] Serfaty, *supra* note 30 (quoting Chairman Neal).

[33] Letter from Hon. Richard E. Neal, Chairman, H. Comm. on Ways & Means, to Hon. Charles P. Rettig, Comm'r, IRS (Apr. 3, 2019),
https://waysandmeans.house.gov/sites/democrats.waysandmeans.house.gov/files/documents/Neal%20Letter%20to%20Rettig%20%28signed%29%20-%202019.04.03.pdf.

## APPENDIX B

### Additional Statements

Presidential Candidate Hillary Rodham Clinton (May 11, 2016)

> When you run for president, especially when you become the nominee, that is kind of expected. My husband and I have released 33 years of tax returns. We have got eight years on our Web site right now. So you have got to ask yourself, why doesn't he want to release them? Yes, well, we're going to find out.

*The Lead with Jake Tapper* (CNN television broadcast May 11, 2016),
http://www.cnn.com/TRANSCRIPTS/1605/11/cg.01.html.

Presidential Candidate Hillary Rodham Clinton (Aug. 2, 2016)

> We would like to see those tax returns, wouldn't we?

*CNN New Day* (CNN television broadcast Aug. 2, 2016),
http://www.cnn.com/TRANSCRIPTS/1608/02/nday.03.html.

Presidential Candidate Hillary Rodham Clinton (Aug. 12, 2016)

> He refuses to do what every other presidential candidate in decades has done and release his tax returns.

*The Situation Room* (CNN television broadcast Aug. 12, 2016),
http://www.cnn.com/TRANSCRIPTS/1608/12/sitroom.01.html.

Presidential Candidate Hillary Rodham Clinton (Sept. 6, 2016)

> He said that the American people don't care about his tax returns, and in fact, he's also said that it's none of our business. I just think he's dead wrong. He clearly has something to hide.

> The scams, the frauds and the questionable relationships, the business activities that have stiffed workers, refused to pay small businesses, so, clearly, his tax returns tell a story that the American people deserve and need to know.

*Erin Burnett Outfront* (CNN television broadcast Sept. 6, 2016),
http://www.cnn.com/TRANSCRIPTS/1609/06/ebo.01.html.

Presidential Candidate Hillary Rodham Clinton and Vice Presidential Candidate Tim Kaine (Sept. 7, 2016)

> Clinton:  He clearly has something to hide. We don't know exactly what it is, but we're getting better guesses.
>
> * * *
>
> Clinton:  Clearly, his tax returns tell a story that the American people deserve and need to know.
>
> * * *
>
> Kaine: Maybe he doesn't want people to see that he's got some connections.

*The Situation Room* (CNN television broadcast Sept. 7, 2016),
http://www.cnn.com/TRANSCRIPTS/1609/07/sitroom.02.html.

Presidential Candidate Hillary Rodham Clinton (Sept. 27, 2016)

> Maybe he doesn't want the American people, all of you watching tonight, to know that he's paid nothing in Federal taxes.

*CNN Newsroom* (CNN television broadcast Sept. 27, 2016),
http://www.cnn.com/TRANSCRIPTS/1609/27/cnr.03.html.

Ranking Member Richard Neal (Jan. 12, 2017)

> We request that you join us in fulfilling our sworn constitutional duty by seeking and obtaining copies of the following documents:  President-Elect Trump's personal and corporate tax returns, domestic and foreign, for the past five years, regardless of whether they are still under audit . . . and all other documents necessary to help protect against violations of the Emoluments Clause of the Constitution and conflicts of interest, including with foreign adversaries such as Russia.

Letter from Hon. Richard E. Neal, Ranking Member, H. Comm. on Ways & Means, et al., to Hon. Paul Ryan, Speaker, U.S. House of Reps. (Jan. 12, 2017),
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/2017-01-12.Ranking%20Members%20to%20Speaker%20Ryan%20Re.Trump_.pdf.

Rep. Bill Pascrell (D-NJ) (Feb. 1, 2017)

> President Trump has chosen to keep an ownership stake in his businesses, the scope of which we have no knowledge of as he has refused to disclose his tax returns. We believe that it is imperative for the public to know and understand his 564 financial positions in domestic and foreign companies and his self-reported net worth of more than $10 billion.

We know that state-owned enterprises in China and the United Arab Emirates are involved in his businesses, and that his business ties stretch to India, Turkey, the Philippines, and beyond. Russia, Saudi Arabia, and Taiwan may also have ties to his businesses, these foreign entities are paying rents, licensing agreement payments, and issuing permits for developments -- effectively giving them a tool to influence our new President.

\* \* \*

If the President does not either release his returns or consent to examination of such returns by this Committee, I urge you, as Chairman of the Committee and pursuant to Section 6103(f)(1) of the Internal Revenue Code, to submit a written request to the Secretary of the Treasury for copies of the President's federal tax returns by February 15, 2017. These returns and all accompanying return information should then be made available for examination by all Committee Members in a closed executive session. I further request that the Committee then vote in this closed session to submit the President's federal tax returns to the House of Representatives—thereby, if successful, making them available to the public.

\* \* \*

I believe the powerful Ways and Means Committee has the responsibility to use that power to ensure proper oversight of the executive branch by requesting a review of President Trump's tax returns and moving towards a formal release of these documents to the public.

Letter from Hon. Bill Pascrell, Jr. to Hon. Kevin Brady, Chairman, H. Comm. on Ways & Means (Feb. 1, 2017), https://pascrell.house.gov/news/documentsingle.aspx?DocumentID=2195.


Minority Leader Nancy Pelosi (Feb. 5, 2017)

I want to know what the Russians have on Donald Trump. I think we have to have an investigation by the FBI into his financial, personal and political connections to Russia, and we want to see his tax returns, so we can have truth in the relationship between Putin, whom he admires, and Donald Trump.

*Meet the Press* (NBC television broadcast Feb. 5, 2017), at 3:56, https://www.nbcnews.com/meet-the-press/video/full-pelosi-interview-trump-white-house-using-diversionary-tactics-870511683900.


Minority Leader Nancy Pelosi (Feb. 8, 2017)

As you know, I've been questioning the President's relationship with Russia. It's extremely alarming, and it could undermine our national security. What on earth do the Russians have on Donald Trump? That he could flirt with the idea of lifting sanctions on Russia despite their aggressive military behavior? That he could lift the sanctions already

on the successor to the KGB a group that we know hacked into our systems, disrupting our election? That he is saying things about a person, that qualifies as a war criminal and giving some equivalence to the United States of America? This is the President of the United States. The President of the United States.

So I'm just saying, at least show us your tax returns. Is the audit over? Is this the audit for eternity? And of course that's never been a justification for not releasing your tax returns. The President continues to hide his tax returns which could provide vital insight into what financial influence Russia has on him, whether it's personal, political or financial. We call upon the FBI to do that investigation, it is in our national security interest. Chairman Brady is Chairman of the Ways and Means Committee and Chairman of the Joint Committee of Taxation, is empowered to demand Trump's tax returns from the Secretary of the Treasury. All he has to do is ask, and hold a committee vote to make those tax returns public.

Mr. President what do the Russians have on you personally, politically or financially?

The process is – the privilege only goes to the Chairman to make the request. But then the committee can vote to make the tax returns public. This is as you may recall, you wouldn't recall, but in your history books you may read what happened with President Nixon a long time ago. So we're calling on Chairman Brady to bring out those tax returns.

Press Conference, Minority Leader Nancy Pelosi, House Democratic Leadership Press Conference at 2017 Issues Conference (Feb. 8, 2017), https://www.speaker.gov/newsroom/282017/.


Minority Leader Nancy Pelosi (Feb. 13, 2017)

The reports of the Trump-Russia dossier gain credence with each passing day. As long as Republicans refuse to compel the release of President Trump's tax returns, they are complicit in covering up Russia's financial, personal and political hold on the Administration.

Press Release, Minority Leader Nancy Pelosi, Pelosi: Fire General Flynn (Feb. 13, 2017), https://www.speaker.gov/newsroom/21317/.


Minority Leader Nancy Pelosi (Feb. 14, 2017)

And again Mr. Neal, whose importance in this meeting is that we need to see the truth of President Trump's investments. His committee has the authority, the chairman of the committee in the House or the chairman of the committee in the Senate, Chairman Brady or Chairman Hatch and in addition to the Finance Committee, and Ways and Means Committee – the Joint Committee on Taxation, the chairman on that committee, Mr. Brady, again, have the authority to ask the Secretary of the Treasury for the tax returns of anyone in our country if there's reason to know that.

They can ask for the president's tax returns, and then by a vote in their committee, they can decide where they should be released to the public, so there's another stonewalling because they said they can't be caught up in rummaging. This isn't rummaging, this is truth and consequences. The American people have a right to know the truth. We see the consequences which can be dangerous to our national security.

So the question is, why is the FBI not fully investigating the political, personal, and financial ties of Donald Trump to the Russians? Show us your tax reforms -- return so we can see what some of that connection might be, and stop flirting with lifting sanctions and condemning the START Treaty and the rest of that, which have -- because you're flirting with Russia, which has a direct impact on the safety of the American people.

Press Conference, Minority Leader Nancy Pelosi, Reacting to Resignation of National Security Advisor Michael Flynn (Feb. 14, 2017), https://www.speaker.gov/newsroom/2142017/.


Rep. Bill Pascrell (D-NJ) (Feb. 14, 2017)

The president and the Congressional Republicans have been very vocal about their desire to enact comprehensive tax reform for this congress. We believe it is imperative for the public to know and understand how such tax reform will benefit the president.

* * *

This is not willy-nilly, this is a serious attempt to get the truth to the American people, and you will decide Mr. Chairman, using the power of this committee to make them public.

H. Comm. on Ways & Means, Full Committee Markup, at 32:45, 40:45 (Feb. 14, 2017) (Statement of Rep. Pascrell), https://gop-waysandmeans.house.gov/event/ways-means-hold-meeting/.


Ranking Member Neal (Feb. 14, 2017)

The President has indicated during the course of the campaign that only he knows how to fix the tax system and as we proceed to tax reform, which is a very complex issue and matter, as we all know, and how difficult it is to do. There is an opportunity here for all of us to cooperate and for the president to lead the way. So I am in support of Mr. Doggett's amendment and Mr. Pascrell's letter.

H. Comm. on Ways & Means, Full Committee Markup, at 33:23 (Feb. 14, 2017) (statement of Ranking Member Neal), https://gop-waysandmeans.house.gov/event/ways-means-hold-meeting/.

Rep. Sander Levin (D-MI) (Feb. 14, 2017)

The only way you will bury the doubts is by letting the public see the information.

H. Comm. on Ways & Means, Full Committee Markup, at 36:51 (Feb. 14, 2017) (statement of Rep. Levin), https://gop-waysandmeans.house.gov/event/ways-means-hold-meeting/.

Amendment Offered by Rep. Lloyd Doggett (D-TX) (Feb. 14, 2017)

Amend the Ways and Means Committee oversight plan by adding the following under matters under the Committee's Tax Jurisdiction:

Pursuant to Section 6103(f)(1) of the Internal Revenue Code, the Chairman of the Committee will submit a written request to the Secretary of the Treasury by March 1, 2017, for copies of the President's federal tax returns for the last ten years. These returns and all accompanying return information should then be made available for examination by bipartisan Committee staff, and additionally, in executive session, by all committee members. The Committee will review potential conflicts and violations of the emoluments clause, and potential entanglements with foreign governments and foreign state owned enterprises.

Amendment offered by Rep. Doggett to the Authorization and Oversight Plan of the H. Comm. on Ways & Means (Feb. 14, 2017), https://gop-waysandmeans.house.gov/wp-content/uploads/2017/02/20170214-Doggett-Amendment.pdf.

Ranking Member Richard Neal (Feb. 14, 2017)

The last seven American presidents have released to the American people their tax forms. And they've done it as a standard operating procedure through the course of the campaign and then subsequently during their time as president.

It was an annual event, and there was sufficient opportunity then for members of Congress, members of the administration and the media to sift and sort what those tax forms told us. So in this instance, I think there is, again, an opportunity for all of us to review the president's tax forms to find out just how extensive the overseas investments have been.

And it'll then give the American people the chance to see it. He indicated that once the audit was done, that he would release the tax forms, and then pointed out just a few weeks ago through a spokesperson that the American people didn't care about those tax forms.

Well I believe that ABC News has indicated that 75 percent of the American people would like to see the tax forms, consistent with what the last seven American presidents have done. . . .

Press Conference, Statement by Rep. Richard Neal, C-Span Video, 19:00 (Feb. 14, 2017), https://www.c-span.org/video/?424013-1/house-democrats-call-investigation-wake-michael-flynns-resignation.

Rep. Bill Pascrell (D-NJ) (Feb. 14, 2017)

> Since February, we've held nine votes on the floor of the House of Representatives. And in -- March 1st, I offered a resolution of inquiry that was debated in the Ways and Means Committee. At each turn, the Republicans in Congress blocked our efforts.

> Why are they hiding and being complicit, to use the speaker's -- the leader's word, in keeping Trump's conflicts secret and hidden? Why? Why is that? Why won't Republican members of Congress use their authority in the law to provide oversight and make sure the president and his family are not hiding financial ties that could cause conflicts in the decision-making?

> We have no way of knowing whether Mr. Trump or his firms have received Russian income or loans or entered into Russian-linked partnerships. We have a right to know that.

> The legislative branch has the responsibility and the authority to check the executive branch, under Section 6103 of the tax code, which allows for an examination of his returns, the authority put in place specifically so Congress could examine conflicts of interest in the executive, following that great scandal in the early 1920s.

> Today, I'll be introducing a new resolution of inquiry to give the Ways and Means Committee another chance to get it. And -- and by the way, in conclusion, it's not enough for Republican congressmen to go to town meetings and say, "Yes, the president should give us his tax returns," and then not -- come back to Washington and not have the courage to stand up for their convictions and say, "This is the direction we should be going."

> And that's not good enough. So there's been over 20 people on the other side that have said he should release his tax returns, but will not vote to do it. Congress can, and must, use its authority to address President Trump's tax returns and give the American people the transparency they deserve.

Press Conference, Statement by Rep. Bill Pascrell (D-NJ) (Feb. 14, 2017), http://www.cq.com/doc/newsmakertranscripts-5142259.

Minority Leader Nancy Pelosi (Feb. 27, 2017)

> What do the Russians have on Donald Trump that he would flirt with lifting our sanctions against Russia because of their aggression in eastern Europe? That he would undermine the START Treaty? Praise Putin and stonewall any investigation to bring the truth to light – including releasing his tax returns?

Press Conference, Minority Leader Nancy Pelosi, Prebuttal to President Trump's Speech to Joint Session of Congress (Feb. 27, 2017), https://www.speaker.gov/newsroom/22717-2/.

Resolution Offered by Rep. Bill Pascrell (D-NJ) (Feb. 27, 2017)

> Expressing the sense of the House of Representatives that the President shall immediately disclose his tax return information to Congress and the American people.
>
> * * *
>
> Whereas, disclosure of the President's tax returns could help those investigating Russian influence in the 2016 election understand the President's financial ties to the Russian Federation and Russian citizens, including debts owed and whether he shares any partnership interests, equity interests, joint ventures or licensing agreements with Russia or Russians;
>
> * * *
>
> Whereas, the American people have the right to know whether or not their President is operating under conflicts of interest related to international affairs, tax reform, government contracts, or otherwise:
>
> Now, therefore, be it resolved, that the House of Representatives shall, one, immediately request the tax return information of Donald J. Trump for tax years 2006 through 2015 for review in closed executive session by the Committee on Ways and Means, as provided under section 6103 of the Internal Revenue Code, and vote to report the information therein to the full House of Representatives; two, support transparency in government and the longstanding tradition of Presidents and Presidential candidates disclosing their tax returns.

163 Cong. Rec. H1337 (daily ed. Feb. 27, 2017) (statement of Rep. Pascrell), https://www.congress.gov/congressional-record/2017/02/27/house-section/article/H1337-2.

Rep. Bill Pascrell (D-NJ) (Feb. 27, 2017)

> To restore the dignity of the House, we must use our authority to request President Trump's tax returns and give the American people the transparency they deserve.
>
> * * *
>
> Let's shine a bright light on the President's conflicts together, together, as we, as a Congress, and the broader American public can judge whether his decisions are being made for himself, his business interests, or for the greater good of the American people.

163 Cong. Rec. H1337 (daily ed. Feb. 27, 2017) (statement of Rep. Pascrell), https://www.congress.gov/congressional-record/2017/02/27/house-section/article/H1337-2.

Minority Leader Nancy Pelosi (Feb. 28, 2017)

> Tonight, House Republicans made themselves accomplices to hiding President Trump's tax returns from the American people.

> Our security and our democracy have been endangered by Russia's clear influence on the Trump Administration. The American people deserve the truth about Russia's personal, political and financial grip on President Trump. If there's nothing there, then what are Republicans afraid of?

> The President's refusal to release his tax returns is yet another example of his contempt for the promises he made in his campaign. While Republicans stonewall an independent investigation, Democrats will continue to demand the truth for the American people.

Press Release, Minority Leader Nancy Pelosi, Statement on Republican Vote to Keep Trump's Tax Returns Secret (Feb. 28, 2017), https://www.speaker.gov/newsroom/2272017-2/.


Minority Leader Nancy Pelosi (Feb. 28, 2017)

> What we are calling for is an independent outside commission, take it away from Congress, take it away from politics, an independent outside commission to look into the political, personal and financial ties of the Trump organization -- him personally, his businesses, his campaign -- to the Russians.

>    * * *

> The American people want to know the truth. He could begin by releasing his tax returns. Why should every president since Gerald Ford in modern history have released his tax returns, but this president says I'm above not only the law but the traditions of the office that I hold?

*Andrea Mitchell Reports* (MSNBC television broadcast Feb. 28, 2017), https://www.speaker.gov/newsroom/320217/.


Minority Leader Nancy Pelosi (Mar. 2, 2017)

> Well, in all of this all roads lead to the Republicans in the Congress. What are they afraid of? They have been afraid of the truth every step of the way. They don't want to see the President's tax returns, when every President since Gerald Ford, every President in modern times has released his tax returns, and candidates release their tax returns.

> So what is it? That would be a key indicator of their interest in the truth. So the question is to them, what are they afraid of in the tax returns? What are they afraid of in the investigation of the Russian involvement to undermine our democracy, to repeat that in other countries, to come back here and do that again?

Press Conference, Minority Leader Nancy Pelosi (Mar. 2, 2017),
https://www.speaker.gov/newsroom/322017-3/.

Minority Leader Nancy Pelosi (Mar. 3, 2017)

> What do the Russian have on Donald Trump that he would do that? And I don't know
> who knew what in all of this, but it's important for us to find out and we must have that
> investigation.

> * * *

> What are -- what are the Republicans in Congress afraid of? They don't want to see the
> president's tax returns, the first time since Gerald Ford, who was -- since Gerald Ford, all
> presidents have put it out. They don't want to investigate in a wholesome way the hack --
> the disruption of our system? What are the Republicans afraid of? This goes right to the
> Republicans in Congress -- to their doorstep. And when the public sentiment, as Lincoln
> said, is everything.

> As they hear from their constituents, perhaps maybe they'll be more inclined to seek the
> truth.

Statement of Minority Leader Nancy Pelosi, Politico Playbook Interview (Mar. 3, 2017),
http://www.cq.com/doc/newsmakertranscripts-5053910.

Rep. Bill Pascrell (D-NJ), et al. (Mar. 3, 2017)

> We write you to request that you use your authority to request the tax returns of President
> Donald Trump for review by the Senate Committee on Finance and House Committee on
> Ways and Means.

> * * *

> If the President does not either release his returns or consent to examination of such
> returns by this Committee, we urge you, as Chairman of the Committee and pursuant to
> Section 6103(f)(1) of the Internal Revenue Code, to submit a written request to the
> Secretary of the Treasury by March 15, 2017, for copies of the President's federal tax
> returns for the last ten years. These returns and all accompanying return information
> should then be made available for examination by all Committee Members in a closed
> executive session. We further request that the Committee then vote in this closed session
> to submit the President's federal tax returns to the House of Representatives and Senate
> —thereby, if successful, making them available to the public.

> We believe the powerful and respected Committees on Finance and Ways and Means
> have the responsibility to ensure oversight of the executive branch by requesting a review
> of President Trump's tax returns and moving toward a formal release of these documents
> to the public.

Letter from Hon. Bill Pascrell, Jr., et al., to Hon. Orrin Hatch, Chairman, S. Comm. on Finance, & Hon. Kevin Brady, Chairman, H. Comm. on Ways & Means (Mar. 2, 2017), https://pascrell.house.gov/news/documentsingle.aspx?DocumentID=1898.

Resolution Offered by Rep. Anna Eshoo (D-CA) (Mar. 7, 2017)

> Expressing the sense of the House of Representatives that the President shall immediately disclose his tax return information to Congress and the American people.

> * * *

> Whereas, disclosure of the President's tax returns could help those investigating Russian influence in the 2016 election understand the President's financial ties to the Russian Federation and Russian citizens, including debts owed and whether he shares any partnership interests, equity interests, joint ventures or licensing agreements with Russia or Russians;

> * * *

> Whereas, the American people have the right to know whether or not their President is operating under conflicts of interest related to international affairs, tax reform, government contracts, or otherwise: Now, therefore, be it:

> Resolved. That the House of Representatives shall--

> 1. Immediately request the tax return information of Donald J. Trump for tax years 2006 through 2015 for review in closed executive session by the Committee on Ways and Means, as provided under Section 6103 of the Internal Revenue Code, and vote to report the information therein to the full House of Representatives.

> 2. Support transparency in government and the longstanding tradition of Presidents and Presidential candidates disclosing their tax returns.

163 Cong. Rec. H1571 (daily ed. Mar. 7, 2017) (statement of Rep. Eshoo), https://www.congress.gov/congressional-record/2017/03/07/house-section/article/H1571-6.

Rep. Bill Pascrell (D-NJ) (Mar. 8, 2017)

> And we can't get the President's tax returns. Not yet. It's going to be embarrassing when those tax returns come out. They're coming out sooner or later. They're coming out sooner or later. I may have nothing at all to do with how they get out, but they're going to get out sooner or later.

H. Comm. on Ways & Means, Markup of GOP Health Care Repeal Bill, 115th Cong., at 2:41:20 (Mar. 8, 2017), https://youtu.be/3RMbUKK9ETs.

Minority Leader Nancy Pelosi (Mar. 8, 2017)

Well it's a question of the American people wanting to know the truth. Why is it that President Trump should be the exception to every candidate or cabinet nominee for president since Gerald Ford – that the public has been able to see the President's tax returns. What does the President have to hide? What do the Russians have on Donald Trump, personally, politically and financially, that he is keeping a secret? Why are the Republicans in Congress accomplices to that secrecy? Why are the Republicans in Congress voting to say "no, we don't think he should release his tax returns?" It's a very bad vote for them. That's a very bad vote for them, that's a very bad vote for them.

So our members – Mr. Pascrell as you know, acts with great spontaneity, yesterday Congresswoman Eshoo, others Members of Congress want to say, "we want the facts, we want the truth." The tax returns many believe are part of the Russian connection, the disruption of our election, the money pouring into the Trump organization, any personal embarrassment to the President – we want to know the truth, and we can start by seeing his tax returns. Which is not an extraordinary request – unless you're Donald Trump and think you're above custom, tradition and maybe even the law. Thank you!

Press Conference, Minority Leader Nancy Pelosi (Mar. 8, 2017),
https://www.speaker.gov/newsroom/382017-2/.


Minority Leader Nancy Pelosi (Mar. 9, 2017)

They don't want the American people to see the facts. They're always afraid of the facts. It's just a remarkable thing. They're afraid of the facts of the President's tax returns. And we will continue to ask for those tax returns because we want to know about the Russian connection.

What do the Russians have on Donald Trump politically, financially, and personally? What is that connection? What would the tax returns tell us about that? And we need a bipartisan, independent, nonpartisan outside investigation to get to the bottom of that.

Press Conference, Minority Leader Nancy Pelosi (Mar. 9, 2017),
https://www.speaker.gov/newsroom/3917/.


Rep. Sander Levin (D-MI) (Mar. 28, 2017)

I think you are wrong about 90%. Even if it were only 10%, let the public see it. Let the public see it.

* * *

This committee should use its authority to better understand the connections between the President, and his family, and Russia.

The President now says he wants to lead the effort on tax reform. His past returns are directly relevant to our forthcoming discussions about tax reform. It is important to understand how such tax reform would benefit the President, his 564 positions in domestic and foreign companies, and his self-reported net worth of more than $10 billion.

\* \* \*

We are asking for the disclosure because it is relevant to the discussion about the Russian connection, and now you all and we all say that we want to take up tax reform. The President says he wants to lead the effort. With hidden tax reform, tax returns, that is totally incredible.

H. Comm. on Ways & Means, Markup of H. Res. 186, 115th Cong., at 21:30 (Mar. 28, 2017), https://www.youtube.com/watch?v=CeRfw_m9bMw&feature=youtu.be.


Rep. Bill Pascrell (D-NJ) (Mar. 28, 2017)

Our constituents are demanding transparency. . . . We have the authority. We have the cause. With all of the conflicts we know about, and all that we don't, we must gather all of the possible information we can. The IRS is best equipped to conduct financial investigations into possible crimes dealing with money. The President's tax returns will provide us with the clues.

H. Comm. on Ways & Means, Markup of H. Res. 186, 115th Cong., at 28:52 (Mar. 28, 2017), https://www.youtube.com/watch?v=CeRfw_m9bMw&feature=youtu.be.


Rep. Lloyd Doggett (D-TX) (Mar. 28, 2017)

The House investigation has been totally discredited within the last week. Whether it was discredited or not, this committee has a role to play with reference to tax returns. And when you have the President's son in law talking with former KGB official running a bank in Russia, and you have an indication from the President's son a few years back that the Russians make up a pretty disproportionate cross section of a lot of our assets, and that's a direct quote, there is reason to want to know whether there is anything in his tax returns showing payments to Russians, or payments from Russians. It may be that not every bit of the information we are seeking is not contained within the form on individual taxes that President Trump may have filed. But there may well be an indication in those returns of information that will lead to that information, and that I why I believe the President went back on his promise to the American people, and refused to disclose the very information he said he would disclose in the future when these audits were concluded. I want to know whether he has, as his son said, continued to have a pretty disproportionate cross section of a lot of their assets with the Russians.

\* \* \*

I want to emphasize that the Chairman and the members of this committee are misconstruing section 6103, narrowly construing it to justify this cover-up of the Trump tax returns, and that this committee has a significant interest in these returns as it relates to the administration of our business. Both with reference to our trade agenda, from which we heard about earlier today, given the large number of trademarks that President Trump was able to magically get approved from the Chinese earlier this year, and with reference to our tax responsibilities.

\* \* \*

Without those tax returns to know what conflicts may exist for him, what kind of self-dealing may exist for him, we will never know. Section 6103 deals with more than tax administration, it deals with the assessment, collection, enforcement, publication, and statistical gathering function under the laws and statutes. There is every reason why in terms of its work in tax and the fact that we are considering major tax legislation, that we would want to know whether he will benefit personally, and that is why he is advancing these various legislative changes.

H. Comm. on Ways & Means, Markup of H. Res. 186, 115th Cong., at 40:10 (Mar. 28, 2017), https://www.youtube.com/watch?v=CeRfw_m9bMw&feature=youtu.be.

Rep. Ryan Higgins (D-NY) (Mar. 28, 2017)

Ryan Higgins (D-NY) (54:06): The American people have a right to know if the President would personally gain from proposals he will ask this committee to consider. The American people have a right to know if the President's tax returns offers clarity about business ties he may have to Russia, to Germany, to Saudi Arabia, or any other foreign interest that may benefit them and or him.

H. Comm. on Ways & Means, Markup of H. Res. 186, 115th Cong., at 54:06 (Mar. 28, 2017), https://www.youtube.com/watch?v=CeRfw_m9bMw&feature=youtu.be.

House Resolution 186 (Mar. 9, 2017)

IN THE HOUSE OF REPRESENTATIVES

March 9, 2017

Mr. Pascrell (for himself, Mr. Crowley, Mr. Danny K. Davis of Illinois, Ms. Sewell of Alabama, Mr. Neal, Ms. Eshoo, Mr. Doggett, Mr. Sarbanes, Ms. DelBene, Mr. Thompson of California, and Mr. Blumenauer) submitted the following resolution; which was referred to the Committee on Ways and Means

Of inquiry directing the Secretary of the Treasury to provide to the House of Representatives the tax returns and other specified financial information of President Donald J. Trump.

Page 14 of 42

*Resolved,* That the Secretary of the Treasury is directed to furnish to the House of Representatives, not later than 10 days after the adoption of this resolution, the full tax returns of Donald J. Trump for tax years 2006 through 2015, as well as financial documentation and any information in possession of the Secretary that specify—

(1) Mr. Trump's debts held by foreign governments and foreign companies;

(2) Mr. Trump's investments in foreign countries and foreign enterprises; and

(3) Mr. Trump's use of any tax shelters, corporate structures, tax avoidance maneuvers, abatements, or other loopholes to reduce or eliminate tax liability.

H.R. Res. 186, 115th Cong. (2017), https://www.congress.gov/bill/115th-congress/house-resolution/186.

Ranking Member Richard Neal and Rep. Bill Pascrell (D-NJ) (Mar. 30, 2017)

Committee Democrats strongly oppose the Committee's action of unfavorably reporting H. Res. 186, Resolution of inquiry directing the Secretary of the Treasury to provide to the House of Representatives the tax returns and other specified financial information of President Donald J. Trump. Committee Republicans continue to block our requests for this Committee to exercise its authority under Section 6103 of the Internal Revenue Code to obtain, examine, and make available to the public President Trump's federal tax returns.

This Committee has broad jurisdiction over a variety of laws that affect the lives of millions of Americans, including the federal tax law. The President and Congressional Republicans have been very vocal regarding their desire to enact comprehensive tax reform this Congress. Committee Democrats believe that it is imperative for the public to know and understand how such tax reform will benefit the President, his 564 financial positions in domestic and foreign companies, and his self-reported net worth of more than $10 billion.

* * *

Tax returns provide the clearest picture of a president's financial health, including how much he earns, how much tax he pays, his sources of income (e.g., capital gains, dividend income, and certain business income), the size of his deductions, whether he makes charitable contributions, and whether he uses tax shelters, loopholes, or other special-interest provisions to his advantage. All of these items are critical in order for the public to gain a more complete understanding of how tax reform will benefit President Trump and his vast business empire.

If ever there was a president with respect to which this Committee should exercise its Section 6103 statutory authority to obtain individual tax returns, President Trump is the one. A president with a vast domestic and international business empire. A president who has rebuked over 40 years of tradition and refused to release his individual tax returns to

the public. A president who will negotiate and ultimately may sign comprehensive tax reform into law. A president who is not the average American--he has assets, business interests, and foreign entanglements that far surpass the average taxpayer. ... Hence, Committee Democrats remain steadfast in our pursuit to have his individual tax returns disclosed to the public.

\* \* \*

Starting in February, Committee Democrats began pressing Committee Republicans to use the authority under Section 6103 to obtain President Trump's tax returns and make them available to the public. Committee Democrats have sent letters urging, and offered amendments to force, the Chairman to obtain President Trump's tax returns for review by the Committee.

\* \* \*

Procedurally, upon submission to the House, the tax return and return information would become available to the public.

H.R. Rep. No. 115-73 (Mar. 30, 2017), Resolution of Inquiry Directing the Secretary of the Treasury to Provide to the House of Representatives the Tax Returns and other Specified Financial Information of President Donald J. Trump, Adverse Report together with Dissenting Views, https://www.congress.gov/congressional-report/115th-congress/house-report/73; *see also* H.R. Rep. No. 115-309 (Sept. 14, 2017), Resolution of Inquiry Directing the Secretary of the Treasury to Provide to the House of Representatives the Tax Return Information of President Donald J. Trump as Well as the Tax Returns of Each Business Entity Disclosed by Donald J. Trump on His Office of Government Ethics Form 278e, Adverse Report with Dissenting Views, https://www.congress.gov/congressional-report/115th-congress/house-report/309/1, https://gop-waysandmeans.house.gov/event/markup-h-res-479/.

Resolution Offered by Rep. Joe Crowley (D-NY) (Mar. 15, 2017)

Expressing the sense of the House of Representatives that the President shall immediately disclose his tax return information to Congress and the American people.

\* \* \*

Whereas, disclosure of the President's tax returns could help those investigating Russian influence in the 2016 election understand the President's financial ties to the Russian Federation and Russian citizens, including debts owed and whether he shares any partnership interests, equity interests, joint ventures or licensing agreements with Russia or Russians;

\* \* \*

Whereas, the American people have the right to know whether or not their President is operating under conflicts of interest related to international affairs, tax reform, government contracts, or otherwise: Now, therefore, be it:

Resolved. That the House of Representatives shall--

1. Immediately request the tax return information of Donald J. Trump for tax years 2006 through 2015 for review in closed executive session by the Committee on Ways and Means, as provided under Section 6103 of the Internal Revenue Code, and vote to report the information therein to the full House of Representatives.

2. Support transparency in government and the longstanding tradition of Presidents and Presidential candidates disclosing their tax returns."

163 Cong. Rec. H2068 (daily ed. Mar. 15, 2017) (statement of Rep. Crowley), https://www.congress.gov/congressional-record/2017/03/15/house-section/article/H2068-1.


Minority Leader Nancy Pelosi (Mar. 16, 2017)

The Deflector-in-Chief's desperation demands answer to our original question, the one I ask almost every day: What is Russia's political, personal, and financial grip on the Trump Administration? What do the Russians have on President Trump? They have stonewalled over 100 letters from House Democrats requesting disclosure and transparency on his ties to Russia, his conflicts of interest, and other Administration actions.

You have heard me say before: this has an impact on our national security. What do the Russians have on him that he should flirt with the idea of weakening sanctions on Russia, undermining NATO and Europe? Secondly, undermining and questioning the value of the New START Treaty. Also, praising Putin at the expense of the greatness of America. What is it that they have on him? Show us your tax credits – your tax deduction – returns. Every – they did do something the other day, which was curious, to do a transom report. Who knows where that came from. What we want to see are the President's tax returns in the same manner that every President and candidate for President – nominee of the party for President has done since Nixon, but, of course, that was demanded, but then followed through with wonderful President Gerald Ford. So, if the President wants to strengthen our security, he should come clean with the American people.

Press Conference, Minority Leader Nancy Pelosi (Mar. 16, 2017), https://www.speaker.gov/newsroom/31617/.


Resolution Offered by Rep. Jared Polis (D-CO) (Mar. 21, 2017)

Whereas, tax returns provide an important baseline disclosure because they contain highly instructive information including whether the candidate can be influenced by foreign entities and reveal any conflicts of interest;

\* \* \*

Whereas, disclosure of the President's tax returns is important towards investigating Russian influence in the 2016 election, understanding the President's financial ties to the Russian Federation and Russian citizens, including debts owed and whether he shares any partnership interests, equity interests, joint ventures, or licensing agreements with Russia or Russian nationals, formally or informally associated with Vladmir Putin;

\* \* \*

Whereas, the American people have the right to know whether or not their President is operating under conflicts of interest related to international affairs, tax reform, government contracts, or otherwise:

Now, therefore, be it resolved that the House of Representatives shall:

One, immediately request the tax return information of Donald J. Trump for tax years 2006 through 2015 for review in closed executive session by the Committee on Ways and Means, as provided under section 6103 of the Internal Revenue Code, and vote to report the information therein to the full House of Representatives;

Two, support transparency in government and the longstanding tradition of Presidents and Presidential candidates disclosing their tax returns.

163 Cong. Rec. H2308 (daily ed. Mar. 21, 2017) (statement of Rep. Polis), https://www.congress.gov/congressional-record/2017/03/22/house-section/article/H2308-1.

Minority Leader Nancy Pelosi (Mar. 28, 2017)

Since Gerald Ford was President, every candidate for President, every nominee of a major party, every candidate for President of the United States, Democrat and Republican, has released their income tax returns out of respect for the American people--out of respect for the American people. Week in and week out--in fact, sometimes day in and day out--in committee as well as on the floor, the Republicans have kept the President's income tax returns private when the public has a right to know that, that the public has always known that about every President since Gerald Ford--in fact, since Richard Nixon; although, in his case, it wasn't voluntary.

163 Cong. Rec. H2498 (daily ed. Mar. 28, 2017) (statement of Rep. Pelosi), https://www.congress.gov/congressional-record/2017/3/28/house-section/article/H2489-1.

Minority Leader Nancy Pelosi (Apr. 5, 2017)

What is President Trump hiding that he refuses to release his taxes to the American people – even as an overwhelming 74 percent demand he release them?  The disturbing

conflicts of interests, revelations of shady dealings, and Trump's deep ties to Putin's Russia must be the reason.

\* \* \*

But week after week, Republicans have repeatedly voted to help President Trump stonewall the American people – complicit in keeping President Trump's taxes and finances hidden.

That is why House Democrats, led by Congresswoman Anna Eshoo, filed a discharge petition today to #DemandAVote to require President Donald Trump to disclose his tax returns, so the American people can see for themselves the extent of his financial interests, and whether they are influencing his policy decisions toward Russia, on tax reform and other issues.

Minority Leader Nancy Pelosi, Blog Post, #DemandAVote: House Democrats Launch Discharge Petition to Release President Donald Trump's Tax Returns (Apr. 5, 2017), https://www.speaker.gov/newsroom/demandavote-house-democrats-launch-discharge-petition-to-release-president-donald-trumps-tax-returns/.

Minority Leader Nancy Pelosi (Apr. 5, 2017)

As you know, every President since Gerald Ford – actually, every nominee on both sides of the aisle since then has released their tax returns. So the history of it is important to American people. It isn't as if the tax returns tell the whole story but they are a key that opens the door to so much information.

We're especially concerned about any information that might show any connection – Russian connection, Chinese connection, in terms of business interests of the Trump organization to any of these countries. It's really a very important thing.

At a time when they are saying, we don't want to see the President's tax return ... they now say, 'we have to protect the President's privacy.'

It's not a right to privacy that the President has. He's the President of the United States there is a question about a Russia connection politically, personally, financially to the President, there's concerns about recent actions by the Chinese government, in relation to the Trump Organization. There are plenty of reasons why we need this key to open the door to the information we need to connect the dots and if they have nothing to fear, then what are they afraid of.

Press Conference, Minority Leader Nancy Pelosi, Demanding a Vote Requiring President Trump to Release Tax Returns (Apr. 5, 2017), https://www.speaker.gov/newsroom/4517/.

Ranking Member Richard Neal (Apr. 5, 2017)

> This is not about the law, this is about custom and practice. It's a settled tradition and as I noted by using the word earlier, about begrudges – candidates reach the level of expectation that they're supposed to release their tax forms. I'm not aware of any of the Presidents that have been cited who ever publicly suggested that they thought it was an invasion of privacy.

Press Conference, Statement by Ranking Member Richard Neal (Apr. 5, 2017), https://www.speaker.gov/newsroom/4517/.

Rep. David Cicilline (D-RI) (Apr. 5, 2017)

> And this is a very simple idea in that the President's ability to lead this country is directly undermined by the questions which continue to rise about his potential conflicts of interest, and whether or not he's making decisions in the best interest of the American people, or in his own personal or financial best interest. One way to get at that question is a simple release of his tax returns, a tradition which has been a tradition of every president in recent history. His refusal to do that, and sadly the Republicans' refusal so far to be part of this effort is disappointing, but we're not going to stop. This is something the American people are demanding so that they can have a sense of what those conflicts might be, and we're going to use every avenue we can to continue to press until we're successful in persuading or requiring the President to share those with the American people.

Press Conference, Statement by Rep. David Cicilline (D-RI) (Apr. 5, 2017), https://www.speaker.gov/newsroom/4517/.

Rep. John Sarbanes (D-MD) (Apr. 5, 2017)

> I just want to thank my colleagues and Anna for their efforts on this issue, which is going to be continuous. We're not going to let up. When you talk to people out in the country – as everybody here has said – there is real anxiety on the part of Americans about whether the President may have some divided loyalty – whether when he goes to make a decision that is supposed to be on behalf of the public. There are some other concerns of interests he has competing with that.

> This is the highest office in the land. The public trust is placed in this office. That is the expectation of 330 million Americans – that you will carry out that office, recognizing the public trust that is placed in it.

> And Americans just want to know that when the President is making important decisions on domestic policy and on foreign policy, that he doesn't have divided loyalties. This is nagging away at people. And he can come clean if he provides his tax returns, which is the first important baseline step in being transparent. That will do a lot to put that anxiety

to rest. But, the fact that he won't release the tax returns, I think, is making a lot of Americans nervous.

Press Conference, Statement by Rep. John Sarbanes (D-MD) (Apr. 5, 2017), https://www.speaker.gov/newsroom/4517/.

Minority Leader Nancy Pelosi (Apr. 6, 2017)

Republicans will sell your most private information, your most private information, but they refuse to reveal the President's tax returns, something every President since Gerald Ford has done, and indeed every nominee of the other party has done.

And there is a vital interest in the President's tax returns. Republicans are desperate, again, to keep them secret. What is it that they are afraid of? Why don't they have that key that 74 percent of the American people want us to unlock that door to see where it leads?

If it's all okay, they have nothing to be afraid of. But we think that it will show us some connection that will be useful in the investigation of what do the Russians have on Donald Trump politically, personally, and financially.

Press Conference, Minority Leader Nancy Pelosi (Apr. 6, 2017), https://www.speaker.gov/newsroom/4617-4/.

Rep. Hakeem Jeffries (D-NY) (Apr. 7, 2017)

Unfortunately, Donald Trump sees things differently. As we approach tax day, it's important to remember that every President since Gerald Ford, Democrats and Republicans, have released their tax returns to the American people. Before the election, Donald Trump repeatedly promised to release his tax returns, just like Jimmy Carter, Ronald Reagan, George H.W. Bush, Bill Clinton, George W. Bush and Barack Obama before him. But as President, Donald Trump has broken this promise.

Is he hiding something from the American people? I certainly hope not. Here's what I do know. The American people deserve an answer to that question. The tax return issue is about fairness. It's about being straight with the American people. It's about playing by the rules.

There is a cloud of uncertainty hanging over the White House when it comes to our President. He came to Washington on a promise to drain the swamp. But instead, by failing to keep his word and release his tax returns, Donald Trump is a living, breathing conflict of interest.

* * *

This is not a Democratic issue or a Republican issue. This is an American issue. Our Democracy was attacked. The release of the President's tax returns will help the American people better understand the extent of Trump's financial ties to Putin's Russia. The American people have a right to know whether financial conflicts of interest exist between the President of the United States and a hostile foreign power.

The American people have a right to know whether the decisions being made by President Trump are in the best interest of America, or are benefiting other countries and corporations with whom he has a business relationship. The American people have a right to know whose side the President is on. His tax returns will help provide the information necessary to figure that out.

Press Conference, Congressman Hakeem Jeffries Delivers Weekly Democratic Address (Apr. 7, 2017), https://www.speaker.gov/newsroom/congressman-hakeem-jeffries-delivers-weekly-democratic-address/.


Minority Leader Nancy Pelosi (Apr. 17, 2017)

What are President Trump and the Republican Congress hiding? Every President since Gerald Ford, Democrat and Republican, has released his tax returns to the public. Despite the history, despite his own promises, President Trump and Republicans in Congress are desperate to keep the American people in the dark.

Who does President Trump owe? America needs to know. All roads lead back to the President's tax returns – and the light they can shine on his actions and the Trump-Russia connection. Releasing the President's tax returns is vital for our national security and our democracy.

Press Release, Minority Leader Nancy Pelosi, Statement on Tax Day (Apr. 17, 2017), https://www.speaker.gov/newsroom/41717/.


Rep. Ben Ray Luján (D-NM) (Apr. 21, 2017)

The President has done everything possible to distract and mislead the American people about his connection to Russia and his truly unprecedented web of conflicts.

He has refused to divest his business ties or release his tax returns to the American people so they can understand his conflicts of interest and get to the truth.

Press Conference, Congressman Ben Ray Luján Delivers Weekly Democratic Address (Apr. 21, 2017), https://www.speaker.gov/newsroom/congressman-ben-ray-lujan-delivers-weekly-democratic-address/.

Minority Leader Nancy Pelosi (Apr. 23, 2017)

> The infrastructure bill is one of the biggest secrets in Washington, D.C., second only to the president not showing us his tax returns.

> We need to see those so we can see how his tax policy will affect his own tax situation. We need to see them so we can see what is the hold that the Russians have on him politically, financially, and personally.

*Meet the Press* (NBC television broadcast Apr. 23, 2017), https://www.nbcnews.com/meet-the-press/meet-press-april-23-2017-n749866, http://www.cq.com/doc/newsmakertranscripts-5087573, https://www.speaker.gov/newsroom/42317/.

Rep. Lloyd Doggett (D-TX) (Apr. 26, 2017)

> Without an end to the Republican cover-up of Trump's tax returns, we cannot determine whether this is mostly just more self-enrichment for the Trump family. Trump talks like a populist but governs like a plutocrat. Like the near trillion dollar tax cut in the failed health care bill that he endorsed, Trump's tax plan fills the coffers of giant corporations and lines the pockets of the superrich.

Press Release, Rep. Lloyd Doggett (D-TX), Neal, Doggett Statements on President Trump's Tax Proposal (Apr. 26, 2017), https://waysandmeans.house.gov/media-center/press-releases/neal-doggett-statements-president-trump-s-tax-proposal.

Rep. John Lewis (D-GA) (Apr. 26, 2017)

> This afternoon, the Administration released its principles for tax reform. I must express my concern about beginning tax reform when the public has no idea how the proposal will personally benefit the First Family.

> On April 15th, thousands of Americans took to the streets and demanded transparency, truth, and accountability. They know that there is no provision in the Internal Revenue Code that prevents him from releasing his tax returns. Failure to meet this standard presents a dangerous and slippery slope for policy makers. The American people expect and deserve better.

Press Release, Rep. John Lewis (D-GA), Ranking Member Lewis Opening Statement at Oversight Subcommittee Hearing on 2017 Tax Filing Season (Apr. 26, 2017), https://waysandmeans.house.gov/media-center/press-releases/ranking-member-lewis-opening-statement-oversight-subcommittee-hearing-5.

Minority Leader Nancy Pelosi (May 15, 2017)

> One of the concerns that we have is that Russia is an adversary to the United States. And yet, when the president became president-elect, he was putting Putin on a pedestal and he was questioning whether we should even have sanctions against Russia for their aggression in Ukraine and Crimea, et cetera, and questioning the -- undermining the relationship we have with NATO, which is our transatlantic friendship for security. And it was like, why on Earth is he undermining our allies and praising Putin?

> And so that's one of the things that we want to see about the investigation, because it relates to if there have -- as I said, financial. What is the financial connection? Political. They did – it's an absolute fact -- disrupt our election by hacking and leaking. The question is, was there collusion? And, third, personally. What is it that is making him do all these special things for the Russians?

> You only know that if you're basing it on fact and not just rumor and hearsay if you have the investigation. And that's why we're saying, let's just find out the truth. Let the chips fall where they may. And if he has nothing to hide, he shouldn't be opposing, nor should my Republican colleagues in Congress, be opposing the release of his tax returns, any of the investigation into other aspects of the Trump-Russia connection. And that's why when something like this comes up, it's like predictable, almost, sadly.

*CNN Town Hall* (CNN television broadcast May 15, 2017), http://transcripts.cnn.com/TRANSCRIPTS/1705/15/se.01.html.


Minority Leader Nancy Pelosi (May 16, 2017)

> The question is what is the connection? And that requires investigation to get the facts that proves the case, or not. What are the Republicans and the president afraid of? The truth.

> So, when it comes to our national security, here he is putting Putin on a pedestal, undermining NATO, questioning whether we should even have sanctions vis-a-vis Russia in terms of their aggression in Europe. And that is not in our national security interest. That is undermining our Trans-Atlantic pillar of strength for us.  But casual about it and putting -- so what do the Russians have on him politically, personally, financially?

> Go to the next step. We have a chance to see his tax returns. Show us your tax returns so we can see what the connection is between you and Russia. And, by the way, the connection between yourself and (inaudible) and the cost to the average person in our country.

> So, this is about our economy as well. And then of course as I mentioned about the security of our democracy. So, this is intrinsic. It's fundamental. It's systemic. It's very important that we get to the bottom of it.

> And there is so much evidence. . . .

Transcript, House Minority Leader Pelosi, Remarks at Center for American Progress Forum (May 16, 2017), http://www.cq.com/doc/newsmakertranscripts-5102881, https://www.youtube.com/watch?v=WoMAnFNyV94.

Resolution Offered by Rep. Bill Pascrell (D-NJ) (May 16, 2017)

Expressing the sense of the House of Representatives that the President shall immediately disclose his tax return information to Congress and the American people.

* * *

Whereas, tax returns provide an important baseline disclosure because they contain highly instructive information including whether the candidate paid taxes, what they own, what they have borrowed and from whom, whether they have made any charitable donations, and whether they have taken advantage of tax loopholes;

Whereas, disclosure of the President's tax returns could help those investigating Russian influence in the 2016 election understand the President's financial ties to the Russian Federation and Russian citizens, including debts owed and whether he shares any partnership interests, equity interests, joint ventures or licensing agreements with Russia or Russians;

* * *

Whereas, the President's tax returns would show us whether he has foreign bank accounts and how much profit he receives from his ownership in myriad partnerships;

* * *

Whereas, the Chairmen of the Ways and Means Committee, Joint Committee on Taxation, and Senate Finance Committee have the authority to request the President's tax returns under Section 6103 of the tax code;

* * *

Whereas, the American people have the right to know whether or not their President is operating under conflicts of interest related to international affairs, tax reform, government contracts, or otherwise: Now, therefore, be it:

Resolved, That the House of Representatives shall--

1. Immediately request the tax return information of Donald J. Trump for tax years 2006 through 2015 for review in closed executive session by the Committee on Ways and Means, as provided under Section 6103 of the Internal Revenue Code, and vote to report the information therein to the full House of Representatives

2. Support transparency in government and the longstanding tradition of Presidents and Presidential candidates disclosing their tax returns.

163 Cong. Rec. H4212-13 (daily ed. May 16, 2017) (statement of Rep. Pascrell), https://www.congress.gov/congressional-record/2017/05/16/house-section/article/H4212-1.

## Minority Leader Nancy Pelosi (May 18, 2017)

But this is something that has foreign intrigue, it has issues that relate to undermining our democracy by interference in our election. It's about, "Show us your tax returns so we can see what public policy is regarding that, and do you have a Russian connection, Mr. President, in your dealings?" And it's very serious.

So in order for us to move forward in a way where we're moving forward with the American people, it's very important that we do it based on the facts. There is reason to believe that the President was engaged in some very inappropriate, for the moment, activity. But until you have the facts that you can present to the public in the public domain so the American people are moving with you at the same time, I don't think that our democracy is well served.

Press Conference, Minority Leader Nancy Pelosi (May 18, 2017), https://www.speaker.gov/newsroom/51817-5/.

## Resolution Offered by Rep. Linda Sanchez (D-CA) (May 24, 2017)

Expressing the sense of the House of Representatives that the President shall immediately disclose his tax return information to Congress and the American people.

* * *

Whereas, tax returns provide an important baseline of reasonable information including whether the President paid taxes, ownership interests, charitable donations made, and whether tax deductions have been exploited;

Whereas, disclosure of the President's tax returns could help those investigating Russian influence in the 2016 election understand the President's financial ties to the Russian Federation and Russian citizens, including debts owed and whether he shares any partnership interests, equity interests, joint ventures or licensing agreements with Russia or Russians;

* * *

Whereas, the President's tax returns would show us whether he has foreign bank accounts and how much profit he receives from his ownership in myriad partnerships;

* * *

Whereas, the Chairmen of the Ways and Means Committee, Joint Committee on Taxation, and Senate Finance Committee have the authority to request the President's tax returns under Section 6103 of the tax code;

* * *

Whereas, the American people have the right to know whether or not their President is operating under conflicts of interest related to international affairs, tax reform, government contracts, or otherwise: Now, therefore, be it:

Resolved, That the House of Representatives shall--

1. Immediately request the tax return information of Donald J. Trump for tax years 2006 through 2015 for review in closed executive session by the Committee on Ways and Means, as provided under Section 6103 of the Internal Revenue Code, and vote to report the information therein to the full House of Representatives

2. Support transparency in government and the longstanding tradition of Presidents and Presidential candidates disclosing their tax returns.

163 Cong. Rec. H4523-25 (daily ed. May 24, 2017) (statement of Rep. Sanchez), https://www.congress.gov/congressional-record/2017/5/24/house-section/article/h4523-1.

Minority Leader Nancy Pelosi (June 2, 2017)

And speaking of taxes, I think that the decision the President made on the Paris accord, I think that the budget that he has put forth, again, really speaks further to the fact that he should show us his tax returns. It's very important that we see his tax returns. It relates to Russia. What do the Russians have on Donald Trump, politically, personally, and financially? And he won't show us his tax returns, to give us some [,] maybe that would clear up the issue or maybe it will be a path to some other questions. So show us your tax returns.

We talk about lifting the debt ceiling. We talk about tax returns. We do know that what he proposed, what he was talking about before would have given him a tax break of $30 million on the year that he has revealed his tax return. A tax break of $30 million. Show us your tax returns.

Press Conference, Minority Leader Nancy Pelosi (June 2, 2017), https://www.speaker.gov/newsroom/6217-4/.

Minority Leader Nancy Pelosi (June 6, 2017)

I think we have to remove all doubt as the impact of Russians in our life. And I think it's important the American people to know what did Russians have on Donald Trump politically, financially, and personally, that he is standing in the way of this legitimate

investigation as to the Russian impact on our election and to prevent them from doing it again.

* * *

[T]he American people have a right to know the truth. And why would the Republicans stand in the way of the truth? Why can't we see his tax returns?

*New Day* (CNN television broadcast June 6, 2017),
http://transcripts.cnn.com/TRANSCRIPTS/1706/06/nday.03.html.

Resolution Offered by Rep. Michael Capuano (D-MA) (June 7, 2017)

Expressing the sense of the House of Representatives that the President shall immediately disclose his tax return information to Congress and the American people.

* * *

Whereas, tax returns provide an important baseline of reasonable information including whether the President paid taxes, ownership interests, charitable donations made, and whether tax deductions have been exploited;

Whereas, disclosure of the President's tax returns could help those investigating Russian influence in the 2016 election understand the President's financial ties to the Russian Federation and Russian citizens, including debts owed and whether he shares any partnership interests, equity interests, joint ventures or licensing agreements with Russia or Russians;

* * *

Whereas, the President's tax returns would show us whether he has foreign bank accounts and how much profit he receives from his ownership in myriad partnerships;

* * *

Whereas, the Chairmen of the Ways and Means Committee, Joint Committee on Taxation, and Senate Finance Committee have the authority to request the President's tax returns under Section 6103 of the tax code;

* * *

Whereas, the American people have the right to know whether or not their President is operating under conflicts of interest related to international affairs, tax reform, government contracts, or otherwise: Now, therefore, be it:

Resolved, That the House of Representatives shall--

1. Immediately request the tax return information of Donald J. Trump for tax years 2006 through 2015 for review in closed executive session by the Committee on Ways and Means, as provided under Section 6103 of the Internal Revenue Code, and vote to report the information therein to the full House of Representatives

2. Support transparency in government and the longstanding tradition of Presidents and Presidential candidates disclosing their tax returns.

163 Cong. Rec. H4684 (daily ed. June 7, 2017), https://www.congress.gov/congressional-record/2017/06/07/house-section/article/H4684-1.

Rep. Michael Capuano (D-MA) (June 7, 2017)

The investigations are ongoing. At some point, it is unquestioned that the President's tax returns will become relevant to what the FBI is doing. It is only a matter of time.

For the integrity of the House, for the dignity of the House, I believe firmly that we should exercise the law that the Congress put in place itself to do our own due diligent investigation and not just simply sit on our hands while others do our work for us.

These documents will become public, and when they do, regardless of what they show, I believe firmly it will reflect negatively on this House for not having done our duty, for having shirked our responsibilities. That is why I believe this is a privilege of the House. That is why I believe this House should take this action.

* * *

There aren't any Americans that don't believe they have a right to know that their President has not been subject to undue influence. That is all this does. It draws no conclusion from it, and it allows the majority party to call on it to make the determination; not me, but the majority party; the chair of the Ways and Means Committee.

That is why I offered this resolution. That is why I think this resolution is going to continue to be offered, and, at some point, the House is going to do it. I don't know why Members of the House want to drag this out and pretend that somehow you are going to be able to avoid it. You are not. It is going to happen.

163 Cong. Rec. H4684-86 (daily ed. June 7, 2017) (statement of Rep. Capuano), https://www.congress.gov/congressional-record/2017/06/07/house-section/article/H4684-1.

Minority Leader Nancy Pelosi (June 9, 2017)

Well, I think he abused power. I think there is no question he abused power. Whether he obstructed justice remains for the facts to come forward, and that is what we want: the

facts. And I hope that our Republican colleagues will not continue to stand in the way of our getting the facts.

Also, we'd like to see his tax returns, because that will, again, help connect the dots here. And, again, maybe it will all be exculpatory, but let's find that out. Right now we have to remove all doubt about the integrity of our government.

Press Conference, Minority Leader Nancy Pelosi (June 9, 2017), https://www.speaker.gov/newsroom/61217-2/.

## Rep. Lloyd Doggett (D-TX) (June 13, 2017)

Today, Congressman Lloyd Doggett (D-TX), Ranking Member of the Ways & means Tax Policy Subcommittee, is offering a "privileged resolution" that would require the House of Representatives to immediately request the President's tax returns and those of his businesses. His resolution, which must be considered within two legislative days, would also postpone consideration of any tax reform legislation until the President's tax returns are obtained.

The House Ways and Means Committee has the authority to obtain the President's tax returns under section 6103 of the Tax Code. If this "privileged resolution" were approved, it would launch the process of reviewing those tax returns in an Executive Session of the Ways and Means Committee, which could vote to release the returns to the public.

Rep. Doggett has filed three separate amendments in the Ways and Means Committee to obtain President Trump's tax returns – on February 14, March 8, and March 28. The Committee voted all three times along party lines to continue to cover-up the President's tax returns, and the House has refused nine times to act on President Trump's tax returns.

* * *

RESOLUTION

Expressing the sense of the House of Representatives that the President shall immediately disclose his tax return information to the House of Representatives and the American people.

* * *

Whereas, disclosure of the President's tax returns could help those investigating Russian influence in the 2016 election better understand the President's financial ties to the Russian Federation, Russian businesses, and Russian individuals;

Whereas, after breaking his pledge to make his tax returns available, President Trump instead presented a one page letter from a law firm giving him a clean bill of health on any business dealings with Russians, but failed to note that the very same law firm

boasted of the "prestigious honor" of being named "Russia Law Firm of the Year" for 2016;

* * *

Now, therefore, be it:

*Resolved*, That the House of Representatives shall—

1. Immediately request the tax return and return information of Donald J. Trump for tax years 2006 through 2015, as provided under section 6103 of the Internal Revenue Code of 1986, as well as the tax return (and return information with respect to the President's businesses) of each business entity disclosed by Donald J. Trump on his Office of Government Ethics Form 278e, specifically each corporation and each partnership (within the meaning of subchapter K of chapter 1 of the Internal Revenue Code of 1986) where he is listed as an officer, director, or equivalent, or exercises working control; and

2. Postpone consideration of tax reform legislation until the elected Representatives of the American people in this House have obtained President Trump's tax returns and return information to ascertain how any changes to the tax code might financially benefit the President.

Press Release, Rep. Lloyd Doggett (D-TX), Privileged Resolution Would Require Trump Tax Returns Before Tax Reform Consideration (June 13, 2017), https://doggett.house.gov/media-center/press-releases/privileged-resolution-would-require-trump-tax-returns-tax-reform; privileged resolution available at https://www.congress.gov/congressional-record/2017/06/13/house-section/article/H4898-1, https://www.congress.gov/congressional-record/2017/6/21/house-section/article/h5013-1.


Minority Leader Nancy Pelosi (June 20, 2017)

As Speaker Ryan moves to the question and answer portion of his 'major' tax reform speech, we have some questions: Where are President Trump's tax returns?  What happened to 'At some point I'll release it'?

By blatantly refusing to reveal his tax returns, the President fails to fulfill his promise to the American people, honor tradition, and be transparent about his financial history – despite the fact that 74 percent of Americans want Presidents to disclose their tax returns. House Republicans have voted 9 times to keep President Trump's tax returns secret.

If Speaker Ryan and House Republicans respect the oath they took to support and defend the U.S. Constitution, they must stop the pointless distractions and demand transparency and truth from the White House.  American taxpayers deserve to know that the President of the United States is playing by the rules and putting the people's business before the Trump family business.

Minority Leader Nancy Pelosi, Blog Post, *Where are President Trump's Tax Returns?* (June 20, 2017), https://www.speaker.gov/newsroom/where-are-president-trumps-tax-returns/.

Minority Leader Nancy Pelosi (July 13, 2017)

> Republicans . . . won't join us in the release of the President's tax returns, which could be very instructive in terms of any connection to Russia.  Why should this President of all Presidents and all candidates for President in the two major parties, since Gerald Ford, not release his returns so the American people can know?

Press Conference, Minority Leader Nancy Pelosi (July 13, 2017), https://www.speaker.gov/newsroom/71317-8/.

Rep. Bill Pascrell (D-NJ) (July 14, 2017)

> On February the 1st, I wrote a letter to the chairman of the committee which I participate in, and that is the Ways and Means Committee Chairman Kevin Brady. In that letter, I asked him to use his existing authority to obtain President Trump's tax returns for review by our committee.

> And I would say, from the get-go here, that a lot of the questions that are being asked today and have been asked in the past could have been avoided if the president of the United States had followed the ethics commission and -- to divest himself of all of his holdings and assets. President chose -- chose not to do that.

> And the more we get into 2017, the more we understand how the tax returns are critical. He could have avoided all this by divesting himself, but the deals that have been made just at the -- during the time that he's been the president is a reflection.

> Every president -- and this has nothing to do with party affiliation, which I said to Kevin Brady in February of this year -- every president must have a clean when he goes into that office and raises his hand to be sworn, so that he can be objective in his decisions. We have no assurances of that right now, and we are not going to simply sit back and reflect on the good of his word. I'm not. I don't think many Americans are.

> And members of Congress, specifically the tax-writing committees, currently have authority in the tax code to get the president's tax returns, to examine his conflicts of interest.

Press Conference, Statement by Rep. Bill Pascrell (D-NJ) (July 14, 2017), http://www.cq.com/doc/newsmakertranscripts-5142259.

Resolution Offered by Rep. David Cicilline (D-RI) (July 18, 2017)

Expressing the sense of the House of Representatives that the President shall immediately disclose his tax return information to Congress and the American people.

* * *

Whereas, the chairmen of the Committee on Ways and Means, Joint Committee on Taxation, and the Committee on Finance have the authority to request the President's tax returns under section 6103 of the Internal Revenue Code of 1986;

* * *

Whereas, without access to the President's tax returns, the American people cannot determine how much he will personally benefit from proposed changes to the Tax Code or from policy decisions he makes, nor can the American people fully understand the financial interests and motivations of the President;

* * *

Whereas, disclosure of the President's tax returns would help those investigating Russian interference in the 2016 election and assist them in better understanding the President's financial ties to the Russian Federation, Russian businesses, and Russian individuals;

* * *

Resolved, That the House of Representatives shall--

1. Immediately request the tax return and return information of Donald J. Trump for tax years 2006 through 2015, as provided under section 6103 of the Internal Revenue Code of 1986, as well as the tax return, and return information with respect to the President's businesses, of each business entity disclosed by Donald J. Trump on his Office of Government Ethics Form 278e, specifically each corporation and each partnership, within the meaning of subchapter K of chapter 1 of the Internal Revenue Code of 1986, where he is listed as an officer, director, or equivalent, or exercises working control; and

2. Postpone consideration of tax reform legislation until the elected Representatives of the American people in this House have obtained President Trump's tax returns and return information to ascertain how any changes to the Tax Code might financially benefit the President.

163 Cong. Rec. H5941-42 (daily ed. July 18, 2017) (statement of Rep. Cicilline), https://www.congress.gov/congressional-record/2017/7/18/house-section/article/h5941-1.

House Resolution 479 (July 27, 2017)

### IN THE HOUSE OF REPRESENTATIVES

July 27, 2017

Mr. Pascrell (for himself and Mr. Crowley) submitted the following resolution; which was referred to the Committee on Ways and Means

Of inquiry directing the Secretary of the Treasury to provide to the House of Representatives the tax return information of President Donald J. Trump as well as the tax returns of each business entity disclosed by Donald J. Trump on his Office of Government Ethics Form 278e.

*Resolved*, That the Secretary of the Treasury is directed to furnish to the House of Representatives, not later than 14 days after the adoption of this resolution, the full tax returns of Donald J. Trump for tax years 2006 through 2016, if available, as well as the tax returns for such taxable years of each business entity disclosed by Donald J. Trump on his Office of Government Ethics Form 278e, specifically each business entity specified in section 2 of this resolution; and any supplemental information in the possession of the President relating to—

(1) the amount of taxes paid by Mr. Trump and each such business entity with respect to such taxable years;

(2) the debts of Mr. Trump and such business entities which are held by foreign governments or foreign companies;

(3) the investments of Mr. Trump and such business entities which are in foreign countries or foreign enterprises;

(4) Mr. Trump's personal and business profits received from foreign enterprises;

(5) the amount of charitable giving claimed by Mr. Trump with respect to such taxable years; and

(6) any use of tax shelters or other loopholes to reduce the amount of taxes owed.

* * *

H.R. Res. 479, 155th Cong. (2017), https://www.congress.gov/bill/115th-congress/house-resolution/479.

Ranking Member Richard Neal (Sept. 7, 2017)

Mr. Pascrell's resolution would direct the Treasury Secretary to provide the House with the personal and business tax returns and other financial information of President Trump.

Let me refresh everyone's memories on the facts here. Until recently, every President since Gerald Ford released their tax returns to the American public. President Gerald Ford released a summary of his tax returns. President Jimmy Carter. President Ronald Reagan. President George H.W. Bush. President Bill Clinton. President George W. Bush. President Barack Obama.

Republican and Democratic Presidents. They all released their tax returns to the American people.

This is not a partisan issue. The reason for releasing this information is to avoid conflicts of interest. Tax returns include important information about income and charitable giving and business interests, among other things. And this information is important for the American people to have so they know that their President is always acting in their best interest.

Therefore, I support my friend Mr. Pascrell's resolution. I believe it's in our country's best interest for our Presidents to release their tax returns.

H. Comm. on Ways & Means, Markup of H. Res. 479, 115th Cong., Opening Statement of Ranking Member Neal (Sept. 7, 2017), https://waysandmeans.house.gov/media-center/press-releases/ranking-member-neal-opening-statement-markup-hres-479.

Rep. Bill Pascrell (D-NJ) (Sept. 7, 2017)

What we need to explore are the possibilities of conflicts of interest. This is not something we made up, this is provided by the law. It is a fishing expedition. Why? Because we don't have the conclusion. You don't get to the conclusion until you investigate, and we have that authority under the law. If you looked at the word, "under IRS audit" I want you to prove to me that he is still under audit.

H. Comm. on Ways & Means, Markup of H. Res. 479, 115th Cong., at 47:51 (Sept. 7, 2017) (Statement of Rep. Pascrell), https://youtu.be/F2AyBERrEIY.

Minority Leader Nancy Pelosi (Apr. 17, 2018)

While Americans file their taxes, Tax Day also serves as a bitter reminder that President Trump still refuses to show the public his tax returns. Hard-working families deserve to know how their president has padded his own pockets with a tax scam that inflicts such damage on the deficit and the future of Social Security and Medicare. As Republicans in Congress refuse to demand this basic measure of transparency and accountability from President Trump, we must ask: what does President Trump have to hide?

Press Release, Minority Leader Nancy Pelosi, Statement on Tax Day (Apr. 17, 2018), https://www.speaker.gov/newsroom/41718-2/.

<u>Rep. Lloyd Doggett (D-TX)</u> (Sept. 13, 2018)

> We of course cannot know whether the benefit for Trump will be bigly or just huge until we lift this cover up of the Trump tax returns. As the smoke continues to build with one revelation after another, there's greater need than ever to see what Trump may be hiding in those returns, the working papers to explain them, and those for the 500 business entities which stretch from Manhattan to Azerbaijan. Trump's tax returns relate directly to what is before us today.

H. Comm. on Ways & Means, Full Committee Markup for Tax Reform 2.0, 115th Cong., at 1:29:00 (Sept. 13, 2018) (Statement of Rep. Doggett), https://youtu.be/SmtV7Jnx6PY.

<u>Rep. Lloyd Doggett (D-TX)</u> (Sept. 13, 2018)

> The stench of corruption permeates this Administration, and it comes right from the top. This amendment is designed to end the Republican coveru-p of Trump's tax returns. While this amendment seeks to achieve the same result that I have sought with 5 prior attempts in this committee, it includes extensive new findings from some of the notable developments of recent months that make clear we are not only dealing with the self-described "King of Debt," but someone who continues to act as if he were just King.

> Trump's tax returns relate directly to what is before us today. There is no issue this Committee could consider more important than the integrity of our tax code, and the faith that the American people have in our democracy. Trump has surrounded himself with convicted tax evaders – rich friends who have decided they are above the law, and that working people who can't afford fancy tax lawyers should have to pick up the slack. Even Richard Nixon invited the Joint Committee on Taxation to review his tax returns, explaining that "people have got to know whether or not their President is a crook."

> While this Committee has refused to do its job—while in this Congress instead of oversight, we have been overlooking Administration misconduct—the President's tax returns have in fact already been reviewed. That was a review that, amazingly, President Trump presented as his 'Good Housekeeping Seal of Approval 'to assure America he had no business dealings with the Russians.' It was a review of his tax returns by his personal law firm, which, of course, gave him a clean bill of health on any Russian connection— only months after it boasted of the 'prestigious honor' of being named 'Russia Law Firm' of the year. I am only asking that this Committee do for the American people what the 'Russia Law Firm of the Year' has done for Mr. Trump.

> Before this Committee considers a dime of more tax breaks, we must obtain and review the President's tax returns. Any tax bill released should be accompanied by a line-by-line report of how much Trump, his family, and his companies will benefit from each one.

> His tax returns can help tell us whether he is putting America First, or Trump first, his family second, and Russian third.

Press Release, Rep. Lloyd Doggett (D-TX), Rep. Doggett Offers Amendment to Secure Trump Tax Returns, Meet the Nixon Standard (Sept. 13, 2018), https://doggett.house.gov/media-center/press-releases/rep-doggett-offers-amendment-secure-trump-tax-returns-meet-nixon, https://www.youtube.com/watch?v=6UuAmtMzs8E&feature=youtu.be.


<u>Press Account Quoting Ranking Member Richard Neal</u> (Oct. 3, 2018)

"This has never happened before, so you want to be very meticulous."

Robert Rubin, *Trump's Tax Returns in the Spotlight if Democrats Capture the House*, Wall St. J., Oct. 3, 2018, https://www.wsj.com/articles/trumps-tax-returns-in-the-spotlight-if-democrats-capture-the-house-1538575880.


<u>Press Account Quoting Ranking Member Richard Neal</u> (Oct. 12, 2018)

"I think we would all be comfortable if this was done on a voluntary basis," Neal said.

"If they would resist the overture then I think you could probably see a long and grinding court case," he added.

* * *

"It is not cut and dry," Neal said, noting that there was still plenty of discussion ahead for how and when to request the returns officially.

* * *

"Anticipate a long court case in the end," Neal said.

Lauren Fox, *Leading Democrat on House Ways and Means would ask for Trump's tax returns*, CNN, Oct. 12, 2018, https://www.cnn.com/2018/10/12/politics/house-ways-mean-tax-returns-richard-neal/index.html.


<u>Press Account Quoting Minority Leader Nancy Pelosi</u> (Oct. 10, 2018)

Expect Democrats to immediately try to force President Trump to release his tax returns if they take back the House in November, Minority Leader Nancy Pelosi said Wednesday.

Demanding the president's tax returns "is one of the first things we'd do — that's the easiest thing in the world. That's nothing," Pelosi told The Chronicle's editorial board in an hour-long interview.

John Wildermuth, *Pelosi: Trump's tax returns are fair game if Democrats win House*, S.F. Chron., Oct. 11, 2018, https://www.sfchronicle.com/politics/article/Pelosi-Trump-s-tax-returns-are-fair-game-if-13297954.php.

Press Account Quoting Minority Leader Nancy Pelosi (Dec. 13, 2018)

> House Minority Leader Nancy Pelosi (D-Calif.) said Thursday that she expects a House committee to "take the first steps" toward obtaining President Trump's tax returns after Democrats take control of the chamber next month, but she cautioned that securing them is "a little more challenging than you might think."

> "There is popular demand for the Congress to request the president's tax returns," said Pelosi, who is likely to become House speaker. "I'm sure the White House will resist, so the question is, 'Where do we go from there?"

John Wagner, *Pelosi says she expects a House committee will 'take the first steps' toward obtaining Trump's tax returns*, Wash. Post, Dec. 13, 2018, https://www.washingtonpost.com/powerpost/pelosi-says-she-expects-a-house-committee-will-take-the-first-steps-toward-obtaining-trumps-tax-returns/2018/12/13/fbc02660-feec-11e8-862a-b6a6f3ce8199_story.html?utm_term=.ebb1d6c1325c.

Press Account Quoting Spokesperson for Ranking Member Richard Neal (Jan. 2, 2019)

> Rep. Richard Neal (D-Mass.), who will be the new Ways and Means Committee chairman, wants to take some time to try to build a case with the public about why Trump ought to voluntarily release his tax filings, before tapping an obscure law that allows the heads of Congress' tax committees to examine anyone's returns.

> "He wants to lay out a case about why presidents should be disclosing their tax returns before he formally forces him to do it," said Dan Rubin, a Neal spokesperson. Pulling the legal trigger may not come until February at the earliest.

> \* \* \*

> "He is a very policy-driven person, and I think he sees that if we break the glass and pull that alarm, you won't get anything done after that," said Rubin.

Brian Faler, *Incoming Democratic tax chairman won't make quick grab for Trump's returns*, Politico, Jan. 2, 2019, https://www.politico.com/story/2019/01/02/congress-trump-tax-returns-richard-neal-1056839, https://neal.house.gov/in-the-news/incoming-democratic-tax-chairman-wont-make-quick-grab-trumps-returns.

Press Account Quoting Chairman Richard Neal (Jan. 23, 2019)

> The chairman of the House Ways and Means Committee, U.S. Rep. Richard Neal, D-Springfield, said Wednesday he plans to request President Trump's tax returns, but expects a drawn-out legal battle to result, and thus is choosing his words carefully on the matter.

"I plan to do it," Mr. Neal said in a visit to the Telegram & Gazette offices. "We are now in the midst of putting together the case. It will be a long and grinding legal case."

\* \* \*

Mr. Neal added: "I hope the president will voluntarily release his tax documents. I don't think that, given the conversation so far, there is any indication he intends to do that. I also think the public has reasonably come to expect that presidential candidates and aspirants release those documents. It's likely to end up in a court case."

"We need to approach this gingerly and make sure the rhetoric that is used does not become a footnote to the court case."

He said: "I've been meticulous about my choice of words, for good reason."

Mark Sullivan, *Powerful Ways and Means chairman Neal to pursue Trump's tax returns*, Telegram & Gazette, Jan. 23, 2019, https://www.telegram.com/news/20190123/powerful-ways-and-means-chairman-neal-to-pursue-trumps-tax-returns, https://neal.house.gov/in-the-news/powerful-ways-and-means-chairman-neal-pursue-trump-s-tax-returns.


Press Account Quoting Chairman Richard Neal (Jan. 24, 2019)

House Ways and Means Chairman Richard E. Neal said Thursday he plans to approach the tricky topic of obtaining President Donald Trump's tax returns "methodically and judiciously."

Neal said he started to have "preliminary conversations" about the issue after he was named chairman-designate on Dec. 20, before he formally assumed the position after the 116th Congress began earlier this month.

"One of the things you have to be mindful of is that this has to be a part of a carefully prepared and documented legal case," said Neal, D-Mass. "And it's not subject to just whim and the emotion of the moment."

Added Neal: "This has to be prepared in accordance with staff, House counsel and an understanding that this is likely to become the basis of a long and arduous court case."

\* \* \*

"We're in this precarious period of time when the American people aren't quite sure of what to believe about many, many issues," Neal continued. "So again, methodically and judiciously we'll proceed."

Doug Sword, *Neal: "Long and Arduous" Process to Get Trump's Tax Returns*, CQ, Jan. 24, 2019, http://www.cq.com/doc/news-5449807.

<u>Speaker Nancy Pelosi</u> (Feb. 7, 2019)

I think, overwhelmingly, the public wants to see the President's tax returns. And so, they want to know the truth. They want to know the facts. And he has nothing to hide.

I'll just tell you this and go on from there, because we have important work to do, and we have important judgments to make, and we need information to make those judgments.

* * *

You have to be very, very careful if you go forward.

As I said, we are in our first month. The committees have been appointed. They have organized. They are prioritizing their work and, in terms of the tax issue, it's not a question of just sending a letter. You have to do it in very careful way. And the chairman of the committee will be doing that.

So, I know there's this impatience because people want to know, that answers the question, but we have to do it in a very careful way.

Press Conference, Speaker Nancy Pelosi (Feb. 7, 2019),
https://www.speaker.gov/newsroom/2719-2/.


<u>Rep. Dan Kildee (D-MI)</u> (Feb. 7, 2019)

Well, the committee has a right to the returns. The law was written because it expected that a moment may occur where there's a public interest in having a tax return gained by the committee in order to evaluate it, or acquired by the committee for this kind of evaluation.

What we need to do, and what the speaker said, and what Chairman Neal is absolutely doing is lay the record, lay the groundwork, make the justification to use this rarely used authority in order to make sure that we have a solid legal basis. So, today's hearing was very much focused on laying a legal foundation to explore what the law allows us to do, to understand that completely, to make sure that we're doing this in a methodical way.

This is unchartered territory. It's clear that the president does not want some information that is included in his tax return to be revealed, otherwise he would not have broken with 50 years of norms that Democrats and Republicans have adhered to releasing tax returns. There's a reason he doesn't want them there.

So he will fight this, and he probably fight it as far as he can, because we expect that and for the reasons that I already stated, this is unchartered territory. It's very important that we're methodical and we lay the foundation for the public purpose to acquire access to these returns and that's the process that we're going through now.

* * *

The public has a right to know whether or not their elected officials are benefiting from the decisions that they make using the public responsibilities that the public has vested in them.

So whether it's his personal entanglements, debt or the decisions that he's making on policy going forward, this is the reason disclosure is so important, this is the reason that past candidates and presidents have released their returns, so the public will know whether or not the individual has entanglements that could impact their public decision making, and that's really the purpose behind this entire area of inquiry for us.

*All In with Chris Hayes* (MSNBC television broadcast Feb. 7, 2019), https://topnewsshow.com/all-in-with-chris-hayes-2-7-19-msnbc/, http://www.msnbc.com/transcripts/all-in/2019-02-07.


Press Account Quoting Rep. Bill Pascrell (D-NJ) (Feb. 26, 2019)

"Evidence that Trump has abused our tax laws is plentiful," Rep. Bill Pascrell (D-NJ), who has been making the case for pursuing Trump's tax returns under Section 6103 essentially since Trump was inaugurated, said in an emailed statement to Vox. He cited a New York Times investigation into Trump and his family's tax practices that suggested the family for years engaged in a number of schemes to avoid taxes, and leaked pages from Trump's 1995 and 2005 tax returns; the 1995 ones show a nearly $1 billion loss.

"Americans have a right to know if their president has paid his taxes, if he has followed the law, and if he is free from financial conflicts of interest," Pascrell continued. "The law is clear. Under 6103, the Ways and Means Committee chairman is entitled to request Trump's tax returns — and the Treasury secretary is obligated to deliver them. That's all there is to it."

Emily Stewart, *Democrats' coming battle to get Trump's tax returns, explained*, Vox, Feb. 26, 2019, https://www.vox.com/platform/amp/policy-and-politics/2019/2/26/18223760/democrats-trump-tax-returns-richard-neal.


Speaker Nancy Pelosi (Apr. 4, 2019)

No president in the modern era has worked so diligently to keep their tax returns out of the public eye.  What is President Trump hiding?

@SpeakerPelosi, Twitter (Apr. 4, 2019), https://twitter.com/SpeakerPelosi/status/1113886412649189376.


Press Account Quoting Chairman Richard Neal (Apr. 5, 2019)

Neal told reporters on Thursday that he took roughly three months to build the case for requesting the returns, which he argued was reasonable given the gravity of the request.

"This was a very reasoned approach. Our position from day one was that this would be measured," Neal said. "This is likely to wind its way through the federal court system and we wanted to make sure that the case that we constructed was in fact one that would stand up under the critical scrutiny of the federal courts."

Sunlen Serfaty et al., *Republicans warn Trump tax request 'sets a dangerous standard' and accuse Dems of weaponizing IRS*, CNN, Apr. 5, 2019, https://www.cnn.com/2019/04/04/politics/trump-tax-returns-request-republicans-congress/index.html.

# EXHIBIT F

**Vaughan, Frederick**

| | |
|---|---|
| **From:** | Vaughan, Frederick |
| **Sent:** | Monday, May 6, 2019 5:23 PM |
| **To:** | 'brandon.casey@mail.house.gov' |
| **Cc:** | 'gary.andres@mail.house.gov' |
| **Subject:** | Treasury correspondence |
| **Attachments:** | Secretary Mnuchin Response to Chairman Neal (2019-05-06).pdf; Appendix A - Chronology (5.6.19).pdf; Appendix B - Additional Statements (5.6.19).pdf |

Brandon

Attached is a letter from Secretary Mnuchin to Chairman Neal, along with updated appendices concerning the Committee's request.

Best, Fritz

--
**Frederick W. Vaughan**
**Deputy Assistant Secretary**
**Legislative Affairs**
**U.S. Department of the Treasury**
**1500 Pennsylvania Avenue, N.W.**
**Washington, D.C. 20220**
**202-622-2678**



# DEPARTMENT OF THE TREASURY
## WASHINGTON, D.C.

SECRETARY OF THE TREASURY

May 6, 2019

The Honorable Richard E. Neal
Chairman
Committee on Ways and Means
U.S. House of Representatives
Washington, DC  20515

Dear Chairman Neal:

I write in further response to your letter of April 3, 2019, requesting the confidential tax returns (and other return information) of President Trump and related business entities for 2013 through 2018, pursuant to 26 U.S.C. § 6103(f).

As you have recognized, the Committee's request is unprecedented, and it presents serious constitutional questions, the resolution of which may have lasting consequences for all taxpayers. Accordingly, the Department of the Treasury has consulted with the Department of Justice concerning the lawfulness of your request.  As explained in my April 23 letter, the Committee's statutory authority under section 6103(f) is bounded by Congress's authority under the Constitution, and the Supreme Court has held that the Constitution requires that Congressional information demands must reasonably serve a legitimate legislative purpose.

In reliance on the advice of the Department of Justice, I have determined that the Committee's request lacks a legitimate legislative purpose, and pursuant to section 6103, the Department is therefore not authorized to disclose the requested returns and return information.

The Department of Justice has informed us that it intends to memorialize its advice in a published legal opinion as soon as practicable.  Out of respect for the deadlines previously set by the Committee, and consistent with our commitment to a prompt response, I am informing you now that the Department may not lawfully fulfill the Committee's request.

Although the Department is unable to provide you with the requested confidential tax returns and return information, we renew our previous offer to provide information concerning the Committee's stated interest in how the IRS conducts mandatory examinations of Presidents, as provided by the Internal Revenue Manual.  If the Committee is interested, we remain committed to providing such an accommodation.

Sincerely,

Steven T. Mnuchin

Steven T. Mnuchin

cc:  The Honorable Kevin Brady, Ranking Member

# APPENDIX A

## Chronology

*Updated May 6, 2019*

The 2016 Election

The effort to expose President Trump's tax returns began during the 2016 election. The Democratic candidate for President urged then-candidate Trump to release his returns. When he declined to do so, the Democratic candidate sought to generate political pressure to force their release, repeatedly criticizing his decision and expressing her belief that public exposure of the returns would be politically damaging to her opponent.[1]

Representative Neal's Advocacy for Exposure

When President Trump took office after the election, the House Minority Leader and senior Democratic members of the Committee on Ways and Means (including Ranking Member Neal) took up their party's election season demands in Congress. Their chosen tool was section 6103(f). The stated rationales have shifted over time, but the objective remained constant: Use section 6103(f) to obtain the tax returns and make them public.

As Ranking Member of the Committee, Representative Neal immediately began urging the Committee to obtain President Trump's tax returns for the purpose of releasing them. In February 2017, he explained his desire for a public opportunity to "see the tax forms" and for "the media to sift and sort" them.[2] In March 2017, Ranking Member Neal and other Members urged Chairman Kevin Brady to submit a section 6103(f) request "for copies of the President's

---

[1] *See, e.g.*, *The Lead with Jake Tapper* (transcript of CNN television broadcast May 11, 2016) ("[W]hy doesn't he want to release them? Yes, well, we're going to find out."), http://www.cnn.com/TRANSCRIPTS/1605/11/cg.01 html; *New Day* (transcript of CNN television broadcast Aug. 2, 2016) ("We would like to see those tax returns, wouldn't we?"), http://www.cnn.com/TRANSCRIPTS/1608/02/nday.03 html; *The Situation Room* (transcript of CNN television broadcast Aug. 12, 2016) ("He refuses to do what every other presidential candidate in decades has done and release his tax returns."), http://www.cnn.com/TRANSCRIPTS/1608/12/sitroom.01 html; *Erin Burnett OutFront* (transcript of CNN television broadcast Sept. 6, 2016) ("He said that the American people don't care about his tax returns, and in fact, he's also said that it's none of our business. I just think he's dead wrong."), http://www.cnn.com/TRANSCRIPTS/1609/06/ebo.01 html; *The Situation Room* (transcript of CNN television broadcast Sept. 7, 2016) ("He clearly has something to hide."), http://www.cnn.com/TRANSCRIPTS/1609/07/sitroom.02.html; *CNN Newsroom* (transcript of CNN television broadcast Sept. 27, 2016) ("[M]aybe he doesn't want the American people, all of you watching tonight, to know that he's paid nothing in Federal taxes. . . ."), http://www.cnn.com/TRANSCRIPTS/1609/27/cnr.03 html.

[2] Press Conference, Statement by Rep. Richard Neal, C-SPAN Video, at 19:10–20:19 (Feb. 14, 2017), https://www.c-span.org/video/?424013-1/house-democrats-call-investigation-wake-michael-flynns-resignation.

federal tax returns for the last ten years."[3]  They explained that the Committee should "then vote . . . to submit the President's federal tax returns to the House of Representatives and Senate— thereby, if successful, making them available to the public."[4]  In April 2017, Ranking Member Neal recalled the 2016 election and asserted that President Trump was "supposed to" have made these returns available to the public as a candidate.[5]

Ranking Member Neal also served as an original cosponsor of a resolution of inquiry, H. Res. 186, providing that "the Secretary of the Treasury is directed to furnish to the House of Representatives, not later than 10 days after the adoption of this resolution, the full tax returns of Donald J. Trump for tax years 2006 through 2015."[6]  Ranking Member Neal explained that the resolution was designed to force the immediate public exposure of those returns.[7]

On March 30, 2017, the Committee voted down H. Res. 186 and issued a report condemning the resolution as an "abuse of authority."[8]  In dissenting views included in the committee report, Ranking Member Neal reiterated his "steadfast" objective of exposing the President's tax returns to the public:

> Committee Republicans continue to block our requests for this Committee to exercise its authority under Section 6103 of the Internal Revenue Code to obtain, examine, *and make available to the public* President Trump's federal tax returns. . . . *Committee Democrats remain steadfast in our pursuit to have [President Trump's] individual tax returns disclosed to the public*.[9]

Ranking Member Neal's dissenting views made no mention of any interest in understanding how the IRS audits and enforces the Federal tax laws against a President, as the Committee's April 3 letter now asserts.

---

[3] Letter from Hon. Bill Pascrell, Jr., et al., to Hon. Orrin Hatch, Chairman, S. Comm. on Finance, & Hon. Kevin Brady, Chairman, H. Comm. on Ways & Means (Mar. 2, 2017), https://pascrell house.gov/news/documentsingle.aspx?DocumentID=1898.

[4] *Id*.

[5] "This is not about the law, this is about custom and practice.  It's a settled tradition . . . candidates reach the level of expectation that they're supposed to release their tax forms."  Press Conference, Statement by Ranking Member Richard Neal (Apr. 5, 2017), https://www.speaker.gov/newsroom/4517/.

[6] H.R. Res. 186, 115th Cong. (Mar. 9, 2017).

[7] *See id*.; H.R. Rep. No. 115-73, Dissenting Views, at 8 (Mar. 30, 2017), https://www.congress.gov/115/crpt/hrpt73/CRPT-115hrpt73.pdf (hereinafter Ways & Means Report).

[8] Ways & Means Report, *supra* note 7, at 3.

[9] *Id*., Dissenting Views, at 7–8 (emphasis added).

Other Senior House Democrats' Advocacy for Exposure

Leader Pelosi and other senior Ways and Means Committee members also repeatedly stated that the purpose of requesting President Trump's tax returns was to "make those tax returns public."[10] Leader Pelosi explained that requesting the returns would satisfy the public's "right to know"[11] and complained that Republicans "won't join us in the release of the President's tax returns."[12]

Exposure for the sake of exposure was the one constant purpose that drove the requests that Ranking Member Neal and other senior Committee members advocated throughout the previous Congress.  In addition, Congressional leaders offered a wide variety of evolving rationales and speculation about what, if anything, might be found in the tax returns upon their exposure. Before the conclusion of the Special Counsel's investigation, a common theory was that the President's tax returns would show "the President's relationship with Russia,"[13] "disruption of our [2016] election,"[14] and "any personal embarrassment to the President."[15]  Leader Pelosi speculated: "We think [the returns] will show us some connection that will be useful in the investigation of what do the Russians have on Donald Trump . . . ."[16]

Another theory offered by the lead sponsor of H. Res. 186, Representative Pascrell, was that exposure of the President's tax returns would help "make sure the President and his family are not hiding financial ties that could cause conflicts in the decision making."[17]  Representative Pascrell also thought it was "imperative for the public to know" the President's "self-reported net worth,"[18] and Ranking Member Neal thought they should know "just how extensive [his] overseas investments have been," based on the tax returns.[19]

In yet another theory, Ranking Member Neal's dissent in support of H. Res. 186 explained that the President's tax returns would give the "clearest picture" of the President's "financial health" and inform the consideration of tax reform legislation (which was enacted in December 2017).[20]

---

[10] Press Conference, Minority Leader Nancy Pelosi, House Democratic Leadership Press Conference at 2017 Issues Conference (Feb. 8, 2017), https://www.speaker.gov/newsroom/282017/ (hereinafter 2017 Issues Conference).

[11] 163 Cong. Rec. H2498 (daily ed. Mar. 28, 2017) (statement of Rep. Pelosi), https://www.congress.gov/congressional-record/2017/03/28/house-section/article/H2489-1.

[12] Press Conference, Minority Leader Nancy Pelosi (July 13, 2017), https://www.speaker.gov/newsroom/71317-8/.

[13] 2017 Issues Conference, *supra* note 10.

[14] Press Conference, Minority Leader Nancy Pelosi (Mar. 8, 2017), https://www.speaker.gov/newsroom/382017-2/.

[15] *Id*.

[16] Press Conference, Minority Leader Nancy Pelosi (Apr. 6, 2017), https://www.speaker.gov/newsroom/4617-4/.

[17] Press Conference, Statement by Rep. Bill Pascrell (July 14, 2017), http://www.cq.com/doc/newsmakertranscripts-5142259; *see also* House Democrats on Russian Interference in 2016 Election, C-SPAN Video (July 14, 2017), https://www.c-span.org/video/?431350-1/democrats-step-pressure-gop-amid-widening-russia-probe.

[18] Letter from Hon. Bill Pascrell, Jr., to Hon. Kevin Brady, Chairman, H. Comm. on Ways & Means (Feb. 1, 2017), https://pascrell house.gov/news/documentsingle.aspx?DocumentID=2195.

[19] Press Conference, Rep. Richard Neal, C-SPAN Video, at 19:46 (Feb. 14, 2017), https://www.c-span.org/video/?424013-1/house-democrats-call-investigation-wake-michael-flynns-resignation.

[20] Ways & Means Report, *supra* note 7, Dissenting Views, at 7.

Other theories included speculation that the tax returns would expose the President's "emoluments;"[21] would show his "charitable donations" or "tax loopholes;"[22] would reveal whether he had a "Chinese connection;"[23] or would "maybe . . . be a path to some other questions."[24]   At other times, Leader Pelosi simply explained that exposure of the President's tax returns would "fulfill" a campaign "promise," or would "honor tradition." [25]

Although the efforts to force the public release of President Trump's tax returns in the previous Congress failed (despite numerous letters, committee amendments, resolutions, and other attempts),[26] Leader Pelosi made clear that the effort would continue if Democrats took the House in 2018.  The *San Francisco Chronicle* reported in October 2018 that Leader Pelosi "told the [paper's] editorial board" that "[d]emanding the president's tax returns 'is one of the first things we'd do—that's the easiest thing in the world.'"[27]

The Committee's Construction of a Pretextual Purpose

With a new Democratic majority in the House, the Committee pressed ahead in the effort to obtain and release the President's tax returns.  Chairman Neal had recognized the unprecedented nature of the Committee's planned request: "This has never happened before, so you want to be very meticulous."[28]

---

[21] Letter from Hon. Richard E. Neal, Ranking Member, H. Comm. on Ways & Means, et al., to Hon. Paul Ryan, Speaker, U.S. House of Reps., at 2, 6 (Jan. 12, 2017), https://oversight house.gov/sites/democrats.oversight.house.gov/files/documents/2017-01-12.Ranking%20Members%20to%20Speaker%20Ryan%20Re.Trump_.pdf; *see also* Amendment offered by Rep. Doggett to the Authorization and Oversight Plan of the H. Comm. on Ways & Means, 115th Cong. (Feb. 14, 2017), https://gop-waysandmeans house.gov/wp-content/uploads/2017/02/20170214-Doggett-Amendment.pdf.

[22] *See, e.g.*, 163 Cong. Rec. H4212-13 (daily ed. May 16, 2017) (statement of Rep. Pascrell), https://www.congress.gov/congressional-record/2017/05/16/house-section/article/H4212-1.

[23] Press Conference, Minority Leader Nancy Pelosi, Demanding a Vote Requiring President Trump to Release Tax Returns (Apr. 5, 2017), https://www.speaker.gov/newsroom/4517/ (hereinafter Pelosi Press Conference Apr. 5, 2017).

[24] Press Conference, Minority Leader Nancy Pelosi (June 2, 2017), https://www.speaker.gov/newsroom/6217-4/.

[25] Blog Post, Minority Leader Nancy Pelosi, Where are President Trump's Tax Returns? (June 20, 2017), https://www.speaker.gov/newsroom/where-are-president-trumps-tax-returns/.

[26] *See* Rep. Bill Pascrell, *President Trump's Tax Returns*, https://pascrell.house.gov/issues/president-trumps-tax-returns/ (last visited May 6, 2019).

[27] John Wildermuth, *Pelosi: Trump's tax returns are fair game if Democrats win House*, S.F. Chron., Oct. 11, 2018 (quoting Minority Leader Pelosi), https://www.sfchronicle.com/politics/article/Pelosi-Trump-s-tax-returns-are-fair-game-if-13297954.php.

[28] Richard Rubin, *Trump's Tax Returns in the Spotlight if Democrats Capture the House*, Wall St. J., Oct. 3, 2018, https://www.wsj.com/articles/trumps-tax-returns-in-the-spotlight-if-democrats-capture-the-house-1538575880.

In January 2019, the Committee spokesperson explained the plan to "force" the disclosure of the President's returns: "'[Chairman Neal] wants to lay out a case about why presidents should be disclosing their tax returns before he formally forces [the President] to do it.'"[29]

Because Congress may only conduct investigations to further a legitimate legislative purpose, Congressional investigations ordinarily begin with a legislative purpose, and that purpose defines the scope of the documents that are pertinent to the Committee's investigation.[30]  But here, by the Committee's own admission, the Committee's investigation began in the opposite direction. The Committee started with the documents it planned to obtain and release (the President's tax returns), and then it sought—in Chairman Neal's words—to "construct[]" a "case" for seeking the documents that would appear to be in furtherance of a legitimate legislative purpose.[31]

The Committee knew that exposure for the sake of exposure would not be a legitimate purpose, and so the Committee could no longer rely upon prior statements to that effect.  At the same time, the Committee lacked jurisdiction to rely upon other frequently cited public justifications for the request—such as interest in "the Russia connection"[32] and the President's alleged financial conflicts of interest.  Other House committees might have tried to make 6103(f) requests based upon such justifications, but no other House committee would have the authority to publicly release the tax returns after obtaining them.  As the Committee was advised by the former Chief of Staff of the Joint Committee on Taxation, there is "one key for purposes of disclosing the information to the public" and the statute "gave that key to the tax committees."[33] To use this key, the Committee on Ways and Means had to make the request, and the other justifications that might have been offered by other committees had to be discarded.

Thus, the Committee with the key to publicly disclose the tax returns, in Chairman Neal's words, "constructed" a "case" to justify its request.[34]  The result was the Committee's letter of April 3, asserting a single legislative interest in "the extent to which the IRS audits and enforces the

---

[29] Brian Faler, *Incoming Democratic tax chairman won't make quick grab for Trump's returns*, Politico (Jan. 2, 2019) (quoting Committee Spokesperson), https://www.politico.com/story/2019/01/02/congress-trump-tax-returns-richard-neal-1056839.

[30] *See* 165 Cong. Rec. S2260 (daily ed. Apr. 4, 2019) (statement of Sen. Grassley), https://www.congress.gov/116/crec/2019/04/04/CREC-2019-04-04-senate.pdf.

[31] Sunlen Serfaty et al., *Republicans warn Trump tax request 'sets a dangerous standard' and accuse Dems of weaponizing IRS*, CNN, Apr. 5, 2019, https://www.cnn.com/2019/04/04/politics/trump-tax-returns-request-republicans-congress/index.html ("[W]e wanted to make sure that the case that we constructed was in fact one that would stand up under the critical scrutiny of the federal courts.").

[32] Pelosi Press Conference Apr. 5, 2017, *supra* note 23.

[33] Transcript, *Legislative Proposals and Tax Law Related to Presidential and Vice-Presidential Tax Returns: Hearing before Subcomm. on Oversight, H. Comm. on Ways & Means*, 116th Cong. (Feb. 7, 2019) (statement of George K. Yin), https://waysandmeans.house.gov/sites/democrats.waysandmeans.house.gov/files/documents/Transcript%20-%20Final.pdf.

[34] Serfaty, *supra* note 31 (quoting Chairman Neal).

Federal tax laws against a President," and requesting the tax returns and related documents of just one of them—President Trump.[35]

---

[35] Letter from Hon. Richard E. Neal, Chairman, H. Comm. on Ways & Means, to Hon. Charles P. Rettig, Comm'r, IRS (Apr. 3, 2019), https://waysandmeans.house.gov/sites/democrats.waysandmeans.house.gov/files/documents/Neal%20Letter%20to%20Rettig%20%28signed%29%20-%202019.04.03.pdf.

**APPENDIX B**

**Additional Statements**

*Updated May 6, 2019*


Presidential Candidate Hillary Rodham Clinton (May 11, 2016)

When you run for president, especially when you become the nominee, that is kind of expected. My husband and I have released 33 years of tax returns. We have got eight years on our Web site right now. So you have got to ask yourself, why doesn't he want to release them? Yes, well, we're going to find out.

*The Lead with Jake Tapper* (transcript of CNN television broadcast May 11, 2016), http://www.cnn.com/TRANSCRIPTS/1605/11/cg.01.html.


Presidential Candidate Hillary Rodham Clinton (Aug. 2, 2016)

We would like to see those tax returns, wouldn't we?

*New Day* (transcript of CNN television broadcast Aug. 2, 2016), http://www.cnn.com/TRANSCRIPTS/1608/02/nday.03.html.


Presidential Candidate Hillary Rodham Clinton (Aug. 12, 2016)

He refuses to do what every other presidential candidate in decades has done and release his tax returns.

*The Situation Room* (transcript of CNN television broadcast Aug. 12, 2016), http://www.cnn.com/TRANSCRIPTS/1608/12/sitroom.01.html.


Presidential Candidate Hillary Rodham Clinton (Sept. 6, 2016)

He said that the American people don't care about his tax returns, and in fact, he's also said that it's none of our business. I just think he's dead wrong. He clearly has something to hide.

* * *

The scams, the frauds and the questionable relationships, the business activities that have stiffed workers, refused to pay small businesses, so, clearly, his tax returns tell a story that the American people deserve and need to know.

*Erin Burnett OutFront* (transcript of CNN television broadcast Sept. 6, 2016),
http://www.cnn.com/TRANSCRIPTS/1609/06/ebo.01.html.

Presidential Candidate Hillary Rodham Clinton and Vice Presidential Candidate Tim Kaine
(Sept. 7, 2016)

> Clinton:  He clearly has something to hide. We don't know exactly what it is, but we're
> getting better guesses.
>
> * * *
>
> Kaine: Maybe he doesn't want people to see that he's got some connections.

*The Situation Room* (transcript of CNN television broadcast Sept. 7, 2016),
http://www.cnn.com/TRANSCRIPTS/1609/07/sitroom.02.html.

Presidential Candidate Hillary Rodham Clinton (Sept. 27, 2016)

> [M]aybe he doesn't want the American people, all of you watching tonight, to know that
> he's paid nothing in Federal taxes. . . .

*CNN Newsroom* (transcript of CNN television broadcast Sept. 27, 2016),
http://www.cnn.com/TRANSCRIPTS/1609/27/cnr.03.html.

Ranking Member Richard Neal (Jan. 12, 2017)

> We request that you join us in fulfilling our sworn constitutional duty by seeking and
> obtaining copies of the following documents:  President-Elect Trump's personal and
> corporate tax returns, domestic and foreign, for the past five years, regardless of whether
> they are still under audit . . . and all other documents necessary to help protect against
> violations of the Emoluments Clause of the Constitution and conflicts of interest,
> including with foreign adversaries such as Russia.

Letter from Hon. Richard E. Neal, Ranking Member, H. Comm. on Ways & Means, et al., to
Hon. Paul Ryan, Speaker, U.S. House of Reps. (Jan. 12, 2017),
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/2017-01-
12.Ranking%20Members%20to%20Speaker%20Ryan%20Re.Trump_.pdf.

Rep. Bill Pascrell (D-NJ) (Feb. 1, 2017)

> President Trump has chosen to keep an ownership stake in his businesses, the scope of
> which we have no knowledge of as he has refused to disclose his tax returns. We believe
> that it is imperative for the public to know and understand his 564 financial positions in
> domestic and foreign companies and his self-reported net worth of more than $10 billion.
> We know that state-owned enterprises in China and the United Arab Emirates are

involved in his businesses, and that his business ties stretch to India, Turkey, the Philippines, and beyond. Russia, Saudi Arabia, and Taiwan may also have ties to his businesses.  These foreign entities are paying rents, licensing agreement payments, and issuing permits for developments – effectively giving them a tool to influence our new President.

* * *

If the President does not either release his returns or consent to examination of such returns by this Committee, I urge you, as Chairman of the Committee and pursuant to Section 6103(f)(1) of the Internal Revenue Code, to submit a written request to the Secretary of the Treasury for copies of the President's federal tax returns by February 15, 2017.  These returns and all accompanying return information should then be made available for examination by all Committee Members in a closed executive session.  I further request that the Committee then vote in this closed session to submit the President's federal tax returns to the House of Representatives—thereby, if successful, making them available to the public.

* * *

I believe the powerful Ways and Means Committee has the responsibility to use that power to ensure proper oversight of the executive branch by requesting a review of President Trump's tax returns and moving towards a formal release of these documents to the public.

Letter from Hon. Bill Pascrell, Jr. to Hon. Kevin Brady, Chairman, H. Comm. on Ways & Means (Feb. 1, 2017), https://pascrell.house.gov/news/documentsingle.aspx?DocumentID=2195.


Minority Leader Nancy Pelosi (Feb. 5, 2017)

I want to know what the Russians have on Donald Trump.  I think we have to have an investigation by the FBI into his financial, personal, and political connections to Russia, and we want to see his tax returns, so we can have truth in the relationship between Putin, whom he admires, and Donald Trump.

*Meet the Press* (NBC television broadcast at 3:56, Feb. 5, 2017) https://www.nbcnews.com/meet-the-press/video/full-pelosi-interview-trump-white-house-using-diversionary-tactics-870511683900.


Minority Leader Nancy Pelosi (Feb. 8, 2017)

As you know, I've been questioning the President's relationship with Russia.  It's extremely alarming, and it could undermine our national security.  What on earth do the Russians have on Donald Trump?  That he could flirt with the idea of lifting sanctions on Russia despite their aggressive military behavior? That he could lift the sanctions already on the successor to the KGB a group that we know hacked into our systems, disrupting

our election?  That he is saying things about a person, that qualifies as a war criminal and giving some equivalence to the United States of America? This is the President of the United States.  The President of the United States.

So I'm just saying, at least show us your tax returns.  Is the audit over?  Is this the audit for eternity?  And of course that's never been a justification for not releasing your tax returns.  The President continues to hide his tax returns which could provide vital insight into what financial influence Russia has on him, whether it's personal, political or financial.  We call upon the FBI to do that investigation, it is in our national security interest.  Chairman Brady is Chairman of the Ways and Means Committee and Chairman of the Joint Committee of Taxation, is empowered to demand Trump's tax returns from the Secretary of the Treasury.  All he has to do is ask, and hold a committee vote to make those tax returns public.

Mr. President what do the Russians have on you personally, politically or financially?

The process is – the privilege only goes to the Chairman to make the request.  But then the committee can vote to make the tax returns public.  This is as you may recall, you wouldn't recall, but in your history books you may read what happened with President Nixon a long time ago.  So we're calling on Chairman Brady to bring out those tax returns.

Press Conference, Minority Leader Nancy Pelosi, House Democratic Leadership Press Conference at 2017 Issues Conference (Feb. 8, 2017), https://www.speaker.gov/newsroom/282017/.

Minority Leader Nancy Pelosi (Feb. 13, 2017)

The reports of the Trump-Russia dossier gain credence with each passing day.  As long as Republicans refuse to compel the release of President Trump's tax returns, they are complicit in covering up Russia's financial, personal and political hold on the Administration.

Press Release, Minority Leader Nancy Pelosi, Pelosi: Fire General Flynn (Feb. 13, 2017), https://www.speaker.gov/newsroom/21317/.

Minority Leader Nancy Pelosi (Feb. 14, 2017)

And again Mr. Neil [sic], whose importance in this meeting is that we need to see the truth of President Trump's investments.  His committee has the authority, the chairman of the committee in the House or the chairman of the committee in the Senate, Chairman Brady or Chairman Hatch and in addition to the Finance Committee, and Ways and Means Committee – the Joint Committee on Taxation, the chairman on that committee, Mr. Brady, again, have the authority to ask the Secretary of the Treasury for the tax returns of anyone in our country if there's reason to know that.

They can ask for the president's tax returns, and then by a vote in their committee, they can decide where they should be released to the public, so there's another stonewalling because they said they can't be caught up in rummaging.  This isn't rummaging, this is truth and consequences.  The American people have a right to know the truth.  We see the consequences which can be dangerous to our national security.

\* \* \*

So, the question is: why is the FBI not fully investigating the political, personal, and financial ties of Donald Trump to the Russians? Show us your tax returns so we can see what some of that connection might be.  And stop flirting with lifting sanctions and condemning the [new] START Treaty and the rest of that because you're flirting with Russia – which has a direct impact on the safety of the American people.

Press Conference, Minority Leader Nancy Pelosi, Reacting to Resignation of National Security Advisor Michael Flynn (Feb. 14, 2017), https://www.speaker.gov/newsroom/2142017/.

Rep. Bill Pascrell (D-NJ) (Feb. 14, 2017)

The President and the Congressional Republicans have been very vocal regarding their desire to enact comprehensive tax reform for this Congress. We believe it is imperative for the public to know and understand how such tax reform will benefit the President.

\* \* \*

This is not willy-nilly.  This is a serious attempt to get the truth to the American people, and then . . . you will decide Mr. Chairman, under the law, whether or not that it should be made public.  That's the power and the authority that rests with you and the Committee.

*Full Committee Markup: Hearing Before the H. Comm. on Ways & Means*, 115th Cong., at 32:30, 40:45 (Feb. 14, 2017) (Statement of Rep. Pascrell), https://www.youtube.com/watch?v=NSYeHHG7KMw.

Ranking Member Neal (Feb. 14, 2017)

The President has indicated during the course of the campaign that only he knows how to fix the tax system.  And as we proceed to tax reform, which is a very complex issue and matter, as we all know, and how difficult it is to do, there is an opportunity here for all of us to cooperate and for the president to lead the way.  So I am in support of Mr. Doggett's amendment and Mr. Pascrell's letter.

*Full Committee Markup: Hearing Before the H. Comm. on Ways & Means*, 115th Cong., at 33:23 (Feb. 14, 2017) (statement of Ranking Member Neal), https://www.youtube.com/watch?v=NSYeHHG7KMw.

Rep. Sander Levin (D-MI) (Feb. 14, 2017)

The only way you'll bury the doubts is by letting the public see the information.

*Full Committee Markup: Hearing Before the H. Comm. on Ways & Means*, 115th Cong., at 36:45 (Feb. 14, 2017) (statement of Rep. Levin), https://www.youtube.com/watch?v=NSYeHHG7KMw.

Amendment Offered by Rep. Lloyd Doggett (D-TX) (Feb. 14, 2017)

Amend the Ways and Means Committee oversight plan by adding the following under matters under the Committee's Tax Jurisdiction:

Pursuant to Section 6103(f)(1) of the Internal Revenue Code, the Chairman of the Committee will submit a written request to the Secretary of the Treasury by March 1, 2017, for copies of the President's federal tax returns for the last ten years.  These returns and all accompanying return information should then be made available for examination by bipartisan Committee staff, and additionally, in executive session, by all committee members.  The Committee will review potential conflicts and violations of the emoluments clause, and potential entanglements with foreign governments and foreign state owned enterprises.

Amendment offered by Rep. Doggett to the Authorization and Oversight Plan of the H. Comm. on Ways & Means, 115th Cong. (Feb. 14, 2017), https://gop-waysandmeans.house.gov/wp-content/uploads/2017/02/20170214-Doggett-Amendment.pdf.

Ranking Member Richard Neal (Feb. 14, 2017)

The last seven American presidents have released to the American people their tax forms. And they've done it as a standard operating procedure through the course of the campaign and then subsequently during their time as president.

It was an annual event, and there was sufficient opportunity then for members of Congress, members of the administration and the media to sift and sort what those tax forms told us. So in this instance, I think there is, again, an opportunity for all of us to review the president's tax forms to find out just how extensive the overseas investments have been.

And it'll then give the American people the chance to see it. He indicated that once the audit was done, that he would release the tax forms, and then pointed out just a few weeks ago through a spokesperson that the American people didn't care about those tax forms.

Well I believe ABC News has indicated that 75 percent of the American people would like to see the tax forms, consistent with what the last seven American presidents have done. . . .

Press Conference, Statement by Rep. Richard Neal, C-SPAN Video, at 19:10 – 20:19 (Feb. 14, 2017), https://www.c-span.org/video/?424013-1/house-democrats-call-investigation-wake-michael-flynns-resignation.

Minority Leader Nancy Pelosi (Feb. 27, 2017)

> What do the Russians have on Donald Trump that he would flirt with lifting our sanctions against Russia because of their aggression in eastern Europe?  That he would undermine the START Treaty?  Praise Putin and stonewall any investigation to bring the truth to light – including releasing his tax returns?

Press Conference, Minority Leader Nancy Pelosi, Prebuttal to President Trump's Speech to Joint Session of Congress (Feb. 27, 2017), https://www.speaker.gov/newsroom/22717-2/.

Resolution Offered by Rep. Bill Pascrell (D-NJ) (Feb. 27, 2017)

> Expressing the sense of the House of Representatives that the President shall immediately disclose his tax return information to Congress and the American people.
>
> * * *
>
> Whereas, disclosure of the President's tax returns could help those investigating Russian influence in the 2016 election understand the President's financial ties to the Russian Federation and Russian citizens, including debts owed and whether he shares any partnership interests, equity interests, joint ventures or licensing agreements with Russia or Russians;
>
> * * *
>
> Whereas, the American people have the right to know whether or not their President is operating under conflicts of interest related to international affairs, tax reform, government contracts, or otherwise:
>
> Now, therefore, be it resolved, that the House of Representatives shall, one, immediately request the tax return information of Donald J. Trump for tax years 2006 through 2015 for review in closed executive session by the Committee on Ways and Means, as provided under section 6103 of the Internal Revenue Code, and vote to report the information therein to the full House of Representatives; two, support transparency in government and the longstanding tradition of Presidents and Presidential candidates disclosing their tax returns.

163 Cong. Rec. H1337-38 (daily ed. Feb. 27, 2017) (statement of Rep. Pascrell), https://www.congress.gov/congressional-record/2017/02/27/house-section/article/H1337-2.

Rep. Bill Pascrell (D-NJ) (Feb. 27, 2017)

>To restore the dignity of the House, we must use our authority to request President Trump's tax returns and give the American people the transparency they deserve.

>* * *

>Let's shine a bright light on the President's conflicts together, together, as we, as a Congress, and the broader American public can judge whether his decisions are being made for himself, his business interests, or for the greater good of the American people.

163 Cong. Rec. H1338-39 (daily ed. Feb. 27, 2017) (statement of Rep. Pascrell), https://www.congress.gov/congressional-record/2017/02/27/house-section/article/H1337-2.

Minority Leader Nancy Pelosi (Feb. 28, 2017)

>Tonight, House Republicans made themselves accomplices to hiding President Trump's tax returns from the American people.

>Our security and our democracy have been endangered by Russia's clear influence on the Trump Administration.  The American people deserve the truth about Russia's personal, political and financial grip on President Trump.  If there's nothing there, then what are Republicans afraid of?

>The President's refusal to release his tax returns is yet another example of his contempt for the promises he made in his campaign.  While Republicans stonewall an independent investigation, Democrats will continue to demand the truth for the American people.

Press Release, Minority Leader Nancy Pelosi, Statement on Republican Vote to Keep Trump's Tax Returns Secret (Feb. 28, 2017), https://www.speaker.gov/newsroom/2272017-2/.

Minority Leader Nancy Pelosi (Feb. 28, 2017)

>What we are calling for is an independent outside commission, take it away from Congress, take it away from politics, an independent outside commission to look into the political, personal, and financial ties of the Trump organization, him personally, his businesses, his campaign, to the Russians.

>* * *

>The American people want to know the truth. He could begin by releasing his tax returns. Why should every president since Gerald Ford in modern history have released his tax returns, but this president says I'm above not only the law but the traditions of the office that I hold?

*Andrea Mitchell Reports* (MSNBC television broadcast at 07:28, 07:58, Feb. 28, 2017), https://www.msnbc.com/andrea-mitchell-reports/watch/house-dem-leader-we-ve-gotten-under-trump-s-skin-886623299804.

Minority Leader Nancy Pelosi (Mar. 2, 2017)

> Well, in all of this all roads lead to the Republicans in the Congress.  What are they afraid of?  They have been afraid of the truth every step of the way.  They don't want to see the President's tax returns, when every President since Gerald Ford, every President in modern times has released his tax returns, and candidates release their tax returns.

> So what is it?  That would be a key indicator of their interest in the truth.  So the question is to them, what are they afraid of in the tax returns?  What are they afraid of in the investigation of the Russian involvement to undermine our democracy, to repeat that in other countries, to come back here and do that again?

Press Conference, Minority Leader Nancy Pelosi (Mar. 2, 2017), https://www.speaker.gov/newsroom/322017-3/.

Minority Leader Nancy Pelosi (Mar. 3, 2017)

> What do the Russian have on Donald Trump that he would do that? And I don't know who knew what in all of this, but it's important for us to find out and we must have that investigation.

> * * *

> What are – what are the Republicans in Congress afraid of?  They don't want to see the president's tax returns, the first time since Gerald Ford, who was – since Gerald Ford, all presidents have put it out.  They don't want to investigate in a wholesome way the hack – the disruption of our system? What are the Republicans afraid of?  This goes right to the Republicans in Congress – to their doorstep. And when the public sentiment, as Lincoln said, is everything.

> As they hear from their constituents, perhaps maybe they'll be more inclined to seek the truth.

Statement of Minority Leader Nancy Pelosi, Politico Playbook Interview (Mar. 3, 2017), http://www.cq.com/doc/newsmakertranscripts-5053910.

Rep. Bill Pascrell (D-NJ), et al. (Mar. 3, 2017)

> We write you to request that you use your authority to request the tax returns of President Donald Trump for review by the Senate Committee on Finance and House Committee on Ways and Means.

\* \* \*

If the President does not either release his returns or consent to examination of such returns by this Committee, we urge you, as Chairman of the Committee and pursuant to Section 6103(f)(1) of the Internal Revenue Code, to submit a written request to the Secretary of the Treasury by March 15, 2017, for copies of the President's federal tax returns for the last ten years. These returns and all accompanying return information should then be made available for examination by all Committee Members in a closed executive session. We further request that the Committee then vote in this closed session to submit the President's federal tax returns to the House of Representatives and Senate —thereby, if successful, making them available to the public.

We believe the powerful and respected Committees on Finance and Ways and Means have the responsibility to ensure oversight of the executive branch by requesting a review of President Trump's tax returns and moving toward a formal release of these documents to the public.

Letter from Hon. Bill Pascrell, Jr., et al., to Hon. Orrin Hatch, Chairman, S. Comm. on Finance, & Hon. Kevin Brady, Chairman, H. Comm. on Ways & Means (Mar. 2, 2017), https://pascrell.house.gov/news/documentsingle.aspx?DocumentID=1898.

<u>Resolution Offered by Rep. Anna Eshoo (D-CA)</u> (Mar. 7, 2017)

Expressing the sense of the House of Representatives that the President shall immediately disclose his tax return information to Congress and the American people.

\* \* \*

Whereas, disclosure of the President's tax returns could help those investigating Russian influence in the 2016 election understand the President's financial ties to the Russian Federation and Russian citizens, including debts owed and whether he shares any partnership interests, equity interests, joint ventures or licensing agreements with Russia or Russians;

\* \* \*

Whereas, the American people have the right to know whether or not their President is operating under conflicts of interest related to international affairs, tax reform, government contracts, or otherwise:  Now, therefore, be it:

Resolved. That the House of Representatives shall–

1. Immediately request the tax return information of Donald J. Trump for tax years 2006 through 2015 for review in closed executive session by the Committee on Ways and Means, as provided under Section 6103 of the Internal Revenue Code, and vote to report the information therein to the full House of Representatives.

> 2. Support transparency in government and the longstanding tradition of Presidents and Presidential candidates disclosing their tax returns.

163 Cong. Rec. H1572 (daily ed. Mar. 7, 2017) (statement of Rep. Eshoo), https://www.congress.gov/congressional-record/2017/03/07/house-section/article/H1571-6.

Rep. Bill Pascrell (D-NJ) (Mar. 8, 2017)

> And we can't get the President's tax returns.  Not yet.  It's going to be embarrassing when those tax returns come out.  They're coming out sooner or later.  They're coming out sooner or later.  I may have nothing at all to do with how they get out, but they're going to get out sooner or later.

*Markup of GOP Health Care Repeal Bill: Hearing Before the H. Comm. on Ways & Means*, 115th Cong., at 2:41:20 (Mar. 8, 2017), https://youtu.be/3RMbUKK9ETs.

Minority Leader Nancy Pelosi (Mar. 8, 2017)

> Well it's a question of the American people wanting to know the truth.  Why is it that President Trump should be the exception to every candidate or cabinet nominee for president since Gerald Ford – that the public has been able to see the President's tax returns.  What does the President have to hide?  What do the Russians have on Donald Trump, personally, politically and financially, that he is keeping a secret?  Why are the Republicans in Congress accomplices to that secrecy?  Why are the Republicans in Congress voting to say "no, we don't think he should release his tax returns?"  It's a very bad vote for them.  That's a very bad vote for them, that's a *very* bad vote for them.

> So our members – Mr. Pascrell as you know, acts with great spontaneity, yesterday Congresswoman Eshoo, others [sic] Members of Congress want to say, "we want the facts, we want the truth."  The tax returns many believe are part of the Russian connection, the disruption of our election, the money pouring into the Trump organization, any personal embarrassment to the President – we want to know the truth, and we can start by seeing his tax returns.  Which is not an extraordinary request – unless you're Donald Trump and think you're above custom, tradition and maybe even the law.  Thank you!

Press Conference, Minority Leader Nancy Pelosi (Mar. 8, 2017), https://www.speaker.gov/newsroom/382017-2/.

Minority Leader Nancy Pelosi (Mar. 9, 2017)

> They don't want the American people to see the facts.  They're always afraid of the facts.  It's just a remarkable thing.  They're afraid of the facts of the President's tax returns.  And we will continue to ask for those tax returns because we want to know about the Russian connection.

What do the Russians have on Donald Trump politically, financially, and personally? What is that connection?  What would the tax returns tell us about that?  And we need a bipartisan, independent, nonpartisan outside investigation to get to the bottom of that.

Press Conference, Minority Leader Nancy Pelosi (Mar. 9, 2017), https://www.speaker.gov/newsroom/3917/.


House Resolution 186 (Mar. 9, 2017)

Mr. Pascrell (for himself, Mr. Crowley, Mr. Danny K. Davis of Illinois, Ms. Sewell of Alabama, Mr. Neal, Ms. Eshoo, Mr. Doggett, Mr. Sarbanes, Ms. DelBene, Mr. Thompson of California, and Mr.  Blumenauer) submitted the following resolution; which was referred to the Committee on Ways and Means

RESOLUTION

Of inquiry directing the Secretary of the Treasury to provide to the House of Representatives the tax returns and other specified financial information of President Donald J. Trump.

*Resolved,* That the Secretary of the Treasury is directed to furnish to the House of Representatives, not later than 10 days after the adoption of this resolution, the full tax returns of Donald J. Trump for tax years 2006 through 2015, as well as financial documentation and any information in possession of the Secretary that specify—

(1) Mr. Trump's debts held by foreign governments and foreign companies;

(2) Mr. Trump's investments in foreign countries and foreign enterprises; and

(3) Mr. Trump's use of any tax shelters, corporate structures, tax avoidance maneuvers, abatements, or other loopholes to reduce or eliminate tax liability.

H.R. Res. 186, 115th Cong. (2017), https://www.congress.gov/bill/115th-congress/house-resolution/186.


Resolution Offered by Rep. Joe Crowley (D-NY) (Mar. 15, 2017)

Expressing the sense of the House of Representatives that the President shall immediately disclose his tax return information to Congress and the American people.

* * *

Whereas, disclosure of the President's tax returns could help those investigating Russian influence in the 2016 election understand the President's financial ties to the Russian Federation and Russian citizens, including debts owed, and whether he shares any partnership interests, equity interests, joint ventures, or licensing agreements with Russia or Russians;

* * *

Whereas, the American people have the right to know whether or not their President is operating under conflicts of interest related to international affairs, tax reform, government contracts, or otherwise:

Now, therefore, be it resolved, that the House of Representatives shall:

One, Immediately request the tax return information of Donald J. Trump for tax years 2006 through 2015 for review in closed executive session by the Committee on Ways and Means, as provided under Section 6103 of the Internal Revenue Code, and vote to report the information therein to the full House of Representatives

Two, Support transparency in government and the longstanding tradition of Presidents and Presidential candidates disclosing their tax returns.

163 Cong. Rec. H2068-69 (daily ed. Mar. 15, 2017) (statement of Rep. Crowley), https://www.congress.gov/congressional-record/2017/03/15/house-section/article/H2068-1.


Minority Leader Nancy Pelosi (Mar. 16, 2017)

The Deflector-in-Chief's desperation demands answer to our original question, the one I ask almost every day:  What is Russia's political, personal, and financial grip on the Trump Administration?  What do the Russians have on President Trump?  They have stonewalled over 100 letters from House Democrats requesting disclosure and transparency on his ties to Russia, his conflicts of interest, and other Administration actions.

You have heard me say before: this has an impact on our national security.  What do the Russians have on him that he should flirt with the idea of weakening sanctions on Russia, undermining NATO and Europe?  Secondly, undermining and questioning the value of the New START Treaty.  Also, praising Putin at the expense of the greatness of America.  What is it that they have on him?  Show us your tax credits – your tax deduction – returns.  Every – they did do something the other day, which was curious, to do a transom report.  Who knows where that came from.  What we want to see are the President's tax returns in the same manner that every President and candidate for President – nominee of the party for President has done since Nixon, but, of course, that was demanded, but then followed through with wonderful President Gerald Ford.  So, if the President wants to strengthen our security, he should come clean with the American people.

Press Conference, Minority Leader Nancy Pelosi (Mar. 16, 2017), https://www.speaker.gov/newsroom/31617/.


Resolution Offered by Rep. Jared Polis (D-CO) (Mar. 21, 2017)

Whereas, tax returns provide an important baseline disclosure because they contain highly instructive information including whether the candidate can be influenced by foreign entities and reveal any conflicts of interest;

\* \* \*

Whereas, disclosure of the President's tax returns is important towards investigating Russian influence in the 2016 election, understanding the President's financial ties to the Russian Federation and Russian citizens, including debts owed and whether he shares any partnership interests, equity interests, joint ventures, or licensing agreements with Russia or Russian nationals, formally or informally associated with Vladmir Putin;

\* \* \*

Whereas, the American people have the right to know whether or not their President is operating under conflicts of interest related to international affairs, tax reform, government contracts, or otherwise:

Now, therefore, be it resolved that the House of Representatives shall:

One, immediately request the tax return information of Donald J. Trump for tax years 2006 through 2015 for review in closed executive session by the Committee on Ways and Means, as provided under section 6103 of the Internal Revenue Code, and vote to report the information therein to the full House of Representatives;

Two, support transparency in government and the longstanding tradition of Presidents and Presidential candidates disclosing their tax returns.

163 Cong. Rec. H2308-09 (daily ed. Mar. 22, 2017) (statement of Rep. Polis), https://www.congress.gov/congressional-record/2017/03/22/house-section/article/H2308-1.


Rep. Sander Levin (D-MI) (Mar. 28, 2017)

I think you are wrong perhaps about 90%.  Even if it were only 10%, let the public see it. Let the public see it.

\* \* \*

This committee should use its authority to better understand the connections between the President, and his family, and Russia.

The President now says he wants to lead the effort on tax reform.  His past returns are directly relevant to our forthcoming discussions about tax reform.  It is important to understand how such tax reform would benefit the President, his 564 financial positions in domestic and foreign companies, and his self-reported net worth of more than $10 billion.

\* \* \*

We're asking for the disclosure because it's relevant to the discussion about the Russian connection, and now you all and we all say that we want to take up tax reform. The President said he wants to lead the effort. With hidden tax reform, tax returns, that is totally incredible.

*Markup of H. Res. 186: Hearing Before the H. Comm. on Ways & Means*, 115th Cong., at 21:33 (Mar. 28, 2017), https://www.youtube.com/watch?v=CeRfw_m9bMw&feature=youtu.be.


Rep. Bill Pascrell (D-NJ) (Mar. 28, 2017)

Our constituents are demanding transparency. . . . We have the authority. We have the cause. With all the conflicts we know about, and all that we don't, we must gather all the possible information we can. The IRS is best equipped to conduct financial investigations into possible crimes dealing with money. The President's tax returns will provide us with the clues.

*Markup of H. Res. 186: Hearing Before the H. Comm. on Ways & Means*, 115th Cong., at 29:05 (Mar. 28, 2017), https://www.youtube.com/watch?v=CeRfw_m9bMw&feature=youtu.be.


Rep. Lloyd Doggett (D-TX) (Mar. 28, 2017)

The House investigation has been totally discredited within the last week. Whether it was discredited or not, this Committee has a role to play with reference to tax returns. And when you have the President's son-in-law talking with a former KGB official running a bank in Russia, and you have an indication from the President's son a few years back that the Russians make up a pretty disproportionate cross section of a lot of our assets, and that's a direct quote, there is reason to want to know whether there is anything in his tax returns showing payments to Russians, or payments from Russians. It may be that not every bit of the information we are seeking is contained within the form on individual taxes that President Trump may have filed. But there may well be an indication in those returns of information that will lead to that information, and that's why I believe the President went back on his promise to the American people, and refused to disclose the very information he said he would disclose in the future when these audits were concluded. I want to know whether he has, as his son said, continued to have a pretty disproportionate cross section of a lot of their assets with the Russians.

* * *

I want to emphasize that the Chairman and the members of this Committee are misconstruing section 6103, narrowly construing it really to justify this cover-up of the Trump tax returns, and that this Committee has a significant interest in these returns as it relates to the administration of our business. Both with reference to our trade agenda, from which we heard about earlier today, given the large number of trademarks that President Trump was able to magically get approved from the Chinese earlier this year, and with reference to our tax responsibilities.

* * *

Without those tax returns to know what conflicts may exist for him, what kind of self-dealing may exist for him, we will never know.  Section 6103 deals with more than tax administration, it deals with the assessment, collection, enforcement, publication, and statistical gathering functions under the laws and statutes.  There is every reason why in terms of its work in tax and the fact that we are considering major tax legislation, that we would want to know whether he will benefit personally, and that's why he is advancing these various legislative changes.

*Markup of H. Res. 186: Hearing Before the H. Comm. on Ways & Means*, 115th Cong., at 41:28 (Mar. 28, 2017), https://www.youtube.com/watch?v=CeRfw_m9bMw&feature=youtu.be.


Rep. Brian Higgins (D-NY) (Mar. 28, 2017)

The American people have a right to know if the President would personally gain from proposals he will ask this Committee to consider.  The American people have a right to know if the President's tax returns offers clarity about business ties he may have to Russia, to Germany, to Saudi Arabia, or any other foreign interest that may benefit them and/or him.

*Markup of H. Res. 186: Hearing Before the H. Comm. on Ways & Means*, 115th Cong., at 54:06 (Mar. 28, 2017), https://www.youtube.com/watch?v=CeRfw_m9bMw&feature=youtu.be.


Minority Leader Nancy Pelosi (Mar. 28, 2017)

Since Gerald Ford was President, every candidate for President, every nominee of a major party, every candidate for President of the United States, Democrat and Republican, has released their income tax returns out of respect for the American people – out of respect for the American people. Week in and week out – in fact, sometimes day in and day out – in committee as well as on the floor, the Republicans have kept the President's income tax returns private when the public has a right to know that, that the public has always known that about every President since Gerald Ford – in fact, since Richard Nixon; although, in his case, it wasn't voluntary.

163 Cong. Rec. H2498 (daily ed. Mar. 28, 2017) (statement of Rep. Pelosi), https://www.congress.gov/congressional-record/2017/3/28/house-section/article/H2489-1.


Ranking Member Richard Neal and Rep. Bill Pascrell (D-NJ) (Mar. 30, 2017)

Committee Democrats strongly oppose the Committee's action of unfavorably reporting H. Res. 186, Resolution of inquiry directing the Secretary of the Treasury to provide to the House of Representatives the tax returns and other specified financial information of President Donald J. Trump. Committee Republicans continue to block our requests for this Committee to exercise its authority under Section 6103 of the Internal Revenue Code

to obtain, examine, and make available to the public President Trump's federal tax returns.

This Committee has broad jurisdiction over a variety of laws that affect the lives of millions of Americans, including the federal tax law. The President and Congressional Republicans have been very vocal regarding their desire to enact comprehensive tax reform this Congress. Committee Democrats believe that it is imperative for the public to know and understand how such tax reform will benefit the President, his 564 financial positions in domestic and foreign companies, and his self-reported net worth of more than $10 billion.

* * *

Tax returns provide the clearest picture of a president's financial health, including how much he earns, how much tax he pays, his sources of income (e.g., capital gains, dividend income, and certain business income), the size of his deductions, whether he makes charitable contributions, and whether he uses tax shelters, loopholes, or other special-interest provisions to his advantage. All of these items are critical in order for the public to gain a more complete understanding of how tax reform will benefit President Trump and his vast business empire.

If ever there was a president with respect to which this Committee should exercise its Section 6103 statutory authority to obtain individual tax returns, President Trump is the one. A president with a vast domestic and international business empire. A president who has rebuked over 40 years of tradition and refused to release his individual tax returns to the public. A president who will negotiate and ultimately may sign comprehensive tax reform into law. A president who is not the average American–he has assets, business interests, and foreign entanglements that far surpass the average taxpayer. . . .  Hence, Committee Democrats remain steadfast in our pursuit to have his individual tax returns disclosed to the public.

* * *

Starting in February, Committee Democrats began pressing Committee Republicans to use the authority under Section 6103 to obtain President Trump's tax returns and make them available to the public. Committee Democrats have sent letters urging, and offered amendments to force, the Chairman to obtain President Trump's tax returns for review by the Committee.

* * *

Procedurally, upon submission to the House, the tax return and return information would become available to the public.

H.R. Rep. No. 115-73 (Mar. 30, 2017), Resolution of Inquiry Directing the Secretary of the Treasury to Provide to the House of Representatives the Tax Returns and other Specified Financial Information of President Donald J. Trump, Adverse Report together with Dissenting Views, 115th Cong., https://www.congress.gov/congressional-report/115th-congress/house-

report/73; *see also* H.R. Rep. No. 115-309 (Sept. 14, 2017), Resolution of Inquiry Directing the Secretary of the Treasury to Provide to the House of Representatives the Tax Return Information of President Donald J. Trump as Well as the Tax Returns of Each Business Entity Disclosed by Donald J. Trump on His Office of Government Ethics Form 278e, Adverse Report together with Dissenting Views, 115th. Cong., https://www.congress.gov/congressional-report/115th-congress/house-report/309/1; *Markup of H. R. Res. 479: Hearing Before the H. Comm. on Ways & Means*, 115th Cong. (Sept. 7, 2017), https://gop-waysandmeans.house.gov/event/markup-h-res-479/.


Minority Leader Nancy Pelosi (Apr. 5, 2017)

> What is President Trump hiding that he refuses to release his taxes to the American people – even as an overwhelming 74 percent demand he release them?  The disturbing conflicts of interests, revelations of shady dealings, and Trump's deep ties to Putin's Russia must be the reason.
>
> * * *
>
> But week after week, Republicans have repeatedly voted to help President Trump stonewall the American people – complicit in keeping President Trump's taxes and finances hidden.
>
> That is why House Democrats, led by Congresswoman Anna Eshoo, filed a discharge petition today to #DemandAVote to require President Donald Trump to disclose his tax returns, so the American people can see for themselves the extent of his financial interests, and whether they are influencing his policy decisions toward Russia, on tax reform and other issues.

Minority Leader Nancy Pelosi, Blog Post, #DemandAVote: House Democrats Launch Discharge Petition to Release President Donald Trump's Tax Returns (Apr. 5, 2017), https://www.speaker.gov/newsroom/demandavote-house-democrats-launch-discharge-petition-to-release-president-donald-trumps-tax-returns/.


Minority Leader Nancy Pelosi (Apr. 5, 2017)

> As you know, every President since Gerald Ford – actually, every nominee on both sides of the aisle since then has released their tax returns.  So the history of it is important to American people.  It isn't as if the tax returns tell the whole story but they are a key that opens the door to so much information.
>
> We're especially concerned about any information that might show any connection – Russian connection, Chinese connection, in terms of business interests of the Trump organization to any of these countries.  It's really a very important thing.
>
> At a time when they are saying, we don't want to see the President's tax return . . . they now say, "we have to protect the President's privacy."

It's not a right to privacy that the President has.  He's the President of the United States there is a question about a Russia connection politically, personally, financially to the President, there's concerns about recent actions by the Chinese government, in relation to the Trump Organization.  There are plenty of reasons why we need this key to open the door to the information we need to connect the dots and if they have nothing to fear, then what are they afraid of.

Press Conference, Minority Leader Nancy Pelosi, Demanding a Vote Requiring President Trump to Release Tax Returns (Apr. 5, 2017), https://www.speaker.gov/newsroom/4517/.


<u>Ranking Member Richard Neal</u> (Apr. 5, 2017)

This is not about the law, this is about custom and practice.  It's a settled tradition and as I noted by using the word earlier, about begrudges – candidates reach the level of expectation that they're supposed to release their tax forms.  I'm not aware of any of the Presidents that have been cited who ever publicly suggested that they thought it was an invasion of privacy.

Press Conference, Statement by Ranking Member Richard Neal (Apr. 5, 2017), https://www.speaker.gov/newsroom/4517/.


<u>Rep. David Cicilline (D-RI)</u> (Apr. 5, 2017)

And this is a very simply [sic] idea in that the President's ability to lead this country is directly undermined by the questions which continue to rise about his potential conflicts of interest, and whether or not he's making decisions in the best interest of the American people, or in his own personal or financial best interest.  One way to get at that question is a simple release of his tax returns, a tradition which has been a tradition of every president in recent history.  His refusal to do that, and sadly the Republicans' refusal so far to be part of this effort is disappointing, but we're not going to stop.  This is something the American people are demanding so that they can have a sense of what those conflicts might be, and we're going to use every avenue we can to continue to press until we're successful in persuading or requiring the President to share those with the American people.

Press Conference, Statement by Rep. David Cicilline (D-RI) (Apr. 5, 2017), https://www.speaker.gov/newsroom/4517/.


<u>Rep. John Sarbanes (D-MD)</u> (Apr. 5, 2017)

I just want to thank my colleagues and Anna for their efforts on this issue, which is going to be continuous.  We're not going to let up.  When you talk to people out in the country – as everybody here has said – there is real anxiety on the part of Americans about whether the President may have some divided loyalty – whether when he goes to make a

decision that is supposed to be on behalf of the public.  There are some other concerns of interests he has competing with that.

This is the highest office in the land.  The public trust is placed in this office.  That is the expectation of 330 million Americans – that you will carry out that office, recognizing the public trust that is placed in it.

And Americans just want to know that when the President is making important decisions on domestic policy and on foreign policy, that he doesn't have divided loyalties.  This is nagging away at people.  And he can come clean if he provides his tax returns, which is the first important baseline step in being transparent.  That will do a lot to put that anxiety to rest.  But, the fact that he won't release the tax returns, I think, is making a lot of Americans nervous.

Press Conference, Statement by Rep. John Sarbanes (D-MD) (Apr. 5, 2017), https://www.speaker.gov/newsroom/4517/.


Minority Leader Nancy Pelosi (Apr. 6, 2017)

Republicans will sell your most private information, your most private information, but they refuse to reveal the President's tax returns, something every President since Gerald Ford has done, and indeed every nominee of the other party has done.

And there is a vital interest in the President's tax returns.  Republicans are desperate, again, to keep them secret.  What is it that they are afraid of?  Why don't they have that key that 74 percent of the American people want us to unlock that door to see where it leads?

If it's all okay, they have nothing to be afraid of.  But we think that it will show us some connection that will be useful in the investigation of what do the Russians have on Donald Trump politically, personally, and financially.

Press Conference, Minority Leader Nancy Pelosi (Apr. 6, 2017), https://www.speaker.gov/newsroom/4617-4/.


Rep. Hakeem Jeffries (D-NY) (Apr. 7, 2017)

Unfortunately, Donald Trump sees things differently.  As we approach tax day, it's important to remember that every President since Gerald Ford, Democrats and Republicans, have released their tax returns to the American people.  Before the election, Donald Trump repeatedly promised to release his tax returns, just like Jimmy Carter, Ronald Reagan, George H.W. Bush, Bill Clinton, George W. Bush and Barack Obama before him.  But as President, Donald Trump has broken this promise.

Is he hiding something from the American people?  I certainly hope not.  Here's what I do know.  The American people deserve an answer to that question.  The tax return issue

is about fairness.  It's about being straight with the American people.  It's about playing by the rules.

There is a cloud of uncertainty hanging over the White House when it comes to our President.  He came to Washington on a promise to drain the swamp.  But instead, by failing to keep his word and release his tax returns, Donald Trump is a living, breathing conflict of interest.

\* \* \*

This is not a Democratic issue or a Republican issue.  This is an American issue.  Our Democracy was attacked.  The release of the President's tax returns will help the American people better understand the extent of Trump's financial ties to Putin's Russia.  The American people have a right to know whether financial conflicts of interest exist between the President of the United States and a hostile foreign power.

The American people have a right to know whether the decisions being made by President Trump are in the best interest of America, or are benefiting other countries and corporations with whom he has a business relationship.  The American people have a right to know whose side the President is on.  His tax returns will help provide the information necessary to figure that out.

To whom much is given, much is expected.  Donald Trump has been given the opportunity to lead this great nation.  The least we can expect is that President Trump play by the rules and share his tax returns with the American people.

Press Conference, Congressman Hakeem Jeffries Delivers Weekly Democratic Address (Apr. 7, 2017), https://www.speaker.gov/newsroom/congressman-hakeem-jeffries-delivers-weekly-democratic-address/.


<u>Minority Leader Nancy Pelosi</u> (Apr. 17, 2017)

What are President Trump and the Republican Congress hiding?  Every President since Gerald Ford, Democrat and Republican, has released his tax returns to the public.  Despite the history, despite his own promises, President Trump and Republicans in Congress are desperate to keep the American people in the dark.

Who does President Trump owe?  America needs to know.  All roads lead back to the President's tax returns – and the light they can shine on his actions and the Trump-Russia connection.  Releasing the President's tax returns is vital for our national security and our democracy.

Press Release, Minority Leader Nancy Pelosi, Statement on Tax Day (Apr. 17, 2017), https://www.speaker.gov/newsroom/41717/.

<u>Rep. Ben Ray Luján (D-NM)</u> (Apr. 21, 2017)

The President has done everything possible to distract and mislead the American people about his connection to Russia and his truly unprecedented web of conflicts.

He has refused to divest his business ties or release his tax returns to the American people so they can understand his conflicts of interest and get to the truth.

Press Conference, Congressman Ben Ray Luján Delivers Weekly Democratic Address (Apr. 21, 2017), https://www.speaker.gov/newsroom/congressman-ben-ray-lujan-delivers-weekly-democratic-address/.

<u>Minority Leader Nancy Pelosi</u> (Apr. 23, 2017)

The infrastructure bill is one of the biggest secrets in Washington, D.C., second only to the president not showing us his tax returns.

We need to see those so we can see how his tax policy will affect his own tax situation. We need to see them so we can see what is the hold that the Russians have on him politically, financially, and personally.

*Meet the Press* (transcript of NBC television broadcast Apr. 23, 2017), https://www.nbcnews.com/meet-the-press/meet-press-april-23-2017-n749866.

<u>Rep. Lloyd Doggett (D-TX)</u> (Apr. 26, 2017)

Without an end to the Republican cover-up of Trump's tax returns, we cannot determine whether this is mostly just more self-enrichment for the Trump family. Trump talks like a populist but governs like a plutocrat.  Like the near trillion dollar tax cut in the failed health care bill that he endorsed, Trump's tax plan fills the coffers of giant corporations and lines the pockets of the superrich.

Press Release, Ranking Member Richard Neal (D-MA) and Rep. Lloyd Doggett (D-TX), Neal, Doggett Statements on President Trump's Tax Proposal (Apr. 26, 2017), https://waysandmeans.house.gov/media-center/press-releases/neal-doggett-statements-president-trump-s-tax-proposal.

<u>Rep. John Lewis (D-GA)</u> (Apr. 26, 2017)

This afternoon, the Administration released its principles for tax reform.  I must express my concern about beginning tax reform when the public has no idea how the proposal will personally benefit the First Family.

On April 15th, thousands of Americans took to the streets and demanded transparency, truth, and accountability.  They know that there is no provision in the Internal Revenue Code that prevents him from releasing his tax returns.  Failure to meet this standard

presents a dangerous and slippery slope for policy makers.  The American people expect and deserve better.

Press Release, Ranking Member John Lewis (D-GA), Opening Statement at Oversight Subcommittee Hearing on 2017 Tax Filing Season (Apr. 26, 2017), https://waysandmeans.house.gov/media-center/press-releases/ranking-member-lewis-opening-statement-oversight-subcommittee-hearing-5.


Minority Leader Nancy Pelosi (May 15, 2017)

> One of the concerns that we have is that Russia is an adversary to the United States. And yet, when the president became president-elect, he was putting Putin on a pedestal and he was questioning whether we should even have sanctions against Russia for their aggression in Ukraine and Crimea, et cetera, and questioning the – undermining the relationship we have with NATO, which is our transatlantic friendship for security. And it was like, why on Earth is he undermining our allies and praising Putin?

> And so that's one of the things that we want to see about the investigation, because it relates to if there have – as I said, financial. What is the financial connection? Political. They did – it's an absolute fact – disrupt our election by hacking and leaking. The question is, was there collusion? And, third, personally. What is it that is making him do all these special things for the Russians?

> You only know that if you're basing it on fact and not just rumor and hearsay if you have the investigation. And that's why we're saying, let's just find out the truth. Let the chips fall where they may. And if he has nothing to hide, he shouldn't be opposing, nor should my Republican colleagues in Congress, be opposing the release of his tax returns, any of the investigation into other aspects of the Trump-Russia connection. And that's why when something like this comes up, it's like predictable, almost, sadly.

*CNN Town Hall* (transcript of CNN television broadcast May 15, 2017), http://transcripts.cnn.com/TRANSCRIPTS/1705/15/se.01.html.


Minority Leader Nancy Pelosi (May 16, 2017)

> The question is what is the connection? And that requires investigation to get the facts that proves the case, or not. What are the Republicans and the president afraid of? The truth.

> So, when it comes to our national security, here he is putting Putin on a pedestal, undermining NATO, questioning whether we should even have sanctions vis-a-vis Russia in terms of their aggression in Europe. And that is not in our national security interest. That is undermining our Trans-Atlantic pillar of strength for us.  But casual about it and putting – so what do the Russians have on him politically, personally, financially?

Go to the next step. We have a chance to see his tax returns. Show us your tax returns so we can see what the connection is between you and Russia. And, by the way, the connection between your self-aggrandizement and the cost to the average person in our country.

So, this is about our economy as well. And then of course as I mentioned about the security of our democracy. So, this is intrinsic. It's fundamental. It's systemic. It's very important that we get to the bottom of it.

And there is so much evidence. . . .

Rep. Nancy Pelosi, House Minority Leader, Remarks at Center for American Progress Forum (May 16, 2017), http://www.cq.com/doc/newsmakertranscripts-5102881; *see also* Video: Rep. Nancy Pelosi (D-CA), See Progress, at 10:13 (May 16, 2017), https://www.youtube.com/watch?v=WoMAnFNyV94.

Resolution Offered by Rep. Bill Pascrell (D-NJ) (May 16, 2017)

Expressing the sense of the House of Representatives that the President shall immediately disclose his tax return information to Congress and the American people;

* * *

Whereas, tax returns provide an important baseline disclosure because they contain highly instructive information, including whether the candidate paid taxes, number one; what they own, number two; what they have borrowed and from whom, number three; whether they have made any charitable donations, number four; and whether they have taken advantage of tax loopholes, number five.

Whereas, disclosure of the President's tax returns could help those investigating Russian influence in the 2016 election understand the President's financial ties to the Russian Federation and Russian citizens, including debts owed and whether he shares any partnership interests, equity interests, joint ventures or licensing agreements with Russia or Russians;

* * *

Whereas, the President's tax returns would show us whether he has foreign bank accounts and how much profit he receives from his ownership in myriad partnerships;

* * *

Whereas, the Chairmen of the Ways and Means Committee, Joint Committee on Taxation, and Senate Finance Committee have the authority to request the President's tax returns under Section 6103 of the tax code;

* * *

Whereas, the American people have the right to know whether or not their President is operating under conflicts of interest related to international affairs, tax reform, government contracts, or otherwise: Now, therefore, be it:

Resolved, That the House of Representatives shall–

1. Immediately request the tax return information of Donald J. Trump for tax years 2006 through 2015 for review in closed executive session by the Committee on Ways and Means, as provided under Section 6103 of the Internal Revenue Code, and vote to report the information therein to the full House of Representatives

2. Support transparency in government and the longstanding tradition of Presidents and Presidential candidates disclosing their tax returns.

163 Cong. Rec. H4212-13 (daily ed. May 16, 2017) (statement of Rep. Pascrell), https://www.congress.gov/congressional-record/2017/05/16/house-section/article/H4212-1.

Minority Leader Nancy Pelosi (May 18, 2017)

But this is something that has foreign intrigue, it has issues that relate to undermining our democracy by interference in our election.  It's about, "Show us your tax returns so we can see what public policy is regarding that, and do you have a Russian connection, Mr. President, in your dealings?"  And it's very serious.

So in order for us to move forward in a way where we're moving forward with the American people, it's very important that we do it based on the facts.  There is reason to believe that the President was engaged in some very inappropriate, for the moment, activity.  But until you have the facts that you can present to the public in the public domain so the American people are moving with you at the same time, I don't think that our democracy is well served.

Press Conference, Minority Leader Nancy Pelosi (May 18, 2017), https://www.speaker.gov/newsroom/51817-5/.

Resolution Offered by Rep. Linda Sanchez (D-CA) (May 24, 2017)

Expressing the sense of the House of Representatives that the President shall immediately release his tax return information to Congress and the American people.

* * *

Whereas, tax returns provide an important baseline of reasonable information including whether the President paid taxes, ownership interests, charitable donations made, and whether tax deductions have been exploited;

Whereas, disclosure of the President's tax returns could help those investigating Russian influence in the 2016 election understand the President's financial ties to the Russian Federation and Russian citizens, including debts owed and whether he shares any partnership interests, equity interests, joint ventures or licensing agreements with Russia or Russians;

* * *

Whereas, the President's tax returns would show us whether he has foreign bank accounts and how much profit he receives from his ownership in myriad partnerships;

* * *

Whereas, the Chairmen of the Ways and Means Committee, Joint Committee on Taxation, and Senate Finance Committee have the authority to request the President's tax returns under Section 6103 of the tax code;

* * *

Whereas, the American people have the right to know whether or not their President is operating under conflicts of interest related to international affairs, tax reform, government contracts, or otherwise: Now, therefore, be it:

Resolved, That the House of Representatives shall–

1. Immediately request the tax return information of Donald J. Trump for tax years 2006 through 2015 for review in closed executive session by the Committee on Ways and Means, as provided under Section 6103 of the Internal Revenue Code, and vote to report the information therein to the full House of Representatives

2. Support transparency in government and the longstanding tradition of Presidents and Presidential candidates disclosing their tax returns.

163 Cong. Rec. H4524 (daily ed. May 24, 2017), https://www.congress.gov/congressional-record/2017/5/24/house-section/article/h4523-1.

Minority Leader Nancy Pelosi (June 2, 2017)

And speaking of taxes, I think that the decision the President made on the Paris accord, I think that the budget that he has put forth, again, really speaks further to the fact that he should show us his tax returns.  It's very important that we see his tax returns.  It relates to Russia.  What do the Russians have on Donald Trump, politically, personally, and financially?  And he won't show us his tax returns, to give us some [–] maybe that would clear up the issue or maybe it will be a path to some other questions.  So show us your tax returns.

We talk about lifting the debt ceiling.  We talk about tax returns.  We do know that what he proposed, what he was talking about before would have given him a tax break of $30 million on the year that he has revealed his tax return.  A tax break of $30 million.  Show us your tax returns.

Press Conference, Minority Leader Nancy Pelosi (June 2, 2017), https://www.speaker.gov/newsroom/6217-4/.


Minority Leader Nancy Pelosi (June 6, 2017)

I think we have to remove all doubt as the impact of the Russians in our life. And I think it's important the American people to know what did Russians have on Donald Trump politically, financially, and personally, that he is standing in the way of this legitimate investigation as to the Russian impact on our election and to prevent them from doing it again.

* * *

[T]he American people have a right to know the truth. And why would the Republicans stand in the way of the truth? Why can't we see his tax returns?

*New Day* (transcript of CNN television broadcast June 6, 2017), http://transcripts.cnn.com/TRANSCRIPTS/1706/06/nday.03.html.


Resolution Offered by Rep. Michael Capuano (D-MA) (June 7, 2017)

Expressing the sense of the House of Representatives that the President shall immediately release his tax return information to Congress and the American people.

* * *

Whereas, tax returns provide an important baseline of reasonable information including whether the President paid taxes, ownership interests, charitable donations made, and whether tax deductions have been exploited;

Whereas, disclosure of the President's tax returns could help those investigating Russian influence in the 2016 election understand the President's financial ties to the Russian Federation and Russian citizens, including debts owed and whether he shares any partnership interests, equity interests, joint ventures or licensing agreements with Russia or Russians;

* * *

Whereas, the President's tax returns would show us whether he has foreign bank accounts and how much profit he receives from his ownership in myriad partnerships;

* * *

Whereas, the Chairmen of the Ways and Means Committee, Joint Committee on Taxation, and Senate Finance Committee have the authority to request the President's tax returns under Section 6103 of the tax code;

\* \* \*

Whereas, the American people have the right to know whether or not their President is operating under conflicts of interest related to international affairs, tax reform, government contracts, or otherwise: Now, therefore, be it:

Resolved, That the House of Representatives shall–

1. Immediately request the tax return information of Donald J. Trump for tax years 2006 through 2015 for review in closed executive session by the Committee on Ways and Means, as provided under Section 6103 of the Internal Revenue Code, and vote to report the information therein to the full House of Representatives

2. Support transparency in government and the longstanding tradition of Presidents and Presidential candidates disclosing their tax returns.

163 Cong. Rec. H4685 (daily ed. June 7, 2017), https://www.congress.gov/congressional-record/2017/06/07/house-section/article/H4684-1.


Rep. Michael Capuano (D-MA) (June 7, 2017)

The investigations are ongoing. At some point, it is unquestioned that the President's tax returns will become relevant to what the FBI is doing. It is only a matter of time.

For the integrity of the House, for the dignity of the House, I believe firmly that we should exercise the law that the Congress put in place itself to do our own due diligent investigation and not just simply sit on our hands while others do our work for us.

These documents will become public, and when they do, regardless of what they show, I believe firmly it will reflect negatively on this House for not having done our duty, for having shirked our responsibilities. That is why I believe this is a privilege of the House. That is why I believe this House should take this action.

\* \* \*

There aren't any Americans that don't believe they have a right to know that their President has not been subject to undue influence. That is all this does. It draws no conclusion from it, and it allows the majority party to call on it to make the determination; not me, but the majority party; the chair of the Ways and Means Committee.

That is why I offered this resolution. That is why I think this resolution is going to continue to be offered, and, at some point, the House is going to do it. I don't know why

> Members of the House want to drag this out and pretend that somehow you are going to be able to avoid it. You are not. It is going to happen.

163 Cong. Rec. H4684-86 (daily ed. June 7, 2017) (statement of Rep. Capuano), https://www.congress.gov/congressional-record/2017/06/07/house-section/article/H4684-1.


Minority Leader Nancy Pelosi (June 9, 2017)

> Well, I think he abused power.  I think there is no question he abused power.  Whether he obstructed justice remains for the facts to come forward, and that is what we want: the facts.  And I hope that our Republican colleagues will not continue to stand in the way of our getting the facts.
>
> Also, we'd like to see his tax returns, because that will, again, help connect the dots here. And, again, maybe it will all be exculpatory, but let's find that out.  Right now we have to remove all doubt about the integrity of our government.

Press Conference, Minority Leader Nancy Pelosi (June 9, 2017), https://www.speaker.gov/newsroom/61217-2/.


Rep. Lloyd Doggett (D-TX) (June 13, 2017)

> Today, Congressman Lloyd Doggett (D-TX), Ranking Member of the Ways & means [sic] Tax Policy Subcommittee, is offering a "privileged resolution" that would require the House of Representatives to immediately request the President's tax returns and those of his businesses. His resolution, which must be considered within two legislative days, would also postpone consideration of any tax reform legislation until the President's tax returns are obtained.
>
> The House Ways and Means Committee has the authority to obtain the President's tax returns under section 6103 of the Tax Code. If this "privileged resolution" were approved, it would launch the process of reviewing those tax returns in an Executive Session of the Ways and Means Committee, which could vote to release the returns to the public.
>
> Rep. Doggett has filed three separate amendments in the Ways and Means Committee to obtain President Trump's tax returns—on February 14, March 8, and March 28. The Committee voted all three times along party lines to continue to cover-up the President's tax returns, and the House has refused nine times to act on President Trump's tax returns.

* * *

RESOLUTION

Expressing the sense of the House of Representatives that the President shall immediately disclose his tax return information to the House of Representatives and the American people.

* * *

Whereas, disclosure of the President's tax returns could help those investigating Russian influence in the 2016 election better understand the President's financial ties to the Russian Federation, Russian businesses, and Russian individuals;

Whereas, after breaking his pledge to make his tax returns available, President Trump instead presented a one page letter from a law firm giving him a clean bill of health on any business dealings with Russians, but failed to note that the very same law firm boasted of the "prestigious honor" of being named "Russia Law Firm of the Year" for 2016;

* * *

Now, therefore, be it:

*Resolved*, That the House of Representatives shall—

1. Immediately request the tax return and return information of Donald J. Trump for tax years 2006 through 2015, as provided under section 6103 of the Internal Revenue Code of 1986, as well as the tax return (and return information with respect to the President's businesses) of each business entity disclosed by Donald J. Trump on his Office of Government Ethics Form 278e, specifically each corporation and each partnership (within the meaning of subchapter K of chapter 1 of the Internal Revenue Code of 1986) where he is listed as an officer, director, or equivalent, or exercises working control; and

2. Postpone consideration of tax reform legislation until the elected Representatives of the American people in this House have obtained President Trump's tax returns and return information to ascertain how any changes to the tax code might financially benefit the President.

Press Release, Rep. Lloyd Doggett (D-TX), Privileged Resolution Would Require Trump Tax Returns Before Tax Reform Consideration (June 13, 2017), https://doggett.house.gov/media-center/press-releases/privileged-resolution-would-require-trump-tax-returns-tax-reform; *see also* 163 Cong. Rec. H4898-99 (daily ed. June 13, 2017) (statement of Rep. Doggett), https://www.congress.gov/congressional-record/2017/6/21/house-section/article/h5013-1;163 Cong. Rec. H5013-16 (daily ed. June 21, 2017) (statement of Rep. Doggett), https://www.congress.gov/congressional-record/2017/6/21/house-section/article/h5013-1.

<u>Minority Leader Nancy Pelosi</u> (June 20, 2017)

> As Speaker Ryan moves to the question and answer portion of his 'major' tax reform speech, we have some questions: Where are President Trump's tax returns?  What happened to 'At some point I'll release it'?

> By blatantly refusing to reveal his tax returns, the President fails to fulfill his promise to the American people, honor tradition, and be transparent about his financial history – despite the fact that 74 percent of Americans want Presidents to disclose their tax returns. House Republicans have voted 9 times to keep President Trump's tax returns secret.

> If Speaker Ryan and House Republicans respect the oath they took to support and defend the U.S. Constitution, they must stop the pointless distractions and demand transparency and truth from the White House.  American taxpayers deserve to know that the President of the United States is playing by the rules and putting the people's business before the Trump family business.

Blog Post, Minority Leader Nancy Pelosi, Where are President Trump's Tax Returns? (June 20, 2017), https://www.speaker.gov/newsroom/where-are-president-trumps-tax-returns/.


<u>Minority Leader Nancy Pelosi</u> (July 13, 2017)

> Republicans . . . won't join us in the release of the President's tax returns, which could be very instructive in terms of any connection to Russia.  Why should this President of all Presidents and all candidates for President in the two major parties, since Gerald Ford, not release his returns so the American people can know?

Press Conference, Minority Leader Nancy Pelosi (July 13, 2017), https://www.speaker.gov/newsroom/71317-8/.


<u>Rep. Bill Pascrell (D-NJ)</u> (July 14, 2017)

> On February the 1st, I wrote a letter to the chairman of the committee which I participate in, and that is the Ways and Means Committee Chairman Kevin Brady. In that letter, I asked him to use his existing authority to obtain President Trump's tax returns for review by our committee.

> And I would say, from the get-go here, that a lot of the questions that are being asked today and have been asked in the past could have been avoided if the president of the United States had followed the ethics commission and – to divest himself of all of his holdings and assets. President chose – chose not to do that.

> And the more we get into 2017, the more we understand how the tax returns are critical. He could have avoided all this by divesting himself, but the deals that have been made just at the – during the time that he's been the president is a reflection.

Every president – and this has nothing to do with party affiliation, which I said to Kevin Brady in February of this year – every president must have a clean slate when he goes into that office and raises his hand to be sworn, so that he can be objective in his decisions. We have no assurances of that right now, and we are not going to simply sit back and reflect on the good of his word. I'm not. I don't think many Americans are.

And Members of Congress, specifically the tax-writing committees, currently have authority in the tax code to get the President's tax returns, to examine his conflicts of interest.

* * *

Since February, we've held nine votes on the floor of the House of Representatives. And in – March 1st, I offered a resolution of inquiry that was debated in the Ways and Means Committee. At each turn, the Republicans in Congress blocked our efforts.

Why are they hiding and being complicit, to use the speaker's – the leader's word, in keeping Trump's conflicts secret and hidden? Why? Why is that? Why won't Republican Members of Congress use their authority in the law to provide oversight and make sure the president and his family are not hiding financial ties that could cause conflicts in the decision-making?

We have no way of knowing whether Mr. Trump or his firms have received Russian income or loans or entered into Russian-linked partnerships. We have a right to know that.

The legislative branch has the responsibility and the authority to check the executive branch, under Section 6103 of the tax code, which allows for an examination of his returns, the authority put in place specifically so Congress could examine conflicts of interest in the executive, following that great scandal in the early 1920s.

Today, I'll be introducing a new resolution of inquiry to give the Ways and Means Committee another chance to get it. And – and by the way, in conclusion, it's not enough for Republican congressmen to go to town meetings and say, "Yes, the president should give us his tax returns," and then not – come back to Washington and not have the courage to stand up for their convictions and say, "This is the direction we should be going."

And that's not good enough. So there's been over 20 people on the other side that have said he should release his tax returns, but will not vote to do it. Congress can, and must, use its authority to address President Trump's tax returns and give the American people the transparency they deserve.

Press Conference, Rep. Bill Pascrell (D-NJ) (July 14, 2017), http://www.cq.com/doc/newsmakertranscripts-5142259; House Democrats on Russian Interference in 2016 Election (C-SPAN Video July 14, 2017, at 09:54), https://www.c-span.org/video/?431350-1/democrats-step-pressure-gop-amid-widening-russia-probe.

<u>Resolution Offered by Rep. David Cicilline (D-RI)</u> (July 18, 2017)

Expressing the sense of the House of Representatives that the President shall immediately disclose his tax return information to Congress and the American people.

* * *

Whereas, the chairmen of the Committee on Ways and Means, Joint Committee on Taxation, and the Committee on Finance have the authority to request the President's tax returns under section 6103 of the Internal Revenue Code of 1986;

* * *

Whereas, without access to the President's tax returns, the American people cannot determine how much he will personally benefit from proposed changes to the Tax Code or from policy decisions he makes, nor can the American people fully understand the financial interests and motivations of the President;

* * *

Whereas, disclosure of the President's tax returns would help those investigating Russian interference in the 2016 election and assist them in better understanding the President's financial ties to the Russian Federation, Russian businesses, and Russian individuals;

* * *

Now, therefore, be it resolved, that the House of Representatives shall–

one, immediately request the tax return and return information of Donald J. Trump for tax years 2006 through 2015, as provided under section 6103 of the Internal Revenue Code of 1986, as well as the tax return, and return information with respect to the President's businesses, of each business entity disclosed by Donald J. Trump on his Office of Government Ethics Form 278e, specifically each corporation and each partnership, within the meaning of subchapter K of chapter 1 of the Internal Revenue Code of 1986, where he is listed as an officer, director, or equivalent, or exercises working control; and

Two, postpone consideration of tax reform legislation until the elected Representatives of the American people in this House have obtained President Trump's tax returns and return information to ascertain how any changes to the Tax Code might financially benefit the President.

163 Cong. Rec. H5941-42 (daily ed. July 18, 2017) (statement of Rep. Cicilline), https://www.congress.gov/congressional-record/2017/7/18/house-section/article/h5941-1.


<u>House Resolution 479</u> (July 27, 2017)

Mr. Pascrell (for himself and Mr. Crowley) submitted the following resolution; which was referred to the Committee on Ways and Means

RESOLUTION

Of inquiry directing the Secretary of the Treasury to provide to the House of Representatives the tax return information of President Donald J. Trump as well as the tax returns of each business entity disclosed by Donald J. Trump on his Office of Government Ethics Form 278e.

   *Resolved*,  That the Secretary of the Treasury is directed to furnish to the House of Representatives, not later than 14 days after the adoption of this resolution, the full tax returns of Donald J. Trump for tax years 2006 through 2016, if available, as well as the tax returns for such taxable years of each business entity disclosed by Donald J. Trump on his Office of Government Ethics Form 278e, specifically each business entity specified in section 2 of this resolution; and any supplemental information in the possession of the President relating to—

(1) the amount of taxes paid by Mr. Trump and each such business entity with respect to such taxable years;

(2) the debts of Mr. Trump and such business entities which are held by foreign governments or foreign companies;

(3) the investments of Mr. Trump and such business entities which are in foreign countries or foreign enterprises;

(4) Mr. Trump's personal and business profits received from foreign enterprises;

(5) the amount of charitable giving claimed by Mr. Trump with respect to such taxable years; and

(6) any use of tax shelters or other loopholes to reduce the amount of taxes owed.

   * * *

H.R. Res. 479, 115th Cong. (2017), https://www.congress.gov/bill/115th-congress/house-resolution/479.


Ranking Member Richard Neal (Sept. 7, 2017)

Mr. Pascrell's resolution would direct the Treasury Secretary to provide the House with the personal and business tax returns and other financial information of President Trump.

Let me refresh everyone's memories on the facts here.  Until recently, every President since Gerald Ford released their tax returns to the American public.  President Gerald Ford released a summary of his tax returns. President Jimmy Carter. President Ronald

Reagan. President George H.W. Bush. President Bill Clinton. President George W. Bush. President Barack Obama.

Republican and Democratic Presidents. They all released their tax returns to the American people.

This is not a partisan issue. The reason for releasing this information is to avoid conflicts of interest. Tax returns include important information about income and charitable giving and business interests, among other things. And this information is important for the American people to have so they know that their President is always acting in their best interest.

Therefore, I support my friend Mr. Pascrell's resolution. I believe it's in our country's best interest for our Presidents to release their tax returns.

Press Release, Ranking Member Richard Neal, Opening Statement at Markup of H.R. Res. 479 (Sept. 7, 2017), https://waysandmeans.house.gov/media-center/press-releases/ranking-member-neal-opening-statement-markup-hres-479.


Rep. Bill Pascrell (D-NJ) (Sept. 7, 2017)

What we need to explore are the possibilities of conflicts of interest.  This is not something we made up, this is provided by the law.  Now . . . it's a fishing expedition. Why? Because we don't have the conclusion.  You don't get to the conclusion until you're allowed to investigate, and we have that authority under the law.  And if you looked at the word, "under IRS audit," I want you to prove to me that he's still under audit.

*Markup of H.R. Res. 479: Hearing Before the H. Comm. on Ways & Means*, 115th Cong., at 47:51 (Sept. 7, 2017) (statement of Rep. Pascrell), https://youtu.be/F2AyBERrEIY.


Minority Leader Nancy Pelosi (Apr. 17, 2018)

While Americans file their taxes, Tax Day also serves as a bitter reminder that President Trump still refuses to show the public his tax returns. Hard-working families deserve to know how their president has padded his own pockets with a tax scam that inflicts such damage on the deficit and the future of Social Security and Medicare. As Republicans in Congress refuse to demand this basic measure of transparency and accountability from President Trump, we must ask: what does President Trump have to hide?

Press Release, Minority Leader Nancy Pelosi, Statement on Tax Day (Apr. 17, 2018), https://www.speaker.gov/newsroom/41718-2/.

Rep. Lloyd Doggett (D-TX) (Sept. 13, 2018)

We of course cannot know whether the benefit for Trump will be bigly or just huge until we lift this cover-up of the Trump tax returns.  As the smoke continues to build with one revelation after another, there's greater need than ever to see what Trump may be hiding in those returns, the working papers to explain them, and those for the 500 business entities which stretch from Manhattan to Azerbaijan.  Trump's tax returns relate directly to what is before us today.

*Full Committee Markup of Tax Reform 2.0: Hearing Before the H. Comm. on Ways & Means*, 115th Cong., at Part 2, 1:29:00 (Sept. 13, 2018) (statement of Rep. Doggett), https://youtu.be/SmtV7Jnx6PY.

Rep. Lloyd Doggett (D-TX) (Sept. 13, 2018)

The stench of corruption permeates this Administration, and it comes right from the top. This amendment is designed to end the Republican coverup of Trump's tax returns. While this amendment seeks to achieve the same result that I have sought with 5 prior attempts in this committee, it includes extensive new findings from some of the notable developments of recent months that make clear we are not only dealing with the self-described "King of Debt," but someone who continues to act as if he were just King.

Trump's tax returns relate directly to what is before us today. There is no issue this Committee could consider more important than the integrity of our tax code, and the faith that the American people have in our democracy. Trump has surrounded himself with convicted tax evaders—rich friends who have decided they are above the law, and that working people who can't afford fancy tax lawyers should have to pick up the slack. **Even Richard Nixon invited the Joint Committee on Taxation to review his tax returns, explaining that "people have got to know whether or not their President is a crook."**

While this Committee has refused to do its job—while in this Congress instead of oversight, we have been overlooking Administration misconduct—the President's tax returns have in fact already been reviewed. That was a review that, amazingly, President Trump presented as his "Good Housekeeping Seal of Approval" to assure America he had no business dealings with the Russians. It was a review of his tax returns by his personal law firm, which, of course, gave him a clean bill of health on any Russian connection—only months after it boasted of the "prestigious honor" of being named "Russia Law Firm" of the year. I am only asking that this Committee do for the American people what the "Russia Law Firm of the Year" has done for Mr. Trump.

Before this Committee considers a dime of more tax breaks, we must obtain and review the President's tax returns. Any tax bill released should be accompanied by a line-by-line report of how much Trump, his family, and his companies will benefit from each one.

**His tax returns can help tell us whether he is putting America First, or Trump first, his family second, and Russian third.**

Press Release, Rep. Lloyd Doggett (D-TX), Rep. Doggett Offers Amendment to Secure Trump Tax Returns, Meet the Nixon Standard (Sept. 13, 2018), https://doggett.house.gov/media-center/press-releases/rep-doggett-offers-amendment-secure-trump-tax-returns-meet-nixon (emphases in original); *see also* Rep. Lloyd Doggett, My Remarks Offering an Amendment to Secure Trump Tax Returns, Meet the Nixon Standard (Sept. 13, 2018), https://www.youtube.com/watch?v=6UuAmtMzs8E&feature=youtu.be.

Press Account Quoting Ranking Member Richard Neal (Oct. 3, 2018)

"This has never happened before, so you want to be very meticulous," Mr. Neal said.

Richard Rubin, *Trump's Tax Returns in the Spotlight if Democrats Capture the House*, Wall St. J. (Oct. 3, 2018), https://www.wsj.com/articles/trumps-tax-returns-in-the-spotlight-if-democrats-capture-the-house-1538575880.

Press Account Quoting Minority Leader Nancy Pelosi (Oct. 10, 2018)

Expect Democrats to immediately try to force President Trump to release his tax returns if they take back the House in November, Minority Leader Nancy Pelosi said Wednesday.

Demanding the president's tax returns "is one of the first things we'd do—that's the easiest thing in the world. That's nothing," Pelosi told The Chronicle's editorial board in an hour-long interview.

John Wildermuth, *Pelosi: Trump's tax returns are fair game if Democrats win House*, S.F. Chron. (Oct. 11, 2018), https://www.sfchronicle.com/politics/article/Pelosi-Trump-s-tax-returns-are-fair-game-if-13297954.php.

Press Account Quoting Ranking Member Richard Neal (Oct. 12, 2018)

"I think we would all be comfortable if this was done on a voluntary basis," Neal said.

"If they would resist the overture then I think you could probably see a long and grinding court case," he added.

* * *

"It is not cut and dry," Neal said, noting that there was still plenty of discussion ahead for how and when to request the returns officially.

* * *

"Anticipate a long court case in the end," Neal said.

Lauren Fox, *Leading Democrat on House Ways and Means would ask for Trump's tax returns*, CNN (Oct. 12, 2018), https://www.cnn.com/2018/10/12/politics/house-ways-mean-tax-returns-richard-neal/index.html.


Press Account Quoting Minority Leader Nancy Pelosi (Dec. 13, 2018)

House Minority Leader Nancy Pelosi (D-Calif.) said Thursday that she expects a House committee to "take the first steps" toward obtaining President Trump's tax returns after Democrats take control of the chamber next month, but she cautioned that securing them is "a little more challenging than you might think."

"There is popular demand for the Congress to request the president's tax returns," said Pelosi, who is likely to become House speaker. "I'm sure the White House will resist, so the question is, 'Where do we go from there?'"

John Wagner, *Pelosi says she expects a House committee will 'take the first steps' toward obtaining Trump's tax returns*, Wash. Post (Dec. 13, 2018), https://www.washingtonpost.com/powerpost/pelosi-says-she-expects-a-house-committee-will-take-the-first-steps-toward-obtaining-trumps-tax-returns/2018/12/13/fbc02660-feec-11e8-862a-b6a6f3ce8199_story.html?utm_term=.ebb1d6c1325c.


Press Account Quoting Spokesperson for Ranking Member Richard Neal (Jan. 2, 2019)

Rep. Richard Neal (D-Mass.), who will be the new Ways and Means Committee chairman, wants to take some time to try to build a case with the public about why Trump ought to voluntarily release his tax filings, before tapping an obscure law that allows the heads of Congress' tax committees to examine anyone's returns.

* * *

"He wants to lay out a case about why presidents should be disclosing their tax returns before he formally forces him to do it," said Dan Rubin, a Neal spokesperson.

* * *

"He is a very policy-driven person, and I think he sees that if we break the glass and pull that alarm, you won't get anything done after that," said Rubin.

Brian Faler, *Incoming Democratic tax chairman won't make quick grab for Trump's returns*, Politico (Jan. 2, 2019), https://www.politico.com/story/2019/01/02/congress-trump-tax-returns-richard-neal-1056839; *see also* Press Release, Rep. Richard Neal (Jan. 2, 2019), https://neal.house.gov/in-the-news/incoming-democratic-tax-chairman-wont-make-quick-grab-trumps-returns.

Press Account Quoting Chairman Richard Neal (Jan. 23, 2019)

    The chairman of the House Ways and Means Committee, U.S. Rep. Richard Neal, D-Springfield, said Wednesday he plans to request President Trump's tax returns, but expects a drawn-out legal battle to result, and thus is choosing his words carefully on the matter.

    "I plan to do it," Mr. Neal said in a visit to the Telegram & Gazette offices. "We are now in the midst of putting together the case. It will be a long and grinding legal case."

    * * *

    Mr. Neal added: "I hope the president will voluntarily release his tax documents. I don't think that, given the conversation so far, there is any indication he intends to do that. I also think the public has reasonably come to expect that presidential candidates and aspirants release those documents. It's likely to end up in a court case."

    "We need to approach this gingerly and make sure the rhetoric that is used does not become a footnote to the court case."

    He said: "I've been meticulous about my choice of words, for good reason."

Mark Sullivan, *Powerful Ways and Means chairman Neal to pursue Trump's tax returns*, Telegram & Gazette (Jan. 23, 2019), https://www.telegram.com/news/20190123/powerful-ways-and-means-chairman-neal-to-pursue-trumps-tax-returns; *see also* Press Release, Rep. Richard Neal (Jan. 23, 2019), https://neal.house.gov/in-the-news/powerful-ways-and-means-chairman-neal-pursue-trump-s-tax-returns.

Press Account Quoting Chairman Richard Neal (Jan. 24, 2019)

    House Ways and Means Chairman Richard E. Neal said Thursday he plans to approach the tricky topic of obtaining President Donald Trump's tax returns "methodically and judiciously."

    Neal said he started to have "preliminary conversations" about the issue after he was named chairman-designate on Dec. 20, before he formally assumed the position after the 116th Congress began earlier this month.

    "One of the things you have to be mindful of is that this has to be a part of a carefully prepared and documented legal case," said Neal, D-Mass. "And it's not subject to just whim and the emotion of the moment."

    Added Neal: "This has to be prepared in accordance with staff, House counsel and an understanding that this is likely to become the basis of a long and arduous court case."

    * * *

"We're in this precarious period of time when the American people aren't quite sure of what to believe about many, many issues," Neal continued. "So again, methodically and judiciously we'll proceed."

Doug Sword, *Neal: "Long and Arduous" Process to Get Trump's Tax Returns*, CQ, Jan. 24, 2019, http://www.cq.com/doc/news-5449807.

Speaker Nancy Pelosi (Feb. 7, 2019)

I think, overwhelmingly, the public wants to see the President's tax returns.  And so, they want to know the truth.  They want to know the facts.  And he has nothing to hide.

I'll just tell you this and go on from there, because we have important work to do, and we have important judgments to make, and we need information to make those judgments.

* * *

You have to be very, very careful if you go forward.

As I said, we are in our first month.  The committees have been appointed.  They have organized.  They are prioritizing their work and, in terms of the tax issue, it's not a question of just sending a letter.  You have to do it in very careful way.  And the chairman of the committee will be doing that.

So, I know there's this impatience because people want to know, that answers the question, but we have to do it in a very careful way.

Press Conference, Speaker Nancy Pelosi (Feb. 7, 2019), https://www.speaker.gov/newsroom/2719-2/.

Rep. Dan Kildee (D-MI) (Feb. 7, 2019)

Well, the committee has a right to the returns. The law was written because it expected that a moment may occur where there's a public interest in having a tax return gained by the committee in order to evaluate it, or acquired by the committee for this kind of evaluation.

What we need to do, and what the Speaker said, and what Chairman Neal is absolutely doing is lay the record, lay the groundwork, make the justification to use this rarely used authority in order to make sure that we have a solid legal basis. So, today's hearing was very much focused on laying a legal foundation to explore what the law allows us to do, to understand that completely, to make sure that we're doing this in a methodical way.

This is unchartered territory. It's clear that the President does not want some information that is included in his tax return to be revealed, otherwise he would not have broken with

50 years of norms that Democrats and Republicans have adhered to releasing tax returns. There's a reason he doesn't want them there.

So he will fight this, and he probably fight it as far as he can, because we expect that and for the reasons that I already stated, this is unchartered territory. It's very important that we're methodical and we lay the foundation for the public purpose to acquire access to these returns and that's the process that we're going through now.

* * *

The public has a right to know whether or not their elected officials are benefiting from the decisions that they make using the public responsibilities that the public has vested in them.

So whether it's his personal entanglements, debt or the decisions that he's making on policy going forward, this is the reason disclosure is so important, this is the reason that past candidates and presidents have released their returns, so that the public will know whether or not the individual has entanglements that could impact their public decision making, and that's really the purpose behind this entire area of inquiry for us.

*All In with Chris Hayes* (transcript of MSNBC television broadcast Feb. 7, 2019), http://www.msnbc.com/transcripts/all-in/2019-02-07.


Press Account Quoting Rep. Bill Pascrell (D-NJ) (Feb. 26, 2019)

"Evidence that Trump has abused our tax laws is plentiful," Rep. Bill Pascrell (D-NJ), who has been making the case for pursuing Trump's tax returns under Section 6103 essentially since Trump was inaugurated, said in an emailed statement to Vox. He cited a New York Times investigation into Trump and his family's tax practices that suggested the family for years engaged in a number of schemes to avoid taxes, and leaked pages from Trump's 1995 and 2005 tax returns; the 1995 ones show a nearly $1 billion loss.

"Americans have a right to know if their president has paid his taxes, if he has followed the law, and if he is free from financial conflicts of interest," Pascrell continued. "The law is clear. Under 6103, the Ways and Means Committee chairman is entitled to request Trump's tax returns—and the Treasury secretary is obligated to deliver them. That's all there is to it."

Emily Stewart, *Democrats' coming battle to get Trump's tax returns, explained*, Vox (Feb. 26, 2019), https://www.vox.com/platform/amp/policy-and-politics/2019/2/26/18223760/democrats-trump-tax-returns-richard-neal.


Speaker Nancy Pelosi (Apr. 4, 2019)

No president in the modern era has worked so diligently to keep their tax returns out of the public eye.  What is President Trump hiding?

Nancy Pelosi (@SpeakerPelosi), Twitter (Apr. 4, 2019, 3:29 p.m.),
https://twitter.com/SpeakerPelosi/status/1113886412649189376.

Press Account Quoting Chairman Richard Neal (Apr. 5, 2019)

> Neal told reporters on Thursday that he took roughly three months to build the case for
> requesting the returns, which he argued was reasonable given the gravity of the request.

> "This was a very reasoned approach. Our position from day one was that this would be
> measured," Neal said. "This is likely to wind its way through the federal court system and
> we wanted to make sure that the case that we constructed was in fact one that would
> stand up under the critical scrutiny of the federal courts."

Sunlen Serfaty et al., *Republicans warn Trump tax request 'sets a dangerous standard' and
accuse Dems of weaponizing IRS*, CNN (Apr. 5, 2019),
https://www.cnn.com/2019/04/04/politics/trump-tax-returns-request-republicans-
congress/index.html.

Chairman Richard Neal (Apr. 5, 2019)

> I want to make this very clear: this is about policy.  We have resisted politics. . . .

> * * *

> We're anticipating that we're in the midst of building a case. . . .

> * * *

> Our intent is to test a federal law that has been on the books since 1924 and to apply the
> full tenor of that law to the request that we've made and to make sure that that law under
> again the magnifying glass stands up.

> * * *

> This was not motivated by malevolence. . . .

> * * *

> I think if people could say that no other American president has ever submitted their tax
> forms, then I could understand that people might suggest . . . this was an ill-considered
> strategy. . . . When you have eight American presidents in succession who have all
> previewed their tax forms for the American people, I don't think that there's any sense
> here one would be feeling any heat over this.

Emily Judem, *Rep. Neal: Request for Trump's Taxes 'Was Not Motivated By Malevolence'*,
WGBH News (Apr. 5, 2019), https://www.wgbh.org/news/national-news/2019/04/05/rep-neal-
request-for-trumps-taxes-was-not-motivated-by-malevolence; *Connecting Point* (WGBY
television broadcast Apr. 5, 2019), https://video.wgby.org/video/the-state-were-in-rep-neal-
requests-trumps-tax-returns-i1mcqf/.

Press Account Quoting Chairman Richard Neal (Apr. 25, 2019)

> Anticipating a court fight with Donald Trump over access to the president's tax returns, U.S. Rep. Richard E. Neal, D-Springfield, said he's likely to release his own returns in the future.

> "And I certainly would if I were running for president," Neal said. . . .

Jim Kinney, *Rep. Richard Neal says he may release his own taxes as fight with President Donald Trump heats up*, The Republican (Springfield, Mass.) (Apr. 25, 2019), https://www.masslive.com/news/2019/04/rep-richard-neal-says-he-will-release-his-own-taxes-as-fight-with-president-donald-trump-heats-up.html.

Chairman Richard Neal (Apr. 26, 2019)

> I've always thought that this was headed to court.  I did not believe there would be any voluntary inclination to turn over the tax forms.

> * * *

> I'd go so far as to state the following:  the law doesn't say "maybe," and the law doesn't say "what if," and I can assure you that this is a discussion about policy and not about politics.  A reminder—I have to be a bit careful if it's okay partially because I'm petitioner in the case, so my comments are probably going to be broad and general—but the last eight presidents going back to President Nixon have all voluntarily submitted their tax forms.  And in the case of President Nixon, he actually turned the tax forms over to what is known as the Joint Tax Committee.  The Joint Tax Committee staff is comprised of economists, tax attorneys, and accountants.  And Chuck Grassley, who is the Chairman of the Finance Committee in the Senate, he's currently the Vice-Chairman of that committee and I'm currently the Chairman.  And our positions would revert come next January, because it's always been bipartisan in nature.  But it has broad responsibility on the tax front.  And they reviewed President Nixon's forms.  President Ford and others all released their forms without any public argument.  And I think in this case here, all we're saying here is we'd like to have some idea as to how the Internal Revenue Service—and you should remember that is the body that I have petitioned for the President's tax forms.  We have not petitioned the President directly because that would not be within the confines of the law.  And in 1955, the Treasury Secretary delegated to the IRS this broad responsibility.  So, our requests have gone to the Internal Revenue Service.

> * * *

> The law is very clear, and it says "shall furnish."  There's a series of steps after this.  This idea that all of a sudden the President's tax forms would become public is not accurate.  There would have to be a careful process of review.  And after the review concluded, we could reach a determination as to Members of the Ways and Means Committee actually casting a vote on that basis.  But not to miss the point that we have not gone lightly into

this consideration.  And we have been very careful.  I have pointed out time and again, that this is not about painting your face and going to a demonstration.  I've carefully refrained from a lot of commentary with the cable shows and others.  I've stayed away from it largely because I think this is a matter of policy.

* * *

And I must tell you from the outset as we prepared this case, I want to point out that House Counsel as well as the tax staff of the Ways and Means Committee – they have in a very meticulous manner prepared the documentation.

* * *

We believe that, as I indicated, that they do review the President's tax forms.  We're suggesting we would like to see the procedure as to how that is done.

* * *

The House of Representatives after we became the majority in early January, and reminding all that we were not in a position to demand those tax forms until we became the majority because upon becoming the majority then we were in charge of appointing House Counsel.  So, we've done this on the basis of House Counsel, and in early January, we voted in the House of Representatives—I think it's H.R. 1—to require presidents to release their tax forms.  We think that that's entirely consistent with the vote we've already cast.

Arjun Singh, *Neal Says Request for Trump's Tax Returns Is About Policy, Not Politics*, Bos. Pub. Radio (Apr. 26, 2019), https://www.wgbh.org/news/politics/2019/04/26/neal-says-request-for-trumps-tax-returns-is-about-policy-not-politics.

Press Account Quoting Rep. Bill Pascrell (D-NJ) (Apr. 26, 2019)

"Mr. Trump thinks he's above the law.  He thinks he's king," said Pascrell, a political street fighter who mastered the art of hurling verbal brickbats long before Trump entered politics.  "This is a Democracy.  Go to Russia.  He'll be very comfortable there, I'm sure, from what I hear."

* * *

But Pascrell also had some strategic advice. Republicans should take steps to insulate themselves from the fallout if Trump's tax returns are eventually made public and contain scandalous details, he argued.

"This could get messy down the line," Pascrell said.  "This is going to come out sooner or later. And somebody is going to ask, 'how come you weren't asking for it.?' [sic] And I don't think it is good enough just to say you were protecting the president."

Charles Stile, *As Trump keeps tax return under wraps, Pascrell turns up the heat*, N. Jersey Record (Apr. 26, 2019), https://www.northjersey.com/story/news/columnists/charles-stile/2019/04/26/trump-tax-returns-target-nj-congressman/3551375002/.

<u>Speaker Nancy Pelosi</u>

> By stonewalling Congress, Trump is refusing to allow the American people to make an independent judgment about his Administration's policies and his personal conduct in office.

> President Trump's stonewalling has metastasized from refusing to release his tax returns or divest his assets to the Trump Administration now refusing to cooperate on every level of government, from sabotaging Americans' health care to protecting our elections.

> \* \* \*

> ***What is President Trump Hiding?***

> President Trump is taking extraordinary and unprecedented measures to conceal information about himself and to cover-up his Administration's dangerous and secretive activities from the public. This is part of a massive, unprecedented and growing pattern of obstruction.

> \* \* \*

> <u>Trump Concealing Truth from the Public</u>: The President is . . . stonewalling Congressional inquiries. . . . The President's behavior has consequences for the country:

> \* \* \*

> *Violates 30 years of Presidential Precedent:* U.S. tax code Section 6103 provides Congress the legal authority to request tax returns, yet Trump's Treasury Department is refusing to provide the Ways and Means Committee the President's tax returns. The law is explicit: "the Secretary ***shall*** furnish such committee with any return or return information..." requested by the Chairman of the Committee. To date, no requests under 6103 have been denied.

Nancy Pelosi, Speaker of the House, Trump Administration Obstruction: Unprecedented, Unwarranted, Unconstitutional, https://www.politico.com/f/?id=0000016a-72b0-dca8-a1ff-7fb813f60001 (last visited May 6, 2019) (emphases in original).

EXHIBIT G

**Vaughan, Frederick**

---

| | |
|---|---|
| **From:** | McAfee, Karen <Karen.McAfee@mail.house.gov> |
| **Sent:** | Friday, May 10, 2019 2:50 PM |
| **To:** | Vaughan, Frederick |
| **Cc:** | Sok, Justin |
| **Subject:** | House Ways & Means Subpoena to Secretary Mnuchin |
| **Attachments:** | WM Subpoena Mnuchin 5.10.19.pdf |

Fritz,

I am confirming that you agreed by telephone to waive in-person service and allow the Committee to serve the Secretary electronically.  Accordingly, please find attached a letter and enclosure to Secretary Mnuchin.  Please feel free to reach out to me if you have any questions.

Best,
Karen

Karen B. McAfee
Staff Director, Subcommittee on Oversight
Committee on Ways & Means, Democratic Staff
1129 Longworth House Office Building
Washington, DC 20515
(202) 225-4021

*This document and any related communications or documents generated by the Committee on Ways and Means are confidential congressional records, remain subject to congressional control, and are entrusted to you only for use in handling this matter.  Any related documents communicated to us in response to this document or to any related House communications are also confidential congressional records and remain subject to congressional control.  Accordingly, the aforementioned materials are not "agency records" for purposes of the Freedom of Information Act or other law.*

---

**From:** Frederick.Vaughan@treasury.gov <Frederick.Vaughan@treasury.gov>
**Sent:** Friday, May 10, 2019 2:38 PM
**To:** McAfee, Karen <Karen.McAfee@mail.house.gov>
**Cc:** Justin.Sok@treasury.gov
**Subject:** RE: House Ways & Means Committee Request

Just tried your direct. Mine is 202-622-2678.

Best, Fritz

--
**Frederick W. Vaughan**
Deputy Assistant Secretary
Legislative Affairs
U.S. Department of the Treasury
1500 Pennsylvania Avenue, N.W.
Washington, D.C. 20220
202-622-2678

---

**From:** McAfee, Karen <Karen.McAfee@mail.house.gov>
**Sent:** Friday, May 10, 2019 2:27 PM
**To:** Vaughan, Frederick <Frederick.Vaughan@treasury.gov>

**Cc:** Sok, Justin <Justin.Sok@treasury.gov>
**Subject:** House Ways & Means Committee Request

Frederick,

I received your name from my Staff Director, Brandon Casey, at the Ways and Means Committee.  Would you be able to call me today to discuss documents that we would like to deliver to the Secretary of Treasury?  My direct number is 202-226-1432.

Thanks,
Karen

Karen B. McAfee
Staff Director, Subcommittee on Oversight
Committee on Ways & Means, Democratic Staff
1129 Longworth House Office Building
Washington, DC 20515
(202) 225-4021

*This document and any related communications or documents generated by the Committee on Ways and Means are confidential congressional records, remain subject to congressional control, and are entrusted to you only for use in handling this matter.  Any related documents communicated to us in response to this document or to any related House communications are also confidential congressional records and remain subject to congressional control.  Accordingly, the aforementioned materials are not "agency records" for purposes of the Freedom of Information Act or other law.*

RICHARD E. NEAL,
MASSACHUSETTS,
CHAIRMAN

JOHN LEWIS, GEORGIA
LLOYD DOGGETT, TEXAS
MIKE THOMPSON, CALIFORNIA
JOHN B. LARSON, CONNECTICUT
EARL BLUMENAUER, OREGON
RON KIND, WISCONSIN
BILL PASCRELL JR., NEW JERSEY
DANNY K. DAVIS, ILLINOIS
LINDA T. SÁNCHEZ, CALIFORNIA
BRIAN HIGGINS, NEW YORK
TERRI A. SEWELL, ALABAMA
SUZAN DELBENE, WASHINGTON
JUDY CHU, CALIFORNIA
GWEN MOORE, WISCONSIN
DAN KILDEE, MICHIGAN
BRENDAN BOYLE, PENNSYLVANIA
DON BEYER, VIRGINIA
DWIGHT EVANS, PENNSYLVANIA
BRAD SCHNEIDER, ILLINOIS
TOM SUOZZI, NEW YORK
JIMMY PANETTA, CALIFORNIA
STEPHANIE MURPHY, FLORIDA
JIMMY GOMEZ, CALIFORNIA
STEVEN HORSFORD, NEVADA

BRANDON CASEY,
MAJORITY STAFF DIRECTOR

KEVIN BRADY,
TEXAS,
RANKING MEMBER

DEVIN NUNES, CALIFORNIA
VERN BUCHANAN, FLORIDA
ADRIAN SMITH, NEBRASKA
KENNY MARCHANT, TEXAS
TOM REED, NEW YORK
MIKE KELLY, PENNSYLVANIA
GEORGE HOLDING, NORTH CAROLINA
JASON SMITH, MISSOURI
TOM RICE, SOUTH CAROLINA
DAVID SCHWEIKERT, ARIZONA
JACKIE WALORSKI, INDIANA
DARIN LAHOOD, ILLINOIS
BRAD R. WENSTRUP, OHIO
JODEY ARRINGTON, TEXAS
DREW FERGUSON, GEORGIA
RON ESTES, KANSAS

GARY ANDRES,
MINORITY STAFF DIRECTOR

# Congress of the United States

## U.S. House of Representatives

COMMITTEE ON WAYS AND MEANS

1102 LONGWORTH HOUSE OFFICE BUILDING
(202) 225–3625

### Washington, DC 20515–0348

http://waysandmeans.house.gov

May 10, 2019

The Honorable Charles P. Rettig
Commissioner
Internal Revenue Service
1111 Constitution Avenue, NW
Washington, D.C.  20224

The Honorable Steven T. Mnuchin
Secretary
Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C.  20220

Dear Commissioner Rettig and Secretary Mnuchin,

To date, the Internal Revenue Service ("IRS") has failed to provide the return and return information requested by my April 3, 2019 letter, despite an unambiguous legal obligation to do so.  Such information originally was due by April 10, 2019.  In a letter dated April 23, 2019, I was notified that the Department of the Treasury ("Treasury") was consulting with the Department of Justice ("Justice") in connection with this request.  The letter advised that Treasury, and not the IRS, expected to provide the Committee on Ways and Means ("Committee") a final decision by May 6, 2019, after it had received Justice's legal guidance.  On May 6, relying on advice from Justice, Treasury notified me by letter of its determination that it is not authorized to disclose the requested tax returns and return information because the Committee's request "lacks a legitimate legislative purpose."

As stated in my prior correspondence, the IRS is under a mandatory obligation to provide the information requested under section 6103(f)(1) of the Internal Revenue Code, which states that "[u]pon written request from the chairman of the Committee on Ways and Means of the House of Representatives, the chairman of the Committee on Finance of the Senate, or the chairman of the Joint Committee on Taxation, the Secretary *shall* furnish such committee with any return or return information specified in such request" (emphasis added).  Section 6103 has long been regarded as clear and unambiguous.  Compliance is not discretionary under any circumstance, even if the taxpayer is under audit.  The Committee never has been denied a request made under section 6103(f).  Although the Committee is not required to provide a reason for requests under section 6103(f), I am responding to your letters out of respect for the IRS, Treasury, and their responsibility to fairly and impartially administer the Federal tax laws.

*The Committee Has a Legitimate Legislative Purpose*

The April 23 letter alleges that the Committee's asserted purpose is a pretext, but this claim is false.  As stated in my April 3 letter, the Committee requested the return and return information

Commissioner Rettig
Secretary Mnuchin
May 10, 2019
Page 2

because it is considering legislative proposals and conducting oversight related to our Federal tax laws, including, but not limited to, the extent to which the IRS audits and enforces the Federal tax laws against a President.  Earlier this Congress, compliance and disclosure related to the Federal tax returns of the President and Vice President were included in the scope of a Committee hearing.  As you know, the mandatory examination of the President and Vice President is set forth in the Internal Revenue Manual ("IRM") but is not codified.  Legislation may therefore be necessary.  It cannot be denied that legislation related to IRS examination and enforcement is within the Committee's jurisdiction, and the Committee has a responsibility to inform itself in the course of legislating.

The President is the most powerful public official in this country.  No other single American has the power to sign bills into law and direct an entire branch of government.  The Committee believes this fact calls for concordant scrutiny into the President's ability to influence, even indirectly, the administration of the Federal tax laws.  The purpose underlying inclusion of the mandatory audit in the IRM was so that no IRS employee would have to make the decision to audit a sitting President.[1]  However, there is more to an audit than just the decision to initiate it.  Among other considerations, the Committee wants to be sure that IRS employees who determine the scope of the President's audit, or who determine whether to continue previously-initiated audits, are protected in the course of their work.

As the Supreme Court has stated: "A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information—which not infrequently is true—recourse must be had to others who do possess it."[2]  With respect to the Committee's consideration of legislative proposals concerning mandatory examination, the President's tax returns and return information are necessary to guide that legislative action.

Treasury takes issue with the fact that the Committee seeks tax information related to only the current President.  This concern is misplaced and ignores the fact that the tax issues raised by the current President are unique.  The President has stated repeatedly that his returns are under routine audit,[3] and, in 2016, his tax attorneys reported that his returns have been under continuous examination since 2002 and involve transactions and activities reported on returns in 2008 and earlier.[4]  The continuous audit and activities from 2008 and before, the use by the President of a grantor trust controlling hundreds of businesses, and the volume of his tax returns[5] make this President markedly different from previous Presidents or Vice Presidents examined under the IRS's mandatory audit procedures.

---

[1] JCX-3-19, *Background Regarding the Confidentiality and Disclosure of Federal Tax Returns* (Feb. 4, 2019), at 21 (quoting IRS spokesperson).
[2] *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927).
[3] *See, e.g.*, Donald J. Trump (@realDonaldTrump), Twitter (May 11, 2016, 1:51 PM), https://twitter.com/realDonaldTrump/status/730500562022760448.
[4] Letter from Sheri A. Dillon and William F. Nelson to Mr. Donald J. Trump, *Re: Status of U.S. federal income tax returns* (Mar. 7, 2016).
[5] *See, e.g.*, Donald J. Trump (@realDonaldTrump), Twitter (Oct. 15, 2015, 10:13 AM), https://twitter.com/realDonaldTrump/status/654706635663773696.

Commissioner Rettig
Secretary Mnuchin
May 10, 2019
Page 3

*Case Law Supports the Committee*

The April 23 letter relies heavily on a single quotation from *Watkins v. United States* about exposure "for the sake of exposure."[6]   In *Watkins*, the facts at hand and the nature of the investigation were wholly different from the Committee's current oversight efforts.   The Committee's efforts to understand the IRS's mandatory audit of the President, the head of the Executive Branch, bear no similarity to the House Un-American Activities Committee's efforts to uncover members of the Communist Party.   Moreover, the Court's objection in *Watkins* was that the witness was not informed adequately of the scope of the Committee's investigation, a defect that certainly cannot be claimed here.   In this instance, the Committee clearly has defined the scope of its investigation, and your letters evidence that you are fully aware of and have spent much time pondering the Committee's legislative purpose.

Furthermore, selectively quoting from *Watkins* does not erase the remainder of the Court's opinion.   Importantly, the Court lays out the IRS's obligation here: "It is unquestionably the duty of all citizens to cooperate with the Congress in its efforts to obtain the facts needed for intelligent legislative action.   It is their unremitting obligation . . . to respect the dignity of the Congress and its committees."[7]   *Watkins* also undermines Treasury's efforts to second-guess why the Committee requested certain tax returns instead of others: "The legislature is free to determine the kinds of data that should be collected."[8]   Clearly, the Supreme Court agrees that Congress is in the best position to determine what information it requires to perform its own legislative work.

In closing, I appreciate Treasury's offer for a briefing.   A briefing, however, is not a substitute for the requested tax returns and return information.   In total, the IRS has had more than four weeks to comply with the Committee's straightforward request.   Therefore, please see the enclosed subpoena.   The return date is May 17, 2019.   Thank you for your prompt attention to this matter.

Sincerely,

The Honorable Richard E. Neal, *Chairman*
Committee on Ways and Means

Enclosure

---

[6] 354 U.S. 178, 200 (1957).
[7] *Id.* at 187.
[8] *Id.* at 215.

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

*To* The Honorable Steven Mnuchin, Secretary
United States Department of the Treasury _____

You are hereby commanded to be and appear before the

Committee on Ways and Means _____

of the House of Representatives of the United States at the place, date, and time specified below.

☑ **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of production: 1102 Longworth House Office Building, Washington, D.C. 20515

Date: May 17, 2019 _____      Time: 5:00 p.m. _____

☐ **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: _____

Date: _____      Time: _____

☐ **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: _____

Date: _____      Time: _____

*To* examiners or agents designated by Chairman Richard Neal _____

_____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this 10th ___ day of May _____ 20 19

_____
*Chairman or Authorized Member*

Attest:

_____
*Clerk*

## Schedule A

In accordance with the attached instructions, you are required to produce, for each of the tax years 2013 through 2018, the following return and return information:

1. The Federal individual income tax returns of Donald J. Trump.

2. All administrative files (workpapers, affidavits, etc.) for each requested Federal individual income tax return of Donald J. Trump.

3. The Federal income tax returns of the following entities:

   - The Donald J. Trump Revocable Trust;
   - DJT Holdings LLC;
   - DJT Holdings Managing Member LLC;
   - DTTM Operations LLC;
   - DTTM Operations Managing Member Corp;
   - LFB Acquisition Member Corp;
   - LFB Acquisition LLC; and
   - Lamington Farm Club, LLC d/b/a Trump National Golf Club—Bedminster.

4. All administrative files (workpapers, affidavits, etc.) for each requested Federal income tax return of each entity listed above.

## **Schedule B (Instructions)**

1. In complying with this subpoena, you are required to produce all responsive documents that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf.

2. Subpoenaed documents, and all documents reasonably related to the subpoenaed documents, should not be destroyed, altered, removed, transferred, or otherwise made inaccessible to the Committee on Ways and Means ("Committee").

3. In the event that any entity, organization, or individual denoted in this subpoena is or has been known by any name other than that herein denoted, the subpoena shall be read also to include that alternative identification.

4. All documents shall be Bates-stamped sequentially and produced sequentially.

5. Documents produced in electronic format should be organized, identified, and indexed electronically. The Committee's preference is to receive any electronic documents in Portable Document Format (PDF).

6. Documents produced in response to this subpoena should include an index describing the contents of the production. To the extent more than one CD, hard drive, memory stick, thumb drive, zip file, box, or folder is produced, each should contain an index describing its contents.

7. Documents produced in response to this subpoena shall be produced together with copies of file labels, dividers, or identifying markers with which they were associated when the subpoena was served.

8. When you produce documents, you should identify the paragraph(s) in the subpoena schedule to which the documents respond.

9. The pendency of or potential for litigation shall not be a basis to withhold any information.

10. In accordance with 5 U.S.C. § 552(d), the Freedom of Information Act ("FOIA") and any statutory exemptions to FOIA shall not be a basis for withholding any information.

11. Pursuant to 5 U.S.C. § 552a(b)(9), the Privacy Act shall not be a basis for withholding information.

12. If compliance with the subpoena cannot be made in full by the specified due date, compliance shall be made to the extent possible by that date. An explanation of why full compliance is not possible shall be provided along with any partial production.

13. In the event that a document is withheld in full or in part on a claim of privilege, provide a privilege log containing the following information concerning any such document: (a) every privilege asserted; (b) the type of document; (c) the general subject matter; (d) the date, author, addressee, and any other recipient(s); (e) the relationship of the author and addressee to each other; and (f) the basis for the privilege(s) asserted. If a claimed privilege applies to only a portion of any document, that portion only should be withheld and the remainder of the document should be produced. As used herein, "claim of privilege" includes, but is not limited to, any claim that a document either may or must be withheld from production pursuant to any statute, rule, or regulation.

14. In complying with the subpoena, be apprised that (unless otherwise determined by the Committee) the Committee does not recognize: any purported non-disclosure privileges associated with the common law including, but not limited to, the deliberative-process privilege, the attorney-client privilege, and attorney work product protections; any purported privileges or protections from disclosure under FOIA or the Privacy Act; or any purported contractual privileges, such as non-disclosure agreements.

15. Any assertion by a subpoena recipient of any such non-constitutional legal bases for withholding documents or other materials shall be of no legal force and effect and shall not provide a justification for such withholding or refusal, unless and only to the extent that the Committee (or the chair of the Committee, if authorized) has consented to recognize the assertion as valid.

16. If any document responsive to this subpoena was, but no longer is, in your possession, custody, or control, identify the document (by date, author, subject, and recipients), and explain the circumstances under which the document ceased to be in your possession, custody, or control.

17. If a date or other descriptive detail set forth in this subpoena referring to a document is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the subpoena, produce all documents that would be responsive as if the date or other descriptive detail were correct.

18. This subpoena is continuing in nature and applies to any new information. Any record, document, compilation of data, or information not produced because it has not been located or discovered by the due date shall be produced immediately upon subsequent location or discovery.

19. Upon completion of the production, submit a written certification, signed by you or your counsel, stating that: (1) a diligent search has been completed of all documents in your possession, custody, or control that reasonably could contain responsive documents; and (2) all documents located during the search that are responsive have been produced to the Committee.

## **Schedule C (Definitions)**

1.  The term "return" shall have the meaning given to it in 26 U.S.C. § 6103(b)(1).

2.  The term "return information" shall have the meaning given to it in 26 U.S.C. § 6103(b)(2).

3.  The term "individual income tax return" shall have the meaning given to it in 26 U.S.C. § 6011(e)(3)(C).

## PROOF OF SERVICE

Subpoena for The Honorable Steven Mnuchin, Secretary
United States Department of the Treasury

Address 1500 Pennsylvania Avenue, NW

Washington, D.C. 20220

before the Committee on Ways and Means

*U.S. House of Representatives*
*116th Congress*

Served by (print name) Karen B. McAfee

Title Staff Director, Subcommittee on Oversight, Committee on Ways and Means

Manner of service Electronic

Date May 10, 2019

Signature of Server Karen B. McAfee

Address 1102 Longworth House Office Building

Washington, D.C. 20515

# EXHIBIT H

**Vaughan, Frederick**

| | |
|---|---|
| **From:** | Vaughan, Frederick |
| **Sent:** | Friday, May 17, 2019 3:35 PM |
| **To:** | 'brandon.casey@mail.house.gov'; 'McAfee, Karen' |
| **Cc:** | 'gary.andres@mail.house.gov' |
| **Subject:** | Treasury correspondence |
| **Attachments:** | Secretary Mnuchin Letter to Chairman Neal (2019-05-17).pdf |

Please see the attached correspondence from Secretary Mnuchin to Chairman Neal.

Best, Fritz

--
**Frederick W. Vaughan**
**Deputy Assistant Secretary**
**Legislative Affairs**
**U.S. Department of the Treasury**
**1500 Pennsylvania Avenue, N.W.**
**Washington, D.C. 20220**
**202-622-2678**



## DEPARTMENT OF THE TREASURY
### WASHINGTON, D.C.

SECRETARY OF THE TREASURY

May 17, 2019

The Honorable Richard E. Neal
Chairman
Committee on Ways and Means
U.S. House of Representatives
Washington, DC  20515

Dear Chairman Neal:

I write in response to your letter of May 10, 2019, in which you reiterate your request for the confidential tax returns (and other return information) of President Trump and related business entities, and in which you include a subpoena for the documents you have requested.

As I explained in my May 6 letter to the Committee, the Department of the Treasury (the Department) has consulted with the Department of Justice concerning the lawfulness of the Committee's unprecedented request.  In reliance on the advice of the Department of Justice, we have determined that the Committee's request lacks a legitimate legislative purpose, and pursuant to section 6103, the Department is therefore not authorized to disclose the requested returns and return information.  For the same reasons, we are unable to provide the requested information in response to the Committee's subpoena.  As I explained in my May 6 letter, the Department of Justice has informed us that it intends to memorialize its advice in a published legal opinion as soon as practicable.

In my April 23 letter to the Committee, I offered to work with the Committee to accommodate its stated interest in understanding how the IRS audits and enforces the Federal tax laws against a President by providing the Committee with additional information on the mandatory audit process.  I renewed that offer in my May 6 letter.  While the Committee's latest letter appears to decline these offers because they are "not a substitute" for the President's tax returns, the Department's offer would provide information that directly bears upon what the Committee has stated to be its legislative interest in this subject.  Consistent with the Executive Branch's constitutional commitment to accommodation, the Department remains committed to providing such an accommodation.

Sincerely,

Steven T. Mnuchin

# EXHIBIT I



**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

COMMISSIONER

May 17, 2019

The Honorable Richard E. Neal
Chairman
Committee on Ways and Means
U.S. House of Representatives
Washington, DC  20515

Dear Chairman Neal:

I write in response to your letter dated May 10, 2019, transmitting a subpoena for
returns and return information of specific individual and business taxpayers.  Based on
advice received from the Department of Justice, as explained in the Secretary's letter
sent to you earlier today, we are precluded by law from providing the requested returns
and return information.

Although we cannot provide the documents requested by the subpoena, we have
offered to provide additional information to accommodate the Committee's stated
interest in understanding how the IRS audits and enforces the tax laws against a
President, and we remain committed to providing such information if the Committee
requests it.

Your letter expresses a concern that IRS employees could be subject to undue
influence when conducting mandatory audits of a President's tax returns.  More
specifically, your letter references a concern that "employees who determine the scope
of the President's audit, or who determine whether to continue previously-initiated
audits, are protected in the course of their work."  That concern is unfounded for the
reasons described below.

The IRS strives to treat all taxpayers with the highest degree of impartiality.  Procedures
implemented by the IRS in 1977 strongly protect the integrity of the mandatory audit
process set forth in Internal Revenue Manual (IRM) 3.28.3 and 4.2.1.11.  These
procedures were implemented, and have been maintained in largely the same form for
over 40 years in order to insulate the IRS's examination process from any bias or
appearance of bias.  Under the procedures, within 10 days of receiving a copy of a
President or Vice President's return, a manager in one of the IRS's operating divisions
assigns the examination to a revenue agent who is instructed to follow the IRM's
general audit procedure guidelines.  IRM 4.2.1.11(5) and IRM 4.2.1.11(3)(d).  Under
those guidelines, the scope and depth of the examination is determined by the revenue

2

agent, based on established risk protocols. IRM 4.10.3.2. In accordance with normal examination procedures, where warranted, the mandatory examination of a President or Vice President's return can be expanded to include related or prior year returns. IRM 4.2.1.11(6).

From start to finish, all aspects of the processing and examination of a President or Vice President's returns are conducted by experienced, career IRS employees. As with any examination, if any IRS or Treasury official other than the career employees responsible for the examination attempts to influence its outcome or direction, procedures are in place to notify the Treasury Inspector General for Tax Administration. These procedures play a critical role in ensuring the integrity and impartiality of the examination process. No political appointee has to our knowledge had any involvement in any examination of a President or Vice President's tax returns at any time since the mandatory procedures were put in place in 1977.

If you would like additional information regarding the IRS's mandatory examination procedures, please contact me directly, or a member of your staff may contact Leonard Oursler, Director, Legislative Affairs, at (202) 317-6985.

Sincerely,

Charles P. Rettig

# EXHIBIT J

**Vaughan, Frederick**

| | |
|---|---|
| **From:** | McAfee, Karen <Karen.McAfee@mail.house.gov> |
| **Sent:** | Friday, May 24, 2019 1:01 PM |
| **To:** | Vaughan, Frederick |
| **Cc:** | Sok, Justin; Leonard.T.Oursler@irs.gov; Probst, Scott; Casey, Brandon |
| **Subject:** | Re: Ways and Means Response to Offer for Additional Information |

Hi Fritz,

Thanks for your response.  It looks like the best day for us right now is Tuesday, June 4th.  We are fairly flexible on time that day.

We would like to speak to the experts that are involved with the audits.  We want to understand exactly what happens from the moment the returns enter the mail to the IRS through the time that the audit is completed.  Our questions go beyond what is outlined in the IRM.

I understand your preference for a bipartisan briefing.  However, the Minority is not a party to the Chairman's request.  Thus, we do not feel it would be appropriate to make this a bipartisan briefing.

Please suggest a few times on June 4th that work for you, and I will secure a meeting space for us.  Enjoy your weekend.

Best,
Karen

On May 24, 2019, at 12:00 PM, "Frederick.Vaughan@treasury.gov" <Frederick.Vaughan@treasury.gov> wrote:

> Karen
>
> To follow up, we would be happy to provide a detailed briefing to the Committee on the mandatory audit process. We want to make sure that we have the right experts available to provide the information you're interested in. Please let us know what particular aspects of the audit process you would like the briefing to focus on. Our preference would be for a bipartisan briefing. Please let us know if you would like to invite the Minority staff or if we should.
>
> As for scheduling, please let us know if there's a particular day in the week of June 3 that is best for you.
>
> Have a great long weekend.
>
> Best, Fritz
>
> --
> Frederick W. Vaughan
> Deputy Assistant Secretary
> Office of Legislative Affairs
> U.S. Department of the Treasury

**From:** Sok, Justin <Justin.Sok@treasury.gov>
**Date:** May 23, 2019 at 11:46:12 AM EDT
**To:** 'McAfee, Karen' <Karen.McAfee@mail.house.gov>, Oursler Leonard T
<Leonard.T.Oursler@irs.gov>
**Cc:** Probst, Scott <Scott.Probst@mail.house.gov>, Casey, Brandon
<Brandon.Casey@mail.house.gov>, Vaughan, Frederick <Frederick.Vaughan@treasury.gov>
**Subject:** RE: Ways and Means Response to Offer for Additional Information

Hey Karen, thanks for the email. I am adding Fritz, and I know Lenny is out for a funeral. Let us have a conversation and see what we can do on this. Thank you!—JS

Justin W. Sok
Office of Legislative Affairs
U.S. Department of Treasury
202-622-0488 (o)
202-738-3442 (c)

---

**From:** McAfee, Karen <Karen.McAfee@mail.house.gov>
**Sent:** Wednesday, May 22, 2019 6:30 PM
**To:** Oursler Leonard T <Leonard.T.Oursler@irs.gov>; Sok, Justin <Justin.Sok@treasury.gov>
**Cc:** Probst, Scott <Scott.Probst@mail.house.gov>; Casey, Brandon <Brandon.Casey@mail.house.gov>
**Subject:** Ways and Means Response to Offer for Additional Information

Good evening Lenny and Justin,

I hope all is well.  We wanted to thank Treasury and the IRS for the accommodation offered to the Committee to provide additional information on the mandatory audit process.  This offer was made in the Secretary's April 23, May 6, and May 17 letters to Chairman Neal and the Commissioner's May 17 letter to the Chairman.

It is unclear from the letters exactly what type of additional information Treasury and the IRS intend to provide to Committee.  If there are documents or other written materials that Treasury and the IRS would like to provide, please feel free to send those documents to me.  If the intent is to provide a briefing, Committee staff is available to meet this week in our offices.  Please suggest some potential times.

If you have any questions, please feel free to reach me at 226-1432.  I look forward to hearing from you.

Best,
Karen

Karen B. McAfee
Staff Director, Subcommittee on Oversight
Committee on Ways & Means, Democratic Staff
1129 Longworth House Office Building
Washington, DC 20515
(202) 225-4021

*This document and any related communications or documents generated by the Committee on Ways and Means
are confidential congressional records, remain subject to congressional control, and are entrusted to you only for use in handling this
matter.  Any related documents communicated to us in response to this document or to any related House communications are
also confidential congressional records and remain subject to congressional control.  Accordingly, the aforementioned materials are not
"agency records" for purposes of the Freedom of Information Act or other law.*

EXHIBIT K

**Vaughan, Frederick**

| | |
|---|---|
| **From:** | McAfee, Karen <Karen.McAfee@mail.house.gov> |
| **Sent:** | Wednesday, June 5, 2019 4:06 PM |
| **To:** | Vaughan, Frederick |
| **Cc:** | Casey, Brandon; Andres, Gary; Kaldahl, Rachel; Leonard.T.Oursler@irs.gov; Scott.S.Landes@irs.gov; Sok, Justin |
| **Subject:** | RE: Briefing on Mandatory Audit Process |

Hi Fritz,

Thanks for your response.  We look forward to the briefing.  As an accommodation to Treasury and the IRS, we will start the Monday briefing at 9AM on every term dictated by Treasury below.  Thus, we have satisfied every condition set by Treasury to date in order to obtain the briefing offered in the four letters from Treasury and the IRS.  We will see you on June 10th in Rayburn 2020.  Please send the list of attendees.

Best,
Karen

---

**From:** Frederick.Vaughan@treasury.gov <Frederick.Vaughan@treasury.gov>
**Sent:** Tuesday, June 4, 2019 5:16 PM
**To:** McAfee, Karen <Karen.McAfee@mail.house.gov>
**Cc:** Casey, Brandon <Brandon.Casey@mail.house.gov>; Andres, Gary <Gary.Andres@mail.house.gov>; Kaldahl, Rachel <Rachel.Kaldahl@mail.house.gov>; Leonard.T.Oursler@irs.gov; Scott.S.Landes@irs.gov; Justin.Sok@treasury.gov
**Subject:** Briefing on Mandatory Audit Process

Karen

Following up on the Committee's request for a briefing on the mandatory audit process, you asked if we can do 8:30 a.m. on June 10. The morning of June 10 works for us as well. But due to childcare responsibilities for one of our IRS briefers, we will need to begin at 9 a.m. Assuming that start time works for you, I am confirming that we will provide a briefing to you on the mandatory audit process at 2020 Rayburn HOB on June 10 at 9 a.m.

We understand that Minority staff also has expressed an interest in attending this briefing. While you have indicated your preference that the briefing not be bipartisan, our practice has been to provide bipartisan briefings when both sides have expressed interest in attending. Accordingly, we will provide a bipartisan briefing. To ensure there is plenty of time for all questions, we are willing to stay as long as necessary so that you have as much time as you need.

We will plan to see you at 9 a.m. on Monday. I will get you a list of attendees later this week.

Best, Fritz

--
**Frederick W. Vaughan**
**Deputy Assistant Secretary**
**Legislative Affairs**
**U.S. Department of the Treasury**
**1500 Pennsylvania Avenue, N.W.**
**Washington, D.C. 20220**
**202-622-2678**

# EXHIBIT L

**Vaughan, Frederick**

| | |
|---|---|
| **From:** | Oursler Leonard T <Leonard.T.Oursler@irs.gov> |
| **Sent:** | Saturday, June 8, 2019 12:12 PM |
| **To:** | Desmond, Michael J.; Wielobob, Kirsten; Grant Dianne; Cullinan, Thomas A.; Vaughan, Frederick; Sok, Justin; Chapman Robert B; Lemons, Terry L |
| **Subject:** | FW: Briefing on Mandatory Audit Process |
| **Attachments:** | Neal Letter to Rettig 6103 mandatory audit process 2019.06.04.pdf |

All,
Attached is an agent letter from Chairman Neal covering Ways & Means Democratic staff for Monday briefing.

**From:** McAfee, Karen <Karen.McAfee@mail.house.gov>
**Sent:** Friday, June 7, 2019 7:08 PM
**To:** Oursler Leonard T <Leonard.T.Oursler@irs.gov>
**Cc:** Landes Scott S <Scott.S.Landes@irs.gov>; Chapman Robert B <Robert.B.Chapman@irs.gov>
**Subject:** Briefing on Mandatory Audit Process

Lenny,

Please see attached letter regarding the briefing.  Please let me know if you need anything further.  Have a good weekend.

Best,
Karen

Karen B. McAfee
Staff Director, Subcommittee on Oversight
Committee on Ways & Means, Democratic Staff
1129 Longworth House Office Building
Washington, DC 20515
(202) 225-4021

*This document and any related communications or documents generated by the Committee on Ways and Means are confidential congressional records, remain subject to congressional control, and are entrusted to you only for use in handling this matter.  Any related documents communicated to us in response to this document or to any related House communications are also confidential congressional records and remain subject to congressional control.  Accordingly, the aforementioned materials are not "agency records" for purposes of the Freedom of Information Act or other law.*

**From:** Frederick.Vaughan@treasury.gov <Frederick.Vaughan@treasury.gov>
**Sent:** Friday, June 7, 2019 2:00 PM
**To:** McAfee, Karen <Karen.McAfee@mail.house.gov>
**Cc:** Casey, Brandon <Brandon.Casey@mail.house.gov>; Andres, Gary <Gary.Andres@mail.house.gov>; Kaldahl, Rachel <Rachel.Kaldahl@mail.house.gov>; Leonard.T.Oursler@irs.gov; Scott.S.Landes@irs.gov; Justin.Sok@treasury.gov
**Subject:** RE: Briefing on Mandatory Audit Process

Karen

Below is a list of who we expect to attend:

- Kirsten Wielobob, Deputy Commissioner for Services and Enforcement, IRS
- Diane Grant, Senior Advisor to the Office of the Commissioner, IRS
- Mike Desmond, IRS Chief Counsel
- Thomas Cullinan, Counselor to the Commissioner and Chief Counsel, IRS
- Robert Chapman, Analysis, Legislative Affairs, IRS
- Fritz Vaughan, Deputy Assistant Secretary for Legislative Affairs, Department of the Treasury
- Justin Sok, Senior Advisor, Office of Legislative Affairs, Department of the Treasury
- Arianne Couch, Special Assistant, Department of the Treasury

Have a nice weekend. See you on Monday morning.

Best, Fritz

---

**From:** McAfee, Karen <Karen.McAfee@mail.house.gov>
**Sent:** Wednesday, June 5, 2019 4:06 PM
**To:** Vaughan, Frederick <Frederick.Vaughan@treasury.gov>
**Cc:** Casey, Brandon <Brandon.Casey@mail.house.gov>; Andres, Gary <Gary.Andres@mail.house.gov>; Kaldahl, Rachel <Rachel.Kaldahl@mail.house.gov>; Leonard.T.Oursler@irs.gov; Scott.S.Landes@irs.gov; Sok, Justin <Justin.Sok@treasury.gov>
**Subject:** RE: Briefing on Mandatory Audit Process

Hi Fritz,

Thanks for your response.  We look forward to the briefing.  As an accommodation to Treasury and the IRS, we will start the Monday briefing at 9AM on every term dictated by Treasury below.  Thus, we have satisfied every condition set by Treasury to date in order to obtain the briefing offered in the four letters from Treasury and the IRS.  We will see you on June 10th in Rayburn 2020.  Please send the list of attendees.

Best,
Karen

---

**From:** Frederick.Vaughan@treasury.gov <Frederick.Vaughan@treasury.gov>
**Sent:** Tuesday, June 4, 2019 5:16 PM
**To:** McAfee, Karen <Karen.McAfee@mail.house.gov>
**Cc:** Casey, Brandon <Brandon.Casey@mail.house.gov>; Andres, Gary <Gary.Andres@mail.house.gov>; Kaldahl, Rachel <Rachel.Kaldahl@mail.house.gov>; Leonard.T.Oursler@irs.gov; Scott.S.Landes@irs.gov; Justin.Sok@treasury.gov
**Subject:** Briefing on Mandatory Audit Process

Karen

Following up on the Committee's request for a briefing on the mandatory audit process, you asked if we can do 8:30 a.m. on June 10. The morning of June 10 works for us as well. But due to childcare responsibilities for one of our IRS briefers, we will need to begin at 9 a.m. Assuming that start time works for you, I am confirming that we will provide a briefing to you on the mandatory audit process at 2020 Rayburn HOB on June 10 at 9 a.m.

We understand that Minority staff also has expressed an interest in attending this briefing. While you have indicated your preference that the briefing not be bipartisan, our practice has been to provide bipartisan briefings when both sides have expressed interest in attending. Accordingly, we will provide a bipartisan briefing. To ensure there is plenty of time for all questions, we are willing to stay as long as necessary so that you have as much time as you need.

We will plan to see you at 9 a.m. on Monday. I will get you a list of attendees later this week.

Best, Fritz

--
**Frederick W. Vaughan**
Deputy Assistant Secretary
Legislative Affairs
U.S. Department of the Treasury
1500 Pennsylvania Avenue, N.W.
Washington, D.C. 20220
202-622-2678

RICHARD E. NEAL,
MASSACHUSETTS,
CHAIRMAN

JOHN LEWIS, GEORGIA
LLOYD DOGGETT, TEXAS
MIKE THOMPSON, CALIFORNIA
JOHN B. LARSON, CONNECTICUT
EARL BLUMENAUER, OREGON
RON KIND, WISCONSIN
BILL PASCRELL JR., NEW JERSEY
DANNY K. DAVIS, ILLINOIS
LINDA T. SÁNCHEZ, CALIFORNIA
BRIAN HIGGINS, NEW YORK
TERRI A. SEWELL, ALABAMA
SUZAN DELBENE, WASHINGTON
JUDY CHU, CALIFORNIA
GWEN MOORE, WISCONSIN
DAN KILDEE, MICHIGAN
BRENDAN BOYLE, PENNSYLVANIA
DON BEYER, VIRGINIA
DWIGHT EVANS, PENNSYLVANIA
BRAD SCHNEIDER, ILLINOIS
TOM SUOZZI, NEW YORK
JIMMY PANETTA, CALIFORNIA
STEPHANIE MURPHY, FLORIDA
JIMMY GOMEZ, CALIFORNIA
STEVEN HORSFORD, NEVADA

BRANDON CASEY,
MAJORITY STAFF DIRECTOR

## Congress of the United States
### U.S. House of Representatives

COMMITTEE ON WAYS AND MEANS

1102 LONGWORTH HOUSE OFFICE BUILDING
(202) 225–3625

### Washington, DC 20515–0348

http://waysandmeans.house.gov

KEVIN BRADY,
TEXAS,
RANKING MEMBER

DEVIN NUNES, CALIFORNIA
VERN BUCHANAN, FLORIDA
ADRIAN SMITH, NEBRASKA
KENNY MARCHANT, TEXAS
TOM REED, NEW YORK
MIKE KELLY, PENNSYLVANIA
GEORGE HOLDING, NORTH CAROLINA
JASON SMITH, MISSOURI
TOM RICE, SOUTH CAROLINA
DAVID SCHWEIKERT, ARIZONA
JACKIE WALORSKI, INDIANA
DARIN LAHOOD, ILLINOIS
BRAD R. WENSTRUP, OHIO
JODEY ARRINGTON, TEXAS
DREW FERGUSON, GEORGIA
RON ESTES, KANSAS

GARY ANDRES,
MINORITY STAFF DIRECTOR

June 4, 2019

The Honorable Charles P. Rettig
Commissioner
Internal Revenue Service
1111 Constitution Avenue, NW
Washington, D.C.  20224

Dear Commissioner Rettig:

As you know, the Committee is considering legislative proposals and conducting oversight related to our Federal tax laws, including, but not limited to, the extent to which the Internal Revenue Service ("IRS") audits and enforces the Federal tax laws against a President.

Pursuant to my authority under Internal Revenue Code Section 6103(f)(4), I designate the following individuals as my agents to inspect and receive returns and return information related to IRS audits of a President and enforcement of the Federal tax laws against a President, including the mandatory audit process and the auditing of Presidential tax returns and any related individuals and entities: Brandon Casey, Karen McAfee, Susan Athy, Zachary Baron, Isabella More, and Moyer McCoy.

This document is a record of the Committee and is entrusted to the IRS only for use in handling this matter. Additionally, any documents created by the IRS in connection with a response to this Committee document, including (but not limited to) any replies to the Committee, are records of the Committee and shall be segregated from agency records and remain subject to the control of the Committee. Accordingly, the aforementioned documents are not "agency records" for purposes of the Freedom of Information Act. Absent explicit Committee authorization, access to this document and any responsive documents shall be limited to IRS personnel who need such access for the purpose of providing information or assistance to the Committee.

Thank you for your prompt attention to this matter.

Sincerely,

The Honorable Richard E. Neal, *Chairman*

**Vaughan, Frederick**

| | |
|---|---|
| **From:** | Oursler Leonard T <Leonard.T.Oursler@irs.gov> |
| **Sent:** | Saturday, June 8, 2019 12:15 PM |
| **To:** | Desmond, Michael J.; Wielobob, Kirsten; Grant Dianne; Cullinan, Thomas A.; Vaughan, Frederick; Sok, Justin; Chapman Robert B; Lemons, Terry L |
| **Subject:** | FW: Briefing on Mandatory Audit Process |
| **Attachments:** | Neal Letter to Rettig 6103R mandatory audit process 2019.06.05.pdf |

All,

Attached is an agent letter signed by Chairman Neal covering Republican staff for Monday briefing.

**From:** McAfee, Karen <Karen.McAfee@mail.house.gov>
**Sent:** Friday, June 7, 2019 6:59 PM
**To:** Oursler Leonard T <Leonard.T.Oursler@irs.gov>
**Cc:** Kaldahl, Rachel <Rachel.Kaldahl@mail.house.gov>; Landes Scott S <Scott.S.Landes@irs.gov>; Chapman Robert B <Robert.B.Chapman@irs.gov>
**Subject:** FW: Briefing on Mandatory Audit Process

Lenny,

Please see attached letter.  Please let me know if you need anything further.  Have a good weekend.

Best,
Karen

Karen B. McAfee
Staff Director, Subcommittee on Oversight
Committee on Ways & Means, Democratic Staff
1129 Longworth House Office Building
Washington, DC 20515
(202) 225-4021

*This document and any related communications or documents generated by the Committee on Ways and Means are confidential congressional records, remain subject to congressional control, and are entrusted to you only for use in handling this matter.  Any related documents communicated to us in response to this document or to any related House communications are also confidential congressional records and remain subject to congressional control.  Accordingly, the aforementioned materials are not "agency records" for purposes of the Freedom of Information Act or other law.*

**From:** Frederick.Vaughan@treasury.gov <Frederick.Vaughan@treasury.gov>
**Sent:** Friday, June 7, 2019 2:00 PM
**To:** McAfee, Karen <Karen.McAfee@mail.house.gov>
**Cc:** Casey, Brandon <Brandon.Casey@mail.house.gov>; Andres, Gary <Gary.Andres@mail.house.gov>; Kaldahl, Rachel <Rachel.Kaldahl@mail.house.gov>; Leonard.T.Oursler@irs.gov; Scott.S.Landes@irs.gov; Justin.Sok@treasury.gov
**Subject:** RE: Briefing on Mandatory Audit Process

Karen

Below is a list of who we expect to attend:

- Kirsten Wielobob, Deputy Commissioner for Services and Enforcement, IRS
- Diane Grant, Senior Advisor to the Office of the Commissioner, IRS
- Mike Desmond, IRS Chief Counsel
- Thomas Cullinan, Counselor to the Commissioner and Chief Counsel, IRS
- Robert Chapman, Analysis, Legislative Affairs, IRS
- Fritz Vaughan, Deputy Assistant Secretary for Legislative Affairs, Department of the Treasury
- Justin Sok, Senior Advisor, Office of Legislative Affairs, Department of the Treasury
- Arianne Couch, Special Assistant, Department of the Treasury

Have a nice weekend. See you on Monday morning.

Best, Fritz

---

**From:** McAfee, Karen <[Karen.McAfee@mail.house.gov](mailto:Karen.McAfee@mail.house.gov)>
**Sent:** Wednesday, June 5, 2019 4:06 PM
**To:** Vaughan, Frederick <[Frederick.Vaughan@treasury.gov](mailto:Frederick.Vaughan@treasury.gov)>
**Cc:** Casey, Brandon <[Brandon.Casey@mail.house.gov](mailto:Brandon.Casey@mail.house.gov)>; Andres, Gary <[Gary.Andres@mail.house.gov](mailto:Gary.Andres@mail.house.gov)>; Kaldahl, Rachel <[Rachel.Kaldahl@mail.house.gov](mailto:Rachel.Kaldahl@mail.house.gov)>; [Leonard.T.Oursler@irs.gov](mailto:Leonard.T.Oursler@irs.gov); [Scott.S.Landes@irs.gov](mailto:Scott.S.Landes@irs.gov); Sok, Justin <[Justin.Sok@treasury.gov](mailto:Justin.Sok@treasury.gov)>
**Subject:** RE: Briefing on Mandatory Audit Process

Hi Fritz,

Thanks for your response.  We look forward to the briefing.  As an accommodation to Treasury and the IRS, we will start the Monday briefing at 9AM on every term dictated by Treasury below.  Thus, we have satisfied every condition set by Treasury to date in order to obtain the briefing offered in the four letters from Treasury and the IRS.  We will see you on June 10th in Rayburn 2020.  Please send the list of attendees.

Best,
Karen

---

**From:** [Frederick.Vaughan@treasury.gov](mailto:Frederick.Vaughan@treasury.gov) <[Frederick.Vaughan@treasury.gov](mailto:Frederick.Vaughan@treasury.gov)>
**Sent:** Tuesday, June 4, 2019 5:16 PM
**To:** McAfee, Karen <[Karen.McAfee@mail.house.gov](mailto:Karen.McAfee@mail.house.gov)>
**Cc:** Casey, Brandon <[Brandon.Casey@mail.house.gov](mailto:Brandon.Casey@mail.house.gov)>; Andres, Gary <[Gary.Andres@mail.house.gov](mailto:Gary.Andres@mail.house.gov)>; Kaldahl, Rachel <[Rachel.Kaldahl@mail.house.gov](mailto:Rachel.Kaldahl@mail.house.gov)>; [Leonard.T.Oursler@irs.gov](mailto:Leonard.T.Oursler@irs.gov); [Scott.S.Landes@irs.gov](mailto:Scott.S.Landes@irs.gov); [Justin.Sok@treasury.gov](mailto:Justin.Sok@treasury.gov)
**Subject:** Briefing on Mandatory Audit Process

Karen

Following up on the Committee's request for a briefing on the mandatory audit process, you asked if we can do 8:30 a.m. on June 10. The morning of June 10 works for us as well. But due to childcare responsibilities for one of our IRS briefers, we will need to begin at 9 a.m. Assuming that start time works for you, I am confirming that we will provide a briefing to you on the mandatory audit process at 2020 Rayburn HOB on June 10 at 9 a.m.

We understand that Minority staff also has expressed an interest in attending this briefing. While you have indicated your preference that the briefing not be bipartisan, our practice has been to provide bipartisan briefings when both sides have expressed interest in attending. Accordingly, we will provide a bipartisan briefing. To ensure there is plenty of time for all questions, we are willing to stay as long as necessary so that you have as much time as you need.

We will plan to see you at 9 a.m. on Monday. I will get you a list of attendees later this week.

Best, Fritz

--
**Frederick W. Vaughan**
Deputy Assistant Secretary
Legislative Affairs
U.S. Department of the Treasury
1500 Pennsylvania Avenue, N.W.
Washington, D.C. 20220
202-622-2678

RICHARD E. NEAL,
MASSACHUSETTS,
CHAIRMAN

JOHN LEWIS, GEORGIA
LLOYD DOGGETT, TEXAS
MIKE THOMPSON, CALIFORNIA
JOHN B. LARSON, CONNECTICUT
EARL BLUMENAUER, OREGON
RON KIND, WISCONSIN
BILL PASCRELL JR., NEW JERSEY
DANNY K. DAVIS, ILLINOIS
LINDA T. SÁNCHEZ, CALIFORNIA
BRIAN HIGGINS, NEW YORK
TERRI A. SEWELL, ALABAMA
SUZAN DELBENE, WASHINGTON
JUDY CHU, CALIFORNIA
GWEN MOORE, WISCONSIN
DAN KILDEE, MICHIGAN
BRENDAN BOYLE, PENNSYLVANIA
DON BEYER, VIRGINIA
DWIGHT EVANS, PENNSYLVANIA
BRAD SCHNEIDER, ILLINOIS
TOM SUOZZI, NEW YORK
JIMMY PANETTA, CALIFORNIA
STEPHANIE MURPHY, FLORIDA
JIMMY GOMEZ, CALIFORNIA
STEVEN HORSFORD, NEVADA

BRANDON CASEY,
   MAJORITY STAFF DIRECTOR

KEVIN BRADY,
TEXAS,
RANKING MEMBER

DEVIN NUNES, CALIFORNIA
VERN BUCHANAN, FLORIDA
ADRIAN SMITH, NEBRASKA
KENNY MARCHANT, TEXAS
TOM REED, NEW YORK
MIKE KELLY, PENNSYLVANIA
GEORGE HOLDING, NORTH CAROLINA
JASON SMITH, MISSOURI
TOM RICE, SOUTH CAROLINA
DAVID SCHWEIKERT, ARIZONA
JACKIE WALORSKI, INDIANA
DARIN LAHOOD, ILLINOIS
BRAD R. WENSTRUP, OHIO
JODEY ARRINGTON, TEXAS
DREW FERGUSON, GEORGIA
RON ESTES, KANSAS

GARY ANDRES,
   MINORITY STAFF DIRECTOR

# Congress of the United States
## U.S. House of Representatives
### COMMITTEE ON WAYS AND MEANS
1102 LONGWORTH HOUSE OFFICE BUILDING
(202) 225–3625

### Washington, DC 20515–0348
http://waysandmeans.house.gov

June 5, 2019

The Honorable Charles P. Rettig
Commissioner
Internal Revenue Service
1111 Constitution Avenue, NW
Washington, D.C. 20224

Dear Commissioner Rettig:

As you know, the Committee is considering legislative proposals and conducting oversight related to our Federal tax laws, including, but not limited to, the extent to which the Internal Revenue Service ("IRS") audits and enforces the Federal tax laws against a President.

Pursuant to my authority under Internal Revenue Code Section 6103(f)(4), I designate the following individuals as my agents, only for the purpose of receiving an in-person briefing about the Presidential mandatory audit process from the IRS on June 10, 2019, to inspect and receive returns and return information related to how the IRS audits and enforces the Federal tax laws against a President, including the mandatory audit process and the auditing of Presidential tax returns and any related individuals and entities: Rachel Kaldahl, Jason Vassilicos, Sean Clerget, and Molly Fromm.

This document is a record of the Committee and is entrusted to the IRS only for use in handling this matter. Additionally, any documents created by the IRS in connection with a response to this Committee document, including (but not limited to) any replies to the Committee, are records of the Committee and shall be segregated from agency records and remain subject to the control of the Committee. Accordingly, the aforementioned documents are not "agency records" for purposes of the Freedom of Information Act.

Thank you for your prompt attention to this matter.

Sincerely,

The Honorable Richard E. Neal, *Chairman*

# EXHIBIT M

**Vaughan, Frederick**

| | |
|---|---|
| **From:** | Vaughan, Frederick |
| **Sent:** | Monday, June 10, 2019 2:12 PM |
| **To:** | Casey, Brandon; 'McAfee, Karen' |
| **Cc:** | Andres, Gary; Kaldahl, Rachel; Sok, Justin; Leonard.T.Oursler@irs.gov; LegAffairs |
| **Subject:** | Today's Briefing on Mandatory Audit Process |
| **Attachments:** | Letter to Chairman Neal (2019-06-10).pdf; Briefing on Mandatory Examinations of Officeholders.pdf; Attachments for Briefing on Mandatory Examinations Process.zip |

Brandon and Karen

Attached is a letter from me, as well as copies of the slide deck and tabbed materials from the briefing. Please let us know if you need additional copies of the other historical materials we provided in binders.

Best, Fritz

--
**Frederick W. Vaughan**
**Deputy Assistant Secretary**
**Legislative Affairs**
**U.S. Department of the Treasury**
**1500 Pennsylvania Avenue, N.W.**
**Washington, D.C. 20220**
**202-622-2678**



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

June 10, 2019

The Honorable Richard E. Neal
Chairman
Committee on Ways and Means
U.S. House of Representatives
Washington, D.C. 20515

Dear Chairman Neal:

This morning, senior officials from the Internal Revenue Service (IRS) provided your staff a thorough, three-hour briefing concerning the process by which the IRS audits and enforces the Federal tax laws against a President. We appreciate that your staff consented to make this briefing bipartisan after initially seeking to exclude Minority staff.

The IRS has conducted mandatory examinations of the tax returns of all Presidents and Vice Presidents since 1977. As IRS officials explained at today's briefing, the IRS is not aware of any reports of improper bias or partiality in the conduct of the mandatory examinations in the more than forty-year history of that process. These examinations are performed by experienced, career IRS civil servants and are conducted pursuant to established IRS protocols. The process is shielded from improper influence of any kind by a variety of robust safeguards and legal constraints, as extensively detailed in today's briefing.

Consistent with the Executive Branch's constitutional commitment to accommodation, we will continue to address the Committee's stated interest within the limits of the law. IRS officials answered most of your staff's questions about the mandatory examination process. At the close of the briefing, your staff committed to send us a list of follow-up questions, which we look forward to receiving.

Sincerely,

Frederick W. Vaughan
Deputy Assistant Secretary
Office of Legislative Affairs

cc:    The Honorable Kevin Brady, Ranking Member



# Mandatory Examinations of Presidents' and Vice Presidents' Income Tax Returns

**June 10, 2019**

 Contents

| Slides | Topic |
|--------|-------|
| 3-4 | Overview |
| 5-6 | Special Processing Procedures |
| 7-8 | Assignment of Return |
| 9-10 | Impartiality |
| 11-31 | Mandatory Examination Procedures |
| 32 | Office of Appeals Consideration |
| 33 | Judicial Review |

2

 Overview

- Since 1977, the IRS has conducted mandatory examinations of the federal income tax returns filed by Presidents and Vice Presidents of the United States (Officeholders).
- Robust safeguards ensure the integrity of the mandatory examination process.
- The mandatory examinations are conducted by experienced, career IRS Revenue Agents:
  - It is the Revenue Agent's "duty to determine the correct amount of the tax, with strict impartiality as between the taxpayer and the Government, and without favoritism or discrimination as between taxpayers."
  - Revenue Agents are required to objectively apply IRS examination procedures and applicable provisions of tax law.
- Efforts by certain executive branch employees to influence the examination process are prohibited by law and subject to mandatory disclosure to the Treasury Inspector General for Tax Administration (TIGTA).
- The IRS is not aware of any reports of improper bias or partiality in the conduct of an Officeholder's examination in the more than 40-year history of the mandatory procedures.

 Overview

- In a memorandum dated June 6, 1977 (**Tab A**), the Internal Revenue Service (IRS) formally documented special procedures for processing the income tax returns of the President and Vice President (collectively "Officeholders") and for mandatory examinations of those returns.

- The special processing and mandatory examination procedures were incorporated into the Internal Revenue Manual and are now set forth in IRM 3.28.3 (Special Processing Procedures) (**Tab B**) and IRM 4.2.1 (General Examination Procedures) (**Tab C**).

- Because they are subject to a mandatory examination, Officeholder returns are excluded from the IRS's normal discriminant index function (DIF) selection procedures.  IRM 3.28.3.4.3(3)(a); IRM 4.2.1.15(3)(a).

4



# Special Processing Procedures: Return Intake

- If the Officeholder submits a paper income tax return, it is filed with the IRS's Austin Submission Processing Campus. IRM 3.28.3.2(3).

  - Once received, the Officeholder's return is initially processed by the Austin Campus under normal return-processing procedures, including processing of payment or refund and capturing information from the return for the IRS's account records.  IRM 3.28.3.4.1(1).

  - After the original return is processed, it is delivered to the Office of the Deputy Commissioner for Services and Enforcement, a career civil servant office.  IRM 3.28.3.4.1(4).

  - The original return is secured and maintained by the Office of the Deputy Commissioner as a permanent record of the United States.  IRM 3.28.3.4.1(5).

5

 **Special Processing Procedures: Return Intake**

- If the Officeholder submits their income tax return electronically, the return is processed in the same manner as all other e-filed individual income tax returns, including processing of payment or refund and capturing information from the return for the IRS's account records.

  - After the electronically filed return is processed, a hard copy is printed from the electronic record and delivered to the Office of the Deputy Commissioner for Services and Enforcement.

  - The paper copy of the return is secured and maintained by the Office of the Deputy Commissioner as a permanent record of the United States.

6



# Assignment of Return for Mandatory Examination

- Upon receipt, the Office of the Deputy Commissioner for Services and Enforcement provides a copy of the Officeholder's return to the appropriate IRS business division – either Small Business/Self Employed (SBSE) or Large Business & International (LB&I) – for examination.  *E.g.*, IRM 4.2.1.15.

- The appropriate business division is determined by the Office of the Deputy Commissioner for Services and Enforcement based on the complexity of the return and whether the Officeholder's return (or a related return) is already under examination by one of the divisions for prior years.



# Assignment of Return for Mandatory Examination

- The head of the business division to which the return is assigned determines the appropriate revenue agent group to conduct the mandatory examination. *E.g.*, IRM 4.2.1.15(3).

- Once transmitted to a revenue agent group, the Group Manager must assign the Officeholder's return to a specific Revenue Agent for examination within 10 days. IRM 4.2.1.15(5).

- The location of the Officeholder's return is monitored at all times through the examination process and special procedures are in place to ensure its security. IRM 4.2.1.15(7).



# Impartiality of the Mandatory Examination

- The mandatory audit process for Officeholders is handled by career IRS employees and managers.

- If a Revenue Agent has any reason to believe that their impartiality and independence may be questioned, the Agent is instructed to discuss the matter with their immediate supervisor for reassignment consideration. External attempts to corrupt or threaten IRS employees in the performance of their duties, including examining returns, are reported to and investigated by TIGTA.

- In the more than 40-year history of the mandatory examination procedures, the IRS is not aware of any reports of improper bias or partiality in the examination of Officeholders' returns.

9



# Impartiality of the Mandatory Examination

- Under IRS Policy Statement 4-7, it is the assigned Revenue Agent's "duty to determine the correct amount of the tax, with strict impartiality as between the taxpayer and the Government, and without favoritism or discrimination as between taxpayers."

- By statute, efforts by certain executive branch employees to influence the examination process are prohibited and subject to mandatory TIGTA disclosure requirements.  IRC  §  7217.

  - More specifically, with narrow exceptions inapplicable to mandatory Officeholder examinations, the President, Vice President, members of the Cabinet, members of the Executive Office of the President, and other senior executive branch officials are forbidden from requesting "directly or indirectly, any officer or employee of the Internal Revenue Service to conduct or terminate any audit or other investigation of any particular taxpayer with respect to the tax liability of such taxpayer."  I.R.C.  §  7217.

10



# Mandatory Examination Process: Overview

- There are four general components to the mandatory Officeholder examination process:

  - Audit Planning, including scope determinations, preliminary research, and whether special expertise may be required;

  - Contact with the Officeholder's representative;

  - Information gathering; and

  - Exam determinations and response.

- All relevant IRM provisions apply to mandatory Officeholder examinations.  IRM 3.28.3.4.3(3)(d).

11



# Mandatory Examination Process: Scope Determination

- The scope and depth of the mandatory examination is determined by reference to established risk protocols.

- "[E]xaminers must use their professional judgment to set the scope of the examination.  Examiners should only work issues of merit and conclude the examination when the issues no longer warrant examination."

- Examiners are expected to effectively manage their workload by prioritizing the issues so that the issues with higher audit potential are examined over those with lower potential.  Issues with little or no audit potential should not be selected for examination.

  - The goal of any examination is to determine the "substantially correct" tax liability applying an 80/20 concept, *i.e.*, the principle that in general the first 20 percent of effort yields 80 percent of business results.



# Mandatory Examination Process: Scope Determination

- The initial examination scope determinations are revisited throughout the course of the mandatory examination and, at a minimum, must be evaluated at the midpoint of the examination and when a significant event occurs.

- The examiner must consider the facts and circumstances, evaluate internal controls and use professional judgment to determine whether the scope should be expanded or contracted.

  - Examiners must document the reasons for expanding or contracting the scope of the examination.



# Mandatory Examination Process: Scope Determination

- Based on risk protocols, the scope of the mandatory examination can be expanded to include prior year and related returns as well as other types of tax liabilities (*e.g.*, gift tax liabilities and employment tax liabilities with respect to household employees).  IRM 4.2.1.15(6).

- Entity and other returns that impact the Officeholder's income tax return (*e.g.*, the return of a partnership issuing a Schedule K-1 to the Officeholder) are subject to mandatory compliance checks.

14



# Mandatory Examination Process: Scope Determination

- After the Officeholder's return is assigned but prior to initial contact, the Revenue Agent will risk assess the return and review any large, unusual or questionable items (LUQ items).

- The IRM contains a checklist of issues that the Revenue Agent should consider in the pre-contact analysis to determine whether an item on a return is an LUQ item.

- Whether an item on an Officeholder's return is an LUQ item will depend on the Revenue Agent's perception of the return as a whole and the separate items that comprise the return.

15



# Mandatory Examination Process: Scope Determination

- Factors Revenue Agents are directed to consider when identifying LUQs include:

  - Comparative size of the item;

  - Absolute size of the item;

  - Inherent character of the item;

  - Evidence of intent to mislead;

  - Beneficial effect of the manner in which an item is reported;

  - Relationship to other items;

  - Whipsaw issues; and

  - Missing items.

16



# Mandatory Examination Process: Preliminary Research

- The Revenue Agent will conduct preliminary research of IRC sections, Treasury regulations, rulings and court cases concerning the proper tax treatment of a particular issue identified in the preliminary analysis of the Officeholder's return.

  - This assists the Revenue Agent in the development of specific interview questions, determining possible audit procedures, and determining what information should be requested from the Officeholder.

17



# Mandatory Examination Process: Initial Contact

- The Examination Area Director or other appropriate manager, arranges for preliminary contact with the Officeholder's authorized representative.

- After the planning phase and the initial manager contact, the assigned Revenue Agent will contact the Officeholder's representative to initiate the mandatory examination, sending an initial contact letter.  A copy of the initial contact letter is provided at **Tab D**.

  - The initial contact letter must include IRS Publication 1 **(Tab E)**, *Your Rights As A Taxpayer*, and Notice 609, *Privacy Act and Paperwork Reduction Act*. The letter will also provide contact information for the Revenue Agent's manager in the event that an issue needs to be elevated.

  - The initial contact letter should include a focused Information Document Request informing the Officeholder of the specific information or documents to be provided at the initial appointment.



# Mandatory Examination Process: Initial Contact

- Separate initial contact letters are sent to the Officeholder and their spouse in the case of a joint return filed under IRC § 6013. Section 3201(d) of RRA 98.

- Generally, the Officeholder will have 14 days from the date of the initial contact letter to respond to the Revenue Agent.

- After sending the initial contact letter, the Revenue Agent will schedule an initial meeting with the Officeholder's representative.



# Mandatory Examination Process: Information Gathering

- The Revenue Agent will request information (*e.g.*, books and records) from the Officeholder's representative by issuing Form 4564, Information Document Request.   A sample Information Document Request is provided at **Tab F**.

- IRS Form 4564 will be used to document all requested information and documents needed to support items being examined.

- The Information Document Request will list the specific records, information, and documents the Officeholder should have available at the initial interview.



# Mandatory Examination Process: Information Gathering

- The examination of an Officeholder may include interviews of the Officeholder, the person preparing the Officeholder's return, or third parties with knowledge of items reported on the return.

- In addition to document requests, the Revenue Agent may conduct a site visit of the Officeholder's prior residence or place of business.

- If all information necessary to resolve the examination is not provided by the Officeholder in response to Information Document Requests, the Revenue Agent may consider issuing an administrative summons, including a summons to a third party, such as a bank or other financial institution or the counterparty to a transaction involving the Officeholder.



# Mandatory Examination Process: Referrals for Specialists

- During the planning phase, Revenue Agents should determine if their case requires a referral for specialist assistance in developing and resolving complex issues.

  - Informal advice from a specialist may be solicited on issues that do not appear to warrant a referral, but for which some assistance is required.

- Specialists include computer audit specialists, economists, engineers, and actuaries, among others.  When a specialist is involved in a case, the Revenue Agent maintains control of the examination.

- Any specialist assigned to the case meets with the Revenue Agent and the Officeholder's representative to discuss the issue, information required, time for information to be presented, and an estimated completion date of the Specialist's report.

22



# Mandatory Examination Process: Depth Determination

- In conducting the examination of an Officeholder's return, the Revenue Agent must exercise judgment in determining the depth required for the examination, *i.e.*, the degree of intensity and thoroughness applied in order to make a determination as to the correctness of a reported item.

- Factors that the Revenue Agent should consider in making the depth determination include:

  - Type of evidence available or expected for the issue;

  - Complexity of the issue;

  - Materiality of the issue; and

  - Internal controls.



# Mandatory Examination Process: Assistance From the Office of Chief Counsel

- The Revenue Agent may request advice or guidance from the Office of Chief Counsel on any technical or procedural matter related to the tax liability of the Officeholder.

- Area Counsel may provide advice through consultation or by memorandum. Written advice is generally first requested through IRS Technical Services, which acts as a liaison in responding to examiners' technical questions.



# Mandatory Examination Process: Assistance From the Office of Chief Counsel

- Examples of Area Counsel assistance include providing advice regarding:

  - The meaning, enforceability, and effect of legal terms in a contract;

  - Application of State laws to the elements of a contract;

  - Information regarding applicable State statutes that relate to corporate existence and the status of transferee assets;

  - Review of a case to ascertain favorable points, factual weaknesses, and/or adverse circumstances to the government's case in order to determine whether the Service's position on the issue would be fairly presented in court;

  - Evaluation of primary or secondary evidence in a case, which would be useful in litigation; and

  - Documentation of evidence; review of proposed statutory notices of deficiency; and advice related to the issuance and enforcement of summons.

- The Revenue Agent may also request informal advice from Counsel.



# Mandatory Examination Process: Determination and Response

- After all the facts have been gathered through examination of the books, records and supporting documents, interviews, etc. and the Revenue Agent has all the information to be considered in resolving the issues, the Revenue Agent applies their professional judgment to arrive at a conclusion regarding all items that were identified for examination.

- Revenue Agents are expected to arrive at a definite conclusion by a balanced and impartial evaluation of all of the evidence. Revenue Agents are given the authority to recommend the proper disposition of all identified issues, as well as any issues raised by the Officeholder.



# Mandatory Examination Process: Determination and Response

- Given the length of time it may take to gather all relevant documents and information, during the course of the mandatory examination, the Revenue Agent may solicit a consent to extend the normal three-year assessment limitations period under IRC section 6501(c)(4).

  - Statute extensions are generally requested on Form 872, Consent to Extend the Time to Assess Tax.  A copy of the Form 872 is provided at **Tab G**.



# Mandatory Examination Process: Determination and Response

- The Revenue Agent employs independent and objective judgment in reaching conclusions on issues being examined and in all aspects of their duties and will decide all matters on their merits, free from bias and conflicts of interest.

- Internal Revenue Manual 4.10.7.4(4) instructs that the fairness of the Revenue Agent's conclusions will be demonstrated by:

  - Making decisions impartially and objectively based on consistent application of procedures and the applicable tax law;

  - Treating individuals equitably;

  - Being open-minded and willing to seek out and consider all relevant information, including opposing perspectives;

  - Voluntarily correcting mistakes and improprieties made by the Revenue Agent or someone else in the Service and refusing to take unfair advantage of mistakes or ignorance of taxpayers; and

  - Employing open, equitable and impartial processes for gathering and evaluating information necessary to decisions.

28



# Mandatory Examination Process: Determination and Response

- When the mandatory examination is complete, any proposed adjustments to the Officeholder's return are summarized and explained on an IRS Form 4549, Income Tax Examination Changes or an IRS Form 5701, Notice of Proposed Adjustment. Copies of the Form 4549 and Form 5701 are provided at **Tab H**.

- As part of the mandatory examination process, the Revenue Agent's determinations are subject to mandatory quality review to ensure that issues were properly identified and documented.  *E.g.*, IRM 4.2.1.15(8)(b).



# Mandatory Examination Process: Determination and Response

- The Revenue Agent should solicit agreement to any proposed adjustments and attempt to secure agreement to the proposed tax liability.

  - In making a proposed adjustment, the Revenue Agents should adhere to the law, regulations, rulings, and court decisions on which their conclusions are based and provide the Officeholder with copies of workpapers explaining the proposed adjustment.

- The Revenue Agent must inform their group manager when they believe an examination will have unagreed issues.



# Mandatory Examination Process: Determination and Response

- If there are unagreed issues, the Revenue Agent must issue the appropriate 30-day letter (*e.g.,* **Tab I**) to transmit the examination report to the Officeholder's representative and provide 30 days to request consideration by the IRS Office of Appeals.

- IRS Publication 3498 **(Tab J**)**,** *The Examination Process*, is provided to the Officeholder's representative with the examination report and with all 30-day letters providing an opportunity to pursue administrative appeals.   Section 3504 of the IRS Restructuring and Reform Act of 1998 (RRA 98), Pub. L. No.  105-206.

31



# Office of Appeals Consideration

- The Office of Appeals is an independent organization within the IRS that helps taxpayers, including Officeholders, resolve their tax disputes through an informal, administrative process.   *See generally* IRM 8.1.

- The Appeals Mission is to resolve tax controversies, without litigation, on a basis which is fair and impartial to both the Government and the taxpayer and in a manner that will enhance voluntary compliance and public confidence in the integrity and efficiency of the Service.

- Appeals holds conferences to provide a meaningful opportunity for Officeholders, through their representatives, to present their position and to consider settlement proposals.

 Judicial Review

- If a basis for settlement is not reached, Appeals will issue a statutory notice of deficiency (90 day letter) (**Tab K**) to the Officeholder.

- The Officeholder may thereafter petition the United States Tax Court for independent judicial review.  IRC § § 6212, 6213.

- Officeholders may also pay the amount due, file a claim for refund, wait for the claim to be acted on (or passage of time)  and file suit in the United States District Court or the United States Court of Federal Claims.  IRC § 7422.



Department of the Treasury

Internal Revenue Service

www.irs.gov

## Internal Revenue Service
# memorandum

date: JUN 6 1977

to: All Regional Commissioners

from: Deputy Commissioner

subject: Processing Returns and Accounts of the President and Vice President

For some time, we have centralized the procedures for processing returns and accounts of the President and Vice President. These procedures have been in effect since the unauthorized disclosure of tax return information relating to then President Nixon. They were intended to protect the confidentiality of tax data for these officials by severely limiting access to their returns and tax accounts. Because of the high costs involved and the strong possibility that the purpose of centralized procedures would be misunderstood, the decision has been made to discontinue them.

For your information, the following processing guidelines replace the former special procedures. All prior memoranda on this subject no longer have effect.

1. All tax returns for the President and Vice President will receive normal pipeline processing through the service center. In the case of individual income tax returns, however, the whereabouts of the return will be monitored at all times during processing. After completion of processing, the income tax returns will be forwarded (in double sealed envelopes) to the Deputy Commissioner.

2. Account data will be carried on the appropriate master file and the accounts will not be subjected to restricted access procedures.

3. Individual income tax returns for the President and Vice President will be subject to mandatory audit examination. The district Commissioner responsible for the examination will be determined by the Deputy Commissioner after consultation with the respective Regional Commissioner and the Assistant Commissioner (Compliance). After a determination is made as to the district having jurisdiction, copies of returns will be transmitted for the necessary examination. The transmittal memorandum will point out that:

Any line marked with a #
is for Official Use Only

-2-

All Regional Commissioners

       a.  Regardless of DIF score, the return will be
examined.                                                  #
#

       b.  Personnel should be assigned to the examination
as necessary, including specialists, to conduct the audit.     #
#

       c.  The District Director, or designee, should arrange
for contact with the authorized representative for the beginning
of the audit.                           #
#
#

       d.  All current prescribed Internal Revenue Manual
procedures, i.e., requesting technical assistance, information
from other agencies, etc., will apply in these as in all other
cases.                                     #
#
#
#

       e.  The return copies and any related returns examined
concurrently, as well as the relevant workpapers and examination
reports, will be subject to regular filing and retention procedures. #
#
#

   4.  Gift (and/or Estate) tax returns will be examined in
accordance with procedures relating to all taxpayers.           #
#

*W. E. Williams*

W. E. Williams
(6-6-77)

These instructions will be reissued in the IR Manual and
Law Enforcement Manual in accordance with IRM 1254.

Any line marked with a #
is for Official Use Only

**MANUAL
TRANSMITTAL**                                                    **3.28.3**

Department of the Treasury
**Internal Revenue Service**                          **OCTOBER 31, 2018**

---

**EFFECTIVE DATE**

(01-01-2019)

**PURPOSE**

(1)     This transmits revised IRM 3.28.3, Special Processing Procedures - Individual Income Tax Returns.

**MATERIAL CHANGES**

(1)     Minor editorial changes throughout.

(2)     IRM 3.28.3.1 Added new Program Scope and Objectives

(3)     IRM 3.28.3.2 Updated Introduction to place the President and Vice President returns are placed as permanent records by the National Archives.

(4)     IRM 3.28.3 Added new Acronyms Chart

(5)     IRM 3.28.3.4.1 Updated to forward the original income tax return in double sealed envelopes

(6)     IRM 3.28.3.5.1 Corrected from Appendix to Title 5 to Appendix 4 to Title 5 in several sections

(7)     IRM 3.28.3.5.2.1 Deleted alpha list and created numeric listing

(8)     IRM 3.28.3.5.2.2 Added Code and Edit should review Form 2848 for completeness

**EFFECT ON OTHER DOCUMENTS**

IRM 3.28.3, dated November 02, 2017 effective January 1, 2018 is superseded.

**AUDIENCE**

Wage and Investment Submission Processing Campus personnel

Linda J. Brown
Director, Submission Processing
Wage and Investment Division

3.28.3
Individual Income Tax Returns

# Table of Contents

3.28.3.1    Program Scope and Objectives

3.28.3.2    Introduction

3.28.3.3    Deviations From This Internal Revenue Manual (IRM)

  3.28.3.3.1    Acronyms

3.28.3.4    Processing Returns and Accounts of the President and Vice President

  3.28.3.4.1    Individual and Gift Tax Return Processing

  3.28.3.4.2    Account Data Storage and Access

  3.28.3.4.3    Mandatory Examination

3.28.3.5    Blind Trust Form 1040 Returns

  3.28.3.5.1    General Information and Instructions

  3.28.3.5.2    Blind Trust Tax Return Processing

    3.28.3.5.2.1    Document Perfection Procedures

    3.28.3.5.2.2    Accounts Management Centralized Authorization File (CAF) Procedures - Processing the
Power of Attorney (POA)

# Individual Income Tax Returns    3.28.3

**3.28.3.1**
**(01-01-2019)**
**Program Scope and**
**Objectives**

(1) **Purpose:** This Internal Revenue Manual (IRM) provides instructions for processing returns and the accounts of the President and Vice President of the United States of America.

(2) **Audience:** This IRM is used by tax examiners and clerks in Austin Submission Processing site.

(3) **Policy Owner:** The Director of Submission Processing (SP)

(4) **Program Owner:** Wage and Investment (W&I)

(5) **Primary Stakeholders:** Other areas that may be affected by these procedures include (but not limited to):

- Information Technology (IT) Programmers
- Chief Counsel
- Submission Processing

(6) **Program Goals:** The goal of this IRM is to provide instructions to process the tax returns and accounts of the President and Vice President of the United States of America.

(7) **Annual Clearance of IRM:** This IRM is updated and published annually after review and concurrence by affected offices according to the clearance process established in IRM 1.11.9 *Internal Management Documents, Clearing and Approving Internal Management Documents*

**3.28.3.2**
**(01-01-2019)**
**Introduction**

(1) This section of the Internal Revenue Manual (IRM) provides instructions for processing:

- The tax returns and accounts of the President and Vice President of the United States of America.
- The tax returns of political appointees who have their assets placed in a qualified blind trust as defined by section 102(f)(3) of the Appendix to Title 5 of the United States Code (or any successor provision of the United States Code).

(2) These procedures apply to all functions within the campuses.

(3) The tax returns of the President and Vice President will be mailed to the Field Director, Austin Submission Processing Campus.

(4) The Field Director of Austin can designate the **walk- through** processing of the President and Vice President's returns to a subordinate. This person must make sure that the original returns are not unnecessarily folded or bent, and the edit marks and stamps are neatly placed on the returns, since they are deemed permanent records by the National Archives.

(5) When filing a political appointee's tax return, the trustees of to a qualified blind trust as defined by section 102(f)(3) of the Appendix 4 to Title 5 of the United States Code ("blind trust") are to follow the "Where to File" Instructions for Form 1040 and file the tax return at the appropriate campus based on the appointee's address.

(6) The President, Vice President, or any political appointee who has placed his/ her assets in a blind trust must request permission for the trustee to prepare and file their individual tax return. The request for permission must be in

writing and be submitted with the tax return and a properly executed Form 2848, Power of Attorney and Declaration of Representative. Permission for the trustee to prepare and file the return will be granted automatically on receipt of the required documents. The IRS does not send an approval letter to the President, Vice President, political appointee or trustee.

**3.28.3.3**
**(01-01-2019)**
**Deviations From This**
**Internal Revenue Manual**
**(IRM)**

(1) Service Center Directors, Headquarter Branch Chiefs, and Headquarter Analysts do not have the authority to approve deviations from IRM procedures. Any request for an exception or deviation to an IRM procedure must be elevated through appropriate channels for executive approval. This will ensure that other functional areas are not adversely affected by the changes and that it does not result in disparate treatment of taxpayers.

(2) See guidelines in IRM **1.11.2**, Internal Management Documents System, **Internal Revenue Manual(IRM) Process**. Request for an IRM deviation must be submitted in writing and signed by the Field Director, following instructions from IRM **1.11.2.2.4**.

(3) Any disclosure issues will be coordinated by the Program Owner. No deviations can begin until they are reviewed by the Program Owner and approved at the Executive Level. All requests must be submitted to the Submission Processing Headquarters IRM Coordinator.

**3.28.3.3.1**
**(01-01-2019)**
**Acronyms**

(1) An acronym is an abbreviated word formed from the initial letter or letters of each major part of a compound term, such as IDRS for Integrated Data Retrieval System.

(2) A list of some of the acronyms and definitions used in this IRM are listed in the chart below.

| ACRONYM | DEFINITION |
|---|---|
| CAF | Centralized Authorization File |
| DIF | Discriminant Index Function |
| IDRS | Integrated Data Retrieval System |
| IRM | Internal Revenue Manual |
| IT | Information Technology |
| POA | Power of Attorney |
| SB/SE | Small Business/Self-Employed |
| SP | Submission Processing |
| W&I | Wage & Investment |

| | |
|---|---|
| 3.28.3.4<br>(01-01-2019)<br>**Processing Returns and Accounts of the President and Vice President** | (1) Follow the instructions in this subsection of the manual when processing the individual tax returns and accounts of the President and Vice President of the United States in office at the time of filing. |

(2) This IRM provides procedures for:

- Individual and Gift Tax Returns Processing
- Account Data Storage and Access
- Mandatory Examination

| | |
|---|---|
| 3.28.3.4.1<br>(01-01-2019)<br>**Individual and Gift Tax Return Processing** | (1) Follow the normal return-processing procedures for all tax returns of the President and Vice President of the United States. |

(2) Maintain the privacy of the tax return of the President and Vice-President **at all times** during processing.

- Ensure that other employees in the immediate area cannot view the returns.
- Keep the returns locked in a secure drawer or cabinet while you are away from your work area and the returns are still under your control.

(3) Once the individual income tax return has posted, make a photocopy of the return and stamp "COPY" in the top margin of the copy. Route the copy to Files.

(4) Forward the **original** processed individual income tax return in double-sealed envelopes to prevent any damage to the return to:

Internal Revenue Service
Deputy Commissioner for Services and Enforcement
1111 Constitution Ave NW, Room 3000 IR
Washington, DC 20224

(5) The tax returns of both the President and Vice President are permanent records under the Records Control Schedules Document 12990, RCS 8, Item 12, since they are deemed permanent records by the National Archives.

(6) Process gift tax returns in accordance with the same procedures relating to all taxpayers.

| | |
|---|---|
| 3.28.3.4.2<br>(01-01-2019)<br>**Account Data Storage and Access** | (1) Carry the account data of the President and Vice President on the appropriate Master File. |

(2) Do not subject the accounts to restricted access procedures.

| | |
|---|---|
| 3.28.3.4.3<br>(01-01-2019)<br>**Mandatory Examination** | (1) Individual income tax returns for the President and Vice President are subject to mandatory examinations. See IRM 4.2.1.11, *Processing Returns and Accounts of the President and Vice President.* |

(2) The Small Business/Self-Employed (SB/SE) Director of Examination will determine the area office responsible for the examination of the return.

# 3.28    Special Processing Procedures

(3)  Copies of the returns to be examined will be transmitted after the examining office with jurisdiction is selected. Copies of returns must bear the word **Copy** in the top right margin. The transmittal memorandum will contain the following directions:

    a.  Regardless of the Discriminant Index Function (DIF) score, the returns will be examined.

    b.  IRS personnel, including specialists, will be assigned to the examination as appropriate.

    c.  The Examination Area Director, or his/her designee, will arrange for contact with the authorized representatives of the President and Vice President for the beginning of the examination.

    d.  All relevant IRM procedures will apply to these return examinations.

    e.  The examination papers of the President and Vice President are subject to regular retention procedures Document 12990, RCS 23, Item 43a.

**3.28.3.5**
**(01-01-2019)**
**Blind Trust Form 1040 Returns**

(1)  Follow the instructions in this subsection of the IRM when processing blind trust individual income tax returns.

(2)  The instructions include the following procedures:

- General Information and Instructions
- Blind Trust Tax Return Processing
- Document Perfection Procedures
- Accounts Management Centralized Authorization File (CAF) Procedures - Processing the Form 2848

**3.28.3.5.1**
**(01-01-2019)**
**General Information and Instructions**

(1)  The President, Vice President, or a political appointee will be considered to have shown good cause for receiving permission and will **automatically be granted permission** to have their return filed by a trustee when both of the following conditions are met:

    a.  The President, Vice President, or political appointee has an interest in a blind trust that meets the requirements of Section 102(f)(3) of the Appendix 4 to Title 5 of the United States Code (USC) or any successor provision of the USC.

    b.  The President, Vice President, or political appointee in accordance with Rev. Proc. 2010–11 submits with the income tax return both a letter requesting permission for the trustee to prepare and file the income tax return on behalf of the eligible individual and a power of attorney.

***Note:***  A separate request must be made for each tax year (tax period).

(2)  The trustee must attach both of the following to their filed return:

- A letter requesting permission for the trustee to prepare and file the President's, Vice President's, or political appointee's return.
- A valid power of attorney authorizing the trustee to represent the taxpayer that includes a statement specifically authorizing the trustee to prepare and file the taxpayer's return on behalf of the taxpayer.

(3)  The IRS must use extreme caution not to violate a blind trust.

      a.    Address all correspondence and refunds concerning the blind trust tax return to the authorized trustee.

      b.    Do not disclose any information regarding the source(s) or nature of the blind trust income to the taxpayer.

(4)    Generally, the taxpayer's name will be in the Entity, but the address will belong to the trustee to ensure that any correspondence and/or refund is mailed only to the trustee. Any attached Power of Attorney (POA) should be reviewed for completeness using the criteria in IRM 3.28.3.5.2.1, *Document Perfection Procedures* by the Code and Edit tax examiner, then faxed to the Ogden CAF Unit to be posted.

(5)    **Do not** disclose information regarding the source of the blind trust income if contact with the taxpayer is ever required.

**3.28.3.5.2**
**(01-01-2019)**
**Blind Trust Tax Return**
**Processing**

(1)    Blind Trust returns can generally be identified by the presence of any of the following:

- The notation "Blind Trust" in the signature area
- An income statement or schedule indicating "Income from Blind Trust"
- A trust agreement which specifies "Blind Trust"
- A POA attached indicating "Blind Trust," or posted to the CAF with a Blind Trust Authorization Indicator or
- A letter requesting permission for the trustee to prepare and file the President's, Vice President's or political appointee's return

(2)    The letter requesting permission and the POA must be attached to the return. It is the responsibility of the Code and Edit tax examiner to determine that the POA is complete before routing it to the Ogden CAF Unit. If the POA is already posted, the Code and Edit tax examiner should ensure that the Blind Trust Authorization Indicator is posted on the account. See IRM 3.28.3.5.2.1, *Document Perfection Procedures*.

(3)    If the Form 2848 is an original, or the CAF needs to be updated with the Blind Trust Authorization Indicator, the Code and Edit tax examiner will:

      a.    Perfect the Form 2848. See IRM 3.28.3.5.2.1(3) for specific procedures

      b.    Call the Ogden CAF Unit Manager to alert him/her that they are faxing a POA for a "Blind Trust" to the unit

      c.    Edit "Blind Trust" in the top margin of the Form 2848

      d.    Fax the original Form 2848 to the Ogden CAF Unit

      e.    Staple the Form 2848 to the back of the return

(4)    If the request letter is attached and the POA is posted correctly, continue processing the return. Leave the request letter (and any POA) attached to the return.

(5)    If the POA is posted to the CAF, but the Blind Trust Authorization Indicator needs updating, refer to IRM 3.28.3.5.2.1(6) for instructions on how to contact the Ogden CAF Unit to update that field.

**3.28.3.5.2.1**
**(01-01-2019)**
**Document Perfection**
**Procedures**

(1)    Determine that the letter requesting permission for the trustee to prepare and file the President's, Vice President's, or political appointee's return is present and the POA is attached when "blind trust" is indicated on the return.

**Note:** The POA authorization may be contained in the trust agreement when a blind trust agreement is attached. If **all** of the items required to be included in a valid POA authorization, including the specific acts, are listed in the blind trust agreement, then it is acceptable. Edit the taxpayer's name and social security number (SSN), and "See Attached" on a Form 2848. Then, fax the "Form 2848" package to the Ogden CAF Unit for processing.

(2) If a Form 2848 is attached, check Command Code (CC) CFINK to determine if it is an **original** or **copy** of the POA. If the CAF is up to date (including the blind trust Authorization Indicator), then continue processing the return and leave the **copy** of the Form 2848 attached to the return.

(3) If an **original** Form 2848 is attached to the return, the Code and Edit tax examiner will edit **"BLIND TRUST"** in the top-center margin of the Form 2848 and ensure that the following applicable parts of the Form 2848 are completed.

    a.  **Line 1 - Taxpayer information**: Taxpayer name(s) and address, SSN(s).

    b.  **Line 2 - Representative(s)**: Representative(s) name(s) and address, CAF number, telephone number.

    c.  **Line 3 - Acts authorized**: Description of matter (type of tax form number (e.g., Form 1040), tax period (must be only ONE tax period)

    d.  **Line 4 - Specific use not recorded on Centralized Authorization File (CAF)**: Box should be checked.

    e.  **Line 5a - Additional acts authorized** - Sign a return box should be checked. A statement should be included granting the trustee permission to sign the tax return. "This power of attorney is being filed pursuant to Treasury Regulation section 1.6012-1(a)(5), which requires a power of attorney to be attached to a return if a return is signed by an agent by reason of **specific permission granted by IRS**" **Line 5a** may also include the following authorizations:

        •   Waiver of restriction on assessment or collection
        •   Waiver of notice of disallowance
        •   Consent to extend the period for assessment or collection
        •   Closing agreement

    f.  **Line 5b - Specific acts not authorized -** Should be blank.

    g.  **Line 6 - Retention/revocation of prior power(s) of attorney**: If the box is checked, research CC CFINK to determine if it should have been checked.

    h.  **Line 7 - Signature of taxpayer(s) and date**: The signature of the taxpayer(s) and the date is required.

    i.  **Part II - Declaration of Representative**: Designation, jurisdiction, signature, and date of agent is required. Correspond with the agent if this is missing.

(4) If the Form 2848 is complete:

    1.  Detach the Form 2848 from the return and call the Ogden CAF Unit Manager to notify him/her that you are faxing a blind trust POA for **expedite** processing

    2.  Fax the original Form 2848 to the Ogden CAF unit.

    3.  Upon acknowledgement of receipt from the Ogden CAF Unit Manager that the POA was input correctly to the CAF, staple the Form 2848 to the back of the return and continue processing.

(5) Correspond with the political appointee for the missing items or authorizations when the POA does not grant the trustee authority to perform all of the specific acts (Line 5 on Form 2848) on behalf of the political appointee, or any other required items are missing, except Part II. If Part II is incomplete, correspond with the trustee.

(6) The request letter and POA **must be** present. If either one is missing or incomplete, use the table below to determine the proper action:

| If a POA is: | and request letter is: | Then: |
|---|---|---|
| 1) **Attached**, or already correctly posted on the CAF with the Blind Trust Authorization Indicator | **Attached** | Continue processing. |
| 2) On the CAF, but the Blind Trust Authorization **Indicator is not** present | **Attached** | Contact the Ogden CAF Unit Manager. Fax the request letter to them for verification to allow the update to the CAF with the Blind Trust Authorization Indicator. |
| 3) **Not** found on the CAF, or attached to the return | **Attached** | Correspond with the trustee for the missing POA. **Suspend** the return while corresponding for the missing POA. |
| 4) **Attached**, or already posted on the CAF | **Not** attached | Correspond with the trustee for a copy of the request letter. **Suspend** the return while corresponding for the missing request letter. |
| 5) **Not** found on the CAF, or attached to the return | **Not** attached | There is an indication of a "blind trust." Code and Edit should correspond with the "trustee" for the missing documents. **Suspend** the return while corresponding for the missing documents. |

(7) If the request letter is attached, a valid POA has posted, and other correspondence conditions are present on the return, **suspend** the return and correspond with the trustee.

3.28.3.5.2.2
(01-01-2019)
**Accounts Management Centralized Authorization File (CAF) Procedures - Processing the Power of Attorney (POA)**

(1) The Form 2848 (POA) for the "blind trust" can be **mailed or faxed** directly to any CAF unit by the agent or taxpayer. If any CAF Unit, other than Ogden, receives a Form 2848 (POA) with indication of "blind trust", they should contact the Ogden CAF Unit Manager, and fax the Form 2848 directly to him/her for processing.

(2)   When the Form 2848 (POA) is **attached** to a blind trust tax return, the Code and Edit tax examiner should review the Form 2848 for completeness, then phone the Ogden CAF Unit Manager and immediately fax the Form 2848 to him/her for input to the CAF. The CAF Unit Manager will acknowledge receipt and input the Form 2848. After input to the CAF, the Code and Edit tax examiner will continue processing the return.

(3)   **Ogden CAF Unit Only** – Process the blind trust POA according to instructions. in IRM 21.3.7.8.10, *Blind Trust Authorizations*.

**MANUAL
TRANSMITTAL**

**4.2.1**

Department of the Treasury
**Internal Revenue Service**

**MAY 29, 2019**

IRS

**EFFECTIVE DATE**

(05-29-2019)

**PURPOSE**

(1)    This transmits revised IRM 4.2.1, General Examining Procedures, General Examination Information.

**MATERIAL CHANGES**

(1)    Significant changes to this IRM are listed in the table below.

| Prior Reference | New Reference | Description of Change |
|---|---|---|
| N/A | IRM 4.2.1.1 through IRM 4.2.1.1.6 | Added and moved content to provide background information, legal authorities that govern the actions covered in this IRM, roles and responsibilities, terms, acronyms, and related resources available to assist examiners when conducting examinations. In addition, content from IRM 4.2.1.13.1, Definitions, has been moved to IRM 4.2.1.1.4, Terms. |
| N/A | IRM 4.2.1.6 | Guidance for "reopening of closed cases" has been added as it was not moved to another section when IRM 4023 was obsoleted. |
| IRM 4.2.2.1 through IRM 4.2.2.1.2 | IRM 4.2.1.7 through IRM 4.2.1.7.2 | Content from IRM 4.2.2.1, Collateral Examinations, was moved from IRM 4.2.2.1 through IRM 4.2.2.1.2 to IRM 4.2.1.7 through IRM 4.2.1.7.2. |
| N/A | IRM 4.2.1.11 | Moved guidance on "Assistance to Chief Counsel" from IRM 4.10.1.4.8 to IRM 4.2.1.11. |
| IRM 4.2.1.16 | N/A | Content has been removed. See IRM 25.24.5, Return Preparer Misconduct Field Examination. |
| IRM 4.2.1.19 | IRM 4.2.1.22 | Renumbered and added a "Note" providing guidance for when the taxpayer's problem involves an Appeals' agreed resolution not being implemented or there was an error involving the implementation. |

Manual Transmittal Cont. (1)

| Prior Reference | New Reference | Description of Change |
|---|---|---|
| IRM 4.2.2.3 through IRM 4.2.2.3.1 | IRM 4.2.1.23 | Moved and revised content from IRM 4.2.2.3, Extensions of the Replacement Period of Involuntary Converted Property. IRM 4.2.2.3.1, Involuntary Converted Property Extension Procedures, has been replaced by a reference to IRM 4.8.8.6, Involuntary Converted Property. |
| IRM 4.2.2.4 | IRM 4.2.1.24 | Moved and revised content from IRM 4.2.2.4, Identification of Bad Payer Information. |
| IRM 4.2.2.5 | IRM 4.2.1.25 | Moved and revised content from IRM 4.2.2.5, Awards Received by Informants. |
| Throughout IRM 4.2.1 | | Minor editorial changes have been made throughout this IRM. Website addresses, legal references, and IRM references were reviewed and updated as necessary. |

**EFFECT ON OTHER DOCUMENTS**

This material supersedes IRM 4.2.1, dated November 23, 2016 and incorporates content from IRM 4.2.2, General Examining Procedures.

**AUDIENCE**

Small Business and Self-Employed (SB/SE), Large Business and International (LB&I), and Wage and Investment (W&I) examiners.

Maha H. Williams
Director, Examination-Field and Campus Policy
Small Business/Self-Employed

4.2.1
General Examination Information

# Table of Contents

4.2.1.1      Program Scope and Objectives

   4.2.1.1.1      Background

   4.2.1.1.2      Authority

   4.2.1.1.3      Responsibilities

   4.2.1.1.4      Terms

   4.2.1.1.5      Acronym

   4.2.1.1.6      Related Resources

4.2.1.2      Identification and Control Numbers

4.2.1.3      Potentially Dangerous Taxpayer (PDT) and Caution Upon Contact (CAU) Indicators

4.2.1.4      Request for Armed Escort

4.2.1.5      1254 Suspense

4.2.1.6      Reopening of Closed Cases

4.2.1.7      Collateral Examinations

   4.2.1.7.1      Collateral Examination Procedures: Initiating Area

   4.2.1.7.2      Collateral Examinations: Receiving Area

4.2.1.8      General Appeals Guidelines

   4.2.1.8.1      Cases Not Fully Developed

   4.2.1.8.2      New or Reopened Issues

   4.2.1.8.3      Disagreements With Appeals Determinations

   4.2.1.8.4      Docketed Case Examination Assistance

      4.2.1.8.4.1      New Information Received in Appeals

      4.2.1.8.4.2      Examination Assistance Request Package

      4.2.1.8.4.3      Examination Assistance Point of Contact Actions

      4.2.1.8.4.4      Examiner Secures New Information and Related Case File

         4.2.1.8.4.4.1      Examiner Responsibilities

         4.2.1.8.4.4.2      Examiner Returns New Information and Related Case File

      4.2.1.8.4.5      Examination Assistance Point of Contact

4.2.1.9      New Issues Raised by Counsel

4.2.1.10      Litigation Affecting the IRS

   4.2.1.10.1      Notification to Area Counsel in State Court Suits

   4.2.1.10.2      Suits for Recovery of Erroneous Refunds

4.2.1.11      Assistance to Chief Counsel or U.S. Attorney

   4.2.1.11.1      Chief Counsel or U.S. Attorney Requests for Civil Suit Data

4.2.1.12      Awards of Litigation and Administrative Costs in Tax Cases

4.2.1.13      Statute Expiration Reports

4.2.1.14    Taxpayer Notification of Assessment Statute Expiration and Acceptance of Voluntary Payments on
            Expired Statute Returns When Taxpayer Was Contacted for Examination

  4.2.1.14.1    Guidelines for Cases with Expired Statutes Where the Deficiency Cannot Be Determined

  4.2.1.14.2    Guidelines for Cases with Expired Statutes Where the Deficiency Can Be Determined or there is
               No Change to Tax

  4.2.1.14.3    Guidelines for Cases with Expired Statutes Where the Taxpayer Makes a Voluntary Payment

4.2.1.15    Processing Returns and Accounts of the President and Vice President

4.2.1.16    Blind Trust Income Tax Returns Filed by Presidential Appointees

4.2.1.17    Reporting Allegations of Tax Violations Involving Senior Treasury Officials

  4.2.1.17.1    Compliance Examination Procedures

4.2.1.18    Reporting Misconduct of IRS Employees or Officials

4.2.1.19    Income Tax Bonds Under IRC 332(b) and IRC 905(c)

4.2.1.20    Property Blocked by Foreign Funds Control or Vested by Office of Foreign Assets Control

  4.2.1.20.1    Office of Foreign Assets Control (OFAC) Information

  4.2.1.20.2    Investigation and Disposition

  4.2.1.20.3    Payor Failure to Withhold Tax at Source

4.2.1.21    Witness Security Program

4.2.1.22    Taxpayer Advocate Program

4.2.1.23    Extensions of the Replacement Period of Involuntarily Converted Property

4.2.1.24    Identification of Bad Payer Information

4.2.1.25    Awards Received by Informants

4.2.1.26    Restructuring and Reform Act of 1998

# General Examination Information   4.2.1

**4.2.1.1**
**(05-29-2019)**
**Program Scope and**
**Objectives**

(1) Purpose. This IRM section provides information on various topics as shown in the table of contents. References to other resources, such as related IRMs and websites are included when applicable and provide additional guidance as needed to ensure a thorough understanding of the topic.

(2) Audience. These procedures apply to examiners in Small Business and Self-Employed (SB/SE) Field Examination, SB/SE Speciality Examination, Large Business and International (LB&I), and W&I.

(3) Policy Owner. The Director, Examination - Field and Campus Policy, who is under the Director, Headquarters Examination, owns the policy in this IRM.

(4) Contact Information. To recommend changes or make any other suggestions related to this IRM section, see IRM 1.11.6.6, Providing Feedback About an IRM Section - Outside of Clearance.

**4.2.1.1.1**
**(05-29-2019)**
**Background**

(1) This IRM provides information for general examination procedures that examiners should understand and apply in the performance of their duties.

**4.2.1.1.2**
**(05-29-2019)**
**Authority**

(1) By law, the Service has the authority to conduct examinations under Title 26, Internal Revenue Code, Subtitle F – Procedure and Administration, Chapter 78, Discovery of Liability and Enforcement of Title, Subchapter A, Examination and Inspection.

(2) The following IRC sections, Rev. Procs, and Delegation Orders provide the authority for various topics as referenced within this IRM:

- IRC 332(b) - Complete liquidations of subsidiaries
- IRC 905(c) - Applicable rules
- IRC 6501(a) - Limitations on assessment and collection
- IRC 6532(b) - Periods of limitation on suits
- IRC 7121 - Closing agreements
- IRC 7405 - Action for recovery of erroneous refunds
- IRC 7430 - Awarding of costs and certain fees
- IRC 7605(b) -Time and place of examination
- Rev. Proc. 64-22, Statement of some principles of Internal Revenue tax administration.
- Rev. Proc. 2005-32, Examination of returns and claims for refund, credit, or abatement; determination of correct tax liability.
- Rev. Proc. 2010-11, Forms and Instructions.
- Rev. Proc. 2012-18, Ex Parte communications between appeals and other Internal Revenue Service employees.
- Rev. Proc. 2016-22, Appeals Functions.
- Delegation Order 4-7(formerly DO-57, Rev. 9) - IRM 1.2.43.8, Delegation Order 4-7 (formerly DO-57, Rev. 9).
- Delegation Order 4-47(New) - IRM 1.2.43.37, Delegation Order 4-47 (New).
- SBSE Delegation Order 1-23-33, Authority to Grant Extensions of Time to Replace Involuntarily Converted Property Under Section 1033 of the Internal Revenue Code - IRM 1.2.65.4.11.

**4.2.1.1.3**
**(05-29-2019)**
**Responsibilities**

(1) The Director, Headquarters Examination, is the executive responsible for providing policy and guidance for SB/SE Examination employees and ensuring consistent application of policy, procedures and tax law to effect tax administration while protecting taxpayers' rights. See IRM 1.1.16.3.5, Headquarters Examination, for additional information.

(2) The Director, Examination - Field and Campus Policy, reports to the Director, Headquarters Examination, and is responsible for the delivery of policy and guidance that impacts the field examination process. See IRM 1.1.16.3.5.1, Field and Campus Policy, for additional information.

(3) Field Examination General Processes (FEGP), which is under the Director, Examination - Field and Campus Policy, is the group responsible for providing policy and procedural guidance on standard examination processes to field employees. See IRM 1.1.16.3.5.1.1, Field Exam General Processes, for additional information.

(4) All examiners must perform their professional responsibilities in a way that supports the *IRS Mission*. This requires examiners to provide top quality service and to apply the law with integrity and fairness to all.

(5) Income tax examiners and their managers should thoroughly acquaint themselves with the examination procedures and information contained in this IRM, as well as other resources, such as those listed in IRM 4.2.1.1.6, Related Resources, below.

**4.2.1.1.4**
**(04-23-2014)**
**Terms**

(1) The following table lists terms and their definitions that are used in this IRM:

| Term | Definition |
|------|-----------|
| Senior Treasury Official | For purposes of this IRM is defined as: <br>• All individuals within the Treasury Department serving in Executive Levels I through V. <br>• All individuals within the Treasury Department serving in the Senior Executive Service or positions classified above grade general schedule (GS)-15 (or comparable pay band). <br>• All individuals within the IRS in grade GS-15 (or comparable pay band) serving in positions centralized in the IRS Executive Resources Board. <br>• All individuals within the Treasury Department (other than IRS) in grade GS-15 (or comparable pay band), which the Deputy Secretary may designate. |
| Treasury Department | The Office of the Secretary and all agencies, bureaus, and other organizational elements within the Department of the Treasury. |

**4.2.1.1.5**
**(05-29-2019)**
**Acronym**

(1) The following table lists commonly used acronyms and their definitions used throughout this IRM:

| Acronym | Definition |
|---------|-----------|
| AARS | Appeals Account Resolution Specialists |
| ADP | Automated Data Processing |
| ATE | Appeals Technical Employee |
| AUR | Automated Underreporter |
| CAU | Caution Upon Contact |
| CI | Criminal Investigation |
| DOJ | Department of Justice |
| EA | Examination Assistance |
| IRP | Information Reporting Program |
| LB&I | Large Business & International |
| LTA | Local Taxpayer Advocate |
| OEP | Office of Employee Protection |
| PDT | Potentially Dangerous Taxpayer |
| RRA | Restructuring and Reform Act |
| SAC | Special Agent in Charge |
| TAS | Taxpayer Advocate Service |
| TC | Transaction Code |
| TIGTA | Treasury Inspector General for Tax Administration |
| TS | Technical Services |
| WSC | Witness Security Coordinator |

**4.2.1.1.6**
**(05-29-2019)**
**Related Resources**

(1) Helpful information can be found on websites, including, but not limited to the following:

- *AUR HQ Payer Agent Coordinator*
- *EA Routing Instructions*
- *Office of Employee Protection*
- *Office of Foreign Assets Control*
- *http://www.treasury.gov/tigta/contact_report.shtml*

**4.2.1.2**
**(04-23-2014)**
**Identification and**
**Control Numbers**

(1) The similarity of taxpayers' names and the voluminous flow of documents require the use of permanent identifying numbers coupled with taxpayers' names. These numbers are necessary for automated data processing (ADP) purposes to ensure positive control of each tax account and all related transactions. Some standard titles and abbreviations used are as follows:

a.   Social security number (SSN)—the number assigned to an individual for social security purposes, tax account purposes, or both.

b.   Employer identification number (EIN)—the number assigned for any tax purpose to a person other than an individual. Also means the identification number which is assigned to an individual who is required to file a return with respect to their liability for any tax other than income, estate, or gift taxes.

c.   Document locator number (DLN)—the number assigned to each return or other document introduced into processing for control and file reference purposes.

d.   Individual taxpayer identification number (ITIN)—the number assigned to individuals who are required for U.S. tax purposes to have a U.S. taxpayer identification number but who do not have, and are not eligible to obtain a SSN issued by the Social Security Administration.

e.   Internal revenue service number (IRSN)—the number used in place of a required TIN during processing.

(2)   The spacing of the digits in identifying numbers is an integral part of the number. The proper spacing must be observed in all instances. The spaces may be indicated by using hyphens, blank spaces, etc. For example, EIN as 00-0000000; and, SSN as 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.

(3)   The foregoing identification and control numbers do not preclude the use of reference or control numbers such as Tax Court docket numbers, Criminal Investigation (CI) case numbers, reference numbers used in connection with the collection of delinquent accounts, or other numbers or codes used for control or reference purposes.

**4.2.1.3**
**(04-23-2014)**
**Potentially Dangerous Taxpayer (PDT) and Caution Upon Contact (CAU) Indicators**

(1)   The IRS has two servicewide employee safety programs designed to warn employees of taxpayers who have been designated as potentially dangerous and or should be approached with caution:

•   Potentially Dangerous Taxpayer (PDT) Program
•   Caution Upon Contact (CAU) Taxpayer Program

(2)   The Office of Employee Protection (OEP) has sole responsibility for administering the PDT and CAU programs. The OEP enhances the safety of IRS employees by taking the following actions:

a.   Making PDT and CAU determinations.
b.   Maintaining the PDT and CAU indicator databases.
c.   Providing information and feedback to employees, managers, and executives.

(3)   OEP maintains two IRMs that provide guidance and information:

a.   IRM 25.4.1, Potentially Dangerous Taxpayer, provides procedures and guidelines for referring and designating taxpayers under the PDT program. See IRM Exhibit 25.4.1-1, Display of PDT Indicator, for a listing of documents and systems that display the PDT indicator.

b.   IRM 25.4.2, Caution Upon Contact Taxpayer, provides procedures and guidelines for referring and designating taxpayers under the CAU program. See IRM Exhibit 25.4.2-1, Display of CAU Indicator, for a listing of documents and systems that display the CAU indicator.

(4)   The OEP performs PDT and CAU five-year reviews, which consist of reviewing the taxpayer against established five-year renewal criteria. See IRM 25.4.1.8, Five-Year Review of PDT Records and IRM 25.4.2.7, Five-Year Review of CAU Records, for additional information.

(5)   The OEP *Office of Employee Protection* website provides additional guidance and information such as the following:

- Definition of assaults, threats, and intimidation
- Process of reporting assaults, threats, and intimidation
- Criteria for PDT
- Criteria for CAU
- Explanation of relationship between the TIGTA and the OEP
- "A Guide to the Office of Employee Protection Programs" desk guide
- Spotlight on Safety brochure
- Spotlight on Safety newsletter
- Frequently asked questions

**4.2.1.4**
**(04-23-2014)**
**Request for Armed**
**Escort**

(1)   The TIGTA Office of Investigations (OI) has primary responsibility to provide armed escorts for IRS personnel who in the course of their official duties have been threatened with bodily harm indicating the need for such protection. See IRM 9.5.11.10, Armed Escort Assignment.

***Exception:***  CI has primary responsibility for the protection of the Commissioner of Internal Revenue.

(2)   When an examiner feels they need an armed escort, they will immediately report the facts causing the need to their group manager. Armed escorts may be requested by IRS employees when they intend to meet with taxpayers who have been designated by the OEP as PDT or CAU, or in other circumstances where the examiner and the group manager believe any interaction during the performance of duties may pose a risk of injury to the employee.

(3)   If the group manager determines that an armed escort is necessary, they will request such protection in writing via a memorandum, not to exceed two pages, to the TIGTA-OI special agent in charge (SAC) of the appropriate TIGTA-OI field division. To ensure the safety of IRS and TIGTA-OI personnel, as well as guarantee the operational integrity of the armed escort, a request must be submitted at a minimum one week prior to the scheduled appointment date. If a request is submitted with less than a one week notification, it may require a postponement of the appointment or an alternate meeting location.

(4)   All armed escort requests will be reviewed by the respective TIGTA-OI SAC. Armed escorts will be provided on a case-by-case basis. If the TIGTA-OI SAC determines that an armed escort is not warranted, IRS management may seek a reconsideration of the denied request by contacting the TIGTA-OI SAC who rendered the decision. If a resolution cannot be reached and the requesting IRS management official still believes an armed escort is warranted, the IRS management official can request a final reconsideration from the TIGTA-OI, Deputy Assistant Inspector General for Investigations (DAIGI)-Field Operations.

(5)   Since TIGTA-OI has primary responsibility for providing armed escorts, IRS management may not request and or alternatively seek assistance from CI if the request for an armed escort has been denied. If CI receives a request for

an armed escort from an IRS employee or management official, CI will refer the IRS employee or management official to the nearest TIGTA-OI office.

**Note:** Unless specifically asked for assistance by TIGTA-OI, CI will no longer be responsible for providing armed escorts to IRS employees except as noted in paragraph (1) above. If CI assistance is needed, the TIGTA SAC will forward the request in writing to the appropriate CI Director, Field Operations, for concurrence.

(6) If an armed escort is being considered for a taxpayer designated a PDT, contact TIGTA-OI directly. The memorandum should contain the following information:

   a.   Taxpayer name.
   b.   Taxpayer social security number.
   c.   Taxpayer contact number(s).
   d.   Taxpayer home address.
   e.   Assigned IRS employee name, position, and contact information.
   f.   Supervisor name, position, and contact information.
   g.   Description of the tax issue.
   h.   Description of activity to take place.
   i.   Phone number of IRS employees or others who will attend.
   j.   Location of activity.
   k.   Any contacts or statements related to the taxpayer that caused concern.
   l.   Any other information related to the subject that would indicate an armed escort is warranted.

(7) If an armed escort is being considered for a taxpayer designated as CAU, the requesting employee or management official must contact the OEP and obtain the basis for the OEP's designation. IRS management must evaluate this information and if it is decided an armed escort is still needed, proceed with the memorandum. The memorandum should contain the following information:

   a.   Taxpayer name.
   b.   Taxpayer social security number.
   c.   Taxpayer contact number(s).
   d.   Taxpayer home address.
   e.   Assigned IRS employee name, position, and contact information.
   f.   Supervisor name, position, and contact information.
   g.   Basis for the OEP CAU designation.
   h.   Description of the tax issue.
   i.   Description of activity to take place.
   j.   Number of IRS employees or others who will attend.
   k.   Location of activity.
   l.   Any contacts or statements related to the taxpayer that caused concern.
   m.  Any other information related to the subject that would indicate an armed escort is warranted.

(8) If an employee is requesting an armed escort for reasons other than PDT and CAU, IRS management must evaluate the situation. If IRS management concurs with requesting an armed escort, prepare a memorandum. The memorandum should contain the following information:

   a.   Taxpayer name.
   b.   Taxpayer social security number.
   c.   Taxpayer contact number(s).

d.  Taxpayer home address.
e.  Position, grade, function, and POD information, if the taxpayer is an IRS employee or contractor.
f.  Assigned IRS employee name, position, and contact information.
g.  Supervisor name, position, and contact information.
h.  Background information concerning the taxpayer.
i.  Description of activity to take place.
j.  Number of IRS employees, management officials, and or others who will attend.
k.  Location of activity.
l.  Any contacts or statements related to the taxpayer that caused concern.
m.  Any other information related to the subject that would indicate an armed escort is warranted.

(9)  When an actual threat or assault has been made, TIGTA has primary jurisdiction and must be contacted. For contact information, refer to the *TIGTA-OI* website.

---

**4.2.1.5**
(04-23-2014)
**1254 Suspense**

(1)  Examination Technical Services holds cases pending a court decision or business unit guidance. Cases may be held in 1254 suspense under the following circumstances:

a.  The facts in the case to be suspended are the same or similar to an issue pending in a federal court.
b.  The issue is similar to one that is under consideration in District Court in another jurisdiction, but only if a Form 906, Closing Agreement on Final Determination Covering Specific Matters, has been secured, usually by Appeals.
c.  Chief Counsel or another business unit has identified the issue as a suspense issue.

(2)  For cases held in 1254 suspense pending a court decision, the facts in the case to be suspended must be so similar to those in the pending case that a decision in one will ultimately decide the other.

(3)  The examiner must discuss any case being considered for 1254 suspense with the group manager. The group manager must contact the area Examination Technical Services function to determine whether the case meets the criteria for 1254 suspense.

(4)  Prior to forwarding a case to Examination Technical Services for 1254 suspense, the examiner must:

a.  Develop the case to the fullest extent possible.
b.  Ensure a partial agreement is assessed if a case has other issue(s) that do not meet 1254 suspense criteria. See instructions for preparing partially agreed reports in IRM 4.10.8.5, Partially Agreed Cases. The only issues that may be placed in 1254 suspense are unagreed issues meeting the 1254 suspense criteria.

*Note:*  If a partial agreement cannot be secured, the case should not be sent to 1254 suspense. Prepare an unagreed report for **all** issues pursuant to the instructions in IRM 4.10.8.11, Unagreed Case Procedures (SB/SE Field and Office Examiners only). If the taxpayer fails to file a protest, close the case for issuance of a statutory notice of deficiency.

c.  Ensure an examination report addressing the unagreed issue(s) being suspended is shared with the taxpayer and a copy is retained in the case file, for purposes of IRC 6404(g).

d.  Ensure a claim disallowance that addresses the unagreed issue(s) being suspended is in the case file, if applicable. A claim allowance must also be included in the case file should the taxpayer's position prevail.

e.  Ensure there are at least 24 months remaining on the statute of limitations. If not, secure an extension prior to sending the case to Examination Technical Services for 1254 suspense.

f.  Complete Form 1254, Examination Suspense Report, and ensure the key case is identified.

(5) See IRM 4.8.2.11, Suspense Cases, for additional guidance.

**4.2.1.6**
**(05-29-2019)**
**Reopening of Closed Cases**

(1) There may be times when an examiner should consider reopening a tax year that was previously examined and closed. IRC 7605(b) provides that "No taxpayer shall be subjected to unnecessary examination or investigation, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary, after investigation, notifies the taxpayer in writing that an additional inspection is necessary."

*Note:* Reopening procedures do not apply when the taxpayer requests the reopening, such as an audit reconsideration or claim for refund.

(2) Rev. Proc. 2005-32 provides information on reopening closed cases. The following sections provide information the examiner must consider prior to the reopening of a closed case:

- Rev. Proc. 2005-32, Section 4.01 - Closed Case - provides definitions of a closed case.
- Rev. Proc. 2005-32, Section 4.02 - Reopening - defines what constitutes a "reopening."
- Rev. Proc. 2005-32, Section 4.03 - Taxpayer contacts and other actions that are not examinations, inspections or reopenings - provides a list of four categories of contacts the Service makes with taxpayers and certain other actions taken by the Service that are not examinations, inspections, or reopenings.

*Note:* A prior examination is indicated by a Transaction Code (TC) 300. A TC 290 is **not** a prior examination.

(3) The Service will not reopen any case closed after examination by an area office or campus to make an adjustment unfavorable to a taxpayer unless one of the three following criteria is met (see Rev. Proc. 2005-32, Section 5.01 and Policy Statement 4-3 (IRM 1.2.13.1.1 for additional guidance):

- There is evidence of fraud, malfeasance, collusion, concealment or misrepresentation of a material fact,
- The prior closing involved a clearly defined substantial error based on an established Service position existing at the time of the previous examination, or

- Other circumstances exist which indicate failure to reopen would be a serious administrative omission. See Rev. Proc. 2005-32, Section section 5.02 - Other circumstances permitting reopening, for additional information.

(4) All Service initiated reopenings to make adjustments unfavorable to a taxpayer must be approved by the territory manager. See IRM 1.2.43.8, Delegation Order 4-7 (formerly DO-57, Rev. 9). Prior approval must be obtained using Form 4505, Reopening Memorandum, before starting the examination.

(5) When a reexamination of the taxpayer's books and records is necessary, Letter 939 (DO), Reopening Letter, must be prepared by the examiner and sent with Form 4505 to the territory manager for signature. The examiner must issue Letter 939 to the taxpayer at the time the reexamination is started.

**Note:** When a reopening does not require the reexamination of the books and records, Letter 939 is not needed.

(6) Once the approval has been obtained to reopen a closed case and Letter 939 issued (if required), the examiner should contact the taxpayer using the appropriate initial contact letter. See IRM 4.10.2.8.1, Making Initial Contact. For guidance on report writing procedures, see IRM 4.10.8.8, Reports For Cases Reopened By Examination.

4.2.1.7
(10-01-2003)
**Collateral Examinations**

(1) A collateral examination is requested when an exchange of information between areas is essential to resolve an issue of material consequence. Collateral examinations are used only when the information cannot be obtained from the taxpayer, the taxpayer's representative, or third parties. Every reasonable effort must be made to secure the information rather than to routinely request a collateral examination.

(2) Collateral activity is the performance of work of short duration, work that does not require the examination of books and records, and work that calls for little independent judgment or conclusions. For example, a collateral examination would be justified where:

   a. An interview is required to get specific information for the examiner;
   b. A document is to be obtained;
   c. A transcript of an account or a listing f invoices is needed; or
   d. A summons needs to be served.

(3) All collateral requests must receive priority treatment. If the collateral examination results in a finding of nationwide interest, the receiving area will furnish the information to Technical Services who will share it with Headquarters using Technical Coordination Report procedures. See IRM 4.8.8.12.3, Technical Coordination Report, for additional information.

(4) Collateral examination requests involving tax shelter cases will be identified as such on the top of Form 6229, Collateral Examination. The receiving area will acknowledge receipt of the collateral request and provide a status report to the requesting office within 45 days and provide status reports to the initiating area every 30 days.

**4.2.1.7.1
(10-01-2003)
Collateral Examination
Procedures: Initiating
Area**

(1)   Form 6229, Collateral Examination, is used by all areas to request or exchange information between areas to resolve an issue(s) of material consequence. Form 6229 is prepared as early as possible in each examination when a collateral examination is needed from another area.

(2)   The examiner assigned the return will prepare the original Form 6229. Part 2 of the form is retained in the case file. The original Form 6229 and three copies are forwarded.

   a.   The narrative section of Form 6229 must include sufficient background information to clearly state the issue(s). Additional schedules and attachments are included as needed. A copy of the out-of-area return is also included, if available.
   b.   Information requested must be specific to the issue(s).
   c.   The examiner's name and telephone number must be included so the receiving area has the correct examiner to contact for clarification of the issue, if needed.
   d.   The completed Form 6229 is submitted to the group manager for review. After approval, the group manager will forward Form 6229. If Campus action is required (i.e., the return), Form 6229 is forwarded to the Campus servicing the receiving area. If no Campus action is required, the initiating area will submit the request to the applicable territory manager of the receiving area. The initiating area will photocopy the retained Part 2 and put an "X" next to the "Follow-up" line when furnishing information to the receiving area.

**4.2.1.7.2
(10-01-2003)
Collateral Examinations:
Receiving Area**

(1)   The receiving area must acknowledge receipt of the request by completing Part 3 of Form 6229 and return it to the initiating area.

   a.   The receiving examiner must include his/her name, address, telephone number and date received. If the case is reassigned, the new examiner must notify the initiating area of the change.
   b.   Photocopies of Part 4 of Form 6229 are used for subsequent communication with the initiating area.
   c.   The receiving examiner must provide a clear, concise response to each question raised.

(2)   If the receiving area believes the results of the collateral examination would not justify the time and cost involved, a memorandum explaining that decision is attached to Form 6229 and forwarded to the initiating area. The territory manager will approve any declination memorandum. The group manager will forward a copy of the Form 6229 with a copy of the declination memorandum attached to the respective Planning and Special Programs (PSP) section for information purposes. Territory managers should resolve disagreements between the initiating and receiving areas concerning the need for a collateral examination. Area Directors will resolve any disagreement between the respective territory managers.

**4.2.1.8
(04-23-2014)
General Appeals
Guidelines**

(1)   This section provides general information related to how Appeals works an examination case and the formal procedures for Examination staff to voice concerns about a case settled by Appeals.

**4.2.1.8.1**
**(04-23-2014)**
**Cases Not Fully**
**Developed**

(1)  Appeals will not return cases to Examination when the case is not fully developed and the taxpayer has not presented new information or evidence. Instead, Appeals will attempt to settle the case on factual hazards.

**4.2.1.8.2**
**(04-23-2014)**
**New or Reopened Issues**

(1)  The appeal process is not a continuation or an extension of the examination process. Appeals will not raise new issues and will focus dispute resolution efforts on resolving the points of disagreement identified by the parties.

    a.  A new issue is a matter not raised during an examination.

    b.  In resolving disputes, Appeals may consider new theories and or alternative legal arguments that support the parties' positions when evaluating the hazards of litigation in a case. However, the appeals officer will not develop evidence that is not in the case file to support the new theory or argument.

    c.  The discussion of new or additional cases or other authorities (e.g., revenue rulings or revenue procedures) that supports a theory or argument previously presented does not constitute consideration of a new issue.

    d.  A change in computation is not a new issue.

(2)  Appeals will not reopen an issue on which the taxpayer and the IRS are in agreement.

*Exception:*  See IRC 7121.

(3)  The restrictions on raising a new issue **do not apply** to new issues raised by taxpayers. For this purpose, the term "new issue" means issues identified by Appeals in non-docketed cases.

(4)  Appeals will not raise a new issue in a docketed case. A new issue in a docketed case is any adjustment to or change to an item that affects the petitioner's tax liability that was not included in the notice of deficiency and is raised or discussed during consideration of the case. However, Appeals will consider any new issue the government raises in its pleadings and may consider any new evidence developed by Examination or Counsel to support the government's position.

**4.2.1.8.3**
**(04-23-2014)**
**Disagreements With**
**Appeals Determinations**

(1)  This section provides formal procedures for Examination to voice concerns about a case settled in Appeals. These procedures are not intended to replace any informal procedures currently in use at the area level. Management in Examination and Appeals can continue to address and resolve disagreements over case resolution at the lowest possible level. These formal procedures are used when the informal process results in Examination still having unresolved significant concerns about the disposition by Appeals of an issue.

(2)  Formal disagreement is expressed by written dissent. The written dissent must clearly state the reason(s) for dissent, the rationale supporting the reason(s) for the dissent, and whether Examination requests a conference with the appropriate Appeals executive (Director, Examination Appeals; Director, Collection Appeals or Director, Specialized Examination Programs and Referrals). The rationale for the dissent should include the following:

a. Citation of the specific facts that were not considered, or given enough weight, if Examination believes Appeals did not properly consider the facts.

b. Citation of the applicable law (e.g., IRCs, Treas. Regs., Rev. Ruls., court cases, etc.) that was not considered and or accorded different weight if Examination believes there was unsound application of the law by Appeals.

*Note:* Formal dissents by Examination are not appropriate in a case settled by Appeals where "hazards of litigation" were considered in the settlement of the case. Appeals clearly identifies within the Appeals Case Memorandum (ACM) those cases resolved by considering the "hazards of litigation."

*Note:* The decision to hold a conference is at the discretion of the appropriate Appeals executive. If a conference is held, the parties must follow the ex parte communication guidelines set forth in Rev. Proc. 2012-18, Section 2.03(11).

(3) Dissents should be forwarded to the appropriate Appeals Director (Examination Appeals, Collection Appeals, or Specialized Examination Programs and Referrals) via the *AP Formal Dissents* centralized mailbox within 90 days (extensions may be mutually agreed upon) of receipt of an ACM by Examination. The appropriate Director will retrieve the formal dissent from the centralized mailbox and send Examination an acknowledgment of receipt.

(4) Upon receipt of the dissent, the Appeals Director will determine whether a reply to the dissent is appropriate, and guided by IRM 1.2.17.4, Policy Statement 8-3 (Formerly P-8-50), and existing regulations and statutes, whether the case should be reopened.

(5) The above procedures do not preclude the exchange of non-case specific information that occurs through advisory boards or between analysts in Examination and Appeals.

4.2.1.8.4
(11-23-2016)
**Docketed Case
Examination Assistance**

(1) Rev. Proc. 2016-22 describes the practices for the administrative appeals process in cases docketed in the United States Tax Court (Tax Court). See IRM 8.4.1, Procedures for Processing and Settling Docketed Cases, for additional information. These procedures do not apply to cases docketed in United States District Court or the United States Court of Federal Claims.

(2) Jurisdiction of a **docketed** case must remain with the Office of Chief Counsel (Counsel) or the Office of Appeals (Appeals). Therefore, when Appeals receives **"new information"** (see IRM 4.2.1.8.4.1) from a taxpayer, representative or counsel of record for a docketed case that merits analysis by Examination, Appeals can request examination assistance (EA). Appeals retains jurisdiction of the case while the new information is under review by Examination.

*Note:* When Appeals receives new information in a **non-docketed** case, Appeals generally releases jurisdiction of the case and returns it to the originating function to examine the new information and make an audit determination. See IRM 8.2.1.7.2, Verification of New Material or Request for Further Development - ATE.

**Note:** In docketed Tax Court cases, a power of attorney is not required from the counsel of record. An attorney who is admitted to practice before the court becomes the counsel of record by filing a petition or entering an appearance in the case. A counsel of record is authorized to act on behalf of the taxpayer in the court proceedings, access the tax information of the person they represent and represent the taxpayer before the Internal Revenue Service. In a case docketed in the Tax Court, anyone other than the counsel of record must be eligible to practice before the IRS and, in order to be recognized, must present a Form 2848, Power of Attorney and Declaration of Representative, or other power of attorney.

(3)  Standardized docketed case EA procedures ensure:

   a.  Examination is able to provide EA to Appeals by analyzing new information provided by petitioning taxpayers, consistent with its mission, and
   b.  All petitioning taxpayers receive consistent treatment when they provide new information not previously made available to Examination.

(4)  **Examination Assistance Exception.** If the docketed case is IRS Campus-sourced and meets the exception in paragraph (2) of IRM 8.6.1.6.5, Taxpayer Provides New Information, Appeals will review the new information and proceed with normal consideration. If the case does not meet the exception, Appeals will generally request EA.

4.2.1.8.4.1
(11-23-2016)
**New Information
Received in Appeals**

(1)  **"New information"** is information received in Appeals from the taxpayer, representative or counsel of record not previously made available to Examination for consideration prior to issuance of the IRS Notice, relating to issues:

   •  Previously examined,
   •  Raised in the petition, or
   •  Raised by the Government in its pleadings.

**Note:** For this purpose, an IRS Notice includes a Notice of Deficiency, a Notice of Final Determination, Final Partnership Administrative Adjustment (FPAA), a Notice of Determination of Worker Classification or any similar document that outlines the Service's position on the particular tax matter and provides Tax Court rights.

(2)  New information includes:

   •  New information, evidence or documentation.
   •  A relevant new issue for which Counsel has provided advice indicating that the issue does not require a formal amendment to the Tax Court petition.
   •  A new theory or alternative legal argument presented by the taxpayer that warrants analysis by Examination before Appeals can fully evaluate the hazards of litigation.

**Note:** Appeals must physically secure the new information and review it to determine if it merits analysis by Examination. **Analysis** may include categorizing, sorting or reviewing taxpayer records, or requiring additional steps or reasoning to reach a conclusion.

# 4.2   General Examining Procedures

**4.2.1.8.4.2**
**(11-23-2016)**
**Examination Assistance**
**Request Package**

(1) Appeals will prepare an EA request package and forward it via encrypted email to the EA Point of Contact (EA POC) within the appropriate originating function. The EA request package will include the following electronic files:

    a.   Form 14361, Docketed Examination Assistance Request – Jurisdiction Not Released, completed by Appeals.

    b.   Form 14362, Docketed Examination Assistance Issues and Results, partially completed by Appeals and used by Examination to approve or deny the EA request, and provide EA results to Appeals.

    c.   IRS Notice and relevant attachments to the IRS Notice, if available.

*Note:* There must be at least 60 calendar days remaining before the Tax Court calendar date on the date Appeals sends the EA request package.

(2) Appeals will use the *EA_Routing_Instructions* posted on the Appeals website to determine the correct EA POC based on guidance in IRM 4.2.1.8.4.5.

**4.2.1.8.4.3**
**(11-23-2016)**
**Examination Assistance**
**Point of Contact Actions**

(1) Generally, within five (5) business days of receiving the EA request package from Appeals, the EA POC will review Form 14361 and Form 14362 to ensure:

    a.   There are at least 45 calendar days from the date Appeals sent the request to the due date shown on Form 14361, Part F, Explanation.

    b.   There are at least 60 calendar days from the date Appeals sent the request to the Tax Court calendar date shown on Form 14361, Part F.

    c.   The issues to consider are identified on Form 14362, Part C, Issues and Results.

(2) The EA POC must communicate the decision to approve or deny the EA request to the Appeals Team Manager (ATM) within 30 calendar days or less.

    •   If the EA request is **approved**, the EA POC completes Form 14362, Part B, Examination Assistance Approved/Denied, indicating approval and sends the digitally signed form to the ATM via encrypted email. The EA POC will personally provide the EA or assign and forward the EA request package to the examiner, via encrypted email. See IRM 4.2.1.8.4.5.

    •   If the EA request is **denied**, the EA POC completes Form 14362, Part B, by using the drop-down menu to indicate the reason the request was denied, and sends the digitally signed form to the ATM via encrypted email.

*Note:* If the EA POC denies an EA request, Appeals (concerned that a significant risk to taxpayer compliance exists) can elevate the EA request to the Appeals Area Director for discussion with the EA POC's manager.

**4.2.1.8.4.4**
**(11-23-2016)**
**Examiner Secures New**
**Information and Related**
**Case File**

(1) After the Appeals Technical Employee (ATE) is notified of the examiner assignment, they will promptly contact the examiner using available means (e.g., phone, email, Skype, etc.) to arrange for timely and efficient delivery of the new information and relevant administrative file information.

(2) The ATE and examiner will coordinate and agree upon a method of delivery of the new information and related administrative file information. The method of delivery may include, but is not limited to:

- • Providing workspace in the Appeals office for the examiner to perform EA.
- • Mailing/shipping using standard procedures, including Form 3210, Document Transmittal.
- • Using available electronic means of transmitting information, such as encrypted email, Enterprise e-Fax (EEFax), etc.

**Note:** The ATE will maintain physical possession of original tax returns, executed statute extensions, and required Tax Court-related documents. If the examiner needs any of these documents to perform the requested EA, the ATE will provide copies. If the examiner is providing EA in Appeals workspace, the ATE may provide the entire original administrative file to the examiner and secure the file from the examiner at the end of the business day.

4.2.1.8.4.4.1
(11-23-2016)
**Examiner
Responsibilities**

(1) The examiner **will**:

a. Appropriately charge time for EA activities. LB&I and SB/SE field examiners will charge time to activity code 822, Details out of Industry or Area to: Appeals Division. Campus correspondence examiners will charge time and volume to Organization Function Program (OFP) code 91969. Campus AUR examiners will charge time to the applicable OFP code.

b. Complete the assigned EA by the due date specified on Form 14361, Part F.

   **Note:** Examiners can request additional time to complete the EA, but Appeals can deny the request and require the immediate return of the EA package based on the needs of the case (e.g., Tax Court calendar date, Counsel requests return of case for trial preparation, etc.)

c. Review and analyze the EA issues using the information received from Appeals.

   **Caution:** The examiner **must not** contact the taxpayer, representative or counsel of record without the written concurrence (i.e., email) of the assigned Counsel attorney; see IRM 4.2.1.8.4.4.1 (3).

   **Note:** If the new information affects a related FBAR case, consult with an Operating Division FBAR Coordinator.

d. Prepare workpapers to support the EA findings (as applicable).

e. Record the findings and EA time charged on Form 14362, Part C.

   **Note:** The ATE will have entered the issues to be addressed on Part C of Form 14362, including the issue name, year/period, and per return amount. The examiner will enter the corrected amount, adjustment and explanation.

f. Complete Form 14362, Part D, Examiner's Information.

g. Obtain manager's approval, if required, on Form 14362, Part E, Manager's Approval.

h. Send the approved Form 14362 and any related electronic workpapers to the ATE via encrypted email or other electronic method agreed upon by the ATE and examiner.

i. Return applicable items to the ATE. See IRM 4.2.1.8.4.4.2.

    j.  Conduct any communications with Appeals in accordance with the ex parte rules. Appeals will invite the taxpayer, representative or counsel of record to participate in any substantive discussion of the disputed issues between Exam and Appeals. See IRM 4.2.7, Ex Parte Communication Procedures.

> **Note:** Appeals will issue Letter 4642, Docketed Case Examination Assistance, to inform the taxpayer, representative or counsel of record that Appeals requested EA from Examination and will share any information provided by Examination with the taxpayer, representative or counsel of record for review and comment.

(2)  The examiner **will not:**

    a.  Prepare tax computations or create an examination report.
    b.  Issue an IDR. See IRM 4.2.1.8.4.4.1 (3).
    c.  Provide a summary of the results to the taxpayer, representative or counsel of record.
    d.  Provide any assurances as to the final tax impact of the EA to the taxpayer, representative or counsel of record, as Appeals may base final settlement on additional factors, such as the hazards of litigation.
    e.  Pursue the development of any issues not currently before the Tax Court for the specific case without written concurrence (i.e., email) of the assigned Counsel attorney.

(3)  **Although not required**, the examiner has the **discretion to**:

    a.  Contact the assigned Counsel attorney at any time during the EA process.

> **Note:** Appeals will identify the assigned Counsel attorney on Form 14361 Part E, Area Counsel Contact Information. If the assigned Counsel attorney is not identified on Form 14361, the examiner should contact the ATE for the identity of the assigned Counsel attorney.

    b.  Verbally ask questions or request additional information from the taxpayer, representative or counsel of record to clarify the new information received from Appeals **but only after receiving the written concurrence (i.e., email) of the assigned Counsel attorney**. To avoid potential Tax Court discovery issues, the examiner **must not** issue an information document request (IDR). The examiner must document the conversation as well as information requested, date requested, date due, and requested method of delivery on Form 9984, Examining Officer's Activity Record, or a workpaper.

> **Caution:** If the examiner opts to interact with the taxpayer, representative or counsel of record as outlined above, the examiner must first contact the assigned Counsel attorney to secure the name of the appropriate party for such interaction in writing (i.e., email).

> **Note:** Prior to requesting EA, the ATE will inform the taxpayer, representative or counsel of record of the critical importance of providing all information in support of their position to the ATE at the beginning of the Appeals process. Appeals will only request EA once on a case; therefore, the taxpayer, representative or counsel of record should have provided all necessary information to the ATE prior to the examiner receiving the EA request.

| 4.2.1.8.4.4.2<br>(11-23-2016)<br>**Examiner Returns New Information and Related Case File** | (1) All administrative case file information including original documents and electronic files (e.g., CD-ROM, flash drive, etc.) provided by the taxpayer, representative or counsel of record through the ATE to the examiner will be returned to the ATE in the manner they were received. |

*Note:* Information provided to the examiner electronically (e.g., email, Skype, etc.) does not need to be returned to the ATE since the ATE has the original documents.

(2) The examiner will provide Appeals with any new information received and retained by the examiner from the taxpayer, representative or counsel of record during the EA.

(3) The examiner will use Form 3210 to track and acknowledge receipt of information returned to the ATE.

| 4.2.1.8.4.5<br>(11-23-2016)<br>**Examination Assistance Point of Contact** | (1) Appeals will use the *EA_Routing_Instructions* posted on the Appeals website to determine the correct EA POC. The following table provides the general business rules for determining the EA POC by Primary Business Code (PBC). |

| Primary Business Code | Originating Function and EA POC Information |
|---|---|
| 190—195 | **W&I Campus Cases**—Forward EA requests to the appropriate, designated Campus Liaison (CL). Depending on the specific Campus (by PBC) there may be different CL EA POCs for the following programs:<br>• ASFR—Automated Substitute for Return<br>• CORR—Campus Correspondence Examination<br>• EITC—Earned Income Tax Credit<br>The CL will review and approve/deny the initial request. If approved, the CL may personally provide the EA or assign the EA work to another examiner. |
| 201—207 | **SB/SE Field Examination Cases**—Forward to the appropriate, designated EA POC as follows (based upon information in the case file and AIMS/IDRS):<br>• If the Exam group is known, the EA POC will be the current Exam group manager. If approved, the EA POC may assign the EA to the original examiner or another examiner.<br>• If the Exam group no longer exists or cannot be determined, the EA POC will be the Territory Manager.<br>• If the Territory no longer exists or cannot be determined, Appeals will contact the Area PSP office for assistance in determining where to route the EA request. The Area PSP will not decide whether to approve or deny the EA request. |
| 212 | **SB/SE Field Employment Tax Cases**—Forward to the appropriate, designated EA POC as follows (based upon information in the case file and AIMS/IDRS):<br>• If the Exam group is known, the EA POC will be the current Exam group manager.<br>• If the Exam group no longer exists or cannot be determined, the EA POC will be the Territory Manager.<br>• If the Territory no longer exists or cannot be determined, the EA POC will be the Chief Employment Tax. |

| Primary Business Code | Originating Function and EA POC Information |
|---|---|
| **213** | **SB/SE Field Estate & Gift Tax Cases**—Forward to the appropriate, designated EA POC as follows (based upon information in the case file and AIMS/IDRS):<br>• If the Exam group is known, the EA POC will be the current Exam group manager.<br>• If the Exam group no longer exists or cannot be determined, the EA POC will be the Territory Manager.<br>• If the Territory no longer exists or cannot be determined, the EA POC will be the Chief, Estate and Gift. |
| **214** | **SB/SE Field Excise Tax Cases**—Forward EA requests to the appropriate, designated PBC 214 (Excise Tax) EA POC.<br>• If the Exam group is known, the EA POC will be the current Exam group manager.<br>• If the Exam group no longer exists or cannot be determined, the EA POC will be the Territory Manager.<br>• If the Territory no longer exists or cannot be determined, the EA POC will be the Chief Excise Tax. |
| **295—299** | **SB/SE Campus Cases** —Forward EA requests to the appropriate, designated CL. Depending on the specific Campus (by PBC) there may be different CL EA POCs for the following programs:<br>• ASFR—Automated Substitute for Return<br>• AUR—Automated Underreporter<br>• CORR—Campus Correspondence Examination<br>• EITC—Earned Income Tax Credit<br>The CL will review and approve/deny the initial request. If approved, the CL may personally provide the EA or assign the EA work to another examiner. |
| **3XX** | **LB&I Examination Cases**—Forward EA requests to the appropriate, designated EA POC as follows (based upon the PBC):<br>• If the Examination Group Code is known, the EA POC point will be the current Examination/Compliance Manager (Group/Team Manager).<br>• If the Examination group no longer exists or cannot be determined, the EA POC will be the Compliance Territory Manager.<br>• If the Territory no longer exists or cannot be determined, Appeals will contact the Compliance Function Director Field Operations (DFO) for assistance in determining where to route the EA request. The DFO will not decide whether to approve or deny the EA request. |

| | |
|---|---|
| 4.2.1.9<br>(04-23-2014)<br>**New Issues Raised by Counsel** | (1)  In general, Counsel will not raise new issues, unless the grounds are substantial and the potential effect on tax liability is material. See *Chief Counsel Directives Manual (CCDM) 35.4.1.2*, Raising New Issues in Tax Court Cases. |
| 4.2.1.10<br>(04-23-2014)<br>**Litigation Affecting the IRS** | (1)  The legal work of the IRS is performed by the Office of Chief Counsel. Referrals to the Associate Area Counsel office should be considered in unrelated tax issue matters. |

**4.2.1.10.1**
**(04-23-2014)**
**Notification to Area Counsel in State Court Suits**

(1)  The IRS ordinarily will not intervene in litigation in state courts between private litigants even though the purpose of the parties is to obtain a decree or judgment affecting the federal tax liability of one or the other of the parties to the litigation. In those cases arising in state courts between private litigants, to which officials of the IRS have not been made a party but which may have a direct bearing upon the construction of an internal revenue code, or upon the government's title or right to possession to property which has been seized, the IRS may intervene or take other appropriate steps in connection with the proceeding. See IRM 1.2.13.1.8, Policy Statement 4–10 and *CCDM 34.6.2.6*, Intervention.

(2)  When pending proceedings come to the attention of examiners, a memorandum report of the proceeding should be made to the Associate Area Counsel office. Area Counsel will determine whether the IRS should intervene or take any steps in connection with the proceeding.

**4.2.1.10.2**
**(04-23-2014)**
**Suits for Recovery of Erroneous Refunds**

(1)  Examiners may determine a taxpayer erroneously received a payment of money in the form of a tax refund. IRC 7405 provides that any portion of tax which has been erroneously refunded may be recovered by civil action. IRC 6532(b) provides that a general suit under IRC 7405 may be brought within two years. Begin computing the two-year period from the day after issuance of the refund check or the date the direct deposit cleared. Examiners should contact Chief Counsel, Procedure and Administration, if there is a potential statute problem. If any part of the refund was induced by fraud or misrepresentation of a material fact, suit may be brought at any time within five years from the day after issuance of the refund check or the date the direct deposit cleared. See IRM 5.1.8.7.1.1.2, Unassessable Erroneous Refunds, and IRM 21.4.5.15, Collection Methods for Category D Erroneous Refunds, for additional information.

(2)  Assessable erroneous refunds may also be recovered by administrative action within the applicable period of limitation upon assessment and collection. The type of tax involved is determinative of the type of administrative action available. Ordinarily, recovery by suit is utilized because administrative recovery is barred by the statute of limitations on assessment. Any contemplated collection activity based on administrative recovery should be coordinated with Counsel.

(3)  The erroneous refund suit is limited to erroneously refunded amounts that exceed the litigating threshold established by the Department of Justice (DOJ).

(4)  A recommendation for an erroneous refund suit to the Associate Area Counsel should be accompanied by the administrative file, a copy of any request made to the taxpayer for voluntary payment, a copy of the taxpayer's refusal to make voluntary payment, transcript of account, and a narrative report containing the following information:

   a.  The type of tax involved and the amount of money expected to be recovered.

   b.  The date the period of limitations on collection will expire.

   c.  A brief statement that administrative remedies are impractical or have been exhausted, including the reasons that administrative actions have not been effective.

   d.  Facts, evidence, and other matters necessary for development of the case.

e.   Brief personal history of the taxpayer or other facts that might have a bearing on the suit.

f.   Location of the principal executive office, date of incorporation, state of incorporation, and the name and address of the statutory agent for service if the taxpayer is a corporation.

g.   A statement of the exact legal premise for recovery of the erroneous refund.

(5)   After the narrative report and other related documents are prepared, the examiner will submit the entire case file to the group manager for review. If the manager agrees, the case will be referred to Area Counsel using locally established procedures. For example, the manager may request Technical Services (TS) conduct a further technical review and prepare the advisory request, or an area may have an agreement with its Area Counsel and TS to send requests for technical assistance directly to Area Counsel (TS should receive a copy of the request if bypassed).

| | |
|---|---|
| 4.2.1.11<br>(08-24-2017)<br>**Assistance to Chief Counsel or U.S. Attorney** | (1)   When examiners are needed to assist Area Counsel or the Office of the United States Attorney, the Area Director will honor requests and assign an examiner to provide the services needed in the litigation of cases. |
| | (2)   Examiners will not discuss the merits of the case with the taxpayer or the taxpayer's attorney when consulting with them or examining pertinent books and records. |
| | (3)   Every effort will be made to comply with a request by the date specified. If is not possible to comply with the request for assistance, the party who initiated the request will be notified. |
| 4.2.1.11.1<br>(04-23-2014)<br>**Chief Counsel or U.S. Attorney Requests for Civil Suit Data** | (1)   In suits initiated by or against the IRS, the Disclosure Office or Field Collection-Advisory receives and processes requests from U.S. Attorneys or Chief Counsel for data or documents. Basic data in refund suits, other than suits involving Trust Fund Recovery Penalty assessments, is requested directly from the campus. For additional information, see IRM 25.3.6.1, Types of Litigation Controlled by Advisory. |
| | (2)   A DOJ attorney may request assistance prior to or during a trial resulting in Counsel requesting a supplemental investigation by an examiner. See *CCDM 34.7.1.2.2*, When Supplemental Investigation Is Warranted. The request may be formal or informal. If formal, Counsel will request a supplemental investigation by preparing a memorandum to the Area Director (or comparable level of management) for the area in which the case arose. See *CCDM 34.7.1.2.3*, Procedure for Supplemental Investigation. |
| | (3)   Electronically stored information (ESI) is subject to discovery in litigation if it is relevant to the case. ESI includes, but is not limited to, email and other electronic communications, word processing documents, spreadsheets, electronic calendars, telephone logs, Internet usage files, metadata, voice mail, text messages, and network access information. For additional information regarding ESI, see IRM 25.3.1.7, Preserving Electronically Stored Information in Litigation Cases. |

**4.2.1.12**
**(04-23-2014)**
**Awards of Litigation and**
**Administrative Costs in**
**Tax Cases**

(1)  IRC 7430 provides for the award of costs, attorneys' fees and other expenses to a "prevailing party" in any civil tax action brought in a federal court of the United States, if the taxpayer has met the requirements of IRC 7430(b) and the IRS does not establish that its position was "substantially justified". The position of the IRS will be "substantially justified" if it had a reasonable basis both in law and in fact. A party who meets the requirements of IRC 7430(b) may also qualify as a "prevailing party" if the liability of the taxpayer as determined by a judgment in the proceeding is equal to or less than the liability of the taxpayer which would have been determined if the United States had accepted a qualified offer of the party under IRC 7430(g) and none of the exceptions of IRC 7430(c)(4)(E)(ii) apply. If the qualified offer rule applies, a showing of substantial justification by the United States does not preclude the taxpayer from receiving an award under IRC 7430. This paragraph is not applicable to litigation in state courts.

(2)  The law also applies to taxpayer suits for refunds as well as a wide variety of litigation such as suits to reduce a tax claim to judgment, to enforce a levy, to foreclose a tax lien, to recover an erroneous refund, to establish transferee liability, or to enforce a summons.

(3)  The law provides that an award may be made only if the taxpayer has exhausted all available administrative remedies within the IRS, did not unreasonably protract the proceeding, has substantially prevailed with respect to the amount in controversy or has substantially prevailed with respect to the most significant issue or set of issues presented, and satisfies the net worth requirements. Even if the taxpayer satisfies all of the above requirements, the taxpayer will not be treated as the prevailing party if the United States establishes that the position of the United States in the proceeding was substantially justified, unless the qualified offer rule of IRC 7430(c)(4)(E) applies.

(4)  IRC 7430 also allows a taxpayer who prevails before the IRS in an administrative proceeding to request reimbursement of reasonable administrative costs incurred in defending the taxpayer's position.

   a.  Taxpayers must file their requests with the IRS personnel who have jurisdiction over the tax matter underlying the claim for costs. If the taxpayer does not know who has jurisdiction over the tax matter, the taxpayer may send the request to the IRS office that considered the underlying matter. See Treas. Reg. 301.7430-2(c)(2).
   b.  Administrative cost awards under IRC 7430 are considered by Appeals in non-docketed cases. Therefore, requests for IRC 7430 administrative cost awards in non-docketed cases should be routed to the Appeals office personnel who considered the taxpayer's matter.
   c.  Administrative cost awards under IRC 7430 are considered by Counsel in docketed cases. Therefore, requests for IRC 7430 administrative cost awards in docketed cases should be routed to Counsel.
   d.  Regardless of whether the case is docketed or non-docketed, all requests for IRC 7430 administrative cost awards with respect to an administrative proceeding related to requests for damages for Bankruptcy Code violations should be routed pursuant to the instructions in Treas. Reg. 301.7430-2(c)(2).

(5)  There is no IRS form for requesting an IRC 7430 administrative cost award. Taxpayers and their representatives may file a request for an IRC 7430 administrative cost award by mailing a letter or Form 843, Claim for Refund and

Request for Abatement, to the IRS. If the examiner is unsure if a Form 843 is requesting an IRC 7430 administrative cost award, they should consult with the lead or group manager.

*Note:* Taxpayers must file a motion with the Tax Court consistent with Tax Court Rule 231 for reimbursement of litigation costs.

|  |  |
|---|---|
| 4.2.1.13<br>(04-23-2014)<br>**Statute Expiration Reports** | (1)  A statute expiration report is required when the period for assessment or the assessment period that was extended by consent has expired. See IRM 25.6.1.13, Barred Assessments/Barred Statute Cases, for guidance and a list of exceptions to the reporting requirement. |

(2)  SB/SE area office employees should refer to IRM 25.6.1.13.2.8, Statute Expiration Reporting Responsibilities and Procedures for SB/SE Area Office Involved Directly With or Providing Support for Tax Return Examinations, for guidance.

(3)  LB&I field operations and campus employees should refer to IRM 25.6.1.13.2.9, Statute Expiration Reporting Responsibilities and Procedures for LB&I Field Operations and LB&I Campus Employees, for guidance.

(4)  W&I campus examination employees should refer to IRM 25.6.1.13.2.7.2, Responsibilities of W&I Examination Operations at Campuses, for guidance.

**4.2.1.14**
**(04-23-2014)**
**Taxpayer Notification of Assessment Statute Expiration and Acceptance of Voluntary Payments on Expired Statute Returns When Taxpayer Was Contacted for Examination**

(1)  IRM 1.2.13.1.20, Policy Statement 4-65, provides that the IRS shall not make any effort, real or implied, to solicit voluntary payments of a deficiency or taxpayer delinquent account barred by statute. However, payments made by the taxpayer completely of their free will shall be accepted.

(2)  Taxpayers must be notified in writing of assessment statute expiration if they were contacted for examination. The appropriate notification letter depends on whether a deficiency can be determined. See IRM 4.2.1.14.1 and IRM 4.2.1.14.2 for additional guidance. The responsibilities for preparing the notification letter, mailing and routing are the following:

    a.  The undated notification letter is prepared and signed by the immediate manager of the party responsible for the statute expiration. The notification letter, along with the completed Form 3999, Statute Expiration Report, are forwarded to the Area Director (or comparable level of management) via second-level management.

    b.  The Area Director (or comparable level of management) signs the Form 3999 and the letter is date-stamped and mailed by his or her secretary or staff assistant. The date of taxpayer notification is entered in Box 7 of Form 3999.

    c.  A copy of the notification letter and the Form 3999 are forwarded back to the manager via second-level management.

    d.  The Area Director (or comparable level of management) retains a copy of the Form 3999 and the applicable taxpayer notification letter. The final Form 3999 and a copy of the taxpayer notification letter are sent forward to the Examination Director (or comparable level of management).

(3)  In multi-year and related examinations, it is not necessary to separately process the year in which the statute expired. The return can follow the case file through the normal examination process. However, a copy of the final approved Form 3999 must be in the case file.

**4.2.1.14.1**
**(04-23-2014)**
**Guidelines for Cases with Expired Statutes Where the Deficiency Cannot Be Determined**

(1) If the examination has not reached the point where the deficiency can be determined, prepare Letter 5318, Deficiency Case Discontinued Due to Statute Expiration-Deficiency Undetermined. Letter 5318 explains that the examination has been discontinued because the statutory period in which the IRS can legally issue a refund or assess a deficiency has expired.

**4.2.1.14.2**
**(04-23-2014)**
**Guidelines for Cases with Expired Statutes Where the Deficiency Can Be Determined or there is No Change to Tax**

(1) If the deficiency can be determined or the case is a no-change, prepare Letter 5321, Deficiency Case Discontinued Due to Statute Expiration-Deficiency Determined, and an unagreed or no-change examination report.

   a. The report can be a copy of a report previously furnished to the taxpayer, a revision of that report or an initial report prepared after statute expiration. However, adjustments that give the taxpayer a beneficial "double deduction" are prohibited as discussed in 26 CFR 1.161-1, e.g., capitalizing an item previously expensed and allowing a depreciation deduction in subsequent years. IRC 6401(a) provides that the term overpayment includes any payment of any internal revenue tax which is assessed or collected after the expiration of the period of limitation applicable. It will generally be possible for the taxpayer to file a timely claim within two years and have any payment refunded. This permits a double deduction if a report includes issues that involve subsequent returns. See IRM 4.10.8.9.6, Unagreed Cases: Reports, for guidance on unagreed reports.

   b. The report should reflect the deficiency or no change to tax resulting from issues that have been developed to a point where the IRS's position is reasonably sound. Letter 5321 advises the taxpayer "... you have no legal obligation to pay the amount shown on the enclosed report."

   *Note:* In order to show the statute has expired and the taxpayer is under no legal obligation to pay the deficiency, include the following statement in the "Other Information" section of the report: "You will not be assessed a deficiency for (year) and are under no obligation to pay the deficiency shown on this examination report."

   c. The purpose of the report is to help the taxpayer in filing subsequent returns and to furnish the amount of the deficiency if the taxpayer elects to make a voluntary payment.

**4.2.1.14.3**
**(04-23-2014)**
**Guidelines for Cases with Expired Statutes Where the Taxpayer Makes a Voluntary Payment**

(1) If the taxpayer inquires about making a voluntary payment, they should be informed the payment will be accepted and can be mailed to the office contacted. The subject of voluntary payments should not be discussed unless the taxpayer inquires about voluntary payments. If the taxpayer makes a voluntary payment:

   a. Prepare and process Form 3244-A, Payment Posting Voucher-Examination, treating the payment as an advance payment. See IRM 4.4.24.2, Form 3244-A, and IRM 4.4.24.6.4, Completion of Form 3244-A for IRC 6603 Deposits.

   b. Prepare Form 3198, Special Handling Notice for Examination Case Processing, following the instructions in IRM 25.6.1.13.2.8.3 (1), Closing Cases Involving Expired Statute Returns, and submit the case for normal processing. Voluntary payments are sent to Excess Collection File.

   c. Prepare and issue Letter 5319, Deficiency Case-Voluntary Payment Received After Statute Expiration, acknowledging receipt of the payment.

## 4.2 General Examining Procedures

**4.2.1.15**
**(04-23-2014)**
**Processing Returns and Accounts of the President and Vice President**

(1) The individual income tax returns for the President and Vice President are subject to mandatory examinations and cannot be surveyed. See IRM 3.28.3.4.3, Mandatory Examination.

(2) Copies of the returns to be examined will be transmitted by the Office of the Deputy Commissioner for Services and Enforcement to the SB/SE, Director, Examination.

(3) The area responsible for the examination will be determined by the SB/SE, Director, Examination or their designee. After a determination is made as to the area having jurisdiction, copies of the returns will be transmitted to the area planning and special programs (PSP) territory manager for control and assignment to the appropriate field group. The transmittal memorandum will contain the following instructions:

    a.   Regardless of discriminant index function (DIF) score, the returns will be examined.

    b.   IRS personnel, including specialists, will be assigned to the examination as appropriate.

    c.   The Examination Area Director, or their designee, will arrange for contact with the authorized representative of the President and or Vice President for the examination.

    d.   All relevant IRM procedures will apply to these returns.

(4) Upon receipt, the group should ensure Project Code 0207, Treasury Mandates, and Source Code 46, have been input for the primary and any prior or subsequent year returns.

(5) The returns must be assigned within 10 business days of receipt in the group. The returns require expeditious handling at all levels to ensure prompt completion of the examinations.

(6) Related returns, including estate and gift tax returns, will be handled in accordance with procedures relating to all taxpayers.

(7) The location of the returns of the President and Vice President will be monitored at all times throughout the examination process.

    a.   The returns should be kept in an orange folder at all times.

    b.   The returns should not be exposed to viewing by other employees.

    c.   The returns should be locked in a secure drawer or cabinet when the examiner is away from the work area.

(8) The returns should be processed similar to the examination of an employee return per IRM 4.2.6, Examination of Employee Returns, with the exception of the following:

    a.   The returns of the President and Vice President are mandatory examinations and cannot be surveyed.

    b.   The returns are subject to mandatory review and must be closed directly to the Employee Audit Reviewer in *Baltimore Technical Services*. The "Other" box in the "Forward to Technical Services" section of Form 3198 must be checked and the examiner should notate "President (or Vice President) Examination; Forward to Baltimore Technical Services." The examining area will notify Baltimore Technical Services when the return is being forwarded.

c.   Baltimore Technical Services will provide Centralized Case Processing (CCP) with advance notice when the return is being closed.

**4.2.1.16**
**(04-23-2014)**
**Blind Trust Income Tax Returns Filed by Presidential Appointees**

(1)   Taxpayers who are presidential appointees are permitted to file their individual income tax returns through a trustee of a blind trust. IRM 4.11.55.1.6, Terms, defines a blind trust as a device used to give management of one's investments to an outside person over whom the beneficiary has no control.

(2)   Extreme caution should be exercised not to violate a blind trust. All correspondence, inquiries, etc., should be directed to the authorized trustee unless the power of attorney indicates otherwise. No information regarding the source or nature of a blind trust can be disclosed. See IRM 3.28.3.4.1, General Information and Instructions, and Rev. Proc. 2010-11, for additional information.

**4.2.1.17**
**(04-23-2014)**
**Reporting Allegations of Tax Violations Involving Senior Treasury Officials**

(1)   Allegations of income tax evasion or allegations concerning the willful failure to file any tax return by a senior Treasury official where prosecution is recommended, where the fraud penalty under IRC 6663 is asserted, or the fraudulent failure to file penalty under IRC 6651(f) is asserted when prosecution is not recommended, will be reported to the Commissioner of Internal Revenue. The Commissioner of Internal Revenue will immediately report the allegations to the Deputy Secretary of Treasury or to the Secretary of Treasury.

**Note:**  For a definition of "Treasury Department" or "Senior Treasury Official" see IRM 4.2.1.1.4.

**4.2.1.17.1**
**(04-23-2014)**
**Compliance Examination Procedures**

(1)   Upon recommending the assertion of the fraud penalty under IRC 6663 or the fraudulent failure to file penalty under IRC 6651(f) (for a "senior Treasury official") where prosecution has not been recommended by the CI function, the territory manager will provide the Area Director (or comparable level of management) with a memorandum, for forwarding through channels, to the Commissioner of Internal Revenue. The memorandum will contain the following information:

a.   Taxpayer name, residence address, and social security number.
b.   Taxpayer position, now held, which qualifies him or her as a "senior Treasury official."
c.   Brief summary of the findings and the tax years involved.
d.   Additional civil taxes and penalties.

**4.2.1.18**
**(04-23-2014)**
**Reporting Misconduct of IRS Employees or Officials**

(1)   All information received concerning misconduct of IRS employees or officials will be reported to TIGTA via the local TIGTA office or by a report to the TIGTA hotline using one of the following methods:

•   Online—complete and submit the online form on TIGTA's web page at: *http://www.treasury.gov/tigta/contact_report.shtml*
•   Email—send a secure email message to the TIGTA Hotline Complaints Unit at *Complaints@tigta.treas.gov*
•   Telephone—1-800-366-4484
•   Fax—202-927-7018
•   Mail—

Treasury Inspector General for Tax Administration

Hotline

PO Box 589

Ben Franklin Station

Washington, DC 20044-0589

**4.2.1.19**
**(04-23-2014)**
**Income Tax Bonds**
**Under IRC 332(b) and**
**IRC 905(c)**

(1)   A bond for the purpose of securing payment of internal revenue taxes is collateral security offered by the taxpayer, representative or a third party, which satisfies the provisions of IRC 7101 and 26 CFR 301.7101–1.

(2)   If an IRC 332(b) liquidation is not completed within a single year, the recipient corporation must sign a waiver of the statute of limitations on assessment and may be required to file a bond.

    a.   The recipient corporation must waive the statute of limitations on assessment for each year that falls wholly or partly in the liquidation period. Form 952, Consent to Fix Period of Limitation on Assessment of Income Taxes, is used to extend the period of assessment of all income taxes of the receiving corporation on the complete liquidation of a subsidiary under IRC 332. See 26 CFR 1.332-4.

    b.   Under a three year corporate liquidation plan, the recipient corporation may be required to file a bond in case nonrecognition treatment is later lost. See 26 CFR 1.332-4(a)(3).

(3)   Under IRC 905(c), in the case of any credit sought for a foreign tax accrued but not paid, the Area Director or Director of Field Operations, as a condition precedent to the allowance of a credit, may require a bond from the taxpayer.

    a.   A bond under IRC 905(c) is filed using Form 1117, Income Tax Surety Bond. Form 1117 will be executed by the taxpayer or representative and approved by the Area Director (or comparable level of management) on behalf of the Commissioner of Internal Revenue.

    b.   No period of limitations is established under either IRC 905(c) or IRC 6501(a) for the furnishing of a bond requested pursuant to IRC 905(c) for a foreign tax credit based on an accrual of a foreign tax. Such bond may be required from a taxpayer at any time and the foreign tax credit may be disallowed without regard to any period of limitations if a taxpayer refuses to furnish the bond. See Rev. Rul. 73-573.

(4)   If IRC 332(b) or IRC 905(c) issues are present, examiners should contact their Area Counsel for help in determining whether to secure a bond and what the terms should be. Any bonds secured will be held by Collection Advisory. See IRM 5.6.1, Collateral Agreements and Security Type Collateral, and IRM 5.6.2, Maintenance, for additional information.

| | |
|---|---|
| 4.2.1.20<br>(04-23-2014)<br>**Property Blocked by**<br>**Foreign Funds Control**<br>**or Vested by Office of**<br>**Foreign Assets Control** | (1)  The Office of Foreign Assets Control (OFAC) of the Department of Treasury administers and enforces economic and trade sanctions based on U.S. foreign policy and national security goals against targeted foreign countries and regimes, terrorists, international narcotics traffickers, those engaged in activities related to the proliferation of weapons of mass destruction, and other threats to the national security, foreign policy, or economy of the United States. OFAC acts under Presidential national emergency powers, as well as authority granted by specific legislation, to impose controls on transactions and freeze foreign assets under U.S. jurisdiction. |

(2)  On September 24, 2001, the President of the United States issued an executive order that immediately froze U.S. financial assets of and prohibited U.S. transactions with 27 different entities. These entities include terrorist organizations, individual terrorist leaders, a corporation that serves as a front for terrorism, and several nonprofit organizations.

(3)  Treasury Directive (TD) 15-43 (May 3, 2007, reaffirmed September 8, 2011) delegates to the Commissioner of Internal Revenue the authority of the OFAC to investigate and review for compliance with economic sanctions programs persons that the IRS has the authority to examine for compliance with the Bank Secrecy Act provisions in Title 31 (31 U.S.C. 5311 et seq.). The authority to investigate and review includes, but is not limited to, the authority to compel the production of documents and information and otherwise to examine a person's compliance with OFAC-administered economic sanctions. IRM 1.2.43.37, Delegation Order 4-47 (New), addresses the Commissioner of Internal Revenue's authorization under TD 15-43 with respect to conducting reviews for compliance with economic sanctions programs.

(4)  Information regarding blocked property of aliens and foreign corporations may be obtained from records located in OFAC. When such information is requested by area offices, a request detailing the desired information will be forwarded to the SB/SE Area Director.

(5)  Requests should contain clear instructions on what is requested and why. OFAC collects the information for bank regulatory purposes and needs to know who will be the end user of the information and how the information will be used; e.g., by a revenue agent to conduct an examination. Make the request in a letter sent to the address listed on the contacts page of the *Office of Foreign Assets Control* website and include the subject line "Records Request from Federal Agency".

| | |
|---|---|
| 4.2.1.20.1<br>(04-23-2014)<br>**Office of Foreign Assets**<br>**Control (OFAC)**<br>**Information** | (1)  Information obtained from the records of OFAC with respect to blocked accounts will be considered to be of a confidential nature and the source thereof will not be disclosed to taxpayers or their representatives, nor will such information be used in any legal proceeding without written authorization from headquarters. |

(2)  OFAC will pay all taxes legally assessed against a former owner whose property has been vested by that office if the tax is attributable to taxable income accruing prior to the date of vesting. This is conditional upon a proper determination of the taxes, where there is no non-vested property from which the taxes may be realized, and there are vested funds available for payment of the taxes.

# 4.2   General Examining Procedures

**4.2.1.20.2**
**(04-23-2014)**
**Investigation and**
**Disposition**

(1)   Investigation of returns will be made under the general procedure prescribed for investigation of income tax returns. If the owner has property vested by OFAC, any deficiency in tax liability arising from income realized prior to vesting or from income earned on non-vested property will be asserted under the general prescribed procedures. Preliminary (30-day) letters or statutory notices of deficiency in cases where communication cannot be had with the owner or representative, should be addressed in care of the party or agency having custody of the property. Under war conditions, such address may be treated as the taxpayer's last known address.

(2)   If all the property of the owner has been vested, the preliminary (30-day) letter, as well as the statutory notice of deficiency, should be addressed to the owner, in care of Justice Dept., Civil Division, Office of Foreign Assets Control. Visit the *Office of Foreign Assets Control* website for additional information on the OFAC.

(3)   If the owner of the property or the party having custody of the property (in situations in which the property has not been vested by OFAC) does not agree to any proposed deficiencies, the parties will have the right to a protest. Any reasonable request for an extension to the 30-day letter should be given favorable consideration, provided the interests of the government are adequately protected.

(4)   If Appeals consideration is not requested, the case file will be forwarded to the LB&I, International, PSP program manager. The file will include the audit report and a statement of reasons why an agreement was not reached. In cases where agreements were concluded in vested cases, the file will be noted to assess in the name of the OFAC, for the former owner. Likewise, agreed assessments in non-vested cases will be made in the name of the owner in care of the person, party, or agency having custody of the property.

**4.2.1.20.3**
**(04-23-2014)**
**Payor Failure to**
**Withhold Tax at Source**

(1)   In cases of blocked or vested property, where it is determined the payor failed to withhold tax at the source on income, the amount required by statute to be withheld will be asserted against the payor agent. In cases where it is determined that income arising, but not paid, prior to blocking or vesting was turned over to OFAC without withholding, the liability of the payor agent for withholding will be promptly reported to the LB&I, International, PSP program manager for adjustment.

**4.2.1.21**
**(04-23-2014)**
**Witness Security**
**Program**

(1)   Federal agencies have always recognized a duty to protect informants and witnesses from threats or possible danger resulting from their assistance to the government by furnishing information or by testifying on behalf of the government in the prosecution of individuals. See IRM 9.5.11.11, Protection and Maintenance of Informants and Witnesses.

(2)   The IRS has the authority to temporarily protect an informant or witness until a determination is made by the DOJ that the person qualifies for protection under its Witness Security Program.

(3)   The IRS has the authority to approve all confidential expenditures for other protective arrangements undertaken by the IRS for an informant or witness who does not qualify for or is refused protection under the DOJ's Witness Security Program, in an investigation which is not under jurisdiction of the U.S. Attorney's Office.

(4) Examination personnel who become aware of or have indications that the taxpayer assigned may be a person in the Witness Security Program will immediately suspend the examination. No subsequent attempts by examination employees will be made to contact a protected witness. Any necessary contact will be coordinated through the special agent in charge (SAC) to the Deputy Chief, CI, Attn: Witness Security Coordinator (WSC). A memorandum will be prepared for signature of the area director (or comparable level of management) containing the following:

   a. Any examination action taken to date.
   b. Facts indicating that the taxpayer is enrolled in the Witness Security Program.
   c. Relevant facts involved in the tax matter, e.g., year under examination, information needed, etc.

(5) Upon receipt by an IRS employee of information alleging a threat or possible danger to a past or present government informant or witness or family member, as a result of furnishing information or otherwise cooperating with the government, the employee will forward the information immediately to the SAC.

4.2.1.22
(05-29-2019)
**Taxpayer Advocate Program**

(1) The Taxpayer Advocate Service (TAS) helps taxpayers resolve problems with the IRS and recommends changes to prevent problems through two types of advocacy—case-related and systemic. See IRM 13.1.1.2(5), Philosophy of Advocacy. TAS has identified criteria that qualify taxpayers for TAS assistance. TAS Criteria 1-9 reflect situations requiring acceptance of taxpayer cases to be worked by TAS.

(2) TAS refers to Criteria 1-4 as "Economic Burden" cases, Criteria 5-7 as "Systemic Burden" cases, Criteria 8 as "Best Interest of the Taxpayer" cases, and Criteria 9 as "Public Policy" cases. See IRM 13.1.7.2, TAS Case Criteria.

(3) All inquiries meeting TAS criteria should be documented on Form 911, Request for Taxpayer Advocate Service Assistance (And Application for Taxpayer Assistance Order), and forwarded to TAS by the most expeditious method available.

***Note:*** If the taxpayer specifically requests TAS assistance, the case should be referred to the Local Taxpayer Advocate (LTA).

(4) Problems that meet TAS criteria do not necessarily need to be sent to TAS if they can be immediately resolved by the function. All IRS employees should handle potential TAS cases with the taxpayer's best interest in mind. For other taxpayer problem resolutions, see IRM 4.10.1.4.6, Problem Solving.

***Note:*** If the taxpayer's problem involves an Appeals agreed resolution not being implemented or there was an error involving the implementation, refer the taxpayer to the Appeals customer service number, see IRM 8.1.9.2, AARS Closed Case Referrals, for additional information. An Appeals Account Resolution Specialist (AARS) will be able to provide assistance (AARS will not change case decisions or determinations).

(5) If TAS accepts a Form 911 that is related to a taxpayer under examination, it will be forwarded to Examination for review by the responsible group. The

group manager will refer to the *Service Level Agreement* between the National Taxpayer Advocate and the Commissioner of their respective division for procedural guidance.

    a.    Examiners should charge time expended on TAS activities to miscellaneous examination Activity Code 671, Taxpayer Advocate, per IRM 4.9, Examination Technical Time Reporting System. Time charged to this code should only include actual time spent on TAS activities. Examination time should be charged to the case in the usual manner.

    b.    The statute of limitations on assessment may be extended by IRC 7811(d) and should be confirmed in writing with TAS.

---

**4.2.1.23**
**(05-29-2019)**
**Extensions of the Replacement Period of Involuntarily Converted Property**

(1)    The provisions of IRC 1033, Involuntary Conversions, allow for the deferral of gains realized on the disposition of compulsorily or involuntarily converted property when a taxpayer purchases similar property within the specified replacement period. When the taxpayer is unable to replace the property within the normal replacement period, they can request an extension of the replacement period by writing to the Area Director. The Area Director will forward the taxpayer's request for an extension of time to Technical Services (TS) for consideration. TS will take final action to approve or deny the request as delegated by IRM 1.2.65.4.11, Delegation Order SBSE 1-23-33, Authority to Grant Extensions of Time to Replace Involuntarily Converted Property Under Section 1033 of the Internal Revenue Code. See IRM 4.8.8.6, Involuntarily Converted Property, for additional information.

**Note:** The request is most likely to be received by the Commissioner's Representative in miscellaneous mail forwarded by the Campus.

(2)    If the converted property is owned by several taxpayers under the jurisdiction of different Area Directors' offices, the *TS national coordinator* will conduct the investigation to determine whether reasonable cause exists for not replacing the converted property within the required time period.

---

**4.2.1.24**
**(05-29-2019)**
**Identification of Bad Payer Information**

(1)    During the preliminary review of IRP data, examiners may determine that information provided by the payer is incorrect.

(2)    Bad payer data is defined as any situation where the payer made an error on the information return of a type that could occur on other information returns. When errors have occurred on **ten or more** of these documents filed by one payer or transmitter, bad payer data exists. Examples of bad payer data include but are not limited to:

- Duplicate filing of Forms W-2 or 1099;
- Corrected Forms W-2 or 1099 not identified as a corrected, thus appearing to duplicate the original filing;
- Misplaced decimals;
- Additional digits added to amounts;
- Nontaxable income reported as taxable; and
- Income reported on the wrong form.

(3)    When examiners determine that bad payer data exists, they will briefly explain the identified error on a copy of the IRP and email it to the *AUR HQ Payer Agent Coordinator*, by selecting the coordinator from the AUR Coordinator Site - "Ogden".

| | |
|---|---|
| 4.2.1.25<br>(05-29-2019)<br>**Awards Received by Informants** | (1) Informant awards for confidential services are often received from the Bureau of Customs, Federal Bureau of Investigation, Central Intelligence Agency, Secret Service, local Police Departments, Whistleblower program, and other similar sources. It is imperative that the source of income not be revealed in the examiner's report and that the identify of the informant be protected. See IRM 25.2.2.9, Confidentiality of the Whistleblower, for additional guidance on confidentiality. |

(2) If during the examination, unidentified income reported on the return or unreported income is discovered, the taxpayer may explain that the income was received for services of a confidential nature.

- If verification of the source of income is necessary, then verification should be secured through inquiry of the official in charge of making the payment
- If the official is in the same locality as the examiner, then the official will be interviewed personally without any written communication or other report. If a personal interview is not possible, the examiner will prepare for the personal signature of the Area Director, a letter to the official marked "Confidential - To be opened by addressee only" requesting verification of the payment for confidential services.

(3) If the taxpayer states that the unidentified or unreported income was received for services of a confidential nature, the case will be processed in the usual manner without disclosing the source of the payment.

- In the case file, the description of the income will state "miscellaneous income -source verified."
- Correspondence used to verify the source of income will not remain in the case file but will be maintained in special file, confidential in nature, under the personal control of the Area Director.

| | |
|---|---|
| 4.2.1.26<br>(04-23-2014)<br>**Restructuring and Reform Act of 1998** | (1) All employees should be familiar with the provisions of the *Restructuring and Reform Act of 1998 (RRA 98)*, including the following: |

    a. Section 1105, Prohibition on Executive Branch Influence Over Taxpayer Audits and Other Investigations, superseded by IRC 7217.

    b. Section 1203, Termination of Employment for Misconduct. See Document 11043, RRA '98 Section 1203 All Employee Guide, for additional information.

    c. Section 3466, Application of Certain Fair Debt Collection Procedures, superseded by IRC 6304.

(2) In addition, the Service has a long-standing commitment to the fair and equitable treatment of all taxpayers set forth in Rev. Proc. 64-22. The pertinent part of Rev. Proc. 64-22 states the law will be administered in a reasonable, practical manner. Issues should be raised by examiners when they have merit and never arbitrarily or for trading purposes.



**Department of the Treasury**
**Internal Revenue Service**
**[Operating Division / Program Name]**

**Date:**
06/05/2019
**Taxpayer ID number (last 4 digits):**

**Form:**

**Tax periods:**

**Person to contact:**

**Contact telephone number:**

**Contact fax number:**

**Employee ID number:**

Dear [enter Name]:

Your federal return for the period(s) shown above was selected for examination.

**What you need to do**
Please call me on or before [date]        . You may contact me from [time]        to [time]        at the telephone number provided above.

During our telephone conversation, we'll talk about the items I'll be examining on your return, the types of documents I'll ask you to provide, the examination process, and any concerns or questions you may have. We'll also set the date, time, and agenda for our first meeting.

**Someone may represent you**
You may have someone represent you during any part of this examination. If you decide you want representation, the representative you authorize will need a completed Form(s) 2848, *Power of Attorney and Declaration of Representative,* before we can discuss any of your tax matters.

If you choose to have someone represent you, please provide a completed Form 2848 by our first appointment. You can mail or fax the form to me or have your representative provide it at the first appointment, if you won't be present. You can obtain Form 2848 from our office, from our web site, www.irs.gov or by calling (800) 829-3676.

If you filed a joint return, you and your spouse may attend the examination. If you and/or your spouse choose not to attend with your representative, you must provide completed Form(s) 2848. You should provide a separate Form 2848 for each spouse if you filed jointly even if you use the same representative.

**Your rights as a taxpayer**
We have enclosed Publication 1, *Your Rights as a Taxpayer* and Notice 609, *Privacy Act Notice*. The Declaration of Taxpayer Rights found in Publication 1 discusses general rules and procedures we follow in examinations. It explains what happens before, during, and after an examination, and provides additional sources of information.

**Letter 2205 (Rev. 1-2017)**
Catalog Number 63744P

A video presentation, "Your Guide to an IRS Audit," is available at http://www.irsvideos.gov/audit. The video explains the examination process and will assist you in preparing for your audit.

Thank you for your cooperation and I look forward to hearing from you by [date]          .

Sincerely,


[Name]
Internal Revenue Agent

Enclosures:
Publication 1
Notice 609



# Your Rights as a Taxpayer

Publication 1

This publication explains your rights as a taxpayer and the processes for examination, appeal, collection, and refunds. Also available in Spanish.

# The Taxpayer Bill of Rights

## 1. The Right to Be Informed

Taxpayers have the right to know what they need to do to comply with the tax laws. They are entitled to clear explanations of the laws and IRS procedures in all tax forms, instructions, publications, notices, and correspondence. They have the right to be informed of IRS decisions about their tax accounts and to receive clear explanations of the outcomes.

## 2. The Right to Quality Service

Taxpayers have the right to receive prompt, courteous, and professional assistance in their dealings with the IRS, to be spoken to in a way they can easily understand, to receive clear and easily understandable communications from the IRS, and to speak to a supervisor about inadequate service.

## 3. The Right to Pay No More than the Correct Amount of Tax

Taxpayers have the right to pay only the amount of tax legally due, including interest and penalties, and to have the IRS apply all tax payments properly.

## 4. The Right to Challenge the IRS's Position and Be Heard

Taxpayers have the right to raise objections and provide additional documentation in response to formal IRS actions or proposed actions, to expect that the IRS will consider their timely objections and documentation promptly and fairly, and to receive a response if the IRS does not agree with their position.

## 5. The Right to Appeal an IRS Decision in an Independent Forum

Taxpayers are entitled to a fair and impartial administrative appeal of most IRS decisions, including many penalties, and have the right to receive a written response regarding the Office of Appeals' decision. Taxpayers generally have the right to take their cases to court.

## 6. The Right to Finality

Taxpayers have the right to know the maximum amount of time they have to challenge the IRS's position as well as the maximum amount of time the IRS has to audit a particular tax year or collect a tax debt. Taxpayers have the right to know when the IRS has finished an audit.

## 7. The Right to Privacy

Taxpayers have the right to expect that any IRS inquiry, examination, or enforcement action will comply with the law and be no more intrusive than necessary, and will respect all due process rights, including search and seizure protections, and will provide, where applicable, a collection due process hearing.

## 8. The Right to Confidentiality

Taxpayers have the right to expect that any information they provide to the IRS will not be disclosed unless authorized by the taxpayer or by law. Taxpayers have the right to expect appropriate action will be taken against employees, return preparers, and others who wrongfully use or disclose taxpayer return information.

## 9. The Right to Retain Representation

Taxpayers have the right to retain an authorized representative of their choice to represent them in their dealings with the IRS. Taxpayers have the right to seek assistance from a Low Income Taxpayer Clinic if they cannot afford representation.

## 10. The Right to a Fair and Just Tax System

Taxpayers have the right to expect the tax system to consider facts and circumstances that might affect their underlying liabilities, ability to pay, or ability to provide information timely. Taxpayers have the right to receive assistance from the Taxpayer Advocate Service if they are experiencing financial difficulty or if the IRS has not resolved their tax issues properly and timely through its normal channels.

**The IRS Mission** | Provide America's taxpayers top-quality service by helping them understand and meet their tax responsibilities and enforce the law with integrity and fairness to all.

Publication 1  (Rev. 9-2017)  Catalog Number 64731W  Department of the Treasury  **Internal Revenue Service**  www.irs.gov

# Examinations, Appeals, Collections, and Refunds

## Examinations (Audits)

We accept most taxpayers' returns as filed. If we inquire about your return or select it for examination, it does not suggest that you are dishonest. The inquiry or examination may or may not result in more tax. We may close your case without change; or, you may receive a refund.

The process of selecting a return for examination usually begins in one of two ways. First, we use computer programs to identify returns that may have incorrect amounts. These programs may be based on information returns, such as Forms 1099 and W-2, on studies of past examinations, or on certain issues identified by compliance projects. Second, we use information from outside sources that indicates that a return may have incorrect amounts. These sources may include newspapers, public records, and individuals. If we determine that the information is accurate and reliable, we may use it to select a return for examination.

Publication 556, Examination of Returns, Appeal Rights, and Claims for Refund, explains the rules and procedures that we follow in examinations. The following sections give an overview of how we conduct examinations.

## By Mail

We handle many examinations and inquiries by mail. We will send you a letter with either a request for more information or a reason why we believe a change to your return may be needed. You can respond by mail or you can request a personal interview with an examiner. If you mail us the requested information or provide an explanation, we may or may not agree with you, and we will explain the reasons for any changes. Please do not hesitate to write to us about anything you do not understand.

## By Interview

If we notify you that we will conduct your examination through a personal interview, or you request such an interview, you have the right to ask that the examination take place at a reasonable time and place that is convenient for both you and the IRS. If our examiner proposes any changes to your return, he or she will explain the reasons for the changes. If you do not agree with these changes, you can meet with the examiner's supervisor.

## Repeat Examinations

If we examined your return for the same items in either of the 2 previous years and proposed no change to your tax liability, please contact us as soon as possible so we can see if we should discontinue the examination.

## Appeals

If you do not agree with the examiner's proposed changes, you can appeal them to the Appeals Office of the IRS. Most differences can be settled without expensive and time-consuming court trials. Your appeal rights are explained in detail in both Publication 5, Your Appeal Rights and How To Prepare a Protest If You Don't Agree, and Publication 556, Examination of Returns, Appeal Rights, and Claims for Refund.

If you do not wish to use the Appeals Office or disagree with its findings, you may be able to take your case to the U.S. Tax Court, U.S. Court of Federal Claims, or the U.S. District Court where you live. If you take your case to court, the IRS will have the burden of proving certain facts if you kept adequate records to show your tax liability, cooperated with the IRS, and meet certain other conditions. If the court agrees with you on most issues in your case and finds that our position was largely unjustified, you may be able to recover some of your administrative and litigation costs. You will not be eligible to recover these costs unless you tried to resolve your case administratively, including going through the appeals system, and you gave us the information necessary to resolve the case.

## Collections

Publication 594, The IRS Collection Process, explains your rights and responsibilities regarding payment of federal taxes. It describes:

- What to do when you owe taxes. It describes what to do if you get a tax bill and what to do if you think your bill is wrong. It also covers making installment payments, delaying collection action, and submitting an offer in compromise.

- IRS collection actions. It covers liens, releasing a lien, levies, releasing a levy, seizures and sales, and release of property.

- IRS certification to the State Department of a seriously delinquent tax debt, which will generally result in denial of a passport application and may lead to revocation of a passport.

Your collection appeal rights are explained in detail in Publication 1660, Collection Appeal Rights.

## Innocent Spouse Relief

Generally, both you and your spouse are each responsible for paying the full amount of tax, interest, and penalties due on your joint return. However, if you qualify for innocent spouse relief, you may be relieved of part or all of the joint liability. To request relief, you must file Form 8857, Request for Innocent Spouse Relief. For more information on innocent spouse relief, see Publication 971, Innocent Spouse Relief, and Form 8857.

## Potential Third Party Contacts

Generally, the IRS will deal directly with you or your duly authorized representative. However, we sometimes talk with other persons if we need information that you have been unable to provide, or to verify information we have received. If we do contact other persons, such as a neighbor, bank, employer, or employees, we will generally need to tell them limited information, such as your name. The law prohibits us from disclosing any more information than is necessary to obtain or verify the information we are seeking. Our need to contact other persons may continue as long as there is activity in your case. If we do contact other persons, you have a right to request a list of those contacted. Your request can be made by telephone, in writing, or during a personal interview.

## Refunds

You may file a claim for refund if you think you paid too much tax. You must generally file the claim within 3 years from the date you filed your original return or 2 years from the date you paid the tax, whichever is later. The law generally provides for interest on your refund if it is not paid within 45 days of the date you filed your return or claim for refund. Publication 556, Examination of Returns, Appeal Rights, and Claims for Refund, has more information on refunds.

If you were due a refund but you did not file a return, you generally must file your return within 3 years from the date the return was due (including extensions) to get that refund.

## Taxpayer Advocate Service

TAS is an *independent* organization within the IRS that can help protect your taxpayer rights. We can offer you help if your tax problem is causing a hardship, or you've tried but haven't been able to resolve your problem with the IRS. If you qualify for our assistance, which is always free, we will do everything possible to help you. Visit *www.taxpayeradvocate.irs.gov* or call 1-877-777-4778.

## Tax Information

The IRS provides the following sources for forms, publications, and additional information.

- *Tax Questions:* 1-800-829-1040 (1-800-829-4059 for TTY/TDD)
- *Forms and Publications:* 1-800-829-3676 (1-800-829-4059 for TTY/TDD)
- *Internet:* www.irs.gov
- *Small Business Ombudsman:* A small business entity can participate in the regulatory process and comment on enforcement actions of the IRS by calling 1-888-REG-FAIR.
- *Treasury Inspector General for Tax Administration:* You can confidentially report misconduct, waste, fraud, or abuse by an IRS employee by calling 1-800-366-4484 (1-800-877-8339 for TTY/TDD). You can remain anonymous.

| Form **4564**<br>(Rev. September 2006) | Department of the Treasury — Internal Revenue Service<br>**Information Document Request** | Request Number |
|---|---|---|

| To: *(Name of Taxpayer and Company Division or Branch)* | Subject |
|---|---|
| | SAIN number | Submitted to: |
| | Dates of Previous Requests *(mmddyyyy)* |
| *Please return Part 2 with listed documents to requester identified below* | |

Description of documents requested

Information Due By _____   At Next Appointment ☐   Mail in ☐

| **From:** | Name and Title of Requester | Employee ID number | Date *(mmddyyyy)* |
|---|---|---|---|
| | Office Location | | Telephone Number<br>(    ) |

Catalog Number 23145K          www.irs.gov          Part 1 - Taxpayer's File Copy          Form **4564** (Rev. 9-2006)

| Form **4564**<br>(Rev. September 2006) | Department of the Treasury — Internal Revenue Service<br>**Information Document Request** | Request Number |
|---|---|---|

**To:** *(Name of Taxpayer and Company Division or Branch)*

| | Subject |
|---|---|
| | SAIN number |  Submitted to: |
| | Dates of Previous Requests *(mmddyyyy)* |

*Please return Part 2 with listed documents to requester identified below*

Description of documents requested

Information Due By _____  At Next Appointment ☐   Mail in ☐

**From:** | Name and Title of Requester | Employee ID number | Date *(mmddyyyy)* |
| Office Location | Telephone Number<br>(    ) |

| Form **4564**<br>(Rev. September 2006) | Department of the Treasury — Internal Revenue Service<br># Information Document Request | Request Number |
|---|---|---|

To: *(Name of Taxpayer and Company Division or Branch)*

Subject

SAIN number | Submitted to:

Dates of Previous Requests *(mmddyyyy)*

*Please return Part 2 with listed documents to requester identified below*

Description of documents requested

Information Due By _____   At Next Appointment ☐   Mail in ☐

**From:**

Name and Title of Requester | Employee ID number | Date *(mmddyyyy)*

Office Location | Telephone Number<br>(     )

| Form **872** | Department of the Treasury-Internal Revenue Service | In reply refer to: |
|---|---|---|
| (Rev. July 2014) | **Consent to Extend the Time to Assess Tax** | TIN |

_____

_____

*(Name(s))*

taxpayer(s) of _____

_____

*(Address)*

and the Commissioner of Internal Revenue consent and agree to the following:

(1) The amount of any Federal _____ tax due on any return(s) made by or

*(Kind of tax)*

for the above taxpayer(s) for the period(s) ended

_____

_____

may be assessed at any time on or before _____ . If a provision

*(Expiration date)*

of the Internal Revenue Code suspends the running of the period of limitations to assess such tax, then, when, under the Internal Revenue Code, the running of the period resumes, the extended period to assess will include the number of days remaining in the extended period immediately before the suspension began.

(2) The taxpayer(s) may file a claim for credit or refund and the Service may credit or refund the tax within 6 months after this agreement ends, except with respect to the items in paragraph (4).

(3) Paragraph (4) applies only to any taxpayer who holds an interest, **either directly or indirectly,** in any partnership subject to subchapter C of chapter 63 of the Internal Revenue Code.

(4) Without otherwise limiting the applicability of this agreement, this agreement also extends the period of limitations for assessing any tax (including penalties, additions to tax and interest) attributable to any partnership items (see section 6231 (a)(3)), affected items (see section 6231(a)(5)), computational adjustments (see section 6231(a)(6)), and partnership items converted to nonpartnership items (see section 6231(b)). Additionally, this agreement extends the period of limitations for assessing any tax (including penalties, additions to tax, and interest) relating to any amounts carried over from the taxable year specified in paragraph (1) to any other taxable year(s). This agreement extends the period for filing a petition for adjustment under section 6228(b) but only if a timely request for administrative adjustment is filed under section 6227.  For partnership items which have converted to nonpartnership items, this agreement extends the period for filing a suit for refund or credit under section 6532, but only if a timely claim for refund is filed for such items.

(5) This Form contains the entire terms of the Consent to Extend the Time to Assess Tax. There are no representations, promises, or agreements between the parties except those found or referenced on this Form.

## Your Rights as a Taxpayer

You have the right to refuse to extend the period of limitations or limit this extension to a mutually agreed-upon issue(s) or mutually agreed-upon period of time. **Publication 1035, Extending the Tax Assessment Period,** provides a more detailed explanation of your rights and the consequences of the choices you may make. If you have not already received a Publication 1035, the publication can be obtained, free of charge, from the IRS official who requested that you sign this consent or from the IRS' web site at www.irs.gov or by calling toll free at 1-800-TAX-FORM (1-800-829-3676). Signing this consent will not deprive you of any appeal rights to which you would otherwise be entitled.

*(Space for signature is on the back of this form and signature instructions are attached)*

| TIN | Period Ending | | Expiration Date |
|---|---|---|---|

## SIGNING THIS CONSENT WILL NOT DEPRIVE THE TAXPAYER(S) OF ANY APPEAL RIGHTS TO WHICH THEY WOULD OTHERWISE BE ENTITLED.

**YOUR SIGNATURE HERE** ➡

*(Date signed)*

*(Type or Print Name)*

I am aware that I have the right to refuse to sign this consent or to limit the extension to mutually agreed-upon issues and/or period of time as set forth in I.R.C. § 6501(c)(4)(B).

**SPOUSE'S SIGNATURE** ➡

*(Date signed)*

*(Type or Print Name)*

I am aware that I have the right to refuse to sign this consent or to limit the extension to mutually agreed-upon issues and/or period of time as set forth in I.R.C. § 6501(c)(4)(B).

**TAXPAYER'S REPRESENTATIVE SIGN HERE** ➡
*(Only needed if signing on behalf of the taxpayer.)*

*(Date signed)*

*(Type or Print Name)*

I am aware that I have the right to refuse to sign this consent or to limit the extension to mutually agreed-upon issues and/or period of time as set forth in I.R.C. § 6501(c)(4)(B). In addition, the taxpayer(s) has been made aware of these rights.

If this document is signed by a taxpayer's representative, the Form 2848, Power of Attorney and Declaration of Representative, or other power of attorney document must state that the acts authorized by the power of attorney include representation for the purposes of Subchapter C of Chapter 63 of the Internal Revenue Code in order to cover items in paragraph (4).

**CORPORATE NAME** ➡

**CORPORATE OFFICER(S) SIGN HERE** ➡

*(Type or Print Name)*          *(Title)*          *(Date signed)*

➡

*(Type or Print Name)*          *(Title)*          *(Date signed)*

I (we) am aware that I (we) have the right to refuse to sign this consent or to limit the extension to mutually agreed-upon issues and/or period of time as set forth in I.R.C. § 6501 (c)(4)(B).

## INTERNAL REVENUE SERVICE SIGNATURE AND TITLE

*(IRS Official's Name - see instructions)*          *(IRS Official's Title - see instructions)*

*(IRS Official's Signature - see instructions)*          *(Date signed)*

## Instructions

If this consent is for:

- Income tax, self-employment tax, or FICA tax on tips and is made for any year(s) for which a joint return was filed, both husband and wife must sign the original and copy of this form unless one, acting under a power of attorney, signs as agent for the other. The signatures must match the names as they appear on the front of this form.

- Gift tax and the donor and the donor's spouse elected to have gifts to third persons considered as made one-half by each, both husband and wife must sign the original and copy of this form unless one, acting under a power of attorney, signs as agent for the other. The signatures must match the names as they appear on the front of this form.

- Chapter 41, 42, or 43 taxes involving a partnership or is for a partnership return, only one authorized partner need sign.

- Chapter 42 taxes, a separate Form 872 should be completed for each potential disqualified person, entity, or foundation manager that may be involved in a taxable transaction during the related tax year. See Revenue Ruling 75-391, 1975-2C.B 446.

If you are an attorney or agent of the taxpayer(s), you may sign the consent provided the action is specifically authorized by a power of attorney. If the power of attorney was not previously filed, you must include it with this form.

If you are acting as a fiduciary (such as executor, administrator, trustee, etc.) and you sign this consent, attach Form 56, Notice Concerning Fiduciary Relationship, unless it was previously filed.

If the taxpayer is a corporation, sign this consent with the corporate name followed by the signature and title of the officer(s) authorized to sign.

## Instructions for Internal Revenue Service Employees

Complete the delegated IRS official's name and title of the employee who is signing the form on behalf of the IRS.

An IRS official delegated authority under Delegation Order 25-2 must sign and date the consent. (IRM 1.2.52.3)

| Form **4549** (January 2019) | Department of the Treasury - Internal Revenue Service **Report of Income Tax Examination Changes** |
| --- | --- |

| Name and address of taxpayer | | Taxpayer identification number | Return form number |
| --- | --- | --- | --- |
| | | Person with whom examination changes were discussed. | Name and title |

| | Period Ended | Period Ended | Period Ended |
| --- | --- | --- | --- |
| 1. **Adjustments to income** | | | |
| a. | | | |
| b. | | | |
| c. | | | |
| d. | | | |
| e. | | | |
| f. | | | |
| g. | | | |
| h. | | | |
| i. | | | |
| j. | | | |
| k. | | | |
| l. | | | |
| m. | | | |
| n. | | | |
| o. | | | |
| p. | | | |
| 2. **Total adjustments** | | | |
| 3. Taxable income per return or as previously adjusted | | | |
| 4. **Corrected taxable income**       Tax method       Filing status | | | |
| 5. **Tax** | | | |
| 6. **Additional taxes/Alternative minimum tax** | | | |
| 7. Corrected tax liability | | | |
| 8. **Less**  a. | | | |
|    **credits**  b. | | | |
|        c. | | | |
|        d. | | | |
| 9. **Balance** *(line 7 less lines 8a through 8d)* | | | |
| 10.  Plus  a. | | | |
|    other  b. | | | |
|    taxes  c. | | | |
|        d. | | | |
| 11.  Total corrected tax liability *(line 9 plus lines 10a through 10d)* | | | |
| 12.  Total tax shown on return or as previously adjusted | | | |
| 13.  Adjustments to:  a. | | | |
|        b. | | | |
|        c. | | | |
| 14.  Deficiency-Increase in tax or *(overassessment-decrease in tax) (line 11 less line 12 adjusted by lines 13a through 13c)* | | | |
| 15.  Adjustments to prepayment credits - increase *(decrease)* | | | |
| 16.  **Balance due or *(overpayment)* -** *(line 14 adjusted by line 15) (excluding interest and penalties)* | | | |

The Internal Revenue Service has agreements with state tax agencies under which information about federal tax, including increases or decreases, is exchanged with the states. If this change affects the amount of your state income tax, **you should amend your state return** by filing the necessary forms.

You may be subject to backup withholding if you underreport your interest, dividend, or patronage dividend income you earned and do not pay the required tax. The IRS may order backup withholding (withholding of a percentage of your dividend and/or interest payments) if the tax remains unpaid after it has been assessed and four notices have been issued to you over a 120-day period.

Page _____ of _____

| Name of taxpayer | | Taxpayer identification number | Return form number | |
|---|---|---|---|---|
| | | **Period Ended** | **Period Ended** | **Period Ended** |
| 17.  **Penalties, additions to tax, and additional amounts -- IRC sections** | | | | |
| a. | | | | |
| b. | | | | |
| c. | | | | |
| d. | | | | |
| e. | | | | |
| f. | | | | |
| g. | | | | |
| h. | | | | |
| i. | | | | |
| j. | | | | |
| k. | | | | |
| l. | | | | |
| m. | | | | |
| n. | | | | |
| 18.  **Total penalties, additions to tax, and additional amounts** | | | | |
| 19.  **Summary of taxes, penalties and interest** | | | | |
| a.  Balance due or *(overpayment)* taxes - *(line 16, page 1)* | | | | |
| b.  Penalties and additions *(line 18)* - computed to | | | | |
| c.  Interest* *(IRC § 6601)* - estimated and computed to | | | | |
| d.  Amount due or *(refund)* - *(sum of lines a, b, and c)* | | | | |

*Interest, as provided by law, will be charged on any unpaid amount until it is paid in full.

Other information

| Examiner's name | | Employee ID | Office | |
|---|---|---|---|---|
| Examiner's signature | | | Date | |

Consent to Assessment and Collection- I do not wish to exercise my appeal rights with the Internal Revenue Service or to contest in the United States Tax Court the findings in this report. Therefore, I give my consent to the immediate assessment and collection of any increase in tax and penalties, and accept any decrease in tax and penalties shown above, plus additional interest as provided by law. It is understood that this report is subject to acceptance by the Area Director, Area Manager, Specialty Tax Program Chief, or Director of Field Operations.

**Note: If a joint return was filed, BOTH taxpayers must sign**

| Signature of taxpayer | Date | Signature of taxpayer | Date |
|---|---|---|---|
| By | | Title | Date |

Form **5701**
(April 2019)

Department of the Treasury - Internal Revenue Service

# Notice of Proposed Adjustment

| Name of taxpayer | Issue number |
|---|---|
| Name and title of person to whom delivered | Date |
| Entity for this proposed adjustment | Response due |

Based on the information we now have available and our discussions with you, we believe the proposed adjustment listed below should be included in the revenue agent's report. However, if you have additional information that would alter or reverse this proposal, please furnish this information as soon as possible.

| Years | Amount | Account or Return Line | SAIN Number | UIL Code |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

Reasons for proposed adjustment *(If the explanation of the adjustment will be longer than the space provided below, the entire explanation should begin on Form 886-A (explanation of items)*

Taxpayer's/Representative's action

☐ Agreed    ☐ Agreed in part    ☐ Disagreed    ☐ Have additional information; will submit by _____

| Taxpayer's/Representative's signature | Date |
|---|---|

If disagreed in part or in full - check here for consideration of Fast Track Settlement

☐ Taxpayer    ☐ IRS

| Team Manager | Date |
|---|---|



**Department of the Treasury**
**Internal Revenue Service**

Date:

Taxpayer ID number:

PC                    EGC
Tax periods ended:


Person to contact:

Contact telephone number:

Contact hours:

Contact fax number:


**We're auditing your        Form            , and need a response from you.**

**Proposed changes to your        Form**

Dear

We reviewed your        federal income tax return, any information you gave us, and made proposed changes to your tax. As a result, we found that you:

☐ are due a refund of $

☐ owe a balance of $              . This amount may include tax, penalties, and estimated interest due. You should pay the balance due immediately to avoid additional penalties and interest charges.

**What you need to do**
Review the enclosed Form 4549, *Income Tax Examination Changes,* and attached Form 886 and let us know by                if you agree or disagree with our proposed changes. If your address has changed, please provide your current address and contact information when you respond.

**If you agree with our changes**
- Sign, date and mail the enclosed Form 4549 to us in the envelope we provided.

- If you are due a refund, you should receive a refund check within 8 weeks if you don't owe other taxes or debts we're required to collect.

- If you owe additional taxes, make your check or money order payable to the United States Treasury. Write your taxpayer ID number, tax year and form number on the check.

- If you can't pay the total amount due, pay as much as you can and make payment arrangements to pay the rest over time. Payment options are described in the enclosed Publication 3498-A, *The Examination Process (Audits by Mail).* You can also search "tax payment options" at www.irs.gov.

**Letter 525 (Rev. 9-2014)**
Catalog Number 40216W

**If you don't agree with our changes**

Return a copy of this letter along with your explanation and any supporting documents. Form 886 attached to the Form 4549 explains documentation you need to give us. Publication 3498-A describes the audit process and explains other options, including your appeal rights, if you disagree with our proposed changes.

**If we don't hear from you**

If we don't receive a response from you, we'll send you a Notice of Deficiency, which will state the amount you owe with penalties and explain your right to file a petition in the United States Tax Court. Once a Notice of Deficiency is sent to you, you cannot appeal disagreements to the IRS. We will still consider new information you may provide to us, but you will need to file a petition with the United States Tax Court to challenge the deficiency.

If you need assistance, please don't hesitate to contact us. If you want to authorize someone, in addition to you, to contact the IRS about this letter, please complete and send us Form 2848, *Power of Attorney and Declaration of Representative.* You can download this form at www.irs.gov or request a copy by calling 1-800-TAX-FORM (1-800-829-3676).

Please provide a telephone number, including area code and the best time for us to call you if I need more information.

Telephone number: (          ) _____ - _____   Hours: _____

Sincerely,

Enclosures:
Form 4549
Publication 3498-A
☐ Form 886
Copy of this letter
Envelope

## The IRS Mission

*Provide America's taxpayers top quality service by helping them understand and meet their tax responsibilities and by applying the tax law with integrity and fairness to all.*



Department of the Treasury
**Internal Revenue Service**

www.irs.gov

Publication 3498 (Rev. 11-2004)
Catalog Number 73074S

# The Examination Process

## Introduction

The Internal Revenue Service (IRS) accepts most federal returns as filed.  Some returns, however, are examined, or audited, to determine if income, expenses, and credits are reported accurately.

This publication discusses general rules and procedures we follow in examinations.  It explains what happens before, during, and after an examination. It also explains appeal and payment procedures.

As a taxpayer, you have the right to fair, professional, prompt, and courteous service from IRS employees, as outlined in the Declaration of Taxpayer Rights found on page 3.

We must follow the tax rules set forth by Congress in the Internal Revenue Code.  We also follow Treasury Regulations, court decisions, and other rules and procedures written to administer the tax laws.

If the examination results in a change to your tax liability, you may ask us to reconsider your case.  Some reasons why we may reconsider your case include:

- You are submitting additional information that could result in a change to the additional amount we have determined that you owe;

- You are filing an original delinquent return after we have determined that you owe an additional amount, or;

- You are identifying a mathematical or processing error we made.

You must request reconsideration in writing and submit it to your local IRS office.

# What's *Inside . . .*

**Introduction**

***Declaration of Taxpayer Rights*** . . . . . . . . . .   3

***Your Return Is Going To Be Examined*** . . . . .   3

    Before the Examination . . . . . . . . . . . .   3

    During the Examination . . . . . . . . . . . .   3

    Examinations by Mail . . . . . . . . . . . . .   3

    Examinations in Person . . . . . . . . . . . .   3

    How to Stop Interest from Accumulating. . . .   4

    Consents to Extend the Statute of
    Limitations . . . . . . . . . . . . . . . . .   4

    Results of the Examination . . . . . . . . . .   4

***What to Do When You Receive a Bill
from the IRS*** . . . . . . . . . . . . . . . . . . .   4

***What To Do if You Agree or Disagree
with the Examination Results*** . . . . . . . . . . .   5

    If You Agree . . . . . . . . . . . . . . . . .   5

    If You Do Not Agree . . . . . . . . . . . . . .   5

    Fast Track Mediation Services . . . . . . . . .   5

***How Do You Appeal a Decision?*** . . . . . . . . .   6

    The Appeal System . . . . . . . . . . . . . .   6

    Appeal Within the IRS . . . . . . . . . . . . .   6

    Making a Small Case Request . . . . . . . .   6

    Filing a Formal Protest . . . . . . . . . . . .   6

***After the Examination*** . . . . . . . . . . . . . . .   7

    Payment Options . . . . . . . . . . . . . .   7

    Temporarily Delay the
    Collection Process . . . . . . . . . . . . . .   7

    Innocent Spouse Relief . . . . . . . . . . . .   8

    You Must Contact Us . . . . . . . . . . . . .   8

    What If You Believe Your Bill Is Wrong . . . . .   8

**Privacy Act Statement.** . . . . . . . . . . . . . .   8

**? Do you have questions or need help right away?  Call us.  We are here to help you.**

## For General Information:

For information about a specific examination please contact the person named on the appointment letter.



***For tax information and help:***

    Call the number on the bill you received or call us toll free at:

    1-800-829-1040 *(for 1040 filers)*
    1-800-829-4933 *(for business filers)*
    1-800-829-4059 /TDD



***For tax forms and publications:***

    **1-800-829-3676**
    1-800-829-4059 /TDD
    1-703-368-9694-Forms by Fax



***Internet:  www.irs.gov***

    **FTP - ftp.fedworld.gov/pub/**

    **TELENET-iris.irs.gov**

    You'll find answers to frequently asked tax questions, tax forms on-line, searchable publications, hot tax issues, news, and help through e-mail.



***If you prefer to write to us . .***

    Enclose a copy of your tax bill.  Print your name, social security number or taxpayer identification number, and the tax form and period shown on your bill.  Write to us at the address shown on your tax bill.



***You may also visit your nearest IRS Office.***

You'll find the exact address in your local phone book under *U.S. Government*

## *Declaration of Taxpayer Rights*

### I. Protection of Your Rights

*IRS employees will explain and protect your rights as a taxpayer throughout your contact with us.*

### II. Privacy and Confidentiality

*The IRS will not disclose to anyone the information you give us, except as authorized by law. You have the right to know why we are asking you for information, how we will use it, and what happens if you do not provide requested information.*

### III. Professional and Courteous Service

*If you believe that an IRS employee has not treated you in a professional, fair, and courteous manner, you should tell that employee's supervisor. If the supervisor's response is not satisfactory, you should write to the IRS Director for your Area or the Center where you file your return.*

### IV. Representation

*You may either represent yourself or, with proper written authorization, have someone else represent you. Your representative must be a person allowed to practice before the IRS, such as an attorney, certified public accountant, or enrolled agent (a person enrolled to practice before the IRS). If you are in an interview and ask to consult such a person, then we must stop and reschedule the interview in most cases.*

*You can have someone accompany you at an interview. You may make sound recordings of any meetings with our examination, appeal, or collection personnel, provided you tell us in writing 10 days before the meeting.*

### V. Payment of Only the Correct Amount of Tax

*You are responsible for paying only the correct amount of tax due under the law—no more, no less. If you cannot pay all of your tax when it is due, you may be able to make monthly payments.*

### VI. Help with Unresolved Tax Problems

*The Taxpayer Advocate Service can help you if you have tried unsuccessfully to resolve a problem with the IRS. Your local Taxpayer Advocate can offer you special help if you have a significant hardship as a result of a tax problem. For more information, call toll-free, 1-877-777-4778 (1-800-829-4059 for TTY/TDD) or write to the Taxpayer Advocate at the IRS office that last contacted you.*

### VII. Appeals and Judicial Review

*If you disagree with us about the amount of your tax liability or certain collection actions, you have the right to ask the Appeals Office to review your case. You may also ask a court to review your case.*

### VIII. Relief from Certain Penalties and Interest

*The IRS will waive penalties when allowed by law if you can show you acted reasonably and in good faith or relied on the incorrect advice of an IRS employee. We will waive interest that is the result of certain errors or delays caused by an IRS employee.*

## *Your Return Is Going To Be Examined.*

### *Before the Examination*

We accept most taxpayers' returns as filed. If we inquire about your return or select it for examination, it does not suggest that you are dishonest. The inquiry or examination may or may not result in more tax. We may close your case without change or you may receive a refund.

The process of selecting a return for examination usually begins in one of two ways. One way is to use computer programs to identify returns that may have incorrect amounts. The programs may be based on information returns, such as Forms 1099 or W-2, on studies of past examinations, or on certain issues identified by other special projects. Another way is to use information from compliance projects that indicates a return may have incorrect amounts. These sources may include newspapers, public records, and individuals. If we determine the information is accurate and reliable, we may use it to select a return for examination.

Publication 556, *Examination of Returns, Appeal Rights, and Claims for Refund,* explains the rules and procedures that we follow in examinations. The following sections give an overview of how we conduct examinations.

### *During the Examination*

#### Examinations by Mail

Some examinations are conducted entirely by mail. If the examination is conducted by mail, you'll receive a letter from us asking for additional information about certain items shown on your return, such as income, expenses, and itemized deductions.

If the examination is conducted by mail, you can:

1. Act on your own behalf. *(In the case of a jointly filed return, either spouse can respond or both spouses can send a joint response.)*

2. Have someone represent you in correspondence with us. This person must be an attorney, accountant, enrolled agent, an enrolled actuary, or the person who prepared the return and signed it as the preparer. If you choose to have someone represent you, you must furnish us with written authorization. Make this authorization on Form 2848, *Power of Attorney and Declaration of Representative.*

   Note: *You may obtain any of the forms and publications referenced in this publication by calling 1-800-829-3676.*

#### Examinations in Person

An examination conducted in person begins when we notify you that your return has been selected. We will tell you what information you need to provide at that time. If you gather the information before the examination, we may be able to complete it more easily and in a shorter time.

If the examination is conducted in person, it can take place in your home, your place of business, an IRS office, or the office of your attorney, accountant, or enrolled agent *(a person enrolled to practice before the IRS).* If the time or place is not convenient for you, the examiner will try to work out something more suitable.

*Your Return Is Going To Be Examined. (cont.)*

If the examination is conducted in person, you can:

1. Act on your own behalf. *(In the case of a jointly filed return, either spouse or both can attend the interview.)* If you are acting on your own behalf, you may leave to consult with your representative. We will suspend the interview and reschedule the examination. We cannot suspend the interview if we are conducting it as a result of your receiving an administrative summons.

2. Have someone accompany you, either to support your position or to witness to the proceedings.

3. Accompany someone who will represent you. This person must be an attorney, accountant, enrolled agent, an enrolled actuary, or the person who prepared the return and signed it as the preparer.

4. Have your representative act for you and not be present at the audit yourself. If you choose to have someone represent you in your absence, you must furnish us with written authorization. Make this authorization on **Form 2848**, *Power of Attorney and Declaration of Representative*.

## How to Stop Interest from Accumulating

During your examination, if you think you will owe additional tax at the end of the examination, you can stop interest from accumulating by paying all or part of the amount you think you will owe. Interest will stop accumulating on the part you pay when the IRS receives your money. Interest will only be charged on the tax, penalties, and interest that are unpaid on the date they are assessed.

## Consents to Extend the Statute of Limitations

We try to examine tax returns as soon as possible after they are filed, but occasionally we may request that you extend the statute of limitations of your tax return.

A return's statute of limitation generally limits the time we have to examine it and assess tax. Assessments of tax must be made within 3 years after a return is due or filed, whichever is later. We can't assess additional tax or make a refund or credit *(unless you filed a timely claim)* after the statute of limitations has expired. Also, if you disagree with the results of the examination, you can't appeal the items you disagree with unless sufficient time remains on the statute. Because of these restrictions, if there isn't much time remaining to examine your return, assess additional taxes, and/or exercise your appeal rights, you have the opportunity to extend the statute of limitations. This will allow you additional time to provide further documentation to support your position, request an appeal if you do not agree with our findings, or to claim a tax refund or credit. It also allows the Service time to complete the examination, make any additional assessment, if necessary, and provide sufficient time for processing.

A written agreement between you and the Service to extend the statutory period of a tax return is called a "consent." Consents can be used for all types of tax except estate tax.

There are two basic kinds of consent forms. One sets a specific expiration date for the extension, and the other for an indefinite period of time. Either type of consent may be limited by restrictive conditions. The use of a restricted consent is to allow the statute to expire with regard to all items on the return except those covered by the restrictive language.

If the statute of limitations for your tax return is approaching, you may be asked to sign a consent. You may:

1. Refuse to extend the statute of limitations;

2. Limit or restrict the consent to particular issues, or

3. Limit the extension to a particular period of time.

The consent will be sent or presented to you with a letter explaining this process and **Publication 1035**, *Extending the Tax Assessment Period*. For further information, refer to this publication.

## Results of the Examination

If we accept your return as filed, you will receive a letter stating that the examiner proposed no changes to your return. You should keep this letter with your tax records.

If we don't accept your return as filed, we will explain any proposed changes to you and your authorized representative. It is important that you understand the reasons for any proposed changes; don't hesitate to ask about anything that is unclear to you.

## *What to Do When You Receive a Bill from the IRS*



# What To Do If You Agree or Disagree with the Examination Results

## If You Agree

If you agree with a proposed *increase* to tax, you can sign an agreement form and pay any additional tax you may owe.  You must pay interest and applicable penalties on any additional balance due.  If you pay when you sign the agreement, interest is generally figured from the due date of your return to the date of your payment.

 If you do not pay the additional tax and interest, you will receive a bill *(See "What To Do When You Receive a Bill from the IRS" on page 4.)*  If the amount due *(including interest and applicable penalties)* is less than $100,000 and you pay it within 21 business days, we will not charge more interest or penalties.   If the amount is $100,000 or more, the period is reduced to 10 calendar days.  If you can't pay the tax due at the end of the examination, you may pay whatever amount you can and request an installment agreement for the balance. *(See "Setting up an Installment Agreement" on page 7.)*

If you are entitled to a refund, you will receive it sooner if you sign the agreement form at the end of the examination.  You will also be paid interest on the refund.

## If You Do Not Agree

If you do not agree with the proposed changes, the examiner will explain your appeal rights.  If your examination takes place in an IRS office, you may request an immediate meeting with the examiner's supervisor to explain your situation.   You may also enter into an *Agreement to Mediate* to help resolve disputes through Fast Track Mediation services. *(See next column.)*  Mediation can take place at this meeting or afterwards.   If an agreement is reached, your case will be closed.

If you cannot reach an agreement with the supervisor at this meeting, or if the examination took place outside an IRS office or was conducted through correspondence with an IRS Campus employee, the examiner will prepare a report explaining your position and ours.  The examiner will forward your case to the Area office for processing .

You will receive:

- A letter (known as a 30-day letter) notifying you of your rights to appeal the proposed changes within 30 days,

- A copy of the examiner's report explaining the proposed changes, and

- An agreement or a waiver form.

You generally have 30 days from the date of the 30-day letter to tell us whether you will accept the proposed changes or appeal them.  The letter will explain what steps you should take, depending on what action you choose.  Be sure to follow the instructions carefully.  Appeal rights are explained following this section.



**Caution**

If you do not respond to the 30-day letter, or if you respond but do not reach an agreement with an appeals officer, we will send you a 90-day letter, also known as a *Notice of Deficiency*.  This is a legal document that explains the proposed changes and the amount of the proposed tax increase.  You will have 90 days (150 days if it is addressed to you outside the United States) from the date of this notice to file a petition with the Tax Court.  If you do not petition the Tax Court you will receive a bill for the amount due.

## Fast Track Mediation Services

If you do not agree with any or all of the IRS findings, you may request Fast Track Mediation services to help you resolve disputes resulting from the examination (audits).  Fast Track Mediation offers an expedited process with a trained mediator, who will help facilitate communication, in a neutral setting.  The mediator will work with you and the IRS to understand the nature of the dispute.  The purpose is to help the two of you reach a mutually satisfactory resolution that is consistent with the applicable law.  The mediator has no authority to require either party to accept any resolution.  You may withdraw from the mediation process anytime.  If any issues remain unresolved you will retain all of your usual appeal rights.

Most cases qualify for Fast Track Mediation.  To begin the process, you may request the examiner or IRS representative to arrange a mediation meeting.  Both you and the IRS representative must sign a simple *Agreement to Mediate* form.  A mediator will then be assigned.  Generally, within a week, the mediator will contact you and the IRS representative to schedule a meeting.  After a brief explanation of the process, the mediator will discuss with you when and where to hold the mediation session.

For additional information, refer to Publication 3605, *Fast Track Mediation-A Process for Prompt Resolution of Tax Issues.*

# *How Do You Appeal a Decision?*

## The Appeal System

Because people sometimes disagree on tax matters, the Service has an appeal system.  Most differences can be settled within this system without going to court.

Your reasons for disagreeing must come within the scope of tax laws, however.  For example, you cannot appeal your case based only on moral, religious, political, constitutional, conscientious, or similar grounds.

If you do not want to appeal your case within the IRS, you may take your case directly to tax court.

## Appeal Within the IRS

You may appeal our tax decision to a local appeals office, which is separate and independent of the IRS Office taking the action you disagree with.  An appeals office is the only level of appeal within the IRS.  Conferences with Appeals Office personnel may be conducted in person, through correspondence, or by telephone with you or your authorized representative

If you want to have a conference with an appeals officer, follow the instructions in the letter you received. We will send your conference request letter to the appeals office to arrange for a conference at a convenient time and place. You or your qualified representative should be prepared to discuss all disputed issues at the conference.  Most differences are settled at this level.  Only attorneys, certified public accountants or enrolled agents are allowed to represent a taxpayer before Appeals.  An unenrolled preparer may be a witness at the conference, but not a representative.

If you want to have a conference with an appeals officer, you may also need to file either a **small case request** or a **formal written protest** with the contact person named in the letter you receive.

Whether you file a small case request or a formal written protest depends on several factors.

## *Making a Small Case Request*

You may make a **small case request** if the total amount of tax, penalties, and interest for *each* tax period involved  is $25,000 or less, and you do not meet one of the exceptions below for which a formal protest is required.   If more than one tax period is involved and *any* tax period exceeds the $25,000 threshold, you must file a formal written protest for all periods involved.   The total amount includes the proposed increase or decrease in tax and penalties or claimed refund.  For an *Offer-in-Compromise*, include total unpaid tax, penalty, and interest due.

To make a small case request, follow the instructions in our letter to you by sending a brief written statement requesting an appeals conference.  Indicate the changes you do not agree with and the reasons you do not agree with them.



**Caution**

Be sure to send the protest within the time limit specified in the letter you received.

You must file a formal written protest

- If the total amount of tax, penalties, and interest for any tax period is more than $25,000;

- In all partnership and S corporation cases, regardless of the dollar amount;

- In all employee plan and exempt organization cases, regardless of the dollar amount;

- In all other cases, unless you qualify for other special appeal procedures, such as requesting appeals consideration of liens, levies, seizures, or installment agreements. *(See Publication 1660, Collection Appeal Rights, for more information on special collection appeals procedures.)*

## *Filing a Formal Protest*

When a **formal protest** is required, send it within the time limit specified in the letter you received.   Include in your protest:

- Your name and address, and a daytime telephone number.

- A statement that you want to appeal the IRS findings to the Appeals Office.

- A copy of the letter showing the proposed changes and findings you do not agree with *(or the date and symbols from the letter.)*

- The tax periods or years involved.

- A list of the charges that you do not agree with, and why you do not agree.

- The facts supporting your position on any issue that you do not agree with.

- The law or authority, if any, on which you are relying.

- You must sign the written protest, stating that it is true, under the penalties of perjury as follows:

*"Under the penalties of perjury, I declare that I examined the facts stated in this protest, including any accompanying documents, and, to the best of my knowledge and belief, they are true, correct, and complete."*

If your representative prepares and signs the protest for you, he or she must substitute a declaration stating:

- That he or she submitted the protest and accompanying documents and;

- Whether he or she knows personally that the facts stated in the protest and accompanying documents are true and correct.

We urge you to provide as much information as you can, as this will help us speed up your appeal.  This will save you both time and money.

Additional information about the Appeals process may be found in **Publication 5**, *Your Appeals Rights and How to Prepare a Protest if you Don't Agree.*

# After the Examination

## Payment Options

### You cannot pay all that you owe now

If you cannot pay all your taxes now, pay as much as you can. By paying now, you reduce the amount of interest and penalty you owe. Then immediately call, write, or visit the nearest IRS office to explain your situation. After you explain your situation, we may ask you to fill out a Collection Information Statement. If you are contacting us by mail or by telephone, we will mail the statement to you to complete and return to us. This will help us compare your monthly income with your expenses so we can figure the amount you can pay. We can then help you work out a payment plan that fits your situation. This is known as an installment agreement.

### Payment by credit card

Individual taxpayers may make credit *(and debit) card* payments on tax liabilities *(including installment agreement* payments) by phone or Internet. Payments may be made to the United States Treasury through authorized credit card service providers.

The service providers charge a convenience fee based on the payment amount. You will be informed of the convenience fee amount before the credit card payment is authorized. This fee is in addition to any charges, such as interest, that may be assessed by the credit card issuer. Visit www.irs.gov to obtain a list of autho-rized service providers and to obtain updated information on credit card payment options.

Note: *You can use debit cards issued by VISA and MasterCard when making tax payments through the participating service providers. However, the service providers and card issuers treat debit cards and credit cards equally for the purpose of processing electronic tax payments. Therefore, debit card users are charged the same fee traditionally associated with credit card transactions*

### Payment by Electronic Federal Tax Payment System (EFTPS)

EFTPS is an Electronic Federal Tax Payment System developed by the Internal Revenue Service and Financial Management Service (FMS).

The system allows federal taxes to be paid electronically. The system allows the use of the Internet at www.eftps.gov or telephone to initiate tax payments directly. EFTPS payments may also be made through your local financial institution. The service is convenient, secure and saves time.

You may enroll in EFTPS through the website at www.eftps.gov or by completing a form available from EFTPS customer service at (800) 555-4477 or (800) 945-8400.

### Setting up an installment agreement

Installment agreements allow you to pay your full debt in smaller, more manageable amounts. Installment agreements generally require equal monthly payments. The amount and number of your installment payments will be based on the amount you owe and your ability to pay that amount within the time we can legally collect payment from you.

You should be aware, however, that an installment agreement is more costly than paying all the taxes you owe now. Like revolving credit arrangements, we charge interest on the unpaid portion of the debt. Penalties also continue to accumulate on installment agreements.

If you want to pay off your tax debt through an installment agreement, call the number shown on your bill. If you owe:

- $25,000 or less in tax, we will tell you what you need to do to set up the agreement;

- More than $25,000, we may still be able to set up an installment agreement for you, but we may also ask for financial information to help us determine your ability to pay.

Even if you set up an installment agreement, we may still file a Notice of Federal Tax Lien to secure the government's interest until you make your final payment.

Note: *We cannot take any collection actions affecting your property while we consider your request for an installment agreement, while your agreement is in effect, for 30 days after we reject your request for an agreement, or for any period while you appeal the rejection.*

If you arrange for an installment agreement, you may pay with:

- Personal or business checks, money orders, or certified funds *(all made payable to the U.S. Treasury),*

- Credit and debit cards,

- Payroll deductions your employer takes from your salary and regularly sends to IRS, or

- Electronic transfers from your bank account or other similar means.

### Apply for an Offer-in-Compromise

In some cases, we may accept an *Offer-in-Compromise* to settle an unpaid tax account, including any penalties and interest. With this kind of arrangement, we can accept less than the full amount you owe when it is doubtful we will be able to collect the entire amount due.

Offers in compromise are also possible if collection action would create an economic hardship. You may want to discuss these options with your examiner.

## Temporarily Delay the Collection Process

If we determine that you can't pay *any* of your tax debt, we may temporarily delay collection until your financial condition improves. You should know that if we delay collecting from you, your debt will increase because penalties and interest are charged until you pay the full amount. During a temporary delay, we will again review your ability to pay. We may also file a *Notice of Federal Tax Lien,* to protect the government's interest in your assets. See Publication 594, *The IRS Collection Process.*

## After the Examination (cont.)

### Innocent Spouse Relief

If you filed a joint tax return, you are jointly and individually responsible for the tax and any interest or penalty due on the joint return, even if you later divorce. In some cases, a spouse may be relieved of the tax, interest, and penalties on a joint return.

You can ask for relief no matter how small the liability.

Three types of relief are available.

- Innocent spouse relief - may apply to all joint filers;

- Separation of liability - may apply to joint filers who are divorced, widowed, legally separated, or have not lived together for the past 12 months;

- Equitable relief - applies to all joint filers.

Innocent spouse relief and separation of liability apply only to items incorrectly reported on the return. If a spouse does not qualify for innocent spouse relief or separation of liability, the IRS may grant equitable relief.

Each type of relief is different and each has different requirements. You must file Form 8857, *Request for Innocent Spouse Relief*, to request any of these methods of relief. Publication 971, *Innocent Spouse Relief*, explains each type of relief, who may qualify, and how to request relief.

### You Must Contact Us

It is important that you contact us regarding any correspondence you receive from us. If you do not pay your bill or work out a payment plan, we are required by law to take further collection actions.

### What If You Believe Your Bill is Wrong



**Caution**

If you believe your bill is wrong, let us know as soon as possible. Call the number on your bill, write to the IRS office that sent you the bill, call 1-800-829-1040 *(for 1040 filers)*, 1-800-829-4933 *(for business filers)*, 1-800-829-4059 */TDD*, or visit your local IRS office.

To help us correct the problem, gather a copy of the bill along with copies of any records, tax returns, and canceled checks, etc., that will help us understand why you believe your bill is wrong.

If you write to us, tell us why you believe your bill is wrong. With your letter, include copies of all the documents you gathered to explain your case. Please do not send original documents. If we find you are correct, we will adjust your account and, if necessary, send you a corrected bill.

# Privacy Act Statement

*The Privacy Act of 1974 says that when we ask you for information, we must first tell you our legal right to ask for the information, why we are asking for it, and how it will be used. We must also tell you what could happen if you do not provide it and whether or not you must respond under the law.*

*This notice applies to tax returns and any papers filed with them. It also applies to any questions we need to ask you so we can complete, correct, or process your return; figure your tax; and collect tax, interest, or penalties.*

*Our legal right to ask for information is found in Internal Revenue Code sections 6001, 6011, and 6012(a), and their regulations. They say that you must file a return or statement with us for any tax you are liable for. Your response is mandatory under these sections.*

*Code section 6109 and its regulations say that you must show your social security number or individual taxpayer identification number on what you file. You must also fill in all parts of the tax form that apply to you. This is so we know who you are, and can process your return and papers. You do not have to check the boxes for the Presidential Election Campaign Fund.*

*We ask for tax return information to carry out the U.S. tax laws. We need it to figure and collect the right amount of tax.*

*We may give the information to the Department of Justice and to other Federal agencies, as provided by law. We may also give it to cities, states, the District of Columbia, and U.S. Commonwealths or possessions to carry out their tax laws. And we may give it to certain foreign governments under tax treaties they have with the United States.*

*We may also disclose this information to Federal, state, or local agencies that investigate or respond to acts or threats of terrorism or participate in intelligence or counterintelligence activities concerning terrorism.*

*If you do not file a return, do not give us the information we ask for, or provide fraudulent information, the law says that we may have to charge you penalties and, in certain cases, subject you to criminal prosecution. We may also have to disallow the exemptions, exclusions, credits, deductions, or adjustments shown on your tax return. This could make your tax higher or delay any refund. Interest may also be charged.*

*Please keep this notice with your records. You may want to refer to it if we ask you for other information. If you have questions about the rules for filing and giving information, please call or visit any Internal Revenue Service office.*

**Department of the Treasury**
**Internal Revenue Service**
**[Operating Division / Program Name]**

IRS

**Date:**
 09/05/2019
**Taxpayer ID number:**

**Form:**

**Person to contact:**

**Employee ID number:**

**Contact telephone number:**

**Contact fax number:**

**Last day to file petition with US tax court:**

**Certified Mail**    [Certified Mailing Number]

Dear [Name]:

### Notice of Deficiency

Tax Year Ended:

Deficiency:
Increase in tax

**Why we are sending you this letter**
We determined that you owe additional tax or other amounts, or both, for the tax years above. This letter is your
**Notice of Deficiency** as we're required by law to send you. The enclosed Form 4549-A, Income Tax
Examination Changes (Unagreed and Excepted Agreed), or Form 5278, Statement - Income Tax Changes,
shows how we figured the deficiency.

**If you agree with the Notice of Deficiency**
If you agree with our determination, sign the enclosed Form 4089-B, Notice of Deficiency  - Waiver, and return
it to us at the address on the top of the first page of this letter. Sending this now can help limit the accumulation
of interest.

**If you disagree with the Notice of Deficiency**
If you want to contest our final determination, you have 90 days from the date of this letter (150 days if
addressed to you outside of the United States) to file a petition with the United States Tax Court.

**Letter 531 (Rev. 1-2019)**
Catalog Number 40223L

**How to file your petition**

You can get a petition form and the rules for filing from the Tax Court's website at www.ustaxcourt.gov, by contacting the Office of the Clerk at the address below, or by calling 202-521-0700. Send your completed petition form, a copy of this letter, and copies of all statements and schedules you received with this letter to the address below.

United States Tax Court
400 Second Street, NW
Washington, DC 20217

If this notice shows more than one tax year, you can file one petition form showing all of the years you disagree with.

The Tax Court has a simplified procedure for small tax cases. If you plan to file a petition for multiple tax years and the amount in dispute for any one or more of the tax years exceeds $50,000 (including penalties), you can't use this simplified procedure. If you use this simplified procedure, you can't appeal the Tax Court's decision. You can get information about the simplified procedure from www.ustaxcourt.gov or by writing to the court at the address above.

If you recently sought bankruptcy relief by filing a petition in bankruptcy court, see enclosed Notice 1421, How Bankruptcy Affects Your Right to File a Petition in Tax Court in Response to a Notice of Deficiency.

You can represent yourself before the Tax Court, or anyone allowed to practice before the Tax Court can represent you.

**Time limits on filing a petition**
**The court can't consider your case if you file the petition late.**
- A petition is considered timely filed if the Tax Court receives it within
  - 90 days from the date this letter was mailed to you, or
  - 150 days from the date this letter was mailed to you if this letter is addressed to you outside of the United States.
- A petition is also generally considered timely if the United States Postal Service postmark date is within the 90 or 150-day period and the envelope containing the petition is properly addressed with the correct postage. The postmark rule doesn't apply if mailed from a foreign country.
- A petition is also generally considered timely if the date marked by a designated private delivery service is within the 90 or 150-day period. Not all services offered by private delivery companies are designated delivery services. For a list of designated delivery services available for domestic and international mailings, see Notice 2016-30, which is available on the IRS website at www.irs.gov/irb/2016-18_IRB/ar07.html. Please note that the list of approved delivery companies may be subject to change.
- The time you have to file a petition with the Tax Court is set by law and can't be extended or suspended, even for reasonable cause. We can't change the allowable time for filing a petition with the Tax Court.

**If you are married**

We're required to send a notice to each spouse. If both want to petition the Tax Court, **both** must sign and file the petition or **each** must file a separate, signed petition. If only one spouse timely petitions the Tax Court, the deficiency may be assessed against the non-petitioning spouse. If only one spouse is in bankruptcy at the time we issued this letter or files a bankruptcy petition after the date of this letter, the bankruptcy automatic stay does not prevent the spouse who is not in bankruptcy from filing a petition with the Tax Court. The bankruptcy automatic stay of the spouse seeking bankruptcy relief doesn't extend the time for filing a petition in Tax Court for the spouse who is not in bankruptcy.

**If we don't hear from you**
If you decide not to sign and return Form 4089-B, and you don't file a timely petition with the Tax Court, we'll assess and bill you for the deficiency (and applicable penalties and interest) after 90 days from the date of this letter (150 days if this letter is addressed to you outside the United States).

**Note:** If you are a C corporation, we're required by Internal Revenue Code Section 6621(c) to charge an interest rate two percent higher than the normal rate on corporate underpayments in excess of $100,000.

**If you need more assistance**
If you have questions, you can contact the person at the top of this letter. If you write, include a copy of this letter, your telephone number, and the best hours to reach you. Keep the original letter for your records.

**Information about the IRS Taxpayer Advocate Service**
The IRS office whose phone number appears at the top of the notice can best address and access your tax information and help get you answers. However, you may be eligible for free help from the Taxpayer Advocate Service (TAS) if you can't resolve your tax problem with the IRS, or you believe an IRS procedure just isn't working as it should. TAS is an independent organization within the IRS that helps taxpayers and protects taxpayer rights. Contact your local Taxpayer Advocate Office at:


Or call TAS at 877-777-4778. For more information about TAS and your rights under the Taxpayer Bill of Rights, go to taxpayeradvocate.irs.gov. Do not send your Tax Court petition to the TAS address listed above. Use the Tax Court address provided earlier in the letter. Contacting TAS does not extend the time to file a petition.

**Information about Low Income Taxpayer Clinics and other resources**
Assistance can be obtained from individuals and organizations that are independent from the IRS. The Directory of Federal Tax Return Preparers with credentials recognized by the IRS can be found at http://irs.treasury.gov/rpo/rpo.jsf. IRS Publication 4134 provides a listing of Low Income Taxpayer Clinics (LITCs) and is available at www.irs.gov. Also, see the LITC page at www.taxpayeradvocate.irs.gov/litcmap. Assistance may also be available from a referral system operated by a state bar association, a state or local society of accountants or enrolled agents or another nonprofit tax professional organization. The decision to obtain assistance from any of these individuals and organizations will not result in the IRS giving preferential treatment in the handling of the issue, dispute or problem. You don't need to seek assistance to contact us. We will be pleased to deal with you directly and help you resolve your situation.

Sincerely,


[Name]
Commissioner
By


[Name]
[Title]

Enclosures:
[Form 4549-A or Form 5278]
Form 4089-B
Notice 1421

**Letter 531 (Rev. 1-2019)**
Catalog Number 40223L

# EXHIBIT N

**Vaughan, Frederick**

| | |
|---|---|
| **From:** | McAfee, Karen <Karen.McAfee@mail.house.gov> |
| **Sent:** | Thursday, June 13, 2019 6:39 PM |
| **To:** | Vaughan, Frederick |
| **Cc:** | Casey, Brandon; Andres, Gary; Kaldahl, Rachel; Sok, Justin; Oursler Leonard T |
| **Subject:** | FW: Today's Briefing on Mandatory Audit Process |
| **Attachments:** | Treasury IRS Briefing Prepared Questions.pdf |

Fritz,

Thank you for the follow-up letter and electronic materials.  Yes, the briefing was three hours, with nearly one hour spent walking through the IRM materials you provided and with a long, and necessary, break to accommodate staff.  Despite its length, I would not classify it as thorough.

I also do not agree that the briefing answered most of our questions.  Although some questions were addressed, IRS and Treasury attendees declined to answer the majority of questions for a range of reasons, including (1) lack of authorization under section 6103 despite Republican and Democratic Committee staff having 6103 authorization from the Chairman and your knowledge of the limitations placed on return information when only a few taxpayers are involved, (2) objections raising various privileges, (3) inability to evaluate tax policy considerations, and (4) lack of awareness of specific internal policies and practices.  Notably, of the eight IRS and Treasury attendees present at the briefing, there was not one person who was or is involved in, or was or is an examiner for, a mandatory presidential audit.  We also found various, important instances where IRS practice did not conform to procedures outlined in the Internal Revenue Manual.  The briefing reinforced our concerns about the substantial discretion a single IRS revenue agent possesses in conducting the audit of presidential returns and the absence of guardrails to ensure that such employee is not subject to undue influence by a president or his representatives.  The absence of direction on the scope of an audit and handling of a grantor trust, among other things, reinforce the need for oversight and codification of procedures related to the mandatory examination of a president's return.

As requested by you during the briefing, I am enclosing a copy of the written questions that Committee staff prepared in advance for our use at the briefing.  We also discussed possibly having a follow-up briefing.  However, it seemed to be your position and that of Chief Counsel Mike Desmond and Counselor to the Commissioner Tom Cullinan that there was a hard and fast rule not to discuss any 6103 information related to the mandatory audit process despite Committee staff having authorization.  This rule seemed to be in place when we asked questions about current and former Democratic and Republican presidents.  Given the small universe of President-taxpayers, substantial discretion during the audit, and audit practices that do not match IRM procedures, the Committee needs access to returns and return information in order for it to fulfill its legislative and oversight activities.  Please confirm whether any follow-up briefings will provide return and return information.

Thanks, again, for the briefing.  Please let me know if you need anything further.

Best,
Karen

**From:** Frederick.Vaughan@treasury.gov <Frederick.Vaughan@treasury.gov>
**Sent:** Monday, June 10, 2019 2:12 PM
**To:** Casey, Brandon <Brandon.Casey@mail.house.gov>; McAfee, Karen <Karen.McAfee@mail.house.gov>
**Cc:** Andres, Gary <Gary.Andres@mail.house.gov>; Kaldahl, Rachel <Rachel.Kaldahl@mail.house.gov>;

Justin.Sok@treasury.gov; Leonard.T.Oursler@irs.gov; LegAffairs@treasury.gov
**Subject:** Today's Briefing on Mandatory Audit Process

Brandon and Karen

Attached is a letter from me, as well as copies of the slide deck and tabbed materials from the briefing. Please let us know if you need additional copies of the other historical materials we provided in binders.

Best, Fritz

--
**Frederick W. Vaughan**
Deputy Assistant Secretary
Legislative Affairs
U.S. Department of the Treasury
1500 Pennsylvania Avenue, N.W.
Washington, D.C. 20220
202-622-2678

# Questions Prepared in Advance by Democratic Staff for Use at the Treasury/IRS Briefing on Mandatory Audit Process

## Opening/Introductions

I will note at the outset that all Democratic and Republican Committee staff in the room have been authorized by the Chairman pursuant to 6103(f)(4) to receive and discuss returns and return information related to IRS audits of a President and enforcement of the Federal tax laws against a President, including the mandatory audit process and the auditing of Presidential tax returns and any related individuals and entities.

1.  I would like for each person present to state his or her name, title, and, to the extent that you are not an employee of the Internal Revenue Service, whether you are authorized to receive and discuss section 6103 taxpayer information?

2.  Will each person please state whether they are authorized to approve or disapprove of the disclosure of 6103 information?  If you have authority, please identify the relevant delegation.  If no one has authority, why isn't someone present today at this briefing who has this authority?

3.  Commissioner Rettig's letter dated May 17, 2019, states that Chairman Neal's concerns that IRS employees could be subject to undue influence when conducting mandatory audits of a President's tax returns is "unfounded."  I would like to go around the room and have individuals identify whether they were confirmed by the Senate.  If so, please also identify who nominated you for the position.  If you are not Senate confirmed, please identify when you started at either Treasury or IRS and who hired you for your position.

4.  Who prepared the written materials you intend to speak from today?

5.  Did anyone at Treasury request to see your materials in advance of this meeting?  If so, who?

6.  Did anyone at the Department of Justice or the White House request to see your materials in advance of this meeting?  If so, who?

7.  Did any of those at Treasury, the Department of Justice, or the White House actually see the documents?

8.  I would like each Treasury official in the room to answer this question:  Did you ask to see or review the written materials being discussed today in advance of this meeting?  Did you ask that someone else be allowed to see or review the written materials?  If so, who?

9.  Did anyone at IRS or Treasury ask you to rehearse or run-through your presentation in advance of this meeting?  If so, who?

10.     Did anyone at IRS or Treasury ask you to revise, modify, or delete portions of your presentation today in advance of this meeting?  If so, what revisions, modifications, or deletions were you asked to make?

11.     Would each person present please state whether he or she has first-hand experience with the mandatory audit process?  If so, please briefly describe your experience.

**Experience with mandatory audit process**

We are considering codification of the mandatory audit procedures.

12.     How would you suggest that be done and would you support this?

13.     How can we ensure resources that are needed are available?

14.     What are you views on whether the issues and determination of the audit be publicly disclosed?

We are interested in what actually happens in practice during the mandatory audit process.

15.     Have you ever seen a President's tax return?

16.     If so, what President and what tax years?

17.     Have you ever participated in the audit of a President's tax return?

18.     If so, what President and what tax years?

19.     Do Presidential audits have to be closed within a certain amount of time?

20.     What is the maximum number of Presidential audits that could be pending in a particular year?

21.     How long do Presidential audits generally take?

22.     How many IRS employee hours are spent each year on Presidential audits?

23.     How many IRS employee hours were spent in 2013, 2014, 2015, 2016, 2017, 2018, and 2019?

24.     What is your most recent experience with the audit of a President's tax return?

25.     What was your role?

26.     When did the audit start and when did it conclude?

27.     Do you or does anyone else notify the IRS Commissioner when the audit starts?

28.     Do you or does anyone else notify the Secretary, Treasury General Counsel, or other Treasury senior leadership when the audit starts?  If so, who?

29.     Do you or does anyone else notify the Department of Justice, the Office of Legal Counsel, or the White House when the audit starts?  If so, who?

30.     Do you or does anyone else report to the IRS Commissioner periodically on the issues being examined during the audit?  If so, who?  How often does this occur?

31.     Do you or does anyone else periodically report to the Secretary, Treasury General Counsel, or other Treasury senior leadership on issues being examined during the audit? If so, who?

32.     Do you or does anyone else report to the Department of Justice, the Office of Legal Counsel, or the White House on issues being examined during the audit?  If so, who?

33.     Do you or does anyone else notify the IRS Commissioner prior to closing the audit?

34.     Do you or does anyone else notify the Secretary, Treasury General Counsel, or other Treasury senior leadership prior to closing the audit?

35.     Do you or does anyone else notify the Department of Justice, the Office of Legal Counsel, or the White House prior to closing the audit?

36.     Do mandatory audits always include all related business activities of a President?

37.     If business activities are included on a Schedule C attached to the return, are these business activities also audited?

38.     Do mandatory audits always include ongoing audits or all open tax years?

39.     Does the IRS examine beyond the numbers showing on the face of the return?

40.     Does the IRS ever look at related businesses of a President?  If so, under what circumstances does the IRS do so?

41.     How many IRS employees were involved in each of the mandatory presidential audits that you were involved in?

42.     Which divisions of the IRS were involved in the audit?

43.     Are the examiners set up as a team?

44.     Who on the team makes decisions with respect to the audit?

45.     How many layers of separation are there between the team and the individuals in this room today?

46.     Who has to approve decisions made by the team?

47.     Do these decisions ultimately need approval from the IRS Commissioner or Chief Counsel?

48.     Do these decisions ultimately need approval from the Secretary, Treasury General Counsel, or senior leadership at Treasury?

49.     Do these decisions ultimately need approval from the Department of Justice, the Office of Legal Counsel, or the White House?

50.     What happens when the President does not agree with the results of the examination?

51.     To your knowledge, has a President ever disagreed with the results of an examination of his returns?

52.     What is the process that is followed?

53.     Is this in the IRM?

54.     Who is notified that the President does not agree?

55.     Who makes the final decision to assess the deficiency?

56.     What happens if the President fails to remit the taxes owed?

57.     To your knowledge, has a President ever failed to remit taxes owed?

58.     Who is notified?

59.     Who makes the final decision on whether to pursue collection?

60.     Has the IRS ever sued a President for back taxes?

61.     Was this ever done while a President is in office?

62.     Can this be done while the President is in office?

**Historical practice**

63.     How many examinations under the presidential mandatory audit process have been closed during the current year (2019)?

64.     How many examinations under the mandatory audit process were closed during the preceding two years (calendar years 2017 and 2018)?

5

65.    How many examinations were closed within the preceding two years (2015 and 2016)?

66.    How many examinations were closed during 2013 and 2014?

67.    How many examinations were closed during 2007 and 2008?

68.    For each examination closed within each of the above periods, how many examiners were assigned?

69.    For each examination closed within each of the above periods, how many taxable years were under examination?

70.    For each examination closed within each of the above periods, what is the grade or management level of each person who worked each case?

71.    For each examination closed within each of the above periods, how many hours were or have been worked by each person through the today?

72.    For each examination closed within each of the above periods, what issues were under examination?

73.    For each examination closed within each of the above periods, what is the highest level of any employee who has worked, reviewed, discussed, seen, or otherwise been involved with any issue or return under examination or any workpaper in such examination?

74.    For each examination closed within each of the above periods, has the Treasury Secretary been involved in, aware of, briefed, or otherwise involved in any aspect of the examination?

75.    For each examination closed within each of the above periods, has the Commissioner been involved in, aware of, briefed, or otherwise involved in any aspect of the examination?

76.    For each examination closed within each of the above periods, has the Chief Counsel been involved in, aware of, briefed, or otherwise involved in any aspect of the examination?

77.    For each examination closed within each of the above periods, has any member of the General Counsel's office been involved in, aware of, briefed, or otherwise involved in any aspect of the examination?

78.    For each examination closed within each of the above periods, has the Treasury Secretary, Commissioner, Chief Counsel, or any member of the General Counsel's office been involved in any change in policy or practice regarding the examination of Presidential returns?

79.  Was the Clinton Foundation audited as part of the review of President Clinton's tax returns?

80.  Have there been assessments issued against Presidents in the past year? Two years? Ten years? Eighteen years?

81.  What are the sources of income for Presidents over the past year? Two years? Ten years? Eighteen years?

82.  Did President and Mrs. Obama file jointly or separately?  If separately, was Mrs. Obama's return also examined?

83.  For President Obama's first return filed while in office (for taxable year 2007), when was the return filed?

84.  For President Obama's first return filed while in office (for taxable year 2007), when was it sent to Baltimore?

85.  For President Obama's first return filed while in office (for taxable year 2007), when was first contact made with the President or his representative?

86.  For President Obama's first return filed while in office (for taxable year 2007), how many meetings or contacts were made?  With whom?  With the President?

87.  For President Obama's first return filed while in office (for taxable year 2007), how did the IRS verify wages/salary?

88.  For President Obama's first return filed while in office (for taxable year 2007), how did the IRS verify royalties?

89.  For President Obama's first return filed while in office (for taxable year 2007), how did the IRS verify other income?

90.  For President Obama's first return filed while in office (for taxable year 2007), were any income issues examined?  If so, how many examiners/agents were involved and how many hours of work?

91.  For President Obama's first return filed while in office (for taxable year 2007), what deductions were examined?  If so, how many examiners/agents were involved and how many hours of work?

92.  For George W. Bush, we have the same questions.  Did President and Mrs. Bush file jointly or separately?  If separately, was Mrs. Bush's return also examined?

93.  For President Bush's first return filed while in office (for taxable year 2001), when was the return filed?

94.     For President Bush's first return filed while in office (for taxable year 2001), how did the IRS verify wages/salary?

95.     For President Bush's first return filed while in office (for taxable year 2001), how did the IRS verify other income?

96.     For President Bush's first return filed while in office (for taxable year 2001), were any income issues examined?  If so, how many examiners/agents were involved and how many hours of work?

97.     For President Bush's first return filed while in office (for taxable year 2001), what deductions were examined?  If so, how many examiners/agents were involved and how many hours of work?

98.     Did President Trump and Mrs. Trump file jointly or separately?  If separately, are Mrs. Trump's returns also being examined?

99.     For President Trump's first return filed while in office (for taxable year 2016), when was the return filed?  What about the second return (for taxable year 2017)?

100.    For President Trump's first return filed while in office (for taxable year 2016), when was it sent to Baltimore?  What about the second return?

101.    For President Trump's first return filed while in office (for taxable year 2016), when was first contact made with the President or his representative?  What about for the second return?

102.    For President Trump's first return filed while in office (for taxable year 2016), how many meetings or contacts were made?  With whom?  With the President?  What about for the second return?

103.    For President Trump's first return filed while in office (for taxable year 2016), how did the IRS verify wages/salary?  What about for the second return?

104.    For President Trump's first return filed while in office (for taxable year 2016), how did the IRS verify royalties? What about for the second return?

105.    For President Trump's first return filed while in office (for taxable year 2016), how did the IRS verify other income?  What about for the second return?

106.    For President Trump's first return filed while in office (for taxable year 2016), were any income issues examined?  If so, how many examiners/agents were involved and how many hours of work?  What about for the second return?

107.   For President Trump's first return filed while in office (for taxable year 2016), what deductions were examined?  If so, how many examiners/agents were involved and how many hours of work?  What about for the second return?

108.   Are any of President Trump's businesses under audit?  Have any of President Trump's businesses been under audit since he took office?  If so, which entities?

109.   Is President Trump's revocable trust under audit?  Has it been under audit since he took office?

110.   How many years of President Trump's tax returns are currently under audit?

**Current practice**

111.   How many examinations of Presidential returns are currently open and ongoing?

112.   For each examination, how many examiners are assigned?

113.   For each examination, how many taxable years are under examination?

114.   For each examination, what is the grade or management level of each person who worked each case?

115.   For each examination, how many hours have been worked by each such person through today?

116.   For each examination, what are the issues under examination?

117.   For each examination, what is the highest level of any employee who has worked, reviewed, discussed, seen, or otherwise been involved in any return or issue under examination or any workpaper in such examination?

118.   For each examination, has the Treasury Secretary been involved in, aware of, briefed on, or otherwise involved in any aspect of the examination?

119.   For each examination, has the Chief Counsel been involved in, aware of, briefed, or otherwise involved in any aspect of the examination?

120.   For each examination, has any member of the General Counsel's office been involved in, aware of, briefed, or otherwise involved in any aspect of the examination?

121.   For each examination, has the Treasury Secretary, Commissioner, Chief Counsel, or any member of the General Counsel's office been involved in any change in policy or practice regarding the examination of Presidential returns?

**Orange Folders**

We would like to understand more about where the presidential tax returns are kept and the contents of the orange folders that hold them.

122.   Are the returns kept in your office?

123.   If not, where are the located?

124.   Are there copies of the returns kept in other locations—DC, Baltimore, Ogden?

125.   How many returns are kept in the office?

126.   How many tax years do they cover?

127.   Is each return kept in an orange folder?

128.   How big is the folder?

129.   What about when the returns are large—is there more than one folder?

130.   Does each tax year for each President have a separate orange folder?

131.   What is on the outside of the folder?

132.   What is on the inside of the folder?

133.   Is there a routing slip or other checklist attached to or inside the folder?

134.   Please describe the general contents of an orange folder.

135.   To your knowledge during your tenure at the IRS, has the return of each President for each tax year been audited?

136.    What documents in the orange folder would show that the return has been audited?

137.    What is the depth and scope of each audit?

138.    Is the depth and scope the same as for employee compliance audits?

139.    What documents are in the orange folder that show the depth and scope of a Presidential audit?

140.    Is there a form, checklist, or spreadsheet or other internal document in the orange folder that describes the scope and depth of a Presidential audit?  If so, what is the form number?

141.    Is the return transcribed and loaded on the Master File?

142.    Who has access to the Master File?

143.    Do IRS examiners have access to the paper copy of the return?

144.    How do you keep track of who has accessed the returns (including any copies thereof)?

145.    Is there a sign out sheet, routing slip, or other documentation that shows who has accessed the return?

146.    How do the examiners access the return being audited?

147.    Do the examiners have other cases or audits while they are working on the President's return?

## **Undue political influence**

The Commissioner's letter dated May 17, 2019, states that the mandatory audit procedures were implemented to insulate the IRS examination process from any bias or appearance of bias.  The letter further states that procedures are in place to notify TIGTA if any IRS or Treasury officials other than a career employee attempts to influence the outcome or direction of the examination.

148.   The Secretary and Commissioner have both testified that the IRS is "under the supervision" of the Treasury Department.  Is the mandatory examination of the President's tax return under the supervision of the Treasury Department?

149.   What are the procedures referred to in the May 17 letter?

150.   Are they written?

151.   Are they located in the IRM?  If so, what section?

152.   How are these procedures communicated to the employees working on the mandatory audit?

153.   Do the procedures only apply to IRS and Treasury officials?

154.   What positions and titles are considered to be IRS and Treasury officials for purposes of the procedures described in the May 17 letter?

155.   Do the procedures cover improper influence by the President?

156.   Do the procedures cover improper influence by White House employees?

157.   Do the procedures cover improper influences by Department of Justice or Office of Legal Counsel employees?

158.   Who is Brian Callanan?  Is he considered an IRS or Treasury official?

159.   How, as the Deputy Commissioner, have you satisfied yourself that there is no inappropriate communication, either direct or indirect, between political appointees and the examination team?

160.   How, as the Deputy Commissioner, have you satisfied yourself that the issues examined are the proper issues to be examined?

161.   How, as the Deputy Commissioner, have you satisfied yourself that the scope and depth of the examination are proper?

162.   How, as the Chief Counsel, have you satisfied yourself that there is no inappropriate communication, either direct or indirect, between political appointees and the examination team?

163.   How, as the Chief Counsel, have you satisfied yourself that the issues examined are the proper issues to be examined?

164.   How, as the Chief Counsel, have you satisfied yourself that the scope and depth of the examination are proper?

165.   On October 17, 2018, White House Press Secretary Sarah Sanders stated, "The President and First Lady filed their taxes on time and as always are they are automatically under audit, which the President thinks is extremely unfair."  Is this the type of statement for which there are procedures in place to notify TIGTA?

166.   Deputy Commissioner, can you confirm the statement of White House spokesperson Sanders that the President filed his 2017 tax return on or about October 17, 2018?

167.   Deputy Commissioner, do you share the view, expressed by the President according to White House spokesperson Sanders, that a mandatory audit of the President's 2017 tax return is "extremely unfair"?

168.   Senior Advisor, do you share the President's view that a mandatory audit is "extremely unfair"?

169.   Chief Counsel, do you share the President's view that a mandatory audit is "extremely unfair"?

170.   I would like to have each Treasury official present answer separately whether he or she shares the President's view that a mandatory audit is "extremely unfair"?

171.   I would like each person present to state whether they know if the Commissioner or Treasury Secretary share the President's view that a mandatory audit is "extremely unfair"?

172.   Has the Treasury Secretary or Commissioner ever made any statement publicly or to employees affirming that the mandatory audit is fair?

173.   To your knowledge, have the examiners working on the audit ever been instructed to disregard the President's statement that the examiners' fulfilling their mandatory obligations is extremely unfair?

174.   Has any statement been made to assure the examiners that fulfilling their duties will not result in any kind of retaliation or any adverse personnel action?  If so, what statement?

175.   Has the Treasury Secretary, Commissioner, Treasury General Counsel or anyone else made any statement, directly or indirectly, to confirm or contradict the President at this point?  If so, what statement?  When and where?

176.   Chief Counsel, do you consider White House Spokesperson Sanders' statement to be an attempt to influence the conduct of the examination?  Is it a section 7214 violation?  Has TIGTA been notified?

177.   What steps has the IRS taken to ensure that the judgment of auditors on the scope and depth of the examination is not influenced by statements of the White House?

178.   What statements, publicly or privately, have been made by the White House, Treasury Secretary, DOJ, Treasury General Counsel, etc. about the President's examination?

179.   Does TIGTA report to anyone in the IRS that an IRS employee has notified TIGTA that they are feeling political pressure?

180.   What do you tell employees who come to you with concerns about political pressure?

181.   Deputy Commissioner, did you see the IRS draft memorandum titled "Congressional Access to Return and Return Information" before it was published in the Washington Post on May 21, 2019?  If so, when?

182.   Senior Advisor, did you see the IRS draft memorandum titled "Congressional Access to Return and Return Information" before it was published in the Washington Post on May 21, 2019?  If so, when?

183. Chief Counsel, did you see the IRS draft memorandum titled "Congressional Access to Return and Return Information" before it was published in the Washington Post on May 21, 2019?  If so, when?

184. Chief Counsel, did the Commissioner ask you for legal advice on Chairman Neal's request prior to April 9, 2019?  If so, when did he ask you for advice?

185. Each Treasury employee and official in the room, did you see the IRS draft memorandum titled "Congressional Access to Return and Return Information" before it was published in the Washington Post on May 21, 2019?  If so, when?

186. Please answer separately starting with the Deputy Commissioner, who wrote the memo? Who approved the memo?

187. Please answer separately starting with the Deputy Commissioner, did the Commissioner or the Secretary see, review, have a discussion about, or receive a briefing on the memo before May 21, 2019?

188. Please answer separately starting with the Deputy Commissioner, whose decision was it not to finalize the memo?

189. Please answer separately starting with the Deputy Commissioner, whose decision was it not to give the memo to the Treasury Secretary or the Commissioner?

190. Please answer separately starting with the Deputy Commissioner, are there any other analyses that were prepared within the IRS or Chief Counsel on the question of 6103(f)?

191. Please answer separately starting with the Deputy Commissioner, whose decision was it not to give the memo to the Treasury Secretary or the Commissioner?

The Commissioner's May 17th letter states that "from start to finish, all aspects of the processing and examination of a President or a Vice President's returns are conducted by experienced, career employees."

192. What is the general composition of the employees who conduct the audit?

193.    What are the grade levels and titles of the employees who conducted the examination of the returns filed for tax years 2013, 2014, 2015, 2016, 2017, and 2018?

194.    Who do these individuals report to with respect to returns under audit?

195.    From start to finish, who provides final approval on all aspects of the mandatory audit process?  The audit plan?  Changes to the audit plan?  Deletions from the audit plan?  Ending the audit?  Assessments?  Staffing levels?

**Return processing**

We would like to see some actual examples and illustrations of how the audit process has worked on presidential returns.  For now, we would like to walk through the mechanics of how the return travels through the IRS and is processed.

196.    I would like to confirm that Presidents file by paper.  Correct?

197.    The return is mailed to Austin with markings on the envelope.  Who opens the envelope?

198.    What grade is this person?

199.    Do they sign a checklist or routing slip that states that they have the tax return?

200.    Does that routing slip or checklist become a part of the orange folder?

201.    Does this person notify anyone upon receipt of the tax return?  If so, who?

202.    What happens to the return next?

203.    What about when the returns are large—is there more than one envelope?

204.    Do Presidents file their business returns by paper as well?

205.    Are those returns mailed to Austin?  If not, how are those returns associated with the individual returns that are mailed to Austin?

206. Is there a separate routing slip or checklist for each of the business returns?

**Department of Justice**

207. When will the Committee be receiving the guidance Treasury and IRS relied upon to deny Chairman Neal's request under section 6103 and related subpoenas? The letter from Treasury stated "as soon as practicable."

**Internal Revenue Manual [sections below are cited in the Commissioner's May 17 letter]**

IRM section 3.28.3.2 specifies:

(3) The returns of the Pres are mailed to the Field Director, to the Field Director, Austin Submission Processing Campus

208. The return arrives and then what steps are taken, when and by whom?

209. What about a return in the case of a grantor trust?  Form 1041? Form 1099?

210. Which returns are mailed to the Field Director?

211. How are entities controlled by a grantor trust processed—employment tax returns, for example?

(4) The Field Director of Austin can designate the walk-through processing of the President and Vice-President's returns

(6) President who has assets in a blind trust must request permission for the trustee to prepare and file their individual tax return, in writing with a Form 2848 (power of attorney or representative)

212. Have Forms 2848 been filed for a President and when were they filed?

213. What return(s) are covered by the Form 2848?

IRM section 3.28.3.4 Processing Returns and Accounts of the President and Vice-President

IRM section 3.28.3.4.1 Individual and Gift Tax Return Processing

(3) Photocopy the return and stamp "COPY" in the top.  Route the copy to Files.

214.   Where are Files?

(4) Forward the original processed individual return to Deputy Commissioner for Services and Enforcement, 1111 Constitution Avenue, Washington DC 20224

(5) Returns are under the Records Control Schedules Document 1229 since permanent Records of the National Archives

215.   Where do the returns go under Document 1229 and when?

IRM Section 3.28.3.4.2 Account Data

(1) Carry the account data of the President on the appropriate Master File

216.   What is an appropriate Master File? Is it the same Master File as all taxpayers?

(2) Do not subject the accounts to restricted access procedures

217.   Is this the same as prior to 2019?  If not, what changes were made and why?

IRM Section 3.28.3.4.3 Mandatory Examination

(1) President subject to mandatory examinations

(2) SB/SE Director of Exam determined who is responsible

218.   Who is responsible for the President's exams?

219.   How many examiners and what division?

220.   What about those doing the ongoing examinations or prior examinations?

221.   Does the IRS Chief Counsel need to recuse himself from all decisions related to these examinations if he previously provided legal counsel to the President?

(a)   Regardless of the discriminate index function (DIF) conduct exam

222.   Do they have a DIF score for prior years? Is DIF done and not used?

(b)   Employees assigned "as appropriate"

223.    What does "as appropriate" mean?

224.    Who defines or where is this defined in the IRM?

225.    How many employees were assigned in 2013, 2014, 2015, 2016, 2017, 2018 and this year?

226.    How many employees were assigned to the "ongoing" examinations of the President? Are they included as appropriate assigned employees, what happens to the ongoing examination employees?

> (c)     Exam Area Director arranges for contact with the authorized representative of President

227.    Who is the authorized representative for the President?

228.    Is it the Form 2848 party?

229.    When were they contacted?

230.    Does a former IRS Chief Counsel need to recuse himself from serving as an authorized representative of the President?

> (d)     All relevant IRM procedures will apply to these returns?

231.    What are each and all IRM procedures that apply to President's examination in addition to those listed in Commissioner Rettig's May 17 letter? Please list them.

> (e)     The examination papers of the President are subject to regular retention procedures Document 12990

232.    What has been done with the papers and what is included in the "examination papers"?

IRM section 3.28.3.5.1 Blind Trust Form 1040 Returns

(1) The President will be considered to have good cause for receiving permission and automatically be granted permission to have their return filed by a trustee when
>    (a) Interest in a blind trust meeting section 102(f)(3) of the Appendix 4 to Title 5, and

>    (b) Submits with the tax return a letter requesting permission for trustee to prepare and file and a power of attorney. Separate request must be made of each tax year.

233.    Why was this added in 2019?

234.    Is a Blind Trust the same as a Grantor Trust for IRM purposes?

235.    If so, where is that stated?

236.    If not, how does the IRM treat grantor trusts?

237.    Is this procedure new this year?

238.    What was done last year by the President?

239.    What was done this year by the President?

240.    Isn't this what is in IRM section 3.28.3.2(6)?

241.    Is the letter and power of attorney signed by the President and spouse?

(2) The trustee must attach both the letter and power of attorney

242.    Were both attached to each year's returns?

(3) IRS must use extreme caution not to violate a blind trust.

      (a) address all correspondence and refunds to the trustee and
      (b) not disclose to the taxpayer.

Remainder of 3.28.3.5.1 through 5.2 Are Blind Trust processing rules

243.    Are these blind trust procedures applicable here?

IRM Section 4.2.1.11

      (1) Individual returns of President are subject to Mandatory Examination and cannot be surveyed

244.    What does it mean to be "surveyed"?

245.    Are there any examples?

      (2) Copies of returns are "transmitted" by the Office of the Deputy Commissioner for SB/SE, Director, Examination

246.    To whom are these "transmitted"?

247.    How were these "transmitted" and when for each year?

248.    What about the ongoing examinations — what IRM rules apply to those examinations at this point?

249.    What about open years not under examination?

(3) The area responsible for the Exam is determined by the SB/SE director

250.    Who is responsible for these exams?

251.    How many examiners and what division?

252.    What about those doing the ongoing examinations or prior examinations?

        (a)     Regardless of the discriminate index function (DIF) conduct exam

253.    Do they have a DIF score for prior years?

254.    Is DIF done and not used?

        (b)     Employees assigned "as appropriate"

255.    What does that mean?

256.    Who defines "as appropriate" and where in the IRM is that stated or defined?

257.    What has been "appropriate" in 2015, 2016, 2017 and 2018?

        (c)     Exam Area Director arranges for contact with the authorized representative of President

258.    Who is the authorized representative for the President?

259.    Is it the Form 2848 party?

260.    When were they contacted?

261.    Does former IRS Chief Counsel need to recuse himself from serving as an authorized representative of the President?

(d)    All relevant IRM procedures will apply to these returns

262.    What are each and all of the IRM procedures that apply to President's examination in addition to those listed in Commissioner's May 17 letter? Please list them.

(4) Use "Employee Returns" Source Code 46 for the primary and any prior and subsequent years.

263.    What years have the Code 46 in this case and what returns?

264.    What are "subsequent" returns, after they leave office?

(5) the returns must be assigned in 10 days after receipt and ensure "prompt" completion of the examination.

265.    When were these returns assigned and what is "prompt" completion—when were they completed?

266.    Commissioner's letter says within 10 days of receiving a copy of the return, a manager in one of IRS's operating divisions assigns the examination to a revenue agent.   Where is the manager requirement in the IRM; is it sent to the manager by the SB/SE Deputy Commissioner or whom? What manager was assigned these returns?

(6) Related returns, including estate and gift tax returns, will be handled in accordance with procedures relating to all taxpayers

267.    What related returns are included? Is this the same for all taxpayers?

(7) Location of the returns of the President and Vice President will be monitored at all times throughout the examination process

268.    Have the returns been in an orange folder? Not exposed to viewing by other employees?

269.    What is the secure area?

270.    Where are workpapers kept?

271.    Who has access to the cabinet?

272.    What does an orange folder look like?  We would like to see an example of an orange folder.

(8) Returns of President. Should be processed similar to examinations of an employee return with the exception of:

     (a) The returns are mandatory examinations and cannot be surveyed.

273.    What is the survey?

274.    Would the prohibition on surveys include open years not under exam?

     (b) The returns are subject to mandatory review and must be closed directly to Employee Audit Reviewer in Baltimore Technical Services.  The examining area will notify Baltimore when the return is being forwarded.

275.    How long before this occurs after the start of the examination?

276.    What must occur before the case is closed – report anything to supervisors of employees assigned?

277.    Is this reported to anyone at IRS National Office?

278.    Is this reported to anyone at all?

279.    What happens if amounts are assessed?

280.    What happens if not complete and the President's term ends?

281.    Are any of the President's returns done and already sent to Baltimore?

282.    Do the procedures set forth in IRM 4.8.4.2.5 apply upon closing the case only: "closed directly to the employee audit review in Baltimore" and examiner notates President or Vice-President's return and Forwards to Baltimore Technical services"?

283.    Can you describe how Examination of Employee Returns IRM section 42.6 differs from Mandatory Examination of the President?

<u>IRM section 4.10.3.2 Risk Analysis</u>

284.    Please explain the risk analysis associated with a Presidential return?

285.    What issues might be included and what issues were in this exam?

286.   What about prior exam issues?

(a)      During the pre-contact phase, examiners determine the scope of the examination See IRM 4.10.2.3  [pre-contact analysis- review of the case file to identify large and questionable items (a) review the complete tax return; (b) review internal and external date from IDRS, IRP, e-file, CDE etc. (c) perform preliminary research, (d) Document all actions on Lead Sheet 110, TCO Audit Plan (managerial approval if pre-contact is more than 1 hour on a non-business return.)  *See IRM 4.10.2.3.1 Large unusual or questionable items definition—all of these must be examined unless no adjustment likely and then must explain this.] See also examination of income section IRM 4.10.2.3.2

287.   How is the pre-contact phase done with the Presidential exam?

288.   What is the TCO audit plan on a Presidential exam and is there a need for managerial approval for over one hour (how long did this take here)?

289.   What are the Large, Unusual or Questionable items on a President's return?

(b)      At the mid-point of the examination, the examiner will re-evaluate and adjust the scope of the examination if necessary. See IRM 4.10.3.2.2- Mid-Audit Decision Point (505 Rule): whether the remaining issues should be examined based on facts and judgement on whether the government's best interest to continue the examination. If it is not in the government's best interest to continue the examination, the examiner must document this determination See IRM 4.10.3.2.1. for additional guidance.

290.   Is there ever a mandatory exam stopped at mid-point in the examination?

291.   Describe when it is in the government's best interest to continue an examination.

EXHIBIT O

**Vaughan, Frederick**

| | |
|---|---|
| **From:** | Vaughan, Frederick |
| **Sent:** | Friday, June 21, 2019 1:13 PM |
| **To:** | 'McAfee, Karen' |
| **Cc:** | Casey, Brandon; Andres, Gary; Kaldahl, Rachel; Sok, Justin; Oursler Leonard T |
| **Subject:** | RE: Today's Briefing on Mandatory Audit Process |

Karen

To clarify, IRS attendees spent an hour providing the prepared briefing and two hours answering questions—the approximately 40 total minutes of break time you referenced was in addition to this.

Regarding follow up, thank you for sharing the questions that Committee staff prepared in advance of the briefing. We answered many of those questions at the briefing. Please let us know which of the questions you would like us to prioritize. Some of the information may take time to track down, but we will do our best to locate what we can as expeditiously as possible.

With respect to 6103 information, the "agent" letters that you sent us over the weekend before the Monday briefing (though they were dated earlier) were insufficient to authorize the disclosure of any 6103 information. While those letters designated staff to receive returns and return information pursuant to section 6103(f)(4), they did not specify what information was requested by the Chairman, as required by section 6103(f)(1). Because section 6103(f)(1) requires a written request from the Chairman specifying the information sought, staff questions seeking to elicit 6103 information at the briefing could not be answered.

Best, Fritz

---

**From:** McAfee, Karen <Karen.McAfee@mail.house.gov>
**Sent:** Thursday, June 13, 2019 6:39 PM
**To:** Vaughan, Frederick <Frederick.Vaughan@treasury.gov>
**Cc:** Casey, Brandon <Brandon.Casey@mail.house.gov>; Andres, Gary <Gary.Andres@mail.house.gov>; Kaldahl, Rachel <Rachel.Kaldahl@mail.house.gov>; Sok, Justin <Justin.Sok@treasury.gov>; Oursler Leonard T <Leonard.T.Oursler@irs.gov>
**Subject:** FW: Today's Briefing on Mandatory Audit Process

Fritz,

Thank you for the follow-up letter and electronic materials.  Yes, the briefing was three hours, with nearly one hour spent walking through the IRM materials you provided and with a long, and necessary, break to accommodate staff.  Despite its length, I would not classify it as thorough.

I also do not agree that the briefing answered most of our questions.  Although some questions were addressed, IRS and Treasury attendees declined to answer the majority of questions for a range of reasons, including (1) lack of authorization under section 6103 despite Republican and Democratic Committee staff having 6103 authorization from the Chairman and your knowledge of the limitations placed on return information when only a few taxpayers are involved, (2) objections raising various privileges, (3) inability to evaluate tax policy considerations, and (4) lack of awareness of specific internal policies and practices.  Notably, of the eight IRS and Treasury attendees present at the briefing, there was not one person who was or is involved in, or was or is an examiner for, a mandatory presidential audit.  We also found various, important instances where IRS practice did not conform to procedures outlined in the Internal Revenue Manual.  The briefing reinforced our concerns about the substantial discretion a single IRS revenue

agent possesses in conducting the audit of presidential returns and the absence of guardrails to ensure that such employee is not subject to undue influence by a president or his representatives.  The absence of direction on the scope of an audit and handling of a grantor trust, among other things, reinforce the need for oversight and codification of procedures related to the mandatory examination of a president's return.

As requested by you during the briefing, I am enclosing a copy of the written questions that Committee staff prepared in advance for our use at the briefing.  We also discussed possibly having a follow-up briefing.  However, it seemed to be your position and that of Chief Counsel Mike Desmond and Counselor to the Commissioner Tom Cullinan that there was a hard and fast rule not to discuss any 6103 information related to the mandatory audit process despite Committee staff having authorization.  This rule seemed to be in place when we asked questions about current and former Democratic and Republican presidents.  Given the small universe of President-taxpayers, substantial discretion during the audit, and audit practices that do not match IRM procedures, the Committee needs access to returns and return information in order for it to fulfill its legislative and oversight activities.  Please confirm whether any follow-up briefings will provide return and return information.

Thanks, again, for the briefing.  Please let me know if you need anything further.

Best,
Karen

---

**From:** Frederick.Vaughan@treasury.gov <Frederick.Vaughan@treasury.gov>
**Sent:** Monday, June 10, 2019 2:12 PM
**To:** Casey, Brandon <Brandon.Casey@mail.house.gov>; McAfee, Karen <Karen.McAfee@mail.house.gov>
**Cc:** Andres, Gary <Gary.Andres@mail.house.gov>; Kaldahl, Rachel <Rachel.Kaldahl@mail.house.gov>; Justin.Sok@treasury.gov; Leonard.T.Oursler@irs.gov; LegAffairs@treasury.gov
**Subject:** Today's Briefing on Mandatory Audit Process

Brandon and Karen

Attached is a letter from me, as well as copies of the slide deck and tabbed materials from the briefing. Please let us know if you need additional copies of the other historical materials we provided in binders.

Best, Fritz

--
**Frederick W. Vaughan**
**Deputy Assistant Secretary**
**Legislative Affairs**
**U.S. Department of the Treasury**
**1500 Pennsylvania Avenue, N.W.**
**Washington, D.C. 20220**
**202-622-2678**

EXHIBIT P

**Vaughan, Frederick**

---

| | |
|---|---|
| **From:** | McAfee, Karen <Karen.McAfee@mail.house.gov> |
| **Sent:** | Tuesday, June 25, 2019 3:39 PM |
| **To:** | Vaughan, Frederick |
| **Cc:** | Casey, Brandon; Andres, Gary; Kaldahl, Rachel; Sok, Justin; Leonard.T.Oursler@irs.gov |
| **Subject:** | RE: Today's Briefing on Mandatory Audit Process |

Hi Fritz,

You are welcome.  The authorization letters are sufficient.  Please feel free to provide the answers on a rolling basis.

Best,
Karen

Karen B. McAfee
Staff Director, Subcommittee on Oversight
Committee on Ways & Means, Democratic Staff
1102 Longworth House Office Building
Washington, DC 20515
(202) 225-3625

*This document and any related communications or documents generated by the Committee on Ways and Means are confidential congressional records, remain subject to congressional control, and are entrusted to you only for use in handling this matter.  Any related documents communicated to us in response to this document or to any related House communications are also confidential congressional records and remain subject to congressional control.  Accordingly, the aforementioned materials are not "agency records" for purposes of the Freedom of Information Act or other law.*

---

**From:** Frederick.Vaughan@treasury.gov <Frederick.Vaughan@treasury.gov>
**Sent:** Friday, June 21, 2019 1:13 PM
**To:** McAfee, Karen <Karen.McAfee@mail.house.gov>
**Cc:** Casey, Brandon <Brandon.Casey@mail.house.gov>; Andres, Gary <Gary.Andres@mail.house.gov>; Kaldahl, Rachel <Rachel.Kaldahl@mail.house.gov>; Justin.Sok@treasury.gov; Leonard.T.Oursler@irs.gov
**Subject:** RE: Today's Briefing on Mandatory Audit Process

Karen

To clarify, IRS attendees spent an hour providing the prepared briefing and two hours answering questions—the approximately 40 total minutes of break time you referenced was in addition to this.

Regarding follow up, thank you for sharing the questions that Committee staff prepared in advance of the briefing. We answered many of those questions at the briefing. Please let us know which of the questions you would like us to prioritize. Some of the information may take time to track down, but we will do our best to locate what we can as expeditiously as possible.

With respect to 6103 information, the "agent" letters that you sent us over the weekend before the Monday briefing (though they were dated earlier) were insufficient to authorize the disclosure of any 6103 information. While those letters designated staff to receive returns and return information pursuant to section 6103(f)(4), they did not specify what information was requested by the Chairman, as required by section 6103(f)(1). Because section 6103(f)(1) requires a written request from the Chairman specifying the information sought, staff questions seeking to elicit 6103 information at the briefing could not be answered.

1

Best, Fritz

---

**From:** McAfee, Karen <Karen.McAfee@mail.house.gov>
**Sent:** Thursday, June 13, 2019 6:39 PM
**To:** Vaughan, Frederick <Frederick.Vaughan@treasury.gov>
**Cc:** Casey, Brandon <Brandon.Casey@mail.house.gov>; Andres, Gary <Gary.Andres@mail.house.gov>; Kaldahl, Rachel <Rachel.Kaldahl@mail.house.gov>; Sok, Justin <Justin.Sok@treasury.gov>; Oursler Leonard T <Leonard.T.Oursler@irs.gov>
**Subject:** FW: Today's Briefing on Mandatory Audit Process

Fritz,

Thank you for the follow-up letter and electronic materials.  Yes, the briefing was three hours, with nearly one hour spent walking through the IRM materials you provided and with a long, and necessary, break to accommodate staff.  Despite its length, I would not classify it as thorough.

I also do not agree that the briefing answered most of our questions.  Although some questions were addressed, IRS and Treasury attendees declined to answer the majority of questions for a range of reasons, including (1) lack of authorization under section 6103 despite Republican and Democratic Committee staff having 6103 authorization from the Chairman and your knowledge of the limitations placed on return information when only a few taxpayers are involved, (2) objections raising various privileges, (3) inability to evaluate tax policy considerations, and (4) lack of awareness of specific internal policies and practices.  Notably, of the eight IRS and Treasury attendees present at the briefing, there was not one person who was or is involved in, or was or is an examiner for, a mandatory presidential audit.  We also found various, important instances where IRS practice did not conform to procedures outlined in the Internal Revenue Manual.  The briefing reinforced our concerns about the substantial discretion a single IRS revenue agent possesses in conducting the audit of presidential returns and the absence of guardrails to ensure that such employee is not subject to undue influence by a president or his representatives.  The absence of direction on the scope of an audit and handling of a grantor trust, among other things, reinforce the need for oversight and codification of procedures related to the mandatory examination of a president's return.

As requested by you during the briefing, I am enclosing a copy of the written questions that Committee staff prepared in advance for our use at the briefing.  We also discussed possibly having a follow-up briefing.  However, it seemed to be your position and that of Chief Counsel Mike Desmond and Counselor to the Commissioner Tom Cullinan that there was a hard and fast rule not to discuss any 6103 information related to the mandatory audit process despite Committee staff having authorization.  This rule seemed to be in place when we asked questions about current and former Democratic and Republican presidents.  Given the small universe of President-taxpayers, substantial discretion during the audit, and audit practices that do not match IRM procedures, the Committee needs access to returns and return information in order for it to fulfill its legislative and oversight activities.  Please confirm whether any follow-up briefings will provide return and return information.

Thanks, again, for the briefing.  Please let me know if you need anything further.

Best,
Karen

---

**From:** Frederick.Vaughan@treasury.gov <Frederick.Vaughan@treasury.gov>
**Sent:** Monday, June 10, 2019 2:12 PM
**To:** Casey, Brandon <Brandon.Casey@mail.house.gov>; McAfee, Karen <Karen.McAfee@mail.house.gov>
**Cc:** Andres, Gary <Gary.Andres@mail.house.gov>; Kaldahl, Rachel <Rachel.Kaldahl@mail.house.gov>; Justin.Sok@treasury.gov; Leonard.T.Oursler@irs.gov; LegAffairs@treasury.gov
**Subject:** Today's Briefing on Mandatory Audit Process

Brandon and Karen

Attached is a letter from me, as well as copies of the slide deck and tabbed materials from the briefing. Please let us know if you need additional copies of the other historical materials we provided in binders.

Best, Fritz

--
**Frederick W. Vaughan**
**Deputy Assistant Secretary**
**Legislative Affairs**
**U.S. Department of the Treasury**
**1500 Pennsylvania Avenue, N.W.**
**Washington, D.C. 20220**
**202-622-2678**

# EXHIBIT Q

**Vaughan, Frederick**

| | |
|---|---|
| **From:** | McAfee, Karen <Karen.McAfee@mail.house.gov> |
| **Sent:** | Friday, June 28, 2019 5:10 PM |
| **To:** | Oursler Leonard T; Vaughan, Frederick |
| **Cc:** | Sok, Justin; Robert.B.Chapman@irs.gov |
| **Subject:** | WM Letter to IRS/Treasury |
| **Attachments:** | WM Letter to Treasury 6.28.19.pdf; ATT00001.htm |

Hi Lenny and Fritz,

I hope all is well.  Please find attached a letter from Chairman Neal to the Commissioner and Secretary.  Please confirm receipt.  Have a great weekend!

Best,
Karen

Karen B. McAfee

Staff Director, Subcommittee on Oversight

Committee on Ways & Means, Democratic Staff
1102 Longworth House Office Building
Washington, DC 20515
(202) 225-3625

*This document and any related communications or documents generated by the Committee on Ways and Means are confidential congressional records, remain subject to congressional control, and are entrusted to you only for use in handling this matter.  Any related documents communicated to us in response to this document or to any related House communications are also confidential congressional records and remain subject to congressional control.  Accordingly, the aforementioned materials are not "agency records" for purposes of the Freedom of Information Act or other law.*

RICHARD E. NEAL,
MASSACHUSETTS,
CHAIRMAN

JOHN LEWIS, GEORGIA
LLOYD DOGGETT, TEXAS
MIKE THOMPSON, CALIFORNIA
JOHN B. LARSON, CONNECTICUT
EARL BLUMENAUER, OREGON
RON KIND, WISCONSIN
BILL PASCRELL JR., NEW JERSEY
DANNY K. DAVIS, ILLINOIS
LINDA T. SÁNCHEZ, CALIFORNIA
BRIAN HIGGINS, NEW YORK
TERRI A. SEWELL, ALABAMA
SUZAN DELBENE, WASHINGTON
JUDY CHU, CALIFORNIA
GWEN MOORE, WISCONSIN
DAN KILDEE, MICHIGAN
BRENDAN BOYLE, PENNSYLVANIA
DON BEYER, VIRGINIA
DWIGHT EVANS, PENNSYLVANIA
BRAD SCHNEIDER, ILLINOIS
TOM SUOZZI, NEW YORK
JIMMY PANETTA, CALIFORNIA
STEPHANIE MURPHY, FLORIDA
JIMMY GOMEZ, CALIFORNIA
STEVEN HORSFORD, NEVADA

BRANDON CASEY,
MAJORITY STAFF DIRECTOR

## Congress of the United States
### U.S. House of Representatives
COMMITTEE ON WAYS AND MEANS

1102 LONGWORTH HOUSE OFFICE BUILDING
(202) 225-3625

### Washington, DC 20515-0348

http://waysandmeans.house.gov

KEVIN BRADY,
TEXAS,
RANKING MEMBER

DEVIN NUNES, CALIFORNIA
VERN BUCHANAN, FLORIDA
ADRIAN SMITH, NEBRASKA
KENNY MARCHANT, TEXAS
TOM REED, NEW YORK
MIKE KELLY, PENNSYLVANIA
GEORGE HOLDING, NORTH CAROLINA
JASON SMITH, MISSOURI
TOM RICE, SOUTH CAROLINA
DAVID SCHWEIKERT, ARIZONA
JACKIE WALORSKI, INDIANA
DARIN LAHOOD, ILLINOIS
BRAD R. WENSTRUP, OHIO
JODEY ARRINGTON, TEXAS
DREW FERGUSON, GEORGIA
RON ESTES, KANSAS

GARY ANDRES,
MINORITY STAFF DIRECTOR

June 28, 2019

The Honorable Steven T. Mnuchin
Secretary
Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220

The Honorable Charles P. Rettig
Commissioner
Internal Revenue Service
1111 Constitution Avenue, NW
Washington, D.C. 20224

Dear Secretary Mnuchin and Commissioner Rettig,

The Committee on Ways and Means ("Committee") has oversight and legislative authority over the Internal Revenue Service ("IRS") and the Federal tax laws. Consistent with this authority and the Committee's longstanding practice under section 6103(f) of the Internal Revenue Code ("Code"), I requested six years of President Trump's individual tax returns and certain related returns and return information. Upon the denial of that section 6103(f) request, I issued subpoenas for the information. To date, you have not complied with those subpoenas.

As you are aware, on June 10, 2019—in response to your offers to provide the Committee with additional information on the mandatory Presidential audit process outlined in the Internal Revenue Manual (IRM)—a briefing was provided by officials from the IRS and the Department of the Treasury ("Treasury"). It included a walk-through of the applicable IRM provisions and a high-level description of some ways in which current audit practices diverge from the IRM because, as Treasury and IRS officials noted, the provisions are four decades old and are now "outdated" in numerous respects.

Regrettably, of the eight Treasury and IRS officials sent to the briefing, none had ever been involved in a mandatory Presidential audit. Further, despite letters I sent specifically authorizing Majority and Minority Committee staff to receive return and return information in connection with the briefing, the IRS and Treasury declined to answer *any* questions asked by Committee staff related to the actual audits of multiple prior Presidents

across both political parties, including basic questions about whether Presidential returns have ever been filed electronically, how long Presidential audits generally take, whether there ever have been any assessments made to Presidential returns, or whether any President-taxpayers have ever gone to IRS Appeals from a mandatory audit. In total, Majority and Minority Committee staff raised a few hundred questions, most of which Treasury and IRS declined to answer.

The June 10 briefing only reinforced the Committee's need to review the actual return information as part of our oversight duties. For example, the briefing highlighted the substantial discretion a single IRS revenue agent possesses in conducting an audit of a President's tax returns, raising serious concerns about the absence of safeguards protecting both the individual auditor as well as the entire audit process from improper influence. The briefing also raised concerns uniquely and directly relevant to the thoroughness of the Presidential audit process as applied to this President, including how related-entity returns and returns previously under audit have been considered and how highly complex returns are examined. The officials at the briefing reported that there are no specific mandatory audit procedures for a President's grantor trusts. This Committee is charged with conducting oversight of precisely these types of questions, and the answers can only be determined by reviewing the returns and audit file information that the IRS and Treasury have thus far refused to provide.

The limited information conveyed at the briefing is not a replacement for the actual return and return information that the Committee requested under section 6103(f) and now has subpoenaed. As I have explained in our prior correspondence, the Committee is conducting oversight of the IRS's handling of Presidential tax returns and enforcement of tax laws involving the President. As part of that investigation, the Committee is examining the IRS's administration of the mandatory Presidential audit process and the application of that audit process to the tax returns of President Trump and certain related entities. Indeed, the President himself repeatedly has called into question the integrity of the IRS's audit system, including by criticizing the mandatory audit process as "extremely unfair." The Committee is also considering the adequacy of the IRS's review of particular provisions of the Code that testimony before the Oversight Subcommittee has indicated may be relevant to President Trump's returns.

Without studying the returns and the documentation of the agent's decisions that were requested, the Committee cannot evaluate the accuracy of the President's claims about the audit system, assess the fairness and effectiveness of the audit program and the scope of the audits being performed on the President's returns, or understand how particular provisions of the Code are being enforced as part of the IRS's review. Each of these will inform the Committee's legislative judgment of whether and how to amend the Code to respond to issues concerning the audit process or that are otherwise implicated by the President's returns.

Secretary Mnuchin
Commissioner Rettig
Page 3

The subpoenas issued to the IRS and Treasury on May 10 remain pending, and you remain under a legal obligation to provide this information to the Committee. Thank you for your prompt attention to this matter.

Sincerely,

The Honorable Richard E. Neal, *Chairman*