IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| COMMITTEE ON WAYS AND MEANS, UNITED STATES HOUSE OF REPRESENTATIVES, | ) ) ) ) ) | |
| *Plaintiff*, | ) ) | |
| v. | ) ) | No. 1:19-cv-1974-TNM |
| UNITED STATES DEPARTMENT OF THE TREASURY, *et al.*, | ) ) ) | |
| *Defendants*, | ) ) | |
| and | ) ) | |
| DONALD J. TRUMP, *et al.*, | ) ) | |
| *Defendant-Intervenors.* | ) ) | |

**SUPPLEMENTAL DECLARATION OF FREDERICK W. VAUGHAN**

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1.  On September 6, 2019, I submitted a declaration in support of Defendants' motion to dismiss the above-captioned case. *See* ECF No. 44-3 ("First Vaughan Decl."). That declaration describes communications between majority staff for the House Ways and Means Committee and myself surrounding a June 10, 2019, briefing concerning the Presidential audit process.

2.  As my prior declaration explained, personnel from the Department of the Treasury and the Internal Revenue Service ("IRS") provided the June 10 briefing to Committee staff pursuant to an offer first made by the Secretary of the Treasury on April 23, 2019. During

the period surrounding the briefing, the Treasury Office of Legislative Affairs assumed responsibility for all substantive communications with the majority and minority staff of the Committee regarding the briefing, and this assumption of responsibility was communicated to Leonard T. Oursler, Director of the IRS Office of Legislative Affairs. As I explained in my initial declaration, as Deputy Assistant Secretary for Legislative Affairs, I am responsible for managing the Department's engagement with Congress on all congressional oversight requests, and as the record attached to my prior declaration indicates, I took the lead in communicating with the Committee about the briefing.

3. Notwithstanding the foregoing, on and after September 13, 2019, I became aware of information regarding other communications about the June 10 briefing between a program analyst within the IRS Office of Legislative Affairs ("IRS employee") and the Committee majority staff, which were not described in my first declaration. In light of the new information that has now been made available to me, I am respectfully submitting this supplemental declaration to describe these additional communications to ensure that the record of events surrounding the June 10 briefing is complete and accurate.

4. On May 22, 2019, a member of the Treasury Department's Legislative Affairs Office received an email from Karen McAfee, Staff Director of the Subcommittee on Oversight of the House Ways and Means Committee, communicating acceptance of the Secretary's April 23, 2019, offer to provide a briefing on IRS procedures for conducting mandatory audits of Presidents and Vice Presidents. *See* First Vaughan Decl. ¶ 30. That briefing was later confirmed for June 10, 2019. *See id.* ¶ 36.

5. My initial declaration discussed communications with Committee staff concerning authorization letters for staff access to information provided at the briefing that might

2

be covered by § 6103.  First Vaughan Decl. ¶¶ 39-40.  Since the filing of my first declaration, I have been informed that during the month of May 2019, the IRS employee had one or more conversations with Ms. McAfee and that he may have come to believe that during the planned briefing Committee staff would seek return information regarding one or more Presidents of the United States covered by 26 U.S.C. § 6103(a).  On May 31, 2019, the IRS employee sent an email to Ms. McAfee to inquire whether staff had been authorized by the Committee, pursuant to 26 U.S.C. § 6103(f)(4), to inspect information protected by § 6103 and to suggest that the Committee send a letter to the IRS providing such authorization in advance of the June 10 briefing.  *See* Ex. A.  The IRS employee also suggested calling if Ms. McAfee wished to discuss the matter.  Later that day, Ms. McAfee replied by email, "Thanks.  Yes, there is a letter.  Will do."  *See id.*

6.  As described in my first declaration, however, Ms. McAfee did not actually provide any purported authorization letters to Treasury or the IRS until June 7, 2019.  *See* First Vaughan Decl. ¶ 38.  Moreover, the letters Ms. McAfee ultimately provided did not include a request specifying returns or return information protected by § 6103 to be furnished.  Instead, the letters purported simply to provide blanket authorization for staff to receive any section 6103 information related to the mandatory audit process, which is insufficient to permit disclosure under section 6103(f).

7.  The briefing was held on June 10, 2019.  As noted in Exhibit N to my initial declaration, Ms. McAfee sent me an e-mail on June 13, 2019, in which she referred, among other things, to one or more possible follow-up briefings to the June 10 briefing.  I was aware at that time that during the June 10 briefing Ms. McAfee had requested a follow-up briefing to obtain answers to outstanding questions.  I have also now been informed that Ms. McAfee may have

had a conversation with the IRS employee on June 11 in which she mentioned the request for a follow-up briefing.  I am unaware of any further request for a follow-up briefing from Committee staff before the suit was filed on July 2, 2019.

8. Also on June 11, 2019, the IRS employee prepared and, at 11:11 a.m., emailed to Mr. Oursler a compilation of questions posed by Committee staff during the briefing that the IRS employee believed Treasury and IRS personnel had been unable at that time to answer and which could entail subsequent responses, or "get backs."  Mr. Oursler forwarded this compilation to me the next day.

9. On June 11, 2019, at 8:44 a.m., prior to sending the "get back" compilation to Mr. Oursler, the IRS employee sent an email to Ms. McAfee asking to "touch base later on the 'get backs' from yesterday's briefing" to "confirm I am not omitting anything."  *See* Ex. B.  At 12:06 p.m., the IRS employee sent to majority staff the compilation he had sent to Mr. Oursler at 11:11 a.m. of what he understood to be the questions "that went unanswered yesterday and that we may owe you get-backs on," requesting that majority staff "confirm accuracy and completeness."  Ex. C.  At 12:20, he also sent the compilation to minority staff.

10. I understand that, that same day, June 11, 2019, Ms. McAfee and the IRS employee may have spoken by telephone.  I do not know whether Ms. McAfee responded during the June 11 telephone call, or at any other time, to the employee's request that Committee staff "confirm [the] accuracy and completeness" of the "get backs" compilation he had prepared.  I do understand that another member of the majority staff may have asked the IRS employee about the status of the "get backs" at least once during June 2019.

11. After learning that the IRS employee's "get backs" compilation had been sent to Ms. McAfee, but before receiving a copy of that compilation myself, I called Ms. McAfee and

4

spoke with her by telephone. I told her that I had not seen the IRS employee's compilation, that I could not attest to its accuracy or completeness, and that she should still send me a list of whatever follow-up questions Committee staff might have following the briefing—as my June 10 e-mail to her had requested, *see* First Vaughan Decl. ¶¶ 49-50. As explained in my initial declaration, she subsequently sent to me via e-mail a list of 291 questions the Committee staff had prepared prior to the June 10 briefing, without specifying which questions Treasury and IRS should prioritize in preparing responses. First Vaughan Decl. ¶¶ 51-52.

12. On June 28, 2019, Chairman Neal sent a letter to Secretary Mnuchin and Commissioner Rettig, stating that the information provided at the June 10 briefing "is not a replacement for the actual return and return information that the Committee requested under section 6103(f)." First Vaughan Decl. ¶ 55. Thereafter, on July 2, 2019, the Committee filed this lawsuit.

13. I understand that nearly two weeks after the Committee filed suit, during a July 15, 2019, phone call, Ms. McAfee may have asked the IRS employee about the status of "get backs" or questions that had not been answered at the June 10 briefing. On July 17, 2019, the IRS employee sent an email to Ms. McAfee stating that she had "asked in passing the other day about the status of the 'get-backs' from the June 10 briefing" and that he had "asked and can not ascertain anything definite about whether or when the committee staff will receive any answers to any of the questions." Ex. D.

14. Apart from the transmission of the "get backs" compilation to Committee staff, I did not learn about the occurrence of any of the communications described above between the IRS employee and Committee staff at any point prior to September 13, 2019. As noted above, the Treasury Office of Legislative Affairs assumed responsibility for all substantive

communications with the majority and minority staff of the Committee. And as noted in my prior declaration, the staffs for Treasury, IRS, and the Ways and Means Committee had previously exchanged at least 14 e-mails concerning the briefing between May 22 and the evening of June 7, *see* First Vaughan Decl. ¶ 39—all of which included at least one staff member from Treasury, IRS, and the Ways and Means Committee, and none of which included or referred to the IRS employee. Nor was the IRS employee's name or the existence of these communications raised during any of my own conversations with Ms. McAfee.

15. In addition, to my knowledge, prior to September 13, 2019, no IRS employee made the Treasury Department, including its Legislative Affairs Office, aware of the communications between the IRS employee and the Ways and Means Committee, apart from the fact of his having sent the Committee the "get backs" list he created. As a result, I was unaware of these communications when I submitted my first declaration in this matter. I regret any inconvenience to the Court or to the parties that may have been caused by my lack of knowledge of these communications.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 18, 2019.

_Frederick W. Vaughan_
FREDERICK W. VAUGHAN

# EXHIBIT A

**From:** McAfee, Karen <Karen.McAfee@mail.house.gov>
**Sent:** Friday, May 31, 2019 10:48 AM
**To:** Chapman Robert B
**Subject:** Re: Authorization Letter

Hi Robert,

Thanks.  Yes, there is a letter.  Will do.

Best,
Karen

On May 31, 2019, at 9:34 AM, Chapman Robert B <Robert.B.Chapman@irs.gov> wrote:

> Hi, Karen,
>
> In anticipation of the upcoming briefing on the auditing of Presidential returns, it appears that the small number of President-taxpayers involved (there have only been three Presidents 19 years into this millennium) may require, under something like the so-called "rule of three," that we establish that whoever is present at the briefing is authorized under section 6103(f)(4) to access 6103 information.  Presumably there is an existing letter from the Chairman that would authorize one or more members of his staff to be present were any 6103 information to be disclosed.  Could you send over a copy of this general letter or any other more specific letter?  Please call if you wish to discuss.
>
> Robert B. Chapman
> Legislative Affairs
> Internal Revenue Service
> (202) 317-5853

# EXHIBIT B

| | |
|---|---|
| **From:** | Chapman Robert B <Robert.B.Chapman@irs.gov> |
| **Sent:** | Tuesday, June 11, 2019 8:44 AM |
| **To:** | 'karen.mcafee@mail.house.gov' |
| **Subject:** | Get backs |

Hi, Karen,

Can we touch base later on the "get backs" from yesterday's briefing? I need, as we always do, to prepare a list for Kirsten. The number of don't-knows and items to get the Secretary's approval for was so unusually high that we should confirm I am not omitting anything. I will be around all day.

Robert

# EXHIBIT C

| | |
|---|---|
| **From:** | Chapman Robert B <Robert.B.Chapman@irs.gov> |
| **Sent:** | Tuesday, June 11, 2019 12:06 PM |
| **To:** | 'karen.mcafee@mail.house.gov'; Athy, Susan |
| **Cc:** | sean.clerget@mail.house.gov; More, Isabella |
| **Subject:** | Get-backs, etc. |

Karen and Susan,

I think this is a complete list of the questions that went unanswered yesterday and that we may owe you get-backs on (although, as noted in the meeting, the decision may be made not to answer some unspecified number).  I think all but one or two came from the majority side, so can you confirm accuracy and completeness?

Thanks.

1. Who prepared the briefing materials for the briefing?
2. Did anyone in the main Treasury Department request to review the briefing materials?
3. Has any President or Vice-President ever filed electronically?
4. How long, generally, have Presidential and Vice-Presidential audits taken to complete since 1977?
5. How many employee hours or FTEs are generally spent to complete an audit of the President or Vice-President?
6. Please provide the data you have on the hours/FTEs spent on Presidential and Vice-Presidential audits since 1977.
7. Have any mandatory Presidential or Vice-Presidential audits ever gone to Appeals?
8. What, if any, special authorization or budget items would the IRS suggest to legislators to ensure sufficient resources for the mandatory audits of Presidential and Vice-Presidential returns?
9. What are the Treasury Department's views on legislation requiring mandatory disclosure that the mandatory audit was actually performed?
10. How many levels of management or supervision separate anyone in this room from the revenue agent to whom a Presidential or Vice-Presidential audit is assigned?
11. When President Clinton's income tax returns were audited, were the returns of the Clinton Foundation also audited as related returns?
12. Has the IRS assessed a deficiency against a President or Vice President as a result of the mandatory audit in the last two years?
13. Has the IRS assessed a deficiency against a President or Vice President as a result of the mandatory audit in the last 18 years?
14. Has the IRS assessed a deficiency against a President or Vice President as a result of the mandatory audit since 1977?
15. What items of the President's income and Vice-President's income reported in returns filed in the last two years were reported on information returns filed by third parties?
16. What items of the President's income and Vice-President's income reported in returns filed in the last 18 years were reported on information returns filed by third parties?
17. What items of the President's income and Vice-President's income reported in returns filed since 1977 were reported on information returns filed by third parties?
18. For each of the eight years in which President Obama was subject to the mandatory audit, provide the dates on which:
    a. His individual income tax return was filed;
    b. The return was copied as provided in the IRM;
    c. The copy was sent to the examination unit in Baltimore;
    d. The information on the return was added to the Master File;

      e. The mandatory audit was commenced;
      f. The mid-point evaluation was made;
      g. The audit was closed.

Alternatively, provide the same information for President Clinton, President Bush, or President Trump.

19. How many mandatory Presidential or Vice-Presidential audits are pending now?
20. For each pending audit, how many revenue agents are assigned?
21. For each revenue agent assigned to each pending audit, what is his or her grade or management level?
22. For each pending audit, how many taxable years are being examined?
23. During the mandatory quality review of the mandatory Presidential and Vice-Presidential audits, does the quality review team review the scope of the issues to be examined?
24. If the audit is "sent back" by the quality review team, what happens?
25. Can you provide the workpapers for any Presidential audits showing the documentation of the scope-and-depth decisions?
26. Who approves the audit plan for a mandatory audit of a Presidential or Vice-Presidential income tax return?
27. Does anyone ever approve or change an audit plan?
28. Can you provide an example of an instance in which it would not be in the best interests of the government to complete a mandatory Presidential or Vice-Presidential audit?
29. Are there any policies in place to require any managers to communicate orally to revenue agents the procedures to notify TIGTA in the event of any improper attempt to influence to conduct of a mandatory audit?
30. Who or what is the central point of contact for reporting such attempts to TIGTA?
31. Are general White House employees subject to the restriction/prohibition of 26.U.S.C. § 7217?
32. Is the mandatory audit process "extremely unfair"?
33. Has the Chief Counsel had any conversations about Presidential or Vice-Presidential audits with any representative of the taxpayer?
34. Prior to the publication by the Washington Post of the memorandum entitled Congressional Access to Returns and Return Information, had Chief Counsel Mike Desmond, Counselor to the Commissioner Tom Cullinan, Deputy Commissioner Kirsten Wielobob, or Senior Advisor Dianne Grant seen that memorandum?
35. Who wrote that memorandum?
36. Who approved that memorandum?
37. Prior to April 10, 2019, were there any conversations between or among Mike Desmond, Brian Callanan, Brent McIntosh, the Commissioner, and the Secretary about the memorandum?
38. Did the Commissioner ask for legal advice regarding Chairman Neal's April 3, 2019, letter prior to April 9 or April 10, 2019?  Without regard to the content of any advice that may have been given, did the Commissioner ask for legal advice regarding Chairman Neal's April 3, 2019, letter prior to April 9 or April 10, 2019?
39. Under the Internal Revenue laws, does the Commissioner or Secretary have discretion to provide or not provide tax returns or tax return information requested under the authority of 26 U.S.C. § 6103(f)?
40. Apart from the memorandum published by the Washington Post, has there been any legal analysis performed within IRS Chief Counsel regarding Chairman Neal's Neal's April 3, 2019, letter?
41. Where is the Department of Justice memorandum the Secretary has referred to in his letters?
42. During the current calendar year, 2019:
      a. How many mandatory Presidential or Vice-Presidential audits been closed?
      b. In each such audit:
          i. What issues were examined in each such audit?
          ii. What returns (e.g., 1040, 1041, 1120, etc.) were examined?
          iii. How many taxable years were audited?
          iv. How many examiners were assigned to work on each audit?
          v. What was the highest level of IRS or Treasury employee who received any information about the audit?
      c. Was the Secretary informed of, briefed about, or involved in any way in any such audit?
      d. Was the Commissioner informed of, briefed about, or involved in any way in any such audit?
      e. Was the Chief Counsel informed of, briefed about, or involved in any way in any such audit?

      f. Was the office of Treasury General Counsel informed of, briefed about, or involved in any way in any such audit?
      g. To the extent there were any changes in the procedures or practices of mandatory Presidential or Vice-Presidential audits during this period, who recommended and who approved any such changes?

43. For the period 2017-18: same questions as in Question 42.
44. For the period 2015-16, same questions as in Question 42.
45. For the period 2013-14, same questions as in Question 42.
46. For the period 2007-08, same questions as in Question 42.

# EXHIBIT D

**From:** Chapman Robert B <Robert.B.Chapman@irs.gov>
**Sent:** Wednesday, July 17, 2019 4:51 PM
**To:** 'karen.mcafee@mail.house.gov'
**Subject:** Get-backs from June 10 briefing

Hi, Karen,

You asked in passing the other day about the status of the get-backs from the June 10 briefing.  I have asked and can not ascertain anything definite about whether or when the committee staff will receive any answers to any of the questions.  Please feel free to call if you wish to discuss further.

Robert B. Chapman
Legislative Affairs
Internal Revenue Service
(202) 317-5853