**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON WAYS AND MEANS, UNITED
STATES HOUSE OF REPRESENTATIVES,

                  *Plaintiff*,

  v.

UNITED STATES DEPARTMENT OF THE
TREASURY, *et al.*,

                  *Defendants*,

DONALD J. TRUMP, *et al.*,

                  *Defendant-Intervenors*.

Case No. 19-cv-01974-TNM

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS AND DEFENDANT-INTERVENORS' MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................................ 1

BACKGROUND ........................................................................................................................ 4

I.     STATUTORY AND REGULATORY FRAMEWORK ........................................................... 4

     A.     Section 6103(f) ......................................................................................... 4

     B.     Subpoena Authority ................................................................................. 9

II.     FACTUAL BACKGROUND .............................................................................................. 9

     A.     The Committee's Need for President Trump's Tax Returns ................... 10

          1.     Tax Compliance Issues Relating To President Trump's Returns ............. 10

          2.     IRS Procedures For Auditing Presidents' Tax Returns ........................... 11

          3.     Legislative Proposals Relating To Presidential Tax Returns .................... 11

          4.     The Committee's Requests and Defendants' Refusals ............................. 12

          5.     The Committee's Subpoenas .................................................................. 13

     B.     Concerns About the Presidential Audit Program .................................... 13

LEGAL STANDARDS ............................................................................................................. 15

ARGUMENT .......................................................................................................................... 16

I.     THIS COURT HAS SUBJECT MATTER JURISDICTION OVER THIS CASE ................................ 16

     A.     The Committee Has Article III Standing ................................................ 17

          1.     The Committee Has Suffered Injury In Fact ........................................... 17

          2.     Defendants' Arguments Against Standing Are Meritless ........................ 21

               a.     *Raines* and similar cases are inapposite ............................. 22

               b.     The Committee's injuries are concrete and particularized ........................................................................ 24

               c.     This case presents issues amendable to judicial resolution ........................................................................... 26

               d.     Adjudication of this dispute will not violate separation of powers .............................................................. 28

          3.     The Committee Is Authorized To Bring This Suit ................................. 32

     B.     This Court Has Statutory Subject-Matter Jurisdiction ........................... 36

II.     THIS COURT SHOULD NOT DISMISS OR STAY THIS ACTION BECAUSE DEFENDANTS HAVE MADE CLEAR THAT ACCOMMODATION IS IMPOSSIBLE ............................................ 43

III.   THE COMPLAINT STATES VALID CLAIMS FOR RELIEF ........................................48

    A.    The Committee Is Entitled To Seek Judicial Enforcement
        Of Its Subpoenas ........................................................................................48

        1.    The Committee Can Seek Relief Directly under
               Article I ..........................................................................48

        2.    The Committee Can Invoke the Federal Courts' Traditional
               Equity Powers ................................................................51

        3.    The Committee Can Obtain Declaratory Relief ...........................53

    B.    The Committee May Challenge The Secretary's Action
        Under The APA ..........................................................................................55

        1.    APA Review Here Is Not Precluded ...........................................55

        2.    The Secretary's Refusal of a Section 6103 Request
               Is "agency action" .........................................................58

        3.    The Committee Is a "person aggrieved" by the Secretary's
               Conduct ..........................................................................60

    C.    Mandamus Is Available Here .....................................................................63

    D.    The Committee Can Obtain Relief Through Non-Statutory Review .............64

CONCLUSION ...........................................................................................................65

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967)......................................................................................54

*Aetna Life Ins. Co. v. Haworth*,
   300 U.S. 227 (1937)......................................................................................53

*Alexander v. Sandoval*,
   532 U.S. 275 (2001)......................................................................................50

*Ali v. Rumsfeld*,
   649 F.3d 762 (D.C. Cir. 2011).......................................................................54

*American Fed'n of Gov't Employees, AFL-CIO v. United States*,
   330 F.3d 513 (D.C. Cir. 2003).......................................................................33

*Anderson v. Dunn*,
   19 U.S. 204 (1821)...................................................................................30, 48

*Arizona v. United States*,
   567 U.S. 387 (2012)......................................................................................64

* *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*,
   135 S. Ct. 2652 (2015)......................................................................17, 22, 23

*Armstrong v. Bush*,
   924 F.2d 282, 290 (D.C. Cir. 1991)..............................................................56

*Armstrong v. Exceptional Child Center, Inc.*,
   135 S. Ct. 1378 (2015)......................................................................50, 51, 64

*Barenblatt v. United States*,
   360 U.S. 109 (1959)......................................................................................27

*Bennett v. Spear*,
   520 U.S. 154 (1997)......................................................................................62

*Block v. Community Nutrition Inst.*,
   467 U.S. 340 (1984)................................................................................55, 56

*Bowen v. Michigan Acad. of Family Physicians*,
   476 U.S. 667 (1986)..........................................................................54, 55, 58

*Bowsher v. Synar*,
   478 U.S. 714 (1986)..........................................................................27, 28, 62

*Branch Int'l Servs., Inc. v. United States,*
    905 F. Supp. 434 (E.D. Mich. 1995)........................................................................58, 59

*Buckley v. Valeo,*
    424 U.S. 1 (1976).....................................................................................................28

*Burgess v. United States,*
    553 U.S. 124 (2008).................................................................................................60

*C&E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth.,*
    310 F.3d 197 (D.C. Cir. 2002).................................................................................54

*Campbell v. Clinton,*
    203 F.3d 19 (D.C. Cir. 2000)...................................................................................24

*Carroll v. Safford,*
    44 U.S. 441 (3 How. 441) (1845).............................................................................51

*Chamber of Commerce of U.S. v. Reich,*
    74 F.3d 1322 (D.C. Cir. 1996).................................................................................64

*Chenoweth v. Clinton,*
    181 F.3d 112 (D.C. Cir. 1999)............................................................................24, 47

*Coffman v. Breeze Corp.,*
    323 U.S. 316 (1945).................................................................................................53

* *Committee on the Judiciary, U.S. House of Representatives v. Miers,*
    558 F. Supp. 2d 53 (D.D.C 2008)..................................................................... *passim*

* *Committee on Oversight and Government Reform v. Holder,*
    979 F. Supp. 2d 1 (D.D.C. 2013)...................................................................... *passim*

*Commonwealth Land Title Ins. Co. v. KCI Techs., Inc.,*
    922 F.3d 459 (D.C. Cir. 2019).............................................................................10, 15

*Connecticut Nat'l Bank v. Germain,*
    503 U.S. 249 (1992)...........................................................................................40, 41

*Consumer Energy Council of America v. FERC,*
    673 F.2d 425 (D.C. Cir. 1982).................................................................................62

*Council of and for the Blind of Del. Cty. Valley, Inc. v. Regan,*
    709 F.2d 1521 (D.C. Cir. 1983) (en banc)...............................................................62

*Cummings v. Murphy,*
    321 F. Supp. 3d 92 (D.D.C. 2018).................................................................24, 34, 35

*Davis v. Passman,*
    442 U.S. 228 (1979) ..................................................................................48, 50

*Davis v. U.S. Sentencing Comm'n,*
    716 F.3d 660 (D.C. Cir. 2013) ...................................................................53

*DCH Reg'l Med. Ctr. v. Azar,*
    925 F.3d 503 (D.C. Cir. 2019) ...................................................................64

*De Jesus Ramirez v. Reich,*
    156 F.3d 1273 (D.C. Cir. 1998) ...........................................................55, 56

*Deakins v. Monaghan,*
    484 U.S. 193 (1988) ....................................................................................43

*Director, Office of Workers' Compensation Programs v. Newport News Shipbuilding,*
    514 U.S. 122 (1995) ....................................................................................61

*Eastland v. U.S. Servicemen's Fund,*
    421 U.S. 491 (1975) ................................................................9, 18, 27, 50

*Ex Parte Young,*
    209 U.S. 123 (1908) ....................................................................................50

*Exxon Corp. v. FTC,*
    589 F2d 582 (D.C. Cir. 1978) ...................................................................34

*FEC v. Akins,*
    524 U.S. 11 (1998) ......................................................................................17

*Field v. Clark,*
    143 U.S. 649 (1892) ....................................................................................34

*Flast v. Cohen,*
    392 U.S. 83 (1968) ......................................................................................27

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.,*
    561 U.S. 477 (2010) ....................................................................................50

*Freedom from Religion Found., Inc. v. Geithner,*
    644 F.3d 836 (9th Cir. 2011) .....................................................................37

*Gonzaga Univ. v. Doe,*
    536 U.S. 273 (2002) ....................................................................................50

*Government of Manitoba v. Bernhardt,*
    923 F.3d 173 (D.C. Cir. 2019) ...........................................................61, 62

*Grupo Mexicano de Desarrolo, S.A. v. All. Bond Fund, Inc.*,
  527 U.S. 308 (1999) ........................................................................................51

*Guerrero v. Clinton*,
  157 F.3d 1190 (9th Cir. 1988) .........................................................................59

*Heikkila v. Barber*,
  345 U.S. 229 (1953) ........................................................................................56

*Humphrey's Executor v. United States*,
  295 U.S. 602 (1935) ........................................................................................27

*In re Application of the U.S. Senate Permanent Subcomm. on Investigations*,
  655 F.2d 1232 (D.C. Cir. 1981) ..................................................................22, 41

*In re Chapman*,
  166 U.S. 661 (1897) ........................................................................................27

*In re Debs*,
  158 U.S. 564 (1895) ........................................................................................63

*INS v. Chadha*,
  462 U.S. 919 (1983) ...................................................................................27, 33

*Jurney v. MacCracken*,
  294 U.S. 125 (1935) ...................................................................................29, 30

*Kilbourn v. Thompson*,
  103 U.S. 168 (1881) ........................................................................................27

*Koretoff v. Vilsack*,
  614 F.3d 532 (D.C. Cir. 2010) ........................................................................55

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ........................................................................................17

*Marshall v. Gordon*,
  243 U.S. 521 (1917) ........................................................................................48

*Maryland Dep't of Human Res. v. Dep't of Health & Human Servs.*,
  763 F.2d 1441 (D.C. Cir. 1985) ......................................................................61

* *McGrain v. Daugherty*,
  273 U.S. 135 (1927) .............................................................................. *passim*

*Medtronic, Inc. v. Mirowski Family Ventures, LLC*,
  571 U.S. 191 (2014) ........................................................................................53

*Milk Indus. Found. v. Glickman*,
    949 F. Supp. 882 (D.D.C. 1996) ...................................................................58

*Morrison v. Olson*,
    487 U.S. 654 (1988) .......................................................................................27

*Natural Res. Def. Council, Inc. v. Hodel*,
    865 F.2d 288 (D.C. Cir. 1988) .......................................................................59

*NLRB v. Nash-Finch Co.*,
    404 U.S. 138 (1977) .......................................................................................64

*Norton v. Southern Utah Wilderness All.*,
    542 U.S. 55 (2004) .........................................................................................63

*Oryszak v. Sullivan*,
    576 F.3d 522 (D.C. Cir. 2009) .......................................................................36

*PDK Labs. Inc. v. U.S. DEA*,
    362 F.3d 786 (D.C. Cir. 2004) .......................................................................62

*Public Citizen v. U.S. Dept. of Justice*,
    491 U.S. 440 (1989) .......................................................................................17

*Raines v. Byrd*,
    521 U.S. 811 (1997) ............................................................................. *passim*

*Raven v. Sajet*,
    334 F. Supp. 3d 22 (D.D.C. 2018) .................................................................15

*Reed v. County Comm'rs of Del. Cty., PA*,
    277 U.S. 376 (1928) .......................................................................................49

*Sackett v. EPA*,
    566 U.S. 120 (2012) ...........................................................................55, 56, 57

*Schilling v. Rogers*,
    363 U.S. 666 (1960) .......................................................................................53

*Senate Permanent Subcomm. on Investigations v. Ferrer*,
    199 F. Supp. 3d 125 (D.D.C. 2016) ...............................................................22

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*,
    366 F. Supp. 51 (D.D.C. 1973) .....................................................................38

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*,
    498 F.2d 725 (D.C. Cir. 1974) ............................................................. *passim*

*Shelby County, Ala. v. Lynch,*
    799 F.3d 1173 (D.C. Cir. 2015) ...................................................................53

*Shoshone Bannock Tribes v. Reno,*
    56 F.3d 1476 (D.C. Cir. 1995) ....................................................................63

*Sierra Club v. EPA,*
    926 F.3d 844 (D.C. Cir. 2019) ..............................................................18, 25

*Sierra Club v. Thomas,*
    828 F.2d 783 (D.C. Cir. 1987) ....................................................................63

*Skelly Oil Co. v. Phillips Petroleum Co.,*
    339 U.S. 667 (1950) ..............................................................................53, 54

*Tax Analysts v. IRS,*
    117 F.3d 607 (D.C. Cir. 1997) ....................................................................60

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994) ..............................................................................55, 57

*Tierney v. Schweiker,*
    718 F.2d 449 (D.C. Cir. 1983) ....................................................................36

*Trudeau v. FTC,*
    456 F.3d 178 (D.C. Cir. 2006) ....................................................................64

*U.S. House of Representatives v. Burwell,*
    130 F. Supp. 3d 53 (D.D.C. 2015) ..............................................................61

*U.S. House of Representatives v. Mnuchin,*
    379 F. Supp. 3d 8 (D.D.C. 2019) ....................................................17, 28, 52

* *U.S. House of Representatives v. U.S. Dep't of Commerce,*
    11 F. Supp. 2d 76 (D.D.C. 1998) ......................................................17, 19, 23

* *United States v. American Tel. & Tel. Co.,*
    551 F.2d 384 (D.C. Cir. 1976) .......................................................... *passim*

*United States v. American Tel. & Tel. Co.,*
    567 F.2d 121 (D.C. Cir. 1977) ............................................................16, 45, 46

*United States v. Ballin,*
    144 U.S. 1 (1892) ..................................................................................32, 34

*United States v. Burr,*
    25 F. Cas. 30 (C.C.D. Va. 1807) ................................................................26

*United States v. Durenberger,*
    48 F.3d 1239 (D.C. Cir. 1995) ...........................................................................34

*United States v. ICC,*
    337 U.S. 426 (1949) ...........................................................................................26

*United States v. Mine Workers,*
    330 U.S. 258 (1947) ...........................................................................................61

*United States v. Mohammed,*
    693 F.3d 192 (D.C. Cir. 2012) ...........................................................................41

*United States v. Nixon,*
    418 U.S. 683 (1974) ...........................................................................................26

*United States v. Republic Steel Corp.,*
    362 U.S. 482 (1960) ...........................................................................................64

*Vander Jagt v. O'Neill, Jr.,*
    699 F.2d 1166 (D.C. Cir. 1982) .........................................................................47

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens,*
    529 U.S. 765 (2000) ...........................................................................................61

*Virginia House of Delegates v. Bethune-Hill,*
    139 S. Ct. 1945 (2019) .......................................................................................23

*Walker v. Cheney,*
    230 F. Supp. 2d 51 (D.D.C. 2002) ...............................................................24, 35

*Watkins v. United States,*
    354 U.S. 178 (1957) .............................................................................18, 27, 51

*Whitman v. American Trucking Ass'n,*
    531 U.S. 457 (2001) .....................................................................................40, 58

*William Penn Apartments v. D.C. Court of Appeals,*
    39 F. Supp. 3d 11 (D.D.C. 2014) .......................................................................16

*Winstead v. J.C. Penney Co.,*
    933 F.2d 576 (7th Cir. 1991) .............................................................................41

*Wood v. United States,*
    16 Pet. 342 (1842) .............................................................................................40

*Wyandotte Transp. Co v. United States,*
    389 U.S. 191 (1967) ...........................................................................................64

*Young v. United States ex rel. Vuitton et Fils S.A.*,
    481 U.S. 787 (1987)............................................................................................30

*Ziglar v. Abbasi*,
    137 S. Ct. 1843 (2017).................................................................................51, 52

*Zivotofsky v. Clinton*,
    566 U.S. 189 (2012)............................................................................................27

## OFFICE OF LEGAL COUNSEL OPINIONS

*Congressional Committee's Request for the President's Tax Returns Under 26*
    *U.S.C. § 6103(f)*, 43 Op. O.L.C. ---, slip op. (June 13, 2019),
    https://www.justice.gov/olc/file/1173756/download.......................................46

\* *Prosecution for Contempt of Congress of an Executive Branch Official Who*
    *Has Asserted a Claim of Executive Privilege*,
    8 U.S. Op. O.L.C. 101 (1984)......................................21, 24, 31, 42, 49

\* *Response to Congressional Requests for Information Regarding Decisions*
    *Made Under the Independent Counsel Act*, 10 U.S. Op. O.L.C. 68 (1986) ...............21, 37, 42

## CONSTITUTIONS, STATUTES, RULES, AND REGULATIONS

U.S. Constitution,
    Art. I................................................................................................ *passim*
    Art. II...............................................................................................29
    Art. III .............................................................................................. *passim*

2 U.S.C. § 5571.................................................................................................65

5 U.S.C. § 551............................................................................................58, 61, 62

5 U.S.C. § 701............................................................................................55, 58, 60

5 U.S.C. § 702.................................................................................................60

5 U.S.C. § 706.................................................................................................63

26 U.S.C. § 6103.......................................................................................... *passim*

28 U.S.C. § 41.................................................................................................49

28 U.S.C. § 1331.......................................................................................... *passim*

28 U.S.C. § 1337.................................................................................................41

28 U.S.C. § 1338.................................................................................................41

28 U.S.C. § 1343 ......................................................................................................41

28 U.S.C. § 1361 .....................................................................................3, 36, 62, 63

28 U.S.C. § 1364 .................................................................................................36, 42

28 U.S.C. § 1365 ............................................................................................. *passim*

28 U.S.C. § 2201 .................................................................................................52, 53

28 U.S.C. § 2202 ......................................................................................................48

Revenue Act of 1918 ..................................................................................................5

Revenue Act of 1921 ..................................................................................................5

Revenue Act of 1924 ..................................................................................................6

Revenue Act of 1926 ..................................................................................................6

National Labor Relations Act of 1935 ....................................................................64

Pub. L. No. 93-190 (1973) .......................................................................................38

Tax Reform Act of 1976 ............................................................................................7

Pub. L. No. 94-574 (1976) .......................................................................................38

Pub. L. No. 96-486 (1980) .......................................................................................39

Tax Cuts and Jobs Act of 2017 ...............................................................................10

Fed. R. Civ. P. 12 .........................................................................................15, 16, 43

Fed. R. Evid. 201 .....................................................................................................15

## LEGISLATIVE MATERIALS

Rules of the U.S. House of Representatives (116th Cong.)
    Rule II ..............................................................................................32, 35
    Rule X.1 ..............................................................................................9, 18
    Rule XI.1 .................................................................................................9
    Rule XI.2 ..............................................................................................9, 18

65 Cong. Rec. 3299 (1924) ........................................................................................5

65 Cong. Rec. 3699 (1924) ........................................................................................5

65 Cong. Rec. 3701 (1924) ........................................................................................5

65 Cong. Rec. 6196 (1924) ...................................................................................5

65 Cong. Rec. 7677 (1924) ...................................................................................5

H.R. 1, 116th Cong. (Jan. 4, 2019) .....................................................................11

H. Rep. No. 95-1756 (1978) ................................................................................38

H. Rep. No. 116-186 (2019) ..................................................................................8

H. Rep. No. 79-1980 (1946) ..........................................................................54, 58

H. Res. 5, 111th Cong. (Jan. 5, 2011) .................................................................32

H. Res. 5, 114th Cong. (Jan. 6, 2015) .................................................................32

H. Res. 6, 104th Cong. (Jan. 5, 1995) .................................................................32

H. Res. 6, 116th Cong. (Jan. 9, 2019) .................................................................32

H. Res. 430, 116th Cong. (June 11, 2019) ....................................................33, 35

H. Res. 507, 116th Cong. (2019) .........................................................................13

H. Res. 509, 116th Cong. (2019) .........................................................................13

S. Rep. No. 93-768, 93d Cong. (1974) ..................................................................8

S. Rep. No. 95-170 (1977) ..............................................................................40, 41

S. Rep. No. 170 (1978) ........................................................................................42

S. Res. 180, 68th Cong., 65 Cong. Rec. 3299 (1924) ...........................................5

S. Res. 262, 70th Cong. (1928) ...........................................................................49

*Inquiry into the Matter of Billy Carter and Libya: Hearings Before the Subcomm. to Investigate the Activities of Individuals Representing the Interests of Foreign Gov'ts*, Vol. III-Appendix, 96th Cong., 2d Sess., Serial No. 96-8 (1981) ..........................8

*Investigation into Certain Charges of the Use of the Internal Revenue Service for Political Purposes*, 93d Cong., 1st Sess. (Comm. Print Dec. 20, 1973) ...................7

Jefferson's Manual and Rules of the House of Representatives (1801) .........................................33

Joint Committee on Taxation, History of the Joint Committee .......................................6

Joint Committee on Taxation, JCX-3-19, *Background Regarding the Confidentiality and Disclosure of Federal Tax Returns* (Feb. 4, 2019), https://tinyurl.com/JCTReport ...............................................................9

## OTHER AUTHORITIES

Charlie Savage, *Trump Vows Stonewall of "All" House Subpoenas*, N.Y. Times (Apr. 24, 2019)..........................................................................45

Charlie Savage and Nicholas Fandos, *The House v. Trump: Stymied Lawmakers Increasingly Battle in the Court*, N.Y. Times (Aug. 13, 2019) ...............................................31

*Donald Trump's War on Oversight*, Economist (May 9, 2019) ...................................45

*Exclusive: Mick Mulvaney on President Trump's Border Security push, Growing Tensions with House Democrats*, Fox News (Apr. 7, 2019, 6:00) ...................................45

George K. Yin, *Congressional Authority to Obtain and Release Tax Returns*, 154 Tax Notes 1013 (2017) ..................................................................7

George K. Yin, *Preventing Congressional Violations of Taxpayer Privacy*, 69 Tax Lawyer 103 (2015) ..................................................................6

Josh Chafetz, *Congress's Constitution: Legislative Authority and the Separation of Powers* (2017)..................................................................29

*Remarks by President Trump Before Marine One Departure*, White House (Apr. 10, 2019, 9:28 AM)..................................................................45

Tom Hamburger et al., *Trump Moves to Resist House Inquiries, Setting up Fight over Congressional Subpoena Powers*, Wash. Post (Apr. 17, 2019) ...............................45

Todd Garvey, Cong. Research Serv., RL34097, *Congress's Contempt Power and the Enforcement of Congressional Subpoenas: Law, History, Practice, and Procedure* (2017)..................................................................29

## INTRODUCTION AND SUMMARY OF ARGUMENT

Defendants' motion fundamentally fails to recognize that the Congressional power to obtain information, long recognized as essential to Congress's constitutional authority, resides in each House of Congress *separately*.[1]  The Committee is not seeking to wrest enforcement of federal law from the Executive; it is seeking to ensure that the House's own authority, which it exercises by constitutional assignment, is not hindered.  When that power is obstructed by a refusal to comply with lawful demands for information, the House is empowered to vindicate its authority.

According to Defendants, Congress, the House, and its committees may not vindicate their rights and powers to obtain information by bringing suit.  Rather, Defendants argue, Congress is dependent on the discretion of the Executive Branch to assist in such a situation.  Defendants' position is not limited to Congressional requests for information directed to federal agencies; under their arguments, the House could do nothing on its own even if its subpoenas were routinely disregarded by private parties.  That position, if accepted, would drastically impair Congress's ability to inform itself and fulfill its constitutional functions.  Unsurprisingly, it has been rejected by the D.C. Circuit, several judges in this District, and the Justice Department's own Office of Legal Counsel during the Reagan Administration.  This Court should likewise reject Defendants' radical view of Congressional authority.

*First*, this Court has subject-matter jurisdiction over this dispute.  The Complaint rests on two straightforward theories of standing, based on injuries to the House and the Committee's informational and institutional rights and powers.  Article I and Section 6103(f) vest the Committee with the right to obtain the information it requested, and Defendants' refusal to provide it caused the Committee injury in fact.  Defendants' defiance of the subpoenas also

---

[1] We refer to Defendants and Defendant-Intervenors collectively as "Defendants."

injured the Committee by impairing its ability to investigate and conduct oversight of the

Executive Branch; the rejection of a subpoena by itself can be redressed by the federal courts.

*Raines v. Byrd*, 521 U.S. 811 (1997), holds nothing to the contrary; that case involved *individual*

*legislators'* attempt to vindicate an interest that belonged to Congress *as an institution*, but here

the Committee is suing to protect its own (and the House's) institutional rights and powers.

*Second*, this lawsuit is consistent with the separation of powers.  Plaintiff is not

attempting to undermine the Executive Branch's power to enforce the law.  Rather, Plaintiff is

seeking to protect interests—the fundamental Article I power to obtain information necessary to

legislation and oversight—that belong to the House (and, by delegation, to the Committee) as a

body, separately from the Senate and the Executive Branch.  For a century and a half, Congress

and its committees protected those interests by exercising the inherent power of contempt—

arresting and detaining contumacious individuals—without the assistance of the Executive.

Here, the Committee is seeking to vindicate similar inherent rights and powers, but in a more

modest and orderly way.  As the D.C. Circuit, other judges in this District, and the Department of

Justice's Office of Legal Counsel have recognized, the Committee may do so on its own, without

relying on the Executive.  And the Committee has the authorization of the full House to do so,

for it was authorized to bring this suit under House rules empowering the House's Bipartisan

Legal Advisory Group to authorize litigation such as this on behalf of the House.

*Third*, the Court has statutory subject-matter jurisdiction.  The Complaint states claims

arising under federal law and so falls within the Court's general federal-question jurisdiction

under 28 U.S.C. § 1331.  A separate provision, 28 U.S.C. § 1365, which authorizes certain

Senate subpoena-enforcement actions, is irrelevant here and did not repeal Section 1331 by

implication.  The enactment history of Section 1365 shows it was necessary to authorize

subpoena-enforcement actions against private parties, which before 1980 might not have fallen within the reach of Section 1331.

*Fourth*, there is no basis for abstention in this case to promote a possible compromise. The President has stated that the Executive Branch agencies under his control will not produce his tax returns and return information, and the Department of Justice has concluded that it would be unconstitutional and illegal for them to do so. The parties are at an impasse that can be resolved only by the courts.

*Fifth*, Plaintiff has several causes of action to pursue relief in this case. For enforcement of the subpoenas, it may rely on Article I, which grants the substantive rights in question. Alternatively, to enforce its subpoenas or its Section 6103 request, the Committee may rely on the courts' historic equity powers, which have often been used to compel Executive officials to comply with the law even absent a statutory cause of action, and on the Declaratory Judgment Act, which furnishes a remedy for rights established elsewhere. Plaintiff has also properly invoked the Administrative Procedure Act; Defendants' final refusal to furnish information that Plaintiff is entitled to receive under the law is "agency action," and the Committee is the "person aggrieved" by that action. Relief would also be available, if necessary, under the federal mandamus statute, 28 U.S.C. § 1361, or the well-settled mechanism of nonstatutory review.

Whatever the form of action appropriate here, Defendants may not, as they contend, simply reject with impunity Plaintiff's constitutionally grounded subpoenas and request for information based on Section 6103(f). Defendants present their position as encouraging the Court not to take sides in an inter-branch contest. But Defendants' position, if accepted, *would* require the Court to side definitively with the Executive Branch—and on issues with far broader implications than the immediate dispute over President Trump's tax returns. If Defendants'

justiciability arguments were adopted, then Congress, the House, the Senate, and their committees would be irreparably disabled from vindicating their powers to obtain information vital to oversight of the Executive Branch.  The Court should reject Defendants' effort to free themselves from their legal obligations to comply with Congressional subpoenas and the Committee's Section 6103 request.  It should deny the motion to dismiss.

## BACKGROUND

### I.   STATUTORY AND REGULATORY FRAMEWORK

#### A.   Section 6103(f)

Section 6103(a) of the Internal Revenue Code prohibits the disclosure of taxpayer returns and return information, absent a statutory exception.  One such exception, Section 6103(f)(1), *requires* in clear terms that the Secretary of the Treasury shall provide such information, upon written request, to any of the three Congressional committees with authority over federal tax issues, including the House Committee on Ways and Means:

> Upon written request from the chairman of the Committee on Ways and Means of the House of Representatives, the chairman of the Committee on Finance of the Senate, or the chairman of the Joint Committee on Taxation, the Secretary ***shall furnish*** such committee with any return or return information specified in such request, except that any return or return information which can be associated with, or otherwise identify, directly or indirectly, a particular taxpayer shall be furnished to such committee only when sitting in closed executive session unless such taxpayer otherwise consents in writing to such disclosure.

26 U.S.C. § 6103(f)(1) (emphasis added).  Both Section 6103(f)'s text and its enactment history reflect Congress's central concern that, absent a statutory right of access, the President and the Secretary might hinder the investigation of wrongdoing by the Executive Branch officials—including themselves—who might seek personal or political advantage through changes in the tax code or the administration of the Internal Revenue Service (IRS).

Congress initially codified the Committee's broad right of access in 1924 to overcome obstacles hampering Congressional oversight of alleged Executive Branch wrongdoing.  Before, federal law permitted the inspection of individual tax returns by order of the President and under rules prescribed by the Treasury Secretary.[2]  As part of its investigation of bribery of high-ranking federal officials in the Teapot Dome scandal, the Senate sought from President Coolidge the tax returns of those allegedly involved—a request that President Coolidge initially resisted.[3]  During that time, a Congressional committee likewise sought return information to investigate concerns that Secretary Mellon had improperly maintained ownership interests in certain businesses while at Treasury and that the Bureau of Internal Revenue, the IRS's predecessor, had given him preferential treatment.[4]  Congress also recognized that access to tax return information would assist its legislative responsibilities.  As Senator George Norris explained, access to tax returns would "enable [Congress] to legislate correctly and to finally get a law without loopholes."[5]  In 1924, therefore, Congress passed the precursor to Section 6103(f), which provided that the Congressional tax committees "shall have the right to call on the Secretary of

---

[2] *See* Revenue Act of 1918, ch. 18, § 257, 40 Stat. 1057, 1086-87; Revenue Act of 1921, ch. 136, § 257, 42 Stat. 227, 270.

[3] *See* S. Res. 180, 68th Cong., 65 Cong. Rec. 3299 (1924) (requesting returns); 65 Cong. Rec. 3699-3702 (1924) (President Coolidge's initial response).  The Senate resolution requesting the returns and return information of three central Teapot Dome conspirators asked the President to turn over that information.  President Coolidge refused on the purported ground that he lacked authority to "turn over" returns but could only authorize "inspection" of returns.  Senator Kenneth McKellar observed that the Secretary and President had not previously been "so technical in regard to such matters," but "when the Senate unanimously passes a resolution asking for the tax returns of Doheny, Fall, and Sinclair every technicality is interposed."  65 Cong. Rec. 3701 (1924).  Section 6103(f) was designed in significant part to prevent such Executive Branch obstruction.

[4] *See, e.g.,* 65 Cong. Rec. 6196 (1924) (statement of Sen. Reed); *id*. at 6196-97 (statement of Sen. McKellar).

[5] 65 Cong. Rec. 7677 (1924); *see also id*. at 2919 (statement of Rep. Jacobstein); *id*. at 2953 (statement of Rep. Frear).

the Treasury" for tax return information and that it "shall be [the Secretary's] duty to furnish[]

any data of any character contained in or shown by the returns."[6]

That unqualified right of Congressional access remains in effect today, as restated in

Section 6103(f), which was enacted in its current form in 1976.[7]  The 1976 revisions to the

---

[6] Revenue Act of 1924, Pub. L. 68-176, § 257(a), 43 Stat. 253, 293.

[7] Defendants suggest (at 5) that the 1926 amendments to the law were designed to ensure that Congress would not make improper use of its access to returns and return information. Defendants' account of those amendments is misleadingly incomplete.

*First*, Defendants rely on an article by Professor George Yin for their suggestion that the 1926 amendments were designed to guard against congressional misuse.  *See* George K. Yin, *Preventing Congressional Violations of Taxpayer Privacy*, 69 Tax Lawyer 103 (2015).  But the language they quote comes not from any legislative source concerning the 1926 amendments, but from a newspaper editorial criticizing the bill enacted in 1924.  *Id.* at 126 & n.116.  Professor Yin notes that Congress adopted the 1926 amendments "without any explanation."  *Id.* at 126.

*Second*, although the 1926 amendments limited access by *nontax* committees to those "specially authorized" by a resolution to investigate returns and required the tax committees to sit in executive session to receive information, they did not limit the information the tax committees could receive or the ability of the tax committees to publicize information once received and reviewed.  As Professor Yin observes: "Notably, Congress did not adopt the other restriction urged by Secretary Mellon in 1924 that would have prevented the committees from publicizing any of the tax returns obtained."  *Id.*

*Third*, as Professor Yin also points out, at the same time, Congress strengthened its ability to investigate the IRS and to consider legislation concerning the tax laws and their administration by creating the Joint Committee on Internal Revenue Taxation (JCT), and granting it the same access to tax returns as the two tax committees.  *Id.* at 126.  The establishment of the JCT, like the enactment of Section 6103's predecessor in 1924, was prompted in significant part to prevent improper political influence over the administration of the tax laws by Executive Branch officials.  As the JCT's history of its establishment explains:

> In 1925, after making public charges that millions of tax dollars were being lost through the favorable treatment of large corporations by the Bureau, Senator Couzens was notified by the Bureau that he owed more than $10 million in back taxes. *Then Treasury Secretary Andrew Mellon was believed to be personally responsible for the retaliation against Senator Couzens.* At the time, Secretary Mellon was the principal owner of Gulf Oil, which had benefited from rulings specifically criticized by Senator Couzens.
>
> The investigations by the Senate Select Committee led, in the Revenue Act of 1926, to the creation of the [JCT].

Joint Committee on Taxation, History of the Joint Committee, https://www.jct.gov/about-us/history.html (emphasis added) (last visited Sept. 19, 2019).

*Fourth*, Defendants fail to mention that Professor Yin testified at the Committee's

confidentiality and access provisions, like the original 1924 enactment, were prompted largely by concerns about Executive Branch—and particularly Presidential—abuses, as revealed in two investigations of President Nixon.  The first concerned his use of confidential tax information to punish his political enemies.[8]  The second, described below, concerned President Nixon's own tax returns and the IRS's inadequate auditing of those returns.  In response to those revelations of Executive Branch wrongdoing, Congress restricted the President's access to tax returns and amended Section 6103 to provide that taxpayer returns "shall be confidential," unless one of thirteen exceptions applies.  26 U.S.C. § 6103(a), (c)-(o).[9]  In Section 6103(f), Congress retained the mandatory disclosure obligation that it had imposed on Treasury a half century earlier.

The Committee has frequently relied on Section 6103(f) to obtain information relevant to its legislative and oversight functions—including tax returns and return information concerning specific individuals and entities.[10]  The Senate Finance Committee and the Joint Committee on

---

Oversight Subcommittee hearing that preceded the issuance of the Committee's Section 6103 request and stated that Treasury would be obligated to provide the President's tax returns to the Committee should it request them under Section 6103(f)(1).  *See* Declaration of Todd B. Tatelman in Support of Plaintiff Committee on Ways and Means' Motion for Summary Judgment (Tatelman Decl.), Dkt. 29-3, Ex. KK (Oversight Tr. 19 ("I don't see any wiggle room in this statute for the Secretary to refuse a request.  I believe Congress drafted the authority without conditions[.]"), 33 ("The statute provides no basis for a refusal.").

Those statements are consistent with Professor Yin's article *Congressional Authority to Obtain and Release Tax Returns*, 154 Tax Notes 1013, 1015 (2017), in which he states that "concerns over President Trump's possible conflicts of interest … would certainly seem to justify a tax committee effort to obtain and inspect his confidential tax information.  A review could also assure the American public that the IRS is treating him like any other taxpayer and not giving him preferential treatment."

[8] Staff of Joint Comm. on Internal Revenue Tax., *Investigation into Certain Charges of the Use of the Internal Revenue Service for Political Purposes*, 93d Cong., 1st Sess. (Comm. Print Dec. 20, 1973).

[9] *See* Tax Reform Act of 1976, Pub. L. No. 94-455, 90 Stat. 1520.

[10] *See* Tatelman Decl. Ex. OO (Memorandum from Chairman Richard Neal to Members of the Committee on Ways and Means Re: Historical Use of Authority To Obtain Confidential Tax Information (July 25, 2019)) (listing 12 examples).  Those examples include (i) a Member of Congress; (ii) multiple individual taxpayers related to IRS gift tax examinations; (iii) individuals,

Taxation have also acquired returns and return information of particular individuals and organizations pursuant to Section 6103(f).[11]

Most notably, the Joint Committee on Taxation undertook an investigation of President Nixon's tax returns for 1969 to 1972 and of the IRS's auditing of those returns.  Although President Nixon voluntarily disclosed his returns for those years, the Joint Committee "decided not to confine its examination to the two items mentioned by President Nixon," but "rather to examine all tax items for the years 1969 through 1972."[12]  The Joint Committee also requested and received numerous additional materials from the IRS, including certified copies of the returns President Nixon had voluntarily disclosed, his returns for additional years, and returns of the President's daughter and son-in-law.[13]  The Joint Committee's public report found numerous deficiencies in the IRS's auditing of the Nixons' returns and recommended that they pay roughly $476,000 in response to those deficiencies.[14]  In the wake of the Joint Committee's report, the

---

estates, and other taxpayers owing more than $100 million in taxes, when questions pertaining to tax law enforcement and the soundness of IRS tax administration came to the Committee's attention; (iv) individuals with unpaid tax liabilities; (v) individuals and businesses contracting with the federal government, where the Committee was reviewing the IRS's failure to implement procedures to seize contract payments; and (vi) nonprofit organizations whose applications for tax-exempt status were subject to heightened scrutiny allegedly based on their political affiliations.

[11] *See, e.g.*, *Inquiry into the Matter of Billy Carter and Libya: Hearings Before the Subcomm. to Investigate the Activities of Individuals Representing the Interests of Foreign Gov'ts*, Vol. III-Appendix, 96th Cong., 2d Sess., Serial No. 96-8, at 1666-1701 (1981) (use of Section 6103 to gain access to returns and return information of sitting President's brother).

[12] Staff of Joint Comm. on Internal Revenue Tax., *Examination of President Nixon's Tax Returns for 1969 through 1972*, S. Rep. No. 93-768, 93d Cong. 2d Sess. (1974), at 2 (Joint Tax Committee Nixon Report).

[13] *See* H. Rep. No. 116-186, at 1-6, 9-28 (2019).

[14] Joint Tax Committee Nixon Report, at 4-7.

IRS reformed its processes for auditing Presidents' tax returns and established the first written guidelines governing those audits.[15]

The Committee is not aware of any other instance in which Treasury or the IRS has failed to comply with the plain language of Section 6103(f)(1) and failed to disclose to the Committee return information it requested.

### B.      Subpoena Authority

Pursuant to Article I of the Constitution, each House of Congress possesses investigative power, and each may delegate that power to committees and subcommittees.  *See, e.g.*, *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 505 (1975).  Pursuant to its constitutional rulemaking authority, the House has conferred on the Committee jurisdiction over "[r]evenue measures generally," and the "[d]eposit of public monies," encompassing Treasury, the IRS, and all aspects of the Nation's tax laws and their administration.  House Rule X.1(t)(3), (6).  The House has empowered the Committee to "conduct at any time such investigations and studies as it considers necessary or appropriate in the exercise of its responsibilities."  House Rule XI.1(b)(1). To ensure that the Committee may exercise those functions fully, the House has further authorized the Committee to "require, by subpoena or otherwise, … the production of such books, records, correspondence, memoranda, papers, and documents as it considers necessary." House Rule XI.2(m)(1)(B).

## II.     FACTUAL BACKGROUND

Defendants urged this Court not to consider Plaintiff's summary judgment motion and thereby avoid the merits issues they characterized as "entirely distinct" from the threshold

---

[15] *See* Tatelman Decl. Ex. KK at 15-18 (statement of Joseph J. Thorndike, Director, Tax History Project); Staff of the Joint Committee on Taxation, JCX-3-19, *Background Regarding the Confidentiality and Disclosure of Federal Tax Returns* 23-26 (Feb. 4, 2019), https://tinyurl.com/JCTReport.

questions their motion to dismiss would raise.  Dkt. 33, at 6, 8.  Having gained approval for their chosen procedural course, Defendants have now submitted lengthy (and shifting) declarations designed to contradict the Complaint's factual allegations and to preview their position on the very merits issues they argued should be held in abeyance.  *See, e.g.*, Mem. in Support of Defs.' Mot. to Dismiss (Mem.), Dkt. 44, at 12-13, 39-43.  Those declarations' assertions should be disregarded because the Complaint's well-pleaded allegations must be presumed to be true for purposes of this motion.  *See, e.g., Commonwealth Land Title Ins. Co. v. KCI Techs., Inc*., 922 F.3d 459, 463 (D.C. Cir. 2019); *infra* pp. 15-16.

### A.     The Committee's Need for President Trump's Tax Returns

### 1.     Tax Compliance Issues Relating to President Trump's Returns

Both as a candidate and once elected, President Trump has frequently attacked the integrity of the IRS's audit process.  Complaint (Compl.) ¶ 47, Dkt. No. 1.  Candidate Trump surmised that he is frequently audited "because of the fact that I'm a strong Christian, and I feel strongly about it and maybe there's a bias."  *Id.*  As President, he has continued to express skepticism about the integrity of the IRS's audit system.  *Id.*

Numerous investigative reports have revealed that President Trump, through the complex arrangements of his personal and business finances, has engaged in aggressive tax strategies and decades-long tax avoidance schemes, including taking a questionable $916 million deduction, using a grantor trust to control assets, manipulating tax code provisions pertaining to real estate taxes, and extensively using pass through entities.  *Id.* ¶ 48.  President Trump has taken pride in "brilliantly" maneuvering the tax laws to his personal benefit.  *Id.*  Even as he was championing the Tax Cuts and Jobs Act of 2017, President Trump referred to the tax code as "riddled with loopholes" for "special interests, including myself."  *Id.*

### 2.    IRS Procedures for Auditing Presidents' Tax Returns

IRS guidelines specify that the individual returns of a sitting President and Vice President are subject to a mandatory audit.  Compl. ¶ 42.  The auditing process for Presidents' returns is not currently codified in the Internal Revenue Code; instead, it is set forth in the Internal Revenue Manual (Manual), a compilation of internal guidelines for IRS employees.  *Id.* ¶ 43. The Manual provides that the "individual income tax returns for the President and Vice President are subject to mandatory [audit] examinations" and that "[r]elated returns, including estate and gift tax returns, will be handled in accordance with procedures relating to all taxpayers."  *Id.* ¶ 44.  The Manual generally prescribes the process for the review of these returns, and emphasizes the need for expedition and sensitive handling, but it leaves numerous aspects of the audit process ambiguous, unaddressed, or up to an auditor's discretion.  *Id.* ¶¶ 44-45.

### 3.    Legislative Proposals Relating to Presidential Tax Returns

Since the start of the 116th Congress, the House has pursued legislative efforts relating to Presidents' tax returns.  For example, H.R. 1, introduced on January 4, 2019, would, if enacted, require the President, the Vice President, and certain major-party candidates to disclose their tax returns for the last ten years to the Federal Election Commission (FEC), and would amend Section 6103 to provide for Treasury disclosure of those returns to the FEC, which would then make them publicly available (with redactions).  Compl. ¶ 51.  Several other bills related to Presidents' tax returns or other tax compliance issues have been introduced in the House and referred to the Committee.  *Id.* ¶ 52 (listing examples).  On February 7, the Committee's Subcommittee on Oversight held a hearing on legislative proposals related to Presidents' tax returns.  *Id.* ¶ 53.  Several witnesses testified about important information that could be gleaned from President Trump's tax return information that could assist the Committee in its oversight of the IRS and its consideration of possible legislation.  *Id.* ¶ 55.

#### 4.      The Committee's Requests and Defendants' Refusals

On April 3, the Committee, through Chairman Neal, requested that the IRS provide it, by April 10, the tax returns and related audit-file information of President Trump and eight related entities for tax years 2013 through 2018.  Compl. ¶ 57.  Although the Committee is not required by Section 6103(f) to provide a reason for a request, Chairman Neal explained that "the Committee is considering legislative proposals and conducting oversight related to our Federal tax laws, including, but not limited to, the extent to which the IRS audits and enforces the Federal tax laws against a President."  *Id.* ¶ 58.[16]

Defendants' unwillingness to comply with these lawful requests was evident from the beginning.  On April 7, Acting White House Chief of Staff Mick Mulvaney announced that the Committee would "never" receive President Trump's tax return information.  *Id.* ¶ 63.  On April 10, Secretary Mnuchin responded to Chairman Neal that Treasury would not meet the deadline because it had "begun consultations with the Department of Justice."  *Id.* ¶ 64.[17]  On April 13, the Committee reiterated its Section 6103(f) request in another letter to IRS Commissioner Rettig.  *Id.* ¶ 65.  The Committee explained the importance of the material for the Committee's consideration of "legislative proposals and oversight related to our Federal tax laws, including, but not limited to, the extent to which the IRS audits and enforces the Federal tax laws against a President," and set a new deadline of April 23.  *Id.*[18]  On that date, Secretary Mnuchin informed the Committee that Treasury was continuing to confer with the Department of Justice.  *Id.* ¶ 67.

---

[16] Compl., Ex. A, Letter from the Hon. Richard E. Neal, Chairman, Comm. on Ways and Means, to the Hon. Charles P. Rettig, Comm'r, IRS, at 1 (Apr. 3, 2019).  Verified copies of the exhibits attached the Complaint were also submitted to the Court, with the same letter designations, as exhibits to the Tatelman Declaration, Dkt. 29-3.

[17] Compl., Ex. D, Letter from the Hon. Steven T. Mnuchin, Sec'y, Dept. of Treasury, to Chairman Neal, at 2 (Apr. 10, 2019).

[18] Compl., Ex. E, Letter from Chairman Neal to Comm'r Rettig, at 1, 2 (Apr. 13, 2019).

On May 6, 2019, Secretary Mnuchin wrote to Chairman Neal with Treasury's final decision to refuse the Committee's request. *Id.* ¶ 71.[19]

### 5.   The Committee's Subpoenas

In light of Defendants' refusals, Chairman Neal issued subpoenas to Secretary Mnuchin and Commissioner Rettig on May 10, directing each to produce information virtually identical to what the Committee had sought under Section 6103(f). *Id.* ¶ 72. Chairman Neal explained that, "[a]mong other considerations, the Committee wants to be sure that IRS employees who determine the scope of the President's audit, or who determine whether to continue previously-initiated audits, are protected in the course of their work."[20]  On May 17, the Secretary and the Commissioner responded that they would not comply. *Id.* ¶¶ 75-77.[21]

### B.   Concerns About the Presidential Audit Program

Commissioner Rettig's May 17 letter included comments about the IRS's audits of Presidents' tax returns that only underscored the Committee's need for the requested documents. *Id.* ¶ 77.  He noted that the "scope and depth of the examination is determined by the revenue agent [assigned to the audit], based on established risk protocols." *Id.*  Those protocols provide that the scope of an audit should be determined based on a mix of "experience, judgment, and

---

[19] Compl., Ex. I, Letter from Sec'y Mnuchin to Chairman Neal (May 6, 2019).

[20] Compl., Ex. K, Subpoena from Committee to Sec'y Mnuchin (May 10, 2019); Compl., Ex. L, Subpoena from Committee to Comm'r Rettig, IRS (May 10, 2019).

[21] On July 24, 2019, the House adopted a resolution expressly ratifying investigations and subpoenas issued by any standing committee, including the Committee on Ways and Means, pursuant to its jurisdiction concerning "the President" and "his business entities and organizations"—specifically including "tax information." H. Res. 507, 116th Cong. (2019); *see* H. Res. 509, 116th Cong. (2019). Defendants do not challenge the House's authorization of the subpoenas but suggest (at 27 n.15) that those resolutions did not address the Committee's Section 6103 request or authorize the filing of this lawsuit. But the Congressional tax committees' right to request tax returns and return information is codified in a statute, 26 U.S.C. § 6103(f)(1), and Treasury has never previously demanded a separate vote of the House or Senate for those committees to make such a request. And the filing of this lawsuit was validly authorized by the House, acting through its Bipartisan Legal Advisory Group. *See* pp. 32-36, *infra*.

objective analysis," and may be closed "mid-stream" if the IRS agent assigned to the matter finds it is "not in the government's best interest to continue." *Id.* ¶ 77. Those statements show that the audit program is subject to a high degree of discretion and may not be suited to the complicated issues presented by this President's tax returns. *Id.* ¶ 78.

Chairman Neal accepted the Secretary's offer of a briefing, and on June 10, Treasury and IRS officials met with a bipartisan group of Committee staff about the IRS audit program. *Id.* ¶ 80. None of those officials had been involved in an audit of a President's tax returns, and they declined to answer all questions about actual audits of any Presidents, including basic questions such as how long those audits generally have taken or whether there have ever been any assessments made to Presidential returns. *Id.* The officials acknowledged that the IRS Manual's provisions on audits of Presidents' returns are outdated and diverge from current practice. *Id.*

The briefing raised more concerns about the IRS audit program. *Id.* ¶ 81. The agency officials reported that the program lacks procedures for handling a President's grantor trust, the financial instrument President Trump has reportedly used to organize his assets. *Id.*[22] The officials also stated that a single IRS agent generally has substantial discretion in auditing a President's tax returns, raising concerns about the absence of safeguards to protect the audit process from improper political influence. *Id.*

On June 28, Chairman Neal notified Secretary Mnuchin and Commissioner Rettig that the briefing had "reinforced the Committee's need to review the actual return information as part of our oversight duties." Compl. ¶ 82. Chairman Neal explained that review of the returns and audit-file information was necessary to "evaluate the accuracy of the President's claims about the audit system, assess the fairness and effectiveness of the audit program and the scope of the

---

[22] Compl., Ex. P, Letter from Chairman Neal to Sec'y Mnuchin and Comm'r Rettig, at 2 (June 28, 2019).

audits being performed on the President's returns," and "understand how particular provisions of the [tax code] are being enforced as part of the IRS's review." *Id.*

The Committee also obtained additional information indicating that the mandatory Presidential audit program may not be functioning effectively, in part because of the absence of safeguards to protect IRS employees and the audit process from improper influence. *Id.* ¶ 79. On July 29, the Committee received an unsolicited communication from a federal employee setting forth credible allegations of "evidence of possible misconduct"—specifically, potential "inappropriate efforts to influence" the mandatory audit program.[23]  On August 8, Chairman Neal wrote to Secretary Mnuchin, asking him to produce records relating to those allegations by August 13. *Id.*  In response to Chairman Neal's requests for information regarding these allegations, Treasury has provided only limited documents revealing no information about the allegations.  Secretary Mnuchin made clear that such requests should be directed to the Treasury Inspector General for Tax Administration.[24]

## LEGAL STANDARDS

In considering Defendants' motion to dismiss pursuant to Rule 12(b)(6), the Court must assume the truth of the Complaint's well-pleaded allegations and draw all reasonable inferences in favor of Plaintiff. *See Commonwealth Land Title Ins. Co.*, 922 F.3d at 463; *Raven v. Sajet*, 334 F. Supp. 3d 22, 27 (D.D.C. 2018) (McFadden, J.).  The Court may consider documents incorporated into the Complaint, *Raven*, 334 F. Supp. 3d at 27-28, and matters susceptible to judicial notice, *i.e.*, facts "not subject to reasonable dispute," *id.*; Fed. R. Evid. 201(b).

---

[23] Tatelman Decl. Ex. QQ (Letter from Chairman Neal to Sec'y Mnuchin (Aug. 8, 2019)).

[24] Tatelman Decl. Ex. RR (Letter from Sec'y Mnuchin to Chairman Neal (Aug. 13, 2019)).

Defendants' argument (at 38-43) that the Court should abstain from exercising jurisdiction to encourage interbranch accommodation must be made pursuant to Rule 12(b)(6), not Rule 12(b)(1), and therefore may not rely on matters outside the Complaint, including Defendants' declarations, which dispute well-pleaded factual allegations in the Complaint. That argument does not assert a "lack of subject-matter jurisdiction," Fed. R. Civ. P. 12(b)(1), but rather urges the Court to refrain from exercising jurisdiction it otherwise possesses. Defendants' brief appears to recognize as much by not including their accommodation argument in Part I, which is headed "The Court Should Dismiss this Case for Lack of Subject Matter Jurisdiction." Courts in this Circuit have recognized that abstention arguments should not be treated as asserting a lack of jurisdiction. In *United States v. American Telephone & Telegraph Co.*, 567 F.2d 121, 123 (D.C. Cir. 1977) (*AT&T II*), the D.C. Circuit court held that it possessed jurisdiction (and that the case was otherwise justiciable) but then abstained to allow attempts at interbranch accommodation. *See also William Penn Apartments v. D.C. Court of Appeals,* 39 F. Supp. 3d 11, 19-20 (D.D.C. 2014) (analyzing *Younger* abstention under Rule 12(b)(6)).

## ARGUMENT

## I. THIS COURT HAS SUBJECT MATTER JURISDICTION OVER THIS CASE

In arguing that the Committee may not sue to enforce either valid subpoenas or its unqualified right under Section 6103(f)(1) to obtain tax returns and return information, Defendants run headlong into a thick wall of contrary precedent. The D.C. Circuit has recognized that the House of Representatives may sue to enforce a subpoena, and several judges in this District have squarely held that the House and its committees have standing to sue to obtain information. The Department of Justice's Office of Legal Counsel has likewise recognized that Congress may turn to the federal courts to enforce its subpoenas.

Against this authority, Defendants rely on an inapposite Supreme Court decision, *Raines v. Byrd*, 521 U.S. 811 (1997), and on generalized concerns about separation of powers if Congress were able to secure enforcement of federal law by turning to the Judiciary. Both arguments are misguided, and for the same fundamental reasons: They ignore that the injury here is to a right and power that the House and its authorized committees have *as a body*, and that the House enjoys *separately* from the Senate and the Executive Branch in the lawmaking process. Unlike the individual legislators who sued in *Raines*, Plaintiff is a standing committee of the House exercising investigative and oversight authority delegated to it by the House. As this Court recognized recently, "the investigatory power is one of the few under the Constitution that *each* House of Congress may exercise individually," and "[i]t is perhaps for this reason that the House's power to investigate has been enforced with periodic help from federal courts." *U.S. House of Representatives v. Mnuchin*, 379 F. Supp. 3d 8, 16-17 (D.D.C. 2019) (*Mnuchin*), *appeal pending*, No. 19-5176 (D.C. Cir.).

## A.   The Committee Has Article III Standing

### 1.   The Committee Has Suffered Injury in Fact

To establish its right to sue, the Committee must show that it has suffered a "concrete and particularized" injury "fairly traceable to the challenged action" and "redressable by a favorable ruling." *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2663 (2015). Those requirements are satisfied here. By refusing to comply with either the Committee's request under Section 6103(f) or the Committee's subpoenas seeking the same information, Defendants have injured the Committee in two distinct but related ways.

*First*, Defendants' refusal to comply with the Committee's Section 6103(f) request and subpoenas has injured the Committee by depriving it of information to which it is legally entitled. "[A] plaintiff suffers an 'injury in fact' when the plaintiff fails to [receive] information

which must be … disclosed pursuant to a statute." *FEC v. Akins*, 524 U.S. 11, 21 (1998).

Pleading informational standing requires only that plaintiffs "show… that they sought and were

denied specific … records." *Public Citizen v. U.S. Dept. of Justice*, 491 U.S. 440, 449 (1989).

Section 6103(f)(1) vests the right to receive information without qualification in the Committee,

and so Defendants' refusal to comply with their statutory obligation to furnish that information

"affect[s] the [Committee] in a personal and individual way." *Lujan v. Defenders of Wildlife*,

504 U.S. 555, 560 n.1 (1992). The Committee has "properly alleged a judicially cognizable

injury through its right to receive information by statute." *U.S. House of Representatives v. U.S.

Dep't of Commerce*, 11 F. Supp. 2d 76, 85 (D.D.C. 1998) (*U.S. Dep't of Commerce*) (three-judge

court) (per Lamberth, J., joined by Ginsburg and Urbina, JJ.).[25]

 *Second*, Defendants' refusal to comply has inflicted institutional injuries on the

Committee by preventing it from carrying out the House's constitutionally assigned

responsibilities. Article I grants each House of Congress the power to use compulsory process to

obtain information from third parties, including Executive Branch officials, to "obtain the facts

needed for intelligent legislative action." *Watkins v. United States*, 354 U.S. 178, 187-88 (1957).

That power is essential if Congress is to fulfill its constitutional duties to legislate effectively and

to serve as a check on the Executive Branch. *See McGrain v. Daugherty*, 273 U.S. 135, 175

(1927).

 Each House of Congress may exercise its power to use compulsory process to obtain

information directly or may delegate it to its committees. *See Eastland*, 421 U.S. at 505.

Pursuant to its authority "to determine the Rules of its Proceedings," U.S. Const., Art. I, § 5,

---

[25] Defendants have not contested that Section 6103(f)(1) required them to produce the requested information to the Committee, and in any event, at the motion to dismiss stage, "[f]or purposes of standing, the court assumes the validity of the petitioner's claims." *Sierra Club v. EPA*, 926 F.3d 844, 849 (D.C. Cir. 2019).

cl. 1, the House conferred on the Committee jurisdiction over "[r]evenue measures generally," and over the "[d]eposit of public monies," encompassing Treasury, the IRS, and all aspects of the Nation's tax laws and their administration; the House also delegated it express authority to subpoena information that may further its legislative and oversight functions within that domain. *See* House Rules X.1(t)(3), (6); XI.2(m)(1)(B).  Exercising that authority, the Committee subpoenaed the relevant information to aid its oversight of the IRS and its consideration of tax code reforms.  Defendants' refusal to comply has deprived the Committee of information to which it is lawfully entitled by virtue of the House's constitutional authority.  Compl. ¶¶ 88-93.

Given these palpable injuries, it is not surprising that courts have uniformly concluded that the House and its committees may sue to obtain information to which they are entitled.  More than four decades ago, the D.C. Circuit rejected a nonjusticiability challenge to a dispute between the Legislative and Executive Branches over a Congressional subpoena and held that the House could intervene to vindicate the subpoena because "[i]t is clear that the House as a whole has standing to assert its investigatory power."  *United States v. American Tel. & Tel. Co.*, 551 F.2d 384, 391 (D.C. Cir. 1976) (*AT&T I*).[26]  The *AT&T I* court also noted that the D.C. Circuit had previously reached the merits of a similar dispute, without suggesting any justiciability problems, in *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974).  As the *AT&T I* court held, "*Senate Select Committee* establishes, at a minimum, that the mere fact that there is a conflict between the legislative and executive branches over a congressional subpoena does not preclude judicial resolution of the conflict." 551 F.2d at 390.

---

[26] Although the named intervenor was an individual legislator, the chairman of the relevant House committee, the D.C. Circuit noted that he had been authorized by the House to intervene on behalf of the House and the committee.  *AT&T I*, 551 F.2d at 391.

Several judges of this District Court, facing similar cases in which the House or a House committee claimed to have been deprived of information to which it was legally entitled, have ruled that courts have Article III jurisdiction to resolve such disputes.  A three-judge district court concluded that the House had standing to challenge the Department of Commerce's decision to use statistical sampling in the Census because "[t]he inability to receive information which a person is entitled to by law is sufficiently concrete and particular to satisfy constitutional standing requirements."  *U.S. Dep't of Commerce*, 11 F. Supp. 2d at 86.  That case, like this one, involved a failure to provide the Committee with information to which it is entitled by statute.

In *Committee on the Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53 (D.D.C 2008), Judge Bates held that a House committee had standing to seek enforcement of its subpoena directed to Executive Branch officials who had refused to comply on the ground of supposed absolute immunity.  After reviewing the precedents described above, the court held that the committee had standing because, as in *AT&T I*, "a House subcommittee had issued a valid subpoena in connection with an investigation and DOJ was seeking to invalidate it.  The injury to the House was evident: the validity and efficacy of that particular subpoena was in jeopardy, as was the utility of the subcommittee's investigation.  So, too, in this case."  *Id.* at 70.

Judge Berman Jackson similarly concluded that a House committee had standing to seek enforcement of a subpoena in *Committee on Oversight and Government Reform v. Holder*, 979 F. Supp. 2d 1 (D.D.C. 2013).  As in *Miers*, the court "reject[ed] the notion that merely hearing this dispute between the branches would undermine the foundation of our government, or that it would lead to the abandonment of all negotiation and accommodation in the future."  *Id.* at 11. Rather, the court stressed, "[t]o give the [Executive Branch] the final word [in all subpoena disputes between the Executive and Legislative Branches] would elevate and fortify the

executive branch at the expense of the other institutions that are supposed to be its equal, and do more damage to the balance envisioned by the Framers than a judicial ruling on the narrow privilege question posed by the complaint." *Id*. at 12.

The conclusion that a Congressional committee may sue to enforce a subpoena is also supported by formal opinions of the Executive Branch.  In two comprehensive opinions, the Department of Justice's Office of Legal Counsel (OLC) has stated that Congress or its committees may sue to enforce Congressional subpoenas—and in part for that reason, concluded that the Department of Justice ordinarily should not prosecute Executive Branch officials who refuse such subpoenas on the ground of executive privilege for contempt of Congress, because a civil suit brought by Congress would provide a superior vehicle for resolving inter-branch disputes.  As Assistant Attorney General Theodore Olson explained,

> Congress has a legitimate and powerful interest in obtaining any unprivileged documents necessary to assist it in its lawmaking function … and a civil suit to enforce the subpoena would be aimed at the congressional objective of obtaining the documents …. Congress would be able to vindicate a legitimate desire to obtain documents [in such a civil suit] … There is little doubt that … Congress may authorize civil enforcement of its subpoenas and grant jurisdiction to the courts to entertain such cases.

*Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 U.S. Op. O.L.C. 101, 137 & n.6 (1984).  A subsequent OLC opinion by Assistant Attorney General Charles Cooper agreed.[27]

### 2.  Defendants' Arguments Against Standing Are Meritless

Against this authority, Defendants make four arguments.  All of these arguments have been rejected before, and they should be rejected here as well.

---

[27] *See Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act*, 10 U.S. Op. O.L.C. 68, 83, 86, 88 (1986).  Defendants do not even address these OLC opinions.

### a.      *Raines* and similar cases are inapposite

According to Defendants, *Raines* establishes that neither Congress nor any of its

component bodies may sue to enforce a Congressional subpoena because such a suit seeks only

to vindicate abstract notions of political power rather than concrete and particularized interests.

But the rationale of *Raines* has no application here because that case rested squarely on the fact

that it involved *individual legislators*—not either the House or Senate, nor any of its authorized

committees—who were seeking to advance an interest that neither body of Congress had

endorsed or authorized (and indeed, which both definitively opposed).  As Judges Lamberth,

Bates, and Berman Jackson all recognized, *Raines* does not address a situation in which either

the House or its committees seek to vindicate their legal entitlements to information.

Defendants' argument, if accepted, would have sweeping consequences far beyond this

case.  Not only would it preclude Congressional enforcement of subpoenas and demands for

information directed to Executive Branch officials, it would also preclude Congressional

enforcement of subpoenas directed *to private individuals and entities*.[28]  That result would

drastically undermine Congress's power to investigate and would encourage refusals to comply

with Congressional subpoenas, for it would force Congress to rely on the willingness of the

Executive Branch to prosecute private individuals for contempt of Congress—with no guarantee

that the Executive would necessarily find Congress's subpoenas worthy of enforcement.

In any event, Defendants' arguments find no footing in *Raines*.  *Raines* held "specifically

and only … that six *individual Members* of Congress lacked standing to challenge the Line Item

---

[28] Under Defendants' theory, 28 U.S.C. § 1365, which authorizes the Senate to seek
judicial enforcement of subpoenas against private parties in certain circumstances, would be
unconstitutional because the Senate would lack Article III standing.  But that provision has been
used on several occasions to secure enforcement.  *See In re Application of the U.S. Senate
Permanent Subcomm. on Investigations*, 655 F.2d 1232 (D.C. Cir. 1981); *Senate Permanent
Subcomm. on Investigations v. Ferrer*, 199 F. Supp. 3d 125 (D.D.C. 2016), *vacated as moot*, 856
F.3d 1080 (D.C. Cir. 2017).

Veto Act." *Arizona State Legislature*, 135 S. Ct. at 2664.  As the Court explained, the Act

worked no injury to those Members' right or power to vote in favor of or against any legislation:

> In the vote on the Act, their votes were given full effect.  They simply lost that vote.  Nor can they allege that the Act will nullify their votes in the future …. In the future, a majority of Senators and Congressmen can pass or reject appropriates bills; the Act has no effect on this process.

*Raines*, 521 U.S. at 824.  The Court also held that, to the extent the Members were arguing that

the Act impaired Congress's institutional role in the lawmaking process, they were not the proper

parties to make that claim, which would belong by its nature only to the body as a whole.  Such

an injury, the Court explained, was not personal to individual lawmakers, but was "widely

dispersed," *id.* at 829.  As the Court later explained its holding:

> The "institutional injury" at issue, we reasoned, scarcely zeroed in on any individual Member … "[W]idely dispersed," the alleged injury 'necessarily impacted all Members of Congress and both Houses … equally."  None of the plaintiffs, therefore, could tenably claim a "personal stake" in the suit.

*Arizona State Legislature*, 135 S. Ct. at 2664.

The Court's subsequent decision in *Arizona State Legislature* puts to rest any notion that

a legislative body (as opposed to its individual members) lacks standing to redress an injury done

to its rights and powers.  *Arizona State Legislature* held that the state legislature had standing to

challenge the constitutionality of a state initiative that displaced its role in the Congressional

redistricting process.  In contrast to the individual legislators who lacked standing in *Raines*, the

legislature was "an institutional plaintiff asserting an institutional injury" that the federal courts

were competent to hear.  135 S. Ct. at 2664.  "Put another way, the Members [in *Raines*] had

suffered no injury that granted them *individual* standing because the actual injury was incurred

by the *institution*."  *Miers*, 558 F. Supp. 2d at 69; *see Holder*, 979 F. Supp. 2d at 14; *U.S. Dep't*

*of Commerce*, 11 F. Supp. 2d at 89.

*Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945 (2019), does not suggest a different result.  There, the Court held that "a single House of a bicameral [state] legislature lacks capacity to assert interests belonging to the legislature *as a whole*"—in particular, the interest in sustaining the constitutionality of its enacted legislation.  *Id.* at 1953-54 (emphasis added).  But this case involves an injury to interests held by each body of Congress and its committees *separately*—the statutory right to obtain information under Section 6103(f), and the constitutional power to investigate and gather facts.

Defendants' reliance on post-*Raines* decisions are flawed for the same reason:  Most were lawsuits by individual legislators, just as in *Raines*, and none involved a subpoena enforcement action brought by a Congressional committee.  *See Chenoweth v. Clinton*, 181 F.3d 112, 115 (D.C. Cir. 1999); *Campbell v. Clinton*, 203 F.3d 19, 21 (D.C. Cir. 2000); *Cummings v. Murphy*, 321 F. Supp. 3d 92 (D.D.C. 2018), *appeal pending*, No. 18-5176 (D.C. Cir.).  *Walker v. Cheney*, 230 F. Supp. 2d 51 (D.D.C. 2002), is even farther afield; in that case, the Comptroller General claimed to be suing only "in order to aid Congress," but Congress had given no indication it desired such aid.  230 F. Supp. 2d at 66 (internal citation omitted).  Those cases all fall within the theory of "the impermissible category of an individual plaintiff asserting an *institutional* injury."  *Cummings*, 321 F. Supp. 3d at 106 (emphasis added; quoting *Miers*, 558 F. Supp. 2d at 71).  In this case, by contrast, the Committee *has* suffered institutional injury—denial of information to which it is entitled by law and rejection of valid subpoenas.  And the Committee has been authorized, pursuant to valid action by the House, to sue to vindicate those interests and redress the injury to its power to conduct oversight.

### b.     The Committee's injuries are concrete and particularized

Defendants argue (at 20-21) that the Committee's claims of informational injury are insufficient because "the Constitution confers on Congress no freestanding right to information"

and the Committee is seeking to vindicate only an "abstract dilution of institutional legislative power."  Both arguments are misguided.

*First*, Section 6103(f)(1) gives the Committee a right to obtain the tax returns and return information it has requested.  Nothing more is necessary to establish the Committee's informational injury sufficient to confer standing.  Defendants' objection (at 20) that the Committee "has no lawful interest in tax-return information for its own sake" and must therefore "rely on an injury to its express legislative function" goes to the merits, not to standing.  And the argument that the Committee was not legally entitled to receive the information it requested is not a valid objection to the Committee's standing.  When considering standing at the pleading stage, the Court must assume that plaintiffs have legally meritorious claims.  *See Sierra Club*, 926 F.3d at 849.  And even if it is true, as Defendants argue, that Defendants must furnish tax returns and return information to the Committee only when the Committee articulates a valid legislative purpose for them—a limitation found nowhere in the text of Section 6103(f)[29]—this Court can decide whether the Committee has such a valid legislative purpose when it adjudicates the merits of this dispute, just as courts have resolved similar questions before, *see* pp. 28-31, *infra*.

*Second*, Defendants' refusal to comply with the Committee's subpoenas, by itself, establishes institutional injury sufficient for standing.  Defendants appear to suggest (at 21-22) that, to accept the Committee's claim of institutional injury, this Court would have to decide *how much* injury the Committee had suffered and *to what extent* its legislative function had been impaired, and that those questions are abstract and not susceptible to judicial resolution.  No

---

[29] The snippet of legislative history cited by Defendants (Mem. 20, citing S. Rep. No. 94-938 pt.1, at 320) suggests no connection to a request made under Section 6103(f)(1), which on its face makes Defendants' obligation to produce tax returns and return information unconditional.

authority supports that proposition, which, if accepted, would render all Congressional

subpoenas—indeed, all subpoenas of any kind—unenforceable in court.  The Committee's

issuance of a subpoena for information reflects its determination that the information is relevant

to its legislative and oversight functions.  When a party refuses to comply with that subpoena,

those functions are, by definition, impaired; *that subpoena* is nullified by the refusal, and the

Committee's authority to issue the subpoena is placed in question in a concrete and

particularized dispute that this Court may resolve—just as the Court may resolve whether a

subpoena issued by a grand jury or by an administrative agency is valid.  As the court in *Miers*

explained in the course of rejecting a virtually identical argument, when the Executive Branch

rejects a Congressional subpoena, "the validity and efficacy of [a] particular subpoena [is] in

jeopardy, as [is] the utility of the [C]ommittee's investigation."  *Miers*, 558 F.Supp.2d at 70.

### c.  This case presents issues amenable to judicial resolution

Defendants argue (at 15-18) that, because this case arises in the setting of an inter-branch

conflict, the dispute is not amenable to judicial resolution.  But the mere fact that a case may

raise separation-of-powers questions is not a basis for dismissing suit.  That point is forcefully

demonstrated by *United States v. Nixon*, 418 U.S. 683 (1974), an *intra-branch* dispute in which

the Supreme Court resolved and rejected executive-privilege objections to a subpoena.  The

Court rejected President Nixon's characterization of the dispute as a nonjusticiable political

question and emphasized that, "[w]hatever the correct answer [to the privilege questions] on the

merits, these issues are 'of a type which are traditional justiciable.'"  *Id.* at 697 (quoting *United*

*States v. ICC*, 337 U.S. 426, 430 (1949)).  *See also United States v. Burr*, 25 F. Cas. 30, 34

(C.C.D. Va. 1807) (resolving privilege questions raised by subpoena to the President).

The legal issues presented in this case are equally within the competence of an Article III

court to decide, as the judges in *Senate Select Committee*, *AT&T*, *Miers*, and *Holder* all correctly

concluded.  First, the Committee has alleged that Defendants have failed to comply with their

obligation under Section 6103(f)(1) to produce information.  Defendants question the existence

of a cause of action for the Committee to enforce that right, but they have not disputed that a

court can resolve the legal issues presented.  Second, the Committee has sought enforcement of

its subpoenas, "which is a routine and quintessential judicial task."  *Miers*, 558 F. Supp. 2d at 71;

*see also Holder*, 979 F. Supp. 2d at 22.  "[F]ederal precedent dating back as far as 1807

contemplates that even the Executive is bound to comply with duly issued subpoenas."  *Miers*,

558 F. Supp. 2d at 72.  A subpoena enforcement dispute has thus "traditionally thought to be

capable of resolution through the judicial process."  *Flast v. Cohen*, 392 U.S. 83, 97 (1968).[30]

The merits of this case also present issues that federal courts have regularly resolved.

Federal courts, including the Supreme Court, have frequently decided whether a subpoena lay

outside Congress's constitutional authority.  *See, e.g.*, *Barenblatt v. United States*, 360 U.S. 109,

132 (1959); *Eastland*, 421 U.S. at 508.  Courts have resolved those questions by consulting

conventional sources, such as House rules and resolutions, statements by committee members

accompanying requests for information, legislative proposals, and remarks by committee

members and testimony by witnesses at related hearings.[31]  In short, there is nothing about this

---

[30] The mere fact that a case may implicate questions of allocation of power between the Legislative and Executive Branches does not render it nonjusticiable.  *See Zivotofsky v. Clinton*, 566 U.S. 189, 196-97 (2012) (reversing D.C. Circuit's affirmance of district court's dismissal on political question grounds of Executive-Legislative dispute over recognition of foreign capital, explaining "the Judiciary has a responsibility to decide cases properly before it, even those it "would gladly avoid" (quoting *Cohens v. Virginia*, 6 Wheat. 264, 404 (1821)) (Roberts, C.J.).  In numerous cases, of course, the courts have resolved questions of separation of powers.  *See, e.g.*, *Morrison v. Olson*, 487 U.S. 654 (1988); *Bowsher v. Synar*, 478 U.S. 714, (1986); *INS v. Chadha*, 462 U.S. 919 (1983); *Humphrey's Executor v. United States*, 295 U.S. 602 (1935).

[31] *See Kilbourn v. Thompson*, 103 U.S. 168, 192 (1881) ("looking to the preamble and resolution under which the committee acted"); *In re Chapman*, 166 U.S. 661, 668 (1897) ("According to the preamble and resolutions"); *McGrain*, 273 U.S. at 170 ("for the purpose of determining the essential character of the inquiry recourse may be had to the resolution or order

dispute that makes it categorically unsuitable for judicial resolution.  As nearly a half-century of precedent shows, when Congress and the Executive Branch are at an impasse because the Executive has adamantly rejected a Congressional subpoena, Article III courts may decide whether that subpoena is valid.

### d.  Adjudication of this dispute will not violate separation of powers

Finally, Defendants argue (at 23-26) that adjudication of this dispute will undermine the separation of powers because it will, in effect, allow Congress to wrest control of the enforcement of federal law from the Executive Branch.  Those arguments fail to apprehend that the interests the Committee is seeking to vindicate belong to each House *separately*.  The Committee is not trying to displace the Executive Branch in the enforcement of a federal statute enacted through bicameralism and presentment; it is seeking to protect rights and powers that the House enjoys by itself.  Defendants' historical survey overlooks that, since nearly the beginning of the Republic, each House of Congress has acted separately and without the intervention of the Executive Branch to enforce its subpoenas—by arresting and detaining contemnors, including contumacious Executive Branch officials.  This lawsuit represents a far more modest approach.

The power to investigate, and to secure by compulsory process any information relevant to an investigation, belongs to each House of Congress (and its committees) acting independently from the other and from the Executive Branch.  *See McGrain*, 273 U.S. at 165-68 (comprehensively reviewing Congress's repeated exercise of the power to obtain information by compulsory process and concluding that power, rooted in Article I, belongs to the House and

---

under which it is made"); *Watkins*, 357 U.S. at 208-14 (referring to "the several possible indicia of the 'question under inquiry'" and then looking to the authorizing resolutions, House Rules, and statements at the hearing at which the witness was called).

Senate separately and is essential to their constitutional authority to conduct oversight of the Executive Branch); *Mnuchin*, 379 F. Supp. 3d at 16-17.

Defendants' reliance (at 24) on cases such as *Buckley v. Valeo*, 424 U.S. 1 (1976), and *Bowsher v. Synar*, 478 U.S. 714 (1986), is therefore misplaced.  In those cases, the Supreme Court made clear that Congress may not appropriate to itself the power to execute federal laws, for that power falls to the President, to whom "the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.'"  *Buckley*, 424 U.S. at 136 (quoting U.S. Const. Art. II, § 3).  But the enforcement of a subpoena to vindicate the House's power to investigate is not the enforcement of federal law or the "execution" of the law within the meaning of Article II. A subpoena or demand for information issued by the House or one of its committees is not the enforcement of a statute that has been enacted into law through the lawmaking procedures of Article I, Section 7.  It is, rather, the exercise of a power that the House and Senate possess independently of each other and of the President.

Defendants' position that the power to enforce a Congressional subpoena belongs exclusively to the Executive Branch cannot be squared with history.  Although Congressional lawsuits to enforce subpoenas may date only to 1974—not an inconsiderable pedigree by itself— action by the Houses of Congress to vindicate their inherent powers, taken separately and without the assistance of the Executive Branch, is nearly as old as the Republic.  In 1795, the House exercised its power of contempt to arrest, detain, and try individuals accused of offering bribes to Representatives.  The Senate followed shortly thereafter.[32]  That contempt power was quickly extended to the power to secure compliance with Congressional subpoenas, including

---

[32] *See generally* Josh Chafetz, *Congress's Constitution: Legislative Authority and the Separation of Powers* 172-73 (2017); Todd Garvey, Cong. Research Serv., RL34097, *Congress's Contempt Power and the Enforcement of Congressional Subpoenas: Law, History, Practice, and Procedure* 4-6 (2017).

subpoenas directed to Executive Branch officials who had refused to provide a House committee information it had requested.[33]   The Congressional contempt power exists independent of, and was not displaced by, its authorization to the Executive Branch to bring prosecutions for contempt of Congress.  *See Jurney v. MacCracken*, 294 U.S. 125, 151 (1935).  Thus, the House and Senate exercised their power to arrest and detain for contempt long after they had also authorized Executive Branch prosecutions of individuals for contempt of Congress in 1857.  *See id.*; *McGrain*, 263 U.S. at 165.[34]

This history shows that the House has long secured compliance with its power to investigate by using its own Sergeant at Arms to arrest and detain contemnors, without employing law enforcement officers of the Executive Branch.  Under Defendants' cramped view of Congressional authority, however, the exercise of that power would be unconstitutional because it would constitute execution of the laws, which only the Executive Branch may undertake.  But Congress's power to vindicate its authority by arresting contemnors has been unquestioned since the Supreme Court upheld it 200 years ago, in *Anderson v. Dunn*, 19 U.S. 204 (1821).  In doing so, the Court stressed that failing to recognize the House's power would

---

[33] Chafetz, *supra*, at 174-79.  In 1879, for example, "the House of Representatives actually had its sergeant arrest an executive-branch officer for contempt."  *Id.* at 176.  That arrest took place after the United States' Minister to China refused to produce books and records to a House committee; the House's Sergeant at Arms arrested the minister and brought him before the House.  The House again arrested an Executive Branch official in 1916.  *See id.* at 177-78.

[34] As one careful study observes, "Until the twentieth century Congress was reluctant to use the statutory provisions of 1857 and continued to punish persons summarily."  Carl Beck, Contempt of Congress 7 (1959); *see id.* at App. A, Nos. 16, 24, 31, 33, 34, 35, 36, 58, 59, 60, 66, 67, 74, 78, 81, 92, 93, 98 (providing summaries of instances between 1858 and 1943 in which the House or Senate used its contempt power to arrest or detain individuals for failing to testify or provide documents to a committee).

Defendants rely (at 24) on Justice Scalia's separate opinion in *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987), but the Court there held that Article III courts possess inherent authority to punish out-of-court contempts, and *rejected* Justice Scalia's argument that only the Executive Branch may do so.  *See id.* at 797-801.

lead "to the total annihilation of the House of Representatives to guard itself from contempts." *Id.* at 228.[35]

Both the courts and OLC have concluded that a civil enforcement action like this one is more practical and desirable than the alternatives—an exercise of the House's inherent contempt power to arrest those individuals or a criminal prosecution of the resisting officials for contempt of Congress. As to the former, the *Miers* court stressed that the prospect of "a stand-off between the Sergeant at Arms and executive branch law enforcement officials concerning taking [an Executive Branch official] into custody and detaining him … should be avoided, and there is no need to run the risk of such mischief when a civil action can resolve the same issue in an orderly fashion." 558 F. Supp. 2d at 92. As to the latter possibility, not only is it unlikely that the Executive Branch would ever prosecute an official for resisting a Congressional subpoena on the advice of the Department of Justice, but OLC has suggested that doing so may very well be unconstitutional. *See Prosecution for Contempt of Congress*, 8 Op. OLC at 133-34.

In sum, it is Defendants' standing arguments that would damage the allocation of powers in the Constitution. Their arguments would severely undermine Congress's ability to inform itself and to conduct oversight of the Executive Branch, and they would damage the power of factfinding that is integral to Congress's exercise of its constitutional functions. Four decades of case law uniformly reject those arguments, and this Court should do so as well.[36]

---

[35] *See Jurney*, 294 U.S. at 147-50 (upholding exercise of contempt power for refusal to testify or produce documents to Senate); *McGrain*, 273 U.S. at 174 (same).

[36] Defendants (at 18 n.11) quote a recent story in the *New York Times* to support their suggestion that recognizing the ability of Congressional committees to sue will open the floodgates and thus upset the separation of powers. As that article notes, if there has been a recent increase in litigation by Congressional committees seeking to enforce subpoenas, "the surge in litigation is a consequence of Mr. Trump's norm-busting presidency." Charlie Savage and Nicholas Fandos, *The House v. Trump: Stymied Lawmakers Increasingly Battle in the Court*, New York Times (Aug. 13, 2019). The article goes on: "Kerry W. Kircher, who served as House

### 3.      The Committee Is Authorized To Bring This Suit

In a last-ditch effort to challenge Plaintiff's ability to sue, Defendants contend (at 26-29)

that a separate vote of the full House was required to authorize this litigation.  There is no

authority for that proposition.  The Constitution vests in each House of Congress the exclusive

authority to "determine the Rules of its proceedings."  Art. I, § 5, cl. 2.  Pursuant to that

authority, the House for decades—and through repeated changes in partisan control—has

authorized the Speaker, acting in consultation with the Bipartisan Legal Advisory Group

(BLAG), to direct the General Counsel of the House to represent the House and its committees in

litigation, including by initiating lawsuits.  The House's choice, pursuant to its rulemaking

authority, to rely on BLAG for these purposes is no different than the House's choice to establish

a particular committee structure or to assign certain tasks to particular standing or select

committees.  Those decisions are made by the full House when it votes to adopt its organizing

resolution at the beginning of each Congress and establishes the Rules of the House for that

Congress.  Those choices concern "matters of method," which are "open to the determination" of

the House.  *United States v. Ballin*, 144 U.S. 1, 5 (1892).

The House established BLAG in 1993 as part of its organizing resolution for the 103d

Congress.  *See* H. Res. 5, Adopting the Rules of the House for the 103d Congress § 2 (Jan. 5,

1993) ("The Office of General Counsel shall function pursuant to the direction of the Speaker,

who shall consult with a Bipartisan Legal Advisory Group, which shall include the majority and

minority leaderships.").  The House has reaffirmed that structure through votes of the full

chamber adopting the Rules of the House for each of the subsequent Congresses.  *See, e.g.*, H.

Res. 6, 104th Cong., 1st Sess. (Jan. 5, 1995) (Speaker Newt Gingrich); H. Res. 5, 111th Cong.,

counsel under Republican speakers between 2011 and 2016, said many of the House's lawsuits
were justified, regardless of politics, to ensure that Mr. Trump's vow to defy 'all' of its
subpoenas did not set a precedent."  *Id.*

1st Sess. (Jan. 5, 2011) (Speaker John Boehner).  At the beginning of the 114th Congress, the

House (under Republican leadership) revised the language of the relevant rule to establish a

"Bipartisan Legal Advisory Group composed of the Speaker and the majority and minority

leadership" and to provide that BLAG "speaks for, and articulates the institutional position of,

the House in all litigation matters."  H. Res. 5, § 2(b), 114th Cong., 1st Sess. (Jan. 6, 2015).  The

current House adopted that same provision, codified as House Rule II, cl. 8(b), by majority vote

in adopting its organizing resolution for the 116th Congress.  *See* H. Res. 6, 116th Cong. (Jan. 9,

2019); *see* Jefferson's Manual §§ 670-670a.  The full House subsequently reaffirmed that the

"chair of each standing and permanent select committee, when authorized by the Bipartisan

Legal Advisory Group, retains the ability to initiate or intervene in any judicial proceedings

before a Federal court on behalf of such committee."  H. Res. 430, 116th Cong. (June 11, 2019).

Using the authority granted by the full House, BLAG authorized the present lawsuit.

Compl. ¶ 98.  To hold BLAG's authorization for the litigation insufficient would be to

undermine the House's constitutionally mandated right to create its own Rules.  That

constitutional authority includes the ability to select the process by which committees of the

House may gain authorization to participate in litigation.[37]

Defendants suggest (at 27) that the litigation authorization procedure established by the

House is akin to the one-house veto invalidated in *INS v. Chadha*, 462 U.S. 919 (1983).  But

*Chadha* did not involve the House's rulemaking power or its delegation of authority it can

exercise on its own to a committee.  *Chadha* addressed a provision of the Immigration and

Nationality Act that authorized one House of Congress to invalidate by resolution the decision of

---

[37] *See, e.g.*, *American Fed'n of Gov't Employees, AFL-CIO v. United States*, 330 F.3d 513, 522 (D.C. Cir. 2003) ("The Constitution grants Congress discretion to regulate its internal proceedings.").

the Executive Branch to allow a deportable alien to remain in the United States.  The Court held

the one-house veto unconstitutional because it conflicted with specific provisions in Article I—

the bicameralism and presentment requirements, the Presidential veto, and the Congressional

veto override.  *Id*. at 946.  The Court explained that the "bicameralism and presentment

requirements" in Article I "represent[] the Framers' decision that the legislative power of the

Federal government be exercised in accord with a single, finely wrought and exhaustively

considered, procedure."  *Id*. at 951, 952.

By contrast, the Constitution mandates no specific procedure the Houses of Congress

must follow in authorizing participation in litigation.  That constitutional silence leaves the

matter within each chamber's exclusive control.  In exercising their rulemaking authority, the

House and Senate may not "ignore constitutional restraints or violate fundamental rights."

*Ballin*, 144 U.S. at 5.  But absent such limitations, "all matters of method are open to the

determination of the house."  *Id*.; *cf. Marshall Field & Co., v. Clark*, 143 U.S. 649, 671 (1892)

(when Constitutional clause does not address how each house should exercise a power, the

manner of exercise is "left to the discretion of the respective houses of congress").[38]

Defendants argue (at 28) that the Court "has no way of knowing whether the initiation of

this suit actually reflects the will of the House as a whole."  But the Court need look no further

than the House's own rules—adopted and reaffirmed by resolution of the full House—to see that

the House gave BLAG the authority to authorize this suit.  Defendants' argument would require

this court to do something it may not do: "decide a lawsuit asking it to impose judicially-

---

[38] *See Exxon Corp. v. FTC*, 589 F2d 582, 590 (D.C. Cir. 1978) ("where constitutional rights are not violated, there is no warrant for the judiciary to interfere with the internal procedures of Congress").

formulated rules of conduct on the legislative branch." *United States v. Durenberger*, 48 F.3d 1239, 1243 (D.C. Cir. 1995).

Defendants' other cited authorities only undercut their position. In *Cummings*, the court addressed whether individual Members of Congress had standing to "vindicate a statutory right to information and to compel the production of records from the Executive Branch *without* authorization from the institution to do so." *Cummings*, 321 F. Supp. 3d at 106. There, individual legislator-plaintiffs had no authorization from the House to proceed with their lawsuit. Here, the Committee is proceeding pursuant to BLAG's authorization, which, under the House Rules, represents the authorization of the House as a whole. Rule II, cl. 8(b) (BLAG "speaks for, and articulates the institutional position of, the House in all litigation matters"); *see also* H. Res. 430 (a "vote of [BLAG] to authorization litigation … is the equivalent of a vote of the full House of Representatives"). *Cummings* recognized those distinctions and their significance.[39]

Although the suits in *Miers* and *Holder* were authorized by resolutions of the full House, nothing in those decisions indicates that authorization by BLAG would have been insufficient. Rather, the judges in those cases emphasized the House authorization as a distinguishing factor from *Raines* and other cases in which the suits were brought by *individual plaintiffs* asserting institutional injury. *See Holder*, 979 F. Supp. 2d at 21; *Miers*, 558 F. Supp. 2d at 71. Here, the plaintiff is a standing committee of the House that has exercised its statutory authority pursuant to Section 6103(f) and its subpoena power pursuant to House Rules. And because of BLAG's

---

[39] *See* 321 F. Supp.3d at 117 ("even if their Oversight Committee colleagues rejected their efforts, Plaintiffs could urge the House Bipartisan Legal Advisory Group to support litigation to enforce the Seven Member Rule requests"). The same distinction applies to *Walker*, 230 F. Supp. 2d at 61-62, where the court found it "[n]otabl[e]" that "neither House of Congress, and no congressional committee, ha[d] authorized the Comptroller General to pursue the requested information through this judicial proceeding." This case, by contrast, has been authorized by BLAG.

authorization, there is no danger of a "wayward committee acting contrary to the will of the House." *AT&T I*, 551 F.2d at 393.  To the contrary, BLAG's exercise of its authority ensures that the Committee's resort to litigation comports with the will of the House.

### B.    This Court Has Statutory Subject-Matter Jurisdiction

This Court has statutory subject-matter jurisdiction over each of the Committee's claims pursuant to 28 U.S.C. § 1331.  Section 1331 grants federal district courts "original jurisdiction" over "all civil actions arising under the Constitution [and] laws … of the United States."  28 U.S.C. § 1331.  The Committee's claims fall comfortably within that provision.  Each claim seeks to vindicate a right or power arising under the Constitution or a federal statute, and thus "aris[es]" under federal law.  *See* Compl. ¶¶ 99-140 (seeking to vindicate the Committee's rights and powers under Article I and 26 U.S.C. § 6103(f)).

Defendants focus almost entirely (at 29-32) on the Complaint's subpoena-enforcement claim and offer no argument why the Court would lack statutory jurisdiction over the Committee's claims under the APA, the claim under Section 6103, or the mandamus claim.  District courts have jurisdiction under Section 1331 to adjudicate APA claims, *see, e.g.*, *Oryszak v. Sullivan*, 576 F.3d 522, 524-25 (D.C. Cir. 2009), controversies arising under Section 6103, *see, e.g.*, *Tierney v. Schweiker*, 718 F.2d 449, 454 (D.C. Cir. 1983), and mandamus claims under 28 U.S.C. § 1361.

With respect to the subpoena-enforcement claim, Defendants argue that Congress's passage and amendment of 28 U.S.C. § 1365,[40] which authorizes district court jurisdiction over certain subpoena-enforcement suits brought by the *Senate*, indicates that Section 1331's more general jurisdictional grants do not encompass suits to enforce Congressional subpoenas.  That argument fails for at least four reasons.

---

[40] Section 1365 was previously codified at 28 U.S.C. § 1364.

*First*, the argument fails as a matter of binding Circuit law.  The D.C. Circuit has held

that Section 1331 provides district courts with jurisdiction to adjudicate the validity of a

subpoena issued by a House committee.  In *AT&T*, a House subcommittee issued a subpoena to

AT&T for documents related to national security wiretaps undertaken at the request of the FBI.

When AT&T indicated it would comply, the Justice Department brought an action to prohibit

AT&T from doing so, and the chairman of the House subcommittee intervened as a defendant.

*AT&T I*, 551 F.2d at 387.  The D.C. Circuit concluded it had subject-matter jurisdiction under

Section 1331 because "[t]he Executive brought the suit claiming that its constitutional powers

with respect to national security and foreign affairs included the right to prevent transmission of

the request letters to Congress.  The action therefore arises under the Constitution of the United

States."  *Id.* at 389.

This case presents the identical legal question: whether a Congressional subpoena is

valid.  Although in this case the parties' positions are reversed—the Executive Branch is the

defendant rather than the plaintiff—that fact is of no consequence to the question of statutory

subject-matter jurisdiction, for the controversy "arises under" federal law regardless of the

posture of the litigants.[41]  As the *Miers* court explained in finding subject-matter jurisdiction

under Section 1331 over an action to enforce a Congressional subpoena, "[t]he Executive's

---

[41] *See, e.g.*, *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 844 (9th Cir. 2011) ("in federal-question cases, the identity of the parties is irrelevant and the district court's jurisdiction is grounded in the federal question(s) raised by the plaintiff"); *Response to Congressional Requests for Information*, 10 Op. O.L.C. at 88 ("The rationale used by the Department in [*AT&T I*] would appear to apply equally to suits filed by a House of Congress seeking enforcement of its subpoena against executive privilege claims.").

posture in that case … mirrors that of the Committee here in asking the Court to declare its subpoena valid." *Miers*, 558 F. Supp. 2d at 75; *accord Holder*, 979 F. Supp. 2d at 17 (same).[42]

*Second*, nothing about Section 1365 warrants the conclusion that it ousts the district courts of the jurisdiction they would otherwise have under Section 1331.  By its terms, Section 1365 does not apply to the House.  28 U.S.C. § 1365.  The Section 1365 legislation removed a reference to the House because the House committees had not had an opportunity to review the issues, and not because Congress intended to deny the House subpoena authority if it already existed.  *See* H. R. Rep. No. 95-1756, at 80 (1978).  Accordingly, Defendants' argument (at 30) that "the specific provisions addressing federal subject matter jurisdiction over congressional information access suits control over the general federal question statute" is inapposite; for House subpoena enforcement actions, there is no specific provision that could control over the general.  *See Holder* 979 F. Supp. 2d at 19.

*Third*, the history of Sections 1365 and 1331 does not support Defendants' theory that Congress intended to preclude district courts from taking jurisdiction over House subpoena-enforcement actions.  In 1973, the Senate Select Committee on Presidential Campaign Activities brought a civil action to enforce subpoenas issued to President Nixon.  Judge Sirica held that the court lacked subject-matter jurisdiction because he could not assign a dollar value to the Committee's claim and, therefore, the Committee could not meet Section 1331's $10,000 amount-in-controversy requirement.  *See Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 366 F. Supp. 51, 60-61 (D.D.C. 1973).  In response, Congress enacted a statute conferring "jurisdiction on the District Court for the District of Columbia in any civil

---

[42] In *Miers*, the Department of Justice acknowledged that the district court possessed statutory jurisdiction under 28 U.S.C. § 1331 in a subpoena-enforcement action brought by a House committee.  *See* 558 F. Supp. 2d at 65 n.8.

action that the [Senate Select] Committee theretofore or thereafter brought 'to enforce or secure a declaration concerning the validity of any subpoena'" against Executive Branch officials, including the President, *see Senate Select Comm.*, 498 F.2d at 727 (citing Pub. L. No. 93-190, 87 Stat. 736 (1973)), regardless of the amount in controversy, and the D.C. Circuit proceeded to consider the merits of the subpoena-enforcement dispute, *see id.*

In 1976, Congress sought to enact a permanent fix to the jurisdictional issue identified by Judge Sirica, and it eliminated Section 1331's $10,000 amount-in-controversy requirement for "any such action brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity." Pub. L. No. 94-574, 90 Stat. 2721 (1976); *see AT&T I*, 551 F.2d at 389 n.7. That amendment, however, did not remove the amount-in-controversy requirement in Section 1331 for actions arising under federal law brought against *private* parties. By 1978, therefore, when Congress enacted Section 1365 as part of the Ethics in Government Act, district courts already had subject-matter jurisdiction under Section 1331 to hear suits brought by the House or Senate to enforce subpoenas directed at federal agencies or officials acting in their official capacity. What Section 1365 did, when it was enacted in 1978, was to remove the amount-in-controversy requirement with respect to Senate subpoena-enforcement actions against *private* individuals and entities, which still existed at that time. Congress later removed the amount-in-controversy requirement from Section 1331 entirely, rendering the entire jurisdictional-amount issue moot for all Congressional subpoena-enforcement actions, whether the subpoenas came from the House or Senate or were directed to governmental or private respondents. *See* Pub. L. No. 96-486, § 2(a), 94 Stat. 2369 (1980).

Defendants note (at 29-30) that Section 1365, as enacted in 1978, excluded Senate subpoena-enforcement actions against Executive Branch officials, and suggest that Section 1365

represented a choice by Congress to preclude jurisdiction over such subpoena-enforcement actions under Section 1331.  But there was no reason for Congress to bring enforcement actions against Executive Branch officials within the reach of Section 1365, for such actions already fell within Section 1331, once the amount-in-controversy for actions against federal officials was removed.  Congress was not required to use Section 1365 as a vehicle to fill a gap that did not exist.  Defendants (at 31) quote a sentence from the 1978 Act's legislative history that "a future statute" might be needed to "specifically give the courts jurisdiction to hear a civil legal action brought by Congress to enforce a subp[o]ena against an executive branch official."[43]  But Defendants ignore a later passage from the same report, which explicitly states that the exception for Executive Branch officials "is not intended to be a congressional finding that the federal courts do not now have the authority to hear a civil action to enforce a subpoena against an officer or employee of the federal government."  S. Rep. No. 95-170, at 91-92 (1977).[44]

Defendants also make much of the fact that Congress made a minor clarifying amendment to Section 1365 in 1996, long after it had repealed the amount-in-controversy requirement from Section 1331 for all federal-question cases.  According to Defendants (at 30), "[i]f § 1331 already applied to all suits by Congress seeking to enforce its demands for information … then the 1996 amendments to § 1365 would have been entirely superfluous."  But Defendants point to nothing to indicate that Congress considered the effect of that amendment on

---

[43] Defendants (at 31) attribute that quote to the legislative history of the 1976 amendments to Section 1331, but in fact it comes from the legislative history of Section 1365, enacted in 1978.  *See* S. Rep. No. 95-170, at 89 (1977).  The statement thus provides no support for Congressional intent with respect to the 1976 amendments.

[44] Defendants point (at 45) to two occasions on which Congress specifically authorized actions by legislators and the Houses of Congress.  Those specific provisions were necessary to vest jurisdiction in three-judge district courts, with direct appeals to the Supreme Court, rather than under Section 1331.  They do not suggest that jurisdiction in a single-judge district court would have been lacking under Section 1331.

Section 1331, and certainly nothing to suggest that Congress at that time questioned either its

prior statement (when it enacted Section 1365) that the exception in Section 1365 carving out

subpoena actions against Executive Branch officials was not intended to resolve whether courts

already had jurisdiction over such actions, or the D.C. Circuit's jurisdictional ruling in *AT&T*.

Congress "does not hide elephants in mouseholes." *Whitman v. American Trucking Ass'n*, 531

U.S. 457, 468 (2001).

In any event, "[r]edundancies across statutes are not unusual events in drafting, and so

long as there is no 'positive repugnancy' between two laws, a court must give effect to both."

*Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) (quoting *Wood v. United States*,

16 Pet. 342, 363 (1842)).[45]   Although Section 1331 and 1365 overlap, they "do not pose an

either-or proposition." *Id.*  Section 1331's reach is much broader than Section 1365's, as this

case demonstrates.  Section 1365, however, includes requirements not contained in Section 1331.

For example, Section 1365(b) establishes a procedure in which the district court, upon

application by the Senate or an authorized committee or subcommittee, issues an order to the

party refusing to comply with the Senate subpoena.  28 U.S.C. § 1365(b).  It also provides a

mechanism pursuant to which the district court's jurisdiction is maintained despite adjournment

of the Senate at the end of a Congress.  *Id.*  Accordingly, because "giving effect to both [Sections

1365 and 1331] would not render one or the other wholly superfluous," Section 1365 should not

---

[45] Redundancies among federal jurisdictional provisions are not uncommon.  When Congress removed the amount-in-controversy requirement from Section 1331, it effectively rendered redundant several other provisions, including 28 U.S.C. § 1337 (jurisdiction over commerce and antitrust cases), § 1338 (jurisdiction over patent and trademark cases), and § 1343 (jurisdiction over civil rights cases).  But Congress was not required to repeal those provisions to eliminate any redundancies—as Judge Posner has pointedly observed.  *See Winstead v. J.C. Penney Co.*, 933 F.2d 576, 580 (7th Cir. 1991) ("The legal mind craves an orderly legal universe—a seamless web of rationality—in which every word in a statute or in a contract or in a judicial opinion has a unique and indispensable function and in which there are no gaps and no redundancies.  Yet there are loads of gaps and redundancies in the law.").

be read as precluding "by negative implication" courts from exercising jurisdiction under Section 1331 over House subpoena enforcement actions.  *Connecticut Nat'l Bank*, 503 U.S. at 253; *see also United States v. Mohammed*, 693 F.3d 192, 199 (D.C. Cir. 2012).

Defendants (at 31) cite dictum from a 1981 D.C. Circuit decision that, "[p]rior to 1978 [when § 1365 was enacted] Congress had only two means of enforcing compliance with its subpoenas: a statutory criminal contempt mechanism and the inherent congressional contempt power." (quoting *In re Application of U. S. Senate Permanent Subcomm.*, 655 F.2d at 1238). They also cite (at 30-31) a similar statement from the legislative history of Section 1365. (quoting S. Rep. No. 95-170, at 16 ("Presently, Congress can seek to enforce a subp[o]ena only by use of criminal proceedings or by the impractical procedure of conducting its own trial before the bar of the House of Representatives or the Senate.")).  Those statements, however, simply reflect that Congress did not have broad authority to seek judicial enforcement of its subpoenas because Section 1331, at the relevant time, still contained an amount-in-controversy requirement for suits against private parties.  Indeed, the D.C. Circuit case Defendants cite involved a subpoena issued by a Senate subcommittee to a private individual, not a government official, thus requiring invocation of Section 1365 (then Section 1364).

*Finally*, the Executive Branch has acknowledged that Congress can sue to enforce its subpoenas under Section 1331.  In 1986, OLC concluded that the legislative history of Section 1365 counseled against any argument that its authority "provides the exclusive route for either House to bring a civil action to enforce its subpoenas, and thus, that no route exists for civil enforcement against an executive branch officer."  *Response to Congressional Requests for Information*, 10 Op. O.L.C. at 92 n.31.  OLC observed that the legislative history "specifically notes that the jurisdictional exception for executive branch subpoenas 'is not intended to be a

Congressional finding that the Federal courts do not now have the authority to hear a civil action to enforce a subpoena against an officer or employee of the Federal Government,' but rather was intended specifically to provide the Senate with a less drastic remedy than criminal contempt for refusals by *private* citizens to comply with subpoenas, and to avoid reliance on the Department of Justice to enforce such subpoenas." *Id.* (citing S. Rep. No. 170, 95th Cong., 2d Sess. 88-89 (1978)) (emphasis added).  Accordingly, OLC wrote, "although the civil enforcement route has not been tried by the House, it would appear to be a viable option." *Id.* at 88; *accord Prosecution for Contempt of Congress*, 8 Op. O.L.C. at 137 & n.36.  OLC was correct.

## II. THIS COURT SHOULD NOT DISMISS OR STAY THIS ACTION BECAUSE DEFENDANTS HAVE MADE CLEAR THAT ACCOMMODATION IS IMPOSSIBLE

Unable to establish that this Court lacks jurisdiction, Defendants urge the Court not to entertain the Committee's lawsuit until the parties have had a chance to pursue a compromise resolution.  The Court should reject Defendants' invitation.  The D.C. Circuit has countenanced such abstention—which constitutes a narrow exception to federal courts' "virtually unflagging obligation to exercise their jurisdiction," *Deakins v. Monaghan*, 484 U.S. 193, 203 (1988)—only in the rare circumstance when the record "demonstrates the proximity of the parties to a workable compromise." *AT&T I*, 551 F.2d at 385.  Here, the record demonstrates that no such compromise is possible.  Defendants' one-sided recitation of the exchanges between the Committee and Treasury are both incomplete and contrary to the allegations in the Complaint, which must be taken as true at this stage of the proceedings.[46]  But more fundamentally, that

---

[46] Defendants' abstention argument—like other abstention arguments—must be made pursuant to Fed. R. Civ. P. 12(b)(6), not 12(b)(1), because it urges the Court to refrain from exercising jurisdiction it possesses. *See* p. 16, *supra*.  The Court therefore should not consider Defendants' declarations in addressing this argument.

In any event, as the Complaint shows (¶¶ 63-79), Defendants have consistently blocked Congress's legitimate requests for the President's tax return information at every step.  And contrary to Defendants' assertion, the Committee did not sue immediately after Defendants

recitation mischaracterizes the nature of the Committee's inquiry, and it omits the fact that the President himself has ruled out accommodating the Committee's requests.

The Committee has made clear that it is seeking the President's returns and audit-file information not simply to assess the mandatory audit program in general, but also to assess whether the auditing of this President's returns has been subject to improper political influence and whether this President's tax situation suggests the need for revisions to the tax code. *See* Compl. ¶¶ 58-61, 79; pp. 10, 12-13, *supra*. For those purposes, the Committee has determined that it needs the President's actual returns and audit-file information. But both the President and his acting Chief of Staff have publicly announced that, as to those core materials, the Executive Branch's defiance will be absolute and that no compromise is possible. Defendants have followed suit. No further discussion will resolve an impasse dictated by the President himself.

As the Complaint alleges, the Committee "has multiple oversight and legislative purposes for seeking to review this material, including: (1) evaluating the IRS's Presidential audit program and its application to President Trump; (2) assessing the IRS's review of President Trump's tax law compliance; and (3) considering whether legislation is warranted on Presidential tax audits, tax return transparency, or other tax code provisions implicated by President Trump's returns, including through numerous already pending bills." Compl. ¶ 58. As the Complaint also alleges, during this process of requests and responses, "the Committee—through various investigative means—uncovered additional information indicating that the mandatory Presidential audit program might not be functioning effectively, in part, because of the absence of safeguards to protect IRS employees and the audit process itself from improper influence."

---

refused to comply with its subpoena; the Committee accepted Defendants' offer of a briefing, which produced little useful information. *See id.* ¶¶ 81-82. Defendants' argument on this point is peculiar, as they previously criticized the Committee's supposedly "leisurely pace" in bringing this lawsuit after Defendants rejected the subpoenas. Dkt. 33 at 11.

Compl. ¶ 79.  The Committee's concern about improper influences being brought to bear on the mandatory audit program has been heightened by the Committee's receipt on July 29 of an unsolicited communication from a federal employee setting forth credible allegations of "evidence of possible misconduct"—specifically, potential "inappropriate efforts to influence" the program.[47]

But the President has announced that no compromise is possible and that his subordinates, including Secretary Mnuchin, must defy the Committee.  On April 7—four days after Chairman Neal sent the Section 6103 request—Acting White House Chief of Staff Mick Mulvaney announced that the Committee would "never" receive President Trump's tax return information.[48]  On April 24, the President stated that his Administration's policy is to "fight[] all the subpoenas."[49]  The President has also stated that he will not permit his tax returns to be disclosed to the Committee while they remain under audit.  *See* Compl. ¶¶ 49-50.[50]

The case on which Defendants principally rely, *AT&T*, demonstrates the impropriety of abstention in this case.  In *AT&T I*, the D.C. Circuit refrained from resolving an interbranch conflict over a House committee's subpoena for documents concerning warrantless national security wiretaps, but only after highlighting "the proximity of the parties to a workable

---

[47] Tatelman Decl. Ex. QQ (Letter from Chairman Neal to Sec'y Mnuchin (Aug. 8, 2019)).

[48] *Exclusive: Mick Mulvaney on President Trump's border security push, growing tensions* with *House Democrats*, Fox News (Apr. 7, 2019, 6:00), http://tinyurl.com/MulvaneyFoxNews.

[49] Charlie Savage, *Trump Vows Stonewall of "All" House Subpoenas*, N.Y. Times (Apr. 24, 2019); *see also* Tom Hamburger et al., *Trump moves to resist House inquiries, setting up fight over congressional subpoena powers*, Wash. Post (Apr. 17, 2019); Donald Trump's War on Oversight, The Economist (May 9, 2019) ("Presidents have rebuffed requests, but none has done what Donald Trump has: declare 'We're fighting all the subpoenas', sue to block them and instruct officials to ignore them.").

[50] *See* Remarks by President Trump Before Marine One Departure, White House (Apr. 10, 2019, 9:28 AM), https://tinyurl.com/TrumpMarineOne.

compromise"—so much so that the court was able to "suggest the outlines of a possible settlement which may meet the mutual needs of the congressional and executive parties." 551 F.2d at 386, 385.  The parties had "c[o]me close to success" because they had already agreed on the documents the Committee would be permitted to review; the remaining gap concerned only "the means of verifying the accuracy and candor of the classifications and generic descriptions" in those documents.  *Id*. at 386-87.  When the D.C. Circuit considered the dispute a second time, it decided several threshold legal issues, but refrained from reaching the ultimate question because "[n]egotiation has narrowed … the gap between the parties."  *AT&T II*, 567 F.2d at 123.

*AT&T* offers several lessons for this case.  First, if the parties are close enough that the court can propose a workable compromise, it may refrain from resolving the dispute, but if "the parties reach an impasse," the court must "enter an order disposing of" the matter.  *AT&T I*, 551 F.2d at 385.  Second, if the parties are close to a compromise, then the court should proceed, as the D.C. Circuit did in *AT&T II*, to resolve threshold justiciability questions to give the parties further guidance in their interactions.  But the situation here contrasts starkly with that in *AT&T*.  Indeed, Defendants have not just refused to provide the requested information; they have proclaimed themselves *unable* to provide it, because OLC has concluded that doing so would be unconstitutional and possibly a criminal offense in violation of the confidentiality provisions of Section 6103.[51]  The parties' impasse could not be more definitive.

Consistent with the framework established in *AT&T I*, the *Miers* court correctly rejected the argument that the "federal judiciary should not enter into this dispute between the political

---

[51] *See Congressional Committee's Request for the President's Tax Returns Under 26 U.S.C. § 6103(f)*, 43 Op. O.L.C. ---, slip op. at 3 (June 13, 2019), https://www.justice.gov/olc/file/1173756/download ("In the absence of a legitimate legislative purpose, the disclosure of the President's tax returns to the Chairman was barred by section 6103(a) and the Constitution.").

branches." 558 F. Supp. 2d at 95. *Miers* noted that the "judiciary has a long history of deciding cases that involve various separation of powers issues" including "congressional subpoena disputes between the executive and legislative branches," and that the "historical record … suggests that the political branches have negotiated with one another against the backdrop of presumptive judicial review, mindful of that very real possibility." *Id.* at 95-96.[52]

It should have come as no surprise to Defendants that the Committee filed this lawsuit after Defendants unequivocally stated their refusal to comply with its request and subpoenas under any circumstances.[53] Given the President's flat refusals to permit disclosure of his returns to the Committee, the OLC opinion effectively forbidding Treasury from complying with the Committee's requests, and Defendants' own statements and actions, there is no reasonable prospect of an accommodation and therefore no basis for the Court to refrain from exercising its jurisdiction.

---

[52] Defendants claim (at 42) that this case stands in "stark contrast to *Miers*, where the Court noted that 'no rush to the courthouse by either political branch [was] evident.'" They misread *Miers*, which observed that adjudicating that case would not "open the floodgates for similar litigation that would overwhelm the federal courts and paralyze the accommodations process between the political branches" because prior cases had "paved the way for claims of this type," and yet there were "very few lawsuits brought in federal court raising this issue— certainly no rush to the courthouse by either political branch is evident." 558 F. Supp.2d at 96.

[53] Defendants' reliance (at 38) on *Chenoweth v. Clinton*, 181 F.3d 112 (D.C. Cir. 1999), and *Vander Jagt v. O'Neill, Jr.*, 699 F.2d 1166 (D.C. Cir. 1982), is particularly misplaced. Those cases, unlike this one, involved suits by individual legislators, not a committee acting under the authority of the House. *See* p. 24, *supra* (discussing *Chenoweth*). In *Vander Jagt*, individual Republican members of the House sued the Democratic leadership for allegedly diluting the power of House Republicans. The court concluded, without denying its own jurisdiction, that it would decline to adjudicate the case because it would be a "'startlingly unattractive' idea, given our respect for a coequal branch of government, for us 'to tell the Speaker of the … House of Representatives how many Democrats, and perhaps even which Democrats, he is to appoint to the standing committees, and perhaps to each such committee." *Vander Jagt*, 699 F.2d at 1176. No similar situation is presented here; indeed, *denying* jurisdiction over this case on the ground that the House has not authorized this lawsuit would infringe on the House's constitutionally-based rulemaking power.

**III.     THE COMPLAINT STATES VALID CLAIMS FOR RELIEF**

**A.     The Committee Is Entitled To Seek Judicial Enforcement Of Its Subpoenas**

Defendants argue (at 44-47) that, because Congress has not created a specific section of the United States Code authorizing Congressional enforcement of subpoenas, Congress has no means by which it can vindicate its constitutional authority to secure information through compulsory process.  That argument was rejected in *Miers* and *Holder*, and this Court should reject it as well.  As those courts recognized, Congress has several sources of authority on which it can draw to obtain judicial enforcement of its subpoenas—Article I itself, the courts' traditional equitable power to enjoin unlawful governmental action, and the Declaratory Judgment Act, 28 U.S.C. § 2201-2202.

**1.     The Committee Can Seek Relief Directly under Article I**

Just as Article I provides each House of Congress an implied power to issue compulsory process in furtherance of its investigations, *see, e.g.*, *McGrain*, 273 U.S. at 175, so too it grants each House of Congress a right to seek judicial redress of conduct that interferes with the discharge of its legislative functions.  To hold otherwise would hamstring Congress's right of "self-defence" that the Supreme Court recognized in *Anderson v. Dunn*, 19 U.S. 204, 230 (1821).  *See* pp. 28-31, *supra* (discussing how courts and OLC have found the only alternatives, inherent contempt and criminal prosecution, infeasible).  *Anderson* acknowledged that the Constitution does not expressly grant Congress the right to punish contempt by non-Members, but it noted that "[t]here is not in the whole of [the Constitution], a grant of powers which does not draw after it others, not expressed, but vital to their exercise."  *Id.* at 225-26.  A century later, the Court, in *Marshall v. Gordon*, 243 U.S. 521 (1917), the Court reaffirmed Congress's right to punish contempt and explained that the contempt power is "but a force implied to bring into

existence the conditions to which constitutional limitations apply …. [I]t rests solely upon the right of self-preservation to enable the public powers given to be exerted." *Id.* at 541-42.

As Judge Bates discussed in detail in *Miers*, 558 F. Supp. 2d at 88-94, the same logic counsels in favor of recognizing that Congress possesses an implied power to enforce its subpoenas in civil actions. If Congress has the power to arrest and detain a contumacious subpoena recipient, then Congress can take the more modest route of applying to the courts for relief. Moreover, "the judiciary is clearly discernible as the primary means through which [constitutional] rights may be enforced," and consequently, " [a]t least in the absence of a 'textually demonstrable constitutional commitment of [an] issue to a coordinate political department, [one] may presume that justiciable constitutional rights are to be enforced through the courts." *Miers*, 558 F. Supp. 2d at 88 (quoting *Davis v. Passman*, 442 U.S. 228, 241 (1979)).

Defendants contend (at 44) that *Reed v. County Commissioners of Delaware County, PA*, 277 U.S. 376 (1928), held that Congress's Article I power to compel the production of evidence does not support an Article I right to seek a judicial remedy for noncompliance. *Reed* held no such thing. In *Reed*, a Senate committee filed suit to enforce a subpoena for ballot boxes following a disputed Senatorial election. The question presented was whether the federal courts had *jurisdiction* to hear the case under 28 U.S.C. § 41(1), which then provided the district courts with jurisdiction "of all suits of a civil nature, at common law or in equity, brought by the United States, or by *any officer thereof authorized by law to sue*." 277 U.S. at 386 (emphasis added). The Court determined that, absent an empowering action by the full Senate, the Committee had not been "authorized by law to sue" within the meaning of § 41(1). *Id.* at 389. But in this case, the House *has* authorized the Committee to sue. *See* pp. 32-36, *supra*. *Reed* said nothing to suggest that, in such a circumstance, a Congressional committee could not invoke Article I to

seek judicial enforcement of its subpoenas.  In fact, one day after *Reed* was decided, the Senate

passed a resolution authorizing the committee to file suit.  *See* S. Res. 262, 70th Cong. (1928).

Given that the only action the Senate took in *Reed*'s wake was to authorize the Committee to sue,

as was required for jurisdiction under § 41(1), the Senate plainly understood itself already to

have a cause of action.

In contending (at 46-47) that it would be improper for the Court to imply a right of action

under Article I because "it is up to Congress to create federal causes of action," Defendants rely

on decisions addressing whether *private* parties have the right to resort to federal court to enforce

federal *statutes*.  Those decisions are readily distinguishable.  In enacting federal statutes,

Congress has the authority to determine the scope of any right, benefit, or privilege that it may

bestow on private parties, as well as the mechanisms through which such rights, benefits, or

privileges may be enforced.  Consequently, when a private plaintiff seeks to enforce a federal

right in court, courts must determine whether Congress intended to create private rights at all

and, if so, whether it intended to allow private plaintiffs to enforce those rights.  A key factor in

the latter analysis is whether Congress chose to protect the rights through means other than

private litigation—for instance, through agency enforcement.  *See, e.g., Alexander v. Sandoval*,

532 U.S. 275, 286-90 (2001); *Gonzaga Univ. v. Doe*, 536 U.S. 273, 287-89 (2002).  Those

decisions shed no light on whether the Houses of Congress have a cause of action to enforce

their *constitutional* right to compel testimony and the production of documents.  *See Davis*, 442

U.S. at 241 ("[T]he question of who may enforce a statutory right is fundamentally different

from the question of who may enforce a right that is protected by the Constitution.").

## 2.      The Committee Can Invoke the Federal Courts' Traditional Equity Powers

The Committee can also look to the long-established equitable powers of the federal courts to grant relief against unlawful conduct by Executive Branch officials—one of the historic functions of courts of equity—even in the absence of a statutory cause of action.[54]

Executive Branch officials are constitutionally obligated to comply with Congressional subpoenas absent a lawful excuse.  The Houses of Congress possess a "power of inquiry … as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." *Eastland*, 421 U.S. at 504 & n.15 (internal quotation marks omitted).  In recognizing Congress's right to use compulsory process to vindicate its power to investigate, the Supreme Court emphasized that all citizens have an "unremitting obligation" to testify and produce documents in response to a valid subpoena.  *Watkins*, 354 U.S. at 187.  Here, the Committee alleges that Defendants have unlawfully failed to comply with subpoenas issued in aid of the Committee's legitimate legislative activities, and the Committee seeks only declaratory and injunctive relief.  *See* Compl. ¶¶ 7-9, 18-22, 46, 72-78, 99-104; Prayer for Relief.  The Committee has the right to seek, and this Court has the power to grant, such relief.

Defendants argue (at 46) that courts' equitable powers may be exercised only when "the 'relief … requested was traditionally accorded by courts of equity,'" (quoting *Grupo Mexicano de Desarrolo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)), and that "the Committee's attempt to use a civil lawsuit to force the disclosure of information held by the Executive Branch has no historical foundation, much less a strong tradition in equity."  Defendants' focus on the

---

[54] *See, e.g.*, *Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378, 1384-85 (2015) (recognizing "[t]he power of federal courts of equity to enjoin unlawful executive action"); *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (plaintiffs entitled to seek injunctive relief against government action that allegedly violated Appointments Clause and separation-of-powers principles, even absent statutory cause of action); *see also Ex Parte Young*, 209 U.S. 123, 149, 165, 167 (1908).

historical practice of Congressional subpoena-enforcement suits is far too narrow; none of their cases suggests that a plaintiff must be able to point to a precisely similar case in historic equity practice.  What matters is that federal courts of equity have traditionally accorded declaratory and injunctive relief when Executive officials act contrary to or in excess of federal law.[55]

Defendants invoke (at 46) the statement in *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856 (2017), that "judicially inferring a cause of action that goes beyond 'traditional equitable powers' is a 'significant step under separation-of-powers principles.'"  That observation has no application here.  *Abbasi* considered whether to recognize an implied *damages* remedy for violations of the plaintiffs' constitutional rights.  Damages were not traditionally available in courts of equity.  And in fact, the Court noted that, "[w]hen determining whether traditional equitable powers [*i.e.*, declaratory and injunctive relief] suffice to give necessary constitutional protection—*or whether, in addition*, a damages remedy is necessary—there are a number of economic and governmental concerns to consider."  *Id.* at 1856 (emphasis added).  *Abbasi* thus recognizes that courts possess traditional equitable powers to enforce the Constitution.

Defendants (at 46) also recycle their argument that 28 U.S.C. § 1365, which authorizes *Senate* committees to sue to enforce their subpoenas in certain circumstances, displaces federal courts' traditional equitable powers to afford similar relief to *House* committees—a surprising argument for Defendants to make, given that their Article III standing arguments would lead to the conclusion that Section 1365 is unconstitutional.  But in any event, as explained above (p. 38, *supra*), Section 1365 says nothing about House subpoenas, and its enactment history shows that

---

[55] *See Exceptional Child Ctr.,* 135 S. Ct. at 1384-85 (Court has long held that federal courts may grant injunctive relief against federal officials violating federal law); *see also, e.g.*, *Carroll v. Safford*, 44 U.S. 441, 463 (3 How. 441) (1845) ("[W]e entertain no doubt, that in a proper case, relief may be given in a court of equity[] … to prevent an injurious act by a public officer.").

it was directed to a specific problem with no bearing on courts' broader authority to afford relief when a respondent refuses to comply with a House subpoena.  Nothing indicates Congress intended Section 1365 to displace courts' historic equity powers.

### 3.     The Committee Can Obtain Declaratory Relief

The Declaratory Judgment Act (DJA) also supplies the Committee with a basis to seek a judicial declaration regarding the validity of its subpoenas.  Pursuant to the DJA, a plaintiff may seek a declaration of its "rights and other legal relations" if it can show: (1) there is an "actual controversy"; (2) the court has jurisdiction; and (3) the plaintiff has filed an "appropriate pleading."  28 U.S.C. § 2201.  Those requirements are satisfied here.  The case presents an "actual controversy," *see* pp. 17-21, *supra*; the Court has jurisdiction, *see* pp. 36-43, *supra*; and the Committee has filed an "appropriate pleading," *i.e.*, its Complaint.  The Committee is therefore entitled to a declaration from this Court regarding its "rights and other legal relations" in relation to its subpoenas.  *See Miers*, 558 F. Supp. 2d at 78; *Holder*, 979 F. Supp. 2d at 22.

Defendants contend (at 47) that the DJA does not provide a "cause of action" and that the DJA only enlarges the remedies available for claims otherwise properly in federal court.  That argument misstates the function of the DJA.  Although the DJA does not create substantive rights, it does provide a mechanism for plaintiffs to seek a declaration vindicating rights guaranteed elsewhere—here, in Article I and Section 6103(f).  The DJA expressly states that a court may declare parties' "rights" and "legal relations" in a case involving an "actual controversy" and within the court's jurisdiction, "*whether or not further relief is or could be sought*."  28 U.S.C. § 2201(a) (emphasis added); *see Miers*, 558 F. Supp. 2d at 80.

The Supreme Court has never expressed any doubt that a party meeting the DJA's requirements is entitled to seek declaratory relief.  It has emphasized only two limitations.  First, the DJA does not provide district courts with an independent source of *jurisdiction*.  *Schilling v.*

*Rogers*, 363 U.S. 666, 677 (1960) (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667,

671 (1950)).  Second, the DJA may be invoked only when there is an actual, immediate

controversy; it cannot be used to "secur[e] an advisory opinion in a controversy which has not

arisen."  *Coffman v. Breeze Corp.*, 323 U.S. 316, 324 (1945).  Here, there is undoubtedly an

actual and immediate controversy between the Committee and Defendants.[56]  And in similar

cases, two judges in this District have concluded, in thorough opinions, that the DJA provides a

basis to adjudicate a House Committee's "rights" with respect to a subpoena issued to an

executive official.  *See Miers*, 558 F. Supp. 2d at 78-88; *Holder*, 979 F. Supp. 2d at 22-24.

Defendants rely (at 47) on statements from D.C. Circuit decisions suggesting that the

DJA does not provide a "cause of action."  But those cases, understood in context, go no further

than reaffirming that the DJA is itself not a source of substantive rights and may not be used to

circumvent other limits that Congress has placed on district courts' authority.[57]  Those decisions

do not undermine the long-settled understanding that the DJA provides a mechanism for the

---

[56] The Supreme Court has often acknowledged that the DJA may provide a basis for a plaintiff's entry into court.  *See Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937) (DJA permits insurance company to seek judicial declaration that several of defendant's policies had lapsed and that insurer was responsible only for minimum payment); *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191 (2014) (DJA permitted licensee to sue patentee and seek declaration that its products were not infringing).  The D.C. Circuit has likewise recognized that the DJA enables a plaintiff to enter court to seek a declaration regarding its "rights" and "legal relations."  *See, e.g., Shelby County, Ala. v. Lynch*, 799 F.3d 1173, 1183 (D.C. Cir. 2015) (28 U.S.C. § 1331 and DJA provided "adequate authorization for any attack on the [Voting Rights Act's] constitutionality."); *Davis v. U.S. Sentencing Comm'n*, 716 F.3d 660 (D.C. Cir. 2013) (prisoner could seek declaration that his sentence violated Equal Protection Clause).

[57] *See Ali v. Rumsfeld*, 649 F.3d 762 (D.C. Cir. 2011) (stating DJA does not provide a "cause of action," after court had already rejected plaintiffs' claims pertaining to each of the substantive rights asserted); *C&E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth.*, 310 F.3d 197, 201-02 (D.C. Cir. 2002) (explaining federal courts may not declare a plaintiff's rights under a federal statute when Congress intended the statute to be enforced through other means, such as through a judicially unreviewable administrative hearing).  Defendants also cite *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667 (1950), but that decision states only that the DJA does not expand courts' *jurisdiction*.  *See id.* at 671-672.

courts to resolve the legal rights and obligations of parties, as long as those rights and obligations are established elsewhere.  Here, those rights and obligations are established in Article I and in Section 6103(f).  Nothing more is needed for the DJA to be available in this case.

### B.  The Committee May Challenge The Secretary's Action Under The APA

The Administrative Procedure Act ensures that Executive Branch officials must adhere to the rule of law—that "the statutes of Congress are not merely advisory when they relate to administrative agencies."  H. Rep. No. 79-1980, at 41 (1946).  The APA accordingly provides a broad right to sue to any party aggrieved by an agency's unlawful or action, and it establishes a "strong presumption" that agency action is subject to judicial review.  *Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 670 (1986); *accord Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967).  Defendants cannot overcome that presumption here.

### 1.  APA Review Here Is Not Precluded

The APA creates a "strong presumption that Congress intends judicial review of administrative action."  *Bowen*, 476 U.S. at 670; *see Sackett v. EPA*, 566 U.S. 120, 128 (2012).  Overcoming that presumption and establishing that a particular statute "precludes judicial review" under the APA, 5 U.S.C. § 701(a)(1), requires a showing of some "specific congressional intent," as judicial review "will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress."  *Bowen*, 476 U.S. at 670.  Defendants thus bear the "heavy burden" to demonstrate such congressional intent with respect to the agency action at issue.  *Id*. at 672.  Where there is "doubt" about Congress's "preclusive purpose," the presumption in favor of APA review is "controlling."  *De Jesus Ramirez v. Reich*, 156 F.3d 1273, 1276 (D.C. Cir. 1998).  And that presumption gains even more force "where a finding of preclusion could foreclose all meaningful judicial review" of the agency action at issue.  *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212-13 (1994).

Defendants come nowhere close to carrying their burden.  Defendants do not even attempt to argue (as they must) that that their preclusion theory has any connection to the particular agency action that is at issue in this case.  *See, e.g.*, *Koretoff v. Vilsack*, 614 F.3d 532, 536 (D.C. Cir. 2010) (question is whether "'Congress precluded all judicial review' *of the agency action*" (emphasis added)).  They never mention Section 6103 or explain how Congressional intent to preclude review can be discerned from "the structure of [that] statutory scheme, its objectives, its legislative history, [or] the nature of the administrative action involved."  *Block v. Community Nutrition Inst.,* 467 U.S. 340, 348 (1984).

*Block*, on which Defendants heavily rely, actually demonstrates why there is no preclusion here.  The statute at issue in *Block* established a comprehensive regulatory scheme, complete with an internal appeals process, through which the Department of Agriculture and milk producers worked to set minimum milk prices.  467 U.S. at 345-48.  Milk *consumers* brought an APA action, challenging certain payment rules under the Act's scheme that they claimed made milk more expensive.  *Id.*  The Court explained that, because the Act expressly and exclusively provided *producers* with a means to challenge the Agriculture Department's price-setting rules, an APA lawsuit *by consumers* was precluded; any other result would have been incompatible with, and disrupted, the regulatory scheme.  *Id.* at 348.[58]  The same reasoning

---

[58] *See also Sackett*, 566 U.S. at 129-30 (rejecting argument that APA review was precluded in a case that was "not analogous" to *Block*; "Where a statute provides that particular agency action is reviewable at the instance of one party, who must first exhaust administrative remedies, the inference that it is not reviewable at the instance of other parties, who are not subject to the administrative process, is strong."); *De Jesus Ramirez*, 156 F.3d at 1276 (distinguishing *Block* because it was a case "where the statute itself set forth a regulatory regime that omitted mention of certain parties, giving rise to an inference that those parties were precluded from litigating in court").

governed in the other cases Defendants cite (at 49-50):  The statutory scheme creating the legal

process at issue was incompatible with the APA litigation over that process.[59]

This case could not be more different than *Block*.  Here, the statutory scheme expressly

and exclusively accords the Committee (and two other Congressional committees) a right to

request tax returns and return information, which the Secretary in turn "shall furnish."  26 U.S.C.

§ 6103(f)(1).  Far from being precluded by the process set forth in Section 6103, a right of action

under the APA *complements* that process, by helping to ensure that its aims are accomplished

and that the mandatory duty to comply that it places on the Secretary is "not merely advisory."

H. Rep. No. 79-1980, at 41 (1946).

Defendants refer (at 48-51) to a "panoply of statutes" that govern the contempt and

subpoena enforcement processes, which they argue must provide the only means for Congress to

obtain information.  Their argument is difficult to square with their simultaneous contention (at

44-47) that the Committee's subpoenas are unenforceable—which itself is another consideration

*favoring* APA review, given the strong presumption that Executive action should not be

unreviewable.  *See Thunder Basin*, 510 U.S. at 212-13.  But in any event, Defendants never

explain why the existence of the subpoena and contempt processes precludes APA review in the

circumstances presented by this case.  The contempt and subpoena processes are tools

Congressional committees may use to seek many kinds of information from private individuals,

---

[59] *See also Heikkila v. Barber*, 345 U.S. 229, 234 (1953) (APA litigation over deportation proceedings was precluded where 1917 immigration law that predated the APA had been consistently interpreted to preclude such judicial review).  Similarly, the court in *Armstrong v. Bush* held that the Presidential Records Act was not enforceable under the APA because "[p]ermitting judicial review of the President's compliance with the PRA would upset the intricate statutory scheme Congress carefully drafted to keep in equipoise important competing political and constitutional concerns."  924 F.2d 282, 290 (D.C. Cir. 1991).  Moreover, in that case, the D.C. Circuit held that the APA did not apply to the President in any case, *see id.* at 288; allowing judicial review of the President's actions under a separate statute would have allowed an end-run around the APA's limitations on review.

corporations, and government officials alike.  Section 6103, by contrast, establishes a specific

right to obtain a particular type of information that is and always has been vested only in

particular committees.  The use of the APA to enforce that specific right does not affect, let alone

interfere with, the separate subpoena process—or any other means by which Congressional

committees might gather information in other contexts.  That Congress may have other

information-gathering tools cannot be sufficient to preclude judicial review under the APA.[60]

Nor does it matter for purposes of determining whether an APA action is precluded that Section

6103 (like so many other statutes) does not contain an express right of action.[61]

### 2.    The Secretary's Refusal of a Section 6103 Request Is "agency action"

Defendants' "final" refusal (*see* Compl., Exs. I & J) to produce tax returns and audit-file

information in response to the Committee's Section 6103 request is "agency action" under the

APA.  The APA defines "agency action" as "includ[ing] the whole or a part of an agency rule,

order, license, sanction, relief, *or the equivalent or denial thereof, or failure to act*."  5 U.S.C.

§ 551(13) (emphasis added); *see also* 5 U.S.C. § 701(b)(2).  That capacious definition is "meant

to cover comprehensively *every manner* in which an agency may exercise its power."  *Whitman*

*v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 478 (2001) (emphasis added).  "Almost any action

taken by an agency is either a rule, an order, an adjudication or 'the equivalent ... thereof,' 5

U.S.C. § 551(13), which, if final, is subject to judicial review."  *Milk Indus. Found. v. Glickman*,

949 F. Supp. 882, 893 (D.D.C. 1996).  And that broad definition of "agency action" is in keeping

---

[60] *Cf. Sackett*, 566 U.S. at 129-130 ("[I]f the express provision of judicial review in one section of a long and complicated statute were alone enough to overcome the APA's presumption of reviewability for all final agency action, it would not be much of a presumption at all.").

[61] *See, e.g.*, H. Rep. No. 79-1980, at 41 (1946) ("The mere failure to provide specially by statute for judicial review is certainly no evidence of intent to withhold review.").

with the fundamental rule, noted already, that final decisions by Executive officials are presumptively reviewable under the APA.  *E.g.*, *Bowen*, 476 U.S. at 670.

The Secretary's refusal to comply with the Committee's Section 6103 request fits comfortably within the APA's definition of "agency action," 5 U.S.C. § 551(13), in several ways:  It qualifies as an "order" that the IRS will refuse compliance with the request; a "rule" that such requests must come with a statement of legitimate legislative purpose; the "equivalent" of such an order or rule; a "denial" of relief requested by the Committee; and a "failure to act" when legally required to do so.  The Secretary's final determination that he will not do what the law requires (and will prevent the IRS from doing what the law requires) is thus prototypical agency action.[62]

Defendants contend (at 52) that "agency action" simply "does not extend to interactions arising solely between Congress and the Executive Branch."  They offer no authority for that proposition.  In *Natural Resources Defense Council, Inc. v. Hodel*, 865 F.2d 288 (D.C. Cir. 1988), the court of appeals held that an agency's fulfilment of an ongoing congressional reporting requirement—that is, one of the provisions, present in hundreds of statutes, that require Executive Branch officials to provide periodic reports to congressional committees—*may* not be "agency action."  *Id.* at 318.  But *Hodel* and the other reporting-requirement cases cited by Defendants (at 53) have no application to a statute such as Section 6103(f), which endows a particular committee with a right of access to particular documents held by an Executive Branch

---

[62] At least one district court has found a refusal based on Section 6103 to be agency action.  In *Branch Int'l Servs., Inc. v. United States*, 905 F. Supp. 434 (E.D. Mich. 1995), a plaintiff subpoenaed testimony and documents from the IRS, and the IRS District Director refused to comply, citing Section 6103(c)'s exception to disclosure when disclosure would "seriously impair Federal tax administration."  The plaintiff challenged that decision under the APA, and the district court concluded that "the decision of the District Director not to comply with the subpoena constitutes an adverse 'agency action' under the APA."  *Id.* at 438.

department. *Hodel* made that point explicit: "[A] reporting-to-Congress obligation is *entirely different* than a congressionally imposed requirement that an Executive Branch department or agency gather information and make that information, upon compilation, publicly available." *Id.* at 317 n.30 (emphasis added).[63]

Moreover, as the decisions on which Defendants rely make clear, routine reporting requirements might not be "agency action" when they do not impose "legal consequences" or "determinative or coercive effect[s]." *Guerrero v. Clinton*, 157 F.3d 1190, 1195 (9th Cir. 1988). Routine reporting requirements rarely have any direct effect on any individual's or entity's legal rights or obligations, and so it would be difficult for anyone to mount a challenge to an agency's failure to comply with such a reporting obligation. But Section 6103(f) *does* create specific rights in the tax-writing committees to receive tax returns and return information on request, and imposes on Treasury a legal obligation to provide that information when requested. Defendants' refusal nullified the Committee's right to receive the information in a concrete and particularized way that may be challenged in court.[64]

### 3.  The Committee Is a "person aggrieved" by the Secretary's Conduct

Defendants' final argument is that the Committee is not a "person aggrieved" that is entitled to seek review under the APA. The text of the statute refutes that argument. The APA guarantees to any "person suffering legal wrong because of agency action, or adversely affected

---

[63] Even with respect to reporting requirements, the court in *Hodel* explained that it was not addressing an outright refusal to comply; "the contention [was] not that the Secretary failed entirely to report back to Congress …, but that the Secretarial response lacked the requisite 'detail,'" a problem that Congress itself could most easily remedy. 865 F.2d at 318. Indeed, the court expressly stated that it was *not* "pass[ing] on the broad, theoretical question whether an interbranch reporting requirement can ever be reviewable in the absence of an express provision for judicial review." *Id.* at 318 n.33.

[64] *See* Mem. 4-7 (describing history of confidentiality protections for tax returns and characterizing the Secretary and the IRS Commissioner as the "gatekeepers of federal tax information" (quoting *Tax Analysts v. IRS*, 117 F.3d 607, 613 (D.C. Cir. 1997))).

or aggrieved by agency action" a right "to judicial review thereof."  5 U.S.C. § 702.  Congress

defined the term "person" expansively, offering a non-exhaustive list of "persons" who may

bring APA suits that explicitly "includes" "public … organization[s]."[65]  Congressional

committees are certainly "public organizations."  Congress specified only one kind of entity that

is not a "person"—an "agency"—and then provided a statutory definition for the latter term that

expressly "does not include … the Congress." *Id.* § 701(b)(1)(A).  Congress knew how to

exempt itself from being sued under the APA and would have provided a similar carve-out if it

had also wished to preclude itself from suing as a "person."  It did not do so.[66]

Defendants cite (at 54) *Director, Office of Workers' Compensation Programs v. Newport
News Shipbuilding*, 514 U.S. 122 (1995), as supporting a "'universal assumption' that laws

authorizing suits by 'person[s] adversely affected or aggrieved' are generally intended to redress

injuries of 'private parties.'"  But *Newport News* involved an APA suit brought by an "agency

acting in its governmental capacity."  *Id.* at 129-30.  Thus, *Newport News* only confirms that

Executive Branch agencies may not sue under the APA.  *Newport News* says nothing about

legislative bodies such as Plaintiff.

Case law supports the conclusion, consistent with the text, that Congressional committees

are "persons" who may sue under the APA when they are "aggrieved" by agency action.  *U.S.*

---

[65] 5 U.S.C. § 701(b)(2) ("person" includes "an individual, partnership, corporation, association, or public or private organization other than an agency"); *see Burgess v. United States*, 553 U.S. 124, 133 n.3 (2008) ("[T]he word 'includes' is usually a term of enlargement, and not of limitation." (quotation marks omitted)).

[66] That Defendants "are not aware of any instance … in which either house of Congress … invoked the APA to seek relief against the Executive Branch" (Mem. 48) is neither surprising nor relevant.  The U.S. Code contains few provisions like Section 6103(f), which require agency officials to provide particular Congressional committees with specific types of documents.  Even fewer are the circumstances in which agency officials have violated those provisions.  And it is hardly extraordinary that the availability of the APA to remedy a violation of Section 6103(f) has not been tested before, given that, in the almost 100 years that Section 6103(f) and its predecessors have been on the books, Treasury officials have never before refused a request.

*House of Representatives v. Burwell*, 130 F. Supp. 3d 53 (D.D.C. 2015), squarely rejected

Defendants' argument, correctly concluding that the House is a "person" who can litigate against

an Executive department under the APA.  *Id.* at 78.  The D.C. Circuit has also construed the term

"person" in the APA to include various governmental bodies.  As the D.C. Circuit explained in

holding that a Maryland agency "could be considered a 'public … organization'" under Section

551(2), there is "no warrant for reading into … § 551(2) a limitation on the term 'person' that

Congress neither put there nor demonstrated any intention to put there."  *Maryland Dep't of*

*Human Res. v. Dep't of Health & Human Servs.*, 763 F.2d 1441, 1445 n.1 (D.C. Cir. 1985); *see*

*also Government of Manitoba v. Bernhardt*, 923 F.3d 173, 181 (D.C. Cir. 2019).[67]

Defendants argue (at 55) that if a Congressional committee is a "person" under the APA,

then it might be allowed to engage in other forms of administrative practice under the APA, such

as "involving itself in the processes by which agencies administer regulatory schemes."  But the

kind of legislative action disapproved in *Bowsher v. Synar*, 478 U.S. 714 (1986), and *Consumer*

*Energy Council of America v. FERC*, 673 F.2d 425 (D.C. Cir. 1982), was starkly different than

the kinds of actions persons may take under the APA, such as commenting on draft regulations.

In those cases, Congress exercised unilateral "control" over agency action.  *Bowsher*, 478 U.S. at

734 (Congressional appointee wielding Executive authority); *Consumer Energy Council*, 673

F.2d at 471 (one-house veto over agency regulations).  Submitting comments in the rulemaking

process would give Congress no similarly improper control over Executive Branch action.

---

[67] Defendants cite (at 54) *United States v. Mine Workers*, 330 U.S. 258 (1947), and *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765 (2000), for the proposition that "the word 'person' in a statute is generally presumed not to include an instrumentality of a sovereign, absent affirmative indication otherwise."  Of course, here, Congress *did* indicate otherwise by including "public ... organization[s]" in Section 551(2).  And the recent decision by the D.C. Circuit in *Government of Manitoba* similarly confirms that sovereigns can be persons for APA purposes.  923 F.3d at 181.

Moreover, other doctrines prevent Congress from overstepping its role.  Congress or its committees will rarely be "aggrieved" by agency action and will rarely fall in the "zone of interests" protected by a statute, when private parties are able to protect their interests.  *E.g.*, *Bennett v. Spear*, 520 U.S. 154, 163 (1997).  But this is the rare case in which a Congressional committee is *exactly* the person aggrieved by unlawful agency action.  Enforcing Section 6103 through an APA action is therefore consistent with the APA's text and purpose.[68]

### C.    Mandamus Is Available Here

The Committee is also entitled to seek mandamus under 28 U.S.C. § 1361.  Relief under Section 1361 is available if "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff."  *Council of and for the Blind of Del. Cty. Valley, Inc. v. Regan*, 709 F.2d 1521, 1533 (D.C. Cir. 1983) (en banc).  The standards for compelling agency action under Section 706(1) of the APA and mandamus are essentially the same.[69]

The Committee's right to relief is plain.  Section 6103(f)(1) establishes the Committee's right to receive tax returns and return information upon request, and the Secretary has a nondiscretionary duty to provide such information.  The Secretary thus "failed to take a *discrete* … action that [he was] *required to take*."  *See Norton*, 542 U.S. at 64.  Because the Committee has a clear right to the requested information and the Secretary has demonstrated "'recalcitrance … in the face of a clear statutory duty,'" this Court should "order the agency to act to carry out its substantive statutory mandates."  *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987).

---

[68] *Cf. PDK Labs. Inc. v. U.S. DEA*, 362 F.3d 786, 792 (D.C. Cir. 2004) ("Very rarely has Congress withheld judicial review from those who have suffered an Article III injury at the hands of an administrative agency.").

[69] *See Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 63- 64 (2004); *Shoshone Bannock Tribes v. Reno*, 56 F.3d 1476, 1480 n.3 (D.C. Cir. 1995) (court would "reach the same result whether we label the relief sought as mandamus or as a mandatory injunction [under the APA].").

### D.        The Committee Can Obtain Relief Through Non-Statutory Review

Even if the APA and Section 1361 did not afford the Committee a right of action, the Court may and should compel Defendants to comply with the Committee's requests and subpoenas, either under Section 6103 or under principles of non-statutory judicial review. Section 6103 itself entitles the Committee to equitable relief to enforce Defendants' mandatory duty under Section 6103(f) to furnish it with the requested information. Congress enacted Section 6103(f) in an exercise of its constitutional powers. Defendants' flouting of Section 6103(f)'s directive threatens to thwart those powers, and the Committee is entitled to equitable relief vindicating its authority. As the Supreme Court has made clear on numerous occasions, even absent an express statutory cause of action, courts are empowered to issue injunctive relief to ensure that the proper exercise of governmental authority is not stymied by obstruction.[70]  As the Supreme Court recently reaffirmed, "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England."  *Exceptional Child Ctr.*, 135 S. Ct. at 1384. That principle applies here, where Defendants are second-guessing a Congressional committee's articulated reasons for seeking information and issuing subpoenas—a position that threatens to abridge Congress's powers under Article I.

---

[70] *See, e.g.*, *In re Debs*, 158 U.S. 564, 584 (1895) ("Every government, intrusted by the very terms of its being with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of one and the discharge of the other[.]"); *Wyandotte Transp. Co v. United States*, 389 U.S. 191, 204 (1967) (federal court may issue relief against obstruction of navigable waters); *see also Arizona v. United States*, 567 U.S. 387, 415 (2012) (on challenge by United States, enjoining state restrictions preempted by federal law); *NLRB v. Nash-Finch Co.*, 404 U.S. 138, 142 (1977) (NLRB, "though not granted express statutory remedies, may obtain appropriate and traditional ones to prevent frustration of the purposes" of NLRA); *United States v. Republic Steel Corp.*, 362 U.S. 482, 492 (1960) (approving right of action for injunctive relief "even though Congress had not given specific authority" where "United States had an interest to protect or defend").

Alternatively, the Committee is entitled to non-statutory review of Defendants' refusal to comply with Section 6103(f).  Courts have applied a "general presumption of reviewability" when a plaintiff is unable to challenge executive action based on a statute.  *See, e.g.*, *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996).  "The message of this line of cases is clear enough:  courts will ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command."  *Id.* at 1328 (internal quotations marks omitted).[71]

To obtain non-statutory review, three requirements must be met:  "(i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory."  *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019).  No statute expressly precludes judicial review of Defendants' refusal to follow Section 6103(f)'s mandatory directive.  If the Court were to find that the Committee cannot obtain relief under the APA, mandamus, or Section 6103(f), then the second requirement for non-statutory review would be satisfied.  As to the third requirement, it is clear that Defendants have acted contrary to Section 6103(f)'s specific command that "the Secretary *shall* furnish" (emphasis added) the Committee with the returns and return information requested and have "plainly" misconstrued their authority to question the legitimacy of the Committee's purpose in seeking such information.

## CONCLUSION

The motion to dismiss should be denied.

---

[71] *See Trudeau v. FTC*, 456 F.3d 178, 189-90 (D.C. Cir. 2006) ("[J]udicial review is favored when an agency is charged with acting beyond its authority, even where Congress is understood generally to have precluded review[.]" (internal citations omitted)).

Respectfully submitted,

*/s/ Douglas N. Letter*

Douglas N. Letter (DC Bar No. 253492)
   *General Counsel*
Todd B. Tatelman (VA Bar No. 66008)
   *Deputy General Counsel*
Megan Barbero (MA Bar No. 668854)
   *Associate General Counsel*
Josephine Morse (DC Bar No. 1531317)
   *Associate General Counsel*
Brooks M. Hanner (DC Bar No. 1005346)
   *Assistant General Counsel*
Sarah E. Clouse (MA Bar No. 688187)
   *Assistant General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
Telephone: (202) 225-9700
douglas.letter@mail.house.gov

*Counsel for Plaintiff Committee on Ways and Means, United States House of Representatives*

September 23, 2019