UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COMMITTEE ON WAYS AND MEANS,
U.S. HOUSE OF REPRESENTATIVES,

        *Plaintiff*,

    v.

UNITED STATES DEPARTMENT OF THE
TREASURY et al.,

        *Defendants*.

No. 1:19-cv-1974 (McFadden, J.)

# AMICUS BRIEF OF CONSTITUTIONAL SCHOLARS
## LEE BOLLINGER, MICHAEL DORF, WALTER DELLINGER, PAMELA S. KARLAN, HAROLD HONGJU KOH, NORM ORNSTEIN, LEAH LITMAN, JUDITH RESNIK, GEOFFREY STONE, AND DAVID STRAUSS IN SUPPORT OF PLAINTIFF

LAURENCE H. TRIBE
   (*pro hac vice* pending)
Hauser Hall 420
1575 Massachusetts Avenue
Cambridge, MA 02138
617 495 1767
tribe@law.harvard.edu

JOSHUA MATZ
Kaplan Hecker & Fink LLP
350 Fifth Avenue | Suite 7110
New York, NY 10118
212.763.0883
jmatz@kaplanhecker.com

*Counsel for Amici Curiae*

September 20, 2019

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTEREST AND IDENTITY OF AMICI CURIAE................................................................. 1

INTRODUCTION ..................................................................................................................... 1

ARGUMENT ............................................................................................................................. 2

    I.     Historical Practice Confirms that the Committee Has Suffered Injury-in-Fact............... 2

    II.    The Committee Lacks Any Alternative Institutional Remedies for its Injury................. 9

    III.   Separation of Powers Concerns Support the Committee's Standing............................. 12

CONCLUSION........................................................................................................................ 14

APPENDIX.............................................................................................................................. 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Citizens for Responsibility & Ethics in Washington v. Trump*,
No. 18-474, 2019 WL 4383205 (2d Cir. Sept. 13, 2019) ....................................... 13

*Comm. on Judiciary, U.S. House of Representatives v. Miers*,
558 F. Supp. 2d 53 (D.D.C. 2008) ................................................. 2, 3, 5, 6, 7, 8, 12

*Comm. on Oversight & Gov't Reform v. Holder*,
979 F. Supp. 2d 1 (D.D.C. 2013) ................................................................... 2, 6, 13

*Eastland v. U.S. Servicemen's Fund*,
421 U.S. 491 (1975) ............................................................................................... 3

*In re Debs*,
158 U.S. 564 (1895) ............................................................................................... 5

*I.N.S. v. Chadha*,
462 U.S. 919 (1983) ......................................................................................... 11, 12

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803) ............................................................................ 1, 12

*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819) ............................................................................... 4

*McGrain v. Daugherty*,
273 U.S. 135 (1927) ....................................................................................... 2, 3, 4

*Nixon v. United States*,
506 U.S. 224 (1993) ............................................................................................. 11

*NLRB v. Noel Canning*,
573 U.S. 513 (2014) ............................................................................................... 4

*Quinn v. United States*,
349 U.S. 155 (1955) ............................................................................................... 3

*Raines v. Byrd*,
521 U.S. 811 (1997) ............................................................................................... 7

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*,
  498 F.2d 725 (D.C. Cir. 1974) (en banc) ............................................................. 5

*U.S. House of Representatives v. Mnuchin*,
  379 F. Supp. 3d 8 (D.D.C. 2019) ......................................................... 2, 4, 5, 9

*U.S. House of Representatives v. U.S. Dep't of Commerce*,
  11 F. Supp. 2d 76 (D.D.C. 1998) ...................................................................... 7

United States v. AT&T
  551 F.2d 384 (D.C. Cir. 1976) ..................................................................... 6, 11

United States v. Nixon,
  418 U.S. 683 (1974) ........................................................................................ 12

*Virginia House of Delegates v. Bethune-Hill*,
  139 S. Ct. 1945 (2019) ....................................................................................... 7

*Walker v. Cheney*,
  230 F. Supp. 2d 51 (D.D.C. 2002) .................................................................... 6

*Watkins v. United States*,
  354 U.S. 178 (1957) ........................................................................................... 5

**Statutes**

26 U.S.C. § 6103(f)(1) ............................................................................................. 8

Pub. L. 68-176, § 257(a), 43 Stat. 253, 293 ............................................................ 8

Pub. L. No. 94-455, 90 Stat. 1520 ........................................................................... 8

U.S. CONST. art. I, § 1 .............................................................................................. 2

U.S. CONST. art. I, § 5 ..................................................................................... 11, 12

**Rules**

Fed. R. Civ. P. 45 ..................................................................................................... 5

Fed. R. Civ. P. 81(a)(5) ........................................................................................... 5

House Rule II.8(b) ................................................................................................. 11

**Other Authorities**

3 Annals of Cong. 493 (1849) .................................................................................................... 4

65 Cong. Rec. 2958 ..................................................................................................................... 8

C.S. Potts, *Power of Legislative Bodies to Punish for Contempt*,
   74 U. PA. L. REV. 691 (1926) ................................................................................................ 4

*Congress's (Limited) Power to Represent Itself in Court*,
   99 CORNELL L. REV. 571 (2014) ........................................................................................ 2, 4

*Constitutional Limitations on the Congressional Power of Investigation*,
   40 HARV. L. REV. 153 (1926) .............................................................................................. 4, 5

Federalist No. 47 ....................................................................................................................... 14

Federalist No. 51 ......................................................................................................................... 3

H. Res. 430, 116th Cong. (2019) .............................................................................................. 11

Mill, *Considerations on Representative Governmment*,
   (London: Parker, Son, and Bourn, 1861) ................................................................................ 3

*Preventing Congressional Violations of Taxpayer Privacy*,
   69 TAX LAWYER 103 (2015) .................................................................................................. 8

*Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*,
   8 U.S. Op. Off. Legal Counsel 101 (1984) ............................................................................. 6

*Response to Cong. Requests for Info. Regarding Decisions Made Under the Indep. Counsel Act*,
   10 U.S. Op. Off. Legal Counsel 68 (1986) ............................................................................. 6

## INTEREST AND IDENTITY OF AMICI CURIAE

Amici are scholars of constitutional law and federal courts. They research, write about, and lecture on issues including the separation of powers. They have a strong professional interest in the proper development of the law and in ensuring the stability of our system of checks and balances. Amici certify that they have attempted not to duplicate arguments presented in a party's brief. A full list of amici and their institutional affiliations can be found in Appendix A.

## INTRODUCTION

This case presents the question whether a committee of the House of Representatives, authorized by the House to file suit pursuant to the House's chosen procedures for granting such authorization, has Article III standing to enforce a subpoena against the Executive Branch where the committee has an unqualified statutory right to the subpoenaed information. That question is of great practical importance. If the House Ways and Means Committee lacked Article III standing, then the House's subpoena power would be gutted, and the Executive Branch could defy valid congressional process with impunity. In that world, the House would suffer a grievous blow to its power of inquiry, which is essential to its legislative and oversight functions, and our system of checks and balances would become dangerously unbalanced. This Court should therefore follow history and tradition—not to mention every court that has addressed the question—and hold that the Committee has Article III standing to maintain its subpoena enforcement action.

Indeed, our considered examination of this issue finds that it poses "a question deeply interesting to the United States; but, happily, not of an intricacy proportioned to its interest." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176 (1803). There is simply no merit to the position advanced by the Executive Branch. The Committee suffers informational injury when the Executive Branch denies information to which it is entitled by statute. It suffers institutional injury

when its ability to legislate responsibly is directly undercut by defiance of its subpoenas. Either injury alone would support standing. But here, both injuries entangle with and amplify each other. Together, they form a double helix that anchors the Committee's right to seek judicial redress.

This Court has already issued several scholarly opinions addressing the issues at stake. *See U.S. House of Representatives v. Mnuchin*, 379 F. Supp. 3d 8, 15–19 (D.D.C. 2019); *Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1, 11–16 (D.D.C. 2013); *Comm. on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 68–78 (D.D.C. 2008). In this brief, we elaborate on several especially important points, focusing on "historical practice and precedent," the "availability of [other] institutional remedies," and "the underlying separation-of-powers implications." *Mnuchin*, 379 F. Supp. 3d at 15, 19, 22. As we demonstrate, every relevant consideration militates strongly in favor of holding that the Committee has Article III standing.

## ARGUMENT

### I. Historical Practice Confirms that the Committee Has Suffered Injury-in-Fact

Article I grants Congress "[a]ll legislative Powers," U.S. CONST. art. I, § 1, and authorizes "[e]ach House [to] determine the Rules of its Proceedings," *id.* § 5. The Constitution thus vests the House of Representatives with a "power of inquiry," including "process to enforce it," as an "essential and appropriate auxiliary to the legislative function." *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927); *see also* Tara Leigh Grove & Neal Devins, *Congress's (Limited) Power to Represent Itself in Court*, 99 CORNELL L. REV. 571, 597 (2014). This "investigatory power is one of the few under the Constitution that each House of Congress may exercise individually." *Mnuchin*, 379 F. Supp. 3d at 16–17. And it serves a vital role: "Without the power to investigate—including of course the authority to compel testimony, either through its own processes or through

judicial trial—Congress could be seriously handicapped in its efforts to exercise its constitutional function wisely and effectively." *Quinn v. United States*, 349 U.S. 155, 160–61 (1955).

Two conclusions follow from that understanding of the investigative power. First, because it is intertwined with Congress's other Article I authorities, "the scope of the power of inquiry . . . is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 n.15 (1975) (citation omitted). "So long as the Committee is investigating a matter on which Congress can ultimately propose and enact legislation, the Committee may issue subpoenas in furtherance of its power of inquiry." *Miers*, 558 F. Supp. 2d at 77. Second, and of particular relevance here, any interference with the House's investigative power diminishes not only that authority itself, but also the House's institutional ability to perform its other constitutional duties. That is true most obviously of its power to legislate. As the Supreme Court recognized long ago, "[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information . . . recourse must be had to others who do possess it." *McGrain*, 273 U.S. at 175. But the House's power of inquiry is also essential to its oversight function. The ability to serve subpoenas and investigate suspected misconduct allows the House to keep a watchful eye on the Executive, thereby preserving the "distribution[] of power" at the heart of checks and balances. FEDERALIST NO. 51; *see also* John Stuart Mill, *Considerations on Representative Government* (London: Parker, Son, and Bourn, 1861), at 104 ("[T]he proper office of a representative assembly is to watch and control the government.").

Consistent with this understanding of our constitutional design, "the House has, since the Founding era, exercised an independent power to conduct investigations and gather information."

3

*Mnuchin*, 379 F. Supp. 3d at 17; *see also McGrain*, 273 U.S. at 174 ("Both houses of Congress took this view of [the power of inquiry] early in their history."). That tradition of legislative oversight predates the Republic, with "roots . . . deep in the British Parliament." James M. Landis, *Constitutional Limitations on the Congressional Power of Investigation*, 40 HARV. L. REV. 153, 159 (1926). As far back as the fifteenth century, committees in Parliament routinely exercised "powers to compel the production of persons and papers." *Id.* at 161. This practice carried over into colonial legislatures, which early on exercised the right to investigate the executive. *See* C.S. Potts, *Power of Legislative Bodies to Punish for Contempt*, 74 U. PA. L. REV. 691, 708 (1926). The House conducted its first such investigation in 1792, with a resolution empowering it "to call for such persons, papers, and records, as may be necessary to assist their inquiries" into Major-General Arthur St. Clair's failed raid against Native Americans. *See* Grove & Devins, *Congress's (Limited) Power*, 99 CORNELL L. REV. at 598 (quoting 3 ANNALS OF CONG. 493 (1849)); *see also NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) ("[T]he longstanding practice of the government can inform our determination of what the law is."); *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 401 (1819) ("[A] doubtful question . . . if not put at rest by the practice of the government, ought to receive a considerable impression from that practice.").

Congress maintained an active oversight role in the early decades after the Founding—and often acted through committees, thus establishing an important historical precedent about the role that committees play in implementing and operationalizing the House's power of inquiry. For instance, acting through a committee, the House in 1801 launched an investigation of Winthrop Sargent, Governor of Mississippi Territory. *See* Landis, *Congressional Power of Investigation*, at 172. In March 1810, another House select committee investigated spending by three executive departments. *Id.* at 173. In 1818, a select committee—this time, of the Senate—examined alleged

4

misappropriation of funds by Colonel Thomas, Deputy Quartermaster General. *Id.* at 175. The following year, the House directed a committee to investigate whether General Andrew Jackson had misappropriated funds without Congressional approval. *Id.* at 176. And in 1826, a House select committee investigated conduct of the War Department. *Id.* at 177. In requesting the investigation, the House Speaker correctly observed that "[t]he conduct of public servants is a fair subject of the closest scrutiny and the freest remarks." *Id.* (quoting 3 CONG. DEB. 574 (1826)).

Through the twentieth century, courts upheld Congress's investigatory power and provided "periodic help" in enforcing it. *See Mnuchin*, 379 F. Supp. 3d at 17; *see also Watkins v. United States*, 354 U.S. 178, 187 (1957). Courts also recognized that "[e]very government, [e]ntrusted by the very terms of its being with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other." *In re Debs*, 158 U.S. 564, 584 (1895); *see also Miers*, 558 F. Supp. 2d at 71 ("Courts . . . routinely enforce subpoenas, whether they are grand jury subpoenas, deposition or trial subpoenas to compel testimony or produce documents pursuant to Fed. R. Civ. P. 45, or subpoenas issued by administrative agencies of the United States pursuant to Fed. R. Civ. P. 81(a)(5). That enforcement authority is deeply rooted in the common law tradition.").

Congress had no need to resort to courts for "proper assistance" in enforcing subpoenas against the Executive Branch until President Nixon defied a subpoena for tapes of conversations with an aide. But when that occurred, the D.C. Circuit ruled on the resulting lawsuit *without even questioning* whether a Senate committee had Article III standing to sue Nixon for refusing to comply with valid legal process. *See Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 733 (D.C. Cir. 1974) (en banc). Two years later, in *United States v. AT&T*— a decision that remains binding on this Court—the D.C. Circuit made the point explicit: "It is clear

5

that the House as a whole has standing to assert its investigatory power, and can designate a member to act on its behalf." 551 F.2d 384, 391 (D.C. Cir. 1976). Together, *Senate Select Committee* and *AT&T* held that a committee of either house of Congress has Article III standing to bring a lawsuit when the Executive Branch defies a subpoena demanding information.

Against that background, it is no surprise that the Executive Branch twice acknowledged this point during the Reagan Administration. It first did so in an opinion by Theodore Olson, who concluded that "Congress [can] obtain a judicial resolution of [an] underlying privilege claim and vindicate its asserted right to obtain any documents by a civil action for enforcement of a congressional subpoena." *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege,* 8 U.S. Op. Off. Legal Counsel 101, 137 (1984). Two years later, Charles J. Cooper concluded that the House had only three methods of enforcing a subpoena—and that two of them (referral to the U.S. Attorney based on criminal contempt of Congress and arrest by the Sergeant-at-Arms of the House) were impermissible where the head of an agency acted on the instructions of the President to exert executive privilege in response to a congressional subpoena, leaving only "a civil suit seeking declaratory enforcement of the subpoena" as a "viable option." *Response to Cong. Requests for Info. Regarding Decisions Made Under the Indep. Counsel Act*, 10 U.S. Op. Off. Legal Counsel 68, 83, 88 (1986).

Since then, no court has ever held that either House of Congress—or any committee of either house—lacks Article III standing to enforce a subpoena. Every court to have considered the question has upheld standing or recognized that doing so would be appropriate. *See, e.g.*, *Holder*, 979 F. Supp. 2d at 22 ("[T]his case presents the sort of question that the courts are traditionally called upon to resolve."); *Miers*, 558 F. Supp. 2d at 78 ("[N]on-compliance with a duly issued subpoena is a quintessential informational injury."); *Walker v. Cheney*, 230 F. Supp. 2d 51, 68

6

(D.D.C. 2002) ("[T]here is some authority in this Circuit indicating that a House of Congress or a committee of Congress would have standing to sue to retrieve information to which it is entitled.") (citations omitted). As Judge Lamberth has explained, it is "well established that a legislative body suffers a redressable injury when that body cannot receive information necessary to carry out its constitutional responsibilities." *U.S. House of Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76, 85 (D.D.C. 1998). Of course, "[t]his right to receive information arises primarily in subpoena enforcement cases, where a house of Congress or a congressional committee seeks to compel information in aid of its legislative function"—and where courts have long held that committees have Article III standing. *See id.*[1]

This survey of history and tradition confirms several key propositions: the House possesses a unilateral and far-reaching power of inquiry; the House may exercise that power through its committees; those committees may serve subpoenas on the Executive Branch and seek to enforce them in court; and those committees have Article III standing to do so on behalf of the House because the violation of a subpoena inflicts both "loss of information to which [they] are entitled" and an "institutional diminution of [the] subpoena power." *Miers*, 558 F. Supp. 2d at 71; *see also id.* (observing that this is "precisely the injury on which the standing of *any* governmental body rests when it seeks judicial enforcement of a subpoena it issued" (citation omitted)).

Notably, the House and its committees can assert cognizable institutional and informational injuries even where Congress has not passed a law that "specifically provides an unqualified right

---

[1] As Judge Bates has explained, *Raines v. Byrd*, 521 U.S. 811 (1997), did not change that rule or overrule *AT&T*. *See Miers*, 558 F. Supp. 2d at 71. Where a committee issues a subpoena and is then authorized by the House, it has Article III standing. *Cf. Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1953–54 (2019) (holding that a single house of a bicameral state legislature lacked standing to assert the interests of the full legislature in challenging a redistricting plan, but not questioning ability of a chamber to vindicate its independent powers and interests).

7

to receive certain information." *Id.* at 77. But here, there *is* such a law. And that law is no exotic beast, but rather a century-old, well-established implementation of Congress's power of inquiry.

In fact, 26 U.S.C. § 6103(f)(1) arose from yet another dispute in which Congress made clear its right to compel information from the Executive Branch. *See* George K. Yin, *Preventing Congressional Violations of Taxpayer Privacy*, 69 TAX LAWYER 103, 121 (2015). Following the scandal-plagued administration of President Harding—which featured Teapot Dome, among other controversies—Congress approved legislation granting its tax committees "the right to call on the Secretary of the Treasury" for tax return information, specifying that it "shall be [the Secretary's] duty to furnish[] any data of any character contained in or shown by the returns." Revenue Act of 1924, Pub. L. 68-176, § 257(a), 43 Stat. 253, 293. Representative John Nance Garner of Texas, the then-ranking member of the Ways and Means Committee, explained why this law was needed:

> Under the present law, if this House passed a resolution requesting the Secretary of the Treasury to send the returns of John N. Garner to Congress, he could not do it without violating the law. The law tells him that he cannot send it to the House of Representatives without the direction of the President of the United States. So the House of Representatives itself has not the power to get these returns. Now, *I think the House of Representatives ought to have the power to ask the Secretary of the Treasury for these returns and get them*.

65 CONG. REC. 2958 (emphasis added). Garner's separation of powers argument—namely, that the House should have direct access to tax returns without begging the President's permission— carried the day and won passage of the bill. *See* Yin, *Taxpayer Privacy*, 69 TAX LAWYER at 121.

Following Watergate, Congress overhauled the tax code's confidentiality provisions. *See* Tax Reform Act of 1976, Pub. L. No. 94-455, 90 Stat. 1520. In so doing, it preserved the power of the House Ways and Means Committee to request "any return or return information specified in such request" from the IRS Commissioner, and mandated that the Commissioner "shall furnish" such information upon request. 26 U.S.C. § 6103(f)(1). For obvious reasons, Congress in 1976

was not inclined to blithely accept the President's say-so on access to information—and therefore took steps to retain and protect its own authority to access tax returns, should the need arise. That statute remains in place and vests the Committee with a clear right to the information sought here.

The Committee's Article III standing thus rests on mutually reinforcing pillars: a tradition of legislative oversight and a statutory entitlement to the information requested in its subpoena. In other words, the Committee's litigation prerogative is of the most quotidian Hohfeldian variety: An Act of Congress entitles the Ways and Means Committee to receive from a specific executive agency a specifically identified category of document immediately relevant to its legislative function and oversight powers. The Committee, acting for the House, is unquestionably permitted by Article III to seek a judicial order compelling compliance with its subpoena. The force of the Committee's two intertwined injuries—informational and institutional—makes this case easy.

## II. The Committee Lacks Any Alternative Institutional Remedies for its Injury

This is not a case where "the availability of institutional remedies . . . militates against finding that the House has standing." *Mnuchin*, 379 F. Supp. 3d at 19. As we anticipate the House will detail in its brief, the inter-branch accommodation process has reached an end. Impressively, the Executive Branch maintains a straight face while insisting otherwise. It does so even though the President has bluntly promised to "fight[] all of the subpoenas"—and has, in fact, raised an endless series of (largely meritless) arguments with the apparent purpose of prohibiting the House from obtaining testimony or documents for *any* of its ongoing investigations. *See, e.g.*, *Trump: 'We're fighting all of the subpoenas'*, WASH. POST (April 24, 2019). No rational observer of inter-branch relations could possibly believe that this dispute might actually be resolved out of court.

Nor does "the House retain[] the institutional tools necessary to remedy any harm caused . . . by the Administration's actions." *Mnuchin*, 379 F. Supp. 3d at 20. The Committee needs specific

9

information, in the near future, to wield its legislative and oversight powers. The Committee has exercised the most relevant power it possesses to obtain that information: its power of inquiry. In defying that subpoena, the Executive Branch inflicted distinct clear institutional injuries: denial of information essential to other legislative functions and diminution of the subpoena power itself. Even if the House could attempt to use other powers to pry loose the requested information, that would not redress one of the two injuries it has suffered—namely, diminution of the subpoena power. To require the House to rely on an alternative institutional tool is to break its chosen tool; the power of inquiry means little if the House and its committees cannot rely on compulsory process to obtain information, but must instead wield far clumsier tools as substitutes for subpoenas. Regardless, the Executive Branch does not explain how use of other powers held by the House and its committees—*e.g.*, oversight hearings—might lead to acquisition of the subpoenaed information. And given that there is already a valid Act of Congress squarely on point, it is hard to see what other legislative powers, even those subject to bicameralism and presentment, would remedy the informational injury by causing swift production of the subpoenaed materials.

The presumption that the House should attempt institutional remedies before going to court is not a requirement that the House fruitlessly jam round pegs into square holes. If the Executive Branch were right about alternative remedies here, it is difficult to see how either house of Congress or any committee could *ever* have standing in a subpoena enforcement action (and it is impossible to see how any of this Court's prior precedents in this field could survive). But of course, that is the whole point: to break the subpoena power by making the Executive Branch the sole judge of whether to comply with investigations into its own misconduct. This is not the law.

Finally, the Executive Branch contends that the full House of Representatives should be required to vote to specifically authorize this lawsuit before the Committee can assert standing.

The Executive Branch cites no case imposing such a categorical, formalistic requirement. Nor does it concede that it would honor the subpoena if backed by a floor vote in the House.

The Executive Branch's argument is mistaken. As to the question of Article III standing, the fact that the House chooses to act through its committees does not erase the institutional injury to the House as a whole. Nor is it proper for the Judiciary to second guess the procedures adopted by the House to authorize House action. The House is textually entrusted with control over its internal rules and procedures. *See* U.S. CONST. art. I, § 5; *cf. Nixon v. United States*, 506 U.S. 224, 238 (1993). Here, the House has decided to organize itself into standing committees and to vest certain committees with its subpoena power. The House has also decided—in a rule approved by the full House—that instead of holding a vote on every lawsuit, it will use the Bipartisan Legal Advisory Group (BLAG) to authorize suits on its own behalf. *See* House Rule II.8(b) ("[T]he [BLAG] speaks for, and articulates the institutional position of, the House in all litigation matters."). More recently, the full House has approved a resolution affirming that "the chair of each standing and permanent select committee, when authorized by the Bipartisan Legal Advisory Group, retains the ability to initiate or intervene in any judicial proceeding . . . [to enforce] any subpoena duly issued by that committee." H. Res. 430, 116th Cong. (2019). BLAG authorized this lawsuit. That is the end of the inquiry. *See AT&T*, 551 F.2d at 391 (holding the House can "designate a member to act on its behalf"). But even if it is not, and even if the Court deems it proper to fish for further indications in the legislative record or in public statements that the Committee is adhering to the will of the House, there is no credible suggestion that BLAG or the Committee has engaged in any chicanery. Every available indication is to the contrary.

In that sense, this case is almost the mirror image of *I.N.S. v. Chadha*: while the Court there disallowed a unicameral veto because it violated "explicit Constitutional standards," 462 U.S. 919,
11

959 (1983), here the Constitution *protects* the House's right to "determine the Rules of its Proceedings," U.S. CONST. art. I, § 5. Because it has decided upon rules that allow the Committee to file a subpoena and sue, and that allow BLAG to authorize suit, no further action is required.

### III. Separation of Powers Concerns Support the Committee's Standing

The Executive Branch asks this Court to refuse to enforce a subpoena, and to further hold that the House lacks standing to even *ask* the Court to enforce it. The Executive Branch insists that this would preserve judicial neutrality. Not so. Where a branch of government holds a power requiring enforcement, enforcement affirms judicial neutrality; negation rejects it.

The request here at issue hardly probes unexplored frontiers of the judicial power. As Judge Bates has noted, enforcing a valid subpoena is a "routine and quintessential judicial task." *Miers*, 558 F. Supp. 2d at 71. It occurs all the time in many areas of law, including in high-stakes cases touching the separation of powers. *See id.* The Executive Branch offers no credible basis for distinguishing the Committee's lawsuit. Nor could it. A subpoena is a subpoena. Where one has been validly issued, the Judiciary's role in our separation of powers is to enforce it. A desire to avoid inter-branch conflict is no excuse for abdication. As every first-year law student learns, it is the "province and duty" of the Court "to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). Accordingly, "[o]ur system of government 'requires that federal courts on occasion interpret the Constitution in a manner at variance with the construction given the document by another branch.'" *United States v. Nixon*, 418 U.S. 683, 704 (1974) (citation omitted).

Here, the construction given by the Executive Branch is radical and genuinely alarming. It essentially maintains that nobody can *ever* compel any Executive Branch officer to comply with a congressional subpoena (other than by politely asking a different Executive Branch officer—the local United States Attorney—to file charges for contempt). Put differently, the Executive Branch

12

claims for itself a sweeping, unchecked power to have the final say on the legitimacy of its own refusal to comply with congressional legal process, made in express pursuit of a plain statutory entitlement to specified information. To acquiesce in that unbounded vision "would elevate and fortify the executive branch at the expense of the other institutions that are supposed to be its equal, and do more damage to the balance envisioned by the Framers than a judicial ruling on the narrow . . . question posed by the complaint." *Holder*, 979 F. Supp. 2d at 12.

It would be especially imprudent for this Court to abandon the field where the Executive Branch asserts authority to defy congressional subpoenas based solely on a unilateral judgment that they arise from improper motives. It is well understood that the Judiciary itself cannot second-guess Congress's motives in deciding whether legislatures have standing. *See, e.g.*, *Citizens for Responsibility & Ethics in Washington v. Trump*, No. 18-474, 2019 WL 4383205, at *9 (2d Cir. Sept. 13, 2019) ("[W]hile the existence of a political motivation for a lawsuit does not supply standing, nor does it defeat standing."). But the Executive Branch claims that it is free to reach its own judgments on such matters and to rely on those judgments in answering the more fundamental question whether Congress is entitled to exercise its power of inquiry. The Executive Branch takes this position even though it elsewhere has advocated legal positions premised on doubt about the coherence or rationality of efforts to discern legislative motive. Apparently, in the view of certain officials, legislative intent is unknowable except when Congress seeks to investigate the Executive Branch, at which point it becomes crystal clear and can justify a self-serving refusal to provide evidence sought pursuant to a subpoena. Whatever the Court makes of that position on the merits, allowing the Executive Branch to claim for itself the final say on all subpoenas is especially disruptive to the separation of powers when the Executive Branch simultaneously claims for itself the ability to ignore subpoenas whenever it doubts the unblemished purity of congressional intent.

A holding to that effect would not only vary from decades of precedent but would also allow the Executive Branch to judge its own case, each and every time, in a system designed to create and balance inter-branch conflict. That is not a version of the separation of powers worthy of the name.

As James Madison famously warned, the consolidation of legislative and executive power in a single entity is "the very definition of tyranny." FEDERALIST NO. 47. Such consolidation is precisely what the Executive Branch seeks here: the unassailable, unaccountable power to decide when Congress may exercise its own power of inquiry. As constitutional law scholars, we have profound respect for the complexities of inter-branch relations. Separation of powers cases can raise hard questions. We have spent our careers studying them. But this is not one. The Committee has suffered injury-in-fact and should be held to possess Article III standing.

## CONCLUSION

For the reasons given above, amici respectfully urge this Court to deny the Executive Branch's motion to dismiss for lack of Article III standing.

Dated: September 20, 2019                    Respectfully submitted,

By:    /s/ *Joshua Matz*

JOSHUA MATZ
Kaplan Hecker & Fink LLP
350 Fifth Avenue | Suite 7110
New York, NY 10118
212.763.0883
jmatz@kaplanhecker.com

LAURENCE H. TRIBE (*pro hac vice* pending)
Hauser Hall 420
1575 Massachusetts Avenue
Cambridge, MA 02138
617 495 1767
tribe@law.harvard.edu

*Counsel for Amici Curiae*

# Appendix A

Amici join this brief as individuals; institutional affiliation is noted for informational purposes only and does not indicate endorsement by institutional employers of positions advocated.

**Lee C. Bollinger**, President and Seth Low Professor of the University, Columbia University

**Michael C. Dorf**, Roberts S. Stevens Professor of Law, Cornell Law School

**Walter E. Dellinger III**, Douglas B. Maggs Professor Emeritus of Law, Duke University School of Law

**Pamela S. Karlan**, Kenneth and Harle Montgomery Professor of Public Interest Law and Co-Director, Supreme Court Litigation Clinic, Stanford Law School

**Harold Hongju Koh**, Sterling Professor of International Law, Yale Law School

**Leah Litman**, Assistant Professor of Law, University of Michigan Law School

**Judith Resnik**, Arthur Liman Professor of Law, Yale Law School

**Norman J. Ornstein**, Resident Scholar, American Enterprise Institute

**Geoffrey R. Stone**, Edward H. Levi Distinguished Service Professor of Law, University of Chicago Law School

**David A. Strauss**, Gerald Ratner Distinguished Service Professor of Law and Faculty Director of the Jenner & Block Supreme Court and Appellate Clinic, University of Chicago Law School