**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE ON WAYS AND MEANS, UNITED STATES HOUSE OF REPRESENTATIVES, | ) ) ) ) |
| *Plaintiff*, | ) ) |
| v. | ) ) ) |
| UNITED STATES DEPARTMENT OF THE TREASURY, *et al.* | No. 1:19-cv-1974 (TNM) ) ) ) |
| *Defendants*, | ) ) |
| DONALD J. TRUMP, *et al.*, | ) ) |
| *Defendant-Intervenors.* | ) ) |

**REPLY MEMORANDUM IN SUPPORT OF
<u>DEFENDANTS' AND DEFENDANT-INTERVENORS' MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION.................................................................................................................. 1

ARGUMENT ........................................................................................................................ 4

I.   The Court Lacks Jurisdiction under Article III. ............................................................. 4

    A.   This Dispute Is Not of the Type Traditionally Thought Capable of Resolution Through the Judicial Process. ................................................................................. 4

    B.   The Committee Fails to State a Cognizable Injury................................................. 7

    C.   Lawsuits of This Kind Imperil the Constitution's Allocation of Power Among the Branches of the Federal Government............................................................. 10

    D.   The House of Representatives Cannot Authorize a Lawsuit Without Specifically Voting to Do So. ............................................................................ 12

    E.   Defendants' Argument Is Consistent With D.C. Circuit Case Law. .................... 14

II.   The Court Lacks Statutory Subject Matter Jurisdiction. ............................................ 15

III.  In the Alternative, the Court Should Stay or Dismiss this Suit Without Prejudice To Allow the Constitutionally Mandated Accommodation Process To Proceed. ...... 20

IV.  The Committee Fails to State a Claim. ....................................................................... 25

    A.   The Committee Lacks a Cause of Action to Enforce Its Subpoenas and Section 6103(f) Requests. ................................................................................. 25

    B.   The Committee Cannot Invoke the Federal Courts' Traditional Equity Powers.. 28

    C.   The Declaratory Judgment Act Does Not Provide A Cause of Action................. 30

    D.   The APA Claims Fail as a Matter of Law............................................................. 30

        1.   APA Review is Precluded by Statute ......................................................... 30

        2.   Declining to Provide Information to Congress is Not "Agency Action" Under the APA ......................................................................................... 32

        3.   The Committee is Not a 'Person' Within the Meaning of the APA............ 34

    E.   The Committee's Mandamus Claim Fails as a Matter of Law ............................. 35

    F.   The Committee's Non-Statutory Review Claim Fails as a Matter of Law........... 35

CONCLUSION ................................................................................................................... 36

# TABLE OF AUTHORITIES

## Cases

*Alexander v. Sandoval,*
  532 U.S. 273 (2001) .................................................................................................. 25, 30

*Am. Hosp. Ass'n v. Burwell,*
  812 F.3d 183 (D.C. Cir. 2016) .............................................................................. 35

*Anderson v. Dunn,*
  19 U.S. 204 (1821) .................................................................................................. 26

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n,*
  135 S. Ct. 2652 (2015) .......................................................................................... 7

*Armstrong v. Exceptional Child Ctr., Inc.,*
  135 S. Ct. 1378 (2015) .......................................................................................... 30

*Barnes v. Kline,*
  759 F.2d 21 (D.C. Cir. 1984) ................................................................................ 7

*Bender v. Williamsport Area Sch. Dist.,*
  475 U.S. 534 (1986) .............................................................................................. 13

*Block v. Cmty. Nutrition Inst.,*
  467 U.S. 340 (1984) .............................................................................................. 31

*Block v. N.D. ex rel. Bd. of Univ. & Sch. Lands,*
  461 U.S. 273 (1983) .............................................................................................. 31

*Bond v. United States,*
  564 U.S. 211 (2011) .............................................................................................. 4

*Bowsher v. Synar,*
  478 U.S. 714 (1986) .............................................................................................. 8

*Buckley v. Valeo,*
  424 U.S. 1 (1976) .................................................................................................. 11

*Burford v. Sun Oil Co.,*
  319 U.S. 315 (1943) .............................................................................................. 22

*C & E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth.,*
  310 F.3d 197 (D.C. Cir. 2002) .............................................................................. 30

*Campbell v. Clinton,*
  203 F.3d 19 (D.C. Cir. 2000) ................................................................................ 10

*Carroll v. Safford,*
  44 U.S. (3 How.) 441 (1845) ........................................................................ 30

*Chenoweth v. Clinton,*
  181 F.3d 112 (D.C. Cir. 1999) .................................................................... 15

*Clinton v. City of New York,*
  524 U.S. 417 (1998) ...................................................................................... 5

*Coleman v. Miller,*
  307 U.S. 433 (1939) .................................................................................... 10

*Coll. Sports Council v. Gov't Accountability Office,*
  421 F. Supp. 2d 59 (D.D.C. 2006) .............................................................. 33

*Colo. River Water Conservation Dist. v. United States,*
  424 U.S. 800 (1976) .................................................................................... 22

*Conn. Nat'l Bank v. Germain,*
  503 U.S. 249 (1992) .................................................................................... 17

*Consumer Energy Council of Am. v. Fed. Energy Regulatory Comm'n,*
  673 F.2d 425 (D.C. Cir. 1982) .................................................................... 34

*Ctr. for Biological Diversity v. Brennan,*
  571 F. Supp. 2d 1105 (N.D. Cal. 2007) ...................................................... 33

*\*Cummings v. Murphy,*
  321 F. Supp. 3d 92 (D.D.C. 2018) ..................................................... 9, 12, 14

*Delaney v. Specialized Loan Servicing, LLC,*
  No. 15-cv-5260, 2015 WL 7776902 (N.D. Ill. Dec. 3, 2015) .................... 23

*FEC v. Akins,*
  524 U.S. 11 (1998) ........................................................................................ 8

*Gonzaga Univ. v. Doe,*
  536 U.S. 274 (2002) .................................................................................... 25

*Gov't of Manitoba v. Bernhardt,*
  923 F.3d 173 (D.C. Cir. 2019) .................................................................... 35

*Greenpeace USA v. Stone,*
  748 F. Supp. 749 (D. Haw. 1990) ............................................................... 33

*Grupo Mexicano de Desarrolo, S.A. v. All. Bond Fund., Inc.,*
  527 U.S. 308 (1999) ............................................................................... 28, 29

*Guerrero v. Clinton,*
  157 F.3d 1190 (9th Cir. 1998) ........................................................................... 33

*Hanlin Grp., Inc. v. Power Auth. of State of N.Y.,*
  703 F. Supp. 305 (S.D.N.Y. 1989) ...................................................................... 23

*Howard v. Pritzker,*
  775 F.3d 430 (D.C. Cir. 2015) ............................................................................ 16

*In re Application of the U.S. Senate Permanent Subcomm. on Investigations,*
  627 F.2d 1346 (D.C. Cir. 1980) .......................................................................... 26

*In re Surface Min. Regulation Litig.,*
  627 F.2d 1346 (D.C. Cir. 1980) .......................................................................... 16

*\*INS v. Chadha,*
  462 U.S. 919 (1983) ..................................................................................... 4, 13

*\*Jesner v. Arab Bank, PLC,*
  138 S. Ct. 1386 (2018) ................................................................................ 28, 30

*Marbury v. Madison,*
  5 U.S. 137 (1803) .............................................................................................. 4

*Marshall v. Gordon,*
  243 U.S. 521 (1917) ........................................................................................... 26

*Md. Dep't of Human Res. v. Dep't of Health & Human Servs.,*
  763 F.2d 1441 (D.C. Cir. 1985) .......................................................................... 35

*Mass. Delivery Ass'n v. Coakley,*
  671 F.3d 33 (1st Cir. 2012) ................................................................................ 23

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
  567 U.S. 209 (2012) ..................................................................................... 31, 32

*McGrain v. Daugherty,*
  273 U.S. 135 (1927) ............................................................................................. 8

*Mistretta v. United States,*
  488 U.S. 361 (1989) ........................................................................................... 29

*\*Nat. Res. Def. Council, Inc. v. Hodel,*
  865 F.2d 288 (D.C. Cir. 1988) ....................................................................... 33, 34

*Pennhurst State Sch. & Hosp. v. Halderman,*
  465 U.S. 89 (1984) ............................................................................................. 36

*Physicians Nat'l House Staff Ass'n v. Fanning*,
  642 F.2d 492 (D.C. Cir. 1980) ................................................................. 36

*Printz v. United States*,
  521 U.S. 898 (1997) ............................................................................... 6

*Pub. Citizen v. U.S. Dep't of Justice*,
  491 U.S. 440 (1989) ............................................................................... 8

*R.R. Comm'n v. Pullman Co.*,
  312 U.S. 496 (1941) ............................................................................... 22

*\*Raines v. Byrd*,
  521 U.S. 811 (1997) ......................................................................... *passim*

*\*Reed v. Cty. Comm'rs of Del. Cty., Pa.*,
  277 U.S. 376 (1928) ........................................................... 6, 11, 26, 27

*Senate Select Committee on Presidential Campaign Activities v. Nixon*,
  498 F.2d 725 (D.C. Cir. 1974) ............................................................... 15

*Sierra Club v. Chesapeake Operating, LLC*,
  248 F. Supp. 3d 1194 (W.D. Okla. 2017) .............................................. 23

*Skelly Oil Co. v. Phillips Petroleum Co.*,
  339 U.S. 667 (1950) ............................................................................... 30

*Springer v. Gov't of Philippine Islands*,
  277 U.S. 189 (1928) ............................................................................... 11

*Tax Analysts v. IRS*,
  117 F.3d 607 (D.C. Cir. 1997) ............................................................... 36

*Tobin v. United States*,
  306 F.2d 270 (D.C. Cir. 1962) ............................................................... 28

*Turner v. Burnside*,
  541 F.3d 1077 (11th Cir. 2008) ............................................................. 22

*U.S. Dep't of Commerce v. U.S. House of Reps.*,
  525 U.S. 316 (1999) ............................................................................... 11

*U.S. House of Reps. v. Burwell*,
  130 F. Supp. 3d 53 (D.D.C. 2015) ........................................................ 34

*\*U.S. House of Reps. v. Mnuchin*,
  379 F. Supp. 3d 8 (2019) ................................................................ *passim*

*U.S. House of Reps. v. U.S. Dep't of Commerce*,
  11 F. Supp. 2d 76 (D.D.C. 1998) ........................................................................ 8

*United States v. AT&T*,
  551 F.2d 384 (D.C. Cir. 1976) ........................................................ 14, 15, 19, 21

*United States v. AT&T*,
  567 F.2d 121 (D.C. Cir. 1977) ................................................................ 20, 22

*United States v. Ballin*,
  144 U.S. 1 (1892) ........................................................................................ 13

*United States v. House of Reps. of U.S.*,
  556 F. Supp. 150 (D.D.C. 1983) ................................................................... 32

*United States v. Nixon*,
  418 U.S. 683 (1974) ...................................................................................... 4

*United States v. White*,
  869 F.2d 822 (5th Cir. 1989) ........................................................................ 33

*United States v. Windsor*,
  570 U.S. 744 (2013) ....................................................................................... 1

*Va. House of Delegates v. Bethune-Hill*,
  139 S. Ct. 1945 (2019) ............................................................................. 10, 12

*Walpin v. Corp. for Nat'l & Cmty. Serv.*,
  718 F. Supp. 2d 18 (D.D.C. 2010) .................................................................. 30

*Watkins v. United States*,
  354 U.S. 178 (1957) ..................................................................................... 36

*Waxman v. Thompson*,
  No. 04-3467, 2006 WL 8432224 (C.D. Cal. July 24, 2006) ................................ 8, 9

*William Penn Apartments v. D.C. Court of Appeals*,
  39 F. Supp. 3d 11 (D.D.C. 2014) .................................................................... 23

*Williams v. Pucinski*,
  No. 01-cv-5588, 2002 WL 1585571 (N.D. Ill. July 12, 2002) .............................. 23

*Yates v. United States*,
  135 S. Ct. 1074 (2015) .................................................................................. 17

*Younger v. Harris*,
  401 U.S. 37 (1971) ....................................................................................... 22

*Ziglar v. Abbasi,*
   137 S. Ct. 1873 (2017) ........................................................................... 27, 28, 29

**Constitutional Provision**

U.S. Const. art. I, § 5, cl.2 ........................................................................ 12

**Statutes**

2 U.S.C. § 192 ......................................................................................... 18, 32

2 U.S.C. § 288 ......................................................................................... 31

2 U.SC. § 5571 ....................................................................................... 31

5 U.S.C. § 701 ......................................................................................... 31

5 U.S.C. § 2954 ....................................................................................... 9

26 U.S.C. § 6103 ................................................................................... *passim*

26 U.S.C. § 6110 ..................................................................................... 32

26 U.S.C. § 7431 ..................................................................................... 32

28 U.S.C. § 1331 ................................................................................... 16, 30

28 U.S.C. § 1361 ................................................................................... 16

*28 U.S.C. § 1365 ................................................................................ *passim*

28 U.S.C. §  2201 ................................................................................. 30

Pub. L. No. 93-190, 87 Stat. 736 (1973) ................................................. 31

*Pub. L. No. 104-292, 110 Stat. 3459 (1996) .......................................... 17

**Legislative Materials**

H.R. Rep. No. 95-1756 (1978) ................................................................ 15, 19

H.R. Res. 430, 116th Cong. (2019) ........................................................ 12, 14

H.R. Res. 1420, 94th Cong. (1976) ........................................................ 14

S. Rep. No. 95-170 (1977) ..................................................................... 18, 19

**Other Authorities**

5B Fed. Prac. & Proc. Civ. § 1350 (3d ed.) .................................................................. 23

Curtis A. Bradley & Trevor W. Morrison, *Historical Gloss and the Separation of Powers*,
  126 HARV. L. REV. 411 (2012) ............................................................................... 29

The Federalist No. 78 (Alexander Hamilton) ............................................................. 10

Letter from the Justices to George Washington (Aug. 8, 1793), *reprinted in Hart & Wechsler's
  The Federal Courts and the Federal System* 79 (Richard H. Fallon et al., 5th ed. 2003) .......... 5

*Prosecution for Contempt of Cong. of an Exec. Branch Official Who Has Asserted a Claim of
  Exec. Privilege,*
  8 U.S. Op. O.L.C. 101 (1984) ................................................................................. 15

*Response to Cong. Requests for Information Regarding Decisions Made Under the Indep.
  Counsel Act,*
  10 U.S. Op. O.L.C. 68 (1986) ................................................................................. 15

*\*The authorities upon which we chiefly rely are marked with asterisks.*

**INTRODUCTION**

As this Court has observed, the Founders "emerged from the Revolution determined to establish a government incapable of repeating the tyranny from which the Thirteen Colonies escaped." *U.S. House of Reps. v. Mnuchin*, 379 F. Supp. 3d 8, 10 (2019).[1] "They did so by splitting power across three branches of the federal government and by providing each the tools required to preserve controls over its functions." *Id.* For hundreds of years after the Founding, the system worked as the Founders designed it: ambition counteracted ambition and the political branches worked out their disputes using the particular tools that the Constitution gave them each.

The fundamental question in this proceeding, *see* ECF No. 44 ("Mot."), is whether the political branches must continue to work out their differences through the political process, or instead whether the "Constitution's entirely anticipated political arm wrestling" should be "plac[ed] . . . into permanent judicial receivership." *United States v. Windsor*, 570 U.S. 744, 791 (2013) (Scalia, J., dissenting). As set out in Defendants' motion, there are four reasons why the Court should not—indeed, cannot—decide the merits of this case.

First, this inter-branch dispute does not present a case or controversy within the meaning of Article III. While federal courts are of course capable of providing answers to separation-of-powers questions, the mere existence of such a question does not itself create a justiciable controversy. "The irreplaceable value of the [judicial] power" is to protect "the constitutional rights and liberties of individual citizens," *Raines v. Byrd*, 521 U.S. 811, 829 (1997), and a case or controversy does not arise simply because the political branches disagree about the scope of their respective powers. Congressional suits against the Executive Branch are foreign to Article III and its history, the dispute here entails no injury to Congress cognizable within the judicial power of the United States, and the Committee lacks the authority to sue on the House's behalf in any event.

---

[1] Appeal filed, No. 19-5176 (D.C. Cir. 2019).

Second, the Court lacks statutory jurisdiction.  Even if Congress could grant federal courts subject matter jurisdiction to enforce its informational demands to the Executive Branch, Congress has nowhere attempted to confer jurisdiction upon the courts to enforce subpoenas issued by the House.  While the Committee attempts to muddy the historical record, this much is clear: Congressional suits to enforce subpoenas were unheard of throughout most of American history, and when in 1978 Congress for the first time enacted a statute conferring jurisdiction for certain subpoena enforcement actions brought by the Senate and its committees, it did not enact a comparable provision for the House or its committees.  Instead, it continued to substantively modify the statute conferring jurisdiction for Senate subpoena-enforcement suits as late as 1996, long after it had amended the general federal-question statute to remove the amount-in-controversy requirement for all cases arising under federal law.  The Committee does not seriously dispute that its interpretation of the general federal-question statute—as itself providing jurisdiction over suits of this kind—renders 28 U.S.C. § 1365(a) superfluous, makes the significant limits on its application to subpoenas to Executive Branch officials meaningless, and means the 1996 amendments to that provision were a pointless exercise.  A single House of Congress, much less a single Committee, cannot end-run the statutory limits on federal jurisdiction adopted through bicameralism and presentment.

Third, the Court should not adjudicate the merits of this suit unless and until the Committee earnestly pursues and exhausts the constitutionally mandated negotiation and accommodation process.  The Committee does not dispute that it filed suit following a single briefing on the Internal Revenue Service ("IRS") Presidential audit program, and without having received the Treasury Department's responses to its written questions.  The Committee primarily argues that further negotiations are unwarranted because Defendants have already determined that they cannot lawfully provide the requested tax returns and return information.  But the premise of the

Committee's lawsuit is that the Committee has a legislative interest in the *Presidential audit program*, not in obtaining the President's tax returns for their own sake.  If that interest is sincere, the Committee has provided no reason why further discussions could not address the Committee's purported legislative interest in how the program operates.  Indeed, the Committee has not even meaningfully explained how its request for six years of the President's personal tax returns and return information—including for four years before the President became President—is reasonably related to its purported legislative interest, let alone indispensable to it.

Fourth, the Committee lacks a cause of action.  Congress knows how to create a cause of action for informational disputes and rights arising under the tax code, and it created no such right of action here.  The Committee may not circumvent that decision by relying on the "traditional" powers of the courts of equity because, as the Committee concedes, there is no tradition of federal courts directly enforcing congressional subpoenas or informational rights that Congress has granted itself by statute. Rather, the time-honored enforcement mechanism for Congress's informational inquiries is the criminal contempt statute, any inherent authority that Congress possesses itself, and—vis-à-vis the Executive Branch—the accommodation process backed by the powers the Constitution actually confers on Congress in Article I.  The Administrative Procedure Act ("APA") is inapplicable because the carefully calibrated historical mechanisms for enforcing Congress's limited powers of inquiry preclude judicial review, inter-branch reporting is not "agency action" within the meaning of the APA, and Congress is not a "person" that the APA authorizes to sue.  Finally, the Committee's mandamus and non-statutory review claims cannot be squared with Defendants' role as "gatekeeper" of confidential tax information and their duty to take care that the tax code is faithfully executed consistent with the limits of Congress's power of inquiry under Article I.

For any and all of these reasons, the Court should grant Defendants' motion to dismiss.

### ARGUMENT

**I.    The Court Lacks Jurisdiction under Article III.**

**A.    This Dispute Is Not of the Type Traditionally Thought Capable of Resolution Through the Judicial Process.**

Defendants' motion demonstrated that the Committee lacks standing because the dispute at issue is not of the kind "traditionally thought to be capable of resolution through the judicial process." *Raines*, 521 U.S. at 818-19; *see* Mot. at 14.  From the Founding onwards, Congress and the Executive Branch have repeatedly clashed over access to information, but for nearly two centuries, Congress never attempted to resolve those impasses through civil litigation, instead of through its own powers under Article I and the negotiation and accommodation process mandated by the Constitution.  *See* Mot. at 15-18.  The Committee's arguments to the contrary fail.

First, the Committee contends that "the mere fact that a case may raise separation-of-powers questions is not a basis for dismissing suit."  ECF No. 55 ("Opp.") at 26 (citing *United States v. Nixon*, 418 U.S. 683 (1974)); *see also id.* at 27 n.30 (citing other cases raising separation of powers issues).  Of course.  But federal courts resolve separation of powers disputes only in the context of cases that *also* involve the "the constitutional rights and liberties of individual citizens," *Raines*, 521 U.S. at 829; *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803) ("The province of the court is, solely, to decide on the rights of individuals, not to inquire how the executive, or executive officers, perform duties in which they have a discretion."); *Bond v. United States*, 564 U.S. 211, 222-23 (2011) (providing examples).  To take just one example cited by Plaintiffs, when the Supreme Court decided the constitutionality of the legislative veto in *INS v. Chadha*, 462 U.S. 919 (1983), it did so not because the Executive sued Congress seeking a determination as to the legislative veto's constitutionality, but because a specific individual seeking review of a deportation order brought a claim challenging that order's compatibility with the separation of powers.  *Chadha*, 462 U.S. at 927-28; *see also U.S. House of Reps.*, 379 F. Supp.

3d at 15-16.   In other words, while the presence of a separation of powers question does not *preclude* jurisdiction, it also does not *provide* it.   While there might be "nothing irrational about a system" that allows the political branches to sue each other whenever they disagree about their respective powers, "it is obviously not the regime that has obtained under our Constitution to date." *Raines*, 521 U.S. at 828.

For that reason, the Committee's observation that "[t]he legal issues presented in this case are . . . within the competence of an Article III court to decide," Opp. at 26, misses the point.   For as long as the federal courts have existed, they have refused to decide cases that they have the technical wherewithal to decide when the cases do not present a case or controversy under Article III.   *See, e.g.*, Letter from the Justices to George Washington (Aug. 8, 1793), *reprinted in Hart & Wechsler's The Federal Courts and the Federal System* 79 (Richard H. Fallon et al. eds., 5th ed. 2003).   As Defendants have noted, *see* Mot. at 36, the Supreme Court was obviously capable of deciding the constitutionality of the Line Item Veto Act—it did so in *Clinton v. City of New York*, 524 U.S. 417 (1998)—but it refused to do so in *Raines* because it is not the judiciary's role to provide an "amorphous general supervision of the operations of government."   521 U.S. at 829.

Second, the Committee asserts that, "since nearly the beginning of the Republic, each House of Congress has acted separately and without the intervention of the Executive Branch to enforce its subpoenas—by arresting and detaining contemnors, including contumacious Executive Branch officials."   Opp. at 28; *accord id.* at 29 (describing how House has "exercised its power of contempt to arrest, detain, and try individuals"); *see also* Constitutional Law Scholars Amicus (ECF No. 57) at 4.   But that history only undermines the Committee here.   When the House historically enforced its demands for information, it did so *without the intervention of the Judicial Branch.*   As the Supreme Court has noted, it "has been customary for [Congress] to rely on its own power to compel attendance of witnesses and production of evidence in investigations made by it

or through its committees." *Reed v. Cty. Comm'rs of Del. Cty., Pa.*, 277 U.S. 376, 388 (1928).  In stark contrast, for nearly two hundred years after the founding, it appears to have been universally understood that Congress, a house of Congress, or a congressional committee, could not sue the Executive Branch directly.  *See Raines*, 521 U.S. at 826-29.  The House's authority to issue compulsory process enforceable by its Sergeant at Arms simply does not speak to whether the House may enlist the judiciary as its enforcer against the Executive.  *See Reed*, 277 U.S. at 389 ("Authority to exert the powers of the Senate to compel production of evidence differs widely from authority to invoke judicial power for that purpose").  Indeed, if anything, the fact that Congress traditionally resorted to the difficult process of either itself arresting contemnors or persuading the Executive to pursue a criminal contempt action, while consistently eschewing the "highly attractive" and easier path of filing a civil suit on its own, strongly suggests that "the power was thought not to exist." *Printz v. United States*, 521 U.S. 898, 905 (1997).  And while the Committee asserts that *Raines* concerned only lawsuits brought by individual legislators, Opp. at 22, the Committee ignores that *Raines* focused on the historical absence of inter-branch suits between *Congress itself* and *the President himself*, rather than individual members of the legislative and executive branches, 521 U.S. at 826-29.[2]

Finally, the Committee offers the policy argument that "a civil enforcement action like this one is more practical and desirable than the alternatives," including the exercise of the House's inherent contempt power or referral to the Executive Branch for prosecution.  *See* Opp. at 31.  To be sure, it would raise grave constitutional issues for the House to try to use inherent contempt

---

[2] The Committee's assertion that Defendants' reading of *Raines* necessarily implies the invalidity of 28 U.S.C. § 1365 as applied to private parties is thus incorrect. *See* Opp. at 22 n.28. This Court can rest on *Raines*'s emphasis on the historical absence of inter-branch suits without determining whether the Senate would have a judicially cognizable interest in a suit against private parties.

authority against an Executive Branch official, or for the House to try to compel the Executive Branch to launch a criminal prosecution against an Executive officer.  But Congress has plenty of other tools, including both the constitutionally mandated negotiation and accommodation process and the threat of legislative reprisals backing that process.  In any case, the fact that the Committee now deems impractical or undesirable the tools it actually possesses cannot justify the creation of a civil enforcement power that has no basis in the text or history of the Constitution.

**B.     The Committee Fails to State a Cognizable Injury.**

In addition to being incompatible with the separation of powers, the Committee's suit is not justiciable because the Committee fails to identify an injury that is sufficiently "concrete and particularized" to satisfy Article III.  *Raines*, 521 U.S. at 819.  The Committee's arguments to the contrary are wrong.

First, the Committee argues that *Raines* is irrelevant because it involved only individual legislators.  *See* Opp. at 22.  To the contrary, *Raines* emphasized at the outset that a "key" requirement of Article III is to demonstrate a "*personal injury*," 521 U.S. at 818-19, which is lacking when a plaintiff who is not itself a sovereign entity sues based on alleged impairment of a "political power," *see id.* at 821; *see also Barnes v. Kline*, 759 F.2d 21, 69 (D.C. Cir. 1984) (Bork, J., dissenting) ("[I]f Congress may sue under these circumstances, it should follow that a congressional plaintiff may sue whenever he plausibly alleges an actual impairment of his lawmaking powers.  The harm, in each case, is of the same kind—an injury to lawmaking powers.").  Although the Supreme Court has nevertheless allowed sub-components of a *state* government to sue, it has expressly admonished that its holding does not extend to the *federal* government given the heightened separation-of-powers concerns presented.  *See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2665 n.12 (2015) (noting that the case before it "does not touch or concern the question whether Congress has standing to bring

a suit against the President" because "[t]here is no federal analogue to Arizona's initiative power" and "a suit between Congress and the President would raise separation-of-powers concerns").

Second, the Committee's assertion of informational injury fails.  The Committee's informational-injury argument is the following syllogism: informational injuries can support standing; the Committee is asserting an informational injury; therefore, the Committee has standing.  But while Congress may generally grant *private parties* a right to certain information, *see FEC v. Akins*, 524 U.S. 11, 21 (1998); *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989), the information sought here "is not claimed in any private capacity," *Raines*, 521 U.S. at 821.  Moreover, Congress cannot grant to itself, or any of its members, power that it does not possess under the Constitution.  *See Bowsher v. Synar*, 478 U.S. 714, 726 (1986) ("Congress cannot grant to an officer under its control what it does not possess."); *see also Waxman v. Thompson*, No. 04-3467, 2006 WL 8432224, at *5 (C.D. Cal. July 24, 2006) ("Where *private plaintiffs* assert the violation of a statute that confers a right to obtain information on 'any person,' the Supreme Court has held that deprivation of the right to access constitutes an injury in-fact." (emphasis added)).  And though an "implied" power "to secure needed information" is an "attribute of [Congress's] power to legislate," *McGrain v. Daugherty*, 273 U.S. 135, 161, 175 (1927), that power is an "auxiliary" one which exists only as "necessary and appropriate to make [Congress's] express powers effective," *id.* at 173.  It follows that, unless Plaintiff's asserted informational injury causes a cognizable institutional injury, there is no standing.  The Committee's own authority says as much.  *See U.S. House of Reps. v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76, 86 (D.D.C. 1998) (explaining that "a legislative body suffers injury when it cannot obtain information *necessary to perform its constitutional legislative or judicial functions* . . . ." (emphasis added)).  The Committee's theory of informational injury is thus coterminous with, and redundant of, its theory of institutional injury.

Third, the Committee fares no better with its theory that "Defendants' refusal to comply has inflicted institutional injuries on the Committee by preventing it from carrying out the House's constitutionally assigned responsibilities."   Opp. at 18.   While the Committee characterizes Defendants as challenging "how much injury the Committee has suffered," Opp. at 25 (emphasis omitted), Defendants' point is actually that "abstract dilution of institutional legislative power" at the hands of the Executive Branch is insufficiently "concrete and particularized" to sustain standing—period. *Raines*, 521 U.S. at 819, 821, 825-26.  *Raines* holds that the loss of effectiveness of a particular vote is not a cognizable injury for purposes of Article III, and it follows *a fortiori* that lack of access to information that might inform a particular vote is also not a sufficiently concrete and particularized injury.  *See Waxman*, 2006 WL 8432224, at *7 ("Because plaintiffs do not claim that defendant's failure to produce the requested documents nullified their votes, and assert only that they have been required to vote and legislate without full access to information, *Coleman* provides no basis for a finding that plaintiffs have standing to sue."); *see also Cummings v. Murphy*, 321 F. Supp. 3d 92, 110 (D.D.C. 2018).

The Committee's only response to cases like *Waxman* and *Cummings* is to observe that those cases were brought by individual legislators.  *See* Opp. at 24.  That is true, but those individual legislators claimed that Congress had delegated to them, by statute, the right to demand information from the Executive on behalf of Congress.  *See* 5 U.S.C. § 2954; *Cummings*, 321 F. Supp. 3d at 108.  In that respect, the *Waxman* and *Cummings* plaintiffs had no less of a basis to assert institutional injury than the Committee here.  And those cases' holdings that an informational injury is not cognizable under Article III for members of Congress seeking information on behalf of Congress therefore applies here as well.[3]

---

[3] The Committee further suggests that "[w]hen a party refuses to comply with [a] subpoena . . . that subpoena is nullified by the refusal."  Opp. at 26. To the extent that the Committee means to

### C.   Lawsuits of This Kind Imperil the Constitution's Allocation of Power Among the Branches of the Federal Government.

Lawsuits of this nature threaten the Constitution's allocation of powers in at least three ways.  First, such lawsuits threaten the independence of the judiciary.  It is not the role of federal courts to provide "amorphous general supervision of the operations of government."  *Raines*, 521 U.S. at 829.  Rather, the courts' limited role—resolving disputes between injured individuals— has "maintained public esteem for the federal courts and has permitted the peaceful coexistence of the countermajoritarian implications of judicial review and the democratic principles upon which our Federal Government in the final analysis rests."  *Raines*, 521 U.S. at 829; *see also U.S. House of Reps.*, 379 F. Supp. 3d at 10-11 ("The 'complete independence' of the Judiciary is 'peculiarly essential' under our Constitutional structure, and this independence requires that the courts 'take no active resolution whatever' in political fights between the other branches." (quoting The Federalist No. 78 (Alexander Hamilton))).  To avoid entangling federal courts in *political* disputes, Congress checks the Executive Branch using *political* tools, not civil litigation. "Congress has several political arrows in its quiver to counter perceived threats to its sphere of power," *id.* at 22, and the Committee's fear that dismissing this lawsuit would "damage the allocation of powers in the Constitution" is thus overblown.  *See* Opp. at 31.

Second, it threatens the separation of powers for Congress to initiate judicial proceedings against the Executive Branch to compel compliance with a legal obligation.  *See* Mot. at 24.  While

---

invoke the "vote nullification" doctrine of *Coleman v. Miller*, 307 U.S. 433 (1939), that attempt fails:  the House's ability to issue subpoenas or request information is not nullified where, as here, the subpoena or other legislative request remains in force and simply has not been satisfied.  *See Campbell v. Clinton*, 203 F.3d 19, 22 (D.C. Cir. 2000) ("The Court did not suggest in *Raines* that the President 'nullifies' a congressional vote and thus legislators have standing whenever the government does something Congress voted against, still less that congressmen would have standing anytime a President allegedly acts in excess of statutory authority."); *see also Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1954 (2019) (rejecting *Coleman* nullification theory).

the Committee points to the "power that the House and Senate possess independently of each other and of the President," Opp. at 29, that is the power to use their *own* processes to compel compliance with their subpoenas. *See Reed*, 277 U.S. at 388. In contrast, the "power to seek judicial relief . . . cannot possibly be regarded as . . . in aid of the legislative function." *Buckley v. Valeo*, 424 U.S. 1, 138 (1976); *see also Springer v. Gov't of Philippine Islands*, 277 U.S. 189, 202 (1928). That is why the House previously has disclaimed any power to bring "suit under the myriad of general laws authorizing aggrieved persons to challenge agency action" and dismissed as "speculative" the possibility that it would attempt "to afford itself broad standing to challenge the lawfulness of Executive conduct." Brief for U.S. House of Representatives at 17, 22 & n.25, *U.S. Dep't of Commerce v. U.S. House of Reps.*, 525 U.S. 316 (1999), No. 98-404, 1998 WL 767637 (1998).

Plaintiffs respond that Defendants' arguments leave Congress "dependent on the discretion of the Executive Branch to assist." Opp. at 1. If that is true, it is because the Legislative Branch's "dependence" upon the Executive Branch to bring enforcement proceedings alleging violations of legal obligations is a central feature of the Constitution's separation of powers—not a bug in the system. Congress has numerous *political* tools it can use to try to compel the Executive Branch with respect to its Article II powers, just as the Executive Branch has numerous political tools it can use to try to get Congress to pass particular laws under Article I. As a matter of legal compulsion, however, Congress can no more compel the Executive to bring particular prosecutions than the Executive may compel Congress to enact particular statutes.

Third, permitting the House to file lawsuits against the Executive Branch would especially upend the separation of powers given the Committee's categorical claim that it is itself immune from similar lawsuits. *See* Mot. at 25-26. The Committee offers no argument in response.

**D.     The House of Representatives Cannot Authorize a Lawsuit Without Specifically Voting to Do So.**

The Committee does not dispute that authorization by the House of Representatives is a necessary precondition to its filing suit against the Executive Branch.  Opp. at 32-36; *see also Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945 (2019) (dismissing a suit brought by a sub-component of the institution allegedly injured); *Raines*, 521 U.S. at 829 ("attach[ing] some importance to the fact that appellees have not been authorized to represent their respective Houses of Congress in this action"); *Cummings*, 321 F. Supp. 3d at 115 ("[T]here are good reasons for courts to look to the presence of authorization as a necessary, even if not sufficient, factor in evaluating standing in cases that pit the Executive and Legislative Branches against one another."); Brief of Amicus Curiae Bipartisan Legal Advisory Grp. of U.S. House of Representatives in Supp. of Reversal, *Waxman v. Evans*, 52 F. App'x 84 (9th Cir. 2002) (No. 02-55825), 2002 WL 32115554 ("Under the House rules a committee subpoena cannot be enforced without the approval of the House. Thus, while a committee can issue a subpoena to an executive agency, the entire body must concur before that subpoena can be enforced.").  Nor does it contend that the House actually has voted to authorize this lawsuit.  Instead, the Committee's sole argument is that because the House has the authority to "determine the Rules of its proceedings," U.S. Const. art. I, § 5, cl. 2, it was entitled to declare that "a vote of the Bipartisan Legal Advisory Group to authorize litigation . . . is the *equivalent* of a vote of the full House of Representatives."  *See* H.R. Res. 430, 116th Cong. (2019) (emphasis added).  Opp. at 35; *see also* Former House GCs Amicus (ECF No. 56) at 12.

But that argument, which would allow the House to delegate all its institutional authority to its leadership and thereby shield its members from the political consequences of the House's actions, has no basis in law, logic, or historical practice.  The Committee contends that "the House's choice . . . to rely on BLAG for these purposes is no different than the House's choice to

establish a particular committee structure or to assign certain tasks to particular standing or select committees," Opp. at 32, but that is wrong.  Article I does not require that the House organize itself into committees or say anything about how committees might be structured.  The Committee's examples of committee assignments to manage various internal proceedings are thus irrelevant in light of the Committee's tacit concession—compelled by the above-cited authorities—that at a bare minimum *Article III* requires that the House actually authorize a lawsuit against the Executive Branch purporting to assert the House's interests.  *See Raines*, 521 U.S. at 829 n.10 ("'Generally speaking, members of collegial bodies do not have standing to [take litigation actions] the body itself has declined to take.'" (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 544 (1986)).  That the House has some discretion to organize itself how it thinks best under Article I does not mean that it may ignore the Article III requirement of authorizing litigation against the Executive before filing it.

Indeed, it would have wide-ranging, radical consequences for this Court to accept the House's astonishing suggestion that it can use its "rulemaking power" to make a "delegation of authority it can exercise on its own to a committee." Opp. 33.  After all, the quintessential authority the House "can exercise on its own" is to vote for or against proposed legislation, but it would be patently unconstitutional for the House to make an unfettered delegation of its authority to vote on any and all legislation to BLAG (or, indeed, to the Speaker alone).  *See Chadha*, 462 U.S. at 953 n.16 ("Congress' authority to delegate portions of its power to administrative agencies provides no support for" Congress delegating power to itself); *cf. United States v. Ballin*, 144 U.S. 1, 6-8 (1892) ("the general rule of all parliamentary bodies is that . . . the act of a *majority of the quorum* is the act of the body"; "a major part of the whole is necessary to constitute a quorum, and a majority of the quorum may act").  Yet that is the direct implication of the House's argument here.

Finally, the Committee does not dispute that, in the past cases where the House has sought to enforce subpoenas against the Executive Branch, it specifically voted to authorize the lawsuit at issue. *See* Mot. at 28 n.16.[4]  And *this* House plainly knows how to do so—the same resolution that purported to delegate authority to authorize lawsuits to the BLAG *specifically authorized* other litigation, including the litigation against former White House Counsel Donald McGahn that is now pending in this Court. *See* H.R. Res. 430.  Of course, one can understand why the House might prefer to delegate the approval of litigation to its leadership: litigation may be unpopular, and so it might be politically advantageous to the House to avoid putting certain questions to all its members.  The very point of the authorization requirement, however, is to ensure that "only fully considered inter-branch conflicts enter the judicial realm." *Cummings*, 321 F. Supp. 3d at 115.  If the House is unwilling to put the question whether the House should seek the President's tax returns to its own members, it should not be able to put it to this Court.

### E.  Defendants' Argument Is Consistent With D.C. Circuit Case Law.

Finally, notwithstanding all of the reasons why lawsuits of this kind are not justiciable, the Committee contends that the "D.C. Circuit has recognized that the House of Representatives may sue to enforce a subpoena."  Opp. at 16.  That is not correct.  *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974) (en banc), contained no

---

[4]  The amicus brief filed by former general counsels of the House contends that the authorization provided to Congressman Moss in *AT&T I* is "legally indistinguishable from the circumstances here."  Former House GCs Amicus at 13.  In *AT&T I*, however, the House passed a resolution "authoriz[ing] appellant Congressman Moss to intervene on behalf of the interest of the House."  *United States v. AT&T*, 551 F.2d 384, 393 n.16 (D.C. Cir. 1976); *see* H.R. Res. 1420, 94th Cong. (1976) ("[T]he Chairman of the Subcommittee on  Oversight and Investigations of the Committee on Interstate and Foreign Commerce is authorized to intervene and appear in the pending action entitled '*United States, plaintiff, against American Telephone and Telegraph Co., et al., defendant,*' Civil Action 76-1372 . . . .").  Just as in *Holder* and *Miers*, a majority of the members of the House thus determined that the House should participate in the specific case.

holding on the jurisdictional issue, and *United States v. AT&T*, 551 F.2d 384 (D.C. Cir. 1976) ("*AT&T I*"), involved a lawsuit brought by the Executive Branch against a private telephone company, not a lawsuit brought by Congress against the Executive Branch. The case therefore hinged on an adjudication of individual rights that is absent here. While *AT&T I* did permit the House to appeal, Defendants' motion explained that by the time the D.C. Circuit did so, the district court had quashed the subpoena, and thus *AT&T I* did not hold that the House has standing to challenge mere non-compliance with a still-extant subpoena. *See* Mot. at 34. The Committee offers no response. Thus, particularly in light of the intervening decision in *Raines*, *AT&T I* should not be extended to the situation presented here.[5]

## II.      The Court Lacks Statutory Subject Matter Jurisdiction.

The Court lacks statutory jurisdiction for a simple reason:  28 U.S.C. § 1365(a), first enacted in 1978, "confers jurisdiction on the courts to enforce Congressional subpoenas" in limited circumstances, H.R. Rep. No. 95-1756, at 80 (1978), but it does so only for certain subpoena enforcement actions brought by the Senate and its committees. In contrast, it is undisputed that Congress has deliberately chosen not to enact a comparable statute for the House and its committees when seeking to obtain information, through subpoena or otherwise. Mot. at 29-32. Contrary to the Committee, *see* Opp. at 36, this argument encompasses all the Committee's claims,

---

[5] Although the Office of Legal Counsel previously suggested that Congress might be able to enforce its subpoenas against the Executive Branch through civil litigation in the 1980s, *see Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 U.S. Op. O.L.C. 101, 105 n.6, 137 (1984); *Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act*, 10 U.S. Op. O.L.C. 68, 83, 86, 88 (1986), these opinions were issued prior to the Supreme Court's decision in *Raines*, at a time when the D.C. Circuit accepted a theory of legislator standing that permitted judicial resolution of inter-branch disputes. In light of *Raines*, judicial resolution of inter-branch disputes of this kind is not permissible, as the D.C. Circuit has since recognized, *see Chenoweth v. Clinton*, 181 F.3d 112, 114 (D.C. Cir. 1999), and as the Department of Justice has consistently contended, beginning with its briefs in *Walker v. Cheney*, 230 F. Supp. 2d 51 (D.D.C. 2002).

not merely the claim entitled "Subpoena Enforcement." *See* Mot. at 2, 29. Neither the APA nor § 6103 is a source of subject-matter jurisdiction, and the Committee acknowledges that those claims must be brought, if at all, under § 1331. Opp. at 36. Regardless of how the Committee styles its claims, Congress has made clear that § 1331 does not confer jurisdiction for lawsuits by Congress seeking information from the Executive Branch.[6]

The Committee nonetheless asserts that it may seek enforcement of its demands for information under the general federal-question statute, 28 U.S.C. § 1331. Opp. at 36-43. But it is a basic precept that "[s]pecific terms prevail over the general in the same or another statute which otherwise might be controlling." *Howard v. Pritzker*, 775 F.3d 430, 441 (D.C. Cir. 2015). The Committee cannot reasonably dispute that § 1365(a) is more specific on the subject of jurisdiction for subpoena enforcement than § 1331. *See* Opp. at 36 (referencing "Section 1331's more general jurisdictional grants"). And under the canon against surplusage, "effect must be given, if possible, to every word, clause and sentence of a statute . . . so that no part will be inoperative or superfluous, void or insignificant." *In re Surface Min. Regulation Litig.*, 627 F.2d 1346, 1362 (D.C. Cir. 1980) (quotation marks omitted). The Committee likewise cannot seriously dispute that its interpretation of § 1331 makes § 1365(a) superfluous and its limitations meaningless.[7]

The Committee counters that "[r]edundancies across statutes are not unusual events in drafting," Opp. at 41 (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992)), but the

---

[6] That same analysis also applies to mandamus relief under 28 U.S.C. § 1361, another highly general jurisdictional statute that long predates the 1996 amendments to § 1365(a).

[7] The Committee notes, *see* Opp. at 41, that § 1365(b) authorizes district courts to issue orders compelling compliance with certain Senate subpoenas, and clarifies that any action, contempt proceeding, or sanction imposed pursuant to § 1365(b) does not abate upon adjournment of the Senate if the relevant Senate body certifies a continuing interest in the material. 28 U.S.C. § 1365(b). But the Committee never even attempts to establish that § 1365(b) confers powers that a court exercising jurisdiction under § 1331 would otherwise lack. Moreover, regardless of whether the remedial provisions in *§ 1365(b)* would be superfluous if § 1331 were available, the jurisdictional grant in *§ 1365(a)* still would be.

Committee's interpretation entails far more than mere "redundancies." Rather, the Committee's construction renders a separate jurisdictional statute superfluous and subsumes it within a general jurisdictional grant—even though Congress amended that separate statute *long after* it amended § 1331 to remove the amount-in-controversy requirement for all federal question cases. *See* Mot. at 30. Whether or not it was "a minor clarifying" measure (Opp. at 40), the Committee provides no explanation whatsoever why Congress in 1996 would have substantively amended § 1365 specifically to expand the set of government officials that the Senate could sue, if the Senate already could have sued those very officials under § 1331 as it stood going back to 1976. *See Yates v. United States*, 135 S. Ct. 1074, 1085 (2015) (plurality opinion) (noting that "[t]he Government acknowledges that, under its reading, [18 U.S.C.] § 1519 and [18 U.S.C.] § 1512(c)(1) 'significantly overlap'" and "[n]owhere does the Government explain what independent function § 1512(c)(1) would serve if the Government is right about the sweeping scope of § 1519").[8] The Committee states that "[w]hen Congress removed the amount-in-controversy requirement from Section 1331, it effectively rendered redundant several other provisions," and that "Congress was not required to repeal those provisions to eliminate any redundancies." Opp. at 41 n.45. But again, Congress did not merely fail to repeal § 1365(a)—it substantively amended that provision *after* the amendments to § 1331, which would make no sense if § 1331 independently supplied jurisdiction.

---

[8] The 1996 amendments delineated the circumstances in which § 1365(a) confers jurisdiction for Senate subpoena enforcement actions against executive officials (providing that the statute would confer jurisdiction in cases in which an executive official's refusal to comply was based upon a personal privilege). *See* Pub. L. No. 104-292, § 4, 110 Stat. 3459 (Oct. 11, 1996). Even assuming that this amendment was merely "clarifying"—in the sense that it did not change Congress's understanding of existing law—it cannot reasonably be characterized as "minor." Certainly it is not the sort of action Congress would have taken if it understood § 1365(a) at that time as redundant.

Although the 1996 amendment is dispositive, there are additional flaws with the Committee's argument that § 1365 was enacted when Congress had not yet eliminated the amount-in-controversy requirement for all federal-question claims. Opp. at 38-40. For example, while the Committee contends that the removal of the amount-in-controversy requirement from § 1331 in 1976 sufficed to permit Congress to enforce its subpoenas against the Executive Branch, the Committee cites absolutely nothing in the legislative history of § 1331 suggesting that the amount-in-controversy requirement was lifted with congressional subpoenas in mind. Similarly, the Committee points to nothing in § 1365's legislative history suggesting that Congress viewed the 1976 change to § 1331 as sufficient to provide courts with jurisdiction over congressional subpoena enforcement actions. Indeed, the legislative history of § 1365 strongly suggests that Congress did *not* believe § 1331 conferred such authority. S. Rep. No. 95-170, at 16 (1977) ("Presently, Congress can seek to enforce a subp[o]ena only by use of criminal [contempt] proceedings [under 2 U.S.C. § 192] or by the impractical procedure of conducting its own trial before the bar of the House of Representatives or the Senate."); *id.* at 89 (recognizing that "a future statute" might be needed to "specifically give the courts jurisdiction to hear a civil legal action brought by Congress to enforce a subp[o]ena against an executive branch official").[9]

_____

[9] The Committee, *see* Opp. at 40, points to a later passage from this report, stating that the provision's exception for Executive branch officials "is not intended to be a congressional finding that the federal courts do not now have the authority to hear a civil action to enforce a subpoena against an officer or employee of the federal government." S. Rep. No. 95-170, at 91-92 (1977). Contrary to the Committee, Defendants did not "ignore" that passage, and in fact discussed it at length in the brief. *See* Mot. at 37-38 (explaining that this Senate report accompanied a Senate bill that was later amended to omit a provision conferring subpoena-enforcement jurisdiction for the House). In any event, in the very next sentence the report stated "However, if the federal courts do not now have this authority, this statute does not confer it." S. Rep. No. 95-170, at 92 (1977). This sentence, along with the passages quoted above, belie the Committee's assertion that Congress enacted § 1365 with the understanding that enforcement actions against Executive Branch officials "already fell within Section 1331." Opp. at 40.

Relatedly, the Committee observes that "Section 1365 does not apply to the House" and that "[t]he Section 1365 legislation removed a reference to the House because the House committees had not had an opportunity to review the issues, and not because Congress intended to deny the House subpoena authority if it already existed." Opp. at 38 (citing H. R. Rep. No. 95-1756, at 80 (1978)).   But the Committee does not point to anything in the Conference Report suggesting that the House or the Senate believed such authority "already existed."   And the Conference Report indicates (or at least strongly suggests) that they did not.[10]

Finally, the Committee argues that, notwithstanding all of this, the D.C. Circuit's decision in *AT&T I* establishes statutory jurisdiction here as a matter of binding circuit law.  Opp. at 37.  It does not.  Although *AT&T I* concerned the legal duty of a House subpoena recipient, the case involved a suit brought by the Executive Branch against a private party, *see* 551 F.2d at 385, not a suit brought by Congress against the Executive Branch.   No specific jurisdictional statute delineated the circumstances where the Executive suit at issue in *AT&T I* could be brought, but the Congressional suit at issue here is governed by the specific jurisdictional limitations that Congress itself has enacted in § 1365 (and relatedly, where Congress has intended to provide a cause of action for other specially-constituted committees, it has done so explicitly, *see* pp. 31-32, *infra*). Moreover, *AT&T I* predated the 1996 amendments to § 1365(a) which, as discussed above, compel the conclusion that § 1331 does not apply to lawsuits brought by Congress against the Executive Branch.[11]

---

[10] *See* H.R. Rep. No. 95-1756, at 80 (1978) ("The appropriate committees in the House also have not considered the Senate's proposal to confer jurisdiction on the courts to enforce subp[o]enas of House and Senate committees.   The Senate has twice voted to confer such jurisdiction on the courts and desires at this time to confer jurisdiction on the courts to enforce Senate subp[o]enas.").

[11] For similar reasons, the Committee's reliance (Opp. at 42-43) on an OLC opinion that long predates the 1996 amendments is unpersuasive.

III.    **In the Alternative, the Court Should Stay or Dismiss this Suit Without Prejudice To Allow the Constitutionally Mandated Accommodation Process To Proceed.**

The D.C. Circuit has explained that "[t]he Constitution contemplates" a process of negotiation and mutual accommodation in inter-branch disputes like this one, *United States v. AT&T*, 567 F.2d 121, 130 (D.C. Cir. 1977) (*AT&T II*), and the accommodation process has dominated conflicts between the political branches over requests by Congress for information from the Executive Branch, Mot. at 39.   For reasons previously explained, assuming that the Committee's stated interest in the Presidential audit program is genuine, the Committee brought suit without adequately exhausting the possibilities for gathering additional information sufficient to inform its supposed legislative interest in the program.

As set out in Defendants' motion to dismiss, before April 3, 2019, no one associated with the Committee during the 116th Congress requested from the Department information about the process by which the IRS audits and enforces the Federal tax laws against a sitting President. Vaughan Decl.  ¶ 9.  Then, after not responding for nearly a month to the Secretary's initial offer to provide further information—and after issuing a subpoena accompanied by a letter that seemed to dismiss the Department's offer of additional information out of hand—Committee staff (but no Committee members, Vaughan Decl. ¶ 42) attended one briefing on the Presidential audit process. Mot. at 40-41; Vaughan Decl. ¶¶ 18-30 (describing chronology).  The Committee then filed suit before receiving responses to the list of 291 questions Committee staff had sent following the briefing (a list prepared before the briefing, which included many questions the Department had answered at the briefing).   And it took this step not only without awaiting the Department's responses, but also without even answering the Department's inquiries concerning which questions the Committee wanted prioritized.  Vaughan Decl. ¶¶ 51-56.

The longstanding tradition of accommodation and negotiation establishes that judicial intervention in sensitive inter-branch disputes of this nature should be a remedy of last resort.  The

Court should accordingly not proceed to the merits of the Committee's claims until the Committee has earnestly engaged in and exhausted the negotiation and accommodation process. The Committee makes a number of contrary arguments, but none withstand scrutiny.

Initially, the Committee asserts that Defendants' account of the parties' correspondence is "one-sided" as well as "incomplete." Opp. at 43. But the Committee never explains why. Certainly, the Committee does not seriously dispute the basic points Defendants have outlined— that it filed suit following a single briefing, without awaiting the Department's responses to its follow up questions. And notwithstanding the lack of a rational connection between the Committee's supposed legislative purpose of conducting oversight of the Presidential-audit process and its request for tax returns and return information relating to a single taxpayer—most of which concern years before President Trump assumed office—the Committee has never suggested *any* willingness to consider alternative sources for the information it supposedly needs to satisfy its newfound interest in legislating on the Presidential-audit process.

The Committee further contends that resort to the accommodation process is appropriate only "in the rare circumstance when the record 'demonstrates the proximity of the parties to a compromise.'" Opp. at 43 (quoting *AT&T 1*, 551 F.2d at 385). But although the D.C. Circuit noted that the parties in *AT&T* had taken meaningful steps towards a compromise, this reference does not suggest that a court may only stay or dismiss an action without prejudice when the parties are *already* near an agreement. Such a requirement would be particularly inappropriate where, as here, suit was filed before the Committee meaningfully explored the possibility for accommodation. It would also reward obstreperousness by opening the courthouse doors whenever the House refuses even to open a meaningful dialogue in the accommodation process.

The Committee also insists that, in deciding the accommodation issue, the Court must ignore the correspondence discussed in the Vaughan declarations. Opp. at 16. In support of this

proposition, the Committee asserts that staying or dismissing this case without prejudice based on the Committee's failure to exhaust the accommodation process represents a request for "abstention" that is cognizable only under Rule 12(b)(6) (under which, according to the Committee, the Court may not rely on matters outside the Complaint). *Id.* at 16, 43 n.46. This assertion is doubly incorrect. For one, the Committee provides no support for its characterization of this issue as involving abstention principles.[12] But even if the Government's accommodation arguments are appropriately characterized as a request for judicial abstention, "[a] motion to dismiss based upon abstention and primary jurisdiction grounds may be decided under Rule 12(b)(1)." *Sierra Club v. Chesapeake Operating, LLC*, 248 F. Supp. 3d 1194, 1199 (W.D. Okla. 2017) (collecting cases).[13] Regardless of how the issue is analyzed, the Court is thus not required

---

[12] The Committee cites *AT&T II* for that proposition, Opp. at 16, but that decision did not describe staying or dismissing without prejudice in favor of the accommodation process as a form of judicial abstention; indeed, *AT&T II* used the language of abstention 11 times, all of which involved the Court's discussion of the *political-question doctrine*. *See, e.g.*, 567 F.2d at 123, 126. And requiring negotiation and accommodation before adjudicating the merits of an inter-branch controversy like this one does not resemble any of the traditional abstention doctrines—all of which involve deferring to pending or future proceedings in some other tribunal. *See, e.g.*, *R. Comm'n v. Pullman Co.*, 312 U.S. 496 (1941) (abstention pending certain state-court decisions on questions of state law); *Younger v. Harris*, 401 U.S. 37 (1971) (generally barring federal courts from enjoining pending state criminal proceedings); *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943) (allowing federal courts to abstain in certain diversity cases involving complex questions of state law); *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976) (allowing abstention due to the presence of a concurrent proceeding under certain circumstances). If anything, the accommodation process is more analogous to any number of pre-filing exhaustion requirements, the resolution of which are not generally limited to the face of the complaint regardless of whether they are termed jurisdictional. *See, e.g.*, *Turner v. Burnside*, 541 F.3d 1077, 1082 (11th Cir. 2008) (concluding that statutory exhaustion requirement could be decided with reference to outside materials, even though requirement was not jurisdictional).

[13] *See also Williams v. Pucinski*, No. 01-cv-5588, 2002 WL 1585571, at *2 (N.D. Ill. July 12, 2002) ("Defendants' motion to dismiss is based on the abstention doctrine. This kind of motion is considered under Federal Rule of Civil Procedure 12(b)(1)."); *Hanlin Grp., Inc. v. Power Auth. of State of N.Y.*, 703 F. Supp. 305, 306 (S.D.N.Y. 1989) ("[Defendants'] motion is granted pursuant to Fed. R. Civ. P. 12(b)(1) on the ground that this Court refuses jurisdiction over this action pursuant to the *Burford* abstention doctrine."); *Delaney v. Specialized Loan Servicing, LLC*, No. 15-cv-5260, 2015 WL 7776902, at *2 (N.D. Ill. Dec. 3, 2015) (staying case under *Colorado River*

to blind itself to the relevant materials Defendants have provided (the accuracy of which the Committee does not dispute).  Were it otherwise, any plaintiff in sensitive inter-branch disputes like this one could avoid its constitutional obligation to engage in negotiation and accommodation merely through selective pleading.

At bottom then, the Committee's rejection of accommodation reduces to its claim that no compromise is possible because Defendants have made clear that they will not—indeed, legally cannot—supply the requested tax returns and return information.  Opp. at 44-45, 47.  But this misstates the relevant inquiry.  If the Committee had conceded that it was seeking President Trump's tax returns and return information *as an end in itself* (to make them public)—as the Department and OLC concluded—Defendants' position that they cannot lawfully supply that material might preclude compromise.  But the premise of the Committee's lawsuit is that the Committee wants these materials for a different, legitimate reason—namely, to inform potential legislation on the general presidential-audit process.  *See* Compl. ¶¶ 46-55.

The Committee has provided no reason why sincere and good-faith discussions between the parties could not reasonably be expected to address the Committee's purported legislative interest in how the presidential-audit program operates—or at least likely narrow the issues for the Court to decide—without requiring access to the President's tax returns and return information.

---

doctrine after explaining that, under Rule 12(b)(1), the Court could look beyond the allegations of the Complaint in deciding the issue); 5B Fed. Prac. & Proc. Civ. § 1350 (3d ed.) ("Courts have recognized a variety of other defenses that one normally would not think of as raising subject-matter jurisdiction questions when considering a Rule 12(b)(1) motion, such as . . . the subject matter is one over which the federal court should abstain from exercising jurisdiction.").  As Defendants' citation makes clear, courts have not been entirely consistent on this question.  Opp. at 16 (citing *William Penn Apartments v. D.C. Court of Appeals*, 39 F. Supp. 3d 11, 19-20 (D.D.C. 2014), which considered *Younger* abstention in the context of Rule 12(b)(6), albeit without significant analysis of the issue); *see also Mass. Delivery Ass'n v. Coakley*, 671 F.3d 33, 40 (1st Cir. 2012) (acknowledging disagreement among district courts within the First Circuit on this point).

The returns at issue do not contain any information about audit processes and, for four of the six years of returns requested, are for years preceding the President's time in office.

The Committee responds "that it is seeking the President's returns and audit-file information not simply to assess the mandatory audit program in general, but also to assess whether the auditing of this President's returns has been subject to improper political influence and whether this President's tax situation suggests the need for revisions to the tax code." Opp. at 44. But the Committee nowhere adequately explains why it needs to see the requested tax returns—most of which are for years *before* President Trump became President—to consider revisions to the tax code writ large. And again, presumably the best way for the Committee to pursue its supposed legislative interest in the subject of political influence is to obtain information from the Department about how the Department ensures that its auditing process is free of political influence (some of which Defendants provided with their motion to dismiss, *see* ECF No. 44-4 ¶¶ 14-21). Likewise, the Committee references an "unsolicited communication from a federal employee" concerning what the Committee describes as "evidence of possible misconduct" and potential "inappropriate efforts to influence" the program. Opp. at 45. But the Committee does not explain how these allegations are in any way related to its demand to see six years of tax returns and return information, let alone why *only* the tax returns and return information can satisfy its supposed legislative interest such that further negotiations are not even worthwhile.[14]

---

[14] The Complaint is similarly unenlightening on this point. The Complaint references various "legislative and oversight efforts relating to Presidential tax returns," Compl. ¶ 51, as well as certain bills "that could be implicated by President Trump's returns," *id.* ¶ 52. But with one exception, all of the measures the Complaint describes involve legislation that would require or encourage the President as well as certain other major officeholders and candidates to make their tax returns publicly available. The Committee barely even attempts to explain why it plausibly needs to review the content of President Trump's tax returns and return information in considering these pieces of legislation. The one exception—a bill the Committee describes as "amending the Internal Revenue Code to limit the maximum deduction that can be claimed by a partner in a

For all of these reasons, even if this Court had jurisdiction to entertain this suit and even if the Committee had stated a claim sufficient for purposes of Rule 12(b)(6), the Court should not adjudicate the merits of this controversy until the parties have exhausted the accommodation process such that it is clear that this Court's intervention is actually necessary.

## IV.   The Committee Fails to State a Claim.

### A.   The Committee Lacks a Cause of Action to Enforce Its Subpoenas and Section 6103(f) Requests.

The Committee does not contest, nor could it, that a plaintiff seeking to enforce a substantive right in federal court must possess a procedural right of action to sue. *See, e.g.*, *Alexander v. Sandoval*, 532 U.S. 273, 286 (2001) ("Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress"); *Gonzaga Univ. v. Doe*, 536 U.S. 274, 284 (2002) ("[E]ven where a statute is phrased in . . . explicit rights-created terms, a plaintiff suing under an implied right of action still must show that the statute manifests an intent 'to create not just a private *right* but also a private *remedy*.'" (quoting *Sandoval*, 532 U.S. at 286)). While the Committee's central claim here is that it has a statutory right to the President's tax returns pursuant to § 6103(f), it fails to articulate any concomitant right of action under the tax code, *see* Mot. at 45-46. The Committee thus appears to concede that the statute does not create such a judicial remedy.

Indeed, the Committee argues that it has an implied right of action to enforce its informational inquiries created, silently, by Article I itself. *See* Opp. at 48-50. This is an extraordinary claim in light of Article I's insistence on a careful enumeration of limited Congressional powers, which stands in contrast with the corresponding vesting clauses of executive and judicial power in Articles II and III, respectively. And the authorities the Committee

---

partnership that donates certain conservation easements," *id.*—likewise has no apparent relationship to the Committee's request.

cites do not support its remarkable claim.  The Committee relies on *Anderson v. Dunn*, 19 U.S. 204, 230 (1821) and *Marshall v. Gordon*, 243 U.S. 521 (1917), for the proposition that it has "the right to seek judicial redress of conduct that interferes with the discharge of its legislative functions."  Opp. at 48.  These cases, however, merely held that each House of Congress has certain contempt powers, *see Anderson*, 19 U.S. at 230; *Marshall*, 243 U.S. at 533—powers that the House has not even attempted to exercise here.  The cases did not consider whether a single house of Congress, much less a lone congressional committee, can decline to exercise contempt powers and instead bring a civil lawsuit simply because it believes that route to be more "modest." Opp. at 28, 49.  Moreover, in those cases, officers of Congress were the *defendants* and had been sued by the private parties held in contempt in the context of a petition for habeas corpus, *Marshall*, 243 U.S. at 532, and an action for false imprisonment, *Anderson*, 19 U.S. at 204.  Those rights of action, in favor of individual persons subjected to the compulsory power of Congress, are based on more than two centuries of historical practice.  As Defendants have shown, no such historical pedigree exists here.  Mot. at 15-18, 31; *see also In re Application of the U.S. Senate Permanent Subcomm. on Investigations*, 655 F.2d 1232, 1238 (D.C. Cir. 1981) ("Prior to 1978 Congress had only two means of enforcing compliance with its subpoenas: a statutory criminal contempt mechanism and the inherent congressional contempt power." (footnotes omitted)).

The Supreme Court's holding in *Reed*, 277 U.S. 376, underscores the absence of any historical pedigree.  The Court observed there that "the established practice" of Congress was "to rely on its own powers" to enforce its informational inquiries.  *Id.* at 389.  And, based on that established practice, the Court held that it could not conclude that "the Senate . . . intend[ed] to authorize the committee . . . to invoke the power of the Judicial Department" absent a clear statement to that effect.  *Id.* at 389.  The Committee tries to diminish *Reed* by arguing that it was only about whether authorization had been supplied by the full Senate so as to invoke the

applicable jurisdictional statute at issue, Opp. at 49-50, but the Committee is wrong.  The Supreme Court expressly held that the "[a]uthority to exert the powers of the Senate to compel production of evidence *differs widely* from authority to invoke judicial power to that purpose." *Reed*, 277 U.S. at 389 (emphasis added).  That is the same principle underlying the Supreme Court's modern cause-of-action jurisprudence.  The Committee's limited power to issue congressional subpoenas or invoke § 6103(f) in proper circumstances does not equate to the ability to enforce those efforts directly in federal court.  Thus, while *Reed* confirms that authorization of the full House is *necessary* for the Committee to represent the interests of the full House in any litigation, it does not suggest that such authorization is *sufficient*.  The Committee still needs a cause of action.

Nor do general principles support an implied right of action emanating from Article I to enforce the Committee's subpoena.  The Committee attempts to distinguish *Sandoval* and its progeny by claiming these are only about statutory rights.  *See* Opp. at 50.  But the Supreme Court has emphasized that, while "[t]he decision to recognize an implied cause of action under a statute involves somewhat different considerations than when the question is whether to recognize an implied cause of action to enforce a provision of the Constitution itself," the inquiry is "similar." *Ziglar v. Abbasi*, 137 S. Ct. 1873, 1856 (2017).  Key to that inquiry is "separation-of-powers principles," *id.*, and the Committee cannot credibly suggest that such principles are not squarely presented by a struggle between the Executive Branch and Congress over access to information (much less one involving the confidential records of a sitting President).  *See also Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1398 (2018) ("litigation [that] implicates serious separation-of-powers and [other] concerns[] . . . must be 'subject to vigilant doorkeeping.'" (citations omitted)).

The Committee also seeks to distinguish *Abbasi* and *Jesner* because they concerned damages claims rather than the equitable relief the Committee seeks here, Opp. at 52, but that is not a meaningful distinction.  The Supreme Court held that *whenever* "'a host of considerations . . .

must be weighed and appraised'" before determining whether "the public interest would be served" by a judicial remedy, those considerations "should be committed to 'those who write the laws' rather than 'those who interpret them.'" *Abbasi*, 137 S. Ct. at 1857 (citation omitted).  That principle is not limited to damages claims, and it is squarely applicable here.  Congress has never said, or even implied, that it *wants* the courts to opine on the scope of the House's power of inquiry through a civil lawsuit initiated by a handful of members with delegated powers, thereby bypassing the accommodation process and inviting zero-sum outcomes that may not serve the public interest. Indeed, Congress has repeatedly declined to take the step of creating the judicial vehicle that the Committee asserts here, even when invited to do so by the D.C. Circuit in *Tobin v. United States*, 306 F.2d 270, 276 (D.C. Cir. 1962).  Thus, the fact that each House has a right to *issue subpoenas* does not remotely mean that Congress as a whole would have intended individual Houses to sue to enforce them (let alone individual committees).  In these circumstances, the long tradition of accommodation between the branches, as well as the fact that the "House retains the institutional tools necessary to remedy any harm caused to this power by the Administration's actions," *U.S. House of Reps.*, 379 F. Supp. 3d at 20, counsels against finding an implied cause of action here. *See also* Mot. at 46-47.

### B.    The Committee Cannot Invoke the Federal Courts' Traditional Equity Powers

The Committee similarly cannot invoke the federal courts' equity jurisdiction, as this is not a context where the "relief . . . requested . . . was traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund., Inc.*, 527 U.S. 308, 319 (1999).  In determining whether "traditional equitable powers" apply, particularly in a context where "separation-of-powers principles" are central, *Ziglar*, 137 S. Ct. at 1857, historical context matters.  *See, e.g.*, *Grupo Mexicano*, 527 U.S. at 327-29 (observing that the equitable powers of the federal courts do "not include the power to create remedies previously unknown to equity jurisprudence" and

concluding, based on a historical analysis, that no cause of action existed because "the English courts of equity did not actually exercise" the power asserted); *Mistretta v. United States*, 488 U.S. 361, 401 (1989) (noting that "traditional ways of conducting government . . . give meaning to the Constitution"); *see generally*, Curtis A. Bradley & Trevor W. Morrison, *Historical Gloss and the Separation of Powers*, 126 HARV. L. REV. 411 (2012).  Here—as the Committee concedes—there simply is no historical tradition of the courts adjudicating suits by the House to enforce subpoenas; rather, the "history shows that the House has long secured compliance with its power to investigate by using its *own* Sergeant at Arms to arrest and detain contemnors."  Opp. at 30 (emphasis added). And with respect to disputes between the Executive and Congress, accommodation is the tradition—not litigation.  *See* Mot. at 38-39.

The Committee therefore resorts to an expansive framing, arguing that the proper inquiry is whether "federal courts of equity have traditionally accorded declaratory [or] injunctive relief when Executive officials act contrary to or in excess of federal law" in general, rather than in "precisely similar" cases.  Opp. at 52.  But *Grupo Mexicano* flatly forecloses this argument, as the Supreme Court there carefully distinguished between suits by a creditor to retain a debtor's assets *pre*-judgment versus *post*-judgment.  527 U.S. at 330-32.  In all events, the Committee cannot seriously argue that allowing a *component of Congress* to invoke the courts' equitable power to enforce alleged informational rights against the Executive Branch where Congress itself has declined to create a cause of action is interchangeable with, *e.g.*, an action to "prevent an injurious act by a public officer."  *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015) (citing *Carroll v. Safford*, 44 U.S. (3 How.) 441, 463 (1845)); *see also id.* at 1385 ("The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations.").  In the latter circumstance, the court is acting to protect individual liberty from incursions by the government; in the former, it is tipping the constitutional balance in favor

of one branch of government that already possesses its own constitutional powers and remedies. Equating the two would mean disregarding the separation of powers principles underlying the cause-of-action requirement and abdicating the "vigilant doorkeeping" demanded by those principles. *See Jesner*, 138 S. Ct. at 1398.

### C.     The Declaratory Judgment Act Does Not Provide A Cause of Action

The Committee is also wrong to assert that the Declaratory Judgment Act, 28 U.S.C. § 2201, permits it to proceed in this case absent a clear right of action.  The Committee's argument boils down to the assertion that it may invoke the Declaratory Judgment Act because it has "rights guaranteed elsewhere."  Opp. at 53.  But as Defendants have shown, Mot. at 47, the existence of *rights* is not the question; the question is whether the Committee has a *judicial remedy* guaranteed elsewhere.  *See Walpin v. Corp. for Nat'l & Cmty. Serv.*, 718 F. Supp. 2d 18, 24 (D.D.C. 2010); *C & E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002) (the right must already be "judicially remediable").  Indeed, were that not the standard, the Declaratory Judgment Act would, in essence, act as a universal cause of action—which is emphatically not the law.  *See, e.g.*, *Sandoval*, 532 U.S. at 286.[15]

### D.     The APA Claims Fail as a Matter of Law

#### 1.     APA Review is Precluded by Statute

The Committee's continued invocation of the APA is similarly misplaced.  The APA does

---

[15] Moreover, even the Committee concedes that the Declaratory Judgment Act does not supply jurisdiction, Opp. at 53-54, and it therefore seeks to invoke the jurisdictional grant of 28 U.S.C. § 1331, Opp. at 36-43.  But under *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667 (1950), where jurisdiction rests on § 1331, a plaintiff must show that a non-declaratory judgment action could have been brought.  *See id.* at 671-72 (with respect to "the power of the inferior federal courts to entertain litigation within the restricted area to which the Constitution and Acts of Congress confine them," the Declaratory Judgment Act simply allows a plaintiff to pursue a recognition of rights in lieu of an "immediately enforceable remedy like money damages or an injunction").  The Committee fails to show that such a non-declaratory judgment suit could be brought.

not apply to the extent the relevant legal scheme "preclude[s] judicial review," 5 U.S.C. § 701(a)(1), as determined "not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984). "'[W]hen Congress has dealt in particularity with a claim and [has] intended a specified remedy'—including its exceptions—to be exclusive, that is the end of the matter; the APA does not undo the judgment." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 216 (2012) (quoting *Block v. N.D. ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 286 n.22 (1983)).

Here, Congress has dealt in particularity with efforts by congressional committees to enforce their informational inquiries.  It has sought to allow the Senate, but not the House, to enforce its subpoenas through a civil lawsuit with the explicit exception of subpoenas "issued to an officer or employee of the executive branch of the Federal Government acting within his or her official capacity." 28 U.S.C. § 1365(a); *compare* 2 U.S.C. §§ 288(b) & 288d (establishing Office of Senate Legal Counsel and establishing procedures to authorize Counsel to bring civil subpoena enforcement actions) *with* 2 U.S.C. § 5571 (establishing House Office of General Counsel but making no mention of authority to initiate suits).  And where Congress has intended to provide a cause of action for other specially-constituted committees, it has done so explicitly. *See, e.g.*, Pub. L. No. 93-190, § B, 87 Stat. 736 (Dec. 18, 1973) (creating cause of action for the Senate Select Committee investigating the Watergate scandal to judicially enforce its subpoenas).  That carefully crafted scheme would be pointless if *either* house of Congress could enforce *any* Congressional subpoena against a federal agency in federal court using the APA at any time.  *See Match-E-Be-Nash*, 567 U.S. at 216.  The clear implication is that the House—which lacks the statutory authority of the Senate—must enforce its subpoenas using the judicial process under the criminal contempt statute, 2 U.S.C. § 192.  *Cf. United States v. House of Reps. of U.S.*, 556 F. Supp. 150, 152 (D.D.C.

1983) (noting argument by House of Representatives, as defendant, that the only route to testing the validity of a congressional subpoena was the "established criminal procedures" and observing that "[c]ourts have been extremely reluctant to interfere with th[at] statutory scheme by considering cases . . . seeking declaratory or injunctive relief"). This narrow availability of judicial review makes sense in light of the historical context of accommodation by which these disputes have almost always been resolved.

The Committee counters that the true question is whether the tax code precludes judicial review, Opp. at 56, but that argument does not advance its claim. As Defendants have shown, the tax code *does* preclude judicial review by creating a cause of action for violations of § 6103(a), *see* 26 U.S.C. § 7431, as well as a carefully delineated cause of action for taxpayers to enforce certain informational rights created under the tax code, *see* 26 U.S.C. § 6110(f)(4), while declining to create such a right under § 6103(f). *See* Mot. at 45 & n.20. Thus, absent any indication that Congress intended its informational inquiries under § 6103(f) to be enforced differently than other informational inquiries, it must be assumed that Congress intended the carefully crafted scheme governing congressional subpoenas to be the enforcement scheme under § 6103(f) as well.[16]

### 2. Declining to Provide Information to Congress is Not "Agency Action" Under the APA

The Committee's APA claims also fail for lack of reviewable "agency action." As the D.C. Circuit, in keeping with many other courts, has held, "[e]xecutive responses to congressional reporting requirements" are not the type of agency action rendered reviewable under the APA.

---

[16] In fact, this is the only conclusion that makes sense. Unlike members of the public, Congress cannot grant itself informational rights. The parameters of its power of inquiry are already defined by the Constitution. Thus, § 6103(f) does not create congressional "rights," but rather imposes limitations on the power of inquiry Congress would otherwise possess under the Constitution. Section 6103(f) should therefore be construed to work in tandem with, not as a departure from, Congress's subpoena power.

*Nat'l Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 318 (D.C. Cir. 1988); *see also Greenpeace USA v. Stone*, 748 F. Supp. 749, 765-66 (D. Haw. 1990); *Guerrero v. Clinton*, 157 F.3d 1190, 1195 (9th Cir. 1998); *United States v. White*, 869 F.2d 822, 829 (5th Cir. 1989); *Coll. Sports Council v. Gov't Accountability Office*, 421 F. Supp. 2d 59, 68 (D.D.C. 2006); *Ctr. for Biological Diversity v. Brennan*, 571 F. Supp. 2d 1105, 1118 (N.D. Cal. 2007).   The reason is straightforward— Congress does not need the APA because "the most representative branch is not powerless to vindicate its interests or ensure Executive fidelity to Legislative directives" through other means. *Hodel*, 865 F.2d at 319.

The Committee acknowledges this doctrine, but attempts to minimize it.  First, it says that this line of "reporting-requirement cases" has no application to § 6103(f), "which endows a particular committee with a right of access to particular documents held by an Executive Branch department." Opp. at 59-60.  But the distinction fails—§ 6103(f), like the statute at issue in *Hodel* and other cases, requires an agency to make information available to Congress.  Whether that is done directly by statute (as in *Hodel*) or via a Congressional request (as in § 6103(f)) is immaterial, particularly with respect to *Hodel*'s underlying point that Congress does not need a civil lawsuit to negotiate its prerogatives with the Executive Branch.  Thus, the fact that § 6103(f) purports to "create specific rights in the tax-writing committees to receive tax returns and return information on request," Opp. at 60; *but see supra* note 16 (explaining that Congress cannot grant itself informational rights it does not already possess), does not make it any different from myriad other congressional reporting requirements that "are, of course, legion in federal law."  *Hodel*, 865 F.2d at 317.  And while *Hodel* did not address the "broad, theoretical question whether an inter-branch reporting requirement can ever be reviewable in the absence of an express provision for judicial review," *id.* at 318 n.33, it held that such a requirement is not "agency action" under the APA, which is the only relevant question here.

33

### 3.      The Committee is Not a 'Person" Within the Meaning of the APA.

Undoubtedly, a central reason that the D.C. Circuit concluded in *Hodel* that inter-branch reporting is not "agency action" under the APA is the absurdity of the notion that Congress could be a "person" attempting to invoke the APA to enforce "rights" it has purportedly created for itself by statute.  The Committee fails to cite a single case in which Congress, or one of its committees, has been held to be a "person" entitled to sue and participate in administrative processes under the APA.  Instead, it relies on *U.S. House of Representatives v. Burwell*, 130 F. Supp. 3d 53, 78 (D.D.C. 2015).  But that case did not consider whether Congress was a person pursuant to the APA; it merely concluded that there was "precedent for the House filing suit to vindicate its rights in other contexts," *i.e.*, suits that were not brought under the APA.

The Committee also minimizes the concern that Congress "might be allowed to engage in other forms of administrative practice under the APA," Opp. at 62—a power it has disclaimed in other contexts, Mot. at 55-56—by simply asserting that such practice would not be "improper," Opp. at 62.  However, even that is incorrect.  While legislators might be permitted to participate in such processes in their *individual* capacities, the Committee purports to bring this lawsuit as an instrumentality of Congress itself, which has no ability to participate in the regulatory processes contemplated by the APA. *See Consumer Energy Council of Am. v. Fed. Energy Regulatory Comm'n*, 673 F.2d 425, 474 (D.C. Cir. 1982) (explaining that separation of powers principles preclude Congress from "'participat[ing] . . . in the approval or disapproval of . . . [regulations] 'enacted' by the executive branch'" under the APA and similar statutes (citation omitted)).  And because congressional committees are not subject to the regulatory authority of administrative agencies in their capacities as instrumentalities of Congress, they are unlike the state organizations that the D.C. Circuit has held to be "person[s]" under the APA.  *Compare Maryland Dep't of Human Res. v. Dep't of Health & Human Servs.*, 763 F.2d 1441, 1443 (D.C. Cir. 1985) (state

human resources department was a "person" that could invoke the APA where it challenged agency's determination that it "misspent $207,350 in federal grant monies" and disallowance of federal reimbursement).[17]

### E.   The Committee's Mandamus Claim Fails as a Matter of Law

The Committee similarly fails to state a claim in mandamus.   Rather than demonstrate the "extraordinary circumstances" for which the writ of mandamus is reserved, *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016), the Committee falls back on its conclusory assertion that its "right to relief is plain."   Opp. at 63.   But as Defendants have shown, because "Congress has no freestanding right to information under the Constitution," any request for records "can be sustained *only* in aid of a legitimate investigation and only where Congress's interest in the information overcomes any constitutional interests of the individual resisting the inquiry."   Mot. at 57.   Whatever the scope of these rights, they are neither "clear and indisputable," nor ministerial, and the Committee fails to show otherwise.   *See* Opp. at 63.   Nor has the Committee exhausted alternative avenues of relief, as it must do before mandamus can lie.   Indeed, the Committee entirely fails to respond to the Defendants' arguments on this point, *see id.*, and has thus failed to establish a necessary element of its mandamus claim.

### F.   The Committee's Non-Statutory Review Claim Fails as a Matter of Law

Finally, the Committee does not state a claim under the non-statutory ultra vires doctrine. As Defendants have shown—and the Committee does not dispute—this doctrine applies only

---

[17] The Committee also relies on *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 181 (D.C. Cir. 2019), but that case did little more than acknowledge that states may be "person[s]" within the meaning of the APA *if* they are subject to the regulatory authority of an agency.   In so acknowledging, however, the D.C. Circuit concluded that a Canadian province was *not* a "person" under the circumstances of that case, because it had not been subject to the agency's exercise of its regulatory authority.   *See id.* (discussing the definition of "person" and noting that "the APA evinces no congressional intent to authorize a State as *parens patriae* to sue the federal government").

when the government acts "without any authority whatever," *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984). It does not apply to "error[s] of fact or law." *Physicians Nat'l House Staff Ass'n v. Fanning*, 642 F.2d 492, 496 (D.C. Cir. 1980) (en banc). Here, Defendants are the "gatekeepers" of confidential taxpayer information, *Tax Analysts v. IRS*, 117 F.3d 607, 613 (D.C. Cir. 1997), and Congress lacks the "general authority to expose the private affairs of individuals without justification in terms of the functions of Congress." *Watkins v. United States*, 354 U.S. 178, 187 (1957). Therefore, as part of his duties to take care that the laws be faithfully executed, the Secretary must—at a minimum—make the threshold determination of whether the information entrusted to him for safekeeping is properly disclosed under the governing legal authorities. Whether the Secretary exercised that power correctly in this particular matter goes to the *propriety*, not the *authority*, of his action. That inquiry is beyond the scope of ultra vires review.

## CONCLUSION

For the foregoing reasons, this Court should dismiss the Complaint in its entirety.

Dated:  September 30, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JAMES M. BURNHAM
Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director

JAMES J. GILLIGAN
Special Litigation Counsel

/s/     *Steven A. Myers*
STEVEN A. MYERS (NY Bar No. 4823043)
SERENA M. ORLOFF (CA Bar No. 260888)
ANDREW BERNIE (DC Bar No. 995376)
Trial Attorneys

36

United States Department of Justice
Civil Division, Federal Programs Branch
P.O.  Box 883
Washington, D.C.  20044
Tel: (202) 305-0648
Fax: (202) 305-8470
Email: Steven.A.Myers@usdoj.gov

*Attorneys for Defendants*


 */s/ William S. Consovoy*

William S. Consovoy (D.C. Bar #493423)
Cameron T. Norris
Steven C. Begakis
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com

Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
Ten Post Office Square, 8th Floor
South PMB #706
Boston, Massachusetts 02109
(617) 227-0548

*Attorneys for Defendant-Intervenors*

37