```
 1                  UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2

 3     * * * * * * * * * * * * * * *    )
       COMMITTEE ON WAYS AND MEANS,     )    Civil Action
 4     UNITED STATES HOUSE OF           )    No. 19-01974
       REPRESENTATIVES,                 )
 5                                      )
                      Plaintiffs,       )
 6                                      )
         vs.                            )
 7                                      )
       UNITED STATES DEPARTMENT OF THE  )    Washington, DC
 8     TREASURY, et al.,                )    November 6, 2019
                                        )    10:01 a.m.
 9                     Defendants.      )
                                        )
10     * * * * * * * * * * * * * * *    )

11

12                 TRANSCRIPT OF MOTION HEARING
              BEFORE THE HONORABLE TREVOR N. McFADDEN,
13                  UNITED STATES DISTRICT JUDGE

14

15     APPEARANCES:

16     FOR THE PLAINTIFFS:     MEGAN BARBERO, ESQ.
                               JOSEPHINE T. MORSE, ESQ.
17                             TODD TATELMAN, ESQ.
                               DOUGLAS N. LETTER, ESQ.
18                             U.S. HOUSE OF REPRESENTATIVES
                               OFFICE OF GENERAL COUNSEL
19                             219 Cannon House Office Building
                               Washington, DC 20515
20

21     FOR THE DEFENDANTS:     JAMES BURNHAM, ESQ.
                               STEVEN A. MYERS, ESQ.
22                             SERENA ORLOFF, ESQ.
                               ELIZABETH SHAPIRO, ESQ.
23                             U.S. DEPARTMENT OF JUSTICE
                               CIVIL DIVISION - FEDERAL PROGRAMS
24                                BRANCH
                               1100 L Street, Northwest
25                             Washington, DC 20530
```

1    FOR THE PRESIDENT OF     WILLIAM S. CONSOVOY, ESQ.
     THE UNITED STATES:       CONSOVOY McCARTHY, PLLC
2                             1600 Wilson Boulevard
                              Suite 700
3                             Arlington, Virginia 22209

4
     REPORTED BY:             LISA EDWARDS, RDR, CRR
5                             Official Court Reporter
                              United States District Court for the
6                               District of Columbia
                              333 Constitution Avenue, NW
7                             Room 6706
                              Washington, DC 20001
8                             (202) 354-3269

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURTROOM DEPUTY:  Your Honor, this is Civil

2     Case 19-1974, Committee on Ways and Means, United States

3     House of Representatives versus the United States Department

4     of the Treasury, et al.

5          Counsel, please come forward to identify

6     yourselves for the record.

7          MS. BARBERO:  Your Honor, Megan Barbero, Assistant

8     General Counsel, US House of Representatives.  With me at

9     counsel table, I have General Counsel Douglas Letter, Deputy

10    General Counsel Todd Tatelman and Associate General Counsel

11    Josephine Morse.

12         THE COURT:  Good morning, folks.

13         MR. BURNHAM:  Good morning, your Honor.  James

14    Burnham on behalf of the United States.  With me I've got

15    Steven Myers, Betsy Shapiro and Serena Orloff.

16         Also, just to flag it for the Court, I'll be doing

17    standing and statutory jurisdiction and Mr. Myers will be

18    doing the remaining issues, accommodations, cause of action

19    and all of that.

20         THE COURT:  Okay.

21         MR. BURNHAM:  And I'll let Mr. Consovoy introduce

22    himself.

23         MR. CONSOVOY:  Good morning, your Honor.  Will

24    Consovoy on behalf of the President.

25         We have not sought argument time today.  We are

1     resting on our papers.

2                THE COURT:  Good morning, Mr. Consovoy.

3                And good morning, everyone.  If you're here for

4     the Roger Stone trial, you're in the wrong courtroom.

5                (Laughter.)

6                THE COURT:  I've got -- I thought it might be

7     helpful to the parties to give you some initial impressions;

8     and then I'd love your thoughts on those issues, and I've

9     got some specific questions for you as well.

10               On the subject-matter jurisdiction question, my

11    initial inclination, having read the briefs -- and, by the

12    way, thanks to both parties and the *amici* for the briefs.

13    They were very helpful and well-written.

14               But my initial inclination is that I probably do

15    have subject-matter jurisdiction.  It looks to me like there

16    is a long history of the House subpoenaing people and

17    documents, and there's also a history of efforts to enforce

18    those subpoenas through the courts, although certainly that

19    history is not as long.

20               But I see the Nixon-era cases, including the

21    Senate Committee here in this district, and then in front of

22    the DC Circuit, the *AT&T* case, *Myers*, *Holder*.  I think

23    there's a pretty strong line of cases there suggesting that

24    the House would have standing to bring this type of case.

25               I don't want to characterize the Executive

1    Branch's arguments, but it feels a little like you're saying

2    that the cases predating *Raines* are no longer good law and

3    those after *Raines* were only decided and that the OLC

4    opinions are also incorrect.  And that just -- that's a

5    tough position for me to accept.  But I appreciate your

6    clarifications and corrections in my understanding on any of

7    that.

8                On the statutory question:  Looking to *AT&T*, it

9    seems to -- there's good law suggesting that 1331 would

10   apply, although I think the Executive Branch has raised some

11   good arguments about 1365.  And I'm interested in

12   understanding the Committee's perspective on how I should

13   interpret those two sections.

14               The accommodation process:  I think the Executive

15   points to some important issues there, and I think that may

16   well have a part to play in this case.  But I'm not

17   convinced at this point that I should be dismissing the case

18   on that basis.

19               On the cause of action area, I think the Committee

20   still has some work to do in my mind in convincing me that

21   there is a cause of action here that they can pursue or at

22   least which ones of these that they've floated are really

23   appropriate to proceed on.

24               I think the Executive points to some important

25   precedents from the last few years, particularly *Abbasi* and

1    others, suggesting that courts are no longer in the business

2    of implying causes of action.  And so I'd like to understand

3    better what I should do about the fact that there isn't a

4    specific cause of action as there is for the Senate.

5          And also, on the APA, you know, again, there, it

6    seemed to me that the Executive raises some important

7    questions about whether the House -- or the Committee isn't

8    trying to force a square peg into a round hole.

9          So that's where I am.  I very much appreciate and

10   look forward to hearing the parties' thoughts and arguments.

11         Mr. Burnham?

12         MR. BURNHAM:  Thank you, your Honor.

13         And I appreciate you giving us your initial

14   thoughts initially.  Sorry to force you to decide this

15   issue.  We talked about it in the Border Wall case,

16   Mr. Letter and I; and you were able to avoid it then, but

17   here it is.

18         In times like today, when political passions are

19   running hottest, that is when it is the most important to

20   adhere to the fundamental constitutional principles that

21   have governed our republic for 200 years.

22         I appreciate your Honor's comments about the prior

23   cases, but I think it would help if I just took half a step

24   back and explained why we think our position is clearly

25   correct as a matter of first principles under the

1  Constitution and under *Raines versus Byrd*.  And then I think

2  it'll be easier for me to explain why *AT&T* is not binding

3  and why the two cases post-*Raines* were just wrongly decided.

4          The Constitution's structure, fundamental

5  principles of Article III --

6          THE COURT REPORTER:  Counsel, I'm going to have to

7  ask you to slow down.

8          MR. BURNHAM:  Yes, ma'am.

9          The Constitution's structure, fundamental

10  principles of Article III jurisdiction and basic statutory

11  construction all make clear that the Constitution gives the

12  political branches the tools they need to resolve their

13  disagreements.

14          As far as *Raines versus Byrd*, I think it dispels

15  any doubt about that.  As Justice Scalia later put it for

16  himself, the Chief Justice and Justice Thomas in *Windsor*,

17  quote, "*Raines* did not formally decide this issue, but its

18  reasoning does."  That's at Page 790 of his dissent.

19          Justice Souter and Justice Ginsburg concurred in

20  that decision and explained that, quote, "Intervention in

21  such a controversy would risk damaging the public confidence

22  that is vital to the functioning of the judicial branch by

23  embroiling the federal courts in a power contest at nearly

24  the height of its tension."  And that's the end of the

25  quote.

1          So the principle that underlay *Raines* is, I think,

2     one of the most fundamental separation-of-powers principles

3     we have, which is standing.  Standing requires two things:

4     that a dispute be amenable to judicial resolution and that

5     there be a concrete and particularized injury.

6          And I think when we're looking at especially the

7     post-*Raines* cases, Judge Bork -- then-Judge Bork's aphorism

8     in *Barnes versus Kline*, which I know your Honor is familiar

9     with, is applicable, which is that, quote, "Major

10    alterations in the constitutional system can be accomplished

11    through what seem to be minor adjustments in technical

12    doctrine."  And that's at Page 23 of Judge Bork's dissent.

13         So if you look at *Raines*, what drove the analysis

14    in *Raines* and the way *Raines* put it was they looked at

15    history and they looked at a series of great institutional

16    clashes between Congress and the Executive Branch.  In all

17    of those examples that *Raines* gave, the Executive Branch had

18    the same direct stake in the power at issue that the House

19    Committee or the House of Representatives has here.

20         So the first example they gave was Andrew Johnson

21    and the Tenure of Office Act.  The President had a direct,

22    vested, institutional interest in his ability to remove

23    Executive officers.

24         So if -- what the Court said, though, is that it

25    would have been crazy to think that rather than fire

1    Secretary of War Edward Stanton and attempt impeachment,

2    Andrew Johnson could have simply sued Congress or sued the

3    House or sued the Senate for a declaratory judgment in this

4    Court that the Tenure of Office Act was unconstitutional.

5         That didn't happen.  And it didn't happen because

6    that's just completely inconsistent with how the

7    Constitution operates.  I don't know how you distinguish

8    this case from that example.

9         They gave other examples.  They talked about *INS*

10   *versus Chadha*, where the Attorney General's ability to

11   decide removal issues was subject to a one-house legislative

12   veto.  Again, the Attorney General's institutional interest

13   in that authority was just as direct, just as concrete and

14   just as clear as the Committee's interest here.

15        But the Attorney General can't sue over that.  And

16   that's because this is just -- that's just not how our

17   Constitution operates.

18        And so the way the Court put it is they didn't say

19   individual legislators.  The quote they gave is:  "It is

20   evident from several episodes in our history that in

21   analogous confrontations between one or both houses of

22   Congress and the Executive Branch, no suit was brought on

23   the basis of claimed injury to official authority or power."

24        I think that quote tells you that what the Supreme

25   Court was saying was not that this was about whether it's

1   three Congressmen or the entire House of Representatives.

2   What they're saying is that it speaks about the difference

3   between institutional injury and personal injury or, as the

4   Court put it, a loss of political power versus something

5   that affects the individuals personally.

6        The way the Court explained it is they said there

7   would be, quote, "nothing irrational about a system that

8   granted standing in these cases, but it is obviously not the

9   regime that has obtained under our Constitution to date."

10   That's at Page 828.

11        That's a principle that goes all the way back to

12   *Marbury versus Madison*, where Chief Justice Marshall said

13   that, quote, "The province of the Court is solely to decide

14   on the rights of individuals" at Page 170.

15        Sorry.  I'll slow down.

16        And so I think that tells you that the mode of

17   analysis in *Raines*, which is binding on this Court and does

18   postdate *AT&T*, which is the only arguably binding decision

19   the Court has to grapple with, has completely eviscerated

20   the analysis in *AT&T*.

21        And in fact, the DC Circuit itself has said as

22   much in *Chenoweth,* where they said that after the 1970s,

23   quote, "The Supreme Court began to place greater emphasis

24   upon the separation-of-powers concerns underlying the

25   Article III standing requirement."

1          There's just been -- sorry.  Please.

2          THE COURT:  Well, I mean, Mr. Burnham, you know, I

3     agreed with you on -- in the last case where this was about

4     interpretation, the correct interpretation of a typical

5     statute.

6          But I also suggested that maybe there's something

7     different between subpoena enforcement and each house's

8     investigative authority and general concern about ensuring

9     that the law is properly executed, which is clearly your

10    purview, not Congress's, certainly not one member -- or one

11    house of Congress.

12         So why am I wrong about thinking that the

13    investigative authority and the enforcement -- the subpoena

14    enforcement to back up that investigative authority isn't

15    different from all of those cases about whether, you know,

16    laws are being executed properly?

17         MR. BURNHAM:  Right.

18         So on the one half of this, you have the

19    amenability to judicial resolution.  That is a point about

20    Congress suing the Executive.  That is categorical.  And so

21    whether they're suing about a subpoena or the appropriations

22    power or something else, the history of this is overwhelming

23    that they don't have the ability to bring the Executive

24    Branch into court.

25         There are a bunch of examples that Judge MacKinnon

1     gathers in his concurrence in *Nixon versus Sirica*, which is

2     487 F.2d 700.  It goes all the way back to George

3     Washington, who threatened to turn over papers related to

4     the Jay Treaty.

5              Nobody thought that that would lead to litigation.

6     What it instead led to is the House threatening not to

7     appropriate funds for a priority of General Washington --

8     I'm sorry -- President Washington.  And then President

9     Washington, you know, gave over some information and they

10    worked it out together.

11             There's examples from President Tyler, Grover

12    Cleveland, Presidents Jefferson, Jackson, Tyler, Polk,

13    Buchanan, Grant, Cleveland, Coolidge, Hoover, Franklin

14    Roosevelt, Truman, Reagan, Clinton.  All of these presidents

15    as long as the country has existed have fought with Congress

16    about information.  Congress has never tried to bring one of

17    those to court until the '70s, and there's only two or three

18    examples even in the '70s.  And the first time the House

19    tried to do it was 2008.

20             And so I just think that history is overwhelming

21    when you think about the basic question of whether this is

22    the kind of dispute that courts are supposed to be

23    adjudicating under the separation of powers and under

24    Article III.

25             Now, to answer your question even more directly,

1     the only potential distinction between the Appropriations

2     Clause case and this case is how the House's institutional

3     interest in their subpoena is more direct.

4          But that is not a distinction that I think matters

5     under *Raines* or frankly under the reasoning of this Court's

6     decision in the Border Wall case.  The way this Court put it

7     in its own opinion was the Constitution does not grant the

8     House, quote, "standing to hale the Executive Branch into

9     court claiming a dilution of Congress's legislative

10    authority."  That was at Page 11 of the Court's opinion.

11         But a subpoena is no different than that.  The

12    subpoena power is itself an implied power that, as *McGrain*

13    *versus Daugherty* and other cases have told us, is merely an

14    incident of the legislative power.

15         So there's no difference from a constitutional

16    perspective between failing to provide information that one

17    house of Congress or one committee of Congress thinks it

18    needs to enact legislation and draining the legislation of

19    its intended force.  They're the same.  I mean, one is

20    actually less of an injury to the House if you think about

21    it than the other.

22         THE COURT:  Well, I'm not sure about that,

23    because, I mean, legislation is -- that takes both houses

24    and the President, right, to legislate, whereas

25    investigating is something that each house gets to do

1    individually and to work on crafting legislation.  Doesn't

2    that go down to the house -- the rules of each House and its

3    ability to function independently?

4         MR. BURNHAM:  No, because I think what you're

5    talking about is just something that's antecedent to

6    legislation itself.  So the power to enact legislation is

7    Congress's power.  Congress has an implied power to seek

8    information only to the extent that it has a legitimate

9    legislative purpose.

10        So one of the issues in this case that we'll talk

11   about if we get to the merits will be whether they have a

12   legitimate legislative purpose in trying to obtain -- I

13   think it's eight years of the President's personal tax

14   returns.

15        We think they don't; they think they do.  And we

16   can talk about that.

17        But that is not different in kind from the

18   enactment of legislation or the sort of same issue the Court

19   already confronted in *House versus Mnuchin*.

20        I think -- to put it another way, when the

21   Executive Branch does, as the DC Circuit put it in *Campbell*,

22   quote, "something Congress voted against," end quote, that's

23   no different than the Executive Branch declining to provide

24   information that Congress has asked for.  It's just a

25   deprivation of what *Raines* described as political power as

1    compared to what *Raines* also distinguished it from, which is

2    the, quote, "loss of any private right."

3         THE COURT:  So *Raines* focused on the history, as

4    you point out.  And I thought there's really very little

5    history, if any, of either house thinking that it can

6    enforce the law or ensure that the Executive Branch is

7    enforcing the law correctly.

8         But that's very different from the history that

9    you just recited in these subpoena -- well, subpoena

10   examples.  To be fair, they're not cases; and I hear your

11   point there.

12        But Congress has been subpoenaing for a long time,

13   and the Executive has been complying for a long time.  And

14   isn't maybe the difference that -- is this the first time

15   the Executive Branch isn't complying?

16        MR. BURNHAM:  No.  So the examples I gave are all

17   examples where there was a fight, where the Executive was

18   not doing what Congress wanted.

19        And I don't dispute -- we don't dispute that

20   Congress has the power to issue subpoenas.  But the Supreme

21   Court decided a century ago in *Reed versus County*

22   *Commissioner of Delaware County* that, quote, "Authority to

23   exert the powers of Congress to compel production of

24   evidence differs widely from authority to invoke judicial

25   power for that purpose."  And that's at Pages 388 to 389.

1            And I think what that gets at is, there's no

2     question that they have the power to issue the subpoena.

3     And there's no question that they have every -- all sorts of

4     tools they can use to try to wring the information out of

5     the Executive Branch.

6            I think the thing that is totally unprecedented

7     except for the last 20 years with one or two examples in the

8     Nixon era that didn't address jurisdiction at all -- or that

9     didn't address this constitutional issue at all -- is

10    that -- I lost my train of thought.  But anyway, you

11    understand what I'm saying.

12                THE COURT:  Yes.  I think so.

13                What's, though, the --

14                MR. BURNHAM:  Sorry.  To go back to what I was

15    going to say, if you want.

16                THE COURT:  Well, before I forget --

17                MR. BURNHAM:  Please.  Yes.

18                THE COURT:  -- my own train of thought:  So you

19    agree that they can issue subpoenas.  The OLC, as you know,

20    has said they have three basic ways to enforce those:

21    contempt power, locking someone up and bringing a civil

22    case.  And OLC also says that the first two are impractical

23    and perhaps unconstitutional vis-à-vis an Executive

24    official.

25            So if we all agree that they can subpoena, what

1    are they to do when they're going against an Executive

2    Branch official if their other two options aren't going to

3    do anything?

4              MR. BURNHAM:  So just to be clear, OLC said that a

5    couple times in the 1980s, but that has not been the view of

6    OLC for 35 years.  And it's certainly not OLC's view today.

7              THE COURT:  Have they withdrawn those opinions?

8              MR. BURNHAM:  I'm not sure if they've withdrawn

9    the opinions.  But I mean, we are here on behalf of the

10   United States and the Justice Department speaking for the

11   entire Executive Branch in taking these positions, which are

12   positions we've taken since at least the *Myers* case.

13             And so I just -- I mean, things that Chuck Cooper

14   and Ted Olson issued in the 1980s are no longer the view of

15   the Executive Branch.  I just want to be clear.

16             THE COURT:  Okay.  Well --

17             MR. BURNHAM:  It doesn't mean you can't rely on

18   them for their persuasive value, but they are not our views

19   on the suing part.

20             THE COURT:  Understood.  I think I understand what

21   you're saying.

22             But as to OLC --

23             MR. BURNHAM:  Sure.

24             THE COURT:  -- is there a more recent opinion that

25   I should be looking at that has called into question those

1     prior opinions?

2            MR. BURNHAM:  Well, so, I mean, I'm happy to go

3     ask Mr. Engel when I get back to the Department and let your

4     Honor know if they have issued a new opinion.

5            But I do know that -- I mean, OLC is -- without

6     getting into the internal deliberations, this is the

7     Department's position.  And so the brief in *Myers* is, you

8     know, an official repudiation of the analysis in those OLC

9     opinions, because the Department has said to then Judge

10    Bates and we're telling you now that our view is that the

11    House cannot sue us.

12           So all I'm saying is that there's not -- it

13    doesn't mean -- they're not -- they don't evaporate.  So the

14    Court can read them, if the Court finds them persuasive.

15    That's obviously the Court's prerogative.  All I'm saying is

16    the Department has thought about this issue a lot since the

17    1980s, and the position that I'm articulating today is our

18    reasoned position.

19           I would also just say that back in the '80s,

20    things were a lot different.  I mean, the DC Circuit law

21    back then was that legislators could bring the Executive

22    Branch into court about all kinds of random institutional

23    injuries and the like.  I mean, Bork's opinion in *Barnes*

24    *versus Kline*, of course, was a dissent.  And I note that

25    that dissent is around the same time as those OLC opinions.

1                And just while we are on the topic of persuasive

2       authority, it's true that those opinions are out there.  But

3       we have Justice Scalia's dissent in *Windsor* joined by the

4       Chief Justice and Justice Thomas as well as Judge Bork's

5       dissent in *Barnes versus Kline*.  So I think those are also

6       very important, persuasive authorities that the Court should

7       consider.

8                But setting aside what the significance of the OLC

9       opinions are, your Honor asked:  What is Congress supposed

10      to do?

11               Congress has a lot of tools to get what it needs

12      out of the Executive Branch.  It has the power to

13      appropriate; it has the power to withhold appropriations; it

14      has the power to pass legislation, which it used to great

15      effect in, for example, its battles with President Andrew

16      Johnson when they had a veto-proof majority in both houses

17      of Congress.  Congress has the ability to refuse consent to

18      Executive Branch nominations, judicial nominations.  There's

19      a lot of things Congress can do if it has sufficient

20      political support in Congress and sufficient political will

21      to make the Executive do what it wants.

22               I actually think --

23               THE COURT:  To be fair, though, Mr. Cooper didn't

24      mention any of those in his memo, which is not to say that

25      maybe he wasn't wrong.  But it's just kind of surprising --

1          MR. BURNHAM:   Sure.

2          I don't think Mr. Cooper had the benefit of

3    Judge -- I don't know the exact timing between *Barnes versus*

4    *Kline* and Mr. Cooper's opinion.  He certainly didn't have

5    the benefit of *Raines versus Byrd*.  And he also -- this just

6    had not been a thing at that time.  That was after *AT&T*,

7    when of course the Executive Branch went into court.  And I

8    think that case is different, and I'll get to that in a

9    minute.

10          But that was just at a time when the DC Circuit

11    itself had a very different view of how these sorts of

12    disputes work.

13          And so I just -- I don't know.  I don't think

14    Mr. Cooper was writing on the same slate we're looking at

15    today.  And I don't blame him.  But I don't think that he --

16    you know, they had the benefit of the Supreme Court's

17    analysis in *Raines*.  And I don't think they thought about

18    the issues the way that we think about them now and the way

19    that I think it the right way to think about them.

20          And one other point I would want to make on the

21    congressional tools point:  There's no question -- I mean,

22    none -- in a judicial enforcement of congressional subpoenas

23    against anyone, but certainly against the Executive Branch,

24    is not -- has not been a feature of our republic for the

25    vast minority of its history.

1              There's one or two examples in the '70s.  I think

2      it's actually just *Senate Select Committee*, DDC and DC

3      Circuit.  There is, like, one case in the '80s where they

4      went against a privity party and then there's Myers and

5      *Holder*.

6              So I just think that, you know, if the Court were

7      to change that and if subpoenas were to become the

8      inexorable command that they say, that would be a major

9      revolution in the balance of powers between Congress and the

10     Executive, because what had always been the subject of

11     political compromise, political give-and-take, would

12     suddenly become something that is politically costless to

13     issue.  Every chairman can issue as many subpoenas as he or

14     she wants.  There's no political cost.  It just generally

15     doesn't require a vote, as I understand it, though

16     Mr. Letter will correct me if I'm wrong, of the full House

17     to issue a subpoena.  They can -- they'll be flying around

18     everywhere.

19             And they will all be coming to court to enforce

20     them against all the different parts of the Executive

21     Branch, and all we'll be doing all day long is responding to

22     subpoenas.  And all this Court -- it'd be like FOIA.  All of

23     a sudden, you'll have your FOIA docket --

24             THE COURT:  Heaven forbid.

25             MR. BURNHAM:  Yes.  Well, I know what motivates

1      the Court.  So we don't want another FOIA docket.  No.

2             But -- so I think, though, the history really

3      matters, because that would be a major upheaval in the way

4      the branches have related to each other.  What it would not

5      be is finding that these are not justiciable because these

6      have never happened before.

7             So we know that the country has operated perfectly

8      fine for over 200 years without the House suing the

9      Executive Branch in court.  And I just think that, you know,

10     the Court would need a much more compelling legal argument

11     than has been offered in order to upend all of that history.

12            THE COURT:  Mr. Burnham, obviously, Congress has

13     been sending subpoenas your way for hundreds of years.  Are

14     you familiar with a case where the Executive Branch has

15     said, "No"?

16            MR. BURNHAM:  Well, the George Washington example.

17     I mean, all the examples --

18            THE COURT:  I thought he did end up giving the

19     documents.

20            MR. BURNHAM:  They had a compromise.  I don't know

21     that it was -- I'd have to go check.  I don't think he gave

22     literally every piece of paper Congress wanted.  I think

23     they reached a political compromise.

24            All the examples I gave were examples of fights

25     between the two where there was, you know, pushback and

1    Congress used its tools and they reached a compromise.

2    That's a good thing.  That's how the Constitution is

3    supposed to work.  And there are some documents that the

4    Executive Branch may be very loath to provide and there are

5    some others that it might be less loath to provide.

6            It's perfectly appropriate that Congress would

7    have to exert more political pressure to get this category,

8    the stuff we really don't want to give over, as compared to

9    the category that we don't care about.

10           That's a feature.  That's the way the separation

11   of powers works.

12           And so -- but what they want to do is say that it

13   doesn't matter what the Senate thinks.  Right?  Because they

14   don't even have the ability to use all of Congress right

15   now.  It's just the House, generally speaking, to enforce

16   these subpoenas.

17           But now the House can issue whatever subpoenas it

18   wants, and then we'll rely on the judiciary to come in and

19   kind of be our enforcer against the Executive Branch and

20   make sure we get literally every single piece of paper we

21   ask the Executive Branch for.

22           That is completely different from how things have

23   ever operated before, even after *Myers*, because of course

24   *Myers* and *Holder* are just District Court opinions.

25           So it's not as though that has become the sort of

1    established law in the United States.

2           And I just think that is a major revolution in the

3    way the branches interact with each other that they have not

4    provided any legal basis for as a constitutional or

5    statutory matter.

6           THE COURT:  I think what they're going to tell me

7    is what is revolutionary is for the Executive Branch to just

8    say:  Pound sand.

9           MR. BURNHAM:  Right.

10          THE COURT:  That's never happened before.

11          MR. BURNHAM:  I think the burden would be on them

12   to show that Presidents Andrew Johnson, President Grover

13   Cleveland, past presidents -- presidents and Congress have

14   been fighting for as long as the presidency and Congress has

15   existed.  And presidential resistance to doing whatever

16   Congress wanted is hardly a new phenomenon.

17          President Andrew Johnson was impeached and only

18   was -- was failed to be removed by one vote.  The battles

19   between him and Congress in that era are -- were quite

20   serious.  And there's plenty of other examples of that

21   throughout history.

22          So the notion that all of a sudden we need to

23   invent a new right to go to court because the Congress all

24   of a sudden can't use the political tools it has

25   successfully used for 220 years, I think the House has a

1   pretty heavy burden to carry to show that that is really the

2   case, and I don't think they've come anywhere close to

3   carrying that burden here.

4              THE COURT REPORTER:  Sir, could you please slow

5   down.

6              MR. BURNHAM:  Yes.  Of course.

7              THE COURT:  Tell me about *AT&T*.  Why am I --

8              MR. BURNHAM:  Of course.

9              THE COURT:  -- not bound by that?

10             Of course.

11             So look:  I think the first point is just, you

12  know, the holding of *AT&T* is -- that's at issue is four

13  sentences long and just asserts as sort of a conclusory

14  matter that the House as a whole has standing to assert its

15  investigatory power.

16             You know, that is a decision that predates a sea

17  change in the law, exemplified by *Raines*, and that the DC

18  Circuit itself has recognized.

19             So in *Chenoweth*, the DC Circuit in discussing the

20  1974 *Kennedy* decision, which was two years before *AT&T*, said

21  that after the 1970s, the quote I read earlier, the Supreme

22  Court has begun to recognize much more the

23  separation-of-powers components of standing.

24             And so I think when *AT&T* said that, the reason why

25  it's only four sentences and doesn't have any analysis, any

1  citations or anything, that's because it was predicated on a

2  legal rule in the DC Circuit that has been completely

3  abrogated by *Raines*, which was that the legislators coming

4  in to sue the Executive Branch is a perfectly normal feature

5  of our Constitution.

6           THE COURT:  Do you agree that it's actually a

7  holding and, but for *Raines*, I would be bound by it?

8           MR. BURNHAM:  No.  That was going to be my next

9  point.

10          I mean, it's not -- I don't believe that issue was

11 contested in the case.

12          And so there's a very strong argument that that's

13 just a drive-by jurisdictional holding, which the Supreme

14 Court in many cases -- but *Steel Co.* is the most sort of

15 canonical case -- has said are not binding on the courts.

16          So I think --

17          THE COURT:  It wasn't exactly a drive-by, was it?

18 I mean, they kind of come up with this.  They steer into it.

19 Right?  The standing is always in front of the Court.

20          MR. BURNHAM:  Sure.

21          THE COURT:  And I think the parties didn't even

22 argue 1331, you know.  The Circuit kind of came up with this

23 idea that 1331 should -- and therefore it's okay.  And

24 whether that's a good idea or not, this wasn't accidental.

25          MR. BURNHAM:  So two separate points.

1          And I don't mean to suggest that it is the

2    prototypical drive-by holding.  I guess I would say it's a

3    drive-by holding "light" in that these -- the 1331 issue, of

4    course, is about statutory jurisdiction.

5          So there's two pieces of this:  There's whether

6    the House has appellate standing to -- as a constitutional

7    matter to take the appeal, and then there's the question of

8    whether there's a statutory basis for jurisdiction.

9          Neither of those as best I can tell were subject

10   to any sort of adversarial briefing before the DC Circuit.

11   It is true that the DC Circuit did directly address them.

12   My only point is that, given the almost summary way in which

13   it did, given what the law was in 1976, and -- which is

14   completely different from now in the way the DC Circuit

15   itself has recognized in *Chenoweth*.  I mean, the DC Circuit

16   has told us in *Chenoweth* that everything has changed since

17   the 1970s.

18         And so I just think that for better or worse, the

19   line in *AT&T* is not binding on this Court, and the Court

20   therefore has an obligation to get this issue right.  It has

21   to get it right in light of, you know, *Raines*, the

22   constitutional principles at stake and all of that.

23         One other point on *AT&T*:  The posture of *AT&T* was

24   quite different.  So in that case, the Executive Branch had

25   sued a private party in District Court.  So you have one

1    major distinction, which is that case featured someone with

2    private rights and obligations.  That's a big difference.

3            So the Executive Branch in that case didn't sue

4    the House; it sued a private company.

5            And then the House intervened in the case and

6    said:  You know, this is really all about our subpoena, and

7    we'd like to defend it.

8            The only jurisdictional issue presented to the DC

9    Circuit was whether in an Executive Branch-initiated case

10   against a private party, where a District Court quashed a

11   subpoena, so the subpoena was, you know, blown apart by the

12   District Court, could the House in that posture as an

13   intervenor bring an appeal to the DC Circuit?

14           Now, even if you think that their holding that

15   they could do that is good law today, that is a very

16   different situation from this.

17           So at a minimum, you would have to be extending

18   that to say that because the DC Circuit allowed a House

19   intervenor to take an appeal from a quashed subpoena in an

20   Executive Branch-initiated case, to say that that means the

21   House can now all the time sue the Executive Branch about

22   any subpoena it wants would be a substantial extension of

23   *AT&T*.

24           So I think at a minimum --

25           THE COURT:  Is that right, though?  I thought

1     standing is standing and that a defendant intervenor has to

2     prove it.  I mean, I've looked to that when I've decided

3     whether or not to grant defendant intervenor motions.

4          And I guess I wasn't aware that that standing

5     analysis really changes depending on whether you're an

6     intervenor or where in the case this comes.

7          MR. BURNHAM:  So the amenability of the dispute to

8     judicial resolution certainly would change or could change

9     when you have the interposition of a private party, when

10    there's a private party in the case whose private rights and

11    obligations are at issue.

12         It is true that the Court generally has an

13    obligation to think about defendant intervenor standing.

14    But, you know, when you have other defendants with standing,

15    when you have other plaintiffs with standing, you know, it's

16    not unusual, I think, in the DC Circuit certainly for them

17    to just not delve into the standing of every person.  Now,

18    that's not this case, because here they've addressed it

19    directly.

20         The other point I would make about why it's so

21    different, you know, under separation of powers, if you look

22    at *Buckley versus Valeo*, what *Buckley* says is that, quote,

23    "The power to seek judicial relief is authority that cannot

24    possibly be regarded as merely an aid of the legislative

25    function in Congress."

1              Another way they put it is, quote, "A lawsuit is

2      the ultimate remedy for a breach of the law.  And it is to

3      the President and not to the Congress that the Constitution

4      entrusts the responsibility to take care that the laws be

5      faithfully executed."  That's at Page 138 of *Buckley*.

6              So what I -- the point I'm trying to make is the

7      fact that the Executive initiated the lawsuit, the fact that

8      it included a private party, the fact that the District

9      Court had quashed the subpoena and so the House was -- you

10     know, there could be an argument that that's much closer to

11     nullification than what we're talking about here, because

12     the District Court had said the subpoena's out, and all

13     we're talking about is appellate standing.

14             All that tells us that applying that case here

15     would be an extension of it.

16             Now, it might be an extension that if all you had

17     was *AT&T*, the Court would conclude it is appropriate and

18     sort of flows naturally from it.

19             But, of course, AT&T's not all you have.  You have

20     to reconcile *AT&T* with *Chenoweth*, with *Raines*, with

21     *Campbell*, with all of these decisions that came after.

22             And I think, given the water that went under the

23     bridge after it, there's certainly not a basis to extend it.

24     And I would suggest, as we've argued in our briefs, that

25     that line in *AT&T* is no longer binding at all.

1          THE COURT:  No court has suggested that *AT&T* is no

2     longer good law.  Is that correct?

3          MR. BURNHAM:  I believe this issue's only -- the

4     answer is no, but -- as far as I know.  I believe this

5     issue's only been joined in *Myers* and *Holder*, though.

6          So I don't think there's been -- I mean, not a lot

7     of courts have had the opportunity to wrestle with that

8     question.

9          I also think that *Chenoweth* strongly implied it.

10     Now, *Chenoweth* was talking about the *Kennedy* decision.  I

11     think it's *Kennedy versus Samson*, although I could be

12     garbling that.  It's in *Chenoweth*.  But *Chenoweth* did say

13     that the DC Circuit's 1970s-era cases on legislative

14     standing generally have been overtaken by the Supreme

15     Court's subsequent emphasis on separation of powers.

16          So, you know, *Kennedy* is just two years before

17     *AT&T*.  And so I actually do think the DC Circuit has been

18     fairly candid about the fact that a lot has changed since

19     then.

20          And so I think, you know, between the points I

21     made about why *AT&T*'s distinguishable, the reasoning of

22     *Raines*, the reasoning of this Court's own opinion in *House*

23     *versus Mnuchin* and *Chenoweth*'s own acknowledgement that

24     things have changed, I think there's plenty there to open

25     the door for the Court to come to the right conclusion as

1    opposed to just finding itself bound by *AT&T*.

2          One other point on DC Circuit cases:  Your Honor

3    had mentioned the *Senate Select Committee* case.  I just

4    wanted to make clear that case did not address the

5    jurisdictional issues in the case at all, the DC Circuit

6    case.

7          THE COURT:  Yes.  I think that the Committee will

8    say it was implied.  There was kind of some assumptions that

9    they would have jurisdiction.  But I agree that it was not

10   directly on point.

11         MR. BURNHAM:  They didn't even expressly address

12   it.  So I just would submit that really is a drive-by

13   jurisdictional holding, because they didn't get into it at

14   all.  And so I don't think that's binding on the Court at

15   all.

16         So if I may just turn, then, to the DC -- the DDC

17   cases, I don't think there's much else to say, unless your

18   Honor has questions.

19         But I think they actually provide a good point to

20   pivot to the statutory jurisdiction argument, because in

21   *Myers* the issue was not raised.  So Judge Bates does find

22   1331 jurisdiction, but he did that on his own.

23         The issue was not briefed; there was not an

24   adversarial presentation on it; the Executive Branch didn't

25   contest the availability of 1331.  Of course, we can't waive

1   jurisdictional issues, and so he addressed it himself.

2          And then in the subsequent decision, Judge Berman

3   Jackson's decision in *Holder*, which we call the Fast and

4   Furious case, did not address the 1996 amendment.  And so

5   let me get into that argument, I think, directly, unless you

6   have more questions about the constitutional issues.

7          THE COURT REPORTER:  Sir, I'm going to ask you to

8   slow down.

9          MR. BURNHAM:  Yes, ma'am.

10          So I think everyone would agree that before

11   Congress -- you know, even if it is possible for Congress to

12   give judicial jurisdiction for all of these disputes about

13   every subpoena that the House might want to issue, at a bare

14   minimum, it needs to go through the exercise of bicameralism

15   and presentment and give that jurisdiction to the Courts

16   directly.  It can't simply avoid even that exercise before

17   injecting these sorts of disputes into the Courts.

18          Now, on jurisdictional provision, as the Court

19   knows, the Court has to read the US Code in harmony and make

20   it make sense all together.  The Court has to read all the

21   provisions and figure out if -- what the House -- or what

22   the right interpretation is in light of what all of them

23   say.

24          If I may hand --

25          THE COURT:  So I mean, the harmonious point, that

1    doesn't always work.  Right?  There are plenty of statutes

2    that are duplicative or tough to read together.

3              And so --

4              MR. BURNHAM:  Right.

5              THE COURT:  -- the Committee's point is that

6    1365 -- is that --

7              MR. BURNHAM:  Yes, your Honor.

8              THE COURT:  Yes.  1365 was focused on kind of an

9    anomaly and specific issues with the Senate --

10             MR. BURNHAM:  Right.

11             THE COURT -- and that it doesn't actually tell us

12   a lot about 1331.  Why isn't that right?

13             MR. BURNHAM:  Well, because that doesn't -- it

14   doesn't explain the text or the history of the provision at

15   all.

16             So to take a step back, the way the House reads

17   1331 is it's providing jurisdiction for all subpoena

18   disputes to come into court because they present, as the

19   House tells it, a federal question of law.  And so the

20   Senate, the House, whoever, can come into court, and that

21   provides jurisdiction.

22             So that has -- there's a couple problems with

23   that.  The most obvious problem with that is that it

24   overrides.  It doesn't just make 1365 superfluous; it

25   overrides the limitations in 1365 itself.

1          So if you read 1365, it very carefully carves out

2     this exact kind of suit.  It says:  The Senate may go to

3     courts to enforce subpoenas, but it may not go to court to

4     enforce subpoenas against officials in the Executive Branch.

5          Now, they have a very convoluted story about how

6     in 1976, they removed the amount-in-controversy requirement

7     for 1331, and then they needed this to plug the gap, but

8     they could use 1331 for the Executive Branch.

9          I don't find that story persuasive at all based on

10     the text of the provisions, but it doesn't matter,

11     because -- if I could just hand this up to your Honor,

12     unless this thing works.

13          I'll use the ELMO if it's okay.  Yeah.

14          THE COURT:  It'll pop up for them, too.

15          MR. BURNHAM:  Thank you, your Honor.

16          I can hand it up if you want.  It's okay.

17          THE COURT:  While we're getting that,

18     Mr. Burnham --

19          MR. BURNHAM:  Sure.

20          THE COURT:  -- I think the Committee explains that

21     1365 does some things that 1331 does not.  For instance, it

22     allows for the suit to continue on even when the Senate

23     adjourns or is in recess.

24          Why isn't that enough to distinguish these two?

25          MR. BURNHAM:  Because that's Subsection (b), not

1       Subsection (a).  And so even if the Committee can come up

2       with a story that makes Subsection (b) relevant, it has no

3       explanation at all, none, for why overriding the limitations

4       in Subsection (a) using 1331 -- maybe if it's okay, I'll

5       just hand it up -- thank you, your Honor -- is sensible.

6               And the reason why -- I think the real -- the

7       thing that really is dispositive in favor of our argument

8       here is the highlighted portion.  The highlighted portion

9       was added to the statute in 1996, so long after 1331 as it

10      exists today existed.

11              The Committee has no explanation at all for why

12      Congress would have gone to the trouble of adding this

13      provision if 1331 means what they say.

14              Indeed, this provision is very careful.  It very

15      carefully preserves the compromise in Subsection (a).  It

16      says that the Senate Committee can sue an Executive

17      official, but only when the Executive official is asserting

18      a personal privilege, not one that's been authorized by the

19      Executive Branch.

20              If the Committee is right about 1331, that

21      language is meaningless.

22              And so I just don't understand how the Court could

23      read 1331 next to 1365 and interpret 1331 to have the

24      revolutionary effect that they ascribe to it, particularly

25      when there's nothing in the legislative history of the

1    removal of the amount-in-controversy requirement that

2    indicates anything about trying to suddenly bring the entire

3    fight between the -- the age-old fight between the Executive

4    and Congress about information into the federal courts,

5    whereas there is information in the legislative history of

6    1365 that says they intentionally did not extend this

7    provision to Congress.

8             I'm paraphrasing, but only slightly.

9             THE COURT:  To the House.

10            MR. BURNHAM:  To the House.  Yes.  Sorry.  To the

11   House.  Right.

12            But the House committees hadn't had time to study

13   the issue and all of that.

14            Now, they also say they don't mean this

15   provision's enactment to oust them of any jurisdiction they

16   have, but they also say they don't give it to the House.

17            I don't know what the answer would be.  I don't

18   think there is an answer to the '96 amendment.  The *Holder*

19   case does not address this issue at all.  Judge Bates did

20   not have to grapple with this issue because it -- I mean, it

21   wasn't -- no fault of his own.  It just wasn't presented to

22   him.

23            And so I actually don't think your Honor has any

24   prior authority anywhere that deals with this argument.

25            And I would just also note, this is a much

1    narrower, simpler path to dispose of this suit because this

2    is something -- your Honor doesn't need to address the

3    constitutional issues if it -- if the Court find no

4    statutory jurisdiction.

5         And this is something that, if the House is right

6    about this and Congress really wants these suits in court,

7    Congress can cure, because all Congress would have to do is

8    enact a provision like this that allows them to sue the

9    Executive Branch.

10        I would submit the natural inference, though, from

11   this text that carves out the Executive Branch is that they

12   can't pass it, because no President will want to give

13   statutory jurisdiction to let Congress sue the President in

14   court.

15        THE COURT:  Now, *AT&T* found that 1331 applied.

16   And I don't think *Raines* would touch on this part of *AT&T*.

17   Right?

18        MR. BURNHAM:  That's right.  So a couple points

19   about that:

20        So AT&T's reliance on 1331 is at least arguably

21   dicta, because the case had been a United States-initiated

22   case in the District Court under 1345.  No one had raised

23   the idea that it would actually be 1331 rather than 1345.

24   And perhaps --

25        THE COURT:  It's not dicta.  Right?  I mean, I

1    think the Court specifically discounts whatever they'd been

2    using before and comes up with this all on their own.

3          MR. BURNHAM:  They say they declined to address

4    1345 because they're going to rely on 1331.

5          Whether it's dicta or not, I think the much better

6    point, which was -- maybe I should have made this one first

7    instead of second -- is that predates 1365.  And so whatever

8    the state of the law was in 1976, Congress enacted as part

9    of the Ethics and Government Act 1365 in 1978.

10          And I think it is impossible to read this

11    provision and certainly impossible to read the 1996

12    amendment and its very, very careful carveout of suits just

13    like this one and not think that was done intentionally and

14    not think that this would have been a very strange thing for

15    Congress to do if it was in fact the case that 1331 provided

16    omnibus jurisdiction to bring all of these types of lawsuits

17    into federal court.

18          THE COURT:  Do you know why this wasn't raised in

19    *Myers*?  I know you and I weren't around.

20          MR. BURNHAM:  I'm tempted to blame Mr. Letter; but

21    he was in civil appellate then, not the federal programs

22    branch.

23          I don't know the answer to that, your Honor.  The

24    government doesn't -- as you know from having worked in the

25    government, the government's not always perfect.  I don't

1    know what the reason for that is.  But, of course, we

2    can't -- the federal government can't waive jurisdiction.

3         And so, you know, the fact that we didn't raise it

4    in *Myers* I don't think has much relevance here except that

5    it meant Judge Bates didn't have a chance to really wrestle

6    with it.

7         And so I think on this one, for better or worse,

8    the Court will have to confront the issue directly and on a

9    pretty blank slate.

10        THE COURT:  And remind me about *Holder*.  What did

11   you say?  Just --

12        MR. BURNHAM:  So Judge Jackson said that --

13   discounted -- her basic analysis -- and I don't want to

14   speak for Judge Jackson.  She wrote an opinion, so you can

15   read it.

16        But her basic take was that this is really about

17   the Senate, and so it doesn't tell you anything about the

18   House.  And she never addressed the '96 amendment directly.

19        You know, I don't think that's the right way to

20   think about it.  It would be very weird if the Senate was

21   worse off because they had given themselves an express

22   jurisdictional hook than the House, which doesn't even have

23   that.  And so it'd be really weird, I think, and really

24   frankly untenable to read these limitations as applying only

25   to the Senate and not to the House.

1          Among other problems with that, the limitations in

2     this provision talk about this section, so they refer back

3     to 1365.  So you wouldn't be able to backfill them into 1331

4     anyway.

5          So maybe I'm not being very clear.

6          This provision gives jurisdiction over Senate

7     subpoena enforcement actions and contains very clear limits

8     on that.

9          If they're right about 1331, there's no serious

10    question that it overrides those limitations, because 1331

11    doesn't have those limitations in it.  And by their terms,

12    those limitations only apply to this provision.

13         So the point is, this is not just -- the cases

14    they cite, the Committee cites, are all redundancy case.

15    You know, if you read the statute this way, some other

16    provision won't be able to do any work.

17         And I agree that's an important canon of

18    construction.  And I think that alone is something the Court

19    would need to avoid.

20         But this is much worse than that, because it

21    wouldn't only make 1365 superfluous; it would override the

22    specific limitations in the provision and make those

23    provisions -- it would make them meaningless, not just

24    meaningless because they don't add value, but meaningless as

25    a constraint on the types of actions that Congress is able

1    to bring into court.

2          And I just think, given the constitutional

3    history, given the issues we've raised, the fact that the

4    Senate carved out specifically this exact type of lawsuit --

5    I'm sorry; that Congress did for the Senate -- is something

6    that is really significant and that I think the Court needs

7    to -- you know, it has to pay heed to when it's interpreting

8    these statutes.

9          And I would just reiterate, if the Court goes that

10   way, I think it avoids the constitutional questions and it

11   puts the ball back in the House's court, because as we all

12   know, the House has the ability to pass laws.  And so if the

13   House thinks that it should be able to bring these suits

14   into court, I think the Court should require that it provide

15   statutory jurisdiction to do so.  And then at that point,

16   we'll have no choice but to confront the constitutional

17   question.

18          But the statutory jurisdiction point -- you know,

19   it's a much narrower way of addressing the issue.

20          THE COURT:  So there's these two doctrines:  One

21   is that you've got to read the statutes harmoniously, like

22   you said.

23          MR. BURNHAM:  Yes.

24          THE COURT:  The other is kind of a more

25   realpolitik recognition that Congress isn't perfect any more

1    than the Executive Branch is and that sometimes they're not

2    necessarily focusing on some other part of the statute that

3    was -- another statute that was passed a long time ago.

4              How do I figure out between those two?

5              MR. BURNHAM:  So a couple things.

6              I think the Supreme Court has been beyond clear

7    that Courts are supposed to read statutes according to their

8    text and it's supposed to at least presume that there's a

9    rational purpose behind the text in all the statutes

10   because, otherwise, you know, it's like the old aphorism

11   about legislative history and looking around the cocktail

12   party to find your friends.  Otherwise, it's really not a

13   law interpretation exercise at all.  We're just sort of

14   deciding what we think and then picking the parts that help.

15             But you can even put that aside.

16             Here, the timing is just devastating for their

17   position because of the 1996 amendment.

18             So even -- I mean, I think it's impossible for me

19   to think that the Court could presume that Congress went

20   through the trouble of enacting a new provision in 1996 that

21   was -- for no purpose whatsoever that was already overridden

22   by a different statute in the US Code.

23             So even on the realpolitik way of doing it, where

24   we don't look at the text together and try to harmonize it,

25   we just try to get into the head of Congress and figure out

1    what was happening, I think our position prevails even in

2    that world, because we know that Congress was preserving the

3    limitation in the statute in 1996, 15 years or 16 years

4    after the amount-in-controversy requirement was removed from

5    1331 for everyone.

6         THE COURT:  So are you -- I don't think you

7    addressed this in your brief.  Can you think of another

8    example where you have kind of duelling statutes, a very

9    broad statute that would on its face seem to go with the

10   Plaintiffs and a much narrower statute that is used to

11   back-interpret the broader one?

12        MR. BURNHAM:  So, I mean, you know, I don't

13   have -- let me answer your question this way:

14        They cite a few cases about jurisdictional

15   provisions where 1331 sort of obviates the need for some

16   other grant of jurisdiction that preexisted it, you know,

17   some old grant of jurisdiction for suits against Indian

18   tribes or something.  I mean, that's -- I made that example

19   up.  But where the modern version of 1331 obviates it.

20        They have no examples of a situation where a

21   statute like 1331 overrides specific limitations in a

22   different statute, particularly limitations that postdate

23   its enactment.

24        To answer your question directly, you know, I

25   don't -- I mean, the Supreme Court's recent -- it's a

1    Justice Gorsuch opinion in, I think, an antitrust case about

2    how textualism works.  I mean, the Court has told us dozens

3    of times that the way we read statutes is that the specific

4    controls the general, and we read the statutes in harmony.

5            And so I think for this, all the Court has to do

6    is sit down and put 1365 next to 1331; and there's just no

7    way to read 1331 the way they do and not make a, you know,

8    hash, a mockery, frankly, of the 1996 amendment to 1365 and

9    the specific limitations therein.

10           I'm happy to talk to my -- the rest of the team

11   and see if we can find a few more cases on the point.  But I

12   think as a statutory interpretation matter, it's quite

13   simple.

14           THE COURT:  So the Committee points out that 1331

15   also evolved, according to them, really in reaction to what

16   was happening in this courthouse --

17           MR. BURNHAM:  Right.

18           THE COURT:  -- with the Nixon cases.

19           And why aren't they right about that?

20           MR. BURNHAM:  Sure.

21           THE COURT:  And why doesn't that allow them to go

22   forward under 1331?

23           MR. BURNHAM:  Right.

24           So here's -- here's the chronology.  So it's a

25   little different than I think -- here's what happened:  So

1     there was the *Nixon versus Sirica* case in this courthouse

2     that Chief Judge -- where Chief Judge Sirica -- I'm sorry;

3     it wasn't *Nixon versus*; it was *Senate Select Committee* --

4     where the Chief Judge dismissed the suit based on the

5     amount-in-controversy requirement.

6          That's not when they changed 1331.  What they did

7     after that is, on appeal, they enacted a statute that gave

8     jurisdiction to the Senate Select Committee to be able to

9     sue the Executive Branch for, you know, subpoenas and

10    whatnot.

11         The DC Circuit didn't grapple with the

12    jurisdictional issues.  It didn't touch the constitutional

13    issues.  It didn't talk about 1331.

14         It just proceeded and said, you know, "We're good

15    now," and then decided that they didn't get the documents

16    for various reasons on the merits.

17         1331 had an amount-in-controversy requirement --

18    that's what Chief Judge Sirica relied on -- that in 1976 --

19    prior to that, it said that you had to have at least, I

20    think, $10,000 in dispute.

21         In '76, Congress removed that amount for suits

22    against the United States, its agencies and whatnot.

23         THE COURT:  Do you agree it was in reaction to

24    what --

25         MR. BURNHAM:  No.  I think --

1          THE COURT:  -- what was happening here?

2          MR. BURNHAM:  No.  I think actually the better

3     chronology is they did the Senate Select Committee statute

4     to deal with the lawsuit.  The lawsuit was disposed of and

5     then they moved on.

6          What the legislative history for the '76 change

7     says is that it was meant to remove a, quote, "technical

8     barrier to the consideration on the merits of citizens'

9     complaints against the Federal Government."  That's at House

10    Report No. 94, 1656, at Page 3.

11          Citizens' complaints, not Congress's complaints.

12    Citizens' complaints.

13          The Senate when they did this recognized that,

14    quote, "A future statute might be needed to specifically

15    give the Courts jurisdiction to hear a civil legal action

16    brought by Congress to enforce a subpoena against an

17    Executive Branch official."  Senate Report 94, 996.

18          Now, what do you know?  Two years later, in the

19    Ethics in Government Act, they passed just that provision.

20    But it didn't include the ability to sue Executive Branch

21    officials.

22          Why?  Because I think everyone recognized that

23    there was not sufficient willpower in Congress or the

24    Presidency to allow that.

25          Then the year after that, in 19 -- two years after

1    that, in 1980, is when they removed the

2    amount-in-controversy requirement for everyone.  What they

3    say is that the reason 1365 is limited to private people is

4    because for the two years between '78 and '80, there was

5    still an amount-in-controversy requirement for federal

6    question cases against private people.  That's why they say

7    those limitations exist.

8            I don't think if you read the statute that is a

9    remotely persuasive interpretation of what it says.  But

10   even if it would have been a persuasive interpretation in

11   1980, the 1996 amendments blow it out of the water because

12   there was no reason to continue preserving the ability to

13   not sue the Executive Branch, to carry forward the political

14   compromise that the statute so obviously embodies.  If it

15   were the case, that post-1980, Section 1331 actually allowed

16   precisely what we're doing here for the Senate as well.

17           I know that's fairly convoluted, but hopefully I

18   got it out.  Sorry.

19           Unless your Honor has more questions, I'm happy to

20   turn it over to Ms. Barbero.

21           THE COURT:  Great.  Thank you, sir.

22           That's fine.  Why don't we do that.  We can

23   discuss the cause of action.

24           MR. BURNHAM:  My colleague, Mr. Myers, who speaks

25   much slower than I do, will be addressing cause of action.

1          THE COURT:  Great.

2          MR. BURNHAM:  Thank you.

3          THE COURT:  Thank you, Mr. Burnham.

4          MR. BURNHAM:  Did you want to do that now?

5          THE COURT:  Why don't we break it up and talk

6     about this, what we've had so far.

7          MS. BARBERO:  Thank you, your Honor.

8          May it please the Court:  Megan Barbero.

9          I wanted to jump right into where we were with

10    Section 1365.  But I also had points that I wanted to make

11    with respect to *Raines* and the standing argument.  But let's

12    just pick up the conversation where we were on 1331 and

13    1365.

14          First, I do want to go back to the *AT&T I*

15    decision, which I know was discussed with Mr. Burnham.  And

16    the question was about the holding in *AT&T I* with respect to

17    1331.

18          It's beyond dispute that the Court -- the DC

19    Circuit -- this is in 1976 -- and *AT&T I* said, "We find

20    subject-matter jurisdiction under 28 USC 1331."  That was a

21    case involving a House subpoena and an effort by the

22    Executive Branch to prevent compliance with the House

23    subpoena.

24          The House intervened in that case.  And we can

25    discuss standing.

1        But the Court also held in a separate section of

2   the opinion -- and it's not a drive-by holding -- in a

3   separate section of the opinion held that the House had

4   standing; and then in addressing jurisdiction, very clearly

5   held there was jurisdiction to consider that dispute under

6   1331.

7        That's in 1976.  At that time, there was an

8   amount-in-controversy in Section 1331.  The Court held it

9   was satisfied there.

10        But the Senate was concerned because of the Senate

11   Select Committee background with the Nixon investigation

12   about not being able to satisfy the amount in controversy

13   under Judge Sirica's ruling.

14        And in 19 -- against the backdrop of a DC Circuit

15   holding that there was jurisdiction to consider enforcement

16   of House subpoenas, Congress passed Section 1365 to deal

17   with the specific question of enforcement of Senate

18   subpoenas and the concern about the amount in controversy

19   that was still in place at that time with respect to suits

20   concerning private parties.

21        So the passage of 1365 in 1978 was very specific.

22   It was doing specific work.  And that provision also

23   addresses Senate subpoenas only.

24        The legislative history is absolutely clear that

25   it is not intended to address jurisdiction over House

1    subpoenas, which of course the DC Circuit had said there was

2    jurisdiction under 1331, and the plain language of 1331

3    would cover this situation.

4          Now, Mr. Burnham places very heavy reliance on the

5    1996 clarifying amendments that Congress made to

6    Section 1365.

7          But of course, as we know -- Judge Posner remarked

8    on this in the *JCPenney* case that we cite in our brief --

9    the jurisdictional provisions are full of overlaps and

10   redundancies and gaps.  And even though the judicial mind

11   craves order in these provisions, it simply isn't always

12   there.

13         And when Congress in 1996 was concerned about the

14   specific example of a federal official sued in his or --

15   subpoenaed in his official capacity but asserting personal

16   privileges, the concern was against the backdrop of 1365,

17   which had been on the books at that point for almost 20

18   years, that if the Senate came to court and asserted its

19   right to seek enforcement of its subpoena, that somebody

20   might argue that 1365 governed.  And the amendment in 1996

21   was to clarify that that would not apply, that 1365 would

22   provide jurisdiction if a federal official asserted a

23   personal privilege.

24         There are other examples of -- one of my favorites

25   is -- I think it's Section 1339, which governs actions

1    arising under an act of Congress relating to the Postal

2    Service that is entirely -- it's one sentence:  It's

3    entirely redundant of 1331.

4         Now, Mr. Burnham says there are not other

5    provisions or he's not aware of other provisions that have

6    been revised after the amount-in-controversy requirement was

7    removed from 1331.

8         That happens to be the case for Section 1338,

9    which governs patents and actions arising under patent law.

10   That provision arised [sic] to clarify state court

11   jurisdiction in 2011.  But again, the first section -- the

12   first sentence of that provision would be entirely redundant

13   of 1331.

14        It says:  The District Court shall have original

15   jurisdiction of any civil action arising under any act of

16   Congress relating to patents, a variety of protection,

17   copyrights and trademarks.

18        But again, Congress can go back to these

19   jurisdictional provisions that overlap in many respects that

20   have redundancies to ensure that the presumption under 1331,

21   that there should be District Court jurisdiction over

22   actions arising under the Constitution, which this does, and

23   acts of Congress, which this also does.

24        And to also clarify, your Honor, the discussion

25   about 1331 and whether 1365 somehow impliedly repeals part

1    of 1331, even though it doesn't talk at all about House

2    subpoenas, is specific to the subpoena enforcement claim.

3              The claims that we have brought under 6103 and the

4    APA, there's no dispute that those arise under -- or that

5    there is subject-matter jurisdiction under 1331.

6              So I just wanted to make that clarifying point.

7              THE COURT:  So if you represented a Senate

8    committee as opposed to a House committee, could you use

9    1331?

10             MS. BARBERO:  Your Honor, it would certainly be a

11   more difficult argument with respect to 1365.  I'm not in

12   that position.  I don't want to commit the Senate legal

13   counsel as to what they might argue in front of this Court

14   if they were put in that position.

15             But certainly there is certainly an argument that

16   the plain language of 1331 would apply.

17             The Department, I am sure, would be making the

18   argument, the same specific governancy [sic] general

19   argument.  But in that case, their specific provision would

20   actually apply, which of course it does not here with

21   respect to the House subpoenas.

22             THE COURT:  So under -- but under 1365, you agree

23   that you couldn't bring this suit.  Correct?  If you were

24   the -- the Senate could not bring this suit under 1365?

25             MS. BARBERO:  That's correct.  Under the carveout

1    in 1365(a).

2              THE COURT:  Right.

3              So you're not willing to commit as to whether the

4    Senate could bring it under 1331.  It's --

5              MS. BARBERO:  I'm looking to Mr. Letter.  I assume

6    he is also not willing to commit the Senate to a position in

7    a case that he's --

8              THE COURT:  Oh, nobody's going to suggest you have

9    the authority to bind the Senate.

10             But the question is whether, you know, in this

11   hypothetical of -- whether you think the Senate is able to

12   bring it under 1331.

13             MS. BARBERO:  Your Honor, the argument there would

14   be that the plain language of 1331 applies, that 1365 was

15   doing very specific work when it was he acted because of the

16   amount in controversy, which was still in place in 1331, but

17   that after that was removed with respect to the United

18   States, that 1331 would be available to the Senate.  That is

19   the argument.

20             I think that is certainly an argument they could

21   be making.

22             Again, it's -- our argument is very strong on

23   behalf of the House with respect to House subpoenas, given

24   the *AT&T* decision and the fact that the legislative history

25   is perfectly clear, both in 1978 and in 1996, that 1365 does

1 not govern House subpoenas and is not intended to affect the

2 jurisdiction of this Court to adjudicate the merits of a

3 House subpoena.

4    THE COURT:  What's your theory for -- I understand

5 your theory for 1365, that some of the earlier amendments

6 were to try to address concerns with the Nixon

7 investigations.

8    I don't understand why the 1996 amendment

9 happened.  Like, why not get rid of 1365?  I mean, it's

10 surprising that the Senate would be looking to limit its

11 options vis-à-vis what the House can do.

12    MS. BARBERO:  Well, your Honor, of course, as you

13 noted earlier, Congress and the Executive Branch do the best

14 they can, given what they're faced with and given the

15 jurisdictional provision that was already on the books in

16 1365, which includes 1365(b), which sets up a very specific

17 remedial scheme that applies to Senate subpoenas.

18    Rather than remove that provision entirely from

19 the books, Congress made the reasonable choice to amend it

20 to address what was a specific concern that, as I understand

21 it from the legislative history, arose some years earlier in

22 connection with a witness making a personal privilege

23 objection as part of the Iran Contra investigation and the

24 concern that because he was a federal official, even though

25 he wasn't making an official capacity-type objection to the

1    subpoena, that he might not be covered.

2             So it was again addressing -- it was, in fact,

3    clarifying.  It was addressed to a specific problem.

4             And Congress at that time was again operating

5    against the backdrop of these jurisdictional provisions that

6    had already been on the books with a remedial scheme in

7    place that the Senate wanted to keep in place.  And rather

8    than wipe that off the books and go back to 1331, they did

9    what has been done in these various other provisions that we

10   have discussed, which is to amend the specific provision to

11   address a specific problem that had arisen.

12            But all of this -- or none of this, rather, calls

13   into question at all whether the House can and has been at

14   least since the *AT&T* decision in 1976 entitled to avail

15   itself of 1331 to bring a subpoena enforcement action claim

16   in this Court, which is a claim that arises under the

17   Constitution.  It's governed by 1331.

18            The fact that the Senate -- that there's in place

19   a different scheme for Senate -- or a different

20   jurisdictional provision for Senate subpoenas is really

21   neither here nor there with respect to House subpoenas.

22            THE COURT:  So I mean, the *AT&T* case, it is an odd

23   case.  Right?  The whole posture is unusual.  It's being

24   brought by the Executive Branch.  So 1365 never would have

25   been -- it was just -- it's a very different situation.

1          I'm not sure that I buy the argument that after

2     *AT&T* it was clear the House could bring a subpoena

3     enforcement case and the Senate had this big concern.

4          It seems to me that it was arguably very much in

5     question what the House could do in terms of subpoena

6     enforcement.  And the fact that the Senate has gone to such

7     repeated lengths to ensure that it has not only statutory

8     subject-matter jurisdiction, but also a cause of action, and

9     there's no similar thing for the House, I'm not sure that

10    that cuts in your favor.

11         MS. BARBERO:  To clarify the history, your Honor,

12    *AT&T I* was decided in 1976, which is when the Court held

13    that there was jurisdiction, rejecting the jurisdictional

14    provision that the United States had urged and instead

15    finding jurisdiction under 1331.

16         1365 was enacted two years later against that

17    backdrop.  And again, Congress went in and enacted 1365.

18         I understand the concern.  But the Senate had been

19    grappling with its investigation in the Nixon -- into the

20    Nixon-era issues and trying to ensure that the Senate could

21    come to court without regard to the amount in controversy.

22    That was the issue that Congress was addressing when it

23    enacted 1365 in 1978.

24         And at that time, as the legislative history makes

25    clear, the House simply hadn't had time to fully consider

1    that.  The relevant House committees hadn't been -- hadn't

2    weighed in.

3              And nothing about 1365 was intended to displace in

4    any way the *AT&T* holding that there was jurisdiction under

5    1331.

6              And again, that's the same conclusion that --

7              THE COURT:  But I guess my point is that the *AT&T*

8    holding was kind of a tenuous holding for the House.  They

9    found that in that case, there was an amount in controversy

10   satisfied, but that wouldn't necessarily have worked out for

11   the House in the mine run of enforcement cases.

12             It was brought by the Executive Branch, which

13   arguably complicates the statutory subject-matter

14   jurisdiction analysis.  And it was just kind of *sua sponte*

15   brought up by the Court.

16             I mean, none of that would have given me a whole

17   lot of confidence if I was the House GC back in the 1970s

18   and '80s.

19             MS. BARBERO:  Your Honor, a few points:

20             The amount in controversy was removed from 1331 in

21   October of 1976, which was a few months before the *AT&T*

22   decision.  So the Court did note that the amount in

23   controversy for actions brought against the United States,

24   its agencies, or any officer or employee in its official

25   capacity, had been removed.

1           So there was no -- that's -- in other words, after

2      the *AT&T* decision, which came out in December, the House

3      would have understood that there was jurisdiction under

4      1331.  And there was no longer the concern, as the DC

5      Circuit addressed in *AT&T,* that the amount in controversy

6      would need to be satisfied for suits against the United

7      States.  So that's one point.

8           In addition, of course, this was a jurisdictional

9      issue.

10          So while the Court did *sua sponte* in a sense find

11     that there was jurisdiction under 1331, that was because the

12     Court was grappling with what it described as difficult

13     questions relating to jurisdiction under 1345 in part

14     because the Court understood the suit, although the

15     Plaintiff was the United States, to in real terms be a suit

16     against the House, which was the real party in interest and

17     the Defendant, because of course it was the House's

18     subpoena.

19          So one of the things that concerned the Court was

20     whether jurisdiction was proper under 1345, where the

21     Defendant in effect was the House, which is why they look to

22     131, again, just underscoring that this is in fact a holding

23     of the case.

24          And, of course, I can't speak for the House

25     general counsel in 1976, but certainly at present it is well

1    understood in the Office that this decision provides

2    jurisdiction under 1331.

3            And again, just going briefly to the OLC opinions,

4    which your Honor discussed with Mr. Burnham, in 1984 and

5    1986, it was also the understanding at least at that time of

6    the Department of Justice that the House would have a civil

7    enforcement remedy available to it by invoking the Court's

8    jurisdiction under 1331, which was eight and ten years after

9    the decision was issued and well after 1365 was put in

10   place.

11           So I am happy to answer additional questions about

12   1365.

13           THE COURT:  Ms. Barbero, are you familiar with

14   another similar circumstance, kind of the same question I

15   asked Mr. Burnham, where you have this broad statute that

16   would appear to give -- favor one party, but a narrow --

17   there's a narrow subsequent statute that arguably suggests

18   that the broader statute means less than it appears to mean,

19   where a Court has figured out:  How do you read those two?

20           MS. BARBERO:  Reconcile?

21           I'm not -- we can think more about it.  I don't

22   have off the top of my head an example.

23           But I would note that it's important that this is

24   the jurisdictional context, and we know there's a

25   presumption in favor of District Court jurisdiction.  That

1    would certainly be a thumb on the scale to the extent there

2    were other canons of statutory construction that might apply

3    here to find that the plain language of 1331 should govern,

4    particularly given that the specific statute on which

5    they're relying doesn't speak to House subpoenas.

6           But we could think more about that if that would

7    be helpful.

8           THE COURT:  So can we talk about the BLAG a little

9    bit?

10          So this looks to me like the first time that

11   there's been a case brought by the House based only on a

12   BLAG vote.  Is that correct?  I recognize there's been

13   *amicus* cases.

14          MS. BARBERO:  In addition, your Honor -- well,

15   that's not correct.  The Border Wall case, *House v. Mnuchin*,

16   that was before your Honor, was also authorized by the

17   Bipartisan Legal Advisory Group.

18          And in addition, BLAG has authorized our

19   participation as intervenor in numerous cases, including --

20   *Deutsche Bank* and *Mazars* were both BLAG-authorized

21   interventions where we did need to establish we had

22   standing.

23          But we can talk about --

24          THE COURT:  You did need to?

25          MS. BARBERO:  We certainly -- it was not

1    challenged, but we -- an intervenor does need to establish

2    standing.  I know that was an issue that came up with

3    Mr. Burnham.

4          And we did do that in those cases, although it was

5    not challenged.

6          But in terms of the BLAG authorization, that is

7    the mechanism by which the House has chosen to authorize

8    litigation, including *amicus* participation, intervention and

9    the filing of lawsuits.  That's done at the direction of the

10   Speaker with the Bipartisan Legal Advisory Group, which is

11   composed of the leadership of both parties.  It's a

12   five-member group.

13         THE COURT:  Yes.  I think I'm familiar with how it

14   works.

15         So let me read House Rule -- I guess it's 28B.  It

16   says, "Unless otherwise provided by the House, the BLAG

17   speaks for and articulates the institutional position of the

18   House in all litigation matters."

19         But then Rule -- I guess this is 11.2M(3)(C) --

20   says, "The compliance with the subpoena may be enforced only

21   as authorized or directed by the House."

22         Why doesn't this latter rule fall within the

23   "unless otherwise provided" clause in Rule 28B?  I guess

24   what I'm asking is, is it really true that I can just look

25   to Rule 28B alone and conclude by -- that a vote by the BLAG

1    is equivalent to a vote by the full House?

2              MS. BARBERO:  Your Honor, may I just speak with my

3    colleague?

4              THE COURT:  Sure.

5              MS. BARBERO:  (Confers with co-counsel privately.)

6              Thank you, your Honor.

7              My understanding on how this operates is that

8    because the Committees are not authorized to come to court

9    without going through the process that is set up by the

10   House for authorization to initiate a lawsuit, that the

11   committees cannot seek to enforce a subpoena without going

12   through the Bipartisan Legal Advisory Group.

13             So the rules are internally consistent.

14             THE COURT:  There was this House Resolution 430

15   that says that a vote by BLAG to initiate litigation is

16   equivalent to a vote by the full House.

17             I believe it was passed on June 11th.

18             MS. BARBERO:  Correct.

19             THE COURT:  This lawsuit was filed on July 2nd.

20   Correct?

21             MS. BARBERO:  That's correct.

22             THE COURT:  Do you know what date the BLAG vote

23   authorizing this lawsuit occurred?

24             MS. BARBERO:  We were -- I know we refer to the

25   BLAG vote.  I think it's in Footnote 128 of our brief.  Let

 1     me if I may, your Honor, just check with Mr. Letter.

 2                THE COURT:  Okay.

 3                MS. BARBERO:  (Confers with co-counsel privately.)

 4                Your Honor, thank you.

 5                There is not a specific date that we've provided

 6     in terms of that authorization.  The process does work

 7     through consultation, including with the Speaker and members

 8     of BLAG.

 9                But there has been a BLAG vote to authorize the

10     litigation, as we made clear in our complaint, which was

11     done before the filing of the complaint.

12                THE COURT:  But do I need to be concerned that it

13     occurred to ensure that it occurred after House Resolution

14     430?

15                MS. BARBERO:  No, your Honor, because House

16     Resolution 6, which was passed at the beginning of this

17     Congress, contains the same language in setting up the

18     Bipartisan Legal Advisory Group itself and making clear, as

19     is clear in the rules, that the Bipartisan Legal Advisory

20     Group articulates the institutional position of the House in

21     litigation.

22                THE COURT:  So obviously, you point out there's a

23     couple cases, including mine, where you've done it this way.

24     Certainly historically, it's been through a full vote.  And

25     that's been something that the Courts have always pointed

1     to, including in the *AT&T* case.

2          Should I be concerned that that didn't occur here?

3     I guess I just wonder a little about the -- how far the

4     House rules can go to kind of delegate its authorities that

5     it's traditionally taken as a full House to a couple members

6     of the Committee or arguably to -- you know, maybe to the

7     general counsel's office or to a staffer or something like

8     that.

9          MS. BARBERO:  Your Honor, there's no -- there's

10    not only no reason; but also, the Constitution makes clear

11    that your Honor cannot under the rule-making clause question

12    how the House has chosen to organize itself with respect to

13    its rules, including the rule that sets up the Bipartisan

14    Legal Advisory Group.

15         And Judge Tatel's opinion in the *Mazars* case made

16    that very clear with respect to the subpoena that was issued

17    in that case.

18         But to the extent the concern is about delegating

19    authority to individual members, the House has never

20    operated on that individual member level.  The House has

21    always operated by committee or group.

22         The Bipartisan Legal Advisory Group has been in

23    place since 1993.  It's made up of members of leadership of

24    both parties.  There's a process in place to obtain consent

25    to come to court.  And if there were any question, here

1    it's -- House Resolution 430 should put that to rest.

2            The cases where there's been a question about full

3    House authorization, including in -- is it *AT&T I*? -- where

4    it was Representative Moss, there was a concern that he was

5    acting alone.  And the House took a full House vote to

6    confirm in fact that he was authorized to proceed.

7            But that is how the House -- that is the same --

8    effectively the same thing that has happened here through

9    the Bipartisan Legal Advisory Group that the House has

10   established to manage litigation and speak for the House.

11           That's embodied in the rules.  It's embodied in

12   House Resolution 6 and House Resolution 430.  And as

13   precedent makes clear, there's no basis on which this Court

14   should question how the House has chosen to operate and set

15   up its rules and conduct its business, including authorizing

16   litigation.

17           THE COURT:  I want to ask you just -- going back

18   to the Article III jurisdiction, are you asserting both an

19   informational and institutional injury?

20           MS. BARBERO:  Yes, your Honor.

21           THE COURT:  And what's the difference between

22   those?

23           MS. BARBERO:  Well, in this case, the injury, the

24   informational injury, derives from Section 6103(f), which

25   mandates that the Secretary shall furnish to the Committee

1    tax returns and return information upon request.

2            THE COURT:  And is that the only source of

3    informational injury?

4            MS. BARBERO:  That is the source of the statutory

5    informational injury.

6            To the point about the institutional injury,

7    there's both the injury to the House's authority under

8    Article I to conduct investigations and inquiries to obtain

9    information that it needs to carry out its legislative and

10   oversight purposes.  And also, the injury in the denial of

11   the information.

12           At the end of the day, it's of course the same

13   information that was sought.  It's the President's tax

14   returns, return information and audit files.  The statute

15   requires that the Secretary disclose that information to the

16   Committee upon written request.

17           And the Constitution in this instance -- and I

18   know we're not at the merits stage yet.  But given the

19   legitimate legislative purpose that has been alleged and is

20   absolutely clear in this case, the Constitution also

21   requires that the House have access to that information so

22   that it can legislate and conduct oversight wisely and

23   effectively, in the words of the Supreme Court.

24           THE COURT:  But you're not saying there's

25   freestanding informational injury right here?  Your

1     informational injury is grounded in 6103?

2          MS. BARBERO:  That's correct.

3          THE COURT:  And the *AT&T* case, was that an

4     informational injury or institutional injury case or both?

5          MS. BARBERO:  That would -- that would have

6     been -- it was a subpoena enforcement case, so there wasn't

7     the statutory overlay or separate statutory claim that we

8     have in this case.

9          So the injury, again, was the deprivation of

10    information that the Committee needed to conduct its

11    legislative and oversight purposes.

12         But it derived from Article I of the Constitution.

13    And there wasn't, as far as I'm aware, a separate statutory

14    claim.

15         And, of course, as the Supreme Court has made

16    clear in *Atkins* and *Public Citizen*, when a statute requires

17    that information be made available and those cases to the

18    public and that information is not available, that's a

19    cognizable Article III injury.

20         And our allegation is that the same is true here,

21    because the statute in no uncertain terms makes clear that

22    the Committee is entitled to that information, that when the

23    Secretary refuses to provide that information and makes

24    clear that it is not forthcoming -- that's been clear from

25    the White House, the acting chief of staff, the OLC

1   opinion -- that that injures the Committee under the statute

2   because the Committee is entitled to that information.

3            It's different from just a reporting requirement.

4   It's an affirmative obligation, an affirmative statutory

5   obligation, to make that information available to the

6   Committee and staff who are authorized to receive it under

7   the statute.

8            THE COURT:  Do you agree that since post-*Raines*

9   that I need to engage in a historical analysis of whether

10  there is constitutional subject-matter jurisdiction and

11  standing here?

12           MS. BARBERO:  Your Honor, I do want to talk about

13  *Raines* and also the history.

14           But if I can make a first point about *Raines*,

15  because *Raines*, as your Honor is well aware, was a case

16  about individual legislators and whether they had Article

17  III standing to assert as individuals an institutional

18  injury in the diminution of the legislative power.

19           And the Court -- looking to history in that case,

20  the Court was very much driven by the fact that there was a

21  question about whether these individual legislators could

22  sue and have Article III standing.

23           Now, if the question about history is whether the

24  Committee can issue subpoenas and whether Courts can

25  adjudicate subpoenas, including subpoenas issued to the

1    high-ranking members of the Executive Branch, including the

2    President, we know going back to *United States v. Burn*,

3    1807, we know from Nixon, all of these cases, that the

4    Courts are well positioned to adjudicate the questions that

5    arise in subpoena enforcement actions.

6         THE COURT:  So that sounds like a yes.  You think

7    I do need to do a historical analysis.  And you say:  Go for

8    it.  There's plenty.

9         MS. BARBERO:  I do not think the historical

10   analysis is necessary in the context of determining whether

11   there's an Article III injury here.

12        I understand to the extent the Department is

13   raising through these questions about history and a

14   political clash between the branches, it's another way, I

15   think, of getting at this justiciability question, which to

16   my mind is separate from the Article III case or controversy

17   question.

18        But to the extent the Court -- and I want to go

19   back to that.  But to the extent the Court is concerned

20   about the history, I do think the history strongly weighs in

21   our favor here.

22        But again, looking at the *AT&T* decisions from the

23   DC Circuit, the Court will understood that dispute to be a

24   clash between the branches and had no difficulty finding

25   that there was standing for the House to intervene in that

 1   case.

 2           And I wanted to just briefly -- I know I noted

 3   this before -- but that is, in fact, a separate part of the

 4   opinion.  It's Part 3(c), and the title is Standing.

 5           So this isn't the drive-by-type jurisdictional

 6   ruling.  The Court was assuring itself that there was

 7   standing.

 8           In fact, although the Department says that *AT&T*

 9   was overtaken by *Raines*, the DC Circuit in *AT&T* said, "We

10   need not consider the standing of a single member of

11   Congress to advocate his own interests in a congressional

12   subpoena power."

13           It's clear that the House as a whole has standing

14   to assert its investigatory power and can designate a member

15   to act on its behalf.

16           Now, the question that came up later in *Raines* was

17   a different question, again, about whether individual

18   legislators would sue.

19           And we know that the problem for them in *Raines*,

20   as the Supreme Court made clear in *Arizona State Legislature*

21   and later cases, was that there was not a match between the

22   individual injury that they were asserting, which was an

23   injury to the House as an institution, and the Plaintiffs in

24   that case.

25           THE COURT:  You know, I get that.  But Mr. Burnham

1    points to a lot of the kind of -- some of the atmospherics

2    in the other language in there in *Raines*, which would go

3    further.

4              And it talks about avoiding -- you know, the Court

5    avoiding these types of clashes when they're at the height

6    of their controversy and that judicial power lies in the

7    protection.  It is afforded the constitutional rights and

8    liberties of individual citizens and minority groups against

9    oppressive or discriminatory government action.

10             I mean, there's a lot of other language there in

11   *Raines* that arguably is relevant here.  Right?

12             MS. BARBERO:  A couple of responses, your Honor:

13             One is that Judge Jackson addressed exactly this

14   argument by the Department in the *Holder* case and said that

15   that argument ignored the final paragraph of *Raines*, which

16   contains the holding of the case.  And I am sort of partial

17   to her language there.

18             But going to history and the language that your

19   Honor is noting, the discussion of the history in *Raines*, I

20   think, is very much concerned about cases where there's some

21   question about shifting Executive power to the legislature

22   or shifting legislative power to the Executive and really

23   the balance of power between the branches.

24             That's not this case, where the House is asserting

25   its own -- the Committee is asserting its own investigatory

1    power given to it by Article I.

2            There's no question in terms of balance of power

3    of changing -- you know, giving some legislative control

4    over Executive functions.  That's not what's happening in

5    this case.

6            And even in cases where there have been questions

7    about the separation of powers, the Courts have made very

8    clear that even in politically fraught cases -- this was the

9    case in *Zivotifsky*, where the Supreme Court said, "We would

10   gladly avoid deciding this question."

11           But where there are questions of constitutional or

12   statutory interpretation, even where there are political

13   clashes, it's the duty of the Court to weigh in and say what

14   the law is.

15           And the Courts decided cases like that in *INS*

16   *versus Chadha*, in *Free Enterprise Fund*, about restrictions

17   that Congress had placed on removal of Executive officers.

18   Even in these cases that involve political questions, the

19   Courts have weighed in.

20           And it is certainly true that Congress has long

21   been issuing subpoenas.  By and large, the Executive Branch

22   has been complying with those subpoenas.  And certainly

23   there has been sort of an unprecedented refusal to comply

24   with congressional subpoenas by the current administration.

25           But I do want to touch, your Honor, on this

1    concern about the floodgates opening, because there was the

2    same concern raised again between the *Myers* decision in 2008

3    and the *Holder* decision in 2013.  And what Judge Jackson

4    said is:  The floodgates haven't opened in the last five

5    years.  And there are many reasons why this is true.

6             THE COURT:  It seems a little different today,

7    though.  Right?

8             MS. BARBERO:  Well, there's certainly an

9    unprecedented level of obstruction in terms of

10   nonresponsiveness to congressional subpoenas.  That is true.

11            But even in the current environment, your Honor,

12   bringing a lawsuit does involve cost.  The House does

13   carefully consider the importance of the issues.  This is

14   obviously a case of great importance to the Committee and to

15   the House, which is why the Bipartisan Legal Advisory Group

16   authorized the bringing of the lawsuit.

17            But it is not the case that the House makes the

18   decision to seek a civil enforcement remedy for every

19   subpoena.  That is a unique case in many respects, including

20   that there's a mandatory statutory obligation that the

21   Executive has refused to comply with.

22            And in addition, I wanted to make the point -- and

23   then I have an additional point to make after that -- that

24   if this Court were to hold that the House lacks standing to

25   come into court to seek enforcement of its subpoenas, that

1    would certainly be weighing into the political dispute here.

2         And to the extent the Executive has historically

3    largely complied with congressional subpoenas, that -- we

4    would expect that might no longer be true if the Executive

5    understood that the House couldn't seek a civil enforcement

6    remedy.

7         THE COURT:  What am I to take from the fact there

8    really haven't been these civil enforcement attempts

9    throughout history?  I think one thing that we all agree on

10   is Congress has been subpoenaing people, including the

11   Executive, for a long time.  And yet it's very recent that

12   these have started coming to court.

13        MS. BARBERO:  I think there are various

14   explanations.  It is true that historically the House has

15   sought to take advantage of its other remedies it had

16   available.  And some of the early Supreme Court cases where

17   there are decisions about the validity of congressional

18   subpoenas arise in cases where there's a habeas petition

19   brought because somebody has been arrested by the Sergeant

20   at Arms for refusing to comply with a congressional

21   subpoena.

22        It is not to say that the absence historically of

23   lawsuits meant that that remedy wasn't also available to the

24   House.

25        But bringing a civil case is a more orderly

1    process than sending the Sergeant at Arms out to arrest a

2    high-level Executive Branch employee.

3          And in addition, there may be some questions -- we

4    were talking earlier about subject-matter jurisdiction.  And

5    your Honor pointed out the amount-in-controversy question,

6    which could have been a real issue for the House in

7    considering whether there was subject-matter jurisdiction

8    before *AT&T*.

9          And the amount in controversy was removed to bring

10   a subpoena enforcement action.  So that could also be an

11   explanation for why that hadn't been historically done.

12         But we know at least since 1976 that had been done

13   periodically.  And as I mentioned, there are good reasons

14   why the House chooses to bring the lawsuits that it has, and

15   they have been periodically brought.

16         As your Honor recognized in our Mnuchin Border

17   Wall case, the -- periodically, subpoena enforcement has

18   been both sought and granted by the Courts, and they've

19   weighed in on those disputes.

20         And I also wanted to mention going back to our

21   earlier discussion of *Raines* that the Supreme Court in

22   *Arizona* had explained the meaning of *Raines* and the fact

23   that it relied on six individual members of Congress and was

24   not an institutional injury being asserted by those -- or

25   was an institutional injury that individuals could not

1    assert.

2              THE COURT:  Okay.  Thank you, Ms. Barbero.

3              I want to hear from the Executive on the cause of

4    action issues.

5              Mr. Myers?

6              MR. BURNHAM:  Could I bring up two quick

7    responses, your Honor?

8              THE COURT:  Okay.

9              MR. BURNHAM:  I just have -- just two very, very

10   quick points.

11             THE COURT:  Not too quick.

12             MR. BURNHAM:  No.  Two quick points, said slowly.

13             On the statutory jurisdiction point, I just wanted

14   to make -- point out one thing:  Ms. Barbero's theory, as I

15   understood it, was they enacted the statute to plug the gaps

16   left by *AT&T* for the Senate.

17             If that's true, then there's no reason why they

18   would have included the following direct carveout:  Any

19   subpoena or order issued to an officer or employee of the

20   Executive Branch of the Federal Government acting within his

21   or her official capacity.

22             They said:  No jurisdiction over that.

23             That is what the *AT&T* case was in substance about,

24   because, as the House reads the case, it was an Executive

25   Congress dispute.

1          It would have made no sense to plug --

2          THE COURT:  Is that right?  I thought -- wasn't it

3     about -- AT&T was going to give over the documents.  Right?

4          MR. BURNHAM:  Fair enough.

5          But if that's right, then we win for a different

6     reason, which is that 1331 doesn't give jurisdiction over

7     these disputes in the first place, because what they say is

8     13 -- *AT&T* says 1331 allows the House to enforce subpoenas

9     against the Executive Branch.

10          If *AT&T* doesn't even address that, then they have

11     no case at all to support their interpretation of 1331 and

12     we're on a blank slate just looking at the US Code.

13          I think it's fair to say that *AT&T* was thinking

14     about it as this kind of dispute, but it doesn't matter,

15     because 1365 two years later was not plugging some gap that

16     *AT&T* left just for the Senate.  1365 was providing

17     jurisdiction in the first place.

18          And so there's just no --

19          THE COURT:  I'm sorry.  I'm just trying to follow

20     you, Mr. Burnham.

21          MR. BURNHAM:  Sure.

22          THE COURT:  But you're pointing to this language

23     about an officer or employee of the Executive Branch of the

24     Federal Government.

25          MR. BURNHAM:  Right.  The carveout.

1          THE COURT:  Well, another carveout, right?

2    Because you highlighted the following -- or the next

3    section.

4          MR. BURNHAM:  Yes, your Honor.

5          THE COURT:  But *AT&T*, as I recall -- I mean, the

6    Circuit said that *AT&T* was kind of acting as an agent of the

7    Executive Branch there.

8          MR. BURNHAM:  No.

9          THE COURT:  I'm not sure that it would have been

10   an officer or employee of the Executive Branch.

11         MR. BURNHAM:  Sorry.  Yes.  I have no quarrel with

12   that at all.

13         What I'm trying to say is, their theory is that

14   *AT&T* made clear to everyone that the House and the Senate

15   could sue to -- I'm sorry -- that the House could sue

16   anyone, the Executive Branch, private parties, everybody, to

17   enforce its subpoenas.

18         And that's why Congress only addressed --

19         THE COURT:  Maybe I missed that.

20         I didn't hear Ms. Barbero to say that, that they

21   could sue anybody.  I thought they could sue the Executive

22   Branch under 1331.

23         MR. BURNHAM:  But as your Honor just described

24   *AT&T* as a private party enforcement case, it wouldn't stand

25   for that proposition at all.  Right?

1          THE COURT:  Well, no.  I think the Circuit

2     interpreted what *AT&T* was doing; and they were acting as an

3     agent of the Executive Branch, which would be different than

4     *Mazars*, for instance.

5          MR. BURNHAM:  Right.

6          So let's -- assuming that's what they meant in

7     their very short discussion, if the goal of 65 was to put

8     the Senate on parity with the House, it wouldn't have carved

9     out this kind of lawsuit, which is suits against officers of

10    the Executive Branch, unless nobody wanted those kinds of

11    suits to be in federal court and didn't understand those

12    kinds of suits to properly be in federal courts pre-1365.

13         The fact that they carved it out is what is so

14    significant about the provision.

15         And what distinguishes it from everything they

16    cite -- and Ms. Barbero talked about the patent cases or the

17    patent statute.  I think she was talking about *Mims versus*

18    *Arrow*, which is a Supreme Court case from a few years ago,

19    that just says providing jurisdiction in state courts over

20    certain federal claims doesn't repeal 1331 jurisdiction.

21         And so I just wanted to emphasize that that

22    carveout is how we know that nobody when they passed the

23    statute was trying to preserve or extend or whatever 1331

24    jurisdiction to bring cases against the Executive Branch.

25         THE COURT:  Can you remind me how -- I feel like

1    you keep asking me to overrule *AT&T;* and I just feel like I

2    can't.

3              On this point, are you saying that, whether or not

4    we agree with it, as a District Court, here, would I clearly

5    have been bound by *AT&T*, but that its discussion of 1331 is

6    no longer good law post-1996?

7              MR. BURNHAM:  Post-1978.

8              So I think the statute that *AT&T* was interpreting

9    doesn't exist anymore.

10             1331 has -- it's all in the same title of the US

11   Code, Title 28.  And so 1331 has to be read in harmony with

12   1365.

13             So whatever 1331 meant in 1976, when you add 1365,

14   and you carve out this exact kind of suit, which is a suit

15   against the Executive Branch, 1331 no longer means the same

16   thing because the Court -- the Supreme Court cases are

17   legion.

18             You know, a good example is *Henson versus*

19   *Santander Consumer USA* from 2017, that the Court has to read

20   these provisions together.

21             I think the other reason, though, why *AT&T*'s not

22   binding here is because, as your Honor observed in a

23   question, it is such a different posture and the issues are

24   so different.  The Executive was the one invoking federal

25   jurisdiction.  The House had only taken an appeal after its

1   subpoena was quashed.

2          And so I think that lessens its precedential force

3   in this context.

4          But whatever you think about that, I don't see any

5   way you can read the statutory code in '78 postdating *AT&T*

6   to mean what the Committee says.

7          And I just think the limitation in the '78

8   enactment itself makes clear that this was very carefully

9   written to carve out precisely what the Committee is trying

10  to bring into court today without any statutory basis to do

11  so.

12          THE COURT:  So 1331:  I hear what you're saying,

13  that it's been amended.

14          MR. BURNHAM:  Yes, sir.

15          THE COURT:  But I think the operative language

16  now, I believe, is cases arising under the Constitution,

17  laws or treaties of the United States, which is still --

18  it's the same language as it was back then.  Right?

19          MR. BURNHAM:  Yes.  But you have to read the

20  provisions together.

21          So as a textual matter, the fact that this is, you

22  know, 40 sections later in Title 28 doesn't matter.  I mean,

23  the Court has -- it's as though this were just part of the

24  same provision.  The Court has an obligation to look at what

25  Congress has enacted, read it in harmony.

1            The DC Circuit in *AT&T* didn't have this provision.

2    So the statutory scheme has changed in a very material way.

3    And so for that reason alone, what the Court observed in '76

4    is not binding on this Court as to a statute that didn't

5    exist at the time.  And the statutory that we have today did

6    not exist then.

7            THE COURT:  Okay.

8            MR. BURNHAM:  And so now -- thank you, your Honor.

9            THE COURT:  Mr. Myers?

10            Mr. Myers, I had an initial question for you.  I

11    don't want to spend too much time on this negotiation point,

12    but -- or the accommodation discussion.  But do you -- is

13    the Government standing behind the statements that I think

14    Mr. Mulvaney made about the House never getting the

15    President's tax returns?

16            MR. MYERS:  Your Honor, as set out in OLC opinion

17    in this case, it is the Government's position that legally

18    it can't turn over the tax returns.

19            With respect to the accommodation inquiry,

20    however, that's not really the most relevant question.  And

21    that's because the whole premise of this lawsuit is that the

22    Committee has an interest in evaluating legislation

23    concerning the Presidential audit program, not that they are

24    interested in obtaining the tax returns for their own sake.

25            And what the DC Circuit said in *AT&T II* is that

1     the Court is, quote, "not required to say whether the

2     subcommittee is entitled to all that it seeks when time and

3     experience may confirm that it does not need in any genuine

4     and substantial sense more than is provided by our

5     approach."

6             So what that language means is that even though

7     the House is telling your Honor that it wouldn't be

8     satisfied by anything other than the tax returns and even

9     though the Defendants are saying that it legally can't

10    provide the tax returns, that doesn't mean that the parties

11    shouldn't be directed to engage in the constitutionally

12    required negotiation and accommodation process.

13            And here, that just hasn't happened.

14            THE COURT:  Right.

15            But I guess my concern is here, at the outset of

16    the case, is it appropriate for me to dismiss the case when

17    the House is saying, "What we really want is the President's

18    tax returns" and the Executive Branch, both emphatically

19    from the Acting Chief of Staff and, you know, very

20    thoughtfully through an OLC opinion is saying, "You can't

21    have this"?

22            I mean, that strikes me as an impasse.  Right?

23            MR. MYERS:  Well, your Honor, there is an impasse

24    as well in the *AT&T* litigation, where the House subcommittee

25    said it wanted, it needed these request letters.

1          And what the Court said is:  Well, maybe your

2    legislative need could be met by redacted copies of the

3    backup memoranda.  So go talk.  Go figure out if there's a

4    way that we can come up with an accommodation that works for

5    everybody.

6          And the DC Circuit observed in one of the *AT&T*

7    cases, *AT&T I*, that the legislative and Executive branches

8    have a long history of settlement of disputes that seemed

9    irreconcilable.  That's 551 F.2d at 394.

10          Now, if the Committee stands up after I finish

11    talking and they say that the only thing they want is the

12    tax returns, they're never going to budge off of that

13    request, then at that point perhaps accommodation might not

14    be possible.

15          What that would say is that they lose on the

16    merits for reasons basically articulated in the OLC opinion

17    and that we can brief if the case ever gets there.

18          But so long as the premise of their lawsuit is

19    that they want to obtain the tax returns to evaluate

20    potential legislation concerning how the IRS processes tax

21    returns, then the parties should be directed to figure out

22    if there's an accommodation possible.  That is the clear

23    holding of the two *AT&T* cases.

24          THE COURT:  Okay.  So let's talk about cause of

25    action.

1          MR. MYERS:  Sure.

2          THE COURT:  Maybe we can start with the DJA.

3     Judge Bates had a long, very careful analysis about how the

4     DJA would apply to a case very similar to this.

5          MR. MYERS:  Right.

6          THE COURT:  Where did he go wrong?

7          MR. MYERS:  Where he went wrong is he -- is the

8     Court overlooked the fact that the Declaratory Judgment Act

9     is not itself a cause of action.  It is not itself a giant

10    loophole in the implied cause of action doctrine.

11          As your Honor noted at the beginning of this

12    hearing, there's a lot of law, especially recently,

13    expressing real skepticism of implied causes of action.

14          The way the Committee reads the Declaratory

15    Judgment Act and, respectfully, the way that Judge Bates

16    applied it in *Myers* is to say that whenever there is Article

17    III adversity and a substantive right and a complaint, you

18    can get a declaratory judgment.

19          And if that's right, then the DC Circuit's

20    statement in cases like *Ali versus Rumsfeld* to the effect

21    that the DJA does not provide a cause of action would be

22    essentially meaningless.

23          Our position -- this is really backed up by --

24          THE COURT:  I'm sorry.  *Ali versus Rumsfeld*:  Did

25    that postdate the *Myers* case?

1          MR. MYERS:  2011, your Honor.  It's 649 F.3d 762.

2          What the Supreme Court has said about how the

3    Declaratory Judgment Act works is that it's intended to

4    preempt a potential coercive action.

5          So the classic case for this is patent

6    infringement.  If I'm producing some product and I'm worried

7    that a patentholder is going to sue me, is going to bring a

8    coercive action for patent infringement, then I don't need

9    to wait for that coercive action.  I can turn around and

10   seek anticipatory review through a declaratory judgment

11   action.

12         THE COURT:  But isn't that exactly what's

13   happening here?  Aren't -- isn't this just avoiding a

14   situation where the Secretary is going to have to sue

15   seeking a motion to quash?

16         MR. MYERS:  No, your Honor.  There is not a

17   coercive action as we stand here that we are in a position

18   to bring against the Committee.

19         You know, the Executive Branch thinks that the

20   subpoena and the 6103 requests are legally baseless for the

21   reasons articulated in the OLC opinion.

22         But they're not seeking preemptive review or

23   preemptive ruling on a coercive action.  They certainly

24   haven't pled their complaint that way.

25         THE COURT:  It seems like this was whether to send

1    a Sergeant at Arms out to try to arrest Secretary Mnuchin or

2    whatever.  I mean, there's going to be -- there would be a

3    justiciable clash at some point.  And why not try to head it

4    off now without going into all of that and questions of

5    contempt and arrest and all of that?

6          MR. MYERS:  Well, your Honor, I take that to be

7    the Committee's argument here, which is essentially that

8    because there's an Article I right for them to issue

9    subpoenas and enforce their own subpoenas, well, then,

10   wouldn't it be easier and wouldn't it be more modest if they

11   could just bring a declaratory judgment action in this

12   Court?

13         There is no history or tradition of Congress

14   enforcing its informational demands in that way.

15         We know from the *Reed* case that my colleague

16   Mr. Burnham was discussing with you earlier that the Supreme

17   Court has said there is a big difference between enforcing

18   your own subpoenas through your Article I tools and going to

19   an Article III court and asking the Article III court to

20   enforce the subpoena for you.  There's a big difference.

21         There is a long history and tradition of Congress

22   doing one of those things; and there's not a similar

23   tradition of Congress doing the other.

24         Now, what is Congress supposed to do here?  It has

25   all of its Article I powers.  It can attempt to work this

1    out through the negotiation and accommodation process.

2          Obviously, we think that Congress attempting to

3    arrest an Article II officer would raise really serious

4    constitutional issues.  We don't, we hope, see the case

5    going in that direction.

6          But Congress has a long history of working these

7    issues out with the Executive Branch without bringing

8    actions of this kind.

9          In fact, when Judge Bates held in the *Myers*

10   opinion that there was an implied right of action directly

11   under Article I, I think he was the first court, Judge Bates

12   was the first judge to reach that conclusion.  And even

13   Judge Berman Jackson in the *Holder* case didn't follow that

14   analysis.

15         THE COURT:  So aren't there pretty recent -- you

16   know, I'm aware of *Abbasi*, obviously, and think maybe that

17   has some relevance here.

18         But there's also the *Armstrong* case, maybe *Board*.

19   I think there's some relatively recent Supreme Court cases

20   that do find declaratory judgment is relevant when you're

21   talking about declaring constitutional rights vis-à-vis the

22   Executive Branch.  Why don't those apply here?

23         MR. MYERS:  Right.

24         So the *Armstrong* case, I think there are a number

25   of reasons why that doesn't apply.

1          The *Armstrong* case is all about the District

2     Court's or the Court's long-established equitable powers.

3     And so that language, that holding, invites the Court to

4     think about whether or not there is a long-established

5     history or tradition of the Court's enforcing legislative

6     subpoenas at the request of one house of Congress.  There is

7     no such history or tradition.

8          Now, to be clear, there is a history and tradition

9     of courts enforcing other kinds of subpoenas, of judicial

10     subpoenas, Rule 45 subpoenas, subpoenas that are issued as

11     part of the trial process.  But there is no history or

12     tradition of courts enforcing these kinds of subpoenas.

13          THE COURT:  But there is a history of the Courts

14     recognizing these subpoenas.  Right?  I mean, they've come

15     up in different contexts, and usually it's when somebody's

16     being held by the Sergeant at Arms.  Right?

17          But --

18          MR. MYERS:  There's a history of Courts resolving

19     *habeus corpus* petitions brought by persons who have been

20     arrested by a house of Congress.  Yes.

21          And in a case like that, there is an individual

22     who is in the basement of the House, you know, I suppose,

23     saying, "I've been imprisoned.  My individual rights and

24     liberties are at stake.  Court, please let me out."

25          There's a history of that.  There isn't a history

1    and tradition of the Courts coming directly to Congress and

2    seeking to invoke -- to the Courts, rather, and seeking to

3    invoke the Court's inherent equitable powers.

4         The *Grupo Mexicano* case that we cite in our briefs

5    really makes clear the Court needs to look at a really high

6    level of granularity to figure out --

7         THE COURT:  Right.

8         But doesn't this go to the Committee's point about

9    this being just a more modest example of that; and if it's

10   common ground that Congress can send out subpoenas and they

11   can seek to enforce them through this much more drastic

12   remedy, why can't they come to a court and say:  Please say

13   this is an enforceable subpoena, and the Executive Branch

14   needs to do what we asked it to do?

15        MR. MYERS:  Your Honor, because there is no

16   history or tradition of Congress doing that.  So to the

17   extent that the Committee is trying to invoke this Court's

18   inherent equitable powers, then the question is whether

19   there is a longstanding history or tradition, not whether

20   it's more modest.

21        Of course, I think I need to note, if I haven't

22   already, that we're not conceding that Congress could arrest

23   an Executive officer.  That hasn't been squarely presented

24   here.

25        But again, the fact that something is more modest

1    doesn't mean that Congress gets to do it, that the greater

2    always includes the lesser, you know.

3              If we look at how Congress has actually treated

4    disputes of this kind, it has sought to enforce its

5    informational demands to the Executive Branch through the

6    negotiation and accommodation process backed by its Article

7    I powers.

8              In addition, in certain really narrow, targeted

9    circumstances, Congress has passed statutes that have sought

10   to give either particular bodies of Congress or particular

11   congressional actors a specific cause of action.

12             So we've pointed to the cause of action given to

13   the Senate Select Committee; there's the provision that

14   corresponds to 1365(a), 1365 -- I think it's (a) -- and also

15   2 USC 288(d); there's the provision that gives the

16   comptroller general, who is an officer of the legislative

17   branch, the authority to file a civil action.

18             And if the answer is that Congress didn't need --

19   you know, could have simply invoked this Court's inherent

20   powers or always had a cause of action under Article I, then

21   all of those enactments were superfluous.

22             And for all the reasons my colleague Mr. Burnham

23   has described, that is not really an appropriate way of

24   reading the US Code.

25             So let me move from --

1          THE COURT:  Let me ask you, what if the subpoena

2     was to a private party?  I mean, obviously, Congress has

3     been doing that for a long time, and there's not similar

4     separation-of-powers concerns.

5          Is Congress really -- or the House -- is it

6     helpless to do anything other than arrest the person?  Is

7     that all it can do?

8          MR. MYERS:  Your Honor, it can exercise the powers

9     it possesses under Article I or subject to --

10          THE COURT:  What are those?

11          MR. MYERS:  Yeah.  By that I mean, it has

12     authority, I think, to arrest and detain a contumacious

13     individual.  It can refer to the Executive Branch for

14     criminal prosecution.

15          And again, as I noted, there are certain statutes

16     that give Congress or congressional actors the right to

17     repair to Article III courts.  And, you know, to the extent

18     that the exercise of power in those cases is consistent with

19     Article III, then it can exercise that power as well.

20          THE COURT:  But as a general matter, you don't

21     think Congress can enforce its subpoenas to private parties

22     through the Courts?

23          MR. MYERS:  Absent a statutory cause of action,

24     no.

25          The Supreme Court has said that specifically in

1    *Reed*, where it says that, again, not only do you need the

2    authority to issue the subpoenas; but the authority to

3    enforce those subpoenas through the Court is an entirely

4    different animal.  It's just a different thing.

5            THE COURT:  But if the Supreme Court has found

6    kind of the inherent authority under Article I to issue

7    subpoenas, why isn't that enough to also say that it has the

8    inherent authority to enforce them in the courts?

9            MR. MYERS:  Your Honor, that was the argument

10   presented in *Reed*.  It was rejected in *Reed*, where the Court

11   said there is a big difference between issuing the subpoena

12   and enforcing it yourself versus going to an Article III

13   court to enforce it.

14           THE COURT:  Okay.  I clearly need to go back and

15   read *Reed*.

16           But I didn't think this was a subpoena enforcement

17   case.

18           MR. MYERS:  Well, it's all about the enforcement

19   of informational demands.  The Court said that there is a

20   long history and tradition of the Court -- of Congress,

21   rather -- enforcing its informational demands through its

22   own processes.

23           THE COURT:  And so in *Reed*, was Congress the

24   Plaintiff?

25           MR. MYERS:  It was either an individual senator, I

1    think, or -- yeah.  I think so.

2           THE COURT:  Okay.

3           MR. MYERS:  Yeah.

4           If I can turn your Honor to talking about the APA

5    claims.

6           THE COURT:  Yes, please.

7           MR. MYERS:  There are three reasons why APA review

8    is not available in this case.  But just to take a step back

9    to explain kind of in a broader level --

10           THE COURT:  Oh, can I ask you one question about

11    *Mazars*?  What was the cause of action in *Mazars*?  If the

12    President could sue to block a House subpoena there, why

13    wouldn't the same work here?

14           MR. MYERS:  Your Honor, I understand there to be

15    sort of specific case law that deals with when in particular

16    someone who is not the target of a subpoena has a cause of

17    action to stay compliance with that subpoena that was at

18    issue in *Mazars*.  I'm not an expert on the *Mazars*

19    litigation.

20           THE COURT:  I bet I know somebody who is.

21           Mr. Consovoy, do you know?  Could you respond to

22    that?  Sorry.

23           MR. CONSOVOY:  Yeah.

24           So, your Honor, those are -- the answer was

25    correct.  There are two separate lines of cases.

1        So in the *Eastland* line of cases, the Court has

2    said individuals, including through the President,

3    when they're -- and here, he's standing in the shoes of a

4    third-party custodian, so there's a second issue.

5    Technically, it's litigation between the President and

6    *Mazars*.

7        And he has a cause of action to enforce

8    constitutional rights to protect his individual liberties,

9    which -- it's not a direct interbranch dispute.  In fact, in

10   the *Mazars* opinion and in the briefing, there was a lot of

11   back-and-forth about:  Shouldn't they have done it this way

12   and we wouldn't be in court at all?

13       So it's just an individual -- those are

14   individual-rights cases versus interbranch cases, even

15   though there, it's the President.

16       THE COURT:  And so back to my earlier question to

17   Mr. Myers:  Couldn't the House use a similar cause of action

18   to sue Mazars or someone else to enforce a subpoena against

19   a private citizen?

20       MR. CONSOVOY:  I don't think so.  So there, the

21   Court is grounding the right in the individual rights.  Take

22   *Eastland*, for example, itself.  They're arguing it violated

23   the First Amendment.

24       So when you have a private individual seeking

25   action against a government, they have those rights.  This

1    is not symmetrical in that sense, to when you have the

2    Government seeking to assert rights against a private

3    individual.  They just don't work symmetrically.

4              THE COURT:  Okay.  So in my mind, particularly

5    given *Abbasi* and all this, I'm concerned about making up

6    causes of action and that I should be looking for a statute.

7    But it seems in this general area we have made up causes of

8    action; certainly not in this specific case.  But why

9    isn't -- why isn't that a natural extension of what courts

10   have been doing for a long time, to allow subpoenas to be

11   resolved in court?

12             MR. CONSOVOY:  I think when you look at the

13   history and tradition, there is a long history and tradition

14   in this country of individuals being able to seek redress

15   through the court to protect their individual rights against

16   government.

17             There is not a long history and tradition of one

18   branch of government suing another branch of government or

19   even Congress suing an individual and dragging the Court

20   into that process.  The Courts have a different role in

21   protecting the rights of individuals than it does in

22   protecting the rights of a branch of government.

23             I think that's the line at least the Court drew in

24   the *Eastland* decision.

25             THE COURT:  Thank you, Mr. Consovoy.

1              Thanks, Mr. Myers.

2              MR. MYERS:  Thank you, your Honor.

3              Having had an opportunity just to grab a copy of

4    *Reed* just to clarify that issue --

5              THE COURT:  Oh, yes.

6              MR. MYERS:  Yes.  Petitioners other than

7    Mr. South, a United States senator, constitute a special

8    committee created by a Senate resolution.

9              THE COURT:  So they were seeking to enforce a

10   subpoena --

11             MR. MYERS:  Correct.

12             THE COURT:  -- against -- and who's the Defendant?

13             MR. MYERS:  It is the County Commissioners of

14   Delaware County, Pennsylvania.  As I recall, they were

15   investigating whether an election had been improperly run.

16             I'll turn to the APA claims, unless your Honor has

17   any questions.

18             THE COURT:  Yes.

19             MR. MYERS:  We've articulated three reasons why

20   APA review --

21             THE COURT:  Which do you think is your strongest?

22             MR. MYERS:  Your Honor, they're all strong.  The

23   reason why is that --

24             THE COURT:  Come on.  Pick.

25             MR. MYERS:  -- they all get at the same point,

1    which is that the APA is a statute that permits people who

2    are regulated by the United States Government to sue the

3    United States Government.

4           It is not a statute that is a housekeeping statute

5    that permits one branch of the government to sue another

6    branch of the government.

7           5 USC Section 702 makes clear that the real party

8    in interest, the real defendant, is the United States

9    itself.

10          And so there's a lot of overlap among at least two

11   of our arguments because what it's getting at is that,

12   again, this is a way to challenge the exercise of

13   governmental power, which is not what's happening here.

14          So let me start and maybe --

15          THE COURT:  So that sounds like -- is that the

16   person argument?

17          MR. MYERS:  It's the person argument.  But it's

18   also the agency action argument that flows from the

19   Circuit's case in *Hodel*.

20          THE COURT:  Yes.  So I've got to tell you, as I

21   read *Hodel*, I just saw a lot of language in this pointing

22   out that it wasn't the House seeking to enforce this

23   reporting requirement and that it was some random third

24   party and that that really would open the floodgates.

25          I don't see *Hodel* as being all that helpful to

1    you, I'll tell you.  I was a lot more impressed by the

2    person argument.  But tell me where I'm wrong.

3              MR. MYERS:  I was going to start with the person

4    argument.

5              THE COURT:  So maybe you agree with me.

6              MR. MYERS:  But since you brought up this question

7    about *Hodel*, let me just answer the Court's question.

8              The Court does say that.  The language that you

9    pointed to is absolutely there.

10             But then it goes on to talk about what would

11   happen if Congress, you know, were dissatisfied with the

12   reporting requirement -- with the reporting pursuant to the

13   requirements.

14             It said, "This issue seems to us quintessentially

15   within the province of the political branches to resolve as

16   part of their ongoing relationships."  That's 865 F.2d, at

17   Page 319.

18             So the Court doesn't say that if Congress were

19   unhappy it should bring an APA action.  It says if Congress

20   is unhappy, work it out with the Executive Branch.  And so

21   that's the point I would make about *Hodel*.

22             But let me turn to the person issue.

23             As I noted, 5 USC Section 702 again makes clear

24   that the real defendant is the United States.  And if you

25   think about how the administrative process typically works,

1   that makes sense.  Agencies get their power from Congress

2   and then agencies exercise that power.  And if somebody is

3   unhappy with how the agency has exercised their delegated

4   power, they're very often going to have a problem with both

5   the statutes and the way that the agency has administered

6   the statute.

7          So the agency is the nominal defendant; but the

8   real defendant is the United States.

9          So the conclusion flows from 5 USC 702, also from

10  the Supreme Court's decision in the *Newport News*

11  *Shipbuilding* case, which talks about the universal

12  assumption that suits by persons adversely affected or

13  aggrieved are intended to redress injuries of private

14  parties.

15         The Court goes on to say that the mere impairment

16  of governmental interest is not enough to ground a suit

17  under language like "person affected or aggrieved."  That's

18  exactly what we're dealing with here.

19         Even if your Honor thinks the statute is a little

20  bit unclear or, you know, what I'm saying isn't a slam-dunk,

21  as my colleague, Mr. Burnham has described, interbranch

22  litigation raises a number of really sensitive, really

23  complicate constitutional issues.  So at a minimum, we would

24  expect Congress to speak clearly if it intended this result.

25  If it was trying to --

1          THE COURT:  And they're going to tell me that they

2     did.  They talk about that they have -- the governmental

3     organization or the public organization in the language and

4     that elsewhere, they -- oh, that they specifically say that

5     they are not an agency --

6          MR. MYERS:  Not an agency.

7          THE COURT:  -- no doubt to avoid being sued

8     themselves, which is very smart.

9          MR. MYERS:  Your Honor, I'm sure they will say

10    that.  But what they didn't say is that Congress itself can

11    sue.  And that's the kind of language that they have used in

12    other cases.

13         So again, in the provision that permits the Senate

14    to sue, whether or not that's constitutional is a different

15    question.  But they spoke clearly; and they said the Senate

16    can bring a suit.

17         THE COURT:  But why isn't -- what is that public

18    organization?  Why aren't they a public organization?

19         MR. MYERS:  Your Honor, they're not a public

20    organization, at least under principles of constitutional

21    avoidance, because they did not speak clearly and say that

22    this is meant to encompass Congress, which is a font of the

23    government's regulatory authority, not a subject of the

24    government's regulatory authority.

25         THE COURT:  So I mean, it strikes me that you've

1   got to rely heavily on this constitutional avoidance point;

2   that, otherwise, putting that aside, if we know states are

3   governmental organizations, agencies of states are

4   governmental -- are public organizations, that surely

5   Congress could be too.

6           MR. MYERS:  Well, your Honor, if you take a step

7   back, pursuant to the supremacy clause, we know that the

8   United States Government can issue regulations and statutes

9   that govern states, that govern the instrumentalities of

10  states.

11          The Executive Branch does not exercise regulatory

12  authority over the United States Congress.  And so that is

13  the key difference.  It is a limitation on the APA.  The APA

14  is all about giving people who are regulated by the

15  government, by both Congress and the Executive Branch, the

16  ability to sue the United States.  It's not a tool for

17  interbranch litigation.

18          THE COURT:  I get that point.

19          I'm saying that from plain meaning you would

20  assume that if all of these other governmental bits are

21  public organizations, then surely the House would be as

22  well.

23          MR. MYERS:  Your Honor, if the language is read in

24  an absolute vacuum without any consideration of what the APA

25  is trying to accomplish or the extraordinary constitutional

1       sensitivities of authorizing interbranch litigation, then

2       maybe that's so.  Maybe we can just say Congress is a public

3       organization, end of story.

4               But that's no way to read a statute.

5               THE COURT:  So the Circuit recently said that

6       another country could be a public organization.  Right?

7               MR. MYERS:  I think that's right.

8               THE COURT:  Doesn't that raise similar concerns

9       that another country's government is sovereign and there's a

10      lot of separation-of-powers concerns, and maybe we should

11      have expected Congress to speak clearly before they're going

12      to allow -- before we're going to assume that a sovereign

13      country can utilize the APA?  Aren't a lot of the same

14      arguments applicable there as well?

15              MR. MYERS:  Your Honor, some of them may be, but

16      not all of them are; in particular, this argument about how

17      the government is structured, how it exercises its

18      regulatory authority.

19              I'd also point out that the House itself has

20      disclaimed the power to bring suit under general laws that

21      permit aggrieved persons to challenge agency action.  That

22      was the 1998 brief in the *Commerce* case that we cite on Page

23      56 of our motion to dismiss.

24              And so the interpretations that I'm articulating

25      today shouldn't be foreign to the House.  You know, they've

1    made this exact point.  At a minimum, we think it shows that

2    Congress didn't speak clearly here.

3              THE COURT:  Well, the Government recently said

4    that -- to John Bates that you are susceptible under 1331 to

5    subpoenas.  Right?

6              I mean --

7              MR. MYERS:  Your Honor, I don't think we've

8    conceded 1331 jurisdiction.  I think the issue just wasn't

9    raised.

10             THE COURT:  I thought you did.

11             MR. MYERS:  I could be wrong about that, but

12   that's my recollection.

13             The last point under the APA has to deal with

14   preclusion of review.  And this is a somewhat different

15   point.  But the basic point here is that under ample Supreme

16   Court precedents, in figuring out whether or not review is

17   precluded, you look to the entire statutory scheme, its

18   objectives, its legislative history, and the nature of the

19   administrative action involved.

20             Here, Congress has enacted a comprehensive,

21   thorough scheme for the enforcement of its informational

22   demands.

23             In the mid-19th Century, it enacted the statutes

24   authorizing referral to the Executive Branch for criminal

25   prosecution.  It's enacted the statute I mentioned earlier,

1    31 USC Section 716, which authorizes the comptroller general

2    to demand information from the Executive Branch and then sue

3    if he's not satisfied by the Executive response.

4          And it has in the Tax Code.  Somewhat relatedly,

5    it's created a cause of action for taxpayers to sue, seeking

6    redress for unauthorized disclosure of their confidential

7    tax information.  But it's never enacted a statute that

8    would either permit the House generally to directly enforce

9    its subpoenas in an Article III court or its Section 6103

10   requests.

11         So we think the fair reading of everything that

12   Congress has done in this area is to show that it didn't

13   intend just general APA review to be available.  If it did,

14   statutes like 31 USC Section 716, like 2 USC 288(d), which

15   permits the Senate to sue, would be entirely superfluous.

16         And so we think that APA review is precluded for

17   that reason.

18         THE COURT:  Mandamus:  I get your argument that

19   that's for extreme cases, all that type of thing.

20         MR. MYERS:  Right.

21         THE COURT:  But as I was rereading this, it

22   strikes me that they've got a really strong argument under

23   the plain language of 6103 that you were supposed to turn

24   this over.

25         MR. MYERS:  Right.

1          THE COURT:  And I'm kind of dubious about the

2     claim that I should be kicking this at the 12(b)(6) stage.

3     You know, maybe this is something you fight about on the

4     merits, whether it's so clear that they're entitled to it

5     under mandamus.  But can I really kick this now?

6          MR. MYERS:  You can, your Honor.  The way that

7     mandamus review works is that Plaintiffs need to demonstrate

8     a clear and undisputable right to relief, that the

9     government has engaged in the violation of a clear duty to

10    act.

11         So it's one thing to look at Section 6103 and say

12    that it uses the word "shall."  We all understand that.

13         But as set out in the OLC opinion at great length,

14    you know, as your Honor noted, there are really serious,

15    really considered constitutional issues lurking in the

16    background.

17         THE COURT:  So this is a 12(b)(6) discussion,

18    right?

19         MR. MYERS:  Yes.  That's right.

20         THE COURT:  And so aren't I required to credit

21    everything in their complaint and avoid looking to external

22    documents like an OLC opinion?

23         MR. MYERS:  Well, your Honor, two points on that:

24    I mean, one is it presents the sort of pure question of law,

25    you know, whether or not there's a sort of real substantial

1    question here.  That's a pure question of law.

2           And, second, the OLC opinion.  I forget if it's

3    attached to or certainly discussed in the complaint.

4    It's -- beyond that, it's judicially noticeable.  It's

5    obviously there, you know.

6           And so the way that mandamus works is that the

7    Court doesn't sort of assume that there's been a violation

8    of a clear duty.  There has to be a credible allegation of

9    that.

10          Here, there really isn't.  The OLC opinion makes

11   perfectly clear that there are really serious constitutional

12   issues, the same issues it took -- at least closely related

13   to the issues that it took the DC Circuit, you know, 100

14   pages to work out in the *Mazars* case.

15          And so as set out in the OLC opinion, Congress can

16   only exercise its power of inquiry in aid of its legislative

17   function.  So simply to point to the statute and say that it

18   uses the word "shall" isn't enough to say that there's a

19   clear and indisputable right to relief.  6103 has to be read

20   in conjunction with the limits on Congress's Article I

21   power.

22          So in our view, there is not a clear and

23   indisputable right to relief, nor is there the violation of

24   a clear duty to act.

25          And then I would also just add that there is an

1    adequate -- there is an alternative remedy for the reasons

2    I've articulated with respect to the negotiation and

3    accommodation process.

4         At least until such time as the parties seriously

5    engage in that process, we don't know that Congress -- or

6    the House, I should say -- can't satisfy its legitimate

7    needs through the accommodation process.

8         So at the very least, it's premature to even get

9    to the mandamus question.

10        THE COURT:  Okay.  Thank you very much.

11        MR. MYERS:  Thank you, your Honor.

12        THE COURT:  Thank you, Mr. Myers.

13        Ms. Barbero?

14        So you've got a lot of different potential causes

15   of action.  I suggested at the outset some skepticism as to

16   whether all of these are viable.  I want to be careful about

17   treading in this area and creating case law that may be

18   incorrect, but might kick around in the books for a while,

19   I'm sure.  I will not have the final say in all of this; but

20   some of these things, I might be the only one who's speaking

21   to it.

22        So it would be helpful to get some guidance from

23   you on, what do you think are your most viable claims?  I

24   don't know if you'd want to withdraw others.  It just -- I

25   guess I'm worried about creating case law that lasts long

1    after this case that may or may not be correct, but is kind

2    of unnecessary in an area where we're all kind of creating

3    new territory.

4           MS. BARBERO:  I understand, your Honor, and

5    appreciate the concern.

6           It may be helpful to walk through the causes of

7    action, the sources of authority and explain how all of this

8    works together, which I'm happy to do.  And also, I do want

9    to talk about some of the cases that the Department has

10   relied on.

11          But to start -- and I'd start with the *Armstrong*

12   case, your Honor, the *Armstrong v. Exceptional Childcare*

13   *Services*, which made clear that a Court sitting in equity in

14   a proper case could give a party injured by a federal

15   officer's violation of the Constitution the ability to sue.

16          And the House has come to court now asking for an

17   injunction and declaratory relief because of a violation of

18   the House's authority under Article I of the Constitution as

19   well as the statute.

20          The Court sitting in equity can provide a remedy

21   for the House under Article I of the Constitution for this

22   constitutional violation.  That's clear from *Armstrong*.

23          Now, your Honor has expressed concern a couple of

24   times about the *Abbasi* case.  That case is very different,

25   because the Court there was concerned -- and the discussion

1    in that case very much reflects this concern -- about

2    implying a damages remedy directly under the Constitution.

3    If your Honor looks at the Court's discussion, there's

4    concern about indemnification of federal officers, what that

5    means for the federal FISC.

6         The Court determines that when there are damages

7    at issue, which is not the case here, where we're seeking

8    equitable remedies, that Congress may be in the best

9    position to balance those types of questions and determine

10   when the federal government should be required to pay out

11   funds as a result of a constitutional violation.

12        That is not the case here.  And those cases are

13   distinguishable for that reason.

14        THE COURT:  So as Mr. Myers points out, I think,

15   for the cases you're relying on, *Armstrong*, it's about

16   private parties seeking a cause of action; and that arguably

17   this is a very different circumstance, where you've got one

18   branch of the government coming after another.  And I

19   imagine Mr. Myers's retort may well be:  Well, Congress

20   could have created a cause of action here, and it hasn't.

21   And nobody is better equipped to create such a cause of

22   action than your client.  And the fact that they haven't

23   also says something.  And why should the Courts do the

24   House's work?

25        MS. BARBERO:  Well, your Honor, there's no

1    requirement that the House or that Congress create a cause

2    of action for this type of case.

3          But the idea to the first part of your question

4    about individual rights being at stake, if memory serves,

5    the Department and the Solicitor General made the same

6    argument in the *Free Enterprise Fund PCAOB* case in the

7    Supreme Court, where they said there's no cause of action.

8    That was a case involving the removal protections for the

9    members of the PCAOB.  It was brought under the appointments

10   clause.

11         And the Supreme Court in a footnote rejects that

12   argument and says, you know, They've cited no cases -- I

13   don't have the language in front of me -- but no cases, no

14   law, suggesting that our cause of action case law is limited

15   to those types of cases.

16         The same is true here, where there's a violation

17   of a constitutional authority, that the Court can sitting in

18   equity recognize and provide a remedy for that violation.

19   There's no requirement that the Congress go through the

20   process of creating a cause of action.  We know from

21   *Armstrong*, we know from *Free Enterprise Fund*, that it's not

22   required to do so.

23         There's no reason that the House as a plaintiff

24   would have an additional burden.  If anything, I think it

25   would be -- it would go the other way, because there are

1    not -- this isn't a private rights case.  It's about the

2    House's interest, the Committee's interest in this important

3    information.

4           THE COURT:  Doesn't 1365 create a cause of action

5    for the Senate?

6           MS. BARBERO:  1365 is a jurisdictional provision.

7    Let me look at the language to see whether there's also a

8    cause of action in there.

9           I haven't understood 1365 to create a cause of

10   action, although I'm looking through it now, your Honor.  I

11   primarily understood that as a jurisdictional provision,

12   which would not be uncommon in the subpoena enforcement

13   context.

14          Your Honor, Mr. Consovoy stood up and said

15   effectively that the President had filed suit seeking to

16   stop enforcement of the subpoena in *Mazars* in order to

17   vindicate his constitutional rights.  He didn't cite to a

18   specific statutory cause of action there.  This case and all

19   of the subpoena enforcement cases that have arisen have

20   arisen in a similar context without such an express

21   statutory cause of action.

22          But there's -- and I did want to clarify the

23   record on one point in *Myers*.  The Department there did in

24   fact not dispute that there was statutory jurisdiction under

25   1331.  But in *Myers* and *Holder* and those cases, there

1    wasn't, as there isn't here, an express statutory cause of

2    action for the subpoena enforcement aspect of this, but the

3    Courts were -- nonetheless found that they could decide the

4    case.

5              THE COURT:  Right.

6              And, you know, as Mr. Myers points out, that

7    predated a couple of these cases, including *Abbasi*, where

8    the Supreme Court seems a little less keen on the cause of

9    action creation work than we've done in the past.  Right?

10             MS. BARBERO:  And *Abbasi* again, your Honor, is a

11   damages case and not an equity case.

12             And in addition to that, this isn't a case where

13   there would be concerns about whether there would be

14   judicially administerable standards and those types of

15   concerns, because we have a clear statutory duty to provide

16   very specific information to the Committee.

17             So finding that there's a cause of action directly

18   under the Constitution for Congress to obtain the type of

19   information that's required by statute as well as to find

20   that when Congress enacted Section 6103(f) and provided for

21   itself the right to obtain this information and the

22   mandatory duty that the Treasury Secretary provided, that

23   surely Congress would have understood that in the

24   unprecedented event that the Secretary refused to comply

25   with that statute, that Congress could come to court to

1    enforce that right to obtain an injunction to require that

2    the Secretary comply with the statute and to obtain a

3    declaration.

4              THE COURT:  If I find that the mandamus count

5    survives, is that enough?

6              MS. BARBERO:  Your Honor, the mandamus count would

7    provide a cause of action, certainly.  And there is a clear

8    and indisputable right, as we argued in the brief.  The

9    mandamus statute is satisfied.

10             I would strongly urge the Court to find that

11   there -- that other causes of action that we've asserted are

12   also valid.  But if I may consult with counsel for just one

13   minute.

14             (Confers with co-counsel privately.)

15             Thank you, your Honor.

16             We agree.  Both mandamus would provide

17   subject-matter jurisdiction and a cause of action.  And

18   therefore, dismissal of the complaint would be improper just

19   under the mandamus statute for those reasons.

20             THE COURT:  Right.

21             So I guess what I'm asking, though, is:  Do you

22   need the other causes of action if you just have -- if I say

23   mandamus applies here, you've got a cause of action?

24             MS. BARBERO:  Your Honor, we could get the relief

25   that we have sought in the complaint, which is production of

1   the information that the Committee has requested, under the

2   mandamus statute.

3         So we don't -- that's a long way of saying we

4   wouldn't need -- if your Honor were to find that mandamus is

5   satisfied here, and that there is -- as we have argued and

6   the statute is clear, that we have a clear and undisputable

7   right to the tax return and return information that the

8   Department has refused to provide, that would provide us

9   with the relief we've requested.

10        THE COURT:  I think your last thing is

11   nonstatutory relief.  And you say that that would apply only

12   if all these others don't.  Correct?

13        MS. BARBERO:  The *ultra vires* claim?

14        THE COURT:  Yes.

15        MS. BARBERO:  Yes.

16        THE COURT:  So if I found here that mandamus

17   applies, I would, I guess, be dismissing the *ultra vires*

18   count.  Is that correct?

19        MS. BARBERO:  Because we would have relief

20   available.  Yes.

21        THE COURT:  Right.

22        How about the APA and the implied cause of action?

23   And there, I'm not arguing that as a legal matter you

24   wouldn't be able to assert all three.

25        But I'm asking as a practical matter and kind of

1    as a prudential matter, are you all comfortable with one

2    count going forward and me not ruling one way or the other

3    on these others?

4              And you can talk.

5              MS. BARBERO:  Thank you.

6              (Confers with co-counsel privately.)

7              Thank you, your Honor.

8              Out of an abundance of caution and to make sure

9    that we reserve all of our rights and potential argument,

10   could we get back to you by -- with a submission regarding

11   this question?

12             THE COURT:  Sure.

13             MS. BARBERO:  Thank you.

14             THE COURT:  What I'm proposing is that, again, for

15   the reasons that I set out at the outset that I don't know

16   that you all want me putting -- writing things on the

17   federal supplement that you might not get to appeal or it

18   really doesn't make sense if there's one that is going

19   forward for you all to agree to dismiss the others.

20             So get back to me on that.  You don't need to --

21             MR. BURNHAM:  We would like an opportunity to

22   respond to whatever they file.

23             THE COURT:  Sure.

24             MR. BURNHAM:  Thank you, your Honor.

25             THE COURT:  So we'll put the *ultra vires* aside.

1          Let's talk about the APA, particularly this person

2    point.  How are you all a person under the APA?

3          MS. BARBERO:  Well, your Honor previewed my

4    argument.  But if you would indulge me just to walk

5    relatively quickly through the definitional provision in

6    Section 551.

7          Congress there was very clear that an agency

8    includes each authority of the government of the United

9    States, but does not include the Congress.  That's in

10   551(a)(1).

11         And then in the very next provision, Congress

12   adopted an expansive definition of "person."  Person

13   includes any individual, partnership, corporation,

14   association or public or private organization.

15         And our argument is that by making clear that

16   Congress was not an agency such that it could be sued under

17   the APA, and including public organization in the broad

18   definition of "person," that Congress in enacting the APA

19   set up a scheme where Congress could sue in the event that

20   it was aggrieved by an agency action, which is what has

21   happened here with the refusal to comply.

22         THE COURT:  So can Congress also submit comments

23   in the notice and comment rulemaking?

24         MS. BARBERO:  I don't know that that would be the

25   most efficient way for Congress to communicate its comments

1     to the Executive Branch.

2                  THE COURT:  It would be a bizarre way to do it.

3                  MS. BARBERO:  It would be an odd way for Congress

4     to do it.  And I think there's a difference in that

5     provision, where it's interested person versus a person

6     aggrieved.

7                  But I don't know that the fact that Congress might

8     be able to submit comments in a rulemaking is really here or

9     there with respect to whether Congress is a person

10    authorized to sue under the APA.

11                 THE COURT:  Isn't it the same?  I thought it was

12    the same definition.  Maybe I'm wrong.

13                 MS. BARBERO:  I think it's "person"; and it's just

14    with a modifier, if I'm recalling correctly.

15                 But in any event, the point is, if Congress

16    could -- or a committee of Congress could submit comments to

17    an agency in a rulemaking, that really shouldn't give the

18    Court much pause in terms of determining whether when

19    Congress is a public organization aggrieved by the

20    Executive's noncompliance with the law, the refusal to

21    comply with the statute that creates a mandatory duty, that

22    the APA provides a vehicle through which the Congress can

23    come to court and assert that the Executive Branch is acting

24    in contravention to law and advance those claims in this

25    Court as a person aggrieved by those actions.

1          And we know from recent DC Circuit law and other

2      cases that foreign governments could -- are persons who

3      could sue under the APA.  I think there are suggestions in

4      the case law that Indian tribes may be able to do so; state

5      organizations can do so.  The reasoning in those cases

6      suggests that congresses would be similarly positioned.

7          THE COURT:  Maybe.

8          I think Mr. Myers's point is, though, with the

9      possible exception of a foreign government, all of these

10     others are regulated by the Federal Government, and

11     therefore should have an opportunity to push back and have

12     their voices heard in this process.

13         And even -- I want to go back and read that recent

14     DC Circuit case.  But my recollection is that there, the

15     foreign government was in a sense regulated in that it was

16     looking to receive -- I think it was hunting trophies or

17     something from the US, and therefore it was also in some

18     ways in the situation of a normal citizen for those

19     purposes.

20         Again, very different from a coequal branch of

21     government.

22         MS. BARBERO:  Your Honor, I've been informed that

23     individual members of Congress and groups of members in fact

24     submit comments to agencies in rulemaking.  So that does --

25         THE COURT:  But that's different.

1          MS. BARBERO:  That's different.

2          So the -- but to the point of the question about

3    Congress and whether it's regulated by the Executive Branch,

4    this is an unusual scheme that we have here.  It is not the

5    ordinary case where Congress would -- or the House or

6    Committee of the House would come into court and say:  In

7    fact, we satisfy the APA and can bring a cause of action

8    here under the APA or a claim under the APA.

9          This is a statute that very specifically provides

10   the Committee on Ways and Means is entitled to information

11   from the Secretary of the Treasury upon written demand.  So

12   it's not the same sort of regulated-regulator-type

13   relationship that you have.

14         On the other hand, under this statutory scheme,

15   surely Congress is aggrieved by -- the Committee is

16   aggrieved by the refusal to provide the information --

17         THE COURT:  I get that.  That's not what I'm

18   pushing back on.

19         It's this idea that you are a person within the

20   meaning of the APA.  Is the Supreme Court -- could the

21   Supreme Court claim to be APA or claim to be a person under

22   the APA?  Maybe this District Court could.  Maybe we could

23   sue to stop FOIA or something like that.  I don't know.

24         (Laughter.)

25         MS. BARBERO:  I'm not aware of whether there are

1    any cases on whether the judiciary or any individual members

2    of the judiciary could sue under the APA as a person.

3           It would --

4           THE COURT:  Well, an individual one probably

5    could.  Maybe I can take my chances.

6           But I don't know that the Court could as a

7    governmental -- saying that it's a public organization in

8    the same sense that a state could.

9           MS. BARBERO:  Your Honor, the question would be

10   the same question that we're grappling with today, which is

11   whether -- I mean, there may be many other reasons that

12   would prevent the judiciary as a branch of government from

13   suing in the judiciary under a statute to obtain some --

14          THE COURT:  It would be awkward.

15          MS. BARBERO:  -- remedy.  It would be a little

16   awkward.  So there's that.

17          But more to the point, the question -- the

18   statutory interpretation question would be the same one that

19   we are grappling with now, which is whether the Plaintiff

20   meets the statutory definition of person.  And I don't think

21   going back to 551 -- so the -- Congress again is excluded

22   from the definition of agency, as are courts of the United

23   States.

24          But the person includes a public organization.

25   And the Committee on Ways and Means is a public

1    organization.  It has been aggrieved under the specific

2    statute by the action of the Executive Branch.

3          The APA was designed and set up to remedy exactly

4    that type of situation where the Executive acted in

5    contravention of statute and affected the rights.  And here,

6    it's a deprivation of information that a person, a public

7    organization, would otherwise be entitled to.

8          So I recognize it's an unusual case.  And in the

9    *Burwell* case, I think it was Judge Collyer who held that

10   Congress or the House, rather, was a person under the APA.

11   So it's not uncharted territory here.

12         But we do meet the statutory definition.  And

13   again, that is one of the causes of action that we have

14   asserted.  But as we've discussed briefly the others, we

15   also have the Declaratory Judgment Act.

16         THE COURT:  And do you agree you need -- that

17   doesn't get you the whole way there.  Right?  You still need

18   to have statutory subject-matter jurisdiction and you still

19   need to have an underlying cause of action.  Is that

20   correct?

21         MS. BARBERO:  The substantive right being

22   asserted?

23         THE COURT:  And you're relying on 6103 and Article

24   I?

25         MS. BARBERO:  Correct.  That's absolutely correct.

1          I'm happy to answer more questions on cause of

2     action if your Honor has more.

3          THE COURT:  No.

4          MS. BARBERO:  I would just then briefly say on the

5     question of accommodation that it is quite clear that the

6     parties are at an impasse on the basis of what's been

7     requested, which is the tax return and return information

8     and the audit files, which has been in no uncertain terms

9     made clear that it will not be forthcoming; and not only

10    that, that it could potentially be a criminal violation in

11    the view of the Executive to provide that information.

12         THE COURT:  Okay.  Thank you, Ms. Barbero.

13         Mr. Myers, quickly.

14         MR. MYERS:  Thank you, your Honor.  And I'll try

15    to be very quick.

16         Really, there are just sort of two topic areas I

17    want to talk about.  One is mandamus.

18         We respectfully submit that mandamus is not a

19    universal solution to every cause of action problem.  In

20    other words, it can't be the case that the Plaintiff gets to

21    plead that there's been a clear violation of a duty.

22         The Court said:  Okay.  We're here on 12(b)(6).

23    I'll take that to be true.

24         So you get past your 12(b)(6) motion, go through

25    the whole discovery process, and then you have to fight it

1    out on summary judgment.  That's just never how mandamus has

2    been understood.

3               THE COURT:  But that's -- 6103 is a pretty clear

4    statute.  Right?

5               MR. MYERS:  Your Honor, 6103 says what it says.

6    But I don't think there's any dispute by my friends on the

7    other side that it has to be read in conjunction with the

8    constitutional limits on Congress's Article I power.

9               So if your Honor looks at the OLC opinion, holds

10   it up and said, Hey, that's frivolous.  This is ridiculous.

11   Of course there's a mandamus claim here.

12              Well, then I lose and we have a set of other

13   problems.

14              My point is that your Honor can't just say:  Well,

15   they have pled that it's frivolous.  There needs to be a

16   threshold analysis of whether or not this is a mandamus

17   case.

18              And if that analysis is not part of the 12(b)(6)

19   process, then mandamus would get you past a 12(b)(6) motion

20   in every case, which is just not the law.

21              In addition to that, mandamus here, we submit, is

22   precluded.

23              Congress, for example, when it gave the Senate the

24   authority to sue, it did two things:  First, it passed a

25   jurisdictional provision.  That's 28 USC Section 1365 that

1   my colleague Mr. Burnham just talked about.  It also passed

2   a cause of action provision.  That's 2 USC Section 288(d).

3          And as I noted earlier, Congress has passed a

4   number of other statutes that permit either parts of

5   Congress or officers of Congress to sue the Executive Branch

6   in certain limited circumstances.

7          The upshot of those provisions is preclusion of

8   the mandamus claim.  All of those provisions would be

9   superfluous if all Congress had to do is say that there's

10  been a violation of a legal obligation and therefore

11  mandamus applies.

12         With respect to Plaintiffs' equitable claim,

13  Ms. Barbero says that *Ziglar* and *Abbasi* are properly read to

14  be limited to damages claims.

15         As we set out in our briefs, *Abbasi*, I think,

16  makes clear that whenever a host of considerations must be

17  weighed in evaluating whether or not a cause of action is

18  appropriate, then that determination is best left to the

19  lawmakers.

20         As your Honor noted, Plaintiffs here are uniquely

21  well positioned to fix their cause of action problem.  But

22  it would take the exercise of political will to do that.

23  And that's an appropriate question for political actors, not

24  for this Court.  There's just no history or tradition of

25  these actions being brought directly by Congress under

1    Article I.

2         THE COURT:  Thank you, Mr. Myers.

3         MR. MYERS:  Thank you.

4         THE COURT:  So two things:  First, as to this

5    take-back, to be clear, what I'm asking -- and again, in the

6    light of me not wanting to rule in this area on things that

7    I don't need to be ruling on, I'm asking you all to consider

8    your multiple causes of action.

9         And if you can come back to me and say, "If the

10   Court, of course, finds subject-matter jurisdiction and

11   finds that there is a cause of action under the APA or the

12   APA and mandamus or whatever, then we would voluntarily

13   dismiss the remaining counts," that's what I'm asking, if

14   you're willing and interested in doing that.  And if you can

15   do that in the next couple of days.

16        To the extent the Executive wants to respond,

17   you're welcome to.

18        MR. BURNHAM:  Thank you, your Honor.

19        THE COURT:  I'm not sure.  Maybe this is entirely

20   inappropriate.  But I'd think in this type of area, it might

21   be wise.

22        And then the other thing:  On the accommodation

23   process, obviously, I want to consider all of this.  But I

24   do take the *AT&T* language on the accommodation process

25   seriously.

1          And I think since there is this pending motion to

2     dismiss over whether I even have jurisdiction in this case,

3     I don't think it's appropriate for me to start directing the

4     parties to do anything.

5          But if this case proceeds, I don't think this

6     would be the last discussion we would have about the

7     accommodation process.  And I just suggest it would behoove

8     the parties to be thinking about what that should look like

9     and perhaps even start doing that now.

10          I really think it would be -- given the

11     Committee's ostensible interest in knowing about the audit

12     process, I'd think there should be a way for the parties to

13     figure this out without the Court having to direct the

14     Executive on the one hand or deny the House on the other.

15          All right.  Yes.  Yes, ma'am.

16          MS. BARBERO:  Your Honor, we just -- I just wanted

17     to make one point about the accommodations process, which

18     didn't come out earlier, but is relevant to the suggestion

19     that we should negotiate, which is the interest in the audit

20     process itself that the Committee has asserted requires the

21     Committee to be able to see the President's tax returns,

22     return information and the audit files, which we understand

23     include the auditors' notes as well as supervisors' notes

24     about the actual scope of the audit, what's been asked for,

25     what types of discretionary decisions have been made.  And

1    I'm happy to go into more detail about what that would

2    involve.

3              But until the Department is willing to agree that

4    the Committee can have access to that information, there

5    really isn't an accommodation that could be had that would

6    satisfy the Committee's legitimate legislative and oversight

7    interests.

8              THE COURT:  I don't think we need to get into

9    that.  But it seems to me there could be common ground.

10              MR. LETTER:  Your Honor, may I ask you one

11   question?

12              THE COURT:  Yes, sir.

13              MR. LETTER:  Sorry.

14              Mr. Burnham asked if they could get a reply to the

15   first thing that we're sending to you.

16              I just want to make sure:  As I understand it,

17   we're just saying to you we would or would not be willing to

18   have you withdraw certain points.  I'm not sure why DOJ

19   would have any response to whether we do or don't.  We

20   either will or we won't.  This isn't for argument, I'm

21   assuming.

22              So I'm puzzled what the response would be.

23              THE COURT:  I don't know either.  But if he wants

24   to say something, I will read it.

25              MR. LETTER:  Thank you very much.

1                    THE COURT:   Thanks, folks.

2                 (Proceedings concluded.)

1                               **CERTIFICATE**

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4       certify that the foregoing constitutes a true and accurate

5       transcript of my stenographic notes, and is a full, true,

6       and complete transcript of the proceedings produced to the

7       best of my ability.

8

9

10                   Dated this 7th day of November, 2019.

11

12               /s/ Lisa Edwards, RDR, CRR
                 Official Court Reporter
13               United States District Court for the
                   District of Columbia
14               333 Constitution Avenue, NW, Room 6706
                 Washington, DC 20001
15               (202) 354-3269

16

17

18

19

20

21

22

23

24

25

## $

**$10,000** [1] - 46:20

## '

**'70s** [3] - 12:17, 12:18, 21:1
**'76** [3] - 46:21, 47:6, 83:3
**'78** [3] - 48:4, 82:5, 82:7
**'80** [1] - 48:4
**'80s** [3] - 18:19, 21:3, 58:18
**'96** [2] - 37:18, 40:18

## /

**/s** [1] - 131:12

## 1

**100** [1] - 108:13
**10:01** [1] - 1:8
**11** [1] - 13:10
**11.2M(3)(C** [1] - 62:19
**1100** [1] - 1:24
**11th** [1] - 63:17
**12(b)(6** [5] - 107:2, 107:17, 124:24, 125:18, 125:19
**12(b)(6)** [1] - 124:22
**128** [1] - 63:25
**13** [1] - 78:8
**131** [1] - 59:22
**1331** [84] - 5:9, 26:22, 26:23, 27:3, 32:22, 32:25, 34:12, 34:17, 35:7, 35:8, 35:21, 36:4, 36:9, 36:13, 36:20, 36:23, 38:15, 38:20, 38:23, 39:4, 39:15, 41:3, 41:9, 41:10, 44:5, 44:15, 44:19, 44:21, 45:6, 45:7, 45:14, 45:22, 46:6, 46:13, 46:17, 48:15, 49:12, 49:17, 49:20, 50:6, 50:8, 51:2, 52:3, 52:7, 52:13, 52:20, 52:25, 53:1, 53:5, 53:9, 53:16, 54:4, 54:12, 54:14, 54:16, 54:18, 56:8, 56:15, 56:17,

57:15, 58:5, 58:20, 59:4, 59:11, 60:2, 60:8, 61:3, 78:6, 78:8, 78:11, 79:22, 80:20, 80:23, 81:5, 81:10, 81:11, 81:13, 81:15, 82:12, 105:4, 105:8, 113:25
**1338** [1] - 52:8
**1339** [1] - 51:25
**1345** [5] - 38:22, 38:23, 39:4, 59:13, 59:20
**1365** [49] - 5:11, 34:6, 34:8, 34:24, 34:25, 35:1, 35:21, 36:23, 37:6, 39:7, 39:9, 41:3, 41:21, 45:6, 45:8, 48:3, 49:10, 49:13, 50:16, 50:21, 51:6, 51:16, 51:20, 51:21, 52:25, 53:11, 53:22, 53:24, 54:14, 54:25, 55:5, 55:9, 55:16, 56:24, 57:16, 57:17, 57:23, 58:3, 60:9, 60:12, 78:15, 78:16, 81:12, 81:13, 92:14, 113:4, 113:6, 113:9, 125:25
**1365(a** [1] - 92:14
**1365(a)** [1] - 54:1
**1365(b** [1] - 55:16
**138** [1] - 30:5
**15** [1] - 44:3
**16** [1] - 44:3
**1600** [1] - 2:2
**1656** [1] - 47:10
**170** [1] - 10:14
**1807** [1] - 70:3
**19** [2] - 47:25, 50:14
**19-01974** [1] - 1:4
**19-1974** [1] - 3:2
**1970s** [5] - 10:22, 25:21, 27:17, 31:13, 58:17
**1970s-era** [1] - 31:13
**1974** [1] - 25:20
**1976** [12] - 27:13, 35:6, 39:8, 46:18, 49:19, 50:7, 56:14, 57:12, 58:21, 59:25, 76:12, 81:13
**1978** [4] - 39:9, 50:21, 54:25, 57:23
**1980** [2] - 48:1, 48:11
**1980s** [3] - 17:5, 17:14, 18:17
**1984** [1] - 60:4
**1986** [1] - 60:5

**1993** [1] - 65:23
**1996** [13] - 33:4, 36:9, 39:11, 43:17, 43:20, 44:3, 45:8, 48:11, 51:5, 51:13, 51:20, 54:25, 55:8
**1998** [1] - 104:22

## 2

**2** [3] - 92:15, 106:14, 126:2
**20** [2] - 16:7, 51:17
**200** [2] - 6:21, 22:8
**20001** [2] - 2:7, 131:14
**2008** [2] - 12:19, 74:2
**2011** [2] - 52:11, 87:1
**2013** [1] - 74:3
**2017** [1] - 81:19
**2019** [2] - 1:8, 131:10
**202** [2] - 2:8, 131:15
**20515** [1] - 1:19
**20530** [1] - 1:25
**219** [1] - 1:19
**220** [1] - 24:25
**22209** [1] - 2:3
**23** [1] - 8:12
**28** [4] - 49:20, 81:11, 82:22, 125:25
**288(d** [2] - 92:15, 106:14
**288(d)** [1] - 126:2
**28B** [3] - 62:15, 62:23, 62:25
**2nd** [1] - 63:19

## 3

**3** [1] - 47:10
**3(c** [1] - 71:4
**31** [2] - 106:1, 106:14
**319** [1] - 100:17
**333** [2] - 2:6, 131:14
**35** [1] - 17:6
**354-3269** [2] - 2:8, 131:15
**388** [1] - 15:25
**389** [1] - 15:25
**394** [1] - 85:9

## 4

**40** [1] - 82:22
**430** [1] - 63:14, 64:14, 66:1, 66:12
**45** [1] - 90:10
**487** [1] - 12:2

## 5

**5** [3] - 99:7, 100:23, 101:9
**551** [3] - 85:9, 118:6, 122:21
**551(a)(1)** [1] - 118:10
**56** [1] - 104:23

## 6

**6** [3] - 1:8, 64:16, 66:12
**6103** [10] - 53:3, 68:1, 87:20, 106:9, 106:23, 107:11, 108:19, 123:23, 125:3, 125:5
**6103(f** [2] - 66:24, 114:20
**649** [1] - 87:1
**65** [1] - 80:7
**6706** [2] - 2:7, 131:14

## 7

**700** [2] - 2:2, 12:2
**702** [3] - 99:7, 100:23, 101:9
**716** [2] - 106:1, 106:14
**762** [1] - 87:1
**790** [1] - 7:18
**7th** [1] - 131:10

## 8

**828** [1] - 10:10
**865** [1] - 100:16

## 9

**94** [2] - 47:10, 47:17
**996** [1] - 47:17

## A

**a)** [2] - 36:1, 36:15
**a.m** [1] - 1:8
**Abbasi** [8] - 5:25, 89:16, 97:5, 110:24, 114:7, 114:10, 126:13, 126:15
**ability** [4] - 8:22, 9:10, 11:23, 14:3, 19:17, 23:14, 42:12,

47:20, 48:12, 103:16, 110:15, 131:7
**able** [13] - 6:16, 41:3, 41:16, 41:25, 42:13, 46:8, 50:12, 54:11, 97:14, 116:24, 119:8, 120:4, 128:21
**abrogated** [1] - 26:3
**absence** [1] - 75:22
**absent** [1] - 93:23
**absolute** [1] - 103:24
**absolutely** [4] - 50:24, 67:20, 100:9, 123:25
**abundance** [1] - 117:8
**accept** [1] - 5:5
**access** [2] - 67:21, 129:4
**accidental** [1] - 26:24
**accommodation** [16] - 5:14, 83:12, 83:19, 84:12, 85:4, 85:13, 85:22, 89:1, 92:6, 109:3, 109:7, 124:5, 127:22, 127:24, 128:7, 129:5
**accommodations** [2] - 3:18, 128:17
**accomplish** [1] - 103:25
**accomplished** [1] - 8:10
**according** [2] - 43:7, 45:15
**accurate** [1] - 131:4
**acknowledgement** [1] - 31:23
**act** [5] - 52:1, 52:15, 71:15, 107:10, 108:24
**Act** [8] - 8:21, 9:4, 39:9, 47:19, 86:8, 86:15, 87:3, 123:15
**acted** [2] - 54:15, 123:4
**Acting** [1] - 84:19
**acting** [6] - 66:5, 68:25, 77:20, 79:6, 80:2, 119:23
**Action** [1] - 1:3
**action** [79] - 3:18, 5:19, 5:21, 6:2, 6:4, 47:15, 48:23, 48:25, 52:15, 56:15, 57:8, 72:9, 76:10, 77:4, 85:25, 86:9, 86:10, 86:13, 86:21, 87:4, 87:8, 87:9, 87:11, 87:17, 87:23, 88:11,

89:10, 92:11, 92:12, 92:17, 92:20, 93:23, 95:11, 95:17, 96:7, 96:17, 96:25, 97:6, 97:8, 99:18, 100:19, 104:21, 105:19, 106:5, 109:15, 110:7, 111:16, 111:20, 111:22, 112:2, 112:7, 112:14, 112:20, 113:4, 113:8, 113:10, 113:18, 113:21, 114:2, 114:9, 114:17, 115:7, 115:11, 115:17, 115:22, 115:23, 116:22, 118:20, 121:7, 123:2, 123:13, 123:19, 124:2, 124:19, 126:2, 126:17, 126:21, 127:8, 127:11
**actions** [10] - 41:7, 41:25, 51:25, 52:9, 52:22, 58:23, 70:5, 89:8, 119:25, 126:25
**actors** [3] - 92:11, 93:16, 126:23
**acts** [1] - 52:23
**actual** [1] - 128:24
**add** [3] - 41:24, 81:13, 108:25
**added** [1] - 36:9
**adding** [1] - 36:12
**addition** [8] - 59:8, 61:14, 61:18, 74:22, 76:3, 92:8, 114:12, 125:21
**additional** [3] - 60:11, 74:23, 112:24
**address** [14] - 16:8, 16:9, 27:11, 32:4, 32:11, 33:4, 37:19, 38:2, 39:3, 50:25, 55:6, 55:20, 56:11, 78:10
**addressed** [8] - 29:18, 33:1, 40:18, 44:7, 56:3, 59:5, 72:13, 79:18
**addresses** [1] - 50:23
**addressing** [5] - 42:19, 48:25, 50:4, 56:2, 57:22
**adequate** [1] - 109:1
**adhere** [1] - 6:20
**adjourns** [1] - 35:23
**adjudicate** [3] - 55:2, 69:25, 70:4
**adjudicating** [1] -

12:23
**adjustments** [1] - 8:11
**administerable** [1] - 114:14
**administered** [1] - 101:5
**administration** [1] - 73:24
**administrative** [2] - 100:25, 105:19
**adopted** [1] - 118:12
**advance** [1] - 119:24
**advantage** [1] - 75:15
**adversarial** [2] - 27:10, 32:24
**adversely** [1] - 101:12
**adversity** [1] - 86:17
**Advisory** [9] - 61:17, 62:10, 63:12, 64:18, 64:19, 65:14, 65:22, 66:9, 74:15
**advocate** [1] - 71:11
**affect** [1] - 55:1
**affected** [3] - 101:12, 101:17, 123:5
**affects** [1] - 10:5
**afforded** [1] - 72:7
**age** [1] - 37:3
**age-old** [1] - 37:3
**agencies** [6] - 46:22, 58:24, 101:1, 101:2, 103:3, 120:24
**agency** [12] - 99:18, 101:3, 101:5, 101:7, 102:5, 102:6, 104:21, 118:7, 118:16, 118:20, 119:17, 122:22
**agent** [2] - 79:6, 80:3
**aggrieved** [10] - 101:13, 101:17, 104:21, 118:20, 119:6, 119:19, 119:25, 121:15, 121:16, 123:1
**ago** [3] - 15:21, 43:3, 80:18
**agree** [16] - 16:19, 16:25, 26:6, 32:9, 33:10, 41:17, 46:23, 53:22, 69:8, 75:9, 81:4, 100:5, 115:16, 117:19, 123:16, 129:3
**agreed** [1] - 11:3
**aid** [2] - 29:24, 108:16
**al** [2] - 1:8, 3:4

**Ali** [1] - 86:20, 86:24
**allegation** [2] - 68:20, 108:8
**alleged** [1] - 67:19
**allow** [4] - 45:21, 47:24, 97:10, 104:12
**allowed** [2] - 28:18, 48:15
**allows** [3] - 35:22, 38:8, 78:8
**almost** [2] - 27:12, 51:17
**alone** [4] - 41:18, 62:25, 66:5, 83:3
**alterations** [1] - 8:10
**alternative** [1] - 109:1
**amenability** [2] - 11:19, 29:7
**amenable** [1] - 8:4
**amend** [2] - 55:19, 56:10
**amended** [1] - 82:13
**Amendment** [1] - 96:23
**amendment** [8] - 33:4, 37:18, 39:12, 40:18, 43:17, 45:8, 51:20, 55:8
**amendments** [3] - 48:11, 51:5, 55:5
**amici** [1] - 4:12
**amicus** [2] - 61:13, 62:8
**amount** [20] - 35:6, 37:1, 44:4, 46:5, 46:17, 46:21, 48:2, 48:5, 50:8, 50:12, 50:18, 52:6, 54:16, 57:21, 58:9, 58:20, 58:22, 59:5, 76:5, 76:9
**amount-in-controversy** [10] - 35:6, 37:1, 44:4, 46:5, 46:17, 48:2, 48:5, 50:8, 52:6, 76:5
**ample** [1] - 105:15
**analogous** [1] - 9:21
**analysis** [8] - 8:13, 11:10, 12:20, 18:8, 20:17, 25:25, 29:5, 40:13, 58:14, 69:9, 70:7, 70:10, 86:3, 89:14, 125:16, 125:18
**AND** [1] - 1:3
**Andrew** [5] - 8:20, 9:2, 19:15, 24:12, 24:17
**animal** [1] - 94:4

**anomaly** [1] - 34:9
**answer** [12] - 12:25, 31:4, 37:17, 37:18, 39:23, 44:13, 44:24, 60:11, 92:18, 95:24, 100:7, 124:1
**antecedent** [1] - 14:5
**anticipatory** [1] - 87:10
**antitrust** [1] - 45:1
**anyway** [2] - 16:10, 41:4
**APA** [34] - 6:5, 53:4, 95:4, 95:7, 98:16, 98:20, 99:1, 100:19, 103:13, 103:24, 104:13, 105:13, 106:13, 106:16, 116:22, 118:1, 118:2, 118:17, 118:18, 119:10, 119:22, 120:3, 121:7, 121:8, 121:20, 121:21, 121:22, 122:2, 123:3, 123:10, 127:11, 127:12
**apart** [1] - 28:11
**aphorism** [2] - 8:7, 43:10
**appeal** [6] - 27:7, 28:13, 28:19, 46:7, 81:25, 117:17
**appear** [1] - 60:16
**aPPEARANCES** [1] - 1:15
**appellate** [3] - 27:6, 30:13, 39:21
**applicable** [2] - 8:9, 104:14
**applied** [2] - 38:15, 86:16
**applies** [5] - 54:14, 55:17, 115:23, 116:17, 126:11
**apply** [10] - 5:10, 41:12, 51:21, 53:16, 53:20, 61:2, 86:4, 89:22, 89:25, 116:11
**applying** [2] - 30:14, 40:24
**appointments** [1] - 112:9
**appreciate** [5] - 5:5, 6:9, 6:13, 6:22, 110:5
**approach** [1] - 84:5
**appropriate** [10] - 5:23, 12:7, 19:13, 23:6, 30:17, 84:16, 92:23, 126:18, 126:23, 128:3

**Appropriations** [1] - 13:1
**appropriations** [2] - 11:21, 19:13
**area** [7] - 5:19, 97:7, 106:12, 109:17, 110:2, 127:6, 127:20
**areas** [1] - 124:16
**arguably** [8] - 10:18, 38:20, 57:4, 58:13, 60:17, 65:6, 72:11, 111:16
**argue** [2] - 26:22, 51:20, 53:13
**argued** [3] - 30:24, 115:8, 116:5
**arguing** [2] - 96:22, 116:23
**argument** [36] - 3:25, 22:10, 26:12, 30:10, 32:20, 33:5, 36:7, 37:24, 49:11, 53:11, 53:15, 53:18, 53:19, 54:13, 54:19, 54:20, 54:22, 57:1, 72:14, 72:15, 88:7, 94:9, 99:16, 99:17, 99:18, 100:2, 100:4, 104:16, 106:18, 106:22, 112:6, 112:12, 117:9, 118:4, 118:15, 129:20
**arguments** [5] - 5:1, 5:11, 6:10, 99:11, 104:14
**arise** [3] - 53:4, 70:5, 75:18
**arised** [1] - 52:10
**arisen** [3] - 56:11, 113:19, 113:20
**arises** [1] - 56:16
**arising** [5] - 52:1, 52:9, 52:15, 52:22, 82:16
**Arizona** [2] - 71:20, 76:22
**Arlington** [1] - 2:3
**Arms** [4] - 75:20, 76:1, 88:1, 90:16
**Armstrong** [8] - 89:18, 89:24, 90:1, 110:11, 110:12, 110:22, 111:15, 112:21
**arose** [1] - 55:21
**arrest** [7] - 76:1, 88:1, 88:5, 89:3, 91:22, 93:6, 93:12
**arrested** [2] - 75:19, 90:20
**Arrow** [1] - 80:18

**Article** [35] - 7:5, 7:10, 10:25, 12:24, 66:18, 67:8, 68:12, 68:19, 69:16, 69:22, 70:11, 70:16, 73:1, 86:16, 88:8, 88:18, 88:19, 88:25, 89:3, 89:11, 92:6, 92:20, 93:9, 93:17, 93:19, 94:6, 94:12, 106:9, 108:20, 110:18, 110:21, 123:23, 125:8, 127:1
**articulated** [4] - 85:16, 87:21, 98:19, 109:2
**articulates** [2] - 62:17, 64:20
**articulating** [2] - 18:17, 104:24
**ascribe** [1] - 36:24
**aside** [4] - 19:8, 43:15, 103:2, 117:25
**aspect** [1] - 114:2
**assert** [7] - 25:14, 69:17, 71:14, 77:1, 97:2, 116:24, 119:23
**asserted** [7] - 51:18, 51:22, 76:24, 115:11, 123:14, 123:22, 128:20
**asserting** [6] - 36:17, 51:15, 66:18, 71:22, 72:24, 72:25
**asserts** [1] - 25:13
**Assistant** [1] - 3:7
**Associate** [1] - 3:10
**association** [1] - 118:14
**assume** [4] - 54:5, 103:20, 104:12, 108:7
**assuming** [2] - 80:6, 129:21
**assumption** [1] - 101:12
**assumptions** [1] - 32:8
**assuring** [1] - 71:6
**AT&T** [65] - 4:22, 5:8, 7:2, 10:18, 10:20, 20:6, 25:7, 25:12, 25:20, 25:24, 27:19, 27:23, 28:23, 30:17, 30:20, 30:25, 31:1, 31:17, 32:1, 38:15, 38:16, 49:14, 49:16, 49:19, 54:24, 56:14, 56:22, 57:2, 57:12, 58:4, 58:7, 58:21, 59:2, 59:5, 65:1, 66:3,

68:3, 70:22, 71:8, 71:9, 76:8, 77:16, 77:23, 78:3, 78:8, 78:10, 78:13, 78:16, 79:5, 79:6, 79:14, 79:24, 80:2, 81:1, 81:5, 81:8, 82:5, 83:1, 83:25, 84:24, 85:6, 85:7, 85:23, 127:24
**AT&T's** [4] - 30:19, 31:21, 38:20, 81:21
**Atkins** [1] - 68:16
**atmospherics** [1] - 72:1
**attached** [1] - 108:3
**attempt** [2] - 9:1, 88:25
**attempting** [1] - 89:2
**attempts** [1] - 75:8
**Attorney** [3] - 9:10, 9:12, 9:15
**audit** [7] - 67:14, 83:23, 124:8, 128:11, 128:19, 128:22, 128:24
**auditors'** [1] - 128:23
**authorities** [2] - 19:6, 65:4
**authority** [29] - 9:13, 9:23, 11:8, 11:13, 11:14, 13:10, 15:22, 15:24, 19:2, 29:23, 37:24, 54:9, 65:19, 67:7, 92:17, 93:12, 94:2, 94:6, 94:8, 102:23, 102:24, 103:12, 104:18, 110:7, 110:18, 112:17, 118:8, 125:24
**authorization** [4] - 62:6, 63:10, 64:6, 66:3
**authorize** [2] - 62:7, 64:9
**authorized** [10] - 36:18, 61:16, 61:18, 61:20, 62:21, 63:8, 66:6, 69:6, 74:16, 119:10
**authorizes** [1] - 106:1
**authorizing** [4] - 63:23, 66:15, 104:1, 105:24
**avail** [1] - 56:14
**availability** [1] - 32:25
**available** [10] - 54:18, 60:7, 68:17, 68:18, 69:5, 75:16,

75:23, 95:8, 106:13, 116:20
**Avenue** [2] - 2:6, 131:14
**avoid** [6] - 6:16, 33:16, 41:19, 73:10, 102:7, 107:21
**avoidance** [2] - 102:21, 103:1
**avoiding** [3] - 72:4, 72:5, 87:13
**avoids** [1] - 42:10
**aware** [4] - 29:4, 52:5, 68:13, 69:15, 89:16, 121:25
**awkward** [2] - 122:14, 122:16

### B

**back-and-forth** [1] - 96:11
**back-interpret** [1] - 44:11
**backdrop** [4] - 50:14, 51:16, 56:5, 57:17
**backed** [2] - 86:23, 92:6
**backfill** [1] - 41:3
**background** [2] - 50:11, 107:16
**backup** [1] - 85:3
**balance** [4] - 21:9, 72:23, 73:2, 111:9
**ball** [1] - 42:11
**Bank** [1] - 61:20
**Barbero** [10] - 3:7, 48:20, 49:8, 60:13, 77:2, 79:20, 80:16, 109:13, 124:12, 126:13
**BARBERO** [55] - 1:16, 3:7, 49:7, 53:10, 53:25, 54:5, 54:13, 55:12, 57:11, 58:19, 60:20, 61:14, 61:25, 63:2, 63:5, 63:18, 63:21, 63:24, 64:3, 64:15, 65:9, 66:20, 66:23, 67:4, 68:2, 68:5, 69:12, 70:9, 72:12, 74:8, 75:13, 110:4, 111:25, 113:6, 114:10, 115:6, 115:24, 116:13, 116:15, 116:19, 117:5, 117:13, 118:3, 118:24, 119:3, 119:13, 120:22,

121:1, 121:25, 122:9, 122:15, 123:21, 123:25, 124:4, 128:16
**Barbero's** [1] - 77:14
**bare** [1] - 33:13
**Barnes** [4] - 8:8, 18:23, 19:5, 20:3
**barrier** [1] - 47:8
**based** [3] - 35:9, 46:4, 61:11
**baseless** [1] - 87:20
**basement** [1] - 90:22
**basic** [6] - 7:10, 12:21, 16:20, 40:13, 40:16, 105:15
**basis** [8] - 5:18, 9:23, 24:4, 27:8, 30:23, 66:13, 82:10, 124:6
**Bates** [9] - 18:10, 32:21, 37:19, 40:5, 86:3, 86:15, 89:9, 89:11, 105:4
**battles** [2] - 19:15, 24:18
**become** [3] - 21:7, 21:12, 23:25
**BEFORE** [1] - 1:12
**began** [1] - 10:23
**beginning** [2] - 64:16, 86:11
**begun** [1] - 25:22
**behalf** [5] - 3:14, 3:24, 17:9, 54:23, 71:15
**behind** [2] - 43:9, 83:13
**behoove** [1] - 128:7
**benefit** [3] - 20:2, 20:5, 20:16
**Berman** [2] - 33:2, 89:13
**best** [5] - 27:9, 55:13, 111:8, 126:18, 131:7
**bet** [1] - 95:20
**Betsy** [1] - 3:15
**better** [6] - 6:3, 27:18, 39:5, 40:7, 47:2, 111:21
**between** [24] - 8:16, 9:21, 10:3, 11:7, 13:1, 13:16, 20:3, 21:9, 22:25, 24:19, 31:20, 37:3, 43:4, 48:4, 66:21, 70:14, 70:24, 71:21, 72:23, 74:2, 88:17, 94:11, 96:5
**beyond** [3] - 43:6, 49:18, 108:4
**bicameralism** [1] -

33:14
**big** [5] - 28:2, 57:3, 88:17, 88:20, 94:11
**bind** [1] - 54:9
**binding** [9] - 7:2, 10:17, 10:18, 26:15, 27:19, 30:25, 32:14, 81:22, 83:4
**Bipartisan** [9] - 61:17, 62:10, 63:12, 64:18, 64:19, 65:13, 65:22, 66:9, 74:15
**bit** [2] - 61:9, 101:20
**bits** [1] - 103:20
**bizarre** [1] - 119:2
**BLAG** [12] - 61:8, 61:12, 61:18, 61:20, 62:6, 62:16, 62:25, 63:15, 63:22, 63:25, 64:8, 64:9
**BLAG-authorized** [1] - 61:20
**blame** [2] - 20:15, 39:20
**blank** [2] - 40:9, 78:12
**block** [1] - 95:12
**blow** [1] - 48:11
**blown** [1] - 28:11
**Board** [1] - 89:18
**bodies** [1] - 92:10
**books** [6] - 51:17, 55:15, 55:19, 56:6, 56:8, 109:18
**Border** [4] - 6:15, 13:6, 61:15, 76:16
**Bork** [1] - 8:7
**Bork's** [4] - 8:7, 8:12, 18:23, 19:4
**Boulevard** [1] - 2:2
**bound** [4] - 25:9, 26:7, 32:1, 81:5
**Branch** [78] - 5:10, 8:16, 8:17, 9:22, 11:24, 13:8, 14:21, 14:23, 15:6, 15:15, 16:5, 17:2, 17:11, 17:15, 18:22, 19:12, 19:18, 20:7, 20:23, 21:21, 22:9, 22:14, 23:4, 23:19, 23:21, 24:7, 26:4, 27:24, 28:3, 28:9, 28:20, 28:21, 32:24, 35:4, 35:8, 36:19, 38:9, 38:11, 43:1, 46:9, 47:17, 47:20, 48:13, 49:22, 55:13, 56:24, 58:12, 70:1, 73:21, 76:2, 77:20, 78:9,

78:23, 79:7, 79:10, 79:16, 79:22, 80:3, 80:10, 80:24, 81:15, 84:18, 87:19, 89:7, 89:22, 91:13, 92:5, 93:13, 100:20, 103:11, 103:15, 105:24, 106:2, 119:1, 119:23, 121:3, 123:2, 126:5

**branch** [11] - 7:22, 39:22, 92:17, 97:18, 97:22, 99:5, 99:6, 111:18, 120:20, 122:12

**BRANCH** [1] - 1:24
**Branch's** [1] - 5:1
**Branch-initiated** [2] - 28:9, 28:20
**branches** [8] - 7:12, 22:4, 24:3, 70:14, 70:24, 72:23, 85:7, 100:15

**breach** [1] - 30:2
**break** [1] - 49:5
**bridge** [1] - 30:23
**brief** [7] - 18:7, 44:7, 51:8, 63:25, 85:17, 104:22, 115:8
**briefed** [1] - 32:23
**briefing** [2] - 27:10, 96:10
**briefly** [4] - 60:3, 71:2, 123:14, 124:4
**briefs** [5] - 4:11, 4:12, 30:24, 91:4, 126:15
**bring** [27] - 4:24, 11:23, 12:16, 18:21, 28:13, 37:2, 39:16, 42:1, 42:13, 53:23, 53:24, 54:4, 54:12, 56:15, 57:2, 76:9, 76:14, 77:6, 80:24, 82:10, 87:7, 87:18, 88:11, 100:19, 102:16, 104:20, 121:7
**bringing** [5] - 16:21, 74:12, 74:16, 75:25, 89:7
**broad** [3] - 44:9, 60:15, 118:17
**broader** [3] - 44:11, 60:18, 95:9
**brought** [14] - 9:22, 47:16, 53:3, 56:24, 58:12, 58:15, 58:23, 61:11, 75:19, 76:15, 90:19, 100:6, 112:9, 126:25

**Buchanan** [1] - 12:13
**Buckley** [3] - 29:22, 30:5
  **budge** [1] - 85:12
**Building** [1] - 1:19
**bunch** [1] - 11:25
**burden** [4] - 24:11, 25:1, 25:3, 112:24
**Burn** [1] - 70:2
**burnham** [1] - 92:22
**Burnham** [18] - 3:14, 6:11, 11:2, 22:12, 35:18, 49:3, 49:15, 51:4, 52:4, 60:4, 60:15, 62:3, 71:25, 78:20, 88:16, 101:21, 126:1, 129:14
**BURNHAM** [71] - 1:21, 3:13, 3:21, 6:12, 7:8, 11:17, 14:4, 15:16, 16:14, 16:17, 17:4, 17:8, 17:17, 17:23, 18:2, 20:1, 21:25, 22:16, 22:20, 24:9, 24:11, 25:6, 25:8, 26:8, 26:20, 26:25, 29:7, 31:3, 32:11, 33:9, 34:4, 34:7, 34:10, 34:13, 35:15, 35:19, 35:25, 37:10, 38:18, 39:3, 39:20, 40:12, 42:23, 43:5, 44:12, 45:17, 45:20, 45:23, 46:25, 47:2, 48:24, 49:2, 49:4, 77:6, 77:9, 77:12, 78:4, 78:21, 78:25, 79:4, 79:8, 79:11, 79:23, 80:5, 81:7, 82:14, 82:19, 83:8, 117:21, 117:24, 127:18
**Burwell** [1] - 123:9
**business** [2] - 6:1, 66:15
  **buy** [1] - 57:1
**BY** [1] - 2:4
**Byrd** [3] - 7:1, 7:14, 20:5

---

## C

**Campbell** [2] - 14:21, 30:21
**candid** [1] - 31:18
**Cannon** [1] - 1:19
**cannot** [4] - 18:11, 29:23, 63:11, 65:11

**canon** [1] - 41:17
**canonical** [1] - 26:15
**canons** [1] - 61:2
**capacity** [4] - 51:15, 55:25, 58:25, 77:21
**capacity-type** [1] - 55:25
**care** [2] - 23:9, 30:4
**careful** [4] - 36:14, 39:12, 86:3, 109:16
**carefully** [4] - 35:1, 36:15, 74:13, 82:8
**carry** [3] - 25:1, 48:13, 67:9
  **carrying** [1] - 25:3
**carve** [2] - 81:14, 82:9
  **carved** [3] - 42:4, 80:8, 80:13
**carveout** [6] - 39:12, 53:25, 77:18, 78:25, 79:1, 80:22
**carves** [2] - 35:1, 38:11
  **Case** [1] - 3:2
  **case** [137] - 4:22, 4:24, 5:16, 5:17, 6:15, 9:8, 11:3, 13:2, 13:6, 14:10, 16:22, 17:12, 20:8, 21:3, 22:14, 25:2, 26:11, 26:15, 27:24, 28:1, 28:3, 28:5, 28:9, 28:20, 29:6, 29:10, 29:18, 30:14, 32:3, 32:4, 32:5, 32:6, 33:4, 37:19, 38:21, 38:22, 39:15, 41:14, 45:1, 46:1, 48:15, 49:21, 49:24, 51:8, 52:8, 53:19, 54:7, 56:22, 56:23, 57:3, 58:9, 59:23, 61:11, 61:15, 65:1, 65:15, 65:17, 66:23, 67:20, 68:3, 68:4, 68:6, 68:8, 69:15, 69:19, 70:16, 71:1, 71:24, 72:14, 72:16, 72:24, 73:5, 73:9, 74:14, 74:17, 74:19, 75:25, 76:17, 77:23, 77:24, 78:11, 79:24, 80:18, 83:17, 84:16, 85:17, 86:4, 86:25, 87:5, 88:15, 89:4, 89:13, 89:18, 89:24, 90:1, 90:21, 91:4, 94:17, 95:8, 95:15, 97:8, 99:19, 101:11, 104:22,

108:14, 109:17, 109:25, 110:1, 110:12, 110:14, 110:24, 111:1, 111:7, 111:12, 112:2, 112:6, 112:8, 112:14, 113:1, 113:18, 114:4, 114:11, 114:12, 120:4, 120:14, 121:5, 123:8, 123:9, 124:20, 125:17, 125:20, 128:2, 128:5
  **cases** [62] - 4:20, 4:23, 5:2, 6:23, 7:3, 8:7, 10:8, 11:15, 13:13, 15:10, 26:14, 31:13, 32:2, 32:17, 41:13, 44:14, 45:11, 45:18, 48:6, 58:11, 61:13, 61:19, 62:4, 64:23, 66:2, 68:17, 70:3, 71:21, 72:20, 73:6, 73:8, 73:15, 73:18, 75:16, 75:18, 80:16, 80:24, 81:16, 82:16, 85:7, 85:23, 86:20, 89:19, 93:18, 95:25, 96:1, 96:14, 102:12, 106:19, 110:9, 111:12, 111:15, 112:12, 112:13, 112:15, 113:19, 113:25, 114:7, 120:2, 120:5, 122:1
  **categorical** [1] - 11:20
  **category** [2] - 23:7, 23:9
  **causes** [10] - 6:2, 86:13, 97:6, 97:7, 109:14, 110:6, 115:11, 115:22, 123:13, 127:8
  **caution** [1] - 117:8
**Century** [1] - 105:23
**century** [1] - 15:21
**certain** [8] - 80:20, 92:8, 93:15, 126:6, 129:18
  **certainly** [25] - 4:18, 11:10, 17:6, 20:4, 20:23, 29:8, 29:16, 30:23, 39:11, 53:10, 53:15, 54:20, 59:25, 61:1, 61:25, 64:24, 73:20, 73:22, 74:8, 75:1, 87:23, 97:8, 108:3, 115:7
  **CERTIFICATE** [1] -

131:1
**certify** [1] - 131:4
**Chadha** [2] - 9:10, 73:16
  **chairman** [1] - 21:13
**challenge** [2] - 99:12, 104:21
**challenged** [2] - 62:1, 62:5
  **chance** [1] - 40:5
  **chances** [1] - 122:5
**change** [5] - 21:7, 25:17, 29:8, 47:6
**changed** [5] - 27:16, 31:18, 31:24, 46:6, 83:2
  **changes** [1] - 29:5
  **changing** [1] - 73:3
**characterize** [1] - 4:25
**check** [2] - 22:21, 64:1
**Chenoweth** [9] - 10:22, 25:19, 27:15, 27:16, 30:20, 31:9, 31:10, 31:12
**Chenoweth's** [1] - 31:23
  **chief** [1] - 68:25
**Chief** [8] - 7:16, 10:12, 19:4, 46:2, 46:4, 46:18, 84:19
**Childcare** [1] - 110:12
  **choice** [2] - 42:16, 55:19
  **chooses** [1] - 76:14
  **chosen** [3] - 62:7, 65:12, 66:14
**chronology** [2] - 45:24, 47:3
**Chuck** [1] - 17:13
**Circuit** [37] - 4:22, 10:21, 14:21, 18:20, 20:10, 21:3, 25:18, 25:19, 26:2, 26:22, 27:10, 27:11, 27:14, 27:15, 28:9, 28:13, 28:18, 29:16, 31:17, 32:2, 32:5, 46:11, 49:19, 50:14, 51:1, 59:5, 70:23, 71:9, 79:6, 80:1, 83:1, 83:25, 85:6, 104:5, 108:13, 120:1, 120:14
**Circuit's** [3] - 31:13, 86:19, 99:19
  **circumstance** [2] - 60:14, 111:17
  **circumstances** [2] -

92:9, 126:6
**citations** [1] - 26:1
**cite** [7] - 41:14,
44:14, 51:8, 80:16,
91:4, 104:22, 113:17
**cited** [1] - 112:12
**cites** [1] - 41:14
**Citizen** [1] - 68:16
**citizen** [2] - 96:19,
120:18
**citizens** [1] - 72:8
**citizens'** [3] - 47:8,
47:11, 47:12
**CIVIL** [1] - 1:23
**Civil** [2] - 1:3, 3:1
**civil** [10] - 16:21,
39:21, 47:15, 52:15,
60:6, 74:18, 75:5,
75:8, 75:25, 92:17
**claim** [13] - 53:2,
56:15, 56:16, 68:7,
68:14, 107:2, 116:13,
121:8, 121:21,
125:11, 126:8, 126:12
**claimed** [1] - 9:23
**claiming** [1] - 13:9
**claims** [7] - 53:3,
80:20, 95:5, 98:16,
109:23, 119:24,
126:14
**clarifications** [1] -
5:6
**clarify** [6] - 51:21,
52:10, 52:24, 57:11,
98:4, 113:22
**clarifying** [3] - 51:5,
53:6, 56:3
**clash** [3] - 70:14,
70:24, 88:3
**clashes** [3] - 8:16,
72:5, 73:13
**classic** [1] - 87:5
**Clause** [1] - 13:2
**clause** [4] - 62:23,
65:11, 103:7, 112:10
**clear** [55] - 7:11,
9:14, 17:4, 17:15,
32:4, 41:5, 41:7, 43:6,
50:24, 54:25, 57:2,
57:25, 64:10, 64:18,
64:19, 65:10, 65:16,
66:13, 67:20, 68:16,
68:21, 68:24, 71:13,
71:20, 73:8, 79:14,
82:8, 85:22, 90:8,
91:5, 99:7, 100:23,
107:4, 107:8, 107:9,
108:8, 108:11,
108:19, 108:22,
108:24, 110:13,

110:22, 114:15,
115:7, 116:6, 118:7,
118:15, 124:5, 124:9,
124:21, 125:3,
126:16, 127:5
**clearly** [10] - 6:24,
11:9, 50:4, 81:4,
94:14, 101:24,
102:15, 102:21,
104:11, 105:2
**Cleveland** [3] -
12:12, 12:13, 24:13
**client** [1] - 111:22
**Clinton** [1] - 12:14
**close** [1] - 25:2
**closely** [1] - 108:12
**closer** [1] - 30:10
**co** [4] - 63:5, 64:3,
115:14, 117:6
**Co** [1] - 26:14
**co-counsel** [4] -
63:5, 64:3, 115:14,
117:6
**cocktail** [1] - 43:11
**code** [1] - 82:5
**Code** [6] - 33:19,
43:22, 78:12, 81:11,
92:24, 106:4
**coequal** [1] - 120:20
**coercive** [5] - 87:4,
87:8, 87:9, 87:17,
87:23
**cognizable** [1] -
68:19
**colleague** [6] -
48:24, 63:3, 88:15,
92:22, 101:21, 126:1
**Collyer** [1] - 123:9
**Columbia** [2] - 2:6,
131:13
**COLUMBIA** [1] - 1:1
**comfortable** [1] -
117:1
**coming** [5] - 21:19,
26:3, 75:12, 91:1,
111:18
**command** [1] - 21:8
**comment** [1] -
118:23
**comments** [6] - 6:22,
118:22, 118:25,
119:8, 119:16, 120:24
**Commerce** [1] -
104:22
**Commissioner** [1] -
15:22
**Commissioners** [1] -
98:13
**commit** [3] - 53:12,
54:3, 54:6

**COMMITTEE** [1] -
1:3
**committee** [6] -
13:17, 53:8, 65:21,
98:8, 119:16
**Committee** [47] - 3:2,
4:21, 5:19, 6:7, 8:19,
21:2, 32:3, 32:7,
35:20, 36:1, 36:11,
36:16, 36:20, 41:14,
45:14, 46:3, 46:8,
47:3, 50:11, 65:6,
66:25, 67:16, 68:10,
68:22, 69:1, 69:2,
69:6, 69:24, 72:25,
74:14, 82:6, 82:9,
83:22, 85:10, 86:14,
87:18, 91:17, 92:13,
114:16, 116:1, 121:6,
121:10, 121:15,
122:25, 128:20,
128:21, 129:4
**Committee's** [8] -
5:12, 9:14, 34:5, 88:7,
91:8, 113:2, 128:11,
129:6
**committees** [3] -
37:12, 58:1, 63:11
**Committees** [1] -
63:8
**common** [2] - 91:10,
129:9
**communicate** [1] -
118:25
**company** [1] - 28:4
**compared** [2] - 15:1,
23:8
**compel** [1] - 15:23
**compelling** [1] -
22:10
**complaint** [8] -
64:10, 64:11, 86:17,
87:24, 107:21, 108:3,
115:18, 115:25
**complaints** [4] -
47:9, 47:11, 47:12
**complete** [1] - 131:6
**completely** [5] - 9:6,
10:19, 23:22, 26:2,
27:14
**compliance** [3] -
49:22, 62:20, 95:17
**complicate** [1] -
101:23
**complicates** [1] -
58:13
**complied** [1] - 75:3
**comply** [7] - 73:23,
74:21, 75:20, 114:24,
115:2, 118:21, 119:21

**complying** [3] -
15:13, 15:15, 73:22
**components** [1] -
25:23
**composed** [1] -
62:11
**comprehensive** [1] -
105:20
**compromise** [6] -
21:11, 22:20, 22:23,
23:1, 36:15, 48:14
**comptroller** [2] -
92:16, 106:1
**conceded** [1] - 105:8
**conceding** [1] -
91:22
**concern** [17] - 11:8,
50:18, 51:16, 55:20,
55:24, 57:3, 57:18,
59:4, 65:18, 66:4,
74:1, 74:2, 84:15,
110:5, 110:23, 111:1,
111:4
**concerned** [9] -
50:10, 51:13, 59:19,
64:12, 65:2, 70:19,
72:20, 97:5, 110:25
**concerning** [3] -
50:20, 83:23, 85:20
**concerns** [7] - 10:24,
55:6, 93:4, 104:8,
104:10, 114:13,
114:15
**conclude** [2] - 30:17,
62:25
**concluded** [1] -
130:2
**conclusion** [4] -
31:25, 58:6, 89:12,
101:9
**conclusory** [1] -
25:13
**concrete** [2] - 8:5,
9:13
**concurred** [1] - 7:19
**concurrence** [1] -
12:1
**conduct** [4] - 66:15,
67:8, 67:22, 68:10
**confers** [4] - 63:5,
64:3, 115:14, 117:6
**confidence** [2] -
7:21, 58:17
**confidential** [1] -
106:6
**confirm** [2] - 66:6,
84:3
**confront** [2] - 40:8,
42:16
**confrontations** [1] -

9:21
**confronted** [1] -
14:19
**Congress** [152] -
8:16, 9:2, 9:22, 11:11,
11:20, 12:15, 12:16,
13:17, 14:7, 14:22,
14:24, 15:12, 15:18,
15:20, 15:23, 19:9,
19:11, 19:17, 19:19,
19:20, 21:9, 22:12,
22:22, 23:1, 23:6,
23:14, 24:13, 24:14,
24:16, 24:19, 24:23,
29:25, 30:3, 33:11,
36:12, 37:4, 37:7,
38:6, 38:7, 38:13,
39:8, 39:15, 41:25,
42:5, 42:25, 43:19,
43:25, 44:2, 46:21,
47:16, 47:23, 50:16,
51:5, 51:13, 52:1,
52:16, 52:18, 52:23,
55:13, 55:19, 56:4,
57:17, 57:22, 64:17,
71:11, 73:17, 73:20,
75:10, 76:23, 77:25,
79:18, 82:25, 88:13,
88:21, 88:23, 88:24,
89:2, 89:6, 90:6,
90:20, 91:1, 91:10,
91:16, 91:22, 92:1,
92:3, 92:9, 92:10,
92:18, 93:2, 93:5,
93:16, 93:21, 94:20,
94:23, 97:19, 100:11,
100:18, 100:19,
101:1, 101:24,
102:10, 102:22,
103:5, 103:12,
103:15, 104:2,
104:11, 105:2,
105:20, 106:12,
108:15, 109:5, 111:8,
111:19, 112:1,
112:19, 114:18,
114:20, 114:23,
114:25, 118:7, 118:9,
118:11, 118:16,
118:18, 118:19,
118:22, 118:25,
119:3, 119:7, 119:9,
119:15, 119:16,
119:19, 119:22,
120:23, 121:3, 121:5,
121:15, 122:21,
123:10, 125:23,
126:3, 126:5, 126:9,
126:25
**Congress's** [6] -
11:10, 13:9, 14:7,

47:11, 108:20, 125:8
**congresses** [1] -
120:6
**congressional** [10] -
20:21, 20:22, 71:11,
73:24, 74:10, 75:3,
75:17, 75:20, 92:11,
93:16
**Congressmen** [1] -
10:1
**conjunction** [2] -
108:20, 125:7
**connection** [1] -
55:22
**consent** [2] - 19:17,
65:24
**consider** [8] - 19:7,
50:5, 50:15, 57:25,
71:10, 74:13, 127:7,
127:23
**consideration** [2] -
47:8, 103:24
**considerations** [1] -
126:16
**considered** [1] -
107:15
**considering** [1] -
76:7
**consistent** [2] -
63:13, 93:18
**CONSOVOY** [6] -
2:1, 2:1, 3:23, 95:23,
96:20, 97:12
**Consovoy** [6] - 3:21,
3:24, 4:2, 95:21,
97:25, 113:14
**constitute** [1] - 98:7
**constitutes** [1] -
131:4
**Constitution** [23] -
2:6, 7:1, 7:11, 9:7,
9:17, 10:9, 13:7, 23:2,
26:5, 30:3, 52:22,
56:17, 65:10, 67:17,
67:20, 68:12, 82:16,
110:15, 110:18,
110:21, 111:2,
114:18, 131:14
**Constitution's** [2] -
7:4, 7:9
**constitutional** [31] -
6:20, 8:10, 13:15,
16:9, 24:4, 27:6,
27:22, 33:6, 38:3,
42:2, 42:10, 42:16,
46:12, 69:10, 72:7,
73:11, 89:4, 89:21,
96:8, 101:23, 102:14,
102:20, 103:1,
103:25, 107:15,

108:11, 110:22,
111:11, 112:17,
113:17, 125:8
**constitutionally** [1] -
84:11
**constraint** [1] -
41:25
**construction** [3] -
7:11, 41:18, 61:2
**consult** [1] - 115:12
**consultation** [1] -
64:7
**Consumer** [1] -
81:19
**contains** [3] - 41:7,
64:17, 72:16
**contempt** [2] - 16:21,
88:5
**contest** [2] - 7:23,
32:25
**contested** [1] - 26:11
**context** [5] - 60:24,
70:10, 82:3, 113:13,
113:20
**contexts** [1] - 90:15
**continue** [2] - 35:22,
48:12
**Contra** [1] - 55:23
**contravention** [2] -
119:24, 123:5
**control** [1] - 73:3
**controls** [1] - 45:4
**controversy** [22] -
7:21, 35:6, 37:1, 44:4,
46:5, 46:17, 48:2,
48:5, 50:8, 50:12,
50:18, 52:6, 54:16,
57:21, 58:9, 58:20,
58:23, 59:5, 70:16,
72:6, 76:5, 76:9
**contumacious** [1] -
93:12
**conversation** [1] -
49:12
**convinced** [1] - 5:17
**convincing** [1] - 5:20
**convoluted** [2] -
35:5, 48:17
**Coolidge** [1] - 12:13
**Cooper** [4] - 17:13,
19:23, 20:2, 20:14
**Cooper's** [1] - 20:4
**copies** [1] - 85:2
**copy** [1] - 98:3
**copyrights** [1] -
52:17
**corporation** [1] -
118:13
**corpus** [1] - 90:19
**correct** [20] - 6:25,

11:4, 21:16, 31:2,
53:23, 53:25, 61:12,
61:15, 63:18, 63:20,
63:21, 68:2, 95:25,
98:11, 110:1, 116:12,
116:18, 123:20,
123:25
**corrections** [1] - 5:6
**correctly** [2] - 15:7,
119:14
**corresponds** [1] -
92:14
**cost** [2] - 21:14,
74:12
**costless** [1] - 21:12
**counsel** [9] - 3:5,
3:9, 53:13, 59:25,
63:5, 64:3, 115:12,
115:14, 117:6
**COUNSEL** [1] - 1:18
**Counsel** [5] - 3:8,
3:9, 3:10, 7:6
**counsel's** [1] - 65:7
**count** [4] - 115:4,
115:6, 116:18, 117:2
**country** [5] - 12:15,
22:7, 97:14, 104:6,
104:13
**country's** [1] - 104:9
**counts** [1] - 127:13
**County** [4] - 15:21,
15:22, 98:13, 98:14
**couple** [10] - 17:5,
34:22, 38:18, 43:5,
64:23, 65:5, 72:12,
110:23, 114:7, 127:15
**course** [22] - 18:24,
20:7, 23:23, 25:6,
25:8, 25:10, 27:4,
30:19, 32:25, 40:1,
51:1, 51:7, 53:20,
55:12, 59:8, 59:17,
59:24, 67:12, 68:15,
91:21, 125:11, 127:10
**court** [41] - 11:24,
12:17, 13:9, 18:22,
20:7, 21:19, 22:9,
24:23, 31:1, 34:18,
34:20, 35:3, 38:6,
38:14, 39:17, 42:1,
42:11, 42:14, 51:18,
52:10, 57:21, 63:8,
65:25, 74:25, 75:12,
80:11, 82:10, 88:19,
89:11, 90:24, 91:12,
94:13, 96:12, 97:11,
97:15, 106:9, 110:16,
114:25, 119:23, 121:6
**Court** [142] - 2:5, 2:5,
3:16, 8:24, 9:4, 9:18,

9:25, 10:4, 10:6,
10:13, 10:17, 10:19,
10:23, 13:6, 14:18,
15:21, 18:14, 19:6,
21:6, 21:22, 22:1,
22:10, 23:24, 25:22,
26:14, 26:19, 27:19,
27:25, 28:10, 28:12,
29:12, 30:9, 30:12,
30:17, 31:25, 32:14,
33:18, 33:19, 33:20,
36:22, 38:3, 38:22,
39:1, 40:8, 41:18,
42:6, 42:9, 42:14,
43:6, 43:19, 45:2,
45:5, 49:8, 49:18,
50:1, 50:8, 52:14,
52:21, 53:13, 55:2,
56:16, 57:12, 58:15,
58:22, 59:10, 59:12,
59:14, 59:19, 60:19,
60:25, 66:13, 67:23,
68:15, 69:19, 69:20,
70:18, 70:19, 70:23,
71:6, 71:20, 72:4,
73:9, 73:13, 74:24,
75:16, 76:21, 80:18,
81:4, 81:16, 81:19,
82:23, 82:24, 83:3,
83:4, 84:1, 85:1, 86:8,
87:2, 88:12, 88:17,
89:19, 90:3, 91:5,
93:25, 94:3, 94:5,
94:10, 94:19, 94:20,
96:1, 96:21, 97:19,
97:23, 100:8, 100:18,
101:15, 105:16,
108:7, 110:13,
110:20, 110:25,
111:6, 112:7, 112:11,
112:17, 114:8,
115:10, 119:18,
119:25, 121:20,
121:21, 121:22,
122:6, 124:22,
126:24, 127:10,
128:13, 131:12,
131:13
**COURT** [181] - 1:1,
3:12, 3:20, 4:2, 4:6,
7:6, 11:2, 13:22, 15:3,
16:12, 16:16, 16:18,
17:7, 17:16, 17:20,
17:24, 19:23, 21:24,
22:12, 22:18, 24:6,
24:10, 25:4, 25:7,
25:9, 26:6, 26:17,
26:21, 28:25, 31:1,
32:7, 33:7, 33:25,
34:5, 34:8, 34:11,
35:14, 35:17, 35:20,

37:9, 38:15, 38:25,
39:18, 40:10, 42:20,
42:24, 44:6, 45:14,
45:18, 45:21, 46:23,
47:1, 48:21, 49:1,
49:3, 49:5, 53:7,
53:22, 54:2, 54:8,
55:4, 56:22, 58:7,
60:13, 61:8, 61:24,
62:13, 63:4, 63:14,
63:19, 63:22, 64:2,
64:12, 64:22, 66:17,
66:21, 67:2, 67:24,
68:3, 69:8, 70:6,
71:25, 74:6, 75:7,
77:2, 77:8, 77:11,
78:2, 78:19, 78:22,
79:1, 79:5, 79:9,
79:19, 80:1, 80:25,
82:12, 82:15, 83:7,
83:9, 84:14, 85:24,
86:2, 86:6, 86:24,
87:12, 87:25, 89:15,
90:13, 91:7, 93:1,
93:10, 93:20, 94:5,
94:14, 94:23, 95:2,
95:6, 95:10, 95:20,
96:16, 97:4, 97:25,
98:5, 98:9, 98:12,
98:18, 98:21, 98:24,
99:15, 99:20, 100:5,
102:1, 102:7, 102:17,
102:25, 103:18,
104:5, 104:8, 105:3,
105:10, 106:18,
106:21, 107:1,
107:17, 107:20,
109:10, 109:12,
111:14, 113:4, 114:5,
115:4, 115:20,
116:10, 116:14,
116:16, 116:21,
117:12, 117:14,
117:23, 117:25,
118:22, 119:2,
119:11, 120:7,
120:25, 121:17,
122:4, 122:14,
123:16, 123:23,
124:3, 124:12, 125:3,
127:2, 127:4, 127:19,
129:8, 129:12,
129:23, 130:1
**Court's** [17] - 13:5,
13:10, 18:15, 20:16,
31:15, 31:22, 44:25,
60:7, 90:2, 90:5, 91:3,
91:17, 92:19, 100:7,
101:10, 111:3
**courthouse** [2] -
45:16, 46:1

courtroom [1] - 4:4
COURTROOM [1] - 3:1
courts [16] - 4:18, 6:1, 7:23, 12:22, 26:15, 31:7, 35:3, 37:4, 80:12, 80:19, 90:9, 90:12, 93:17, 94:8, 97:9, 122:22
Courts [19] - 33:15, 33:17, 43:7, 47:15, 64:25, 69:24, 70:4, 73:7, 73:15, 73:19, 76:18, 90:13, 90:18, 91:1, 91:2, 93:22, 97:20, 111:23, 114:3
cover [1] - 51:3
covered [1] - 56:1
crafting [1] - 14:1
craves [1] - 51:11
crazy [1] - 8:25
create [4] - 111:21, 112:1, 113:4, 113:9
created [3] - 98:8, 106:5, 111:20
creates [1] - 119:21
creating [4] - 109:17, 109:25, 110:2, 112:20
creation [1] - 114:9
credible [1] - 108:8
credit [1] - 107:20
criminal [3] - 93:14, 105:24, 124:10
CRR [3] - 2:4, 131:3, 131:12
cure [1] - 38:7
current [2] - 73:24, 74:11
custodian [1] - 96:4
cuts [1] - 57:10

D

damages [4] - 111:2, 111:6, 114:11, 126:14
damaging [1] - 7:21
date [3] - 10:9, 63:22, 64:5
Dated [1] - 131:10
Daugherty [1] - 13:13
days [1] - 127:15
DC [41] - 1:7, 1:19, 1:25, 2:7, 4:22, 10:21, 14:21, 18:20, 20:10, 21:2, 25:17, 25:19, 26:2, 27:10, 27:11, 27:14, 27:15, 28:8, 28:13, 28:18, 29:16,

31:13, 31:17, 32:2, 32:5, 32:16, 46:11, 49:18, 50:14, 51:1, 59:4, 70:23, 71:9, 83:1, 83:25, 85:6, 86:19, 108:13, 120:1, 120:14, 131:14
DDC [2] - 21:2, 32:16
deal [3] - 47:4, 50:16, 105:13
dealing [1] - 101:18
deals [2] - 37:24, 95:15
December [1] - 59:2
decide [5] - 6:14, 7:17, 9:11, 10:13, 114:3
decided [7] - 5:3, 7:3, 15:21, 29:2, 46:15, 57:12, 73:15
deciding [2] - 43:14, 73:10
decision [2] - 7:20, 10:18, 13:6, 25:16, 25:20, 31:10, 33:2, 33:3, 49:15, 54:24, 56:14, 58:22, 59:2, 60:1, 60:9, 74:2, 74:3, 74:18, 97:24, 101:10
decisions [4] - 30:21, 70:22, 75:17, 128:25
declaration [1] - 115:3
Declaratory [4] - 86:8, 86:14, 87:3, 123:15
declaratory [6] - 9:3, 86:18, 87:10, 88:11, 89:20, 110:17
declaring [1] - 89:21
declined [1] - 39:3
declining [1] - 14:23
defend [1] - 28:7
Defendant [3] - 59:17, 59:21, 98:12
defendant [7] - 29:1, 29:3, 29:13, 99:8, 100:24, 101:7, 101:8
Defendants [2] - 1:9, 84:9
defendants [1] - 29:14
DEFENDANTS [1] - 1:21
definition [6] - 118:12, 118:18, 119:12, 122:20, 122:22, 123:12
definitional [1] -

118:5
Delaware [2] - 15:22, 98:14
delegate [1] - 65:4
delegated [1] - 101:3
delegating [1] - 65:18
deliberations [1] - 18:6
delve [1] - 29:17
demand [2] - 106:2, 121:11
demands [5] - 88:14, 92:5, 94:19, 94:21, 105:22
demonstrate [1] - 107:7
denial [1] - 67:10
deny [1] - 128:14
DEPARTMENT [2] - 1:7, 1:23
Department [15] - 3:3, 17:10, 18:3, 18:9, 18:16, 53:17, 60:6, 70:12, 71:8, 72:14, 110:9, 112:5, 113:23, 116:8, 129:3
Department's [1] - 18:7
deprivation [3] - 14:25, 68:9, 123:6
Deputy [1] - 3:9
DEPUTY [1] - 3:1
derived [1] - 68:12
derives [1] - 66:24
described [5] - 14:25, 59:12, 79:23, 92:23, 101:21
designate [1] - 71:14
designed [1] - 123:3
detail [1] - 129:1
detain [1] - 93:12
determination [1] - 126:18
determine [1] - 111:9
determines [1] - 111:6
determining [2] - 70:10, 119:18
Deutsche [1] - 61:20
devastating [1] - 43:16
dicta [3] - 38:21, 38:25, 39:5
difference [10] - 10:2, 13:15, 15:14, 28:2, 66:21, 88:17, 88:20, 94:11, 103:13, 119:4
different [40] - 11:7,

11:15, 13:11, 14:17, 14:23, 15:8, 18:20, 20:8, 20:11, 21:20, 23:22, 27:14, 27:24, 28:16, 29:21, 43:22, 44:22, 45:25, 56:19, 56:25, 69:3, 71:17, 74:6, 78:5, 80:3, 81:23, 81:24, 90:15, 94:4, 97:20, 102:14, 105:14, 109:14, 110:24, 111:17, 120:20, 120:25, 121:1
differs [1] - 15:24
difficult [2] - 53:11, 59:12
difficulty [1] - 70:24
dilution [1] - 13:9
diminution [1] - 69:18
direct [7] - 8:18, 8:21, 9:13, 13:3, 77:18, 96:9, 128:13
directed [3] - 62:21, 84:11, 85:21
directing [1] - 128:3
direction [2] - 62:9, 89:5
directly [15] - 12:25, 27:11, 29:19, 32:10, 33:5, 33:16, 40:8, 40:18, 44:24, 89:10, 91:1, 106:8, 111:2, 114:17, 126:25
disagreements [1] - 7:13
disclaimed [1] - 104:20
disclose [1] - 67:15
disclosure [1] - 106:6
discounted [1] - 40:13
discounts [1] - 39:1
discovery [1] - 124:25
discretionary [1] - 128:25
discriminatory [1] - 72:9
discuss [2] - 48:23, 49:25
discussed [5] - 49:15, 56:10, 60:4, 108:3, 123:14
discussing [2] - 25:19, 88:16
discussion [10] - 52:24, 72:19, 76:21, 80:7, 81:5, 83:12,

107:17, 110:25, 111:3, 128:6
dismiss [5] - 84:16, 104:23, 117:19, 127:13, 128:2
dismissal [1] - 115:18
dismissed [1] - 46:4
dismissing [2] - 5:17, 116:17
dispels [1] - 7:14
displace [1] - 58:3
dispose [1] - 38:1
disposed [1] - 47:4
dispositive [1] - 36:7
dispute [16] - 8:4, 12:22, 15:19, 29:7, 46:20, 49:18, 50:5, 53:4, 70:23, 75:1, 77:25, 78:14, 96:9, 113:24, 125:6
disputes [8] - 20:12, 33:12, 33:17, 34:18, 76:19, 78:7, 85:8, 92:4
dissatisfied [1] - 100:11
dissent [6] - 7:18, 8:12, 18:24, 18:25, 19:3, 19:5
distinction [2] - 13:1, 13:4, 28:1
distinguish [2] - 9:7, 35:24
distinguishable [2] - 31:21, 111:13
distinguished [1] - 15:1
distinguishes [1] - 80:15
District [16] - 2:5, 2:6, 23:24, 27:25, 28:10, 28:12, 30:8, 30:12, 38:22, 52:14, 52:21, 60:25, 81:4, 90:1, 121:22, 131:13
DISTRICT [3] - 1:1, 1:1, 1:13
district [2] - 4:21, 131:13
DIVISION [1] - 1:23
DJA [3] - 86:2, 86:4, 86:21
docket [2] - 21:23, 22:1
doctrine [2] - 8:12, 86:10
doctrines [1] - 42:20
documents [6] - 4:17, 22:19, 23:3,

46:15, 78:3, 107:22
**DOJ** [1] - 129:18
**done** [10] - 39:13,
56:9, 62:9, 64:11,
64:23, 76:11, 76:12,
96:11, 106:12, 114:9
**door** [1] - 31:25
**doubt** [2] - 7:15,
102:7
**Douglas** [1] - 3:9
**DOUGLAS** [1] - 1:17
**down** [6] - 7:7,
10:15, 14:2, 25:5,
33:8, 45:6
**dozens** [1] - 45:2
**dragging** [1] - 97:19
**draining** [1] - 13:18
**drastic** [1] - 91:11
**drew** [1] - 97:23
**drive** [7] - 26:13,
26:17, 27:2, 27:3,
32:12, 50:2, 71:5
**drive-by** [6] - 26:13,
26:17, 27:2, 27:3,
32:12, 50:2
**drive-by-type** [1] -
71:5
**driven** [1] - 69:20
**drove** [1] - 8:13
**dubious** [1] - 107:1
**duelling** [1] - 44:8
**dunk** [1] - 101:20
**duplicative** [1] - 34:2
**duty** [8] - 73:13,
107:9, 108:8, 108:24,
114:15, 114:22,
119:21, 124:21

**E**

**early** [1] - 75:16
**easier** [2] - 7:2,
88:10
**Eastland** [3] - 96:1,
96:22, 97:24
**Edward** [1] - 9:1
**EDWARDS** [2] - 2:4,
131:3
**Edwards** [1] - 131:12
**effect** [4] - 19:15,
36:24, 59:21, 86:20
**effectively** [3] - 66:8,
67:23, 113:15
**efficient** [1] - 118:25
**effort** [1] - 49:21
**efforts** [1] - 4:17
**eight** [2] - 14:13,
60:8
**either** [7] - 15:5,

92:10, 94:25, 106:8,
126:4, 129:20, 129:23
**election** [1] - 98:15
**ELIZABETH** [1] -
1:22
**ELMO** [1] - 35:13
**elsewhere** [1] -
102:4
**embodied** [2] - 66:11
**embodies** [1] - 48:14
**embroiling** [1] - 7:23
**emphasis** [2] -
10:23, 31:15
**emphasize** [1] -
80:21
**emphatically** [1] -
84:18
**employee** [5] -
58:24, 76:2, 77:19,
78:23, 79:10
**enact** [3] - 13:18,
14:6, 38:8
**enacted** [12] - 39:8,
46:7, 57:16, 57:17,
57:23, 77:15, 82:25,
105:20, 105:23,
105:25, 106:7, 114:20
**enacting** [2] - 43:20,
118:18
**enactment** [4] -
14:18, 37:15, 44:23,
82:8
**enactments** [1] -
92:21
**encompass** [1] -
102:22
**end** [5] - 7:24, 14:22,
22:18, 67:12, 104:3
**enforce** [25] - 4:17,
15:6, 16:20, 21:19,
23:15, 35:3, 35:4,
47:16, 63:11, 78:8,
79:17, 88:9, 88:20,
91:11, 92:4, 93:21,
94:3, 94:8, 94:13,
96:7, 96:18, 98:9,
99:22, 106:8, 115:1
**enforceable** [1] -
91:13
**enforced** [1] - 62:20
**enforcement** [30] -
11:7, 11:13, 11:14,
20:22, 41:7, 50:15,
50:17, 51:19, 53:2,
56:15, 57:3, 57:6,
58:11, 60:7, 68:6,
70:5, 74:18, 74:25,
75:5, 75:8, 76:10,
76:17, 79:24, 94:16,
94:18, 105:21,

113:12, 113:16,
113:19, 114:2
**enforcer** [1] - 23:19
**enforcing** [8] - 15:7,
88:14, 88:17, 90:5,
90:9, 90:12, 94:12,
94:21
**engage** [3] - 69:9,
84:11, 109:5
**engaged** [1] - 107:9
**Engel** [1] - 18:3
**ensure** [5] - 15:6,
52:20, 57:7, 57:20,
64:13
**ensuring** [1] - 11:8
**Enterprise** [3] -
73:16, 112:6, 112:21
**entire** [4] - 10:1,
17:11, 37:2, 105:17
**entirely** [7] - 52:2,
52:3, 52:12, 55:18,
94:3, 106:15, 127:19
**entitled** [7] - 56:14,
68:22, 69:2, 84:2,
107:4, 121:10, 123:7
**entrusts** [1] - 30:4
**environment** [1] -
74:11
**episodes** [1] - 9:20
**equipped** [1] -
111:21
**equitable** [5] - 90:2,
91:3, 91:18, 111:8,
126:12
**equity** [4] - 110:13,
110:20, 112:18,
114:11
**equivalent** [2] - 63:1,
63:16
**era** [5] - 4:20, 16:8,
24:19, 31:13, 57:20
**especially** [2] - 8:6,
86:12
**ESQ** [9] - 1:16, 1:16,
1:17, 1:17, 1:21, 1:21,
1:22, 1:22, 2:1
**essentially** [2] -
86:22, 88:7
**establish** [2] - 61:21,
62:1
**established** [4] -
24:1, 66:10, 90:2,
90:4
**et** [2] - 1:8, 3:4
**Ethics** [2] - 39:9,
47:19
**evaluate** [1] - 85:19
**evaluating** [1] -
83:22, 126:17
**evaporate** [1] - 18:13

**event** [3] - 114:24,
118:19, 119:15
**everywhere** [1] -
21:18
**evidence** [1] - 15:24
**evident** [1] - 9:20
**eviscerated** [1] -
10:19
**evolved** [1] - 45:15
**exact** [5] - 20:3, 35:2,
42:4, 81:14, 105:1
**exactly** [5] - 26:17,
72:13, 87:12, 101:18,
123:3
**example** [12] - 8:20,
9:8, 19:15, 22:16,
44:8, 44:18, 51:14,
60:22, 81:18, 91:9,
96:22, 125:23
**examples** [16] - 8:17,
9:9, 11:25, 12:11,
12:18, 15:10, 15:16,
15:17, 16:7, 21:1,
22:17, 22:24, 24:20,
44:20, 51:24
**except** [2] - 16:7,
40:4
**exception** [1] - 120:9
**Exceptional** [1] -
110:12
**excluded** [1] -
122:21
**executed** [3] - 11:9,
11:16, 30:5
**Executive** [111] -
4:25, 5:10, 5:14, 5:24,
6:6, 8:16, 8:17, 8:23,
9:22, 11:20, 11:23,
13:8, 14:21, 14:23,
15:6, 15:13, 15:15,
15:17, 16:5, 16:23,
17:1, 17:11, 17:15,
18:21, 19:12, 19:18,
19:21, 20:7, 20:23,
21:10, 21:20, 22:9,
22:14, 23:4, 23:19,
23:21, 24:7, 26:4,
27:24, 28:3, 28:9,
28:20, 28:21, 30:7,
32:24, 35:4, 35:8,
36:16, 36:17, 36:19,
37:3, 38:9, 38:11,
43:1, 46:9, 47:17,
47:20, 48:13, 49:22,
55:13, 56:24, 58:12,
70:1, 72:21, 72:22,
73:4, 73:17, 73:21,
74:21, 75:2, 75:4,
75:11, 76:2, 77:3,
77:20, 77:24, 78:9,

78:23, 79:7, 79:10,
79:16, 79:21, 80:3,
80:10, 80:24, 81:15,
81:24, 84:18, 85:7,
87:19, 89:7, 89:22,
91:13, 91:23, 92:5,
93:13, 100:20,
103:11, 103:15,
105:24, 106:2, 106:3,
119:1, 119:23, 121:3,
123:2, 123:4, 124:11,
126:5, 127:16, 128:14
**Executive's** [1] -
119:20
**exemplified** [1] -
25:17
**exercise** [11] - 33:14,
33:16, 43:13, 93:8,
93:18, 93:19, 99:12,
101:2, 103:11,
108:16, 126:22
**exercised** [1] - 101:3
**exercises** [1] -
104:17
**exert** [2] - 15:23,
23:7
**exist** [4] - 48:7, 81:9,
83:5, 83:6
**existed** [3] - 12:15,
24:15, 36:10
**exists** [1] - 36:10
**expansive** [1] -
118:12
**expect** [2] - 75:4,
101:24
**expected** [1] -
104:11
**experience** [1] - 84:3
**expert** [1] - 95:18
**explain** [4] - 7:2,
34:14, 95:9, 110:7
**explained** [4] - 6:24,
7:20, 10:6, 76:22
**explains** [1] - 35:20
**explanation** [3] -
36:3, 36:11, 76:11
**explanations** [1] -
75:14
**express** [3] - 40:21,
113:20, 114:1
**expressed** [1] -
110:23
**expressing** [1] -
86:13
**expressly** [1] - 32:11
**extend** [3] - 30:23,
37:6, 80:23
**extending** [1] - 28:17
**extension** [4] -
28:22, 30:15, 30:16,

97:9
**extent** [10] - 14:8, 61:1, 65:18, 70:12, 70:18, 70:19, 75:2, 91:17, 93:17, 127:16
**external** [1] - 107:21
**extraordinary** [1] - 103:25
**extreme** [1] - 106:19

# F

**F.2d** [3] - 12:2, 85:9, 100:16
**F.3d** [1] - 87:1
**face** [1] - 44:9
**faced** [1] - 55:14
**fact** [31] - 6:3, 10:21, 30:7, 30:8, 31:18, 39:15, 40:3, 42:3, 54:24, 56:2, 56:18, 57:6, 59:22, 66:6, 69:20, 71:3, 71:8, 75:7, 76:22, 80:13, 82:21, 86:8, 89:9, 91:25, 96:9, 111:22, 113:24, 119:7, 120:23, 121:7
**failed** [1] - 24:18
**failing** [1] - 13:16
**fair** [5] - 15:10, 19:23, 78:4, 78:13, 106:11
**fairly** [2] - 31:18, 48:17
**faithfully** [1] - 30:5
**fall** [1] - 62:22
**familiar** [4] - 8:8, 22:14, 60:13, 62:13
**far** [5] - 7:14, 31:4, 49:6, 65:3, 68:13
**Fast** [1] - 33:3
**fault** [1] - 37:21
**favor** [5] - 36:7, 57:10, 60:16, 60:25, 70:21
**favorites** [1] - 51:24
**feature** [3] - 20:24, 23:10, 26:4
**featured** [1] - 28:1
**FEDERAL** [1] - 1:23
**Federal** [4] - 47:9, 77:20, 78:24, 120:10
**federal** [19] - 7:23, 34:19, 37:4, 39:17, 39:21, 40:2, 48:5, 51:14, 51:22, 55:24, 80:11, 80:12, 80:20, 81:24, 110:14, 111:4,

111:5, 111:10, 117:17
**few** [6] - 5:25, 44:14, 45:11, 58:19, 58:21, 80:18
**fight** [5] - 15:17, 37:3, 107:3, 124:25
**fighting** [1] - 24:14
**fights** [1] - 22:24
**figure** [7] - 33:21, 43:4, 43:25, 85:3, 85:21, 91:6, 128:13
**figured** [1] - 60:19
**figuring** [1] - 105:16
**file** [2] - 92:17, 117:22
**filed** [2] - 63:19, 113:15
**files** [1] - 67:14, 124:8, 128:22
**filing** [2] - 62:9, 64:11
**final** [2] - 72:15, 109:19
**fine** [2] - 22:8, 48:22
**finish** [1] - 85:10
**fire** [1] - 8:25
**First** [1] - 96:23
**first** [20] - 6:25, 8:20, 12:18, 15:14, 16:22, 25:11, 39:6, 49:14, 52:11, 52:12, 61:10, 69:14, 78:7, 78:17, 89:11, 89:12, 112:3, 125:24, 127:4, 129:15
**FISC** [1] - 111:5
**five** [2] - 62:12, 74:4
**five-member** [1] - 62:12
**fix** [1] - 126:21
**flag** [1] - 3:16
**floated** [1] - 5:22
**floodgates** [3] - 74:1, 74:4, 99:24
**flows** [3] - 30:18, 99:18, 101:9
**flying** [1] - 21:17
**focused** [2] - 15:3, 34:8
**focusing** [1] - 43:2
**FOIA** [4] - 21:22, 21:23, 22:1, 121:23
**folks** [2] - 3:12, 130:1
**follow** [2] - 78:19, 89:13
**following** [2] - 77:18, 79:2
**font** [1] - 102:22
**Footnote** [1] - 63:25
**footnote** [1] - 112:11

**FOR** [4] - 1:1, 1:16, 1:21, 2:1
**forbid** [1] - 21:24
**force** [4] - 6:8, 6:14, 13:19, 82:2
**foregoing** [1] - 131:4
**foreign** [4] - 104:25, 120:2, 120:9, 120:15
**forget** [2] - 16:16, 108:2
**formally** [1] - 7:17
**forth** [1] - 96:11
**forthcoming** [2] - 68:24, 124:9
**forward** [6] - 3:5, 6:10, 45:22, 48:13, 117:2, 117:19
**fought** [1] - 12:15
**four** [2] - 25:12, 25:25
**Franklin** [1] - 12:13
**frankly** [3] - 13:5, 40:24, 45:8
**fraught** [1] - 73:8
**Free** [3] - 73:16, 112:6, 112:21
**freestanding** [1] - 67:25
**friends** [2] - 43:12, 125:6
**frivolous** [2] - 125:10, 125:15
**front** [4] - 4:21, 26:19, 53:13, 112:13
**full** [9] - 21:16, 51:9, 63:1, 63:16, 64:24, 65:5, 66:2, 66:5, 131:5
**fully** [1] - 57:25
**function** [3] - 14:3, 29:25, 108:17
**functioning** [1] - 7:22
**functions** [1] - 73:4
**Fund** [3] - 73:16, 112:6, 112:21
**fundamental** [4] - 6:20, 7:4, 7:9, 8:2
**funds** [2] - 12:7, 111:11
**Furious** [1] - 33:4
**furnish** [1] - 66:25
**future** [1] - 47:14

# G

**gap** [2] - 35:7, 78:15
**gaps** [2] - 51:10, 77:15

**garbling** [1] - 31:12
**gathers** [1] - 12:1
**GC** [1] - 58:17
**General** [7] - 3:8, 3:9, 3:10, 9:15, 12:7, 112:5
**general** [11] - 11:8, 45:4, 53:18, 59:25, 65:7, 92:16, 93:20, 97:7, 104:20, 106:1, 106:13
**GENERAL** [1] - 1:18
**General's** [2] - 9:10, 9:12
**generally** [5] - 21:14, 23:15, 29:12, 31:14, 106:8
**genuine** [1] - 84:3
**George** [2] - 12:2, 22:16
**giant** [1] - 86:9
**Ginsburg** [1] - 7:19
**give-and-take** [1] - 21:11
**given** [16] - 27:12, 27:13, 30:22, 40:21, 42:2, 42:3, 54:23, 55:14, 58:16, 61:4, 67:18, 73:1, 92:12, 97:5, 128:10
**gladly** [1] - 73:10
**goal** [1] - 80:7
**Gorsuch** [1] - 45:1
**govern** [4] - 55:1, 61:3, 103:9
**governancy** [1] - 53:18
**governed** [3] - 6:21, 51:20, 56:17
**Government** [12] - 39:9, 47:9, 47:19, 77:20, 78:24, 83:13, 97:2, 99:2, 99:3, 103:8, 105:3, 120:10
**government** [22] - 39:24, 39:25, 40:2, 72:9, 96:25, 97:16, 97:18, 97:22, 99:5, 99:6, 103:15, 104:9, 104:17, 107:9, 111:10, 111:18, 118:8, 120:9, 120:15, 120:21, 122:12
**Government's** [1] - 83:17
**government's** [3] - 39:25, 102:23, 102:24
**governmental** [7] - 99:13, 101:16, 102:2, 103:3, 103:4, 103:20,

122:7
**governments** [1] - 120:2
**governs** [2] - 51:25, 52:9
**grab** [1] - 98:3
**Grant** [1] - 12:13
**grant** [4] - 13:7, 29:3, 44:16, 44:17
**granted** [2] - 10:8, 76:18
**granularity** [1] - 91:6
**grapple** [3] - 10:19, 37:20, 46:11
**grappling** [4] - 57:19, 59:12, 122:10, 122:19
**great** [6] - 8:15, 19:14, 48:21, 49:1, 74:14, 107:13
**greater** [2] - 10:23, 92:1
**ground** [3] - 91:10, 101:16, 129:9
**grounded** [1] - 68:1
**grounding** [1] - 96:21
**Group** [9] - 61:17, 62:10, 63:12, 64:18, 64:20, 65:14, 65:22, 66:9, 74:15
**group** [2] - 62:12, 65:21
**groups** [2] - 72:8, 120:23
**Grover** [2] - 12:11, 24:12
**Grupo** [1] - 91:4
**guess** [11] - 27:2, 29:4, 58:7, 62:15, 62:19, 62:23, 65:3, 84:15, 109:25, 115:21, 116:17
**guidance** [1] - 109:22

# H

**habeas** [1] - 75:18
**habeus** [1] - 90:19
**hale** [1] - 13:8
**half** [2] - 6:23, 11:18
**hand** [6] - 33:24, 35:11, 35:16, 36:5, 121:14, 128:14
**happy** [7] - 18:2, 45:10, 48:19, 60:11, 110:8, 124:1, 129:1
**hardly** [1] - 24:16

**harmonious** [1] - 33:25

**harmoniously** [1] - 42:21

**harmonize** [1] - 43:24

**harmony** [4] - 33:19, 45:4, 81:11, 82:25

**hash** [1] - 45:8

**head** [3] - 43:25, 60:22, 88:3

**hear** [5] - 15:10, 47:15, 77:3, 79:20, 82:12

**heard** [1] - 120:12

**HEARING** [1] - 1:12

**hearing** [2] - 6:10, 86:12

**heaven** [1] - 21:24

**heavily** [1] - 103:1

**heavy** [2] - 25:1, 51:4

**heed** [1] - 42:7

**height** [2] - 7:24, 72:5

**held** [8] - 50:1, 50:3, 50:5, 50:8, 57:12, 89:9, 90:16, 123:9

**help** [2] - 6:23, 43:14

**helpful** [6] - 4:7, 4:13, 61:7, 99:25, 109:22, 110:6

**helpless** [1] - 93:6

**Henson** [1] - 81:18

**hereby** [1] - 131:3

**high** [3] - 70:1, 76:2, 91:5

**high-level** [1] - 76:2

**high-ranking** [1] - 70:1

**highlighted** [3] - 36:8, 79:2

**himself** [3] - 3:22, 7:16, 33:1

**historical** [3] - 69:9, 70:7, 70:9

**historically** [5] - 64:24, 75:2, 75:14, 75:22, 76:11

**history** [54] - 4:16, 4:17, 4:19, 8:15, 9:20, 11:22, 12:20, 15:3, 15:5, 15:8, 20:25, 22:2, 22:11, 24:21, 34:14, 36:25, 37:5, 42:3, 43:11, 47:6, 50:24, 54:24, 55:21, 57:11, 57:24, 69:13, 69:19, 69:23, 70:13, 70:20, 72:18, 72:19, 75:9, 85:8, 88:13,

88:21, 89:6, 90:5, 90:7, 90:8, 90:11, 90:13, 90:18, 90:25, 91:16, 91:19, 94:20, 97:13, 97:17, 105:18, 126:24

**Hodel** [5] - 99:19, 99:21, 99:25, 100:7, 100:21

**hold** [1] - 74:24

**Holder** [11] - 4:22, 21:5, 23:24, 31:5, 33:3, 37:18, 40:10, 72:14, 74:3, 89:13, 113:25

**holding** [17] - 25:12, 26:7, 26:13, 27:2, 27:3, 28:14, 32:13, 49:16, 50:2, 50:15, 58:4, 58:8, 59:22, 72:16, 85:23, 90:3

**holds** [1] - 125:9

**hole** [1] - 6:8

**Honor** [102] - 3:1, 3:7, 3:13, 3:23, 6:12, 8:8, 18:4, 19:9, 32:2, 32:18, 34:7, 35:11, 35:15, 36:5, 37:23, 38:2, 39:23, 48:19, 49:7, 52:24, 53:10, 54:13, 55:12, 57:11, 58:19, 60:4, 61:14, 61:16, 63:2, 63:6, 64:1, 64:4, 64:15, 65:9, 65:11, 66:20, 69:12, 69:15, 72:12, 72:19, 73:25, 74:11, 76:5, 76:16, 77:7, 79:4, 79:23, 81:22, 83:8, 83:16, 84:7, 84:23, 86:11, 87:1, 87:16, 88:6, 91:15, 93:8, 94:9, 95:4, 95:14, 95:24, 98:2, 98:16, 98:22, 101:19, 102:9, 102:19, 103:6, 103:23, 104:15, 105:7, 107:6, 107:14, 107:23, 109:11, 110:4, 110:12, 110:23, 111:3, 111:25, 113:10, 113:14, 114:10, 115:6, 115:15, 115:24, 116:4, 117:7, 117:24, 118:3, 120:22, 122:9, 124:2, 124:14, 125:5, 125:9, 125:14, 126:20, 127:18, 128:16,

129:10

**Honor's** [1] - 6:22

**HONORABLE** [1] - 1:12

**hook** [1] - 40:22

**Hoover** [1] - 12:13

**hope** [1] - 89:4

**hopefully** [1] - 48:17

**host** [1] - 126:16

**hottest** [1] - 6:19

**house** [8] - 9:11, 11:11, 13:17, 13:25, 14:2, 15:5, 90:6, 90:20

**HOUSE** [2] - 1:4, 1:18

**House** [150] - 1:19, 3:3, 3:8, 4:16, 4:24, 6:7, 8:18, 8:19, 9:3, 10:1, 12:6, 12:18, 13:20, 14:2, 14:19, 18:11, 21:16, 22:8, 23:15, 23:17, 24:25, 25:14, 27:6, 28:4, 28:5, 28:12, 28:18, 28:21, 30:9, 31:22, 33:13, 33:21, 34:16, 34:19, 34:20, 37:9, 37:10, 37:11, 37:12, 37:16, 38:5, 40:18, 40:22, 40:25, 42:12, 42:13, 47:9, 49:21, 49:22, 49:24, 50:3, 50:16, 50:25, 53:1, 53:8, 53:21, 54:23, 55:1, 55:3, 55:11, 56:13, 56:21, 57:2, 57:5, 57:9, 57:25, 58:1, 58:8, 58:11, 58:17, 59:2, 59:16, 59:21, 59:24, 60:6, 61:5, 61:11, 61:15, 62:7, 62:15, 62:16, 62:18, 62:21, 63:1, 63:10, 63:14, 63:16, 64:13, 64:15, 64:20, 65:4, 65:5, 65:12, 65:19, 65:20, 66:1, 66:3, 66:5, 66:7, 66:9, 66:10, 66:12, 66:14, 67:21, 68:25, 70:25, 71:13, 71:23, 72:24, 74:12, 74:15, 74:17, 74:24, 75:5, 75:14, 75:24, 76:6, 76:14, 77:24, 78:8, 79:14, 79:15, 80:8, 81:25, 83:14, 84:7, 84:17, 84:24, 90:22, 93:5, 95:12, 96:17,

99:22, 103:21, 104:19, 104:25, 106:8, 109:6, 110:16, 110:21, 112:1, 112:23, 121:5, 121:6, 123:10, 128:14

**House's** [7] - 13:2, 42:11, 59:17, 67:7, 110:18, 111:24, 113:2

**house's** [1] - 11:7

**housekeeping** [1] - 99:4

**houses** [3] - 9:21, 13:23, 19:16

**hundreds** [1] - 22:13

**hunting** [1] - 120:16

**hypothetical** [1] - 54:11

---

**I**

**idea** [5] - 26:23, 26:24, 38:23, 112:3, 121:19

**identify** [1] - 3:5

**ignored** [1] - 72:15

**II** [2] - 83:25, 89:3

**Ill** [17] - 7:5, 7:10, 10:25, 12:24, 66:18, 68:19, 69:17, 69:22, 70:11, 70:16, 86:17, 88:19, 93:17, 93:19, 94:12, 106:9

**imagine** [1] - 111:19

**impairment** [1] - 101:15

**impasse** [3] - 84:22, 84:23, 124:6

**impeached** [1] - 24:17

**impeachment** [1] - 9:1

**implied** [8] - 13:12, 14:7, 31:9, 32:8, 86:10, 86:13, 89:10, 116:22

**impliedly** [1] - 52:25

**implying** [2] - 6:2, 111:2

**importance** [2] - 74:13, 74:14

**important** [8] - 5:15, 5:24, 6:6, 6:19, 19:6, 41:17, 60:23, 113:2

**impossible** [3] - 39:10, 39:11, 43:18

**impractical** [1] - 16:22

**impressed** [1] -

100:1

**impressions** [1] - 4:7

**imprisoned** [1] - 90:23

**improper** [1] - 115:18

**improperly** [1] - 98:15

**inappropriate** [1] - 127:20

**incident** [1] - 13:14

**inclination** [2] - 4:11, 4:14

**include** [3] - 47:20, 118:9, 128:23

**included** [2] - 30:8, 77:18

**includes** [5] - 55:16, 92:2, 118:8, 118:13, 122:24

**including** [16] - 4:20, 61:19, 62:8, 64:7, 64:23, 65:1, 65:13, 66:3, 66:15, 69:25, 70:1, 74:19, 75:10, 96:2, 114:7, 118:17

**inconsistent** [1] - 9:6

**incorrect** [2] - 5:4, 109:18

**indeed** [1] - 36:14

**indemnification** [1] - 111:4

**independently** [1] - 14:3

**Indian** [1] - 44:17, 120:4

**indicates** [1] - 37:2

**indisputable** [3] - 108:19, 108:23, 115:8

**individual** [26] - 9:19, 65:19, 65:20, 69:16, 69:21, 71:17, 71:22, 72:8, 76:23, 90:21, 90:23, 93:13, 94:25, 96:8, 96:13, 96:14, 96:21, 96:24, 97:3, 97:15, 97:19, 112:4, 118:13, 120:23, 122:1, 122:4

**individual-rights** [1] - 96:14

**individually** [1] - 14:1

**individuals** [7] - 10:5, 10:14, 69:17, 76:25, 96:2, 97:14, 97:21

**indulge** [1] - 118:4

**inexorable** [1] - 21:8

**inference** [1] - 38:10

**information** [37] - 12:9, 12:16, 13:16, 14:8, 14:24, 16:4, 37:4, 37:5, 67:1, 67:9, 67:11, 67:13, 67:14, 67:15, 67:21, 68:10, 68:17, 68:18, 68:22, 68:23, 69:2, 69:5, 106:2, 106:7, 113:3, 114:16, 114:19, 114:21, 116:1, 116:7, 121:10, 121:16, 123:6, 124:7, 124:11, 128:22, 129:4
**informational** [12] - 66:19, 66:24, 67:3, 67:5, 67:25, 68:1, 68:4, 88:14, 92:5, 94:19, 94:21, 105:21
**informed** [1] - 120:22
**infringement** [2] - 87:6, 87:8
**inherent** [5] - 91:3, 91:18, 92:19, 94:6, 94:8
**initial** [5] - 4:7, 4:11, 4:14, 6:13, 83:10
**initiate** [2] - 63:10, 63:15
**initiated** [4] - 28:9, 28:20, 30:7, 38:21
**injecting** [1] - 33:17
**injunction** [2] - 110:17, 115:1
**injured** [1] - 110:14
**injures** [1] - 69:1
**injuries** [2] - 18:23, 101:13
**injury** [25] - 8:5, 9:23, 10:3, 13:20, 66:19, 66:23, 66:24, 67:3, 67:5, 67:6, 67:7, 67:10, 67:25, 68:1, 68:4, 68:9, 68:19, 69:18, 70:11, 71:22, 71:23, 76:24, 76:25
**inquiries** [1] - 67:8
**inquiry** [2] - 83:19, 108:16
**INS** [2] - 9:9, 73:15
**instance** [3] - 35:21, 67:17, 80:4
**instead** [3] - 12:6, 39:7, 57:14
**institution** [1] - 71:23
**institutional** [14] - 8:15, 8:22, 9:12, 10:3, 13:2, 18:22, 62:17,

64:20, 66:19, 67:6, 68:4, 69:17, 76:24, 76:25
**instrumentalities** [1] - 103:9
**intend** [1] - 106:13
**intended** [7] - 13:19, 50:25, 55:1, 58:3, 87:3, 101:13, 101:24
**intentionally** [2] - 37:6, 39:13
**interact** [1] - 24:3
**interbranch** [5] - 96:9, 96:14, 101:21, 103:17, 104:1
**interest** [12] - 8:22, 9:12, 9:14, 13:3, 59:16, 83:22, 99:8, 101:16, 113:2, 128:11, 128:19
**interested** [4] - 5:11, 83:24, 119:5, 127:14
**interests** [2] - 71:11, 129:7
**internal** [1] - 18:6
**internally** [1] - 63:13
**interposition** [1] - 29:9
**interpret** [3] - 5:13, 36:23, 44:11
**interpretation** [10] - 11:4, 33:22, 43:13, 45:12, 48:9, 48:10, 73:12, 78:11, 122:18
**interpretations** [1] - 104:24
**interpreted** [1] - 80:2
**interpreting** [2] - 42:7, 81:8
**intervene** [1] - 70:25
**intervened** [2] - 28:5, 49:24
**intervenor** [8] - 28:13, 28:19, 29:1, 29:3, 29:6, 29:13, 61:19, 62:1
**intervention** [2] - 7:20, 62:8
**interventions** [1] - 61:21
**introduce** [1] - 3:21
**invent** [1] - 24:23
**investigating** [2] - 13:25, 98:15
**investigation** [3] - 50:11, 55:23, 57:19
**investigations** [2] - 55:7, 67:8
**investigative** [3] - 11:8, 11:13, 11:14

**investigatory** [3] - 25:15, 71:14, 72:25
**invites** [1] - 90:3
**invoke** [4] - 15:24, 91:2, 91:3, 91:17
**invoked** [1] - 92:19
**invoking** [2] - 60:7, 81:24
**involve** [3] - 73:18, 74:12, 129:2
**involved** [1] - 105:19
**involving** [2] - 49:21, 112:8
**Iran** [1] - 55:23
**irrational** [1] - 10:7
**irreconcilable** [1] - 85:9
**IRS** [1] - 85:20
**issue** [43] - 6:15, 7:17, 8:18, 14:18, 15:20, 16:2, 16:9, 16:19, 18:16, 21:13, 21:17, 23:17, 25:12, 26:10, 27:3, 27:20, 28:8, 29:11, 32:21, 32:23, 33:13, 37:13, 37:19, 37:20, 40:8, 42:19, 57:22, 59:9, 62:2, 69:24, 76:6, 88:8, 94:2, 94:6, 95:18, 96:4, 98:4, 100:14, 100:22, 103:8, 105:8, 111:7
**issue's** [2] - 31:3, 31:5
**issued** [7] - 17:14, 18:4, 60:9, 65:16, 69:25, 77:19, 90:10
**issues** [25] - 3:18, 4:8, 5:15, 9:11, 14:10, 20:18, 32:5, 33:1, 33:6, 34:9, 38:3, 42:3, 46:12, 46:13, 57:20, 74:13, 77:4, 81:23, 89:4, 89:7, 101:23, 107:15, 108:12, 108:13
**issuing** [2] - 73:21, 94:11
**it'd** [2] - 21:22, 40:23
**it'll** [2] - 7:2, 35:14
**itself** [21] - 10:21, 13:12, 14:6, 20:11, 25:18, 27:15, 32:1, 34:25, 56:15, 64:18, 65:12, 71:6, 82:8, 86:9, 96:22, 99:9, 102:10, 104:19, 114:21, 128:20

**J**

**Jackson** [6] - 12:12, 40:12, 40:14, 72:13, 74:3, 89:13
**Jackson's** [1] - 33:3
**JAMES** [1] - 1:21
**James** [1] - 3:13
**Jay** [1] - 12:4
**JCPenney** [1] - 51:8
**Jefferson** [1] - 12:12
**John** [1] - 105:4
**Johnson** [5] - 8:20, 9:2, 19:16, 24:12, 24:17
**joined** [2] - 19:3, 31:5
**JOSEPHINE** [1] - 1:16
**Josephine** [1] - 3:11
**Judge** [28] - 8:7, 8:12, 11:25, 18:9, 19:4, 20:3, 32:21, 33:2, 37:19, 40:5, 40:12, 40:14, 46:2, 46:4, 46:18, 50:13, 51:7, 65:15, 72:13, 74:3, 86:3, 86:15, 89:9, 89:11, 89:13, 123:9
**JUDGE** [1] - 1:13
**judge** [1] - 89:12
**judgment** [6] - 9:3, 86:18, 87:10, 88:11, 89:20, 125:1
**Judgment** [4] - 86:8, 86:15, 87:3, 123:15
**judicial** [12] - 7:22, 8:4, 11:19, 15:24, 19:18, 20:22, 29:8, 29:23, 33:12, 51:10, 72:6, 90:9
**judicially** [2] - 108:4, 114:14
**judiciary** [5] - 23:18, 122:1, 122:2, 122:12, 122:13
**July** [1] - 63:19
**jump** [1] - 49:9
**June** [1] - 63:17
**jurisdiction** [68] - 3:17, 4:10, 4:15, 7:10, 16:8, 27:4, 27:8, 32:9, 32:20, 32:22, 33:12, 33:15, 34:17, 34:21, 37:15, 38:4, 38:13, 39:16, 40:2, 41:6, 42:15, 42:18, 44:16, 44:17, 46:8, 47:15,

49:20, 50:4, 50:5, 50:15, 50:25, 51:2, 51:22, 52:11, 52:15, 52:21, 53:5, 55:2, 57:8, 57:13, 57:15, 58:4, 58:14, 59:3, 59:11, 59:13, 59:20, 60:2, 60:8, 60:25, 66:18, 69:10, 76:4, 76:7, 77:13, 77:22, 78:6, 78:17, 80:19, 80:20, 80:24, 81:25, 105:8, 113:24, 115:17, 123:18, 127:10, 128:2
**jurisdictional** [21] - 26:13, 32:8, 32:5, 32:13, 33:1, 33:18, 40:22, 44:14, 46:12, 51:9, 52:19, 55:15, 56:5, 56:20, 57:13, 59:8, 60:24, 71:5, 113:6, 113:11, 125:25
**JUSTICE** [1] - 1:23
**Justice** [11] - 7:15, 7:16, 7:19, 10:12, 17:10, 19:3, 19:4, 45:1, 60:6
**justice** [1] - 7:19
**justiciability** [1] - 70:15
**justiciable** [2] - 22:5, 88:3

**K**

**keen** [1] - 114:8
**keep** [2] - 56:7, 81:1
**Kennedy** [4] - 25:20, 31:10, 31:11, 31:16
**key** [1] - 103:13
**kick** [2] - 107:5, 109:18
**kicking** [1] - 107:2
**kind** [29] - 12:22, 14:17, 19:25, 23:19, 26:18, 26:22, 32:8, 34:8, 35:2, 42:24, 44:8, 58:8, 58:14, 60:14, 65:4, 72:1, 78:14, 79:6, 80:9, 81:14, 89:8, 92:4, 94:6, 95:9, 102:11, 107:1, 110:1, 110:2, 116:25
**kinds** [5] - 18:22, 80:10, 80:12, 90:9, 90:12
**Kline** [4] - 8:8, 18:24, 19:5, 20:4

**knowing** [1] - 128:11
**knows** [1] - 33:19

# L

**lacks** [1] - 74:24
**language** [25] -
36:21, 51:2, 53:16,
54:14, 61:3, 64:17,
72:2, 72:10, 72:17,
72:18, 78:22, 82:15,
82:18, 84:6, 90:3,
99:21, 100:8, 101:17,
102:3, 102:11,
103:23, 106:23,
112:13, 113:7, 127:24
**large** [1] - 73:21
**largely** [1] - 75:3
**last** [7] - 5:25, 11:3,
16:7, 74:4, 105:13,
116:10, 128:6
**lasts** [1] - 109:25
**latter** [1] - 62:22
**laughter** [2] - 4:5,
121:24
**law** [31] - 5:2, 5:9,
11:9, 15:6, 15:7,
18:20, 24:1, 25:17,
27:13, 28:15, 30:2,
31:2, 34:19, 39:8,
43:13, 52:9, 73:14,
81:6, 86:12, 95:15,
107:24, 108:1,
109:17, 109:25,
112:14, 119:20,
119:24, 120:1, 120:4,
125:20
**lawmakers** [1] -
126:19
**laws** [5] - 11:16,
30:4, 42:12, 82:17,
104:20
**lawsuit** [13] - 30:1,
30:7, 42:4, 47:4,
63:10, 63:19, 63:23,
74:12, 74:16, 80:9,
83:21, 85:18
**lawsuits** [4] - 39:16,
62:9, 75:23, 76:14
**lead** [1] - 12:5
**leadership** [2] -
62:11, 65:23
**least** [14] - 5:22,
17:12, 38:20, 43:8,
46:19, 56:14, 60:5,
76:12, 97:23, 99:10,
102:20, 108:12,
109:4, 109:8
**led** [1] - 12:6

**left** [3] - 77:16,
78:16, 126:18
**Legal** [9] - 61:17,
62:10, 63:12, 64:18,
64:19, 65:14, 65:22,
66:9, 74:15
**legal** [7] - 22:10,
24:4, 26:2, 47:15,
53:12, 116:23, 126:10
**legally** [3] - 83:17,
84:9, 87:20
**legion** [1] - 81:17
**legislate** [2] - 13:24,
67:22
**legislation** [10] -
13:18, 13:23, 14:1,
14:6, 14:18, 19:14,
83:22, 85:20
**legislative** [28] -
9:11, 13:9, 13:14,
14:9, 14:12, 29:24,
31:13, 36:25, 37:5,
43:11, 47:6, 50:24,
54:24, 55:21, 57:24,
67:9, 67:19, 68:11,
69:18, 72:22, 73:3,
85:2, 85:7, 90:5,
92:16, 105:18,
108:16, 129:6
**legislators** [6] - 9:19,
18:21, 26:3, 69:16,
69:21, 71:18
**Legislature** [1] -
71:20
**legislature** [1] -
72:21
**legitimate** [5] - 14:8,
14:12, 67:19, 109:6,
129:6
**length** [1] - 107:13
**lengths** [1] - 57:7
**less** [4] - 13:20, 23:5,
60:18, 114:8
**lessens** [1] - 82:2
**lesser** [1] - 92:2
**letter** [4] - 21:16,
39:20, 54:5, 64:1
**Letter** [2] - 3:9, 6:16
**LETTER** [4] - 1:17,
129:10, 129:13,
129:25
**letters** [1] - 84:25
**level** [5] - 65:20,
74:9, 76:2, 91:6, 95:9
**liberties** [3] - 72:8,
90:24, 96:8
**lies** [1] - 72:6
**light** [4] - 27:3,
27:21, 33:22, 127:6
**limit** [1] - 55:10

**limitation** [3] - 44:3,
82:7, 103:13
**limitations** [12] -
34:25, 36:3, 40:24,
41:1, 41:10, 41:11,
41:12, 41:22, 44:21,
44:22, 45:9, 48:7
**limited** [4] - 48:3,
112:14, 126:6, 126:14
**limits** [3] - 41:7,
108:20, 125:8
**line** [5] - 4:23, 27:19,
30:25, 96:1, 97:23
**lines** [1] - 95:25
**LISA** [2] - 2:4, 131:3
**Lisa** [1] - 131:12
**literally** [2] - 22:22,
23:20
**litigation** [14] - 12:5,
62:8, 62:18, 63:15,
64:10, 64:21, 66:10,
66:16, 84:24, 95:19,
96:5, 101:22, 103:17,
104:1
**loath** [2] - 23:4, 23:5
**locking** [1] - 16:21
**long-established** [2]
- 90:2, 90:4
**longstanding** [1] -
91:19
**look** [15] - 6:10, 8:13,
25:11, 29:21, 43:24,
59:21, 62:24, 82:24,
91:5, 92:3, 97:12,
105:17, 107:11,
113:7, 128:8
**looked** [3] - 8:14,
8:15, 29:2
**looking** [14] - 5:8,
8:6, 17:25, 20:14,
43:11, 54:5, 55:10,
69:19, 70:22, 78:12,
97:6, 107:21, 113:10,
120:16
**looks** [4] - 4:15,
61:10, 111:3, 125:9
**loophole** [1] - 86:10
**lose** [2] - 85:15,
125:12
**loss** [2] - 10:4, 15:2
**lost** [1] - 16:10
**love** [1] - 4:8
**lurking** [1] - 107:15

# M

**ma'am** [3] - 7:8, 33:9,
128:15
**MacKinnon** [1] -

11:25
**Madison** [1] - 10:12
**major** [5] - 8:9, 21:8,
22:3, 24:2, 28:1
**majority** [1] - 19:16
**manage** [1] - 66:10
**mandamus** [24] -
106:18, 107:5, 107:7,
108:6, 109:9, 115:4,
115:6, 115:9, 115:16,
115:19, 115:23,
116:2, 116:4, 116:16,
124:17, 124:18,
125:1, 125:11,
125:16, 125:19,
125:21, 126:8,
126:11, 127:12
**mandates** [1] - 66:25
**mandatory** [3] -
74:20, 114:22, 119:21
**Marbury** [1] - 10:12
**Marshall** [1] - 10:12
**match** [1] - 71:21
**material** [1] - 83:2
**matter** [26] - 4:10,
4:15, 6:25, 23:13,
24:5, 25:14, 27:7,
35:10, 45:12, 49:20,
53:5, 57:8, 58:13,
69:10, 76:4, 76:7,
78:14, 82:21, 82:22,
93:20, 115:17,
116:23, 116:25,
117:1, 123:18, 127:10
**matters** [3] - 13:4,
22:3, 62:18
**Mazars** [12] - 61:20,
65:15, 80:4, 95:11,
95:18, 96:6, 96:10,
96:18, 108:14, 113:16
**McCARTHY** [1] - 2:1
**McFADDEN** [1] -
1:12
**McGrain** [1] - 13:12
**mean** [47] - 11:2,
13:19, 13:23, 17:9,
17:13, 17:17, 18:2,
18:5, 18:13, 18:20,
18:23, 20:21, 22:17,
26:10, 26:18, 27:1,
27:15, 29:2, 31:6,
33:25, 37:14, 37:20,
38:25, 43:18, 44:12,
44:18, 44:25, 45:2,
55:9, 56:22, 58:16,
60:18, 72:10, 79:5,
82:6, 82:22, 84:10,
84:22, 88:2, 90:14,
92:1, 93:2, 93:11,
102:25, 105:6,

107:24, 122:11
**meaning** [3] - 76:22,
103:19, 121:20
**meaningless** [5] -
36:21, 41:23, 41:24,
86:22
**means** [6] - 28:20,
36:13, 60:18, 81:15,
84:6, 111:5
**Means** [3] - 3:2,
121:10, 122:25
**MEANS** [1] - 1:3
**meant** [6] - 40:5,
47:7, 75:23, 80:6,
81:13, 102:22
**mechanism** [1] -
62:7
**meet** [1] - 123:12
**meets** [1] - 122:20
**Megan** [2] - 3:7, 49:8
**MEGAN** [1] - 1:16
**member** [5] - 11:10,
62:12, 65:20, 71:10,
71:14
**members** [10] - 64:7,
65:5, 65:19, 65:23,
70:1, 76:23, 112:9,
120:23, 122:1
**memo** [1] - 19:24
**memoranda** [1] -
85:3
**memory** [1] - 112:4
**mention** [2] - 19:24,
76:20
**mentioned** [3] - 32:3,
76:13, 105:25
**mere** [1] - 101:15
**merely** [2] - 13:13,
29:24
**merits** [7] - 14:11,
46:16, 47:8, 55:2,
67:18, 85:16, 107:4
**met** [1] - 85:2
**Mexicano** [1] - 91:4
**mid-19th** [1] - 105:23
**might** [16] - 4:6,
23:5, 30:16, 33:13,
47:14, 51:20, 53:13,
56:1, 61:2, 75:4,
85:13, 109:18,
109:20, 117:17,
119:7, 127:20
**Mims** [1] - 80:17
**mind** [4] - 5:20,
51:10, 70:16, 97:4
**mine** [2] - 58:11,
64:23
**minimum** [5] - 28:17,
28:24, 33:14, 101:23,
105:1

**minor** [1] - 8:11
**minority** [2] - 20:25, 72:8
**minute** [2] - 20:9, 115:13
**missed** [1] - 79:19
**Mnuchin** [5] - 14:19, 31:23, 61:15, 76:16, 88:1
**mockery** [1] - 45:8
**mode** [1] - 10:16
**modern** [1] - 44:19
**modest** [4] - 88:10, 91:9, 91:20, 91:25
**modifier** [1] - 119:14
**months** [1] - 58:21
**morning** [5] - 3:12, 3:13, 3:23, 4:2, 4:3
**MORSE** [1] - 1:16
**Morse** [1] - 3:11
**Moss** [1] - 66:4
**most** [7] - 6:19, 8:2, 26:14, 34:23, 83:20, 109:23, 118:25
**motion** [5] - 87:15, 104:23, 124:24, 125:19, 128:1
**MOTION** [1] - 1:12
**motions** [1] - 29:3
**motivates** [1] - 21:25
**move** [1] - 92:25
**moved** [1] - 47:5
**MR** [124] - 3:13, 3:21, 3:23, 6:12, 7:8, 11:17, 14:4, 15:16, 16:14, 16:17, 17:4, 17:8, 17:17, 17:23, 18:2, 20:1, 21:25, 22:16, 22:20, 24:9, 24:11, 25:6, 25:8, 26:8, 26:20, 26:25, 29:7, 31:3, 32:11, 33:9, 34:4, 34:7, 34:10, 34:13, 35:15, 35:19, 35:25, 37:10, 38:18, 39:3, 39:20, 40:12, 42:23, 43:5, 44:12, 45:17, 45:20, 45:23, 47:2, 48:24, 49:2, 49:4, 77:6, 77:9, 77:12, 78:4, 78:21, 78:25, 79:4, 79:8, 79:11, 79:23, 80:5, 81:7, 82:14, 82:19, 83:8, 83:16, 84:23, 86:1, 86:5, 86:7, 87:1, 87:16, 88:6, 89:23, 90:18, 91:15, 93:8, 93:11, 93:23, 94:9, 94:18, 94:25, 95:3,

95:7, 95:14, 95:23, 96:20, 97:12, 98:2, 98:6, 98:11, 98:13, 98:19, 98:22, 98:25, 99:17, 100:3, 100:6, 102:6, 102:9, 102:19, 103:6, 103:23, 104:7, 104:15, 105:7, 105:11, 106:20, 106:25, 107:6, 107:19, 107:23, 109:11, 117:21, 117:24, 124:14, 125:5, 127:3, 127:18, 129:10, 129:13, 129:25
**MS** [54] - 3:7, 49:7, 53:10, 53:25, 54:5, 54:13, 55:12, 57:11, 58:19, 60:20, 61:14, 61:25, 63:2, 63:5, 63:18, 63:21, 63:24, 64:3, 64:15, 65:9, 66:20, 66:23, 67:4, 68:2, 68:5, 69:12, 70:9, 72:12, 74:8, 75:13, 110:4, 111:25, 113:6, 114:10, 115:6, 115:24, 116:13, 116:15, 116:19, 117:5, 117:13, 118:3, 118:24, 119:3, 119:13, 120:22, 121:1, 121:25, 122:9, 122:15, 123:21, 123:25, 124:4, 128:16
**multiple** [1] - 127:8
**Mulvaney** [1] - 83:14
**must** [1] - 126:16
**MYERS** [49] - 1:21, 83:16, 84:23, 86:1, 86:5, 86:7, 87:1, 87:16, 88:6, 89:23, 90:18, 91:15, 93:8, 93:11, 93:23, 94:9, 94:18, 94:25, 95:3, 95:7, 95:14, 98:2, 98:6, 98:11, 98:13, 98:19, 98:22, 98:25, 99:17, 100:3, 100:6, 102:6, 102:9, 102:19, 103:6, 103:23, 104:7, 104:15, 105:7, 105:11, 106:20, 106:25, 107:6, 107:19, 107:23, 109:11, 124:14, 125:5, 127:3
**Myers** [29] - 3:15, 3:17, 4:22, 17:12,

18:7, 21:4, 23:23, 23:24, 31:5, 32:21, 39:19, 40:4, 48:24, 74:2, 77:5, 83:9, 83:10, 86:16, 86:25, 89:9, 96:17, 98:1, 109:12, 111:14, 113:23, 113:25, 114:6, 124:13, 127:2
**Myers's** [2] - 111:19, 120:8

---

# N

**narrow** [3] - 60:16, 60:17, 92:8
**narrower** [2] - 38:1, 42:19, 44:10
**natural** [2] - 38:10, 97:9
**naturally** [1] - 30:18
**nature** [1] - 105:18
**nearly** [1] - 7:23
**necessarily** [2] - 43:2, 58:10
**necessary** [1] - 70:10
**need** [30] - 7:12, 22:10, 24:22, 38:2, 41:19, 44:15, 59:6, 61:21, 61:24, 62:1, 64:12, 69:9, 70:7, 71:10, 84:3, 85:2, 87:8, 91:21, 92:18, 94:1, 94:14, 107:7, 115:22, 116:4, 117:20, 123:16, 123:17, 123:19, 127:7, 129:8
**needed** [4] - 35:7, 47:14, 68:10, 84:25
**needs** [9] - 13:18, 19:11, 33:14, 42:6, 67:9, 91:5, 91:14, 109:7, 125:15
**negotiate** [1] - 128:19
**negotiation** [5] - 83:11, 84:12, 89:1, 92:6, 109:2
**never** [10] - 12:16, 22:6, 24:10, 40:18, 56:24, 65:19, 83:14, 85:12, 106:7, 125:1
**new** [5] - 18:4, 24:16, 24:23, 43:20, 110:3
**Newport** [1] - 101:10
**News** [1] - 101:10
**next** [6] - 26:8,

36:23, 45:6, 79:2, 118:11, 127:15
**Nixon** [11] - 4:20, 12:1, 16:8, 45:18, 46:1, 46:3, 50:11, 55:6, 57:19, 57:20, 70:3
**Nixon-era** [2] - 4:20, 57:20
**nobody** [4] - 12:5, 80:10, 80:22, 111:21
**nobody's** [1] - 54:8
**nominal** [1] - 101:7
**nominations** [2] - 19:18
**noncompliance** [1] - 119:20
**none** [4] - 20:22, 36:3, 56:12, 58:16
**nonetheless** [1] - 114:3
**nonresponsiveness** [1] - 74:10
**nonstatutory** [1] - 116:11
**normal** [2] - 26:4, 120:18
**Northwest** [1] - 1:24
**note** [5] - 18:24, 37:25, 58:22, 60:23, 91:21
**noted** [8] - 55:13, 71:2, 86:11, 93:15, 100:23, 107:14, 126:3, 126:20
**notes** [3] - 128:23, 131:5
**nothing** [3] - 10:7, 36:25, 58:3
**notice** [1] - 118:23
**noticeable** [1] - 108:4
**noting** [1] - 72:19
**notion** [1] - 24:22
**November** [2] - 1:8, 131:10
**nullification** [1] - 30:11
**number** [3] - 89:24, 101:22, 126:4
**numerous** [1] - 61:19
**NW** [2] - 2:6, 131:14

---

# O

**objection** [2] - 55:23, 55:25
**objectives** [1] -

105:18
**obligation** [7] - 27:20, 29:13, 69:4, 69:5, 74:20, 82:24, 126:10
**obligations** [2] - 28:2, 29:11
**observed** [3] - 81:22, 83:3, 85:6
**obstruction** [1] - 74:9
**obtain** [9] - 14:12, 65:24, 67:8, 85:19, 114:18, 114:21, 115:1, 115:2, 122:13
**obtained** [1] - 10:9
**obtaining** [1] - 83:24
**obviates** [2] - 44:15, 44:19
**obvious** [1] - 34:23
**obviously** [11] - 10:8, 18:15, 22:12, 48:14, 64:22, 74:14, 89:2, 89:16, 93:2, 108:5, 127:23
**occur** [1] - 65:2
**occurred** [3] - 63:23, 64:13
**October** [1] - 58:21
**odd** [2] - 56:22, 119:3
**OF** [8] - 1:1, 1:4, 1:7, 1:12, 1:18, 1:18, 1:23, 2:1
**offered** [1] - 22:11
**OFFICE** [1] - 1:18
**office** [1] - 65:7
**Office** [4] - 1:19, 8:21, 9:4, 60:1
**officer** [7] - 58:24, 77:19, 78:23, 79:10, 89:3, 91:23, 92:16
**officer's** [1] - 110:15
**officers** [5] - 8:23, 73:17, 80:9, 111:4, 126:5
**Official** [1] - 2:5
**official** [15] - 9:23, 16:24, 17:2, 18:8, 36:17, 47:17, 51:14, 51:15, 51:22, 55:24, 55:25, 58:24, 77:21, 131:12
**officials** [2] - 35:4, 47:21
**often** [1] - 101:4
**OLC** [22] - 5:3, 16:19, 16:22, 17:4, 17:6, 17:22, 18:5, 18:8, 18:25, 19:8, 60:3,

68:25, 83:16, 84:20, 85:16, 87:21, 107:13, 107:22, 108:2, 108:10, 108:15, 125:9
**OLC's** [1] - 17:6
**old** [3] - 37:3, 43:10, 44:17
**Olson** [1] - 17:14
**omnibus** [1] - 39:16
**ON** [1] - 1:3
**one** [57] - 8:2, 9:11, 9:21, 11:10, 11:18, 12:16, 13:16, 13:17, 13:19, 14:10, 16:7, 20:20, 21:1, 21:3, 24:18, 27:23, 27:25, 32:2, 36:18, 38:22, 39:6, 39:13, 40:7, 42:20, 44:11, 51:24, 52:2, 59:7, 59:19, 60:16, 72:13, 75:9, 77:14, 81:24, 85:6, 88:22, 90:6, 95:10, 97:17, 99:5, 107:11, 107:24, 109:20, 111:17, 113:23, 115:12, 117:1, 117:2, 117:18, 122:4, 122:18, 123:13, 124:17, 128:14, 128:17, 129:10
**one-house** [1] - 9:11
**ones** [1] - 5:22
**ongoing** [1] - 100:16
**open** [2] - 31:24, 99:24
**opened** [1] - 74:4
**opening** [1] - 74:1
**operate** [1] - 66:14
**operated** [4] - 22:7, 23:23, 65:20, 65:21
**operates** [3] - 9:7, 9:17, 63:7
**operating** [1] - 56:4
**operative** [1] - 82:15
**opinion** [26] - 13:7, 13:10, 17:24, 18:4, 18:23, 20:4, 31:22, 40:14, 45:1, 50:2, 50:3, 65:15, 69:1, 71:4, 83:16, 84:20, 85:16, 87:21, 89:10, 96:10, 107:13, 107:22, 108:2, 108:10, 108:15, 125:9
**opinions** [10] - 5:4, 17:7, 17:9, 18:1, 18:9, 18:25, 19:2, 19:9, 23:24, 60:3
**opportunity** [4] -

31:7, 98:3, 117:21, 120:11
**opposed** [2] - 32:1, 53:8
**oppressive** [1] - 72:9
**options** [2] - 17:2, 55:11
**order** [4] - 22:11, 51:11, 77:19, 113:16
**orderly** [1] - 75:25
**ordinary** [1] - 121:5
**organization** [14] - 102:3, 102:18, 102:20, 104:3, 104:6, 118:14, 118:17, 119:19, 122:7, 122:24, 123:1, 123:7
**organizations** [4] - 103:3, 103:4, 103:21, 120:5
**organize** [1] - 65:12
**original** [1] - 52:14
**ORLOFF** [1] - 1:22
**Orloff** [1] - 3:15
**ostensible** [1] - 128:11
**otherwise** [6] - 43:10, 43:12, 62:16, 62:23, 103:2, 123:7
**oust** [1] - 37:15
**outset** [3] - 84:15, 109:15, 117:15
**overlap** [2] - 52:19, 99:10
**overlaps** [1] - 51:9
**overlay** [1] - 68:7
**overlooked** [1] - 86:8
**overridden** [1] - 43:21
**override** [1] - 41:21
**overrides** [4] - 34:24, 34:25, 41:10, 44:21
**overriding** [1] - 36:3
**overrule** [1] - 81:1
**oversight** [4] - 67:10, 67:22, 68:11, 129:6
**overtaken** [2] - 31:14, 71:9
**overwhelming** [2] - 11:22, 12:20
**own** [14] - 13:7, 16:18, 31:22, 31:23, 32:22, 37:21, 39:2, 71:11, 72:25, 83:24, 88:9, 88:18, 94:22

## P

**Page** [9] - 7:18, 8:12,

10:10, 10:14, 13:10, 30:5, 47:10, 100:17, 104:22
**pages** [1] - 108:14
**Pages** [1] - 15:25
**paper** [2] - 22:22, 23:20
**papers** [2] - 4:1, 12:3
**paragraph** [1] - 72:15
**paraphrasing** [1] - 37:8
**parity** [1] - 80:8
**Part** [1] - 71:4
**part** [14] - 5:16, 17:19, 38:16, 39:8, 43:2, 52:25, 55:23, 59:13, 71:3, 82:23, 90:11, 100:16, 112:3, 125:18
**partial** [1] - 72:16
**participation** [2] - 61:19, 62:8
**particular** [4] - 92:10, 95:15, 104:16
**particularized** [1] - 8:5
**particularly** [6] - 5:25, 36:24, 44:22, 61:4, 97:4, 118:1
**parties** [17] - 4:7, 4:12, 26:21, 50:20, 62:11, 65:24, 79:16, 84:10, 85:21, 93:21, 101:14, 109:4, 111:16, 124:6, 128:4, 128:8, 128:12
**parties'** [1] - 6:10
**partnership** [1] - 118:13
**parts** [3] - 21:20, 43:14, 126:4
**party** [15] - 21:4, 27:25, 28:10, 29:9, 29:10, 30:8, 43:12, 59:16, 60:16, 79:24, 93:2, 96:4, 99:7, 99:24, 110:14
**pass** [3] - 19:14, 38:12, 42:12
**passage** [1] - 50:21
**passed** [10] - 43:3, 47:19, 50:16, 63:17, 64:16, 80:22, 92:9, 125:24, 126:1, 126:3
**passions** [1] - 6:18
**past** [4] - 24:13, 114:9, 124:24, 125:19
**patent** [5] - 52:9, 80:16, 80:17, 87:5,

87:8
**patentholder** [1] - 87:7
**patents** [2] - 52:9, 52:16
**path** [1] - 38:1
**pause** [1] - 119:18
**pay** [2] - 42:7, 111:10
**PCAOB** [2] - 112:6, 112:9
**peg** [1] - 6:8
**pending** [1] - 128:1
**Pennsylvania** [1] - 98:14
**people** [6] - 4:16, 48:3, 48:6, 75:10, 99:1, 103:14
**perfect** [2] - 39:25, 42:25
**perfectly** [5] - 22:7, 23:6, 26:4, 54:25, 108:11
**perhaps** [4] - 16:23, 38:24, 85:13, 128:9
**periodically** [3] - 76:13, 76:15, 76:17
**permit** [3] - 104:21, 106:8, 126:4
**permits** [4] - 99:1, 99:5, 102:13, 106:15
**person** [25] - 29:17, 93:6, 99:16, 99:17, 100:2, 100:3, 100:22, 101:17, 118:1, 118:2, 118:12, 118:18, 119:5, 119:9, 119:13, 119:25, 121:19, 121:21, 122:2, 122:20, 122:24, 123:6, 123:10
**personal** [6] - 10:3, 14:13, 36:18, 51:15, 51:23, 55:22
**personally** [1] - 10:5
**persons** [4] - 90:19, 101:12, 104:21, 120:2
**perspective** [2] - 5:12, 13:16
**persuasive** [7] - 17:18, 18:14, 19:1, 19:6, 35:9, 48:9, 48:10
**petition** [1] - 75:18
**Petitioners** [1] - 98:6
**petitions** [1] - 90:19
**phenomenon** [1] - 24:16
**pick** [2] - 49:12, 98:24
**picking** [1] - 43:14

**piece** [2] - 22:22, 23:20
**pieces** [1] - 27:5
**pivot** [1] - 32:20
**place** [11] - 10:23, 50:19, 54:16, 56:7, 56:18, 60:10, 65:23, 65:24, 78:7, 78:17
**placed** [1] - 73:17
**places** [1] - 51:4
**plain** [6] - 51:2, 53:16, 54:14, 61:3, 103:19, 106:23
**plaintiff** [1] - 112:23
**Plaintiff** [4] - 59:15, 94:24, 122:19, 124:20
**Plaintiffs** [5] - 1:5, 44:10, 71:23, 107:7, 126:20
**plaintiffs** [1] - 29:15
**PLAINTIFFS** [1] - 1:16
**Plaintiffs'** [1] - 126:12
**play** [1] - 5:16
**plead** [1] - 124:21
**pled** [2] - 87:24, 125:15
**plenty** [4] - 24:20, 31:24, 34:1, 70:8
**PLLC** [1] - 2:1
**plug** [3] - 35:7, 77:15, 78:1
**plugging** [1] - 78:15
**point** [56] - 5:17, 11:19, 15:4, 15:11, 20:20, 20:21, 25:11, 26:9, 27:12, 27:23, 29:20, 30:6, 32:2, 32:10, 32:19, 33:25, 34:5, 39:6, 41:13, 42:15, 42:18, 45:11, 51:17, 53:6, 58:7, 59:7, 64:22, 67:6, 69:14, 74:22, 74:23, 77:13, 77:14, 81:3, 83:11, 85:13, 88:3, 91:8, 98:25, 100:21, 103:1, 103:18, 104:19, 105:1, 105:13, 105:15, 108:17, 113:23, 118:2, 119:15, 120:8, 121:2, 122:17, 125:14, 128:17
**pointed** [4] - 64:25, 76:5, 92:12, 100:9
**pointing** [2] - 78:22, 99:21
**points** [15] - 5:15,

5:24, 26:25, 31:20, 38:18, 45:14, 49:10, 58:19, 72:1, 77:10, 77:12, 107:23, 111:14, 114:6, 129:18

**political** [20] - 6:18, 7:12, 10:4, 14:25, 19:20, 21:11, 21:14, 22:23, 23:7, 24:24, 48:13, 70:14, 73:12, 73:18, 75:1, 100:15, 126:22, 126:23

**politically** [2] - 21:12, 73:8

**Polk** [1] - 12:12

**pop** [1] - 35:14

**portion** [2] - 36:8

**position** [16] - 5:5, 6:24, 18:7, 18:17, 18:18, 43:17, 44:1, 53:12, 53:14, 54:6, 62:17, 64:20, 83:17, 86:23, 87:17, 111:9

**positioned** [3] - 70:4, 120:6, 126:21

**positions** [2] - 17:11, 17:12

**Posner** [1] - 51:7

**possesses** [1] - 93:9

**possible** [4] - 33:11, 85:14, 85:22, 120:9

**possibly** [1] - 29:24

**post** [3] - 7:3, 8:7, 69:8

**post-1978** [1] - 81:7

**post-1980** [1] - 48:15

**post-1996** [1] - 81:6

**post-Raines** [3] - 7:3, 8:7, 69:8

**Postal** [1] - 52:1

**postdate** [3] - 10:18, 44:22, 86:25

**postdating** [1] - 82:5

**posture** [4] - 27:23, 28:12, 56:23, 81:23

**potential** [5] - 13:1, 85:20, 87:4, 109:14, 117:9

**potentially** [1] - 124:10

**pound** [1] - 24:8

**power** [40] - 7:23, 8:18, 9:23, 10:4, 11:22, 13:12, 13:14, 14:6, 14:7, 14:25, 15:20, 15:25, 16:2, 16:21, 19:12, 19:13, 19:14, 25:15, 29:23, 69:18, 71:12, 71:14, 72:6, 72:21, 72:22,

72:23, 73:1, 73:2, 93:18, 93:19, 99:13, 101:1, 101:2, 101:4, 104:20, 108:16, 108:21, 125:8

**powers** [19] - 8:2, 10:24, 12:23, 15:23, 21:9, 23:11, 25:23, 29:21, 31:15, 73:7, 88:25, 90:2, 91:3, 91:18, 92:7, 92:20, 93:4, 93:8, 104:10

**practical** [1] - 116:25

**pre-1365** [1] - 80:12

**precedent** [1] - 66:13

**precedential** [1] - 82:2

**precedents** [2] - 5:25, 105:16

**precisely** [2] - 48:16, 82:9

**precluded** [3] - 105:17, 106:16, 125:22

**preclusion** [2] - 105:14, 126:7

**predated** [1] - 114:7

**predates** [2] - 25:16, 39:7

**predating** [1] - 5:2

**predicated** [1] - 26:1

**preempt** [1] - 87:4

**preemptive** [2] - 87:22, 87:23

**preexisted** [1] - 44:16

**premature** [1] - 109:8

**premise** [2] - 83:21, 85:18

**prerogative** [1] - 18:15

**present** [2] - 34:18, 59:25

**presentation** [1] - 32:24

**presented** [4] - 28:8, 37:21, 91:23, 94:10

**presentment** [1] - 33:15

**presents** [1] - 107:24

**preserve** [1] - 80:23

**preserves** [1] - 36:15

**preserving** [2] - 44:2, 48:12

**Presidency** [1] - 47:24

**presidency** [1] - 24:14

**President** [18] - 3:24,

8:21, 12:8, 12:11, 13:24, 19:15, 24:12, 24:17, 30:3, 38:12, 38:13, 70:2, 95:12, 96:2, 96:5, 96:15, 113:15

**PRESIDENT** [1] - 2:1

**President's** [5] - 14:13, 67:13, 83:15, 84:17, 128:21

**Presidential** [1] - 83:23

**presidential** [1] - 24:15

**Presidents** [2] - 12:12, 24:12

**presidents** [3] - 12:14, 24:13

**pressure** [1] - 23:7

**presume** [1] - 43:8, 43:19

**presumption** [2] - 52:20, 60:25

**pretty** [5] - 4:23, 25:1, 40:9, 89:15, 125:3

**prevails** [1] - 44:1

**prevent** [2] - 49:22, 122:12

**previewed** [1] - 118:3

**primarily** [1] - 113:11

**principle** [2] - 8:1, 10:11

**principles** [7] - 6:20, 6:25, 7:5, 7:10, 8:2, 27:22, 102:20

**priority** [1] - 12:7

**private** [23] - 15:2, 27:25, 28:2, 28:4, 28:10, 29:9, 29:10, 30:8, 48:3, 48:6, 50:20, 79:16, 79:24, 93:2, 93:21, 96:19, 96:24, 97:2, 101:13, 111:16, 113:1, 118:14

**privately** [4] - 63:5, 64:3, 115:14, 117:6

**privilege** [3] - 36:18, 51:23, 55:22

**privileges** [1] - 51:16

**privity** [1] - 21:4

**problem** [7] - 34:23, 56:3, 56:11, 71:19, 101:4, 124:19, 126:21

**problems** [3] - 34:22, 41:1, 125:13

**proceed** [2] - 5:23, 66:6

**proceeded** [1] -

46:14

**Proceedings** [1] - 130:2

**proceedings** [1] - 131:6

**proceeds** [1] - 128:5

**process** [24] - 5:14, 63:9, 64:6, 65:24, 76:1, 84:12, 89:1, 90:11, 92:6, 97:20, 100:25, 109:3, 109:5, 109:7, 112:20, 120:12, 124:25, 125:19, 127:23, 127:24, 128:7, 128:12, 128:17, 128:20

**processes** [2] - 85:20, 94:22

**produced** [1] - 131:6

**producing** [1] - 87:6

**product** [1] - 87:6

**production** [2] - 15:23, 115:25

**program** [1] - 83:23

**PROGRAMS** [1] - 1:23

**programs** [1] - 39:21

**proof** [1] - 19:16

**proper** [2] - 59:20, 110:14

**properly** [4] - 11:9, 11:16, 80:12, 126:13

**proposing** [1] - 117:14

**proposition** [1] - 79:25

**prosecution** [2] - 93:14, 105:25

**protect** [2] - 96:8, 97:15

**protecting** [2] - 97:21, 97:22

**protection** [2] - 52:16, 72:7

**protections** [1] - 112:8

**prototypical** [1] - 27:2

**prove** [1] - 29:2

**provide** [19] - 13:16, 14:23, 23:4, 23:5, 32:19, 42:14, 51:22, 68:23, 84:10, 86:21, 110:20, 112:18, 114:15, 115:7, 115:16, 116:8, 121:16, 124:11

**provided** [8] - 24:4, 39:15, 62:16, 62:23,

64:5, 84:4, 114:20, 114:22

**provides** [4] - 34:21, 60:1, 119:22, 121:9

**providing** [3] - 34:17, 78:16, 80:19

**province** [2] - 10:13, 100:15

**provision** [36] - 33:18, 34:14, 36:13, 36:14, 37:7, 38:8, 39:11, 41:2, 41:6, 41:12, 41:16, 41:22, 43:20, 47:19, 50:22, 52:10, 52:12, 53:19, 55:15, 55:18, 56:10, 56:20, 57:14, 80:14, 82:24, 83:1, 92:13, 92:15, 102:13, 113:6, 113:11, 118:5, 118:11, 119:5, 125:25, 126:2

**provision's** [1] - 37:15

**provisions** [15] - 33:21, 35:10, 41:23, 44:15, 51:9, 51:11, 52:5, 52:19, 56:5, 56:9, 81:20, 82:20, 126:7, 126:8

**prudential** [1] - 117:1

**Public** [1] - 68:16

**public** [17] - 7:21, 68:18, 102:3, 102:17, 102:18, 102:19, 103:4, 103:21, 104:2, 104:6, 118:14, 118:17, 119:19, 122:7, 122:24, 122:25, 123:6

**pure** [2] - 107:24, 108:1

**purpose** [6] - 14:9, 14:12, 15:25, 43:9, 43:21, 67:19

**purposes** [3] - 67:10, 68:11, 120:19

**pursuant** [2] - 100:12, 103:7

**pursue** [1] - 5:21

**purview** [1] - 11:10

**push** [1] - 120:11

**pushback** [1] - 22:25

**pushing** [1] - 121:18

**put** [15] - 7:15, 8:14, 9:18, 10:4, 13:6, 14:20, 14:21, 30:1, 43:15, 45:6, 53:14, 60:9, 66:1, 80:7,

117:25
**puts** [1] - 42:11
**putting** [2] - 103:2, 117:16
**puzzled** [1] - 129:22

## Q

**quarrel** [1] - 79:11
**quash** [1] - 87:15
**quashed** [4] - 28:10, 28:19, 30:9, 82:1
**questions** [18] - 4:9, 6:7, 32:18, 33:6, 42:10, 48:19, 59:13, 60:11, 70:4, 70:13, 73:6, 73:11, 73:18, 76:3, 88:4, 98:17, 111:9, 124:1
**quick** [5] - 77:6, 77:10, 77:11, 77:12, 124:15
**quickly** [2] - 118:5, 124:13
**quintessentially** [1] - 100:14
**quite** [4] - 24:19, 27:24, 45:12, 124:5
**quote** [20] - 7:17, 7:20, 7:25, 8:9, 9:19, 9:24, 10:7, 10:13, 10:23, 13:8, 14:22, 15:2, 15:22, 25:21, 29:22, 30:1, 47:7, 47:14, 84:1

## R

**Raines** [40] - 5:2, 5:3, 7:1, 7:3, 7:14, 7:17, 8:1, 8:7, 8:13, 8:14, 8:17, 10:17, 13:5, 14:25, 15:1, 15:3, 20:5, 20:17, 25:17, 26:3, 26:7, 27:21, 30:20, 31:22, 38:16, 49:11, 69:8, 69:13, 69:14, 69:15, 71:9, 71:16, 71:19, 72:2, 72:11, 72:15, 72:19, 76:21, 76:22
**raise** [3] - 40:3, 89:3, 104:8
**raised** [7] - 5:10, 32:21, 38:22, 39:18, 42:3, 74:2, 105:9
**raises** [2] - 6:6, 101:22
**raising** [1] - 70:13

**random** [2] - 18:22, 99:23
**ranking** [1] - 70:1
**rather** [8] - 8:25, 38:23, 55:18, 56:7, 56:12, 91:2, 94:21, 123:10
**rational** [1] - 43:9
**RDR** [3] - 2:4, 131:3, 131:12
**reach** [1] - 89:12
**reached** [2] - 22:23, 23:1
**reaction** [2] - 45:15, 46:23
**read** [35] - 4:11, 18:14, 25:21, 33:19, 33:20, 34:2, 35:1, 36:23, 39:10, 39:11, 40:15, 40:24, 41:15, 42:21, 43:7, 45:3, 45:4, 45:7, 48:8, 60:19, 62:15, 81:11, 81:19, 82:5, 82:19, 82:25, 94:15, 99:21, 103:23, 104:4, 108:19, 120:13, 125:7, 126:13, 129:24
**reading** [2] - 92:24, 106:11
**reads** [3] - 34:16, 77:24, 86:14
**Reagan** [1] - 12:14
**real** [10] - 36:6, 59:15, 59:16, 76:6, 86:13, 99:7, 99:8, 100:24, 101:8, 107:25
**really** [45] - 5:22, 15:4, 22:2, 23:8, 25:1, 28:6, 29:5, 32:12, 36:7, 38:6, 40:5, 40:16, 40:23, 42:6, 43:12, 45:15, 56:20, 62:24, 72:22, 75:8, 83:20, 84:17, 86:23, 89:3, 91:5, 92:8, 92:23, 93:5, 99:24, 101:22, 106:22, 107:5, 107:14, 107:15, 108:10, 108:11, 117:18, 119:8, 119:17, 124:16, 128:10, 129:5
**realpolitik** [2] - 42:25, 43:23
**reason** [14] - 25:24, 36:6, 40:1, 48:3, 48:12, 65:10, 77:17, 78:6, 81:21, 83:3, 98:23, 106:17,

111:13, 112:23
**reasonable** [1] - 55:19
**reasoned** [1] - 18:18
**reasoning** [5] - 7:18, 13:5, 31:21, 31:22, 120:5
**reasons** [13] - 46:16, 74:5, 76:13, 85:16, 87:21, 89:25, 92:22, 95:7, 98:19, 109:1, 115:19, 117:15, 122:11
**recalling** [1] - 119:14
**receive** [2] - 69:6, 120:16
**recent** [7] - 17:24, 44:25, 75:11, 89:15, 89:19, 120:1, 120:13
**recently** [3] - 86:12, 104:5, 105:3
**recess** [1] - 35:23
**recited** [1] - 15:9
**recognition** [1] - 42:25
**recognize** [4] - 25:22, 61:12, 112:18, 123:8
**recognized** [5] - 25:18, 27:15, 47:13, 47:22, 76:16
**recognizing** [1] - 90:14
**recollection** [2] - 105:12, 120:14
**reconcile** [2] - 30:20, 60:20
**record** [2] - 3:6, 113:23
**redacted** [1] - 85:2
**redress** [3] - 97:14, 101:13, 106:6
**redundancies** [2] - 51:10, 52:20
**redundancy** [1] - 41:14
**redundant** [2] - 52:3, 52:12
**Reed** [8] - 15:21, 88:15, 94:1, 94:10, 94:15, 94:23, 98:4
**refer** [3] - 41:2, 63:24, 93:13
**referral** [1] - 105:24
**reflects** [1] - 111:1
**refusal** [4] - 73:23, 118:21, 119:20, 121:16
**refuse** [1] - 19:17
**refused** [3] - 74:21,

114:24, 116:8
**refuses** [1] - 68:23
**refusing** [1] - 75:20
**regard** [1] - 57:21
**regarded** [1] - 29:24
**regarding** [1] - 117:10
**regime** [1] - 10:9
**regulated** [6] - 99:2, 103:14, 120:10, 120:15, 121:3, 121:12
**regulated-regulator -type** [1] - 121:12
**regulations** [1] - 103:8
**regulator** [1] - 121:12
**regulatory** [4] - 102:23, 102:24, 103:11, 104:18
**reiterate** [1] - 42:9
**rejected** [1] - 94:10
**rejecting** [1] - 57:13
**rejects** [1] - 112:11
**related** [3] - 12:3, 22:4, 108:12
**relatedly** [1] - 106:4
**relating** [3] - 52:1, 52:16, 59:13
**relationship** [1] - 121:13
**relationships** [1] - 100:16
**relatively** [2] - 89:19, 118:5
**relevance** [2] - 40:4, 89:17
**relevant** [6] - 36:2, 58:1, 72:11, 83:20, 89:20, 128:18
**reliance** [2] - 38:20, 51:4
**relied** [3] - 46:18, 76:23, 110:10
**relief** [9] - 29:23, 107:8, 108:19, 108:23, 110:17, 115:24, 116:9, 116:11, 116:19
**rely** [4] - 17:17, 23:18, 39:4, 103:1
**relying** [3] - 61:5, 111:15, 123:23
**remaining** [2] - 3:18, 127:13
**remarked** [1] - 51:7
**remedial** [2] - 55:17, 56:6
**remedies** [2] - 75:15, 111:8

**remedy** [12] - 30:2, 60:7, 74:18, 75:6, 75:23, 91:12, 109:1, 110:20, 111:2, 112:18, 122:15, 123:3
**remind** [2] - 40:10, 80:25
**remotely** [1] - 48:9
**removal** [4] - 9:11, 37:1, 73:17, 112:8
**remove** [3] - 8:22, 47:7, 55:18
**removed** [10] - 24:18, 35:6, 44:4, 46:21, 48:1, 52:7, 54:17, 58:20, 58:25, 76:9
**repair** [1] - 93:17
**repeal** [1] - 80:20
**repeals** [1] - 52:25
**repeated** [1] - 57:7
**reply** [1] - 129:14
**Report** [2] - 47:10, 47:17
**REPORTED** [1] - 2:4
**REPORTER** [3] - 7:6, 25:4, 33:7
**Reporter** [2] - 2:5, 131:12
**reporting** [4] - 69:3, 99:23, 100:12
**Representative** [1] - 66:4
**REPRESENTATIVE S** [2] - 1:4, 1:18
**Representatives** [4] - 3:3, 3:8, 8:19, 10:1
**represented** [1] - 53:7
**republic** [2] - 6:21, 20:24
**repudiation** [1] - 18:8
**request** [5] - 67:1, 67:16, 84:25, 85:13, 90:6
**requested** [3] - 116:1, 116:9, 124:7
**requests** [2] - 87:20, 106:10
**require** [3] - 21:15, 42:14, 115:1
**required** [6] - 84:1, 84:12, 107:20, 111:10, 112:22, 114:19
**requirement** [14] - 10:25, 35:7, 37:1, 44:4, 46:5, 46:17, 48:2, 48:5, 52:6, 69:3,

148

99:23, 100:12, 112:1, 112:19

**requirements** [1] - 100:13

**requires** [5] - 8:3, 67:15, 67:21, 68:16, 128:20

**rereading** [1] - 106:21

**reserve** [1] - 117:9

**resistance** [1] - 24:15

**Resolution** [6] - 63:14, 64:13, 64:16, 66:1, 66:12

**resolution** [4] - 8:4, 11:19, 29:8, 98:8

**resolve** [2] - 7:12, 100:15

**resolved** [1] - 97:11

**resolving** [1] - 90:18

**respect** [14] - 49:11, 49:16, 50:19, 53:11, 53:21, 54:17, 54:23, 56:21, 65:12, 65:16, 83:19, 109:2, 119:9, 126:12

**respectfully** [2] - 86:15, 124:18

**respects** [2] - 52:19, 74:19

**respond** [3] - 95:21, 117:22, 127:16

**responding** [1] - 21:21

**response** [3] - 106:3, 129:19, 129:22

**responses** [2] - 72:12, 77:7

**responsibility** [1] - 30:4

**rest** [2] - 45:10, 66:1

**resting** [1] - 4:1

**restrictions** [1] - 73:16

**result** [2] - 101:24, 111:11

**retort** [1] - 111:19

**return** [7] - 67:1, 67:14, 116:7, 124:7, 128:22

**returns** [13] - 14:14, 67:1, 67:14, 83:15, 83:18, 83:24, 84:8, 84:10, 84:18, 85:12, 85:19, 85:21, 128:21

**review** [9] - 87:10, 87:22, 95:7, 98:20, 105:14, 105:16, 106:13, 106:16, 107:7

**revised** [1] - 52:6

**revolution** [2] - 21:9, 24:2

**revolutionary** [2] - 24:7, 36:24

**rid** [1] - 55:9

**ridiculous** [1] - 125:10

**rights** [19] - 10:14, 28:2, 29:10, 72:7, 89:21, 90:23, 96:8, 96:14, 96:21, 96:25, 97:2, 97:15, 97:21, 97:22, 112:4, 113:1, 113:17, 117:9, 123:5

**risk** [1] - 7:21

**Roger** [1] - 4:4

**role** [1] - 97:20

**Room** [2] - 2:7, 131:14

**Roosevelt** [1] - 12:14

**round** [1] - 6:8

**rule** [5] - 26:2, 62:22, 65:11, 65:13, 127:6

**Rule** [5] - 62:15, 62:19, 62:23, 62:25, 90:10

**rule-making** [1] - 65:11

**rulemaking** [4] - 118:23, 119:8, 119:17, 120:24

**rules** [7] - 14:2, 63:13, 64:19, 65:4, 65:13, 66:11, 66:15

**ruling** [5] - 50:13, 71:6, 87:23, 117:2, 127:7

**Rumsfeld** [2] - 86:20, 86:24

**run** [2] - 58:11, 98:15

**running** [1] - 6:19

---
**S**
---

**sake** [1] - 83:24

**Samson** [1] - 31:11

**sand** [1] - 24:8

**Santander** [1] - 81:19

**satisfied** [7] - 50:9, 58:10, 59:6, 84:8, 106:3, 115:9, 116:5

**satisfy** [4] - 50:12, 109:6, 121:7, 129:6

**saw** [1] - 99:21

**scale** [1] - 61:1

**Scalia** [1] - 7:15

**Scalia's** [1] - 19:3

**scheme** [9] - 55:17, 56:6, 56:19, 83:2, 105:17, 105:21, 118:19, 121:4, 121:14

**scope** [1] - 128:24

**sea** [1] - 25:16

**second** [3] - 39:7, 96:4, 108:2

**Secretary** [10] - 9:1, 66:25, 67:15, 68:23, 87:14, 88:1, 114:22, 114:24, 115:2, 121:11

**section** [4] - 41:2, 50:1, 50:3, 52:11, 79:3

**Section** [18] - 48:15, 49:10, 50:8, 50:16, 51:6, 51:25, 52:8, 66:24, 99:7, 100:23, 106:1, 106:9, 106:14, 107:11, 114:20, 118:6, 125:25, 126:2

**sections** [2] - 5:13, 82:22

**see** [7] - 4:20, 45:11, 82:4, 89:4, 99:25, 113:7, 128:21

**seek** [10] - 14:7, 29:23, 51:19, 63:11, 74:18, 74:25, 75:5, 87:10, 91:11, 97:14

**seeking** [12] - 87:15, 87:22, 91:2, 96:24, 97:2, 98:9, 99:22, 106:5, 111:7, 111:16, 113:15

**seeks** [1] - 84:2

**seem** [2] - 8:11, 44:9

**Select** [7] - 21:2, 32:3, 46:3, 46:8, 47:3, 50:11, 92:13

**Senate** [57] - 4:21, 6:4, 9:3, 21:2, 23:13, 32:3, 34:9, 34:20, 35:2, 35:22, 36:16, 40:17, 40:20, 40:25, 41:6, 42:4, 42:5, 46:3, 46:8, 47:3, 47:13, 47:17, 48:16, 50:10, 50:17, 50:23, 51:18, 53:7, 53:12, 53:24, 54:4, 54:6, 54:9, 54:11, 54:18, 55:10, 55:17, 56:7, 56:18, 56:19, 56:20, 57:3, 57:6, 57:18, 57:20, 77:16, 78:16, 79:14, 80:8, 92:13, 98:8, 102:13, 102:15, 106:15, 113:5, 125:23

**senator** [2] - 94:25, 98:7

**send** [2] - 87:25, 91:10

**sending** [3] - 22:13, 76:1, 129:15

**sense** [3] - 33:20, 59:10, 78:1, 84:4, 97:1, 101:1, 117:18, 120:15, 122:8

**sensible** [1] - 36:5

**sensitive** [1] - 101:22

**sensitivities** [1] - 104:1

**sentence** [2] - 52:2, 52:12

**sentences** [2] - 25:13, 25:25

**separate** [8] - 26:25, 50:1, 50:3, 68:7, 68:13, 70:16, 71:3, 95:25

**separation** [10] - 8:2, 10:24, 12:23, 23:10, 25:23, 29:21, 31:15, 73:7, 93:4, 104:10

**separation-of-powers** [5] - 8:2, 10:24, 25:23, 93:4, 104:10

**Serena** [1] - 3:15

**SERENA** [1] - 1:22

**Sergeant** [4] - 75:19, 76:1, 88:1, 90:16

**series** [1] - 8:15

**serious** [5] - 4:20, 41:9, 89:3, 107:14, 108:11

**seriously** [1] - 109:4, 127:25

**serves** [1] - 112:4

**Service** [1] - 52:2

**Services** [1] - 110:13

**set** [10] - 63:9, 66:14, 83:16, 107:13, 108:15, 117:15, 118:19, 123:3, 125:12, 126:15

**sets** [2] - 55:16, 65:13

**setting** [2] - 19:8, 64:17

**settlement** [1] - 85:8

**several** [1] - 9:20

**shall** [4] - 52:14, 66:25, 107:12, 108:18

**Shapiro** [1] - 3:15

**SHAPIRO** [1] - 1:22

**shifting** [2] - 72:21,

72:22

**Shipbuilding** [1] - 101:11

**shoes** [1] - 96:3

**short** [1] - 80:7

**show** [3] - 24:12, 25:1, 106:12

**shows** [1] - 105:1

**sic** [2] - 52:10, 53:18

**side** [1] - 125:7

**significance** [1] - 19:8

**significant** [2] - 42:6, 80:14

**similar** [8] - 57:9, 60:14, 86:4, 88:22, 93:3, 96:17, 104:8, 113:20

**similarly** [1] - 120:6

**simple** [1] - 45:13

**simpler** [1] - 38:1

**simply** [6] - 9:2, 33:16, 51:11, 57:25, 92:19, 108:17

**single** [2] - 23:20, 71:10

**Sirica** [4] - 12:1, 46:1, 46:2, 46:18

**Sirica's** [1] - 50:13

**sit** [1] - 45:6

**sitting** [3] - 110:13, 110:20, 112:17

**situation** [7] - 28:16, 44:20, 51:3, 56:25, 87:14, 120:18, 123:4

**six** [1] - 76:23

**skepticism** [2] - 86:13, 109:15

**slam** [1] - 101:20

**slam-dunk** [1] - 101:20

**slate** [3] - 20:14, 40:9, 78:12

**slightly** [1] - 37:8

**slow** [4] - 7:7, 10:15, 25:4, 33:8

**slower** [1] - 48:25

**slowly** [1] - 77:12

**smart** [1] - 102:8

**solely** [1] - 10:13

**Solicitor** [1] - 112:5

**solution** [1] - 124:19

**someone** [4] - 16:21, 28:1, 95:16, 96:18

**sometimes** [1] - 43:1

**somewhat** [2] - 105:14, 106:4

**sorry** [15] - 6:14, 10:15, 11:1, 12:8, 16:14, 37:10, 42:5,

46:2, 48:18, 78:19, 79:11, 79:15, 86:24, 95:22, 129:13

**sort** [16] - 14:18, 23:25, 25:13, 26:14, 27:10, 30:18, 43:13, 44:15, 72:16, 73:23, 95:15, 107:24, 107:25, 108:7, 121:12, 124:16

**sorts** [3] - 16:3, 20:11, 33:17

**sought** [7] - 3:25, 67:13, 75:15, 76:18, 92:4, 92:9, 115:25

**sounds** [2] - 70:6, 99:15

**source** [2] - 67:2, 67:4

**sources** [1] - 110:7

**Souter** [1] - 7:19

**south** [1] - 98:7

**sovereign** [2] - 104:9, 104:12

**Speaker** [2] - 62:10, 64:7

**speaking** [3] - 17:10, 23:15, 109:20

**speaks** [3] - 10:2, 48:24, 62:17

**special** [1] - 98:7

**specific** [28] - 4:9, 6:4, 34:9, 41:22, 44:21, 45:3, 45:9, 50:17, 50:21, 50:22, 51:14, 53:2, 53:18, 53:19, 54:15, 55:16, 55:20, 56:3, 56:10, 56:11, 61:4, 64:5, 92:11, 95:15, 97:8, 113:18, 114:16, 123:1

**specifically** [6] - 39:1, 42:4, 47:14, 93:25, 102:4, 121:9

**spend** [1] - 83:11

**sponte** [2] - 58:14, 59:10

**square** [1] - 6:8

**squarely** [1] - 91:23

**Staff** [1] - 84:19

**staff** [2] - 68:25, 69:6

**staffer** [1] - 65:7

**stage** [2] - 67:18, 107:2

**stake** [4] - 8:18, 27:22, 90:24, 112:4

**stand** [2] - 79:24, 87:17

**standards** [1] - 114:14

**standing** [35] - 3:17, 4:24, 8:3, 10:8, 10:25, 13:8, 25:14, 25:23, 26:19, 27:6, 29:1, 29:4, 29:13, 29:14, 29:15, 29:17, 30:13, 31:14, 49:11, 49:25, 50:4, 61:22, 62:2, 69:11, 69:17, 69:22, 70:25, 71:7, 71:10, 71:13, 74:24, 83:13, 96:3

**Standing** [1] - 71:4

**stands** [1] - 85:10

**Stanton** [1] - 9:1

**start** [7] - 86:2, 99:14, 100:3, 110:11, 128:3, 128:9

**started** [1] - 75:12

**state** [5] - 39:8, 52:10, 80:19, 120:4, 122:8

**State** [1] - 71:20

**statement** [1] - 86:20

**statements** [1] - 83:13

**states** [4] - 103:2, 103:3, 103:9, 103:10

**STATES** [5] - 1:1, 1:4, 1:7, 1:13, 2:1

**States** [27] - 2:5, 3:2, 3:3, 3:14, 17:10, 24:1, 38:21, 46:22, 54:18, 57:14, 58:23, 59:7, 59:15, 70:2, 82:17, 98:7, 99:2, 99:3, 99:8, 100:24, 101:8, 103:8, 103:12, 103:16, 118:9, 122:23, 131:13

**States-initiated** [1] - 38:21

**statute** [54] - 11:5, 36:9, 41:15, 43:2, 43:3, 43:22, 44:3, 44:9, 44:10, 44:21, 44:22, 46:7, 47:3, 47:14, 48:8, 48:14, 60:15, 60:17, 60:18, 61:4, 67:14, 68:16, 68:21, 69:1, 69:7, 77:15, 80:17, 80:23, 81:8, 83:4, 97:6, 99:1, 99:4, 101:6, 101:19, 104:4, 105:25, 106:7, 108:17, 110:19, 114:19, 114:25, 115:2, 115:9, 115:19, 116:2, 116:6, 119:21, 121:9, 122:13, 123:2, 123:5, 125:4

**statutes** [15] - 34:1, 42:8, 42:21, 43:7, 43:9, 44:8, 45:3, 45:4, 92:9, 93:15, 101:5, 103:8, 105:23, 106:14, 126:4

**statutory** [39] - 3:17, 5:8, 7:10, 24:5, 27:4, 27:8, 32:20, 38:4, 38:13, 42:15, 42:18, 45:12, 57:7, 58:13, 61:2, 67:4, 68:7, 68:13, 69:4, 73:12, 74:20, 77:13, 82:5, 82:10, 83:2, 83:5, 93:23, 105:17, 113:18, 113:21, 113:24, 114:1, 114:15, 121:14, 122:18, 122:20, 123:12, 123:18

**stay** [1] - 95:17

**Steel** [1] - 26:14

**steer** [1] - 26:18

**stenographic** [1] - 131:5

**step** [4] - 6:23, 34:16, 95:8, 103:6

**STEVEN** [1] - 1:21

**Steven** [1] - 3:15

**still** [7] - 5:20, 48:5, 50:19, 54:16, 82:17, 123:17, 123:18

**Stone** [1] - 4:4

**stood** [1] - 113:14

**stop** [2] - 113:16, 121:23

**story** [4] - 35:5, 35:9, 36:2, 104:3

**strange** [1] - 39:14

**Street** [1] - 1:24

**strikes** [3] - 84:22, 102:25, 106:22

**strong** [5] - 4:23, 26:12, 54:22, 98:22, 106:22

**strongest** [1] - 98:21

**strongly** [3] - 31:9, 70:20, 115:10

**structure** [2] - 7:4, 7:9

**structured** [1] - 104:17

**study** [1] - 37:12

**stuff** [1] - 23:8

**sua** [2] - 58:14, 59:10

**subcommittee** [2] - 84:2, 84:24

**subject** [17] - 4:10, 4:15, 9:11, 21:10,

27:9, 49:20, 53:5, 57:8, 58:13, 69:10, 76:4, 76:7, 93:9, 102:23, 115:17, 123:18, 127:10

**subject-matter** [12] - 4:10, 4:15, 49:20, 53:5, 57:8, 58:13, 69:10, 76:4, 76:7, 115:17, 123:18, 127:10

**submission** [1] - 117:10

**submit** [8] - 32:12, 38:10, 118:22, 119:8, 119:16, 120:24, 124:18, 125:21

**subpoena** [58] - 11:7, 11:13, 11:21, 13:3, 13:11, 13:12, 15:9, 16:2, 16:25, 21:17, 28:6, 28:11, 28:19, 28:22, 30:9, 33:13, 34:17, 41:7, 47:16, 49:21, 49:23, 51:19, 53:2, 55:3, 56:1, 56:15, 57:2, 57:5, 59:18, 62:20, 63:11, 65:16, 68:6, 70:5, 71:12, 74:19, 75:21, 76:10, 76:17, 77:19, 82:1, 87:20, 88:20, 91:13, 93:1, 94:11, 94:16, 95:12, 95:16, 95:17, 96:18, 98:10, 113:12, 113:16, 113:19, 114:2

**subpoena's** [1] - 30:12

**subpoenaed** [1] - 51:15

**subpoenaing** [3] - 4:16, 15:12, 75:10

**subpoenas** [55] - 4:18, 15:20, 16:19, 20:22, 21:7, 21:13, 21:22, 22:13, 23:16, 23:17, 35:3, 35:4, 46:9, 50:16, 50:18, 50:23, 51:1, 53:2, 53:21, 54:23, 55:1, 55:17, 56:20, 56:21, 61:5, 69:24, 69:25, 73:21, 73:22, 73:24, 74:10, 74:25, 75:3, 75:18, 78:8, 79:17, 88:9, 88:18, 90:6, 90:9, 90:10, 90:12, 90:14, 91:10, 93:21, 94:2, 94:3, 94:7,

97:10, 105:5, 106:9

**Subsection** [5] - 35:25, 36:1, 36:2, 36:4, 36:15

**subsequent** [3] - 31:15, 33:2, 60:17

**substance** [1] - 77:23

**substantial** [3] - 28:22, 84:4, 107:25

**substantive** [2] - 86:17, 123:21

**successfully** [1] - 24:25

**sudden** [3] - 21:23, 24:22, 24:24

**suddenly** [2] - 21:12, 37:2

**sue** [37] - 9:15, 18:11, 26:4, 28:3, 28:21, 36:16, 38:8, 38:13, 46:9, 47:20, 48:13, 69:22, 71:18, 79:15, 79:21, 87:7, 87:14, 95:12, 96:18, 99:2, 99:5, 102:11, 102:14, 103:16, 106:2, 106:5, 106:15, 110:15, 118:19, 119:10, 120:3, 121:23, 122:2, 125:24, 126:5

**sued** [8] - 9:2, 9:3, 27:25, 28:4, 51:14, 102:7, 118:16

**sufficient** [3] - 19:19, 19:20, 47:23

**suggest** [4] - 27:1, 30:24, 54:8, 128:7

**suggested** [3] - 11:6, 31:1, 109:15

**suggesting** [4] - 4:23, 5:9, 6:1, 112:14

**suggestion** [1] - 128:18

**suggestions** [1] - 120:3

**suggests** [2] - 60:17, 120:6

**suing** [7] - 11:20, 11:21, 17:19, 22:8, 97:18, 97:19, 122:13

**suit** [15] - 9:22, 35:2, 35:22, 38:1, 46:4, 53:23, 53:24, 59:14, 59:15, 81:14, 101:16, 102:16, 104:20, 113:15

**Suite** [1] - 2:2

**suits** [11] - 38:6,

39:12, 42:13, 44:17, 46:21, 50:19, 59:6, 80:9, 80:11, 80:12, 101:12

**summary** [2] - 27:12, 125:1
**superfluous** [5] - 34:24, 41:21, 92:21, 106:15, 126:9
**supervisors'** [1] - 128:23
**supplement** [1] - 117:17
**support** [2] - 19:20, 78:11
**suppose** [1] - 90:22
**supposed** [7] - 12:22, 19:9, 23:3, 43:7, 43:8, 88:24, 106:23
**supremacy** [1] - 103:7
**Supreme** [29] - 9:24, 10:23, 15:20, 20:16, 25:21, 26:13, 31:14, 43:6, 44:25, 67:23, 68:15, 71:20, 73:9, 75:16, 76:21, 80:18, 81:16, 87:2, 88:16, 89:19, 93:25, 94:5, 101:10, 105:15, 112:7, 112:11, 114:8, 121:20, 121:21
**surely** [4] - 103:4, 103:21, 114:23, 121:15
**surprising** [2] - 19:25, 55:10
**survives** [1] - 115:5
**susceptible** [1] - 105:4
**symmetrical** [1] - 97:1
**symmetrically** [1] - 97:3
**system** [2] - 8:10, 10:7

---

# T

**table** [1] - 3:9
**take-back** [1] - 127:5
**talks** [2] - 72:4, 101:11
**target** [1] - 95:16
**targeted** [1] - 92:8
**Tatel's** [1] - 65:15
**Tatelman** [1] - 3:10
**TATELMAN** [1] -

---

1:17
**Tax** [1] - 106:4
**tax** [16] - 14:13, 67:1, 67:13, 83:15, 83:18, 83:24, 84:8, 84:10, 84:18, 85:12, 85:19, 85:20, 106:7, 116:7, 124:7, 128:21
**taxpayers** [1] - 106:5
**team** [1] - 45:10
**technical** [2] - 8:11, 47:7
**technically** [1] - 96:5
**Ted** [1] - 17:14
**tempted** [1] - 39:20
**ten** [1] - 60:8
**tension** [1] - 7:24
**tenuous** [1] - 58:8
**Tenure** [2] - 8:21, 9:4
**terms** [10] - 41:11, 57:5, 59:15, 62:6, 64:6, 68:21, 73:2, 74:9, 119:18, 124:8
**territory** [2] - 110:3, 123:11
**text** [6] - 34:14, 35:10, 38:11, 43:8, 43:9, 43:24
**textual** [1] - 82:21
**textualism** [1] - 45:2
**THE** [188] - 1:1, 1:7, 1:12, 1:16, 1:21, 2:1, 2:1, 3:1, 3:12, 3:20, 4:2, 4:6, 7:6, 11:2, 13:22, 15:3, 16:12, 16:16, 16:18, 17:7, 17:16, 17:20, 17:24, 19:23, 21:24, 22:12, 22:18, 24:6, 24:10, 25:4, 25:7, 25:9, 26:6, 26:17, 26:21, 28:25, 31:1, 32:7, 33:7, 33:25, 34:5, 34:8, 34:11, 35:14, 35:17, 35:20, 37:9, 38:15, 38:25, 39:18, 40:10, 42:20, 42:24, 44:6, 45:14, 45:18, 45:21, 46:23, 47:1, 48:21, 49:1, 49:3, 49:5, 53:7, 53:22, 54:2, 54:8, 55:4, 56:22, 58:7, 60:13, 61:8, 61:24, 62:13, 63:4, 63:14, 63:19, 63:22, 64:2, 64:12, 64:22, 66:17, 66:21, 67:2, 67:24, 68:3, 69:8, 70:6, 71:25, 74:6, 75:7, 77:2, 77:8, 77:11,

---

78:2, 78:19, 78:22, 79:1, 79:5, 79:9, 79:19, 80:1, 80:25, 82:12, 82:15, 83:7, 83:9, 84:14, 85:24, 86:2, 86:6, 86:24, 87:12, 87:25, 89:15, 90:13, 91:7, 93:1, 93:10, 93:20, 94:5, 94:14, 94:23, 95:2, 95:6, 95:10, 95:20, 96:16, 97:4, 97:25, 98:5, 98:9, 98:12, 98:18, 98:21, 98:24, 99:15, 99:20, 100:5, 102:1, 102:7, 102:17, 102:25, 103:18, 104:5, 104:8, 105:3, 105:10, 106:18, 106:21, 107:1, 107:17, 107:20, 109:10, 109:12, 111:14, 113:4, 114:5, 115:4, 115:20, 116:10, 116:14, 116:16, 116:21, 117:12, 117:14, 117:23, 117:25, 118:22, 119:2, 119:11, 120:7, 120:25, 121:17, 122:4, 122:14, 123:16, 123:23, 124:3, 124:12, 125:3, 127:2, 127:4, 127:19, 129:8, 129:12, 129:23, 130:1
**themselves** [2] - 40:21, 102:8
**then-Judge** [1] - 8:7
**theory** [4] - 55:4, 55:5, 77:14, 79:13
**therefore** [6] - 26:23, 27:20, 115:18, 120:11, 120:17, 126:10
**therein** [1] - 45:9
**They've** [1] - 112:12
**they've** [8] - 5:22, 17:8, 25:2, 29:18, 76:18, 90:14, 104:25, 106:22
**thinking** [4] - 11:12, 15:5, 78:13, 128:8
**thinks** [5] - 13:17, 23:13, 42:13, 87:19, 101:19
**third** [2] - 96:4, 99:23
**third-party** [1] - 96:4
**Thomas** [2] - 7:16,

---

19:4
**thorough** [1] - 105:21
**thoughtfully** [1] - 84:20
**thoughts** [3] - 4:8, 6:10, 6:14
**threatened** [1] - 12:3
**threatening** [1] - 12:6
**three** [6] - 10:1, 12:17, 16:20, 95:7, 98:19, 116:24
**threshold** [1] - 125:16
**throughout** [2] - 24:21, 75:9
**thumb** [1] - 61:1
**timing** [2] - 20:3, 43:16
**Title** [2] - 81:11, 82:22
**title** [2] - 71:4, 81:10
**today** [12] - 3:25, 6:18, 17:6, 18:17, 20:15, 28:15, 36:10, 74:6, 82:10, 83:5, 104:25, 122:10
**TODD** [1] - 1:17
**Todd** [1] - 3:10
**together** [7] - 12:10, 33:20, 34:2, 43:24, 81:20, 82:20, 110:8
**took** [4] - 6:23, 66:5, 108:12, 108:13
**tool** [1] - 103:16
**tools** [7] - 7:12, 16:4, 19:11, 20:21, 23:1, 24:24, 88:18
**top** [1] - 60:22
**topic** [2] - 19:1, 124:16
**totally** [1] - 16:6
**touch** [3] - 38:16, 46:12, 73:25
**tough** [2] - 5:5, 34:2
**trademarks** [1] - 52:17
**tradition** [15] - 88:13, 88:21, 88:23, 90:5, 90:7, 90:8, 90:12, 91:1, 91:16, 91:19, 94:20, 97:13, 97:17, 126:24
**traditionally** [1] - 65:5
**train** [2] - 16:10, 16:18
**transcript** [2] - 131:5, 131:6

---

**TRANSCRIPT** [1] - 1:12
**treading** [1] - 109:17
**Treasury** [3] - 3:4, 114:22, 121:11
**TREASURY** [1] - 1:8
**treated** [1] - 92:3
**treaties** [1] - 82:17
**Treaty** [1] - 12:4
**TREVOR** [1] - 1:12
**trial** [2] - 4:4, 90:11
**tribes** [1] - 44:18, 120:4
**tried** [2] - 12:16, 12:19
**trophies** [1] - 120:16
**trouble** [2] - 36:12, 43:20
**true** [15] - 19:2, 27:11, 29:12, 62:24, 68:20, 73:20, 74:5, 74:10, 75:4, 75:14, 77:17, 112:16, 124:23, 131:4, 131:5
**Truman** [1] - 12:14
**try** [7] - 16:4, 43:24, 43:25, 55:6, 88:1, 88:3, 124:14
**trying** [12] - 6:8, 14:12, 30:6, 37:2, 57:20, 78:19, 79:13, 80:23, 82:9, 91:17, 101:25, 103:25
**turn** [9] - 12:3, 32:16, 48:20, 83:18, 87:9, 95:4, 98:16, 100:22, 106:23
**two** [32] - 5:13, 7:3, 8:3, 12:17, 16:7, 16:22, 17:2, 21:1, 22:25, 25:20, 26:25, 27:5, 31:16, 35:24, 42:20, 43:4, 47:18, 47:25, 48:4, 57:16, 60:19, 77:6, 77:9, 77:12, 78:15, 85:23, 95:25, 99:10, 107:23, 124:16, 125:24, 127:4
**Tyler** [2] - 12:11, 12:12
**type** [10] - 4:24, 42:4, 55:25, 71:5, 106:19, 112:2, 114:18, 121:12, 123:4, 127:20
**types** [7] - 39:16, 41:25, 72:5, 111:9, 112:15, 114:14, 128:25
**typical** [1] - 11:4
**typically** [1] - 100:25

## U

**U.S** [2] - 1:18, 1:23
**ultimate** [1] - 30:2
**ultra** [3] - 116:13, 116:17, 117:25
**unauthorized** [1] - 106:6
**uncertain** [2] - 68:21, 124:8
**uncharted** [1] - 123:11
**unclear** [1] - 101:20
**uncommon** [1] - 113:12
**unconstitutional** [2] - 9:4, 16:23
**under** [78] - 6:25, 7:1, 10:9, 12:23, 13:5, 29:21, 30:22, 38:22, 45:22, 49:20, 50:5, 50:13, 51:2, 52:1, 52:9, 52:15, 52:20, 52:22, 53:3, 53:4, 53:5, 53:22, 53:24, 53:25, 54:4, 54:12, 56:16, 57:15, 58:4, 59:3, 59:11, 59:13, 59:20, 60:2, 60:8, 65:11, 67:7, 69:1, 69:6, 79:22, 82:16, 89:11, 92:20, 93:9, 94:6, 101:17, 102:20, 104:20, 105:4, 105:13, 105:15, 106:22, 107:5, 110:18, 110:21, 111:2, 112:9, 113:24, 114:18, 115:19, 116:1, 118:2, 118:16, 119:10, 120:3, 121:8, 121:14, 121:21, 122:2, 122:13, 123:1, 123:10, 126:25, 127:11
**underlay** [1] - 8:1
**underlying** [2] - 10:24, 123:19
**underscoring** [1] - 59:22
**understood** [11] - 17:20, 59:3, 59:14, 60:1, 70:23, 75:5, 77:15, 113:9, 113:11, 114:23, 125:2
**undisputable** [2] - 107:8, 116:6
**unhappy** [3] - 100:19, 100:20, 101:3

**unique** [1] - 74:19
**uniquely** [1] - 126:20
**UNITED** [5] - 1:1, 1:4, 1:7, 1:13, 2:1
**united** [1] - 2:5
**United** [26] - 3:2, 3:3, 3:14, 17:10, 24:1, 38:21, 46:22, 54:17, 57:14, 58:23, 59:6, 59:15, 70:2, 82:17, 98:7, 99:2, 99:3, 99:8, 100:24, 101:8, 103:8, 103:12, 103:16, 118:8, 122:22, 131:13
**universal** [2] - 101:11, 124:19
**unless** [8] - 32:17, 33:5, 35:12, 48:19, 62:16, 62:23, 80:10, 98:16
**unnecessary** [1] - 110:2
**unprecedented** [4] - 16:6, 73:23, 74:9, 114:24
**untenable** [1] - 40:24
**unusual** [4] - 29:16, 56:23, 121:4, 123:8
**up** [35] - 11:14, 16:21, 22:18, 26:18, 26:22, 35:11, 35:14, 35:16, 36:1, 36:5, 39:2, 44:19, 49:5, 49:12, 55:16, 58:15, 62:2, 63:9, 64:17, 65:13, 65:23, 66:15, 71:16, 77:6, 85:4, 85:10, 86:23, 90:15, 97:5, 97:7, 100:6, 113:14, 118:19, 123:3, 125:10
**upend** [1] - 22:11
**upheaval** [1] - 22:8
**upshot** [1] - 126:7
**urge** [1] - 115:10
**urged** [1] - 57:14
**US** [7] - 3:8, 33:19, 43:22, 78:12, 81:10, 92:24, 120:17
**USA** [1] - 81:19
**USC** [10] - 49:20, 92:15, 99:7, 100:23, 101:9, 106:1, 106:14, 125:25, 126:2
**uses** [2] - 107:12, 108:18
**utilize** [1] - 104:13

## V

**vacuum** [1] - 103:24
**Valeo** [1] - 29:22
**valid** [1] - 115:12
**validity** [1] - 75:17
**value** [2] - 17:18, 41:24
**variety** [1] - 52:16
**various** [3] - 46:16, 56:9, 75:13
**vast** [1] - 20:25
**vehicle** [1] - 119:22
**version** [1] - 44:19
**versus** [28] - 3:3, 7:1, 7:14, 8:8, 9:10, 10:4, 10:12, 12:1, 13:13, 14:19, 15:21, 18:24, 19:5, 20:3, 20:5, 29:22, 31:11, 31:23, 46:1, 46:3, 73:16, 80:17, 81:18, 86:20, 86:24, 94:12, 96:14, 119:5
**vested** [1] - 8:22
**veto** [2] - 9:12, 19:16
**veto-proof** [1] - 19:16
**viable** [2] - 109:16, 109:23
**view** [7] - 17:5, 17:6, 17:14, 18:10, 20:11, 108:22, 124:11
**views** [1] - 17:18
**vindicate** [1] - 113:17
**violated** [1] - 96:22
**violation** [12] - 107:9, 108:7, 108:23, 110:15, 110:17, 110:22, 111:11, 112:16, 112:18, 124:10, 124:21, 126:10
**vires** [3] - 116:13, 116:17, 117:25
**Virginia** [1] - 2:3
**vis-à-vis** [3] - 16:23, 55:11, 89:21
**vital** [1] - 7:22
**voices** [1] - 120:12
**voluntarily** [1] - 127:12
**vote** [12] - 21:15, 24:18, 61:12, 62:25, 63:1, 63:15, 63:16, 63:22, 63:25, 64:9, 64:24, 66:5
**voted** [1] - 14:22

**vs** [1] - 1:6

## W

**wait** [1] - 87:9
**waive** [2] - 32:25, 40:2
**walk** [2] - 110:6, 118:4
**Wall** [4] - 6:15, 13:6, 61:15, 76:17
**wants** [7] - 19:21, 21:14, 23:18, 28:22, 38:6, 127:16, 129:23
**War** [1] - 9:1
**Washington** [10] - 1:7, 1:19, 1:25, 2:7, 12:3, 12:7, 12:8, 12:9, 22:16, 131:14
**water** [2] - 30:22, 48:11
**Ways** [3] - 3:2, 121:10, 122:25
**ways** [2] - 16:20, 120:18
**WAYS** [1] - 1:3
**weigh** [1] - 73:13
**weighed** [4] - 58:2, 73:19, 76:19, 126:17
**weighing** [1] - 75:1
**weighs** [1] - 70:20
**weird** [2] - 40:20, 40:23
**welcome** [1] - 127:17
**well-written** [1] - 4:13
**whatnot** [2] - 46:10, 46:22
**whatsoever** [1] - 43:21
**whereas** [2] - 13:24, 37:5
**White** [1] - 68:25
**whole** [7] - 25:14, 56:23, 58:16, 71:13, 83:21, 123:17, 124:25
**widely** [1] - 15:24
**WILLIAM** [2] - 2:1
**willing** [5] - 54:3, 54:6, 127:14, 129:3, 129:17
**willpower** [1] - 47:23
**Wilson** [1] - 2:2
**win** [1] - 78:5
**Windsor** [2] - 7:16, 19:3
**wipe** [1] - 56:8
**wise** [1] - 127:21
**wisely** [1] - 67:22

**withdraw** [2] - 109:24, 129:18
**withdrawn** [2] - 17:7, 17:8
**withhold** [1] - 19:13
**witness** [1] - 55:22
**wonder** [1] - 65:3
**word** [2] - 107:12, 108:18
**words** [3] - 59:1, 67:23, 124:20
**works** [10] - 23:11, 35:12, 45:2, 62:14, 85:4, 87:3, 100:25, 107:7, 108:6, 110:8
**world** [1] - 44:2
**worried** [2] - 87:6, 109:25
**worse** [4] - 27:18, 40:7, 40:21, 41:20
**wrestle** [2] - 31:7, 40:5
**wring** [1] - 16:4
**writing** [2] - 20:14, 117:16
**written** [4] - 4:13, 67:16, 82:9, 121:11
**wrongly** [1] - 7:3
**wrote** [1] - 40:14

## Y

**year** [1] - 47:25
**years** [22] - 5:25, 6:21, 14:13, 16:7, 17:6, 22:8, 22:13, 24:25, 25:20, 31:16, 44:3, 47:18, 47:25, 48:4, 51:18, 55:21, 57:16, 60:8, 74:5, 78:15, 80:18
**yourself** [1] - 94:12
**yourselves** [1] - 3:6

## Z

**Ziglar** [1] - 126:13
**Zivotifsky** [1] - 73:9