**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE ON WAYS AND MEANS, UNITED STATES HOUSE OF REPRESENTATIVES, *Plaintiff*, v. UNITED STATES DEPARTMENT OF THE TREASURY, ET AL., *Defendants*, DONALD J. TRUMP, ET AL., *Defendant-Intervenors*. | Case No. 19-cv-01974-TNM |

**REPLY IN SUPPORT OF MOTION TO LIFT STAY**

The Court stayed this proceeding more than four weeks ago on the expectation that the D.C. Circuit would imminently issue a ruling in *Committee on the Judiciary v. McGahn*, No. 19-5331 (D.C. Cir.). Tel. Conf. Tr. at 11:9-17 (Jan. 14, 2020), Dkt. 78 ("Tr."). That expectation has proven inaccurate. Further delay of this proceeding—including further delay of briefing of the merits—is unwarranted.

## ARGUMENT

The Court's stated rationale for staying this case was its expectation that the D.C. Circuit would shortly issue a ruling in *McGahn*. Tr. at 11:9-17. But a decision has not emerged, and despite DOJ's insistence that a ruling is "imminent" (Opp. 2),[1] no one knows when one will be forthcoming. Indeed, the D.C. Circuit can take months to issue a decision even in an expedited appeal. *See Trump v. Mazars*, 940 F.2d 710, 718 (D.C. Cir. 2019) (decision issued three months after argument), *cert. and stay granted*, 140 S. Ct. 660 (Dec. 13, 2019). Given that there is now less than one year left in the current Congress, the Committee urges the Court to lift the stay or, at the very least, direct the parties to begin briefing the merits so that the Court is positioned to resolve this case swiftly upon receiving a decision in *McGahn*. Far from making "demand[s]" on the Court (Opp. 1), the Committee has accepted the Court's explicit invitation, *see* Tr. 11:11-13, to move to lift the stay if the D.C. Circuit did not rule quickly in *McGahn*.

As the Committee has repeatedly stressed, it needs the requested tax return and audit file information to investigate, among other things, concerns about improper political influence exerted in the mandatory audit program. To assess whether legislation is required to reform the Program and, if so, how best to achieve needed reforms, the Committee needs to know more than

---

[1] We use "Opp." as an abbreviation for Defendants' and Defendants-Intervenors' Opposition to Plaintiff's Motion to Lift Stay, Dkt. 81 (Feb. 11, 2020).

the general, publicly available information and forms Defendants have offered. It needs to know how the current President's individual and related business returns have actually been handled. The Committee explained this point in issuing its Section 6103 request and its subpoenas; it alleged the point in its complaint; and it has explained the point in every filing it has made to this Court. *See* Compl. Exs. A, E, K, L, P, QQ, Dkts. 1-1, 1-5, 1-11, 1-12, 1-16, 1-40; Compl. ¶¶ 58-61, 79, Dkt 1. Yet Defendants still refuse to acknowledge it, claiming instead that the Committee's only legitimate investigatory interest could be in whatever general materials about the program Defendants deem sufficient to share.

In its complaint, *see* Compl. ¶¶ 79-80, Dkt. 1, the Committee alleges that, before going to court it had uncovered information indicating that the mandatory audit program might not be functioning effectively, in part, because of the absence of safeguards to protect IRS employees and the audit process itself from improper influence and because Treasury officials had admitted that the written procedures were outdated and diverged from current practice. That information directly bears on the handling of President Trump's returns. Thus, the only way the Committee can get to the bottom of whether the audit program has been corrupted; if so, how; and thus, what to do about such corruption is to learn how the President's returns have been audited.[2]

---

[2] As counsel for the Committee explained yet again in a recent email exchange with counsel for the government Defendants as part of the meet and confer process and efforts to find an accommodation:

> The Committee has made clear that it is seeking the President's returns and related administrative files not simply to assess the mandatory audit program in general, but to understand and evaluate the thoroughness of the audit of the President's returns, whether and how the publicly available materials on the mandatory audit program (which Treasury staff admitted at the briefing were outdated) diverge from current practices, whether the auditing of this President's returns has been subject to improper political influence, and whether codification of the audit

In taking up the Court's invitation to request that the stay be lifted if the D.C. Circuit did not rule promptly in *McGahn*, the Committee offered three reasons—in addition to the fact that the D.C. Circuit has not issued a decision—that continuation of the stay was unwarranted. Defendants' responses to those considerations are long on rhetoric but short on attention to the authorities and precedents the Committee marshalled.

*First*, the Committee explained that, after the January 14 conference, counsel for President Trump in the Senate impeachment trial disavowed the position of Defendants (who include the President) in this case that the House is constitutionally barred from obtaining judicial enforcement of its subpoenas. Mot. 2-3 (quoting Answer of President Donald J. Trump to Articles of Impeachment and statements by Jay Sekulow and Alan Dershowitz, counsel for the President in the Senate impeachment trial).[3]  Defendants now try to disavow the disavowals, citing statements by other members of the President's impeachment trial team. Opp. 18-19.

---

program or other revisions to the tax code are needed.  *See, e.g.*, Exs. A, E, K, P, QQ; Compl. ¶¶ 58-61, 79.

>   Neither the briefing that you referenced nor the publicly-available IRM provisions that your clients provided at the briefing are a substitute for the actual returns and related administrative files.  As Chairman Neal wrote in his June 28, 2019 letter, generalized information is "not a replacement for the actual return and return information that the Committee requested under section 6103(f) and now has subpoenaed" because "[w]ithout studying the returns and the documentation of the agent's decisions that were requested, the Committee cannot evaluate the accuracy of the President's claims about the audit system, assess the fairness and effectiveness of the audit program and the scope of the audits being performed on the President's returns, or understand how particular provisions of the Code are being enforced as part of the IRS's review." Ex. P.

Email from Douglas Letter to Steven A. Myers et al., Jan. 25, 2020, Opp. at Ex. B, Dkt. 81-2.

[3] We use "Mot." as an abbreviation for Motion to Lift Stay, Dkt. 79 (Jan. 28, 2020).

Those efforts are unavailing. Defendants seek to characterize the statements upon which the Committee relied as conditional. They were not. They represented clear and unqualified statements that House committees may and, indeed, should, if necessary, go to court to enforce their subpoenas. As Kenneth Starr, a former Solicitor General of the United States and former judge on the D.C. Circuit, stated in terms that could not have been clearer:

> The House of Representatives could have followed that well-trodden path. It could have sought expedition. The E. Barrett Prettyman Courthouse is 6 blocks down. The judges are there. They are all very able. They are hardworking people of integrity. Follow the path. Follow the path of the law.
>
> Go to court.

166 Cong. Rec. S583 (Jan. 27, 2020).

Defendants cite a footnote in the President's trial memorandum as well as a statement by one of President Trump's other impeachment trial lawyers in an effort to muddy the waters. Opp. 18. But Defendants offer no alternative explanation of the unqualified statements upon which the Committee relies. And they ignore the fact that the statement from a footnote in the trial memorandum that they highlight contradicts other statements in the same memorandum. *See* Trial Mem. of President Donald J. Trump 197 (Jan. 20, 2020) (identifying the federal courts as the forum in which disputes over congressional subpoenas should be resolved if the parties reach impasse after efforts at accommodation).[4] Defendants appear to be arguing that what President Trump's impeachment counsel meant to say was that, before impeaching the President, the House was required to file futile subpoena-enforcement suits so that DOJ could then successfully obtain dismissal on justiciability grounds, without any ruling on

---

[4] Available at https://www.whitehouse.gov/wp-content/uploads/2020/01/Trial-Memorandum-of-President-Donald-J.-Trump.pdf.

4

the merits. The Court should not assume that the President's accomplished lawyers meant to advance such a cynical argument—that Congressional committees are constitutionally obliged to waste their own time and resources, and those of the Judiciary, on futile gestures.

*Second*, the Committee explained that only some of the threshold issues presented in the pending motion to dismiss in this case are likely to be addressed by the D.C. Circuit in *McGahn*. Mot. 3-4. Whatever the D.C. Circuit may hold with respect to the issues pertaining to enforcement of Congressional subpoenas that are common to this case and *McGahn*, its decision will very likely leave unresolved the Section 6103–related issues unique and central to this case, such as whether the Committee has Article III standing to assert, and has stated claims to vindicate, its mandatory statutory entitlement to the information it seeks under Section 6103.

Defendants' only response is that the sufficiency of informational injury as a basis for standing is common to this case and *McGahn*. Opp. 7. But *McGahn* does not involve one of the informational injuries alleged in this case—the injury suffered when a party is refused information that a federal statute entitles it to receive. *See* 26 U.S.C. § 6103(f) (providing that the Secretary of Treasury "shall furnish … any return or return information specified"). That injury has long been recognized by the Supreme Court as sufficient to support Article III jurisdiction. *See* Pl.'s Mem. of Law in Opp'n to Defs. and Defs.-Intervenors' Mot. to Dismiss 17-18, Dkt. 55 (Sept. 23, 2019). And Defendants' limited response effectively concedes that *McGahn* will not address other issues distinct to this case; as Defendants' opposition acknowledges, *McGahn* will not address the Administrative Procedure Act, Section 6103(f), or the Committee's claims sounding in mandamus or non-statutory review. Contrary to Defendants' assertions, no ruling in *McGahn* could obviate this Court's deciding whether the claims distinct to this suit may continue to the merits stage.

*Third*, the Committee explained that continued delay contravenes both the Judiciary's duty to quickly resolve disputes that involve Congress's exercise of its investigative powers and conflicts with the well-established practices of expedition followed by other courts in this District and elsewhere. Mot. 4-11. The Supreme Court's clear direction to district courts in *Eastland v. U.S. Serviceman's Fund* was to "give[] the most expeditious treatment" to motions that delay the Congress's exercise of its investigative powers. 421 U.S. 491, 511 n.17 (1975).

Contrary to Defendants' contention (Opp. 11-12), courts' "duty to see that . . . litigation" concerning congressional investigations "is swiftly resolved" does not vanish simply because the Committee is the plaintiff. *Eastland*, 421 U.S. at 511 n.17. *Eastland* rested in significant part on the Speech or Debate Clause, but one of that Clause's core purposes is to prevent Congress's urgent legislative work from being delayed by judicial proceedings. That is precisely the situation here. Defendants have ignored their statutory obligations under Section 6103(f) and refused to comply with duly authorized subpoenas, thus causing the precise harm at issue in *Eastland*: "protracted delay [that] has frustrated a congressional inquiry." *Id.*

The courts of appeals, including the D.C. Circuit, have repeatedly recognized the Judiciary's duty not to delay Congressional inquiries unnecessarily and to expedite proceedings involving Congressional requests for information. *See, e.g.*, *Trump v. Deutsche Bank AG*, 943 F.3d 627, 662 (2d Cir. 2019) ("further delay [in] production of documents in response to subpoenas that were issued seven months ago . . . would run directly counter to the Supreme Court's instruction" in *Eastland*), *cert. and stay granted*, 140 S. Ct. 660 (Dec. 13, 2019); *Mazars*, 940 F.2d at 718 (courts should "'give[] the most expeditious treatment' to suits seeking to enjoin congressional subpoenas" (quoting *Eastland*)).

Defendants contend that courts routinely maintain stays in "analogous circumstances" and that the Committee is demanding "special treatment" in seeking to move this case along promptly. Opp. at 9-11. Defendants do not, however, explain how any of the cases they point to are "analogous" to this one, and they are not. None involved either a Congressional subpoena or a nondiscretionary statutory obligation to provide information to Congress. As for recent, genuinely analogous subpoena-enforcement cases, the Committee's opening brief recounted several examples in which judges in this District have, in accord with the D.C. Circuit's guidance, expedited cases involving Congressional investigations. Mot. 7-10. Perhaps most notably, in *Committee on Oversight & Reform v. Barr*, the district court (Moss, J.) recently rejected a request by defendants to hold the case in abeyance pending a decision in *McGahn*, and instead ordered the parties to brief the justiciability and merits issues simultaneously and on a compressed timeframe. *See* Min. Entry, *Barr*, No. 1:19-cv-3557 (D.D.C. Dec. 12, 2019).

Defendants offer no reason why the Court should not, at the very least, direct the parties to begin briefing the merits. Defendants invoke "[t]he requirement that a federal court assure itself of jurisdiction to hear a case before proceeding to the merits." Opp. at 8 (quoting Mem. & Order 3-4, Dkt. 38 (Aug. 29, 2019)). But that means only that a court cannot *resolve* the merits before determining whether it has jurisdiction. *See Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Co.*, 549 U.S. 422, 430-431 (2007) ("*Steel Co.* . . . clarified that a federal court generally may not *rule* on the merits of a case without first determining that it has jurisdiction." (emphasis added)). It also does not mean that a court must follow a multi-step briefing process. *See, e.g.*, Order, *Trump v. Comm. on Oversight & Reform*, No. 1:19-cv-1136, Dkt. 25 (D.D.C. May 9, 2019) (order under Fed. R. Civ. P. 65(a)(2) advancing trial on the merits and consolidating it with the hearing on the motion for a preliminary injunction). Indeed, in many

7

cases, the parties brief justiciability and merits questions simultaneously. *See, e.g.*, Min. Order, *McGahn*, 1:19-cv-02379 (D.D.C. Sept. 3, 2019). That is the very course that other judges in this District have recently followed in other subpoena-enforcement disputes. *See* Mot. 7-9.[5]

Defendants also suggest that the Court should continue to delay briefing of the merits because Defendant-Intervenors intend to seek discovery. Opp. 9. As the Committee noted previously, the Defendant-Intervenors' claim to discovery is without merit. *See* Mot. 12. The Supreme Court has made clear that such discovery is impermissible, *see Barenblatt v. United States*, 360 U.S. 109, 132 (1959) ("So long as Congress acts in pursuance of its constitutional [investigative] power, the judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power."), and the Committee will assert any and all applicable privileges, including the absolute immunity afforded by the Speech or Debate Clause, *see Senate Permanent Subcomm. On Investigations v. Ferrer*, 856 F.3d 1080, 1086-1087 (D.C. Cir. 2017) (rejecting argument that a Congressional committee seeking judicial enforcement of a subpoena necessarily accepts a restriction on its Speech or Debate Clause immunity). Even if the Court thought briefing on that issue would be helpful, however, there is no reason that such briefing cannot (or should not) get underway now.

*Finally*, Defendants assert that the Committee has not engaged in a genuine effort to resolve their disagreement. That claim is incorrect. The Committee has repeatedly sought to engage with Defendants, who have nonetheless maintained the absolutist position that "Treasury

---

[5] Defendants contend that the D.C. Circuit "recently held that it was an abuse of discretion for a district court *to proceed* with discovery and expedited merits briefing in an interbranch dispute where 'unsettled' but potentially dispositive threshold questions were presented." Opp. 10 (quoting *In re Trump*, 781 Fed. Appx. 1, 2 (D.C. Cir. 2019)). The Committee here is not seeking discovery, but precisely what the D.C. Circuit advised: prompt resolution of the threshold legal issues presented in Defendants' motion to dismiss.

is prohibited by Section 6103 from providing the specific tax records sought by the Committee." Email from Steven A. Myers to Douglas Letter et al., Jan. 22, 2020, Opp. at Ex. B, Dkt. 81-2. Counsel for Defendants state in their opposition brief that they were "exploring whether they could provide certain information identified by the Committee in a way that would not implicate individual taxpayer information" and suggest that the Committee's instant motion "cut off discussions that had not even left the starting gate." Opp. 17. This motion cut off nothing, since litigation filings do not prevent Treasury from offering more information, and to this day Defendants have not provided the mysterious information to which they refer in their Opposition.

Defendants also contend that prompt resolution of this case is unnecessary because the Committee's "only stated concern" is that "political support" for its "oversight and legislative agenda might wane if the Court permits this litigation process to unfold in due course." Opp. 2. That is false. The Committee is concerned with protecting its institutional authority to conduct oversight of the Executive Branch in order to legislate effectively, and to obtain information necessary for its pressing investigation. Unlike the Senate, which is a continuing body, a new House is formed every two years. If litigation over House inquiries were handled at the pace Defendants urge, the Executive Branch could evade effective oversight by doing what Defendants are doing here—running out the clock.

February 15, 2020

Respectfully submitted,

*/s/ Douglas N. Letter*
Douglas N. Letter (D.C. Bar No. 253492)
   *General Counsel*
Todd B. Tatelman (VA Bar No. 66008)
   *Principal Deputy General Counsel*
Megan Barbero (MA Bar No. 668854)
   *Deputy General Counsel*
Josephine Morse (D.C. Bar No. 1531317)
   *Deputy General Counsel*
Brooks M. Hanner (D.C. Bar No. 1005346)
   *Associate General Counsel*

Office of General Counsel
U.S. House of Representatives
219 Cannon House Office Building
Washington, D.C. 20515
(202) 225-9700
douglas.letter@mail.house.gov

*Counsel for Plaintiff Committee on Ways and Means, United States House of Representatives*