# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 3, 2020          Decided February 28, 2020

No. 19-5331

COMMITTEE ON THE JUDICIARY OF THE UNITED STATES HOUSE
OF REPRESENTATIVES,
APPELLEE

v.

DONALD F. MCGAHN, II,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-02379)

———

*Hashim M. Mooppan*, Deputy Assistant Attorney General, U.S. Department of Justice, argued the cause for appellant. With him on the briefs were *Mark R. Freeman*, *Michael S. Raab*, and *Martin Totaro*, Attorneys.

*Megan Barbero*, Associate General Counsel, U.S. House of Representatives, argued the cause for appellee. With her on the briefs were *Douglas N. Letter*, General Counsel, *Todd B. Tatelman*, Deputy General Counsel, *Josephine Morse*, Associate General Counsel, *Adam A. Grogg* and *William E. Havemann*, Assistant General Counsel, *Jonathan B. Schwartz*, Attorney, and *Annie L. Owens*.

2

*Steven A. Hirsch*, *Justin Florence*, *Jamila G. Benkato*, and *Cameron O. Kistler* were on the brief for *amici curiae* Republican Legal Experts, et al. in support of plaintiff-appellee.

Before: HENDERSON, ROGERS, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

Concurring opinion filed by *Circuit Judge* HENDERSON.

Dissenting opinion filed by *Circuit Judge* ROGERS.

GRIFFITH, *Circuit Judge*: The Committee on the Judiciary of the House of Representatives ordered the former White House Counsel, Donald F. McGahn, II, to testify before the Committee. President Donald Trump instructed McGahn to refuse, asserting that certain presidential advisers possess "absolute testimonial immunity" from compelled congressional process. The Committee now seeks to invoke this court's jurisdiction to enforce its subpoena. The Department of Justice (DOJ), on behalf of McGahn, responds that Article III of the Constitution forbids federal courts from resolving this kind of interbranch information dispute. We agree and dismiss this case.

I

A

In May 2017, the Deputy Attorney General appointed Special Counsel Robert Mueller to investigate whether President Trump's campaign coordinated with the Russian government during the 2016 presidential election. *See* ROBERT

3

S. MUELLER, III, REPORT ON THE INVESTIGATION INTO RUSSIAN INTERFERENCE IN THE 2016 PRESIDENTIAL ELECTION, vol. I, at 1-2 (2019). This investigation's scope soon expanded when the President took several actions that "raised questions about whether he had obstructed justice." *Id.* vol. II, at 1. As part of his investigation, the Special Counsel interviewed McGahn, who was then the White House Counsel. McGahn witnessed several of the President's efforts to thwart the Special Counsel's investigation, including the President's aborted attempt to fire the Special Counsel. *Id.* vol. II, at 77-90, 113-20; *see also* Committee Br. 6 n.3.

On March 4, 2019, pursuing leads developed by the Special Counsel, the Committee began an investigation into the President's possible "obstruction of justice, public corruption, and other abuses of power." J.A. 542. The Committee sent a letter asking McGahn to turn over certain White House documents relating to the President's possible obstruction, but McGahn did not comply. On April 22, the Committee issued a duly authorized subpoena ordering McGahn to produce these documents and to testify before the Committee on May 21.

On May 20, McGahn's successor as White House Counsel, Pat A. Cipollone, informed the Committee that the President had "directed Mr. McGahn not to appear at the Committee's scheduled hearing." J.A. 304. Cipollone wrote that the DOJ's Office of Legal Counsel (OLC) advised him that certain presidential aides, including McGahn, are "absolutely immune from compelled congressional testimony with respect to matters occurring during [their] service . . . to the President." J.A. 303. Cipollone enclosed the memorandum from OLC setting forth this theory of absolute testimonial immunity. *See Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. (May 20, 2019).

4

McGahn's private attorney likewise informed the Committee that McGahn would not testify, though he would agree to comply with any "accommodation" reached by the Committee and the White House. J.A. 631-32. The Committee and the White House later reached such an accommodation regarding the subpoenaed documents, but they could not agree to terms for McGahn's testimony.

B

On August 7, the Committee sued McGahn in the District Court for the District of Columbia, claiming that McGahn "enjoys no absolute immunity from appearing before the Judiciary Committee." Compl. ¶ 111, J.A. 63. The Committee alleged that McGahn's refusal to testify frustrated its efforts to "determin[e] whether to approve articles of impeachment" against the President, "assess the need for remedial legislation," and "conduct oversight of DOJ." *Id.* ¶ 10, J.A. 17. The Committee asked the court to declare that McGahn's refusal to appear at all was "without legal justification," and to enjoin McGahn "to appear and testify forthwith." *Id.* at 53, J.A. 64.

The parties filed cross-motions for summary judgment. The district court granted the Committee's motion and denied McGahn's. Mem. Op. at 118, J.A. 966.

The district court first rejected DOJ's threshold arguments, concluding that (1) the court had subject-matter jurisdiction under 28 U.S.C. § 1331, *id.* at 41-45, J.A. 889-93; (2) the dispute was justiciable because it raised "garden-variety legal questions that the federal courts address routinely and are well-equipped to handle," *id.* at 47-48, J.A. 895-96; (3) the Committee had Article III standing because it "alleged an actual and concrete injury to its right to compel information,"

5

*id.* at 75, J.A. 923; and (4) the Committee possessed an implied cause of action under Article I of the Constitution, *id.* at 77-81, J.A. 925-29.

On the merits, the district court rejected DOJ's assertion of absolute testimonial immunity and ordered McGahn to appear before the Committee. *Id.* at 89-118, J.A. 937-66. The court concluded that presidential aides "who have been subpoenaed for testimony by an authorized committee of Congress must appear." *Id.* at 116, J.A. 964. Only then may an aide assert "any legally applicable privilege in response to the questions asked of them." *Id.* McGahn timely appealed.

C

The House of Representatives has since passed two articles of impeachment against the President. H.R. Res. 755, 116th Cong. (2019). The first article charges the President with "abuse of power"; the second with "obstruction of Congress." Although the second article does not mention McGahn expressly, it alleges that the President unlawfully directed officials "not to comply with" congressional subpoenas and asserts that these directives "were consistent with President Trump's previous efforts to undermine United States Government investigations into foreign interference in United States elections." *Id.* at 6-8. The Senate voted to acquit the President on February 5. *See* 166 CONG. REC. S936-39 (daily ed. February 5, 2020).

The Committee also issued a report detailing the President's alleged wrongdoing, *see* H.R. REP. NO. 116-346 (2019), that explains the Committee's continued interest in McGahn's testimony. Specifically, the Committee explained that it intended to use McGahn's testimony "in a Senate trial on these articles of impeachment" and to continue investigating

6

"President Trump's obstruction of the Special Counsel." *Id.* at 159 n.928; *see also* Committee Suppl. Br. 5-8. If the Committee obtains McGahn's testimony, it may "consider[] whether to recommend new articles of impeachment." *Id.* at 7. The Committee also claims that it needs McGahn's testimony "for pressing legislative and oversight purposes," including the consideration of certain legislation. *Id.* at 8-9.

II

When a litigant asks a federal court to resolve a dispute, the Constitution requires that court first to decide whether the matter is a "Case" or "Controversy" within the meaning of Article III. This limitation is essential to the democratic structure of the Constitution enacted by "We the People" in 1789. U.S. CONST. pmbl. Compared to Congress and the President, unelected and unaccountable federal judges sit at the furthest remove from the citizenry. To the Framers, "[n]o liberty was more central than the people's liberty to govern themselves under rules of their own choice." AKHIL REED AMAR, AMERICA'S CONSTITUTION: A BIOGRAPHY 10 (2005). And those rules must be made by the people's politically accountable representatives, not by life-tenured judges. Article III comes third for a reason; if Congress is "first among equals," the judiciary is last. *Id.* at 208.

To protect the elected branches from undue interference, Article III carefully circumscribes the jurisdiction of the courts. *See* Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 SUFFOLK U. L. REV. 881, 881 (1983) (Article III prevents the "overjudicialization of the processes of self-governance"). If federal courts had power to answer "every question under the constitution," they could reach "almost every subject proper for legislative discussion and decision." *DaimlerChrysler Corp. v. Cuno*, 547

7

U.S. 332, 341 (2006) (quoting 4 PAPERS OF JOHN MARSHALL 95 (C. Cullen ed. 1984) (emphasis omitted)). The separation of powers "could exist no longer, and the other departments would be swallowed up by the judiciary." *Id.* Our government would become one not of laws, but of lawyers.

Of course, judicial exposition of the Constitution's meaning is an "indispensable feature of our constitutional system," *Cooper v. Aaron*, 358 U.S. 1, 18 (1958), but Article III grants federal courts "'Power' to resolve not questions and issues but 'Cases' or 'Controversies,'" *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 132 (2011) (quoting U.S. CONST. art. III). We may not disregard this limitation simply to "settle" a dispute "for the sake of convenience and efficiency." *Raines v. Byrd*, 521 U.S. 811, 820 (1997).

"Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Given the separation-of-powers principles animating Article III, standing analysis is "especially rigorous" when we are asked to decide whether the action of "one of the other two branches of the Federal Government was unconstitutional." *Raines*, 521 U.S. at 819-20. Accordingly, we must ask whether adjudicating the dispute is "consistent with a system of separated powers" and whether the claim is "traditionally thought to be capable of resolution through the judicial process." *Allen v. Wright*, 468 U.S. 737, 752 (1984) (internal quotation marks omitted); *see also Rucho v. Common Cause*, 139 S. Ct. 2484, 2494 (2019); *Raines*, 521 U.S. at 818-20; *Flast v. Cohen*, 392 U.S. 83, 97 (1968). This interbranch quarrel satisfies neither condition. *See* Part II.A (separation-of-powers principles); Part II.B (history). And even Congress—from the statutes it has passed—seems to agree that suits like this one do not belong in federal court. *See* Part II.C.

8

A

1

The Committee's suit asks us to settle a dispute that we have no authority to resolve. The Constitution does not vest federal courts with some "amorphous general supervision of the operations of government." *Raines*, 521 U.S. at 829 (internal quotation marks omitted); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 594 (1952) (Frankfurter, J., concurring) ("The Framers, however, did not make the judiciary the overseer of our government."). Instead, as Chief Justice Marshall explained, federal courts sit "to decide on the *rights of individuals*." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803) (emphasis added). To that end, we lack authority to resolve disputes between the Legislative and Executive Branches until their actions harm an entity "beyond the [Federal] Government." *Raines*, 521 U.S. at 834 (Souter, J., concurring in the judgment). Without such a harm, any dispute remains an intramural disagreement about the "operations of government" that we lack power to resolve.

In this case, the Committee's dispute with the Executive Branch is unfit for judicial resolution because it has no bearing on the "rights of individuals" or some entity beyond the federal government. *Marbury*, 5 U.S. at 170. The Committee is not a private entity seeking vindication of its "constitutional rights and liberties . . . against oppressive or discriminatory government action." *Raines*, 521 U.S. at 829 (internal quotation marks omitted). Nor does the Committee seek the "production or nonproduction of specified evidence . . . in a pending criminal case"—the "kind of controversy" threatening individual liberty that "courts traditionally resolve." *United States v. Nixon*, 418 U.S. 683, 696-97 (1974).

9

Instead, the Committee claims that the Executive Branch's assertion of a constitutional privilege is "obstructing the Committee's investigation." Committee Br. 15. That obstruction may seriously and even unlawfully hinder the Committee's efforts to probe presidential wrongdoing, but it is not a "judicially cognizable" injury. *Raines*, 521 U.S. at 819; *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009) ("[T]he traditional role of Anglo-American courts . . . is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law."); *Raines*, 521 U.S. at 833 (Souter, J., concurring in the judgment) ("[A] dispute involving only officials . . . who serve in the branches of the National Government lies far from . . . the conceptual core of the case-or-controversy requirement."). If the law were otherwise, then the branches' mere assertions of institutional harms would compel us to resolve generalized disputes about the "operations of government." *Id.* at 829 (majority opinion) (internal quotation marks omitted). But as the Supreme Court has repeatedly made clear, the Constitution denies us that role.

2

The Constitution imposes limitations on the "judicial Power" for good reason. Interbranch disputes are deeply political and often quite partisan. *Compare, e.g.*, *Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1 (D.D.C. 2013), *with* Sandra Hernandez, *Partisan Politics Plague Probe of "Fast and Furious,"* L.A. TIMES (Mar. 29, 2012). By restricting the role of the judiciary, Article III preserves the "public confidence" in the federal courts by preventing "[r]epeated and essentially head-on confrontations between the life-tenured branch and the representative branches of government." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464,

10

474 (1982) (internal quotation marks omitted). If we throw ourselves into "a power contest nearly at the height of its political tension," *Raines*, 521 U.S. at 833 (Souter, J., concurring in the judgment), we risk seeming less like neutral magistrates and more like pawns on politicians' chess boards.

In this case, the dangers of judicial involvement are particularly stark. Few cases could so concretely present a direct clash between the political branches. The Committee opened an investigation into possible presidential wrongdoing, which culminated in articles of impeachment against the President. The Committee claims that, in furtherance of this investigation, McGahn must testify about events that occurred during his tenure as White House Counsel. Meanwhile, the President denies all wrongdoing, and he has instructed McGahn not to testify.

The branches are thus locked in a bitter political showdown that raises a contentious constitutional issue: The Committee claims an absolute right to McGahn's testimony, and the President claims an absolute right to refuse it. We cannot decide this case without declaring the actions of one or the other unconstitutional, and "occasions for constitutional confrontation . . . should be avoided whenever possible." *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 389-90 (2004) (internal quotation marks and alterations omitted). Indeed, the House cited the Executive Branch's litigating position *in this very case* in support of its "obstruction of Congress" article of impeachment. *See* H.R. REP. NO. 116-346, at 155 & n.906. In turn, the White House Counsel cited the Committee's litigating position in the President's defense. *See* Trial Memorandum of President Donald J. Trump, In Proceedings Before the United States Senate 49, 53 (Jan. 20, 2020).

11

Judicial entanglement in the branches' political affairs would not end here. If the Committee can enforce this subpoena in the courts, chambers of Congress (and their duly authorized committees) can enforce *any* subpoena. Though momentous, the legal issue in this case is quite narrow: whether the President may assert absolute testimonial immunity on behalf of McGahn. But future disagreements may be complicated and fact-intensive, and they will invariably put us in the "awkward position of evaluating the Executive's claims of confidentiality and autonomy," *Cheney*, 524 U.S. at 389, against Congress's need for information, *e.g.*, *Trump v. Mazars USA, LLP*, 940 F.3d 710 (D.C. Cir. 2019), *cert. granted*, 140 S. Ct. 660 (2019).

In such disputes, we would have few authorities to guide us—sparse constitutional text, no statute, a handful of out-of-context cases, and a set of more-or-less ambiguous historical sources. *Cf. Youngstown*, 343 U.S. at 634 (Jackson, J., concurring) ("A judge . . . may be surprised at the poverty of really useful and unambiguous authority applicable to concrete problems of executive power."). We would be forced to supervise the branches, scrutinize their asserted constitutional interests, and elaborate a common law of congressional investigations. Article III confines us to the "proper—and properly limited—role of the courts in a democratic society," *Summers*, 555 U.S. at 492-93 (internal quotation marks omitted), and that constraint precludes us from becoming an ombudsman for interbranch information disputes.

We needn't speculate. Just *one day* after the district court issued its order in this case, the House Committee on Oversight and Reform sued to enforce congressional subpoenas against the Attorney General and the Secretary of Commerce. *See* Complaint, *Comm. on Oversight & Reform v. Barr*, No. 19-cv-3557 (D.D.C. Nov. 26, 2019), Dkt. No. 1. The Oversight

12

Committee seeks documents related to yet another politically charged dispute: the administration's decision to add a citizenship question to the census. *See id.* at 83-84; Catie Edmondson, *House Committee Sues Barr and Ross Over 2020 Census Documents*, N.Y. TIMES (Nov. 26, 2019).

Or simply consider this case. If we order McGahn to testify, what happens next? McGahn, compelled to appear, asserts executive privilege in response to the Committee's questions. The Committee finds those assertions baseless. In that case, the Committee assures us, it would come right back to court to make McGahn talk. *See* Oral Arg. Tr. 60:25-61:1. The walk from the Capitol to our courthouse is a short one, and if we resolve this case today, we can expect Congress's lawyers to make the trip often.

3

Extending our jurisdiction beyond the constitutional boundary would also displace the long-established process by which the political branches resolve information disputes. The Constitution "contemplates that practice will integrate the dispersed powers into a workable government," *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring), and the political branches have long resolved most of their differences through "negotiation and accommodation," Josh Chafetz, *Executive Branch Contempt of Congress*, 76 U. CHI. L. REV. 1083, 1132 (2009); *see also* Neal Devins, *Congressional-Executive Information Access Disputes: A Modest Proposal—Do Nothing*, 49 ADMIN. L. REV. 109 (1996); Irving Younger, *Congressional Investigations and Executive Secrecy: A Study in the Separation of Powers*, 20 U. PITT. L. REV. 755 (1959). Sometimes negotiations fail, *see History of Refusals by Executive Branch Officials to Provide Information Demanded by Congress*, 6 Op. O.L.C. 751 (1982), but for almost two

13

centuries, neither branch thought to "submit[] their disputes to the courts," Chafetz, *supra*, at 1146-47.

The absence of a judicial remedy doesn't render Congress powerless. Instead, the Constitution gives Congress a series of political tools to bring the Executive Branch to heel. *See Goldwater v. Carter*, 444 U.S. 996, 1004 (1979) (opinion of Rehnquist, J.) (noting that the "coequal branches of our Government" have "resources available to protect and assert [their] interests"). Congress (or one of its chambers) may hold officers in contempt, withhold appropriations, refuse to confirm the President's nominees, harness public opinion, delay or derail the President's legislative agenda, or impeach recalcitrant officers. *See* Chafetz, *supra*, at 1152-53; *see also* H.R. Res. 755, 116th Cong., at 6 (2019) (impeaching President Trump for "obstruction of Congress"). And Congress can wield these political weapons without dragging judges into the fray.

Adjudicating these disputes would displace this flexible system of negotiation, accommodation, and (sometimes) political retaliation with a zero-sum game decided by judicial diktat. The Constitution enjoins the branches to conduct their business with "autonomy but reciprocity." *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring). But why compromise when the federal courts offer the tantalizing possibility of total victory? And why would the Executive Branch negotiate if it can force litigation and "delay compliance for years"? Chafetz, *supra*, at 1154. Letting political fights play out in the political branches might seem messy or impractical, but democracy can be a messy business, and federal courts are ill-equipped to micromanage sprawling and evolving interbranch information disputes. *Cf. Youngstown*, 343 U.S. at 635 (Jackson, J., concurring) ("The actual art of governing under our Constitution does not and cannot conform to judicial

14

definitions of the power of any of its branches."). Perhaps that's why these lawsuits were unheard-of for almost two centuries.

To be sure, as the Committee notes, courts in this circuit have agreed to resolve a handful of interbranch information disputes beginning in the 1970s. *See* Committee Br. 17-20; *United States v. AT&T*, 551 F.2d 384, 391 (D.C. Cir. 1976) ("*AT&T I*"); *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974) ("*Senate Select Comm.*"); *Holder*, 979 F. Supp. 2d at 1; *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008). But as we explain below, the legal basis for that practice is dubious, *see infra* Part III.C; Chafetz, *supra*, at 1154 ("The courts have never offered a persuasive reason why a congressional subpoena to an executive branch official is a matter of which the judiciary can properly take notice."), and the innovations of the 1970s shouldn't displace the established practice of the 1790s.

B

Speaking of history: Past practice leads to the same conclusion as these separation-of-powers principles. The Supreme Court has said—time and again—that an Article III case or controversy must be one that is "traditionally thought to be capable of resolution through the judicial process." *Allen*, 468 U.S. at 752 (internal quotation marks omitted); *see also Rucho*, 139 S. Ct. at 2494; *Summers*, 555 U.S. at 492; *Raines*, 521 U.S. at 819; *Nixon*, 418 U.S. at 696; *Flast*, 392 U.S. at 97; *Youngstown*, 343 U.S. at 594 (Frankfurter, J., concurring) ("Judicial power can be exercised only as to matters that were the traditional concern of the courts at Westminster."). In this case, the history cuts decisively against the Committee. Neither interbranch disputes (in general) nor interbranch information

15

disputes (in particular) have traditionally been resolved by federal courts.

1

Begin with interbranch disputes in general. In *Raines v. Byrd*, six Members of Congress sued to challenge the constitutionality of the Line Item Veto Act, which authorized the President to "cancel" spending provisions in appropriations statutes. 521 U.S. at 814-15. The Supreme Court concluded that the "individual members of Congress" lacked standing, attaching "some importance to the fact that [the congressmen] ha[d] not been authorized to represent their respective Houses of Congress." *Id.* at 829-30. But of special significance here, the Court noted that the Members' attempt to litigate against the Executive Branch was "contrary to historical experience." *Id.* at 829.

That historical conclusion is critical. In "analogous confrontations between one or both Houses of Congress and the Executive Branch," the Court reasoned, "no suit was brought on the basis of claimed injury to official authority or power." *Id.* at 826. But if, as the Members argued, the Constitution countenanced suits based on "diminution of . . . official power," then President Andrew Johnson could have challenged the Tenure of Office Act, which prevented him from removing Senate-confirmed officers "without the consent of the Senate." *Id.* at 826-27. Or a President could have challenged the for-cause removal provision for the Post Office Department (enacted in 1872) long before the Supreme Court adjudicated its constitutionality in *Myers v. United States*, 272 U.S. 52 (1926). *See Raines*, 521 U.S. at 827-28.

But the branches *never* brought these kinds of suits. Instead, the Supreme Court only ever resolved these

16

interbranch skirmishes after one branch's allegedly unconstitutional actions harmed the concrete interests of private actors. *See Raines*, 521 U.S. at 826-28. In *INS v. Chadha*, for instance, the Supreme Court found that Chadha, an immigrant, had standing to challenge the one-House legislative veto because success on the merits would entitle him to "cancell[ation]" of a "deportation order against [him]." 462 U.S. 919, 936 (1983); *see also Buckley v. Valeo*, 424 U.S. 1, 12 n.10 (1976) (challenge to the Federal Election Campaign Act by parties raising separation-of-powers problems with "an agency designated to adjudicate their rights" and by organizations asserting unlawful "compelled disclosure" "on behalf of [their] members"); *The Pocket Veto Case*, 279 U.S. 655, 673 (1929) (challenge to President Coolidge's pocket veto by "Indian tribes" that "filed a petition in the Court of Claims setting up certain claims in accordance with the terms of the bill").

Since *Raines*, the Supreme Court has adjudicated other major separation-of-powers cases, but not one of them arose out of a pure interbranch dispute. *E.g.*, *Zivotofsky v. Kerry*, 576 U.S. 1 (2015); *NLRB v. Noel Canning*, 573 U.S. 513 (2014); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010). Instead, every single one of these decisions implicated the concrete rights of private actors. *Raines* reasoned that the abject absence of interbranch lawsuits meant that adjudicating one would be "contrary to historical experience," 521 U.S. at 829, and history hasn't changed since.

2

Lawsuits to resolve interbranch information disputes, likewise, have few historical antecedents. The Committee's first example of a suit by a chamber of Congress to enforce a subpoena against the Executive Branch comes from 1974. *See*

*Senate Select Comm.*, 498 F.2d at 725. And the Committee's earliest case is its *only* appellate precedent for such a suit. *See also* TODD GARVEY, CONG. RESEARCH SERV., R45983, CONGRESSIONAL ACCESS TO INFORMATION IN AN IMPEACHMENT INVESTIGATION 21 (2019) ("[N]either Congress nor the President appears to have turned to the courts to resolve an investigative dispute until the 1970s."); Chafetz, *supra*, at 1083-84 (similar).

But interbranch information disputes long predate *Senate Select Committee*. For instance, in 1794, President Washington withheld papers that "in [his] judgment, for public considerations, ought not to be communicated." *History of Refusals by Executive Branch Officials to Provide Information Demanded by Congress*, 6 Op. O.L.C. 751, 752-53 (1982) (internal quotation marks omitted). Likewise, many other Presidents refused to give information to one of the chambers of Congress. *E.g.*, *id.* at 751-81 (listing refusals of Presidents Adams, Jefferson, Monroe, Lincoln, Theodore Roosevelt, Franklin Roosevelt, Truman, Carter, and Reagan, among others). And yet, as the Committee concedes, none of these refusals resulted in a "suit[] to enforce subpoenas before the mid-1970s." Committee Br. 26.

That concession seriously undermines the Committee's case. In *Raines*, the Court knew that our circuit allowed legislators to bring lawsuits alleging "injury to their institutional power as legislators," 521 U.S. at 820 n.4; *see also infra* Part III.C, but the Court still concluded that such litigation was "contrary to historical experience," *id* at 829. So too here, a single appellate precedent from 1974 cannot establish historical bona fides for the Committee's suit.

Indeed, in every litigated information dispute since *Raines*, the Executive Branch has argued that these information

18

disputes have no place in federal court. In *Holder*, the Obama Administration argued that congressional committees could not "circumvent [the] historical . . . process of negotiation and accommodation by seeking resolution of [an] inherently political dispute in federal court." *See* Mem. in Supp. of Def.'s Mot. to Dismiss at 30, *Comm. on Oversight & Reform v. Holder*, No. 12-cv-1332 (D.D.C. Oct. 15, 2012), Dkt. No. 13-1. Likewise, in *Miers*, the Bush Administration claimed that federal courts lacked jurisdiction to resolve these disputes, arguing that the branches had "for centuries" followed a "political accommodation process" to "resolv[e] inter-branch disputes over requests for information." *See* Mem. in Supp. of Def.'s Mot. to Dismiss at 24, *Comm. on the Judiciary v. Miers*, No. 08-cv-0409 (D.D.C. May 9, 2008), Dkt. No. 16-1. Principles and practice thus agree: The Committee may not invoke the jurisdiction of the federal courts to enforce its subpoena.

C

Congress seems to agree, too. The current statutory regime for enforcement of congressional subpoenas reflects Congress's judgment that information disputes between the political branches do not belong in federal court. Under this regime, only the Senate—and not the House—has statutory authority to enforce a subpoena in federal court. *See* 2 U.S.C. § 288d; *In re U.S. Senate Permanent Subcomm. on Investigations*, 655 F.2d 1232, 1238 & n.28 (D.C. Cir. 1981). What is more, Congress expressly *excluded* federal jurisdiction over suits involving Executive Branch assertions of "governmental privilege." 28 U.S.C. § 1365(a).

The obvious effect of section 1365(a)'s carve-out is to keep interbranch information disputes like this one out of court. Indeed, the legislative history confirms what the statute's plain

19

text says. As the sponsors of a Senate bill amending section 1365 explained, the law's "purpose is to keep disputes between the executive and legislative branches out of the courtroom." 142 Cong. Rec. 19412 (1996) (statement of Sen. Specter); *see also id.* at 19413 (statement of Sen. Levin) (explaining that the provision "seeks to keep interbranch disputes out of the courtroom"). The Committee asks us to decide this case, but Congress expresses its will through statutes—not through the litigating positions of one part of one half of the bicameral body. We will not second-guess the judgment of Congress at the Committee's behest, and the absence of congressional authorization is the third strike against the Committee's case.

\* \* \*

We conclude that separation-of-powers principles and historical practice compel us to dismiss for lack of jurisdiction the Committee's suit to enforce a congressional subpoena against the Executive Branch.

III

The Committee (and the district court's opinion) rely on three core arguments to the contrary. First, the Committee attempts to frame the case as a run-of-the-mill dispute about the effect of a duly issued subpoena—the kind of "legal question" that courts have long adjudicated. Committee Br. 10, 17-20, 23-25. Second, relying largely on *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 135 S. Ct. 2652 (2015), the Committee argues that it may assert an "institutional injury" to satisfy Article III, even in a suit against the Executive Branch. Committee Br. 20-23. Third, the Committee insists that circuit precedent before *Raines* requires that we resolve this dispute. Committee Br. 17-20. None of these arguments is persuasive.

20

A

Seeking to minimize the significant separation-of-powers concerns raised by this suit, the Committee—like the district court—describes this matter as nothing more than a "garden-variety" information dispute that "federal courts address routinely." Mem. Op. at 47-48, J.A. 895-96; *see also* Committee Br. 24-25.

Not so. As even the district court acknowledged, "for two hundred years after the Founding[,] lawsuits between the Congress and the Executive branch *did not exist*, even though disputes between the Legislative and Executive Branches over congressional requests for information have arisen since the beginning of the Republic." Mem. Op. at 51, J.A. 899 (emphasis added) (internal quotation marks omitted). But the district court discounted this history. It saw no reason to distinguish disputes "between [the] branches of government" from those "between Congress and an individual party." *Id.* at 54, J.A. 902.

By focusing on the abstract legal question presented while ignoring the parties' identities, the district court gave short shrift to the separation-of-powers principles at stake. In the district court's view, "[j]urisdiction exists because the Judiciary Committee's claim presents a legal question, and it is 'emphatically' the role of the Judiciary to say what the law is." *Id.* at 4, J.A. 852 (citing *Marbury*, 5 U.S. at 177). But that's not how Article III works. "The Federal Judiciary is vested with the 'Power' to resolve not questions and issues but 'Cases' or 'Controversies.'" *Ariz. Christian Sch. Tuition Org.*, 563 U.S. at 132. We resolve legal questions "in the course of carrying out the judicial function of deciding cases," *DaimlerChrysler Corp.*, 547 U.S. at 340, not the other way around. Were it

21

otherwise, there would be no prohibition on advisory opinions; no doctrines on standing, ripeness, or mootness.

The Committee and the district court thus ask the wrong question: Have we resolved this type of *legal issue* before? Article III compels us to ask instead: Have we resolved this type of *case or controversy* before?

Here, the answer is clearly no. First, the Committee gestures at instances in which federal courts have resolved disputes over executive privilege. "For more than two hundred years," the Committee argues, "courts have adjudicated the Executive's legal obligations to respond to subpoenas." Committee Br. 24. But those cases arose out of efforts to enforce *judicial* subpoenas in *criminal* cases—not, as here, congressional subpoenas. *See Nixon*, 418 U.S. at 683; *United States v. Burr*, 25 F. Cas. 30, 34 (C.C.D. Va. 1807) (Marshall, C.J.); *In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997).

In *United States v. Nixon*, for instance, the Supreme Court resolved President Nixon's claims of executive privilege against a subpoena issued by a district court. That case was clearly within a federal court's power to adjudicate; it involved a subpoena issued under the court's own authority in the "regular course of a federal criminal prosecution." *Nixon*, 418 U.S. at 697. Indeed, the Supreme Court reiterated that "the primary constitutional duty of the Judicial Branch [is] to do justice in criminal prosecutions." *Id.* at 707; *see also Cheney*, 542 U.S. at 384 ("The distinction *Nixon* drew between criminal and civil proceedings is not just a matter of formalism."). Unlike *Nixon*, this case involves an effort to enforce a *congressional* subpoena lacking the same impact on the rights of private actors.

22

Second, federal courts also have considered the permissibility of congressional subpoenas, but such cases arose in three discrete procedural contexts different from this one: (1) prosecutions for criminal contempt of Congress, *see, e.g.*, *Watkins v. United States*, 354 U.S. 178 (1957); 2 U.S.C. §§ 192-194; (2) applications for writs of habeas corpus, *see, e.g.*, *McGrain v. Daugherty*, 273 U.S. 135 (1927); and (3) civil suits affecting the rights of private parties, *see, e.g.*, *Kilbourn v. Thompson*, 103 U.S. 168 (1880); *Mazars*, 940 F.3d at 710. Like subpoenas issued in the context of a criminal prosecution, and unlike this litigation, all three of these settings directly implicate the "rights of individuals," *Marbury*, 5 U.S. at 170, and thus fall within the heartland of federal jurisdiction.

B

The Committee next asserts that it has suffered an "institutional injury" that gives it standing to pursue this suit. Committee Br. 15. The Committee argues that the House possesses the "sole Power of Impeachment," along with a broad power to investigate. *See* U.S. CONST. art. I, § 2, cl. 5 (impeachment); *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504-06 (1975) (investigations). In turn, the House delegated to the Committee the authority "to conduct investigations and issue subpoenas." Committee Br. 15-16. McGahn's refusal to appear impedes that investigation, so the Committee concludes that it "has alleged an actual and concrete injury to its right to compel information." *Id.* at 15.

The Committee's argument fails. Its seemingly straightforward theory is incompatible with the Supreme Court's case law on legislative standing. Worse, the theory lacks a sensible limiting principle.

23

The Committee claims that *Arizona State Legislature*, 135 S. Ct. at 2652, "puts to rest any notion that a legislative body . . . lacks standing to redress an injury to its rights and powers." Committee Br. 21. There, the Supreme Court held that a *state* legislature had Article III standing to assert an "institutional injury" to its redistricting powers under the Constitution's Election Clause. *Ariz. State Legislature*, 135 S. Ct. at 2664-65. If the Arizona State Legislature had standing to sue there, the Committee argues, then surely the Committee has standing to sue here.

We reject the Committee's extension of *Arizona State Legislature* to this very different dispute. For one thing, the Court made abundantly clear that its decision did "not touch or concern" the question presented here: "whether Congress has standing to bring a suit against the President." *Id.* at 2665 n.12. The Court acknowledged that a suit between components of the *federal* government would raise "separation-of-powers concerns absent [in suits involving state legislatures]." *Id.*

In any event, the Committee's reading of *Arizona State Legislature* is also flatly inconsistent with *Raines*. True, that decision's specific holding is that "*individual legislators* . . . seeking to advance an *institutional* interest" lack standing. Committee Br. 20. But *Raines* says much more, and its reasoning forecloses the Committee's theory. As explained above, "confrontations between one or both Houses of Congress and the Executive Branch" were *never* resolved "on the basis of claimed injury to official authority or power." *Raines*, 521 U.S. at 826. It wasn't just *Members* of Congress that never sued; *Congress* itself never sued either. We decline the Committee's invitation to treat *Raines*'s reasoning as dicta, but to read *Arizona State Legislature* to hold what the Court expressly said it did not.

24

The Committee's theory of institutional injury is also boundless. If one component of the federal government may assert an institutional injury against another, the Committee's theory sweeps in a huge number of seemingly nonjusticiable claims. *See Barnes v. Kline*, 759 F.2d 21, 44-47 (D.C. Cir. 1985) (Bork, J., dissenting), *vacated sub nom. Burke v. Barnes*, 479 U.S. 361 (1987).

Consider some possible suits: The House could sue the Senate for "adjourn[ing] for more than three days" "without [its] Consent," U.S. CONST. art. I, § 5, cl. 4, or for violating the House's prerogative to originate "Bills for raising Revenue," *id.* § 7, cl. 1. Congress could sue the President for failing to "from time to time give . . . Information of the State of the Union," *id.* art. II, § 3, cl. 1, or for engaging in armed conflict in violation of the Declare War Clause, *id.* art. I, § 8, cl. 11. And why stop with the federal government? Congress could sue a State for "lay[ing] any Duty of Tonnage" or "enter[ing] into any Agreement or Compact with Another State" without "the Consent of Congress." *Id.* art. I, § 10, cl. 3.

Perhaps enterprising litigants could distinguish these other institutional injuries from the House's interest in investigations, but even then the Committee's argument fares no better: Either the Committee's asserted "institutional injury" is *sui generis*—a ticket good for one ride only—or its theory throws open the courthouse doors to lawsuits that seem not to belong. We reject the Committee's extension of *Arizona State Legislature* to suits between the Legislative and Executive Branches.

C

The Committee also relies on our circuit precedent. In the past, the Committee's standing claims would have fared better

under our case law, but not so today. Beginning in 1974, the D.C. Circuit experimented with an expansive view of legislative standing, permitting even individual Members of Congress to assert institutional injuries against the Executive Branch. *See, e.g.*, *Moore v. U.S. House of Representatives*, 733 F.2d 946, 951 (D.C. Cir. 1984) (suit alleging a violation of the Origination Clause); *Goldwater v. Carter*, 617 F.2d 697, 702 (D.C. Cir. 1979) (en banc) (suit alleging a violation of the Treaty Clause), *vacated*, 444 U.S. 996 (1979); *Kennedy v. Sampson*, 511 F.2d 430, 435-36 (D.C. Cir. 1974) (suit challenging a pocket veto); *see also Raines*, 521 U.S. at 820 n.4 (collecting cases).

Since *Raines*, however, we have three times considered and three times rejected efforts to assert congressional standing. *See Blumenthal v. Trump*, No. 19-5237, slip op. (D.C. Cir. Feb. 7, 2020) (per curiam); *Campbell v. Clinton*, 203 F.3d 19 (D.C. Cir. 2000); *Chenoweth v. Clinton*, 181 F.3d 112 (D.C. Cir. 1999). Although we have never formally overruled our earlier legislative-standing cases, *Raines*'s reasoning casts serious doubt on their continued vitality. Nevertheless, the Committee argues that three of our pre-*Raines* decisions compel a conclusion that the Committee has standing: *AT&T I*, 551 F.2d at 391; *United States v. AT&T*, 567 F.2d 121 (D.C. Cir. 1977) ("*AT&T II*"); and *Senate Select Committee*, 498 F.2d at 725. None of these cases authorizes the Committee's suit.

In *AT&T I*, a House subcommittee issued a subpoena to AT&T instructing it to turn over certain national-security documents arising out of an executive-branch wiretapping program. 551 F.2d at 385-86. After negotiations between the subcommittee and the Executive Branch broke down, DOJ filed suit, seeking an injunction to prevent AT&T from releasing the documents. *Id.* at 387. The subcommittee authorized a member of the House to intervene as a defendant,

26

and we concluded that "the House as a whole has standing to assert its investigatory power, and can designate a member to act on its behalf." *Id.* at 387, 391. The Committee seizes on this language, claiming that McGahn's argument that it lacks standing is foreclosed by circuit precedent.

The Committee is wrong. First, the entire analysis of the House's standing to intervene in *AT&T I* consists of a single sentence, followed by no citations. "[D]rive-by jurisdictional rulings of this sort" typically "have no precedential effect." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998).

Second, *Raines* casts serious doubt on this circuit's line of cases that freely dispensed legislative standing. *See Chenoweth*, 181 F.3d at 117 n.* (concluding that *Raines* left "no room for the broad theory of legislative standing that we adopted in *Moore* and *Kennedy*"). As discussed, *Raines*'s emphasis on separation-of-powers issues and "historical practice," 521 U.S. at 826-29, compels the conclusion that we lack jurisdiction to consider lawsuits between the Legislative and Executive Branches. Indeed, the *Raines* Court knew that we had authorized Members of Congress to "assert injury to their institutional power as legislators," *id.* at 820 n.4, but the Court still concluded that "*no suit* was brought on the basis of claimed injury to official authority or power," *id.* at 826 (emphasis added). The Court's historical analysis thus discounted our brief forays into legislative standing, and we are accordingly hesitant to find standing based solely on *AT&T I.*

Third, *AT&T I* is distinguishable. Before *Raines*, we kept "distinct our analysis of *standing* and our consideration of the *separation of powers* issues raised when a legislator [brought] a lawsuit concerning a legislative or executive act." *Chenoweth*, 181 F.3d at 114 (emphases added). In other words, a holding that Congress had standing was not necessarily a

27

holding that the case was justiciable. But in *Raines*, the Supreme Court was "unmoved by [our circuit's] concern . . . that the separation of powers issues would distort [the] standing analysis." *Id.* at 115 (internal quotation marks omitted). After *Raines*, we recognized that we should "merge our separation of powers and standing analyses" when applying the old legislative-standing cases. *Id.* at 116.

Although *AT&T I* said that "the House as a whole has standing to assert its investigatory power," 551 F.2d at 391, that wasn't the end of the analysis. The court *also* considered whether the suit presented a nonjusticiable political question—an issue it found "difficult" and chose to "leave open pending further proceedings." *Id*. Together, *AT&T I*'s standing holding and its (lack of a) separation-of-powers holding nullify the case's precedential effect. Under *Chenoweth*, we "merge" our separation-of-powers and standing analyses. 181 F.3d at 116. And *AT&T I*'s "merged" holding decides *not to decide* whether the case was justiciable.

*AT&T I* was not the end of the matter. Unable to strike a bargain, the parties returned to court to seek a judicial resolution. *See AT&T II*, 567 F.2d at 121. After laying out the serious separation-of-powers concerns, we ultimately held that "complete judicial abstention on political question grounds is not warranted" if "it is or may be possible to establish an *effective judicial settlement*." *Id.* at 123, 127 (emphasis added). We then adopted a "gradual approach" designed to encourage an "accommodation between the two branches." *Id.* at 131. Here, by contrast, there is no prospect of a judicially managed settlement. The Committee claims an absolute right to compel McGahn's testimony; the President an absolute right to withhold it. J.A. 845 ("Defendant agrees [with the plaintiff] that the parties' negotiations have now reached a stage at which it is clear that fundamental disagreements remain [and] . . . it

28

appears unlikely the parties will reach a mutually acceptable accommodation."). Therefore, neither *AT&T I* nor *AT&T II* permits the Committee to bring suit to enforce its subpoena.

The Committee next argues that *Senate Select Committee*, 498 F.2d at 725, authorizes this suit. Committee Br. 18. Again, the Committee is wrong. First, *Senate Select Committee* did not address standing at all, and "the existence of unaddressed jurisdictional defects has no precedential effect." *Lewis v. Casey*, 518 U.S. 343, 352 n.2 (1996). Second, for the reasons already given, *Raines* casts doubt on our prior legislative standing decisions. Finally, and in any event, *Senate Select Committee* is distinguishable. There, Congress passed a *statute* that expressly authorized the lawsuit. *See* 498 F.2d at 727 n.10; Pub. L. No. 93-190, 87 Stat. 736 (1973). A statute could mitigate the separation-of-powers considerations that counsel against adjudicating interbranch disputes. If Congress passed such a statute here, the analysis might be different. *See infra* Part V. But the fact that no such statute exists is enough to distinguish *Senate Select Committee*.

\* \* \*

Ultimately, the Committee's reliance on our old legislative-standing cases cannot save it from confronting *Raines*. Our expansive approach to legislative standing was doubtful then, *see Barnes*, 759 F.2d at 44 (Bork, J., dissenting) (challenging legislative standing); *Moore*, 733 F.2d at 956 (Scalia, J., concurring in the judgment) (same), and is even more so now. Regardless, *AT&T I*, *AT&T II*, and *Senate Select Committee* are distinguishable from this case, and nothing in our precedent compels us to ignore the serious separation-of-powers problems raised by the Committee's lawsuit.

29

IV

The dissent would hold that the Committee has standing. It reasons that (1) *Raines* does not foreclose the Committee's lawsuit, *see* Dissent at 5-14; that (2) we can and should resolve this interbranch dispute because the federal courts are the Committee's "last resort," *see id.* at 15-19; and that (3) declining to decide this matter will frustrate Congress's capacity to perform its constitutional functions, *see id.* at 1-5, 18-19.

Respectfully, each argument is wrong. The dissent misreads *Raines*, and it wrongly assumes that our jurisdiction expands or contracts depending on a legal question's importance or a litigant's alternative remedies. Worse still, the dissent imagines Congress to be politically impotent, then uses that supposed powerlessness to justify intrusive judicial supervision of the elected branches.

A

Begin with *Raines*. The dissent suggests that *Raines* never held that the Constitution bars Congress from asserting a cognizable institutional injury against the Executive Branch. *See* Dissent at 6-7, 10-11. But the Court recognized that suits brought by Congress raise special "separation-of-powers concerns." *Raines*, 521 U.S. at 824 n.8; *see also Ariz. State Legislature*, 135 S. Ct. at 2665 n.12. And the Court made clear that history "cut[s] against" congressional standing, emphasizing that "in analogous confrontations between one or both Houses of Congress and the Executive Branch, *no suit* was brought on the basis of claimed injury to official authority or power." *Raines*, 521 U.S. at 826 (emphasis added). If *Raines* were as narrow as the dissent would have it, the Court would not have indulged in pages of superfluous historical analysis.

30

And the dissent has no real answer to that history. It protests that interbranch information disputes have been "traditionally" amenable to judicial resolution; for support, the dissent cites the same two pre-*Raines* appellate decisions from 1974 and 1976. Dissent at 8-9 (citing *Senate Select Committee* and *AT&T I*). But the 25 odd years between 1974 and 1997 represent a narrow slice of a constitutional tradition that began over 225 years ago. Unsurprisingly, *Raines* took a broader view of the history, and from that perspective, the legislative-standing doctrine of the 1970s was a blip on the radar. Indeed, the Supreme Court ignored our circuit's pre-*Raines* legislative-standing cases when it surveyed the historical record and found "no suit" had been brought in "analogous confrontations." *Raines*, 521 U.S. at 826. We too decline to rest our decision on a fleeting diversion from otherwise uniform historical experience.

B

Unmoored from *Raines*, the dissent then asserts that federal courts may resolve interbranch disputes "as a last resort." Dissent at 15 (internal quotation marks omitted). The dissent identifies a few factors that make it "appropriate" to "exercise jurisdiction." *Id*. Here, we must answer only a "narrow" legal question, Congress's "alternative remedies" are "impracticable," and "there is nothing political about the case itself." Dissent at 16, 17, 22.

But Article III limits us to "Cases" and "Controversies," and an interbranch dispute does not transform into a justiciable suit simply because Congress has exhausted its political remedies and packaged its grievance as a tidy constitutional puzzle. Instead, we must ask whether this lawsuit is the *kind of dispute* that we may resolve. If so, we must answer the legal

31

question "properly before [us]," even if its resolution has significant "political implications." *Zivotofsky v. Clinton*, 566 U.S. 189, 194, 196 (2012). If not, we must refuse to answer it, even if doing so seems (by our lights) prudent. *See Cohens v. Virginia*, 19 U.S. 264, 404 (1821) ("We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.").

What the dissent articulates instead is an impermissible jurisdictional balancing test: How narrow must the legal issue be? How powerless Congress? And when is a matter too political? This approach would allow federal courts to make "case-by-case" determinations "whether it is 'wise' or 'useful' for us to intervene in a particular dispute." *Moore*, 733 F.2d at 963 (Scalia, J., concurring in the judgment). We took this tack once before. Prior to *Raines*, we developed a doctrine of "circumscribed equitable discretion" that prevented us sometimes (but only sometimes) from resolving legislative-standing cases, and we have abandoned that doctrine since. *See Chenoweth*, 181 F.3d at 114-16. The dissent would replicate that dubious discretionary regime, now under the guise of Article III standing. We should not make the same mistake again.

C

The dissent's real concern seems to be that our decision will "dramatically undermin[e]" Congress's capacity to "fulfill its constitutional obligations." Dissent at 19. But the dissent undervalues the political tools at Congress's disposal. Although the dissent spends pages explaining OLC's position that Congress cannot resort to the criminal-contempt statute or to its inherent contempt power, *see id.* at 12-14, 17-19, it pays almost no attention to Congress's many political tools.

32

Take the Appropriations Clause. The Executive Branch cannot spend a dime without Congress's consent, U.S. CONST. art. 1, § 9, cl. 7, and that's a powerful incentive to follow Congress's instructions. Don't take our word for it; take James Madison's: "This power over the purse, may in fact be regarded as the most compleat and effectual weapon with which any constitution can arm the immediate representatives of the people, *for obtaining a redress of every grievance*, and for carrying into effect every just and salutary measure." THE FEDERALIST NO. 58, at 394 (J. Cooke ed. 1961) (emphasis added). The dissent likewise discounts the Senate's appointment power, the impeachment power, and the informal power to "publicly embarrass executive branch officials." Devins, *supra*, at 134.

The dissent suggests that Congress cannot fend for itself because these "remedies cannot be undertaken by a single House of Congress." Dissent at 17. But that's a *feature* of a bicameral legislature, one with "finely wrought and exhaustively considered" mechanisms through which the chambers act. *Chadha*, 462 U.S. at 951. Anyway, many of the remedies *can* be exercised without majorities in both chambers: Most appropriations must be approved by the House and Senate every year. A censure vote takes a bare majority from either chamber. And Members of Congress can denounce the Executive Branch from their own bully pulpits.

With this range of political tools, Congress can tailor its sanctions to the gravity of the Executive Branch's offense. A congressional inquiry may begin and end with a polite request for information. Or a chamber of Congress may escalate by, say, issuing a formal subpoena, threatening to withhold appropriations, or passing articles of impeachment. By the same token, the Executive Branch's interest in reaching a mutually agreeable compromise should grow as Congress turns

up the heat. *See* Devins, *supra*, at 132 ("[T]he executive and legislative branches negotiate with each other in an atmosphere in which each branch is aware of the other's ability to raise the stakes and the complexity of the negotiating process.").

This political process also offers an array of possible *resolutions* in interbranch disputes—a diverse set of compromises and accommodations. For instance, the Executive Branch might agree to waive executive privilege if the Legislative Branch narrows its document request. Or if the dispute concerns an official's testimony, the Executive Branch might agree to allow an official to answer written interrogatories or to testify in private. *See, e.g.*, Decl. of Michael M. Purpura, Deputy Counsel to the President, J.A. 717 (noting that the White House Counsel's Office discussed these possible accommodations with the Committee).

The dissent's approach would eliminate this dynamic system of escalating political sanctions and flexible settlements. When a lawsuit is the end-game of any interbranch dispute, the response to an overbroad subpoena isn't "Let's talk" but "We'll see you in court." And the resolution of such a dispute isn't a negotiated compromise—one that leaves everyone a little dissatisfied—but a rigid judicial judgment. No doubt, leaving these disputes to the political process is *messy*. Sometimes, the Executive Branch will seem recalcitrant, or a congressional act of retaliation will seem disproportionate. But the messiness and flexibility of the political process come as a package deal. Judicial involvement might resolve a few interbranch disputes more cleanly, but it would also eliminate the process's flexibility. And anyway, even if a jurisdiction of "last resort" were a better system, Article III forbids federal judges from deciding—on a case-by-case basis—when it makes sense to settle the score.

34

The dissent also suggests that the political process will systematically favor the Executive Branch, *e.g.*, Dissent at 1, 24-25, but it's far from obvious that judicial resolution is better even for Congress. Litigation takes a long time, and Congress turns over every two years. In *Miers*, for instance, our circuit declined to expedite the appeal of the district court's order because the case could not be "fully and finally resolved by the Judicial Branch" before the Congress that issued the subpoenas expired. *Comm. on the Judiciary v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008) (per curiam); *see also* Chafetz, *supra*, at 1150 ("[C]ourts tend to move at a pace that is poorly suited to Congress's need for timely information."). And in some information disputes, the Executive Branch may wind up "giving up the information and caving in because those who hold the information are not up to the fight." Devins, *supra*, at 133 (quoting Theodore Olson, former Assistant Attorney General for the Office of Legal Counsel). A win for the Committee today may only hamstring Congress in the future.

But what about *this* case? What about the President's blatant refusal to cooperate with the Committee's investigation into his alleged wrongdoing? To the dissent, that this obstruction should go unredressed seems unimaginable. *See* Dissent at 17.

Nevertheless, the inevitable consequence of Article III's case-or-controversy requirement is that Congress will obtain only the concessions it can wrest from the Executive Branch with the ample but imperfect tools at its disposal. Sometimes, those tools will yield fewer concessions than Congress might wish, but the remedy for that perceived wrong is in politics or at the ballot box. If federal courts were to swoop in to rescue Congress whenever its constitutional tools failed, it would not just *supplement* the political process; it would replace that process with one in which unelected judges become the

35

perpetual "overseer[s]" of our elected officials. *Youngstown*, 343 U.S. at 594 (Frankfurter, J., concurring). That is not the role of judges in our democracy, and that is why Article III compels us to dismiss this case.

V

We conclude by noting a few limitations on the scope of this decision: First, we do not address whether a chamber of Congress may bring a civil suit against private citizens to enforce a subpoena. At oral argument, DOJ asserted that Article III precludes a chamber of Congress from *ever* enforcing its subpoena in civil litigation—even against private parties. *See* Oral Arg. Tr. 30:2-10. If adopted, DOJ's position would render unconstitutional the statutes authorizing the Senate to enforce subpoenas in federal court. *See* 2 U.S.C. § 288d(a); 28 U.S.C. § 1365(a); *see also Senate Permanent Subcomm.*, 655 F.2d at 1238 n.28. Of course, such a lawsuit would not be an *interbranch* dispute, so it would present very different separation-of-powers concerns. We see no reason to address—let alone to adopt—DOJ's expansive argument here.

Second, we do not decide whether a congressional statute authorizing a suit like the Committee's would be constitutional. Congress may sometimes "elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law," *Spokeo*, 136 S. Ct. at 1549 (internal quotation marks and alterations omitted), and a statute authorizing suit would reflect Congress's (and perhaps the President's) view that judicial resolution of interbranch disputes is "consistent with a system of separated powers," *Allen*, 468 U.S. at 752. Perhaps that statute would render suits to enforce subpoenas "judicially cognizable," *Raines*, 521 U.S. at 819, though of course Congress could not "erase Article III's

36

standing requirements," *id.* at 820 n.3. We leave that issue for another day.

Third, we do not question the federal courts' authority to adjudicate disputes historically recognized to be within our jurisdiction. For example, in criminal prosecutions, we can adjudicate executive-privilege claims arising out of criminal subpoenas, as in *Nixon*, 418 U.S. at 683. Likewise, we may adjudicate cases concerning congressional subpoenas if they implicate the rights of private parties, as in *Mazars*, 940 F.3d at 723 (noting that the Committee's subpoena was issued to a "*non-governmental* custodian[] of the President's financial information" (emphasis added)). Such cases ask us to "decide on the rights of individuals," *Marbury*, 5 U.S. at 170, and we "cannot avoid" resolving difficult constitutional questions "merely because the issues have political implications," *Zivotofsky*, 566 U.S. at 196.

Finally, we express no view on the merits, except to emphasize a crucial aspect of our constitutional design. Even when *courts* have no role policing the boundaries of the branches' prerogatives in a dispute about the operations of government, the branches have a duty to conduct themselves with "autonomy but reciprocity" and to "integrate the[ir] dispersed powers into a workable government." *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring). Heeding Justice Jackson's injunction, the branches have long resolved their differences through negotiation and compromise.

That is to be encouraged. The branches may (and will) disagree in good faith about their obligations to one another; that is the point of a system in which "[a]mbition . . . counteract[s] ambition." THE FEDERALIST NO. 51, at 349 (James Madison) (J. Cooke ed. 1961). But the legitimate scope of that disagreement is not boundless. Instead, the Constitution

37

binds Members of Congress and the Executive Branch by "Oath or Affirmation," *see* U.S. CONST. art. II, § 1; *id.* art. VI; 33 U.S.C. § 3331, and those so bound have a duty to conduct themselves with fidelity to the Constitution.

## VI

We lack jurisdiction to hear and therefore dismiss the Committee's lawsuit because it does not present an Article III case or controversy. The judgment is vacated, and the case is remanded with instructions to direct that the complaint be dismissed.

*So ordered.*

KAREN LECRAFT HENDERSON, *Circuit Judge*, concurring: I join Judge Griffith in concluding that, under United States Supreme Court precedent, the Committee lacks standing. I am reluctant, however, to endorse what I view as McGahn's categorical stance. In his swing for the fences, McGahn has passed up a likely base hit. First, McGahn urges us to foreclose Article III standing when the Congress, or a House thereof, asserts *any* institutional injury in *any* interbranch dispute;[1] I do not believe, however, Supreme Court precedent supports a holding of that scope. Second, McGahn's assertion of absolute testimonial immunity against compelled congressional process is, in my opinion, a step too far, again, under Supreme Court precedent.

I

As the majority opinion makes clear, *Raines v. Byrd*, 521 U.S. 811 (1997), is the touchstone of our legislative standing analysis. And if this suit pitted individual legislators against the prerogatives of the Executive Branch, a straightforward application of *Raines* would resolve it in short order. *Cf. Blumenthal v. Trump*, 949 F.3d 14, 19 (D.C. Cir. 2020) (per curiam). But the issues are far from being on all fours with *Raines*. Indeed, whereas it was "importan[t]" in *Raines* that the individual legislators, despite alleging an institutional injury, "ha[d] not been authorized to represent their respective Houses of Congress," 521 U.S. at 829, the Committee on the Judiciary (Committee) *has* been authorized by the House of Representatives to litigate the enforceability of the Committee's duly issued subpoena, *see* H.R. Res. 430, 116th Cong. (2019). Thus, although *Raines* may have sounded the death knell for individual legislators asserting an institutional

---

[1] McGahn's counsel went further, arguing that "the broadest formulation of our argument would be that Congress, when it's asserting its institutional prerogatives, *never* ha[s] standing." Oral Arg. Tr. 13:14–16 (emphasis added).

2

injury at the hand of the Executive, it may not necessarily follow that legislative standing no longer exists in all circumstances. *Cf. Campbell v. Clinton*, 203 F.3d 19, 32 (D.C. Cir. 2000) (Randolph, J., concurring in the judgment) ("If the Supreme Court had meant to do away with legislative standing [in *Raines*], it would have said so and it would have given reasons for taking that step."). At the same time that *Raines* and its progeny take us in a direction that is, for now, fairly clear, it is important to remember that this case presents federal legislators *qua* the Congress, that is, as an *institutional* plaintiff asserting an *institutional* injury. Whether such institutional plaintiff with an institutional injury could change that direction awaits Supreme Court resolution. But lest there be any doubt, I join the holding of the majority opinion as well as its rationale: namely, the Committee lacks standing under Supreme Court precedent.

Article III of the Constitution confines the federal judicial authority to "Cases" or "Controversies." U.S. CONST. art. III, § 2, cl. 1. In turn, "[s]tanding to sue is a doctrine rooted in the traditional understanding of a case or controversy" and "limits the category of litigants empowered to maintain a lawsuit in federal court." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "[T]he 'irreducible constitutional minimum' of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citation omitted) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). The Supreme Court has "also stressed that the alleged injury must be legally and judicially cognizable," which "requires, among other things, that the plaintiff have suffered 'an invasion of a legally protected interest which is . . . concrete and particularized,' and that the dispute is 'traditionally thought to be capable of resolution through the

3

judicial process.'" *Raines*, 521 U.S. at 819 (citation omitted) (first quoting *Lujan*, 504 U.S. at 560; then quoting *Flast v. Cohen*, 392 U.S. 83, 97 (1968)). Although this familiar formulation is a prerequisite to federal jurisdiction in all instances, it is especially important here, where the dispute implicates the separation-of-powers considerations underpinning our standing doctrine.

"The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013); *see Raines*, 521 U.S. at 820 (Article III is "about keeping the Judiciary's power within its proper constitutional sphere"). The cabining of power within the respective branches was of utmost importance to the Founders. Upon leaving office, President George Washington highlighted "[t]he necessity of reciprocal checks in the exercise of political power, by dividing and distributing it into different depositories and constituting each the guardian of the public weal against invasions by the others." George Washington, Washington's Farewell Address to the People of the United States (Sept. 19, 1796), *reprinted in* S. DOC. NO. 106–21, at 19 (2000) [hereinafter Farewell Address]. Any change in the respective allocations of power must be effected by the people through constitutional amendment because, as Washington cautioned, there should "be no change by usurpation; for though this, in one instance, may be the instrument of good, it is the customary weapon by which free governments are destroyed." *Id.* The fear, then, is that federal courts will exceed their circumscribed authority by exercising jurisdiction even if a plaintiff lacks the concrete, personalized interest mandated by the case-or-controversy limitation. *See United States v. Richardson*, 418 U.S. 166, 188 (1974) (Powell, J., concurring)

4

("Relaxation of standing requirements is directly related to the expansion of judicial power.").

To guard against the expansion of judicial power at the expense of the coequal branches, "our standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines*, 521 U.S. at 819–20; *cf. Chenoweth v. Clinton*, 181 F.3d 112, 114 (D.C. Cir. 1999) (separation-of-powers considerations "are particularly acute . . . when a legislator attempts to bring an essentially political dispute into a judicial forum"). It is unclear just how much rigor is mandated by *Raines*'s "especially rigorous" instruction.[2] Although we should "exercise self-restraint in the utilization of our power to negative the actions of the other branches," *Richardson*, 418 U.S. at 188 (Powell, J., concurring), the separation-of-powers element magnifies, rather than modifies, our standing analysis.[3] In other words, the existence of an

_____

[2] Indeed, "[t]he cases cited to support this dictum . . . are merely cases where a determination of unconstitutionality is avoided by applying what there is no reason to believe is anything other than *normal* standing requirements." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2697 (2015) (Scalia, J., dissenting).

[3] Complicating matters, some Supreme Court Justices have hinted that separation-of-powers principles factor into our substantive analysis. For example, in *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945 (2019), Justice Alito interpreted the majority's "use of the term 'judicially cognizable' injury rather than 'concrete' injury" to mean that the decision was "not really based on the *Lujan* factors" that frame the traditional standing inquiry, *id.* at 1958 (Alito, J., dissenting). And "[i]f one House of Congress . . . attempt[s] to invoke the power of a federal court, the court must consider whether this attempt is consistent with the structure created by the Federal Constitution. An interest

5

interbranch dispute does not by itself determine whether the traditional requisites of standing are satisfied. Instead, we must conduct a "careful[] inquir[y]" to determine whether the "claimed injury is personal, particularized, concrete, and otherwise judicially cognizable." *Raines*, 521 U.S. at 820. At the same time, exercising extra care does not *require* us to find the dispute beyond our ken. "Proper regard for the complex nature of our constitutional structure requires neither that the Judicial Branch shrink from a confrontation with the other two coequal branches of the Federal Government, nor that it hospitably accept for adjudication claims of constitutional violation by other branches of government where the claimant has not suffered cognizable injury." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982).

Thus, as in every case that comes before us, the proper starting point is to ask whether the Committee has suffered a cognizable injury. Although early American courts articulated that the Article III case-or-controversy limitation contemplated suits brought by individuals, and strict adherence to this tenet would seem to preclude "suits between units of government regarding their legitimate powers," *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2694 (2015) (Scalia, J., dissenting), the Supreme Court has yet to impose such a blanket application. To the contrary, recent Supreme Court precedent leaves open the possibility of legislative standing in an intragovernmental dispute, at least where a *state* legislature asserts an institutional injury. Indeed, the Supreme Court held that the Arizona Legislature had standing to litigate an alleged injury to its redistricting power under the Federal Constitution's Elections Clause against the

---

asserted . . . by one or both Houses of Congress that is inconsistent with that structure may not be judicially cognizable." *Id.* at 1959.

6

State's independent redistricting commission. *Id.* at 2663–66. Applying the familiar Article III standing analysis, the Court required the Arizona Legislature to "'show, first and foremost,' injury in the form of 'invasion of a legally protected interest that is concrete and particularized and actual or imminent.'" *Id.* at 2663 (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997) (quotation marks omitted)). And, importantly, *Raines* was not dispositive there. *Id.* at 2664. *Raines* involved "six *individual Members* of Congress" but "[t]he Arizona Legislature, in contrast, is an institutional plaintiff asserting an institutional injury, and it commenced this action after authorizing votes in both of its chambers." *Id.* "That 'different . . . circumstance' was not *sub judice* in *Raines*." *Id.* (citation and alteration omitted) (quoting *Raines*, 521 U.S. at 830). It is requisite, then, that the legislative plaintiff is the same body to which the institutional power at stake is entrusted. *Cf. Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1953 (2019) ("[I]n *Arizona State Legislature* there was no mismatch between the body seeking to litigate and the body to which the relevant constitutional provision allegedly assigned exclusive redistricting authority."). Therefore, "[j]ust as individual members lack standing to assert the institutional interests of a legislature, a single House of a bicameral legislature lacks capacity to assert interests belonging to the legislature as a whole." *Id.* at 1953–54 (citation omitted).

Here, the Committee's alleged injury is to its power to conduct investigations and compel information. Committee Br. 15–16. The Constitution grants the House of Representatives the "sole Power of Impeachment," U.S. CONST. art. I, § 2, cl. 5,[4] and Article I's grant of "[a]ll legislative Powers" to the

---

[4] Although the subpoena issued to McGahn predated the start of formal impeachment proceedings, the extended timeline of this

7

Congress, *id.* art. I, § 1, also impliedly confers the power to investigate, which encompasses "the subpoena power [that] may be exercised by a committee acting, as here, on behalf of one of the Houses," *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 505 (1975) (citing *McGrain v. Daugherty*, 273 U.S. 135, 158 (1927)). "The House has delegated to the Committee authority to conduct investigations and issue subpoenas," Committee Br. 16; thus, the Committee's "investigative authority . . . has an express constitutional source," *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 732 (D.C. Cir. 1974). Because the alleged institutional injury infringes, at least in part, on a power vested exclusively in the House and, in turn, delegated to the Committee, the Supreme Court's post-*Raines* precedent does not categorically foreclose the possibility that the Committee's asserted injury could support Article III standing. Competing constitutional prerogatives and the potential availability of alternative legislative remedies do not paralyze federal courts from acting when confronting an otherwise justiciable case. That said, the Committee's standing argument may not be dead on arrival but it is certainly flatlining.

Assuming the Committee can survive to this point by relying on *Arizona State Legislature* and *Bethune-Hill*, I believe those cases take it no further. Most notably, neither implicated the separation-of-powers concerns animating both *Raines* and this dispute. *See Bethune-Hill*, 139 S. Ct. at 1958 (Alito, J., dissenting) ("[T]he decision in *Raines* rested heavily on federal separation-of-powers concerns, which are notably absent here."); *Ariz. State Legislature*, 135 S. Ct. at 2665 n.12 ("[A] suit between Congress and the President would raise

---

dispute enabled the Committee to catch the moving target and provide a more concrete impeachment justification for its inquiry.

8

separation-of-powers concerns absent here."). This is, of course, no trifling distinction.

Although this case involves a controversy—the Executive and Legislative Branches' divergent positions have brought the parties and perhaps even the country to a constitutional standstill—even that is not enough for Article III standing. "In the constitutional sense, controversy means more than disagreement and conflict; rather it means the kind of controversy courts traditionally resolve." *United States v. Nixon*, 418 U.S. 683, 696 (1974). And on this point, "historical practice appears to cut against" the Committee. *Raines*, 521 U.S. at 826. In *Raines*, the Supreme Court declared that in past "confrontations between one or both Houses of Congress and the Executive Branch, no suit was brought on the basis of claimed injury to official authority or power," *id.*, and the majority opinion here ably expounds on this point, *see* Majority Op. 14–16; *see also Ariz. State Legislature*, 135 S. Ct. at 2695 (Scalia, J., dissenting) ("[W]e have *never* passed on a separation-of-powers question raised directly by a governmental subunit's complaint.").

In sum, the Supreme Court has made clear that: first, legislators lack Article III standing to remedy an institutional injury, subject to extremely narrow exceptions, *see Raines*, 521 U.S. at 829; and, second, its lead decision finding standing in a legislative body asserting an institutional injury does not implicate separation-of-powers concerns, *see Ariz. State Legislature*, 135 S. Ct. at 2665 n.12. Nor does this suit resemble a "case" or "controversy" traditionally contemplated as within our Article III power. Accordingly, judicial restraint counsels that we find the Committee lacks standing for want of a cognizable injury.

9

A contrary holding would extend *Arizona State Legislature* to coequal branches of the federal government in defiance of every warning fairly gleaned from Supreme Court precedent. To the extent, if any, *Arizona State Legislature* leaves the legislative standing door ajar, it is not our role to fling that door open. Rather, the continued functioning of our constitutional system requires that we exercise abundant caution before deviating from historical practice, especially when the underlying dispute is inextricably intertwined with "a power contest nearly at the height of its political tension." *Raines*, 521 U.S. at 833 (Souter, J., concurring in the judgment). This credo has guided our country since its birth. Again, in his farewell address, Washington implored that "[t]owards the preservation of your government . . . it is requisite . . . that you resist with care the spirit of innovation upon its principles." Farewell Address, at 15. Indeed, "time and habit are at least as necessary to fix the true character of governments as of other human institutions" and "experience is the surest standard by which to test the real tendency of the existing constitution of a country." *Id.* Heeding this solemn counsel, I, like my colleague, believe we must refrain from expanding the federal judicial power to encompass a suit never before deemed cognizable. If federal legislative standing is to be given new life, it must be the Supreme Court—not an inferior court—that resuscitates it.

II

The conclusion that the Committee has failed to assert a cognizable injury is the start and end of our decision. *See Valley Forge*, 454 U.S. at 475–76 ("Those who do not possess Art. III standing may not litigate as suitors in the courts of the United States."). Yet notwithstanding the Executive Branch received its requested relief, it is difficult to identify any winners here. Over the course of nearly six months, federal courts have been

10

"improperly and unnecessarily plunged into the bitter political battle being waged between the President and Congress." *Raines*, 521 U.S. at 827. Make no mistake, the merits question at issue here is of the utmost importance. Although neither the congressional subpoena power nor the President's interest in withholding information is expressly provided for, each is impliedly grounded in the Constitution. *See Nixon*, 418 U.S. at 708 ("[A] presumptive privilege for Presidential communications . . . is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution."); *Watkins v. United States*, 354 U.S. 178, 187 (1957) ("The power of the Congress to conduct investigations is inherent in the legislative process."). When these constitutional components collide, which should prevail? The Committee presses us to cast the crucial vote in this contest of competing prerogatives but "much of the allocation of powers is best left to political struggle and compromise." *Barnes v. Kline*, 759 F.2d 21, 55 (D.C. Cir. 1984) (Bork, J., dissenting), *vacated sub nom. Burke v. Barnes*, 479 U.S. 361 (1987). And, indeed, although informational disputes between the Legislative and Executive Branches have existed since Washington's administration, *see Nixon v. Sirica*, 487 F.2d 700, 778–79 (D.C. Cir. 1973) (en banc) (Wilkey, J., dissenting) (historical background), the Judiciary was not asked to settle them until the Watergate years. In past political battles, executive officials—including sitting and former presidents— often acquiesced, voluntarily providing testimony and documents. *See, e.g.*, *Sitting Presidents & Vice Presidents Who Have Testified Before Congressional Committees*, U.S. SENATE (2017), https://perma.cc/J2HH-X5WG. Other times, they did not. But in no instance were such disputes resolved by federal judges. Now, breakdowns in the time-honored process of negotiation and accommodation have embroiled this court in a fight we are ill-suited to referee.

11

Although the Committee's lack of standing eliminates the need to reach the merits, I also write separately to highlight the narrower defense against congressional overreach provided by well-settled privileges. From the outset, the Executive Branch has taken the position "that Mr. McGahn is absolutely immune from compelled congressional testimony." Letter from Pat A. Cipollone, Counsel to the President, to Jerrold Nadler, Chairman, Comm. on the Judiciary, U.S. House of Representatives 1 (May 20, 2019).[5] This categorical approach erects a barrier that, although supported by many of the same principles, is purportedly "distinct from, and broader than," executive privilege. *Testimonial Immunity Before Cong. of the Former Counsel to the President*, 43 Op. O.L.C. (May 20, 2019), 2019 WL 2315338, at *2 [hereinafter *Testimonial Immunity*]. In other words, absolute immunity means that McGahn need not honor the subpoena at all. But unlike an assertion of privilege to specific questions, which encourages the parties to use accommodation and other political tools, McGahn's absolutist stance has prevented their use and prematurely involved the courts. Indeed, had the Committee prevailed here—assuming, of course, standing, jurisdiction and a viable cause of action—the dispute would still be far from over. As McGahn's counsel recognized, available privileges would limit the scope of the Committee's questioning.[6] And

---

[5] The Trump administration is not the first to raise this argument. *See, e.g.*, *Immunity of the Assistant to the President & Dir. of the Office of Political Strategy & Outreach from Cong. Subpoena*, 38 Op. O.L.C. (July 15, 2014), 2014 WL 10788678 (Obama); *Immunity of the Former Counsel to the President from Compelled Cong. Testimony*, 31 Op. O.L.C. 191 (2007) (George W. Bush); *Assertion of Exec. Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1 (1999) (Clinton).

[6] "[I]f Mr. McGahn were to have to testify . . . he would have . . . not just attorney-client, but a bunch of executive privilege-based objections to the concrete questions." Oral Arg. Tr. 37:8–12.

12

the Committee readily concedes that, should privilege negotiations reach an impasse, it "would go back to the District Court for a resolution of those" issues. Oral Arg. Tr. 60:25–61:1. Resolving matters following specific assertions of privilege could have therefore delayed judicial involvement and decreased the need for repetitive litigation, while at the same time protecting the President's interests. Because absolute immunity is its primary position, however, the Executive Branch has yet to make a formal assertion of privilege in this case.

Absolute immunity, which provides more expansive protection than executive privilege, is nonetheless predicated on substantially the same rationales. For example, the need to protect against interfering with "the President's access to . . . sound and candid advice," Appellant's Br. 53, is likewise reflected in the presidential communications privilege, which is recognized "to encourage the candid advice necessary for effective decisionmaking," *Dellums v. Powell*, 561 F.2d 242, 246 (D.C. Cir. 1977). Each also preserves the autonomy of presidential decisionmaking. *See In re Sealed Case*, 121 F.3d 729, 745 (D.C. Cir. 1997) (executive privileges are "designed to protect executive branch decisionmaking"); Appellant's Br. 52 (immunity is "necessary to preserve the autonomy and confidentiality of presidential decisionmaking"). According to McGahn, however, the assertion of executive privilege to specific questions neither lowers the risk of inadvertent disclosure nor avoids the potential chill of candid advice and, perhaps more fundamentally, may cultivate the appearance of executive subordination if a politically motivated Congress summons executive officials before it for intrusive questioning. *See* Appellant's Br. 52, 55–56.

I believe McGahn's claimed immunity rests on somewhat shaky legal ground. Although presidents have invoked

13

executive privilege to withhold information from the Congress since the early days of the republic, *see generally History of Refusals by Exec. Branch Officials to Provide Info. Demanded by Cong.*, 6 Op. O.L.C. 751 (1982),[7] the legal basis of absolute immunity was "first described" in a 1971 memorandum by then-Assistant Attorney General William H. Rehnquist, *see Testimonial Immunity*, 2019 WL 2315338, at *1. Extrapolating from historical practice and acknowledging that his generalizations were "necessarily tentative and sketchy," Mr. Rehnquist concluded that the President's immediate advisors "should be deemed absolutely immune from testimonial compulsion by a congressional committee." Memorandum from William H. Rehnquist, Assistant Attorney Gen., Office of Legal Counsel, for John D. Ehrlichman, Assistant to the President for Domestic Affairs, *Re: Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff"* 7 (Feb. 5, 1971) [hereinafter Rehnquist Memorandum]. Subsequent OLC opinions are largely derivative and identify no caselaw recognizing the existence of such immunity from congressional process.

The Judiciary has, however, addressed executive immunity and privilege in other contexts. In *United States v. Burr*, 25 F. Cas. 30 (No. 14692D) (C.C.D. Va. 1807), "Chief Justice Marshall squarely ruled that a subpoena may be directed to the President," *Sirica*, 487 F.2d at 709 (en banc) (per curiam). Granted, judicial subpoenas in criminal cases reflect unique interests—the defendant's constitutional protections and the "'longstanding principle' that the grand jury 'has a right

---

[7] Some legal minds have argued that these refusals to comply with congressional demands for information rested "squarely on the ground of separation of powers," *Sirica*, 487 F.2d at 770 (en banc) (Wilkey, J., dissenting); others maintain that many did not in fact involve "a claim of constitutional right," *see* Archibald Cox, *Executive Privilege*, 122 U. PA. L. REV. 1383, 1397 (1974).

14

to every man's evidence'"—that are not implicated by congressional process. *Id.* at 712 (quoting *Branzburg v. Hayes*, 408 U.S. 665, 688 (1972)). But that distinction does not suggest congressional subpoenas are less deserving of compliance. Indeed, "[a] subpoena has never been treated as an invitation to a game of hare and hounds;" otherwise, "the great power of testimonial compulsion, so necessary to the effective functioning of courts *and legislatures*, would be a nullity." *United States v. Bryan*, 339 U.S. 323, 331 (1950) (emphasis added). And, although "the singular importance of the President's duties," *Nixon v. Fitzgerald*, 457 U.S. 731, 751 (1982), entitles him "to absolute immunity from damages liability predicated on his official acts," *id.* at 749, the same consideration—"diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government," *id.* at 751—does not completely shield a sitting President from the reach of the Judiciary. In civil litigation predicated on his unofficial acts, the President cannot claim temporary immunity (i.e., a stay of proceedings until after he leaves office). *Clinton v. Jones*, 520 U.S. 681, 692 (1997). Moreover, notwithstanding the Supreme Court in *Clinton* did not address the court's power to compel the President's attendance, it "assume[d] that the testimony of the President, both for discovery and for use at trial, may be taken at the White House at a time that will accommodate his busy schedule." *Id.* at 691–92. The risk of Executive Branch impediment was therefore mitigated by the President's ability to remain at the seat of power.[8]

---

[8] "Although Presidents have responded to written interrogatories, given depositions, and provided videotaped trial testimony, no sitting President has ever testified, or been ordered to testify, in open court." *Clinton*, 520 U.S. at 692 n.14 (citation omitted).

15

More fundamentally, even if the President himself is absolutely immune from compelled congressional process, it does not necessarily follow that his close advisors are too. In fact, although the Speech or Debate Clause[9] derivatively applies to Congressmembers' "alter egos"—that is, their aides, *see Gravel v. United States*, 408 U.S. 606, 617 (1972)—the Supreme Court has not endorsed analogous extensions of presidential immunity. In *Butz v. Economou*, 438 U.S. 478, 507 (1978), the Court held that Cabinet members were entitled to only qualified immunity in a civil damages suit. And although certain federal officials—the President, legislators, judges and federal prosecutors—can invoke absolute immunity for actions taken pursuant to the unique functions of their respective offices, "[t]he undifferentiated extension of absolute 'derivative' immunity to the President's aides . . . could not be reconciled with the 'functional' approach that has characterized the immunity decisions of" the Supreme Court. *Harlow v. Fitzgerald*, 457 U.S. 800, 811 (1982). Accordingly, former senior White House aides could not claim derivative absolute immunity, *id.* at 809, although the Supreme Court left open the possibility that absolute immunity may be justified for "aides entrusted with discretionary authority in such sensitive areas as national security or foreign policy," *id.* at 812.[10] Rather, "qualified immunity adequately protects those

---

[9] Senators and Representatives "shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1.

[10] Subsequent cases, however, declined to recognize national security as a basis for functional absolute immunity of the Attorney General, *see Mitchell v. Forsyth*, 472 U.S. 511, 520 (1985), and the National Security Advisor, *see Halperin v. Kissinger*, 807 F.2d 180, 194 (Scalia, Circuit Justice, D.C. Cir. 1986).

16

positions from undue interference." *Halperin v. Kissinger*, 807 F.2d 180, 194 (Scalia, Circuit Justice, D.C. Cir. 1986). Given that absolute immunity from personal liability is considered unnecessary to foster candid advice and maintain effective decisionmaking, it is not obvious that testimony before the Congress—protected by applicable privileges—would have such an effect.

To the contrary, it seems likely that the invocation of well-settled privileges could adequately protect the Executive Branch's undeniably critical interests. Again, the dearth of head-on conflicts between the President and the Congress requires analogy to related settings. In judicial proceedings the President's executive privilege is not absolute, *see Nixon*, 418 U.S. at 706 ("[N]either the doctrine of separation of powers, nor the need for confidentiality of high-level communications, without more, can sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances."), at least "[a]bsent a claim of need to protect military, diplomatic, or sensitive national security secrets," *id.*[11] In practice, absolute privilege would function the same as immunity—once either is claimed, any further inquiry is necessarily foreclosed. True, the necessity of protecting Executive decisionmaking "justif[ies] a presumptive privilege for Presidential communications," *id.* at 708, but, critically, this presumption can be overcome by a satisfactory demonstration of specific need for the information, *see Dellums*, 561 F.2d at 249. Thus, a qualified executive privilege would seem, at least to me, the most appropriate mechanism to govern a dispute like the one now before us.

---

[11]  *Nixon* involved a criminal proceeding but we soon rejected a generalized claim of absolute executive privilege in civil litigation as well. *See Dellums*, 561 F.2d at 245–46.

17

Granted, consideration of executive privilege takes on a new dimension when the privilege is claimed against the Congress. *See Nixon*, 418 U.S. at 712 n.19 ("We are not here concerned with the balance between the President's generalized interest in confidentiality and . . . congressional demands for information . . . ."); *In re Sealed Case*, 121 F.3d at 753 ("The President's ability to withhold information from Congress implicates different constitutional considerations than the President's ability to withhold evidence in judicial proceedings."). So too with the attorney-client privilege, which McGahn could assert in response to, in all likelihood, many, "if not the predominance of the questions [the Committee] would ask him." Oral Arg. Tr. 37:8–12. Although government lawyers may not rely on this privilege before a federal grand jury if the client communications relate to possible criminal violations, *In re Lindsey*, 158 F.3d 1263, 1274 (D.C. Cir. 1998), "no one can say with certainty the extent to which a privilege would generally protect a White House Counsel from testifying at a congressional hearing," *id.* at 1277. Given the President's weighty interest in the confidentiality of his communications, one concern is that the Congress, susceptible to the fruits of political temptation, would not proceed "with all the protection that a district court will be obliged to provide." *Nixon*, 418 U.S. at 706.

The lack of clarity surrounding the exercise of privilege is especially acute in the shadows of an impeachment inquiry. *See, e.g.*, *In re Lindsey*, 158 F.3d at 1277 ("Impeachment proceedings . . . cannot be analogized to traditional legal processes . . . . How the policy and practice supporting the common law attorney-client privilege would apply in such a political context thus is uncertain."). Indeed, even as early Presidents asserted a power to withhold information from the Congress, they simultaneously recognized that the balance of competing constitutional interests may be different when the

18

House acts pursuant to its impeachment power. In an 1846 message to the House of Representatives, President James K. Polk declined to provide requested information regarding the State Department's contingent fund but acknowledged that had the demand been made pursuant to an impeachment inquiry, "the power of the House, in the pursuit of this object, would penetrate into the most secret recesses of the Executive Departments." 2 Asher C. Hinds, *Hinds' Precedents of the House of Representatives of the United States* § 1561 (1907). "It could command the attendance of any and every agent of the Government, and compel them . . . to testify on oath to all facts within their knowledge." *Id.* This view of executive privilege stands in stark contrast to the expansive immunity now pushed by McGahn.[12]

And a qualified—rather than absolute—privilege can still adequately protect the undeniably important Executive Branch interests at stake when the Congress attempts to pry open the lid of presidential confidentiality. *See Comm. on the Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 102 (D.D.C. 2008) ("[A]ssert[ing] executive privilege on a question-by-question basis as appropriate . . . should serve as an effective check against public disclosure of truly privileged communications, thereby mitigating any adverse impact on the

---

[12] In addition to abstract uncertainty, there are numerous issues that must be worked out on a more individualized level, such as the scope of the asserted privilege and whether the privilege has been waived, with respect to certain information. Here, the parties did not reach these important questions because the White House did not formally assert executive privilege—or any other privilege, for that matter—regarding the content of McGahn's testimony. The strategic calculation to rely upon testimonial immunity was made despite the recognition that an immediate advisor like McGahn would be "unlikely to answer many of the [Committee's] questions." *Testimonial Immunity*, 2019 WL 2315338, at *4.

19

quality of advice that the President receives."). It seems unlikely that the risk of inadvertent disclosure will diminish the candor with which the President's immediate advisors offer counsel. Indeed, "[a]n advisor to the President has no guarantee of confidentiality. His advice may be disclosed by the President or a successor." *Dellums*, 561 F.2d at 246. In other words, executive privilege does not exist to protect the secrecy interests of an individual aide; it exists to keep the President's decisionmaking process running smoothly. Senior advisors already operate with the knowledge that their advice could be made public by the President. And if the President himself cannot rely on the supremacy of his position to postpone the required submission of testimony in civil litigation, *see Clinton*, 520 U.S. at 692, the imposition that a congressional hearing places on his advisors would presumably not be enough to warrant absolute privilege from process. This is especially true of a former advisor like McGahn, who is no longer "presumptively available to the President 24 hours a day." Rehnquist Memorandum, at 7. Further, fear that repeated assertions of privilege will generate "congressional and media condemnation" appears overblown. *Testimonial Immunity*, 2019 WL 2315338, at *4. It is unclear why declining to answer or produce on narrower privilege grounds would provoke stronger criticism than a refusal to show up at all. Moreover, the Congress itself is also subject to judgment in the court of public opinion. Should the Congress conduct an inquisition with questionable motives, such as harassment of an advisor or retaliation for an administration's policy decisions, it too would be subject to consequences, both abstract—the reputation of the body as a whole—and concrete—the electability of individual members.

Finally, I emphasize that the applicability of specific privileges in this case is not yet susceptible to judicial resolution: none has been formally asserted and, in any event,

20

we do not reach the merits because of the Committee's lack of standing. I write separately, however, because I see qualified privileges as the preferred mechanism for resolving these interbranch informational disputes in the future. Even setting aside the shaky foundation of testimonial immunity, a categorical refusal to participate in congressional inquiries strikes a resounding blow to the system of compromise and accommodation that has governed these fights since the republic began. Political negotiations should be the first—and, it is hoped, only—recourse to resolve the competing and powerful interests of two coequal branches of government. And even if one is skeptical of this rosy projection, I believe the applicable privileges provide a narrower starting point and, should the parties reach an impasse, frame the issue in a manner more suitable—and, indeed, more familiar—to judicial resolution.

ROGERS, *Circuit Judge*, dissenting:   Today the court reaches the extraordinary conclusion that the House of Representatives, in the exercise of its "sole Power of Impeachment," U.S. CONST. art. I, § 2, cl. 5, lacks standing under Article III of the Constitution to seek judicial enforcement of a subpoena in connection with an investigation into whether to impeach the President.  The House comes to the court in light of the President's blanket and unprecedented order that no member of the Executive Branch shall comply with the subpoena duly issued by an authorized House Committee.  Exercising jurisdiction over the Committee's case is not an instance of judicial encroachment on the prerogatives of another Branch, because subpoena enforcement is a traditional and commonplace function of the federal courts. The court removes any incentive for the Executive Branch to engage in the negotiation process seeking accommodation, all but assures future Presidential stonewalling of Congress, and further impairs the House's ability to perform its constitutional duties.  I respectfully dissent.

The House issued the subpoena at issue in furtherance of the exercise of its "sole Power of Impeachment," U.S. CONST. art. I, § 2, cl. 5.   The Founding Fathers understood impeachment to be a vital check on the Executive Branch and essential to the preservation of the system of democratic self-governance against possible overreaching by a powerful President.  Alexander Hamilton, for instance, stated that "the powers relating to impeachments are . . . an essential check in the hands of [Congress] upon the encroachments of the executive." FEDERALIST NO. 66 (Alexander Hamilton).   He understood that the power to impeach the president was a key feature distinguishing the chief executive from the monarchs of England, *see* FEDERALIST NO. 69 (Alexander Hamilton).  The power to impeach and remove the President from office distinguished the President from a king. Having only recently emerged from a violent revolution precipitated in large part by arbitrary and abusive action by King George III of Great

2

Britain, the Founders well knew the destructive power of unchecked and uncheckable authority in the hands of a single person.

The circumstances that culminated in the impeachment inquiry illustrate the singular role that the impeachment power plays in checking possible Presidential excesses. Special Counsel Robert S. Mueller, III identified "multiple acts" of the President that were "capable of exerting undue influence over law enforcement investigations." Special Counsel Robert S. Mueller, III, Report on the Investigation into Russian Interference in the 2016 Presidential Election (March 2019), Vol II. at 157. The Special Counsel's Report also acknowledged that the Department of Justice's understanding is that, as a constitutional matter, a sitting president may not be criminally indicted. Thus, as the Special Counsel noted, impeachment would be the only available mechanism through which to address potential Presidential misconduct identified in the Report. The House's power of impeachment thus serves as a critical check upon the President.

In turn, the power of inquiry, including the power to issue a subpoena and thereby compel a witness to appear before the House, is critically important to the efficacy of the impeachment power. The Supreme Court and this court have long recognized that the ability to acquire information is indispensable to Congress's performance of its constitutional roles. The courts have consistently held that Congress has a constitutional right in the ability to acquire information, including by compulsory process. In *McGrain v. Daugherty*, 273 U.S. 135 (1927), the Supreme Court stated, "We are of opinion that the power of inquiry — with process to enforce it — is an essential and appropriate auxiliary to the legislative function." *Id.* at 174. So too the Court stated in *Quinn v. United States*, 349 U.S. 155 (1955), that "[w]ithout the power to

3

investigate — including of course the authority to compel testimony, either through its own processes or through judicial trial — Congress could be seriously handicapped in its efforts to exercise its constitutional function wisely and effectively." *Id.* at 160–61.  That right of inquiry "may be as broad, as searching, and as exhaustive as is necessary to make effective the constitutional powers of Congress."  *Townsend v. United States*, 95 F.2d 352, 361 (D.C. Cir. 1938); *see also Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 n.15 (1975); *Barenblatt v. United States*, 360 U.S. 109, 111 (1959); *Watkins v. United States*, 354 U.S. 178, 188 (1957).

Through the subpoena at issue the House has attempted to exercise its "power of inquiry — with process to enforce it," *McGrain*, 273 U.S. at 174.  When the House has determined that the President may have committed "high Crimes and Misdemeanors," U.S. CONST. art. I, § 2, cl. 5, it has a constitutional obligation to investigate further and to decide whether to exercise its tremendous power of impeachment. The question of whether to impeach or not is a grave and solemn decision upon which turns whether a duly elected President may be removed from office.  It is not a decision taken lightly and, for that reason, must be made on an informed basis.  In the context of impeachment, when the accuracy and thoroughness of the investigation may well determine whether the President remains in office, the House's need for information is at its zenith.

For the first time in our history, the President has met the House's attempt to perform its constitutional responsibility with sweeping categorical resistance, instructing all members of the Executive Branch not to cooperate with the House's impeachment inquiry.  *See* Letter from Pat A. Cipollone, Counsel to the President, to Hon. Nancy Pelosi, Speaker of the House, et al., at 7 (Oct. 8, 2019).  He has denounced the

4

impeachment investigation as without "[l]egitimate [b]asis," *id.* at 6, and an "unconstitutional effort[] to overturn the democratic process," *id.* at 2. Indeed, at oral argument, McGahn's Department of Justice ("Department") counsel acknowledged that he was unaware of any instance in history in which the President instructed the Executive Branch "not to cooperate in any form or fashion" with a Congressional inquiry. Oral Arg. Tr. at 21.

The President and Congress have traditionally been able to resolve disputes over Congressional desire for Executive Branch documents and testimony. The President's reticence to turn them over here through informal processes of negotiation and give-and-take, as repeatedly proposed by the House Committee, makes clear that the likelihood of the parties privately reaching a mutually acceptable resolution of their dispute over McGahn's testimony seems remote at best. Consequently, the specific injury that the Committee seeks to vindicate before the court is limited to McGahn's defiance of its subpoena by refusing to appear.

This is the context in which the court now addresses the jurisdictional hurdles that the Committee must meet in attempting to obtain judicial enforcement of the subpoena of McGahn by the House of Representatives. The court has today concluded that the House lacks Article III standing. Under the Supreme Court's analysis in *Raines v. Byrd*, 521 U.S. 811 (1997), there are four factors that the court must consider in determining whether the House of Representatives has standing under Article III of the Constitution to bring the instant suit. As explained in Part I, *infra*, all four of those factors indicate that the House has standing here. The House also has a cause of action to enforce its subpoena in federal court, in view of the essentiality of the subpoena power to the House's performance of its constitutional functions. There is a

5

cause of action directly under Article I of the Constitution; alternatively, the House may proceed under the Declaratory Judgment Act, as it meets the Act's requirements, and none of its limitations apply.  This court has subject matter jurisdiction over the House's lawsuit under 28 U.S.C. § 1331, as the House seeks to vindicate its constitutional power, namely compulsory process in the exercise of its power of inquiry.  Because the House has established that it has standing and a cause of action, and that there is federal subject matter jurisdiction over its lawsuit, the district court order enforcing the subpoena by directing McGahn to appear before the Committee should be affirmed.

## I.

In *Raines v. Byrd*, 521 U.S. 811 (1997), the Supreme Court held that six individual Members of Congress lacked Article III standing to challenge the constitutionality of the Line Item Veto Act.  *Id.* at 814.  The Court relied on four considerations: (1) the individual plaintiffs alleged an institutional injury that was "wholly abstract and widely dispersed"; (2) plaintiffs' "attempt to litigate th[eir] dispute at this time [wa]s contrary to historical experience"; (3) the plaintiffs "ha[d] not been authorized to represent their respective Houses of Congress . . . , and indeed both Houses actively oppose[d] their suit"; and (4) dismissing the lawsuit "neither deprive[d] Members of Congress of an adequate remedy . . . , nor foreclose[d] the Act from constitutional challenge."  *Id.* at 829. Notably, the Court added that "[w]hether the case would be different if any of these circumstances were different we need not now decide." *Id.*  Those factors that the Supreme Court relied on are applicable to the instant case, yet each factor that in *Raines* counselled against the existence of standing is absent here. *Raines* thus does not control the outcome of this case.

6

First, the lawsuit in *Raines* was brought by plaintiffs who had alleged a "wholly abstract and widely dispersed" institutional injury. *Id.* Here, the injury is neither abstract nor widely dispersed. In *Raines*, the plaintiffs' complaint amounted to no more than that the Line Item Veto Act had altered the balance of power between the President and Congress in favor of the former. *See Raines*, 521 U.S. at 825–26. Here, the House has a long-recognized right, based on the constitution, to have McGahn appear before it. In defying the Committee's subpoena, McGahn has flaunted the House's "power of inquiry" and "process to enforce it," *McGrain*, 273 U.S. at 174. That injury is specific and acute, not "wholly abstract." Nor is the injury widely dispersed. By virtue of McGahn's defiance of the subpoena, the full House has incurred an institutional injury. And in view of House authorization of the instant lawsuit, the House is the plaintiff seeking to remedy that institutional injury. Thus, the very entity that has suffered the injury is suing to vindicate the injury. As such, the Committee's injury is not "widely dispersed." The court is in agreement that *Raines* is not dispositive on this issue. *See* Op. at 35 (Griffith, J.); Op. at 5–7 (Henderson, J.).

The suggestion that Article III standing is satisfied only when an individual right is at stake, Op. at 8–9 (Griffith, J.), is foreclosed by *Raines* itself. There the Court stated that "the institutional injury [plaintiffs] allege is wholly abstract and widely dispersed." *Raines*, 521 U.S. at 829. By identifying those defects with the alleged institutional injury, the Supreme Court left open the possibility that some institutional injuries would be sufficient to confer a legislative body standing. If the Court in *Raines* had been of the view that no institutional injury to a legislative body could be adequate to confer standing, it would not have bothered to identify problems with the specific institutional injury alleged. The Court would have stated that

7

the alleged injury was an institutional one incurred by a legislative body and left it at that.  Furthermore, in *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 135 S. Ct. 2652 (2015), the Supreme Court distinguished *Raines* and held that the Arizona State Legislature *qua* legislature had incurred an institutional injury in its loss of redistricting authority where the authority was vested, by a ballot initiative, in an independent entity.  The Court's holding thus precludes the view that there is standing only when an individual right is implicated.  *See also Sixty-Seventh Minn. State Senate v. Beens*, 406 U.S. 187 (1972).

Second, the *Raines* plaintiffs' attempt to litigate the dispute was "contrary to historical experience."  *Raines*, 521 U.S. at 829.  History is different here than it was in *Raines*, for the relevant history is Presidential cooperation with the legislative Branch exercising its constitutional responsibilities with respect to impeachment.  Although there have been relatively few instances of interbranch subpoena-enforcement litigation in the federal courts, the history of Presidential cooperation means that there have been few occasions necessitating resort to the courts.  The degree of Presidential interference with the constitutional responsibilities of Congress, giving rise to the instant lawsuit, *see, e.g.*, Oral Arg. Tr. at 21, is a dramatic break with past Presidential practice of acknowledging the gravity of Congress's constitutional responsibilities, including impeachment, and responding with requested information.  Although there may have been isolated instances of Presidential nondisclosure of requested Executive Branch documents or testimony, this broad and indiscriminate defiance flouts the "respect due to coequal and independent departments" of the federal government, *Marshall Field & Co. v. Clark*, 143 U.S. 649, 672 (1892), and "disregards that coequal position in our system of the three departments of government," *id.* at 676, and the "reciprocity" each branch

8

owes to each other, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring).  Indeed, the fact that the Supreme Court has not squarely addressed the question presented here is unsurprising, given the long history of Presidential cooperation with congressional investigations.

Furthermore, federal courts have traditionally decided cases such as this one, given that the courts have entertained Congressional subpoena-enforcement lawsuits against Executive Branch officials since 1974.  This court, sitting *en banc* in *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974), unanimously enforced a Senate Committee subpoena *duces tecum* served on the President for production of the "Nixon tapes."  The court did not independently analyze jurisdiction, including Article III standing, observing without critique that the district court had addressed and rejected the President's contention that the lawsuit was non-justiciable because it was an interbranch conflict.  *See id.* at 728.  "Finding the reasoning of this court in *Nixon v. Sirica*, which concerned a grand jury subpoena, 'equally applicable to the subpoena of a congressional committee,' the [d]istrict [c]ourt held that, under that case and the relevant Supreme Court precedent, the issues presented to it were justiciable."  *Id.* (emphasis added) (quoting *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 370 F. Supp. 521 (D.D.C. 1974)).  This court was satisfied with that analysis and so proceeded to address the merits of the case.  *See id.* at 728–29.

This court revisited a similar issue in *United States v. AT&T*, 551 F.2d 384 (D.C. Cir. 1976).  There, the court considered a suit brought by the Executive Branch to enjoin AT&T from complying with a congressional subpoena on national security grounds.  The President had directed AT&T, "as an agent of the United States, to respectfully decline to

9

comply with the Committee subpoena," *id.* at 387, and the House of Representatives had intervened as a defendant to represent its interest in AT&T's compliance with the subpoena. As such, the court characterized the case as a "portentous clash between the executive and legislative branches," *id.* at 385, and undertook a more extensive jurisdictional analysis than in *Senate Select Committee*. The court reasoned that "*Senate Select Committee* establishes, at a minimum, that the mere fact that there is a conflict between the legislative and executive Branches over a congressional subpoena does not preclude judicial resolution of the conflict," *id.* at 390, and held that "[i]t is clear that the House as a whole has standing to assert its investigatory power, *id.* at 391.

More recently, courts have likewise held that the federal courts have jurisdiction to decide a Congressional subpoena-enforcement action against a former White House Counsel and one of the highest-ranking members of the Executive Branch, the Attorney General. *See Comm. on the Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008); *Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1 (D.D.C. 2013). *AT&T* and *Senate Select Committee* are our precedent for the proposition that the Committee has standing here and demonstrate, as *Raines* requires, that these interbranch disputes have been amenable to judicial resolution. The Supreme Court has acknowledged that historical practice is constitutionally significant even when it does not extend as far back into the past as the Founding. In *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014), the Supreme Court was asked to interpret the Recess Appointments Clause of the Constitution. The Court noted that "in interpreting the Clause, we put significant weight upon historical practice," and stated that "precedent[] show[s] that this Court has treated practice as an important interpretive factor even when the nature or longevity of that practice is subject to dispute, and even when

10

that practice began after the founding era." *Id.* at 2559–60; *see also id.* at 2560 (collecting cases).

Third, in *Raines* the plaintiff Members of Congress had "not been authorized to represent their respective Houses of Congress in this action, and indeed both Houses actively oppose[d] their suit." *Raines*, 521 U.S. at 829. Not so here. The Committee's lawsuit was authorized by the House of Representatives in H. Res. 430, 116th Cong. (2019). Subsequent Supreme Court treatment of *Raines* has reaffirmed that the key feature of that case, which was fatal to the plaintiffs' standing, was that there was a mismatch between the individual legislators filing suit and the institutional injury, to the entire Congress, that they sought to vindicate.

In *Arizona State Legislature*, 135 S. Ct. 2652, the Supreme Court rejected the argument that *Raines* stood for the proposition that the Arizona State Legislature lacked standing and characterized *Raines* as "holding specifically and only that 'individual members of Congress [lack] Article III standing.'" *Id.* at 2664 (alteration in original) (quoting *Raines*, 521 U.S. at 813–14). The plaintiff in *Arizona State Legislature* had standing and the plaintiffs in *Raines* did not, the Court explained, because the former, but not the latter, was "an institutional plaintiff asserting an institutional injury." *Id.* "That 'different . . . circumstanc[e]' was not *sub judice* in *Raines*." *Id.* (alterations in original) (citation omitted) (quoting *Raines*, 521 U.S. at 830).

Also, in *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945 (2019), the Supreme Court relied on *Raines* in deciding that a single House of a bicameral state legislature did not have standing to appeal judicial invalidation of a state redistricting plan when the state constitution vested that authority in the General Assembly, of which the House of

11

Delegates was only a part.  Although the outcome in *Virginia House of Delegates* differed from that in *Arizona State Legislature*, it rested on the same understanding of *Raines*. Citing *Raines*, the Court reasoned that "[j]ust as individual members lack standing to assert the institutional interests of a legislature, a single House of a bicameral legislature lacks capacity to assert interests belonging to the legislature as a whole." *Id.* at 1953–54 (citation omitted).  In *Virginia House of Delegates*, the Court distinguished *Arizona State Legislature* on the grounds that in the latter, "there was no mismatch between the body seeking to litigate and the body to which the relevant constitutional provision allegedly assigned exclusive redistricting authority." *Id.* at 1954.

Thus, the Supreme Court in both *Arizona State Legislature* and *Virginia House of Delegates* considered *Raines* to stand for the proposition that although a legislative institution may properly assert an institutional injury, an individual unauthorized Member of that institution may not. *See Virginia House of Delegates*, 139 S. Ct. at 1953-54.  There being no mismatch here, the central obstacle to the plaintiffs' standing in *Raines* is not present.  And while the Supreme Court has twice endorsed this narrower understanding of *Raines*, namely that the chief defect in plaintiffs' case was their lack of authorization, it has never relied upon *Raines* for the broad propositions advanced by McGahn in the instant case.  So too on three other occasions, this court has held that unauthorized legislators lack standing to vindicate injuries to the legislative bodies of which they are a part. *Blumenthal v. Trump*, No. 19-5237 (slip op.) (D.C. Cir. Feb. 7, 2020), *Campbell v. Clinton*, 203 F.3d 19 (D.C. Cir. 2000), and *Chenoweth v. Clinton*, 181 F.3d 112 (D.C. Cir. 1999), all involved individual unauthorized legislators' attempts to sue the President.  The court appropriately relied on *Raines* to reject standing in all three of those cases.  Because the instant lawsuit has been expressly

12

authorized by the full House of Representatives, neither those three cases nor *Raines* stands for the proposition that the Committee lacks Article III standing.

Fourth, declining to exercise jurisdiction over the plaintiffs' lawsuit in *Raines* did not deprive individual Members of an "adequate remedy" or "foreclose[] the [Line Item Veto] Act from constitutional challenge." *Raines*, 521 U.S. at 829. Significantly, on two occasions, the Department's Office of Legal Counsel ("OLC") has concluded that there is no other adequate remedy for the House's injury. A 1984 OLC Opinion authored by Acting Assistant Attorney General Theodore Olson analyzed the methods available to Congress to enforce a subpoena and concluded that there was no constitutionally viable alternative to a civil subpoena-enforcement action in federal court, that is, the very mechanism that the House pursues here. *See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101 (1984) ("Olson"). As OLC explained, Congress has two potential alternatives to a civil enforcement action: First, it can hold a recalcitrant subpoena recipient in contempt and refer the citation to the Department of Justice for prosecution under the criminal contempt of Congress statute, 2 U.S.C. 192. Conviction under the statute can result in imprisonment of up to one year and a fine of up to $1,000. *See id.* Second, Congress can detain a subpoena recipient, pursuant to its inherent contempt authority. *See generally Jurney v. MacCracken*, 294 U.S. 125 (1935). Neither option is practicable. First, the criminal contempt statute is not available to vindicate the House's injury. The Olson Opinion concluded that the "contempt of Congress statute does not require and could not constitutionally require a prosecution" of an Executive Branch official who defies a Congressional subpoena on the basis of Executive privilege "or even . . . a

13

referral to a grand jury of the facts relating to the alleged contempt." Olson, 8 Op. O.L.C. at 142. Because a President may sometimes be required, in order to faithfully perform his constitutional duties, to withhold certain requested information from Congress, prosecuting a subordinate for "act[ing] to aid the President's performance of [that] duty would be . . . inconsistent with the Constitution." *Id.*

Two years later, Assistant Attorney General Charles Cooper reaffirmed "that the contempt of Congress statute simply was not intended to apply and could not constitutionally be applied to an Executive Branch official who asserts the President's claim of executive privilege." *Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act*, 10 Op. O.L.C. 68, 83 (1986) ("Cooper"). Both OLC Opinions make clear that the Department of Justice understands itself not to be required to prosecute an Executive Branch official who has declined, on the basis of Executive privilege, to comply with a Congressional subpoena. Therefore, citing McGahn for contempt and referring the citation to the Department of Justice for prosecution would be ineffective because the Department would decline to pursue the prosecution. Indeed, it strains credulity to suppose that the President would direct McGahn not to comply with the subpoena at issue and subsequently countenance a criminal prosecution of his former White House Counsel for failing to comply with the subpoena.

The second alternative, detaining McGahn pursuant to the House's inherent contempt authority, is similarly impracticable. Understandably desiring not to risk physical combat with the Executive Branch, *cf.* Oral Arg. Tr. at 53–54, *In re App. of Comm. on Judiciary, U.S. House of Representatives, for an Order Authorizing Release of Certain Grand Jury Materials*, No. 19-5288 (D.C. Cir. Jan. 3, 2020),

14

the House has declined to use that authority to detain an Executive official for nearly 100 years. OLC has concluded that Congress's exercise of its inherent contempt authority to arrest an Executive official is not viable, although for different reasons. The OLC has focused not on the unseemliness and undesirableness of physical confrontation between the Branches but rather on the concern that subjecting close presidential advisors to Congressional detention would unduly chill such advisors in the exercise of their duties in service of the President's performance of his constitutional functions. *See* Olson, 8 Op. O.L.C. at 140. OLC has twice suggested that "the same reasoning that suggests that the [criminal contempt] statute could not constitutionally be applied against a Presidential assertion of privilege applies to congress' inherent contempt powers as well." *Id.* at 140 n.42; Cooper, 10 Op. O.L.C. at 86. Separate from the legal question of whether such detention would comport with the Constitution, Cooper also noted the practical unlikelihood that Congress would pursue that relief, noting that Congress had not used its inherent contempt authority since 1917 and that "it seems most unlikely that Congress would dispatch the Sergeant-at-Arms to arrest and imprison an Executive Branch official who claimed executive privilege." Cooper, 10 Op. O.L.C. at 86. It suffices here to note that the prospect that the House will direct its Sergeant at Arms to arrest McGahn is vanishingly slim, so long as a more peaceable judicial alternative remains available.

Significantly, in *Raines*, the Supreme Court stated that if any of the four considerations it relied upon had been different, the outcome of the standing analysis might have been different. *See Raines*, 521 U.S. at 829. Here, not just one but all four factors are different than they were in *Raines*. Consequently, *Raines* does not support, much less dictate, that the Committee lacks standing here.

15

## II.

The court undoubtedly must proceed with caution given the separation of powers principles implicated when a House of Congress files a lawsuit against a former close presidential advisor. Courts should resolve such disputes only as a "last resort," *Raines*, 521 U.S. at 833 (Souter, J., concurring) (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 474 (1982)). Here, it is appropriate for the court to exercise jurisdiction for two reasons.

First, subpoena enforcement is a "familiar judicial exercise," *Zivotofsky ex rel. Zivotofsky v. Clinton*, 556 U.S. 189, 196 (2012), with which courts are well-acquainted, because judicial enforcement of a subpoena is an ordinary corollary to civil litigation. *See, e.g.*, *Miers* 558 F. Supp. 2d 53. The Federal Rules of Civil Procedure authorize a party to issue, under the auspices of the court, a subpoena ordering testimony, document production, or production of other tangible objects. *See* FED. R. CIV. P. 45(a). If the recipient of such a civil subpoena objects on the grounds that compliance would require the disclosure of privileged matter, then a motion requesting that the court quash the subpoena would be available. *See* FED. R. CIV. P. 45(e)(2). The court must quash or modify the subpoena if it determines that the subpoena "requires disclosure of privileged or other protected matter." FED. R. CIV. P. 45(d)(3). If the party has no valid grounds for objecting, however, the court may enforce the subpoena by holding in contempt a person who refuses to obey it. *See* FED. R. CIV. P. 45(g). Thus, the precise function that the Committee asks the court to perform — determining whether McGahn has a valid excuse for failing to appear before the Committee and compelling his compliance if he does not — is a commonplace feature of civil litigation in federal court. In exercising

16

jurisdiction over the Committee's subpoena-enforcement suit, the court does not take sides in an interbranch dispute or involve the court in any political dispute, because the court need only to address whether McGahn must appear before the Committee in response to a valid subpoena; what he does at that point remains to be seen.  Although this case comes to us against the factual background of a bitter political battle over presidential impeachment, that does not render the case itself non-justiciable as "political," for "courts cannot avoid their responsibility merely 'because the issues have political implications.'"  *Zivotofsky*, 566 U.S. at 196 (quoting *INS v. Chadha*, 462 U.S. 919, 943 (1983)).

Furthermore, what the Committee seeks here is quite narrow: a declaration that McGahn is required by law to appear before it.  Neither the subpoena itself nor the district court's order that he comply with that subpoena requires him to answer any questions before the Committee.  "[T]he question of whether or not the recipient of a subpoena has to disclose, or may withhold, the *particular* information that the subpoena requests is entirely distinct from the question of whether the recipient of a subpoena has the legally enforceable duty to perform in response to a subpoena at all."  Dist. Ct. Op. at 31.  The district court explained that it reached only the latter question: rejecting the claim of absolute immunity, "as far as the duty to appear is concerned, this Court holds that Executive branch officials are not absolutely immune from compulsory congressional process."  *Id.*  "[W]hether or not the law requires the recalcitrant official to release the testimonial information that the congressional committee requests is a separate question, and one that will depend in large part on whether the requested information is itself subject to withholding consistent with the law on the basis of a recognized privilege."  *Id.*

17

Consequently, compliance with the subpoena, and with the district court's order, requires only that McGahn appear before the Committee so that it may ask him questions. Although the applicability of any given privilege in response to any given question is beyond the scope of the instant case, at least in its present posture, it is notable both that McGahn has testified before a grand jury concerning at least some of the matters that are the subject of the subpoena and that McGahn potentially has at his disposal various reasons to decline to answer a question, *see* Op. at 16–19 (Henderson, J.). Given McGahn's role as a close presidential advisor, it is plausible that he could properly assert the executive privilege, state secrets privilege, or attorney-client privilege in response to at least some of the Committee's questions. Although the President has claimed that McGahn is absolutely immune from compulsory Congressional process itself and directed him not to comply with the subpoena, there has been no formal assertion of executive privilege. Potentially available privileges are powerful protections of the President's interest in Executive Branch confidentiality, and they remain unaffected by an order compelling McGahn to appear before the Committee.

Second, McGahn's suggestion that there are alternative remedies available to Congress flies in the face of OLC's opinions that these are impracticable. Practically speaking, based on the current record, Congress will obtain McGahn's appearance by proceeding in court, or not at all. One of my colleagues points to use of the contempt power, withholding appropriations, "harness[ing] public opinion," "delay[ing] or derail[ing] the President's legislative agenda," and impeachment. Op. at 13 (Griffith, J.). Some of these remedies cannot be undertaken by a single House of Congress, and in any event, OLC did not consider them possible tools for the enforcement of a Congressional subpoena. Further, OLC has opined that the criminal contempt statute does not apply to

18

Executive Branch officials asserting a claim of Executive privilege, Olson, 8 Op. O.L.C. at 142, and so it is extremely likely that the Department of Justice would refuse to prosecute McGahn were he cited for contempt. Similarly, although the House could direct its Sergeant at Arms to arrest and detain McGahn until he complies with the subpoena, the House has reasonably exhibited its desire not to engage in a personal arrest of, or physical confrontation with, an Executive Branch official when judicial process is available. The infrequency with which Congress has detained an Executive Branch official —twice in the country's history, and not since 1916, *see Marshall v. Gordon*, 243 U.S. 521 (1917) — attests to the impracticability of that remedy.

OLC has also drawn the reasonable inference that, lacking any other effective way to enforce its subpoena, a House of Congress may bring a civil subpoena-enforcement action in federal court. Congress has a "legitimate and powerful interest" in obtaining information necessary to the performance of its constitutional responsibilities, and Congress could "vindicate its asserted right to obtain any documents by a civil action for enforcement of a congressional subpoena," in lieu of a criminal contempt citation or exercise of its inherent contempt authority. Olson, 8 Op. O.L.C. at 137; Cooper, 10 Op. O.L.C. at 83 ("a civil suit seeking declaratory enforcement of the subpoena" is one of the three possible options available for Congressional subpoena enforcement). Analyzing *Senate Select Committee*, among other precedent, OLC concluded that "although the civil enforcement route has not been tried by the House, it would appear to be a viable option." *Id.* at 88. So, in acknowledgement of the impracticability of alternatives, OLC has concluded that Congress may file a subpoena-enforcement action in federal court. The majority's rejection of that conclusion leaves the House unable to enforce its subpoena,

19

dramatically undermining its ability to fulfill its constitutional obligations now and going forward.

## III.

The interbranch nature of this lawsuit requires the court to carefully review the separation of powers considerations associated with exercising jurisdiction over this case. "*Raines* . . . may . . . require us to merge our separation of powers and standing analyses." *Chenoweth*, 181 F.3d at 116. Yet McGahn's various arguments that proper respect for the separation of powers dictates that the Committee lacks standing are unpersuasive, as are those of my colleague, *see* Op. at 7–9 (Henderson, J.), inasmuch as the circuit courts provide a fitting place to offer analyses, ultimately for the Supreme Court's review.

First, McGahn argues that deciding this lawsuit would constitute a Congressional arrogation of power, providing it another tool to achieve victory in an interbranch struggle with the Executive. In his view, Congress already has several tools at its disposal in such conflicts, and it disrupts the delicate balance between Congress and the Executive to afford the former another tool. These tools are impracticable here, as OLC has twice explained in formal Opinions. Further, the suggestion that a civil subpoena-enforcement suit in federal court is a "new" weapon in Congress's arsenal is unwarranted. Federal courts have consistently permitted Congress to bring civil subpoena-enforcement actions, going back to 1974. McGahn can point to no federal court that has accepted the argument that Congress lacks standing to file a subpoena-enforcement action in federal court against an Executive Branch official; to the contrary, every court to have taken up the question has determined that there is standing in such a case. Thus, the better understanding is that the current balance

20

of power between the two political Branches includes Congress's power to vindicate in federal court its constitutional right to compulsory process. So understood, what would disrupt the present balance of power is not a holding that such lawsuits are permissible but the decision that they are not. On the one hand, it is true that the judiciary can disrupt the delicate balance of powers between the Branches when it intervenes in a dispute in which it ought not. On the other hand, it is also true that the judiciary can upset that careful equilibrium when it dismisses a suit that it ought to decide. In precluding Congress's resort to the courts to enforce a subpoena, the court encourages increased Presidential non-cooperation with Congressional subpoenas and thereby substantially undermines the ability of Congress to acquire information from the Executive Branch necessary to the performance of its constitutional responsibilities. That outcome will have broad disruptive consequences for relations between Congress and the President going forward and substantially upset the status quo.

To the extent my colleague attempts to limit the breadth of his decision that the House lacks Article III standing by stating that the outcome might change if, in the future, there were a statute "expressly authoriz[ing]" a Congressional subpoena-enforcement lawsuit, Op. at 28 (Griffith, J.), this remarkable suggestion is difficult to take seriously. The theory is that "a statute authorizing suit would reflect Congress's (and perhaps the President's) view that judicial resolution of interbranch disputes is 'consistent with a system of separated powers,'" which in turn would "render suits to enforce subpoenas 'judicially cognizable.'" *Id.* at 36 (first quoting *Allen v. Wright*, 468 U.S. 737, 752 (1984); then quoting *Raines*, 521 U.S. at 819). Having claimed that "separation-of-powers principles and historical practice compel us to dismiss" the Committee's suit, *id.* at 19, the suggestion is that the political Branches might

21

undo the court's constitutional ruling that the Committee lacks Article III standing simply by expressing a different view of the separation of powers principles at stake in this case. Although the political Branches can and sometimes do overrule statutory rulings of the federal courts, courts — not Congress or the President — are the final arbiter of the meaning of the Constitution. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803); *cf. City of Boerne v. Flores*, 521 U.S. 507 (1997). The proposition that the political Branches could overrule a constitutional holding of the court by confirming that they have a different understanding of the separation of powers misrepresents the role of the court in that system of separated powers.

Second, according to McGahn, exercising jurisdiction here would impede the Executive in the performance of its constitutional responsibilities. The traditional means of enforcing Congressional subpoenas, according to McGahn, has been by the criminal contempt statute. By attempting to enforce its subpoena directly in federal court and circumventing the Executive's prosecutorial role, he maintains that the House is infringing on the Executive's exclusive authority to enforce the law. Yet, as explained, OLC twice opined that the criminal contempt statute does not and could not apply to a close Presidential advisor, the Department of Justice would almost certainly not pursue a prosecution of McGahn. Indeed, OLC has concluded that prosecution of McGahn for his failure to comply with the House subpoena is not a constitutional obligation of the President but would be unconstitutional because it would indirectly interfere with the President's performance of his duties. The argument that this lawsuit would effect a circumvention of the President's performance of his constitutional responsibilities is thus misplaced. This statement is also misguided because it ignores the fact that enforcement of congressional subpoenas is not

22

committed exclusively to the Executive Branch. Congress itself possesses the power to enforce its subpoena itself through its inherent contempt power. *See generally Jurney*, 294 U.S. 125. Because Congress may act unilaterally to enforce a subpoena, McGahn's view that the House may not "circumvent" the law-enforcement duty of the Executive Branch is unavailing.

Third, McGahn argues that assuming jurisdiction here threatens to undermine the Judiciary itself. He maintains that for the courts to intervene in interbranch disputes risks undermining public confidence in the judiciary. Judicial "intervention" in an "interbranch controversy" could "risk damaging the public confidence that is vital to the functioning of the Judicial Branch," *Raines*, 521 U.S. at 833 (Souter, J., concurring), but that risk is minimal here. As discussed, the scope of the legal question that the Committee asks this court to decide is narrow and offers no occasion for the court to weigh in on the political dispute between the House and the President. This is not a case that risks "embroiling the federal courts in a power contest nearly at the height of its political tension." *Id.* Although there is a dramatic backdrop of a highly charged political battle over the impeachment of the President, there is nothing political about the case itself. And speculation that Congress or the President might attempt to politicize a decision of this court does not justify a refusal to exercise jurisdiction over the Committee's lawsuit, for "the judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.'" *Zivotofsky*, 566 U.S. at 194 (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821)).

Although the dispute occurs against the backdrop of a bitter political struggle over the impeachment of the President, the narrow legal question of whether McGahn must appear in

23

response to a valid subpoena is not a political dispute.  That the political Branches disagree as to the proper resolution on the merits does not render this lawsuit a political dispute. Otherwise, any separation of powers cases in which the interests of the two political Branches are at odds, *see, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1 (2015), would have been inappropriately considered.  Nor does the fact that the court would necessarily declare one Branch's actions unlawful render this subpoena-enforcement suit non-justiciable.  Courts regularly review the actions of Congress or the Executive Branch for compliance with the Constitution, and indeed doing so is a bedrock feature of judicial review, *see Marbury*, 5 U.S. (1 Cranch) 137.  Although courts should do so only as a "last resort," *see Raines*, 521 U.S. at 833 (Souter, J., concurring) (quoting *Valley Forge Christian College*, 454 U.S. at 474), the fact that deciding the case would require the court to declare unlawful the action of one Branch does not, standing alone, justify dismissing the Committee's lawsuit. The Supreme Court has developed a robust doctrine for determining when a lawsuit presents a non-justiciable political question, designed to keep courts out of political disputes.  *See Baker v. Carr*, 369 U.S. 186 (1962).  Tellingly, McGahn does not argue that this dispute presents a political question within the meaning of *Carr*.

During the President's impeachment trial in the Senate, both sides referenced this lawsuit in connection with the second Article of Impeachment, alleging that the President obstructed Congress.  Such references do not mean that the dispute is too political for judicial resolution.   Rather, those statements illustrate the futility of subpoena enforcement absent judicial involvement and of attempting to dispose of this case in a manner that escapes comment by the political Branches. The President's personal counsel argued to the Senate: "We're acting as if the courts are an improper venue to determine

24

constitutional issues of this magnitude . . . .  That is why we have courts.  That is why we have a federal judiciary."  Senate Trial Tr., Day 2, pt.1, at 1:07:08–32, *In re Impeachment of President Donald J. Trump* (Jan. 21, 2020).  The suggestion was thus that the President ought not be impeached for obstructing Congress's investigation because the House could have acquired the documents and testimony it wanted by pursuing its case in federal court.  Of course, that is not what McGahn has argued.  More broadly, it illustrates that regardless of how the court decides the limited question before it, it has, as in any subpoena-enforcement litigation, no power to control comments about it.  Because the political Branches will likely attempt to bolster their positions in the impeachment fight using the court's decision, regardless of the disposition, this cannot be a reason for the court to abstain.  Furthermore, the infrequency of Congressional lawsuits against the Executive in the aftermath of *Senate Select Committee*, *AT&T*, and *Miers* belies that exercising jurisdiction here will open the courts to a deluge of political lawsuits between the other two Branches of the federal government.  The paucity of such cases instead suggests that Congress generally has preferred not to resort to the courts in order to obtain information for the discharge of its constitutional duties.

Finally, the view that deciding this subpoena-enforcement issue would "displace the long-established process by which the political branches resolve information disputes," Op. at 12 (Griffith, J.), is backward.  At least since the 1970s, the political Branches have negotiated their informational disputes against the backdrop of possible resort to the courts.  By foreclosing that possibility going forward, the court now diminishes the incentive the Executive Branch might have to reach an accommodation.  Future Presidents may direct widescale non-compliance with lawful Congressional inquiries, secure in the knowledge that Congress can do little to enforce a subpoena

25

short of directing a Sergeant at Arms to physically arrest an Executive Branch officer. By encouraging Presidential stonewalling, the court effectively dismantles the accommodation process.

## IV.

For the foregoing reasons, the House of Representatives has appropriately sought judicial enforcement of its subpoena of McGahn in the face of the unprecedented degree of Presidential non-cooperation. The House has a cause of action to bring a subpoena-enforcement suit in federal court seeking declaratory and injunctive relief requiring McGahn's compliance with the subpoena, given its need for evidence if it is to determine whether and more precisely how to exercise its power of impeachment. There is a long history of parties resorting to the courts to enjoin unlawful, and specifically unconstitutional, Executive Branch action. *See, e.g.*, *Ex parte Young*, 209 U.S. 123 (1908). That is precisely what the House asks the court to do here, given that the object of its lawsuit is to compel McGahn to appear before its duly authorized Committee in compliance with its subpoena, and its right to have him do so is rooted in Article I of the Constitution.

Even if a cause of action directly under the Constitution were inadequate, the Declaratory Judgment Act provides a cause of action for Congress to enforce its subpoena. The Act requires that there be "a case of actual controversy" over which a federal court may exercise jurisdiction; it then authorizes the court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Those two requirements — (1) an actual case or controversy, and (2) federal court jurisdiction — are met here. First, this is an actual case or controversy, with antagonistic parties who

26

have separate sincere interests in the outcome.  Given that the Committee has Article III standing, it follows that this is a genuine case or controversy.  Second, for the reasons that follow, 28 U.S.C. § 1331 supplies federal jurisdiction over this lawsuit.  The statutory requirements for proceeding under the Declaratory Judgment Act are thus met.

The various limits that the Supreme Court and this court have placed upon lawsuits brought under the Declaratory Judgment Act do not preclude the House from proceeding under the Act.  First, the Supreme Court has long stressed that the Declaratory Judgment Act does not provide an independent source of federal jurisdiction.  *See Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950).  In *Skelly Oil*, the Supreme Court stated that the Declaratory Judgment Act "enlarged the range of remedies available in the federal courts but did not extend their jurisdiction." *Id.*  In that case, plaintiffs filed suit pursuant to the Declaratory Judgment Act asking the federal court to interpret a contract provision, a question solely of state law. *Id.* at 672.  The Court decided that the mere fact that the plaintiffs had proceeded under the Act did not suffice to render the case's state contract law issue a federal question for purposes of § 1331. *See id.* at 671–72. The proscription of *Skelly Oil* is no obstacle to the Committee here because the court has jurisdiction under 28 U.S.C. § 1331.  Thus, the Committee does not impermissibly seek to rely on the Act as a source of federal court jurisdiction.

Second, the Declaratory Judgment Act "presupposes the existence of a judicially remediable right." *C&E Servs., Inc. v. D.C. Water & Sewer Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002) (quoting *Schilling v. Rogers*, 363 U.S. 666, 677 (1960)).  In *C&E Services*, the issue was whether the appellant could obtain a declaratory judgment that, in structuring its bidding process, the D.C. Water & Sewer Authority had violated the federal

27

Service Contract Act.  The court held that it could not, because the Service Contract Act required any dispute arising under it to be resolved by the Secretary of Labor; the Declaratory Judgment Act was not an avenue to circumvent that statutory requirement.  *See id.* at 202.  Citing *Schilling v. Rogers*, 363 U.S. 666 (1960), the court stated that "federal courts may not declare a plaintiff's rights under a federal statute that Congress intended to be enforced exclusively through a judicially unreviewable administrative hearing." *Id.* at 201.  That makes *C&E Services* quite different from the instant case because here the Committee is suing in the context of its constitutional duty of impeachment to enforce a right to compulsory process that follows from the constitution, not a statute.  Furthermore, because the Committee does not assert a statutory right, there is no statutorily mandated exclusive remedial scheme for vindication of that right, as there was in *C&E Services*.

More broadly, *C&E Services* and *Schilling* stand for the proposition that the Declaratory Judgment Act provides no substantive right that a plaintiff may seek to adjudicate in federal court.  Rather, the Act is a vehicle for vindicating some separate and independent substantive right.  There can be no dispute that such a right exists here; the Constitution itself is the source of the right that the Committee seeks to vindicate here.  The Supreme Court has long recognized Congress's broad power of inquiry and the concomitant right to compel witnesses to appear before it.  *See, e.g.*, *McGrain*, 273 U.S. at 174.  Thus, because the Committee here asserts a right based on its constitutional duty, the requirement that a Declaratory Judgment Act plaintiff rely on an independent substantive right is satisfied.

It is true, as McGahn emphasizes, that this court once stated: "Nor does the Declaratory Judgment Act . . . provide a cause of action." *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir.

28

2011) (citation omitted).   That statement was made in the context of unique factual circumstances very different from those of the instant case.   In *Ali*, the appellants were Afghan and Iraqi citizens detained abroad in their home countries in the course of American military operations in those two countries. *See id.* at 764.   Their lawsuit sought, among other things, a declaratory judgment that their treatment in detention violated the law of nations, treaties to which the United States was a party, and the Fifth and Eighth Amendments of the U.S. Constitution.   *Id.* at 764–65.   In *Ali*, the court held that the Declaratory Judgment Act did not provide the plaintiffs with a cause of action, *see id.* at 778, casting doubt on the proposition that the Fifth and Eighth Amendments protected the plaintiffs at all, as they were detained outside the United States in a country over which the United States did not exercise "*de facto* sovereignty," *Boumediene v. Bush*, 553 U.S. 723, 755 (2008). The court wrote that "we have . . . held that the Suspension Clause does not apply to Bagram detainees.  [Appellants] offer no reason — and we see none ourselves — why the plaintiffs' Fifth and Eighth Amendment claims would be any stronger than the Suspension Clause claims of the Bagram detainees." *Ali*, 649 F.3d at 772.  The clear implication of that reasoning is that the Fifth and Eighth Amendments did not apply to the *Ali* plaintiffs, and thus that no constitutional right was at stake. Here, no party disputes the existence of the constitutional right — namely, the power of inquiry — that the House seeks to vindicate, *see McGrain*, 273 U.S. at 174.  Thus, the defect in *Ali* was akin to the problem of *C&E Services*, namely that there was no substantive right that plaintiffs could assert.  So understood, *Ali* does not prevent the House from proceeding under the Declaratory Judgment Act here to vindicate an established constitutional right.

Furthermore, the federal courts have subject matter jurisdiction over the Committee's lawsuit pursuant to 28

29

U.S.C. § 1331, which grants statutory jurisdiction over "all civil actions arising under the Constitution . . . of the United States." Because the House seeks to vindicate its right of compulsory process, and because that power flows from Article I of the Constitution, *see, e.g.*, *McGrain*, 273 U.S. at 174, the Committee's lawsuit arises under the Constitution. This conclusion is bolstered by the analysis in *AT&T*, 551 F.2d at 389, which recognized that there is federal-question jurisdiction over such an interbranch dispute because of the "constitutional powers" that the dispute implicates.

To the extent McGahn maintains that 28 U.S.C. § 1365 amounts to an implied repeal of federal jurisdiction under § 1331, that argument is unpersuasive. Section 1365, entitled "Senate actions," confers on the U.S. District Court for the District of Columbia original jurisdiction "over any civil action brought by the Senate or any authorized committee or subcommittee . . . to enforce, to secure a declaratory judgment concerning the validity of, or to prevent a threatened refusal or failure to comply with, any subpoena or order issued by the Senate or committee or subcommittee." 28 U.S.C. § 1365. By explicitly granting the federal courts jurisdiction over a Senate subpoena-enforcement action but not a House subpoena-enforcement action, McGahn suggests, Congress intended that the federal courts should not have jurisdiction over the latter. Yet this argument overlooks the context of the statute, namely that when Congress enacted § 1365 in 1978, § 1331 contained an amount-in-controversy requirement for suits against private parties and officials acting in the individual capacities. The Senate had good reason to believe that this requirement would be an obstacle to subpoena-enforcement suits; the district court in *Senate Select Committee* had originally dismissed the Senate's lawsuit for failure to meet the requirement. *See Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 366 F. Supp. 51, 59–61 (D.D.C. 1973). Congress

30

addressed this problem in 1978 with the enactment of § 1365, which granted federal courts subject matter jurisdiction over Senate subpoena-enforcement actions without regard to the amount in controversy. *See* S. Rep. No. 95-170, at 20–21 (1978).

Congress is free to address problems *seriatim* without thereby implicating questions not before it. *See, e.g.*, *Williamson v. Lee Optical*, 348 U.S. 483, 489 (1955) ("[R]eform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others." (citation omitted)). With § 1365, Congress was responding to a particular problem: the amount in controversy requirement that, until it was eliminated in 1980, prevented federal courts from exercising jurisdiction over Congressional subpoena-enforcement suits under § 1331. Given the specific obstacle Congress overcame in enacting § 1365, there is no basis to conclude the statute bears on federal jurisdiction over House subpoena-enforcement actions. The inference that § 1365 has repealed such jurisdiction is therefore unwarranted.

At oral argument, McGahn's Department counsel relied on the legislative history of § 1365 in which two Senators stated § 1365 indicates that there is no federal jurisdiction over a Congressional subpoena-enforcement suit unless specifically authorized, and that Congress wants the courts to refrain from exercising jurisdiction over such disputes. *See* Oral Arg. Tr. at 26–27. Yet given the jealousy with which each House of Congress guards its constitutional prerogatives, it would be inappropriate in the absence of a clear statutory directive to conclude § 1365 also restricted the power of the House to file a federal subpoena-enforcement action.

31

**V.**

Today the court does not reach the merits of McGahn's absolute-immunity claim, although it concludes that McGahn would be unlikely to prevail, *see* Op. at 9–20 (Henderson, J.). Thus, it suffices at this point to observe that the analysis of *United States v. Nixon*, 418 U.S. 683 (1974), would appear to foreclose McGahn's argument on the merits.

Accordingly, I respectfully dissent.