# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Decided August 31, 2020

No. 19-5331

COMMITTEE ON THE JUDICIARY OF THE UNITED STATES HOUSE
OF REPRESENTATIVES,
APPELLEE

v.

DONALD F. MCGAHN, II,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-02379)

———

*Hashim M. Mooppan*, Deputy Assistant Attorney General, U.S. Department of Justice, and *Mark R. Freeman*, *Michael S. Raab*, and *Martin Totaro*, Attorneys, were on the briefs for appellant.

*Douglas N. Letter*, General Counsel, U.S. House of Representatives, *Todd B. Tatelman*, Deputy General Counsel, *Megan Barbero* and *Josephine Morse*, Associate General Counsel, *Adam A. Grogg* and *William E. Havemann*, Assistant General Counsel, *Jonathan B. Schwartz*, Attorney, and *Annie L. Owens* were on the brief for appellee.

2

*Steven A. Hirsch*, *Justin Florence*, *Jamila G. Benkato*, and *Cameron O. Kistler* were on the brief for *amici curiae* Republican Legal Experts, et al. in support of plaintiff-appellee.

Before: HENDERSON, ROGERS, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

Dissenting opinion filed by *Circuit Judge* ROGERS.

GRIFFITH, *Circuit Judge*: In *Committee on the Judiciary v. McGahn*, 2020 WL 4556761 (Aug. 7, 2020), the en banc court held that the Committee on the Judiciary of the House of Representatives has Article III standing to seek judicial enforcement of a subpoena issued to former White House Counsel Donald F. McGahn, II. *Id.* at *15. It remanded the case to this three-judge panel to consider the remaining issues, including whether the Committee has a cause of action to enforce its subpoena and, if so, whether McGahn must testify despite the Executive Branch's assertion of absolute testimonial immunity. *Id.* We have no occasion to address the immunity argument because we conclude that the Committee lacks a cause of action. Accordingly, the case must be dismissed.

I

The en banc court held that the Committee has Article III standing, but the Committee "also need[s] a cause of action to prosecute" its case in federal court. *Make the Road N.Y. v. Wolf*, 962 F.3d 612, 631 (D.C. Cir. 2020). Here, the Committee argues that it has an implied cause of action under Article I, that it can invoke the traditional power of courts of equity to

3

enjoin unlawful executive action, and that the Declaratory Judgment Act provides a separate basis for this suit. We disagree.

A

Start with Article I. The Committee argues that it is "entitled under Article I to seek equitable relief to enforce a subpoena . . . issued in furtherance of its constitutional power of inquiry." Committee Panel Br. 34 (internal quotation marks omitted). But time and again, the Supreme Court has warned federal courts to hesitate before finding implied causes of action—whether in a congressional statute or in the Constitution. *See, e.g.*, *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1015 (2020); *Hernandez v. Mesa*, 140 S. Ct. 735, 741-43 (2020); *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1402 (2018); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017); *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001). "When a party seeks to assert an implied cause of action under the Constitution itself, . . . separation-of-powers principles are or should be central to the analysis," and usually Congress "should decide" whether to authorize a lawsuit. *Ziglar*, 137 S. Ct. at 1857 (internal quotation marks omitted).

In this case, Congress has *declined* to authorize lawsuits like the Committee's twice over. First, Congress has granted an express cause of action to the Senate—but not to the House. *See* 2 U.S.C. § 288d; 28 U.S.C. § 1365(b). Second, the Senate statute expressly *excludes* suits that involve executive-branch assertions of "governmental privilege." 28 U.S.C. § 1365(a). The expression of one thing implies the exclusion of the other, and authorizing the Committee to bring its lawsuit would conflict with *two* separate statutory limitations on civil suits to enforce congressional subpoenas. When determining whether to "recognize any causes of action not expressly created by

4

Congress," "our watchword is caution," *Hernandez*, 140 S. Ct. at 742, and we should not ignore Congress's carefully drafted limitations on its authority to sue to enforce a subpoena.

The Committee next suggests that—even if Article I alone doesn't provide a cause of action—the court may exercise its "traditional equitable powers" to grant relief. *Ziglar*, 137 S. Ct. at 1856. But even those equitable powers remain "subject to express and implied statutory limitations," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015), and are further limited to relief that was "traditionally accorded by courts of equity," *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Again, "implied statutory limitations" foreclose suits by the House and suits that implicate a governmental privilege; this one checks both boxes, so Congress itself has precluded us from granting the requested relief to the Committee.

In any event, there is also nothing "traditional" about the Committee's claim. The Committee cannot point to a single example in which a chamber of Congress brought suit for injunctive relief against the Executive Branch prior to the 1970s. True enough, the en banc court rejected McGahn's argument that "federal courts have not historically entertained congressional subpoena enforcement lawsuits," but the full court also recognized the "relative recency" of lawsuits to enforce subpoenas. *McGahn*, 2020 WL 4556761, at *14. When determining the scope of our equitable authority, however, "relatively recent" history isn't enough. In *Grupo Mexicano*, the Supreme Court explained that we "must ask whether the relief" that the Committee requests "was traditionally accorded *by courts of equity*." 527 U.S. at 319 (emphasis added). The relief requested here—an injunction issued against a former Executive Branch official in an interbranch information dispute—cannot possibly have been traditionally available in

5

courts of equity, because the "separate systems of law and equity" in our federal system ceased to exist in 1938. *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 137 S. Ct. 954, 960 (2017). The Committee's smattering of examples from the 1970s comes (at least) thirty years too late.

Confining ourselves "within the broad boundaries of traditional equitable relief" constrains federal courts to their proper role in a democratic system. *Grupo Mexicano*, 527 U.S. at 322. We cannot simply gesture towards the "flexibility" of equity and offer whatever relief (in our view) seems necessary to redress an alleged harm; that would transform equity's "flexibility" into "omnipotence." *Id.* Congress may someday determine that the federal courts should stand ready to enforce legislative subpoenas against executive-branch officials, but authorizing that remedy ourselves would be "incompatible with the democratic and self-deprecating judgment" that we lack the "power to create remedies previously unknown to equity jurisprudence." *Id.* at 332. "The debate concerning [the] formidable power" to compel executive-branch officials to respond to congressional subpoenas "should be conducted and resolved where such issues belong in our democracy: in the Congress." *Id.* at 333.

Finally, the Committee claims that the Declaratory Judgment Act allows it to bring suit. *See* 28 U.S.C. § 2201(a). This argument is even less persuasive. The Declaratory Judgment Act does not itself "provide a cause of action," as the "availability of declaratory relief presupposes the existence of a judicially remediable right." *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011) (cleaned up); *see also C&E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002). That statute is "procedural only" and simply "enlarge[s] the range of remedies available in the federal courts." *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667,

6

671 (1950) (internal quotation marks omitted). Because Article I does not create a "judicially remediable right" to enforce a congressional subpoena, the Committee cannot use the Declaratory Judgment Act to bootstrap its way into federal court. Thus, even though the Committee has the Article III standing necessary to "get[] [it] through the courthouse door, [that] does not keep [it] there." *Make the Road*, 962 F.3d at 631.

## B

The dissent's contrary arguments fail. First, the dissent suggests that the court may infer a cause of action from the Committee's Article I power to issue subpoenas. Dissent at 1-2. The dissent quotes *McGrain v. Daugherty*, which held that the "power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function." 273 U.S. 135, 174 (1927); *see also Quinn v. United States*, 349 U.S. 155, 160-61 (1955) (similar). But the Supreme Court has also explained that "[a]uthority to exert the powers of the [House] to compel production of evidence *differs widely* from authority to invoke judicial power to that purpose." *Reed v. Cty. Comm'rs of Del. Cty.*, 277 U.S. 376, 389 (1928) (emphasis added). And neither of the cases that the dissent cites says that Article I gives the Committee power to file a civil suit to enforce its subpoenas. *McGrain* arose out of a habeas corpus suit filed after the Senate exercised its *inherent* contempt power to arrest the Attorney General's brother. *See McGrain*, 273 U.S. at 153-54. And although *Quinn* stated that Congress has "the authority to compel testimony" through "its own processes" or a "judicial trial," that case arose out of a criminal conviction for contempt of Congress—a violation of a criminal statute. 349 U.S. at 160-61. These cases do not demonstrate that Article I creates a cause of action for the Committee. To the contrary, they show that Congress has long relied on its own devices—either its inherent contempt power, *see, e.g.*,

7

*Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204 (1821), or the criminal contempt statute enacted in 1857, *see McGrain*, 273 U.S. at 167.

Our circuit has already recognized these limits on Congress's power to enforce subpoenas. As we explained, "Prior to 1978 Congress had *only two* means of enforcing compliance with its subpoenas: [1] a statutory criminal contempt mechanism and [2] the inherent congressional contempt power." *In re U.S. Senate Permanent Subcomm. on Investigations*, 655 F.2d 1232, 1238 (D.C. Cir. 1981) (emphasis added) (footnote omitted). Although Congress "[r]espond[ed] to this deficiency" by enacting a "mechanism for civil enforcement of *Senate* subpoenas" in 1978, that statute "does not . . . include civil enforcement of subpoenas by the House of Representatives." *Id.* at 1238 & n.28 (emphasis added). Our precedent thus plainly presupposes that the Constitution alone does not provide a cause of action.

The dissent's reliance on the Declaratory Judgment Act also fails. The dissent concedes that the Act "'presupposes the existence of a judicially remediable right.'" Dissent at 3 (quoting *C&E Servs.*, 310 F.3d at 201). The dissent locates this "judicially remediable right" in Article I, but as explained above, Congress has no implied constitutional power to seek civil enforcement of its subpoenas. The Committee thus cannot identify an underlying judicial remedy that could authorize it to invoke the Declaratory Judgment Act.

II

Because the Committee lacks a cause of action to enforce its subpoena, this lawsuit must be dismissed. We note that this decision does not preclude Congress (or one of its chambers) from *ever* enforcing a subpoena in federal court; it simply

8

precludes it from doing so without first enacting a statute authorizing such a suit. The Constitution's Necessary and Proper Clause vests Congress with power to "make all Laws which shall be necessary and proper for carrying into Execution" its constitutional powers, and that Clause gives Congress—and certainly not the federal courts—the broad discretion to structure the national government through the legislative process. U.S. CONST. art. I, § 8, cl. 18.

If Congress (rather than a single committee in a single chamber thereof) determines that its current mechanisms leave it unable to adequately enforce its subpoenas, it remains free to enact a statute that makes the House's requests for information judicially enforceable. Indeed, Congress has passed similar statutes before, authorizing criminal enforcement in 1857 and civil enforcement for the Senate in 1978. *See Senate Permanent Subcomm.*, 655 F.3d at 1238 & n.26. Because no "legislation pursues its purposes at all costs," *CTS Corp. v. Waldburger*, 573 U.S. 1, 12 (2014) (internal quotation marks omitted), any such statute might, for example, carve out certain categories of subpoenas, or create unique procedural protections for defendants. That's exactly what Congress has done in the past. The 1857 statute, for instance, stated that "no person examined and testifying" before Congress "shall be held to answer criminally . . . for any fact or act [about] which he shall be required to testify." *In re Chapman*, 166 U.S. 661, 665 n.1 (1897). And the Senate's civil enforcement statute exempts from suit any defendant asserting a "governmental privilege." 28 U.S.C. § 1365(a).

Balancing the various policy considerations in crafting an enforcement statute is a legislative judgment. For that reason, the Constitution leaves to Congress—and not to the federal courts—the authority to craft rights and remedies in our constitutional democracy. Perhaps "new conditions" "might

9

call for a wrenching departure from past practice" and for a new statute allowing the House to leverage the power of federal courts to compel testimony or the production of documents. *Grupo Mexicano*, 527 U.S. at 322. But if any institution is well-positioned to "perceive" those new conditions, to assess Congress's needs, to balance those needs against the countervailing policy considerations, and then "to design the appropriate remedy," that institution is Congress. *Id.*

   The judgment of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.

                                                             *So ordered.*

ROGERS, *Circuit Judge*, dissenting: In *Committee on the Judiciary v. McGahn*, 2020 WL 4556761 (Aug. 7, 2020), the *en banc* court held that a Committee of the House of Representatives has Article III standing to seek judicial enforcement of a subpoena duly issued to former White House Counsel Donald F. McGahn, II. *Id.* at *15. It remanded to the panel initially assigned to hear the case the remaining issues, including the jurisdictional issues the court considers today. *Id.* For the following reasons, the Committee has a cause of action to litigate its subpoena enforcement lawsuit in federal court and the court has statutory subject matter jurisdiction to resolve it. Further, on the merits, McGahn's contention that he is entitled to absolute immunity from the Committee's subpoena lacks merit.

## I.

McGahn contends that, notwithstanding the Committee's Article III standing, *see generally McGahn*, 2020 WL 4556761, there is no statutory or constitutional authorization for the Committee to bring the present subpoena enforcement lawsuit. But there is both an implied cause of action under Article I of the Constitution and a cause of action pursuant to the Declaratory Judgment Act authorizing the Committee to bring this lawsuit.

## A.

In *McGrain v. Daugherty,* 273 U.S. 135 (1927), the Supreme Court indicated that the Constitution implies a right of action to enforce a subpoena. In that case, the Supreme Court stated that "the power of inquiry — with process to enforce it — is an essential and appropriate auxiliary to the legislative function." *Id.* at 174; *see McGahn*, 2020 WL 4556761, at *4–5. The Court inferred from Article I not only the power of a House of Congress to demand testimony and

2

information but also "process to enforce" such a demand, namely a subpoena enforcement lawsuit.   Similarly, the Supreme Court stated in *Quinn v. United States*, 349 U.S. 155 (1955), that a subpoena gives Congress "the authority to compel testimony, either through its own processes or through judicial trial," *id.* at 160–61, indicating that the subpoena power encompasses the authority to enforce a subpoena in federal court.   In sum, the Supreme Court has explained that the powers of Congress enumerated in Article I of the Constitution imply not only a right to information but also a right to seek judicial enforcement of its subpoena.

### B.

Even if an implied cause of action under the Constitution were inadequate, the Declaratory Judgment Act provides a cause of action for Congress to enforce its subpoena.   The Act authorizes the court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought," so long as there is "a case of actual controversy" over which a federal court may exercise jurisdiction.   28 U.S.C. § 2201(a).   Those two requirements — (1) an actual case or controversy, and (2) federal court jurisdiction — are met here.   First, the *en banc* court has held that the Committee has Article III standing.   *See generally McGahn*, 2020 WL 4556761.   It follows that the present dispute is a genuine case or controversy. Second, 28 U.S.C. § 1331 supplies federal jurisdiction over this lawsuit, as explained in Part II *infra*. The statutory requirements for proceeding under the Declaratory Judgment Act are thus met. Under the plain text of the Act, nothing else is required.   In particular, "the wording of the statute does not indicate that any independent cause of action is required to invoke" the Declaratory Judgment Act, *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 80 (D.D.C. 2008), and the Supreme Court,

3

although emphasizing that the Act is not a source of federal court jurisdiction or any substantive rights, has never stated that it does not create a right of action.

The various limits that the Supreme Court and this court have placed upon lawsuits brought under the Declaratory Judgment Act do not preclude the House of Representatives from proceeding under the Act.  First, the Supreme Court has emphasized that the Declaratory Judgment Act does not provide an independent source of federal jurisdiction. In *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950), the Court stated that the Declaratory Judgment Act "enlarged the range of remedies available in the federal courts but did not extend their jurisdiction."  *Id.*  In that case, plaintiffs filed suit pursuant to the Declaratory Judgment Act seeking an interpretation by the federal court of a contract provision, a question solely of state law. *Id.* at 672.  The Court decided that the mere fact that the plaintiffs had proceeded under the Act did not suffice to render the case's state contract law issue a federal question for purposes of § 1331.  *See id.* at 671–72. The proscription of *Skelly Oil* is no obstacle to the Committee here because the court has jurisdiction under 28 U.S.C. § 1331, *see* Part II *infra*.  Thus, the Committee does not impermissibly seek to rely on the Act as a source of federal court jurisdiction.

Second, the Declaratory Judgment Act "presupposes the existence of a judicially remediable right." *C&E Servs., Inc. v. D.C. Water & Sewer Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002) (quoting *Schilling v. Rogers*, 363 U.S. 666, 677 (1960)).  In *C&E Services*, the issue was whether the appellant could obtain a declaratory judgment that, in structuring its bidding process, the D.C. Water & Sewer Authority had violated the federal Service Contract Act.  The court held that it could not, because the Service Contract Act required any dispute arising under it to be resolved by the U.S. Secretary of Labor; the Declaratory

4

Judgment Act was not an avenue to circumvent that statutory requirement.  *See id.* at 202.  Citing *Schilling v. Rogers*, 363 U.S. 666 (1960), the court stated that "federal courts may not declare a plaintiff's rights under a federal statute that Congress intended to be enforced exclusively through a judicially unreviewable administrative hearing."  *Id.* at 201.  That makes *C&E Services* quite different because the Committee is suing in the context of its constitutional duty of impeachment to enforce a right to compulsory process that follows from the Constitution, not a statute.  Furthermore, because the Committee does not assert a statutory right, there is no statutorily mandated exclusive remedial scheme for vindication of that right, as there was in *C&E Services*.

More broadly, *C&E Services* and *Schilling* stand for the proposition that the Declaratory Judgment Act provides no substantive right that a plaintiff may seek to adjudicate in federal court.  Rather, the Act is a vehicle for vindicating a separate and independent substantive right.  The Constitution itself is the source of the right of compulsory process that the Committee seeks to vindicate here; the Supreme Court has long recognized Congress's broad power of inquiry and the concomitant right to compel witnesses to appear before it.  *See, e.g.*, *McGrain*, 273 U.S. at 174; *see McGahn*, 2020 WL 4556761, at *4–5.  Thus, because the Committee asserts a right to have McGahn appear before it to testify, and because this court has held that a dispute over that right is susceptible of judicial resolution, *see McGahn*, 2020 WL 4556761, at *15, the requirement that a Declaratory Judgment Act plaintiff rely on an independent judicially remediable substantive right is satisfied.

McGahn points out that this court has stated: "Nor does the Declaratory Judgment Act . . . provide a cause of action."  *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011) (citation

5

omitted).  That statement was made in the context of unique factual circumstances very different from the present case.  In *Ali*, the appellants were Afghan and Iraqi citizens detained in their home countries in the course of U.S. military operations there.  *See id.* at 764–65.  Their lawsuit sought, among other things, a declaratory judgment that their treatment in detention violated the law of nations, treaties to which the United States was a party, and the Fifth and Eighth Amendments of the U.S. Constitution.  *Id.*  The court held that the Declaratory Judgment Act did not provide the plaintiffs with a cause of action, *see id.* at 778, casting doubt that the Fifth and Eighth Amendments protected them because they were detained overseas in a country over which the United States did not exercise "*de facto* sovereignty," *id.* at 772 (citing *Boumediene v. Bush*, 553 U.S. 723, 755 (2008)).  The court stated:  "[W]e have . . . held that the Suspension Clause does not apply to Bagram detainees.  [Appellants] offer no reason — and we see none ourselves — why their Fifth and Eighth Amendment claims would be any stronger than the Suspension Clause claims of the Bagram detainees."  *Id.*  The clear implication of that reasoning is that the Fifth and Eighth Amendments did not apply to the *Ali* plaintiffs, and thus that no constitutional right was at stake.

No party disputes the existence of the constitutional power — namely, the power of inquiry — that the House seeks to vindicate.  *See McGrain*, 273 U.S. at 174.  The defect in *Ali*, then, was akin to the problem of *C&E Services*, namely that there was no substantive right that plaintiffs could assert.  So understood, *Ali* does not prevent the House from proceeding under the Declaratory Judgment Act here to vindicate an established constitutional right.

6

**II.**

It is not enough that the Committee have Article III standing and a cause of action to bring the present lawsuit; the court must also assure itself that it has statutory subject matter jurisdiction to resolve the dispute. Contrary to McGahn's position, the court has subject matter jurisdiction over the Committee's lawsuit pursuant to 28 U.S.C. § 1331, which grants statutory jurisdiction over "all civil actions arising under the Constitution . . . of the United States." The present lawsuit "aris[es] under the Constitution" and is therefore within the court's jurisdiction.

The power that the Committee seeks to exercise in the present lawsuit flows from the Constitution. "Because Congress must have access to information to perform its constitutional responsibilities, when Congress 'does not itself possess the requisite information — which not infrequently is true — recourse must be had to others who do possess it." *McGahn*, 2020 WL 4556761, at *4 (quoting *McGrain*, 273 U.S. at 175). Consequently, "the Supreme Court has acknowledged the essentiality of information to the effective functioning of Congress and long 'held that each House has power to secure needed information' through the subpoena power." *Id.* (quoting *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020)) (internal quotation marks omitted). "That constitutional power entitles each House to the testimony of a witness and production of requested documents in response to a lawful subpoena." *Id.* Because the House seeks through the present lawsuit to exercise its subpoena power, and because that power flows from Article I of the Constitution, *see, e.g.*, *McGrain*, 273 U.S. at 174, the Committee's lawsuit arises under the Constitution. The court therefore has subject matter jurisdiction pursuant to § 1331.

7

This conclusion is bolstered by *United States v. AT&T*, 551 F.2d 384 (D.C. Cir. 1976).  In that case, the Executive Branch sued AT&T to enjoin its compliance with a congressional subpoena.  The President had directed AT&T "as an agent of the United States, to respectfully decline to comply with the Committee subpoena." *Id.* at 387 (citation omitted).  The House of Representatives intervened as a defendant to represent its interest in AT&T's compliance with the Committee subpoena.  After observing that the subpoena dispute presented "a clash of the powers of the legislative and executive branches," this court held that subject matter "[j]urisdiction exists under 28 U.S.C. § 1331," as explained in Part II. *Id.* at 389.  The court reasoned that because the question before it was whether the Executive Branch possessed the "constitutional powers" to "prevent transmission of [requested information] to Congress" pursuant to a congressional subpoena, "[t]he action therefore arises under the Constitution of the United States." *Id.*  *AT&T* thus establishes that a dispute over whether a party must comply with a congressional subpoena arises under the Constitution and therefore lies within § 1331's grant of subject matter jurisdiction.

McGahn responds that notwithstanding the plain text of § 1331 and this court's precedent interpreting that provision to provide subject matter jurisdiction over a dispute concerning a congressional subpoena, 28 U.S.C. § 1365 has impliedly repealed federal jurisdiction granted by § 1331.  That argument, which the majority embraces, is unpersuasive.

Section 1365, entitled "Senate actions," confers on the U.S. District Court for the District of Columbia original jurisdiction "over any civil action brought by the Senate or any authorized committee or subcommittee . . . to enforce, to secure a declaratory judgment concerning the validity of, or to prevent a threatened refusal or failure to comply with, any subpoena or

8

order issued by the Senate or committee or subcommittee."  28
U.S.C. § 1365.   On its face, § 1365 says nothing about
subpoena enforcement lawsuits brought by the House of
Representatives.   Yet by explicitly granting the federal courts
jurisdiction over a Senate subpoena enforcement action but not
a House subpoena enforcement action, McGahn maintains that
Congress intended that the federal courts should not have
jurisdiction over the latter.  This argument fails on two grounds.
First, it overlooks the key context.  When Congress enacted §
1365 in 1978, § 1331 contained an amount-in-controversy
requirement for lawsuits against private parties and officials
acting in their individual capacities.   The Senate had good
reason to believe that this requirement would be an obstacle to
subpoena-enforcement lawsuits because the district court in
*Senate Select Committee on Presidential Campaign Activities
v. Nixon*, 366 F. Supp. 51 (D.D.C. 1973), had originally
dismissed the Senate's lawsuit for failure to meet the
requirement, *see id.* at 59–61.  Congress addressed this problem
in 1978 with the enactment of § 1365, which granted federal
courts subject matter jurisdiction over Senate subpoena-
enforcement actions without regard to the amount in
controversy.  The Senate Committee on Governmental Affairs
explicitly disclaimed the inference that McGahn now seeks to
draw, stating in its report on § 1365 that the provision "is not
intended to be a Congressional finding that the Federal courts
do not now have the authority to hear a civil action to enforce
a subp[o]ena against an officer or employee of the Federal
Government."  S. Rep. No. 95-170, at 91–92 (1978).

Congress is free to address problems *seriatim* without
thereby implicating questions not before it.  As the Supreme
Court has explained, "reform may take one step at a time,
addressing itself to the phase of the problem which seems most
acute to the legislative mind.  The legislature may select one
phase of one field and apply a remedy there, neglecting the

9

others." *Williamson v. Lee Optical*, 348 U.S. 483, 489 (1955) (citation omitted)).  With § 1365, Congress was responding to a particular problem: the amount in controversy requirement that, *until it was eliminated in 1980*, prevented federal courts from exercising jurisdiction over Congressional subpoena-enforcement suits under § 1331.  Given the specific obstacle Congress overcame in enacting § 1365, there is no basis to conclude the statute bears on federal jurisdiction over House subpoena-enforcement actions.  The inference that § 1365 has repealed such jurisdiction is therefore unwarranted.

Second, the Supreme Court has cautioned against the implied repeal argument that McGahn advances.  Because "[r]edundancies across statutes are not unusual events in drafting, . . . so long as there is no 'positive repugnancy' between two laws, a court must give effect to both."  *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) (quoting *Wood v. United States*, 41 U.S. (16 Pet.) 342, 363 (1842)).  Consequently, "jurisdiction conferred by 28 U.S.C. § 1331 should hold firm against 'mere implication flowing from subsequent litigation.'" *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 383 (2012) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 808 (1976)).  That admonition counsels against McGahn's and the majority's theory of the effect that § 1365 has on the court's jurisdiction over the present lawsuit.

To the extent that legislative history may shed light on the meaning of § 1365 as McGahn urges, reliance on two Senators' statements during Floor debate on the bill is misplaced.  Two Senators stated that § 1365 indicates there is no federal jurisdiction over a Congressional subpoena-enforcement suit unless specifically authorized and reflects a Congressional judgment courts should refrain from exercising jurisdiction over such disputes.  Given the jealousy with which each House

10

of Congress guards its constitutional prerogatives, these statements are hardly a clear instruction concerning the effect of § 1365 on the institutional powers of the House of Representatives.  It would therefore be inappropriate, in the absence of a clear statutory directive, to conclude that § 1365 also restricted the power of the House to file a federal subpoena-enforcement lawsuit.

**III.**

On the merits, McGahn's contention that he is absolutely immune from the Committee's subpoena must fail.  His claim of absolute immunity amounts to the position that the President has the exclusive prerogative to determine what information, if any, will be disclosed in response to a subpoena.  Precedent forecloses that position.

In *United States v. Nixon*, 418 U.S. 683 (1974), the Supreme Court rejected this capacious view of Presidential power over Executive Branch information.  Stating that "neither the doctrine of separation of powers, nor the need for confidentiality of high-level communications, without more, can sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances," the Court instead held that the President possesses a qualified executive privilege whereby Presidential communications are presumptively privileged but whose disclosure may be compelled in the case of demonstrated specific need in a criminal proceeding.  *Id.* at 706–07.  As the *en banc* court recently recognized, this "potentially available privilege is a powerful protection of the President's interest in Executive Branch confidentiality" in the present case.  *McGahn*, 2020 WL 4556761, at *11.

11

The Supreme Court elaborated on the President's qualified power to screen Executive Branch materials from disclosure in *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977), concerning not a judicial subpoena in a criminal matter but rather a statute regulating the preservation of President Nixon's Presidential papers. The Court reiterated that although the context was different, the executive privilege was "a qualified one" and that "there has never been an expectation that the confidences of the Executive Office are absolute and unyielding." *Id.* at 446, 450. The privilege is similarly qualified when asserted in civil litigation. *See Dellums v. Powell*, 561 F.2d 242, 245–46 (D.C. Cir. 1977).

This court has rejected the claim of absolute presidential privilege in the factual circumstances of the present case, namely in response to a congressional subpoena. In *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974), the court considered a subpoena enforcement lawsuit brought by a Senate Committee. Rather than indulge the President's claim of absolute privilege in response to the subpoena, the court stated that the proper analysis was to determine whether the Committee's demonstrated "public need" was sufficient to overcome the President's general interest in confidentiality; if so, *in camera* review of the requested materials by the district court would follow in order to assess the Executive Branch's particularized claims of privilege. *Id.* at 729–31. The court explained that "[s]o long as the presumption that the public interest favors confidentiality can be defeated only by a strong showing of need by another institution of government . . . the effective functioning of the presidential office will not be impaired." *Id.* at 730.

This precedent demonstrates that although the President's communications with close advisors, including the White

12

House Counsel, are presumptively privileged, the President does not have absolute, unreviewable discretion to determine what information will be disclosed in response to a subpoena — whether a judicial subpoena in a criminal proceeding or a valid congressional subpoena.  Yet that is exactly the nature of McGahn's absolute immunity claim.  By asserting that he need not even appear in response to the Committee's duly issued subpoena, he in essence contends that the President may unilaterally determine that no information will be disclosed in response to the subpoena.  He thereby seeks to revive a view of Presidential power expressly rejected by the Supreme Court.

Accordingly, the judgment of the district court should be affirmed, *see Comm. on the Judiciary, U.S. House of Representatives v. McGahn*, 415 F. Supp. 3d 148 (D.D.C. 2019), and I respectfully dissent.