**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE ON WAYS AND MEANS, UNITED STATES HOUSE OF REPRESENTATIVES,<br>*Plaintiff–Counterdefendant*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE TREASURY; INTERNAL REVENUE SERVICE; JANET YELLEN, in her official capacity as Secretary of the United States Department of the Treasury; and CHARLES P. RETTIG, in his official capacity as Commissioner of the Internal Revenue Service,<br>*Defendants–Crossdefendants*,<br><br>and<br><br>DONALD J. TRUMP; THE DONALD J. TRUMP REVOCABLE TRUST; DJT HOLDINGS LLC; DJT HOLDINGS MANAGING MEMBER LLC; DTTM OPERATIONS LLC; DTTM OPERATIONS MANAGING MEMBER CORP.; LFB ACQUISITION MEMBER CORP.; LFB ACQUISITION LLC; and LAMINGTON FARM CLUB, LLC d/b/a TRUMP NATIONAL GOLF CLUB-BEDMINSTER<br>*Intervenors–Counterclaimants–Crossclaimants.* | No. 1:19-cv-1974-TNM |

## <u>ANSWER AND COUNTERCLAIMS/CROSS-CLAIMS</u>

Intervenors—Donald J. Trump, The Donald J. Trump Revocable Trust, DJT Holdings LLC, DJT Holdings Managing Member LLC, DTTM Operations LLC, DTTM Operations Managing Member Corp, LFB Acquisition Member Corp., LFB Acquisition LLC, and Lamington Farm Club, LLC d/b/a Trump National Golf Club-Bedminster—respectfully submit this responsive pleading pursuant to Federal Rules of Civil Procedure 12 and 24(c).

## ANSWER

1.      Intervenors deny that the Committee's requests are valid oversight requests or that they are entitled to any relief. Intervenors admit the rest.

2.      The text of Section 6103(f) speaks for itself. Intervenors admit that Congress enacted the Revenue Act of 1924 in 1924. Intervenors deny for lack of knowledge the allegations regarding the frequency of the use of Section 6103(f) and the extent of the Executive Branch's compliance therewith. Intervenors deny the rest.

3.      Intervenors admit that to date, Defendants have declined to produce President Trump's tax return information in response to the Committee's requests. Intervenors deny the rest.

4.      The text of Section 6103(f) speaks for itself. Intervenors lack sufficient information to respond to the allegations about alleged statements by the President. Intervenors deny the rest.

5.      Deny.

6.      Deny.

7.      Intervenors admit that to date, Defendants have not complied with the Committee's subpoenas for nearly identical information and have cited advice from the Office of Legal Counsel concluding that Defendants have acted correctly. Intervenors deny the rest.

8.      The cited authority speaks for itself. The remainder of the paragraph consists of legal conclusions to which no response is required.

9.      Intervenors admit that the Committee asks this Court to order Defendants to produce the requested information. Intervenors deny the rest.

10.     Intervenors admit that the Court has jurisdiction over this action.

11.     Admit.

12.     Admit.

13.     Admit.

14.     Admit.

15.     Deny. Janet Yellen is the current Secretary of the Treasury and this action continues against her in her official capacity.

16.     Deny.

17.     Intervenors deny for lack of knowledge.

18.     The cited authority speaks for itself. The remainder of the paragraph consists of legal conclusions to which no response is required.

19.     The cited authority speaks for itself. The remainder of the paragraph consists of legal conclusions to which no response is required.

20.     The cited authorities speak for themselves. The remainder of the paragraph consists of legal conclusions to which no response is required.

21.     The cited authorities speak for themselves. The remainder of the paragraph consists of legal conclusions to which no response is required.

22.     The cited authorities speak for themselves. The remainder of the paragraph consists of legal conclusions to which no response is required.

23.     Intervenors admit that Congress has enacted legislation purporting to require Treasury to provide the Committee with tax return information. The remainder of the paragraph consists of legal conclusions to which no response is required.

24.     The cited authority speaks for itself. The remainder of the paragraph consists of legal conclusions to which no response is required.

25.     Admit.

26.     Admit.

27.     The cited authorities speak for themselves. The remainder of the paragraph consists of legal conclusions to which no response is required.

28.     The cited authority speaks for itself. The remainder of the paragraph consists of legal conclusions to which no response is required.

29.     The text of Section 6103(f) speaks for itself. The remainder of the paragraph consists of legal conclusions to which no response is required.

30.     Intervenors admit that Congress enacted the Revenue Act of 1924 in 1924. The remainder of the paragraph consists of legal conclusions to which no response is required.

31.     The cited authorities speak for themselves. The remainder of the paragraph consists of legal conclusions to which no response is required.

32.     The cited authorities speak for themselves. The remainder of the paragraph consists of legal conclusions to which no response is required.

33.     The cited authorities speak for themselves. The remainder of the paragraph consists of legal conclusions to which no response is required.

34.     Intervenors admit that Congress enacted the Revenue Act of 1924 in 1924. The cited authorities speak for themselves. The remainder of the paragraph consists of legal conclusions to which no response is required.

35.     Intervenors admit that Congress enacted the Tax Reform Act of 1976 in 1976. The cited authorities speak for themselves. The remainder of the paragraph consists of legal conclusions to which no response is required.

36.     The cited authorities speak for themselves. The remainder of the paragraph consists of legal conclusions to which no response is required.

37.     The cited documents speak for themselves. Intervenors deny the remaining allegations for lack of knowledge.

38.     Deny for lack of knowledge.

39.     The cited documents speak for themselves. Intervenors deny the remaining allegations for lack of knowledge.

40.     Deny for lack of knowledge.

41.     The cited document speaks for itself. Intervenors deny the remaining allegations for lack of knowledge.

42.     The cited documents speak for themselves. Intervenors admit the IRS audit policy was adopted in 1977. The remainder of the paragraph consists of legal conclusions to which no response is required.

43.     The cited documents and authority speak for themselves. The remainder of the paragraph consists of legal conclusions to which no response is required.

44.     The cited documents speak for themselves. The remainder of the paragraph consists of legal conclusions to which no response is required.

45.     The cited documents speak for themselves. The remainder of the paragraph consists of legal conclusions to which no response is required.

46.     Deny.

47.     The cited documents speak for themselves. Intervenors deny that President Trump has frequently attacked the integrity of, or continually expressed disdain for, the IRS's audit system. Intervenors deny the rest.

48.     The cited documents speak for themselves. Intervenors deny the rest.

49.     Intervenors admit that President Trump has declined to disclose his tax returns and that President Trump and Defendant Rettig made the quoted statements. Intervenors deny the rest.

50.     Intervenors admit that President Trump made the quoted statements.

51.     The text of H.R. 1 speaks for itself. Intervenors deny the rest.

52.     Intervenors admit that the Tax Transparency Act of 2019, H.R. 1489, 116th Cong. (2019), the Presidential Allowance Modernization Act of 2019, H.R. 1496, 116th Cong. (2019), the RIGHT Act of 2019, H.R. 1028, 116th Cong. (2019), and the Charitable Conservation Easement Program Integrity Act of 2019, H.R. 1992, 116th Cong. (2019), were referred to the Committee. Intervenors deny the rest.

53.     Intervenors admit the Committee convened a hearing on February 7, 2019. The transcript of the hearing speaks for itself.

54.     Intervenors admit that numerous witnesses testified at the hearing. The transcript of the hearing speaks for itself.

55.     The transcript of the hearing speaks for itself. Intervenors deny the rest of the allegations in this paragraph.

56.     Intervenors admit that the Committee submitted an oversight plan. The cited document speaks for itself.

57.     Intervenors admit that the Committee on April 3, 2019, requested tax return information (including the "administrative files") for President Trump and eight related entities for tax years 2013 through 2018. The Committee has since submitted a modified request seeking information for the tax ears 2015-2020. Intervenors deny the rest.

58.     Intervenors admit that the Committee did not include within its April 2019 Section 6103(f) request a stated reason for the request and that Chairman Neal made the quoted statement. Intervenors deny the rest.

59.     Intervenors admit that the Committee has sought six years of tax return information, including "administrative files," for President Trump and eight related entities, and that Chairman Neal made the quoted statement. Intervenors deny the rest.

60.     Deny.

61.     Deny.

62.     Admit.

63.     Admit.

64.     Admit.

65.     Intervenors admit that on April 13, 2019, the Committee reiterated its Section 6103(f) request in a letter, the content of which speak for itself. Intervenors deny the rest.

66.     Admit, except to deny the characterization of counsel's support for Treasury's decisions to consult with the Department of Justice.

67.     Admit that the Secretary Mnuchin responded in a letter dated April 23, 2019, the content of which speaks for itself.

68.     Intervenors admit that Secretary Mnuchin made the quoted statements. Intervenors deny the rest.

69.     Intervenors admit that Secretary Mnuchin made the quoted statements. Intervenors deny the rest.

70.     Intervenors admit that the Commissioner of the IRS sent a letter to the Committee dated April 23, 2019, the content of which speaks for itself.

71.     Intervenors admit that Secretary Mnuchin and Commissioner Rettig sent letters to the Committee dated May 6, 2019, the contents of which speak for themselves. Intervenors deny the rest.

72.     Intervenors admit that the Committee issued subpoenas with a return date of May 17, 2019, but otherwise lack sufficient information to respond to the allegations in this paragraph.

73.     Intervenors admit that Chairman Neal made the quoted statements. Intervenors deny the rest.

74.     Intervenors admit that Chairman Neal made the quoted statements. Intervenors deny the rest.

75.     Intervenors admit that the Secretary of the Treasury and the Commissioner of the IRS responded by letters dated May 17, 2019, the contents of which speaks for themselves.

76.     Intervenors admit that Secretary Mnuchin made the quoted statement. Intervenors deny the rest.

77.     Intervenors admit that Commissioner Rettig made the quoted statements. Intervenors deny the rest.

78.     Deny.

79.     Deny for lack of knowledge.

80.     Deny for lack of knowledge.

81.     Deny for lack of knowledge.

82.     Intervenors admit that Chairman Neal sent a letter dated June 28, 2019, the content of which speaks for itself. Intervenors deny the rest for lack of knowledge.

83.     Intervenors admit that after Secretary Mnuchin and Commissioner Rettig declined to comply with the Committee's Section 6103(f) request, and that OLC published an opinion

supporting their decision to decline to provide the Committee with the tax returns, the content of which speaks for itself.

84.     The OLC opinion speaks for itself. Intervenors deny the rest of this paragraph.

85.     The OLC opinion speaks for itself. Intervenors deny the rest of this paragraph.

86.     The OLC opinion speaks for itself. Intervenors deny the rest of this paragraph.

87.     Deny.

88.     The paragraph sets forth legal conclusions, to which no response is required.

89.      The paragraph sets forth legal conclusions, to which no response is required.

90.     Deny.

91.     Deny.

92.     Deny.

93.     Deny.

94.     Deny.

95.     Intervenors admit that the House is not a continuing body and that the 116th Congress ended on January 3, 2021. Intervenors deny the rest.

96.     Deny.

97.     Deny.

98.     Intervenors admit that the Bipartisan Legal Advisory Group voted to authorize the Committee to initiate this litigation. The cited authorities speak for themselves. Intervenors deny the rest.

99.     Intervenors incorporate their responses to the preceding paragraphs, as if set forth fully herein.

100.    Intervenors admit that the Committee authorized, issued, and served the subpoenas on Defendants. Intervenors deny the rest.

101.    Intervenors admit that the subpoenas demand that the Defendants produce the documents set forth in Schedule A of the subpoenas. Intervenors deny the rest.

102.    Deny.

103.    Deny.

104.    Deny.

105.    Intervenors incorporate their responses to the preceding paragraphs, as if set forth fully herein.

106.    Intervenors admit that the statute's text includes the quoted language.

107.    Deny.

108.    Section 6103(f) speaks for itself. Intervenors deny the rest.

109.    Deny.

110.    Deny.

111.    Intervenors incorporate their responses to the preceding paragraphs, as if set forth fully herein.

112.    Intervenors admit that the statute's text includes the quoted language.

113.    Deny.

114.    Deny.

     i.    Deny.

    ii.    Deny.

   iii.    Deny.

   iv.    Deny.

115.    Deny.

116.    Intervenors incorporate their responses to the preceding paragraphs, as if set forth fully herein.

117.    Intervenors admit that the statute's text includes the quoted language.

118.    Deny.

119.    Deny.

    i.    Deny.

    ii.    Deny.

120.    Deny.

121.    Intervenors incorporate their responses to the preceding paragraphs, as if set forth fully herein.

122.    Intervenors admit that the statute's text includes the quoted language.

123.    Deny.

124.    Deny.

125.    Deny.

126.    Intervenors incorporate their responses to the preceding paragraphs, as if set forth fully herein.

127.    The text of Section 6103(f) speaks for itself. Intervenors deny the rest.

128.    Intervenors admit that the Committee provided Defendants with a written request for tax return information and that Defendants have not provided the requested documents. Intervenors deny the rest.

129.    Deny.

130.    Deny.

131.    Intervenors incorporate their responses to the preceding paragraphs, as if set forth fully herein.

132.    The text of Section 6103(f) speaks for itself. Intervenors deny the rest.

133.    Intervenors admit that the Committee provided Defendants with a written request for tax return information and that Defendants have not complied with that request. Intervenors deny the rest.

134.    Deny.

135.    Deny.

136.    Intervenors incorporate their responses to the preceding paragraphs, as if set forth fully herein.

137.    Deny.

138.    The text of Section 6103(f) speaks for itself. Intervenors deny the rest.

139.    Deny.

140.    Deny.

**RESPONSE TO PRAYER FOR RELIEF**

Intervenors deny that the Committee is entitled to any relief.

## COUNTERCLAIMS & CROSS-CLAIMS

1.      During the 2016 election, then-Candidate Trump declined to disclose his federal tax returns, citing ongoing IRS audits and the need to not prejudice his rights in those proceedings.

2.      The tax returns became a major campaign issue. Secretary Clinton repeatedly insinuated that their nondisclosure suggested they contained politically damaging information. As she framed the criticism at one presidential debate, "[W]hy won't he release his tax returns? … Maybe he's not as rich as he says he is. Second, maybe he's not as charitable as he says he is. Third, we don't know all of his business dealings …. Or maybe he doesn't want the American people ... to know that he's paid nothing in federal taxes.... It must be something really important, even terrible, that he's trying to hide."

3.      After President Trump's election, Democrats in Congress and across the country only became more eager to disclose the President's tax returns for political gain.

4.      During the 115th Congress, when they were still the minority party, House Democrats gave a variety of reasons for wanting the President's tax returns. Their statements all had a common theme: the tax returns would contain damaging information about President Trump that the House Democrats would release to the public.

   a.      Then-Leader Nancy Pelosi, for example, said there was a "popular demand" for the President's tax returns, which she suspected would reveal "a Russia connection" and "what [the] Russians have on Donald Trump." In a press conference with the House Democratic Leadership, she reiterated her concern about Russia and called on the Ways and Means Committee to "make those tax returns public."

   b.      Committee Democrats released a report stating they "remain steadfast in our pursuit to have his individual tax returns disclosed to the public."

c.       Then-Ranking Member Richard Neal said he wanted the public to "see the tax forms" and for "the media to sift and sort" them.

d.       Representative Lloyd Doggett, another Committee member, said "[t]he public has an interest in knowing of the President's personal and business affairs"; he suspected the returns would show that the President "will benefit personally" from tax reforms, has "payments to or from Russians," and has "conflicts with and entanglements with foreign governments and potential violations of the Emoluments Clause." He also said that "Trump's a self-made myth" and promised that, if Democrats took back the House in 2018, the Committee would not "even need a subpoena" to "obtain his tax returns."

e.       Representative Judy Chu, another Committee member, complained that Republicans had "blocked" Democrats' requests "to see Trump's tax returns" "8 different times." She insisted that "[w]e need to know the truth" and to "[r]elease the returns" to see if Trump committed fraud when he was a private citizen.

f.       Representative Bill Pascrell, another Committee member, stated that "[w]e must see Trump's tax returns to know just how far and how deep the crimes go." "Americans have a right to know if their President is a crook," he also stated. "Seeing Trump's tax returns will help us determine if he is one." Another time he stated, "After losing dad's support, Trump went on a spending spree — where did that money come from? The only way to know is to get his tax returns. I'll never give up on this."

5.       After the 2018 midterm elections, Democrats took control of the House and, with it, the power to issue subpoenas and document requests.

6.       Now-Speaker Pelosi confirmed that Democrats would use their new power to obtain and expose President Trump's tax information. "I think overwhelmingly the public wants

to see the president's tax returns," she said. "And so they want to know the truth, they want to know the facts and he has nothing to hide."

7.      Representative Pascrell said that under the new Speaker's leadership, "I am confident we will have the will and the tools to finally expose Trump's financial history to sunlight." "We will not rest on the committee until Donald Trump's personal and business records are given total scrutiny. We must see how far the crimes go." Once the new Congress began, Representative Pascrell announced that "we continue to work to expose Donald Trump's tax returns to vital congressional sunlight."

8.      Representative Jimmy Gomez, a Committee member, noted that Chairman Neal was creating the "justification" for requesting President Trump's tax information. Representative Gomez stated, "We really need to get those tax returns to get a better picture and to understand if he committed a crime." "I think that the information leads us in that direction, but I'm not sure if we're quite there yet. I think we need those tax returns to seal the deal."

9.      Representative Pascrell urged the Committee to seek President Trump's tax information without delay, noting that "his returns would show" if he committed "fraud."

10.      Knowing he could not request the President's tax returns unless he had a legitimate legislative purpose, Chairman Neal began "contruct[ing]" a "case" that "would stand up under the critical scrutiny of the federal courts." He had to be "meticulous about [his] choice of words," he said, because his request would "become the basis of a long and arduous court case." He implored his fellow Democrats to "resist the emotion of the moment," not "step on [their] tongue[s]," and "approach this gingerly and make sure the rhetoric that is used does not become a footnote to the court case." Getting the tax returns "has to be part of a carefully prepared and documented legal

case," Chairman Neal explained. "It will be done judiciously and methodically, but it will be done."

11.     In "construct[ing]" his "case," Chairman Neal knew he could not rely on any of the rationales that Democrats had offered in the past. A bare desire to expose the President's tax information would be illegal, and the Ways and Means Committee has no jurisdiction over "emoluments," "conflicts of interest," or "Russia." But the Ways and Means Committee had to be the one to make the request, House Democrats believed, because only it can both request the President's returns and disclose them to the public. *Cf.* 26 U.S.C. §6103(f)(4).

12.     So Chairman Neal came up with a new rationale. In a letter to the IRS Commissioner dated April 3, 2019, he requested six years' worth of tax returns and other information regarding President Trump and eight Trump entities. He justified his request in terms of "the Federal tax laws"—specifically, determining "the extent to which the IRS audits and enforces the Federal tax laws against a President."

13.     Chairman Neal's rationale was pretextual, as he had admitted it would be.

    a.     While House Democrats had offered countless justifications for obtaining the President's tax returns, no one at the time had ever mentioned a desire to find out how the IRS audits Presidents.

    b.     The Chairman's request bore little resemblance to an effort to investigate how the IRS audits Presidents. It asked for the information of only one President, asked for open files for which audits have not been completed, and never asked the IRS for the most relevant information—namely, how it audits Presidents.

    c.     Representative Pascrell said that Neal's strategy "was chosen according to counsel" because it was "the best way" to "make sure we got the tax returns."

      d.      In discussing Neal's request, Representative Doggett tied the tax returns to figuring out how "[t]he Trump family may have gained as much as a billion dollars from the recent Trump tax law."

      e.      Representative Gomez, during an interview on CNN, parroted Chairman Neal's rationale but added that "the American people also want to know what is really in the tax returns of this President."

14.      In a series of letters, attorneys for the President and Treasury Department challenged this newly-minted rationale as illegitimate. In response, the Chairman did not dispute that his new rationale was pretextual; he merely insisted that no one could "question or second guess the motivations of the Committee."

15.      On May 6, 2019, the Treasury Department indicated it could not comply with the Committee's request for the President's federal tax returns. After compiling and reviewing over 40 pages of Democrats' public statements, Secretary Mnuchin concluded that the Committee's request lacked a legitimate legislative purpose. It was instead a partisan effort to expose the President's private tax information.

16.      The Department of Justice agreed. In a June 13, 2019 memorandum, the Office of Legal Counsel carefully summarized the record to date and concluded that "Chairman Neal's April 3 letter represents the culmination of a sustained effort over more than two years to seek the public release of President Trump's tax returns." "[T]hroughout 2017 and 2018, Chairman Neal and other Members of Congress made clear their intent to acquire and release the President's tax returns. They offered many different justifications for such an action, … [b]ut oversight of 'the extent to which the IRS audits and enforces the Federal tax laws against a President' had never been the focus of their demands."

17.     OLC found that "the Committee's stated purpose in the April 3 letter blinks reality. It is pretextual. No one could reasonably believe that the Committee seeks six years of President Trump's tax returns because of a newly discovered interest in legislating on the presidential-audit process. The Committee's request reflects the next assay in a long-standing political battle over the President's tax returns. Consistent with their long-held views, Chairman Neal and other majority members have invoked the Committee's authority to obtain and publish these returns. Recognizing that the Committee may not pursue exposure for exposure's sake, however, the Committee has devised an alternative reason for the request."

18.     The Committee's request for tax information was part of a broader, nationwide effort by Democratic officials to obtain President Trump's financial information and expose it to the public.

19.     In July 2019, California passed a law purporting to "prohibit the Secretary of State from printing on a primary election ballot the name of a candidate for President of the United States who has not filed with the Secretary of State the candidate's federal income tax returns for the five most recent taxable years." A federal district court found that, despite its ostensibly neutral framing, this law "was primarily intended to force President Trump to disclose his tax returns." The law was ultimately invalidated by the California Supreme Court.

20.     In August 2019, the District Attorney of New York County—in the country's first state grand-jury subpoena to a sitting President—requested President Trump's tax returns. The District Attorney stated that his subpoena was part of an investigation into "potential crimes under New York law."

21.     Before President Trump's inauguration, New York considered the TRUMP Act, which would have required presidential candidates to publicly disclose their federal tax returns

from the last five years in order to appear on the ballot in New York. Ultimately, New York enacted the TRUST Act in May 2019, allowing Congress to obtain a President's state returns from New York if Congress had requested the President's federal returns from the Treasury Department (which, for President Trump, it had already done).

22.     New York legislators viewed the TRUST Act as a way to help the Committee accomplish the reason it requested the President's federal return: obtaining and exposing his private tax information for political gain.

  a. As the bill's sponsor Senator Holyman explained, "[N]o one is above the law and we have a situation in Washington where a coequal branch of government has requested tax information from the White House and it is being stonewalled." "New York, as the home of the president and the headquarters for some of his companies, has a unique role and responsibility in that regard to allow Congress to do its constitutionally-mandated job." Only New York could "help head off the constitutional crisis brewing between Congress and the White House over refusal to comply with the request for Donald Trump's tax returns." "As the situation in Washington unfolds the desire by my colleagues is even greater to pass this bill," Senator Hoylman added. "Applying pressure in New York is a positive thing for the efforts by Chairman Neal."

  b. When asked how best to expose President Trump's tax information, Senator Holyman said, "I don't care how we get it done, frankly"; "I want the route that is most politically feasible." "What's at stake here," Senator Hoylman stated, is "the desire of New Yorkers and the American people to seek the truth behind Trump's taxes." "Typically in politics, where there's smoke there's fire." "A lot of New Yorkers, and frankly, Americans

have questions about what he's hiding," and "we have a responsibility to do so as the state that is the home state for President Trump and many of his businesses."

c.      When asked why the TRUST Act is not "blatantly political," Senator Hoylman responded, "We as New Yorkers shouldn't be bystanders to the preservation of our democracy" and "Donald Trump has broken over 40 years of political traditions by not releasing his tax returns."

d.      When asked a similar question, another of the bill's sponsors Assemblymember Buchwald admitted that "[o]bviously it is a bill dominated by Democratic support" but added that some non-Democrats also "want President Trump to release his taxes." "Making sure that the public has information about the man currently in the White House is something that I feel is incumbent upon us to make sure is released." "New York state could play a unique role with regards to transparency of tax returns in connection with the president," Assemblymember Buchwald added.

e.      Senator Andrea Stewart-Cousins voted for the TRUST Act because "[n]o one is above the law and we see things unfolding, that, really, is blocking the ability for our counterparts on the congressional level to actually do their responsibility."

f.      Senator Michael Gianaris voted for it to "send a message that no one is above the law…. [W[e have a president who is defying the norms of checks and balances and the balance of power in this country."

g.      Assemblymember Thomas Abinanti echoed that "the President has spurned the tradition of releasing his own tax returns, and he has intentionally and publicly thwarted the legitimate and necessary oversight of Congress."

      h.      Carl E. Heastie, the Democratic speaker of the Assembly, echoed that "there seems to be nationwide desire" to see Mr. Trump's taxes.

      i.      Senator Luis Sepúlveda described the law as a way to "resist" the "current president [who] is potentially breaking every rule."

23.      The New York legislature's illegitimate motives did not go unnoticed. Assemblymember Michael Benedetto, a Democrat, stated, "Make no mistake, I have complete disdain with what is going on in this administration in Washington." "But … the purpose [of the TRUST Act] is obviously political in nature .… No Legislature should craft legislation for political reasons just to get a few people they consider their enemies." Assemblymember Carrie Woerner, who voted for the TRUST Act, lamented that it was "an intrusion … driven by politics." Governor Cuomo also expressed initial reservations about the TRUST Act because "if we have to pass a law that is clearly designed to help a Democratic Congress access Donald Trump's tax returns it will be in the courts for years, because this really does raise serious constitutional questions."

24.      Committee Democrats implored Chairman Neal to take advantage of the TRUST Act. Since President Trump's New York taxes have nothing to do with the IRS's process for auditing Presidents' federal taxes, these requests revealed the pretextual nature of that rationale.

      a.      Representative Doggett said, "we should take a look" at "New York's information."

      b.      Referencing the TRUST Act, Representative Pascrell said he supports "any tool … that might shed sunlight on Trump's tax return history" because the country needs to know what he "is hiding" and whether he "is a crook."

c.      Representative Judy Chu declared that "[t]he new law out of New York State is a new and interesting option that I believe should be considered and examined as we move forward."

25.    Other House Democrats added their voices to this chorus.

a.      Representative Maxine Waters, who chairs the House Financial Services Committee, said that "I'm for" "[w]hatever it takes to get" the President's tax returns.

b.      Representative Pramila Jayapal, co-chair of the House Progressive Caucus, similarly said, "Yes, absolutely, we need to ask [for the state returns]. We need to know."

c.      Representative Charlie Crist answered a question about the TRUST Act by asking rhetorically, "Why not? I don't think there is any downside for us."

26.    Democrats also tied the TRUST Act to this lawsuit, characterizing the state returns as a backup plan in case this suit was unsuccessful or took too long.

a.      According to Representative Nadler, also a New Yorker and the Chair of the House Judiciary Committee, the TRUST Act means "we can turn to New York State" "[i]f confronted with inability to receive the federal tax return." He called the Act a "workaround to a White House that continues to obstruct and stonewall the legitimate oversight work of Congress."

b.      Senator Hoylman likewise framed the TRUST Act as giving "Congress a constitutional escape hatch should they not want to wait for the federal court case and its appeals process to be finalized, which potentially could take months to years."

c.      Assembly Speaker Heastie predicted that Chairman Neal would use the bill as "'in case of emergency break glass' type legislation."

d.      So did Representative Hakeem Jeffries, the fifth highest ranking Democrat in the House: "continued obstruction from the administration … may cause the chairman of the Ways and Means Committee to change his mind."

27.     In February 2019, two other House Committees served subpoenas on banks seeking "a broad range of financial records of Donald J. Trump, members of his family, and affiliated entities."

28.     In April 2019, shortly after the Committee requested President Trump's tax information, the House Oversight Committee subpoenaed eight years' worth of his accounting documents. The Committee has since stated in court that this subpoena also seeks tax returns.

29.     In February 2019, the Chairwoman Maloney of the Oversight Committee claimed that President Trump failed to disclose his tax returns because they were "embarrassing" and "also potentially illegal."

30.     In September 2020, Chairwoman Maloney claimed to "know why Trump went to such great lengths to hide [his tax returns]—devastating losses as a businessman, gaming the system to avoid taxes, massive debts that will come due over the next few years, and completely out of touch with American families."

31.     In July 2020, Representative Cooper, a Democratic member of the Oversight Committee, framed the impact of the Supreme Court's decision in *Mazars* as delaying when "Americans will have the chance to see" President Trump's financial information.

32.     In September 2020, Representative Cooper compared President Trump to Leona Helmsley, a convicted felon, in claiming to "know why he hasn't" released his tax returns.

33.     In October 2020, Representative Connolly, a Democratic member of the Oversight Committee, accused President Trump of "potentially … fail[ing] to properly pay [his] taxes."

34.     In September 2020, Representative Raskin, a Democratic member of the Oversight Committee, called President Trump a "[b]illionaire tax cheat."

35.     In September 2020, Representative Ocasio-Cortez called President Trump a "walking scam." She also publicly referred to the President as a "motherfucker[] … only paying $750 a year in taxes."

36.     In September 2020, Representative Tlaib claimed to "finally know" why President Trump "resisted releasing his tax returns for so many years: they reveal a failed businessman using unscrupulous—and potentially illegal—tactics to avoid paying the fair share that the rest of us pay into our society."

37.     In August 2020, Representative DeSaulnier, a Democratic member of the Oversight Committee, asserted that "[i]t is past time the American public gets to see the President's tax returns."

38.     In June 2019, Speaker Pelosi said, while discussing the many House investigations targeting President Trump, "I want to see him in prison."

39.     While this case was pending in 2019 and 2020, many House Democrats (including Committee members) publicly lamented that the Committee was unlikely to get the tax returns before the 2020 election. An aide to one of the Committee Democrats said there was "widespread frustration from members of the committee at how slowly this process [of getting the President's tax information] has moved." Committee members were fixated on 2020 because their goal was to expose President Trump's tax information for political gain, rather than study legislation concerning audits.

40.     In August 2019, Representative Gomez stated that his State was "ready for th[e] fight" "to see @realDonaldTrump's tax returns." In October 2020, he stated that "[o]ne way or

another … the American people are going to learn the truth about Trump's finances and business entanglements."

41.     In August 2020, Speaker Pelosi said, "When we win this election and we have a new president of the United States in January, and we have a new secretary of the Treasury, and Richie Neal asks for the president's tax returns, then the world will see what the president has been hiding all of this time."

42.     Representative Doggett said on September 27, 2020, "Trump hides his tax returns because, unlike most working Americans, he is a freeloader who doesn't believe in paying taxes."

43.     This Court held a status conference in this case on January 22, 2021. During that conference, the Committee stated (through its counsel) that §6103 requests "carry over from one Congress to the next." So despite the adjournment of the 116th Congress on January 3, 2020, the Committee's 2019 request for Intervenors' tax returns was "live" and "still there before the Treasury Department."

44.     Over the next six months, the parties filed monthly joint status reports with the Court.

45.     In the first two reports, the Committee reiterated its position that its April 2019 request "remains outstanding."

46.     In the next three reports, the Committee and Defendants reported that they were engaged in "communications" about this litigation. Although Intervenors asked to be involved in those communications, they were never afforded that opportunity.

47.     In the sixth report, filed on July 2, 2021, the Committee and Defendants again said they were engaged in "communications" (again without Intervenors). They asked the Court to direct them to file a "final status report" by July 30, 2021.

48.     What the Committee and Defendants did not reveal—either to the Court or to Intervenors—is that, two weeks earlier, Chairman Neal had written a letter to Defendants Yellen and Rettig. Although they knew about this letter when they filed the sixth joint status report, the Committee and Defendants did not reveal its existence to Intervenors or the Court until July 30, 2021.

49.     In that letter from June 16, 2021, Chairman Neal noted that the Committee "previously requested former President Trump's tax returns and return information" and "continues to seek" it. "Because this matter remains in active litigation," the Committee offered Chairman Neal's letter "as an accommodation."

50.     At the end of the letter, Chairman Neal stated that he "request[s]," "pursuant to the authority provided by Section 6103(f) of the [Tax] Code," the same information about Intervenors that he sought in April 2019—except for "tax years 2015 through 2020" instead of for "tax years 2013 through 2018."

51.     On the afternoon of July 30—the same day the parties' seventh joint status report was due—Defendants revealed the existence of a new opinion from the Office of Legal Counsel. According to that opinion, the Treasury Department had sought OLC's advice on June 17.

52.     The new OLC opinion concludes that Treasury can lawfully comply with Chairman Neal's request for Intervenors' tax information. Notably, the new opinion did not renounce OLC's prior conclusion that the record reveals the Committee's intent is not to pursue "a newly discovered interest in legislating on the presidential-audit process," but to "obtain and publish" Intervenors' tax information. It instead concluded that Treasury must accept the Chairman's stated purposes at face value.

53.     In reaction to OLC's opinion, Speaker Pelosi said "[t]he American people deserve to know the facts" about President Trump's supposed "undermining of our security and democracy as president."

54.     Representative Doggett reacted that, with the "evidence" from President Trump's tax returns, the Committee can now uncover "his tax evasion" and "foreign entanglements."

55.     Representative Pascrell also expressed approval of OLC's opinion, calling President Trump a "corrupt private citizen" and connecting "[t]his case" to "Donald Trump's crimes."

### CROSS-CLAIM & COUNTERCLAIM I
#### No Legitimate Legislative Purpose
#### (Against Plaintiff and Defendants)

56.     Intervenors incorporate and restate the prior allegations regarding their counterclaims and cross-claims.

57.     "The powers of Congress … are dependent solely on the Constitution," and "no express power in that instrument" allows Congress to investigate individuals or to demand their private information. *Kilbourn v. Thompson*, 103 U.S. 168, 182-89 (1880). The Constitution instead permits Congress to enact certain kinds of legislation. *See, e.g.*, Art. I, §8. Thus, Congress' power to investigate "is justified solely as an adjunct to the legislative process." *Watkins v. United States*, 354 U.S. 178, 197 (1957). "Congress is not invested with a general power to inquire into private affairs. The subject of any inquiry always must be one on which legislation could be had." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 n.15 (1975) (cleaned up); *see also Quinn v. United States*, 349 U.S. 155, 161 (1955) ("[T]he power to investigate" does not "extend to an area in which Congress is forbidden to legislate."). In other words, the inquiry must have a "legitimate legislative purpose." *Eastland*, 421 U.S. at 501 n.14.

58.     "Oversight" and "transparency," in a vacuum, are not legitimate purposes. For more than a century, the Supreme Court has been quite "sure" that neither the House nor the Senate "possesses the general power of making inquiry into the private affairs of the citizen." *Kilbourn*, 103 U.S. at 190. "[T]here is no congressional power to expose for the sake of exposure." *Watkins*, 354 U.S. at 200. "No inquiry is an end in itself; it must be related to, and in furtherance of, a legitimate task of the Congress." *Id*. at 187.

59.     Moreover, the legislative purpose justifying a committee's investigation must fall within that committee's jurisdiction. "The theory of a committee inquiry is that the committee members are serving as the representatives of the parent assembly in collecting information for a legislative purpose." *Id.* at 200. Congress therefore must "spell out that group's jurisdiction and purpose with sufficient particularity." *Id*. at 201. The committee "must conform strictly to the resolution" creating its jurisdiction. *Exxon Corp. v. FTC*, 589 F.2d 582, 592 (D.C. Cir. 1978). Especially when an investigation is "novel" or "expansive," courts will construe the committee's jurisdiction "narrowly." *Tobin v. United States*, 306 F.2d 270, 275 (D.C. Cir. 1962).

60.     "[T]he records called for" by Congress must also be "pertinent to the [congressional] inquiry." *McPhaul v. United States*, 364 U.S. 372, 380 (1960). This "pertinency" requirement ensures that Congress is "coping with a problem that falls within its legislative sphere." *Watkins*, 354 U.S. at 206. If the congressional request is not "reasonably 'relevant to the inquiry,'" then it lacks a legitimate purpose. *McPhaul*, 364 U.S. at 381-82; *accord Hearst v. Black*, 87 F.2d 68, 71 (D.C. Cir. 1936); *Bergman v. Senate Special Comm. on Aging*, 389 F. Supp. 1127, 1130 (S.D.N.Y. 1975).

61.     Because Congress must have a legislative purpose for its inquiries, it cannot demand personal, confidential information to exercise "any of the powers of law enforcement."

*Quinn*, 349 U.S. at 161. Those enforcement powers "are assigned under our Constitution to the Executive and the Judiciary." *Id*. Because Congress is not "a law enforcement or trial agency," congressional investigations conducted "for the personal aggrandizement of the investigators" or "to 'punish' those investigated" are "indefensible." *Watkins*, 354 U.S. at 187. Our tripartite system of separated powers requires that "any one of the[] branches shall not be permitted to encroach upon the powers confided to the others, but that each shall by the law of its creation be limited to the exercise of the powers appropriate to its own department and no other." *Kilbourn*, 103 U.S. at 190-91.

62.     When assessing whether a committee has a valid purpose, courts must determine the inquiry's "real object," its "primary purpose[]," its "gravamen." *McGrain v. Daughtery*, 273 U.S. 135, 178 (1927); *Barenblatt v. United States*, 360 U.S. 109, 133 (1959); *Kilbourn*, 103 U.S. at 195. "[S]everal sources are available in aid of ascertaining this," including "statements of the members of the committee." *Shelton v. United States*, 404 F.2d 1292, 1297 (D.C. Cir. 1968).

63.     Chairman Neal's April 2019 and June 2021 requests for Intervenors' tax information lack a legitimate legislative purpose.

64.     The primary purpose of the requests is to obtain and expose Intervenors' information for the sake of exposure, to improperly conduct law enforcement, or some other impermissible goal—not to study federal legislation.

65.     The requests are not pertinent to legislation that is within the Committee's jurisdiction and constitutionally valid.

**CROSS-CLAIM AND COUNTERCLAIM II**
**Violation of *Mazars***
**(Against Plaintiff and Defendants)**

66.     Intervenors incorporate and restate the prior allegations regarding their counterclaims and cross-claims.

67.     Congressional requests for information that implicate the separation of powers must satisfy the heightened standard articulated by the Supreme Court in *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020).

68.     The *Mazars* test applies to Chairman Neal's April 2019 request, which was made while President Trump was in office. Because Intervenors immediately objected, the legality of the request must be assessed at that time. *Watkins*, 354 U.S. at 214-15; *see id.* at 206 (requiring a "clear determination" by the body "initiating" the investigation); *United States v. Rumely*, 345 U.S. 41, 48 (1953) ("as of the time of [the] refusal"); *Shelton v. United States*, 327 F.2d 601, 607 (D.C. Cir. 1963) ("when the subpoena was issued").

69.     The *Mazars* test also applies to Chairman Neal's June 2021 request. This request was not a new request, but a continuation of the April 2019 request—a request that, according to the Committee, never expired. It, too, should be evaluated as a request to a President.

70.     Regardless, subpoenas to former Presidents are also covered by the *Mazars* standard. That standard is grounded in the "separation of powers." *Mazars*, 140 S. Ct. at 2033, 2034, 2035, 2036. The Supreme Court has "reject[ed] the argument that only an incumbent President may assert" separation-of-powers claims defending the Office of the President; a "former President" can "also be heard to assert them." *Nixon v. GSA*, 433 U.S. 425, 439 (1977). A "former President in this context can hardly be viewed as an ordinary private citizen." *Pub. Citizen, Inc. v. DOJ*, 111 F.3d 168, 170 (D.C. Cir. 1997). The protection that he—and, in turn, "'the Republic'"— needs from congressional subpoenas of his private papers "'cannot be measured by the few months or years between the submission of the [subpoena] and the end of the President's tenure.'" *Nixon*, 433 U.S. at 449.

71.     Chairman Neal's requests badly fail the *Mazars* test. His legislative purpose lacks a basis in evidence and is admittedly pretextual. Passing broad reforms that the Chairman has already identified does not justify the significant step of requesting a President's records. Other sources could provide the needed information, especially since Defendants are now so eager to disclose information about presidential audits. And the Chairman's requests burden Intervenors by interfering with ongoing examinations and overriding the Tax Code's "core purpose of protecting taxpayer privacy." *Tax Analysts v. IRS*, 117 F.3d 607, 615 (D.C. Cir. 1997); *accord Nat'l Treasury Employees Union v. FLRA*, 791 F.2d 183, 184 (D.C. Cir. 1986).

## CROSS-CLAIM III
### Violation of §6103(f)
### (Against Defendants)

72.     Intervenors incorporate and restate the prior allegations regarding their counterclaims and cross-claims.

73.     Chairman Neal's April 2019 and June 2021 requests purport to be made under 26 U.S.C. §6103(f).

74.     While that statute speaks in generic terms, it does not explicitly authorize the Committee's chairman to request the returns or return information of the President or a former President.

75.     Under "the canons of construction applicable to statutes that implicate the separation of power," that "textual silence" means that §6103(f) cannot be read to cover the information of Presidents or former Presidents.

76.     By targeting President Trump and his businesses, Chairman Neal's requests seek "the President's information." *Mazars*, 140 S. Ct. at 2026.

77.     Chairman Neal thus has no authority to request, and Defendants have no authority to comply with his requests, for Intervenors' information. *See* 18 U.S.C. §1905; 26 U.S.C. §§7213(a)(1), 7431(a).

**CROSS-CLAIM IV**
**Violation of First Amendment**
**(Against Defendants)**

78.     Intervenors incorporate and restate the prior allegations regarding their counterclaims and cross-claims.

79.     The "First Amendment freedoms" of "speech," "political belief," and "association" apply to congressional investigations. *Watkins*, 354 U.S. at 188.

80.     The First Amendment prohibits the government from harassing political opponents and retaliating against disfavored speech. *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75 (1990); *Lozman v. City of Riviera Beach*, 138 S.Ct. 1945, 1949 (2018).

81.     The government commits illegal retaliation when the target's speech or politics motivated its actions "at least in part." *Cruise-Gulyas v. Minard*, 918 F.3d 494, 497 (6th Cir. 2019). That is because, even when the government could legitimately act "for any number of reasons, there are some reasons upon which the government may not rely"—including "constitutionally protected speech or associations." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

82.     To determine whether an impermissible purpose exists, courts look at the "face" of the action to see if, for example, it has been "'gerrymander[ed]'" to target particular individuals. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533-34 (1993). "Facial neutrality" is "not determinative," however. *Lukumi*, 508 U.S. at 533-34. An impermissible purpose can also be detected from "the effect" and other evidence in "the record." *Id.* at 535; *Sorrell*, 564 U.S. at 564. "Relevant evidence includes, among other things, the historical background of the decision under challenge, the specific series

of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Lukumi*, 508 U.S. at 540.

83.     As OLC found and never disavowed, the record overwhelming reveals that the purpose of the requests for Intervenors' tax information is to expose the private tax information of one individual—President Trump—for political gain. The requests are tailored to, and in practical operation will affect, only President Trump. The requests single out President Trump because he is a Republican and a political opponent. They were made to retaliate against President Trump because of his policy positions, his political beliefs, and his protected speech, including the positions he took during the 2016 and 2020 campaigns.

84.     Chairman Neal's requests are a major departure from historical practice. Section 6103(f) has never been used against a President, a former President, or any elected official.

85.     Chairman Neal's requests have always been a transparent effort by one political party to harass an official from the other party because they dislike his politics and speech. Chairman Neal sought President Trump's tax returns and return information because his party had recently gained control of the House, President Trump was (and is) their political opponent, and they want to use the information to damage him politically. A vocal wing of the Chairman's party has been clamoring for President Trump's tax returns since before the 2016 election. And Chairman Neal made his request just days after prominent Democratic constituencies began publicly criticizing the House for its failure to go after President Trump.

86.     Chairman Neal and other Committee Democrats have admitted that the stated purpose of the requests is pretextual—a retroactive rationalization to help win this case.

87.     Though the government once confirmed the requests' impermissible purpose, it abruptly switched positions with no warning to Intervenors. The new OLC opinion does not deny the record of impermissible intent, but instead gives wobbly justifications and shallow reasoning for why the executive branch should ignore that evidence. The government's complete reversal on the legality of Chairman Neal's requests came, of course, under President Biden, a Democrat who ran against President Trump and made the disclosure of President Trump's tax returns a campaign issue.

88.     Defendants plan to comply with Chairman Neal's requests, both carrying out the Committee's unlawful discrimination and retaliation and engaging in their own unlawful discrimination and retaliation.

## CROSS-CLAIM V
### Violation of Due Process
### (Against Defendants)

89.     Intervenors incorporate and restate the prior allegations regarding their counterclaims and cross-claims.

90.     Some or all of the information in Chairman Neal's requests is the subject of ongoing examinations by the IRS.

91.     IRS examinations are trial-like adjudications. Basic principles of due process require adjudications to be insulated from congressional interference.

92.     When a congressional investigation focuses on a "pending" adjudication, it violates "the right of private litigants to a fair trial and, equally important, with their right to the appearance of impartiality"—the "sine qua non of American judicial justice." *Pillsbury Co. v. FTC*, 354 F.2d 952, 964 (5th Cir. 1966).

93.     Even the most scrupulous IRS officials could not help but be influenced by the fact that Congressional partisans are scrutinizing their work in real time. *Id.*

94.     Making Congress "a partner in the investigation," every administration since George Washington has recognized, would create "a substantial danger that congressional pressures will influence the course of the investigation." 8 Op. O.L.C. 252, 263 (1984).

95.     By allowing the Committee to obtain files that are the subject of ongoing examinations, Defendants are violating Intervenors' due-process rights.

**CROSS-CLAIM VI**
**Violation of Separation of Powers**
**(Against Defendants)**

96.     Intervenors incorporate and restate the prior allegations regarding their counterclaims and cross-claims.

97.     "Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must "take Care that the Laws be faithfully executed.'" *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2191 (2020).

98.     Some or all of the information in Chairman Neal's requests is the subject of ongoing examinations by the IRS.

99.     The executive branch has long refused to "provide committees of Congress with access to, or copies of, open law enforcement files." 10 Op. O.L.C. 68, 76 (1986).

100.     Congressional inquiries made "while the decisionmaking process is ongoing" impose the "greatest" intrusion on "the Executive Branch's function of executing the law." 5 Op. O.L.C. 27, 31 (1981).

101.     "The Constitution's division of power among the three branches is violated where one branch invades the territory of another, whether or not the encroached-upon branch approves the encroachment." *New York v. United States*, 505 U.S. 144, 182 (1992). "The constitutional authority of Congress cannot be expanded by the 'consent' of the governmental unit whose domain is thereby narrowed," even when "that unit is the Executive Branch." *Id.*

102.   By allowing the Committee to obtain files that are the subject of ongoing examinations, Defendants are violating the separation of powers.

**WHEREFORE**, Intervenors ask this Court to enter judgment in their favor and provide the following relief:

a.   A declaratory judgment that Chairman Neal's April 2019 and June 2021 requests are unlawful and unenforceable because they lack a legitimate legislative purpose, exceed statutory authority, violate the First Amendment, violate due process, and/or violate the separation of powers;

b.   A declaratory judgment that Defendants are not authorized to comply with Chairman Neal's April 2019 and June 2021 requests;

c.   A permanent injunction prohibiting the enforcement of Chairman Neal's April 2019 and June 2021 requests;

d.   A permanent injunction prohibiting Defendants from complying with, or taking any other action to disclose, the information sought in Chairman Neal's April 2019 and June 2021 requests;

e.   A permanent injunction ordering Defendants to end all ongoing examinations of Intervenors;

f.   A temporary restraining order and preliminary injunction granting the relief specified above during the pendency of this action;

g.   Intervenors' reasonable costs and expenses, including attorneys' fees; and

h.   All other preliminary and permanent relief that Intervenors are entitled to, including equitable relief under the All Writs Act to protect this Court's jurisdiction.

Respectfully submitted,

Dated: August 4, 2021          /s/ Patrick Strawbridge
                               Patrick Strawbridge (*pro hac vice*)
                               CONSOVOY MCCARTHY PLLC
                               Ten Post Office Square, 8th Floor
                               South PMB #706
                               Boston, MA 02109
                               (617) 227-0548
                               patrick@consovoymccarthy.com

                               William S. Consovoy (D.C. Bar #493423)
                               Cameron T. Norris
                               CONSOVOY MCCARTHY PLLC
                               1600 Wilson Boulevard, Suite 700
                               Arlington, VA 22209
                               (703) 243-9423
                               will@consovoymccarthy.com
                               cam@consovoymccarthy.com