## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMMITTEE ON WAYS AND MEANS,
UNITED STATES HOUSE OF
REPRESENTATIVES,

     *Plaintiff–Counterdefendant*,

  v.

UNITED STATES DEPARTMENT OF THE
TREASURY, ET AL.,

     *Defendants–Crossdefendants*,

DONALD J. TRUMP, ET AL.,

     *Intervenors–*
     *Counterclaimants–*
     *Crossclaimants*.

Case No. 19-cv-01974-TNM

## COUNTERDEFENDANT'S MOTION TO DISMISS

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Counterdefendant Committee on Ways and Means of the United States House of Representatives moves to dismiss all counterclaims because, as stated in the accompanying Memorandum of Law, they fail to state a claim upon which relief can be granted. A proposed order is submitted herewith.

September 9, 2021

Respectfully submitted,

/s/ Douglas N. Letter

SETH P. WAXMAN (D.C. Bar No. 257337)
KELLY P. DUNBAR (D.C. Bar No. 500038)
DAVID M. LEHN (D.C. Bar No. 496847)
ANDRES C. SALINAS (D.C. Bar No. 156118)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 663-6000
seth.waxman@wilmerhale.com

KATHERINE V. KELSH (*pro hac vice* motion
forthcoming)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

DOUGLAS N. LETTER (D.C. Bar No. 253492)
    *General Counsel*
TODD B. TATELMAN (VA Bar No. 66008)
ERIC R. COLUMBUS (D.C. Bar No. 487736)
STACIE M. FAHSEL (D.C. Bar. No. 1034314)
OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, DC  20515
(202) 225-9700
douglas.letter@mail.house.gov

*Counsel for Plaintiff–Counterdefendant
Committee on Ways and Means, United States
House of Representatives*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE ON WAYS AND MEANS, UNITED STATES HOUSE OF REPRESENTATIVES, | |
| *Plaintiff–Counterdefendant*, | |
| v. | |
| UNITED STATES DEPARTMENT OF THE TREASURY, ET AL., | Case No. 19-cv-01974-TNM |
| *Defendants–Crossdefendants*, | |
| DONALD J. TRUMP, ET AL., | |
| *Intervenors– Counterclaimants– Crossclaimants.* | |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>COUNTERDEFENDANT'S MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

BACKGROUND .....................................................................................................................4

    A.    The House Committee On Ways And Means .........................................................4

    B.    Section 6103(f) Continues The Committee's Long-Established Statutory Right To Obtain Tax Returns And Tax Information From Treasury......................5

    C.    IRS Procedures For Auditing Presidents' Tax Returns ..........................................7

    D.    The Committee's 2019 Request To Treasury .........................................................8

    E.    The Committee's June 2021 Request To Treasury..................................................9

    F.    The 2021 OLC Opinion ........................................................................................11

    G.    Former President Trump's Counterclaims And Cross-Claims ..............................13

LEGAL STANDARD...........................................................................................................14

ARGUMENT ........................................................................................................................15

I.    COUNTERCLAIM I FAILS AS A MATTER OF LAW ..........................................................15

    A.    The Committee's 2021 Request Serves Valid Purposes.......................................15

    B.    Allegations Regarding Individual Legislators' Motives Do Not Vitiate The Committee's Request ..........................................................................................18

        1.    The Committee's Supposed Motives Are Legally Irrelevant ..................19

        2.    Even If Relevant, Allegations Regarding Subjective Motive Would Not Vitiate The Committee's Purposes ....................................................21

    C.    The Committee's Interest In Former President Trump's Foreign Activities Does Not Vitiate The 2021 Request ....................................................................24

II.    COUNTERCLAIM II FAILS AS A MATTER OF LAW.........................................................25

    A.    The *Mazars* Test Does Not Apply ......................................................................26

    B.    Regardless Of Which Test Applies, The Request Does Not Violate The Separation Of Powers .........................................................................................30

1.      The Request Imposes No Burden On The Current Or Future
        Presidents ................................................................................... 30

2.      The Committee's Purposes Warrant Involving Mr. Trump's Papers ........ 32

3.      The 2021 Request Seeks Only What Is Reasonably Necessary ................ 34

4.      The Committee Justified Its Need For The Requested Materials ............. 36

III.    THE REMAINING CROSS-CLAIMS AGAINST TREASURY SHOULD BE DISMISSED ................. 38

CONCLUSION ................................................................................................................. 38

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abhe & Svoboda, Inc. v. Chao*,
  508 F.3d 1052 (D.C. Cir. 2007) ................................................................................14

*Action Alliance of Senior Citizens of Greater Philadelphia v. Sullivan*,
  930 F.2d 77 (D.C. Cir. 1991) ....................................................................................22

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..................................................................................................14

*Banneker Ventures, LLC v. Graham*,
  798 F.3d 1119 (D.C. Cir. 2015) ................................................................................14

*Barenblatt v. United States*,
  360 U.S. 109 (1959) ..................................................................................................19

*Barry v. United States ex rel. Cunningham*,
  279 U.S. 597 (1929) ..................................................................................................16

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ..................................................................................................19

*Brown & Williamson Tobacco Corp. v. Williams*,
  62 F.3d 408 (D.C. Cir. 1995) ....................................................................................20

*D.A.M. v. Barr*,
  474 F. Supp. 3d 45 (D.D.C. 2020) ......................................................................15, 37

*Duplex Printing Press Co. v. Deering*,
  254 U.S. 443 (1921) ..................................................................................................30

*Eastland v. U.S. Servicemen's Fund*,
  421 U.S. 491 (1975) ............................................................................13, 15, 19, 20, 21

*Electronic Privacy Information Center v. IRS*,
  910 F.3d 1232 (D.C. Cir. 2018) ..............................................................................6, 7

*Hutcheson v. United States*,
  369 U.S. 599 (1962) ..................................................................................................20

*Johnson v. Commission on Presidential Debates*,
  202 F. Supp. 3d 159 (D.D.C. 2016) ..........................................................................15

*Kaempe v. Myers*,
  367 F.3d 958 (D.C. Cir. 2004) ..................................................................................15

*Kaspersky Lab, Inc. v. U.S. Department of Homeland Security*,
  909 F.3d 446 (D.C. Cir. 2018) ................................................................ 14

*Landgraf v. USI Film Products*,
  511 U.S. 244 (1994) ............................................................................... 30

*Marbury v. Madison*,
  5 U.S. 137 (1803) ................................................................................... 34

*McGrain v. Daughtery*,
  273 U.S. 135 (1927) ........................................................... 3, 12, 16, 20

*NFIB v. Sebelius*,
  567 U.S. 519 (2012) ............................................................................... 18

*Nixon v. Administrator of Gen. Services*,
  433 U.S. 425 (1977) ...................................................................... 3, 27, 31

*Pernice v. Bovim*,
  183 F. Supp. 3d 84 (D.D.C. 2016) ........................................................ 14

*Public Citizen, Inc. v. Trump*,
  297 F. Supp. 3d 6 (D.D.C. 2018) ......................................................... 15

*Senate Select Committee on Presidential Campaign Activities v. Nixon*,
  498 F.2d 725 (D.C. Cir. 1974) .............................................................. 30

*Strumsky v. Washington Post Co.*,
  842 F. Supp. 2d 215 (D.D.C. 2012) ..................................................... 14

*Tenney v. Brandhove*,
  341 U.S. 367 (1951) ......................................................................... 20, 23

*Tory v. Cochran*,
  544 U.S. 734 (2005) ............................................................................... 30

*Trump v. Mazars USA, LLP*,
  140 S. Ct. 2019 (2020) .................................................................. *passim*

*Trump v. Mazars USA LLP*,
  2021 WL 3602683 (D.D.C. Aug. 11, 2021) ..................................... *passim*

*Trump v. Mazars USA LLP*,
  940 F.3d 710 (D.C. Cir. 2019) .............................................................. 22

*Watkins v. United States*,
  354 U.S. 178 (1957) ...................................................... 3, 12, 18, 19, 23, 25, 33

## CONSTITUTIONS, STATUTES, RULES AND REGULATIONS

U.S. Constitution,
    art. I, § 5, cl. 2 ................................................................................25
    art. I, § 8, cl. 1 ................................................................................17
    art. I, § 8, cl. 18 ........................................................................17, 18
    art. I, § 9, cl. 7 ................................................................................17
    art. I, § 9, cl. 8 ........................................................................18, 33

26 U.S.C. § 6103 ........................................................................ *passim*

Revenue Act of 1924, Pub. L. No. 68-176, 43 Stat. 253 ...........................5

Tax Reform Act of 1976, Pub. L. No. 94-455, 90 Stat. 1520 .....................6

Fed. R. Civ. P. 12(b)(6)............................................................................14

Fed. R. Evid. 201(b).......................................................................14, 37

## LEGISLATIVE MATERIALS

65 Cong. Rec. 3699-3702 (1924) ..............................................................5

*Hearing on Legislative Proposals and Tax Law Related to Presidential and Vice-*
    *Presidential Tax Returns: Hearing Before the Subcomm. on Oversight of the*
    *H. Comm. on Ways and Means*, 116th Cong. (Feb. 7, 2019) ...........37, 38

S. Res. 180, 68th Cong., 65 Cong. Rec. 3299 (1924) .................................5

Staff of Joint Comm. on Internal Revenue Tax., Examination of President Nixon's
    Tax Returns for 1969 through 1972, S. Rep. No. 93-768, 93d Cong. 2d Sess.
    (1974) .......................................................................................... 5, 6

Staff of Joint Comm. on Internal Revenue Tax., Investigation into Certain
    Charges of the Use of the Internal Revenue Service for Political Purposes, 93d
    Cong., 1st Sess. (Comm. Print Dec. 20, 1973) .........................................6

Staff of the Joint Comm. on Taxation, JCX-3-19, *Background Regarding the*
    *Confidentiality and Disclosure of Federal Tax Returns* (Feb. 4, 2019) .................. 6

U.S. House of Representatives Rule X.1(t), 117th Cong.........................4, 24

## OTHER AUTHORITIES

Internal Revenue Manual .......................................................................7

*President and Mrs. Bush Release 2000 Tax Return*, The White House (President
    George W. Bush Archives) (Apr. 13, 2001) .........................................31

*President Obama and Vice President Biden's 2015 Tax Returns*, The White
House (President Barack Obama Archives) (Apr. 15, 2016)..................................................31

*The President and Vice President release their 2020 tax returns*, The White
House (May 17, 2021) ............................................................................................................31

## INTRODUCTION

Like all Americans, Presidents of the United States are required to comply with the federal tax laws.  The Internal Revenue Service ("IRS") has long had a policy that the President's tax returns are subject to mandatory examination.  But Donald Trump presented serious, unprecedented challenges to the IRS's ability to perform Presidential audits.  Mr. Trump owned a highly complex web of businesses, engaged in business activities internationally, had a history (as he has boasted) of aggressive tax avoidance, refused to release his returns publicly (contrary to the modern practice), and repeatedly denounced the IRS's audits as "unfair" to him.  Therefore, the Committee on Ways and Means of the U.S. House of Representatives ("Committee")—which has legislative and oversight jurisdiction over federal tax laws—became concerned about whether the IRS had the resources and safeguards to audit Mr. Trump's tax returns—and similar future Presidents' returns—effectively and independently of improper attempts to influence an audit.  On top of that, Mr. Trump's business activities raised legitimate concerns about whether income he may have received from foreign sources exposed him to improper influence.  Congress has a constitutional right and duty to know that and to develop appropriate legislation to address such risks.

To investigate those concerns and to determine whether any remedial legislation would be necessary or appropriate, the Committee asked the IRS and the Department of the Treasury ("Treasury") to provide two categories of documents:  income tax returns for Mr. Trump and certain of his businesses, along with any related IRS audit files, for the tax years he was in office and for the two preceding tax years.  The Committee made this request under Section 6103(f)(1) of the Internal Revenue Code—a longstanding statutory provision that directs Treasury to furnish the tax return and return information of any taxpayer to the Chair of the Committee upon request.  Accompanying this request was a lengthy letter explaining and substantiating the Committee's

legislative and oversight needs for the requested tax returns and return information.  Upon the advice of the Department of Justice ("DOJ"), Treasury determined in the summer of 2021—after Mr. Trump had left office—that it would comply with the Committee's request.

Mr. Trump, however, has interposed a series of claims against the Committee and Treasury, seeking to block Treasury from complying with the Committee's request and effectively asking for permanent immunity for his tax returns and related IRS records from Section 6103(f)(1).  He principally claims that the Committee's Section 6103(f)(1) request is constitutionally invalid because it lacks a legitimate legislative purpose and violates the constitutional separation of powers under the Supreme Court's recent decision in *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020).  Mr. Trump's claims fail as a matter of law, and therefore his complaint should be dismissed.

Mr. Trump does not dispute that the stated purposes for the request are within Congress's Article I authority or deny the factual bases for the Committee's concerns, including his own public statements attacking the IRS for auditing him.  Indeed, Mr. Trump's pleading in this case reinforces the Committee's concerns:  As further evidence of his desire for special treatment under the tax laws, his prayer for relief seeks not only to block the Committee's request under Section 6103(f)(1), but also a "permanent injunction" ordering the IRS to "end all ongoing examinations" of his taxes.  Nonetheless, relying on cherry-picked statements from various public officials—the majority of whom are not members of the Committee (and many of whom are not even members of Congress)—Mr. Trump argues that the Committee's stated interest in the IRS's Presidential audit program is "pretextual" and that the Committee's *real* purpose is to publicly disclose his tax returns in a political effort to harass or embarrass him.  This claim fails because federal courts have no power to examine the motives of Members of Congress to

determine whether their acts are valid.  The courts are instead "bound to presume that the action of the legislative body was with a legitimate object, if it is capable of being so construed," *McGrain v. Daughtery*, 273 U.S. 135, 178 (1927)—and as DOJ concluded, the Committee's request plainly is capable of being so construed.  The rule that Mr. Trump advocates would conscript the judiciary into reviewing and second-guessing facially valid Congressional acts, an approach that would disregard the deference owed by courts to Congress as a co-equal branch of government and that would raise serious separation-of-powers concerns.  In any event, the "evidence" of pretext that Mr. Trump cites confirms that the Committee's request indeed serves legitimate legislative and oversight purposes.  Certainly, supposed political motives are legally insufficient to render an otherwise valid act unconstitutional, as the Supreme Court made clear in *Mazars*—a case involving "a clash between rival branches of government over records of intense *political* interest for all involved."  140 S. Ct. at 2034 (emphasis added).  And the individual legislators' statements that Mr. Trump recites express concerns about his "tax evasion," "corrupt[ion]," and "foreign entanglements"—concerns well within Congress's undeniable authority to investigate and consider legislation addressing "corruption, maladministration or inefficiency" in government.  *Watkins v. United States*, 354 U.S. 178, 200 n.33 (1957).

Moreover, Mr. Trump's claim based on the Supreme Court's *Mazars* decision fails because that case involved a Congressional subpoena for a sitting President's records.  The standard adopted in *Mazars* logically does not apply to a *statutory* request for a *former* President's records.  In any event, whether evaluated under the *Mazars* standard, the balancing test adopted by the Supreme Court in *Nixon v. Administrator of Gen. Servs.* ("*GSA*"), 433 U.S. 425 (1977), or the modified version of the *Mazars* standard used by the district court in that case on remand, the Committee's request easily accords with the separation of powers.  The

Committee has a strong interest specifically in Mr. Trump's tax returns and return information given the unprecedented challenges he posed to the IRS's Presidential audit program while in office.  The Committee's request is well tailored to only the materials that will illuminate how the IRS conducted its audits while he was President.  The Committee has substantiated its needs at length, which have been accepted by the Executive Branch.  And because Mr. Trump is no longer the President, the Committee's request will not burden the current President (or future ones).

For these and additional reasons, the Court should dismiss former President Trump's claims and permit Treasury to comply with the Committee's request for information under 26 U.S.C. § 6103(f).

## BACKGROUND

### A.     The House Committee On Ways And Means

The Committee on Ways and Means has legislative and oversight authority over all federal revenue measures, which encompasses all aspects of our nation's tax laws and their administration.  *See* Answer ¶ 12, Dkt. 113; U.S. House of Representatives Rule X.1(t), 117th Cong.[1]  Pursuant to this authority, the Committee is responsible for conducting oversight of the IRS to ensure that tax laws are administered in a fair and effective manner, and to inform legislation for protecting and enhancing the country's tax system.  For that system to function, Americans must have confidence that no taxpayer—including the President of the United States—is above the law.  Therefore, the Committee has sought the tax returns and return information of former President Trump and certain of his businesses, including related IRS audit files.

---

[1] https://rules.house.gov/sites/democrats.rules.house.gov/files/117-House-Rules-Clerk.pdf.

**B.      Section 6103(f) Continues The Committee's Long-Established Statutory Right To Obtain Tax Returns And Tax Information From Treasury**

For almost a century, the political branches have recognized that a statutory right of access to taxpayer information is integral to Congress's ability to investigate wrongdoing by Executive Branch officials—including Presidents.  In 1924, Congress requested the tax records of high-ranking federal officials suspected of bribery as part of the Teapot Dome scandal, but President Coolidge refused.  *See* S. Res. 180, 68th Cong., 65 Cong. Rec. 3299 (1924) (requesting returns); 65 Cong. Rec. 3699-3702 (1924) (President Coolidge's initial response).  In response, Congress passed Section 6103(f)'s precursor, which provided that the Committee on Ways and Means (and certain other Congressional committees) "shall have the right to call on the Secretary of the Treasury" for tax returns, that it "shall be [the Secretary's] duty to furnish … any data of any character contained in or shown by the returns" requested by the Committee, and that the Committee "shall have the right … to inspect all or any of the returns."  Revenue Act of 1924, Pub. L. No. 68-176, § 257(a), 43 Stat. 253, 293.

In 1973, the Joint Committee on Taxation relied on Section 6103(f)'s predecessor to obtain President Nixon's tax returns as part of its independent review of his tax liability for 1969 to 1972.  Though President Nixon voluntarily disclosed his returns for those years, the Joint Committee "decided not to confine its examination" to those returns but "rather to examine all tax items for the years 1969 through 1972."  Staff of Joint Comm. on Internal Revenue Tax., Examination of President Nixon's Tax Returns for 1969 through 1972, S. Rep. No. 93-768, 93d Cong. 2d Sess. (1974), at 2 ("Joint Tax Committee Nixon Report").  The Joint Committee therefore requested and received numerous additional materials from the IRS, including certified copies of the returns President Nixon had voluntarily disclosed and his returns for additional years.  *See* Joint Tax Committee Nixon Report at 4-7.  Though the IRS had accepted President

Nixon's returns as filed and had complimented him for the care he took in preparing his returns, the Joint Committee ultimately determined that President Nixon owed over $400,000. *Id.* Thereafter, to relieve IRS employees of having to decide whether to audit Presidents' and Vice Presidents' returns, the IRS adopted a policy of conducting a mandatory audit for them. *See* Staff of the Joint Committee on Taxation, JCX-3-19, *Background Regarding the Confidentiality and Disclosure of Federal Tax Returns*, at 20-21 (Feb. 4, 2019).[2]

This assurance of Congressional access to taxpayer information was continued with the enactment of the current version of Section 6103 in 1976. *See* Tax Reform Act of 1976, Pub. L. No. 94-455, § 1202, 90 Stat. 1520, 1667 (amending 26 U.S.C. § 6103). The 1976 amendment was prompted, in part, by concerns about President Nixon's abuse of the tax system. *See* Staff of Joint Comm. on Internal Revenue Tax., Investigation into Certain Charges of the Use of the Internal Revenue Service for Political Purposes, 93d Cong., 1st Sess. (Comm. Print Dec. 20, 1973).[3] As enacted, Section 6103(a) prohibits the disclosure of taxpayer returns and return information. That prohibition, however, is subject to "thirteen tightly drawn categories of exceptions." *Electronic Priv. Info. Ctr. v. IRS*, 910 F.3d 1232, 1237 (D.C. Cir. 2018). Among those exceptions, Section 6103(f)(1) provides that, "[u]pon written request from the chairman of the Committee on Ways and Means of the House of Representatives …, the Secretary shall furnish [the] committee with any return or return information specified in such request." 26 U.S.C. § 6103(f)(1).

---

[2] https://www.jct.gov/publications/2019/jcx-3-19/.

[3] https://www.jct.gov/publications/1973/jcs-37-73/.

### C.       IRS Procedures For Auditing Presidents' Tax Returns

The mandatory audit of Presidents' returns has never been codified in law, whether in the Internal Revenue Code or an implementing regulation.  Rather, it is set forth in the Internal Revenue Manual ("Manual"), a compilation of internal, non-binding guidelines for IRS employees.  *See* IRM Standards, I.R.M. 1.11.2.2 (Aug. 12, 2021);[4] *see also Electronic Priv.*, 910 F.3d at 1244-1245 ("It is well-settled … that the provisions of the [M]anual are directory rather than mandatory, are not codified regulations, and clearly do not have the force and effect of law.").  The Manual provides that the "individual income tax returns for the President and Vice President are subject to mandatory examinations" and that "[r]elated returns, including estate and gift tax returns, will be handled in accordance with procedures relating to all taxpayers." Processing Returns and Accounts of the President and Vice President, I.R.M. 4.2.1.15(1), (6) (Apr. 23, 2014); *see also* Mandatory Examination, I.R.M. 3.28.3.5.3(1) (Nov. 17, 2020). Although the Manual describes the general process for examining a President's individual income tax returns, the IRS has acknowledged to the Committee that many of the mandatory-audit provisions are outdated and no longer applied.

Further, many aspects of the audit process are left to the IRS auditor's discretion.  The Manual does not specify the scope, length, or depth of the IRS's examination of the returns and does not account for a President who, like former President Trump, had hundreds of business entities, ongoing audits, and inordinately complex returns.  The Manual fails to specify, for example, whether the audit extends to the President's business or related entities, open tax years, or ongoing audits.  Nor does the Manual establish how the IRS auditor should be selected and supervised, direct how the IRS agents conducting the audit should interact with the President and

---

[4] The Manual is publicly available at https://www.irs.gov/irm.

his representatives, or provide explicit safeguards in the event a President interferes with or questions the appropriateness of such examination, as Mr. Trump did.  Indeed, though the revenue agent's identity is kept secret within the IRS, it is known by the President and his representatives, who communicate with the agent directly, heightening the risk of improper influence.  In short, the IRS's current procedures, which are neither fully written nor closely followed, fail to assure the Committee that there are sufficient safeguards in place to protect the integrity of Presidential audits and the ability of revenue agents to objectively enforce the tax laws with respect to Presidents.  These are obviously topics on which Congress could legislate.

### D.    The Committee's 2019 Request To Treasury

In April 2019, Committee Chairman Richard E. Neal sent a letter to the IRS Commissioner requesting the tax returns and return information of then-President Donald J. Trump and eight of his businesses for tax years 2013 through 2018, including the IRS's "administrative files" for the requested returns.  Answer ¶¶ 57, 59; Counterclaims/Cross-Claims ¶ 12, Dkt. 113.  The Committee explained that its request was in furtherance of its consideration of legislative proposals and oversight related to "Federal tax laws," including "the extent to which the IRS audits and enforces the Federal tax laws against a President." Counterclaims/Cross-Claims ¶ 12; *see* Letter for Charles P. Rettig, Commissioner, Internal Revenue Service, from Richard E. Neal, Chairman, Committee on Ways and Means, U.S. House of Representatives at 1 (Apr. 3, 2019) ("2019 Request").[5]

Treasury then sought guidance from DOJ's Office of Legal Counsel ("OLC") regarding whether Treasury was required to comply with the Committee's request.  Counterclaims/Cross-

---

[5] https://waysandmeans.house.gov/sites/democrats.waysandmeans.house.gov/files/ documents/Neal%20Letter%20to%20Rettig%20%28signed%29%20-%202019.04.03.pdf.

Claims ¶ 16.  OLC advised Treasury that it was not required to comply with the Committee's

request because the Committee's asserted purpose for requesting the tax records was pretextual.

*Id.* ¶¶ 16-17; *see* OLC, *Congressional Committee's Request for the President's Tax Returns*

*Under 26 U.S.C. § 6103(f)*, 43 Op. O.L.C. __ (June 13, 2019) ("2019 OLC Op.").[6]  Accordingly,

Treasury denied the April 2019 Request.  As Treasury has subsequently acknowledged, this was

the first time that a Congressional request under Section 6103(f) was denied.  *See Ways and*

*Means Committee's Request for the Former President's Tax Returns and Related Tax*

*Information Pursuant to 26 U.S.C. § 6103(f)(1)*, 45 Op. O.L.C. __ (slip op. at 11) (July 30, 2021)

("2021 OLC Op.") (attached as Exhibit A).

### E.      The Committee's June 2021 Request To Treasury

In June 2021, Chairman Neal submitted another request under Section 6103(f)(1)—the

only request at issue now—on behalf of the Committee.  *See* Counterclaims/Cross-Claims ¶¶ 48-

49; Letter for Janet L. Yellen, Secretary of the Treasury, from Richard E. Neal, Chairman,

Committee on Ways and Means, U.S. House of Representatives at 6-7 (June 16, 2021) ("2021

Request") (attached as Exhibit B).  The 2021 Request again sought the tax returns and return

information for Mr. Trump and eight of his businesses, but for a different period from the 2019

Request: tax years 2015 through 2020.  *See* 2021 Request at 6-7; *see also* Counterclaims/Cross-

Claims ¶ 50.

The 2021 Request explained that it was made in furtherance of the Committee's

"responsibility to conduct rigorous oversight of the [IRS] to ensure that our tax laws are

administered in a fair and impartial manner and to inform legislation necessary for safeguarding"

the tax system.  2021 Request at 1.  It noted that "Americans must have confidence that no

---

[6] https://www.justice.gov/olc/file/1173756/download.

taxpayer is able to operate above the law"—especially not "the President of the United States, who is the single most powerful public official in the country." *Id.* The request then detailed the Committee's interest in former President Trump's tax returns and tax information. It stated that "[t]he Committee has been considering legislative proposals and conducting oversight related to our Federal tax laws, including, but not limited to, the extent to which the IRS audits and enforces the Federal tax laws against a President." *Id.* For example, the request stated, the Committee sought to determine whether IRS agents were subject to "improper interference," whether they considered "ongoing audits that predate" the Presidential term, whether they "reviewed" business "activities involving many interrelated entities and income from and deductions related to foreign sources," whether they had "access to the necessary books and records," and how the President "responded to" any "examination findings or adjustments." *Id.* at 3.

These questions were raised by Mr. Trump's Presidency, the 2021 Request stated, because, among other reasons, he "controlled hundreds of business entities while in office and … routinely criticized the IRS for auditing him." 2021 Request at 4. For example, the request noted that Mr. Trump "controlled … [a] large, complex, and far-reaching web of" businesses engaged in both "domestic and foreign business activities," and that he appeared to have "used his businesses to take aggressive tax positions to minimize his tax liability," yet the IRS Manual's "provisions on the mandatory audit program do not account for such substantial business activities." *Id.* at 4-5. The request also explained that Mr. Trump claimed to "have been under continuous audit since before his Presidency," which, if true, meant that he could be in a position to improperly influence that audit as President. *Id.* Indeed, that concern was heightened, the 2021 Request observed, in light of Mr. Trump's open "disdain for IRS audits"

while a candidate and President—he called the automatic Presidential audit "extremely unfair" and complained that "people in the IRS … treat [him] very, very badly." *Id.* at 5-6. Further, the request stated that "former President Trump's tax returns could reveal hidden business entanglements raising tax law and other issues, including conflicts of interest, affecting proper execution of the former President's responsibilities." *Id.* at 4.

In sum, as the 2021 Request explained, the Committee "cannot properly evaluate the effectiveness or fairness of the mandatory audit program, in practice" or "legislate responsibly on this matter or address the real potential for abuse of power" without access to the requested tax returns and administrative files. 2021 Request at 3; *see also id.* at 6.

### F.     The 2021 OLC Opinion

Upon receiving the 2021 Request, Treasury asked OLC for its opinion as to whether the Secretary must furnish the requested materials to the Committee. In July 2021, OLC concluded that the 2021 Request was valid and therefore, under Section 6103(f)(1), Treasury must comply with it. 2021 OLC Op. at 3. As in its 2019 Opinion, OLC determined that Section 6103(f)(1)'s "unambiguous … directive" commands Treasury to supply the requested information to the Committee, yet "does not exempt the June 2021 Request from the constitutional requirement that congressional demands for information must serve a legitimate legislative purpose." *Id.* at 3-4. But unlike its 2019 Opinion, OLC determined that the Committee's request "for former President Trump's tax information would further the Committee's principal stated objective of assessing the IRS's presidential audit program—a plainly legitimate area for congressional inquiry and possible legislation." *Id.* at 4.

As OLC's 2021 Opinion explained, two key factors drove its different conclusion. First, OLC explained that "the 2019 Opinion failed to give due weight to Congress's status as a co-equal branch of government with legitimate needs for information in order to exercise its

constitutional authorities." 2021 OLC Op. at 19. Like courts, OLC stated, the Executive Branch should "presume that … Legislative Branch officials act in good faith and in furtherance of legitimate objectives" and that "the tax committees are best situated to determine when Congress ought to have access to tax information." *Id.* Accordingly, OLC declared: Although the Executive Branch need not "'blindly accept a pretextual justification' offered by a committee to justify an informational request," where "a tax committee requests tax information pursuant to section 6103(f)(1) and has invoked facially valid reasons for its request (despite the statute's not requiring any), the Executive Branch should conclude that the request lacks a legitimate legislative objective only in exceptional circumstances." *Id.* (quoting 2019 OLC Op. at 17). Such circumstances arise only where "a committee's asserted purpose truly blinks reality," for the Executive Branch need not "'blind' itself to 'what all others can see and understand.'" *Id.* at 26 (brackets omitted) (quoting *Mazars*, 140 S. Ct. at 2034). OLC added that, like courts, the Executive Branch is "'bound to presume that the action of the legislative body was with a legitimate object if it is capable of being so construed.'" *Id.* at 22 (quoting *McGrain*, 273 U.S. at 178). And neither "the fact that a congressional request for information might serve partisan or other political interests," nor the fact that legislators might want to "expose for the sake of exposure," such as to "embarrass" a President, can "'vitiate an investigation … if [a] legislative purpose is [also] being served.'" *Id.* at 26, 38 (quoting *Watkins*, 354 U.S. at 200).

Second, OLC explained that even if the 2019 Opinion's doubts about whether the 2019 Request served a legitimate purpose were sound, the 2021 Request left no room for such doubt. 2021 OLC Op. at 31. Specifically, OLC noted that the 2021 Request adjusted the tax years requested, and "explain[ed] in detail how review of those" materials "could assist" the Committee's legislative work, including why "it is reasonable for the Committee to focus on

former President Trump's returns" given the challenges he posed to the IRS's audit process.  *Id.*
at 31-33.  OLC also found that the Committee's concerns about hidden business entanglements
and foreign financial influence were "independently sufficient to justify the request" because
"[a]n investigation into possible presidential conflicts of interest or foreign influence and
leverage involves a 'subject on which legislation could be had.'"  *Id.* at 34 (quoting *Eastland v.
U.S. Servicemen's Fund*, 421 U.S. 491, 506 (1975) (quotation marks omitted)).

Finally, OLC did "not understand *Mazars* to alter the legal framework for reviewing the
June 2021 Request" because "the June 2021 Request seeks the tax information, not of a sitting
President, but of a former President."  2021 OLC Op. at 28.  OLC found that this difference
greatly mitigated the *Mazars* Court's concerns regarding the separation of powers.  *Id.*

### G.    Former President Trump's Counterclaims And Cross-Claims

After OLC released its 2021 Opinion, Treasury informed former President Trump and the
Committee that it intended to produce to the Committee materials responsive to the 2021
Request.  *See* Joint Status Report at 2, Dkt. 111.  Consequently, the Committee dismissed the
complaint it had previously filed against Treasury concerning the 2019 Request, *see* Dkt. 115;
Minute Order, Aug. 5, 2021, and Mr. Trump and his business entities filed counterclaims against
the Committee and cross-claims against Treasury (along with the Secretary, the IRS, and the IRS
Commissioner).  Against both the Committee and Treasury, Mr. Trump claims that the 2021
Request (1) lacks a legitimate legislative purpose and (2) violates *Mazars*.  Counterclaims/Cross-
Claims ¶¶ 56-71.  Against Treasury alone, Mr. Trump alleges that the 2021 Request violates: (3)
26 U.S.C. § 6103(f); (4) the First Amendment; (5) due process; and (6) the separation of powers.
*Id.* ¶¶ 72-102.

**LEGAL STANDARD**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a "complaint must contain sufficient factual matter … to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In determining whether a complaint states a claim, courts may consider "any matters within the pleadings," *Pernice v. Bovim*, 183 F. Supp. 3d 84, 87 (D.D.C. 2016), meaning "the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which [the court] may take judicial notice," *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007); *see Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015) (incorporation-by-reference doctrine permits courts to "consider a document that a complaint specifically references without converting the motion into one for summary judgment").

Here, the Committee's 2021 Request and the 2021 OLC Opinion are "part of the pleadings" and therefore may be considered on this motion: they are "integral" to Mr. Trump's counter- and cross-claims, "they are referred to in [his] complaint, and their authenticity is undisputed."  *Pernice*, 193 F. Supp. 3d at 87; *see also Strumsky v. Washington Post Co.*, 842 F. Supp. 2d 215, 217-218 (D.D.C. 2012).

Additionally, the Court may take judicial notice of the Legislative and Executive Branch materials cited here.  In deciding a motion to dismiss, a court may "'take judicial notice of a fact that is not subject to reasonable dispute if it … can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'"  *Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 464 (D.C. Cir. 2018); *see also* Fed. R. Evid. 201(b).  Matters subject to judicial notice include "historical, political, or statistical facts" and "public records and government documents available from reliable sources" like government websites.  *Johnson v. Commission on Presidential Debates*, 202 F. Supp. 3d 159, 167 (D.D.C. 2016); *see also D.A.M.*

14

*v. Barr*, 474 F. Supp. 3d 45, 55 n.12 (D.D.C. 2020) (Congressional testimony judicially noticeable); *Public Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6, 24 n.6 (D.D.C. 2018) (Executive Branch statements judicially noticeable).  Courts need not "accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice."  *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004).

## ARGUMENT

## I.   COUNTERCLAIM I FAILS AS A MATTER OF LAW

In Counterclaim I, former President Trump alleges that the Committee's 2021 Request "lack[s] a legitimate legislative purpose."  Counterclaims/Cross-Claims ¶ 63.  He does not deny, however, that the request identified multiple objectives within Congress's Article I authority.  Instead, he urges the Court to disregard the request's express rationale and conclude that the Committee's stated objectives are pretextual, based largely on the purported political motives of various officials—most of whom are not even on the Committee, and many of whom are not even members of Congress.  Supreme Court precedent squarely forecloses Mr. Trump's attempt to look into the Committee's motives, and, in any event, the purported motives he invokes would not render the request invalid as a matter of law.  Counterclaim I must be dismissed.

### A.   The Committee's 2021 Request Serves Valid Purposes

"The congressional power to obtain information is broad and indispensable," *Mazars*, 140 S. Ct. at 2031 (quotation marks omitted), "as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution," *Eastland*, 421 U.S. at 504 & n.15.  It "encompasses inquiries into the administration of existing laws, studies of proposed laws, and surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them."  *Mazars*, 140 S. Ct. at 2031.  There are only a few discrete "limitations" on this power, chiefly that the Congressional request be "related to, and in

15

furtherance of, a legitimate task of Congress," that is, that it "concern a subject on which legislation could be had." *Id.* (quotation marks omitted).

In evaluating whether a Congressional request advances a legitimate purpose, this Court, like the Executive Branch, is "bound to presume that the action of the legislative body was with a legitimate object if it is capable of being so construed." *McGrain*, 273 U.S. at 178 (quotation marks omitted); *Barry v. United States ex rel. Cunningham*, 279 U.S. 597, 619 (1929) ("presumption in favor of regularity" applies to Congressional acts); 2021 OLC Op. at 21-24 (describing Executive Branch practice of affording deference to Congress's stated rationales). Such deference is especially appropriate here, where "the Committee is requesting information pursuant to statutory authority"—a long-established right of access to taxpayer information that "has been approved through the bicameralism and presentment process." 2021 OLC Op. at 23; *see id.* at 24 ("[t]he political branches have repeatedly determined over the course of the last century that the congressional tax committees should have a statutorily unlimited right of access to tax information"). The 2021 Request plainly satisfies constitutional review under these standards.

First, the Committee's 2021 Request relates to and furthers Congress's oversight of and legislating on the administration of the tax laws. In the request, the Committee stated that it "has serious concerns about the IRS's full and fair administration of the tax laws with respect to a President and believes legislation may be needed in this area." 2021 Request at 2. The Committee explained that it seeks to determine, for example, whether IRS agents conducting Presidential audits are susceptible to improper interference by the President (or his representatives), whether they can access the necessary information to conduct a Presidential audit, and whether the IRS has adequate authority and resources to conduct complex Presidential

audits like those needed for Mr. Trump's returns.  *See id.* at 1, 3.  Congressional access specifically to Mr. Trump's tax information, the Committee explained, is needed because of the unique and "exceedingly challenging circumstances presented by former President Trump": he "is the sole President the Committee is aware of who controlled hundreds of business entities while in office" (including entities engaged in "foreign business activities"), who claimed to be under "continuous audit" since long before his Presidency, "and who routinely criticized the IRS for auditing him."  *Id.* at 4-6.  Thus, Mr. Trump raises heightened concerns about "whether the mandatory audit program has functioned as intended when the taxpayer's history is as complex as former President Trump's" and whether the IRS has the "ability to freely enforce the tax laws against" an adversarial President.  *Id.* at 5-6.  With these concerns in mind, the 2021 Request stated, "the Committee continues to consider and prioritize legislation on equitable tax administration, including legislation on the President's tax compliance, and public accountability," and reviewing Mr. Trump's returns and the related IRS administrative files would be integral to the Committee's ability to do so.  *Id.* at 2, 6.

Enacting legislation to enhance the IRS's resources, powers, and protections for carrying out Presidential audits is plainly within Congress's authority.  Article I provides Congress the power "[t]o lay and collect Taxes," U.S. Const. art. I, § 8, cl. 1, as well as the authority to control the appropriation of funds to federal agencies like the IRS, *see id.* art. I, § 9, cl. 7.  And it authorizes Congress to "make all Laws which shall be necessary and proper for carrying into Execution" these enumerated powers and "all other powers vested … in the Government of the United States."  *Id.* art. I, § 8, cl. 18.

Second, the 2021 Request relates to and furthers Congress's oversight of government officials and legislation to prevent conflicts of interest that might impair their ability to perform

their public duties.  In the 2021 Request, the Committee stated that "[f]ormer President Trump's tax returns could reveal hidden business entanglements raising tax law and other issues, including conflicts of interest, affecting proper execution of the former President's responsibilities" and "might also show foreign financial influences on former President Trump." 2021 Request at 4.  Here, too, such legislation is well within Congress's power.  The Constitution prohibits the President from "accept[ing] … any … present[ or] Emolument … from any … foreign State" without the "Consent of the Congress."  U.S. Const. art. I, § 9, cl. 8. And that power is also supported by the Necessary & Proper Clause.  *Id.* art. I, § 8, cl. 18.  As the court recently concluded on remand in *Mazars*, "Congress's power to consent—or not to consent—to foreign emoluments allows it to enact laws that are 'derivative of, and in service to, that granted power.'"  *Trump v. Mazars USA LLP*, 2021 WL 3602683, at *25 (D.D.C. Aug. 11, 2021) (quoting *NFIB v. Sebelius*, 567 U.S. 519, 560 (2012)) (brackets omitted).  And more generally, the Supreme Court has long recognized that the Necessary & Proper Clause empowers Congress to "inquire into and publicize" governmental "corruption, maladministration or inefficiency."  *Watkins*, 354 U.S. at 200 n.33.

### B.     Allegations Regarding Individual Legislators' Motives Do Not Vitiate The Committee's Request

Former President Trump does not deny that the Committee's stated objectives constitute purposes within Congress's constitutional authority.  Instead, he asserts that those purposes are "pretextual," *e.g.*, Counterclaims/Cross-Claims ¶ 14, and he speculates that "the primary purpose" of the 2021 Request "is to obtain and expose [his] information for the sake of exposure," *id.* ¶ 64.  That argument fails for two reasons: the motives of individual legislators are

legally irrelevant, and in any event, the supposed motives of individual Committee Members reflect legitimate legislative purposes.[7]

### 1.    The Committee's Supposed Motives Are Legally Irrelevant

Mr. Trump asks this Court to disregard the Committee's stated rationales for the 2021 Request—which facially and unquestionably serves valid legislative purposes—as pretext and instead to focus on the Committee's supposed motives for requesting his tax returns and tax information.  Mr. Trump's argument ignores controlling precedent.

As Mr. Trump acknowledged in *Mazars*, "[u]nder … existing precedent, … [c]ourt[s] cannot probe for an unstated and illegitimate motive behind" a Congressional request for information.  Reply Br. for Pet'rs, 2020 WL 1643780, at *15 (U.S. Mar. 27, 2020).  The Supreme Court has clearly and repeatedly instructed that "the motives of committee members … alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served."  *Watkins*, 354 U.S. at 200.  "[I]n determining the legitimacy of a congressional act [courts] do not look to the motives alleged to have prompted it."  *Eastland*, 421 U.S. at 508.  "[T]esting the motives of committee members for this purpose … is not [the courts'] function."  *Watkins*, 354 U.S. at 200.  Rather, "[s]o long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power."  *Barenblatt v. United States*, 360 U.S. 109, 132 (1959).[8]  The Supreme Court reaffirmed these principles in *Mazars*, stating that, in

---

[7] Mr. Trump also alleges that the Committee's motive is "to improperly conduct law enforcement, or some other impermissible goal."  Counterclaims/Cross-Claims ¶ 64.  These vague and "conclusory" contentions, which are unsupported by any factual allegations, "do[] not supply facts adequate" to state a claim.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

[8] Moreover, inquiry into legislators' motives would be foreclosed by the Speech or Debate Clause, which provides Members of Congress (and their aides) a "privilege" against

evaluating the constitutional validity of a Congressional request, courts should consider "the *asserted* legislative purpose" and "the evidence *offered* by Congress to establish that a subpoena advances a valid legislative purpose," without suggesting that courts should—or even could— look behind that record.  140 S. Ct. at 2035 (emphases added).

 Mr. Trump's request that this Court scrutinize and second-guess the Committee's stated rationales based on the Committee's supposed subjective motives defies that clear precedent and raises significant separation-of-powers concerns.  "[J]ust as the Constitution forbids the Congress to enter fields reserved to the Executive and Judiciary, it imposes on the Judiciary the reciprocal duty of not lightly interfering with Congress' exercise of its legitimate powers."  *Hutcheson v. United States*, 369 U.S. 599, 622 (1962) (lead opinion of Harlan, J.).  Consistent with that principle, "the scope of [judicial] inquiry" into whether "[t]he particular [Congressional] investigation at issue here is related to and in furtherance of a legitimate task of Congress … is narrow."  *Eastland*, 421 U.S. at 505-506.  As explained above, "'courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province,'" *id.* at 506 (quoting *Tenney v. Brandhove*, 341 U.S. 367, 378 (1951)), and courts "are bound to presume that the action of the legislative body was with a legitimate object if it is capable of being so construed," *McGrain*, 273 U.S. at 178 (quotation marks omitted).  This presumption can be overcome only if it is "obvious" that "a committee's investigation has exceeded the bounds of legislative power."  *Tenney*, 341 U.S. at 378.  A contrary rule would "disrupt the legislative function" and enable "judicial power" to "imperil[]" "legislative independence."  *Eastland*, 421 U.S. at 503.

---

compelled testimony and document production.  *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 418-421 (D.C. Cir. 1995).

Mr. Trump's allegations of subjective motive do not come close to satisfying that standard.  As discussed above, the Committee's 2021 Request on its face evidences multiple purposes that are fairly—indeed, squarely—within Congress's Article I authority.  Mr. Trump has not alleged facts showing that the request obviously exceeds Congress's constitutional authority.  On the contrary, his sole contention is that the Committee's rationale for its request is *pretext* based on supposed evidence of motive that this Court is constitutionally barred from scrutinizing.  In any event, as discussed next, his charge of pretext fails on its own terms.

> **2.  Even If Relevant, Allegations Regarding Subjective Motive Would Not Vitiate The Committee's Purposes**

Even if it were proper for the Court to consider former President Trump's allegations about the motives of Committee Members in making the 2021 Request, those allegations would not undermine the legal conclusion that the request serves legitimate purposes.

Tellingly, Mr. Trump does not engage with the extensive explanation that the Committee provided in the 2021 Request, relying instead on statements that, for one or more reasons, do not reflect the Committee's motives in issuing the 2021 Request.  His pleading recites at length statements by officials who were not on the Committee and were not involved in the Committee's investigation, including eleven New York state officials and a New York district attorney, thirteen members of Congress who are not members of the Committee on Ways and Means, the California state legislature, and even Hillary Clinton.  *See, e.g.*, Counterclaims/Cross-Claims ¶¶ 2, 19-20, 22-23, 25-26, 29-37.  He also cites various statements by Members of the Committee *other than* its Chair.  *See, e.g., id.* ¶¶ 7-9, 13, 40, 42, 54-55.  For purposes of evaluating the validity of the Committee's 2021 Request, only statements by the Committee as a body or through its Chair—the sole Committee Member vested with authority to issue a request to Treasury under Section 6103(f), *see also* Rule 15 of the Committee on Ways and Means for

the 117th Congress[9]—in connection with that request could be relevant to evaluating the request's validity.  And the only such statement cited in Mr. Trump's pleading is the 2021 Request itself, which undisputedly evinces no hint of pretext but rather plainly articulates legitimate legislative and oversight purposes.

In any event, the cited statements of Committee Members and the Speaker of the House do not establish pretext, but rather confirm the legitimacy of the 2021 Request's stated objectives.  Those statements refer, for example, to uncovering Mr. Trump's "tax evasion," self-dealing, "foreign entanglements," "corrupt[ion]," "fraud," and "crimes," as well as to his "undermining of our security and democracy."  Counterclaims/Cross-Claims ¶¶ 7, 13, 42, 53-55. Those statements do not "spoil[] the Committee's otherwise valid legislative inquiry"; they accord with the Committee's legitimate legislative and oversight goals—ensuring that the tax laws are applied effectively and impartially to Presidents and safeguarding against Presidents having hidden conflicts of interest that compromise their ability to perform their public duties. Indeed, "an interest in past illegality can be wholly consistent with an intent to enact remedial legislation."  *Trump v. Mazars USA LLP*, 940 F.3d 710, 728 (D.C. Cir. 2019), *vacated on other grounds by Mazars*, 140 S. Ct. 2019.[10]  The same is true of the earlier, pre-2021 Request statements by other Members of the Committee and the Speaker that Mr. Trump's pleading cites. *See* Counterclaims/Cross-Claims ¶¶ 4, 6-13, 40-42.

Mr. Trump maintains that some of these statements demonstrate that the Committee's purpose was to "expose" the requested "information for the sake of exposure."

---

[9] https://waysandmeans.house.gov/sites/democrats.waysandmeans.house.gov/files/documents/117thWMRulesFINAL.pdf.

[10] This portion of the D.C. Circuit's decision in *Mazars* "continue[s] to have precedential effect" because the Supreme Court's opinion "expressed no opinion on the merits of" it.  *Action All. of Senior Citizens of Greater Phila. v. Sullivan*, 930 F.2d 77, 83 (D.C. Cir. 1991).

Counterclaims/Cross-Claims ¶ 64.  But even this speculative and conclusory argument misunderstands the law.  Not all Congressional exposure is illegitimate.  "The public is, of course, entitled to be informed concerning the workings of its government."  *Watkins*, 354 U.S. at 200.  Thus, although "there is no congressional power to expose for the sake of exposure," Congress has "the power … to inquire into and publicize corruption, maladministration or inefficiency in agencies of the Government."  *Id.* at 200 & n.33.  Indeed, "Congress has assiduously performed an 'informing function' of this nature" since the Founding era.  *Id.* at 200 n.33.  In other words, exposure is illegitimate only if it is entirely divorced from a legislative or oversight purpose.  But here, the statements cited by Mr. Trump still show that any exposure would be in connection with the Committee's legitimate investigative and legislative efforts.

Finally, the Supreme Court has foreclosed Mr. Trump's vague assertion that the 2021 Request is illegitimate because the Committee issued it for "political gain."  *E.g.*, Counterclaims/Cross-Claims ¶¶ 3, 17, 22, 39.  The Court has declared: "In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed.  Courts are not the place for such controversies."  *Tenney*, 341 U.S. at 378.  Again, "[t]he courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province."  *Id.*  The *Mazars* district court recently stressed these principles in rejecting a similar challenge by Mr. Trump to another Congressional request.  2021 WL 3602683, at *9-10.  Indeed, because Congress is by design a "political branch[]," *Mazars*, 140 S. Ct. at 2026, if Mr. Trump were correct and the "mere presence of a political motivation were enough to disqualify a Congressional request, the effect would be to deny Congress its authority to seek information," 2021 OLC Op. at 26; *see Mazars*, 140 S. Ct. at 2033-2035.  That "result is incompatible with the Constitution."  2021 OLC Op. at 26.

C.      **The Committee's Interest In Former President Trump's Foreign Activities Does Not Vitiate The 2021 Request**

Former President Trump contends that the 2021 Request is invalid because "the Ways and Means Committee has no jurisdiction over 'emoluments,' 'conflicts of interest,' or 'Russia.'"  Counterclaims/Cross-Claims ¶ 11.  Apart from the tendentious framing of Mr. Trump's charge—no one could reasonably think, for example, that the Committee is asserting jurisdiction over a foreign nation—his argument fails for several reasons.

First, the Committee's stated interest in Mr. Trump's foreign entanglements is unnecessary to justify its request.  As explained above, *see* pp. 16-17, the Committee's stated interest in Presidential audits is itself sufficient to justify the request—it undisputedly serves valid legislative and oversight purposes within the Committee's jurisdiction over all federal revenue measures.  *See* U.S. House of Representatives Rule X.1(t), 117th Cong.

Second, the Committee's stated concerns about Mr. Trump's foreign entanglements *do* concern the impartial and effective administration of the tax laws because the tax laws address the reporting of foreign income and assets.  *See* 2021 Request at 3.

Third, the Committee's oversight powers are broad and not limited to its legislative jurisdiction.  The House Rules contain no jurisdictional limits on a committee's oversight powers.  Thus, nothing prevents the Committee from obtaining information related to whether Mr. Trump received foreign emoluments, had conflicts of interest, or was subject to improper influence by a foreign nation when he was President.

Fourth, the Committee's power to request tax returns and return information under Section 6103(f) is unconstrained by the *Committee's* legislative jurisdiction.  Section 6103(f) is a statute duly enacted by the President and Congress, and it imposes no restriction on the purpose for which a Congressional tax committee may submit a request to Treasury for returns or return

information; it merely states that "[u]pon" such request, Treasury "shall furnish" the requested materials to the committee chair.  26 U.S.C. § 6103(f).

Fifth, the Court has no authority to question whether the 2021 Request was specifically within the *Committee's* jurisdiction under the House Rules.  The only question for courts is whether a request is "related to, and in furtherance of, a legitimate task *of the Congress*," *i.e.*, whether it "concern[s] a subject on which *legislation could be had*."  *Mazars*, 140 S. Ct. at 2031 (emphases added; quotation marks omitted); *see also Watkins*, 354 U.S. at 200 ("The theory of a committee inquiry is that the committee members are serving as the representatives of the parent assembly in collecting information for a legislative purpose.").  Beyond that, the allocation of jurisdiction between Congressional committees is vested exclusively in the chambers of Congress, and courts have no power to review whether a committee overstepped the boundaries set by its chamber.  *See* U.S. Const. art. I, § 5, cl. 2 ("Each House may determine the Rules of its Proceedings ….").

## II. COUNTERCLAIM II FAILS AS A MATTER OF LAW

In Counterclaim II, former President Trump asserts that the Committee's request does not "satisfy the heightened standard" applicable to "Congressional requests for information that implicate the separation of powers" articulated by the Supreme Court in *Mazars*. Counterclaims/Cross-Claims ¶¶ 67-71.  That standard, however, does not apply to Congressional requests made pursuant to statute or to requests for records relating to former Presidents.  Mr. Trump's second counterclaim fails as a matter of law for those reasons alone.  For the same reasons, the "*Mazars* lite" standard adopted by the district court in *Mazars* on remand is also inapplicable.  Instead, the more general separation-of-powers balancing test used by the Supreme Court in *GSA* applies.

25

The doctrinal question of which of these standards applies here is ultimately academic to the outcome of this case. Regardless of which test applies, the result is clear: the 2021 Request is constitutionally valid. The Committee has articulated and substantiated that the requested tax returns and return information are integral to its ability to carry out its legislative and oversight aims of ensuring that Presidential audits are effective and fair, that IRS staff are safeguarded from improper interference, and that Presidents are not secretly susceptible to foreign influence through emoluments or other foreign-source benefits. Further, the Committee's legitimate need for the requested tax materials far outweighs the negligible burden, if any, that its request for a former President's tax records would place on sitting Presidents.

Consequently, Counterclaim II must be dismissed.

## A. The *Mazars* Test Does Not Apply

Counterclaim II fails because the *Mazars* test does not apply to statutory requests for a former President's information. *Mazars* involved subpoenas issued while Mr. Trump was in office by House committees to banks and an accounting firm for financial information relating to him. 140 S. Ct. at 2026-2027. The Court first held that the "demanding standards" applicable to subpoenas for "Oval Office communications"—which "safeguard[] the public interest in candid, confidential deliberations within the Executive Branch"—do not apply to requests for "nonprivileged, private information, which by definition does not implicate sensitive Executive Branch deliberations." *Id.* at 2032-2033. Nonetheless, the Court held that "Congressional subpoenas for information from the President" raise "significant separation of powers issues" because "Congress and the President have an ongoing institutional relationship as the opposite and rival political branches established by the Constitution." *Id.* at 2033-2034, 2036 (quotation marks omitted). Accordingly, the Court determined that a "balanced approach is necessary"—

one that accounts for "both the significant legislative interests of Congress and the 'unique position' of the President."  *Id.* at 2035.

To that end, the Court identified four "special considerations [that] inform this analysis":

First, courts should carefully assess whether the asserted legislative purpose warrants the significant step of involving the President and his papers. … Second, to narrow the scope of possible conflict between the branches, courts should insist on a subpoena no broader than reasonably necessary to support Congress's legislative objective. … Third, courts should be attentive to the nature of the evidence offered by Congress to establish that a subpoena advances a valid legislative purpose. … Fourth, courts should be careful to assess the burdens imposed on the President by a subpoena.

*Mazars*, 140 S. Ct. at 2035-2036.

Previously, in *GSA*, the Supreme Court articulated a different balancing test for evaluating Congressional demands for a former President's information.  After President Nixon left office, Congress enacted a statute directing the General Services Administration "to take custody of [his] Presidential papers and tape recordings" and to "determine the terms and conditions upon which public access may eventually be had" to them.  433 U.S. at 429.  In assessing the validity of the statute, the Court adopted a standard that balanced "the important interests that the Act seeks to attain" against "the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions."  *Id.* at 443, 446.  This standard largely corresponds to the first and fourth *Mazars* factors.  *See Mazars*, 2021 WL 3602683, at *13 ("the two interests" balanced under *GSA* test are "two of the four considerations set forth in *Mazars* itself").

The *GSA* test, not the *Mazars* test, should apply here for two reasons.  First, like in *GSA* but unlike in *Mazars*, here "[t]he relevant congressional request was made pursuant to an actual statute."  *Mazars*, 2021 WL 3602683, at *18 n.30 (distinguishing this case from enforcement of Congressional subpoena for Mr. Trump's financial information).  Second, also like in *GSA* but

27

unlike in *Mazars*, the request here seeks information relating to a *former* President.  Where a former President's personal information is sought, the "ongoing relationship" between the Legislative and Executive Branches that "necessarily inform[ed] the Court's analysis" in *Mazars* is absent.  140 S. Ct. at 2026.  In this circumstance, the Congressional request neither "pit[s] the political branches against one another" nor occurs in a context where there are political incentives for the two branches to engage in "negotiation and compromise."  *Id.* at 2031, 2034.  And because "the close connection between the Office of the President and its occupant" has been severed, there is no risk that the Congressional "demand" could "harass the President or render him complaisant to the humors of the Legislature."  *Id.* at 2034 (cleaned up).

On remand in *Mazars*, the district court—now confronting Congressional subpoenas "directed at a former President"—agreed that "that change affects the foundations of the *Mazars* test" in these very ways.  The court observed that, "because President Trump no longer 'alone composes a branch of government,' this dispute no longer implicates a present 'clash between rival branches of government.'"  2021 WL 3602683, at *13 (quoting *Mazars*, 140 S. Ct. at 2034).  Such a request, the court said, will neither "'intru[de] into the operation of the Office of the President' nor … burden 'the sitting President's time and attention.'"  *Id.* (quoting *Mazars*, 140 S. Ct. at 2036) (alterations omitted).  Further, the court recognized that "the *Mazars* test was crafted against a 'tradition of negotiation and compromise' between co-equal branches of government, but … a former President's incentives to accommodate Congress are greatly diminished compared to those of an incumbent."  *Id.* (quoting *Mazars*, 140 S. Ct. at 2031).  Yet, instead of applying the *GSA* test, the *Mazars* district court applied what it termed "*Mazars* lite" because, in its view, "[t]hese foundational differences alter the *Mazars* framework in important ways that support reduced judicial scrutiny of a congressional subpoena to a former President."

*Id.* at \*13.  Under the "*Mazars* lite" test, the court explained, each *Mazars* factor would be applied in a "less rigorous" way in the context of a Congressional request for a former President's nonprivileged, private information.  *Id.*

The Committee respectfully submits that the *Mazars* district court erred in applying its "*Mazars* lite" test instead of the *GSA* balancing test.  Nonetheless, for the reasons discussed shortly, the 2021 Request is constitutionally valid—and thus Counterclaim II fails—under any of the three tests just described.

Finally, Mr. Trump contends that the full-blown *Mazars* test should apply here irrespective of the fact that he is no longer President because he was the President when the *2019 Request* was made and the 2021 Request "was not a new request, but a continuation of the April 2019 request."  Counterclaims/Cross-Claims ¶¶ 68-69.  Again, Counterclaim II fails even under that test, but in any event, the *Mazars* district court rejected the same argument by Mr. Trump, 2021 WL 3602683, at \*11, and rightly so.  First, this case concerns the 2021 Request, not the 2019 Request.  The requests are similar, but not the same: the 2021 Request was issued by a new Congress, seeks returns and return information for different tax years, and was accompanied by a detailed explanation of the Committee's legislative and oversight needs.  In any event, courts should respect Congress's prerogative to define its requests for information to the Executive Branch as it sees fit.  *See id.* ("That the two subpoenas are substantively identical does not mean there has only ever been one Mazars subpoena.  The [second] Subpoena is a new demand for records ….").  Second, even if the two requests were one and the same, because Mr. Trump seeks to enjoin Treasury's compliance with the request, the request's validity must be assessed based on the current circumstances.  *See id.* at \*12 (giving "due weight to post-subpoena developments" because prospective relief was sought).  It is well-established that the question of

prospective enforcement *vel non*—which is what this case involves—is determined based on the facts and circumstances existing at the time of the judgment.  *See, e.g.*, *id.*; *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 464 (1921) ("this form of relief operates only in futuro, and the right to it must be determined as of the time of the hearing"); *Tory v. Cochran*, 544 U.S. 734, 737-738 (2005); *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994).  In fact, the D.C. Circuit previously dismissed a lawsuit seeking to enforce a Congressional subpoena because "the Committee's argument that the subpoenaed materials are necessary to its legislative judgments ha[d] been substantially undermined by [the] subsequent" actions disclosing the information sought.  *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 732-733 (D.C. Cir. 1974).  The same principle applies here.

### B.    Regardless Of Which Test Applies, The Request Does Not Violate The Separation Of Powers

Under the full-blown *Mazars* test, the "*Mazars* lite" test, or the *GSA* test, the Committee's request accords with the constitutional separation of powers.

### 1.    The Request Imposes No Burden On The Current Or Future Presidents

Now that Mr. Trump has left office, he cannot plausibly claim that Treasury's compliance with the 2021 Request will burden the Office of the President in any way.  The request seeks no *Presidential* materials—no "Oval Office communications," for example, and nothing related to the official duties of a President—but rather only "nonprivileged, private information" and related IRS records.  *Mazars*, 140 S. Ct. at 2032-2033.  Nor does the request seek anything from or burden *the sitting* President.  Consequently, the request will not "intru[de] into the operation of the Office of the President," expose the President to "harass[ment]," or "render him complaisant to the humors of the Legislature," let alone divert his "time and

attention" (which generally is not constitutionally protected anyway).  *Id.* at 2034, 2036; *see Mazars*, 2021 WL 3602683, at *13 ("burdens imposed on the President … are greatly diminished, if not eliminated entirely, when the President to whom the subpoena is issued no longer occupies the office").  This conclusion is reinforced by the fact that the Executive Branch—which has an obvious interest in safeguarding the institutional interests of the Presidency—has concluded that it must comply with the Committee's request, without expressing any concern that doing so would burden the President.  *See* 2021 OLC Op. at 28-29; *see also GSA*, 433 U.S. at 441 (that President Ford signed disclosure law and President Carter's Administration "support[ed]" its constitutionality in litigation indicated law did not violate separation of powers).

On remand in *Mazars*, the district court acknowledged the possibility that "the threat of a post-presidency subpoena for personal information [would] influence how the sitting President treats Congress while in office," but the court deemed that risk "remote" and "not nearly as injurious to the separation of powers as" a subpoena issued "*during*" the relevant President's term.  2021 WL 3602683, at *13.  Here, that risk is even more attenuated.  Since President Nixon became the first President to release his tax returns to the public, in 1973, every elected President other than Mr. Trump has voluntarily released his returns, including Mr. Trump's successor.[11] The long history of Presidents' willingness to publicly release their returns strongly suggests that

---

[11] *See, e.g.*, *The President and Vice President release their 2020 tax returns*, The White House (May 17, 2021), https://www.whitehouse.gov/briefing-room/disclosures/2021/05/17/the-president-and-vice-president-release-their-2020-tax-returns/; *President Obama and Vice President Biden's 2015 Tax Returns*, The White House (President Barack Obama Archives) (Apr. 15, 2016), https://obamawhitehouse.archives.gov/blog/2016/04/15/president-obama-and-vice-president-bidens-2015-tax-returns; *President and Mrs. Bush Release 2000 Tax Return*, The White House (President George W. Bush Archives) (Apr. 13, 2001), https://georgewbush-whitehouse.archives.gov/news/releases/2001/04/20010413-6.html.

future Presidents will not be troubled by the prospect of doing the same.  Speculation that future Congresses will use Section 6103 requests to obtain tax returns and return information of former Presidents as a tool of harassment contradicts the presumption of good faith due to a co-equal branch of government and overlooks the highly unusual circumstances necessitating the Committee's request for tax records and corresponding IRS files here.  Indeed, Mr. Trump's flat refusal to release his individual returns or to release information about ongoing IRS audits (if any) reinforces the significant concerns underlying the Committee's request for his tax information from the IRS.

In addition, the *Mazars* district court determined that the risk of undue influence on Presidents was "increased" by the "subpoena's breadth and intrusiveness."  2021 WL 3602683, at *17.  The Committee strongly disagrees with this aspect of the *Mazars* court's analysis, but even if the court's characterization were correct, the Committee's 2021 Request is well tailored to the Committee's investigative objectives and includes only those documents most pertinent to the Committee's investigation.  *See infra* pp. 34-36.

### 2. The Committee's Purposes Warrant Involving Mr. Trump's Papers

The Committee's legislative and oversight purposes warrant seeking Mr. Trump's tax information because there are no "other sources [that] could reasonably provide Congress the information it needs in light of its particular legislative objective[s]."  *Mazars*, 140 S. Ct. at 2035-2036.  The Committee does not seek to use Mr. Trump's information as a "'case study' for general legislation," *id.* at 2036, but rather seeks to investigate and potentially develop legislation directed specifically at circumstances involving Presidents and informed specifically by risks that Mr. Trump's actions appear to have generated.

The legislative and oversight objectives identified in the 2021 Request—which include ensuring that Presidential audits are fair, effective, and free from improper interference, and

ensuring that foreign entanglements do not interfere with Presidents' faithful execution of official duties—are obviously specific to the Presidency.  Therefore, only information relating to Presidents will do:  the Committee cannot truly understand a process that applies uniquely to a President other than by examining records of a President.

What is more, the Committee is justifiably focused specifically on Mr. Trump because, as the 2021 Request explained, his actions and statements raised unprecedented and serious concerns about his tax compliance and foreign entanglements and about the IRS's ability to enforce the tax laws against him while President.  His Presidency was a nonpareil stress test, and the Committee has the constitutional right and duty to investigate and assess the extent to which the existing systems withstood that stress and what legislative reinforcements, if any, are needed.  Compared to past Presidents, Mr. Trump's returns appear to be inordinately large and complex, reflecting his sprawling domestic and international business activities, which raises the question of whether the IRS has the requisite resources and authority to examine such returns as effectively as needed for a President.  And he repeatedly attacked the IRS and its audits of him while a Presidential candidate and while President, raising the important question of whether IRS employees are properly protected from a President's attempts to improperly influence its audits. *See supra* pp. 10-11, 17.  In sum, Mr. Trump's returns and related administrative files are not only "necess[ary]" but also "unique[ly] useful[]."  *Mazars*, 2021 WL 3602683, at *16.

Further, Mr. Trump's foreign business activities raise additional concerns about improper foreign influence that could inform relevant remedial legislation aimed at preventing "corruption" and "maladministration" in the Presidency. *Watkins*, 354 U.S. at 200 n.33.  Indeed, given that the Constitution prohibits the acceptance of any foreign emolument without "the Consent of the Congress," U.S. Const. art. I, § 9, cl. 8, "[i]f Congress cannot mandate disclosure

pursuant to its consent authority, one wonders how it could possibly exercise that authority effectively," *Mazars*, 2021 WL 3602683, at \*25.

Finally, the Committee is operating "on a clean slate." *Mazars*, 2021 WL 3602683, at \*16.  In *Mazars*, the district court found that "the legislative objectives" were "relatively incremental and therefore present[ed] only a limited need for former President Trump's financial records" because "the preexisting financial disclosure regime the Committee seeks to build on is already quite extensive." *Id.* at \*16-17.  Again, the Committee strongly disagrees with the *Mazars* district court's analysis on this point: no matter how extensive the preexisting regime may be, it remains open to Congress to investigate whether that regime is achieving Congress's current goals and doing so in appropriate ways; "legislative acts … [are] alterable when the legislature shall please to alter" them. *Marbury v. Madison*, 5 U.S. 137, 177 (1803).  Even if the *Mazars* district court's analysis were sound, however, this case would still be different because there is *no* existing or proposed statute governing Presidential tax audits. *Cf. Mazars*, 2021 WL 3602683, at \*18 n.30 (distinguishing this case).  The point of the Committee's inquiry here is to determine the need, if any, for such legislation and the shape that such legislation would take.

### 3.    The 2021 Request Seeks Only What Is Reasonably Necessary

The 2021 Request is tailored to what is reasonably necessary to serve the Committee's legislative and oversight purposes.

As explained in the 2021 Request, the Committee does *not* know, among other things:

- For which years and for which entities, if any, did the IRS audit former President Trump's tax returns?

- If performed, were those audits thorough and accurate?  Were the audits deficient or inadequate in any way, and if so, how and why?

- Did the IRS have the resources and personnel needed to perform the audits effectively?

- Did the IRS have adequate authority to obtain the information it needed from Mr. Trump to perform the audits?

- Were there any indications that Mr. Trump had received any emoluments, income, or other benefits from foreign sources?

- Did the audits result in any disputes, notices of deficiency, or adjustments and, if so, what was the resolution?

- If any audits for years in which Mr. Trump was President were not completed before his term ended, have they since been completed?  If not, will they be completed and when?

- Did Mr. Trump directly or indirectly try to block, interfere with, or influence the audits?  If so, were the relevant IRS employees properly protected from those efforts in the course of their work, what steps did the IRS take to protect its employees, and to what extent did those efforts affect the IRS's audits?

- In what ways, if any, did the IRS treat Mr. Trump's returns differently from other similarly situated taxpayers?

*See* 2021 Request at 1-5.

The Request seeks the two most obvious and basic categories of documents required to answer those questions:  Mr. Trump's individual income tax returns and the income tax returns for eight of his business entities (for a defined number of years) and related IRS administrative files.  "Without seeing the relevant returns and return information, it is impossible to" answer questions such as these and therefore it is impossible to "properly assess whether the scope of a mandatory audit was complete, objective, and fair and to legislate accordingly."  2021 Request at 6.  Specifically, without both the returns and the accompanying administrative files, the Committee cannot evaluate the sufficiency, independence, or impartiality of the IRS's audits: it needs the returns to see, among other things, what Mr. Trump reported, and it needs the administrative files to see how the IRS audited those returns.  Further, the Committee has requested the returns for tax years that he was in office and the two prior years, in order to ensure that the Committee gains a sufficiently complete picture of the IRS's audits of his returns while

President.  For example, tax returns and return information from the years requested will assist the Committee in fully understanding how the IRS dealt with open tax years and whether the IRS treated Mr. Trump differently during his term in office.  Thus, as OLC determined, the period covered by the 2021 Request "is well-aligned with the Committee's interest in the presidential tax audit program."  2021 OLC Op. at 32; *cf. Mazars*, 2021 WL 3602683, at *17 (determining that subpoena seeking financial records relating to Mr. Trump for years 2011-2018 was both under- and over-inclusive); *id.* at *26.

### 4.    The Committee Justified Its Need For The Requested Materials

The Committee has "adequately" supported its request with "detailed and substantial" evidence.  *Mazars*, 140 S. Ct. at 2036.  The 2021 Request contains more than five single-spaced pages explaining the Committee's legislative and oversight needs for Mr. Trump's tax returns and the related IRS administrative files.  The request explains: the importance of having a fair and effective tax system and the Committee's responsibility for crafting legislation to achieve that goal, 2021 Request at 1, 3; the lack of information about the IRS Presidential audit program, *id.* at 2; the Committee's detailed concerns about the program's inability to handle highly complex returns or to withstand improper pressure by a President, based on its review of the IRS Manual and the IRS's "own admission," *id.* at 2-4; the unprecedented pressures Mr. Trump has applied to the Presidential audit program through his unusually complex returns, foreign business activities, refusal to release his returns publicly, and hostility towards the IRS and its audits of him, based on media reports and his own public statements, *id.* at 4-6; what information Mr. Trump's returns and the related administrative files might reveal regarding the Committee's concerns, *id.* at 4, 6; and the Committee's legislative goals to redress these concerns should they be borne out, *id.* at 2-3.

36

That is alone sufficient, but the 2021 Request is further substantiated by information

obtained by the Committee during its Subcommittee on Oversight's "Hearing on Legislative

Proposals and Tax Law Related to Presidential and Vice-Presidential Tax Returns." *See Hearing*

*on Legislative Proposals and Tax Law Related to Presidential and Vice-Presidential Tax*

*Returns: Hearing Before the Subcomm. on Oversight of the H. Comm. on Ways and Means*,

116th Cong. (Feb. 7, 2019) ("Oversight Tr.").[12]   At that hearing, witnesses testified that Mr.

Trump's tax returns would inform the Committee's assessment of whether the Presidential audit

program functions effectively, particularly under the challenging circumstances presented by Mr.

Trump.   One tax expert witness testified that, "without seeing [Mr. Trump's] returns, the

Committee cannot tell whether the returns are being properly reviewed by the IRS" and "cannot

understand how any disputes have been resolved."   Steven M. Rosenthal*, The Value of*

*Presidential and Vice-Presidential Tax Returns to the Public and Congress*, Tax Policy Center,

at 6 (Feb. 7, 2019) (submitted to and accepted by Subcommittee during hearing, Oversight Tr. at

24).   Another expert witness cited the "experience in the Nixon administration" as evidence "that

the IRS may not be able to … vigorously enforce the law relative to the President," and

recommended that audit requirements be codified in a statute rather "than handled through the

internal policies of the IRS."   Oversight Tr. at 40-41 (testimony of Joseph J. Thorndike).

Witnesses also testified at the hearing that Mr. Trump's tax returns could disclose foreign

emoluments or entanglements that would create conflicts of interest or suggest improper

---

[12] This hearing transcript is available at https://waysandmeans.house.gov/sites/democrats.
waysandmeans.house.gov/files/documents/Transcript%20-%20Final.pdf.  The Court may take
judicial notice of the testimony at the hearing because the factual issue here is not whether the
testimony was true but whether the Committee had a basis for its request, and the testimony
shows that it did.  *See* Fed. R. Evid. 201(b)(2); *D.A.M.*, 474 F. Supp. 3d at 55 n.12 (taking
judicial notice of Congressional testimony).

influence.  "[T]ax transparency," one witness testified, "could lead to greater accountability"
concerning subjects like the receipt of "funds from foreign sources," noting that "a lot of foreign
governments have very extensive funds that invest in businesses."  Oversight Tr. at 26, 52
(testimony of Noah Bookbinder).  Because of such concerns, witnesses urged the Committee to
request Mr. Trump's business tax returns in addition to his individual income tax returns.  *See,
e.g.*, *id.* at 27, 51, 55.

In sum, the Committee's articulation of its legislative and oversight purposes in
requesting Mr. Trump's tax returns and related return information, as well as the bases for the
Committee's belief that those materials would serve Article I purposes, was ample.

### III.   THE REMAINING CROSS-CLAIMS AGAINST TREASURY SHOULD BE DISMISSED

Although the Committee is not named as a defendant in Cross-Claims III through VI, the
Committee believes those claims should be dismissed.  In order to avoid duplicative briefing
consistent with the Court's direction, the Committee refers the Court to the discussion of those
claims in Treasury's motion to dismiss.

### CONCLUSION

The Court should, as quickly as possible, grant the Committee's motion to dismiss and
thereby permit Treasury to comply with the Committee's request for information under 26
U.S.C. § 6103(f).

September 9, 2021

Respectfully submitted,

/s/ Douglas N. Letter

SETH P. WAXMAN (D.C. Bar No. 257337)
KELLY P. DUNBAR (D.C. Bar No. 500038)
DAVID M. LEHN (D.C. Bar No. 496847)
ANDRES C. SALINAS (D.C. Bar No. 156118)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 663-6000
seth.waxman@wilmerhale.com

KATHERINE V. KELSH (*pro hac vice* motion forthcoming)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

DOUGLAS N. LETTER (D.C. Bar No. 253492)
    *General Counsel*
TODD B. TATELMAN (VA Bar No. 66008)
ERIC R. COLUMBUS (D.C. Bar No. 487736)
STACIE M. FAHSEL (D.C. Bar. No. 1034314)
OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, DC  20515
(202) 225-9700
douglas.letter@mail.house.gov

*Counsel for Plaintiff–Counterdefendant*
*Committee on Ways and Means, United States*
*House of Representatives*

39