# EXHIBIT B

**COMMITTEE ON WAYS AND MEANS**
U.S. HOUSE OF REPRESENTATIVES
WASHINGTON, DC 20515

June 16, 2021

The Honorable Janet L. Yellen
Secretary
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220

The Honorable Charles P. Rettig
Commissioner
Internal Revenue Service
1111 Constitution Avenue, NW
Washington, D.C. 20224

Dear Secretary Yellen and Commissioner Rettig,

The Committee on Ways and Means ("Committee") has oversight and legislative authority over our Federal tax laws.[1] Pursuant to this authority, the Committee has a responsibility to conduct rigorous oversight of the Internal Revenue Service ("IRS") to ensure that our tax laws are administered in a fair and impartial manner and to inform legislation necessary for safeguarding our voluntary tax compliance system.

In order for our tax system to function, Americans must have confidence that no taxpayer is able to operate above the law. This, of course, extends to the President of the United States, who is the single most powerful public official in the country. With this in mind, the Committee continues to seek the tax returns and return information, including audit files, of former President Donald J. Trump to inform its legislative work. As you know, the Committee previously requested former President Trump's tax returns and return information, but the previous Administration refused to comply with the Committee's lawful request.[2] Because this matter remains in active litigation, and as an accommodation to the Department of the Treasury and the IRS, the Committee articulates its need for the requested documents below.[3]

### I. *The Committee Has Serious Concerns About the IRS's Ability to Audit a President in a Fair and Impartial Manner.*

The Committee has been considering legislative proposals and conducting oversight related to our Federal tax laws, including, but not limited to, the extent to which the IRS audits and enforces the Federal tax laws against a President. In 1974, it became known publicly that the IRS

---

[1] Under Rule X.1(t) of the United States House of Representatives (117th Cong.), the Committee has been delegated broad legislative, investigative, and oversight authority over revenue measures generally, which encompasses all aspects of our nation's tax laws and their administration.

[2] Letter from Hon. Richard E. Neal, Chairman, H. Comm. on Ways and Means to Hon. Charles P. Rettig, Comm'r, IRS (Apr. 3, 2019).

[3] Pursuant to Section 6103(f) of the Internal Revenue Code, the Chairman of the Committee on Ways and Means has the authority to request and receive tax returns and return information. Section 6103(f) does not require the Chairman to articulate or explain the Committee's legislative purpose for seeking the requested information.

did not properly examine President Nixon's returns. Shortly thereafter, the IRS implemented a mandatory audit program for a sitting President's returns "in the interest of sound tax administration."[4] However, since the program was adopted in 1977, the American people have heard nothing further from the IRS about the specifics of this program, which is merely IRS policy and is not codified in the Federal tax laws. In truth, we do not know for certain that these audits are conducted and, if so, whether they are in accordance with this policy and are both thorough and fair. As is discussed in more detail below, the Committee has serious concerns about the IRS's full and fair administration of the tax laws with respect to a President and believes legislation may be needed in this area.

The Committee has reason to believe that the mandatory audit program is not advancing the purpose for which it was created, which may require Congress to act through legislation. Under the Internal Revenue Manual ("IRM"), individual income tax returns of a President are subject to mandatory examination, but, by the IRS's own admission, many of the relevant IRM provisions are outdated and no longer followed. Further, the applicable IRM sections do not account for a President who, like former President Trump, had ongoing audits, hundreds of business entities, and inordinately complex returns. Critically, the IRM also does not provide explicit safeguards in the event a President interferes with or questions the appropriateness of such examination, which imperils the integrity of the entire process. Considering the enormous power that a President wields over the IRS, these gaps in the IRM procedures warrant Congress's close attention.

The IRM grants an IRS revenue agent substantial discretion to shape the course of the President's audit and to determine, among other things, whether the mandatory audit will include a rigorous review of open tax years or underlying business income required to be reported on an individual income tax return. Over the last two years, the IRS has been unable to provide the Committee assurance that sufficient safeguards exist to shield a revenue agent from undue influence at the hands of a President trying to secure a favorable audit. Perhaps the most troubling fact is that, while the revenue agent's identity is largely secret within the IRS, it is known by the President and the President's representatives, who communicate directly with the agent without supervision. This raises critical questions as to whether this employee is adequately protected and able to act objectively and impartially.

Among the Committee's goals is ensuring that the tax laws are administered fully and fairly. Accordingly, the Committee continues to consider and prioritize legislation on equitable tax administration, including legislation on the President's tax compliance, and public accountability. The mandatory audit should not be merely a rubber stamp, and the IRS must, at a minimum, treat a President like any other taxpayer subject to an audit. Importantly, the Committee also seeks to explore legislation intended to ensure that IRS employees in any way involved in a President's audit are protected in the course of their work and do not feel intimidated because of the taxpayer's identity. Indeed, the purpose underlying inclusion of the mandatory audit in the

---

[4] Bill Curry, "Yearly Audits Set for Carter, Mondale," Wash. Post (June 21, 1977), https://www.washingtonpost.com/archive/politics/1977/06/21/yearly-audits-set-for-carter-mondale/aad47cd9-7906-4cb2-9272-930722027d2a/.

IRM was so that no IRS employee would have to make the decision to audit a sitting President.[5] However, there is more to an audit than just the decision to initiate it.

Under the Rules of the House of Representatives, the Committee's authority to legislate on tax administration is indisputable. Should the Committee find that the mandatory audit program is inadequate, it is within our jurisdiction to consider and enact legislation to address these findings. To the same extent, if the Committee determines that adequate safeguards do not exist to prevent improper influence by a President, we can and will propose legislation to provide the appropriate guardrails.

## II. The Committee is Entitled to Request and Receive Tax Return Information Necessary to Inform Legislation on the Mandatory Audit Program.

Understandably, the Committee cannot properly evaluate the effectiveness or fairness of the mandatory audit program, in practice, without relevant information. And, unless the Committee can assess the sufficiency of current procedures, we cannot legislate responsibly on this matter or address the real potential for abuse of power. If it is, in fact, the case that Presidents can improperly steer the course of their own audits either through their actions or public declarations, the Committee must implement a legislative solution. But, the IRS must first provide us with the necessary information.

Tax returns and return information, including audit files, are integral to the Committee's inquiry into the mandatory audit program. At its core, what the Committee seeks to understand is how the IRM provisions have been applied *in practice* and whether IRS agents have been able to act objectively in the past. Specifically, the Committee requires information about an actual audit and an actual taxpayer. This will help the Committee determine, among other things: (i) whether IRS agents have been able to operate free from improper interference by a President or his representatives; (ii) whether agents have looked at ongoing audits that predate a President's term in office; (iii) whether agents have reviewed underlying business activities, especially activities involving many interrelated entities and income from and deductions related to foreign sources; (iv) whether agents have had access to the necessary books and records to substantiate amounts on the tax return; (v) whether there have been any examination findings or adjustments and how a President has responded to such findings or adjustments; and (vi) whether agents have had access to the necessary resources to undertake an exhaustive review of a complex taxpayer on an annual basis. Information that would shed light on these issues is, necessarily, protected under Section 6103(a) of the Internal Revenue Code ("Code") and subject to disclosure to a covered committee pursuant to Section 6103(f).

In particular, the Committee seeks information about a President who implicates many of our wide-ranging concerns about the mandatory audit program and equitable tax administration, as well as other matters of concern that, unquestionably, lie within Congress's competence to

---

[5] *Id.* At the time, the IRS explained that this decision "automatically relieves any particular IRS employee" of having to make the decision to audit a President. *See also* JCX-3-19, *Background Regarding the Confidentiality and Disclosure of Federal Tax Returns* (Feb. 4, 2019), at 21 (quoting IRS spokesperson).

explore. As is described in more detail below, former President Trump is the sole President the Committee is aware of who controlled hundreds of business entities while in office and who routinely criticized the IRS for auditing him. His returns, reportedly, have been under continuous audit since before his Presidency and raise serious questions of tax policy, administration, and compliance. For these reasons, his tax returns and return information are not only instructive—but indispensable—to the Committee's inquiry into the mandatory audit program. Further, former President Trump's tax returns could reveal hidden business entanglements raising tax law and other issues, including conflicts of interest, affecting proper execution of the former President's responsibilities. An independent examination might also show foreign financial influences on former President Trump that could inform relevant congressional legislation.

As Chairman of the Committee, I am authorized by Section 6103(f) of the Code to request and receive tax returns and return information, including that of a current or former President. Indeed, there exists direct precedent for exactly this type of inquiry. In 1973, President Nixon's tax compliance became a matter of public concern when journalists and tax lawyers questioned the appropriateness of a large deduction he had taken on his 1969 tax return. In response, President Nixon generally denied any impropriety and released a note from the IRS stating that his returns were accepted as filed and complimenting him for the care taken in preparing his returns. Between 1973 and 1974, the Joint Committee on Internal Revenue Taxation ("Joint Committee") requested and received copies from the IRS of President Nixon's returns for multiple tax years, including years that predated his Presidency. Ultimately, the Joint Committee found numerous deficiencies in the IRS's auditing of President Nixon's returns and concluded that President Nixon had an unpaid tax liability of more than $400,000. In the wake of the Joint Committee's findings, the IRS implemented the mandatory audit program in 1977, demonstrating precisely how a congressional committee's investigation served as a highly valuable oversight tool for the IRS's review of a President's returns.

### III. *Former President Trump is a Unique Taxpayer in the Mandatory Audit Program.*

Among Presidents, Donald J. Trump is a unique taxpayer. Unlike his predecessors, he controlled hundreds of businesses throughout his term, raising concerns about financial conflicts of interest that might have affected the administration of laws, including the tax laws. Former President Trump also represented that he had been under continuous audit by the IRS prior to and during his Presidency, reportedly received a $73 million refund that was under investigation when he took office, and routinely complained in public statements about alleged unfair treatment by the IRS. The Committee's concerns about the mandatory audit program have been particularly heightened with respect to him for these reasons, which are discussed in more detail below.

First, former President Trump's tax attorneys have described his returns as "inordinately large and complex."[6] Through a revocable trust, former President Trump controlled more than 500 individual business entities that comprise the Trump Organization. The large, complex, and

---

[6] Letter from Sheri A. Dillon and William F. Nelson to Mr. Donald J. Trump, *Re: Status of U.S. federal income tax returns* (Mar. 7, 2016), *available at* http://static.politico.com/bf/cd/d210b336496e839c1fc7a517407c/letter-from-donald-trumps-tax-attorneys-on-trump-audits.pdf (hereinafter "Morgan Lewis Letter").

far-reaching web of his business empire likely was reported on his individual income tax return, but it is unclear whether any audits (mandatory or otherwise) included a review and substantiation of his underlying domestic and foreign business activities. On their face, the IRM provisions on the mandatory audit program do not account for such substantial business activities. This is especially concerning to the Committee, as news reports indicate that the former President used his businesses to take aggressive tax positions to minimize his tax liability.[7] Indeed, in 2019, he referred to the practice of showing real estate "losses for tax purposes" as "sport."[8]

Second, the former President stated repeatedly that his returns were under routine audit. In 2016, his tax attorneys reported that his returns had been under continuous examination since 2002.[9] Further, last fall, the New York Times reported that former President Trump has been engaged in a decade-long audit battle with the IRS over a $73 million tax refund that he received.[10] According to the New York Times, that amount represents all the Federal income tax that he paid for 2005 through 2007, plus almost $3 million in interest. The New York Times noted that, if the former President were required to repay the entire refund, it could cost him more than $100 million with interest. In no uncertain terms, the continuous audit of his returns, the colossal size of the refund in question, and the use by the former President of a grantor trust controlling hundreds of businesses make him markedly different from other Presidents examined under the IRM's mandatory audit procedures. Understanding how the IRS handled these issues is crucial to the Committee's inquiry into whether the mandatory audit program requires legislative action.

Third, statements by former President Trump and his surrogates raise serious questions about an IRS agent's ability to freely enforce the tax laws against him while he was President. Former President Trump's disdain for IRS audits is widely known. As a Presidential candidate, he expressed his belief that it was "very unfair" that he was "always audited," and claimed that he was audited "when [he] shouldn't be audited."[11] Alarmingly, once he became President, this sentiment was explicitly extended to the automatic, mandatory audit described in the IRM. In 2018, the White House Press Secretary explained, "The President and First Lady filed their taxes on time and as always they are automatically under audit, which the President thinks is extremely

---

[7] For example, according to the New York Times, former President Trump regularly reported massive and questionable deductions, such as a deduction for consulting fees paid to a family member and employee of the Trump Organization, a business expense deduction for a private family residence, and charitable deductions for conservation easements at his properties. Russ Buettner, Susanne Craig, and Mike McIntire, "Long-Concealed Records Show Trump's Chronic Losses and Years of Tax Avoidance," N.Y. Times (Sept. 27, 2020), https://www.nytimes.com/interactive/2020/09/27/us/donald-trump-taxes.html?action=click&module=Spotlight&pgtype=Homepage.

[8] Reuters Staff, "Trump blasts report on his business losses, calls accounting a 'sport,'" Reuters (May 8, 2019), https://www.reuters.com/article/us-usa-trump-taxes-sport/trump-blasts-report-on-his-business-losses-calls-accounting-a-sport-idUSKCN1SE1K5.

[9] See *supra* note 6, Morgan Lewis Letter.

[10] See *supra* note 7, "Long-Concealed Records Show Trump's Chronic Losses and Years of Tax Avoidance." *See also Taxpayer Fairness: Hearing Before the Subcomm. on Oversight of the H. Comm. on Ways and Means,* 116th Cong. (Oct. 13, 2020).

[11] Jenna Johnson, "Donald Trump says IRS audits could be tied to being a 'strong Christian," Wash. Post (Feb. 26, 2016), https://www.washingtonpost.com/news/post-politics/wp/2016/02/26/donald-trump-says-irs-audits-could-be-tied-to-being-a-strong-christian/.

unfair."[12] Following the New York Times report last fall, former President Trump—speaking from the podium in the White House Briefing Room—directly attacked the IRS and its employees, stating "They treat me very badly. You have people in the IRS, they treat me very, very badly."[13]

Knowing only what has been reported publicly, there is ample reason to question whether the mandatory audit program has functioned as intended when the taxpayer's history is as complex as former President Trump's. Simply put, it does not appear that the IRM provisions concerning the mandatory Presidential audit are sufficiently robust for a President who: (i) has "inordinately large and complex" returns; (ii) controls hundreds of business entities, some of which receive income from foreign sources; (iii) raises issues of financial conflicts of interest; (iv) takes aggressive tax positions to minimize his liability; (v) is under continuous audit by the IRS; (vi) has a $73 million refund under review; and (vii) openly attacks the IRS and the very IRS employees conducting the mandatory audit. To be sure that the mandatory audit program will work for all future President-taxpayers (including those with similarly complex taxes), we must see how the program fared under the exceedingly challenging circumstances presented by former President Trump. Further, it would be instructive for the Committee's legislative purposes to understand what happens to the mandatory audit if it is not closed before a President leaves office.

Without seeing the relevant returns and return information, it is impossible to properly assess whether the scope of a mandatory audit was complete, objective, and fair and to legislate accordingly. Therefore, as Chairman of the Committee and pursuant to the authority provided by Section 6103(f) of the Code, I request the following tax returns and return information for each of the tax years 2015 through 2020:

1. The Federal individual income tax returns of Donald J. Trump.

2. For each Federal individual income tax return requested above, a statement specifying: (a) whether such return is or was ever under any type of examination or audit; (b) the length of such examination or audit; (c) the applicable statute of limitations on such examination or audit; (d) the issue(s) under examination or audit; (e) the reason(s) the return was selected for examination or audit; and (f) the present status of such examination or audit (to include the date and description of the most recent return or return information activity).

3. All administrative files (workpapers, affidavits, etc.) for each Federal individual income tax return requested above.

4. The Federal income tax returns of the following entities:

    - The Donald J. Trump Revocable Trust;

---

[12] Arden Farhi, *Trump Files 2017 Taxes Following 6-month Extension,* CBS News (Oct. 17, 2018), https://www.cbsnews.com/news/trump-files-2017-taxes-following-6-month-extension/.

[13] "Trump Calls Years of Tax Avoidance 'Fake News,' Attacks I.R.S.," N.Y. Times (Sept. 27, 2020), https://www.nytimes.com/video/us/politics/100000007364069/trump-taxes.html.

- DJT Holdings LLC;
- DJT Holdings Managing Member LLC;
- DTTM Operations LLC;
- DTTM Operations Managing Member Corp;
- LFB Acquisition Member Corp;
- LFB Acquisition LLC; and
- Lamington Farm Club, LLC d/b/a Trump National Golf Club—Bedminster.

5. For each Federal income tax return of each entity listed above, a statement specifying: (a) whether such return is or was ever under any type of examination or audit; (b) the length of such examination or audit; (c) the applicable statute of limitations on such examination or audit; (d) the issue(s) under examination or audit; (e) the reason(s) the return was selected for examination or audit; and (f) the present status of such examination or audit (to include the date and description of the most recent return or return information activity).

6. All administrative files (workpapers, affidavits, etc.) for each Federal income tax return of each entity listed above.

7. If no return was filed for the tax year requested, a statement that the entity or individual did not file a return for such tax year.

\* \* \*

There have been claims that the true and sole purpose of the Committee's inquiry here is to expose former President Trump's tax returns. These claims are wrong. I echo the words of the Supreme Court: "A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information—which not infrequently is true—recourse must be had to others who do possess it."[14] We have a duty to our constituents to eliminate unfairness where we see it, and we have an obligation to do so by legislating in an informed and responsible manner. The Committee will not shy away from its constitutional duty to serve the American people, not in this instance, not ever.

Sincerely,

The Honorable Richard E. Neal, *Chairman*
Committee on Ways and Means

---

[14] *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927).