**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE ON WAYS & MEANS, UNITED STATES HOUSE OF REPRESENTATIVES, | ) ) ) ) |
| *Plaintiff, Counter-Defendant*, | ) ) |
| v. | ) ) ) |
| UNITED STATES DEPARTMENT OF THE TREASURY, *et. al.*, | ) ) ) |
| *Defendants, Cross-Defendants*, | ) ) |
| v. | ) ) ) |
| DONALD J. TRUMP, *et al.*, | ) ) ) |
| *Intervenor-Defendants, Counter-Claimants, Cross-Claimants.* | ) ) ) ) |

No. 1:19-cv-1974 (TNM)

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF CROSS-DEFENDANTS' MOTION TO DISMISS**

Date:  September 9, 2021

BRIAN D. NETTER
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director

ELIZABETH J. SHAPIRO
Deputy Director

JAMES J. GILLIGAN
Special Litigation Counsel

SERENA M. ORLOFF
Trial Attorney

STEVEN A. MYERS
Senior Trial Counsel

CRISTEN C. HANDLEY
Trial Attorney

JULIA A. HEIMAN
Senior Counsel

U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C.  20044
Telephone: (202) 514-3358
E-mail: james.gilligan@usdoj.gov

*Counsel for Defendants, Cross-Defendants*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................3

I.    Statutory Background .................................................................................................3

      A.    History of Section 6103 of the Tax Code. ....................................................3

      B.    The Current Framework ................................................................................5

II.    Factual Background and Procedural History ..............................................................6

      A.    The Committee's 2019 Request for the Trump Parties' Tax Information ...................6

      B.    The Committee's Suit Against Defendants ...................................................8

      C.    The Committee's 2021 Request for the Trump Parties' Tax Information ...................9

      D.    The Trump Parties' Claims Against Defendants and the Committee .........................13

ARGUMENT .....................................................................................................................14

I.    CROSS-CLAIM I FAILS BECAUSE THE COMMITTEE'S LEGISLATIVE PURPOSE  IS VALID ON ITS FACE .....................................................................14

      A.    Congress's Power of Inquiry and the "Legitimate Legislative Purpose" Requirement .............................................................................................15

      B.    The Committee's Stated Legislative Purpose Is Legitimate .........................16

      C.    The Trump Parties' Claims of Pretext Fail as a Matter of Law .....................18

II.    CROSS-CLAIM II FAILS BECAUSE *MAZARS* DOES NOT APPLY TO THE REQUEST, AND EVEN IT IF DID, ANY REVIEW UNDER *MAZARS* IS SATISFIED ...............................................................................................21

      A.    *Mazars* Is Inapplicable on Its Terms ........................................................21

      B.    The Request Does Not Violate *Mazars* ....................................................23

            1.    The Committee's Investigation Warrants the Step of Seeking President Trump's Tax Returns ....................................................24

            2.    The Request Is Not Broader than Necessary .....................................25

            3.    The Committee Has Provided Detailed and Substantial Evidence of Its Purpose ...................................................................26

4.      The Committee's Legislative Purpose Is Not Outweighed by Executive Branch Interests.................................................27

III.    CROSS-CLAIM III FAILS BECAUSE SECTION 6103(F) NEITHER SUPPLIES A BASIS FOR CHALLENGING DISCLOSURE OF TAX INFORMATION NOR EXCLUDES A FORMER PRESIDENT'S INFORMATION FROM ITS SCOPE. ...............................................................................................29

IV.     CROSS-CLAIM IV STATES NO ACTIONABLE FIRST AMENDMENT VIOLATION. ....................................................................................................32

        A.      Cross-Claim IV Fails To State a Claim of First Amendment Retaliation by Defendants, for Lack of Causation, and Otherwise.........................................32

        B.      Assigning Implausibly Pled Motives of Retaliation to Committee Members Furnishes No Ground on Which To Invalidate the Committee's 2021 Request........................................................................................................34

                1.      The Court may not scrutinize Committee members' motives, even on First Amendment grounds.................................................................35

                2.      Cross-Claim IV does not plausibly allege retaliatory motive by the Committee............................................................................................36

V.      CROSS-CLAIM V DOES NOT STATE A VIABLE DUE PROCESS CLAIM .................38

        A.      The Court Lacks Jurisdiction to Consider Cross-Claim V Because It is Neither Constitutionally Nor Prudentially Ripe.........................................38

        B.      Cross-Claim V Also Fails Because Precedent Establishes that Congress May Lawfully Examine—and Even Hold Hearings on—the Same Information as that at Issue in an Ongoing Administrative Matter. ........................................41

VI.     CROSS-CLAIM VI IS UNRIPE AND FAILS TO STATE A SEPARATION OF POWERS CLAIM. ...............................................................................................42

CONCLUSION.................................................................................................................45

## TABLE OF AUTHORITIES

**CASES**

*Abbot Labs. v. Gardner,*
   387 U.S. 136 (1967)................................................................................................40

*Armstrong v. Bush,*
   924 F.2d 282 (D.C. Cir. 1991) ..........................................................................30, 31

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)................................................................................33, 34, 36

*Askins v. Dist. of Columbia,*
   877 F.2d 94 (D.C. Cir. 1989) ..............................................................................41

*AT&T Corp. v. Fed. Commc'ns Comm'n,*
   349 F.3d 692 (D.C. Cir. 2003) ............................................................................40

*ATX, Inc. v. U.S. Dep't of Transp.,*
   41 F.3d 1522 (D.C. Cir. 1994) ........................................................... 39, 41, 42, 43

*Barenblatt v. United States,*
   360 U.S. 109 (1959)..................................................................................1, 3, 19, 35

*Barry v. United States ex rel. Cunningham,*
   279 U.S. 597 (1929)..............................................................................................16

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ........................................................................................33, 34

*Crawford-El v. Britton,*
   523 U.S. 574 (1998) ..............................................................................................33

*D.C. Fed'n of Civic Assn'ns v. Volpe,*
   459 F.2d 1231 (D.C. Cir. 1972) ......................................................................39, 41

*Daugherty v. Sheer,*
   891 F.3d 386 (D.C. Cir. 2018) ............................................................................33

*Doe v. Dist. of Columbia,*
   796 F.3d 96 (D.C. Cir. 2015) ..............................................................................33

*\*Eastland v. U.S. Servicemen's Fund,*
   421 U.S. 491 (1975)........................................................................................passim

*Elec. Privacy Info. Ctr. v. IRS,*
   910 F.3d 1232 (D.C. Cir. 2018) ............................................................................5

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992) ..................................................................................... 30, 31

*FTC v. Owens-Corning Fiberglas Corp.,*
  626 F.2d 966 (D.C. Cir. 1980) ........................................................................15

*Hartman v. Moore,*
  547 U.S. 250 (2006) ..................................................................................... 32, 33

*Hourani v. Mirtchev,*
  796 F.3d 1 (D.C. Cir. 2015) ............................................................................37

*Hutcheson v. United States,*
  369 U.S. 599 (1962) .........................................................................................20

*INS v. Chadha,*
  462 U.S. 919 (1983) .........................................................................................44

*Koniag, Inc. v. Andrys,*
  580 F.2d 601 (D.C. Cir. 1978) .................................................................... 41, 42

*In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig.,*
  720 F.3d 354 (D.C. Cir. 2013) ........................................................................38

*\*McGrain v. Daugherty,*
  273 U.S. 135 (1927) ...............................................................................15, 18, 20

*Nat'l Park Hospitality Ass'n v. Dep't of Interior,*
  538 U.S. 803 (2003) .........................................................................................40

*Nieves v. Bartlett,*
  139 S. Ct. 1715 (2019) ....................................................................................32

*\*Nixon v. Adm'r of Gen. Servs.,*
  433 U.S. 425 (1977) .............................................................................23, 28, 44

*Nurriddin v. Bolden,*
  818 F.3d 751 (D.C. Cir. 2016) ........................................................................37

*Patton Boggs LLP v. Chevron Corp.,*
  683 F.3d 397 (D.C. Cir. 2012) ........................................................................37

*Peter Kiewit Sons' Co. v. U.S. Army Corps of Eng'rs,*
  714 F.2d 163 (D.C. Cir. 1983) .................................................................... 39, 40

*Pillsbury Co. v. FTC,*
  354 F.2d 952 (5th Cir 1966) ...........................................................................42

*Renne v. Geary,*
  501 U.S. 312 (1991) ..................................................................................................38

*Scahill v. Dist. of Columbia,*
  909 F.3d 1177 (D.C. Cir. 2018) ...............................................................................33

*Schaghticoke Tribal Nation v. Kempthorne,*
  587 F. Supp. 2d 389 (D. Conn. 2008) ................................................................ 41, 43

*Tax Analysts v. IRS,*
  117 F.3d 607 (D.C. Cir. 1997) ............................................................................ 5, 23

*Tenney v. Brandhove,*
  341 U.S. 367 (1951) .........................................................................................19, 34, 37

*Texas v. United States,*
  523 U.S. 296 (1998) .........................................................................................39, 40, 42

*Townsend v. United States,*
  95 F.2d 352 (D.C. Cir. 1938) ....................................................................................15

*Trump v. Mazars USA, LLP,*
  140 S. Ct. 2019 (2020) ........................................................................................*passim*

*Trump v. Mazars USA, LLP,*
  940 F.3d 710 (D.C. Cir. 2019) ..................................................................................20

*Trump v. Mazars,*
  2021 WL 3602683 (D.D.C. Aug. 11, 2021), *appeal filed,*
  Nos. 21-5176 & 21-5177 (D.C. Cir. Aug. 16, 2021) ........................................*passim*

*Watkins v. United States,*
  354 U.S. 178 (1957) .............................................................................................*passim*

*Wilkinson v. United States,*
  365 U.S. 399 (1961) ............................................................................................ 18, 35

*Wyoming Outdoor Council v. U.S. Forest Serv.,*
  165 F.3d 43 (D.C. Cir. 1999) ....................................................................................38

## STATUTES

26 U.S.C. § 6103 ..................................................................................................*passim*

26 U.S.C. §§ 6211–13 .................................................................................................39

26 U.S.C. § 6532 ........................................................................................................39

26 U.S.C. § 7213 ..........................................................................................................5

26 U.S.C. § 7422 .................................................................................................39

26 U.S.C. § 7431 ...................................................................................................5

28 U.S.C. § 1346 .................................................................................................39

Internal Revenue Code of 1954, 68A Stat. 1 ........................................................4

Pub. L. No. 68-176, 43 Stat. 253 (1924) ...............................................................4

Pub. L. No. 94-455, 90 Stat. 1520 (1976), *codified at* 26 U.S.C. § 6103 ............4

## U.S. CONSTITUTION

U.S. Const. art. I, § 8 ..........................................................................................17

U.S. Const. art. I, § 9 ..........................................................................................17

U.S. Const. art. II § 3 ............................................................................................7

## OTHER AUTHORITIES

5 Op. O.L.C. 27, 31 (1981) ............................................................................ 43, 44

10 Op. O.L.C. 68, 76 (1986) .......................................................................... 43, 44

*Confidentiality of Tax Return Information: Hearing Before the H. Comm. on Ways and Means*,
    94th Cong. 154 (1976) ...................................................................................28

*Congressional Access to Tax Returns Under 26 U.S.C. § 6103(f)*, 1 Op. O.L.C. 85 (1977) ............................5

Congressional Committee's Request for the President's Tax Returns Under 26 U.S.C. § 6103(f),
    43 O.L.C. Op. __ (June 13, 2019),
    https://www.justice.gov/olc/opinion/congressional-committee-s-request-president-s-tax-returns-under-26-usc-6103f ................................................................ 6, 7, 17

*Ways and Means Committee's Request for the Former President's Tax Returns and Related Tax
    Information Pursuant to 26 U.S.C. § 6103(f)(1))*,
    45 O.L.C. Op. __ (July 30, 2021),
    https://www.justice.gov/olc/file/1419111/download ........................................*passim*

David Leanhardt, 18 Revelations From a Trove of Trump Tax Records (Sept. 27, 2020),
    https://www.nytimes.com/2020/09/27/us/trump-taxes-takeaways.html ......................................19

George K. Yin, Preventing Congressional Violations of Taxpayer Privacy,
    69 Tax Lawyer 103, (2015),
    https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2628193 .................................. 3, 4

H.R. Rules, 117th Cong., Rule X (Feb. 2, 2021) ........................................... 17, 18

H.R. 347, 117th Cong. (introduced Jan. 19, 2021) ...................................................................17

https://waysandmeans.house.gov/subcommittees/ways-and-means-117th-congress.......................36

IRM § 3.28.3 ...................................................................................................................10

IRM § 3.28.3.5 ................................................................................................................26

IRM § 11.3.4.4 ........................................................................................................... 41, 44

Joint Committee on Taxation, *Background Regarding the Confidentiality and Disclosure of Federal Tax Returns* (Feb. 4, 2019),
    https://www.jct.gov/publications.html?func=startdown&id=5159 ...................................4

Joint Committee on Taxation, *General Explanation of the Tax Reform Act of 1976* (1976).........................4

S. Rep. No. 94-938 (1976) ...................................................................................................4

Scope of Congressional Oversight and Investigative Power With Respect to the
    Executive Branch, 9 Op. O.L.C. 60 (1985) ..............................................................15

*The authorities upon which we chiefly rely are marked with asterisks.*

## INTRODUCTION

In June 2021, the Chairman of the House Committee on Ways and Means ("the Committee") invoked 26 U.S.C. § 6103(f)(1) to solicit from the Department of the Treasury ("Treasury") certain tax returns and return information pertaining to former President Donald Trump and eight associated business entities (collectively, the "Trump parties"). Treasury sought the advice of the Department of Justice's Office of Legal Counsel ("OLC"), which determined that the request was valid and should be fulfilled.

Through a series of cross-claims and counterclaims, the Trump parties seek now to prohibit Treasury from fulfilling the Committee's request. The Trump parties' claims lack legal merit and should be dismissed.

*First*, the Trump parties ask the Court to determine that the Committee's request is void because it allegedly lacks a "legitimate legislative purpose." But "[s]o long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Barenblatt v. United States*, 360 U.S. 109, 132 (1959). Here, the operative request spells out in detail the Committee's interest in legislation relating to the mandatory audit program for sitting presidents ("Presidential Audit Program"), in presidential business entanglements and conflicts of interest, and in possible foreign influences on the President. These subjects are ones "on which legislation could be had," *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 506 (1975), so the Trump parties' claim necessarily fails.

*Second*, the Trump parties challenge the request under *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020), which identified considerations bearing on whether a legislative subpoena can be enforced against the President. But Donald Trump is not the President, so this case does not pose the "palpable" "clash between rival branches of government" presented in *Mazars*, 140 S. Ct. at 2034-35. Here, the Legislature and the Executive Branch agree on the path forward. In any event, the request poses few, if any, burdens on the Executive Branch and serves an important legislative function pursuant to a duly enacted statutory authorization. So any inter-branch balancing of interests

under a *Mazars*-type analysis counsels against judicial intervention to override the Executive-Legislative agreement.

*Third*, the Trump parties invoke section 6103(f) itself.  But section 6103(f) provides no basis for a claim by a taxpayer whose tax information[1] has been requested.  Even if it did, the Committee's request is plainly consistent with the statutory text; the Trump parties' request for a statutory interpretation that accounts for supposed separation-of-powers concerns fails for the same reasons as their other separation-of-powers theories.

*Fourth*, the Trump parties assert a claim under the First Amendment for retaliation.  But to state such a claim, a litigant must adequately allege that his or her protected expression is the "but for" cause of the alleged retaliatory act.  Yet the reason for Defendants' intended release of the Trump parties' tax information to the Committee is the unconditional command of section 6103(f)(1), regardless of any protected expression by any of the Trump parties or Defendants' views thereof.  So far as this claim would call on the Court, even for First Amendment reasons, to probe the motives of individual legislators who support the Committee's request, it is foreclosed by decades of Supreme Court precedent.  In any event, the Trump parties have not plausibly alleged retaliatory motive on the part of Defendants or the Committee.

*Fifth*, the Trump parties further contend that disclosure of information responsive to the Committee's 2021 Request would violate their due process rights, on the theory that congressional review would somehow taint alleged ongoing audits of the Trump parties' returns.  This claim is grounded in speculation.  If any alleged audits were to result in unfavorable determinations, the appropriate recourse would be to litigate those determinations.  There is also nothing anomalous about a congressional inquiry that runs parallel to an ongoing administrative proceeding.  Thus, even if this claim were ripe it would fall far short of stating a claim for a violation of the Trump parties' due-process rights.

---

[1] "Return" and "return information" are defined terms under the Internal Revenue Code and do not encompass all types of tax information.  *See* 26 U.S.C. § 6103(b)(1)-(2).  For ease of reference, and because this lawsuit does not turn on those definitions, this motion uses the term "tax information" to mean "returns" and "return information" collectively as defined under the statute.

*Sixth*, the Trump parties assert a freestanding claim based on supposed separation-of-powers violations. That claim stems from the assumption—unsupported by factual allegations and undermined by the Committee's stated intentions—that the Committee will use the requested information to interfere with the alleged ongoing IRS audit in a manner that injures the Trump parties. Such speculative allegations do not amount to a ripe controversy. Additionally, even if this claim were ripe, it should still be dismissed, as congressional requests for information, including information that is the subject of an ongoing administrative proceeding such as an alleged IRS audit, do not inherently violate the separation of powers. In this case, the Executive Branch has properly determined that the Committee has asserted valid legislative purposes and its request comports with the considerations identified in *Mazars*. Thus, the Committee's request *a fortiori* does not amount to a separation-of-powers violation.

## BACKGROUND

### I. STATUTORY BACKGROUND

#### A.      History of Section 6103 of the Tax Code

Since the late 1800s, Congress has endeavored to balance the privacy interests of federal taxpayers with its own needs, and the needs of other government actors, for access to tax information. *See* George K. Yin, Preventing Congressional Violations of Taxpayer Privacy, 69 Tax Lawyer 103, 105, 119-136 (2015), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2628193 (hereinafter "Taxpayer Privacy"). Immediately following the enactment of the first personal income tax in 1862, the tax laws permitted unrestricted public access to individual taxpayer returns—a system that drew criticism for invading privacy rights and discouraging voluntary tax reporting. *Id.* at 154. Accordingly, in 1894, Congress made it a misdemeanor to disclose certain tax information outside of the tax agency, *id.* at 119, and in 1921 tightened that protection to permit inspection of tax information "only by order of the President under rules prescribed by the Treasury Secretary," *id.* (citation omitted).

Following the Coolidge Administration's refusal to furnish the tax records of officials suspected of involvement in the Teapot Dome scandal, Congress adjusted this framework to provide

3

a direct right of access to tax information for certain congressional committees.  *See id.* at 120-24.  The Revenue Act of 1924 provided that the Ways and Means Committee, the Senate Finance Committee, "or a special committee of the Senate or House, shall have the right to call on the Secretary of the Treasury for, and it shall be his duty to furnish, any data of any character contained in or shown by [tax] returns . . . that may be required by the committee[.]"  Pub. L. No. 68-176, § 257(a), 43 Stat. 253, 293 (1924).  Congress amended this provision two years later, first to limit this right of access by nontax committees to "joint" and "select" committees "specially authorized to investigate returns by a resolution" of the Senate and/or House, and second, to require any committee invoking this access to sit in executive session to receive tax information.  *See* Taxpayer Privacy, 69 Tax Lawyer at 126.  The Internal Revenue Code of 1954, ch. 736, § 6013(d)(1), (2), 68A Stat. 1, 754-55, re-enacted these provisions in the precursor to the current section 6103(f).

In 1976, Congress tightened the disclosure rules again amidst "publicity regarding possible misuse of tax information" by the Nixon Administration.  Joint Committee on Taxation, *Background Regarding the Confidentiality and Disclosure of Federal Tax Returns* ("JCT Report") at 6 (Feb. 4, 2019), https://www.jct.gov/publications.html?func=startdown&id=5159; *see also* S. Rep. No. 94-938, pt. 1, at 19, 317-18 (1976).  Whereas tax returns had previously been deemed "public records," the 1976 Act removed that designation and provided expressly that tax returns (and return information) "shall be confidential."  Pub. L. No. 94-455 § 1202, 90 Stat. 1520, 1667 (1976), *codified at* 26 U.S.C. § 6103(a).  Government officials with access to tax information therefore may not disseminate it without authorization.  Congress also codified the thirteen regulatory exceptions to nondisclosure and removed the ability of the Secretary or the President to create new ones.  *See* Taxpayer Privacy, 69 Tax Lawyer at 131.  In so doing, Congress sought to balance the citizen's right to privacy with "the particular office or agency's need for the information involved," Joint Committee on Taxation, *General Explanation of the Tax Reform Act of 1976*, JCS-33-76, at 315 (1976), including the needs of Congress, "particularly its tax-writing committees . . . [for] access in certain instances to returns and return information in order to carry out its legislative responsibilities[.]"  S. Rep. No. 94-938, pt. 1 at 320.

The 1976 Act also tightened the procedural requirements for Congress to obtain and review tax information, *see Congressional Access to Tax Returns Under 26 U.S.C. § 6103(f)*, 1 Op. O.L.C. 85, 89 (1977), but otherwise did not disrupt the longstanding practice of according the tax committees mandatory access to tax information upon request.

###    B.    The Current Framework

The general framework established in 1976 persists today.  Section 6103 provides that "tax returns" and "return information" "shall be confidential and, except as authorized by [the Internal Revenue Code] . . . no officer or employee of the United States . . . shall disclose any return or return information obtained by him in any manner[.]"  26 U.S.C. § 6103(a).  "Return" and "return information" are defined broadly to encompass information maintained by the IRS relating to tax reporting, liabilities, and administration.  *Id.* § 6103(b)(1)-(2); *see also* supra note 1.  A willful unauthorized disclosure of tax information is a felony, *id.* § 7213(a)(1)-(2), and a taxpayer whose information has been subject to unauthorized inspection or disclosure may, under certain circumstances, seek damages, *id.* § 7431.

Section 6103 sets forth "thirteen tightly drawn categories of exceptions" to the confidentiality of tax information, *Elec. Privacy Info. Ctr. v. IRS*, 910 F.3d 1232, 1237 (D.C. Cir. 2018); *see* 26 U.S.C. § 6103(c)–(o), pursuant to which the Secretary and the IRS Commissioner act as the "gatekeepers of federal tax information."  *Tax Analysts v. IRS*, 117 F.3d 607, 613 (D.C. Cir. 1997).  The exception for disclosure to congressional tax committees set forth in section 6103(f)(1) is the exception at issue in this lawsuit.  As relevant here, paragraph (f)(1) provides that, upon written request from the Committee on Ways and Means of the House of Representatives, the Committee on Finance of the Senate, or the Joint Committee on Taxation (collectively, the "tax committees"), the Secretary "shall furnish" such committee with any specified tax information, except that, absent consent of the taxpayer, any such information "which can be associated with . . . a particular taxpayer shall be furnished to such committee only when sitting in closed executive session."  26 U.S.C. § 6103(f)(1). Tax information so obtained by one of the tax committees, including information associated with

individual taxpayers, may be submitted to the Senate, the House, or both.  *Id.* § 6103(f)(4)(A); *compare id.* § 6103(f)(4)(B).  Nontax committees continue to enjoy only much more limited rights of access, requiring authorization by resolution of the House and/or Senate.  *Id.* § 6103(f)(3).

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    The Committee's 2019 Request for the Trump Parties' Tax Information

As alleged by the Trump parties,[2] during the 2016 presidential election campaign, then-candidate Donald J. Trump declined to release his tax returns publicly, citing allegedly ongoing IRS audits.  Cross-Claim ¶ 1.  That choice, which broke a decades-long practice among major-party nominees, prompted questions that the undisclosed returns might reveal "a Russia connection," foreign government entanglements, and Emoluments Clause violations.  *Id.* ¶ 4.

Following the 2018 mid-term elections, Representative Richard E. Neal became Chairman of the Committee.  In an April 3, 2019, letter to the IRS, Chairman Neal, formally invoking 26 U.S.C. § 6103(f)(1), requested that the IRS produce President Trump's individual tax returns and the returns for eight associated business entities for the tax years 2013-2018, together with the administrative files associated with each return (the Committee's "2019 Request").  Cross-Claim ¶ 12; *see* Congressional Committee's Request for the President's Tax Returns Under 26 U.S.C. § 6103(f) ("2019 OLC Op."), 43 O.L.C. Op. __, at *12-13, https://www.justice.gov/olc/opinion/congressional-committee-s-request-president-s-tax-returns-under-26-usc-6103f.  Chairman Neal explained that the information requested was necessary to "determin[e] the extent to which the IRS audits and enforces the Federal tax laws against a president."  Cross-Claim ¶ 12.

On May 6, 2019, after consulting with OLC, the Secretary of the Treasury denied the Committee's 2019 Request.  Cross-Claim ¶ 15; 2019 OLC Op. at 14.  In a letter to Chairman Neal, the Secretary explained (in the Trump parties' words), that Defendants "could not comply with the

---

[2] Except as otherwise noted, the factual background presented here is based on the facts as alleged in the Trump parties' Answer and Counterclaims/Cross-Claims, ¶¶ 1-55, ECF No. 113 ("Cross-Claim") at 13-36.  Defendants reserve the right, however, to contest the Trump parties' allegations, and/or their ability to prove their allegations, as may be necessary or appropriate in further proceedings.

Committee's request" because "[a]fter compiling and reviewing over 40 pages of Democrats' public statements," the Secretary had "concluded that the Committee's request lacked a legitimate legislative purpose," Cross-Claim ¶ 15, and therefore "section 6103(f) would not authorize disclosure," 2019 OLC Op. at 14.[3]

In a formal opinion published on June 13, 2019, OLC memorialized its advice to Defendants concerning the 2019 Request. *See generally* 2019 OLC Op.; *see also* Cross-Claim ¶¶ 16-17. OLC found that the Constitution required the Committee to establish "a legitimate legislative purpose in support of its request for [President Trump's] tax returns" before their release could be authorized under section 6103(f); and that the Executive Branch was required both to "examine evidence that may bear upon the Committee's true objective," 2019 OLC Op. at 17, 19, and "determine whether a congressional request to disclose confidential tax information under section 6103(f) . . . has been made in furtherance of a legitimate legislative purpose," *id.* at 21. Turning to the public record, OLC concluded that the stated purpose of the 2019 Request—"to consider legislation regarding the IRS's practices in auditing presidential tax filings"—was "implausible," and that the Committee's true purpose was "forcing the public disclosure of [President Trump's] tax returns," *id.* at 26, 29-30. "Given that Congress may not pursue public disclosure for its own sake," OLC concluded that the 2019 Request lacked a legitimate legislative purpose, that it "did not qualify," accordingly, "for the statutory exception to taxpayer confidentiality" under section 6103(f)(1), and that "section 6103(a) therefore required [Defendants] to maintain confidentiality of the requested tax information." *Id.* at 17, 31.[4]

---

[3] Four days later, on May 10, 2019, Chairman Neal served subpoenas on the Secretary and the Commissioner of the IRS for largely the same information requested in the Committee's 2019 Request. On May 17, 2019, Defendants declined to produce the records sought by the Committee. *See* 2019 OLC Op. at 14-15.

[4] According to the Trump parties, OLC found that the Committee's specific purpose in seeking to expose the "private tax information" of President Trump was "political gain." Cross-Claim ¶ 83. OLC made no such finding. *See generally* 2019 OLC Op.

### B.     The Committee's Suit Against Defendants

The Committee initiated this action on July 2, 2019, seeking declaratory and injunctive relief to compel Defendants' compliance with the Committee's 2019 Request (and related subpoenas). Compl. for Decl. & Inj. Relief ¶¶ 1, 9 (ECF No. 1); *id.* at 48 (Prayer for Relief).  The Committee alleged that it was "investigating the IRS's administration of various tax laws and policies relating to Presidential tax returns and tax law compliance by President Trump, including whether the IRS's self-imposed policy of annually auditing the returns of sitting Presidents is working properly[.]"  *Id.* ¶ 4. "Without reviewing the requested return materials," the Committee maintained, it "[could] not ensure that the IRS's audit process is functioning fairly and effectively, understand how provisions of the tax code are implicated by President Trump's returns, or exercise its legislative judgment to determine whether changes to the code may be warranted."  *Id.* ¶ 6.  To redress this deprivation of information necessary to the completion of its investigation, and the performance of its "most basic constitutional functions," the Committee requested an order directing Defendants "to comply with Section 6103(f) and [its] subpoenas by producing the requested information immediately."  *Id.* ¶ 9.

On July 17, 2019, the Trump parties moved "to intervene as defendants and oppose the Committee's suit," Unopposed Motion To Intervene [etc.] at 1 (ECF No. 12), in order to protect their interest "in preventing the disclosure of their confidential tax information," *id.* at 2-4.  The Court granted the motion the following day.  Order (ECF No. 14).  On September 6, 2019, Defendants and the Trump parties jointly moved to dismiss the Committee's complaint, on the grounds that the Committee's informational dispute with the Executive Branch did not present an Article III case or controversy, that the Court lacked statutory subject-matter jurisdiction, that the Committee lacked a cause of action, and that the Committee had failed to state claims on which relief could be granted. *See generally* Mem. of Pt. & Auths. in Supp. of Defs.' & Def-Intervenors' Mot. To Dismiss (ECF No. 44).[5]

---

[5]  By this time, the Committee had already moved for summary judgment on the merits of its claims, *see generally* Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. (ECF No. 29-2).  On August 29, 2019, the Court denied the Committee's motion, without prejudice, pending resolution of the

Following briefing and argument on Defendants' and the Trump parties' motion, the Court stayed this action pending a ruling in *Committee on the Judiciary, United States House of Representatives v. McGahn*, No. 1:19-cv-5331 (D.C. Cir.), which presented many of the same jurisdictional and other threshold issues raised by Defendants and the Trump parties in support of dismissal.  Tr. of Tel. Conf. (Jan. 14, 2020) at 3, 10-11 (ECF No. 78); Docket Entry (Jan. 14, 2020) ("Case stayed").  When the *McGahn* panel ruled that Article III forbids federal courts from resolving inter-branch informational disputes, and the D.C. Circuit granted rehearing *en banc*, the Court again stayed the case, pending further order.  *See* Order (ECF No. 91).

## C.        The Committee's 2021 Request for the Trump Parties' Tax Information

The case remained stayed through the 2020 election.  As the expiration of Donald Trump's term as President approached, the Trump parties moved for a status conference on January 19, 2021.  Mot. For Status Conf. at 1-2 (ECF No. 100).  At the status conference, the Trump parties sought to ensure that they could adjudicate their arguments against disclosure before any release of their tax information to the Committee occurred.  *Id.* at 2-3.  As requested, the Court held a status conference on January 22, 2021, at which it was agreed that the new Administration would be given time to determine its position on releasing the Trump parties' tax information to the Committee.  In the meantime, Defendants would be required to provide 72 hours' notice to the Trump parties' counsel before any such release.  Tr. of Tel. Status Conf. (Jan. 22, 2021) at 11, 15, 17-18 (ECF No. 104).  *See also* Mot. for Status Conf. at 2: Minute Order (Jan. 14, 2021).  Thereafter, incoming leadership at the Departments of Justice and the Treasury evaluated Defendants' position, *see* Joint Status Reports (Feb. 3 and Mar. 3, 2021) (ECF Nos. 102, 105), and on March 31, 2021, Defendants and the Committee informed the Trump parties and the Court that they had begun communications that might inform Defendants' position.  Joint Status Report (Mar. 31, 2021) (ECF No. 106); *see also* Joint Status Reports (Apr. 30, May 28, and July 2, 2021) (ECF Nos. 107-09).

---

threshold issues to be presented in Defendants' and the Trump parties' then forthcoming motion to dismiss.  Mem. & Order (ECF No. 38).

On June 16, 2021, Chairman Neal sent correspondence to the Secretary of the Treasury and the Commissioner of the IRS making a request, pursuant to section 6103(f)(1), for the individual tax returns of President Trump and the same eight associated business entities named in the 2019 Request, for the tax years 2015-2020. *See* Joint Status Report (July 30, 2021) Exh. A at 6-7 (ECF No. 111) ("2021 Request"). The 2021 Request also seeks the administrative files for each requested return. *Id.*

The Committee's 2021 Request explains that, to ensure the full and fair administration of the tax laws, the Committee "has been considering legislative proposals and conducting oversight related to our Federal tax laws, including, but not limited to, the extent to which the IRS audits and enforces the Federal tax laws against a President." *Id.* at 1, 2. In particular, the Committee expressed "serious concerns" that the IRS's mandatory Presidential Audit Program, *see* Internal Revenue Manual ("IRM") § 3.28.3 (2020), may not be "advancing the purpose for which it was created"—thus necessitating legislation—because many of its provisions are outdated, and disregarded; they do not account for a President, like President Trump, with hundreds of businesses and inordinately complex returns; and they do not include explicit safeguards in the event a President interferes with an audit. 2021 Request at 2.

The Committee also explained the importance of individual tax information to its inquiry. To understand how the Presidential Audit Program operates in practice, the Committee seeks information about the audit of an actual taxpayer to ascertain, among other things, (i) whether IRS agents are shielded from improper interference by a President or his representatives; (ii) whether agents look at ongoing audits that predate a President's term in office; (iii) whether agents review a President's underlying business activities, and have access to the necessary books and records to substantiate amounts on the tax return; and (iv) whether agents have access to the necessary resources to undertake an exhaustive review of a complex taxpayer. *Id.* at 3. The Committee also set forth at length the reasons why it considers President Trump's tax information, in particular, to be instructive and "indispensable" to its inquiry. *See generally id.* at 3-6. For example, the inordinate size and complexity of his returns, reflecting his control of more than 500 businesses through a revocable trust, make him

"markedly different from other Presidents" examined under the Presidential Audit Program, and raise questions such as whether any audits of his returns included review and substantiation of his underlying domestic and foreign business activities.  *Id.* at 4-5.  President Trump's public criticism of his treatment by the IRS, both before and during his term in office, also has raised "serious questions" in the Committee's mind about the ability of IRS agents "to freely enforce the tax laws against him." *Id.* at 4, 5-6.

On these grounds the Committee found "ample reason" to question whether the provisions of the Presidential Audit Program are "sufficiently robust" and can function as intended for a President whose taxpayer history "is as complex as former President Trump's."  *Id.* at 6.  "To be sure that the [Presidential Audit Program] will work for all future President-taxpayers (including those with similarly complex taxes)," the Committee concluded that it "must see how the program fared under the exceedingly challenging circumstances presented by former President Trump." *Id.*

In addition to its concerns about the proper functioning of the Presidential Audit Program, the Committee also observed that "President Trump's tax returns could reveal hidden business entanglements raising tax law and other issues, including conflicts of interest, affecting proper execution of [his] responsibilities," as well as "foreign financial influences on former President Trump that could inform relevant congressional legislation."  *Id.* at 4.

The day following its receipt of the Committee's 2021 Request, Treasury wrote to OLC seeking its legal opinion "as to whether the Secretary must furnish the requested returns and return information to the Committee."  *See Ways and Means Committee's Request for the Former President's Tax Returns and Related Tax Information Pursuant to 26 U.S.C. § 6103(f)(1)*, 45 Op. O.L.C. ___, at 17 (Joint Status Report (July 30, 2021) Exh. B ("2021 OLC Op.").  In a formal opinion published on July 30, 2021, OLC found "ample basis to conclude" that the Committee's 2021 Request "would further the Committee's principal stated objective of assessing" the Presidential Audit Program, and that its "additional stated objectives" for reviewing the Trump parties' tax information "are also legitimate."

*Id.* at 4.  OLC concluded "that Treasury must furnish the information specified" in the Committee's 2021 Request.  *Id.* at 3, 39.

The 2021 OLC Opinion first explained how its mode of analysis differed from the 2019 opinion.  *See id.* at 18-26.  To give "due weight to Congress's status as a co-equal branch of government with legitimate needs for information in order to exercise its constitutional authorities," the 2021 opinion concluded that the Executive Branch must extend the same presumption of good faith and regularity to facially valid congressional requests for information that courts extend to the official acts of the political branches.  *Id.* at 19; *see id.* at 22-23.  Requests under section 6103(f)(1) should be accorded an even stronger presumption, OLC explained, inasmuch as section 6103(f)(1) embodies a century-old judgment by both political branches (not merely the determination of a committee of one house) that the congressional tax committees should have a "statutorily unlimited right of access to tax information," and can be relied on to exercise that authority in a deliberate and responsible manner. *Id.* at 23-24.  Absent "exceptional circumstances" in which "a committee's asserted purpose truly blinks reality," the presumption of good faith and regularity should not be overcome.  *Id.* at 26, 38-39.   The fact that a committee's request for information "might serve partisan or other political interests," OLC observed, "is generally irrelevant to assessing its constitutionality[.]"  *Id.*

The 2021 opinion recognized that *Trump v. Mazars*, 140 S. Ct. 2019 (2021), held that the deference owed a congressional subpoena "should be tempered" where a committee seeks the private financial information of a sitting President.  2021 OLC Op. at 27 (citing *Mazars*, 140 S. Ct. at 2035). OLC concluded, however, that the separation-of-powers concerns animating the decision in *Mazars*— the use of Congress's investigatory power to exert control over a President—are "mitigate[d]" and "much less pronounced" in this instance because the Committee's 2021 Request seeks the tax information of a former President who has "return[ed] to life as a private citizen."  *Id.* at 28.  OLC also noted that "the Committee made the June 2021 Request not simply pursuant to a subpoena, but pursuant to a statute that embodied the considered judgment of the political branches going back

nearly a century about the access that should be afforded the tax committees," *id.*, thus further mitigating the concerns undergirding *Mazars*.

Applying this analytical framework to the 2021 Request, OLC concluded that the Committee had invoked subjects of inquiry on which legislation might be had and "articulated in some detail" why the Trump parties' tax information is relevant to informing Congress about them. *Id.* at 29; *see generally id.* at 29-39. In particular, the 2021 OLC Opinion explained why the years covered by the 2021 Request—"well-aligned" with the Committee's interest in the Presidential Audit Program—and its detailed explanation of the reasons why President Trump's tax information is important to understanding how the Presidential Audit Program "works under conditions of stress," address shortcomings that the 2019 OLC Opinion found in the Committee's 2019 Request. *Id.* at 31-34. Additionally, OLC concluded that the Committee's interests in discovering potential "business entanglements," "conflicts of interest," or "foreign financial influences" that could raise "tax law and other issues," are "independently sufficient to justify" the 2021 Request. *Id.* at 34-37. In light of its facial validity, the possibility that some members of Congress might hope to embarrass President Trump or profit politically from the exposure of his tax information "would not serve to invalidate the Committee's request." *Id.* at 38-39. Based on these conclusions, OLC advised Treasury "that the Secretary must comply" with the Committee's 2021 Request in accordance with section 6103(f)(1), and "furnish the Committee with the specified tax returns and return information." *Id.* at 39.

### D.   The Trump Parties' Claims Against Defendants and the Committee

On July 30, 2021, concurrent with the publication of the 2021 OLC Opinion, Defendants informed the Court, the Committee, and the Trump parties that Treasury intends to comply with the Committee's 2021 Request, in accordance with the conclusions reached by OLC. Joint Status Report (July 30, 2021) at 2.[6] In light of this representation, on August 4, 2021, the Committee filed a motion

---

[6] Defendants further advised they would forbear from producing the requested tax information to the Committee "pending a suitable schedule for expedited submission, briefing, and resolution by [the] Court of any claims the Defendant-Intervenors wish to raise." Joint Status Report (July 30, 2021) at 3. The Court issued a Minute Order, also on July 30, 2021, directing that "[p]ending resolution of those proceedings, and in light of the Administration's agreement, Defendants shall provide 72 hours' notice to counsel for the [Trump parties] before any release of the tax return information at issue."

for voluntary dismissal of its claims against Defendants, which the Court granted.  Mot. for Voluntary Dismissal Without Prejudice (ECF No. 115); Minute Order (Aug. 5, 2021).  The same day the Trump parties filed counterclaims and cross-claims, respectively, against the Committee and Defendants, seeking declaratory and injunctive relief against the disclosure of their tax information.  Answer and Counterclaims/Cross-Claims ("Cross-Claim") (ECF No. 113).

The Trump parties raise six claims, on the basis of which they maintain that the release of their tax information to the Committee should be prohibited.  The first two claims, raised against Defendants and the Committee, assert that the 2021 Request for production of the Trump parties' tax information "lack[s] a legitimate legislative purpose," Cross-Claim ¶¶ 56-65, and that it "fail[s]" the "heightened standard" for congressional informational requests "that implicate the separation of powers" articulated in *Mazars*, *id.* ¶¶ 66-71.  The remaining four claims, brought against Defendants only, assert that section 6103(f)(1) "does not . . . authorize the Committee[ ] . . . to request the returns or return information of a President or former President," *id.* ¶¶ 72-77; that the Committee's request, and Defendants' intended compliance therewith, constitute unlawful retaliation in violation of the First Amendment; *id.* ¶¶ 78-88; and that submission of the Trump parties' tax information to the Committee while they allegedly remain under audit violates both their due-process rights; *id.* ¶¶ 89-95; and the separation of powers, *id.* ¶¶ 96-102.  None of these claims has merit.

## ARGUMENT[7]

## I.  CROSS-CLAIM I FAILS BECAUSE THE COMMITTEE'S LEGISLATIVE PURPOSE IS VALID ON ITS FACE.

In Cross-Claim I, the Trump parties assert that the 2021 Request lacks a "legitimate legislative purpose" because the "primary purpose of the request[] is to obtain and expose [the Trump parties' tax] information for the sake of exposure, to improperly conduct law enforcement, or some other impermissible goal—not to study federal legislation."  Cross-Claim ¶ 64.  As the *Mazars* district court observed on remand from the Supreme Court, "no court has accepted" this theory, also advanced by

---

[7]  Defendants incorporate by reference the legal standards section included in the Committee's separate motion to dismiss.

President Trump in that case.  *Trump v. Mazars*, 2021 WL 3602683, at *9 (D.D.C. Aug. 11, 2021), *appeal filed*, Nos. 21-5176 & 21-5177 (D.C. Cir. Aug. 16, 2021) (*Mazars II*).  It fails here as well.

### A.      Congress's Power of Inquiry and the "Legitimate Legislative Purpose" Requirement

The Supreme Court has long recognized that the "power of inquiry" is "an essential and appropriate auxiliary to the legislative function."  *Mazars*, 140 S. Ct. at 2031 (citing *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927)); *see also Eastland*, 421 U.S. at 504 ("the power to investigate is inherent in the power to make laws").  This power belongs to each of the two houses of Congress independently, *see McGrain*, 273 U.S. at 173, and is rooted in the understanding that a "legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change[.]"  *Id.* at 175.  The power encompasses, among other things, "inquiries into the administration of existing laws, studies of proposed laws, and 'surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them.'"  *Mazars*, 140 S. Ct. at  2031 (citing *Watkins v. United States*, 354 U.S. 178, 187 (1957)); *see also* Scope of Congressional Oversight and Investigative Power With Respect to the Executive Branch, 9 Op. O.L.C. 60, 60 (1985) (it is "beyond dispute" that Congress may obtain information "pertinent to possible legislation and in order to evaluate the effectiveness of current laws").

The congressional power of inquiry is "broad," but it is not unlimited.  *Mazars*, 140 S. Ct. at 2031.  Its exercise must serve a "valid legislative purpose" in that it must be "related to, and in furtherance of, a legitimate task of Congress" and "concern a subject on which legislation could be had."  *Id.*  The power may not be used for non-legislative purposes, such as for "law enforcement" or to "try someone before a committee for any crime or wrongdoing."  *Id.* at 2032.  Also, Congress "has no general power to inquire into private affairs" or "compel disclosures" simply to "expose for the sake of exposure."  *Id.*  Nevertheless, while an inquiry into private matters must be "justif[ied] in terms of the functions of the Congress," *Watkins*, 354 U.S. at 187, the mere fact that an inquiry might call for information that is private or confidential does not render it illegitimate.  *See, e.g.*, *id.* at 199 (noting that an inquiry is not barred simply because it "compel[s] disclosure of private matters"); *FTC v. Owens-*

15

*Corning Fiberglas Corp.*, 626 F.2d 966, 970 (D.C. Cir. 1980) (enforcing congressional request for information that constituted trade secrets); *Townsend v. United States*, 95 F.2d 352, 361 (D.C. Cir. 1938) (the fact that the subject of a congressional inquiry might feel "embarrassed" by inquiries "which to him seemed incompetent, irrelevant" or even "impertinent" is generally immaterial). And, in assessing the legitimacy of a legislative purpose, courts generally afford Congress "every reasonable indulgence of legality." *Watkins*, 354 U.S. at 204; *see also Barry v. United States ex rel. Cunningham*, 279 U.S. 597, 619 (1929) ("the proceedings of the houses of Congress, when acting upon matters within their constitutional authority" are entitled to a "presumption in favor of regularity").

### B.     The Committee's Stated Legislative Purpose Is Legitimate

Here, the Executive Branch applied these principles to determine that the subjects the Committee invoked in seeking the requested tax information are ones upon which legislation might be had; that the information requested is relevant to informing Congress about them; that the Committee has been authorized to seek that information; and that there is no basis for looking behind the Committee's stated objectives.  2021 OLC Op. at 20.  These conclusions are correct as a matter of law, and the Trump parties' allegations do not plausibly suggest otherwise.

The 2021 Request sets forth the Committee's legislative purpose in detail.  In it, Chairman Neal explained that the Committee is charged with oversight of the tax laws and tax administration, and that the Committee is "considering legislative proposals and conducting oversight related to our Federal tax laws," including "the extent to which the IRS audits and enforces the Federal tax laws against a President."  2021 Request at 1.  He noted that concerns on this topic date back to 1974, when "it became known publicly that the IRS did not properly examine President Nixon's returns." *Id.* at 1-2.  And, although the IRS responded to that event by implementing the Presidential Audit Program, the Committee is concerned that the Program may not be ensuring the "full and fair administration of the tax laws with respect to a President," and therefore that legislation may be needed.  *Id.* at 2.  Specifically, the Committee believes that the IRM does not account for a President who, like former President Trump, "had ongoing audits, hundreds of business entities, and

16

inordinately complex returns." *Id.* Further, many "of the relevant IRM provisions are outdated and no longer followed," and "[t]he IRM grants an IRS revenue agent substantial discretion to shape the course of the President's audit" without "explicit safeguards in the event that a President interferes with or questions the appropriateness of such examination[.]" *Id.* The 2021 Request explains that, in light of these circumstances, the Committee is considering legislation "on the President's tax compliance[] and public accountability" to ensure that the IRS "treat[s] a President like any other taxpayer subject to an audit." *Id.*

As the 2021 OLC Opinion concluded, "[t]hese matters, and the [Presidential Audit Program] more generally, clearly are subjects on which 'legislation may be had.'" 2021 OLC Op. at 31 (quoting *Eastland*, 421 U.S. at 506). Congress "has the authority '[t]o lay and collect Taxes,' and the tax laws and the IRS are themselves creations of statutes." *Id.* (quoting U.S. Const. art. I, § 8, cl.1). "Congress also has expansive authority to enact 'all Laws which shall be necessary and proper for carrying into Execution' its constitutional authorities, and accordingly, to determine how the IRS should use appropriated funds to audit presidential tax returns." *Id.* (citing U.S. Const. art. I, § 8, cls. 1 & 18 & § 9, cl. 7). The legislative purpose expressed in the 2021 Request is therefore valid on its face. *See id.* at 20-21; *see also* 2019 OLC Op. at 27 ("a review by the Committee of the IRS's performance of its duties" is "an example of routine oversight" by Congress).

The 2021 Request is also valid on the separate and independent grounds stated therein, that the Committee is investigating potential "business entanglements raising tax law and other issues, including conflicts of interest" and "foreign financial influences on former President Trump that could inform relevant congressional legislation." 2021 Request at 4. Just as with the Committee's interest in presidential audits, an investigation into possible presidential conflicts of interest and foreign influence involves "subject[s] on which legislation could be had." *Eastland*, 421 U.S. at 506; *see also* 2021 OLC Op. at 23 (concluding the same). The Committee might, for example, propose "legislation to require more extensive or regular financial or tax-return disclosure by presidents and presidential candidates," 2021 OLC Op. at 34, which would fall within the Committee's jurisdiction over "all

matters relating to" tax returns.  H.R. Rules, 117th Cong., Rule X, cl. 1(t)(3) (Feb. 2, 2021).  Indeed, such legislation has been introduced in the House, *see* H.R. 347, 117th Cong. (introduced Jan. 19, 2021), and the House has also passed a version of similar legislation, which is currently pending before the Senate, *see* H.R. 1, 117th Cong., § 10001, but could still undergo further revisions in the House pending action in the Senate.[8]  The Committee's concerns regarding potential hidden business entanglements of the former President, which may give rise to further tax laws or other legislation, are therefore independently sufficient to justify the request for the former President's tax records.  *See* 2021 OLC Op. at 23-25.  Indeed, the Trump parties do not dispute that potential legislation relating to the above matters could be had or that consideration of such topics would be a legitimate task of Congress.

### C.   The Trump Parties' Claims of Pretext Fail as a Matter of Law

Instead of contending that the Committee's stated purposes are insufficient, the Trump parties argue that they are pretextual, and that in fact, "[t]he primary purpose of the requests is to obtain and expose [the Trump parties'] information for the sake of exposure, to improperly conduct law enforcement, or some other impermissible goal[.]"  Cross-Claim ¶ 64.  To support this assertion, they rely on statements of certain Democratic members of the House, including now-Chairman Neal, some dating back as far as the 115th Congress (2017), *id.* ¶¶ 4-17, as well as inquiries of other governmental entities into the former President's finances.  But neither these statements, nor the possible motives of the individual members who made them, nor the motives of other governmental entities engaged in different investigations, can overcome the validity of the Committee's stated purposes here.

In evaluating the legitimacy of a congressional request for information, courts do "*not* look to the motives alleged to have prompted it."  *Eastland*, 421 U.S. at 508 (emphasis added).  Nor may courts "speculate as to the motivations that may have prompted the decision of individual [committee] members" to support a legislative inquiry.  *Wilkinson v. United States*, 365 U.S. 399, 412 (1961); *see also*

---

[8] Such concrete legislative plans are not, however, necessary to sustain a legislative inquiry. Congress generally need not "declare in advance what [it] meditate[s] doing when the investigation [is] concluded," *McGrain*, 273 U.S. at 178 (citation omitted); *see also Eastland*, 421 U.S. at 509 ("To be a valid legislative inquiry there need be no predictable end result.").

*Watkins*, 354 U.S. at 200 ("[A] solution to our problem is not to be found in testing the motives of committee members for [legislative] purpose."). This is so because even "where a wrong motive or purpose" might underlie a congressional inquiry, the remedy generally lies "in the people, upon whom . . . reliance must be placed for the correction of abuses committed in the exercise of a lawful power.'" *Barenblatt*, 360 U.S. at 132 (citing *Tenney v. Brandhove*, 341 U.S. 367, 377-78 (1951)). The Supreme Court has thus made plain that courts should conclude that a "committee's investigation has exceeded the bounds of legislative power" only where that conclusion is "obvious." *Tenney*, 341 U.S. at 378. And "motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served." *Watkins*, 354 U.S. at 200. This principle— which "is sounder still '[i]n times of political passion'"—reflects the reality that "'dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed.'" *Mazars II*, 2021 WL 3602683, at *10 (citing *Tenney*, 341 U.S. at 378 ("Courts are not the place for such controversies.")). There is thus no authority for probing the Committee's "real object" through the decontextualized statements of individual legislators, Cross-Claim ¶ 62.

But even if motive had any relevance here, the proffered evidence of pretext bears only a tenuous relationship to the 2021 Request. All of the cited statements of individual House members, Cross-Claim ¶¶ 4-17, were made during the 115th and 116th Congresses when President Trump was in office, and none relates to the Request at issue here, which was made in June 2021 after the 117th Congress convened. Moreover, developments since the cited statements significantly weaken any possible connection of those statements to the instant case. President Trump has departed office and news outlets have allegedly obtained and publicized information pertaining to his tax returns, *see id.* ¶¶ 32-37,[9] yet notwithstanding these developments, the Committee retains its legislative interest in the Presidential Audit Program and other legislative matters to which the Trump parties' tax information is relevant. That fact simply underscores the continuity and legitimacy of the stated interest. Even

---

[9] *See also, e.g.*, David Leanhardt, 18 Revelations From a Trove of Trump Tax Records (Sept. 27, 2020), https://www.nytimes.com/2020/09/27/us/trump-taxes-takeaways.html (discussing alleged disclosure to which the cited statements in paragraphs 32-37 appear to relate).

further afield is the Trump parties' reliance on the enactment of state laws implicating President Trump's tax returns, *id.* ¶¶ 19-23, and investigations by the District Attorney of New York County and other congressional committees, *see id.* ¶¶ 20, 27-28.  Other governmental entities may have had reasons to inquire into, or legislate about, President Trump's tax filings and finances, but the purposes motivating those entities have no bearing on the Committee's unique interests in tax legislation.  *See Mazars II*, 2021 WL 3602683, at \*9-10 (rejecting similar argument that circumstantial evidence established an improper purpose, even if the court could consider it).

The Trump parties' contention that the "primary purpose of the requests is to . . . improperly conduct law enforcement" fares no better.  Cross-Claims ¶ 64.  Again, while other governmental entities may have law enforcement interests in President Trump's tax filings, the 2021 Request makes clear that the Committee's interest is in tax legislation, including legislative safeguards to ensure the integrity of the Presidential Audit Program and address conflicts of interest.  *See* 2021 Request at 3-4. And even if that inquiry might uncover past illegality, an "'interest in past illegality can be wholly consistent with an intent to enact [valid] remedial legislation.'"  *Mazars II*, 2021 WL 3602683, at \*10 (citing *Trump v. Mazars USA, LLP*, 940 F.3d 710, 728 (D.C. Cir. 2019)).  On this point, *McGrain* is on all fours.  There, the lower court had concluded that a congressional inquiry into the Attorney General was illegitimate because the Senate was "not investigating the Attorney General's office" but was "investigating the former Attorney General" himself.  *McGrain*, 273 U.S. at 177.  The Supreme Court held that this ruling "was wrong" because the Senate resolution at issue showed that "the subject to be investigated was the administration of the Department of Justice," *id.*, and the fact that any inquiry "might possibly disclose crime or wrongdoing" was "not a valid objection."  *Id.* at 180;[10] *see also Hutcheson v. United States*, 369 U.S. 599, 617-18 (1962) (concluding that a Senate committee's investigation into illegal conduct did not vitiate the legitimate purpose of considering remedial federal legislation).  The same conclusion follows here: the Committee is investigating the IRS and the

---

[10] Indeed, the Court reached that conclusion even in the absence of an express statement by the Senate of its legislative purpose, explaining that "[t]he only legitimate object the Senate could have in ordering the investigation was to aid it in legislating, and we think . . . the presumption should be indulged that this was the real object."  *McGrain*, 273 U.S. at 178.

functioning of the Federal tax laws, including the Presidential Audit Program, and the fact that the information at issue might also be the subject of a valid law-enforcement inquiry does not negate the Committee's legislative purposes.

## II. CROSS-CLAIM II FAILS BECAUSE *MAZARS* DOES NOT APPLY TO THE REQUEST, AND EVEN IT IF DID, ANY REVIEW UNDER *MAZARS* IS SATISFIED.

In Cross-Claim II, the Trump parties allege that even if the Request reflects a valid legislative purpose under the general legal framework set forth in cases such as *Watkins* and *Barenblatt*, it does not comport with the heightened standard of inquiry articulated in *Mazars*, which governs congressional requests for the personal information of a President. *See* Cross-Claims ¶¶ 66-71. This theory fails as well.

### A. *Mazars* Is Inapplicable on Its Terms.

As an initial matter, the *Mazars* standard for evaluating congressional requests for an incumbent President's personal information does not apply to this lawsuit. The Court in *Mazars* articulated four non-exhaustive factors that should be considered when evaluating a subpoena directed at the personal information of a President: (1) "whether the asserted legislative purpose warrants the significant step of involving the President and his papers"; (2) whether the scope of information sought is "reasonably necessary to support Congress's legislative objective"; (3) whether Congress has provided sufficiently "detailed and substantial" evidence of its legislative purpose; and (4) "the burdens imposed" on the Presidency as a result of the subpoena. 140 S. Ct. at 2035-36. But these factors were rooted in the Court's assessment that the dispute involved "a clash between rival branches of government," which would "unavoidably pit the political branches against one another," *id.* at 2034, and the Court's concern that two centuries of accommodation among the political branches could "be transformed" by an approach that afforded too much deference to either branch. *Id.* at 2035; *see also id.* at 2033 (making clear that the factors refer to a request directed at "the President," who has "an ongoing institutional relationship" with Congress). By contrast, the Request here concerns the tax information of a *former* President as to which there is no conflict between the political branches. *See Mazars II*, 2021 WL 3602683, at *13 (because former "President Trump no longer 'alone composes a

21

branch of government,'" the congressional inquiry will not "'intru[de] into the operation of the Office of the President'" or "burden 'the [sitting] President's time and attention'"); 2021 OLC Op. at 28 (noting that the "2021 Request seeks the tax information, not of a sitting President, but of a former President," which "greatly mitigates the Court's concerns about Congress using its investigatory power to exert control over the President" or intrude "into the operation of the Office of the President'" (quoting *Mazars*, 140 S. Ct. at 2034, 2036 )).  Thus, as the district court observed in *Mazars II*, President Trump's departure from office affects the basic "foundation[]" of the *Mazars* framework and counsels "reduced judicial scrutiny."  *Mazars II*, 2021 WL 3602683, at *13.

To account for this foundational difference, the *Mazars II* court adopted a less rigorous "*Mazars* lite" standard.  Under that approach, the first *Mazars* factor, which would otherwise require a careful assessment of "the asserted legislative purpose" is less demanding because a legislative inquiry into the personal affairs of a former President is less "significant" than one targeting the incumbent President.  Thus, the inquiry into whether "other sources could reasonably provide Congress the [requested] information" need not be as searching as it would with respect to a sitting President.  *Id.* at *13.  "For the same reason, with respect to the second *Mazars* factor—which requires a court to 'insist on a subpoena no broader than reasonably necessary to support Congress's legislative objectives'—a court need not 'insist' on as precise a fit when the subpoena is not directed to a sitting President."  *Id.*  As to the third *Mazars* factor—which instructs that a court must be "attentive to the nature of the evidence offered" to establish a valid legislative purpose, the court remains attentive but "a less 'detailed and substantial' submission to substantiate Congress's claimed legislative purpose may suffice given the circumscribed separation of powers concerns at play."  *Id.*  And finally, under the fourth factor, which examines the burdens imposed on the President by a congressional inquiry, *Mazars*, 140 S. Ct. at 2036, the analysis should account for the fact that such burdens are likely to be "greatly diminished" when the President to whom the inquiry relates no longer occupies the office. *Mazars II,* 2021 WL 3602683, at *13.

Assuming a *Mazars*-type analysis applies here at all, Defendants concur with the *Mazars II*

court's application of a more permissive standard in light of President Trump's departure from office. Defendants also respectfully submit that two additional factors warrant an even less rigorous standard for evaluating the Committee's Request.  First, unlike the subpoena in *Mazars*, the Request here was made pursuant to a statute enacted with bicameralism and presentment, which reflects "the long-standing judgment of the political branches . . . that the tax committees are best situated to determine when Congress ought to have access to tax information, notwithstanding the confidentiality rules that govern in other contexts."  2021 OLC Op. at 19.  Thus, unlike a subpoena—which is typically issued by a congressional committee acting alone—the Executive Branch participated in the legislative process that gave rise to section 6103(f).  *See Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 441 (1977) (hereinafter *Nixon v. GSA*) (noting that separation-of-powers concerns were mitigated because "[t]he Executive Branch became a party to the Act's regulation when President Ford signed the Act into law").  Second and relatedly, under the statutory framework established by section 6103(f), Defendants act as the "gatekeepers of federal tax information."  *Tax Analysts*, 117 F.3d at 613.  The Executive Branch (through OLC) therefore has had the opportunity to review the 2021 Request and assess any burdens on the Executive Branch prior to releasing the requested tax information.  *Cf. Nixon*, 433 U.S. at 443 (finding it "highly relevant" for separation-of-powers purposes that the Executive Branch acted as custodian of information relating to a President).  These factors further diminish any separation-of-powers concerns and support a more permissive review than Judge Mehta applied in *Mazars II*.[11]

### B.   The Request Does Not Violate *Mazars*

Even if this Court were to apply some version of a *Mazars* or "*Mazars*-lite" analysis, the 2021 Request does not unduly implicate the separate-of-powers concerns reflected in that analysis.

---

[11]  Defendants agree with the Committee that it would also be possible to apply the "pragmatic, flexible" approach adopted by the Supreme Court in *Nixon v. GSA*, where the Court held that a separation-of-powers analysis involving former President Nixon should focus "on the extent to which [the 2021 Request] prevents the Executive Branch from accomplishing its constitutionally assigned functions" and "whether [any] impact is justified by an overriding need to promote objectives within the constitutional authority of Congress."  433 U.S. at 442-43.  However, because those inquiries are subsumed by the four *Mazars* factors, and (as discussed below) application of that test is satisfied, Defendants do not believe it is necessary to conduct a separate analysis under *Nixon v. GSA*.

23

1.       *The Committee's Investigation Warrants the Step of Seeking President Trump's Tax Returns*

The first factor asks whether the Committee's asserted legislative purpose warrants the "significant step" of inquiring into the President's personal papers. *Mazars*, 140 S. Ct. at 2035. As noted above, this "step" is less "significant" than it was in *Mazars*, because the fact that President Trump is no longer in office "greatly mitigates [any] concerns about Congress using its investigatory power to exert control over the President," 2021 OLC Op. at 28; *see also Mazars II*, 2021 WL 3602683, at *13 ("When Congress subpoenas a former President, the step remains 'significant' but less so than when a sitting President is involved.").

On the other side of the ledger, the Committee could not review the functioning, capacity, and resilience of the Presidential Audit Program under the challenges presented by President Trump, as it seeks to do, without examining tax information that concerns President Trump. Were the Committee to investigate the returns and audits of individuals who are known to have similarly complex financial dealings or who are similarly critical of the IRS, but did not serve as president, such investigation would not reveal the audit process in the same political context that exists where the taxpayer is the President, and thus would not help the Committee understand "whether IRS agents have been able to operate free from improper interference" in that context. 2021 Request at 3. Likewise, examining the audits of other prior Presidents would not provide insights into the functioning of the Program under the unique stressors posed by the Trump presidency. President Trump "controlled more than 500 individual business entities" involving both foreign and domestic activities and has reportedly been in a decade-long battle with the IRS over a $73 million refund since before he entered office. *See* 2021 Request at 4. And as President, he repeatedly and publicly expressed his frustration with the audit process, thus raising concerns within the Committee about whether the IRS agents involved in his audits were able to operate free from political influence and interference. *See id.* at 5-6. Examining the audits of other Presidents whose tax filings were not known to be nearly as large and complex, and who did not openly disparage the system, would not permit the Committee to understand how the Program functions "under the exceedingly challenging circumstances presented by former President Trump." *Id.* at 6; *see also id.* at 3, 5 (explaining that President Trump is

24

"markedly different from other Presidents examined under the IRM's mandatory audit procedures" and uniquely "implicates many of [the Committee's] wide-ranging concerns"). For similar reasons, no other taxpayer's business dealings implicate potential conflicts of interest or foreign entanglements affecting the Presidency to the same extent as those of President Trump, and therefore those filings would not inform the Committee's consideration of such matters.

Nor does the Committee's focus on President Trump suggest that it is improperly using a President as a "case study" for "generally applicable legislation." *Mazars*, 140 S. Ct. at 2036. The Committee is contemplating legislation that would specifically relate to a President as a taxpayer, not legislation that is "generally applicable." Moreover, the Committee is particularly concerned that "IRS employees in any way involved in a President's audit are protected in the course of their work and do not feel intimidated," and thus seeks to understand not simply how the Presidential Audit Program works on paper but whether "IRS agents have been able to act objectively" in carrying out the program. 2021 Request at 2-3. As to that objective, and as discussed above, the unique set of institutional stressors with which the Committee is concerned are ones that, by all appearances, only the audit of President Trump has involved. The request is therefore appropriately concerned with the information of the former President that uniquely implicates the focus of the legislative inquiry. *See* 2021 OLC Op. at 29 ("[T]he Committee's interests here are not about 'general' topics distinct from the presidency, but about an auditing program specific to the presidency and oversight concerns particular to President Trump."). The Committee's investigation thus warrants the "step" of seeking the tax information of the former President, while nevertheless remaining properly focused on how that information implicates the functioning of the tax laws.

### 2. The Request Is Not Broader than Necessary

The second *Mazars* factor—which asks whether a request is "broader than reasonably necessary to support [the Committee's] objectives," *Mazars*, 140 S. Ct. at 2036—is also satisfied.

The fact that the Request seeks tax information not only of President Trump but also eight affiliated business entities is appropriate because the Committee seeks to understand whether, in the

course of a presidential audit, IRS agents review "underlying business activities, especially activities involving many interrelated entities and income from . . . foreign sources." 2021 Request at 3. That breadth is necessary because President Trump has hundreds of business entities and individual returns that necessarily incorporated, and were based upon, the tax filings of those business entities. As a result, examining only President Trump's individual tax returns, without those of the business interests that underlie and give substance to the returns, would give the Committee only limited and superficial insight into the scope of the audit.

The time frame for the Request—tax years 2015-2020—is also appropriate. Under the IRM, the Presidential Audit Program applies to returns filed while a President is in office. *See* 2021 OLC Op. at 32; IRM § 3.28.3.5(1) (providing instructions for processing returns "of the President and Vice President of the United States *in office at the time of filing*" (emphasis added)). For President Trump, who took office in 2017 and departed in January 2021, that time period would include tax years 2016-2019, made in 2017-2020, respectively. The Request thus covers the returns that President Trump and his affiliated business entities presumptively filed during his four years in office, as well as one year on either side. That one-year cushion is appropriate because the scope of a mandatory presidential audit "can be expanded to include prior year and related returns if 'risk protocols' warrant." Decl. of Sunita Lough ¶ 39, ECF No. 44-4; *see also* 2021 OLC Op. at 32 (noting same). The Committee therefore could reasonably believe that the IRS's audit of former President Trump's returns might involve examination of returns filed shortly before he took office or after he departed. And even if that assessment turned out to be factually incorrect, it would not render the scope of the Request unreasonable because "[t]he very nature of the investigative function—like any research—is that it takes the searchers up some 'blind alleys' and into nonproductive enterprises." *Eastland*, 421 U.S. at 509.

### 3. *The Committee Has Provided Detailed and Substantial Evidence of Its Purpose*

The third *Mazars* factor is also satisfied because the 2021 Request provides a detailed explanation of the Committee's need for the tax information at issue. *See Mazars*, 140 S. Ct. at 2036

(Congress should "adequately identif[y] its aims and explain[ ] why the President's information will advance its consideration of the possible legislation").  The 2021 Request describes ways in which the audit system did not function appropriately as to President Nixon, 2021 Request at 1, and the Committee's reasons for concluding that the system also may not have sufficient safeguards for President Trump's "ongoing audits, hundreds of business entities, and inordinately complex returns." *Id.* at 2.  The Committee pointed to specific aspects of former President Trump's tax profile— including hundreds of affiliated business entities, use of a revocable trust to control those entities while in office, and a decade-long battle over a $73 million refund—that make him unique among Presidents in testing the resilience of the Presidential Audit Program.  *Id.* at 4-5.  The Committee also cited specific public statements of the former President that give rise to reasonable concerns about undue influence in the audit process.  *Id.* at 5 ("As a Presidential candidate, he expressed his belief that it was 'very unfair' that he was 'always audited'" and "[a]larmingly, once he became President, this sentiment was explicitly extended to the automatic, mandatory audit described in the IRM").  The Committee also explained why alternative information, such as written materials or a briefing pertaining to the Presidential Audit Program, would not be adequate, namely, that some practices reflected in the IRM are outdated; that the IRM confers extensive discretion on individual auditors; and that the Committee's primary concern is understanding how the audit program functions in practice, rather than on paper or in theory.  *See* 2021 Request at 3 ("At its core, what the Committee seeks to understand is how the IRM provisions have been applied *in practice* and whether IRS agents have been able to act objectively[.]" (emphasis in original)).

4.       *The Committee's Legislative Purpose Is Not Outweighed by Executive Branch Interests*

Finally, the fourth *Mazars* factor similarly weighs in favor of disclosure because the unique circumstances of the 2021 Request present only minimal, if any, burdens on the Presidency.  *See Mazars*, 140 S. Ct. at 2036 ("courts should be careful to assess the burdens imposed on the President by a" congressional inquiry).  The Executive Branch is represented in this litigation by the U.S. Department of Justice.  There is no occasion for the Trump parties to assert interests on behalf of the

Executive Branch.  So it is dispositive that the Executive Branch has determined that the 2021 Request presents no meaningful burdens on the Presidency.

Indeed, as a general matter, the passage of section 6103(f) with the concurrence of the President mitigates concerns about congressional aggrandizement that might otherwise exist in the context of an informational request pursued solely through a subpoena.  *See* 2021 OLC Op. at 23-24. The "political branches have repeatedly determined over the course of the last century that the congressional tax committees should have a statutorily unlimited right of access to tax information— an authority predicated, at least in part, upon the judgment that those committees are uniquely suited to 'assure explicit, deliberate, and responsible congressional attention to the use made by its members and committees of individual tax returns.'"  2021 OLC Op. at 24 (citing *Confidentiality of Tax Return Information: Hearing Before the H. Comm. on Ways and Means*, 94th Cong. 154 (1976)); *see also Nixon*, 433 U.S. at 441 (rejecting separation-of-powers challenge to the Presidential Recordings and Materials Preservation Act in part because the "Executive Branch became a party to the Act's regulation when President Ford signed the Act into law, and the administration of President Carter, acting through the Solicitor General, vigorously supports . . . its constitutionality").  Further, President Trump is no longer in office, thus diminishing any concerns that the 2021 Request will unduly burden Executive Branch interests.  *See Nixon*, 433 U.S. at 448 ("only the incumbent is charged with performance of the executive duty under the Constitution" and therefore "a former President is in less need of [protections] than an incumbent").

Nor is this a situation where Congress could exploit the threat of a post-Presidency request for personal information to exert improper influence over a president while in office.  *See Mazars II*, 2021 WL 3602683, at *13.  The Committee here is focused primarily on the functioning of the IRS and its audit processes under conditions of stress, not the Presidency *per se*.  That is why the Committee sought not only tax returns but also "[a]ll administrative files" for each requested tax return.  2021 Request at 6.  Such inquiries should not be expected to require regular probing of a president's tax filings or audit histories because no prior president has implicated the same combination of concerns

that animate the Committee's inquiry here.  Indeed, there is only one prior example of congressional efforts to review a president's tax returns—with President Nixon, fifty years ago—and in that case President Nixon voluntarily disclosed his returns for review, consistent with the tradition of elected presidents since, and did not oppose the release of other information under section 6103(f) when the Joint Committee on Taxation sought to broaden the review.  *See* 2021 OLC Op. at 33.  And even if similar concerns were to arise again in relation to a future President, the President is subject to the tax laws, just like any other individual, and the commitment to the fair and impartial administration of the tax laws, which both the Executive and Legislative Branches share, would justify the inquiry.  The interests of the two branches are therefore aligned in this respect.

For all of the above reasons, each of the four *Mazars* factors is satisfied.  Cross-Claim II should be dismissed.

## III.  CROSS-CLAIM III FAILS BECAUSE SECTION 6103(F) NEITHER SUPPLIES A BASIS FOR CHALLENGING DISCLOSURE OF TAX INFORMATION NOR EXCLUDES A FORMER PRESIDENT'S INFORMATION FROM ITS SCOPE.

In Cross-Claim III, the Trump parties purport to advance a claim against the Defendants for "[v]iolation of § 6103(f)."  Cross-Claim at 31 (III, heading).  The facet of section 6103(f) at issue here provides that the Secretary of the Treasury "shall furnish . . . any return or return information" to any of three tax committees upon written request of the chairman of one of those committees.  26 U.S.C. § 6103(f)(1).  Citing "the canons of statutory construction applicable to statutes that implicate the separation of power," the Trump parties contend that section 6103(f) "cannot be read to cover the information of Presidents or former Presidents," and therefore Defendants "have no authority" to disclose tax information in response to Chairman Neal's Request.  Cross-Claim ¶¶ 75, 77.  The Trump parties are mistaken, and, for several reasons, the Court should dismiss this claim.

As a preliminary matter, Cross-Claim III assumes that any disclosure not authorized under section 6103(f) amounts to a "violation" of that provision, providing a legal basis on which a taxpayer may seek to resist disclosure.  Cross-Claim at 31 (III, heading).  That is not so.  Section 6103(f) contains no prohibition on disclosure.  Rather, it speaks only to when disclosure is mandatory, s*ee* 26 U.S.C.

§ 6103(f), and appears alongside a dozen other provisions identifying circumstances in which disclosure of tax information is either required or permitted.  26 U.S.C. § 6103(c)–(e), (g)–(o).  Thus, section 6103(f) cannot supply a basis on which to grant the relief against disclosure that the Trump parties seek, and Cross-Claim III should be dismissed for that reason alone.

Nor would Cross-Claim III have fared better had it been asserted under section 6103(a), which prohibits disclosure of tax information except as authorized in the subsequent provisions of the statute, including section 6103(f).  *See* 26 U.S.C. § 6103(a).  As noted above, the Trump parties' contention that section 6103(f) does not authorize Defendants to comply with the Committee's 2021 Request depends upon the contention that section 6103(f) does not apply to a President or former President.  *See* Cross-Claim ¶ 75.  That argument fails, however, because the plain language of section 6103(f)(1) applies without exception to "*any* return or return information," 26 U.S.C. § 6103(f)(1) (emphasis added).

The Trump parties' argument to the contrary—that section 6103(f) implicitly excludes the tax information of a President or former President—depends upon "the canons of construction applicable to statutes that implicate the separation of power."  Cross-Claim ¶ 75; *see Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992) (finding, "[o]ut of respect for the separation of powers and the unique constitutional position of the President . . . that textual silence is not enough to subject the President to the provisions of the APA"); *Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991) (same).  There is no reason to import those canons of construction here.

First, any separation-of-powers concerns that may be raised by a congressional request for a President's information are necessarily addressed by attention to the considerations the Supreme Court identified in *Mazars*, *see supra* Arg. § II.  Indeed, the entire purpose of the Court's analysis was to "take adequate account of the separation of powers principles at stake" when Congress seeks the personal information of a sitting president, "including both the significant legislative interests of Congress and the unique position of the President."  *Mazars*, 140 S. Ct. at 2035 (citation omitted).  Thus, because any separation-of-powers concerns implicated by the Committee's request are resolved

under the *Mazars* analysis discussed in Arg. § II, *supra*, it is not necessary to apply a specialized construction to section 6103(f) in order to address such concerns.

Moreover, the precedent setting forth the canon upon which the Trump parties rely makes plain that the canon has no application to section 6103(f).  In asserting that "'textual silence' means that § 6103(f) cannot be read to cover the information of Presidents or former Presidents" under "the canons of construction applicable to statutes that implicate the separation of power," Cross-Claim ¶ 75, the Trump parties quote without citing *Armstrong v. Bush*, 924 F.2d at 289.  There, the D.C. Circuit addressed whether the President could be considered an "agency" subject to the APA, a result that would have been contrary to "longstanding presidential practice," and would have restricted and regulated his actions as President.  *Id.* (noting that "the President has never been thought to have to comply with APA rulemaking procedures when issuing executive orders").  The D.C. Circuit held that textual silence would not support such an interpretation of the statute, reasoning that "[w]hen Congress decides purposefully to enact legislation restricting or regulating presidential action, it must make its intent clear."  *Id.*  During the following year, the Supreme Court, too, held that the President cannot be considered an "agency" under the APA, reasoning "[w]e would require an express statement by Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion."  *Franklin*, 505 U.S. at 800-01.  The concerns in *Franklin* and *Armstrong* that caused the Supreme Court and the D.C. Circuit to require a clear statement of congressional intent to apply a statute of general applicability to the President are not present here, however.  Section 6103(f) does not regulate "the President's performance of his statutory duties," *id.*. at 801, or "restrict[] or regulat[e] presidential action" in any way, *Armstrong*, 924 F.2d at 289.  Indeed, section 6103(f) does not touch on the President's official duties at all.

Finally, the *Franklin/Armstrong* canon also has no application here because the 2021 Request seeks tax information of a former President.  Indeed, even where a request for a sitting President's information did "implicate special concerns regarding the separation of powers," *Mazars*, 140 S. Ct. at 2036, the Supreme Court concluded that those concerns did not necessarily preclude Congress from

31

using its subpoena power to obtain such information.  *See supra* Arg. § II.  It would be anomalous if the Court were to conclude now that separation-of-powers concerns altogether bar Congress from receiving the tax information of a *former* President via the mandatory statutory mechanism under section 6103(f), yet that is the result that would follow if the Court were to accept the Trump parties' construction.

For all these reasons, the Court should decline the Trump parties' invitation to import the *Franklin/Armstrong* canon into this setting, and it should reject their strained reading of section 6103(f). The broad language of the statute includes a former President's tax information, and the canons of statutory construction supply no basis on which to depart from that plain meaning.

## IV.  CROSS-CLAIM IV STATES NO ACTIONABLE FIRST AMENDMENT VIOLATION.

Cross-Claim IV asserts that by complying with the Committee's request for production of the Trump parties' tax information, Defendants would be "engaging in their own unlawful discrimination and retaliation" against President Trump, and "carrying out the Committee's unlawful discrimination and retaliation," in violation of the First Amendment.  Cross-Claim ¶ 88.  This claim fails on both scores.  Defendants intend to comply with the Committee's 2021 Request because section 6103(f)(1) compels them to do so, not because of implausibly pled motives of retaliation.  Nor does alleged retaliation by the Committee based on President Trump's policies, political beliefs, or protected expression—which is also implausibly pled—permit the Court to impugn the Committee's Request.

### A.  Cross-Claim IV Fails To State a Claim of First Amendment Retaliation by Defendants, for Lack of Causation, and Otherwise

Cross-Claim IV does not state a claim of First Amendment retaliation by Defendants.  This is principally so because section 6103(f)(1), not alleged improper motives harbored by Defendants, is the "but for" cause of Defendants' intended compliance with the Committee's 2021 Request.

"'[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech."  *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)).  To state a claim for First Amendment retaliation, a litigant must allege "(1) 'that he engaged in protected conduct,' (2) 'that the

government took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again,' and (3) 'that there exists a causal link'" between the two. *Scahill v. Dist. of Columbia*, 909 F.3d 1177, 1185 (D.C. Cir. 2018) (quoting *Doe v. Dist. of Columbia*, 796 F.3d 96, 106 (D.C. Cir. 2015)). "To establish the causal link, the constitutional speech must be the but-for cause of the retaliatory action." *Id.* (citing *Doe*, 796 F.3d at 107).

The Trump parties allege that the Committee's 2021 Request "single[s] out President Trump because he is a Republican and a political opponent," and "w[as] made to retaliate against [him] because of his policy positions, his political beliefs, and his protected speech." Cross-Claim ¶¶ 83, 85. They suggest that Defendants intend to comply with the 2021 Request because President Biden is a Democrat. *Id.* ¶ 88. As discussed *supra*, however, Arg. §§ I and II, the Committee's 2021 Request seeks information related to and in furtherance of a legitimate task of Congress, *Watkins*, 354 U.S. at 187, while respecting "the unique position of the President," *Mazars*, 140 S. Ct. at 2035. Because the 2021 Request thus constitutes a valid exercise of Congress's investigative authority, the inflexible statutory command of section 6103(f)(1) requires that Defendants produce the tax information that the Committee seeks, regardless of whether or not they are motivated to do so, or why. Under the terms of the statute, Defendants have no choice in the matter. Thus, the "but for" cause of the intended disclosure is Defendants' legal obligation under section 6103(f)(1) to comply with the Committee's lawful request. The Trump parties' claim of retaliation must be rejected, accordingly, for failure to establish the essential element of causation. *See Hartman*, 547 U.S. at 260 ("[A]ction [allegedly] colored by some degree of bad motive does not amount to [First Amendment retaliation] if that action would have been taken anyway."); *Daugherty v. Sheer*, 891 F.3d 386, 391 (D.C. Cir. 2018) ("'[A]n [an allegedly] improper motive is not sufficient to establish a constitutional violation—there must also be . . . causation[.]'") (quoting *Crawford-El v. Britton*, 523 U.S. 574, 593 (1998)).

Cross-Claim IV must also be dismissed, however, because it does not contain plausible allegations of retaliatory motive that rise "above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The allegation that Defendants

are "engaging in their own unlawful discrimination and retaliation," Cross-Claim ¶ 88, is merely a legal conclusion, no different than the "bare assertion" of discriminatory intent at issue in *Iqbal*, 556 U.S. at 681, and, as such, is "not entitled to be assumed true," *id.*  The sole factual support for the Trump parties' claim of retaliation by Defendants is the allegation that their supposed "reversal on the legality of Chairman Neal's request[ ] came . . . under President Biden, a Democrat who ran against President Trump and made the disclosure of President Trump's tax returns a campaign issue."  Cross-Claim ¶ 87.  But while the Trump parties may be prepared to ascribe "vindictive motives" to Defendants based on nothing more than the party affiliation of the current Administration, *Tenney*, 341 U.S. at 378, a court may not do so.

Simply put, the Trump parties have offered no basis on which plausibly to infer retaliatory motive on Defendants' part.  They have observed that the former President belongs to a different political party than the incumbent President, but differences in party membership are surely not sufficient to create a plausible inference of ill intent.  Indeed, if party membership alone supported an inference of retaliatory purpose, then it would be equally likely that the Trump Administration acted for improper purposes when denying the Committee's original request, at a time when Donald Trump *was* the incumbent President.  *See Twombly*, 550 U.S. at 564-69 (no plausible inference of antitrust conspiracy where alleged parallel conduct was just as explainable as independent competitive business strategies).  Without more than party affiliation to "nudg[e]" a claim of improper motive "across the line from the conceivable to plausible," *Iqbal*, 556 U.S. at 683, a court cannot ascribe ill intent to representatives of one Administration, or the other.  For this reason—in addition to the lack of causation—the Trump parties have not stated a claim of First Amendment retaliation by Defendants.

**B. Assigning Implausibly Pled Motives of Retaliation to Committee Members Furnishes No Ground on Which to Invalidate the Committee's 2021 Request**

The Trump parties also claim that by complying with the 2021 Request, Defendants are "carrying out the Committee's unlawful discrimination and retaliation" against President Trump. Cross-Claim ¶ 88.  A court, however, may not take issue with a congressional inquiry based on the alleged motives of individual committee members, even when those motives are said to offend the

First Amendment.  In any event, the Trump parties have not plausibly alleged that the Committee's

2021 Request is the product of retaliatory design.

    1.   *The Court may not scrutinize Committee members' motives, even on First*
          *Amendment grounds.*

     As discussed *supra*, Arg. § I, "[s]o long as Congress acts in pursuance of its constitutional

power," as is the case here, "the Judiciary lacks authority to intervene on the basis of the motives

which spurred the exercise of that power."  *Barenblatt*, 360 U.S. at 132.  "[M]otives alone would not

vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative

purpose is being served."  *Watkins*, 354 U.S. at 200; *see also Eastland*, 421 U.S. at 508 ("[I]n determining

the legitimacy of a congressional act we do not look to the motives alleged to have prompted it.");

*Wilkinson*, 365 U.S. at 412 (refusing to speculate as to the motives of individual members underlying a

subcommittee's decision to summon a witness).

     These precedents make no exception for claims that committee members acted for reasons

forbidden by the First Amendment.  In *Wilkinson*, the petitioner was convicted for refusing to answer

questions before a subcommittee of the House Un-American Activities Committee.  365 U.S. at 401-

07.  He argued that the subcommittee's questioning violated his First Amendment rights of free

expression and association, contending that the sole reason for summoning him to testify was to harass

and persecute him as a prominent member of a public campaign to abolish the Committee.  *Id.* at 409,

411.  The Supreme Court rejected this argument.  Concluding that the subcommittee convened and

conducted the hearing in pursuit of a valid legislative purpose, *id.* at 410-11, the Court held that "it is

not for us to speculate as to the motivations that may have prompted the decision of individual

members of the subcommittee to summon the petitioner," *id.* at 412.  In *Watkins*, the Court declined

to "test[ ] the motives of committee members" notwithstanding "an impressive array of evidence"

that "[t]he sole purpose of the [committee's] inquiry . . . was to bring down upon [the petitioner] and

others the violence of public reaction because of their past beliefs, expressions and associations."  354

U.S. at 199-200; *see also Eastland*, 421 U.S. at 505-10 (refusing to entertain arguments that an

investigation "related to and in furtherance of a legitimate task of Congress" was intended to expose

unpopular opinions and beliefs and to chill the exercise of First Amendment freedoms).  *Mazars* is also instructive in this regard.  There the Court acknowledged that it was not "blind" to the "intense political" nature of the "clash" over President Trump's financial records.  140 S. Ct. at 2034.  Yet its resolution of the dispute focused on Congress's need for the information requested to advance its stated legislative purpose, and the burdens imposed on the President, *id.* at 2035-36—neither of which has anything to do with the subjective motives of individual legislators.

The Committee's 2021 Request advances a legitimate legislative inquiry and respects the separation-of-powers principles articulated in *Mazars*.  Once that two-fold determination is made, the Supreme Court's precedents leave no room for argument that a court may question the Committee's actions on grounds that the motives of individual members violate the First Amendment.  So far as Cross-Claim IV calls on the Court to undertake that inquiry, it must be dismissed.

### 2.   *Cross-Claim IV does not plausibly allege retaliatory motive by the Committee*

In addition to their legal untenability, the Trump parties' accusations of retaliation by the Committee are deficiently pled.  As noted, the Trump parties allege that the Committee's 2021 Request "single[s] out President Trump because he is . . . a political opponent," and "w[as] made to retaliate against [him] because of his policy positions, his political beliefs, and his protected speech."  Cross-Claim ¶¶ 83, 85.  At bottom, these allegations are no more than a "formulaic recitation of the elements" of a First Amendment retaliation claim, "disentitle[d]" to the presumption of truth, *Iqbal*, 556 U.S. at 681, unless accompanied by other, well-pleaded facts that plausibly suggest an entitlement to relief.

They are not.  Cross-Claim IV does not identify which of former President Trump's policy positions, political beliefs, or protected statements supposedly provoked the Committee's ire; offers no detail as to their content; and does not tell us when former President Trump supposedly took these positions, gave voice to these beliefs, or made these statements.  Cross-Claim IV also fails to identify which, or even how many, of the Committee's two dozen Democratic members, *see* https://waysandmeans.house.gov/subcommittees/ways-and-means-117th-congress,   supposedly nurtured retaliatory intentions because of former President Trump's unspecified positions, beliefs, and

statements; and it advances no reason to suppose that they in fact did so other than their party affiliation.   Pleadings that leave a court "in the dark" as to who supposedly harbored retaliatory motives, and which of former President Trump's positions, beliefs, and statements evoked these intentions, are too vague to construct "the requisite plausible scenario that could show [the Trump parties are] entitled to relief." *Patton Boggs LLP v. Chevron Corp.*, 683 F.3d 397, 403-04 (D.C. Cir. 2012) (citation omitted); *see also Hourani v. Mirtchev*, 796 F.3d 1, 11, 16 (D.C. Cir. 2015).

But even more critically, the Trump parties' claims of retaliatory animus are not simply unsupported, they are contradicted by the factual matter in their pleadings.   They allege a number of statements by Speaker Pelosi, a handful of Committee members (five in all), and several other Democratic House Members, made over a period of nearly five years, indicating that they wished to obtain President Trump's tax returns because of concerns about possible (i) "Russia connection[s]"; (ii) foreign entanglements and financial conflicts of interest; (iii) Emoluments Clause violations; (iv) tax evasion; and (v) other criminal and/or fraudulent acts committed by former President Trump as a private citizen.   Cross-Claim ¶¶ 4, 6-9, 13(d), (e), 22(b), 30-37, 40, 41, 53-55.   None mentions former President Trump's policies or political beliefs, much less suggests that his protected expression is the "but for" reason for seeking the Trump parties' tax information.   To the contrary, the reasons expressed are unrelated to his political policies, statements, or beliefs.   The Trump parties plead no facts to suggest that these statements reflected anything but genuine concern over a sitting President's potential entanglements with hostile foreign powers, and other conflicts of interest that could affect the performance of his duties.   Far from stating a plausible claim to relief, the Trump parties have pled themselves out of court by alleging facts that render success on their retaliation claim impossible.   *See Nurriddin v. Bolden*, 818 F.3d 751, 757 (D.C. Cir. 2016).

As said in *Tenney*, 341 U.S. at 378, "[i]n times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed.   Courts are not the place for such controversies."   But even if the First Amendment provided a vehicle for conveying such

claims into the courtroom, litigants still must arrive with sufficient facts to state a plausible entitlement to relief.  The Trump parties have not done so in Cross-Claim IV.

## V.  CROSS-CLAIM V DOES NOT STATE A VIABLE DUE PROCESS CLAIM.

### A.  The Court Lacks Jurisdiction to Consider Cross-Claim V Because It Is Neither Constitutionally Nor Prudentially Ripe

In Cross-Claim V, the Trump parties assert that because "[s]ome or all of the information [subject to] Chairman Neal's requests is the subject of ongoing examinations by the IRS," Cross-Claim ¶ 90, "allowing the Committee to obtain [that information]" amounts to a violation of their due process rights, *id.* ¶ 95, since "[e]ven the most scrupulous IRS officials could not help but be influenced by the fact that congressional partisans are scrutinizing their work," *id.* ¶ 93.  This speculative claim about the potential influence of congressional scrutiny on the outcome of alleged ongoing examinations depends upon future events that may not occur as anticipated, or may not occur at all.[12] Moreover, because the applicable legal framework focuses on the factors that the agency takes into account in reaching its decisions, postponing judicial review until such decisions have actually been rendered plainly would benefit the Court's analysis.  For these reasons, as explained below, Cross-Claim V is not ripe.

"[A]n Article III court cannot entertain the claims of a litigant unless they are 'constitutionally and prudentially ripe.'"  *In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig.*, 720 F.3d 354, 359 (D.C. Cir. 2013) (quoting *Wyoming Outdoor Council v. U.S. Forest Serv.,* 165 F.3d 43, 48 (D.C. Cir. 1999)).  And, a complainant bears the burden of establishing that his claim is currently ripe for review.  *See Renne v. Geary*, 501 U.S. 312, 316 (1991) ("We presume that federal courts lack jurisdiction unless the contrary appears affirmatively from the record.") (citation omitted).  The Trump parties cannot meet this burden as to Cross-Claim V.

---

[12] The discussion herein addresses the allegations of the Trump parties, and is not intended to confirm or deny the existence of any IRS audits or the existence of any filed returns by the Trump parties.

In addressing a claim of congressional interference in the administrative process—the allegation at the heart of Cross-Claim V—"judicial evaluation of the [alleged congressional] pressure must focus on the *nexus* between the pressure and the actual decision maker." *ATX, Inc. v. U.S. Dep't of Transp.*, 41 F.3d 1522, 1527 (D.C. Cir. 1994). "[T]he proper focus is not on the content of congressional communications in the abstract, but rather upon the relation between the communications and the adjudicator's decisionmaking process." *Id.* (citation omitted). "The test is whether 'extraneous factors intruded into the calculus of consideration' of the individual decisionmaker." *Peter Kiewit Sons' Co. v. U.S. Army Corps of Eng'rs*, 714 F.2d 163, 170 (D.C. Cir. 1983) (*quoting D.C. Fed'n of Civic Assn'ns v. Volpe*, 459 F.2d 1231, 1246 (D.C. Cir. 1972)); *ATX, Inc.*, 41 F.3d at 1528 ("We are concerned when congressional influence shapes the agency's determination of the merits").

Here, the Trump parties aver that the alleged IRS examinations that are the subject of Cross-Claim V remain "ongoing." Cross-Claim ¶¶ 90, 95. Thus, according to their allegations, *see id.*, there are, as yet, no decisions the Court could examine to determine whether extraneous factors interfered to such an extent that relief is warranted. Indeed, even after any alleged initial audit process was complete, the IRS would be required to issue a notice of deficiency, if any, and the taxpayer would have the opportunity to obtain judicial review, either by petitioning the Tax Court prior to paying any deficiency, or paying any deficiency and seeking review in district court or the Court of Federal Claims. *See* 26 U.S.C. §§ 6211–13; 28 U.S.C. § 1346(a)(1); 26 U.S.C. §§ 6532(a), 7422(a).

Constitutional ripeness "originat[es] in the case-or-controversy requirement of Article III" and requires that a claim not be "dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all." *Trump*, 141 S. Ct. at 535 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). Here, although the Trump parties assert that IRS officials "could not help but be influenced" by Congress's scrutiny of their work, Cross-Claim ¶ 93, the Trump parties can only speculate as to the outcomes of any alleged ongoing IRS examinations, and whether congressional scrutiny ultimately would play any role at all in those outcomes. Moreover, it is speculation again to

suppose—if there were a decision resulting from the ongoing examinations into which "extraneous factors intruded," *Peter Kiewit Sons' Co.*, 714 F.2d at 170—that such a decision would withstand the judicial review to which the Trump parties would be entitled. *See supra* (describing process available to a taxpayer upon completion of an examination). For all these reasons, the Trump parties cannot demonstrate that their due process claim is constitutionally ripe.

Nor can the Trump parties demonstrate prudential ripeness, which requires a court to balance "the fitness of the issues for judicial decision and the hardship to the parties of withholding consideration." *Texas*, 523 U.S. at 301 (quoting *Abbot Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). The "fitness for review" inquiry encompasses considerations similar to those discussed above, and includes, *inter alia*, the Court's "interest in avoiding unnecessary adjudication and in deciding issues in a concrete setting." *AT&T Corp. v. Fed. Commc'ns Comm'n*, 349 F.3d 692, 699 (D.C. Cir. 2003). Under the second or "hardship" prong of the prudential ripeness inquiry, the courts consider the claimant's "interest in immediate review." *Id.* at 700.

In this case, awaiting the completion of any applicable process—the alleged ongoing IRS audits, *see* Cross-Claim ¶¶ 90, 95, and any related proceedings on judicial review—would ensure that the Court avoided "unnecessary adjudication." *AT&T Corp.*, 349 F. 3d at 699. And, if adjudication proved necessary after all, postponing review would significantly advance the court's ability to deal with the legal issues presented. *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003). Indeed, without awaiting completion of any alleged ongoing IRS audits, *see* Cross-Claim ¶¶ 90, 95, it is difficult to discern how the Court could conduct the analysis required under the applicable framework at all, since that framework expressly excludes any "abstract" inquiry and requires a court to delve into the considerations that actually affected an agency decision. *See supra* at 39. Against these strong reasons for declining to hear the claim now, the Trump parties can point to no undue hardship to them that would result from postponing judicial review pending the results of any alleged ongoing IRS examinations, *see* Cross-Claim ¶¶ 90, 95. As explained above, the IRS can take no action to collect deficiencies (if any) identified during those examinations until the examinations are

completed *and* the taxpayer has an opportunity to be heard in court.  Accordingly, there is no "immediate and practical" hardship to the Trump parties that can "outweigh[] the competing institutional interest in deferring review." *Askins v. Dist. of Columbia*, 877 F.2d 94, 98 (D.C. Cir. 1989).

For all these reasons, Cross-Claim V is not ripe, and should be dismissed for lack of jurisdiction.

## B. Cross-Claim V Also Fails Because Precedent Establishes that Congress May Lawfully Examine—and Even Hold Hearings on—the Same Information as that at Issue in an Ongoing Administrative Matter.

The Court also should dismiss Cross-Claim V because "allowing [a congressional] Committee to obtain files that are the subject of ongoing examinations," Cross-Claim ¶ 95, does not approach the conduct that could give rise to a violation of due process-rights.

The Trump parties premise their claim on the contention that "IRS examinations are trial-like adjudications." *Id.* ¶ 91.  That is not so,[13] but, even in quasi-judicial proceedings, Congress may lawfully examine the same information at issue in an ongoing administrative matter without violating the due-process rights of the subject of that administrative matter.  "Congressional hearings are not inherently improper whenever their inquiry touches on or arises from a pending administrative matter.  Such hearings, even if contemporaneous with an administrative proceeding, are not unusual." *Schaghticoke Tribal Nation v. Kempthorne*, 587 F. Supp. 2d 389, 410 (D. Conn. 2008) (citing *ATX, Inc.*, 41 F.3d at 1527–28).  Indeed, with respect to IRS investigations in particular, the IRM specifically provides that the IRS may disclose to congressional committees materials that relate to an active IRS matter.  *See infra* at 44 (discussing IRM § 11.3.4.4(13)).

Moreover, the D.C. Circuit has "never questioned the authority of congressional representatives to exert pressure." *ATX, Inc.*, 41 F.3d at 1528 (citing *Volpe*, 459 F.2d at 1249).  Thus, "congressional actions not targeted directly at the decision makers—such as contemporaneous hearings—do not invalidate an agency decision." *Id.* (citing *Koniag, Inc. v. Andrys*, 580 F.2d 601, 610

---

[13] The "trial-like" facet of the process follows after completion of an examination if a deficiency is identified; in that case, the IRS must issue a notice of deficiency, and the taxpayer has the opportunity either to petition the Tax Court or pay any assessment, file a refund claim, and file a refund action, if still necessary, before the district court or Court of Federal Claims.  *See supra.*

(D.C. Cir. 1978)).  This is so even where members of Congress openly express views on the merits of a pending matter.  *See, e.g.*, *Koniag*, 580 F.2d at 610.

*Pillsbury Co. v. FTC*, 354 F.2d 952, 964 (5th Cir 1966), the case on which the Trump parties rely, Cross-Claim ¶ 92, demonstrates the kind of "congressional interference," *id.* ¶ 91, that constitutes a violation of due process:  there, the Fifth Circuit "found an impermissible influence stemming from a congressional hearing during which the Chairman of the Federal Trade Commission was subjected to 'a searching examination as to how and why he reached his decision in a case still pending before him, and [criticism] for reaching the 'wrong' decision.'"  *ATX, Inc.*, 41 F.3d at 1529 (quoting *Pillsbury*, 354 F.2d at 964).  The D.C. Circuit distinguished *Pillsbury* from situations in which congressional hearings did not include appearances by any of the agency decisionmakers.  *Koniag*, 580 F.2d at 610 ("we think the *Pillsbury* decision is not controlling here because none of the persons called before the subcommittee was a decisionmaker in these cases"); *see also ATX, Inc.*, 41 F.3d at 1529.

As explained, even contemporaneous congressional hearings regarding the subject matter of an administrative proceeding comport with due process so long as they do not involve the personal appearance of an agency decisionmaker.  *A fortiori* then, "allowing the Committee to obtain files that are the subject of [alleged] ongoing examinations," Cross-Claim ¶ 95, cannot amount to a violation of the Trump parties' due-process rights.

## VI.  CROSS-CLAIM VI IS UNRIPE AND FAILS TO STATE A SEPARATION OF POWERS CLAIM.

The Trump parties' sixth and final claim alleges that Defendants are violating separation-of-powers principles by giving the Committee access to files that are the subject of an alleged ongoing IRS examination.  *See* Cross-Claim ¶ 102.  This claim must be dismissed for at least two key reasons.

First, as with Cross-Claim V, Cross-Claim VI is unripe because it depends "on contingent future events that may not occur as anticipated, or indeed may not occur at all."  *See Trump*, 141 S. Ct. at 535 (quoting *Texas*, 523 U.S. at 300).  Specifically, the implicit injury on which this claim rests is the assumption that, if given access to the requested materials, the Committee will use those materials to interfere with the alleged IRS audit to the detriment of the Trump parties.  *See* Cross-Claim ¶¶ 100-

02.  This is not only speculative but is contrary to the four corners of the 2021 Request, which convey the Committee's intent to *safeguard* the presidential audit process from political pressures and to "ensur[e] that the tax laws are administered fully and fairly."  *See* 2021 Request at 2.  Accordingly, Cross-Claim VI is unripe and should be dismissed.

Second, Cross-Claim VI fails on the merits.  The cornerstone of this claim is the erroneous assertion that separation-of-powers principles prohibit the Executive from sharing information with Congress any time the information is the subject of or arises from an ongoing administrative matter— in this case, allegedly, an IRS audit.  That conclusion, besides being legally incorrect under the standards discussed above, *see supra* Arg. §§ I & II, is proven false by the Trump parties' own cited authority.

For starters, while congressional requests for the type of information at issue here may *implicate* separation-of-powers concerns, those concerns do not categorically bar disclosure in every case.  *See, e.g.*, *Schaghticoke Tribal Nation*, 587 F. Supp. 2d at 410 ("Congressional hearings are not inherently improper whenever their inquiry touches on or arises from a pending administrative matter.") (citing *ATX, Inc.*, 41 F.3d at 1527-28).  In this case, as discussed in detail above, disclosure is proper because section 6103(f) requires it, and because the Committee has asserted valid legislative purposes and its request comports with *Mazars*, 140 S. Ct. at 2036 (assuming a *Mazars*-type analysis applies here in the first place).  *See supra* Arg. § II.

The Trump parties' citations to portions of OLC opinions, which discuss circumstances in which a President may assert executive privilege, do not bear on the request at issue.  *See* Cross-Claim ¶ 99 (citing 10 Op. O.L.C. 68, 76 (1986)), ¶ 100 (citing 5 Op. O.L.C. 27, 31 (1981)).  In the cited 1981 opinion, for instance, the Department of Justice recommended asserting executive privilege over certain materials after concluding that disclosure "would seriously interfere with or impede the deliberative process of government and, in some cases, the Nation's conduct of its foreign policy." *Id.* at 29.  The opinion further noted that Congress had not sufficiently articulated its stated purposes for requesting the information.  *See id.* at 32 (stating that Congress "has never formally stated its need

for the materials beyond a generalized interest in 'oversight'").  Here, by contrast, there has been no assertion of executive privilege, and thus the President has not determined that the potential dangers of "provid[ing] committees of Congress with access to, or copies of, open law enforcement files" justify withholding the requested information.  *See* 10 Op. O.L.C. 68, 75-76 (1981).

Next, the Trump parties allege that the Executive Branch has "long refused" to provide open law-enforcement files to Congress.  *See* Cross Claim ¶ 99 (citing 10 Op. O.L.C. at 76).  But none of their cited authority states that the Executive *must* do so; to the contrary, in one of the cited OLC opinions, the Department of the Interior released "a large number of the materials" requested by Congress while Interior's decisionmaking process was ongoing.  *See* 5 Op. O.L.C. at 28.  More than that, here the IRM expressly contemplates that the IRS may disclose to congressional committees materials that relate to an active IRS matter.  *See* IRM § 11.3.4.4(13) (allowing IRS to disclose to Congress "[r]ecords relating to cases that are under active investigation" if disclosure will not have a "serious adverse effect on the administration of the tax laws").  All of this together demonstrates the implausibility of the Trump parties' allegations in Cross-Claim VI.

Finally, any separation-of-powers concerns presented in Cross-Claim VI are substantially diminished in light of section 6103(f).  That provision embodies the "long-standing judgment of the political branches" that the congressional "tax committees are best situated to determine when Congress ought to have access to tax information."  *See* 2021 Op. O.L.C. at 19.  To conclude that the separation-of-powers doctrine prevents the Executive from sharing that information with Congress during an IRS audit would be at loggerheads with section 6103(f) and the inter-branch agreement that brought the law into existence in the first place.  *See, e.g.*, *INS v. Chadha*, 462 U.S. 919, 949 (1983) (bicameralism and presentment demonstrate that a law "has been fully considered by the Nation's elected officials."); *Nixon v. GSA*, 433 U.S. at 441 ("The Executive Branch became a party to the Act's regulation when President Ford signed the Act into law."); *id.* at 444-45 (noting "abundant statutory precedent for the regulation and mandatory disclosure of documents in the possession of the

Executive Branch," subject to "applicable privilege inherent in that branch," and citing, among other examples, 26 U.S.C. § 6103).

For these reasons, Cross-Claim VI is unripe, and fails to state a claim upon which relief may be granted.  It should therefore be dismissed.

## **CONCLUSION**

For the foregoing reasons, the Trump parties' claims against Defendants should be dismissed.

Dated:  September 9, 2021          Respectfully submitted,

BRIAN D. NETTER
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director

ELIZABETH J. SHAPIRO
Deputy Director

  */s/ James J. Gilligan*
JAMES J. GILLIGAN
Special Litigation Counsel

SERENA M. ORLOFF
STEVEN A. MYERS
CRISTEN C. HANDLEY
JULIA A. HEIMAN
Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C.  20044
Telephone:     (202) 514-3358
Fax:              (202) 616-8470
E-mail:         james.gilligan@usdoj.gov

*Counsel for Defendants, Cross-Defendants*