## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Committee on Ways and Means, United States
House of Representatives,

        *Plaintiff–Counter-Defendant*,

    v.

United States Department of the Treasury, *et al.*,

        *Defendants–Cross-Defendants*,

    v.

Donald J. Trump, *et al.*,

        *Intervenors–Counter-Claimants,
Cross-Claimants*.

Case No. 1:19-cv-1974 (TNM)

## BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER
## AS *AMICUS CURIAE* IN SUPPORT OF COUNTER-DEFENDANT'S AND CROSS-DEFENDANTS' MOTIONS TO DISMISS

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Dayna J. Zolle (DC Bar No. 1672633)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

INTEREST OF *AMICUS CURIAE* ................................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ..................................... 1

ARGUMENT ..................................................................................................... 4

I.  Legislative Investigations Have a Long History, Both in the British Parliament and in Early American Congresses .......................................................... 4

II. The Supreme Court Has Consistently Affirmed that Congress's Power to Investigate Is Coextensive with Its Power to Legislate ........................................ 9

III. The Ways and Means Committee's Broad Power to Access Tax Information for Investigatory Purposes Is Consistent with the History of Section 6103 ......... 14

IV. The Committee's Requests for Documents Fall Well Within Congress's Investigatory Powers ................................................................................... 18

CONCLUSION ................................................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Barenblatt v. United States,*
    360 U.S. 109 (1959) ..................................................................................... 1

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) .................................................................................. 20

*Dep't of Commerce v. New York,*
    139 S. Ct. 2551 (2019) .............................................................................. 20

*Eastland v. U.S. Servicemen's Fund,*
    421 U.S. 491 (1975) ............................................................................... 9, 12

*Endicott Johnson Corp. v. Perkins,*
    317 U.S. 501 (1943) .............................................................................. 3, 4, 19

*In re the Application of U.S. Senate Permanent Subcomm. on Investigations,*
    655 F.2d 1232 (D.C. Cir. 1981) ................................................................. 9

*McGrain v. Daugherty,*
    273 U.S. 135 (1927) ........................................................................... *passim*

*McPhaul v. United States,*
    364 U.S. 372 (1960) .............................................................................. 3, 4, 19

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012) .................................................................................. 21

*Nixon v. Adm'r of Gen. Servs.,*
    433 U.S. 425 (1977) .............................................................................. 12, 14

*Quinn v. United States,*
    349 U.S. 155 (1955) .................................................................................. 11

*Reed v. Cnty. Comm'rs of Del. Cnty.,*
    277 U.S. 376 (1928) .................................................................................... 9

*Reno v. Am.-Arab Discrim. Comm.,*
    525 U.S. 471 (1999) .................................................................................. 20

*Senate Permanent Subcomm. v. Ferrer,*
    199 F. Supp. 3d 125 (D.D.C. 2016) ........................................................... 9

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Senate Permanent Subcomm. v. Ferrer*,
   856 F.3d 1080 (D.C. Cir. 2017) ................................................. 9

*Sinclair v. United States*,
   279 U.S. 263 (1929) ................................................................ 10, 11

*Tenney v. Brandhove*,
   341 U.S. 367 (1951) ................................................................ 21

*Trump v. Mazars USA, LLP*,
   140 S. Ct. 2019 (2020) ........................................................... 12, 13

*Trump v. Mazars USA LLP*,
   No. 19-CV-01136 (APM), 2021 WL 3602683 (D.D.C. Aug. 11, 2021) .................. 13

*United States v. Armstrong*,
   517 U.S. 456 (1996) ................................................................ 20

*United States v. Chem. Found.*,
   272 U.S. 1 (1926) ................................................................... 20

*United States v. Rumely*,
   345 U.S. 41 (1953) ................................................................ 13

*Watkins v. United States*,
   354 U.S. 178 (1957) .............................................................. *passim*

## STATUTES AND LEGISLATIVE MATERIALS

3 Annals of Cong. (1792) .............................................................. 6, 7

10 Annals of Cong. (1800) ............................................................. 7, 8

4 Cong. Deb. (1827) ................................................................... 9

65 Cong. Rec. (1924) ................................................................. 15, 16

122 Cong. Rec. (1976) ................................................................ 17

26 U.S.C. § 6103(a) .................................................................. 17

26 U.S.C. § 6103(f)(1) ............................................................... 2, 4, 14, 18

**TABLE OF AUTHORITIES – cont'd**

Page(s)

26 U.S.C. § 6103(d)(1) ..................................................... 18

Act of July 14, 1870, ch. 255, 16 Stat. 256................................... 14

*Confidentiality of Tax Return Information: Hearing Before H. Comm. on Ways & Means*, 94th Cong. 90 (1976)..................................... 17, 18

Cong. Globe, 36th Cong., 1st Sess. (1860)................................. 8

*Hearings Before the H. Special Comm. on Investigation of U.S. Steel Corp.*, 62d Cong., 1st Sess. (1911)................................. 13

H.R. 6715, 68th Cong. (1924)............................................. 16

H.R. Rep. No. 22-502 (1832)............................................. 8

Revenue Act of 1924, ch. 234, 43 Stat. 253 ............................ 16

S. Rep. No. 94-938 (1976)................................................ 18

Staff of the Joint Comm. on Taxation, 94th Cong., *General Explanation of the Tax Reform Act of 1976*, JCS-33-76 (1976) ....................... 17, 18

Tariff Act of 1894, ch. 349, 28 Stat. 509 ................................. 14


OTHER AUTHORITIES

*Congressional Access to Tax Returns—26 U.S.C. § 6103(f)*, 1 Op. O.L.C. 85 (1977) .................................................. 18

James M. Landis, *Constitutional Limitations on the Congressional Power of Investigation*, 40 Harv. L. Rev. 153 (1926)................................. 4, 5, 8, 9

Letter from Hon. Richard E. Neal, Chairman, H. Comm. on Ways & Means, to Hon. Charles P. Rettig, Commissioner, Internal Revenue Service (April 3, 2019)........... 1, 19

Letter from Hon. Richard E. Neal, Chairman, H. Comm. on Ways & Means, to Hon. Janet L. Yellen, Secretary, U.S. Dep't of the Treasury, and Hon. Charles P. Rettig, Commissioner, Internal Revenue Service (June 16, 2021) ....................... 2, 19, 20

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Letter from Steven T. Mnuchin, Secretary, Dep't of the Treasury, to Richard E.
Neal, Chairman, H. Comm. on Ways and Means (May 6, 2019) ........................... 2

Letter from President Washington to Henry Knox (April 4, 1792), in XXXII
*Writings of Washington* ................................................................................................ 7

C.S. Potts, *Power of Legislative Bodies to Punish for Contempt*,
74 U. Pa. L. Rev. 691 (1926)......................................................................... 5, 6

William Patrick Walsh, *The Defeat of Major General Arthur St. Clair, November 4,
1791: A Study of the Nation's Response, 1791-1793* (Feb. 1977) (unpublished
Ph.D. dissertation, Loyola University of Chicago) ................................................... 7

*Ways and Means Committee's Request for the Former President's Tax Returns and
Related Tax Information Pursuant to 26 U.S.C. § 6103(f)(1)*, 45 Op. O.L.C. __,
slip op. (July 30, 2021) ........................................................................... *passim*

George K. Yin, *Preventing Congressional Violations of Taxpayer Privacy*,
69 Tax Law. 103 (2015) ...................................................................... 14, 15, 16, 17

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center (CAC) is a think tank, public interest law firm, and action center dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and preserve the rights, freedoms, and structural safeguards that our nation's charter guarantees. CAC accordingly has a strong interest in this case and in the scope of Congress's investigative powers.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Supreme Court has long recognized that "[t]he power of the Congress to conduct investigations is inherent in the legislative process," and "[t]hat power is broad." *Watkins v. United States*, 354 U.S. 178, 187 (1957). Indeed, it "is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." *Barenblatt v. United States*, 360 U.S. 109, 111 (1959). Exercising that power in April 2019, the House Committee on Ways and Means, through its Chairman Richard Neal, requested that the Department of the Treasury and the Internal Revenue Service (IRS) provide the Committee with then-President Donald Trump's individual tax returns and the tax returns of eight of Trump's businesses for each of the tax years 2013 through 2018. It sought these returns as part of its investigative work as it "consider[ed] legislative proposals and conduct[ed] oversight related to our Federal tax laws, including, but not limited to, the extent to which the IRS audits and enforces the Federal tax laws against a President." Letter from Hon. Richard E. Neal, Chairman, H. Comm. on Ways & Means, to Hon. Charles P. Rettig, Commissioner, Internal Revenue Service at 1 (April 3, 2019) (hereinafter "April 2019 Request").

---

[1] *Amicus* states that no counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to the brief's preparation or submission.

The Committee requested this tax information pursuant to 26 U.S.C. § 6103(f)(1), which provides that, "[u]pon written request," the Secretary of the Treasury shall furnish the Committee with "any return or return information," 26 U.S.C. § 6103(f)(1). The Treasury Secretary denied that request. *See* Letter from Steven T. Mnuchin, Secretary, Dep't of the Treasury, to Richard E. Neal, Chairman, H. Comm. on Ways and Means (May 6, 2019), *available at* https://home.treasury.gov/system/files/136/Secretary-Mnuchin-Response-to-Chairman-Neal-2019-05-06.pdf.

In June 2021, the Committee issued a new request under 26 U.S.C. § 6103(f)(1) for the same categories of tax information, but for each of the tax years 2015 through 2020. That request stated that the former president's tax information "[is] not only instructive—but indispensable—to the Committee's inquiry into the mandatory audit program," Letter from Hon. Richard E. Neal, Chairman, H. Comm. on Ways & Means, to Hon. Janet L. Yellen, Secretary, U.S. Dep't of the Treasury, and Hon. Charles P. Rettig, Commissioner, Internal Revenue Service at 4 (June 16, 2021) (hereinafter "June 2021 Request")—a program described in the Internal Revenue Manual under which "individual income tax returns of a President are subject to mandatory examination," *id.* at 2. It also explained that "former President Trump's tax returns could reveal hidden business entanglements raising tax law and other issues, including conflicts of interest, affecting proper execution of the former President's responsibilities" and that "[a]n independent examination might also show foreign financial influences on former President Trump that could inform relevant congressional legislation." *Id.* at 4.

Trump and his businesses argue that the Committee's requests lack a legitimate legislative purpose and that "[t]he primary purpose of the requests" is instead "to obtain and expose Intervenors' information for the sake of exposure, to improperly conduct law enforcement, or some

other impermissible goal."  Answer & Counterclaims/Cross-Claims ¶ 64, ECF No. 113.  These arguments are at odds with decades of Supreme Court precedent that makes clear that courts must uphold congressional requests for records so long as the requests are not "plainly incompetent or irrelevant to any lawful purpose [of Congress] in the discharge of [its] duties."  *McPhaul v. United States*, 364 U.S. 372, 381 (1960) (quoting *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509 (1943)).  Indeed, these arguments would, if accepted, drastically cabin the scope of Congress's authority to investigate, thereby undermining Congress's ability to fulfill its institutional role in our system of government.

Significantly, Congress has exercised its investigative power since the beginning of the Republic.  As early as 1792, Congress investigated a military defeat by "send[ing] for necessary persons, papers and records" from the Washington Administration, and James Madison and other Framers of the Constitution voted in favor of this inquiry.  *McGrain v. Daugherty*, 273 U.S. 135, 161 (1927).  That investigation was only the first of many congressional investigations that have followed in the years since.

Consistent with this long history, the Supreme Court has repeatedly affirmed the existence of Congress's power to investigate and reiterated that the scope of that power is coextensive with the scope of Congress's power to legislate.  As the Court has explained, Congress's power to investigate is "broad," encompassing "inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes" and including "surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them."  *Watkins*, 354 U.S. at 187.  In discussing the breadth of Congress's investigatory power, the Court has made clear that the judiciary should not second-guess the legislature's judgment as to what investigations will facilitate Congress's exercise of its legislative power.  *McPhaul*, 364 U.S. at 381.

In exercise of that broad power, Congress passed Section 6103(f)(1) and its precursors, provisions that give certain congressional committees access to "any return or return information" relevant to the committees' investigations or oversight efforts. 26 U.S.C. § 6103(f)(1). Section 6103(f)(1) is therefore part of a "longstanding practice of according the tax committees unique and especially broad access to tax information." *Ways and Means Committee's Request for the Former President's Tax Returns and Related Tax Information Pursuant to 26 U.S.C. § 6103(f)(1)*, 45 Op. O.L.C. __, slip op. at 9 (July 30, 2021) (hereinafter "2021 OLC Opinion").

Here, the Committee's requests under Section 6103(f)(1) are plainly valid. As the written requests make clear, the requested tax documents would aid the Committee's investigations into the need to amend or extend the nation's tax laws, as well as the need to enact new legislation on the IRS's presidential audit program and ways to address presidential conflicts of interest and business entanglements, among other things. As noted above, an investigation exceeds Congress's powers only when it is "plainly incompetent or irrelevant to any lawful purpose [of Congress] in the discharge of [its] duties." *McPhaul*, 364 U.S. at 381 (quoting *Endicott Johnson Corp.*, 317 U.S. at 509). Trump and his business entities have not made—and cannot make—that showing here.

## ARGUMENT

## I.    Legislative Investigations Have a Long History, Both in the British Parliament and in Early American Congresses.

The practice of legislative oversight predates the birth of the United States, with "roots [that] lie deep in the British Parliament." James M. Landis, *Constitutional Limitations on the Congressional Power of Investigation*, 40 Harv. L. Rev. 153, 159 (1926). In the 1680s, for example, the British Parliament investigated issues as diverse as the conduct of the army in "sending Relief" into Ireland during war, "Miscarriage in the Victualing of the Navy," and the

imposition of martial law by a commissioner of the East India Company. *Id.* at 162 (internal citation and quotation marks omitted). Parliament premised these investigations on the idea that it could not properly legislate if it could not gather information relevant to the topics on which it wanted to legislate. Thus, for instance, a February 17, 1728 entry in the *Commons' Journal* described a parliamentary committee's investigation of bankruptcy laws by explaining that the committee was "appointed to inspect what Laws are expired, or near expiring, and to report their Opinion to the House, which of them are fit to be revived, or continued, and who are instructed to inspect the Laws relating to Bankrupts, and consider what Alterations are proper to be made therein" and that it therefore had the "Power to send for Persons, Papers, and Records, with respect to that Instruction." *Id.* at 163 (internal citation and quotation marks omitted).

American colonial legislatures replicated this British practice of legislative investigation. "The colonial assemblies, like the House of Commons, very early assumed, usually without question, the right to investigate the conduct of the other departments of the government and also other matters of general concern brought to their attention." C.S. Potts, *Power of Legislative Bodies to Punish for Contempt*, 74 U. Pa. L. Rev. 691, 708 (1926). For example, in 1722, the Massachusetts House of Representatives declared that it was "not only their Privilege but Duty to demand of any Officer in the pay and service of this Government an account of his Management while in the Public [E]mploy." *Id.* (internal citation omitted). In exercising that duty, the House, over the objection of the Governor, called before it two military officers to question them about their "failure to carry out certain offensive operations ordered by the [H]ouse at a previous session." *Id.* Similarly, the Pennsylvania Assembly had "a standing committee to audit and settle the accounts of the treasurer and of the collectors of public revenues," *id.* at 709, which had the "full Power and Authority to send for Persons, Papers and Records," *id.* (internal citation omitted).

After the nation's Founding, early state legislatures also understood themselves to have the power to investigate and even to enforce subpoenas against witnesses.  For example, in 1824, the New York House of Representatives appointed a special committee to investigate corruption at the Chemical Bank and the handling of its charter.  In connection with this investigation, the committee required a witness to appear before the committee and, when he refused, adopted a resolution declaring "[t]hat there was no sufficient ground for his refusal to appear before the committee, and testify; that he was guilty of a misdemeanor and contempt of the House; that the sergeant-at-arms deliver him to the keeper of the jail . . . ; [and] that he be imprisoned until further order."  *Id.* at 718 (internal citation omitted).

The U.S. Congress also took actions early in the Republic's history demonstrating that it viewed its authority to investigate broadly.  As the Supreme Court would later recount, the first Congresses used compulsory process to investigate "suspected corruption or mismanagement of government officials."  *Watkins*, 354 U.S. at 192.  For instance, the House created a special committee in March 1792 to inquire into a significant military defeat.  Records of the debate in the House show that a majority of members believed that Congress itself should establish a select committee to investigate this matter, rather than direct the president to investigate.  For example, Representative Thomas Fitzsimons believed it "out of order to request the President . . . to institute . . . a Court of Inquiry," and instead argued that a committee was better suited "to inquire relative to such objects as came properly under the cognizance of this House, particularly respecting the expenditures of public money."  3 Annals of Cong. 492 (1792).  Similarly, Representative Abraham Baldwin "was convinced the House could not proceed but by a committee of their own," which "would be able to throw more light on the subject, and then the House would be able to determine how to proceed."  *Id.*  Thus, the House rejected a proposal directing the president to

6

carry out the investigation, and instead passed, by a vote of 44-10, a resolution creating its own investigative committee: "*Resolved*, That a committee be appointed to inquire into the causes of the failure of the late expedition under Major General St. Clair; and that the said committee be empowered to call for such persons, papers, and records, as may be necessary to assist their inquiries." *Id.* at 493.  Notably, "Mr. Madison, who had taken an important part in framing the Constitution only five years before, and four of his associates in that work, were members of the House of Representatives at the time, and all voted [in favor of] the inquiry." *McGrain*, 273 U.S. at 161 (citing 3 Annals of Cong. 494 (1792)).  Historical evidence suggests that President Washington cooperated fully with this investigation.[2]

Congress conducted numerous similar investigations over the succeeding years, many of which focused specifically on the president and his cabinet.  In 1800, the House of Representatives formed a select committee to investigate the circumstances of the Treasury Secretary's resignation. 10 Annals of Cong. 787-88 (1800).  Representative Roger Griswold believed such an investigation was important because if there is an investigation "on the retirement of every Secretary of the Treasury from office" about "his official conduct, it will operate as a general stimulus to the faithful discharge of duty." *Id.* at 788.  The committee was directed "to examine into the state of

---

[2] President Washington's cabinet agreed that the committee was authorized to make such inquiries and advised the president that he "ought to comply with the requests of Congress although he had the right to refuse to communicate any papers that would tend to injure the public good." William Patrick Walsh, *The Defeat of Major General Arthur St. Clair, November 4, 1791: A Study of the Nation's Response, 1791-1793*, at 58-59 (Feb. 1977) (unpublished Ph.D. dissertation, Loyola University of Chicago), *available at* https://ecommons.luc.edu/cgi/viewcontent.cgi? article=2772&context=luc_diss.  On April 4, 1792, Congress passed a bill requesting that the president "cause the proper officers" to produce "such papers of a public nature" as may be necessary for the investigation, 3 Annals of Cong. 536 (1792), and the Washington Administration complied, turning over all relevant documents because none were found to prejudice the public good, Walsh, *supra*, at 59 (citing Letter from President Washington to Henry Knox (Apr. 4, 1792), *in* XXXII *Writings of Washington* 15).

the Treasury, the mode of conducting business therein, the expenditures[] of the public money, and to report such facts and statements as will conduce to a full and satisfactory understanding of the state of the Treasury." *Id.* at 796-97.

Similarly, in 1832, the House created a committee to discover "whether an attempt was made by the late Secretary of War, John H. Eaton, fraudulently to give to Samuel Houston—a contract—and that the said committee be further instructed *to inquire whether the President of the United States had any knowledge of such attempted fraud*, and whether he disapproved of the same; and that the committee have power to send for persons and papers." Landis, *supra*, at 179 (quoting H.R. Rep. No. 22-502 (1832)) (emphasis added). Later, in 1860, Congress created a special committee to determine whether "any person connected with the present Executive Department of this Government," Cong. Globe, 36th Cong., 1st Sess. 1017-18 (1860), improperly attempted to influence legislation in the House "by any promise, offer, or intimation of employment, patronage, office, favors, or rewards, under the Government, or under any department, officer, or servant thereof, to be conferred or withheld in consideration of any vote given," *id.* at 1018. The committee had the "power to send for persons and papers, examine witnesses, and leave to report at any time, by bill or otherwise." *Id.*

Early congressional committees also conducted investigations concerning "the enactment of new statutes or the administration of existing laws." *Watkins*, 354 U.S. at 192-93. For instance, in 1827, the House Committee on Manufactures initiated an investigation to consider a revision of the tariff laws and sought the power to send for persons and papers in aid of that investigation. This proposal generated substantial debate. Although some members of Congress thought "that the only cases in which the House has a right to send for persons and papers, are those of impeachment, and of contested elections," Landis, *supra*, at 178 n.102 (internal citation omitted),

other members believed that where Congress is considering a measure "deeply affecting the interest of every man in the United States," Congress may "compel the attendance of witnesses who can give . . . practical information upon the subject," *id.* at 178 n.103 (internal citation omitted).  In the end, Congress voted to grant the committee subpoena power.  4 Cong. Deb. 861, 890 (1827).

In short, the power to investigate has been treated as a core congressional power since the early days of the Republic.  Since then, Congress has investigated a broad range of matters, including the "means used to influence the nomination of candidates for the Senate," *Reed v. Cnty. Comm'rs of Del. Cnty.*, 277 U.S. 376, 386 (1928), alleged "interference with the loyalty, discipline, or morale of the Armed Services," *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 500 (1975), the problem of "mob violence and organized crime," *In re the Application of U.S. Senate Permanent Subcomm. on Investigations*, 655 F.2d 1232, 1233 (D.C. Cir. 1981), and the prevention of "sex trafficking, on the Internet," *Senate Permanent Subcomm. v. Ferrer*, 199 F. Supp. 3d 125, 128 (D.D.C. 2016), *vacated as moot*, 856 F.3d 1080 (D.C. Cir. 2017).  As the next Section discusses, the Supreme Court has repeatedly recognized that the congressional power to investigate is as broad as this history suggests.

## II.    The Supreme Court Has Consistently Affirmed that Congress's Power to Investigate Is Coextensive with Its Power to Legislate.

Consistent with this long history, the Supreme Court has recognized that Congress's power to investigate is inherent in its power to legislate—and that this power is broad.  In *McGrain v. Daugherty*, the Court considered whether the Senate, in the course of an investigation regarding the Department of Justice, could compel a witness—in that case, the attorney general's brother— to appear before a Senate committee to give testimony.  273 U.S. at 150-52.  The Court held that "the Senate—or the House of Representatives, both being on the same plane in this regard—has

power, through its own process, to compel a private individual to appear before it or one of its committees and give testimony needed to enable it efficiently to exercise a legislative function belonging to it under the Constitution." *Id.* at 154.  As the Court explained, the power to compel witnesses to testify is an essential aspect of the power to legislate: "A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change." *Id.* at 175.  The Court continued, "[W]here the legislative body does not itself possess the requisite information—which not infrequently is true— recourse must be had to others who do possess it. *Id.*

Applying these principles, the Court then asked whether the particular subpoena at issue was designed "to obtain information in aid of the legislative function." *Id.* at 176.  The Court concluded that "the subject to be investigated was the administration of the Department of Justice—whether its functions were being properly discharged or were being neglected or misdirected." *Id.* at 177.  As the Court explained, "Plainly the subject was one on which legislation could be had and would be materially aided by the information which the investigation was calculated to elicit," *id.*, especially in view of the fact that the powers of the Department of Justice and the attorney general were subject to legislation, *id.* at 178.

Two years later, the Court reiterated that "the power of inquiry is an essential and appropriate auxiliary to the legislative function." *Sinclair v. United States*, 279 U.S. 263, 291 (1929).  It thus affirmed an individual's conviction for contempt of Congress under 2 U.S.C. § 192, which provides for the criminal punishment of witnesses who refuse to answer questions or provide documents pertinent to a congressional investigation.  Rejecting the defendant's claim that the investigation at issue was not related to legislation, the Court stated that because Congress can legislate "respecting the naval oil reserves" and "other public lands and property of the United

States," a Senate committee "undoubtedly" had the power "to investigate and report what had been and was being done by executive departments under the Leasing Act, the Naval Oil Reserve Act, and the President's order in respect of the reserves and to make any other inquiry concerning the public domain."  *Sinclair*, 279 U.S. at 294.

The Court again outlined a broad view of Congress's power to investigate in its 1955 decision in another case involving 2 U.S.C. § 192.  As in *McGrain*, the Court in *Quinn v. United States* made clear the breadth of Congress's investigatory powers, explaining, "There can be no doubt as to the power of Congress, by itself or through its committees, to investigate matters and conditions relating to contemplated legislation.  This power, deeply rooted in American and English institutions, is indeed co-extensive with the power to legislate."  349 U.S. 155, 160 (1955).  The Court emphasized that "[w]ithout the power to investigate—including of course the authority to compel testimony, either through its own processes or through judicial trial—Congress could be seriously handicapped in its efforts to exercise its constitutional function wisely and effectively.  *Id.* at 160-61.

Similarly, in *Watkins v. United States*, the Court made clear yet again that "an investigation is part of lawmaking," 354 U.S. at 197, and once more described the congressional investigatory power expansively.  The Court stated, "The power of the Congress to conduct investigations is inherent in the legislative process."  *Id.* at 187.  The Court explained that Congress's investigative "power is broad," emphasizing that it "encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes," "includes surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them," and "comprehends probes into departments of the Federal Government to expose corruption, inefficiency or waste."  *Id.*  And again, in *Eastland v. U.S. Servicemen's Fund*, the Court

11

recognized that "the power to investigate is inherent in the power to make laws" and that the "[i]ssuance of subpoenas . . . has long been held to be a legitimate use by Congress of its power to investigate." 421 U.S. at 504.  Indeed, the Court ruled, the "power of inquiry" is such "an integral part of the legislative process" that the Speech or Debate Clause provides complete immunity for Congressmembers' decision to issue a subpoena.  *Id.* at 505, 507.  "The issuance of a subpoena pursuant to an authorized investigation," as the Court explained, is "an indispensable ingredient of lawmaking."  *Id.* at 505.

The Court also relied on "Congress' broad investigative power" in upholding a statute that required the preservation of presidential materials from the Nixon Administration.  Among the "substantial public interests that led Congress to seek to preserve [these] materials" was "Congress' need to understand how [our] political processes had in fact operated" during "the events leading to [Nixon]'s resignation . . . in order to gauge the necessity for remedial legislation." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 453 (1977).

Most recently, in *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020), the Court reaffirmed the general importance and breadth of Congress's investigative authority.  That case concerned a series of subpoena requests from three House committees for certain documents in the custody of Mazars USA LLP, Deutsch Bank AG, and Capital One Financial Corporation related to President's Trump's finances, as well as those of his family and businesses, from 2011 through 2019.  The Court noted that it has long recognized that Congress has the "power 'to secure needed information' in order to legislate" and that this "'power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function.'"  *Id.* at 2031 (quoting *McGrain*, 273 U.S. at 161, 174).  The Court explained that without that information, "Congress would be shooting in the dark, unable to legislate 'wisely or effectively.'"  *Id.* (quoting *McGrain*, 273 U.S.

at 175).   Indeed, the Court reiterated that "[t]he congressional power to obtain information is 'broad' and 'indispensable,'" as "[i]t encompasses inquiries into the administration of existing laws, studies of proposed laws, and 'surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them.'"   *Id.* (quoting *Watkins*, 354 U.S. at 187); *see also id.* at 2033 ("It is the proper duty of a representative body to look diligently into every affair of government and to talk much about what it sees." (quoting *United States v. Rumely*, 345 U.S. 41, 43 (1953))).

Although the Court in *Mazars* concluded that an analysis of congressional subpoenas involving a sitting president should include "special considerations," such as "whether the asserted legislative purpose warrants the significant step of involving the President and his papers" and the extent of the "burdens imposed on the President by [the] subpoena," *id.* at 2035-36, any separation of powers concerns are significantly lessened now that the requests pertain to a *former* president and his businesses, *see* 2021 OLC Opinion at 28 ("This distinction greatly mitigates the Court's concerns about Congress using its investigatory power to exert control over the President."); *cf. Trump v. Mazars USA LLP*, No. 19-CV-01136 (APM), 2021 WL 3602683, at *13 (D.D.C. Aug. 11, 2021) (the "constitutional concerns" discussed in the Supreme Court's decision in *Mazars* are "admittedly less substantial when a former President is involved," such that a "less detailed and substantial evidentiary submission to substantiate Congress's claimed legislative purpose may suffice" (internal quotation marks omitted)); *Hearings Before the H. Special Comm. on Investigation of U.S. Steel Corp.*, 62d Cong., 1st Sess. 1392 (1911) (statement of Theodore Roosevelt ("[A]n ex-President is merely a citizen of the United States, like any other citizen, and it is his plain duty to try to help this committee or respond to its invitation, just as anyone else would respond.").   Indeed, the Supreme Court has long recognized that a president's expectation

of privacy is "subject to erosion over time after an administration leaves office." *Nixon*, 433 U.S. at 451.

In sum, the Supreme Court has long recognized that Congress's power to investigate is "broad," encompassing "inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes" and including "surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them." *Watkins*, 354 U.S. at 187.

## III. The Ways and Means Committee's Broad Power to Access Tax Information for Investigatory Purposes Is Consistent with the History of Section 6103.

Section 6103(f)(1) of the Tax Reform Act of 1976—the provision that the Committee invoked in its 2019 and 2021 requests—provides that "[u]pon written request from the chairman of the Committee on Ways and Means of the House of Representatives, . . . the Secretary shall furnish such committee with any return or return information specified in such request." 26 U.S.C. § 6103(f)(1). The history of this provision and its precursors further demonstrates that the power of the House Ways and Means Committee to inspect tax records is as broad as the text of Section 6103(f)(1) suggests.

The nation's first income tax laws from the 1860s "generally gave the public full access to the tax returns of taxpayers." George K. Yin, *Preventing Congressional Violations of Taxpayer Privacy*, 69 Tax Law. 103, 119 (2015). That full publicity rule, however, was unpopular from its inception, and over the next few decades, Congress passed laws making "complete secrecy of returns . . . the order of the day unless the President ordered otherwise." *Id.*; *see, e.g.*, Act of July 14, 1870, ch. 255, § 11, 16 Stat. 256, 259 (barring the publication of certain tax information in newspapers); Tariff Act of 1894, ch. 349, § 34, 28 Stat. 509, 557-58 (making it a misdemeanor to disclose certain tax records outside of the tax agency). In the early twentieth century, Congress

repeatedly quashed efforts to give its committees the ability to inspect tax returns. *See* Yin, *supra*, at 119-20 (collecting examples).

In 1924, however, in response to failed congressional efforts to access tax records relevant to two key investigations, "the political branches decided to afford the congressional tax committees a special role." 2021 OLC Opinion at 5. The first of these investigations concerned those suspected of involvement in the Teapot Dome Scandal, an incident in which government officials accepted bribes in exchange for leasing public oil fields to private interests. *See* Yin, *supra*, at 121. Congress sought the tax returns of the officials who allegedly took part in that scandal, but it lacked direct access to that information; instead, President Coolidge had to authorize the release of the returns. *Id.* Although the president ultimately granted that authorization, "this experience undoubtedly demonstrated to Congress why it should have direct access to the information independent of the President's authority." *Id.*

The second impetus for congressional committees' increased access to tax records involved a 1924 Senate investigation of the Bureau of Internal Revenue, the predecessor to the IRS. *Id.* That investigation was prompted in part by the Bureau's alleged publication of a senator's tax returns at the direction of the Secretary of the Treasury. *Id.* The investigation of this incident "had been stymied by the inability of the investigating committee to examine tax returns," underscoring Congress's need to access tax records when investigations of alleged misconduct make these records relevant. *Id.*

To overcome these obstacles to the conduct of future investigations, Senator George Norris proposed an amendment to the tax laws that would have made tax returns fully open to the public once again. *See* 65 Cong. Rec. 7692 (1924). The Senate passed that amendment, *id.*, but the House rejected the full publicity proposal and agreed instead to a provision limiting access to tax returns

to congressional committees, *see* H.R. 6715, 68th Cong. § 257 (1924).  Thus, under the Revenue Act of 1924, which Congress passed and President Coolidge signed into law, the House Ways and Means Committee, the Senate Finance Committee, and a "special committee" of Congress "shall have the right to call on the Secretary of the Treasury for, and it shall be his duty to furnish, any data of any character contained in or shown by the returns . . . that may be required by the committee."  Revenue Act of 1924, ch. 234, § 257(a), 43 Stat. 253, 293.  Two years later, Congress created the Joint Committee on Internal Revenue Taxation and granted it the same right of access to returns enjoyed by the Ways and Means Committee.  Those "committees were given the discretion to determine what tax returns, if any, would be disclosed to the public."  Yin, *supra*, at 127.

A common sentiment among members of Congress in the debates preceding the 1924 Act's passage was that "[t]he existing secrecy provisions in the law should be properly amended" so that "[t]he insurmountable wall of secrecy now existing in the law would [no longer] block any . . . proposed investigation [by Congress]."  65 Cong. Rec. 2614 (1924).  Even those who believed in more limited disclosure laws "agree[d] . . . that there should be some congressional method found to examine these returns" so as not to "restrict the power of Congress to investigate false returns."  *Id.* at 2959 (statement of Rep. Hawes).  The Revenue Act therefore reflected Congress's recognition that, to allow for the effective operation of critical investigations, certain congressional committees, including the House Ways and Means Committee, must have broad and direct access to individuals' tax returns.

Fifty years later, the pendulum swung back in favor of greater protection of tax information, but Congress continued to recognize the vital importance of allowing its tax committees special access to that information.  In the mid-1970s, concerns about confidentiality

arose when President Nixon and the Secretary of the Treasury repeatedly shared individuals' tax information with members of the executive branch, even though the Revenue Act had allowed only certain congressional committees to access tax returns.  *See* 2021 OLC Opinion at 7.  For instance, President Nixon issued two executive orders authorizing the Department of Agriculture to inspect the tax returns of all farmers, "spark[ing] public and congressional outrage."  Yin, *supra*, at 130; *see also Confidentiality of Tax Return Information: Hearing Before H. Comm. on Ways & Means*, 94th Cong. 90 (1976) (hereinafter "*Confidentiality Hearing*") (statement of Hon. Litton) (expressing concerns after Nixon's executive orders that "the returns of other Americans are equally susceptible to mass inspection").  Members of Congress began to question "whether the extent of actual and potential disclosure of returns and return information to other Federal and State agencies for non-tax purposes breached a reasonable expectation of privacy."  Staff of the Joint Comm. on Taxation, 94th Cong., *General Explanation of the Tax Reform Act of 1976*, JCS-33-76, at 314 (1976) (hereinafter "*General Explanation*").  In response, Congress reformed the Internal Revenue Code by passing the Tax Reform Act of 1976, which sought to "balance Government's need for tax return information with the citizens' right of privacy."  122 Cong. Rec. 24013 (1976) (statement of Sen. Dole); *see Confidentiality Hearing* at 154 (noting that "inspection [by the congressional committees] presumably is needed either as part of [congressional committees'] tax oversight function or as an aid in the drafting of tax legislation" and "recommend[ing] that the existing statutory authority . . . for disclosure . . . to [these committees] be continued").  Among other things, the new law limited the executive branch's access to individuals' tax returns and guaranteed that "[r]eturns" and "return information" "shall be confidential, . . . except as authorized by this title."  26 U.S.C. § 6103(a).

Section 6103(f)(1) presents one of those exceptions, which, like its predecessors since

1924, "singles out the tax committees for special treatment and enhanced access to tax information." 2021 OLC Opinion at 8 (citing *General Explanation* at 317-18; S. Rep. No. 94-938, at 320 (1976)).  Moreover, as the July 2021 OLC Opinion observed, "[o]ne notable change from earlier iterations of the law is that tax committee requests for tax information must be submitted in writing by the chairman of one of the committees. *Id.* at 9 (comparing 26 U.S.C. § 6103(f)(1) (2018) with 26 U.S.C. § 6103(d)(1) (1970)).  The "apparent purpose" of the requirement that "the highest-ranking official of a particular governmental unit [must] pass upon and approve any request for a disclosure" is "to ensure that disclosure is warranted." *Congressional Access to Tax Returns—26 U.S.C. § 6103(f)*, 1 Op. O.L.C. 85, 89 (1977).  Thus, Section 6103(f)(1) "continues the longstanding practice of according the tax committees unique and especially broad access to tax information." 2021 OLC Opinion at 9; *see id.* at 24 ("The political branches have repeatedly determined over the course of the last century that the congressional tax committees should have a statutorily unlimited right of access to tax information—an authority predicated, at least in part, upon the judgment that those committees are uniquely suited to 'assure explicit, deliberate, and responsible Congressional attention to the use made by its members and committees of individual tax returns.'" (quoting *Confidentiality Hearing* at 154)).

Since the passage of the 1976 statute, "the tax committees have occasionally relied upon section 6103(f)(1) to inspect and obtain tax returns and (more frequently) information about the IRS's treatment of tax returns," and "before 2019, Treasury had never before denied such a section 6103(f)(1) request." *Id.* at 11.  The requests at issue here are plainly valid exercises of Congress's power under Section 6103(f)(1), as the next Section explains.

## IV.   The Committee's Requests for Documents Fall Well Within Congress's Investigatory Powers.

As described above, Congress's power to investigate is "broad," encompassing "inquiries

concerning the administration of existing laws as well as proposed or possibly needed statutes." *Watkins*, 354 U.S. at 187.   This Court therefore must uphold the Committee's requests for documents so long as they are not "plainly incompetent or irrelevant to any lawful purpose [of Congress] in the discharge of [its] duties." *McPhaul*, 364 U.S. at 381 (quoting *Endicott Johnson Corp.*, 317 U.S. at 509).   The Committee's requests plainly satisfy this standard.

As Chairman Neal explained in the Committee's April 2019 request for then-President Trump's individual tax returns and those of eight of his businesses for tax years 2013 through 2018, the Committee sought that information because it was "considering legislative proposals and conducting oversight related to our Federal tax laws, including, but not limited to, the extent to which the IRS audits and enforces the Federal tax laws against a President."   April 2019 Request at 1.   Reflecting the potential need for new legislation, the Committee's June 2021 request for tax information from 2015 to 2020 elaborated on the Committee's particular interest in former President Trump's tax returns, emphasizing that, among previous presidents, "Donald J. Trump is a unique taxpayer" because, "[u]nlike his predecessors, he controlled hundreds of businesses throughout his term [in office], raising concerns about financial conflicts of interest that might have affected the administration of laws, including the tax laws."   June 2021 Request at 4.   Thus, Trump's tax records will inform Congress's assessment of whether stronger conflicts of interest laws are necessary to account for the possibility of future presidents with similarly large business holdings.

The Committee indicated that it also needed the requested tax information to perform critical oversight functions, as Trump "also represented that he had been under continuous audit by the IRS prior to and during his Presidency, . . . and routinely complained in public statements about alleged unfair treatment by the IRS."   *Id.*   Thus, the Committee explained that Trump's tax

information "[is] not only instructive—but indispensable—to the Committee's inquiry into the mandatory audit program." *Id.*  The Committee also stated that "former President Trump's tax returns could reveal hidden business entanglements raising tax law and other issues, including conflicts of interest, affecting proper execution of the former President's responsibilities," and that "[a]n independent examination might also show foreign financial influences on former President Trump that could inform relevant congressional legislation." *Id.*  In short, the Committee's requests made clear that they sought the requested tax information for legitimate legislative reasons: to investigate the efficacy of current tax laws and assess the need for any amendments, extensions, or new legislation.

Intervenors are therefore wrong to assert that "[t]he primary purpose of the requests" is "not to study federal legislation," but instead "to obtain and expose Intervenors' information for the sake of exposure, to improperly conduct law enforcement, or some other impermissible goal." Answer & Counterclaims/Cross-Claims ¶ 64, ECF No. 113.  In fact, the Committee's June 2021 request specifically stated that it would be "wrong" to suggest that "the true and sole purpose of the Committee's inquiry here is to expose former President Trump's tax returns."  June 2021 Request at 7.

The Committee's stated reasons for the requests are also entitled to a presumption of good faith and regularity, which the Supreme Court typically affords to "the official acts of public officers."  *United States v. Chem. Found.*, 272 U.S. 1, 14-15 (1926); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)); *cf. Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2579-80 (2019) (explaining that executive agencies are entitled to a presumption of regularity, reflecting respect for a coordinate branch of government whose officers take an oath to support the Constitution); *Reno v. Am.-Arab Discrim. Comm.*, 525 U.S. 471, 489 (1999) (requiring

"clear evidence" to displace the presumption of regularity afforded to a federal prosecutor (quoting *United States v. Armstrong*, 517 U.S. 456, 465 (1996)).   The Supreme Court also generally presumes that acts of Congress are constitutional, *see Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 537-38 (2012) (Roberts, C.J.), exemplifying the trust that courts ordinarily place in members of Congress to act in good faith and consistent with their oaths of office.   Given the numerous legitimate legislative reasons the Committee provided for its requests, it is far from "obvious" that those requests "exceeded the bounds of legislative power," *Tenney v. Brandhove*, 341 U.S. 367, 378 (1951), as would be necessary to overcome the requests' presumption of good faith and regularity.

* * *

In sum, the Committee's requests serve legitimate legislative purposes and are wholly consistent with Congress's plan in passing Section 6103(f)(1) to afford certain committees broad access to tax information.   Intervenors' arguments, if accepted, would drastically cabin the scope of Congress's power to investigate.   Such a result would be at odds with our nation's rich history of congressional investigations and with decades of Supreme Court precedent affirming that Congress possesses broad power to investigate.

## CONCLUSION

For the foregoing reasons, this Court should grant Counter-Defendant's and Cross-Defendants' Motions to Dismiss.

Respectfully submitted,

Dated:  September 15, 2021

*Brianne J. Gorod*
Brianne J. Gorod

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Dayna J. Zolle (DC Bar No. 1672633)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

22

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Local Rule 7(o)(4) because it does not exceed 25 pages.

I further certify that the attached *amicus* brief complies with the typeface and type style requirements of Local Rule 5.1(d) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 and 12-point Times New Roman font.

Executed this 15th day of September, 2021.

/s/ Brianne J. Gorod
Brianne J. Gorod
*Counsel for Amicus Curiae*