**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE ON WAYS AND MEANS, UNITED STATES HOUSE OF REPRESENTATIVES, <br> *Plaintiff–Counterdefendant*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF THE TREASURY; INTERNAL REVENUE SERVICE; JANET YELLEN, in her official capacity as Secretary of the United States Department of the Treasury; and CHARLES P. RETTIG, in his official capacity as Commissioner of the Internal Revenue Service, <br> *Defendants–Crossdefendants*, <br><br> and <br><br> DONALD J. TRUMP; THE DONALD J. TRUMP REVOCABLE TRUST; DJT HOLDINGS LLC; DJT HOLDINGS MANAGING MEMBER LLC; DTTM OPERATIONS LLC; DTTM OPERATIONS MANAGING MEMBER CORP.; LFB ACQUISITION MEMBER CORP.; LFB ACQUISITION LLC; and LAMINGTON FARM CLUB, LLC d/b/a TRUMP NATIONAL GOLF CLUB-BEDMINSTER, <br> *Intervenors–Counterclaimants–Crossclaimants*. | No. 1:19-cv-1974-TNM |

<u>**AMENDED ANSWER AND COUNTERCLAIMS/CROSS-CLAIMS**</u>

Intervenors—Donald J. Trump, The Donald J. Trump Revocable Trust, DJT Holdings LLC, DJT Holdings Managing Member LLC, DTTM Operations LLC, DTTM Operations Managing Member Corp, LFB Acquisition Member Corp., LFB Acquisition LLC, and Lamington Farm Club, LLC d/b/a Trump National Golf Club-Bedminster—respectfully submit this amended responsive pleading.

1

## ANSWER

1.      Intervenors deny that the Committee's requests are valid oversight requests or that they are entitled to any relief. Intervenors admit the rest.

2.      The text of Section 6103(f) speaks for itself. Intervenors admit that Congress enacted the Revenue Act of 1924 in 1924. Intervenors deny for lack of knowledge the allegations regarding the frequency of the use of Section 6103(f) and the extent of the Executive Branch's compliance therewith. Intervenors deny the rest.

3.      Intervenors admit that to date, Defendants have declined to produce President Trump's tax return information in response to the Committee's requests. Intervenors deny the rest.

4.      The text of Section 6103(f) speaks for itself. Intervenors lack sufficient information to respond to the allegations about alleged statements by the President. Intervenors deny the rest.

5.      Deny.

6.      Deny.

7.      Intervenors admit that to date, Defendants have not complied with the Committee's subpoenas for nearly identical information and have cited advice from the Office of Legal Counsel concluding that Defendants have acted correctly. Intervenors deny the rest.

8.      The cited authority speaks for itself. The remainder of the paragraph consists of legal conclusions to which no response is required.

9.      Intervenors admit that the Committee asks this Court to order Defendants to produce the requested information. Intervenors deny the rest.

10.     Intervenors admit that the Court has jurisdiction over this action.

11.     Admit.

12.     Admit.

13.     Admit.

14.     Admit.

15.     Deny. Janet Yellen is the current Secretary of the Treasury and this action continues against her in her official capacity.

16.     Deny.

17.     Intervenors deny for lack of knowledge.

18.     The cited authority speaks for itself. The remainder of the paragraph consists of legal conclusions to which no response is required.

19.     The cited authority speaks for itself. The remainder of the paragraph consists of legal conclusions to which no response is required.

20.     The cited authorities speak for themselves. The remainder of the paragraph consists of legal conclusions to which no response is required.

21.     The cited authorities speak for themselves. The remainder of the paragraph consists of legal conclusions to which no response is required.

22.     The cited authorities speak for themselves. The remainder of the paragraph consists of legal conclusions to which no response is required.

23.     Intervenors admit that Congress has enacted legislation purporting to require Treasury to provide the Committee with tax return information. The remainder of the paragraph consists of legal conclusions to which no response is required.

24.     The cited authority speaks for itself. The remainder of the paragraph consists of legal conclusions to which no response is required.

25.     Admit.

26.     Admit.

27.     The cited authorities speak for themselves. The remainder of the paragraph consists of legal conclusions to which no response is required.

28.     The cited authority speaks for itself. The remainder of the paragraph consists of legal conclusions to which no response is required.

29.     The text of Section 6103(f) speaks for itself. The remainder of the paragraph consists of legal conclusions to which no response is required.

30.     Intervenors admit that Congress enacted the Revenue Act of 1924 in 1924. The remainder of the paragraph consists of legal conclusions to which no response is required.

31.     The cited authorities speak for themselves. The remainder of the paragraph consists of legal conclusions to which no response is required.

32.     The cited authorities speak for themselves. The remainder of the paragraph consists of legal conclusions to which no response is required.

33.     The cited authorities speak for themselves. The remainder of the paragraph consists of legal conclusions to which no response is required.

34.     Intervenors admit that Congress enacted the Revenue Act of 1924 in 1924. The cited authorities speak for themselves. The remainder of the paragraph consists of legal conclusions to which no response is required.

35.     Intervenors admit that Congress enacted the Tax Reform Act of 1976 in 1976. The cited authorities speak for themselves. The remainder of the paragraph consists of legal conclusions to which no response is required.

36.      The cited authorities speak for themselves. The remainder of the paragraph consists of legal conclusions to which no response is required.

37.     The cited documents speak for themselves. Intervenors deny the remaining allegations for lack of knowledge.

38.     Deny for lack of knowledge.

39.     The cited documents speak for themselves. Intervenors deny the remaining allegations for lack of knowledge.

40.     Deny for lack of knowledge.

41.     The cited document speaks for itself. Intervenors deny the remaining allegations for lack of knowledge.

42.     The cited documents speak for themselves. Intervenors admit the IRS audit policy was adopted in 1977. The remainder of the paragraph consists of legal conclusions to which no response is required.

43.     The cited documents and authority speak for themselves. The remainder of the paragraph consists of legal conclusions to which no response is required.

44.     The cited documents speak for themselves. The remainder of the paragraph consists of legal conclusions to which no response is required.

45.     The cited documents speak for themselves. The remainder of the paragraph consists of legal conclusions to which no response is required.

46.     Deny.

47.     The cited documents speak for themselves. Intervenors deny that President Trump has frequently attacked the integrity of, or continually expressed disdain for, the IRS's audit system. Intervenors deny the rest.

48.     The cited documents speak for themselves. Intervenors deny the rest.

49.     Intervenors admit that President Trump has declined to disclose his tax returns and that President Trump and Defendant Rettig made the quoted statements. Intervenors deny the rest.

50.     Intervenors admit that President Trump made the quoted statements.

51.     The text of H.R. 1 speaks for itself. Intervenors deny the rest.

52.     Intervenors admit that the Tax Transparency Act of 2019, H.R. 1489, 116th Cong. (2019), the Presidential Allowance Modernization Act of 2019, H.R. 1496, 116th Cong. (2019), the RIGHT Act of 2019, H.R. 1028, 116th Cong. (2019), and the Charitable Conservation Easement Program Integrity Act of 2019, H.R. 1992, 116th Cong. (2019), were referred to the Committee. Intervenors deny the rest.

53.     Intervenors admit the Committee convened a hearing on February 7, 2019. The transcript of the hearing speaks for itself.

54.     Intervenors admit that numerous witnesses testified at the hearing. The transcript of the hearing speaks for itself.

55.     The transcript of the hearing speaks for itself. Intervenors deny the rest of the allegations in this paragraph.

56.     Intervenors admit that the Committee submitted an oversight plan. The cited document speaks for itself.

57.     Intervenors admit that the Committee on April 3, 2019, requested tax return information (including the "administrative files") for President Trump and eight related entities for tax years 2013 through 2018. The Committee has since submitted a modified request seeking information for the tax ears 2015-2020. Intervenors deny the rest.

58.     Intervenors admit that the Committee did not include within its April 2019 Section 6103(f) request a stated reason for the request and that Chairman Neal made the quoted statement. Intervenors deny the rest.

59.     Intervenors admit that the Committee has sought six years of tax return information, including "administrative files," for President Trump and eight related entities, and that Chairman Neal made the quoted statement. Intervenors deny the rest.

60.     Deny.

61.     Deny.

62.     Admit.

63.     Admit.

64.     Admit.

65.     Intervenors admit that on April 13, 2019, the Committee reiterated its Section 6103(f) request in a letter, the content of which speak for itself. Intervenors deny the rest.

66.     Admit, except to deny the characterization of counsel's support for Treasury's decisions to consult with the Department of Justice.

67.     Admit that the Secretary Mnuchin responded in a letter dated April 23, 2019, the content of which speaks for itself.

68.     Intervenors admit that Secretary Mnuchin made the quoted statements. Intervenors deny the rest.

69.     Intervenors admit that Secretary Mnuchin made the quoted statements. Intervenors deny the rest.

70.     Intervenors admit that the Commissioner of the IRS sent a letter to the Committee dated April 23, 2019, the content of which speaks for itself.

71.    Intervenors admit that Secretary Mnuchin and Commissioner Rettig sent letters to the Committee dated May 6, 2019, the contents of which speak for themselves. Intervenors deny the rest.

72.    Intervenors admit that the Committee issued subpoenas with a return date of May 17, 2019, but otherwise lack sufficient information to respond to the allegations in this paragraph.

73.    Intervenors admit that Chairman Neal made the quoted statements. Intervenors deny the rest.

74.    Intervenors admit that Chairman Neal made the quoted statements. Intervenors deny the rest.

75.    Intervenors admit that the Secretary of the Treasury and the Commissioner of the IRS responded by letters dated May 17, 2019, the contents of which speaks for themselves.

76.    Intervenors admit that Secretary Mnuchin made the quoted statement. Intervenors deny the rest.

77.    Intervenors admit that Commissioner Rettig made the quoted statements. Intervenors deny the rest.

78.    Deny.

79.    Deny for lack of knowledge.

80.    Deny for lack of knowledge.

81.    Deny for lack of knowledge.

82.    Intervenors admit that Chairman Neal sent a letter dated June 28, 2019, the content of which speaks for itself. Intervenors deny the rest for lack of knowledge.

83.    Intervenors admit that after Secretary Mnuchin and Commissioner Rettig declined to comply with the Committee's Section 6103(f) request, and that OLC published an opinion

supporting their decision to decline to provide the Committee with the tax returns, the content of which speaks for itself.

84.    The OLC opinion speaks for itself. Intervenors deny the rest of this paragraph.

85.    The OLC opinion speaks for itself. Intervenors deny the rest of this paragraph.

86.    The OLC opinion speaks for itself. Intervenors deny the rest of this paragraph.

87.    Deny.

88.    The paragraph sets forth legal conclusions, to which no response is required.

89.    The paragraph sets forth legal conclusions, to which no response is required.

90.    Deny.

91.    Deny.

92.    Deny.

93.    Deny.

94.    Deny.

95.    Intervenors admit that the House is not a continuing body and that the 116th Congress ended on January 3, 2021. Intervenors deny the rest.

96.    Deny.

97.    Deny.

98.    Intervenors admit that the Bipartisan Legal Advisory Group voted to authorize the Committee to initiate this litigation. The cited authorities speak for themselves. Intervenors deny the rest.

99.    Intervenors incorporate their responses to the preceding paragraphs, as if set forth fully herein.

100.    Intervenors admit that the Committee authorized, issued, and served the subpoenas on Defendants. Intervenors deny the rest.

101.    Intervenors admit that the subpoenas demand that the Defendants produce the documents set forth in Schedule A of the subpoenas. Intervenors deny the rest.

102.    Deny.

103.    Deny.

104.    Deny.

105.    Intervenors incorporate their responses to the preceding paragraphs, as if set forth fully herein.

106.    Intervenors admit that the statute's text includes the quoted language.

107.    Deny.

108.    Section 6103(f) speaks for itself. Intervenors deny the rest.

109.    Deny.

110.    Deny.

111.    Intervenors incorporate their responses to the preceding paragraphs, as if set forth fully herein.

112.    Intervenors admit that the statute's text includes the quoted language.

113.    Deny.

114.    Deny.

  i.    Deny.

 ii.    Deny.

iii.    Deny.

iv.    Deny.

115.    Deny.

116.    Intervenors incorporate their responses to the preceding paragraphs, as if set forth fully herein.

117.    Intervenors admit that the statute's text includes the quoted language.

118.    Deny.

119.    Deny.

    i.    Deny.

    ii.    Deny.

120.    Deny.

121.    Intervenors incorporate their responses to the preceding paragraphs, as if set forth fully herein.

122.    Intervenors admit that the statute's text includes the quoted language.

123.    Deny.

124.    Deny.

125.    Deny.

126.    Intervenors incorporate their responses to the preceding paragraphs, as if set forth fully herein.

127.    The text of Section 6103(f) speaks for itself. Intervenors deny the rest.

128.    Intervenors admit that the Committee provided Defendants with a written request for tax return information and that Defendants have not provided the requested documents. Intervenors deny the rest.

129.    Deny.

130.    Deny.

131.    Intervenors incorporate their responses to the preceding paragraphs, as if set forth fully herein.

132.    The text of Section 6103(f) speaks for itself. Intervenors deny the rest.

133.    Intervenors admit that the Committee provided Defendants with a written request for tax return information and that Defendants have not complied with that request. Intervenors deny the rest.

134.    Deny.

135.    Deny.

136.    Intervenors incorporate their responses to the preceding paragraphs, as if set forth fully herein.

137.    Deny.

138.    The text of Section 6103(f) speaks for itself. Intervenors deny the rest.

139.    Deny.

140.    Deny.

## RESPONSE TO PRAYER FOR RELIEF

Intervenors deny that the Committee is entitled to any relief.

## AMENDED COUNTERCLAIMS & CROSS-CLAIMS

1.      No one believes that the House Ways and Means Committee has requested President Trump's tax returns to study legislation about the IRS's mandatory presidential audit process.  To quote one Congressman, the Committee's request "is not in good faith" and "nobody believes [it's] in good faith." To quote another, "[o]f course it's political and House Democrats are attacking President Trump." Or to quote another, the request is "all about politics."

2.      The extensive public record, the mismatch between the Committee's request and rationale, the judgment of the executive branch, and the judgment of the U.S. Supreme Court all reflect what is already obvious to any reasonable observer: House Democrats requested President Trump's tax returns because they think he should have released the returns during the campaign, they assume he didn't because the information would hurt him politically, and they want to force the issue to cause him political damage.

3.      Not even those who support the Committee's quest to obtain President Trump's tax returns disagree. No one defends the Committee's audit rationale as a real purpose for the request; they argue that courts are powerless to evaluate anything but the face of the request.

4.      That has never been the law. When the House made similar arguments in *Trump v. Mazars*, the Supreme Court rejected them. As in that case, "[w]e would have to be blind not to see what all others can see and understand"—that the Committee's request is not "a run-of-the-mill legislative effort but rather a clash between rival branches of government over records of intense political interest for all involved." *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2034 (2020) (cleaned up). If this request is backed by a legitimate legislative purpose, then the legitimate-legislative-purpose standard—and the crucial separation-of-powers principles that it protects—has no meaning.

5.      Although the executive branch has decided to abet the Committee's attempt to expose the sensitive financial information of a political rival, its flip-flop does not make the request any more lawful. In fact, its participation creates still more legal defects. This Court should rule for Intervenors, and against the Committee and Defendants, on Intervenors' counterclaims and cross-claims.

## I.      2016 Presidential Campaign

6.      During the 2016 presidential campaign, then-Candidate Trump declined to disclose his federal tax returns.

7.      As Trump's tax attorneys explained then, his returns "have been under continuous examination by the Internal Revenue Service since 2002, consistent with the IRS's practice for large and complex businesses," and "[e]xaminations for returns for the 2009 year and forward are ongoing."

8.      Charles Rettig, before he became IRS Commissioner, explained that no "experienced tax lawyer representing Trump in an IRS audit [would] advise him to publicly release his tax returns during the audit." Rettig said the IRS can target wealthy individuals for audits by its so-called "Wealth Squad," a "specialized, experienced group of examiners solely focused on conducting audits of high-income/high-wealth taxpayers."

9.      Trump's nondisclosure of his tax returns became one of the biggest political issues in the 2016 campaign.

10.     The issue divided the country along partisan lines. In 2016, public polls showed that over 90% of Democratic voters wanted to see the tax returns. By 2018, that number had not dropped—with over 90% of Democrats wanting President Trump to disclose his tax returns versus only 30% of Republicans. And still in 2020, polls showed that Democrats' demand for President Trump's tax returns remained just as high.

11.     The most common talking point was that Trump should disclose his tax returns because, by tradition, other major-party nominees for President had disclosed their tax returns.

12.     Trump's critics exaggerated the scope of this tradition. The tradition had only been around since 1980 (or 9 out of 58 presidential elections). Presidential candidates who released no tax returns include John F. Kennedy, Lyndon B. Johnson, Dwight D. Eisenhower, and Franklin D. Roosevelt. The disclosures after 1980, moreover, were entirely voluntary. And the number of returns varied widely—for example, Bob Dole released 30, while Ronald Reagan released only one and Mitt Romney released only two. Focusing on major-party nominees also ignores the numerous other individuals who ran for President but disclosed no tax returns, including Jerry Brown, Richard Lugar, Ralph Nader, Steve Forbes, Ross Perot, and Mike Huckabee.

13.     Instead of tradition, the reason that Trump's Democratic opponents wanted him to disclose his tax returns is because they assumed that this information would damage him politically. As Secretary Clinton explained the general Democratic sentiment, "[A] lot of us were wondering, 'What is he hiding? It must be really terrible.'"

14.     Secretary Clinton summarized the common theories at a presidential debate: "[W]hy won't he release his tax returns? … Maybe he's not as rich as he says he is. Second, maybe he's not as charitable as he says he is. Third, we don't know all of his business dealings …. Or maybe he doesn't want the American people ... to know that he's paid nothing in federal taxes.... It must be something really important, even terrible, that he's trying to hide." Her campaign spokesman followed up by speculating that "Trump's returns show just how lousy a businessman he is AND how long he may have avoided paying any taxes."

15.     Vice President Biden agreed. Trump's position on his tax returns "anger[ed]" Biden. He accused Trump of not paying his "fair share" of taxes and of playing the American people "for suckers."

16.     Several attempts were made to force the disclosure of Trump's tax information.

17.     For example, Wikileaks suggested it was "working on" getting Trump's returns via hacking. Wikileaks later asked anyone with access to the tax returns to give them to Wikileaks so it could post the returns on its website while protecting the leaker's anonymity.

18.     The New York Times also claimed to have pages from Trump's 1995 tax returns, which it published shortly before election day.

19.     American Bridge 21st Century—a PAC closely associated with Hillary Clinton and whose goal was to "find what Republicans are hiding" and to "keep Donald Trump and the Republican Party unpopular"—created a website titled "Release Your Returns." Still today, the website pledges a donation of $5 million if Trump's returns are released. It also repeats Democrats' widely held reasons for wanting the returns disclosed. It reiterates the theories for why their disclosure would harm Trump politically, speculating that they would show "he hasn't been paying the taxes he owes," that "he isn't as wealthy as he claims," that "he hasn't donated to charity as much as he says," and even that "he has ties to the mafia."

## II.     115th Congress

20.     After the 2016 election, Trump was President, and the Republican Party had majorities in both the House and Senate. In this 115th Congress, Representative Kevin Brady (R-TX) was the chairman of the House Ways and Means Committee, and Representative Richard Neal (D-MA) was the ranking member.

21.     After President Trump's victory, Congressional Democrats' desire to expose his tax information to the public only grew stronger. Democrats assumed that the information would

hurt President Trump politically, undermine his agenda, hurt his reelection chances or the Republican Party's chances in the 2018 midterms, or reveal unlawful conduct that would provide grounds to remove him from office.

22.     During the 115th Congress, House Democrats made many attempts to obtain and publicly expose President Trump's tax information. Because they were in the minority, they knew that these attempts would likely fail—and thus never need to be defended in court. They therefore spoke more candidly about their purposes. In almost every statement, they admitted that their purpose was to disclose President Trump's tax information to the public. And they never once suggested that they wanted his information to help them study the IRS's mandatory audit process for Presidents.

23.     For example, less than two weeks into the 115th Congress, and before President Trump was even sworn in, 21 Democratic ranking members—including Representative Neal—wrote a letter to then-Speaker Ryan, urging him to obtain President Trump's tax information. Their letter made no mention of the IRS's mandatory audit process for Presidents.

24.     Shortly after President Trump was sworn in, Committee-Member Bill Pascrell (D-NJ) "urge[d]" Chairman Brady to use 26 U.S.C. §6103(f) to obtain "the President's federal tax returns." Without even seeing their contents, Committee-Member Pascrell also asked the Committee to "vote … to submit the President's federal tax returns to the House of Representatives—thereby … making them available to the public." Committee-Member Pascrell made no mention of the IRS's mandatory audit process for Presidents.

25.     Just a few months into the 115th Congress, Committee-Member Pascrell introduced a resolution that would require the Treasury Department to provide President Trump's tax

information to the full House. Ranking Member Neal and every other Committee Democrat cosponsored the resolution. Ranking Member Neal was one of the original cosponsors.

26.     In the debate over the resolution's markup, Committee Democrats argued that the resolution was appropriate because "the public" has a right to see President Trump's tax returns because he declined to disclose them during the election, because the tax returns might aid the then-ongoing Mueller investigation by proving a "Russia connection," and because the tax returns would show how the tax legislation that President Trump was pushing would affect him. No mention was made of the IRS's mandatory audit process for Presidents. In fact, Committee-Member Pascrell insisted that §6103 allows requests that are "not related to tax administration" and vehemently denied that "tax administration is the sole purpose of the disclosure."

27.     The Committee rejected this resolution. It correctly noted that the resolution had "no tie to any investigation within our jurisdiction," but would be the first time that the House sought "the disclosure of confidential personal tax return information for purposes of embarrassing or attacking political figures of another party." The Committee also correctly observed that "the information sought by the [resolution's] supporters"—including proof of foreign ties—"would not appear on the President's tax returns in the first place."

28.     Ranking Member Neal, and every other Committee Democrat who voted on the resolution, approved it. Speaking on behalf of all Committee Democrats, Ranking Member Neal also published a report on the resolution. The report reiterated that disclosure was warranted given the tradition of presidential candidates disclosing their tax returns "to the American public," and to show "the public" how the then-pending "tax reform will benefit President Trump and his vast business empire." No mention was made of the IRS's mandatory audit process for Presidents.

29.     Committee Democrats concluded their report by explaining how, under §6103(f)(1), only the Committee could obtain President Trump's tax information and then "submi[t]" that information "to the House." "Procedurally, upon submission to the House, the tax return and return information would become available to the public." Committee Democrats pledged that they "remain steadfast in our pursuit to have his individual tax returns disclosed to the public."

30.     Throughout the remainder of the 115th Congress, Committee Democrats repeatedly tried to force the public release of President Trump's tax information through letters, resolutions, draft legislation, proposed amendments, and more. Still today, Committee-Member Pascrell lists "Trump's Tax Returns" as one of the key "Issues" on his website, alongside "COVID-19," "Economy," and "Health Care." On this Trump's Tax Returns page, Committee-Member Pascrell has "a chronology" of 43 "attempts" by Democrats to disclose President Trump's confidential tax information—the first 28 of which occurred during the 115th Congress.

31.     On President Trump's tax information, House Democrats in the 115h Congress were united in their efforts and purposes. They worked together on all of their attempts to disclose this information, and they spoke in collective terms ("we," "us," "Democrats," and the like).

32.     While they were engaged in these relentless efforts, House Democrats gave many, ever-changing reasons for wanting President Trump's tax information. But their public statements were consistent in two major ways. First, House Democrats consistently said they wanted to expose President Trump's tax information to the public for the sake of exposure, not just to the House or a committee to study legislation. Second, they never once mentioned a desire to study the IRS's mandatory presidential audit process as a purpose for seeking President Trump's tax information.

33.     For example, in February 2017, then–Minority Leader Nancy Pelosi (D-CA) and all Ranking Member Democrats (including Representative Neal) held press conferences where they discussed President Trump's tax returns.

34.     In one press conference, speaking on behalf of the entire leadership team, Minority Leader Pelosi said that "we're calling on Chairman Brady to bring out those tax returns"—to "demand Trump's tax returns from the Secretary of the Treasury … and hold a committee vote to make those tax returns public." Leadership wanted these documents to find out "what do the Russians have on" President Trump.

35.     In another press conference, again speaking on behalf of the Democratic leadership and citing "Mr. Neal" specifically, Minority Leader Pelosi reiterated that Chairman Brady should "ask for the President's tax returns." She insisted that "[t]he American people have a right to know the truth."

36.     At another press conference in April 2017, Minority Leader Pelosi noted that "the American people want us to unlock that door"—meaning President Trump's tax information—and asked what "Republicans … are afraid of" if the information were released. Citing the ongoing Mueller investigation, Minority Leader Pelosi theorized that the tax returns "will be useful in the investigation of what do the Russians have on Donald Trump politically, personally, and financially."

37.     At a press conference in February 2017, Ranking Member Neal said he wanted the public to "see [President Trump's] tax forms" and for "the media to sift and sort" them.

38.     At a press conference regarding yet another attempt to "require President Trump … to disclose [his] tax returns to the American people," Ranking Member Neal admitted that House Democrats were trying to force public disclosure because President Trump had declined to

voluntarily disclose his returns during the campaign: "This is not about the law, this is about custom and practice. It's a settled tradition ... candidates reach the level of expectation that they're supposed to release their tax forms."

39.     At a town hall in March 2017, Ranking Member Neal explained to his constituents that he could not obtain President Trump's tax returns because he was not the chairman of Ways and Means. He agreed that the returns should be disclosed to the public because Presidents since Gerald Ford have traditionally disclosed that information.

40.     In September 2017, Ranking Member Neal provided a statement on yet another resolution to force Treasury to disclose President Trump's tax information. He stressed that "[t]ax returns" would reveal to "the American people" President Trump's "income and charitable giving."

41.     One week later, Ranking Member Neal drafted another report on another failed resolution to force Treasury to disclose President Trump's tax information. "[T]he public" needs to see the "[t]ax returns," the Ranking Member stressed, because they "provide the clearest picture of a president's financial health, including how much he earns, how much tax he pays, his sources of income (e.g., capital gains, dividend income, and certain business income), the size of his deductions, whether he makes charitable contributions, and whether he uses tax shelters, loopholes, or other special-interest provisions to his advantage."

42.     Committee-Member Bill Pascrell (D-NJ) stated that "[w]e must see Trump's tax returns to know just how far and how deep the crimes go." "Americans have a right to know if their President is a crook," he added. "Seeing Trump's tax returns will help us determine if he is one."

43.     Another time Committee-Member Pascrell said, "After losing dad's support, Trump went on a spending spree — where did that money come from? The only way to know is to get his tax returns. I'll never give up on this."

44.     In July 2018, Committee-Member Pascrell speculated that President Trump's tax returns would prove that he "skirt[ed] boundaries of ethics [and] law" and "consorted [with] mafia figures."

45.     In October 2018, Committee-Member Pascrell noted that he had "led efforts to obtain Trump's tax returns" and complained that House Republicans had "voted 18 times to block us." He theorized that, once the tax returns "come out," they would prove the "depth of Trump's corruption" and that "The Art of the Deal and The Apprentice are malignant myths."

46.     Also in October 2018, Committee-Member Pascrell criticized House Republicans for blocking the release of President Trump's tax information and thus preventing the Committee from proving "Trump's" supposed "lifetime of tax evasion and fraud."

47.     In June 2017, Committee-Member Lloyd Doggett (D-TX) said, "Today House Republicans voted to reject a resolution I offered that would end the cover-up of President Trump's tax returns. Trump has bragged about bending the Tax Code to his whim. He has said only he can fix it. My resolution would ensure that before Congress considers Trump's tax plan, the American people will understand whether he only plans to 'fix' the Tax Code for himself."

48.     In May 2018, Committee-Member Doggett noted that he had "demanded [President Trump's] tax returns" because "Americans deserve real answers on how Trump earns [and] spends [money]."

49.     In September 2018, Committee-Member Doggett again called for the disclosure of President Trump's tax returns because "Trump's ongoing threats to the Mueller investigation make the need ever more urgent to see what he may be hiding."

50.     In October 2018, Committee-Member Doggett surmised that House Republicans are "so determined to cover up Trump tax returns" because they want to conceal a "Russian connection" and the supposed fact that "Trump buil[t] his initial wealth through tax dodging— exploiting schemes to pay little tax on inherited millions." He added that "a New Congress" would be able to "review [President Trump's] returns" to "know whether or not the[] President is a crook."

51.     Also in October 2018, Committee-Member Doggett said "we need to see Trump's tax returns" to prove his supposed "tax evasion"—"exactly what I have tried to do 7 times."

52.     Committee-Member Doggett also said in October 2018 that the tax returns would reveal that "Trump's a self-made myth" and promised that, if Democrats took back the House in 2018, the Committee would not "even need a subpoena" to "obtain his tax returns." He reiterated that the returns would show a "Russian connection" and whether President Trump and his family benefited from the tax reform passed in December 2017. Once House Democrats got the returns, Committee-Member Doggett promised, "we'll … put a staff of CPAs to work looking and digging into those returns."

53.     In February 2017, Committee-Member Earl Blumenauer (D-OR) posted that "[a]s we all know, Donald Trump refuses to make his tax returns public." He reassured the public that "there are several actions beings taken to try and release this information." He said he was "working with Rep. Bill Pascrell Jr. and several of my colleagues" on a forced disclosure.

54.     In April 2017, Committee-Member Blumenauer said he supported the forcible release of President Trump's tax returns due to "precedent," to find out "[w]hat is he hiding," and because "America demand[s] answers."

55.     In August 2018, Committee-Member Blumenauer said that President Trump must be forced to release his tax returns to uncover the existence of "illicit payments" he allegedly made.

56.     In October 2018, Committee-Member Blumenauer said that, if Democrats took over the Ways and Means Committee, they would release President Trump's tax information to show that "Trump got rich through tax dodges, lied about it, & proceeded to give an enormous tax cut to the top 1%."

57.     In March 2017, Committee-Member Judy Chu (D-CA) stated, "As GOP & Trump prepare to pass tax reform legislation, we need Trump's tax returns to see how much he stands to benefit from his own plan."

58.     In April 2017, Committee-Member Chu said President Trump's tax returns would allow Americans to see whether he pays his "fair share" of taxes.

59.     Committee-Member Chu complained in October 2018 that Republicans had "blocked" Democrats' requests "to see Trump's tax returns" "8 different times." She insisted that "[w]e need to know the truth" and to "[r]elease the returns" to see if Trump committed fraud when he was a private citizen.

60.     In July 2017, Committee-Member Jimmy Gomez (D-CA) said that "[t]he American People have a right to know" what's in President Trump's tax returns and asked what House Republicans are "afraid of."

61.     In October 2018, Committee-Member Gomez said a report about President Trump's supposed "tax schemes" when he was a private citizen "highlights why the American people still deserve to see" his tax returns.

62.     Also in October 2018, Committee-Member Gomez said that the House should subpoena President Trump's tax returns to confirm that he committed widescale "[f]raud."

63.     In March 2017, Committee-Member Susan DelBene (D-WA) said she "support[s]" Committee-Member Pascrell's "resolution to force disclosure" of President Trump's tax returns because the President should have "nothing to hide."

64.     In April 2017, Committee-Member DelBene said that President Trump must be forced to "release his tax returns" because "[t]he American people deserve answers."

65.     Also in April 2017, Committee-Member Gwen Moore (D-WI) said that the House must forcibly disclose President Trump's tax returns because her "constituents have been clear" and "[t]he truth must be revealed."

66.     Also in April 2017, Committee-Member Dan Kildee (D-MI) said the House should forcibly disclose President Trump's tax returns because "[m]y constituents deserve transparency."

67.     In February 2017, Committee-Member Don Beyer (D-VA) surmised that House Republicans "don't want the people to see [President Trump's] taxes." During the 2016 campaign, Committee-Member Beyer had said that Trump is "[h]iding" something that his tax returns would reveal.

68.     In May 2017, Committee-Member Dwight Evans (D-PA) said that "[t]he American people are waiting to see" President Trump's tax returns, and noted that disclosure was "[e]specially" important due to the ongoing Russia investigation.

69.    In October 2018, Committee-Member Linda Sánchez (D-CA) said she "will continue to fight along with Ways and Means Committee Democrats" to force the "release" of President Trump's tax returns. "The American people deserve answers."

70.    In March 2017, Committee-Member Terri Sewell (D-AL) said she had "voted to release Trump's tax returns," tying the measure to Candidate Trump's decision to not release his tax returns during the campaign and asserting that "voters have the right to know."

71.    In September 2017, Committee-Member Sewell said that the Committee should force the disclosure of President Trump's tax information because "the public deserves transparency" as "Congress considers tax reform."

72.    In October 2018, Committee-Member Sewell reiterated that "[t]he Ways and Means Committee has the power to order the Treasury to release individual tax returns. That includes returns for Trump. Republicans have voted 18 times to keep Trump's tax returns buried-now is the time for them to correct course. The public deserves transparency."

73.    In February 2017, Committee-Member John Larson (D-CT) issued a press release, calling it "outrageous that my Republican colleagues on the Ways and Means Committee are blocking the American public's right to know what is in President Trump's tax returns" and promising that he would "continue to press this issue, so the American public can know the whole truth."

### III.    116th Congress

74.    After the 2018 midterm elections, Democrats took control of the House. Representative Neal became chairman of the Ways and Means Committee, and Representative Pelosi became Speaker of the House. As Speaker, she had to be consulted on and approve all major investigative efforts, including any request for President Trump's tax information.

75.     Before the election, Minority Leader Pelosi promised voters that, if Democrats won a House majority, then obtaining and releasing President Trump's tax returns "is one of the first things we'd do." "[T]hat's the easiest thing in the world. That's nothing."

76.     Similarly, in September 2018, Ranking Member Neal responded "Yeah" when asked whether he would "force" the disclosure of President Trump's tax returns if Democrats took back the House. He added that "Democrats have voted again and again to release those documents."

77.     Committee-Member Doggett added more detail about the Committee's plans, explaining that both "members" as well as "experts like CPAs" would do "a thorough review" of President Trump's tax returns to say "What does this show?". The likely "approach would be to get all of it, review it, and, depending on what that shows, release all or part of it" to the public.

78.     After winning a majority on election day, however, incoming Speaker Pelosi tried to lower expectations. She acknowledged in December 2018 that "[t]here is popular demand for the Congress to request the President's tax returns," but she would only commit that the Ways and Means Committee would "take the first steps" toward making the request. She cautioned that securing the returns is "a little more challenging than you might think."

79.     Incoming Chairman Neal echoed the Speaker's caution. He confirmed in October 2018 that, once he was chairman, he would "get the documents." But he warned that "[t]his has never happened before, so you want to be very meticulous." "It is not cut and dry." He said to "[a]nticipate a long court case."

80.     Chairman Neal also explained that a decision on how to proceed would be made only after he engaged in substantial discussions with other Committee Democrats and with the wider Democratic caucus.

81.     As soon as the 116th Congress began in January 2019, Speaker Pelosi confirmed that Democrats would try to obtain and expose President Trump's tax information. "I think overwhelmingly the public wants to see the president's tax returns," she added. "[T]hey want to know the truth, they want to know the facts and [that] he has nothing to hide."

82.     A spokesperson for Chairman Neal agreed, but cautioned that the Chairman "wants to lay out a case about why presidents should be disclosing their tax returns before he formally forces [President Trump] to do it."

83.     Chairman Neal confirmed that the Committee would pursue the public release of President Trump's tax returns because "the public has reasonably come to expect that presidential candidates and aspirants release those documents."

84.     A poll taken in early 2019 found that only half of all voters thought the new Congress should prioritize obtaining President Trump's tax returns. But "the issue broke sharply along party lines, with 77 percent of Democrats saying it should be a priority, but only 19 percent of Republicans" and "49 percent" of independents. According to numerous press outlets, "liberals" were pressuring Chairman Neal to make the request quickly, were "salivating" over the chance to finally see the returns, and were hosting events, writing letters, meeting with staff, and conducting a multi-million dollar ad campaign to force Committee Democrats to make the request.

85.     Recounting the general sense of Committee Democrats, a Committee aide told the press that "many of us have tried to express the sense of urgency which we and our constituents feel about … obtaining Trump's tax returns." The urgency was that Democrats wanted to obtain and expose this information as quickly as possible because they thought it would help prevent President Trump's reelection in 2020 or help Congress remove him from office before then.

86.     Over the next three months, Chairman Neal consulted with the House's lawyers, Committee Democrats, and others to construct a case for obtaining President Trump's tax information that would stand up in court. He admitted that he was trying to create the legislative purpose that would be most likely to prevail, rather than asserting Committee Democrats' actual purposes for obtaining the information. And he warned Committee Democrats not to repeat their actual purposes because it would make the constructed purpose seem pretextual, and thus make it harder to win in court.

87.     In late January 2019, Chairman Neal said "I plan to do it" when asked whether he planned to request President Trump's tax returns. He said, "We are now in the midst of putting together the case. It will be a long and grinding legal case."

88.     Also in January 2019, Chairman Neal explained that the official request for President Trump's tax information "has to be part of a carefully prepared and documented legal case." "It will be done judiciously and methodically, but it will be done." He stressed that he had "been meticulous about [his] choice of words, for good reason," because the request would "become the basis of a long and arduous court case." He implored his fellow Democrats to "resist the emotion of the moment," not "step on [their] tongue[s]," and "approach this gingerly and make sure the rhetoric that is used does not become a footnote to the court case." These statements were not slips of the tongue; they remain posted on Chairman Neal's official website today.

89.     In February 2019, Chairman Neal reiterated that he was proceeding "quite judiciously." "This is the beginning of a court case." He added that "the idea here is to … make sure that the product stands up under critical analysis."

90.     Later in February 2019, Chairman Neal confirmed to the press that "the staff is preparing the documentation" for requesting President Trump's tax information. The goal,

according to the Chairman, was "to figure out what is the most efficient way to make a request" that would survive in court. He again warned that he and other Democrats have to "resist the impulse to say or do something that clouds the case," and that he planned to proceed on "a better or more deliberative case base[d] on the advice of counsel."

91.     In March 2019, Chairman Neal's spokesperson reassured voters that "Chairman Neal has consistently said he intends to seek President Donald Trump's federal tax returns." Chairman Neal "is currently in the process of consulting with the counsel of the U.S. House of Representatives and the Joint Committee on Taxation to determine the appropriate legal steps to go forward with this unprecedented request," the spokesperson explained. "A strong case is being built." And "Chairman Neal will continue to conduct this process in a judicious, methodical and deliberative manner."

92.     Also in March 2019, Chairman Neal reiterated that "[t]his is likely going to be a long court case. So rather than … succumb to the emotion of the moment, … we're far better off making sure we get it right." He noted that §6103(f) "has not been tested," and he anticipated "a long court case that will be tested at the highest levels of the federal judiciary." He assured the public that "we're proceeding with what I think will be a very sound case."

93.     That same month, Chairman Neal told another press outlet that "[w]e continue to work with counsel and I continue to limit my comments because of counsel's advice."

94.     Committee-Member Kildee also gave an update in February 2019, explaining that "[w]hat we need to do, and what the speaker said, and what Chairman Neal is absolutely doing" is "laying a legal foundation," "mak[ing] the justification to use this rarely used authority." "This is unchartered territory," he added.

95.     During this same period, Committee Democrats confirmed that they wanted President Trump's tax information for the same reasons that they had wanted it in the past. Because the tax-reform bill had already passed and Mueller's investigation was ending, Committee Democrats focused on their other past justifications: Namely, they reiterated their continued desire to expose President Trump's information for the sake of exposure and to uncover evidence of criminal wrongdoing. Their statements were more candid because they were made before the Committee had constructed its made-for-litigation "case." Although President Trump had been in office for two years at this point, no House Democrat said during this period that they wanted his tax information to help study the IRS's mandatory audit process for Presidents.

96.     For example, in March 2019, Speaker Pelosi's spokeswoman told the press that "all roads lead[] back" to President Trump's tax returns, which would show his "improprieties," "potential tax evasion," and "violations of the Constitution."

97.     Committee-Member Pascrell, noting that "this fight" had been ongoing since "February 2017," promised that "the committee" "will not rest … until Donald Trump's personal and business records are given total scrutiny." He predicted that, in the 116th Congress, House Democrats can "finally expose Trump's financial history to sunlight." He said doing so was imperative because "[w]e must see how far the crimes go."

98.     On the first day of the 116th Congress, Committee-Member Pascrell announced that "we continue to work to expose Donald Trump's tax returns to vital congressional sunlight."

99.     In February 2019, Committee-Member Pascrell said that "Congress must see [President Trump's] tax records" to determine whether he had engaged in "criminal" behavior. Later that month, Pascrell stated that "Congress can [and] must conduct oversight of Trump's taxes" because the returns "would likely reveal evidence of criminal conduct by Donald Trump."

100.    Also in February 2019, Committee-Member Pascrell told the press that the Committee should obtain President Trump's tax returns to see how Michael Cohen was allegedly reimbursed. "If Trump wrote these payments off as a business expense, that would constitute fraud and his returns would show that," Pascrell said.

101.    Committee-Member Pascrell likewise stated that Cohen, who had accused Trump of committing various financial crimes while he was a private citizen, "brought out many situations where the tax returns are the only answer." "That's why the returns are so important," Committee-Member Pascrell explained. President Trump's "tax returns would show" any alleged "fraudulent scheme."

102.    In March 2019, Committee-Member Pascrell wrote an op-ed, stating that Michael Cohen's "allegations that Donald Trump routinely evaded taxes and committed other financial fraud should result in an immediate request to the Treasury to turn over President Trump's business and personal tax returns." "We need to know if the president has illegally evaded taxes or unethically avoided them by exploiting special breaks in the law."

103.    Also in March 2019, Committee-Member Pascrell said that "[t]he tax returns are the key to finding out what this guy"—meaning President Trump—"is all about."

104.    On his "Trump Tax Returns" website, under the header "Chronology of Attempts," Committee-Member Pascrell documents 14 attempts in the 116th Congress alone, spanning January 2019 to September 2020. Under the header "Why Is This So Important?", Committee-Member Pascrell makes no mention of the need to study the IRS's mandatory audit process for Presidents. He does note, however, that he believes that "it is imperative for the public to know and understand [President Trump's] 564 financial positions in domestic and foreign companies, and his self-reported net worth of more than $10 billion."

105.    In February 2019, Committee-Member Doggett said that President Trump's tax information should be disclosed because "[t]he public has an interest in knowing of the President's personal and business affairs."

106.    In March 2019, Committee-Member Doggett said that the Committee needed to obtain President Trump's returns to uncover "a potential criminal enterprise"—a "criminal, sleazy kind of operations that would deny revenue the government needs."

107.    In February 2019, Committee-Member Gomez spoke to the press about the Committee's plans to obtain President Trump's tax information. He said, "We really need to get those tax returns to get a better picture and to understand if he committed a crime." While Committee-Member Gomez thought "the information leads us in that direction," he said "we need those tax returns to seal the deal."

108.    In March 2019, Committee-Member Gomez opined that the House "should move to obtain Trump's tax returns" because it "need[s] more" evidence of Trump's supposed criminal wrongdoing. "The only thing that matters," he stressed, "is evidence of wrongdoing." A few days later, Committee-Member Gomez added that "[t]he public wants answers and so do I. And to get the truth, we need Trump's tax returns."

109.    In March 2019, Committee-Member Kildee said that President Trump's tax returns should be forcibly disclosed because "[p]eople don't take [Trump's] word for it when they [hear] he's done nothing wrong, they want to see the evidence, and they have the right to that, and we're gonna get to the bottom of this." He later added that the returns' disclosure was "a simple matter of transparency," something "[t]he American people" have a right to.

110.    In February 2019, Committee-Member Moore said that President Trump's tax returns "could be a key piece of the puzzle" to determining the legality of "Trump's business dealings" with Deutsche Bank.

111.    Also in February 2019, Committee-Member Sánchez reacted to an article that predicted the Trump administration would resist the Committee's attempt to obtain and disclose his tax information by saying "[t]he American people" have a right to know whether President Trump is a "crook."

112.    In February 2019, Committee-Member Boyle justified the Committee's upcoming request for President Trump's tax information in terms of "transparency" and nullifying President Trump's earlier decision "not to disclose."

113.    Other Democrats—including Committee Democrats, other committee chairs, and Speaker Pelosi—were included in Chairman Neal's strategic discussions and decisionmaking process about how to obtain and disclose President Trump's tax information. They all approved Chairman Neal's ultimate decision, supported it, and discussed it in collective terms ("we," "us," "the Committee," "Committee Democrats," and the like).

114.    For example, Committee-Member Boyle announced on February 5, 2019 that "[t]oday" the Committee "began seeking a copy of President Trump's tax returns."

115.    Later that month, Committee-Member Beyer said, "We on the House Ways [and] Means Committee are building the most bullet-proof legal case for why the public should be able to see Pres[ident] Trump's tax returns."

116.    As Committee-Member Gomez described the process, Chairman Neal "knew what was going to be before us as a committee," was acting in a "strategic" manner, and was "setting up something to make sure that we abided by the law." Chairman Neal also "made sure every

34

committee member understood." "[T]his is why he's done it so slow," according to Committee-Member Gomez, "because he knows that this is too important and the American people are counting on him."

117.    In February 2019, Chairman Neal confirmed that he had recently talked to Committee-Member Pascrell "on the phone" about his strategy and that Pascrell was satisfied that the Chairman "was handling it the right way."

118.    Committee-Member Doggett said in March 2019 that he "ha[s] confidence in [Chairman Neal] and the approach he's taken" to obtaining and disclosing President Trump's tax information.

119.    In March 2019, Committee-Member Pascrell gave the press an update on when the Committee would request President Trump's tax information. "We're almost ready to go," he said, speaking from personal knowledge.

120.    Also in March 2019, Committee-Member Brian Higgins (D-NY) told the press that Chairman Neal was "waiting on the appropriate time," making sure that he "underst[ood]" the strategy first.

121.    Committee-Member Larson also recounted the decision-making process, recalling that "several on our committee" had "pressure[d]" Chairman Neal to move faster.

122.    Speaker Pelosi, too, approved Chairman Neal's ultimate request and, speaking from personal knowledge, said that the Chairman had been "very thoughtful" in his actions. Her spokeswoman confirmed in March 2019 that Ways and Means was working with the Oversight, Financial Services, Intelligence, and Judiciary Committees to "present the strongest possible case" to "review the President's tax returns."

123.    On April 3, 2019, Chairman Neal finally made the request. In a letter to Commissioner Rettig on behalf of the Committee, Chairman Neal invoked §6103(f) and requested, for tax years 2013 through 2018, the following:

1.  The Federal individual income tax returns of Donald J. Trump.

2.  For each Federal individual income tax return requested above, a statement specifying: (a) whether such return is or was ever under any type of examination or audit; (b) the length of such examination or audit; (c) the applicable statute of limitations on such examination or audit; (d) the issue(s) under examination or audit; (e) the reason(s) the return was selected for examination or audit; and (f) the present status of such examination or audit (to include the date and description of the most recent return or return information activity).

3.  All administrative files (workpapers, affidavits, etc.) for each Federal individual income tax return requested above.

4.  The Federal income tax returns of the following entities:
    • The Donald J. Trump Revocable Trust;
    • DJT Holdings LLC;
    • DJT Holdings Managing Member LLC;
    • DTTM Operations LLC;
    • DTTM Operations Managing MemberCorp;
    • LFB Acquisition Member Corp;
    • LFB Acquisition LLC; and
    • Lamington Farm Club, LLC d/b/a Trump National Golf Club—Bedminster.

5.  For each Federal income tax return of each entity listed above, a statement specifying: (a) whether such return is or was ever under any type of examination or audit; (b) the length of such examination or audit; (c) the applicable statute of limitations on such examination or audit; (d) the issue(s) under examination or audit; (e) the reason(s) the return was selected for examination or audit; and (f) the present status of such examination or audit (to include the date and description of the most recent return or return information activity).

6.  All administrative files (workpapers, affidavits, etc.) for each Federal income tax return of each entity listed above.

7.  If no return was filed for the tax year requested, a statement that the entity or individual did not file a return for such tax year.

124.    The Committee's request specified only one ostensible legislative purpose: studying "the extent to which the IRS audits and enforces the Federal tax laws against a President"

under the "mandatory examination" process specified in the "Internal Revenue Manual." Specifically, the Committee sought to determine "the scope of any such examination and whether it includes a review of underlying business activities required to be reported on the individual income tax return."

125.    This stated purpose was not the primary purpose, or even one actual purpose, for the request.

126.    Chairman Neal and other Committee Democrats admitted, both before and after the request, that their asserted legislative purpose would be a "case" or a "product" that was "constructed" by attorneys to win in court—not their actual purposes.

127.    One day after making the request, Chairman Neal again admitted that he had "constructed" a "case" for obtaining President Trump's tax information. Because this dispute "is likely to wind its way through the federal court system," he said that the Committee "wanted to make sure" the constructed case "was in fact one that would stand up under the critical scrutiny of the federal courts."

128.    The next day, Chairman Neal admitted that "[o]ur intent is to test" §6103(f) and thus the Committee had chosen the audit rationale because that rationale would best "stand[] up" "under the magnifying glass." He also told the press that the legal case for his request, as opposed to the real political case, was prepared by House counsel, and that he had met with House lawyers more than a dozen times, where they "prepared" him on what he should say.

129.    A source close to Chairman Neal's reelection campaign defended the Chairman against an attack from a primary challenger, insisting that Chairman Neal had "really done everything he could" to obtain President Trump's tax information. The "case" he ultimately chose, the source explained, was "meticulously" developed "with House counsel."

130.     Committee-Member Pascrell, who was personally familiar with the discussions and decisions that went into the request for President Trump's tax information, said that the audit rationale "was chosen according to counsel" because the Committee thought it would be "the best way" to "make sure we got the tax returns."

131.     Over the three prior years, Chairman Neal and other Committee Democrats were not shy about offering numerous reasons why they wanted President Trump's tax information. The IRS's mandatory audit process for Presidents, however, was never mentioned as a potential purpose. That purported purpose appeared for the first time in Chairman Neal's April 3 letter.

132.     Many observers who are well-informed, are supportive of Chairman Neal's efforts, or both recognized that Chairman Neal's audit rationale was obviously pretextual.

133.     One former Democratic official observed that the Committee's stated rationale for requesting President Trump's tax information was "an obvious lie." House Democrats, the former official noted, couldn't "care less about legislation" but are "on a fishing expedition, looking for failed deals, tax write-offs, and anything else they can use to smear Trump before the 2020 election."

134.     A tax professor and former IRS attorney opined that Neal had "made a mistake" by "expressing a narrow purpose"—review of the mandatory audit process—"when everyone knows Democrats have a strong partisan interest in [President Trump's] tax returns."

135.     Another commentator observed that Chairman Neal's stated legislative rationale was "invented." As she noted, "[t]he fact is, of course, Neal's pursuit of Trump's tax returns has nothing to do with legitimate committee oversight functions, and everything to do with Neal's interests in damaging President Trump politically."

136.    A tax professor who wrote the seminal article on this issue observed that "the committee's surgical request for President Trump's tax return information suggests that it wants to investigate President Trump specifically, rather than Presidential audits generally."

137.    Ranking Member Brady—who had extensive first-hand knowledge of the Committee's prior deliberations, statements by Members, and legislative needs—immediately observed that Chairman Neal's request was made "for purely political purposes," an attempt to "[w]eaponiz[e] our nation's tax code by targeting political foes." A few weeks later, the Ranking Member explained that subsequent events had "made clear that this information is not being sought to further a valid legislative purpose, but instead to try to embarrass a political enemy." "[F]rom press accounts to statements by senior members of this Committee, it has become obvious that [Chairman Neal's] supposed legislative purpose is just a pretext, and your request is merely a means to access and make public the tax returns of a single individual for purely political purposes."

138.    Senator Grassley, then Chairman of the Senate Finance Committee, has comparable authority and legislative needs to Chairman Neal, including the same authority to request tax returns under §6103(f). When asked about the Committee's request for Intervenors' tax information, Senator Grassley immediately observed that "the House Democrats are using the IRS for political purposes." He noted there was not even "a shred of evidence to suggest that the IRS hasn't done its job auditing President Trump's taxes." The Committee was "not concerned about oversight of the IRS enforcement process at all," but only "in using their oversight authority to collect as much information about this President's finances as they can get their hands on." He recognized that their stated reasons were "pretexts" and "circular." "[A]ll you have are Democrats who want to go after the president any way they can"; "[t]hey dislike him with a passion, and they

want his tax returns to destroy him." "That's all this is about, and it's Nixonian to the core." Senator Grassley noted his history of taking "an equal opportunity approach to oversight, treating Republican administrations the same as Democratic administrations." "So, I will not go along with efforts to weaponize the authority of tax-writing committees to access tax returns for political purposes. Such an action would be unprecedented."

139.    Even a former official under the Obama administration, who thinks Congress can obtain Intervenors' tax information, admitted that Chairman Neal's "audit" rationale was a stretch. One "might be forgiven," he observed, for "thinking: Really? Is Neal asking for Trump's tax returns because he wants to see if the IRS is treating him favorably?"

140.    Though many supported the effort to expose President Trump's tax information and predicted that Chairman Neal would win in court, no supporter was willing to say that Chairman Neal's audit rationale was an actual purpose for the request. They simply argued that courts lack the power to question this purpose because Chairman Neal had stated it on the face of the request.

141.    In a series of letters, attorneys for the President and Treasury Department challenged Chairman Neal's newly-minted rationale as illegitimate. In response, the Chairman did not dispute that his new rationale was pretextual; he merely insisted that no one could "question or second guess the motivations of the Committee."

142.    Further, despite being "prepared" on what to say by the House's lawyers, Chairman Neal and other Committee Democrats repeatedly contradicted the supposed rationale in their April 3 request. They often described their request in terms of exposing President Trump's tax information to "the public," even though public disclosure is a wholly separate step under the tax code and has nothing to do with helping the Committee study legislation. To the extent they discussed the IRS's audit process, they did so in law-enforcement terms, expressing their desire to

audit President Trump's returns themselves and to uncover evidence of illegal conduct. These statements became more frequent and more candid as time went on, as Committee Democrats realized they probably would not win this case before the November 2020 election and thus had less need to hold their tongues.

143.    For example, in a press release issued on the same day as the request, Chairman Neal said that the request would help the Committee determine whether President Trump is "complying with" the tax laws.

144.    In June 2019, in a meeting with House Democratic leaders, Speaker Pelosi and Chairman Neal agreed that they did not want to open an impeachment inquiry against President Trump. Instead, they thought the better approach was to continue their investigations, including the request for President Trump's tax returns, in the hopes of preventing his reelection and then prosecuting him for supposed crimes. "I don't want to see him impeached, I want to see him in prison," Speaker Pelosi put it.

145.    Near the end of September 2020, Chairman Neal connected a story from the New York Times accusing President Trump of paying little income tax with this case. Chairman Neal questioned President Trump's "business success," how much he paid "in income taxes," and whether President Trump is paying his "fair share," and expressed his view that "the president and his tax attorneys and accountants" have engaged in "a very sophisticated tax avoidance effort." These theories, Chairman Neal explained, were "consistent with the argument we've had in the federal courts with the president over his tax forms." He said that unraveling President Trump's "sophisticated tax avoidance" is a "reason for the president to release his tax forms."

146.     The same day that the Committee made the request, Committee-Member Pascrell expressed gratitude that President Trump's "tax records" would "finally" be exposed to "sunlight" and that President Trump would experience "accountability."

147.     In May 2019, Committee-Member Pascrell said that the Committee must "see Trump's actual returns" because "Trump's entire tenure is built upon the most colossal fraud in US political history. He might've been the worst businessman in the world. His campaign was a lie. He didn't pay taxes for years and lost over $1 billion."

148.     In June 2019, Committee-Member Pascrell said that "[s]eeing Trump's business and personal taxes is the only way we'll know how far his crimes go."

149.     In November 2019, Committee-Member Pascrell repeated on two occasions that "[i]t's past time for Congress to see the returns and find out how far [T]rump's crimes go."

150.     In April 2020, Committee-Member Pascrell criticized Treasury and pledged, "I will never, ever give up until Trump's tax returns are brought out into the beautiful light of day." He said, "I will continue to push until we finally get the returns because Americans deserve to know the truth."

151.     In May 2020, Committee-Member Pascrell complained about being "stymied" in "obtain[ing] Trump's tax returns," which he said were needed because "Americans have a right to know if their chief executive is a crook and they've been denied long enough."

152.     In July 2020, Committee-Member Pascrell wrote that "the passage of time has not dulled the importance of seeing [President Trump's] returns" because "we know only a fraction of the potential crimes Trump is committing."

153.    Commenting on the remand argument in *Mazars*, Committee-Member Pascrell connected the case to "our legal demand for [T]rump's tax returns" and urged the D.C. Circuit to resolve the case immediately "so we can at last see how far [T]rump's crimes go."

154.    In September 2020, Committee-Member Pascrell aligned himself with Manhattan prosecutors and their supposed "evidence of [T]rump felonies." The suggestion that President Trump might somehow face criminal liability was "welcome news and zero surprise" to Pascrell, since he "ha[s] been chasing [T]rump's tax returns since Feb[ruary] 2017."

155.    Also in September 2020, Committee-Member Pascrell observed that he has been "the leader of Congress's fight to obtain the [T]rump tax returns since Feb[ruary] 2017." He said "our case" was based on "our … fears" that President Trump was "abusing the tax system to lie, cheat, and steal."

156.    In late September 2020, Committee-Member Pascrell surmised that President Trump would not disclose his tax returns because he did not pay much income tax.

157.    In October 2020, Committee-Member Pascrell "sent [President Trump] a letter telling him to prove he isn't a tax cheat and asked him, What are you afraid of?"

158.    The day after Chairman Neal's request, Committee-Member Doggett said the request would show whether President Trump "is complying with our tax laws" or is engaged in "questionable tax activities."

159.    Again discussing Neal's request two days after it was made, Committee-Member Doggett said it would allow the Committee to determine how "[t]he Trump family may have gained as much as a billion dollars from the recent Trump tax law."

160.    In May 2019, Committee-Member Doggett said that the Committee "really need[s] these returns" because President Trump has told "lies" and "Americans" need to know if he has paid his fair share of taxes.

161.    In June 2019, Committee-Member Doggett surmised that President Trump's tax returns would reveal the "role tax avoidance plays in his overall business strategy," which is why the President was fighting the Committee's request.

162.    In July 2019, Committee-Member Doggett complained that, "three years in, we still don't know if Donald Trump has paid what he owes, since he has hidden his tax returns and defied" the Committee's request.

163.    In September 2020, Committee-Member Doggett insisted that "President Trump hides his tax returns because … he's a freeloader who doesn't believe in paying taxes." He lamented that the Committee had failed to do what it set out to: "disclosure of what a phony loser Donald Trump really is" and "his losing business empire."

164.    Also in September 2020, Committee-Member Doggett said that President Trump was refusing to disclose his tax returns because he is a "fraud."

165.    Also in September 2020, Committee-Member Doggett said that President Trump was refusing to disclose his tax returns "because he doesn't really believe in contributing his fair share."

166.    In October 2020, Committee-Member Doggett asked rhetorically "What is [President Trump] covering up in his tax records that he doesn't want New York prosecutors, and the public, to know?"

167.    Committee-Member Gomez, after parroting Chairman Neal's audit rationale, stressed on April 5, 2019 that "the American people also want to know what is really in the tax returns of this President."

168.    In August 2019, Committee-Member Gomez stated that California was ready "to see [President Trump's] tax returns."

169.    In October 2020, Committee-Member Gomez stated that "[o]ne way or another … the American people are going to learn the truth about Trump's finances and business entanglements."

170.    In April 2019, Committee-Member Blumenauer announced that the Committee had requested President Trump's tax returns because "the American people" wanted "transparency," after President Trump's "refusal to disclose his returns" during the campaign.

171.    In May 2019, Committee-Member Blumenauer said that the Committee must "continue fighting for [President Trump's] full tax returns to be released to his public" to disprove President Trump's "lies" such as his "business fortune." He surmised that President Trump was "hiding" his tax returns from the Committee to cover up his "chronic losses and years of income tax avoidance."

172.    The day after Chairman Neal made the request, Committee-Member Sánchez gave an interview about it, explaining that "the American people have a right to know whether or not [President Trump's] benefitting from the very policies that he's pushing, whether or not he's cheated on his taxes, whether or not he's paying his fair share, whether he's enriching himself and violating the public trust. All of those can be determined, I think, if we can get the tax returns."

173.    In July 2019, Committee-Member Sánchez said the following about the request for President Trump's tax information: "[A]ll we're trying to find out is … has he benefitted from

many of the tax policies that they've put into place, where does he get … funding from, is he … hiding assets?"

174.    In September 2020, Committee-Member DelBene said that the Committee's "investigation is a first step" into determining whether "people like Trump pay their fair share" of taxes.

175.    On the day that Chairman Neal made the request, Committee-Member Chu announced that she "support[ed]" it. She said "we deserve to know if [President Trump] is following the law," and noted that "every President since Nixon" has disclosed this information.

176.    One week later, Committee-Member Chu gave an interview on the Committee's request, where she repeated that "every president has revealed their tax returns over the last four decades and they've done it because the American people need to know that [their] president is complying with the tax laws of this nation" and "paying their fair share."

177.    In October 2019, Committee-Member Chu surmised that the IRS was "cover[ing] up" evidence of "fraud" in "Trump's tax returns."

178.    Shortly after Chairman Neal made the request, Committee-Member Moore posted that "the President can't … keep his tax returns hidden from the American people."

179.    In October 2020, Committee-Member Moore recounted her questioning at a Committee hearing, where she said she "raised reasons why it's important [that President Trump] disclose his tax returns: the American people deserve to know whether the President abused the tax code by making a false claim of property abandonment or paying consulting fees to his daughter."

180.    The same day that Chairman Neal made the request, Committee-Member Kildee said he supported it because "President Trump is the first president in nearly a half-century to

break precedent and refuse to voluntarily release his tax returns." He added that the tax returns would reveal whether President Trump personally benefited from recent tax cuts.

181.    In June 2019, Committee-Member Kildee admitted that the "audit" rationale was really a way for the Committee to engage in law enforcement: "The President has admitted to tax avoidance schemes which may have been criminal, and was accused by his own personal attorney of actions which amount to tax fraud. I cannot think of a more compelling reason to evaluate the efficacy of the IRS' presidential audit program."

182.    In September 2020, Committee-Member Kildee issued a statement that "the Ways and Means Committee, led by Chairman Richard Neal, must have access to the President's tax returns to ensure the President, is in compliance with federal tax laws." He accused President Trump of "abus[ing] the tax code to avoid paying his fair share."

183.    Also in September 2020, Committee-Member Beyer went on a tirade against President Trump, calling him a "liar," a "cheat," a "robber baron," a "tax dodger," and more. If any of this is "untrue," Committee-Member Beyer challenged, then President Trump could disprove it by "releas[ing] his tax returns." "Show us your tax returns," Committee Beyer added, because doing so would somehow prove that President Trump "cheats, steals, and lies so he can pay almost nothing."

184.    In May 2019, Committee-Member Evans surmised that President Trump "continues to hide his returns" so Americans cannot see his "tax avoidance."

185.    In July 2019, Committee-Member Evans said that "the American people have a right to see [the] President of the United States' tax returns to ensure he, too, is complying with our federal laws."

186.     In October 2019, Committee-Member Jimmy Panetta (D-CA) released a statement, describing the Committee's request for President Trump's tax information as part of the House's broader "impeachment" effort. The request was "one of th[e pending] investigations" of "alleged criminality by this administration."

187.     While this case was pending in 2019 and 2020, many House Democrats (including Committee members) publicly lamented that the Committee was unlikely to get the tax returns before the 2020 election. Committee-Member Kildee, for example, promised that the Committee was "going to push" to get the returns before the election. Another House Democrat involved in the process expressed her "fear" that a slow pace would prevent "us from getting the returns by next November." This fear, which was shared by Democratic voters and echoed by the media, illustrates the insincerity of the Committee's audit rationale. The Committee had no real need to study presidential audit legislation by November 2020, especially given its view that §6103(f) requests do not expire at the end of each Congress; that date was important only because the Committee wanted to inflict political damage on President Trump in time to hinder his reelection.

188.     The saga with New York's so-called TRUST Act also illustrates that the Committee's audit rationale is pretextual. Enacted in May 2019, the TRUST Act is a New York statute that allows the Committee to obtain a President's state returns from New York if the Committee had requested the President's federal returns from Treasury. The text of the law is perfectly gerrymandered to President Trump's circumstances. And the legislators who voted for it uniformly and candidly admitted that the law was intended to help the Committee obtain President Trump's tax information. "What's at stake here," the bill's sponsor said, is "the desire of New Yorkers and the American people to seek the truth behind Trump's taxes." "New York, as the

home of the president and the headquarters for some of his companies, has a unique role and responsibility in that regard to allow Congress to do its constitutionally-mandated job."

189.    New York legislators thought the disclosure of President's state tax returns would assist the Committee's investigation because they understood, correctly, that the Committee's audit rationale was pretextual. President Trump's state tax returns are entirely irrelevant to Chairman Neal's stated purpose of wanting to study how the IRS audits federal tax returns. New York legislators thus understood what was obvious to everyone else: Committee Democrats did not really want to study IRS audits, but rather it wanted (in the legislators' words) to find out "what [President Trump's] hiding," force him to comply with the "tradition[]" of candidates releasing tax returns, and inform "the public" about his finances.

190.    The willingness of multiple Committee Democrats to use the TRUST Act illustrated the same point—as did the willingness of Democrats on the other committees that were working with Ways and Means to obtain President Trump's financial information. Again, this interest in President Trump's state tax returns directly contradicts the Committee's stated interest in studying federal IRS audits: As the Committee's attorneys warned the Members, Congress does "not have jurisdiction over those [state] tax forms."

191.    For example, referencing the TRUST Act, Committee-Member Pascrell said he supports using "any tool … that might shed sunlight on Trump's tax return history" because the country needs to know what he "is hiding" and whether he "is a crook."

192.    Committee-Member Chu declared that "[t]he new law out of New York State is a new and interesting option that I believe should be considered and examined as we move forward."

193.    Committee-Member Doggett agreed that "we should take a look" at "New York's information."

194.     Representative Maxine Waters (D-CA), who chairs the House Financial Services Committee, said "I'm for" "[w]hatever it takes to get" the President's tax returns.

195.     Representative Pramila Jayapal (D-WA), co-chair of the House Progressive Caucus, similarly said, "Yes, absolutely, we need to ask [for the state returns]. We need to know."

196.     Representative Charlie Crist (D-FL) answered a question about the TRUST Act by asking rhetorically, "Why not? I don't think there is any downside for us."

197.     According to Representative Jerry Nadler, a New Yorker and the Democratic Chair of the House Judiciary Committee, the TRUST Act means "we can turn to New York State" "[i]f confronted with inability to receive the federal tax return." Referencing this litigation, he called the Act a "workaround to a White House that continues to obstruct and stonewall the legitimate oversight work of Congress."

198.     So did Representative Hakeem Jeffries (D-NY), the fifth highest ranking Democrat in the House. Representative Jeffries predicted that "continued obstruction from the administration" in this case "may cause the chairman of the Ways and Means Committee" to turn to the TRUST Act. But Chairman Neal didn't get that chance because Judge Nichols enjoined the Committee from invoking the TRUST Act without first giving President Trump notice and an opportunity to be heard—an opportunity the Committee had declined to give the President.

199.     Committee Democrats and New York legislators were not the only Democratic officials who attempted to force the public disclosure of President Trump's tax returns and other financial information. Other House committees engaged in similar efforts, as did Democratic officials in other States and localities. That so many officials made so many attempts to obtain the same documents at the same time—each giving different justifications for their requests—was no coincidence. It demonstrated the national obsession with President Trump's information and how

officials were willing to manufacture justifications to achieve their one real goal: exposing this information to the public in the hopes of damaging President Trump politically.

200.    For example, in July 2019, California passed a law purporting to "prohibit the Secretary of State from printing on a primary election ballot the name of a candidate for President of the United States who has not filed with the Secretary of State the candidate's federal income tax returns for the five most recent taxable years." A federal district court found that, despite its ostensibly neutral framing, this law "was primarily intended to force President Trump to disclose his tax returns." The law was invalidated by the California Supreme Court.

201.    In August 2019, the Democratic District Attorney of New York County requested President Trump's tax returns in what was the nation's first state grand-jury subpoena to a sitting President. The District Attorney stated that his subpoena was part of an investigation into "potential crimes under New York law." As Justice Alito observed in a similar context, "it would be quite a coincidence if the records relevant to an investigation of possible violations of New York criminal law just so happened to be almost identical to the records thought by congressional Committees to be useful in considering federal legislation." *Trump v. Vance*, 140 S. Ct. 2412, 2449 (2020) (dissenting op.).

202.    Numerous Democratic Senators and Representatives, including Speaker Pelosi, sued President Trump for supposed violations of the Foreign Emoluments Clause. After Judge Sullivan incorrectly refused to dismiss the case, the Democratic plaintiffs suggested that they would use discovery to obtain President Trump's tax returns. As Committee-Member Pascrell observed, the emoluments lawsuit was viewed by Congressional Democrats as an opportunity to "finally open the Trump Organization to disinfecting sunlight and reveal the contents of Trump's tax returns."

203.    Since the beginning of the 116th Congress, Speaker Pelosi and the chairs of "multiple House committees" worked together to each "furnish a rationale for needing to see [President Trump's] tax returns." Chairman Neal thus "contacted the chairs of several other House investigative committees, including Oversight and Government Reform, Financial Services, Intelligence and Judiciary, asking them to provide detailed arguments for why they need the president's tax returns." The "idea" was that House Democrats would develop as many theories as possible to achieve their common goal: exposing President Trump's information to the public.

204.    Thus, in February 2019, the Financial Services and Intelligence Committees subpoenaed President Trump's banks for "a broad range of financial records of Donald J. Trump, members of his family, and affiliated entities." The Committees expressly read their subpoenas to request tax returns.

205.    In April 2019, just days after the Committee had requested President Trump's tax information, the Oversight Committee subpoenaed President Trump's accountant for eight years' worth of his sensitive financial documents. According to the Committee, this subpoena also seeks President Trump's tax returns.

206.    The Supreme Court reviewed the legality of these subpoenas in *Mazars*. A 7-Justice majority of the Court said that "[w]e would have to be blind not to see what all others can see and understand: that the [House's] subpoenas [for President Trump's financial information] do not represent a run-of-the-mill legislative effort but rather a clash between rival branches of government over records of intense political interest for all involved." *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2034 (2020) (cleaned up). The Court said that about requests for President Trump's accounting and banking records. But its observation is even truer for the Committee's

current, direct request for President Trump's tax returns—the holy grail of President Trump's financial information, if you're a Democrat.

207.    Indeed, given their coordination and shared vision, Democratic members of the Oversight Committee who discussed obtaining President Trump's tax returns expressed the same purposes that Democratic members of the Ways and Means Committee and other committees had expressed: exposure and law enforcement.

208.    For example, Chairwoman Carolyn Maloney (D-NY) claimed that President Trump failed to disclose his tax returns because they were "embarrassing" and "also potentially illegal." She also claimed to "know why Trump went to such great lengths to hide [his tax returns]— devastating losses as a businessman, gaming the system to avoid taxes, massive debts that will come due over the next few years, and completely out of touch with American families."

209.    Representative Jim Cooper (D-TN) framed the impact of the Supreme Court's decision in *Mazars* as delaying when "Americans will have the chance to see" President Trump's financial information. He also compared President Trump to Leona Helmsley, a convicted felon, in claiming to "know why he hasn't" released his tax returns.

210.    Representative Rashida Tlaib (D-MI) claimed to "finally know" why President Trump "resisted releasing his tax returns for so many years: they reveal a failed businessman using unscrupulous—and potentially illegal—tactics to avoid paying the fair share that the rest of us pay into our society."

211.    Representative Mark DeSaulnier (D-CA) asserted that "[i]t is past time the American public gets to see the President's tax returns."

212.    Representative Alexandria Ocasio-Cortez (D-NY) stated, through her questioning of a witness, that the Oversight Committee should "review" President Trump's "tax returns" to

determine whether, as a private citizen, President Trump "provide[d] inflated assets to an insurance company" and "improperly devalued his assets to avoid paying taxes."

213.    Chairman Neal's request is a major departure from historical practice. Chairman Neal himself recognized that the request was "unprecedented." Indeed, §6103(f) had never been used to obtain and release the individual tax returns of a President, a former President, or any elected official. The only supposed counterexample that the Committee could identify—President Nixon—was irrelevant because that request was made with President Nixon's consent, without clearly invoking §6103, for nonlegislative purposes, and under a substantially different version of the tax code.

214.    Chairman Neal's request for Intervenors' tax information also was starkly disconnected from, and would not meaningfully further, his stated rationale of studying the IRS's mandatory audit process for Presidents. The request asks for the information of only one President, asks for older returns that could not have been subject to the presidential audit process, asks for open files for which audits have not been completed, and never asks the IRS for the most relevant information—namely, how it audits Presidents.

215.    Choosing this ill-fitting, never-before-articulated rationale about IRS audits made sense from the Committee's perspective, though, because it was the only legislative purpose that gave House Democrats a chance to publicly disclose President Trump's tax returns. Other types of legislation that House Democrats might pass—including H.R. 1, financial-disclosure laws, presidential ethics reforms, and foreign policy—fell outside the Ways and Means Committee's legislative jurisdiction, and thus could not serve as the legitimate legislative purpose that the Constitution requires. While other committees might have legislative jurisdiction over these topics and could make requests under §6103, Democrats had to use the Ways and Means Committee

because only it has the power to both request and disclose President Trump's tax information to the public. *See* 26 U.S.C. §6103(f)(4).

216.    On May 6, 2019, the Treasury Department informed the Committee that it could not comply because the request for the President's federal tax returns lacked a legitimate legislative purpose. The Treasury Department was correct.

217.    After compiling and reviewing over 40 pages of Democrats' public statements, Treasury observed that the request asserts a "purpose that is at odds with what you and many others have repeatedly said is the request's intent: to publicly release the President's tax returns." The Committee's April 3 request was instead "the culmination of a long-running, well-documented effort to expose the President's tax returns for the sake of exposure." Treasury refused this effort to "disclo[se] tax return information for political purposes." It accurately pointed out the "widespread, contemporaneous acknowledgement by the Committee Chairman and other key Members that the actual objective is to use the IRS as a means to expose the tax returns of a political opponent."

218.    Treasury also highlighted the "objective" mismatch between the Committee's audit rationale and "the terms of [its] request." The request "does not inquire about the IRS's procedures for presidential audits," ask for "additional information about those policies," ask "whether [they] have changed over time," or ask about "the extensive protections that ensure such audits are conducted with extreme confidentiality and without improper interference." The request also focuses on one President, even though most of the requested categories of information have "never been publicly released with respect to any President." And it seeks files concerning audits that are still "ongoing," which would not allow the Committee to genuinely assess any audit because the Committee would not know "the outcome."

219.     The Justice Department rightly agreed with Treasury's decision. In a June 13, 2019 memorandum, the Office of Legal Counsel carefully summarized the record to date and concluded that "Chairman Neal's April 3 letter represents the culmination of a sustained effort over more than two years to seek the public release of President Trump's tax returns." "[T]hroughout 2017 and 2018, Chairman Neal and other Members of Congress made clear their intent to acquire and release the President's tax returns. They offered many different justifications for such an action," but never "oversight of 'the extent to which the IRS audits and enforces the Federal tax laws against a President.'"

220.     OLC found that "[n]o one could reasonably believe that the Committee seeks six years of President Trump's tax returns because of a newly discovered interest in legislating on the presidential-audit process. The Committee's request reflects the next assay in a long-standing political battle over the President's tax returns. Consistent with their long-held views, Chairman Neal and other majority members have invoked the Committee's authority to obtain and publish these returns. Recognizing that the Committee may not pursue exposure for exposure's sake, however, the Committee has devised an alternative reason for the request." That alternative reason "blinks reality. It is pretextual."

221.     OLC agreed with Treasury that "the Committee's request does not objectively 'fit' [its] stated purpose." "[M]any of the requested documents are barely relevant" to the audit process, including the tax returns themselves, which are filed before that process begins. Several of the requested returns were filed when President Trump was not even President. And the Committee asked only for President Trump's information, "decid[ing] at the outset to rely on a sample consisting of only one conceded outlier."

222.    OLC also agreed with Treasury that the Committee's request is "perfectly tailored to accomplish the Chairman's long-standing and avowed goal" of "obtain[ing] and expos[ing]" President Trump's tax returns. "Congressional investigations ordinarily begin with a legislative purpose, and that purpose defines the scope of the documents that are pertinent to the Committee's investigation. But here, by the Committee's own admission, the Committee's investigation began in the opposite direction. The Committee started with the documents it planned to obtain and release (the President's tax returns), and then it sought—in Chairman Neal's words—to 'construct[]' a 'case' for seeking the documents that would appear to be in furtherance of a legitimate legislative purpose." And the constructed case was chosen because it fell within the Ways and Means Committee's jurisdiction, the one committee that the tax code allows to both request tax returns and publicly disclose them.

223.    The Committee later issued a subpoena for the same information, which Treasury refused for the same reasons.

224.    The executive branch's decision to not comply with the Committee's request was not only substantively correct, but it was reached in an independent and impartial manner. Suspecting otherwise, Chairman Neal asked an inspector general to investigate how the relevant actors had handled his request. After a thorough investigation, the inspector general concluded that "the Department processed the request properly" and there was no "basis to question" its decision.

225.    As Senator Grassley summarized the inspector general's report, with no apparent contradiction from Democrats, "This should put to bed any question about the Treasury Department's handling of this matter…. The Administration [wa]s correct to reject attempts by Democrats to politicize this process. Treasury personnel should be commended for avoiding outside pressures and doing their work by the book."

## IV.    Biden Administration

226.    Then–Vice President Biden was the Democratic nominee for President in the 2020 election cycle, running against the Republican nominee, President Trump.

227.    As he and other Democrats had done in 2016, Vice President Biden made the disclosure of President Trump's tax returns a major political issue in the 2020 campaign. He articulated the same arguments and theories that were articulated during the 2016 campaign about why President Trump should disclose the returns and what politically damaging information the returns might contain.

228.    For example, at a campaign stop in October 2019, Vice President Biden called President Trump "a corrupt president." He said, "Mr. President, even Richard Nixon released his tax returns." And he demanded: "Mr. President, release your tax returns or shut up." He made similar statements again in November 2019 and January 2020.

229.    Also in November 2019, Vice President Biden said, "The American people deserve to know what the most corrupt president in modern history is hiding in his tax returns."

230.    Similarly, in February 2020, the Vice President said that "Donald Trump is the most corrupt president we've ever had — and the American people deserve to know what he's hiding in his tax returns."

231.    At a presidential debate, Vice President Biden complained that President Trump had not released his tax returns during the last "four years." "Show us. Just show us. Stop playing around," the Vice President said to the President. The Vice President surmised that President Trump had not released them because "you're not paying your taxes" or "you're paying taxes that are so low."

232.    At another presidential debate, Vice President Biden pointed at President Trump and said, "You have not released a single solitary year of your tax returns. What are you hiding?"

Vice President Biden openly theorized that the tax returns would show that "[t]he foreign countries are paying you a lot. Russia's paying you a lot. China's paying you a lot." He bellowed at President Trump to "[r]elease your tax returns or stop talking about corruption."

233.    After the 2020 election, Democrats kept a majority in the U.S. House. In this 117th Congress, Speaker Pelosi was still Speaker, and Chairman Neal was still Chairman of the Ways and Means Committee.

234.    Even after President Biden was sworn in, House Democrats continued their quest to obtain and release Intervenors' tax information. Their request and the purposes behind it, as they have repeatedly explained, are the same in the 117th Congress as they were in the 116th and 115th Congresses. Democrats still believe this information will damage President Trump politically. And they are still motivated to release it because President Trump remains the most high-profile Republican and their top political rival. As a report described the prevailing Democratic sentiment in June, Democrats felt it "important" to "keep pursuing" their pending cases against President Trump—including this one—because "the information they obtain could be relevant politically."

235.    As early as August 2020, Speaker Pelosi promised, "When we win this election and we have a new president of the United States in January, and we have a new secretary of the Treasury, and Richie Neal asks for the president's tax returns, then the world will see what the president has been hiding all of this time."

236.    In September 2020, Chairman Neal said that the Committee had already "determined" to "continue" this "lawsuit" "whether or not the president is successful on Election Day." The Committee decided to do so because "we want to make sure that future presidents are also prepared to release their forms."

237.   Shortly after the election, in November 2020, Committee-Member Pascrell rejected the notion that Congress would have "mercy" on former President Trump. The Committee has "got to follow through" on its outstanding request for Intervenors' tax information, according to Pascrell, because "there needs to be some accountability" for President Trump.

238.   On January 22, 2021, in a status conference with this Court, the House's general counsel stated on behalf of the Committee that §6103 requests "carry over from one Congress to the next." So despite the adjournment of the 116th Congress on January 3, 2021, the Committee's 2019 request for Intervenors' tax returns was "live" and "still there before the Treasury Department."

239.   In February 2021, Chairman Neal issued in a statement to the press. In it, he confirmed that the Committee would "continue to pursue" in the 117th Congress the "case for the President's tax returns" that it had pursued in the prior Congress. The purpose of that case, he reiterated, was "oversight of the mandatory presidential audit program." Chairman Neal did not provide any other ostensible purpose for continuing to pursue Intervenors' tax information.

240.   Also in February 2021, Committee-Member Pascrell recapped that he had "been demanding [T]rump's tax returns for exactly four years. Americans have waited long enough to know the extent of [T]rump's crimes and thievery."

241.   That same month, Committee-Member Gomez connected the Committee's outstanding request to investigations that the House had started in the beginning of the 116th Congress. He surmised that President Trump "wouldn't release" his tax returns because he "aggressively avoid[ed] paying his fair share in taxes" and "employed some legally-questionable maneuvers."

242.    Days after President Biden was sworn in, many assumed that the executive branch would change positions on the Committee's request for President Trump's tax information. John Koskinen, the IRS Commissioner under the Obama administration, explained that the Biden administration would make a decision about releasing Intervenors' tax returns, but the decision would be made at a high level because it was "a matter of politics."

243.    At some point in the first six months of his presidency, President Biden decided to release President Trump's returns. His decision was unsurprising, since he had made the disclosure of President Trump's tax returns a major campaign issue and agrees with Democrats nationwide that the information must be politically damaging for President Trump.

244.    When asked in February 2021 about the release of President Trump's tax returns, the White House Press Secretary similarly pointed to what President Biden had said "on the campaign trail," stressing that "the American people deserve transparency" on tax returns. Continuing the campaign criticism, in May 2021 President Biden included a gratuitous and "not-so-subtle dig" at President Trump's decision to not disclose his tax returns on the White House website. President Biden has not changed course on this issue because President Trump remains his top political rival.

245.    The Biden administration also faced substantial pressure from liberals to release President Trump's tax information to the public. By April, the media was reporting that "liberal advocates" and "lawmakers" were "growing impatient that the Justice Department ha[d]n't" flipped positions yet on "Democrats' white whale": President Trump's tax returns.

246.    CREW, for example, repeatedly pressed Defendant Yellen to give into Chairman Neal's request. It urged her to "revers[e] the previous administration's decision and release[e] Trump's tax returns." When Defendants had not done so by May 2021, CREW asked "why

Treasury Secretary Janet Yellen hasn't released Trump's tax returns to Congress yet, as she's legally required to."

247.    Committee-Member Pascrell expressed "confiden[ce]" that President Biden, Attorney General Garland, and Treasury Secretary Yellen would "work expeditiously … to fulfill the Ways and Means Committee's legal request."

248.    Meanwhile, over the same time period, the parties in this case filed six monthly joint status reports with this Court.

249.    In the first two reports, the Committee reiterated its position that its April 2019 request "remains outstanding."

250.    In the next three reports, the Committee and Defendants reported that they were engaged in "communications" about this litigation. Although Intervenors asked to be involved in those communications, they were never afforded that opportunity.

251.    In the sixth report, filed on July 2, 2021, the Committee and Defendants again said they were engaged in "communications"—and again, Intervenors were not allowed to participate. The Committee and Defendants asked the Court to direct them to file a "final status report" by July 30, 2021.

252.    What the Committee and Defendants did not reveal—either to this Court or to Intervenors—is that, two weeks earlier on June 16, 2021, Chairman Neal had written a letter to Defendants Yellen and Rettig. Although they knew about this letter when they filed the sixth joint status report, the Committee and Defendants did not reveal its existence to Intervenors or the Court until July 30, 2021.

253.    In the June 16 letter, Chairman Neal explains that the Committee "previously requested former President Trump's tax returns and return information" and "continues to seek"

this information "to inform its legislative work." "Because this matter remains in active litigation," the Committee offered the letter "as an accommodation." The letter concludes by repeating the same request for Intervenors' tax information under §6103, except the years are shifted upward from tax years 2013 through 2018 to "tax years 2015 through 2020."

254.    The June 16 letter largely focuses on the audit rationale that Chairman Neal first articulated in his April 2019 letter. Though, it adds two conclusory sentences about how the information "could reveal hidden business entanglements raising tax law and other issues, including conflicts of interest, affecting proper execution of the former President's responsibilities," or "might also show foreign financial influences on former President Trump."

255.    Neither "business entanglements" nor "foreign financial influences" were mentioned in Chairman Neal's April 2019 letter. That letter justified the request for Intervenors' tax information solely in terms of studying "the Federal tax laws." And Chairman Neal expressly denied that his request concerned "the Mueller report" or exposing any sort of "nefarious undertaking" by President Trump. It was solely about studying the IRS's mandatory audit process for Presidents.

256.    Nor has President Trump criticized "the automatic, mandatory audit described in the [Internal Revenue Manual]." On the campaign trial in 2016, President Trump did criticize how frequently he was audited as a private businessman. He suspected that the IRS audited him every year because of his politics, a criticism that was of course about the IRS's *choice* of who it *discretionarily* audits. When he was in office, President Trump repeated that same criticism on a few occasions, but the criticism remained about the nonmandatory process that he had been subject to since long before becoming President. On September 27, 2020, for example, President Trump said he was voicing the same criticism of the IRS that he had voiced "four years ago."

257.    That President Trump criticized the IRS does not make him unusual. Many Presidents, officials, candidates for office, and Americans of all stripes have criticized our tax system, the IRS, and IRS audits. Per a famous quote that is featured on the IRS's website, "People who complain about taxes can be divided into two classes: men and women."

258.    Several presidential candidates have proposed abolishing the IRS, including Senator Dole in the 1996 cycle and Senator Ted Cruz in the 2016 cycle. Also in the 2016 cycle, Senator Marco Rubio criticized the IRS for using audits to target conservative groups. And in 2013, Secretary Ben Carson accused the IRS of auditing him because he had criticized President Obama at the National Prayer Breakfast.

259.    President Ronald Reagan was highly critical of the IRS, both as a candidate and President. He called our tax system "utterly unfair." He compared it to "a baby"—"an alimentary canal with an appetite at one end and no sense of responsibility at the other." As a candidate, he criticized inquiries into his taxes as an "invasion of privacy." Reagan refused to release his tax returns when running for President in 1976.

260.    When reports surfaced that the IRS was using audits to target conservative groups, then-President Obama called the IRS's actions "outrageous." Senators, Representatives, and many others criticized the IRS for using audits to target political opponents. The IRS later confirmed that it had been using terms like "tea party" as a basis to subject organizations to special scrutiny. As the Sixth Circuit summarized the findings of the inspector general, the IRS "used political criteria to round up applications for tax-exempt status filed by so-called tea-party groups," "often took four times as long to process tea-party applications as other applications," and "served tea-party applicants with crushing demands for … 'unnecessary information.'" *In re United States (NorCal Tea Party Patriots)*, 817 F.3d 953, 955 (6th Cir. 2016).

261.    President Jimmy Carter called our tax system "a disgrace to the human race."

262.    When President Lincoln first created what would become the IRS, he "apologize[d]" for audits, which he knew would create "inequities in the practical applications."

263.    At no point has the Committee unearthed evidence that President Trump or anyone else in the executive branch was trying to interfere with his mandatory audit by the IRS. While the Committee tried to introduce "whistleblower" evidence to that effect earlier in this case, the Committee later retracted that evidence.

264.    On the afternoon of July 30—the same day that the parties' seventh joint status report was due—Defendants revealed the existence of a new opinion from the Office of Legal Counsel regarding the Committee's request. According to the opinion, the Treasury Department had sought OLC's advice on June 17, which was one day after Chairman Neal sent his letter to Defendants.

265.    The new OLC opinion concludes that Treasury can lawfully comply with the Committee's request for Intervenors' tax information. Notably, the new opinion does not disavow or disprove OLC's prior conclusion that the record reveals the Committee's purpose is not to pursue "a newly discovered interest in legislating on the presidential-audit process," but to "obtain and publish" Intervenors' tax information. It instead concludes that Treasury must accept the Chairman's stated purposes at face value.

266.    OLC's new opinion was unusual. OLC rarely overrules itself; it does so in less than 3% of its opinions. It is even less common for OLC to overrule itself so quickly, in the span of only a few years; as Attorney General Eric Holder explained, "We don't change OLC opinions simply because a new administration takes over." OLC's reversal here is particularly unusual because the only intervening authority since OLC's first opinion was the Supreme Court's decision

in *Mazars*, which substantially *restricted* Congress's authority to request this kind of information. And OLC's reversal is more unusual still because its new opinion takes a position that weakens the executive branch vis-à-vis Congress.

267.     OLC's new opinion is also poorly reasoned and internally inconsistent, reflecting its outcome-driven approach. For example, the new opinion agrees with the old opinion that §6103(f) requires a legitimate legislative purpose, that the executive branch can deny requests that lack such a purpose, and that such a denial would be appropriate in "exceptional circumstances." While the new opinion apparently finds that standard not satisfied here, it never explains why. It does not address the substantial record that Treasury and OLC compiled, explain why that record is unpersuasive, or attempt to defend Chairman Neal's audit rationale as legitimate. It analyzes the Committee's request only on its face. Even assuming this request were facially legitimate, if this record is not the kind of "exceptional circumstances" that could defeat a facially legitimate request, then nothing is. Further, OLC's blind deference to the Committee is nowhere supported in its cited authorities, which discuss a far weaker "presumption of regularity" for government officials and "presumption of constitutionality" for federal statutes. Nor does OLC reconcile its willingness to give a presumption of regularity to the Committee with the Committee's unwillingness to give a presumption of regularity to the IRS officials who audit Presidents.

268.     The OLC opinion references emails and letters between the Justice Department and Treasury Department that Intervenors have not seen and have not been disclosed. The Committee and executive branch likewise negotiated over the Committee's request for Intervenors' tax information for over six months, without allowing Intervenors to participate. Intervenors believe that discovery of these nonprivileged communications would reveal a coordinated effort by the Committee and Defendants to release Intervenors' information, where the parties worked together

to craft an approach that would give the executive branch cover to change positions but have the Committee make only cosmetic changes to its request. This inference is amply supported by the surrounding circumstances, including the parties' decision to exclude Intervenors from their discussions over Intervenors' own tax information, the parties' decision to keep Intervenors in the dark about the Committee's new letter until the OLC opinion was already prepared, and the parties' sudden urgency to rush the disclosure of Intervenors' information once their deal came to light.

269.    As soon as OLC's new opinion was published, Committee Democrats quickly praised it. Thinking they had now secured President Trump's tax returns, they once again expressed their actual, original, illegitimate purposes for making the request in the first place: exposure and law enforcement.

270.    For example, in reaction to OLC's opinion, Speaker Pelosi said "[t]he American people" would now "know the facts" about President Trump.

271.    Committee-Member Doggett reacted that, with the "evidence" from President Trump's tax returns, the Committee can now uncover "his tax evasion."

272.    Committee-Member Pascrell expressed approval of OLC's opinion, calling President Trump a "corrupt private citizen" and connecting "[t]his case" to "Donald Trump's crimes."

273.    Chairman Neal was "glad" to see that the Justice Department "agrees" with "the committee's case"—the same one "I have maintained for years."

274.    Committee-Member Beyer likewise said that OLC's new opinion "confirmed what we have always said."

275.    Senator Grassley, however, rightly maintained that "[t]here's no legitimate legislative purpose for targeting an individual's tax information like this, even if it's the former

president. It's always been obvious that House Democrats wanted to get the former president's tax returns just so they could release them to the public, and the Ways and Means Committee's excuse about doing oversight on the presidential audit program is an obvious pretext that deserves no deference from the Treasury Department."

276.    Senator Grassley identified the "new [OLC] opinion" as "just politics." It contradicts a "very recent opinion," lacks "thoughtful legal analysis," and provides "political justifications to back up partisan House investigations." He observed that, unlike this opinion, the executive branch's prior decisionmaking process was investigated and approved as proper by the inspector general.

277.    The Committee's request is not designed to learn about the IRS's mandatory audit process for Presidents. By seeking information about President Trump alone, the Committee's sample size is too small. Nor is President Trump an especially useful case study into Presidents generally, as the Committee admits when stressing his unusual facts.

278.    For example, the year after his term as Vice President ended, Jill and Joe Biden immediately became wealthy. They made twice as much money in 2017—over $11 million—than they had made in the previous 18 years combined. Their money was earned from speaking engagements and the publication of two books. The Bidens funneled the money through two S-corporations, which allowed them to avoid approximately $500,000 in taxes. According to several tax experts, who are quoted in a report by the Wall Street Journal, this strategy of avoiding taxes by attributing the compensation from speeches and books to S-corporations, rather than to the Bidens themselves, is "aggressive" and legally dubious. It is a "similar tax-avoidance strategy" to what President Trump's critics have accused him of doing. In other words, to paraphrase the Committee's June letter, "news reports indicate that the former [Vice] President used his

businesses to take aggressive tax positions to minimize his tax liability." Yet the Committee has not asked Treasury for President Biden's audit files or any other tax information.

279.    The IRS also reviews the tax returns of the Speaker of the House and the Chairman of the Ways and Means Committee. These powerful lawmakers have at least as much leverage and influence over the IRS as the President and Vice President, since they dictate the IRS's budget and whether its preferred policies get passed. And the Speaker is third in the presidential line of succession, right after the President and Vice President. Yet neither Speaker Pelosi nor Chairman Neal have released their tax returns. And the Committee has not asked Treasury for their tax returns, audit files, or any other tax information.

280.    Vice President Rockefeller is the richest Vice President to ever serve. He did not place his vast business holdings in a blind trust while in office. Because he was so wealthy, he was subject to a routine IRS audit before he was nominated; and the IRS gave him even more scrutiny after he was nominated and confirmed. While his nomination was pending, the IRS found that Rockefeller had drastically underpaid federal income and gift taxes. Rockefeller reached a substantial settlement with the IRS for over $900,000 in 1974 dollars. Rockefeller also refused to let the audit files be disclosed to the public. The Committee has not asked Treasury for audit files or any other tax information concerning Vice President Rockefeller.

281.    Before he became President, Jimmy Carter was a wealthy businessman. Yet, in his first tax year as President, he calculated that he owed zero federal income tax. President Carter engaged in several discussions with the IRS about that return, and he ultimately received a refund of approximately $20,000. While President Carter had placed his businesses in a trust, the trust was not fully blind and it generated several ethics investigations and inquiries. The Committee has not asked Treasury for audit files or any other tax information concerning President Carter.

282.    The Committee's request seeks returns from years when President Trump was not President. These returns by definition cannot provide any useful information about the IRS's process for auditing Presidents. If the Committee wants to study President Trump's tax returns that were not subject to the mandatory audit process, it has not explained why, and its chosen sample is arbitrary.

283.    When asked to explain why he chose a six-year date range, Chairman Neal said that the Committee "followed IRS guidelines, which suggests to taxpayers that six years is generally the measurements that they use for advising taxpayers on how long to keep their forms." That explanation might make sense if the Committee was planning to conduct its own audit of President Trump's tax returns—*i.e.*, to engage in law enforcement. But it makes no sense if the Committee was trying to study how the IRS audits Presidents, as it claims.

284.    The information that the Committee requested would not uncover any hidden business ties or foreign entanglements. As former IRS Commissioner Koskinen recently explained, Intervenors' tax returns likely cannot reveal "previously unknown business relationships," since that kind of information does not appear on tax returns. Defendant Rettig, before he was Commissioner, likewise agreed that reviewing Intervenors' tax returns would be unlikely to provide "an accurate overall financial picture." And President Trump has already filed financial disclosures covering the same period that are publicly available and far more extensive than tax returns.

285.    The Committee claims that it has various questions about the IRS's mandatory audit process, including whether audits are truly mandatory, how broad the examination is, what protections exist for auditors, what procedures are and are not followed, and more. But the only way to find answers to these questions is to ask the IRS. The requested information would provide

no information about the audit process (e.g., the tax returns) or would provide only an unreliable, circumstantial snapshot of the audit process for a given year and given President (e.g., everything else).

286.    The Committee has not asked the IRS to answer its questions about the mandatory audit process, or explained why the IRS's answers to date are insufficient. The Committee did not accept a briefing from the IRS until after it requested Intervenors' tax information. The Committee has not said that it doubts IRS's answers or materials provided to date. Even if it did doubt them, it has not explained why it would maintain those doubts now that the target of its request is no longer in charge of the executive branch. As this case reveals, the executive branch is now extremely cooperative with the Committee in terms of getting it information. The Committee and Defendants have no excuse for reaching an accommodation during their six months of negotiations, one that would take into account Intervenors' interests as well.

287.    Much of the mandatory audit process is written down in the Internal Revenue Manual, which the Committee can simply consult. The Manual states that the IRS examines the "individual income tax returns for the President and Vice President." It also states that the examination is done under the normal "relevant IRM procedures" and is processed like an employee's returns would be. While the Committee says that the IRS told it that some prior audit procedures are no longer followed, the Committee does not say which ones, whether the changes are minor, whether the changes are reflected in the Manual, or how requesting President Trump's information would help answer any of these questions.

288.    The Committee claims to be worried about Presidents interfering with their audits. But by investigating and requesting files from audits that are ongoing, the Committee is itself

interfering with those audits, diluting the evidence to the point of uselessness. And the fairness of any given audit cannot be assessed before the audit is complete.

289.     The Committee has made no effort to minimize the burden on Intervenors by, for example, agreeing to redactions, conducting in camera examination, or foregoing any disclosure to the House or the public. Defendants have not demanded any such efforts either, even though it is within their power as a matter of accommodation.

### CROSS-CLAIM & COUNTERCLAIM I
### No Legitimate Legislative Purpose – Exposure
### (Against Plaintiff and Defendants)

290.     Intervenors incorporate and restate the prior allegations regarding their counterclaims and cross-claims.

291.     "The powers of Congress … are dependent solely on the Constitution," and "no express power in that instrument" allows Congress to investigate individuals or to demand their private information. *Kilbourn v. Thompson*, 103 U.S. 168, 182-89 (1880). The Constitution instead permits Congress to enact certain kinds of legislation. *E.g.*, Art. I, §8. Thus, Congress' power to investigate "is justified solely as an adjunct to the legislative process." *Watkins v. United States*, 354 U.S. 178, 197 (1957). In other words, the inquiry must have a "legitimate legislative purpose." *Eastland*, 421 U.S. at 501 n.14.

292.     "Oversight" and "transparency," in a vacuum, are not legitimate purposes. For more than a century, the Supreme Court has been quite "sure" that neither the House nor the Senate "possesses the general power of making inquiry into the private affairs of the citizen." *Kilbourn*, 103 U.S. at 190. "[T]here is no congressional power to expose for the sake of exposure." *Watkins*, 354 U.S. at 200. "No inquiry is an end in itself; it must be related to, and in furtherance of, a legitimate task of the Congress." *Id*. at 187.

293.    When assessing whether a committee's request has a valid purpose, courts must determine the inquiry's "real object," its "primary purpose[]," its "gravamen." *McGrain v. Daughtery*, 273 U.S. 135, 178 (1927); *Barenblatt v. United States*, 360 U.S. 109, 133 (1959); *Kilbourn*, 103 U.S. at 195. "[S]everal sources are available in aid of ascertaining this," including "statements of the members of the committee." *Shelton v. United States*, 404 F.2d 1292, 1297 (D.C. Cir. 1968).

294.    The Committee's request for Intervenors' tax information lacks a legitimate legislative purpose.

295.    The primary purpose of the request is to obtain and expose Intervenors' information for the sake of exposure—not to study federal legislation. The stated purposes are rationalizations that were created for litigation, not actual bases for the request. Chairman Neal and other Committee members admitted as much in countless statements. And the disconnect between the subpoena's stated rationales and actual requests proves the point.

296.    That the Committee is proceeding under §6103(f), rather than a subpoena, is irrelevant. Like subpoenas, §6103(f) is an exercise of Congress's power of inquiry and thus subject to the same Article I limits.

297.    And the Committee's request does not satisfy the terms of §6103(f) anyway. By targeting President Trump and his businesses, the request seeks "the President's information." *Mazars*, 140 S. Ct. at 2026. While §6103(f) speaks in generic terms, it does not explicitly authorize the Committee's chairman to request the returns or return information of the President or a former President. Under "the canons of construction applicable to statutes that implicate the separation of power," that "textual silence" means that §6103(f) cannot be read to cover the information of Presidents or former Presidents. *Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991).

## CROSS-CLAIM & COUNTERCLAIM II
### No Legitimate Legislative Purpose – Law Enforcement
### (Against Plaintiff and Defendants)

298.    Intervenors incorporate and restate the prior allegations regarding their counterclaims and cross-claims.

299.    Because Congress must have a legislative purpose for its inquiries, it cannot demand personal, confidential information to exercise "any of the powers of law enforcement." *Quinn*, 349 U.S. at 161. Those enforcement powers "are assigned under our Constitution to the Executive and the Judiciary." *Id*. Because Congress is not "a law enforcement or trial agency," congressional investigations conducted "for the personal aggrandizement of the investigators" or "to 'punish' those investigated" are "indefensible." *Watkins*, 354 U.S. at 187. Our tripartite system of separated powers requires that "any one of the[] branches shall not be permitted to encroach upon the powers confided to the others, but that each shall by the law of its creation be limited to the exercise of the powers appropriate to its own department and no other." *Kilbourn*, 103 U.S. at 190-91.

300.    If the Committee's primary purpose is not exposure for the sake of exposure, then it is law enforcement—not legislation.

301.    Per their repeated public statements, Committee Members requested President Trump's tax information for the purpose of proving his supposed criminal wrongdoing.

302.    The Committee's request bears the hallmarks of law enforcement as it singles out one individual, asks for evidence of wrongdoing, and mirrors a request made by an actual prosecutor.

303.    Committee Members also requested President Trump's tax information so they could conduct their own investigation, examination, and audit of President Trump, proving that he

owed more in taxes than he claims or uncovering other wrongdoing. These powers, however, belong exclusively to the executive branch.

## CROSS-CLAIM & COUNTERCLAIM III
### No Legitimate Legislative Purpose – Pertinent to Valid Legislation
### (Against Plaintiff and Defendants)

304.    Intervenors incorporate and restate the prior allegations regarding their counterclaims and cross-claims.

305.    "Congress is not invested with a general power to inquire into private affairs. The subject of any inquiry always must be one on which legislation could be had." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 n.15 (1975) (cleaned up). And legislation could not "be had" if it would be unconstitutional. *See Quinn v. United States*, 349 U.S. 155, 161 (1955) ("[T]he power to investigate" does not "extend to an area in which Congress is forbidden to legislate.").

306.    "[T]he records called for" by Congress also must be "pertinent" to the valid legislation. *McPhaul v. United States*, 364 U.S. 372, 380 (1960). This "pertinency" requirement ensures that Congress is "coping with a problem that falls within its legislative sphere." *Watkins*, 354 U.S. at 206. If the congressional request is not "reasonably 'relevant to the inquiry,'" then it lacks a legitimate purpose entirely. *McPhaul*, 364 U.S. at 381-82; *accord Hearst v. Black*, 87 F.2d 68, 71 (D.C. Cir. 1936); *Bergman v. Senate Special Comm. on Aging*, 389 F. Supp. 1127, 1130 (S.D.N.Y. 1975).

307.    Moreover, the legislative purpose justifying a committee's investigation must fall within that committee's jurisdiction. "The theory of a committee inquiry is that the committee members are serving as the representatives of the parent assembly in collecting information for a legislative purpose." *Id.* at 200. The committee therefore "must conform strictly to the resolution" creating its jurisdiction. *Exxon Corp. v. FTC*, 589 F.2d 582, 592 (D.C. Cir. 1978). Especially when

an investigation is "novel" or "expansive," courts will construe the committee's jurisdiction "narrowly." *Tobin v. United States*, 306 F.2d 270, 275 (D.C. Cir. 1962).

308.   Congress cannot constitutionally require the IRS to audit a President. Presidents alone are vested with the executive power. Congress cannot direct one component of the executive branch to wield that power against its head.

309.   The Committee's request is not reasonably relevant to studying the IRS's audit process. It singles out one President, asks for open files, asks for pre-President files, seeks tax returns themselves, is not aimed at answering procedural questions, and has other flaws.

310.   Other contemplated laws would fall outside the Committee's legislative jurisdiction and would be impertinent to the Committee's request. The Committee's request is not limited to "foreign" ties, for example. The audit files would contain virtually no information about business entanglements, and the tax returns contain no information about the audit process.

311.   Further, Congress cannot require the President—a coequal office created by the Constitution itself—to disclose particular information or divest from certain business relationships.  *See Gordon v. United States*, 117 U.S. 697, 699 (1864); *Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524, 610 (1838).

**CROSS-CLAIM & COUNTERCLAIM IV**
**No Legitimate Legislative Purpose - *Mazars***
**(Against Plaintiff and Defendants)**

312.   Intervenors incorporate and restate the prior allegations regarding their counterclaims and cross-claims.

313.   Congressional requests for information that implicate the separation of powers must satisfy the heightened standard articulated by the Supreme Court in *Mazars*.

314.   The *Mazars* test applies to the Committee's request, which was made while President Trump was in office. Because Intervenors immediately objected, the legality of the

request must be assessed at that time. *Watkins*, 354 U.S. at 214-15; *see id.* at 206 (requiring a "clear determination" by the body "initiating" the investigation); *United States v. Rumely*, 345 U.S. 41, 48 (1953) ("as of the time of [the] refusal"); *Shelton v. United States*, 327 F.2d 601, 607 (D.C. Cir. 1963) ("when the subpoena was issued").

315.    Chairman Neal's June 2021 letter was not a new request, but a voluntary adjustment to the April 2019 request—a request that, according to the Committee, never expired, was made only because President Trump was President, and is supposedly meant to pursue President-specific legislation. It, too, should be evaluated as a request to a President.

316.    Regardless, subpoenas to former Presidents are also covered by the Mazars standard. That standard is grounded in the "separation of powers." *Mazars*, 140 S. Ct. at 2033, 2034, 2035, 2036. The Supreme Court has "reject[ed] the argument that only an incumbent President may assert" separation-of-powers claims defending the Office of the President; a "former President" can "also be heard to assert them." *Nixon v. GSA*, 433 U.S. 425, 439 (1977). A "former President in this context can hardly be viewed as an ordinary private citizen." *Pub. Citizen, Inc. v. DOJ*, 111 F.3d 168, 170 (D.C. Cir. 1997). The protection that he—and, in turn, "'the Republic'"— needs from congressional subpoenas of his private papers "'cannot be measured by the few months or years between the submission of the [subpoena] and the end of the President's tenure.'" *Nixon*, 433 U.S. at 449.

317.    Chairman Neal's request badly fails the *Mazars* test. Among other things, his asserted legislative purpose lacks a basis in evidence and is admittedly pretextual. Passing broad reforms that the Chairman has already identified does not justify the significant step of requesting a President's records. Other sources could provide the needed information, especially since Defendants are now so eager to disclose information about presidential audits. And the Chairman's

request burdens Intervenors by interfering with ongoing examinations, disclosing substantial amounts of sensitive financial information, providing no safeguards or accommodations, and overriding the Tax Code's "core purpose of protecting taxpayer privacy." *Tax Analysts v. IRS*, 117 F.3d 607, 615 (D.C. Cir. 1997); *accord Nat'l Treasury Employees Union v. FLRA*, 791 F.2d 183, 184 (D.C. Cir. 1986).

## CROSS-CLAIM V
### Unconstitutionality of §6103(f)
### (Against Defendants)

318.   Intervenors incorporate and restate the prior allegations regarding their counterclaims and cross-claims.

319.   The only authority that the Committee has cited for requesting Intervenors' tax information is 26 U.S.C. §6103(f). While the Committee initially backed up its §6103(f) request with a subpoena, the Committee contends that the subpoena expired with the 116th Congress and has not been reissued.

320.   If §6103(f) is unconstitutional, then the default rule of taxpayer privacy controls. The Committee would have no authority to request, and Defendants would have no authority to comply with its request, for Intervenors' information. *See* 18 U.S.C. §1905; 26 U.S.C. §§7213(a)(1), 7431(a).

321.   Section 6103(f) states, in relevant part, that "[u]pon written request from the chairman of the Committee on Ways and Means of the House of Representatives," the Treasury Secretary "shall furnish such committee with any return or return information specified in such request."

322.   According to the Committee, the text of §6103(f) is "clear" and "unequivocal." It "imposes no restriction on the purpose for which a Congressional tax committee may submit a request to Treasury for returns or return information." In other words, the statute "contains no

exception to Treasury's obligation to furnish returns or return information to the Congressional tax committees upon written request," not even an exception for when "the Committee lacks a legitimate legislative purpose." As Speaker Pelosi put it, "[t]he law is very clear"; it says "shall— not may, should, could." As Chairman Neal put it, "[t]he law on this is very clear: The IRS 'shall furnish' the Ways and Means Committee with the requested tax returns." Or as Committee-Member Pascrell put it, §6103(f) is "clear as day."

323.    Under Article I of the Constitution, however, "Congress has no general power to inquire into private affairs and compel disclosures," and "there is no congressional power to expose for the sake of exposure." *Mazars*, 140 S. Ct. at 2032. As OLC explained in both its 2019 and 2021 opinions, Congress cannot delegate authority that it doesn't have, and so §6103(f)(1) cannot give Chairman Neal or the Committee the power to obtain otherwise confidential information without a legitimate legislative purpose.

324.    If §6103(f) neither requires a legitimate legislative purpose nor contains an ambiguity that would allow the Court to read that requirement into the statute, then §6103(f) is unconstitutional on its face.

**CROSS-CLAIM VI**
**Violation of First Amendment**
**(Against Defendants)**

325.    Intervenors incorporate and restate the prior allegations regarding their counterclaims and cross-claims.

326.    The "First Amendment freedoms" of "speech," "political belief," and "association" apply to congressional investigations. *Watkins*, 354 U.S. at 188.

327.    The First Amendment prohibits the government from discriminating, harassing, or retaliating on the basis of political party, association, or speech. *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75 (1990); *Lozman v. City of Riviera Beach*, 138 S.Ct. 1945, 1949 (2018).

328.    The government violates the First Amendment when the target's speech or politics motivated its actions "at least in part." *Cruise-Gulyas v. Minard*, 918 F.3d 494, 497 (6th Cir. 2019). That is because, even when the government could legitimately act "for any number of reasons, there are some reasons upon which the government may not rely"—including "constitutionally protected speech or associations." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

329.    To determine whether an impermissible purpose exists, courts look at the "face" of the action to see if, for example, it has been "'gerrymander[ed]'" to particular individuals. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533-34 (1993). An impermissible purpose can also be detected from "the effect" of the action and other evidence in "the record." *Id*. at 535; *Sorrell*, 564 U.S. at 564. "Relevant evidence includes, among other things, the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Lukumi*, 508 U.S. at 540.

330.    Based on all the evidence, the Committee's request for President Trump's tax information is unlawfully motivated by discrimination, harassment, and retaliation in violation of the First Amendment. This Court can and should direct relief against Defendants to prevent them from carrying out this unlawful request.

331.    As OLC found and never disavowed, the record overwhelming reveals that the purpose of the request for Intervenors' tax information is to expose the private tax information of one individual—President Trump—for political gain. The request is tailored to, and in practical operation will affect, only President Trump. The request singles out President Trump because he is a Republican and the chief political opponent of Committee Democrats. It was made to retaliate

against President Trump because of his policy positions, his political beliefs, and his protected speech, including the positions he took during the 2016 and 2020 campaigns.

332.     The Committee's attempt to forcibly disclose President Trump's tax information is in direct retaliation to his refusal to disclose the returns voluntarily during the 2016 and 2020 elections. It is also done with the intent to damage him politically because he is a Republican, whose beliefs, agenda, and politics Committee Democrats oppose in full, and who did or could run against their preferred Democratic candidate for President (Hillary Clinton, then Joe Biden). When President Trump was in office, Committee Democrats consistently voted against his agenda and voted to remove him; their continued pursuit of his tax information is an attempt to keep him at bay.

333.     The Committee's request is a major departure from historical practice. Section 6103(f) has never been used against a President, a former President, or any elected official.

334.     The Committee's request has always been a transparent effort by one political party to harass an official from the other party because they dislike his politics and speech. Chairman Neal sought President Trump's tax returns and return information because his party had recently gained control of the House, President Trump was (and is) their political opponent, and they want to use the information to damage him politically. The Chairman's party has been clamoring for President Trump's tax returns since before the 2016 election.

335.     Chairman Neal and other Committee Democrats have admitted that the stated purpose of the request is pretextual—a retroactive rationalization to help win this case.

336.     Independently, and for many of the same reasons, Defendants' decision to comply with the Committee's request is itself unlawfully motivated by discrimination, harassment, and retaliation in violation of the First Amendment.

337.    Though the executive branch once confirmed the request's impermissible purpose, it switched positions once President Biden came into office after six months of consulting with the Committee. Intervenors were not warned, and were not invited to attend the parties' negotiations. The new OLC opinion does not deny the record of impermissible intent, but instead gives wobbly justifications and shallow reasoning for why the executive branch should ignore that evidence. The government's complete reversal on the legality of Chairman Neal's request came under President Biden, a Democrat who made the disclosure of President Trump's tax returns a campaign issue and knows that President Trump remains the most high-profile Republican and his top political rival. The reversal of position was also made via unusual procedures and under pressure from liberal groups who wanted President Trump's information immediately exposed.

## CROSS-CLAIM VII
### Violation of Separation of Powers
### (Against Defendants)

338.    Intervenors incorporate and restate the prior allegations regarding their counterclaims and cross-claims.

339.    "Under our Constitution, the 'executive Power'—all of it—is 'vested in a President," who must "take Care that the Laws be faithfully executed.'" *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2191 (2020).

340.    Information requested by the Committee is the subject of ongoing examinations by the IRS.

341.    The executive branch has long refused to "provide committees of Congress with access to, or copies of, open law enforcement files." 10 Op. O.L.C. 68, 76 (1986).

342.    Making Congress "a partner in the investigation," as every administration since George Washington has recognized, would create "a substantial danger that congressional pressures will influence the course of the investigation." 8 Op. O.L.C. 252, 263 (1984).

343.    "The Constitution's division of power among the three branches is violated where one branch invades the territory of another, whether or not the encroached-upon branch approves the encroachment." *New York v. United States*, 505 U.S. 144, 182 (1992). "The constitutional authority of Congress cannot be expanded by the 'consent' of the governmental unit whose domain is thereby narrowed," even when "that unit is the Executive Branch." *Id.*

344.    Allowing the Committee to obtain files that are the subject of ongoing examinations violates the separation of powers.

**CROSS-CLAIM VIII**
**Violation of Due Process**
**(Against Defendants)**

345.    Intervenors incorporate and restate the prior allegations regarding their counterclaims and cross-claims.

346.    Information requested by the Committee is the subject of ongoing examinations by the IRS.

347.    IRS examinations are adjudications. Basic principles of due process require IRS examination to be insulated from congressional interference.

348.    When a congressional investigation focuses on a "pending" adjudication, it violates "the right of private litigants to a fair trial and, equally important, with their right to the appearance of impartiality"—the "sine qua non of American judicial justice." *Pillsbury Co. v. FTC*, 354 F.2d 952, 964 (5th Cir. 1966).

349.    Even the most scrupulous IRS officials could not help but be influenced by the fact that Congressional partisans are scrutinizing their work in real time. *Id*. That is especially true here, where the Committee seeks to look over officials' shoulders in real time on a theory that they are being too lax on particular taxpayers.

350.   Congressional inquiries made "while the decisionmaking process is ongoing" impose the "greatest" intrusion on "the Executive Branch's function of executing the law." 5 Op. O.L.C. 27, 31 (1981).

351.   Allowing the Committee to obtain files that are the subject of ongoing examinations violates Intervenors' due-process rights.

**WHEREFORE**, Intervenors ask this Court to enter judgment in their favor and provide the following relief:

a.   A declaratory judgment that Plaintiff has not lawfully requested Intervenors' tax information;

b.   A declaratory judgment that Defendants cannot lawfully disclose Intervenors' tax information;

c.   A permanent injunction prohibiting Defendants from complying with, or taking any other action to disclose, Intervenors' tax information;

d.   A temporary restraining order and preliminary injunction granting the relief specified above during the pendency of this action;

e.   Intervenors' reasonable costs and expenses, including attorneys' fees; and

f.   All other preliminary and permanent relief that Intervenors are entitled to, including equitable relief under the All Writs Act to protect this Court's jurisdiction.

Respectfully submitted,

Dated: August 4, 2021

  */s/ Patrick Strawbridge*  
Patrick Strawbridge (*pro hac vice*)
CONSOVOY MCCARTHY PLLC
Ten Post Office Square, 8th Floor
South PMB #706
Boston, MA 02109
(617) 227-0548
patrick@consovoymccarthy.com

William S. Consovoy (D.C. Bar #493423)
Cameron T. Norris
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com
cam@consovoymccarthy.com