## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMMITTEE ON WAYS AND MEANS,
UNITED STATES HOUSE OF
REPRESENTATIVES,

*Plaintiff–Counterdefendant*,

v.

UNITED STATES DEPARTMENT OF THE
TREASURY, ET AL.,

Case No. 19-cv-01974-TNM

*Defendants–Crossdefendants*,

DONALD J. TRUMP, ET AL.,

*Intervenors–*
*Counterclaimants–*
*Crossclaimants*.

## COUNTERDEFENDANT'S MOTION TO DISMISS

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Counterdefendant Committee on

Ways and Means of the United States House of Representatives moves to dismiss all

counterclaims because, as stated in the accompanying Memorandum of Law, they fail to state a

claim upon which relief can be granted.  A proposed order is submitted with this motion.

October 12, 2021

SETH P. WAXMAN (D.C. Bar No. 257337)
KELLY P. DUNBAR (D.C. Bar No. 500038)
DAVID M. LEHN (D.C. Bar No. 496847)
ANDRES C. SALINAS (D.C. Bar No. 156118)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 663-6000
seth.waxman@wilmerhale.com

KATHERINE V. KELSH (*pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

Respectfully submitted,

*/s/ Douglas N. Letter*
DOUGLAS N. LETTER (D.C. Bar No. 253492)
    *General Counsel*
TODD B. TATELMAN (VA Bar No. 66008)
ERIC R. COLUMBUS (D.C. Bar No. 487736)
STACIE M. FAHSEL (D.C. Bar. No. 1034314)
OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, DC  20515
(202) 225-9700
douglas.letter@mail.house.gov

*Counsel for Plaintiff–Counterdefendant
Committee on Ways and Means, United States
House of Representatives*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

COMMITTEE ON WAYS AND MEANS,
UNITED STATES HOUSE OF
REPRESENTATIVES,

               *Plaintiff–Counterdefendant*,

    v.

UNITED STATES DEPARTMENT OF THE
TREASURY, ET AL.,

              *Defendants–Crossdefendants*,

DONALD J. TRUMP, ET AL.,

              *Intervenors–
              Counterclaimants–
              Crossclaimants.*

Case No. 19-cv-01974-TNM

---

**MEMORANDUM OF LAW IN SUPPORT OF
<u>COUNTERDEFENDANT'S MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................4

    A.    The House Committee On Ways And Means ..........................................................4

    B.    Section 6103(f) Continues The Committee's Long-Established Statutory
Right To Obtain Tax Returns And Tax Information From Treasury......................4

    C.    IRS Procedures For Auditing Presidents' Tax Returns ...........................................6

    D.    The Committee's 2019 Request To Treasury ...........................................................8

    E.    The Committee's June 2021 Request To Treasury.................................................9

    F.    The 2021 OLC Opinion .........................................................................................11

    G.    Former President Trump's Counterclaims And Cross-Claims .............................13

LEGAL STANDARD...........................................................................................................14

ARGUMENT .......................................................................................................................15

I.    COUNTERCLAIMS I, II, AND III FAIL AS A MATTER OF LAW .........................................15

    A.    The Committee's 2021 Request Serves Valid Purposes.......................................16

    B.    Allegations Regarding Individual Legislators' Motives Do Not Vitiate The
Committee's Request.............................................................................................20

           1.    The Committee's Supposed Motives Are Legally Irrelevant ...................20

           2.    Even If Relevant, Allegations Regarding Subjective Motive Would
Not Vitiate The Committee's Purposes ....................................................22

    C.    Mr. Trump's Contentions That The Committee's Request Exceeds Its
Constitutional Authority Fail ................................................................................28

II.    COUNTERCLAIM IV FAILS AS A MATTER OF LAW .........................................................30

    A.    The *Mazars* Test Does Not Apply ........................................................................31

    B.    Regardless Of Which Test Applies, The Request Does Not Violate The
Separation Of Powers ............................................................................................35

1.      The Request Imposes No Burden On The Current President Or Future Presidents.............................................................................35

2.      The Committee's Purposes Warrant Involving Mr. Trump's Papers ........37

3.      The 2021 Request Seeks Only What Is Reasonably Necessary ................39

4.      The Committee Justified Its Need For The Requested Materials.............41

III.    THE REMAINING CROSS-CLAIMS AGAINST TREASURY SHOULD BE DISMISSED .................43

CONCLUSION..................................................................................................................43

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abhe & Svoboda, Inc. v. Chao,*
    508 F.3d 1052 (D.C. Cir. 2007) .................................................................................14

*Action Alliance of Senior Citizens of Greater Philadelphia v. Sullivan,*
    930 F.2d 77 (D.C. Cir. 1991) .....................................................................................25

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ...................................................................................................14

*Banneker Ventures, LLC v. Graham,*
    798 F.3d 1119 (D.C. Cir. 2015) .................................................................................14

*Barenblatt v. United States,*
    360 U.S. 109 (1959) ...................................................................................................21

*Barry v. United States ex rel. Cunningham,*
    279 U.S. 597 (1929) ...................................................................................................17

*Brown & Williamson Tobacco Corp. v. Williams,*
    62 F.3d 408 (D.C. Cir. 1995) .....................................................................................21

*D.A.M. v. Barr,*
    474 F. Supp. 3d 45 (D.D.C. 2020) ........................................................................8, 15

*Duplex Printing Press Co. v. Deering,*
    254 U.S. 443 (1921) ...................................................................................................34

*Eastland v. U.S. Servicemen's Fund,*
    421 U.S. 491 (1975) ...............................................................................13, 16, 21, 22, 29

*Electronic Privacy Information Center v. IRS,*
    910 F.3d 1232 (D.C. Cir. 2018) ...............................................................................6, 7

*Hutcheson v. United States,*
    369 U.S. 599 (1962) ...................................................................................................21

*Johnson v. Commission on Presidential Debates,*
    202 F. Supp. 3d 159 (D.D.C. 2016) .....................................................................15, 35

*Kaempe v. Myers,*
    367 F.3d 958 (D.C. Cir. 2004) ...................................................................................15

*Kaspersky Lab, Inc. v. U.S. Department of Homeland Security,*
    909 F.3d 446 (D.C. Cir. 2018) ...................................................................................15

*Landgraf v. USI Film Products*,
    511 U.S. 244 (1994).................................................................................34

*Marbury v. Madison*,
    5 U.S. 137 (1803)...................................................................................39

*\*McGrain v. Daugherty*,
    273 U.S. 135 (1927).............................................................2, 12, 17, 22, 27

*NFIB v. Sebelius*,
    567 U.S. 519 (2012).................................................................................20

*Nixon v. Administrator of General Services*,
    433 U.S. 425 (1977)......................................................................... 3, 29, 36

*Pernice v. Bovim*,
    183 F. Supp. 3d 84 (D.D.C. 2016)......................................................14, 15

*Public Citizen, Inc. v. Trump*,
    297 F. Supp. 3d 6 (D.D.C. 2018) .............................................................15

*Senate Select Committee on Presidential Campaign Activities v. Nixon*,
    498 F.2d 725 (D.C. Cir. 1974)............................................................29, 35

*Shelton v. United States*,
    404 F.2d 1292 (D.C. Cir. 1968).................................................................23

*Sinclair v. United States*,
    279 U.S. 263 (1929).................................................................................27

*Strumsky v. Washington Post Co.*,
    842 F. Supp. 2d 215 (D.D.C. 2012) .........................................................15

*Tenney v. Brandhove*,
    341 U.S. 367 (1951)............................................................................22, 27

*Tory v. Cochran*,
    544 U.S. 734 (2005).................................................................................34

*\*Trump v. Mazars USA, LLP*,
    140 S. Ct. 2019 (2020)....................................................................... *passim*

*\*Trump v. Mazars USA LLP*,
    2021 WL 3602683 (D.D.C. Aug. 11, 2021) ............................................ *passim*

*Trump v. Mazars USA LLP*,
    940 F.3d 710 (D.C. Cir. 2019)...........................................25, 26, 27, 29

*United States v. Nixon*,
    418 U.S. 683 (1974)...................................................................................... 29

*Watkins v. United States*,
    354 U.S. 178 (1957).................................................................................. *passim*

*Wilkinson v. United States*,
    365 U.S. 399 (1961)......................................................................................23

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)......................................................................................29

## CONSTITUTIONS, STATUTES, RULES, AND REGULATIONS

U.S. Constitution,

    art. I, § 8, cl. 1 ...........................................................................................19
    art. I, § 8, cl. 18 .........................................................................................19
    art. I, § 9, cl. 7 ...........................................................................................19
    art. I, § 9, cl. 8 .....................................................................................19, 38

26 U.S.C. § 6103 .................................................................................... *passim*

Revenue Act of 1924, Pub. L. No. 68-176, 43 Stat. 253 ..................................5

Tax Reform Act of 1976, Pub. L. No. 94-455, 90 Stat. 1520 ...........................6

Fed. R. Civ. P. 12(b)(6).....................................................................................14

Fed. R. Evid. 201(b)......................................................................................8, 15

## LEGISLATIVE MATERIALS

65 Cong. Rec. 3699-3702 (1924)........................................................................5

*Hearing on Legislative Proposals and Tax Law Related to Presidential and Vice-
    Presidential Tax Returns: Hearing Before the Subcomm. on Oversight of the
    H. Comm. on Ways and Means*, 116th Cong. (Feb. 7, 2019) .......................8, 42, 43

Report of the Comm. on Ways and Means, U.S. House of Representatives,
    H. Rep. 116-186 (2019) ...........................................................................5, 6

Rule 15 of the Committee on Ways and Means for the 117th Congress......................22

S. Res. 180, 68th Cong., 65 Cong. Rec. 3299 (1924)......................................5

Staff of Joint Comm. on Internal Revenue Tax., Examination of President Nixon's
    Tax Returns for 1969 through 1972, S. Rep. No. 93-768, 93d Cong. 2d Sess.
    (1974) ......................................................................................................5

Staff of Joint Comm. on Internal Revenue Tax., Investigation into Certain
  Charges of the Use of the Internal Revenue Service for Political Purposes, 93d
  Cong., 1st Sess. (Comm. Print Dec. 20, 1973) ...................................................6

Staff of the Joint Comm. on Taxation, JCX-3-19, *Background Regarding the*
  *Confidentiality and Disclosure of Federal Tax Returns* (Feb. 4, 2019) ...................6

U.S. House of Representatives Rule X.1(t), 117th Cong. .............................................4

## OTHER AUTHORITIES

Aaron Lorenzo & Heather Caygle, *Inside House Dems' move to seize Trump's tax returns*,
  Politico (Apr. 4, 2019) .............................................................................................25

Arden Farhi, *Trump files 2017 taxes following 6-month extension*,
  CBS News (Oct. 17, 2018) ......................................................................................18

Brian Faler, *Neal defends go-slow approach to seeking Trump's tax returns*,
  Politico (Jan. 24, 2019) ...........................................................................................24

Emily Judem, *Rep. Neal: Request For Trump's Taxes 'Was Not Motivated By Malevolence'*,
  GBH News (Apr. 5, 2019) ......................................................................................25

Internal Revenue Manual ................................................................................................7

Mark Sullivan, *Powerful Ways and Means chairman Neal to pursue Trump's tax returns*,
  Worcester Telegram (Jan. 23, 2019) ......................................................................24

*President and Mrs. Bush Release 2000 Tax Return*,
  The White House (President George W. Bush Archives) (Apr. 13, 2001) .............36

*President Obama and Vice President Biden's 2015 Tax Returns*,
  The White House (President Barack Obama Archives) (Apr. 15, 2016) ................36

Reply Br. for Petitioners, *Trump v. Mazars USA, LLP*,
  2020 WL 1643780 (U.S. Mar. 27, 2020) ...............................................................24

*The President and Vice President release their 2020 tax returns*,
  The White House (May 17, 2021) ...........................................................................36

*Trump Calls Years of Tax Avoidance 'Fake News,' Attacks I.R.S.*,
  N.Y. Times (Sept. 27, 2020) ..................................................................................18

## INTRODUCTION

Like all Americans, Presidents of the United States are required to comply with the federal tax laws.  The Internal Revenue Service ("IRS") has long had a policy that the President's tax returns are subject to mandatory examination.  But Donald Trump presented serious, unprecedented challenges to the IRS's ability to perform Presidential audits.  Mr. Trump owned a highly complex web of businesses, engaged in business activities internationally, had a history (as he has boasted) of aggressive tax avoidance, refused to release his returns publicly (contrary to the modern practice), and repeatedly denounced the IRS's audits as "unfair" to him. Therefore, the Committee on Ways and Means of the U.S. House of Representatives ("Committee"), which has legislative and oversight jurisdiction over federal tax laws, became concerned about whether the IRS had the resources and safeguards to audit the tax returns of Mr. Trump and similar future Presidents effectively and independently of improper attempts to influence an audit.  On top of that, Mr. Trump's business activities raised legitimate concerns about whether he had received income from foreign sources that would expose him to improper influence.  Congress has a constitutional right and duty to investigate these circumstances and to determine whether any remedial legislation would be necessary or appropriate.

Exercising this prerogative, in June 2021—after Mr. Trump had left office—the Committee asked the IRS and the Department of the Treasury ("Treasury") to provide two categories of documents for the tax years Mr. Trump was in office and for the two preceding tax years: income tax returns, for him and certain of his businesses, and any related IRS audit files. The Committee made this request under Section 6103(f) of the Internal Revenue Code—a longstanding law directing Treasury to furnish, to the Chair of the Committee upon request, the tax return and return information of any taxpayer.  Accompanying this request was a lengthy letter explaining and substantiating the Committee's legislative and oversight needs for the

requested tax returns and return information.  Upon the advice of the Department of Justice ("DOJ"), Treasury determined that it would comply with the Committee's request.

Mr. Trump, however, has interposed a series of claims against the Committee and Treasury, seeking to block Treasury from complying with the Committee's request and effectively asking for permanent immunity for his tax returns and related IRS records from Section 6103(f).  He principally claims that the Committee's request is constitutionally invalid because it does not serve a legitimate legislative purpose and violates the constitutional separation of powers under the Supreme Court's recent decision in *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020).  He even goes so far as to claim that Section 6103(f) is unconstitutional as applied to a President's tax returns.  Mr. Trump's claims fail as a matter of law, and therefore his complaint should be dismissed.

Mr. Trump does not deny the factual bases for the Committee's concerns, including his own public statements attacking the IRS for auditing him.  Nonetheless, relying on cherry-picked statements from various public officials—many of whom are not Members of the Committee (and some of whom are not even Members of Congress)—Mr. Trump argues that the Committee's stated interest in the IRS's Presidential audit program is "pretextual" and that the Committee's *real* purpose is simply to publicly expose his tax returns "for the sake of exposure" or else to engage in law enforcement.  These claims fail because federal courts have no power to examine the motives of Members of Congress to determine whether their acts are valid under Article I.  The courts are instead "bound to presume that the action of the legislative body was with a legitimate object, if it is capable of being so construed," *McGrain v. Daugherty*, 273 U.S. 135, 178 (1927)—and as DOJ concluded, the Committee's request plainly is capable of being so construed.  The rule Mr. Trump advocates would conscript the judiciary into reviewing and

second-guessing facially valid Congressional acts, an approach that would disregard the deference owed by courts to Congress as a co-equal branch of government and raise serious separation-of-powers concerns.  In any event, the "evidence" of pretext that Mr. Trump cites confirms that the Committee's request indeed serves legitimate legislative and oversight purposes.  Certainly, supposed political motives are legally insufficient to render an otherwise valid action unconstitutional, as the Supreme Court made clear in *Mazars*—a case involving "a clash between rival branches of government over records of intense *political* interest for all involved."  140 S. Ct. at 2034 (emphasis added).  And the individual legislators' statements recited by Mr. Trump express concerns about his "tax evasion," "corrupt[ion]," and "foreign entanglements"—concerns well within Congress's undeniable authority to investigate and consider legislation addressing "corruption, maladministration or inefficiency" in government. *Watkins v. United States*, 354 U.S. 178, 200 n.33 (1957).

Moreover, Mr. Trump's claim based on the Supreme Court's *Mazars* decision fails because that case involved a Congressional subpoena for a sitting President's records.  The standard adopted in *Mazars* logically does not apply to a *statutory* request for a *former* President's records.  In any event, whether evaluated under the *Mazars* standard, the balancing test adopted by the Supreme Court in *Nixon v. Administrator of General Services* ("*GSA*"), 433 U.S. 425 (1977), or the modified version of the *Mazars* standard used by the district court in that case on remand, the Committee's request easily accords with the separation of powers.  The Committee has a strong interest specifically in Mr. Trump's tax returns and return information given the unprecedented challenges he posed while in office to the IRS's ability to audit a President's tax returns.  The Committee's request is well tailored to only the materials that will illuminate how the IRS conducted its audits while he was President.  The Committee has

3

substantiated its needs at length, which have been accepted by the Executive Branch.  And because Mr. Trump is no longer the President, the Committee's request will not burden the current President (or future ones).

For these and additional reasons, the Court should dismiss Mr. Trump's claims and permit Treasury to comply with the Committee's request for information under 26 U.S.C. § 6103(f).

## BACKGROUND

### A.    The House Committee On Ways And Means

The Committee on Ways and Means has legislative and oversight authority over all federal revenue measures, which encompasses all aspects of our nation's tax laws and their administration.  *See* Am. Answer ¶ 12, Dkt. 129; U.S. House of Representatives Rule X.1(t), 117th Cong.[1]  Pursuant to this authority, the Committee is responsible for conducting oversight of the IRS to ensure that tax laws are administered in a fair and effective manner, and to inform legislation for protecting and enhancing the country's tax system.  For that system to function, Americans must have confidence that no taxpayer—including the President of the United States—is above the law.  Therefore, the Committee has sought the tax returns and return information of former President Trump and certain of his businesses, including related IRS audit files.

### B.    Section 6103(f) Continues The Committee's Long-Established Statutory Right To Obtain Tax Returns And Tax Information From Treasury

For almost a century, the political branches have recognized that a statutory right of access to taxpayer information is integral to Congress's ability to investigate wrongdoing by

---

[1] https://rules.house.gov/sites/democrats.rules.house.gov/files/117-House-Rules-Clerk.pdf.

Executive Branch officials—including Presidents.  In 1924, Congress requested the tax records

of high-ranking federal officials suspected of bribery as part of the Teapot Dome scandal, but

President Coolidge refused.  *See* S. Res. 180, 68th Cong., 65 Cong. Rec. 3299 (1924) (requesting

returns); 65 Cong. Rec. 3699-3702 (1924) (President Coolidge's initial response).  In response,

Congress passed Section 6103(f)'s precursor, which provided that the Committee on Ways and

Means (and certain other Congressional committees) "shall have the right to call on the Secretary

of the Treasury" for tax returns, that it "shall be [the Secretary's] duty to furnish … any data of

any character contained in or shown by the returns" requested by the Committee, and that the

Committee "shall have the right … to inspect all or any of the returns."  Revenue Act of 1924,

Pub. L. No. 68-176, § 257(a), 43 Stat. 253, 293.

In 1973, the Joint Committee on Taxation relied on Section 6103(f)'s predecessor to

obtain President Nixon's tax returns as part of its independent review of his tax liability for 1969

to 1972.  Though President Nixon voluntarily disclosed his returns for those years, the Joint

Committee "decided not to confine its examination" to those returns, but "rather to examine all

tax items for the years 1969 through 1972."  Staff of Joint Comm. on Internal Revenue Tax.,

Examination of President Nixon's Tax Returns for 1969 through 1972, S. Rep. No. 93-768, 93d

Cong. 2d Sess. (1974), at 2 ("Joint Tax Committee Nixon Report").  The Joint Committee

therefore requested and received numerous additional materials from the IRS, including certified

copies of the returns President Nixon had voluntarily disclosed and his non-public returns for

other years, including years that predated his Presidency.  *See* Joint Tax Committee Nixon

Report at 4-7; Report of the Comm. on Ways and Means, U.S. House of Representatives, H.

Rep. 116-186, at 4 (2019).  Though the IRS had accepted President Nixon's returns as filed and

had even complimented him for the care he took in preparing his returns, the Joint Committee

ultimately determined that President Nixon owed over $400,000.  *Id.*  Thereafter, to relieve IRS

employees of having to decide whether to audit Presidents' and Vice Presidents' returns, the IRS

adopted a policy of conducting a mandatory audit for them.  *See* Staff of the Joint Committee on

Taxation, JCX-3-19, *Background Regarding the Confidentiality and Disclosure of Federal Tax*

*Returns*, at 20-21 (Feb. 4, 2019).[2]

This statutory assurance of Congressional access to taxpayer information was continued

with the enactment of the current version of Section 6103 in 1976.  *See* Tax Reform Act of 1976,

Pub. L. No. 94-455, § 1202, 90 Stat. 1520, 1667 (amending 26 U.S.C. § 6103).  The 1976

amendment was prompted, in part, by concerns about President Nixon's abuse of the tax system.

*See* Staff of Joint Comm. on Internal Revenue Tax., Investigation into Certain Charges of the

Use of the Internal Revenue Service for Political Purposes, 93d Cong., 1st Sess. (Comm. Print

Dec. 20, 1973).[3]  As enacted, Section 6103(a) prohibits the disclosure of taxpayer returns and

return information.  That prohibition, however, is subject to "thirteen tightly drawn categories of

exceptions."  *Electronic Priv. Info. Ctr. v. IRS*, 910 F.3d 1232, 1237 (D.C. Cir. 2018).  Among

those exceptions, Section 6103(f)(1) provides that, "[u]pon written request from the chairman of

the Committee on Ways and Means of the House of Representatives …, the Secretary shall

furnish [the] committee with any return or return information specified in such request."

26 U.S.C. § 6103(f)(1).

## C.    IRS Procedures For Auditing Presidents' Tax Returns

The mandatory audit of Presidents' returns has never been codified in law, whether in the

Internal Revenue Code or an implementing regulation.  Rather, it is set forth in the Internal

---

[2] https://www.jct.gov/publications/2019/jcx-3-19/.

[3] https://www.jct.gov/publications/1973/jcs-37-73/.

Revenue Manual ("Manual"), a compilation of internal, non-binding guidelines for IRS employees.  *See* IRM Standards, I.R.M. 1.11.2.2 (Aug. 12, 2021);[4] *see also Electronic Priv.*, 910 F.3d at 1244-1245 ("It is well-settled … that the provisions of the [M]anual are directory rather than mandatory, are not codified regulations, and clearly do not have the force and effect of law.").  The Manual provides that the "individual income tax returns for the President and Vice President are subject to mandatory examinations" and that "[r]elated returns, including estate and gift tax returns, will be handled in accordance with procedures relating to all taxpayers." Processing Returns and Accounts of the President and Vice President, I.R.M. 4.2.1.15(1), (6) (Apr. 23, 2014); *see also* Mandatory Examination, I.R.M. 3.28.3.5.3(1) (Nov. 17, 2020). Although the Manual describes the general process for examining a President's individual income tax returns, the IRS has acknowledged to the Committee that many of the mandatory-audit provisions are outdated and no longer are applied.

Further, many aspects of the audit process are left to the IRS auditor's discretion.  The Manual does not specify the scope, length, or depth of the IRS's examination of the returns and does not account for a President who, like former President Trump, had hundreds of business entities, inordinately complex returns, aggressive avoidance strategies, and ongoing audits—or who criticized the IRS for auditing him at all.  The Manual fails to specify, for example, whether the audit extends to the President's business or related entities, open tax years, or ongoing audits. Nor does the Manual establish how the IRS auditor should be selected and supervised, direct how the IRS agents conducting the audit should interact with the President and his representatives, or provide explicit safeguards in the event a President tries to interfere with or questions the appropriateness of such examination, as Mr. Trump did.  Indeed, though the

---

[4] The Manual is publicly available at https://www.irs.gov/irm.

auditor's identity is kept secret within the IRS, it is known by the President and his representatives, who communicate with the agent directly, heightening the risk of improper influence.  In short, the IRS's current procedures, which are neither fully written nor closely followed, fail to assure the Committee that there are sufficient safeguards in place to protect the integrity of Presidential audits and the ability of IRS agents to objectively enforce the tax laws with respect to Presidents.  These are topics on which Congress could legislate.

### D.     The Committee's 2019 Request To Treasury

In February 2019, the Committee held the Hearing on Legislative Proposals and Tax Law Related to Presidential and Vice-Presidential Tax Returns, at which Committee Members and witnesses discussed possible legislation relating to the disclosure of Presidents' tax returns and the fairness and efficacy of the IRS's auditing of Presidents' tax returns.  *Hearing on Legislative Proposals and Tax Law Related to Presidential and Vice-Presidential Tax Returns: Hearing Before the Subcomm. on Oversight of the H. Comm. on Ways and Means*, 116th Cong., Tr. 8, 17, 23, 40-41, 57-58 (Feb. 7, 2019) ("Oversight Tr.").[5]  Then, in April 2019, Committee Chairman Richard E. Neal sent a letter to the IRS Commissioner requesting the tax returns and return information of then-President Donald J. Trump and eight of his businesses for tax years 2013 through 2018, including the IRS's "administrative files" for the requested returns.  Am. Answer ¶¶ 57, 59; Am. Counterclaims/Cross-Claims ¶ 123, Dkt. 129.  The Committee explained that its request was in furtherance of its consideration of legislative proposals and oversight related to "Federal tax laws," including "the extent to which the IRS audits and enforces the Federal tax

---

[5] This hearing transcript is available at https://waysandmeans.house.gov/sites/democrats. waysandmeans.house.gov/files/documents/Transcript%20-%20Final.pdf.  The Court may take judicial notice of the testimony at the hearing to establish the basis for the Committee's request. *See* Fed. R. Evid. 201(b)(2); *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 55 n.12 (D.D.C. 2020) (taking judicial notice of Congressional testimony).

laws against a President."  Am. Counterclaims/Cross-Claims ¶ 124; *see* Letter for Charles P. Rettig, Commissioner, Internal Revenue Service, from Richard E. Neal, Chairman, Committee on Ways and Means, U.S. House of Representatives at 1 (Apr. 3, 2019) ("2019 Request") (attached as Exhibit A).[6]

Treasury sought guidance from DOJ's Office of Legal Counsel ("OLC") regarding whether Treasury was required to comply with the Committee's request.  Am. Counterclaims/Cross-Claims ¶ 219.  OLC advised Treasury that it was not required to comply with the Committee's request because the Committee's asserted purposes for requesting the tax records were (OLC said) pretextual.  *Id.* ¶¶ 219-222; *see* OLC, *Congressional Committee's Request for the President's Tax Returns Under 26 U.S.C. § 6103(f)*, 43 Op. O.L.C. __ (June 13, 2019) ("2019 OLC Op.").[7]  Accordingly, Treasury denied the April 2019 Request.  As Treasury has subsequently acknowledged, this was the first and only time a Congressional request under Section 6103(f) was denied.  *See Ways and Means Committee's Request for the Former President's Tax Returns and Related Tax Information Pursuant to 26 U.S.C. § 6103(f)(1)*, 45 Op. O.L.C. __ (slip op. at 11) (July 30, 2021) ("2021 OLC Op.") (attached as Exhibit B).

E.     **The Committee's June 2021 Request To Treasury**

In June 2021, Chairman Neal submitted another request under Section 6103(f)—the request at issue now.  *See* Am. Counterclaims/Cross-Claims ¶ 253; Letter for Janet L. Yellen, Secretary of the Treasury, from Richard E. Neal, Chairman, Committee on Ways and Means, U.S. House of Representatives at 6-7 (June 16, 2021) ("2021 Request") (attached as Exhibit C). The 2021 Request again sought the tax returns and return information for Mr. Trump and eight

---

[6] https://waysandmeans.house.gov/sites/democrats.waysandmeans.house.gov/files/ documents/Neal%20Letter%20to%20Rettig%20%28signed%29%20-%202019.04.03.pdf.

[7] https://www.justice.gov/olc/file/1173756/download.

of his businesses, but for a different period from the 2019 Request: tax years 2015 through 2020. *See* 2021 Request at 6-7; *see also* Am. Counterclaims/Cross-Claims ¶ 253.

The 2021 Request explained that it was made in furtherance of the Committee's "responsibility to conduct rigorous oversight of the [IRS] to ensure that our tax laws are administered in a fair and impartial manner and to inform legislation necessary for safeguarding" the tax system. 2021 Request at 1. It noted that "Americans must have confidence that no taxpayer is able to operate above the law"—especially not "the President of the United States, who is the single most powerful public official in the country." *Id.* The request then detailed the Committee's interest in former President Trump's tax returns and tax information. It stated that "[t]he Committee has been considering legislative proposals and conducting oversight related to our Federal tax laws, including, but not limited to, the extent to which the IRS audits and enforces the Federal tax laws against a President." *Id.* For example, the request stated that the Committee sought to determine whether IRS agents were subject to "improper interference," whether they considered "ongoing audits that predate" the Presidential term, whether they "reviewed" business "activities involving many interrelated entities and income from and deductions related to foreign sources," whether they had "access to the necessary books and records," and how the President "responded to" any "examination findings or adjustments." *Id.* at 3.

These questions were raised by Mr. Trump's Presidency, the 2021 Request stated, because, among other reasons, he "controlled hundreds of business entities while in office and … routinely criticized the IRS for auditing him." 2021 Request at 4. For example, the request noted that Mr. Trump "controlled … [a] large, complex, and far-reaching web of" businesses engaged in both "domestic and foreign business activities," and that he appeared to have "used

his businesses to take aggressive tax positions to minimize his tax liability," yet the Manual's "provisions on the mandatory audit program do not account for such substantial business activities." *Id.* at 4-5. The request also explained that Mr. Trump claimed to "have been under continuous audit since before his Presidency," which, if true, meant that he could be in a position to improperly influence that audit as President. *Id.* Indeed, that concern was heightened, the 2021 Request observed, in light of Mr. Trump's open "disdain for IRS audits" while a candidate and President—he complained that "people in the IRS … treat [him] very, very badly" and even considered the automatic Presidential audit "extremely unfair." *Id.* at 5-6. Further, the request stated that his "tax returns could reveal hidden business entanglements raising tax law and other issues, including conflicts of interest, affecting proper execution of the former President's responsibilities." *Id.* at 4.

In sum, as the 2021 Request explained, the Committee "cannot properly evaluate the effectiveness or fairness of the mandatory audit program, in practice" or "legislate responsibly on this matter or address the real potential for abuse of power" without access to the requested tax returns and administrative files. 2021 Request at 3; *see also id.* at 6.

### F.    The 2021 OLC Opinion

Upon receiving the 2021 Request, Treasury asked OLC for its opinion as to whether the Secretary must furnish the requested materials to the Committee. In July 2021, OLC concluded that the 2021 Request was valid and therefore, under Section 6103(f)(1), Treasury must comply with it. 2021 OLC Op. at 3. As in its 2019 Opinion, OLC determined that Section 6103(f)(1)'s "unambiguous … directive" commands Treasury to supply the requested information to the Committee, yet "does not exempt the June 2021 Request from the constitutional requirement that congressional demands for information must serve a legitimate legislative purpose." *Id.* at 3-4. But unlike its 2019 Opinion, OLC determined that the Committee's request "for former President

Trump's tax information would further the Committee's principal stated objective of assessing the IRS's presidential audit program—a plainly legitimate area for congressional inquiry and possible legislation." *Id.* at 4.

As OLC's 2021 Opinion explained, two key factors drove its different conclusion. First, OLC explained that "the 2019 Opinion failed to give due weight to Congress's status as a co-equal branch of government with legitimate needs for information in order to exercise its constitutional authorities." 2021 OLC Op. at 19. Like courts, OLC stated, the Executive Branch should "presume that … Legislative Branch officials act in good faith and in furtherance of legitimate objectives" and that "the tax committees are best situated to determine when Congress ought to have access to tax information." *Id.* Accordingly, OLC declared: Although the Executive Branch need not "'blindly accept a pretextual justification' offered by a committee to justify an informational request," where "a tax committee requests tax information pursuant to section 6103(f)(1) and has invoked facially valid reasons for its request (despite the statute's not requiring any), the Executive Branch should conclude that the request lacks a legitimate legislative objective only in exceptional circumstances." *Id.* (quoting 2019 OLC Op. at 17). Such circumstances arise only where "a committee's asserted purpose truly blinks reality," for the Executive Branch need not "'blind' itself to 'what all others can see and understand.'" *Id.* at 26 (brackets omitted) (quoting *Mazars*, 140 S. Ct. at 2034).

OLC added that, like courts, the Executive Branch is "'bound to presume that the action of the legislative body was with a legitimate object if it is capable of being so construed.'" 2021 OLC Op. at 22 (quoting *McGrain*, 273 U.S. at 178). And neither "the fact that a congressional request for information might serve partisan or other political interests," nor the fact that legislators might want to "expose for the sake of exposure," such as to "embarrass" a President,

can "'vitiate an investigation … if [a] legislative purpose is [also] being served.'"  *Id.* at 26, 38

(quoting *Watkins*, 354 U.S. at 200).

Second, OLC explained that even if the 2019 Opinion's doubts about whether the 2019

Request served a legitimate purpose were sound, the 2021 Request left no room for such doubt.

2021 OLC Op. at 31.  Specifically, OLC noted that the 2021 Request adjusted the tax years

requested, and "explain[ed] in detail how review of those" materials "could assist" the

Committee's legislative work, including why "it is reasonable for the Committee to focus on

former President Trump's returns" given the challenges he posed to the IRS's audit process.  *Id.*

at 31-33.  OLC also found that the Committee's concerns about hidden business entanglements

and foreign financial influence were "independently sufficient to justify the request" because

"[a]n investigation into possible presidential conflicts of interest or foreign influence and

leverage involves a 'subject on which legislation could be had.'"  *Id.* at 34 (quoting *Eastland v.*

*U.S. Servicemen's Fund*, 421 U.S. 491, 506 (1975) (quotation marks omitted)).

Finally, OLC did "not understand *Mazars* to alter the legal framework for reviewing the

June 2021 Request" because "the June 2021 Request seeks the tax information, not of a sitting

President, but of a former President."  2021 OLC Op. at 28.  OLC found that this difference

greatly mitigated the *Mazars* Court's concerns regarding the separation of powers.  *Id.*

### G.     Former President Trump's Counterclaims And Cross-Claims

After OLC released its 2021 Opinion, Treasury informed former President Trump and the

Committee that it intended to produce to the Committee materials responsive to the 2021

Request.  *See* Joint Status Report at 2, Dkt. 111.  Consequently, the Committee dismissed the

complaint it had previously filed against Treasury concerning the 2019 Request, *see* Dkt. 115;

Minute Order, Aug. 5, 2021, and Mr. Trump and his business entities filed counterclaims against

the Committee and cross-claims against Treasury (along with the Secretary, the IRS, and the IRS

Commissioner), which he subsequently amended after seeing the Committee's and Treasury's motions to dismiss.  As his pleading stands, Mr. Trump asserts against both the Committee and Treasury claims that the 2021 Request lacks a legitimate purpose because the Committee's "real object" is either (1) to expose Mr. Trump's returns for the sake of exposure or (2) to engage in law enforcement, and because (3) the Committee's request does not relate to legislation that Congress would have the constitutional power to enact.  Am. Counterclaims/Cross-Claims ¶¶ 290-311.  Mr. Trump further claims, against both the Committee and Treasury, that the 2021 Request (4) violates the separation of powers under *Mazars*.  *Id.* ¶¶ 312-317.  Against Treasury alone, Mr. Trump alleges that (5) 26 U.S.C. § 6103(f) is unconstitutional as applied to a President's tax returns and tax information, and that the 2021 Request violates (6) the First Amendment, (7) the separation of powers, and (8) due process*. Id.* ¶¶ 318-351.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a "complaint must contain sufficient factual matter … to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  For purposes of such a motion, courts "should assume the[] veracity" of "well-pleaded factual allegations," but "labels and conclusions" and "naked assertions … do not suffice" to state a claim.  *Id.* at 678-679 (quotation cleaned).

In determining whether a complaint states a claim, courts may consider "any matters within the pleadings," *Pernice v. Bovim*, 183 F. Supp. 3d 84, 87 (D.D.C. 2016), meaning "the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which [the court] may take judicial notice," *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007); *see Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015) (incorporation-by-reference doctrine permits courts to "consider a document that a complaint

specifically references without converting the motion into one for summary judgment").  Here, the Committee's 2019 and 2021 Requests and the 2021 OLC Opinion are "part of the pleadings" and therefore may be considered on this motion: they are "integral" to Mr. Trump's counter- and cross-claims, "they are referred to in [his] complaint, and their authenticity is undisputed." *Pernice*, 193 F. Supp. 3d at 87; *see also Strumsky v. Washington Post Co.*, 842 F. Supp. 2d 215, 217-218 (D.D.C. 2012).

Additionally, the Court may take judicial notice of the Legislative and Executive Branch materials cited here.  In deciding a motion to dismiss, a court may "'take judicial notice of a fact that is not subject to reasonable dispute if it … can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'"  *Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 464 (D.C. Cir. 2018); *see also* Fed. R. Evid. 201(b)(2).  Matters subject to judicial notice include "historical, political, or statistical facts" and "public records and government documents available from reliable sources" like government websites.  *Johnson v. Commission on Presidential Debates*, 202 F. Supp. 3d 159, 167 (D.D.C. 2016); *see also D.A.M.*, 474 F. Supp. 3d at 55 n.12 (Congressional testimony judicially noticeable); *Public Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6, 24 n.6 (D.D.C. 2018) (Executive Branch statements judicially noticeable).  Courts need not "accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice."  *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004).

## ARGUMENT

## I.   COUNTERCLAIMS I, II, AND III FAIL AS A MATTER OF LAW

In Counterclaims I, II, and III, Mr. Trump alleges that the Committee's 2021 Request lacks a "legitimate legislative purpose" and is therefore invalid under Article I.  Am. Counterclaims/Cross-Claims ¶¶ 292-294, 299-302, 306-307.  Counterclaim I asserts that the

"primary purpose of the request is to obtain and expose [Mr. Trump's] information for the sake of exposure," *id.* ¶ 295, and Counterclaim II asserts that if the "primary purpose is not exposure for the sake of exposure, then it is law enforcement," *id.* ¶ 300.  Both counterclaims urge the Court to disregard the request's express rationale and conclude that the Committee's stated objectives are pretextual, based largely on the purported political motives of various officials— some of whom are not even Members of Congress, much less of the Committee.  Supreme Court precedent squarely forecloses Mr. Trump's attempt to look behind the Committee Chairman's stated purposes in making the request and into the Committee's supposed real motives.  In any event, the motives Mr. Trump posits would not invalidate the request.  Counterclaims I and II, therefore, must be dismissed.

Counterclaim III should meet the same fate.  That claim alleges that the 2021 Request is not "pertinent to valid legislation" because the Committee's stated purposes exceed Congress's Article I power.  For that contention to succeed, however, Mr. Trump must, among other things, demonstrate that the request could not possibly result in the enactment of *any* constitutionally valid legislation.  Because Mr. Trump cannot hope to sustain that contention as a matter of law, the Court should also dismiss Counterclaim III.

## A.     The Committee's 2021 Request Serves Valid Purposes

"The congressional power to obtain information is broad and indispensable," *Mazars*, 140 S. Ct. at 2031 (quotation marks omitted), "as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution," *Eastland*, 421 U.S. at 504 & n.15.  It "encompasses inquiries into the administration of existing laws, studies of proposed laws, and surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them."  *Mazars*, 140 S. Ct. at 2031.  There are only a few discrete "limitations" on this power, chiefly that the Congressional request be "related to, and in

furtherance of, a legitimate task of Congress," that is, that it "concern a subject on which legislation could be had." *Id.* (quotation marks omitted).

In evaluating whether a Congressional request advances a legitimate purpose, this Court, like the Executive Branch, is "bound to presume that the action of the legislative body was with a legitimate object if it is capable of being so construed." *McGrain*, 273 U.S. at 178 (quotation marks omitted); *Barry v. United States ex rel. Cunningham*, 279 U.S. 597, 619 (1929) ("presumption in favor of regularity" applies to Congressional acts); 2021 OLC Op. at 21-24 (describing Executive Branch practice of affording deference to Congress's stated rationales). Such deference is especially appropriate here, where "the Committee is requesting information pursuant to statutory authority"—a long-established right of access to taxpayer information that "has been approved through the bicameralism and presentment process." 2021 OLC Op. at 23; *see id.* at 24 ("[t]he political branches have repeatedly determined over the course of the last century that the congressional tax committees should have a statutorily unlimited right of access to tax information"). The 2021 Request plainly satisfies constitutional review under these standards.

First, the Committee's 2021 Request relates to and furthers Congress's oversight of and legislating on the administration of the tax laws. In the request, the Committee stated that it "has serious concerns about the IRS's full and fair administration of the tax laws with respect to a President and believes legislation may be needed in this area." 2021 Request at 2. The Committee explained that it seeks to determine, for example, whether IRS agents conducting Presidential audits are susceptible to improper interference by the President (or his representatives), whether they can access the necessary information to conduct a Presidential audit, and whether the IRS has adequate authority and resources to conduct complex Presidential

audits like those needed for Mr. Trump's returns.  *See id.* at 1, 3.  Congressional access specifically to Mr. Trump's tax information, the Committee explained, is needed because of the unique and "exceedingly challenging circumstances presented by former President Trump": he "is the sole President the Committee is aware of who controlled hundreds of business entities while in office" (including entities engaged in "foreign business activities"), who was (he acknowledges) under "continuous audit" before his Presidency, "and who routinely criticized the IRS for auditing him."  *Id.* at 4-6.  Thus, Mr. Trump raises heightened concerns about "whether the mandatory audit program has functioned as intended when the taxpayer's history is as complex as former President Trump's" and whether the IRS has the "ability to freely enforce the tax laws against" an adversarial President.  *Id.* at 5-6.  With these concerns in mind, the 2021 Request stated, "the Committee continues to consider and prioritize legislation on equitable tax administration, including legislation on the President's tax compliance, and public accountability," and reviewing Mr. Trump's returns and the related IRS administrative files would be integral to the Committee's ability to do so.  *Id.* at 2, 6.

Mr. Trump asserts that he has criticized only the IRS's prior decisions to audit him before he was President, not "the automatic, mandatory [presidential] audit."  Am. Counterclaims/Cross-Claims ¶ 256.  That is demonstrably false and should not be accepted for purposes of this motion.  *See* Farhi, *Trump files 2017 taxes following 6-month extension*, CBS News (Oct. 17, 2018), https://www.cbsnews.com/news/trump-files-2017-taxes-following-6-month-extension (White House press secretary stated, "The President and First Lady … are automatically under audit, which the President thinks is extremely unfair."), *quoted in* 2021 Request at 5-6; *Trump Calls Years of Tax Avoidance 'Fake News,' Attacks I.R.S.*, N.Y. Times (Sept. 27, 2020), https://www.nytimes.com/video/us/politics/100000007364069/

trump-taxes.html (then-President Trump stated, "people in the IRS … treat me very, very, badly"), *quoted in* 2021 Request at 6.  In any event, as the 2021 Request explained, those prior criticisms themselves raise questions about the IRS's ability to audit Mr. Trump free from improper interference when he was President.  2021 Request at 5-6.

Enacting legislation to enhance the IRS's resources, powers, and protections for carrying out Presidential audits is plainly within Congress's authority.  Article I provides Congress the power "[t]o lay and collect Taxes," U.S. Const. art. I, § 8, cl. 1, as well as the authority to control the appropriation of funds to federal agencies like the IRS, *see id.* art. I, § 9, cl. 7.  And it authorizes Congress to "make all Laws which shall be necessary and proper for carrying into Execution" these enumerated powers and "all other powers vested … in the Government of the United States." *Id.* art. I, § 8, cl. 18.  The IRS's audits carry out the agency's duties under a law enacted pursuant to these constitutional authorities: the Internal Revenue Code.

Second, the 2021 Request relates to and furthers Congress's oversight of government officials and development of legislation to prevent conflicts of interest that might impair their ability to perform their public duties.  In the 2021 Request, the Committee stated that "[f]ormer President Trump's tax returns could reveal hidden business entanglements raising tax law and other issues, including conflicts of interest, affecting proper execution of the former President's responsibilities," and "might also show foreign financial influences on former President Trump." 2021 Request at 4.  Here, too, such legislation is well within Congress's power.  The Constitution prohibits the President from "accept[ing] … any … present[ or] Emolument … from any … foreign State" without the "Consent of the Congress."  U.S. Const. art. I, § 9, cl. 8. And that power is also supported by the Necessary and Proper Clause.  *Id.* art. I, § 8, cl. 18.  As the district court recently concluded on remand in *Mazars*, "Congress's power to consent—or not

to consent—to foreign emoluments allows it to enact laws that are 'derivative of, and in service to, that granted power.'" *Trump v. Mazars USA LLP*, 2021 WL 3602683, at *25 (D.D.C. Aug. 11, 2021) (quoting *NFIB v. Sebelius*, 567 U.S. 519, 560 (2012)) (brackets omitted).  And more generally, the Supreme Court has long recognized that the Necessary and Proper Clause empowers Congress to "inquire into and publicize" governmental "corruption, maladministration or inefficiency."  *Watkins*, 354 U.S. at 200 n.33.

## B.    Allegations Regarding Individual Legislators' Motives Do Not Vitiate The Committee's Request

Former President Trump asserts that the Committee's stated purposes are "pretextual," *e.g.*, Am. Counterclaims/Cross-Claims ¶ 141, and he speculates that "the primary purpose" of the 2021 Request "is to obtain and expose [his] information for the sake of exposure," *id.* ¶ 295, or to engage in "law enforcement," *id.* ¶ 300.  That argument fails for two reasons: the motives of individual legislators are legally irrelevant, and in any event, the supposed motives of individual Committee Members reflect legitimate legislative purposes.

### 1.    The Committee's Supposed Motives Are Legally Irrelevant

Mr. Trump asks this Court to disregard the Committee's stated rationales for the 2021 Request as pretextual and instead to focus on individual Committee Members' supposed motives for wanting to request his tax returns and tax information.  Mr. Trump's argument ignores controlling precedent.

As explained above, because the Committee has articulated a legitimate purpose for its request—indeed, simply because its request *can* be construed to serve a legitimate purpose—the Court must assume that that is the request's real aim.  *See supra* pp. 17-18.  Thus, as Mr. Trump acknowledged in *Mazars*, "[u]nder … existing precedent, … [c]ourt[s] cannot probe for an unstated and illegitimate motive behind" a Congressional request for information.  Reply Br. for

Pet'rs, 2020 WL 1643780, at *15 (U.S. Mar. 27, 2020).  The Supreme Court has clearly and repeatedly instructed that "the motives of committee members … alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served." *Watkins*, 354 U.S. at 200.  "[I]n determining the legitimacy of a congressional act [courts] do not look to the motives alleged to have prompted it." *Eastland*, 421 U.S. at 508.  "[T]esting the motives of committee members for this purpose … is not [the courts'] function." *Watkins*, 354 U.S. at 200.  Rather, "[s]o long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Barenblatt v. United States*, 360 U.S. 109, 132 (1959).[8]  The Supreme Court reaffirmed these principles in *Mazars*, stating that, in evaluating the constitutional validity of a Congressional request, courts should consider "the *asserted* legislative purpose" and "the evidence *offered* by Congress to establish that a subpoena advances a valid legislative purpose," without suggesting that courts should—or even could—look behind that record.  140 S. Ct. at 2035 (emphases added).

Mr. Trump's request that this Court scrutinize and second-guess the Committee's stated rationales based on the Committee's supposed subjective motives defies that clear precedent and raises significant separation-of-powers concerns.  "[J]ust as the Constitution forbids the Congress to enter fields reserved to the Executive and Judiciary, it imposes on the Judiciary the reciprocal duty of not lightly interfering with Congress' exercise of its legitimate powers." *Hutcheson v. United States*, 369 U.S. 599, 622 (1962) (lead opinion of Harlan, J.).  Consistent with that

---

[8] Moreover, discovery into legislators' motives would be foreclosed by the Speech or Debate Clause, which provides Members of Congress (and their aides) a "privilege" against compelled testimony and document production.  *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 418-421 (D.C. Cir. 1995).

principle, "the scope of [judicial] inquiry" into whether "[t]he particular [Congressional] investigation at issue here is related to and in furtherance of a legitimate task of Congress … is narrow." *Eastland*, 421 U.S. at 505-506.  As explained above, "'courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province,'" *id.* at 506 (quoting *Tenney v. Brandhove*, 341 U.S. 367, 378 (1951)), and courts "are bound to presume that the action of the legislative body was with a legitimate object if it is capable of being so construed," *McGrain*, 273 U.S. at 178 (quotation marks omitted).  This presumption can be overcome only if it is "obvious" that "a committee's investigation has exceeded the bounds of legislative power." *Tenney*, 341 U.S. at 378.  A contrary rule would "disrupt the legislative function" and enable "judicial power" to "imperil[]" "legislative independence." *Eastland*, 421 U.S. at 503.  And as discussed in this brief, it is not at all "obvious" that the Committee's 2021 Request exceeds Congress's power; to the contrary, the request is clearly within Congress's power.  *See supra* pp. 16-30; *infra* pp. 28-30.

### 2. Even If Relevant, Allegations Regarding Subjective Motive Would Not Vitiate The Committee's Purposes

Even if it were proper for the Court to consider former President Trump's allegations about the motives of Committee Members in wanting to obtain his tax returns, those allegations would not undermine the legal conclusion that the 2021 Request serves legitimate purposes.

The only person whose statements matter in this context is the Committee Chair because Section 6103(f) expressly empowers only the Chair to request a tax return or tax information. 26 U.S.C. § 6103(f).  (Similarly, the Committee's rules empower only the Chair to issue a subpoena.  *See* Rule 15 of the Committee on Ways and Means for the 117th Congress.[9])  And

---

[9] https://waysandmeans.house.gov/sites/democrats.waysandmeans.house.gov/files/documents/117thWMRulesFINAL.pdf.

Chairman Neal's extensive statement in the 2021 Request does not even hint at pretext, let alone support a plausible inference of pretext. Nor do his extensive statements in connection with the 2019 Request or the few remarks quoted in Mr. Trump's pleading that arguably elaborate on those requests. *See* Am. Counterclaims/Cross-Claims ¶¶ 236, 239, 273, 283; Letter for Charles P. Rettig, Commissioner, Internal Revenue Service, and Steven Mnuchin, Secretary of the Treasury, from Richard E. Neal, Chairman, Committee on Ways and Means, U.S. House of Representatives (May 10, 2019) (attached as Exhibit D); Letter for Charles P. Rettig, Commissioner, Internal Revenue Service, and Steven Mnuchin, Secretary of the Treasury, from Richard E. Neal, Chairman, Committee on Ways and Means, U.S. House of Representatives (June 28, 2019) (attached as Exhibit E).[10]

Tellingly, Mr. Trump does not engage with those statements—indeed, his pleading mentions their substance only in passing in three of the 351 paragraphs in his 84-page pleading. *See* Am. Counterclaims/Cross-Claims ¶¶ 124, 131, 254. Instead, he relies on statements that, for one or more reasons, do not reflect the Committee's motives in issuing the 2021 Request. His pleading recites numerous statements by officials who were not on the Committee and were not involved in the Committee's investigation, including a New York district attorney, eleven Members of Congress who are not Members of the Committee on Ways and Means, various

---

[10] The Supreme Court and the D.C. Circuit have recognized, for purposes of evaluating "pertinency" in a criminal prosecution of contempt, that "the remarks of … members of the committee … might sometimes make the topic clear" where an authoritative statement of legislative purpose, such as through an "authorizing resolution" or "the remarks of the chairman," fails to do so. *Watkins*, 354 U.S. at 209; *see Shelton v. United States*, 404 F.2d 1292, 1297-1298 (D.C. Cir. 1968). Here, in contrast, there is no prosecution for contempt, and Chairman Neal authoritatively and clearly articulated the Committee's purpose; hence, statements of other Members cannot supersede his determination of the request's purposes, *see Wilkinson v. United States*, 365 U.S. 399, 411-412 (1961) (purpose of "individual members" could "not vitiate" congressional investigation where "Committee resolution" and "Chairman's statement" articulated legislative purpose).

unnamed Democratic "supporter[s]" and "commentators," and even Hillary Clinton.  *See, e.g.*, Am. Counterclaims/Cross-Claims ¶¶ 135, 140, 201.  He also cites various statements by Members of the Committee *other than* its Chair.  *See, e.g.*, *id.* ¶¶ 24, 42-73, 77, 94, 97-112, 114-116, 118-121, 147-187.  Even the statements by Congressman Neal that Mr. Trump quotes do not support Mr. Trump's contention that the Committee's stated interest in the IRS's audits is not its real interest: statements that the *public wants* to know what is in Mr. Trump's tax returns do not mean that *Chairman Neal's goal* is simply to disclose them to the public, and in any event many of the quoted statements occurred before the Committee began to focus on the effectiveness and integrity of the IRS's audits of Mr. Trump during his Presidency (and mostly before Chairman Neal was Chairman).  *See, e.g.*, *id.* ¶¶ 28, 37-41, 83.

Mr. Trump's characterization depends on decontextualizing and distorting various statements by Chairman Neal.  Read in context, none of the statements—which the Court can review directly and take judicial notice of—indicate that the Committee is indifferent to its stated interests in obtaining Mr. Trump's tax returns and tax information.  The Chairman's desire to move "judiciously and methodically" and "meticulous[ly]" and to develop "a carefully prepared and documented legal case," in consultation with House lawyers, Am. Counterclaims/Cross-Claims ¶¶ 79, 88, 128-129, merely shows that the Committee was appropriately deliberative and attentive to the applicable law in making its request; that desire says nothing at all about the Committee's purposes.[11]  Mr. Trump asserts that the Committee's stated purposes "appeared for

---

[11] *See, e.g.*, Sullivan, *Powerful Ways and Means chairman Neal to pursue Trump's tax returns*, Worcester Telegram (Jan. 23, 2019), https://www.telegram.com /news/20190123/powerful-ways-and-means-chairman-neal-to-pursue-trumps-tax-returns, *quoted in* Am. Counterclaims/Cross-Claims ¶ 88; Faler, *Neal defends go-slow approach to seeking Trump's tax returns*, Politico (Jan. 24, 2019), https://www.politico.com/story/2019/

the first time in" the 2019 Request after being concocted by House lawyers as "rationalizations that were created for litigation."  Am. Counterclaims/Cross-Claims ¶¶ 86, 91, 126-128, 131, 295.  On the contrary, as noted above, questions about the integrity of the audits arose publicly before Chairman Neal issued the 2019 Request, including through expert testimony at the Committee's February 2019 hearing.  *See supra* p. 8.

In any event, the cited statements of other Committee Members and of the Speaker of the House (most of which significantly predate the 2021 Request) do not establish pretext, but rather confirm the legitimacy of the 2021 Request's stated objectives.  Those statements refer, for example, to uncovering Mr. Trump's "tax evasion," self-dealing, "foreign entanglements," "corrupt[ion]," "fraud," and "crimes."  Am. Counterclaims/Cross-Claims ¶¶ 45-46, 51, 59, 96, 100-101, 143-145, 147, 164, 169, 177, 271-272.  Those statements do not "spoil[] the Committee's otherwise valid legislative inquiry."  *Trump v. Mazars USA LLP*, 940 F.3d 710, 728 (D.C. Cir. 2019), *vacated on other grounds by Mazars*, 140 S. Ct. 2019.[12]  Rather, they accord with the Committee's legitimate legislative and oversight goals—ensuring that the tax laws are applied effectively and impartially to Presidents and safeguarding against Presidents having hidden conflicts of interest that compromise their ability to perform their public duties.  Indeed,

---

01/24/richard-neal-trump-tax-returns-1124066, *quoted in* Am. Counterclaims/Cross-Claims ¶ 88; Judem, *Rep. Neal: Request For Trump's Taxes 'Was Not Motivated By Malevolence'*, GBH News (Apr. 5, 2019), https://www.wgbh.org/news/national-news/2019/04/05/rep-neal-request-for-trumps-taxes-was-not-motivated-by-malevolence, *quoted in* Am. Counterclaims/Cross-Claims ¶ 128; Lorenzo & Caygle, *Inside House Dems' move to seize Trump's tax returns*, Politico (Apr. 4, 2019), https://www.politico.com/story/2019/04/04/democrats-trump-tax-returns-1321840, *quoted in* Am. Counterclaims/Cross-Claims ¶ 128.

[12] This and other portions of the D.C. Circuit's decision in *Mazars* "continue to have precedential weight" because the Supreme Court's opinion "expressed no opinion on the merits of" them.  *Action All. of Senior Citizens of Greater Phila. v. Sullivan*, 930 F.2d 77, 83 (D.C. Cir. 1991).

"an interest in past illegality can be wholly consistent with an intent to enact remedial legislation." *Id.*

Mr. Trump maintains in Counterclaim I that some of these statements demonstrate that the Committee's purpose was to "expose" the requested "information for the sake of exposure." Am. Counterclaims/Cross-Claims ¶ 295.  That contention contradicts the documentary record, which plainly shows the Committee's interest in oversight and legislation.  But even Mr. Trump's speculative and conclusory argument misunderstands the law.  Although "there is no congressional power to expose for the sake of exposure," *Mazars*, 140 S. Ct. at 2032, not all Congressional exposure is illegitimate.  Congress has "the power … to inquire into and publicize corruption, maladministration or inefficiency in agencies of the Government."  *Watkins*, 354 U.S. at 200 & n.33; *see id.* at 200 ("The public is, of course, entitled to be informed concerning the workings of its government.").  In other words, exposure is illegitimate only if it is entirely divorced from a legislative or oversight purpose.  And here, the statements cited by Mr. Trump at most show that any exposure would be in connection with the Committee's legitimate investigative and legislative efforts.

Alternatively, in Counterclaim II, Mr. Trump asserts that certain statements reveal that Committee's real motive is impermissibly to conduct criminal law enforcement.  *E.g.*, Am. Counterclaims/Cross-Claims ¶¶ 43-55, 61-62, 96-102, 106-110, 301.  It is true that investigating the effectiveness of the IRS's Presidential audits might expose that Mr. Trump committed criminal tax evasion or other crimes, and the Supreme Court has held that a Congressional subpoena cannot be used "for the purpose of law enforcement."  *Mazars*, 140 S. Ct. at 2032.  But Mr. Trump's claim nonetheless fails because courts "must determine whether Congress's legislative purpose is being served without taking into account either whether the investigation

*will reveal*, or whether the investigators are *motivated to reveal*, criminal conduct." *Mazars*, 940 F.3d at 724 (quotation cleaned). As the Supreme Court has explained, Congress's "authority … to require pertinent disclosures in aid of its own constitutional power is not abridged because the information sought to be elicited may also be of use" in "the prosecution of pending suits." *Sinclair v. United States*, 279 U.S. 263, 295 (1929); *see Mazars*, 940 F.3d at 724 ("the fact that an investigation might expose criminal conduct does not transform a legislative inquiry into a law-enforcement endeavor"). It therefore is not "a valid objection" that the Committee's investigation "might possibly disclose crime or wrongdoing." *McGrain*, 273 U.S. at 179-180. A contrary rule of law would significantly curtail Congress's investigative authority under Article I. What the principle that Congress may not conduct law enforcement actually precludes is Congress "us[ing] subpoenas to try someone before a committee for any crime or wrongdoing." *Mazars*, 140 S. Ct. at 2032 (quotation cleaned). Mr. Trump does not allege, much less plausibly allege, that is the Committee's objective.

Finally, the Supreme Court has foreclosed Mr. Trump's vague assertion that the 2021 Request is illegitimate because the Committee issued it for political gain. *E.g.*, Am. Counterclaims/Cross-Claims ¶¶ 5, 21, 85, 217. As the Court recently recognized in *Mazars*, a Congressional request is not invalid just because it raises "a clash between rival branches of government over records of intense *political* interest for all involved." 140 S. Ct. at 2034 (emphasis added). Rather, the Court has declared: "In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the place for such controversies." *Tenney*, 341 U.S. at 378. Again, "[t]he courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province." *Id.* Indeed, because Congress is by design a "political branch[],"

*Mazars*, 140 S. Ct. at 2026, if Mr. Trump were correct and the "mere presence of a political motivation were enough to disqualify a Congressional request, the effect would be to deny Congress its authority to seek information," 2021 OLC Op. at 26; *see Mazars*, 140 S. Ct. at 2033-2035.  That "result is incompatible with the Constitution."  2021 OLC Op. at 26.  The *Mazars* district court recently stressed these principles in rejecting a similar challenge by Mr. Trump to another Congressional request.  2021 WL 3602683, at *9-10.[13]

### C.     Mr. Trump's Contentions That The Committee's Request Exceeds Its Constitutional Authority Fail

In Counterclaim III, Mr. Trump contends that the 2021 Request is invalid because "Congress cannot constitutionally require the IRS to audit a President," Am. Counterclaims/Cross-Claims ¶ 308, and the Committee's other "contemplated laws" "would fall outside the Committee's legislative jurisdiction," *id.* ¶ 310.  These arguments fail.

Mr. Trump asserts that "Congress cannot constitutionally require the IRS to audit a President.  Presidents alone are vested with the executive power."  Am. Counterclaims/Cross-Claims ¶ 308.  But his separation-of-powers theory has no purchase here because legislation governing the IRS's audit of Presidents' tax returns would relate to the Executive Branch's administration of laws (the Internal Revenue Code) that apply equally to all taxpayers, including Mr. Trump and other Presidents, not laws that apply to Presidents as constitutional officers.  Thus, such legislation would not affect a President's ability to discharge the President's constitutional duties.

---

[13] In Counterclaim I, Mr. Trump also asserts that the 2021 Request "does not satisfy the terms of § 6103(f)" because (he says) § 6103(f) does not "cover the information of Presidents or former Presidents."  Am. Counterclaims/Cross-Claims ¶ 297.  There is no evident connection between that assertion and the substance of Counterclaim I, *i.e.*, that the Committee's stated purpose is pretextual and the real purpose is to expose for the sake of exposure.  In any event, Mr. Trump makes the same argument in Counterclaim V, and for the reasons stated in Treasury's brief addressing that claim, his assertion is wrong.

In any event, as noted, "the relevant inquiry is whether legislation '*may* be had,' not whether constitutional legislation *will* be had.  Accordingly, [courts] first define the universe of possible legislation that the subpoena provides 'information about,' and then consider whether Congress could constitutionally enact any of those potential statutes."  *Mazars*, 940 F.3d at 732 (quoting *Eastland*, 421 U.S. at 508) (citation omitted).  Mr. Trump, in other words, must demonstrate that the 2021 Request "could result in *no* valid legislation."  *Id.* at 736.  But he cannot.  Contrary to his assertion that "Congress cannot require the President—a coequal office created by the Constitution itself—to disclose particular information or divest from certain business relationships," Am. Counterclaims/Cross-Claims ¶ 311, Congress is not wholly disabled from regulating the President's performance of his duties and in fact the power of Congress (and the courts) to compel the President to disclose information has long been recognized.  *See Mazars*, 940 F.3d at 733-736 (holding, "Congress can require the President to make reasonable financial disclosures" (citing *GSA*, 433 U.S. at 441-443)); *Mazars*, 140 S. Ct. at 2032-2033, 2035; *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).[14]  In any event, Mr. Trump's mistaken understanding of the scope of the *President's* power to maintain the confidentiality of information is irrelevant because legislation contemplated by the 2021 Request would govern the *IRS's conduct of audits* of Presidents' tax returns.

Mr. Trump also contends that the 2021 Request is not "reasonably relevant" to the "studying the IRS's audit process" or "[o]ther contemplated laws."  Am. Counterclaims/Cross-Claims ¶¶ 309-310.  The requested materials here plainly are relevant.  *See supra* pp. 17-18.

---

[14] *See also United States v. Nixon*, 418 U.S. 683, 707 (1974); *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 730 (D.C. Cir. 1974).

Indeed, as explained below in the context of Counterclaim IV, the Committee had good reason to focus its request on Mr. Trump and to request both his returns (including for the two years preceding his Presidency) and the related audit files. *See infra* pp. 38-41. Beyond that, Mr. Trump is playing an illogical shell game; each category of material requested need not contain information relating to *all* of the Committee's aims.

## II.   COUNTERCLAIM IV FAILS AS A MATTER OF LAW

In Counterclaim IV, former President Trump asserts that the Committee's request does not "satisfy the heightened standard" applicable to "Congressional requests for information that implicate the separation of powers" articulated by the Supreme Court in *Mazars*. Am. Counterclaims/Cross-Claims ¶¶ 313-317. That standard, however, does not apply to Congressional requests made pursuant to statute or to requests for records relating to former Presidents. This counterclaim fails as a matter of law for those reasons alone. For the same reasons, the "*Mazars* lite" standard adopted by the district court on remand in *Mazars* is also inapplicable. Instead, the more general separation-of-powers balancing test used by the Supreme Court in *GSA* applies.

The doctrinal question of which of these standards applies here is ultimately academic to the outcome of this case. Regardless of which test applies, the result is clear: the 2021 Request is constitutionally valid. The Committee has articulated and substantiated that the requested tax returns and return information are integral to its ability to carry out its legislative and oversight aims of ensuring that Presidential audits are effective and fair, that IRS staff are safeguarded from improper interference, and that Presidents are not secretly susceptible to foreign influence through emoluments or other foreign-source benefits. Further, the Committee's legitimate need for the requested tax materials far outweighs the negligible burden, if any, that its request for a former President's tax records would place on sitting Presidents.

Consequently, Counterclaim IV must be dismissed.

## A.      The *Mazars* Test Does Not Apply

1.      Counterclaim IV fails because the *Mazars* test does not apply to statutory requests for a former President's information.  *Mazars* involved subpoenas issued while Mr. Trump was in office by House committees to banks and an accounting firm for financial information relating to him.  140 S. Ct. at 2026-2027.  The Court first held that the "demanding standards" applicable to subpoenas for "Oval Office communications"—which "safeguard[] the public interest in candid, confidential deliberations within the Executive Branch"—do not apply to requests for "nonprivileged, private information, which by definition does not implicate sensitive Executive Branch deliberations."  *Id.* at 2032-2033.  Nonetheless, the Court held that "Congressional subpoenas for information from the President" raise "significant separation of powers issues" because "Congress and the President have an ongoing institutional relationship as the opposite and rival political branches established by the Constitution."  *Id.* at 2033-2034, 2036 (quotation marks omitted).  Accordingly, the Court determined that a "balanced approach is necessary"— one that accounts for "both the significant legislative interests of Congress and the 'unique position' of the President."  *Id.* at 2035.

> To that end, the Court identified four "special considerations [that] inform this analysis":
>
> First, courts should carefully assess whether the asserted legislative purpose warrants the significant step of involving the President and his papers. … Second, to narrow the scope of possible conflict between the branches, courts should insist on a subpoena no broader than reasonably necessary to support Congress's legislative objective. … Third, courts should be attentive to the nature of the evidence offered by Congress to establish that a subpoena advances a valid legislative purpose. … Fourth, courts should be careful to assess the burdens imposed on the President by a subpoena.

*Mazars*, 140 S. Ct. at 2035-2036.

Previously, in *GSA*, the Supreme Court articulated a different balancing test for evaluating Congressional demands for a former President's information.  After President Nixon left office, Congress enacted a statute directing the General Services Administration "to take custody of [his] Presidential papers and tape recordings" and to "determine the terms and conditions upon which public access may eventually be had" to them.  433 U.S. at 429.  In assessing the validity of the statute, the Court adopted a standard that balanced "the important interests that the Act seeks to attain" against "the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions."  *Id.* at 443, 446.  This standard largely corresponds to the first and fourth *Mazars* factors.  *See Mazars*, 2021 WL 3602683, at *13 ("the two interests" balanced under *GSA* test are "two of the four considerations set forth in *Mazars* itself").

2.      The *GSA* test, not the *Mazars* test, should apply here for two reasons.  First, like in *GSA* but unlike in *Mazars*, here "[t]he relevant congressional request was made pursuant to an actual statute."  *Mazars*, 2021 WL 3602683, at *18 n.30 (distinguishing this case from enforcement of Congressional subpoena for Mr. Trump's financial information).  Second, also like in *GSA* but unlike in *Mazars*, the request here seeks information relating to a *former* President.  Where an ex-President's personal information is sought, the "ongoing relationship" between the Legislative and Executive Branches that "necessarily inform[ed] the Court's analysis" in *Mazars* is absent.  140 S. Ct. at 2026.  In this circumstance, the Congressional request neither "pit[s] the political branches against one another" nor occurs in a context where there are political incentives for the two branches to engage in "negotiation and compromise."  *Id.* at 2031, 2034.  And because "the close connection between the Office of the President and its occupant" has been severed, there is no risk that the Congressional "demand" could "harass the

President or render him complaisant to the humors of the Legislature." *Id.* at 2034 (quotation cleaned).

On remand in *Mazars*, the district court—now confronting Congressional subpoenas "directed at a former President"—agreed that "that change affects the foundations of the *Mazars* test" in these very ways.  The court observed that, "because President Trump no longer 'alone composes a branch of government,' this dispute no longer implicates a present 'clash between rival branches of government.'"  2021 WL 3602683, at *13 (quoting *Mazars*, 140 S. Ct. at 2034).  Such a request, the court said, will neither "'intru[de] into the operation of the Office of the President' nor … burden 'the sitting President's time and attention.'"  *Id.* (quoting *Mazars*, 140 S. Ct. at 2036) (alterations omitted).  Further, the court recognized that "the *Mazars* test was crafted against a 'tradition of negotiation and compromise' between co-equal branches of government, but … a former President's incentives to accommodate Congress are greatly diminished compared to those of an incumbent."  *Id.* (quoting *Mazars*, 140 S. Ct. at 2031)  Yet, instead of applying the *GSA* test, the *Mazars* district court applied what it termed "*Mazars* lite" because, in its view, "[t]hese foundational differences alter the *Mazars* framework in important ways that support reduced judicial scrutiny of a congressional subpoena to a former President."  *Id.* at *13.  Under the "*Mazars* lite" test, the court explained, each *Mazars* factor would be applied in a "less rigorous" way in the context of a Congressional request for a former President's nonprivileged, private information.  *Id.*

The Committee respectfully submits that the *Mazars* district court erred in applying its "*Mazars* lite" test instead of the *GSA* balancing test.  Nonetheless, for the reasons discussed shortly, the 2021 Request is constitutionally valid—and thus Counterclaim IV fails—under any of the three tests just described.

3.      Mr. Trump contends that the full-blown *Mazars* test should apply here irrespective of the fact that he is no longer President because he was the President when the *2019 Request* was made and the 2021 Request "was not a new request, but a voluntary adjustment to the April 2019 request."  Am. Counterclaims/Cross-Claims ¶¶ 314-315.  Again, Counterclaim IV fails even under that test, but in any event, the *Mazars* district court rejected the same argument by Mr. Trump, 2021 WL 3602683, at *11, and rightly so, for two reasons.

First, this case concerns the 2021 Request, not the 2019 Request.  The requests are similar, but not the same: the 2021 Request was issued by a new Congress, seeks returns and return information for different tax years, and was accompanied by its own detailed explanation of the Committee's legislative and oversight needs.  Courts should respect Congress's prerogative to define its requests for information to the Executive Branch as it sees fit.  *See id.* ("That the two subpoenas are substantively identical does not mean there has only ever been one Mazars subpoena.  The [second] Subpoena is a new demand for records ….").

Second, even if the two requests were one and the same, because Mr. Trump seeks to enjoin Treasury's compliance with the request, the request's validity must be assessed based on the current circumstances.  *See id.* at *12 (giving "due weight to post-subpoena developments" because prospective relief was sought).  It is well-established that the question of prospective enforcement *vel non*—which is what this case involves—is determined based on the facts and circumstances existing at the time of the judgment.  *See, e.g.*, *id.*; *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 464 (1921) ("this form of relief operates only in futuro, and the right to it must be determined as of the time of the hearing"); *Tory v. Cochran*, 544 U.S. 734, 737-738 (2005); *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994).  In fact, the D.C. Circuit previously dismissed a lawsuit seeking to enforce a Congressional subpoena because "the

Committee's argument that the subpoenaed materials are necessary to its legislative judgments ha[d] been substantially undermined by [the] subsequent" actions disclosing the information sought. *Senate Select Comm. on Presidential Campaign Activities*, 498 F.2d at 732-733. The same principle applies here. And even if viewed as a single request articulated through the Committee's statements in 2019 and in 2021, the request is constitutionally valid, for all the reasons discussed in this motion.

### B.   Regardless Of Which Test Applies, The Request Does Not Violate The Separation Of Powers

Under the full-blown *Mazars* test, the "*Mazars* lite" test, or the *GSA* test, the Committee's request accords with the constitutional separation of powers.

### 1.   The Request Imposes No Burden On The Current President Or Future Presidents

Now that Mr. Trump has left office, he cannot plausibly claim that Treasury's compliance with the 2021 Request will burden the Office of the President in any way. The request seeks no *Presidential* materials—no "Oval Office communications," for example, and nothing related to the official duties of a President—but rather only "nonprivileged, private information" and related IRS records. *Mazars*, 140 S. Ct. at 2032-2033. Nor does the request seek anything from or burden *the sitting* President. Consequently, the request will not "intru[de] into the operation of the Office of the President," expose the President to "harass[ment]," or "render him complaisant to the humors of the Legislature," let alone divert his "time and attention" (which generally is not constitutionally protected anyway). *Id.* at 2034, 2036; *see Mazars*, 2021 WL 3602683, at *13 ("burdens imposed on the President … are greatly diminished, if not eliminated entirely, when the President to whom the subpoena is issued no longer occupies the office"). This conclusion is reinforced by the fact that the Executive

Branch—which has an obvious interest in safeguarding the institutional interests of the Presidency—has concluded that it must comply with the Committee's request, without expressing any concern that doing so would burden the President. *See* 2021 OLC Op. at 28-29; *see also GSA*, 433 U.S. at 441 (that President Ford signed disclosure law and President Carter's Administration "support[ed]" its constitutionality in litigation indicated law did not violate separation of powers).

On remand in *Mazars*, the district court acknowledged the possibility that "the threat of a post-presidency subpoena for personal information [would] influence how the sitting President treats Congress while in office," but the court deemed that risk "remote" and "not nearly as injurious to the separation of powers as" a subpoena issued "*during*" the relevant President's term. 2021 WL 3602683, at *13. Even if that were correct there, such risk is even more attenuated here. Since President Nixon became the first President to release his tax returns to the public, in 1973, every elected President other than Mr. Trump has voluntarily released his returns, including Mr. Trump's successor.[15] The long history of Presidents' willingness to publicly release their returns strongly suggests that future Presidents will not be troubled by the prospect of doing the same. Speculation that future Congresses will use Section 6103(f) requests to obtain tax returns and return information of former Presidents as a tool of harassment contradicts the presumption of good faith due to a co-equal branch of government and overlooks

---

[15] *See, e.g.*, *The President and Vice President release their 2020 tax returns*, The White House (May 17, 2021), https://www.whitehouse.gov/briefing-room/disclosures/2021/05/17/the-president-and-vice-president-release-their-2020-tax-returns/; *President Obama and Vice President Biden's 2015 Tax Returns*, The White House (President Barack Obama Archives) (Apr. 15, 2016), https://obamawhitehouse.archives.gov/blog/2016/04/15/president-obama-and-vice-president-bidens-2015-tax-returns; *President and Mrs. Bush Release 2000 Tax Return*, The White House (President George W. Bush Archives) (Apr. 13, 2001), https://georgewbush-whitehouse.archives.gov/news/releases/2001/04/20010413-6.html.

the highly unusual circumstances necessitating the Committee's request for tax records and corresponding IRS files here. Indeed, Mr. Trump's flat refusal to release his individual returns or to release information about ongoing IRS audits (if any) reinforces the significant concerns underlying the Committee's request for his tax information from the IRS.

In addition, the *Mazars* district court determined that the risk of undue influence on Presidents was "increased" by the "subpoena's breadth and intrusiveness." 2021 WL 3602683, at *17. The Committee strongly disagrees with this aspect of the *Mazars* court's analysis, but even if the court's characterization were correct, the Committee's 2021 Request is well tailored to the Committee's investigative objectives and includes only those documents most pertinent to the Committee's investigation. *See infra* pp. 39-41.

### 2. The Committee's Purposes Warrant Involving Mr. Trump's Papers

The Committee's legislative and oversight purposes warrant seeking Mr. Trump's tax information because there are no "other sources [that] could reasonably provide Congress the information it needs in light of its particular legislative objective[s]." *Mazars*, 140 S. Ct. at 2035-2036. The Committee does not seek to use Mr. Trump's information as a "'case study' for general legislation," *id.* at 2036, but rather seeks to investigate and potentially develop legislation directed specifically at circumstances involving Presidents and informed specifically by risks that Mr. Trump's actions appear to have generated.

The legislative and oversight objectives identified in the 2021 Request—which include ensuring that Presidential audits are fair, effective, and free from improper interference, and ensuring that foreign entanglements do not interfere with Presidents' faithful execution of official duties—are obviously specific to the Presidency. Therefore, only information relating to Presidents will do: the Committee cannot truly understand a process that applies uniquely to a President other than by examining records relating to a President.

What is more, the Committee is justifiably focused specifically on Mr. Trump because, as the 2021 Request explained, his actions and statements raised unprecedented and serious concerns about his tax compliance and foreign entanglements and about the IRS's ability to enforce the tax laws against him while President. His Presidency was a nonpareil stress test, and the Committee has the constitutional right and duty to investigate and assess the extent to which the existing systems withstood that stress and what legislative reinforcements, if any, are needed. Compared to past Presidents, Mr. Trump's returns appear to be inordinately large and complex, reflecting his sprawling domestic and international business activities, which raises the question of whether the IRS has the requisite resources and authority to examine such returns as effectively as needed for a President. And he repeatedly attacked the IRS and its audits of him both while a Presidential candidate and while President, which raised the important question of whether IRS employees are properly protected from a President's attempts to improperly influence its audits. *See supra* pp. 11, 18-19. In sum, Mr. Trump's returns and related administrative files are not only "necess[ary]" but also "unique[ly] useful[]." *Mazars*, 2021 WL 3602683, at *16.

Further, Mr. Trump's foreign business activities raise additional concerns about improper foreign influence that could inform relevant remedial legislation aimed at preventing "corruption" and "maladministration" in the Presidency. *Watkins*, 354 U.S. at 200 n.33. Indeed, given that the Constitution prohibits the acceptance of any foreign emolument without "the Consent of the Congress," U.S. Const. art. I, § 9, cl. 8, "[i]f Congress cannot mandate disclosure pursuant to its consent authority, one wonders how it could possibly exercise that authority effectively," *Mazars*, 2021 WL 3602683, at *25.

Finally, the Committee is operating "on a clean slate." *Mazars*, 2021 WL 3602683, at *16. In *Mazars*, the district court found that "the legislative objectives" were "relatively incremental and therefore present[ed] only a limited need for former President Trump's financial records" because "the preexisting financial disclosure regime the Committee seeks to build on is already quite extensive." *Id.* at *16-17. Again, the Committee strongly disagrees with the *Mazars* district court's analysis on this point: no matter how extensive the preexisting regime may be, it remains open to Congress to investigate whether that regime is achieving Congress's current goals and doing so in appropriate ways; "legislative acts … [are] alterable when the legislature shall please to alter" them. *Marbury v. Madison*, 5 U.S. 137, 177 (1803). Even if the *Mazars* district court's analysis were sound, however, this case would still be different because there is *no* existing or proposed statute governing Presidential tax audits. *Cf. Mazars*, 2021 WL 3602683, at *18 n.30 (distinguishing this case). The point of the Committee's inquiry here is to determine the need, if any, for such legislation and the shape that such legislation would take.

### 3.    The 2021 Request Seeks Only What Is Reasonably Necessary

The 2021 Request is tailored to what is reasonably necessary to serve the Committee's legislative and oversight purposes.

As explained in the 2021 Request, the Committee does not know, among other things:

- For which years and for which entities, if any, did the IRS audit former President Trump's tax returns?

- If performed, were those audits thorough and accurate? Were the audits deficient or inadequate in any way, and if so, how and why?

- Was Mr. Trump under audit before his election and, if so, did the audit process change after he became President? If so, how and why?

- Did the IRS have the resources and personnel needed to perform the audits effectively?

- Did the IRS have adequate authority to obtain the information it needed from Mr. Trump to perform the audits?

- Were there any indications that Mr. Trump had received any emoluments, income, or other benefits from foreign sources?

- Did the audits result in any disputes, notices of deficiency, or adjustments and, if so, how were they resolved?

- If any audits for years in which Mr. Trump was President were not completed before his term ended, have they since been completed?  If not, will they be completed and when?

- Did Mr. Trump directly or indirectly try to block, interfere with, or influence the audits?  If so, were the relevant IRS employees protected from those efforts in the course of their work, what steps did the IRS take to protect its employees, and to what extent did those efforts affect the IRS's audits?

- In what ways, if any, did the IRS treat Mr. Trump's returns differently from other similarly situated taxpayers?

*See* 2021 Request at 1-5.

The 2021 Request seeks the two most obvious and basic categories of documents required to answer those questions:  Mr. Trump's individual income tax returns and the income tax returns for eight of his business entities (for a defined number of years) and related IRS administrative files.  Mr. Trump asserts that the "audit files would contain virtually no information about business entanglements, and the tax returns contain no information about the audit process."  Am. Counterclaims/Cross-Claims ¶ 310.  But "[w]ithout seeing the relevant returns and return information, it is impossible to" answer such questions and therefore it is impossible to "properly assess whether the scope of a mandatory audit was complete, objective, and fair and to legislate accordingly."  2021 Request at 6.  Contrary to Mr. Trump's assumption, each type of document need not bear on *all* aspects of the Committee's investigation; they need only bear on *some* part, and they do.  Without both the returns and the accompanying administrative files, the Committee cannot evaluate the sufficiency, independence, or

impartiality of the IRS's audits:  it needs the returns to see, among other things, what Mr. Trump reported, and it needs the administrative files to see how the IRS audited those returns.

Further, the tax returns may contain information relating to foreign-source income, *see, e.g.*, IRS Form 1040, Schedules B, C & E; IRS Form 1065, Schedule B & K; IRS Schedule K-1 (Form 1065), and the audit files may contain further materials illuminating those sources. Finally, the Committee has requested the returns for the two tax years preceding Mr. Trump's Presidency in order to ensure that the Committee gains a sufficiently complete picture of the IRS's audits of his returns while President, including whether the IRS's approach to auditing Mr. Trump's returns changed or was affected by his newfound power as the head of the Executive Branch.  Thus, as OLC determined, the period covered by the 2021 Request "is well-aligned with the Committee's interest in the presidential tax audit program."  2021 OLC Op. at 32; *cf. Mazars*, 2021 WL 3602683, at *17 (determining that subpoena seeking financial records relating to Mr. Trump for years 2011-2018 was both under- and over-inclusive); *id.* at *26.

### 4.      The Committee Justified Its Need For The Requested Materials

The Committee has "adequately" supported its request with "detailed and substantial" evidence.  *Mazars*, 140 S. Ct. at 2036.  The 2021 Request contains more than five single-spaced pages explaining the Committee's legislative and oversight needs for Mr. Trump's tax returns and the related IRS administrative files.  The request explains: the importance of having a fair and effective tax system and the Committee's responsibility for crafting legislation to achieve that goal, 2021 Request at 1, 3; the lack of information about the IRS Presidential audit program, *id.* at 2; the Committee's detailed concerns about the program's inability to handle highly complex returns or to withstand improper pressure by a President, based on its review of the Manual and the IRS's "own admission," *id.* at 2-4; the unprecedented pressures Mr. Trump has applied to the Presidential audit program through his unusually complex returns, foreign business

activities, refusal to release his returns publicly, and hostility towards the IRS and its audits of him, based on media reports and his own public statements, *id.* at 4-6; what information Mr. Trump's returns and the related administrative files might reveal regarding the Committee's concerns, *id.* at 4, 6; and the Committee's legislative goals to redress these concerns should they be borne out, *id.* at 2-3.

That is alone sufficient, but the 2021 Request is further substantiated by information obtained by the Committee during its hearing in February 2019. At that hearing, witnesses testified that Mr. Trump's tax returns would inform the Committee's assessment of whether the Presidential audit program functions effectively, particularly under the challenging circumstances presented by Mr. Trump. One tax expert witness testified that, "without seeing [Mr. Trump's] returns, the Committee cannot tell whether the returns are being properly reviewed by the IRS" and "cannot understand how any disputes have been resolved." Steven M. Rosenthal*, The Value of Presidential and Vice-Presidential Tax Returns to the Public and Congress*, Tax Policy Center, at 6 (Feb. 7, 2019) (submitted to and accepted by Subcommittee during hearing, Oversight Tr. at 24). Another expert witness cited the "experience in the Nixon administration" as evidence "that the IRS may not be able to … vigorously enforce the law relative to the President," and recommended that audit requirements be codified in a statute rather "than handled through the internal policies of the IRS." Oversight Tr. at 40-41 (testimony of Joseph J. Thorndike).

Witnesses also testified at the hearing that Mr. Trump's tax returns could disclose foreign emoluments or entanglements that would create conflicts of interest or suggest improper influence. "[T]ax transparency," one witness testified, "could lead to greater accountability" concerning subjects like the receipt of "funds from foreign sources," noting that "a lot of foreign

governments have very extensive funds that invest in businesses." Oversight Tr. at 26, 52 (testimony of Noah Bookbinder). Because of such concerns, witnesses urged the Committee to request Mr. Trump's business tax returns in addition to his individual income tax returns. *See, e.g.*, *id.* at 27, 51, 55.

In sum, the Committee's articulation of its legislative and oversight purposes in requesting Mr. Trump's tax returns and related return information, as well as the bases for the Committee's belief that those materials would serve Article I purposes, was ample.

## III. THE REMAINING CROSS-CLAIMS AGAINST TREASURY SHOULD BE DISMISSED

Although the Committee is not named as a defendant in Cross-Claims V through VIII, the Committee believes those claims should be dismissed. In order to avoid duplicative briefing consistent with the Court's direction, the Committee refers the Court to the discussion of those claims in Treasury's motion to dismiss.

## CONCLUSION

The Court should, as quickly as possible, grant the Committee's motion to dismiss and thereby not interfere with Treasury's compliance with the Committee's request for information under 26 U.S.C. § 6103(f).

October 12, 2021

SETH P. WAXMAN (D.C. Bar No. 257337)
KELLY P. DUNBAR (D.C. Bar No. 500038)
DAVID M. LEHN (D.C. Bar No. 496847)
ANDRES C. SALINAS (D.C. Bar No. 156118)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 663-6000
seth.waxman@wilmerhale.com

KATHERINE V. KELSH (*pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

Respectfully submitted,

*/s/ Douglas N. Letter*
DOUGLAS N. LETTER (D.C. Bar No. 253492)
   *General Counsel*
TODD B. TATELMAN (VA Bar No. 66008)
ERIC R. COLUMBUS (D.C. Bar No. 487736)
STACIE M. FAHSEL (D.C. Bar. No. 1034314)
OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, DC  20515
(202) 225-9700
douglas.letter@mail.house.gov

*Counsel for Plaintiff–Counterdefendant
Committee on Ways and Means, United States
House of Representatives*