# EXHIBIT B

(Slip Opinion)

# Ways and Means Committee's Request for the Former President's Tax Returns and Related Tax Information Pursuant to 26 U.S.C. § 6103(f)(1)

Section 6103(f)(1) of title 26, U.S. Code, vests the congressional tax committees with a broad right to receive tax information from the Department of the Treasury. It embodies a long-standing judgment of the political branches that the tax committees are uniquely suited to receive such information. The committees, however, cannot compel the Executive Branch to disclose such information without satisfying the constitutional requirement that the information could serve a legitimate legislative purpose.

In assessing whether requested information could serve a legitimate legislative purpose, the Executive Branch must give due weight to Congress's status as a co-equal branch of government. Like courts, therefore, Executive Branch officials must apply a presumption that Legislative Branch officials act in good faith and in furtherance of legitimate objectives.

When one of the congressional tax committees requests tax information pursuant to section 6103(f)(1), and has invoked facially valid reasons for its request, the Executive Branch should conclude that the request lacks a legitimate legislative purpose only in exceptional circumstances. The Chairman of the House Ways and Means Committee has invoked sufficient reasons for requesting the former President's tax information. Under section 6103(f)(1), Treasury must furnish the information to the Committee.

July 30, 2021

MEMORANDUM OPINION FOR THE ACTING GENERAL COUNSEL
DEPARTMENT OF THE TREASURY

The Internal Revenue Code requires the Department of the Treasury ("Treasury") and the Internal Revenue Service ("IRS") to keep tax returns and related information confidential, 26 U.S.C. § 6103(a), except in thirteen specified circumstances, *see id*. § 6103(c)–(o). Section 6103(f)(1), at issue here, provides that the Secretary of the Treasury ("Secretary") "shall furnish" such information to any of the three congressional tax committees—the Committee on Ways and Means of the House of Representatives, the Committee on Finance of the Senate, or the Joint Committee on Taxation—"[u]pon written request from the chairman" of one of those committees. In April 2019, Representative Richard Neal, the Chairman of the House Committee on Ways and Means ("Committee"), cited section 6103(f) in a written request to the IRS to provide the Committee with the preceding six years of then-President Donald Trump's individual tax

returns, as well as the tax returns of eight Trump-related businesses. *See* Letter for Charles P. Rettig, Commissioner, Internal Revenue Service, from Richard E. Neal, Chairman, Committee on Ways and Means, U.S. House of Representatives at 1–2 (Apr. 3, 2019) ("April 2019 Request"). Chairman Neal also sought IRS audit histories and work-papers associated with each return, explaining that the Committee was "considering legislative proposals and conducting oversight related to our Federal tax laws, including . . . the extent to which the IRS audits and enforces the Federal tax laws against a President." *Id.*

Treasury sought this Office's advice as to whether it was permitted to comply with the April 2019 Request in light of Treasury's determination that the Committee's asserted legislative purpose for requesting the tax records was a "pretext" and that the Committee's "true purpose" was to publicly disclose the President's tax returns. *See* Letter for Steven A. Engel, Assistant Attorney General, Office of Legal Counsel, from Brent J. McIntosh, General Counsel, Department of the Treasury at 5 (May 2, 2019). This Office responded that Treasury's determination about pretext was "reasonabl[e]" and that, because the Committee lacked a legitimate legislative purpose, section 6103(a) barred disclosure of the information to the Committee notwithstanding the mandate of section 6103(f)(1). *See* Letter for Brent J. McIntosh, General Counsel, Department of the Treasury, from Steven A. Engel, Assistant Attorney General, Office of Legal Counsel at 1 (May 6, 2019). Treasury then denied the April 2019 Request, which prompted the Committee to issue subpoenas for the requested documents to the Secretary and the Commissioner of the IRS. *See* Letter for Steven T. Mnuchin, Secretary of the Treasury, et al., from Richard E. Neal, Chairman, Committee on Ways and Means, U.S. House of Representatives at 3 & encl. (May 10, 2019).

The following month, this Office provided Treasury a more detailed opinion explaining our earlier advice. *Congressional Committee's Request for the President's Tax Returns Under 26 U.S.C. § 6103(f)*, 43 Op. O.L.C. __ (June 13, 2019) ("2019 Opinion"). The 2019 Opinion reasoned that Congress lacks constitutional authority to compel the Executive Branch to provide information to a congressional committee, even when a statute vests the committee with a right to the information, unless the information would serve a legitimate legislative purpose. *Id.* at *17–19. It concluded that Treasury's assessment of the Committee's "actual purpose" was not

*Ways and Means Committee's Request for the Former President's Tax Returns*

only "reasonabl[e]" but "correct[]." *Id.* at *31. Because the Committee lacked a legitimate legislative purpose for requesting the tax information, the 2019 Opinion advised that the April 2019 Request was invalid and that section 6103(a) barred Treasury from complying with the request. *Id.*

On June 16, 2021—after the Committee had sued to enforce its sub-poenas,[1] a new Congress had assembled, and President Trump had left office—Chairman Neal sent Treasury a new written request under section 6103(f)(1). *See* Letter for Janet L. Yellen, Secretary of the Treasury, et al., from Richard E. Neal, Chairman, Committee on Ways and Means, U.S. House of Representatives at 1 (June 16, 2021) ("June 2021 Request"). The Committee's June 2021 Request seeks the same categories of information as the April 2019 Request, but now for the tax years 2015 through 2020. *See id.* at 6–7. The June 2021 Request reiterates and elaborates upon the Committee's principal interest in the information—namely, evaluating "the extent to which the IRS audits and enforces the Federal tax laws against a President." *Id.* at 1. It also identifies an interest in determining whether "former President Trump's tax returns could reveal hidden business entanglements raising tax law and other issues, including conflicts of interest, affecting proper execution of the former President's responsibilities." *Id.* at 4. It further states that "[a]n independent examination might also show foreign financial influences on former President Trump that could inform relevant congressional legislation." *Id.*

You then asked for our views regarding "whether the Secretary must furnish the requested returns and return information to the Committee." Letter for Dawn Johnsen, Acting Assistant Attorney General, Office of Legal Counsel, from Laurie Schaffer, Acting General Counsel, Department of the Treasury at 1 (June 17, 2021). For the reasons set forth below, we conclude that Treasury must furnish the information specified in the June 2021 Request to the Committee.

The statute at issue here is unambiguous: "Upon written request" of the chairman of one of the three congressional tax committees, the Secretary "shall furnish" the requested tax information to the Committee. 26 U.S.C.

---

[1] *See* Compl., *Comm. on Ways & Means v. Dep't of the Treasury*, No. 19-cv-1974 (D.D.C. July 2, 2019), ECF No. 1. The case has been stayed since March 2020. *See* Order, *Comm. on Ways & Means v. Dep't of the Treasury*, No. 19-cv-1974 (D.D.C. Mar. 20, 2020).

§ 6103(f)(1). As the 2019 Opinion recognized, this statutory directive does not exempt the June 2021 Request from the constitutional requirement that congressional demands for information must serve a legitimate legislative purpose. 2019 Opinion at *17–19. The 2019 Opinion went astray, however, in suggesting that the Executive Branch should closely scrutinize the Committee's stated justifications for its requests in a manner that failed to accord the respect and deference due a coordinate branch of government. *Id.* at *24–26. The 2019 Opinion also failed to give due weight to the fact that the Committee was acting pursuant to a carefully crafted statute that reflects a judgment by the political branches, going back nearly a century, that the congressional tax committees should have special access to tax information given their roles in overseeing the national tax system. Particularly in light of this special statutory authority, Treasury should conclude that a facially valid tax committee request lacks a legitimate legislative purpose only in exceptional circumstances.

Applying the proper degree of deference due the Committee, we believe that there is ample basis to conclude that its June 2021 Request for former President Trump's tax information would further the Committee's principal stated objective of assessing the IRS's presidential audit program—a plainly legitimate area for congressional inquiry and possible legislation. The Chairman's additional stated objectives for reviewing that tax information are also legitimate, and the Committee has authority to seek the records for those reasons as well. Even if some individual members of Congress hope to see information from the former President's tax returns disclosed on the public record merely "for the sake of exposure," *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2032 (2020) (internal quotation marks omitted), that would not invalidate the legitimate objectives that the Committee's receipt of the information in question could serve.

## I.

### A.

From the time Congress first enacted an income tax during the Civil War, the political branches have frequently debated whether and to what extent income tax information should be available to the public and to

various government actors.[2] Beginning in 1913, and continuing for more than fifty years thereafter, Congress adopted a basic framework in which the law declared income tax returns to be "public records," but they were not as a practical matter freely available for public perusal. With certain discrete exceptions, the IRS (or its predecessor) could disclose such reports or permit their inspection only by order of the President and in accord with rules prescribed by the Secretary. *See, e.g.*, Revenue Act of 1913, ch. 16, § 2, 38 Stat. 114, 177; *see also Report on Administrative Procedures of the Internal Revenue Service to the Administrative Conference of the United States*, S. Doc. No. 94-266, at 842–53 (1975) ("1975 ACUS Report").

In the Revenue Act of 1924, however, the political branches decided to afford the congressional tax committees a special role. *See id.* ch. 234, § 257(a), 43 Stat. 253, 293. One impetus for this change was frustration within Congress that the Coolidge Administration had stymied congressional access to tax records of federal officials suspected of involvement in the Teapot Dome scandal as well as tax records relevant to a Senate investigation of the Bureau of Internal Revenue (the predecessor to the IRS). *See* George K. Yin, *Preventing Congressional Violations of Taxpayer Privacy*, 69 Tax Law. 103, 120–24 (2015). Many members of Congress supported affording at least some congressional committees access to tax returns, but there was debate about whether such access should be provided to all committees or only to some (and, if the latter, to which ones).[3] Congress chose to single out the tax committees. It eventually passed, and President Coolidge signed, a law that included a new provision guaranteeing that the House Ways and Means Committee, the Senate Finance Committee, and a "special committee" of the Senate or

---

[2] *See Report on Administrative Procedures of the Internal Revenue Service to the Administrative Conference of the United States*, S. Doc. No. 94-266, at 835–43 (1975); *see also* George K. Yin, *Preventing Congressional Violations of Taxpayer Privacy*, 69 Tax Law. 103, 154–60, app. B (2015) (offering a detailed account of income tax confidentiality debates and laws between 1862 and 1921).

[3] *See, e.g.*, 65 Cong. Rec. 9405 (1924) (remarks of Sen. Norris) (lamenting that members of the tax committees "are not the only pebbles on the legislative beach" and that other members "are equally interested in good legislation . . . but they are all denied access to these secret records of big incomes"); Yin, *Preventing Congressional Violations of Taxpayer Privacy*, 96 Tax Law. at 123–24 (recounting other objections to the special treatment of the tax committees).

45 Op. O.L.C. __ (July 30, 2021)

House "shall have the right to call on the Secretary of the Treasury for, and it shall be his duty to furnish, any data of any character contained in or shown by the returns . . . that may be required by the committee." Revenue Act of 1924, § 257(a), 43 Stat. at 293.[4] All other congressional committees—like everyone else—had to continue to rely upon the discretionary approval of the President and the Secretary, or the assistance of the tax committees, in order to inspect tax returns. *See id.*[5]

Two years later, Congress created the Joint Committee on Internal Revenue Taxation (now known as the Joint Committee on Taxation) and gave it the same right of access to returns enjoyed by the Ways and Means Committee and the Finance Committee. *See* Revenue Act of 1926, ch. 27, § 1203(a), (d), 44 Stat. 91, 127–28. The special authority afforded these three congressional tax committees (and other committees that received special authorization by a vote of a chamber) remained a fixture of federal tax law over the next half-century. Eventually, the Internal Revenue Code of 1954 provided that whenever any of the tax committees requests tax returns, the Secretary of the Treasury "shall furnish such committee sitting in executive session with any data of any character contained in or shown by any return." *Id.* ch. 736, § 6103(d)(1)(A), (d)(2), 68A Stat. 1, 754–55. These tax committees were authorized to inspect returns directly

---

[4] The 1924 statute also provided for the open publication of the *amount* of each person's income tax. *See* Revenue Act of 1924, § 257(b), 43 Stat. at 293; *see also United States v. Dickey*, 268 U.S. 378 (1925) (examining the strange distinction between the publicly disclosed tax amounts and the confidential tax returns under the 1924 statute). That provision engendered controversy and was omitted from the 1926 version of the statute. *See* Yin, *Congressional Violations of Taxpayer Privacy*, 96 Tax Law. at 125 & n.114.

[5] President Coolidge issued a signing statement complaining that the provision did not restrict committees from publishing tax returns in open committee or on the floor of Congress. *See* 118 Com. & Fin. Chron. 2739, 2775 (1924) (reproducing the signing statement). Congress addressed these concerns to some extent in amendments it enacted in 1926, by providing that special committees (i.e., not the standing tax committees) could inspect returns only if they were first authorized to do so by a resolution of the House or Senate (or a joint resolution), *see* Revenue Act of 1926, ch. 27, § 257(b)(1), 44 Stat. 9, 51, and by further providing that committees had to be sitting in executive (i.e., not public) session in order to receive the returns, *id.* Congress declined, however, to prohibit authorized committees from making public "[a]ny relevant or useful information thus obtained." *Id.* § 257(b)(3), 44 Stat. at 51. To the contrary, it permitted them to do so by submitting such "relevant or useful" information to the House or the Senate (or both). *Id.*

or through designated examiners or agents, and they were empowered to submit "[a]ny relevant or useful information thus obtained" to the Senate, the House, or both, *id*. § 6103(d)(1)(B)–(C), 68A Stat. at 755—a submission that would effectively make the information public. It remained the case that other congressional committees had to go to much greater lengths to inspect or obtain returns and were not permitted to publicize them.[6]

## B.

In the mid-1970s, substantial concerns arose about "whether the extent of actual and potential disclosure of returns and return information to other Federal and State agencies for non-tax purposes breached a reasonable expectation of privacy on the part of the American citizen with respect to such information." Staff of the Joint Committee on Taxation, *General Explanation of the Tax Reform Act of 1976*, JCS-33-76, at 314 (1976) ("JCT General Explanation"). Because the IRS "probably has more information about more people than any other agency in this country," "almost every other agency that has a need for information about U.S. citizens sought it from the IRS." *Id.* And the President and the Secretary increasingly had been sharing such identifiable tax information within the Executive Branch, including within the White House itself. *See id.*; *see also* Yin, *Preventing Congressional Violations of Taxpayer Privacy*, 69 Tax Law. at 130 (recounting that Congress was especially troubled by President Nixon's orders authorizing the Department of Agriculture to inspect the tax returns of all farmers).[7]

Congress responded to these concerns in the Tax Reform Act of 1976, which made significant reforms to the Internal Revenue Code. *See* Pub. L. No. 94-455, 90 Stat. 1520. The 1976 statute included measures to safeguard taxpayer confidentiality—in particular, to limit the Executive Branch's own access to and use of identifiable tax returns. *Id.* § 1202, 90

---

[6] *See* Staff of the Joint Committee on Taxation, *General Explanation of the Tax Reform Act of 1976*, JCS-33-76, at 316–18 (Dec. 29, 1976) (summarizing the pre-1976 rules with respect to various committees); S. Rep. No. 94-938, at 319–20 (1976) (same); *see also* 1975 ACUS Report at 959–60, 966–68, 1116 nn. 551 & 553 (describing requirements of Executive Branch regulations that governed requests of non-tax committees).

[7] *See also* 122 Cong. Rec. 24,013 (1976) (statement of Sen. Weicker) (suggesting that the IRS was acting like a "lending library" to the rest of the Executive Branch).

Stat. at 1667 (amending 26 U.S.C. § 6103). "Congress reviewed each of the areas in which returns and return information were subject to disclosure," and with respect to each of them, "strove to balance the particular office or agency's need for the information involved with the citizen's right to privacy and the related impact of the disclosure upon the continuation of compliance with our country's voluntary tax assessment system." JCT General Explanation at 315. The result was the version of section 6103 that (in pertinent part) remains in force today.

Section 6103(a) pronounces that "[r]eturns" and "return information" (collectively, "tax information") "shall be confidential, . . . except as authorized by this title." 26 U.S.C. § 6103(a).[8] Government officials with access to tax information thus may not disseminate it without authorization. A willful unauthorized disclosure is a felony, *see id.* § 7213(a)(1)–(2), and any government official or other specified person who willfully inspects tax information without authorization commits a misdemeanor, *id.* § 7213A. The law also provides for civil liability for certain impermissible disclosures. *Id.* § 7431(a).

In sections 6103(c) through (o), however, Congress established "thirteen tightly drawn categories of exceptions" to the general confidentiality rule. *Elec. Privacy Info. Ctr. v. IRS*, 910 F.3d 1232, 1237 (D.C. Cir. 2018). In these "limited situations delineated in the newly amended section 6103," Congress "determined that disclosure was warranted." JCT General Explanation at 315. One of the exceptions, relevant here, is found in section 6103(f)(1). Like its predecessors since 1924, this provision singles out the tax committees for special treatment and enhanced access to tax information. *See* JCT General Explanation at 317–18; S. Rep. No.

---

[8] Section 6103 defines "return[s]" and "return information" broadly. Returns include "any tax or information return, declaration of estimated tax, or claim for refund required by, or provided for or permitted under, the provisions of this title which is filed with the Secretary . . . , and any amendment or supplement thereto." 26 U.S.C. § 6103(b)(1). Return information includes, among other things, "a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return." *Id.* § 6103(b)(2)(A).

*Ways and Means Committee's Request for the Former President's Tax Returns*

94-938, at 320 (1976).[9] Section 6103(f)(1) provides that "[u]pon written request from the chairman of the Committee on Ways and Means of the House of Representatives, the chairman of the Committee on Finance of the Senate, or the chairman of the Joint Committee on Taxation, the Secretary shall furnish such committee with any return or return information specified in such request." *See also id*. § 6103(f)(4) (the Committee or its designated examiners or agents "shall have the authority . . . to inspect returns and return information at such time and in such manner" as the chairman may determine). It further provides that "any return or return information which can be associated with, or otherwise identify, directly or indirectly, a particular taxpayer shall be furnished to such committee only when sitting in closed executive session unless such taxpayer otherwise consents in writing to such disclosure." *Id.* § 6103(f)(1); *see also id.* § 6103(f)(2) (treating the Chief of Staff of the Joint Committee on Taxation similarly to the chairmen of the House and Senate tax committees).

One notable change from earlier iterations of the law is that tax committee requests for tax information must be submitted in writing by the chairman of one of the committees (or by the Chief of Staff of the Joint Committee on Taxation). *Compare* 26 U.S.C. § 6103(f)(1) (2018), *with* 26 U.S.C. § 6103(d)(1) (1970). As this Office previously explained, the "apparent purpose" of this requirement—that "the highest-ranking official of a particular governmental unit [must] pass upon and approve any request for disclosure," and thereby stand behind it in an accountable fashion—is "to ensure that disclosure is warranted." *Congressional Access to Tax Returns Under 26 U.S.C. § 6103(f)*, 1 Op. O.L.C. 85, 89 (1977). In other respects, though, section 6103(f)(1) continues the long-standing practice of according the tax committees unique and especially broad access to tax information.

The tax committees, for example, are the only congressional committees that need not obtain a resolution from the full House or Senate before they request tax information. *Compare* 26 U.S.C. § 6103(f)(1) (concerning the tax committees), *with id.* § 6103(f)(3) (addressing "[o]ther committees"). And, of special significance here, section 6103(f)(1) does not require the tax committees to use the information they obtain for any

---

[9] The 1976 statute prescribed rules for most non-tax committees, rather than leaving them subject to executive regulation. *See* 26 U.S.C. § 6103(f)(3), (f)(4)(B).

45 Op. O.L.C. __ (July 30, 2021)

particular purpose nor to articulate the purpose for which they are seeking the information. Indeed, apart from these committees, virtually no one—not even the President[10]—can request tax information about a non-consenting taxpayer without regard to the purpose for the request.[11] Other congressional committees, in particular, must secure a resolution from the full House or Senate (or both) that authorizes the request for tax information and that specifies the purpose for which it is to be sought and that the information cannot reasonably be obtained from any other source. *See id.* § 6103(f)(3). Moreover, section 6103(f)(4)(A) authorizes the tax committees, and those committees alone, to submit the information they receive "to the Senate or the House of Representatives, or to both," without any requirement that the House or Senate be sitting in closed executive session—which is, in effect, the power to put that information on the public record. *Compare id.* § 6103(f)(4)(A), *with id.* § 6103(f)(4)(B) (providing that, absent taxpayer consent, other committees can furnish identifiable tax information to the Senate or the House "only when sitting in closed executive session").[12]

---

[10] *See* 26 U.S.C. § 6103(g)(1)(D) (providing that the President must state in writing "the specific reason why [an] inspection or disclosure is requested" on his or her behalf).

[11] *See, e.g.*, 26 U.S.C. § 6103(d)(1) (permitting disclosure to state tax officials "for the purpose of, and only to the extent necessary in, the administration of [state tax] laws"); *id.* § 6103(h)(1) (allowing Treasury employees and officers to inspect or obtain tax information only if their duties require it for tax administration); *id.* § 6103(h)(2), (h)(3)(B) (permitting Department of Justice officials involved in a matter of tax administration to examine and use tax information "solely" in connection with a grand jury or court proceeding in delineated circumstances, and generally to do so only pursuant to a request from the Attorney General, the Deputy Attorney General, or an Assistant Attorney General that "set[s] forth the need for the disclosure").

[12] The singular nature of the tax committees' statutory right of access to tax information is further underscored by comparing section 6103(f)(1) with the other statutory exceptions to section 6103(a)'s general rule of taxpayer confidentiality. Although some of those exceptions similarly require the Secretary to provide return information if particular conditions are met, a number of them appear to afford the Secretary discretion about whether to disclose tax information. *See, e.g.*, 26 U.S.C. § 6103(h)(5) ("Upon written request of the [Social Security Administration or Railroad Retirement Board], the Secretary *may* disclose available return information from the master files of the Internal Revenue Service" for the purpose of helping such agency carry out its tax-withholding responsibilities) (emphasis added); *see also, e.g.*, 26 U.S.C. § 6103(e)(11), (i)(3)(A)(i), (i)(3)(B)(i), (i)(3)(C)(i), (i)(7)(A)(i), (k)(7), (k)(8)(A), (k)(9), (k)(10)(A), (k)(13)(A), (k)(14)(A), (*l*)(3)(A), (*l*)(4), (*l*)(5) & (*l*)(18).

*Ways and Means Committee's Request for the Former President's Tax Returns*

Since enactment of the 1976 statute, the tax committees have occasionally relied upon section 6103(f)(1) to inspect and obtain tax returns and (more frequently) information about the IRS's treatment of tax returns.[13] You have advised us that, before 2019, Treasury had never before denied such a section 6103(f)(1) request.[14] After it denied the Committee's request in 2019, Treasury explained to one Senator that "[t]his is unsurprising": "there is no need for close review of most requests under section 6103(f) because the purpose of the request is usually self-evident and legitimate." *See* Letter for Ron Wyden, Ranking Member, Committee on Finance, U.S. Senate, from Justin W. Sok, Senior Advisor, Office of Legislative Affairs, Department of the Treasury at 2 (July 17, 2019).[15]

---

[13] *See* Memorandum for Members of the Committee on Ways and Means, U.S. House of Representatives, from Richard E. Neal, Chairman, Committee on Ways and Means, U.S. House of Representatives, *Re: Historical Use of Authority To Obtain Confidential Tax Information* at 3–5 (July 25, 2019) (enumerating cases over the preceding thirty years in which the tax committees have requested and obtained from the IRS tax information). You have informed us that "the IRS has indicated," based upon "institutional memory and paper records," that "it has no reason to question the account in Chairman Neal's memorandum." E-mail for Martin Lederman & Gillian E. Metzger, Office of Legal Counsel, from Laurie Schaffer, Department of the Treasury, *Re: Request for Information* (July 26, 2021, 9:03 PM). *See also* Letter for Ron Wyden, Ranking Member, Committee on Finance, U.S. Senate, from Justin W. Sok, Senior Advisor, Office of Legislative Affairs, Department of the Treasury, att. A (July 17, 2019) (describing section 6103(f) requests found in IRS records from between 2005 and 2019).

[14] *See* E-mail for Martin Lederman & Gillian E. Metzger, Office of Legal Counsel, from Laurie Schaffer, Department of the Treasury, *Re: Question regarding denial of a section 6103(f) request prior to 2019* (July 29, 2021, 7:19 PM); E-mail for Martin Lederman & Gillian E. Metzger, Office of Legal Counsel, from Brian Sonfield, Department of the Treasury, *Re: FW: Request for information concerning practice under Section 6103(f)* (July 28, 2021, 11:27 AM).

[15] The IRS's Internal Revenue Manual suggests that the IRS can request or even insist upon a delay of congressional committee access to records in cases "under active investigation." I.R.M. § 11.3.4.4(13) (2020). It is not clear what the Manual means by a case "under active investigation"—in particular, whether this phrase includes a case subject to an ongoing audit. Nor is it clear what the statutory authority would be for the IRS to refuse a tax committee request under section 6103(f)(1) where a "functional head" concludes that disclosure would result in a "serious adverse effect on the administration of the tax laws." *Id.* You have informed us that, according to the IRS, it "routinely communicates with committee staff when providing information, identifying information that is particularly sensitive or that the IRS is concerned with disclosing for some reason to ensure the recipients are sensitive to the concerns. Sometimes that results in the

45 Op. O.L.C. __ (July 30, 2021)

## C.

In April 2019, citing "authority under Internal Revenue Code section 6103(f)," Chairman Neal asked the IRS to provide the Committee then-President Trump's individual tax returns, as well as those of eight Trump-related businesses, for each of the tax years 2013 through 2018. April 2019 Request at 1–2. He also requested certain records related to the IRS audit histories and work-papers associated with each return. *Id.* Chairman Neal offered the following explanation for the request:

> The Committee on Ways and Means . . . has oversight and legislative authority over our Federal tax laws. With this authority comes a responsibility to ensure that the Internal Revenue Service . . . is enforcing the laws in a fair and impartial manner.
>
> Consistent with its authority, the Committee is considering legislative proposals and conducting oversight related to our Federal tax laws, including, but not limited to, the extent to which the IRS audits and enforces the Federal tax laws against a President. Under the Internal Revenue Manual, individual income tax returns of a President are subject to mandatory examination, but this practice is IRS policy and not codified in the Federal tax laws. It is necessary for the Committee to determine the scope of any such examination and whether it includes a review of underlying business activities required to be reported on the individual income tax return.

*Id.* at 1.[16]

---

documents remaining in the building and authorized committee staff viewing it in the IRS rather than it being delivered. Sometimes it results in the information being sent under a separate transmittal and highlighted as very sensitive." E-mail for Martin Lederman & Gillian E. Metzger, Office of Legal Counsel, from Laurie Schaffer, Department of the Treasury, *Re: Request for Information* (July 26, 2021, 9:03 PM).

[16] Shortly after his April 2019 Request, Chairman Neal clarified in a follow-up letter that it was "in furtherance of consideration by the Committee . . . of legislative proposals and oversight related to our Federal tax laws, including, *but not limited to*, the extent to which the IRS audits and enforces the Federal tax laws against a President." Letter for Charles P. Rettig, Commissioner, Internal Revenue Service, from Richard E. Neal, Chairman, Committee on Ways and Means, U.S. House of Representatives at 1 (Apr. 13, 2019) (emphasis added). In support of a summary judgment motion in the subsequent lawsuit, the Committee described additional legislative interests that the requested tax

*Ways and Means Committee's Request for the Former President's Tax Returns*

Treasury sought this Office's advice about how to respond to the April 2019 Request. *See* Letter for Steven A. Engel, Assistant Attorney General, Office of Legal Counsel, from Brent J. McIntosh, General Counsel, Department of the Treasury at 1 (May 2, 2019). Specifically, Treasury asked: (1) "Must the Committee demonstrate a legitimate legislative purpose, consistent with constitutional limitations on the authority of Congress, to support its use of 26 U.S.C. § 6103(f)?"; and (2) "Absent a legitimate legislative purpose, does section 6103(a) bar disclosure to the Committee of the requested tax returns and return information?" *Id.*

To accommodate Treasury's interest in expeditiously responding to the Committee, this Office provided a letter opinion four days later, with notice that a formal opinion would follow. Letter for Brent J. McIntosh, General Counsel, Department of the Treasury, from Steven A. Engel, Assistant Attorney General, Office of Legal Counsel at 1 (May 6, 2019). That letter advised Treasury that "the Constitution requires the Committee to demonstrate a legitimate legislative purpose" for a request under section 6103(f). *Id.* It further advised that, "based upon the totality of the circumstances," Treasury had "reasonably concluded that the Committee's asserted legislative purpose is a pretext, and that the Committee ha[d] requested the . . . information for the purpose of public release—which we agree is not a legitimate legislative purpose." *Id.* The letter therefore concluded that section 6103(a) prohibited Treasury from disclosing the requested tax information to the Committee.

Treasury then denied the Chairman's April 2019 Request. *See* Letter for Richard E. Neal, Chairman, Committee on Ways and Means, U.S. House of Representatives, from Steven T. Mnuchin, Secretary, Department of the Treasury at 1 (May 6, 2019). The Secretary explained that "[i]n reliance on the advice of the Department of Justice," Treasury had determined that the request "lacks a legitimate legislative purpose, and pursuant to section 6103, [Treasury] is therefore not authorized to disclose the requested returns and return information." *Id.* The Secretary offered instead to provide the Committee "information concerning the Commit-

---

information might serve. *See* Pl.'s Br. Summ. J. at 3–9, 38–41, *Comm. on Ways & Means v. U.S. Dep't of the Treasury*, No. 19-cv-1974 (D.D.C. Aug. 20, 2019), ECF No. 29-2 (identifying a desire to determine, among other things, whether the IRS lacks the resources to handle complex presidential returns, whether President Trump had been treated unfairly in the audit process, and relevant financial conflicts of interest).

45 Op. O.L.C. __ (July 30, 2021)

tee's stated interest in how the IRS conducts mandatory examinations of Presidents." *Id.*

The Committee responded by serving subpoenas on the Secretary and the Commissioner, demanding the tax information. *See* Letter for Steven T. Mnuchin, Secretary, Department of the Treasury, et al., from Richard E. Neal, Chairman, Committee on Ways and Means, U.S. House of Representatives at 3 & encl. (May 10, 2019). In an accompanying letter, Chairman Neal reiterated that the Committee was conducting oversight related to "the extent to which the IRS audits and enforces the Federal tax laws against a President." *Id*. at 2. Chairman Neal expressed his appreciation for Treasury's offer of a briefing on the audit program but added that such a briefing "is not a substitute for the requested tax returns and return information." *Id.* at 3.

In June 2019, this Office issued a more detailed opinion to Treasury. That opinion explained that Congress lacks constitutional authority to compel the Executive Branch to provide information to a committee, even pursuant to a statute, if the request lacks a legitimate legislative purpose. 2019 Opinion, 43 Op. O.L.C. __, at *17–19. The 2019 Opinion recognized that, under Supreme Court precedent in cases where committees subpoenaed information or testimony, a court would be required to apply a strong presumption that the Committee's stated purpose was sincere. *Id.* at *24–25. It reasoned, however, that the Executive Branch does not owe the Chairman a similar degree of deference. *Id*. at *25–26. The 2019 Opinion then concluded that "[t]he Committee's asserted purpose—to consider legislation regarding the IRS's practices in auditing presidential tax filings—was implausible," and that the "objective mismatch between the Committee's stated purpose, on the one hand, and the particular information that the Committee demanded, on the other, provided strong evidence of pretext." *Id.* at *26.

The 2019 Opinion found that Treasury had "reasonably and correctly" determined not only "that the Committee's stated purpose was pretextual" but also that its "actual purpose" for the request "was simply to provide a means for public disclosure of the President's tax returns." *Id.* at *31. Treasury's assessment was, in turn, based upon numerous statements by Democratic members of the House when they were in the House minority during the 115th Congress, in 2017–2018, some of which the 2019 Opinion described, *see id.* at *7–11. In those statements, House members

14

insisted that President Trump should release his tax returns; and some members of the Committee—including then-Ranking Member Neal— urged it to "use the authority under Section 6103 to obtain President Trump's tax returns and make them available to the public." H.R. Rep. No. 115-73, at 8 (2017) (dissenting views of Ranking Member Neal and Rep. Pascrell). After recounting these statements, the 2019 Opinion characterized Chairman Neal's April 2019 Request as "the culmination of a sustained effort over more than two years to seek the public release of President Trump's tax returns." *Id.* at *7.

The 2019 Opinion acknowledged, in passing, that members of Congress had identified several other interests in the tax information, including so that Congress could evaluate whether the President had financial conflicts of interest or was compromised by foreign powers. *Id.* at *11 & n.19. The Opinion did not explain, however, why those interests were insufficient to justify the April 2019 Request, other than to assert that "many of them would fall outside the jurisdiction of the Ways and Means Committee." *Id.* at *29.

The 2019 Opinion thus found that the Committee lacked a constitutionally adequate basis for the April 2019 Request, which meant that "disclosure was not authorized under section 6103(f), and section 6103(a) therefore required Treasury to maintain confidentiality of the requested tax information." *Id.* at *31.

## D.

At the invitation of the Secretary, Committee staff met with Treasury and IRS officials on June 10, 2019 for a briefing on the IRS's presidential audit program. *See* Letter for Steven T. Mnuchin, Secretary, Department of the Treasury, et al., from Richard E. Neal, Chairman, Committee on Ways and Means, U.S. House of Representatives at 1 (June 28, 2019). On June 28, 2019, Chairman Neal notified Secretary Steven Mnuchin and Commissioner Charles Rettig that the June 10 briefing had "only reinforced the Committee's need to review the actual return information as part of [the Committee's] oversight duties." *Id.* at 2. Four days later, the Committee filed a lawsuit to enforce its subpoenas. *See* Compl., *Comm. on Ways & Means v. Dep't of the Treasury*, No. 19-cv-1974 (D.D.C. July 2, 2019), ECF No. 1. The District Court stayed the proceedings pending an en banc D.C. Circuit decision on congressional standing, *see*

45 Op. O.L.C. __ (July 30, 2021)

*supra* note 1, which the court of appeals issued on August 7, 2020, *see Comm. on the Judiciary v. McGahn*, 968 F.3d 755 (D.C. Cir. 2020) (en banc).

In February 2021, after President Trump had left office, the Ways and Means Committee of the 117th Congress informed the District Court that it still had a "need" for the tax information it had requested "to further its ongoing investigation into Internal Revenue Service administration and policy." Joint Status Report at 2, *Comm. on Ways & Means v. Dep't of the Treasury*, No. 19-cv-1974 (D.D.C. Feb. 3, 2021), ECF No. 102. Treasury requested more time to consider its position as new leadership transitioned into office. *Id*. at 1. The District Court has kept the stay in place and issued a standing order that Treasury notify former President Trump in advance if it decides to provide the requested information to the Committee. Minute Order, *Comm. on Ways & Means v. Dep't of the Treasury*, No. 19-cv-1974 (D.D.C. Feb. 3, 2021).

## E.

In June 2021, Chairman Neal submitted a new request under section 6103(f)(1), on behalf of the Ways and Means Committee in the 117th Congress. The June 2021 Request seeks the same categories of information as the April 2019 Request, but it covers each of the tax years 2015 to 2020 (whereas the April 2019 Request asked for tax information for the tax years 2013 through 2018). *See* June 2021 Request at 6–7. The June 2021 Request expands upon the Committee's earlier assertion of an interest in assessing the IRS's presidential audit program. It states that the Committee has "serious concerns about the IRS's full and fair administration of the tax laws with respect to a President and believes legislation may be needed in this area." *Id*. at 2. It also elaborates upon the Committee's specific interest in former President Trump's returns, emphasizing that "[a]mong Presidents, Donald J. Trump is a unique taxpayer":

> Unlike his predecessors, he controlled hundreds of businesses throughout his term [in office], raising concerns about financial conflicts of interest that might have affected administration of laws, including the tax laws . . . . [He] also represented that he had been under continuous audit by the IRS prior to and during his

Presidency, . . . and routinely complained in public statements about alleged unfair treatment by the IRS.

*Id.* at 4. The June 2021 Request states that the former President's tax information "[is] not only instructive—but indispensable—to the Committee's inquiry into the mandatory audit program." *Id.*

The June 2021 Request identifies other rationales as well. It asserts that "former President Trump's tax returns could reveal hidden business entanglements raising tax law and other issues, including conflicts of interest, affecting proper execution of the former President's responsibilities," and that "[a]n independent examination might also show foreign financial influences on former President Trump that could inform relevant congressional legislation." *Id.* In closing, the Chairman wrote that it would be "wrong" to assert that "the true and sole purpose of the Committee's inquiry here is to expose former President Trump's tax returns." *Id.* at 7.

Upon receiving the Chairman's new request, and in light of our 2019 Opinion concerning the earlier request, you asked for our "legal opinion as to whether the Secretary must furnish the requested returns and return information to the Committee." Letter for Dawn Johnsen, Acting Assistant Attorney General, Office of Legal Counsel, from Laurie Schaffer, Acting General Counsel, Department of the Treasury at 1 (June 17, 2021). In a subsequent letter, you explained that "there have been a number of developments" between the submission of the April 2019 Request and the June 2021 Request that "raise questions about the applicability of the [2019] OLC opinion to the Committee's request in the 2021 Letter." Letter for Dawn Johnsen, Acting Assistant Attorney General, Office of Legal Counsel, from Laurie Schaffer, Acting General Counsel, Department of the Treasury at 2, 3 (July 16, 2021) ("July 2021 Schaffer Letter"). You found significant, for example, that the June 2021 Request "goes into further detail regarding the primary purpose of the Committee's request"—namely, to inform the Committee's understanding of the IRS's practice of auditing presidential tax returns. *Id.* at 2. You also noted the Chairman's invocation of additional purposes, namely, that the tax information responsive to the June 2021 Request "could reveal business entanglements that raise tax law and other issues and foreign financial influences that could inform relevant congressional legislation." *Id.* Your letter further pointed out that the June 2021 Request "tailors the relevant time

period for which tax returns are requested" to the former President's years in office and two adjacent years, thereby better aligning the request "with the Committee's stated purposes" regarding the IRS's audits of presidential returns. *Id.* And you observed that, "[to] the extent separation of powers concerns guided the conclusions of the [2019] OLC opinion, the [June 2021 Request] for the records of a former rather than sitting president may weigh in favor of a different conclusion." *Id.*

## II.

The command of section 6103(f)(1) is unambiguous: "Upon written request" from the chairman of one of the three tax committees, the "Secretary shall furnish . . . any return or return information specified in such request." This provision thus vests the tax committees with a statutory right of special access to tax information, subject only to the limitation that any information that could identify or be associated with a particular taxpayer "shall be furnished . . . only when [the Committee is] sitting in closed executive session," absent taxpayer consent. 26 U.S.C. § 6103(f)(1). And although the tax committees must receive the information in executive session, by statute they enjoy a unique responsibility to decide if and when that information should be disclosed to the public: They may submit any portion of tax information they obtain to the full Senate or the full House in public session. *See id.* § 6103(f)(4)(A).

This Office's 2019 Opinion recognized that "[t]he plain language of 26 U.S.C. § 6103(f)(1) does not require a tax committee to state any purpose in support of its request for tax information." 2019 Opinion at *16. The 2019 Opinion also correctly noted, however, that this statutory mandate does not eliminate the constitutional requirement that a congressional committee may only compel production of information if it could serve a legitimate legislative objective. *Id.* at *19. The question you have asked is whether the Committee's June 2021 Request meets this constitutional test—i.e., whether the information the Committee seeks "is related to, and in furtherance of, a legitimate task of the Congress." *Mazars*, 140 S. Ct. at 2031 (internal citation omitted).

Before we consider that question, however, we believe it is important to explain in some detail how and why our mode of analysis differs from the analysis in the 2019 Opinion, particularly with respect to the proper standard of review in assessing whether the Committee's asserted reasons

for its request are pretextual or genuine. The 2019 Opinion stated that "[w]here . . . there is reason to doubt the Committee's asserted legislative purpose, Treasury may examine the objective fit between that purpose and the information sought, as well as any other evidence that may bear upon the Committee's true objective." *Id*. at *17. According to the opinion, in doing so the Executive Branch, unlike a court, may "engage in searching inquiries about congressional motivation," *id.* at *24, and need not apply the sort of "deference to the decisions of the political branches of government" that characterizes the Judiciary's review of congressional requests for information, *id.* at *25; *see also id.* ("these . . . limitations do not apply to the Executive Branch").

In our view, the 2019 Opinion failed to give due weight to Congress's status as a co-equal branch of government with legitimate needs for information in order to exercise its constitutional authorities. Courts generally presume that Executive and Legislative Branch officials act in good faith and in furtherance of legitimate objectives. As this Office has long recognized, such inter-branch comity is also appropriate when the Executive Branch receives congressional requests for information. The 2019 Opinion further erred in not appropriately respecting the long-standing judgment of the political branches, embodied in section 6103(f)(1), that the tax committees are best situated to determine when Congress ought to have access to tax information, notwithstanding the confidentiality rules that govern in other contexts.

The presumption of good faith and regularity does not mean that the Executive Branch must "blindly accept a pretextual justification" offered by a committee to justify an informational request. *Id*. at *17. But especially where, as here, a tax committee requests tax information pursuant to section 6103(f)(1) and has invoked facially valid reasons for its request (despite the statute's not requiring any), the Executive Branch should conclude that the request lacks a legitimate legislative objective only in exceptional circumstances.

## A.

Congress's authority to investigate "is inherent in the legislative process." *Watkins v. United States*, 354 U.S. 178, 187 (1957); *see also Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975) ("[T]he power to investigate is inherent in the power to make laws."). Although

45 Op. O.L.C. __ (July 30, 2021)

"Congress has no enumerated power to conduct investigations," such a power "'is an essential and appropriate auxiliary to the legislative function.'" *Mazars*, 140 S. Ct. at 2031 (quoting *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927)); *see also Scope of Congressional Oversight and Investigative Power With Respect to the Executive Branch*, 9 Op. O.L.C. 60, 60 (1985) ("It is beyond dispute that Congress may conduct investigations in order to obtain facts pertinent to possible legislation and in order to evaluate the effectiveness of current laws.").

Congress's investigative authority extends to any "subject on which legislation could be had." *Mazars*, 140 S. Ct. at 2031 (internal quotation marks omitted). It is "as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." *Barenblatt v. United States*, 360 U.S. 109, 111 (1959). Given the breadth of Congress's lawmaking and appropriating powers, it follows that Congress's investigatory authority is likewise "broad and indispensable." *Mazars*, 140 S. Ct. at 2031 (internal quotation marks omitted). This authority "encompasses inquiries into the administration of existing laws, studies of proposed laws, and 'surveys of defects in our social, economic or political system for the purpose of enabling Congress to remedy them.'" *Id.* (quoting *Watkins*, 354 U.S. at 187). As the Court recently reaffirmed:

> It is the proper duty of a representative body to look diligently into every affair of government and to talk much about what it sees. . . . Unless Congress ha[s] and use[s] every means of acquainting itself with the acts and the disposition of the administrative agents of the government, the country must be helpless to learn how it is being served.

*Id*. at 2033 (quoting *United States v. Rumely*, 345 U.S. 41, 43 (1953)).

Yet this congressional power to investigate is not unlimited. Most relevant here, a congressional request for information from the Executive Branch "is valid only if it is 'related to, and in furtherance of, a legitimate task of the Congress.'" *Id*. at 2031 (quoting *Watkins*, 354 U.S. at 187). In addition, as the Supreme Court recently reaffirmed, "Congress has no general power to inquire into private affairs and compel disclosures," and "there is no congressional power to expose for the sake of exposure." *Id.* at 2032 (citations and internal quotation marks omitted); *see also Doe v. McMillan*, 412 U.S. 306, 330 (1973) (Douglas, J., concurring) ("[T]here is

*Ways and Means Committee's Request for the Former President's Tax Returns*

simply 'no general authority to expose the private affairs of individuals without justification in terms of the functions of Congress.'" (quoting *Watkins*, 354 U.S. at 187)).[17]

Because Congress may not authorize its agents to wield powers in excess of its own, *see Bowsher v. Synar*, 478 U.S. 714, 726 (1986), section 6103(f)(1) could not confer upon a tax committee the power to obtain otherwise confidential information that did not serve a legitimate legislative objective. Consequently, even when it is acting pursuant to section 6103(f), the Committee can only compel the Executive Branch to share information that is "related to, and in furtherance of, a legitimate task of the Congress." *Mazars*, 140 S. Ct. at 2031 (internal quotation marks omitted).

## B.

The 2019 Opinion correctly noted the need for a legitimate legislative purpose that could support the Committee's request for then-President Trump's tax returns. In evaluating whether the information sought in the April 2019 Request could serve such a purpose, however, the 2019 Opinion failed to afford the Committee the respect due to a coordinate branch of government.

Federal courts generally afford the other branches of the federal government a strong presumption of good faith. For example, courts must eschew "inquiring into 'the mental processes of administrative decisionmakers'" absent a "'strong showing of bad faith or improper behavior.'" *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573–74 (2019) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)). The Supreme Court also has explained that a "presumption of regularity" ordinarily attends "the official acts of public officers." *United States v. Chem. Found*., 272 U.S. 1, 14–15 (1926); *see also Overton Park,* 401 U.S. at 415 (explaining that a government official's decision "is entitled to a presumption of regularity"); *Reno v. Am.-Arab Dis-*

---

[17] The Court has also stated that Congress's investigative authority does not extend to "matters which are within the exclusive province of one of the other branches of the Government," *Barenblatt*, 360 U.S. at 111, and that authority is of course "subject to the limitations placed by the Constitution on governmental action, . . . [including] the Bill of Rights," *id.*, and executive privilege, but those limitations are not germane here.

45 Op. O.L.C. __ (July 30, 2021)

*crim. Comm.*, 525 U.S. 471, 489 (1999) ("[W]e have . . . requir[ed] a criminal defendant to introduce clear evidence displacing the presumption that a prosecutor has acted lawfully." (internal quotation marks omitted)). Accordingly, "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons." *Dep't of Commerce*, 139 S. Ct. at 2573. Nor may a court "set aside an agency's policymaking decision solely because it might have been influenced by political considerations[.]" *Id.*

Courts take a similar approach with respect to the actions of congressional committees, extending deference to their assertions of need for the information they seek and generously presuming a legitimate objective, even in the absence of such an assertion. In the context of evaluating the legitimacy of congressional investigatory demands, in particular, the Supreme Court has long insisted that "[w]e are bound to presume that the action of the legislative body was with a legitimate object if it is capable of being so construed." *McGrain*, 273 U.S. at 178 (quotation marks omitted); *see also id.* (concluding that "[t]he only legitimate object the Senate could have in ordering the investigation was to aid it in legislating, and we think the subject-matter was such that the presumption should be indulged that this was the real object"); *Barry v. United States ex rel. Cunningham*, 279 U.S. 597, 619 (1929) ("The presumption in favor of regularity, which applies to the proceedings of courts, cannot be denied to the proceedings of the houses of Congress, when acting upon matters within their constitutional authority.").

The Executive Branch should likewise presume that congressional agents are acting pursuant to their constitutional authority and in good faith when evaluating the constitutionality of committee requests for information. Such a presumption reflects a general principle of inter-branch comity that is applicable to interactions among all three branches. Consistent with the respect due Congress as a coordinate branch, it has been the policy of the Executive Branch long "to comply with Congressional requests for information to the fullest extent consistent with the constitutional and statutory obligations of the Executive Branch." Memorandum for the Heads of Executive Departments and Agencies from the President, *Re: Procedures Governing Responses to Congressional Requests for Information* at 1 (Nov. 4, 1982). And in doing so, the Executive routinely accepts a committee's representation about its legislative needs

22

for the information. *See, e.g.*, *Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act*, 10 Op. O.L.C. 68, 74 (1986) (reasoning that although Congress cannot second-guess the Executive's prosecutorial decisions, the Legislature has "a legitimate legislative interest in overseeing the [Department of Justice's] enforcement of the Independent Counsel Act and relevant criminal statutes and in determining whether legislative revisions to the Act should be made," and then declining to reject that justification altogether because it "would likely be deemed sufficient to meet the threshold requirement for congressional inquiry" by a court in light of "the general judicial reluctance to look behind congressional assertions of legislative purpose").

Of course, where such requests implicate the Executive Branch's own institutional interests, such as its operational needs for confidentiality or secrecy, the political branches often engage in a practice of "accommodation"—the "tradition of negotiation and compromise." *Mazars*, 140 S. Ct. at 2031. In this "dynamic process," each branch is subject to "an implicit constitutional mandate to seek optimal accommodation through a realistic evaluation of the needs of the conflicting branches in the particular fact situation." *United States v. Am. Tel. & Tel. Co.*, 567 F.2d 121, 127, 130 (D.C. Cir. 1977). The Executive Branch therefore tries to tailor its disclosures—and the conditions placed on those disclosures—to the particular needs that the legislature describes. If, however, the Executive Branch were to deny altogether the good faith of a committee's assertion of its legitimate interests, it would pretermit the accommodation process at the outset.

Accordingly, even if this case involved only a congressional subpoena, the Executive would be required to treat the Committee's stated rationale with deference and a presumption of good faith and regularity. All the more reason exists to do so here, because the Committee is requesting information pursuant to statutory authority. Unlike a subpoena, which typically is issued by a single committee, usually without a vote of either house of Congress—let alone both—section 6103(f)(1) has been approved through the bicameralism and presentment process. U.S. Const. art. I, § 7, cls. 2, 3; *see INS v. Chadha*, 462 U.S. 919, 949 (1983) (bicameralism and presentment ensure that a law "has been carefully and fully considered by the Nation's elected officials"); *id.* at 959 (remarking that the records of

45 Op. O.L.C. __ (July 30, 2021)

the Constitutional Convention and debates in the States preceding ratification reflect an "unmistakable expression of a determination that legislation by the national Congress be a step-by-step, deliberate and deliberative process"). Respect for such determinations by the political branches is reflected in the established presumption of constitutionality afforded statutes by courts and the Executive Branch alike. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 537–38 (2012) (Roberts, C.J.) ("Our permissive reading of these powers is explained in part by a general reticence to invalidate the acts of the Nation's elected leaders. Proper respect for a co-ordinate branch of the government thus requires that we strike down an Act of Congress only if the lack of constitutional authority to pass [the] act in question is clearly demonstrated." (internal quotation marks omitted)); *see also The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 128 n.13 (1996) ("[F]rom the beginning of the Republic, the executive branch has interpreted the Constitution with a due regard for the constitutional views of Congress[.]").

Section 6103(f)(1) provides an even greater reason to accord the Committee's requests a stronger presumption of good faith and regularity. The political branches have repeatedly determined over the course of the last century that the congressional tax committees should have a statutorily unlimited right of access to tax information—an authority predicated, at least in part, upon the judgment that those committees are uniquely suited to "assure explicit, deliberate, and responsible Congressional attention to the use made by its members and committees of individual tax returns."[18] Executive Branch officials should pay particular heed to this judgment.

The 2019 Opinion appears in some places to have applied a similarly deferential standard. It briefly mentioned, for example, that the April 2019 Request is entitled to "due deference and respect," 2019 Opinion at *3, without elaboration or explanation of what level of deference was due.

---

[18] *Confidentiality of Tax Return Information: Hearing Before the H. Comm. on Ways and Means*, 94th Cong. 154 (1976) (summary of a report of an Administrative Conference of the United States steering committee, explaining the Conference's subsequent recommendation to Congress (*see id.* at 157) "that the existing statutory authority . . . for disclosure by the Internal Revenue Service to the House Committee on Way and Means, the Senate Committee on Finance, and the Joint Committee on Internal Revenue Taxation, be continued").

Elsewhere, it invoked a formulation ("blinks reality," *id.* at 16) that is consistent with our approach here. Fairly read, however, the opinion applied more searching review. Indeed, it went out of its way to explain that it was deviating from the relatively deferential posture prescribed by Supreme Court precedents in cases involving congressional subpoenas. The 2019 Opinion recognized that "courts have expressed reluctance to probe congressional motivations in political disputes," yet it asserted that courts "have done so for reasons that do not apply to review by the Executive Branch." *Id.* at *23. The Supreme Court's decisions declining to engage in searching review, it claimed, "rest upon institutional constraints on the Judiciary" that militate in favor of deference to the decisions of the political branches of government"—namely, that "the federal courts are not well equipped to second-guess the action of the political branches by close scrutiny of their motivations." *Id.* at *25. By contrast, "[t]hese same limitations do not apply to the Executive Branch, which operates as a politically accountable check on the Legislative Branch." *Id.*

We believe that this argument in the 2019 Opinion was mistaken. Of course, "'a legislative choice is not subject to courtroom factfinding,'" *id.* at *25 (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993))—but neither is it subject to factfinding in the halls of the Treasury and Justice Departments. The 2019 Opinion emphasized that the Executive Branch—unlike the courts—"operates as a politically accountable check on the Legislative Branch." *Id.* It is true that the Constitution divides sovereign authority between the political branches, and that division of authority ensures that "those who administer each department" possess "the necessary constitutional means, and personal motives, to resist encroachments of the others." *The Federalist* No. 51, at 349 (James Madison) (Jacob E. Cooke ed., 1961). That rivalrous relationship, however, also can lead each branch to inappropriately discount the legitimate interests of the other. *See Mazars*, 140 S. Ct. at 2032–35 (faulting both the President and the House for failing to give adequate weight to the interests of the other). And the Judiciary is designed to be neutral and disinterested. The relative competencies and capabilities of the Judiciary and the Executive, in other words, hardly offer a reason for the latter to deviate from the presumptions and norms of deference that the courts rightly apply when assessing the justifications of the political branches.

45 Op. O.L.C. __ (July 30, 2021)

To be sure, a presumption of regularity and good faith can be overcome in exceptional circumstances. The Executive Branch, like the Judiciary, need not "blind" itself to "what [a]ll others can see and understand.'" *Mazars*, 140 S. Ct. at 2034 (quoting *Rumely*, 345 U.S. at 44). If a committee's asserted purpose truly "blinks reality," 2019 Opinion at *16, an executive agency need not credit that objective any more than a court would. *See, e.g.*, *Dep't of Commerce*, 139 S. Ct. at 2575 ("[H]ere the . . . sole stated reason . . . seems to have been contrived. . . . [W]e cannot ignore the disconnect between the decision made and the explanation given. Our review is deferential, but we are 'not required to exhibit a naiveté from which ordinary citizens are free.'") (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)). But to overcome the presumption "it must be obvious" that a congressional "committee's investigation has exceeded the bounds of legislative power." *Tenney v. Branhove*, 341 U.S. 367, 378 (1951); *see also Reno*, 525 U.S. at 489 (requiring "clear evidence" before the presumption of regularity is displaced (internal quotation marks omitted)).

Moreover, the fact that a congressional request for information might serve partisan or other political interests is generally irrelevant to assessing its constitutionality, provided the request is, in fact, in the furtherance of a legitimate legislative task—just as presidential policy decisions are not suspect simply because the President may calculate that certain decisions will redound to his or her political benefit. "[T]he motives of committee members . . . alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served." *Watkins*, 354 U.S. at 200; *see also Eastland*, 421 U.S. at 508 ("[I]n determining the legitimacy of a congressional act we do not look to the motives alleged to have prompted it."). Such mixed congressional motivations are commonplace. Congress is composed of elected members who stand for re-election. It is therefore neither unusual nor illegitimate for partisan or other political considerations to factor into Congress's work. If the mere presence of a political motivation were enough to disqualify a congressional request, the effect would be to deny Congress its authority to seek information—a result that is incompatible with the Constitution.

26

## C.

In the period between the Committee's April 2019 Request and June 2021 Request, and after issuance of this Office's 2019 Opinion, the Supreme Court decided *Trump v. Mazars*, 140 S. Ct. 2019. That case deserves special mention here because it involved congressional requests for information regarding not just any private party or government official, but the sitting President. In *Mazars*, three congressional committees had issued four subpoenas to financial institutions seeking extensive information about then-President Trump, his children, and affiliated businesses. 140 S. Ct. at 2026–28. Among the committees' explanations for their subpoenas were that the information could help Congress assess "potential legislation on money laundering, terrorist financing, and the global movement of illicit funds through the real estate market"; "banking regulation[s]"; and, more generally, "multiple laws and legislative proposals under our jurisdiction." *Id.* at 2027–29 (internal quotation marks omitted).

The Court in *Mazars* reaffirmed the breadth and importance of Congress's investigatory authority in the mine run of cases. *See, e.g., id.* at 2031 ("Without information, Congress would be shooting in the dark, unable to legislate wisely or effectively. The congressional power to obtain information is broad and indispensable. It encompasses inquiries into the administration of existing laws, studies of proposed laws, and surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them." (internal citations and quotation marks omitted)); *id.* at 2033 ("It is the proper duty of a representative body to look diligently into every affair of government and to talk much about what it sees." (internal quotation marks omitted)). The Court further held, however, that the deference a court must ordinarily afford a congressional subpoena should be tempered in a case involving a sitting president. In such cases, the Court explained, "[a] balanced approach is necessary," one in which "courts must perform a careful analysis that takes adequate account of the separation of powers principles at stake, including both the significant legislative interests of Congress and the unique position of the President." *Id.* at 2035 (internal quotation marks omitted). The Court expressed concern that a congressional demand involving the President, even as to his personal rather than official activities, "may aim to harass the President or render him 'complaisan[t] to the humors of the Legislature,'" and thereby "'exert an imperious controul'

45 Op. O.L.C. __ (July 30, 2021)

over the Executive Branch." *Id.* at 2034 (quoting *The Federalist* No. 71, at 483–84 (Alexander Hamilton)).

Accordingly, the Court announced that certain "special considerations" should inform the analysis in congressional subpoena cases involving a sitting President, including "whether the asserted legislative purpose warrants the significant step of involving the President and his papers"; whether "other sources could reasonably provide Congress the information it needs in light of its particular legislative objective"; whether the legislative subpoena is "broader than reasonably necessary to support Congress's legislative objective"; how "detailed and substantial" is the evidence of Congress's legislative purpose"; and how extensive are the "burdens imposed on the President by [the] subpoena." *Id.* at 2035–36. These considerations would impose a higher burden on Congress when the personal information it is seeking pursuant to a subpoena belongs to the President.

We do not understand *Mazars* to alter the legal framework for reviewing the June 2021 Request. To begin, the Committee made the June 2021 Request not simply pursuant to a subpoena, but pursuant to a statute that embodies the considered judgment of the political branches going back nearly a century about the access that should be afforded the tax committees. More to the point, the June 2021 Request seeks the tax information, not of a sitting President, but of a former President. This distinction greatly mitigates the Court's concerns about Congress using its investigatory power to exert control over the President—to "render him complaisan[t] to the humors of the Legislature." *Id.* at 2034 (internal quotation marks omitted). Similarly, the June 2021 Request does not threaten an "'unnecessary intrusion into the operation of the Office of the President'" or to impose "burdens on the President's time and attention." *Id.* at 2036 (quoting *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 387 (2004)).

Even if separation of powers considerations continue to inform analysis of the June 2021 Request, such considerations would be much less pronounced after a President leaves office and returns to life as a private citizen. *Cf. A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222, 246–57 (2000) (explaining that although the burdens on the presidency preclude indictment or trial of a sitting President, such an immunity does not preclude prosecution once the President leaves office, which "would generally result in the delay, but

28

not the forbearance, of any criminal trial"). This is especially true where, as here, the request does not seek disclosure of privileged presidential communications or seek to impose costs on the President for acts taken in his official capacity. *See Clinton v. Jones*, 520 U.S. 681, 692–95 (1997) (distinguishing *Nixon v. Fitzgerald*, 457 U.S. 731 (1982)).

The Court in *Mazars* also noted a concern about Congress's using the President as a "case study" for "general legislation." 140 S. Ct. at 2036 (internal quotation marks omitted). Here, too, however, we think that any such concern would be misplaced in examining the legitimacy of the June 2021 Request. As explained above, in *Mazars*, the committees contended that their pursuit of extensive information about a single individual and his family and affiliated businesses was "related to potential legislation on money laundering, terrorist financing, and the global movement of illicit funds through the real estate market"; a "review [of] banking regulation[s]"; and, generally, a "review of multiple laws and legislative proposals under our jurisdiction." *Id.* at 2027–29. Such a dragnet request in aid of generally applicable legislative reforms is different not only in degree, but in kind, from the June 2021 Request. Most important, the Committee's interests here are not about "general" topics distinct from the presidency, but about an auditing program specific to the presidency and oversight concerns particular to President Trump. *See infra* Part III.A, B.

### III.

The June 2021 Request satisfies the requirements of section 6103(f)(1), which affords the tax committees broad access to tax information, requiring only that a chairman personally make the request for the information in writing. The June 2021 Request goes further: Although the statute does not require it, Chairman Neal has articulated in some detail the Committee's reasons for requesting the information, as an "accommodation to the Department of the Treasury and the IRS." June 2021 Request at 1.

As we now explain, the subjects the Chairman has invoked are ones upon which legislation might be had; the information requested is relevant to informing Congress about them; and the Committee has been authorized to seek information in support of each of the Committee's stated objectives for the information. And the Executive Branch must accept the Chairman's stated rationales as genuine notwithstanding statements by

45 Op. O.L.C. __ (July 30, 2021)

some legislators that might give rise to a supposition that they may have other motives for obtaining the information.

## A.

The principal interest Chairman Neal invoked in his June 2021 Request is that the Committee has "serious concerns about the IRS's full and fair administration of the tax laws with respect to a President and believes legislation may be needed in this area." June 2021 Request at 2. The Committee has a particular interest in the functioning of the mandatory audit program for presidential tax returns, which the IRS created in 1977. *See supra* Part I.E; I.R.M. § 3.28.3 (2020). The June 2021 Request elaborates on the nature of this interest, describing the Committee's concern that the IRS's program may lack "adequate safeguards" against "improper influence by a President," especially given that the identity of the revenue agent assigned to a presidential audit "is known by the President and the President's representatives, who communicate directly with the agent without supervision." *Id.* at 2–3; *see also id.* at 2 ("[The Committee . . . seeks to explore legislation intended to ensure that IRS employees in any way involved in a President's audit are protected in the course of their work[.]"). More broadly, "[t]he Committee has reason to believe that the mandatory audit program is not advancing the purpose for which it was created, which may require Congress to act through legislation." *Id.* The Chairman further explained that the particular information the Committee has requested—including any audit files—is "integral to the Committee's inquiry into the mandatory audit program" and may help the Committee determine "(i) whether IRS agents have been able to operate free from improper interference by a President or his representatives; (ii) whether agents have looked at ongoing audits that predate a President's term in office; (iii) whether agents have reviewed underlying business activities, especially activities involving many interrelated entities and income from and deductions related to foreign sources; (iv) whether agents have had access to the necessary books and records to substantiate amounts on the tax return; (v) whether there have been any examination findings or adjustments and how a President has responded to such findings or adjustments; and (vi) whether agents have had access to the necessary resources to undertake an exhaustive review of a complex taxpayer on an annual basis." *Id.* at 3.

*Ways and Means Committee's Request for the Former President's Tax Returns*

These matters, and the presidential audit program more generally, clearly are subjects on which "legislation may be had." *Eastland*, 421 U.S. at 506; *see also McGrain*, 273 U.S. at 177. Congress has the authority "[t]o lay and collect Taxes," U.S. Const. art. I, § 8, cl. 1, and the tax laws and the IRS are themselves creations of statutes. Congress also has expansive authority to enact "all Laws which shall be necessary and proper for carrying into Execution" its constitutional authorities, *id.* art. I, § 8, cl. 18, and, accordingly, to determine how the IRS should use appropriated funds to audit presidential tax returns, *id.* art. I, § 9, cl. 7. *See also id.* art. I, § 8, cl. 1.

The 2019 Opinion did not contend otherwise. Indeed, it acknowledged that "a review by the Committee of the IRS's performance of its duties would appear, on its face, to be an example of routine oversight" within Congress's authority. 2019 Opinion at *27. Instead, the 2019 Opinion argued that the audit rationale "blinks reality" and is "pretextual," in that "[n]o one could reasonably believe that the Committee seeks six years of President Trump's tax returns because of a newly discovered interest in legislating on the presidential-audit process." *Id.* at *16–17. The 2019 Opinion stated three bases for its refusal to credit the Chairman's earlier presidential audit program justification. We question whether these objections were well-taken at the time. In any event, we now conclude that none offers a basis for calling into question the auditing rationale described in the Chairman's new June 2021 Request.

First, the 2019 Opinion asserted that the Chairman had not focused sufficiently on seeking records about the audit processes themselves—"the actual IRS documents that would provide the best evidence of its policies and procedures relating to presidential audits." *Id.* at *27. "The Committee's lack of interest in the IRS's audit policies and procedures, or in the audits themselves, speaks volumes." *Id.* at *28.[19] The June 2021 Request, however, asks for "[a]ll administrative files (workpapers, affidavits, etc.)"

---

[19] In fact, the Committee's April 2019 Request did seek the "administrative files" accompanying the President's tax returns, which would include such audit-related information. The 2019 Opinion also noted that Chairman Neal's accompanying "press release" referred only to the President's tax returns, and not to the IRS's administrative files. *Id.* at *27–28. But the contents of an elected official's press release describing a formal request are not grounds for disregarding the contents of that request itself for purposes of assessing its constitutional sufficiency.

31

45 Op. O.L.C. __ (July 30, 2021)

associated with each requested return, 2021 Request at 5, and it explains in detail how review of those files could assist the Committee's inquiry, *see id.* at 3. That more than suffices to demonstrate that the Committee is interested in how the IRS is treating the underlying tax returns and not merely in the information contained in the returns themselves.

The second basis the 2019 Opinion offered for doubting the Chairman's stated rationale was that only two of the six years of records that Chairman Neal requested corresponded to President Trump's tenure in office. *Id.* at *28. This chronological mismatch, the 2019 Opinion stated, betrayed a lack of any "connection at all with the IRS audit procedures supposedly under investigation." *Id.* It is true that the "mandatory audit procedures" governing the IRS's presidential audit program apply to returns filed while a President is in office. July 2021 Schaffer Letter at 2 n.7; *see* I.R.M. § 3.28.3.5(1) (2020) (providing instructions to govern the IRS "when processing the individual tax returns and accounts of the President and Vice President of the United States in office at the time of filing"). The June 2021 Request asks for tax information going back only to the tax year 2015. It therefore covers the returns that former President Trump presumably filed during his four years in office, plus one year on either side of his presidency. This period is well-aligned with the Committee's interest in the presidential tax audit program.

The scope of a mandatory presidential audit "can be expanded to include prior year and related returns" if "risk protocols" warrant. Decl. of Sunita Lough ¶ 39, *Comm. on Ways & Means v. U.S. Dep't of Treasury*, No. 19-cv-1974 (D.D.C. Sept. 6, 2019), ECF No. 44-4. The Committee therefore could believe that the IRS's audit of former President Trump's returns might involve examination of returns filed shortly before he took office. And even if it turns out that, for example, the IRS's presidential audit did not include review of one or two of the returns the Committee is seeking, the Committee does not have knowledge of the scope of the audit. *See Eastland*, 421 U.S. at 509 ("The very nature of the investigative function—like any research—is that it takes the searchers up some 'blind alleys' and into nonproductive enterprises. To be a valid legislative inquiry there need be no predictable end result.").

Finally, the 2019 Opinion reasoned that "the Committee's exclusive focus on a single taxpayer, President Trump, belies its stated interest in investigating an IRS audit program that has applied to all Presidents and

Vice Presidents since 1977." 2019 Opinion at *28. Armed with information about only one person and related businesses, the 2019 Opinion argued, the Committee would not "even begin to be able to assess whether the IRS's policies and procedures are being applied in an evenhanded manner in the presidential-audit program." *Id.* at *29.

As the Chairman notes in his June 2021 Request, it is reasonable for the Committee to focus on former President Trump's returns, just as the Joint Committee on Taxation's predecessor asked only for the IRS's audit of President Nixon's returns in 1973 when there was reason to believe that the auditing process might have been deficient in that particular case[20]:

> Knowing only what has been reported publicly, there is ample reason to question whether the mandatory audit program has functioned as intended when the taxpayer's history is as complex as former President Trump's. Simply put, it does not appear that the IRM provisions concerning the mandatory Presidential audit are sufficiently robust for a President who: (i) has inordinately large and complex returns; (ii) controls hundreds of business entities, some of which receive income from foreign sources; (iii) raises issues of financial conflicts of interest; (iv) takes aggressive tax positions to minimize his liability; (v) is under continuous audit by the IRS; (vi) has a $73 million refund under review; and (vii) openly attacks the IRS and the very IRS employees conducting the mandatory audit. To be sure that the mandatory audit program will work for all future President-taxpayers (including those with similarly complex taxes), we must see how the program fared under the exceedingly challenging circumstances presented by former President Trump.

June 2021 Request at 6 (internal quotation marks omitted). This explanation, which relates to questions about how the presidential auditing pro-

---

[20] *See* Staff of Joint Comm. on Internal Revenue Taxation, *Examination of President Nixon's Tax Returns for 1969 Through 1972*, S. Rep. No. 93-768 (1974); *see also* Letter for Richard E. Neal, Chairman, Committee on Ways and Means, U.S. House of Representatives, from Thomas A. Barthold, Chief of Staff, Joint Committee on Taxation at 1 (July 23, 2019), *reprinted in* H.R. Rep. No. 116-186, at 10 (2019) (explaining that although President Nixon voluntarily released some of his tax returns, the committee also received confidential return information directly from the IRS about Nixon and his daughter and son-in-law, which the Committee thereafter used to inform its investigation and eventual report on Nixon's tax deficiencies).

45 Op. O.L.C. __ (July 30, 2021)

cess works under conditions of stress and with particularly complex tax returns, suffices to explain the Committee's focus, especially given the presumption of legitimacy and good faith that is due the Committee.

## B.

In addition to the stated interest in the presidential audit program, the June 2021 Request asserts that "former President Trump's tax returns could reveal hidden business entanglements raising tax law and other issues, including conflicts of interest, affecting proper execution of the former President's responsibilities," and that an "independent examination" of those documents "might also show foreign financial influences on former President Trump that could inform relevant congressional legislation." June 2021 Request at 4.[21] These objectives are independently sufficient to justify the request for the former President's tax records.

An investigation into possible presidential conflicts of interest or foreign influence and leverage involves "a subject on which 'legislation could be had.'" *Eastland*, 421 U.S. at 506 (*quoting McGrain*, 273 U.S. at 177). Such an investigation might, for example, inform debate over proposed legislation to require more extensive or regular financial or tax return disclosure by Presidents and presidential candidates.[22] Even if such an investigation ultimately did not produce statutory proposals, Congress and the public certainly have a compelling interest in knowing whether the President has accepted foreign emoluments or otherwise been influenced by foreign nations, and whether his or her conduct in office might be influenced by personal economic entanglements. "The public is, of

_____

[21] Similarly, in its filings in the litigation concerning the April 2019 Request and related subpoenas, the Committee described its interest in knowing "whether the President has business entanglements that might create conflicts of interest or otherwise influence his proper execution of his responsibilities." Pl.'s Br. Summ. J. 41, *Comm. on Ways & Means v. Dep't of the Treasury*, No. 19-cv-1974 (D.D.C. Aug. 20, 2019), ECF No. 29-2.

[22] Laws of this type would hardly be unprecedented. See, for example, the Ethics in Government Act, 5 U.S.C. app. §§ 101(a) & (f)(1), 102 (requiring the President to file periodic financial disclosures) and the Foreign Gifts and Decorations Act, 5 U.S.C. § 7342(a)(1)(E) & (c)(3) (requiring the President to report foreign gifts), both of which inform Congress and the public of possible risks of undue influence on the President's actions. *See also* H.R. 1, 117th Cong. § 10001 (2021) (proposed legislation requiring presidents, vice presidents, and candidates for those offices to disclose individual tax returns for the ten most recent tax years).

course, entitled to be informed concerning the workings of its govern-ment," *Watkins*, 354 U.S. at 200—and that includes knowing whether government officials are faithfully performing their duties on behalf of the Nation or whether they are, instead, unduly influenced by self-interest.[23] A counterintelligence investigation concerning foreign influence on federal officials, in particular, is certainly a legitimate congressional task.[24]

Our 2019 Opinion acknowledged that such concerns might have been among the reasons that Congress wished to examine then-President Trump's tax information. 2019 Opinion at *11 & n.19, *29. Yet that opinion largely disregarded these rationales, remarking only that "many" of them "would fall outside the jurisdiction of the Ways and Means Committee, which is the only House committee that could release the returns to the public." *Id.* at *29. That objection was misplaced for two reasons.

For one thing, the Committee did have "jurisdiction" under House Rules with respect to "[a]ll bills, resolutions, and other matters relating to . . . [r]evenue measures generally." H.R. Rules, 116th Cong., Rule X, cl. 1(t)(3) (Jan. 11, 2019). That continues to be true today. H.R. Rules,

---

[23] *See also id.* at 200 n.33 (reaffirming "the power of the Congress to inquire into and publicize corruption, maladministration or inefficiency in agencies of the Government"— an "'informing function'" that Congress has "assiduously performed" "[f]rom the earliest times in its history" (quoting Woodrow Wilson, *Congressional Government* 303 (1885)); *Nixon v. Fitzgerald*, 457 U.S. 731, 757 (1982) ("Vigilant oversight by Congress also may serve to deter Presidential abuses of office[.]"); *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 452–53 (1977) (upholding a law requiring the President to preserve official records in part because it served the "substantial interest[]" of protecting "the American people's ability to reconstruct and come to terms with their history").

[24] For example, the House Permanent Select Committee on Intelligence ("HPSCI") has been investigating the possible "counterintelligence risks arising from foreign financial conflicts of interest [involving the former President] and the possibility of foreign finan-cial leverage" involving former President Trump. *See* Memorandum for HPSCI Members from Adam Schiff, Chairman, HPSCI*, Re: Update on the Committee's Investigation of Counterintelligence Risks Arising from President Trump's Foreign Financial Ties* at 3, 10, 16 (Aug. 25, 2020), https://perma.cc/JR8G-ZHY4 (explaining that HPCSI is seeking information on the former President's foreign financial ties in order to, inter alia, identify counterintelligence risks, including the possibility that "particular foreign governments, entities, or individuals have exploited, or could potentially exploit, any leverage over the President that such financial ties provide," and to "inform [HPSCI's] consideration of potential legislation to address these threats").

45 Op. O.L.C. __ (July 30, 2021)

117th Cong., Rule X, cl. 1(t)(3) (Feb. 2, 2021). Such jurisdiction includes all "matters relating to" tax returns. *Id.* The 2019 Opinion ignored the possibility that evidence of foreign financial influence or conflicts of interest might lead to legislation requiring future Presidents and presidential candidates to make their tax returns public. Indeed, H.R. 1, which passed the House in March and is currently pending before the Senate, would require such action. H.R. 1, 117th Cong., § 10001. Moreover, it is generally not the proper business of the Executive Branch to police whether a House committee adheres to jurisdictional limits imposed by House rules. That is an internal concern for the House itself to attend to, as it sees fit. *Cf.* U.S. Const. art. I, § 5, cl. 2 ("Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behavior, and, with the Concurrence of two thirds, expel a Member.").

To be sure, on rare occasions the other two branches have questioned a congressional committee's jurisdiction (under the chamber's rules or an authorizing resolution) when the committee has tried to compel production of evidence or testimony. When they have done so, however, it has been in order to ascertain whether the house of Congress has authorized the committee to exercise that house's own investigative powers—i.e., whether the house has delegated a particular aspect of its oversight authorities to the committee in question. *See, e.g.*, *Rumely*, 345 U.S. at 44–45; *Watkins*, 354 U.S. at 200–01. Such an inquiry, however, is simply inapposite here, when the Committee is acting pursuant to section 6103(f)(1), because that statute provides the Committee with the authority to "serv[e] as the representative[] of the parent assembly in collecting information for a legislative purpose." *Id.* at 200. No additional House resolution or jurisdictional rule is needed.[25] And because it is within

_____

[25] *See* Letter for William E. Simon, Secretary, Department of the Treasury, from the Attorney General at 6–8 (May 25, 1974) (concluding that the metes and bounds of the pre-1976 version of section 6103 superseded any "jurisdictional" authority that a non-tax committee may have to demand Treasury's production of tax returns under its chamber's rules or non-section 6103-based resolutions). Moreover, that authority of the Committee is legitimate even if the Committee might consider sharing some of the information with the House as a whole so that it may be used by another committee that has a particularized interest in it. *See id.* at 7 & n.4 (explaining that if the House Judiciary Committee wished to obtain President Nixon's tax records at issue there, it would have to do so by one of the means then specified in the executive branch rules promulgated pursuant to the version of section 6103 then in place or potentially "by means of one of the specified [tax] commit-

*Ways and Means Committee's Request for the Former President's Tax Returns*

Congress's power to investigate possible conflicts of interest and foreign influence concerning federal officials, seeking information that could be germane to such an investigation is an alternative, adequate justification for the production of the tax information the Committee has requested.

## C.

This Office's 2019 Opinion ultimately rested upon the assertion that the Committee was disingenuous about its true objective in seeking President Trump's tax information and that the Committee's April 2019 Request instead appeared to be designed "to accomplish the Chairman's long-standing and avowed goal . . . 'to obtain and expose the President's tax returns.'" 2019 Opinion at *29 (quoting Letter for Richard E. Neal, Chairman, Committee on Ways and Means, U.S. House of Representatives, from Steven T. Mnuchin, Secretary of the Treasury at 4 (Apr. 23, 2019) ("Mnuchin Letter")). In support of this view, the opinion cited statements made in 2017 by Democratic members of the Committee, including Representative Neal (at the time the Ranking Member), urging the Committee to use its authority under section 6103(f) "to obtain President Trump's tax returns and make them available to the public." 2019 Opinion at *9 (quoting H.R. Rep. No. 115-73, at 8 (2017) (dissenting views)). Based upon these earlier statements, the opinion concluded that "[t]here is one and only one 'predictable end result' of the Committee's inquiry: the public exposure of the President's tax returns." *Id.* at *30 (quoting Letter for Charles P. Rettig, Commissioner, Internal Revenue Service, from Richard E. Neal, Chairman, Committee on Ways and Means, U.S. House of Representatives at 2 (Apr. 13, 2019)). And that objective, the opinion further concluded, was not within Congress's constitutional authority because "Congress may not pursue public disclosure for its own sake." *Id.* at *31; *see also id.* at *14 (describing an "'effort to expose the President's tax returns for the sake of exposure'" (quoting Mnuchin Letter at 3)).

There are two problems with this analysis. First, if the Committee chooses to publicly disclose any of the tax information in a report to the House (which is the method that section 6103(f)(4)(A) permits), presum-

---

tees," such as the Joint Committee on Taxation, which had authority to obtain the records pursuant to its authority under section 6103).

ably it would not do so purely "for the sake of exposure." Rather, it would do so in order to inform both the House and the American people of problems (or the lack thereof) within the government, or concerning its elected officials—"a subject on which legislation could be had." *Mazars*, 140 S. Ct. at 2031 (internal quotation marks omitted). Such congressional reports and investigations are common.[26] One such case even involved an examination of a President's apparent failure to comply with the tax laws and the inadequacies of the IRS's audit of that President. *See* Staff of Joint Committee on Internal Revenue Taxation, *Examination of President Nixon's Tax Returns for 1969 Through 1972*, S. Rep. No. 93-768 (1974).

The 2019 Opinion itself affirmed that Congress has such an investigatory function. 2019 Opinion at *18 ("Congress's investigative authority also 'comprehends probes into departments of the Federal Government to expose corruption, inefficiency, or waste'" (quoting *Watkins*, 354 U.S. at 187)). *See also Mazars*, 140 S. Ct. at 2033 ("'It is the proper duty of a representative body to look diligently into every affair of government and to talk much about what it sees. It is meant to be the eyes and the voice, and to embody the wisdom and will of its constituents.'" (quoting *Rumely*, 345 U.S. at 43)). Indeed, the 2019 Opinion apparently did not take issue with the propriety of the interest of some legislators to "show 'what the Russians have on Donald Trump,' reveal a potential 'Chinese connection,' . . . [or] expose any alleged emoluments received from foreign governments." 2019 Opinion at *11.[27]

Second, although it is possible that some members of Congress might hope that former President Trump's tax returns are published solely in order to embarrass him or to "expose for the sake of exposure," such

---

[26] The most-well known examples include investigations of the Teapot Dome scandal, Watergate, Whitewater, the Benghazi attacks, and (currently) the events of January 6, 2021.

[27] The 2019 Opinion elsewhere stated that "'Congress's legislative function does not imply a freestanding authority to gather information for the sole purpose of informing the American people.'" 2019 Opinion at *19 (quoting *Assertion of Executive Privilege over Documents Generated in Response to Congressional Investigation into Operation Fast and Furious*, 36 Op. O.L.C. __, at *7 (June 19, 2012) (Holder, Att'y Gen.)). There is no need for us to examine this question because here, as in virtually all cases involving congressional investigations of government officials, Congress is not purporting to exercise any such "freestanding" authority. It is instead acting to inform both itself and the public with respect to matters on which legislation can be, and has been, considered and enacted.

*Ways and Means Committee's Request for the Former President's Tax Returns*

individuals' motives would not serve to invalidate the Committee's request. *See Barenblatt*, 360 U.S. at 133 (explaining that although "'there is no congressional power to expose for the sake of exposure,'" the motives of committee members alone "would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served"") (quoting *Watkins*, 354 U.S. at 200). The Committee's June 2021 Request plainly serves legitimate legislative objectives, even if some individual legislators might have other reasons for wanting access to the information.

We cannot know where receipt of the requested tax information will take the Committee, any more than the Committee itself can predict what it will find or determine. After reviewing and analyzing the information, it will be squarely within the Committee's responsibility to decide whether or not to include some of that information in a report to the full House that might be available to the public, *see* 26 U.S.C. § 6103(f)(4)(A). Particularly in light of section 6103(f)(1), the respect due a co-equal branch of government requires that we presume the Committee will handle the tax information it receives with sensitivity to taxpayer privacy concerns and therefore will include in such a report only the information it believes appropriate for the particular congressional task at hand.

## IV.

For the foregoing reasons, we conclude that the Secretary must comply with the Ways and Means Committee's June 16, 2021 request pursuant to 26 U.S.C. § 6103(f)(1) to furnish the Committee with the specified tax returns and related tax information.

DAWN JOHNSEN
*Acting Assistant Attorney General*
*Office of Legal Counsel*