**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON WAYS & MEANS,
  UNITED STATES HOUSE OF
  REPRESENTATIVES,

       *Plaintiff-Counterdefendant*,

       v.

UNITED STATES DEPARTMENT
  OF THE TREASURY, *et. al.*,

       *Defendants-Crossdefendants*,

       v.

DONALD J. TRUMP, *et al.*,

       *Intervenor-Defendants-
       Counterclaimants-
       Crossclaimants.*

No. 1:19-cv-1974 (TNM)

**MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF CROSS-DEFENDANTS' MOTION TO DISMISS
INTERVENOR-DEFENDANTS' AMENDED CROSS-CLAIMS**

Date:  October 12, 2021

BRIAN D. NETTER
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director

ELIZABETH J. SHAPIRO
Deputy Director

JAMES J. GILLIGAN
Special Litigation Counsel

SERENA M. ORLOFF
Trial Attorney

STEVEN A. MYERS
Senior Trial Counsel

CRISTEN C. HANDLEY
Trial Attorney

JULIA A HEIMAN
Senior Counsel

U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C.  20044
Telephone: (202) 514-3358
E-mail:   james.gilligan@usdoj.gov

*Counsel for Defendants-Crossdefendants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................iv

INTRODUCTION ...................................................................................................................1

BACKGROUND .....................................................................................................................4

I.   STATUTORY BACKGROUND...........................................................................................4

   A.   History of Section 6103 of the Tax Code.............................................................4

   B.   The Current Framework .......................................................................................5

II.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY ...................................................6

   A.   The Committee's 2019 Request for the Trump Parties' Tax Information...........6

   B.   The Committee's Suit Against Defendants ..........................................................8

   C.   The Committee's 2021 Request for the Trump Parties' Tax Information..........9

   D.   The Trump Parties' Claims Against Defendants and the Committee..................14

ARGUMENT.........................................................................................................................15

I.   AMENDED CROSS-CLAIMS I AND II FAIL BECAUSE THE LEGISLATIVE
     PURPOSES OF THE COMMITTEE'S REQUEST ARE VALID ON THEIR FACE...........15

   A.   Congress's Power of Inquiry and the "Legitimate Legislative Purpose" Requirement....15

   B.   The Committee's Stated Legislative Purposes Are Legitimate.............................16

   C.   Amended Cross-Claim I Fails as a Matter of Law Because the Committee Has Not
        Sought the Information Solely or Primarily to Expose Private Matters. ...........19

        1.   The Trump Parties' Claims of Pretext Fail as a Matter of Law. ...................19

        2.   The Trump Parties' Allegations Do Not in any Event Show Pretext............22

   D.   Amended Cross-Claim II Fails as a Matter of Law Because the Committee Has
        Not Sought Information Solely or Primarily for Law Enforcement Purposes.................23

II.  AMENDED CROSS-CLAIM III SHOULD BE DISMISSED BECAUSE THE
     COMMITTEE'S REQUEST IS REASONABLY RELATED TO ENACTMENT
     OF VALID LEGISLATION WITHIN THE COMMITTEE'S JURISDICTION. ...................24

   A.   The Presidential Audit Program Is a Subject on Which Valid Legislation May
        Be Had . ...............................................................................................................25

   B.   The Committee's 2021 Request Is Reasonably Related to Its Inquiry Concerning
        the Presidential Audit Program. ............................................................................26

C. The Committee's Request Is Also Pertinent to "Other Contemplated Laws," and Within the Committee's Jurisdiction ..................................................29

III. AMENDED CROSS-CLAIM IV FAILS BECAUSE *MAZARS* DOES NOT APPLY TO THE COMMITTEE'S 2021 REQUEST, AND EVEN IT IF DID, ANY REVIEW UNDER *MAZARS* IS SATISFIED. ..................................................30

A. *Mazars* Is Inapplicable on Its Terms. ..................................................30

B. The 2021 Request Does Not Violate *Mazars*. ..................................................33

1. The Committee's Investigation Warrants the Step of Seeking President Trump's Tax Returns. ..................................................33

2. The Request Is Not Broader than Necessary. ..................................................35

3. The Committee Has Provided Detailed and Substantial Evidence of Its Needs. ..................................................36

4. The Committee's Legislative Purposes Are Not Outweighed by Executive  Branch Interests. ..................................................37

IV. THE TRUMP PARTIES' CHALLENGES FOCUSED ON 6103(F) IN AMENDED CROSS-CLAIMS I AND V FAIL, BECAUSE SECTION 6103(F) DOES NOT EXCLUDE A FORMER PRESIDENT'S INFORMATION FROM ITS SCOPE, AND BECAUSE SECTION 6103(F) IS PLAINLY CONSTITUTIONAL ..................................................39

A. Section 6103(f) Authorizes the Committee's Request. ..................................................39

B. Section 6103(f) is Constitutional. ..................................................41

V. AMENDED CROSS-CLAIM VI STATES NO ACTIONABLE FIRST AMENDMENT VIOLATION. ..................................................42

A. Amended Cross-Claim VI Fails To State a Claim of First Amendment Discrimination or Retaliation by Defendants—for Lack of Causation, and Otherwise. ..................................................42

B. Assigning Implausibly Pled Motives of Retaliation and Discrimination to Committee Members Furnishes No Ground on Which to Invalidate the 2021 Request ..................................................45

1. The Court may not scrutinize Committee members' motives, even on First Amendment grounds. ..................................................45

2. Amended Cross-Claim VI does not plausibly allege retaliatory motive by the Committee. ..................................................47

VI. AMENDED CROSS-CLAIM VII IS UNRIPE AND FAILS TO STATE A SEPARATION-OF-POWERS CLAIM. ..................................................48

VII. AMENDED CROSS-CAIM VIII DOES NOT STATE A VIABLE DUE PROCESS CLAIM. ..................................................51

A. The Court Lacks Jurisdiction to Consider Amended Cross-Claim VIII Because It Is Neither Constitutionally Nor Prudentially Ripe. ..................................................51

B.   Amended Cross-Claim VIII Also Fails Because Precedent Establishes that Congress May Lawfully Examine—and Even Hold Hearings on—the Same Information as that at Issue in an Ongoing Administrative Matter. ................................................................. 54

CONCLUSION .............................................................................................................................. 55

# TABLE OF AUTHORITIES

## CASES

*Abbot Labs. v. Gardner,*
  387 U.S. 136 (1967) ................................................................................................ 53

*Arizona v. California,*
  283 U.S. 423 (1931) ................................................................................................ 20

*Armstrong v. Bush,*
  924 F.2d 282 (D.C. Cir. 1991) .......................................................................... 39, 40

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ...................................................................................... 43, 44, 45, 47

*Askins v. Dist. of Columbia,*
  877 F.2d 94 (D.C. Cir. 1989) ................................................................................ 54

*AT&T Corp. v. Fed. Commc'ns Comm'n,*
  349 F.3d 692 (D.C. Cir. 2003) .............................................................................. 54

*ATX, Inc. v. U.S. Dep't of the Treasury,*
  41 F.3d 1522 (D.C. Cir. 1994) ....................................................................... *passim*

*Banneker Ventures, LLC v. Graham,*
  798 F.3d 1119 (D.C. Cir. 2015) ............................................................................ 45

*Barenblatt v. United States,*
  360 U.S. 109 (1959) ...................................................................................... 1, 20, 25, 46

*Barry v. United States ex rel. Cunningham,*
  279 U.S. 597 (1929) .......................................................................................... 16, 17

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................................................................ 44

*Buckley v. Valeo,*
  424 U.S. 1 (1976) .................................................................................................... 26

*Cook v. FDA,*
  733 F.3d 1 (D.C. Cir. 2013) .................................................................................. 26

*Crawford-El v. Britton,*
  523 U.S. 574 (1998) ................................................................................................ 43

*Daugherty v. Sheer,*
  891 F.3d 386 (D.C. Cir. 2018) .............................................................................. 43

*Doe v. Dist. of Columbia,*
  796 F.3d 96 (D.C. Cir. 2015) ................................................................................ 43

*Eastland v. U.S. Servicemen's Fund,*
  421 U.S. 491 (1975) ........................................................................................ *passim*

*Elec. Privacy Info. Ctr. v. IRS,*
    910 F.3d 1232 (D.C. Cir. 2018) .................................................................... 6

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ........................................................................... 39, 41

*Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.,*
    561 U.S. 477 (2010) ................................................................................ 45

*FTC v. Owens-Corning Fiberglas Corp.,*
    626 F.2d 966 (D.C. Cir. 1980) ............................................................... 16

*Hartman v. Moore,*
    547 U.S. 250 (2006) ................................................................................ 43

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ................................................................................ 26

*Hourani v. Mirtchev,*
    796 F.3d 1 (D.C. Cir. 2015) ................................................................... 48

*Hutcheson v. United States,*
    369 U.S. 599 (1962) ................................................................................ 24

*In re Domestic Airline Travel Antitrust Litig.,*
    221 F. Supp. 3d 46 (D.D.C. 2016) ......................................................... 45

*In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig.,*
    720 F.3d 354 (D.C. Cir. 2013) ............................................................... 52

*INS v. Chadha,*
    462 U.S. 919 (1983) ................................................................................ 51

*Koniag, Inc. v. Andrus,*
    580 F.2d 601 (D.C. Cir. 1978) ........................................................... 55, 56

*McGrain v. Daugherty,*
    273 U.S. 135 (1927) ......................................................................... *passim*

*McPhaul v. United States,*
    364 U.S. 372 (1960) ........................................................................... 25, 27

*Nat'l Park Hospitality Ass'n v. Dep't of Interior,*
    538 U.S. 803 (2003) ................................................................................ 54

*Nat'l Wildlife Found. v. EPA,*
    980 F.2d 765 (D.C Cir. 1992) ................................................................ 26

*Nieves v. Bartlett,*
    139 S. Ct. 1715 (2019) ............................................................................ 42

*Nixon v. Administrator of General Services,*
    433 U.S. 425 (1977) .............................................................. 26, 33, 38, 51

*Nurriddin v. Bolden,*
    818 F.3d 751 (D.C. Cir. 2016) ............................................................... 49

*Patton Boggs LLP v. Chevron Corp.*,
    683 F.3d 397 (D.C. Cir. 2012) ................................................................ 48

*Peter Kiewit Sons' Co. v. U.S. Army Corps of Eng'rs*,
    714 F.2d 163 (D.C. Cir. 1983) ........................................................ 52, 53

*Pillsbury Co. v. FTC*,
    354 F.2d 952 (5th Cir 1966) ................................................................ 55

*Renne v. Geary*,
    501 U.S. 312 (1991) ............................................................................ 52

*Salerno v. United States*,
    481 U.S. 739 (1987) ............................................................................ 42

*Scahill v. Dist. of Columbia*,
    909 F.3d 1177 (D.C. Cir. 2018) .......................................................... 43

*Schaghticoke Tribal Nation v. Kempthorne*,
    587 F. Supp. 2d 389 (D. Conn. 2008) ............................................ 49, 55

*Shelton v. United States*,
    404 F.2d 1292 (D.C. Cir. 1968) .......................................................... 20

*Sinclair v. United States*,
    279 U.S. 263 (1929), *overruled on other grounds, United States v. Gaudin*,
    515 U.S. 506 (1995) ................................................................ 22, 23, 24

*Tax Analysts v. IRS*,
    117 F.3d 607 (D.C. Cir. 1997) ......................................................... 6, 33

*Tenney v. Brandhove*,
    341 U.S. 367 (1951) ................................................................ 20, 44, 48

*Texas v. United States*,
    523 U.S. 296 (1999) ........................................................................ 49, 53

*Townsend v. United States*,
    95 F.2d 352 (D.C. Cir. 1938) .............................................................. 16

*Trump v. Mazars USA, LLP*,
    140 S. Ct. 2019 (2020) ................................................................ *passim*

*Trump v. Mazars*,
    2021 WL 3602683 (D.D.C. Aug. 11, 2021) .................................. *passim*

*Trump v. Mazars USA, LLP*,
    940 F.3d 710 (D.C. Cir. 2019) .................................................... *passim*

*Trump v. Mazars USA, LLP*,
    2020 WL 528039 (U.S. Jan. 27, 2020) .............................................. 21

*Trump v. New York*,
    141 S. Ct. 530 (2020) ...................................................................... 49, 53

*United States v. Nixon*,
    418 U.S. 683 (1974) ............................................................................ 26

*United States v. Rumely,*
    345 U.S. 41 (1953) ........................................................................................ 25

*Watkins v. United States,*
    354 U.S. 178 (1957) ................................................................................. *passim*

*Wilkinson v. United States,*
    365 U.S. 399 (1961) ................................................................................. 20, 46

*Wyoming Outdoor Council v. U.S. Forest Serv.,*
    165 F.3d 43 (D.C. Cir. 1999) ........................................................................ 52

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 8, cl.1 ......................................................................... 18

U.S. Const. art. I, § 8, cl.18 ....................................................................... 18

U.S. Const. art. I, § 9, cl.7 ......................................................................... 18

## STATUTES

26 U.S.C. § 6038 .................................................................................. 29, 53

26 U.S.C. § 6038B ................................................................................ 29, 53

26 U.S.C. § 6038D ................................................................................ 29, 53

26 U.S.C. § 6046 .................................................................................. 29, 53

26 U.S.C. § 6046A ................................................................................ 29, 53

26 U.S.C. § 6103 ................................................................................. *passim*

26 U.S.C. § 7213 ........................................................................................ 6

26 U.S.C. § 7431 ........................................................................................ 6

28 U.S.C. § 1346 ...................................................................................... 53

Pub. L. No. 68-176, § 257, 43 Stat. 253, 293 (1924) ...................................... 5

Pub. L. No. 94-455 § 1202, 90 Stat. 1520, 1667 (1976), *codified at* 26 U.S.C. § 6103(a) ......................... 5

The Internal Revenue Code of 1954, ch. 736, § 6013, 68A Stat. 1, 754-55 ............................................. 5

## LEGISLATIVE MATERIALS

Authorization and Oversight Plans for All House Committees,
    H. Rep. 117-17 (Apr. 15, 2021) ("House Oversight Plan") ....................... 18, 30

*Confidentiality of Tax Return Information: Hearing Before the H. Comm. on Ways and Means*,
94th Cong. 154 (1976) ...................................................................................38

H.R. 1, 117th Cong. (Jan. 4, 2021) ............................................................... 19

H.R. 232, 117th Cong. (introduced Jan. 6, 2021) ......................................... 18

H.R. 347, 117th Cong. (introduced Jan. 19, 2021) ....................................... 18

H.R. 664, 117th Cong. (introduced Feb. 1, 2021) ........................................ 18

H.R. 5314, 117th Cong. (introduced Sept. 21, 2021) .............................. 18, 19

H.R. Rules, 117th Cong., Rule X, cl. 1(t)(3) (Feb. 2, 2021) ..................... 18, 30

Joint Committee on Taxation, *Background Regarding the Confidentiality and Disclosure of Federal Tax
Returns* ("JCT Report") (Feb. 4, 2019), https://www.jct.gov/publications.html?
func=startdown&id=5159 ................................................................................ 5

Joint Committee on Taxation, *General Explanation of the Tax Reform Act of 1976*,
JCS-33-76 (1976) .......................................................................................... 5

S. Rep. No. 94-938, pt. 1 (1976) ................................................................5, 21

Ways & Means Committee,
https://waysandmeans.house.gov/subcommittees/ways-and-means-117th-congress.................. 47

## OFFICE OF LEGAL COUNSEL OPINIONS

5 Op. O.L.C. 27 (1981) ..........................................................................50, 51, 55

8 Op. O.L.C. 252 (1984) ............................................................................... 50

10 Op. O.L.C. 68 (1986) ............................................................................... 50

*Congressional Access to Tax Returns Under 26 U.S.C. § 6103(f)*, 1 Op. O.L.C. 85 (1977)...........................5

*Congressional Committee's Request for the President's Tax Returns Under 26 U.S.C. § 6103(f)*,
43 O.L.C. Op. __ (June 13, 2019), https://www.justice.gov/olc/opinion/
congressional-committee-s-request-president-s-tax-returns-under-26-usc-6103f........... 7, 8, 18, 45

*Prosecution for Contempt of Cong. of an Exec. Br. Official Who Has Asserted a Claim of Executive
Privilege*, 8 Op. O.L.C. 101 (1984) ............................................................. 26

*Scope of Congressional Oversight and Investigative Power With Respect to the Executive Branch*,
9 Op. O.L.C. 60 (1985) ................................................................................. 16

*Ways and Means Committee's Request for the Former President's Tax Returns and Related Tax Information
Pursuant to 26 U.S.C. § 6103(f)(1)*, 45 Op. O.L.C. ___, (July 30, 2021) .......................................*passim*

**OTHER AUTHORITIES**

George K. Yin, Preventing Congressional Violations of Taxpayer Privacy,
  69 Tax Lawyer 103 (2015), https://papers.ssrn.com/sol3/papers.cfm?abstract_id
  =2628193 ....................................................................................................... 4, 5

Internal Revenue Manual ("IRM"), https://www.irs.gov/irm ...........................................*passim*

# INTRODUCTION

In June 2021, the Chairman of the House Committee on Ways and Means ("the Committee") invoked 26 U.S.C. § 6103(f) to solicit from the Department of the Treasury ("Treasury") certain tax returns and return information of former President Donald Trump and eight associated entities (collectively, the "Trump parties").  Treasury sought the advice of the Department of Justice's Office of Legal Counsel ("OLC"), which determined that the request was valid and should be fulfilled.

Through a series of cross-claims and counterclaims, the Trump parties sought to prevent Treasury from fulfilling the Committee's request, all of which Defendants and the Committee showed, through their earlier motions to dismiss, are without legal merit.  The Trump parties have now amended their pleadings in an effort to cure the legal defects in their claims; but their expanded set of cross-claims, counterclaims, and allegations adopts a "more of the same" approach that fails to advance their position.  The Trump parties' claims still lack legal merit and should be dismissed.

*First*, in Amended Cross-Claims I and II, the Trump parties ask the Court to determine that the Committee's request is void because it allegedly lacks a "legitimate legislative purpose."  The Trump parties contend that the Committee's "primary purpose" in seeking their tax information is to expose it "for the sake of exposure" (Cross-Claim I) and if not that, to conduct "law enforcement" (Cross-Claim II).  But the Committee's request forecloses these arguments:  it spells out in detail the Committee's interest in legislation relating to Treasury's mandatory audit program for sitting presidents ("Presidential Audit Program"), and its interest in investigating potential presidential business entanglements, conflicts of interest, and foreign influences.  These subjects are ones "on which legislation could be had," *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 506 (1975), so Amended Cross-Claims I and II necessarily fail.  The Trump parties' ninety-page effort to impugn the Committee's stated purpose provides no basis for concluding otherwise.  "So long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Barenblatt v. United States*, 360 U.S. 109, 132 (1959).  And in any event, the Trump parties' allegations do not demonstrate improper motive; they reflect reasonable concerns among individual Committee members that are wholly consistent with the

Committee's stated intent to study foreign influence, conflicts of interest, and the Presidential Audit Program under the Trump administration.

*Second*, the Trump parties contend, in Amended Cross-Claim III, that the Committee's request, even if made for the purpose of considering legislation about the Presidential Audit Program, is nevertheless unrelated to legislation that Congress constitutionally could pass and that falls within the Committee's legislative jurisdiction. This claim should be rejected in all respects, because it disregards a wide variety of valid legislative measures that are well within Congress's Article I authority, the jurisdiction conferred on the Committee under House rules, and, too, the authority conferred on the Committee by section 6103(f) itself. It also fails to grapple with the Committee's detailed explanation of its reasons for seeking to review the Trump parties' tax information,[1] and does not account for the wealth of pertinent information that their tax returns and related audit files can be expected to contain.

*Third*, the Trump parties challenge the Committee's request under *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020) (*Mazars III* or *Mazars*), which identified considerations bearing on whether a legislative subpoena for the private information of a sitting President can be enforced. But Donald Trump is no longer the President, so this case does not pose the "palpable" "clash between rival branches of government" presented in *Mazars III*, 140 S. Ct. at 2034-35. Here, the Legislature and the Executive Branch agree concerning the Committee's request, which serves an important legislative function pursuant to a duly enacted statutory authorization, and the Trump parties fail to identify any burdens the request would impose on the Executive Branch, rather than on their own personal interests. So any inter-branch balancing of interests under a *Mazars*-type analysis would preclude judicial intervention to override the Executive-Legislative agreement.

*Fourth*, the Trump parties challenge section 6103(f) itself as unconstitutional on its face, because it does not expressly prohibit disclosure of confidential tax information if Congress has no legitimate legislative reason for seeking it. Their facial challenge fails, however, because section 6103(f)

---

[1] "Return" and "return information" are defined terms under the Internal Revenue Code and do not encompass all types of tax information. *See* 26 U.S.C. § 6103(b)(1)-(2). For ease of reference, and because this lawsuit does not turn on those definitions, this motion uses the term "tax information" to mean "returns" and "return information" collectively as defined under the statute.

may constitutionally be applied in any set of circumstances, as here, in which Congress's request is supported by a valid legislative purpose on a subject as to which Congress may legislate. The Trump parties also continue to maintain that the Committee's request must be denied because section 6103(f)—which applies to requests for "any return or return information"—does not specifically authorize release of a President's tax information. But even if a request for a *former* President's tax information raised separation-of-powers concerns, they are addressed by the request's conformity to the standards announced in *Mazars*, and require no limiting construction be applied to section 6103(f).

*Fifth*, the Trump parties assert a claim under the First Amendment for retaliation and discrimination. But to state such a claim, a litigant must adequately allege that his or her protected expression is the "but for" cause of the alleged retaliatory or discriminatory act. Yet the reason for Defendants' intended release of the Trump parties' tax information to the Committee is the unconditional command of section 6103(f)(1), regardless of any protected expression by President Trump or Defendants' views thereof. So far as this claim would call on the Court, even for First Amendment reasons, to probe the motives of individual legislators who support the Committee's request, it is foreclosed by decades of Supreme Court precedent. In any event, the Trump parties have not plausibly alleged retaliatory or discriminatory motive on the part of Defendants or the Committee.

*Sixth*, the Trump parties assert a separation-of-powers violation based on alleged legislative interference with executive agency functions. That claim rests on an unsupported assumption that the Committee will use the requested information to interfere with alleged ongoing IRS audits in a manner that injures the Trump parties. Such speculative allegations do not give rise to a ripe Article III controversy. Additionally, even if this claim were ripe, it should still be dismissed, as congressional requests for information, including information that is the subject of an ongoing administrative proceeding such as an alleged IRS audit, do not inherently violate the separation of powers. In this case, the Executive Branch has properly determined that the Committee has asserted valid legislative purposes and, in any event, its request does not unduly impinge upon the separation-of-powers considerations identified in *Mazars* (to the extent those considerations even apply here). Thus, the Committee's request *a fortiori* does not amount to a separation-of-powers violation.

*Seventh*, the Trump parties contend that disclosing information responsive to the Committee's request would violate their due-process rights, on the theory that congressional access to their tax information would somehow taint alleged ongoing audits of their returns. This claim is grounded in speculation as well, and if any alleged audits resulted in unfavorable determinations, legal recourse then would be available to contest those determinations. There is also nothing inherently problematic under due process about a congressional inquiry that runs parallel to an ongoing agency proceeding. Thus, even if this claim were ripe, it would fall far short of stating a due-process violation.

## BACKGROUND

## I. STATUTORY BACKGROUND

### A. History of Section 6103 of the Tax Code

Since the late 1800s, Congress has endeavored to balance the privacy interests of federal taxpayers with its own needs, and the needs of other government actors, for access to tax information. *See* George K. Yin, *Preventing Congressional Violations of Taxpayer Privacy*, 69 Tax Lawyer 103, 105, 119-136 (2015), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2628193 (hereinafter "Taxpayer Privacy"). Immediately following the enactment of the first personal income tax in 1862, the tax laws permitted unrestricted public access to individual taxpayer returns—a system that drew criticism for invading privacy rights and discouraging voluntary tax reporting. *Id.* at 154. Accordingly, in 1894, Congress made it a misdemeanor to disclose certain tax information outside of the tax agency, *id.* at 119, and in 1921 tightened that protection to permit inspection of tax information "only by order of the President under rules prescribed by the Treasury Secretary," *id.* (citation omitted).

Following the Coolidge Administration's refusal to furnish the tax records of officials suspected of involvement in the Teapot Dome scandal, Congress adjusted this framework to provide a direct right of access to tax information for certain congressional committees. *See id.* at 120-24. The Revenue Act of 1924 provided that the Ways and Means Committee, the Senate Finance Committee, "or a special committee of the Senate or House, shall have the right to call on the Secretary of the Treasury for, and it shall be his duty to furnish, any data of any character contained in or shown by [tax] returns . . . that may be required by the committee[.]" Pub. L. No. 68-176, § 257(a), 43 Stat. 253,

293 (1924).  Congress amended this provision two years later, first to limit this right of access by nontax committees to "joint" and "select" committees "specially authorized to investigate returns by a resolution" of the Senate and/or House, and second, to require any committee invoking this access to sit in executive session to receive tax information.  *See* Taxpayer Privacy, 69 Tax Lawyer at 126. The Internal Revenue Code of 1954, ch. 736, § 6013(d)(1), (2), 68A Stat. 1, 754-55, re-enacted these provisions in the precursor to the current section 6103(f).

In 1976, Congress tightened the disclosure rules again amidst "possible misuse of tax information" by the Nixon Administration.  Joint Committee on Taxation, *Background Regarding the Confidentiality and Disclosure of Federal Tax Returns* ("JCT Report") at 6 (Feb. 4, 2019), https://www.jct. gov/publications.html?func=startdown&id=5159; *see also* S. Rep. No. 94-938, pt. 1, at 19, 317-18 (1976).  Whereas tax returns had previously been deemed "public records," the 1976 Act removed that designation and provided that tax returns (and return information) "shall be confidential."  Pub. L. No. 94-455 § 1202, 90 Stat. 1520, 1667 (1976), *codified at* 26 U.S.C. § 6103(a).  Government officials with access to tax information therefore may not disseminate it without authorization.  Congress also codified the 13 regulatory exceptions to nondisclosure and removed the ability of the Secretary or the President to create new ones.  *See* Taxpayer Privacy, 69 Tax Lawyer at 131.  In so doing, Congress sought to balance the citizen's right to privacy with "the particular office or agency's need for the information involved," Joint Committee on Taxation, *General Explanation of the Tax Reform Act of 1976*, JCS-33-76, at 315 (1976), including the needs of Congress, "particularly its tax-writing committees . . . [for] access in certain instances to returns and return information in order to carry out its legislative responsibilities[.]"  S. Rep. No. 94-938, pt. 1 at 320.  The 1976 Act also tightened the procedural requirements for Congress to obtain and review tax information, *see Congressional Access to Tax Returns Under 26 U.S.C. § 6103(f)*, 1 Op. O.L.C. 85, 89 (1977), but otherwise did not disrupt the longstanding practice of according the tax committees mandatory access to tax information upon request.

### B.  The Current Framework

The general framework established in 1976 persists today.  Section 6103 provides that "tax returns" and "return information" "shall be confidential and, except as authorized by [the Internal

Revenue Code] . . . no officer or employee of the United States . . . shall disclose any return or return information obtained by him in any manner[.]"  26 U.S.C. § 6103(a).  "Return" and "return information" are defined broadly to encompass information maintained by the IRS relating to tax reporting, liabilities, and administration.  *Id.* § 6103(b)(1)-(2); *see also supra* at 2 n.1.  A willful unauthorized disclosure of tax information is a felony, *id.* § 7213(a)(1)-(2), and a taxpayer whose information has been subject to unauthorized inspection or disclosure may, under certain circumstances, seek damages, *id.* § 7431.

Section 6103 sets forth "thirteen tightly drawn categories of exceptions" to the confidentiality of tax information, *Elec. Privacy Info. Ctr. v. IRS*, 910 F.3d 1232, 1237 (D.C. Cir. 2018); *see* 26 U.S.C. § 6103(c)–(o), pursuant to which the Secretary and the IRS Commissioner act as the "gatekeepers of federal tax information." *Tax Analysts v. IRS*, 117 F.3d 607, 613 (D.C. Cir. 1997).  The exception for disclosure to congressional tax committees set forth in section 6103(f)(1) is the exception at issue in this lawsuit.  As relevant here, paragraph (f)(1) provides that, upon written request from the Committee on Ways and Means of the House of Representatives, the Committee on Finance of the Senate, or the Joint Committee on Taxation (collectively, the "tax committees"), the Secretary "shall furnish" such committee with any specified tax information, except that, absent consent of the taxpayer, any such information "which can be associated with . . . a particular taxpayer shall be furnished to such committee only when sitting in closed executive session." 26 U.S.C. § 6103(f)(1). Tax information so obtained by one of the tax committees, including information associated with individual taxpayers, may be submitted to the Senate, the House, or both.  *Id.* § 6103(f)(4)(A); *compare id.* § 6103(f)(4)(B).  Nontax committees possess a much more limited right of access, requiring authorization by resolution of the House and/or Senate.  *Id.* § 6103(f)(3).

## II.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.  The Committee's 2019 Request for the Trump Parties' Tax Information

As alleged by the Trump parties, during the 2016 presidential election campaign, then-candidate Donald J. Trump declined to release his tax returns publicly, citing allegedly ongoing IRS

audits.  Am. Cross-Claim ¶¶ 6-7.[2]  That choice, which broke a decades-long practice among major-party nominees, *see id.* ¶ 11, raised questions whether the undisclosed returns might reveal "a Russia connection," foreign government entanglements, and Emoluments Clause violations.  Answer and Counterclaims/Cross-Claims ("Cross-Claim") ¶ 4, ECF No. 113.

Following the 2018 mid-term elections, Representative Richard E. Neal became Chairman of the Committee.  In an April 3, 2019, letter to the IRS, Chairman Neal, formally invoking 26 U.S.C. § 6103(f)(1), requested that the IRS produce President Trump's individual tax returns and the returns for eight associated business entities for the tax years 2013-2018, together with the administrative files associated with each return (the Committee's "2019 Request").  Am. Cross-Claim ¶ 123; *see* Congressional Committee's Request for the President's Tax Returns Under 26 U.S.C. § 6103(f) ("2019 OLC Op."), 43 O.L.C. Op. ___ (June 13, 2019), at *12-13, https://www.justice.gov/olc/opinion/congressional-committee-s-request-president-s-tax-returns-under-26-usc-6103f.  Chairman Neal explained that the information requested was necessary to determine "the extent to which the IRS audits and enforces the Federal tax laws against a President."  Am. Cross-Claim ¶ 124.

On May 6, 2019, after consulting with OLC, the Secretary of the Treasury denied the Committee's 2019 Request.  Am. Cross-Claim ¶ 216; 2019 OLC Op. at 14.  In a letter to Chairman Neal, the Secretary explained (in the Trump parties' words), that Defendants "could not comply" with the Committee's request because "[a]fter compiling and reviewing over 40 pages of Democrats' public statements," Treasury had concluded that the Committee's request "lacked a legitimate legislative purpose[,]" Am. Cross-Claim ¶¶ 216-17, and therefore "section 6103(f) would not authorize disclosure," 2019 OLC Op. at 14.[3]

---

[2]  Except as otherwise noted, the factual background presented here is based on the allegations in the Trump parties' Amended Answer and Counterclaims/Cross-Claims, ¶¶ 1-289, ECF No. 129 at 13-72 ("Am. Cross-Claim")  Defendants reserve the right, however, to contest the Trump parties' allegations as may be necessary or appropriate in further proceedings.

[3]  Four days later, on May 10, 2019, Chairman Neal served subpoenas on the Secretary and the Commissioner of the IRS for largely the same information requested in the Committee's 2019 Request.  On May 17, 2019, Defendants declined to produce the records sought by the Committee. *See* 2019 OLC Op. at 14-15.

In a formal opinion published on June 13, 2019, OLC memorialized its advice to Defendants concerning the 2019 Request.  *See generally* 2019 OLC Op.; Am. Cross-Claim ¶¶ 219-22.  OLC found that the Constitution required the Committee to establish "a legitimate legislative purpose in support of its request for [President Trump's] tax returns" before their release could be authorized under section 6103(f); and that the Executive Branch was required both to "examine evidence that may bear upon the Committee's true objective," 2019 OLC Op. at 17, 19, and to "determine whether a congressional request to disclose confidential tax information under section 6103(f) . . . has been made in furtherance of a legitimate legislative purpose," *id.* at 21.  Turning to the public record, OLC concluded that the stated purpose of the 2019 Request—"to consider legislation regarding the IRS's practices in auditing presidential tax filings"—was "implausible," and that the Committee's true purpose was "forcing the public disclosure of [President Trump's] tax returns," *id.* at 26, 29-30. "Given that Congress may not pursue public disclosure for its own sake," OLC concluded that the 2019 Request lacked a legitimate legislative purpose, hence that it "did not qualify for the statutory exception to taxpayer confidentiality" under section 6103(f)(1), and that "section 6103(a) therefore required [Defendants] to maintain confidentiality of the requested tax information."  *Id.* at 17, 31.[4]

## B.  The Committee's Suit Against Defendants

The Committee initiated this action on July 2, 2019, seeking declaratory and injunctive relief to compel Defendants' compliance with the Committee's 2019 Request (and related subpoenas). Compl. for Decl. & Inj. Relief ¶¶ 1, 9 (ECF No. 1); *id.* at 48 (Prayer for Relief).  The Committee alleged that it was "investigating the IRS's administration of various tax laws and policies relating to Presidential tax returns and tax law compliance by President Trump, including whether the IRS's self-imposed policy of annually auditing the returns of sitting Presidents is working properly[.]"  *Id.* ¶ 4. "Without reviewing the requested return materials," the Committee maintained, it "[could] not ensure that the IRS's audit process is functioning fairly and effectively, understand how provisions of the tax code are implicated by President Trump's returns, or exercise its legislative judgment to determine

---

[4]  According to the Trump parties, OLC found that the Committee's specific purpose in seeking to expose the "private tax information" of President Trump was "political gain."  Am. Cross-Claim ¶ 331.  OLC made no such finding.  *See generally* 2019 OLC Op.

whether changes to the code may be warranted." *Id.* ¶ 6.  To redress this deprivation of information necessary to the completion of its investigation, and the performance of its "most basic constitutional functions," the Committee requested an order directing Defendants "to comply with Section 6103(f) and [its] subpoenas by producing the requested information immediately." *Id.* ¶ 9.

On July 17, 2019, the Trump parties moved "to intervene as defendants and oppose the Committee's suit," Unopposed Motion To Intervene [etc.] at 1 (ECF No. 12), to protect their interest "in preventing the disclosure of their confidential tax information," *id.* at 2-4.  The Court granted the motion the following day.  Order (ECF No. 14).  On September 6, 2019, Defendants and the Trump parties jointly moved to dismiss the Committee's complaint, on the grounds that the Committee's informational dispute with the Executive Branch did not present an Article III case or controversy, that the Court lacked statutory subject-matter jurisdiction, that the Committee lacked a cause of action, and that the Committee had failed to state claims on which relief could be granted.  *See generally* Mem. of Pt. & Auths. in Supp. of Defs.' & Def-Intervenors' Mot. To Dismiss (ECF No. 44).[5]

Following briefing and argument on Defendants' and the Trump parties' motion, the Court stayed this action pending a ruling in *Committee on the Judiciary, United States House of Representatives v. McGahn*, No. 1:19-cv-5331 (D.C. Cir.), which presented many of the same jurisdictional and other threshold issues raised by Defendants and the Trump parties in support of dismissal.  Tr. of Tel. Conf. (Jan. 14, 2020) at 3, 10-11 (ECF No. 78); Docket Entry (Jan. 14, 2020) ("Case stayed").  When the *McGahn* panel ruled that Article III forbids federal courts from resolving inter-branch informational disputes, and the D.C. Circuit granted rehearing *en banc*, the Court again stayed the case, pending further order.  *See* Order (ECF No. 91).

**C.  The Committee's 2021 Request for the Trump Parties' Tax Information**

The case remained stayed through the 2020 election.  As the expiration of Donald Trump's term as President approached, the Trump parties moved for a status conference on January 19, 2021.

---

[5] By this time, the Committee had already moved for summary judgment on the merits, *see generally* Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. (ECF No. 29-2).  On August 29, 2019, the Court denied the Committee's motion, without prejudice, pending resolution of the threshold issues presented in Defendants' and the Trump parties' motion to dismiss.  Mem. & Order (ECF No. 38).

Mot. For Status Conf. at 1-2 (ECF No. 100), to ensure that their arguments against disclosure could be adjudicated before any release of their tax information to the Committee occurred. *Id.* at 2-3. As requested, the Court held a status conference on January 22, 2021, at which it was agreed that the new Administration would be given time to determine its position on releasing the Trump parties' tax information to the Committee. In the meantime, Defendants would be required to provide 72 hours' notice to the Trump parties' counsel before any such release. Tr. of Tel. Status Conf. (Jan. 22, 2021) at 11, 15, 17-18 (ECF No. 104). *See also* Mot. for Status Conf. at 2: Minute Order (Jan. 14, 2021). Thereafter, incoming leadership at the Departments of Justice and the Treasury evaluated Defendants' position, *see* Joint Status Reports (Feb. 3 and Mar. 3, 2021) (ECF Nos. 102, 105), and on March 31, 2021, Defendants and the Committee informed the Trump parties and the Court that they had begun communications that might inform Defendants' position. Joint Status Report (Mar. 31, 2021) (ECF No. 106); *see also* Joint Status Reports (Apr. 30, May 28, and July 2, 2021) (ECF Nos. 107-09).[6]

On June 16, 2021, Chairman Neal sent correspondence to the Secretary of the Treasury and the Commissioner of the IRS making a request, pursuant to section 6103(f), for the individual tax returns of President Trump and the same eight associated business entities named in the 2019 Request, for the tax years 2015-2020. *See* Joint Status Report (July 30, 2021) Exh. A at 6-7 (ECF No. 111) ("2021 Request"). The 2021 Request also seeks the administrative files for each requested return. *Id.*

The Committee's 2021 Request explains that, to ensure the full and fair administration of the tax laws, the Committee "has been considering legislative proposals and conducting oversight related to our Federal tax laws, including, but not limited to, the extent to which the IRS audits and enforces the Federal tax laws against a President." *Id.* at 1, 2. In particular, the Committee expressed "serious concerns" that the IRS's mandatory Presidential Audit Program, *see* Internal Revenue Manual ("IRM") § 3.28.3 (2020), may not be "advancing the purpose for which it was created"—thus necessitating

---

[6] The Trump parties fault Defendants and the Committee for failing to attempt to reach an accommodation of the Committee's Request that would also take into account the Trump parties' interests. Am. Cross-Claim ¶¶ 286, 289. They do so notwithstanding their prior admission that efforts of that kind would "no doubt likely" have resulted in "impasse." *Trump v. Mazars USA, LLP*, Nos. 19-715, 19-760 (U.S.), Reply Br. for Pet'rs, at 7.

legislation—because many of its provisions are outdated, and disregarded; do not account for a President, like President Trump, with hundreds of businesses and inordinately complex returns; and do not include explicit safeguards in the event a President interferes with an audit.  2021 Request at 2.

The Committee also explained the importance of individual tax information to its inquiry.  To learn how the Presidential Audit Program operates in practice, the Committee seeks information about the audit of an actual taxpayer to ascertain, among other things, (i) whether IRS agents are shielded from improper interference by a President or his representatives; (ii) whether agents look at ongoing audits that predate a President's term in office; (iii) whether agents review a President's underlying business activities, and have access to the necessary books and records to substantiate amounts on the return; and (iv) whether agents have access to the necessary resources to undertake an exhaustive review of a complex taxpayer.  *Id.* at 3.  The Committee also set forth at length the reasons why it considers President Trump's tax information, in particular, to be instructive and "indispensable" to its inquiry.  *See generally id.* at 3-6.  For example, the inordinate size and complexity of his returns, reflecting his control of more than 500 businesses through a revocable trust, make him "markedly different from other Presidents" examined under the Presidential Audit Program, and raise questions such as whether any audits of his returns included review and substantiation of his underlying domestic and foreign business activities.  *Id.* at 4-5.  President Trump's public criticism of his treatment by the IRS, both before and during his term in office, also has raised "serious questions" in the Committee's mind about the ability of IRS agents "to freely enforce the tax laws against him."  *Id.* at 4, 5-6.

On these grounds the Committee found "ample reason" to question whether the provisions of the Presidential Audit Program are "sufficiently robust" and can function as intended for a President whose taxpayer history "is as complex as former President Trump's."  *Id.* at 6.  "To be sure that the [Presidential Audit Program] will work for all future President-taxpayers (including those with similarly complex taxes)," the Committee concluded that it "must see how the program fared under the exceedingly challenging circumstances presented by former President Trump."  *Id.*

In addition to its concerns about the proper functioning of the Presidential Audit Program, the Committee also observed that "President Trump's tax returns could reveal hidden business

entanglements raising tax law and other issues, including conflicts of interest, affecting proper execution of [his] responsibilities," as well as "foreign financial influences on former President Trump that could inform relevant congressional legislation." *Id.* at 4.

The day following its receipt of the Committee's 2021 Request, Treasury wrote to OLC seeking its legal opinion "as to whether the Secretary must furnish the requested returns and return information to the Committee." *See Ways and Means Committee's Request for the Former President's Tax Returns and Related Tax Information Pursuant to 26 U.S.C. § 6103(f)(1)*, 45 Op. O.L.C. ___ (July 30, 2021), at 17 (Joint Status Report (July 30, 2021) Exh. B) ("2021 OLC Op."). In a formal opinion published on July 30, 2021, OLC found "ample basis to conclude" that the Committee's 2021 Request "would further the Committee's principal stated objective of assessing" the Presidential Audit Program, and that its "additional stated objectives" for reviewing the Trump parties' tax information "are also legitimate." *Id.* at 4. OLC concluded "that Treasury must furnish the information specified" in the Committee's 2021 Request. *Id.* at 3, 39.

The 2021 OLC Opinion first explained how its mode of analysis differed from the 2019 opinion. *See id.* at 18-26. To give "due weight to Congress's status as a co-equal branch of government with legitimate needs for information in order to exercise its constitutional authorities," the 2021 opinion concluded that the Executive Branch must extend the same presumption of good faith and regularity to facially valid congressional requests for information that courts extend to the official acts of the political branches. *Id.* at 19; *see id.* at 22-23. Requests under section 6103(f)(1) should be accorded an even stronger presumption, OLC explained, inasmuch as section 6103(f)(1) embodies a century-old judgment by both political branches (not merely the determination of a committee of one House) that the congressional tax committees should have a "statutorily unlimited right of access to tax information," and can be relied on to exercise that authority in a deliberate and responsible manner. *Id.* at 23-24. Absent "exceptional circumstances" in which "a committee's asserted purpose truly blinks reality," the presumption of good faith and regularity should not be overcome. *Id.* at 26, 38-39. The fact that a committee's request for information "might serve partisan or other political interests," OLC observed, "is generally irrelevant to assessing its constitutionality[.]" *Id.*

The 2021 opinion recognized that *Mazars III* held that the deference owed a congressional subpoena "should be tempered" where a committee seeks the private financial information of a sitting President.  2021 OLC Op. at 27 (citing *Mazars III*, 140 S. Ct. at 2035).  OLC concluded, however, that the separation-of-powers concerns animating the decision in *Mazars*—the use of Congress's investigatory power to exert control over a President—are "mitigate[d]" and "much less pronounced" in this instance because the Committee's 2021 Request seeks the tax information of a former President who has "return[ed] to life as a private citizen."  *Id.* at 28.  OLC also noted that "the Committee made the June 2021 Request not simply pursuant to a subpoena, but pursuant to a statute that embodied the considered judgment of the political branches going back nearly a century about the access that should be afforded the tax committees," *id.*, thus further mitigating the concerns undergirding *Mazars*.

Applying this analytical framework to the 2021 Request, OLC concluded that the Committee had invoked subjects of inquiry on which legislation might be had and "articulated in some detail" why the Trump parties' tax information is relevant to informing Congress about them.  *Id.* at 29; *see generally id.* at 29-39.  In particular, the 2021 OLC Opinion explained why the years covered by the 2021 Request—"well-aligned" with the Committee's interest in the Presidential Audit Program—and its detailed explanation of the reasons why President Trump's tax information is important to understanding how the Presidential Audit Program "works under conditions of stress," address shortcomings that the 2019 OLC Opinion found in the Committee's 2019 Request.  *Id.* at 31-34.  Additionally, OLC concluded that the Committee's interests in discovering potential "business entanglements," "conflicts of interest," or "foreign financial influences" that could raise "tax law and other issues," are "independently sufficient to justify" the 2021 Request.  *Id.* at 34-37.  In light of its facial validity, the possibility that some members of Congress might hope to embarrass President Trump or profit politically from the exposure of his tax information "would not serve to invalidate the Committee's request."  *Id.* at 38-39.  Based on these conclusions, OLC advised Treasury "that the Secretary must comply" with the Committee's 2021 Request in accordance with section 6103(f)(1), and "furnish the Committee with the specified tax returns and return information."  *Id.* at 39.

### D.  The Trump Parties' Claims Against Defendants and the Committee

On July 30, 2021, concurrent with the publication of the 2021 OLC Opinion, Defendants informed the Court, the Committee, and the Trump parties that Treasury intends to comply with the Committee's 2021 Request, in accordance with the conclusions reached by OLC.  Joint Status Report (July 30, 2021) at 2.[7]  In light of this representation, on August 4, 2021, the Committee filed a motion for voluntary dismissal of its claims against Defendants, which the Court granted.  Mot. for Voluntary Dismissal Without Prejudice (ECF No. 115); Minute Order (Aug. 5, 2021).  The same day the Trump parties filed counterclaims and cross-claims, respectively, against the Committee and Defendants, seeking declaratory and injunctive relief against the disclosure of their tax information.  *See generally* Cross-Claim, ECF No. 113.  Defendants and the Committee filed motions to dismiss the Trump parties' cross- and counterclaims, ECF Nos. 123, 124, whereupon the Trump parties filed a set of amended cross-claims and counterclaims.  *See generally* Am. Cross-Claim, ECF No. 129.

The Trump parties now raise eight claims, on the basis of which they maintain that the release of their tax information to the Committee should be prohibited.  The first four claims, raised against Defendants and the Committee, assert that the 2021 Request for production of the Trump parties' tax information lacks a legitimate legislative purpose, Am. Cross-Claim ¶¶ 290-303; that the information sought is not pertinent to legislation within the Committee's jurisdiction that Congress validly could adopt, *id.* ¶¶ 304-11; and that the Request "fails" the "heightened standard" for congressional informational requests "that implicate the separation of powers" articulated in *Mazars*, *id.* ¶¶ 312-18.  The remaining four claims, brought against Defendants only, assert that section 6103(f) is "unconstitutional on its face" because it does not "require[ ] a legitimate legislative purpose" as a condition of releasing tax information to Congress, *id.* ¶¶ 318-24; that the Committee's request, and Defendants' intended compliance with it, constitute unlawful retaliation and discrimination in

---

[7]  Defendants further advised they would forbear from producing the requested tax information to the Committee "pending a suitable schedule for expedited submission, briefing, and resolution by [the] Court of any claims the Defendant-Intervenors wish to raise."  Joint Status Report (July 30, 2021) at 3.  The Court issued a Minute Order, also on July 30, 2021, directing that "[p]ending resolution of those proceedings, and in light of the Administration's agreement, Defendants shall provide 72 hours' notice to counsel for the [Trump parties] before any release of the tax return information at issue."

violation of the First Amendment; *id.* ¶¶ 325-37; and that submission of the Trump parties' tax information to the Committee while they allegedly remain under audit violates both the separation of powers, *id.* ¶¶ 338-44, and their due-process rights, *id.* ¶¶ 345-51.  None of these claims has merit.

**ARGUMENT[8]**

## I.  AMENDED CROSS-CLAIMS I AND II FAIL BECAUSE THE LEGISLATIVE PURPOSES OF THE COMMITTEE'S REQUEST ARE VALID ON THEIR FACE.

In Amended Cross-Claims I and II, the Trump parties assert that the 2021 Request lacks a "legitimate legislative purpose" because its "primary purpose" is either to obtain and expose" the Trump parties' tax information "for the sake of exposure," Am. Cross-Claim ¶ 295 (Am. Cross-Claim I) or to conduct law enforcement, *id.* ¶ 300 (Am. Cross-Claim II).  As the *Mazars* district court observed on remand from the Supreme Court, "no court has accepted" these theories, also advanced by President Trump in that case.  *Trump v. Mazars*, 2021 WL 3602683, at \*9 (D.D.C. Aug. 11, 2021), *appeal filed*, Nos. 21-5176 & 21-5177 (D.C. Cir. Aug. 16, 2021) (*Mazars IV*).  They fail here as well.

### A.  Congress's Power of Inquiry and the "Legitimate Legislative Purpose" Requirement

The Supreme Court has long recognized that the "power of inquiry" is "an essential and appropriate auxiliary to the legislative function."  *Mazars III*, 140 S. Ct. at 2031 (citing *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927)); *see also Eastland*, 421 U.S. at 504 ("the power to investigate is inherent in the power to make laws").  This power belongs to each of the two Houses of Congress independently, *see McGrain*, 273 U.S. at 173, and is rooted in the understanding that a "legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change[.]"  *Id.* at 175.  The power encompasses, among other things, "inquiries into the administration of existing laws, studies of proposed laws, and 'surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them.'"  *Mazars III*, 140 S. Ct. at 2031 (citing *Watkins v. United States*, 354 U.S. 178, 187 (1957)); *see also* Scope of Congressional Oversight and Investigative Power With Respect to the Executive Branch,

---

[8]  Defendants incorporate by reference the legal standards section included in the Committee's separate motion to dismiss.

9 Op. O.L.C. 60, 60 (1985) (it is "beyond dispute" that Congress may obtain information "pertinent to possible legislation and in order to evaluate the effectiveness of current laws").

The congressional power of inquiry is "broad," but it is not unlimited. *Mazars III*, 140 S. Ct. at 2031. Its exercise must serve a "valid legislative purpose" in that it must be "related to, and in furtherance of, a legitimate task of Congress" and "concern a subject on which legislation could be had." *Id.* The power may not be used for solely non-legislative purposes, such as for "law enforcement" or to "try someone before a committee for any crime or wrongdoing." *Id.* at 2032. Also, Congress "has no general power to inquire into private affairs" or "compel disclosures" simply to "expose for the sake of exposure." *Id.* Nevertheless, while an inquiry into private matters must be "justif[ied] in terms of the functions of the Congress," *Watkins*, 354 U.S. at 187, the mere fact that an inquiry might call for information that is private or confidential, or that could have law enforcement implications, does not render it illegitimate. *See, e.g., id.* at 199 (noting that an inquiry is not barred simply because it "compel[s] disclosure of private matters"); *FTC v. Owens-Corning Fiberglas Corp.*, 626 F.2d 966, 970 (D.C. Cir. 1980) (enforcing congressional request for information that constituted trade secrets); *Townsend v. United States*, 95 F.2d 352, 361 (D.C. Cir. 1938) (that the subject of a congressional inquiry might feel "embarrassed" by inquiries "which to him seemed incompetent, irrelevant," or even "impertinent" is generally immaterial); *Trump v. Mazars USA, LLP*, 940 F.3d 710, 728 (D.C. Cir. 2019) ("*Mazars II*") ("easily reject[ing] the suggestion that" an interest in past illegality "spoils [an] otherwise valid legislative inquiry"), *vacated and remanded on other grounds*, *Mazars III*, 140 S. Ct. 2019 (2020). And, in assessing the legitimacy of a legislative purpose, courts generally afford Congress "every reasonable indulgence of legality." *Watkins*, 354 U.S. at 204; *see also Barry v. United States ex rel. Cunningham*, 279 U.S. 597, 619 (1929) ("the proceedings of the houses of Congress, when acting upon matters within their constitutional authority" are entitled to a "presumption in favor of regularity").

## B.  The Committee's Stated Legislative Purposes Are Legitimate

Here, the Executive Branch applied these principles to determine that the subjects the Committee invoked in seeking the requested tax information are ones upon which legislation might be had; that the information requested is relevant to informing Congress about them; that the

Committee has been authorized to seek that information; and that there is no basis for looking behind the Committee's stated objectives.  2021 OLC Op. at 20.  These conclusions are correct as a matter of law, and the Trump parties' allegations do not plausibly suggest otherwise.

The 2021 Request sets out the Committee's legislative purposes in detail.  It explains that the Committee is charged with oversight of the tax laws and tax administration, and that the Committee is "considering legislative proposals and conducting oversight related to our Federal tax laws," including "the extent to which the IRS audits and enforces the Federal tax laws against a President." 2021 Request at 1.  The Request notes that concerns on this topic date back to 1974, when "it became known publicly that the IRS did not properly examine President Nixon's returns."  *Id.* at 1-2.  And, although the IRS responded to that event by implementing the Presidential Audit Program, the Committee is concerned that the Program may not be ensuring the "full and fair administration of the tax laws with respect to a President," and so that legislation may be needed.  *Id.* at 2.  Specifically, the Committee believes that the IRM does not account for a President who, like President Trump, "had ongoing audits, hundreds of business entities, and inordinately complex returns."  *Id.*  Further, many "of the relevant IRM provisions are outdated and no longer followed," and "[t]he IRM grants an IRS revenue agent substantial discretion to shape the course of the President's audit" without "explicit safeguards in the event that a President interferes with or questions the appropriateness of such examination[.]"  *Id.*  The 2021 Request explains that, in light of these circumstances, the Committee is considering legislation "on the President's tax compliance[ ] and public accountability" to ensure that the IRS "treat[s] a President like any other taxpayer subject to an audit."  *Id.*  These statements are consistent with the oversight plan for the 117th Congress, which directs the Committee to use its oversight authority to "ensure the nation's tax laws are being administered in a fair and impartial manner" and, more specifically, to conduct "[o]versight of legislative proposals and tax laws related to Presidential and Vice-Presidential mandatory tax audits."  Authorization and Oversight Plans for All House Committees, H. Rep. 117-17 at 283-84 (Apr. 15, 2021) ("House Oversight Plan").

As OLC concluded, "[t]hese matters, and the [Presidential Audit Program] more generally, clearly are subjects on which 'legislation may be had.'"  2021 OLC Op. at 31 (quoting *Eastland*, 421

17

U.S. at 506).  Congress "has the authority '[t]o lay and collect Taxes,' and the tax laws and the IRS are themselves creations of statutes."  *Id.* (quoting U.S. Const. art. I, § 8, cl.1).  "Congress also has expansive authority to enact 'all Laws which shall be necessary and proper for carrying into Execution' its constitutional authorities, and accordingly, to determine how the IRS should use appropriated funds to audit presidential tax returns."  *Id.* (citing U.S. Const. art. I, § 8, cls. 1 & 18 & § 9, cl. 7).  The Committee's inquiry into the application of the Presidential Audit Program to former President Trump is therefore valid on its face.  *See id.* at 20-21; *see also* 2019 OLC Op. at 27 ("a review by the Committee of the IRS's performance of its duties" is "an example of routine oversight" by Congress).

The 2021 Request is also valid on the separate and independent ground that the Committee is investigating potential "business entanglements raising tax law and other issues, including conflicts of interest" and "foreign financial influences on former President Trump that could inform relevant congressional legislation."  2021 Request at 4.  Just as with the Committee's interest in presidential audits, an inquiry into possible presidential conflicts of interest and foreign influence involves "subject[s] on which legislation could be had."  *Eastland*, 421 U.S. at 508; *see also* 2021 OLC Op. at 23. The Committee might, for example, propose "legislation to require more extensive or regular financial or tax-return disclosure by presidents and presidential candidates," 2021 OLC Op. at 34, which would fall within the Committee's jurisdiction over "all matters relating to" tax returns.  H.R. Rules, 117th Cong., Rule X, cl. 1(t)(3) (Feb. 2, 2021).  Indeed, numerous versions of such legislation have been introduced in the House.  *See* H.R. 347, 117th Cong. (introduced Jan. 19, 2021), H.R. 232, 117th Cong. (introduced Jan. 6, 2021); H.R. 664, 117th Cong. (introduced Feb. 1, 2021); H.R. 5314 § 1201, 117th Cong. (introduced Sept. 21, 2021).  The House has also passed a version of such legislation, which is currently pending before the Senate, *see* H.R. 1 § 10001, 117th Cong. (Jan. 4, 2021), but could still undergo further revisions in the House pending action in the Senate.[9]  The Committee's concerns regarding potential hidden business entanglements of and foreign financial influence on the former

---

[9] Such concrete legislative plans are not, however, necessary to sustain a legislative inquiry. Congress generally need not "declare in advance what [it] meditate[s] doing when the investigation [is] concluded," *McGrain*, 273 U.S. at 178 (citation omitted); *see also Eastland*, 421 U.S. at 509 ("To be a valid legislative inquiry there need be no predictable end result.").

President also are the subject of pending legislation, *see* H.R. 5314 §§ 301-307, 701-703, and may give rise to further tax laws or other legislation.  *See* 2021 OLC Op. at 23-25.  And "the fact that the House has pending several pieces of legislation related to the Committee's inquiry offers highly probative evidence of the Committee's legislative purpose."  *Mazars II*, 940 F.3d at 727.

### C.  Amended Cross-Claim I Fails as a Matter of Law Because the Committee Has Not Sought the Information Solely or Primarily to Expose Private Matters.

#### 1.  The Trump Parties' Claims of Pretext Fail as a Matter of Law.

Instead of contending that the Committee's stated purposes are legally insufficient, the Trump parties argue that they are pretextual.  In Amended Cross-Claim I, the Trump parties contend that the Committee's "primary purpose" "is to obtain and expose [their] information for the sake of exposure—not to study federal legislation."  Am. Cross-Claim ¶ 295.  To support this assertion, they rely on the alleged statements and actions of a broad range of individuals and entities, including, among other things, statements of Rep. Neal and other Committee members across the past four years, *see, e.g.*, *id.* ¶¶ 23-29; comments of Hillary Clinton, Wikileaks, and the New York Times during the 2016 presidential election, *id.* ¶¶ 13-14, 17-18; inquiries of other House committees into the former President's finances and tax filings, *id.* ¶ 199; state laws in California and New York, *id.* ¶¶ 188-89, 200; the alleged opinions of advocacy groups, "commentator[s]," and the "media," *id.* ¶¶ 133-36, 187, 245-46; the views of Republican members of Congress, *id.* ¶¶ 137-38, 225, 275-76; and the alleged "national obsession" with former President Trump's tax returns, *id.* ¶ 199.  These allegations, while lengthy, do not create a factual dispute about the purpose of the Committee's request; they simply confirm that the Trump parties seek to do what Supreme Court precedent forbids—impugn the "motives" of individual Committee members.

First, contrary to the Trump parties' assertions, Cross-Claim ¶ 293, the Court is not permitted to probe the Committee's "real object" by combing through cherry-picked, paraphrased statements by individual Committee members (much less "Democrats" writ large or the "media," *e.g., id.* ¶¶ 81, 84, 187) across a half decade.  The Supreme Court has "ma[d]e clear" that in evaluating the legitimacy of a congressional request for information, courts do "*not* look to the motives alleged to have

prompted it." *Eastland*, 421 U.S. at 508 (emphasis added, citations omitted)).  While courts may—where Congress has neglected to explain its legislative purpose—*confirm* the legitimacy of that purpose by objectively examining "statements of the members of the committee during the hearing" at which such inquiry takes place, *Shelton v. United States*, 404 F.2d 1292, 1297 (D.C. Cir. 1968) (citations omitted), courts should not "speculate as to the motivations . . . of individual [committee] members" as a basis to second-guess an objectively valid purpose that a committee itself has provided. *Wilkinson v. United States*, 365 U.S. 399, 412 (1961).  This venerable principle—which "is sounder still '[i]n times of political passion'"—reflects the reality that "'dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed,'" *Mazars IV*, 2021 WL 3602683, at *10, and that "[c]ourts are not the place for such controversies." *Tenney v. Brandhove*, 341 U.S. 367, 378 (1951).  Courts may therefore conclude that a congressional inquiry "exceed[s] the bounds of legislative power" only if that conclusion is "obvious" without probing the motive of individual legislators. *Id.*

The Supreme Court and the D.C. Circuit have repeatedly applied these principles to claims just like Amended Cross-Claim I.  In *Barenblatt*, for example, the Court rejected an argument that "the true objective of the Committee and of the Congress was purely 'exposure,'" reiterating that "[s]o long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power."  360 U.S. at 132 (citing *Arizona v. California*, 283 U.S. 423, 455 (1931)).  Likewise, in *Watkins*, even while recognizing that Congress has no "general power to expose where the predominant result can only be an invasion of the private rights of individuals[,]" the Court emphasized that "a solution to [that] problem *is not to be found in testing the motives of committee members*[.]" *Watkins*, 354 U.S. at 200 (emphasis added).  The Court reached that conclusion notwithstanding the "impressive array of evidence" marshalled by Watkins indicating "that some Congressmen have believed that [exposure] was their duty," which included official committee reports and publications stating that the committee had "the right to focus the spotlight of publicity upon [Communist] activities"; had conducted "systematic" "exposure"; and "believed itself commanded . . . to expose people and organizations attempting to destroy this country." *Id.* at 199 & n.32.  If such official statements by a congressional committee itself were legally insufficient in *Watkins*,

the far weaker allegations of individual motive here necessarily fail as well.  That is particularly true given the longstanding judgment embodied in section 6103(f) that the tax committees should be trusted with unique access to "return[s] and return information in order to carry out [their] legislative responsibilities[.]"  S. Rep. No. 94-938, pt. 1 at 319 (1976); *see also* 2021 OLC Op. at 23-24 (observing the century-old judgment by both political branches "that the congressional tax committees should have a statutorily unlimited right of access to tax information," and can be relied on to exercise that authority in a "deliberate[ ] and responsible" manner).

The series of decisions in *Mazars* confirm this conclusion.  In *Mazars II*, the D.C. Circuit rejected former President Trump's arguments that Congress's purpose was pretextual, noting that "the Supreme Court has made plain that 'in determining the legitimacy of a congressional act,' courts may 'not look to the motives alleged to have prompted it.'"  940 F.3d at 724-25 (citations omitted).  When the case was heard by the Supreme Court, President Trump honed and elaborated on those arguments, advancing claims of improper purpose virtually indistinguishable from those asserted here.[10]  Yet even while concluding that the "clash between rival branches of government," 140 S. Ct. at 2034, warranted enhanced judicial scrutiny of legislative purpose, the Court nevertheless made plain that such scrutiny applies to the reasons that Congress *itself* has supplied for its inquiry.  *See id.* at 2035-36 (requiring courts to examine "the *asserted* legislative purpose," the "specificity of the subpoena's request" and "the nature of the evidence *offered by Congress* to establish that a subpoena advances a valid legislative purpose" (emphasis added)).  And on remand from the Supreme Court, Judge Mehta again rejected President Trump's "attempt to draw a distinction between judicial scrutiny of congressional motives,

---

[10]  *See, e.g.*, Pet. Br., *Trump v. Mazars USA, LLP*, 2020 WL 528039, at *20 (U.S. Jan. 27, 2020) ("The Committees' evident objective to expose the President's personal finances . . . has been the goal here from the start."); *id.* at *2-3 ("In the runup to the 2018 elections, Nancy Pelosi explained that, should her party reclaim a majority of the House of Representatives, the 'subpoena power' will be 'a great arrow to have in [our] quiver,'" and "[u]pon prevailing, the incoming House majority announced its plans to investigate all aspects of the President's public and private life"); *id.* at *4 (citing statements of six members of the Committee on Oversight and Reform allegedly seeking to expose President Trump's personal information); *id.* at *38 (citing statement of House General Counsel that "Mr. Trump has refused to do what so many others in his position do, which is disclose"); *id.* at *38-39 (citing statements of Rep. Schiff that the "committee 'has a duty to expose foreign interference" and that the public "ha[s] a right to know that their President is working on their behalf, not his family's interests").

which they concede is impermissible, and identification of legislative purpose," holding that any "line between [the two concepts] is ill defined at best" and the committee's own explanation "serves as the clearest and most comprehensive explanation of [its] purpose[.]"  *Mazars IV*, 2021 WL 3602683, at *10.  The same is true here.

### 2.  The Trump Parties' Allegations Do Not in any Event Show Pretext.

Amended Cross-Claim I also fails because even if motive were relevant, the statements alleged by the Trump parties do not evidence an improper motive of "exposure for the sake of exposure." While there is "no congressional power to expose . . . where the predominant result can only be an invasion of the private rights of individuals," Congress's exposure of corruption and maladministration does not fall in that category: the public is "entitled to be informed concerning the workings of its government."  *Watkins*, 354 U.S. at 199-200.  And that desire to inform the Committee and assure the public about the workings of government is precisely the sentiment expressed in the Amended Cross-Claims.  Committee members were allegedly concerned, for example, about presidential threats to the integrity of the Mueller investigation.  *See* Am. Cross-Claim ¶¶ 26, 49.  They expressed their view that "the public deserves transparency" as "Congress considers [the] tax reform" bill that Trump championed.  *Id.* ¶¶ 71, 72; *see also id.* ¶¶ 26, 28, 47, 56.  And they manifested numerous concerns about presidential conflicts of interest, foreign influence, and Emoluments Clause violations. *See, e.g., id.* ¶¶ 34, 36, 50, 52, 55, 91.  All of these statements reflect "matter[s] of concern to the United States," not "merely . . . private or personal affairs."  *Sinclair v. United States*, 279 U.S. 263, 294 (1929), *overruled on other grounds*, *United States v. Gaudin*, 515 U.S. 506 (1995).  Thus, even if the Court could consider them, they do not demonstrate an improper motive to expose for exposure's sake.

Nor does the fact that the Committee now seeks to pursue the specific purposes in the 2021 Request, without relying on reasons that some individual members might previously have expressed, suggest that the 2021 Request is pretextual.  Individual committee members can reasonably have been concerned about the Mueller investigation and President Trump's promotion of legislation that might benefit his interests, while also desiring to understand how the IRS audited him while he sat atop that

agency.  Likewise, Committee members can legitimately believe that President Trump should have publicly disclosed his tax returns to dispel any appearance of impropriety, while *also* seeking to ensure, and to assure the public, that the Presidential Audit Program functions properly, and that any foreign influences on and conflicts of interest in the Presidency will be checked by Congress.  Thus, the fact that certain Committee members believed that President Trump should have disclosed his tax returns does not transform the Committee's 2021 Request into an exercise of exposure for its own sake, and would not "vitiate an investigation" instituted by the Committee "if that assembly's legislative purpose [would be] served." *Watkins*, 354 U.S. at 200.  Amended Cross-Claim I should be dismissed.

### D. Amended Cross-Claim II Fails as a Matter of Law Because the Committee Has Not Sought Information Solely or Primarily for Law Enforcement Purposes.

The Trump parties are similarly misguided in contending, in Amended Cross-Claim II, that "[i]f the Committee's primary purpose is not exposure for the sake of exposure, then it is law enforcement." Am. Cross-Claim ¶ 300.

As with Amended Cross-Claim I, the D.C. Circuit and the Supreme Court have repeatedly rejected nearly identical arguments.  In *McGrain*, for example, the lower court had concluded that a congressional inquiry into the Attorney General constituted illegitimate law enforcement because the Senate was "not investigating the Attorney General's office" but was "investigating the former Attorney General." *McGrain*, 273 U.S. at 177.  The Supreme Court held that this ruling "was wrong" because the Senate resolution at issue showed that "the subject to be investigated was the administration of the Department of Justice," *id.*, and the fact that any inquiry "might possibly disclose crime or wrongdoing" was not a "valid objection." *Id.* at 180.[11]  Likewise, in *Sinclair*, although the congressional resolution at issue cited evidence of "fraud and corruption," 279 U.S. at 289, the Court nevertheless concluded that the purpose was not law enforcement in light of Congress's "plenary power . . . to make all needful rules and regulations respecting the" subject matter at issue and to

---

[11] Indeed, the Court reached that conclusion even in the absence of an express statement by the Senate of its legislative purpose, explaining that "[t]he only legitimate object the Senate could have in ordering the investigation was to aid it in legislating, and we think . . . the presumption should be indulged that this was the real object." *McGrain*, 273 U.S. at 178.

"investigate the actual administration of the land laws." *Id.* at 294-95; *see also id.* at 295 (explaining that Congress's authority "to require pertinent disclosures in aid of its own constitutional power is not abridged because the information sought to be elicited may also be of use in [a criminal prosecution]"). And in *Mazars*, the D.C. Circuit again applied these principles to the same arguments made by former President Trump himself, emphasizing "the fact that an investigation might expose criminal conduct does not transform a legislative inquiry into a law-enforcement endeavor" and "easily reject[ing]" the former President's arguments to the contrary. *Mazars II*, 940 F.3d at 724, 728; *see also Hutcheson v. United States*, 369 U.S. 599, 617-18 (1962) (concluding that a Senate committee's investigation into illegal conduct did not vitiate the legitimate purpose of considering remedial federal legislation).

The same principles apply here. The Committee is investigating the functioning of the Federal tax laws, including the Presidential Audit Program, as well as possible conflicts of interest and foreign financial influence. The fact that some of the information at issue might also be the subject of a law-enforcement inquiry by the New York County District Attorney, Am. Cross-Claim ¶ 201, or that certain Committee members may suspect that President Trump committed tax fraud, *id.* ¶¶ 46, 59, 100, does not transform the Committee's legislative purpose into a law enforcement undertaking. Amended Cross-Claim II should be dismissed.

## II. AMENDED CROSS-CLAIM III SHOULD BE DISMISSED BECAUSE THE COMMITTEE'S REQUEST IS REASONABLY RELATED TO ENACTMENT OF VALID LEGISLATION WITHIN THE COMMITTEE'S JURISDICTION.

Amended Cross-Claim III shifts focus from the purpose of the Committee's 2021 Request to its means. To constitute a valid exercise of Congress's investigative power, a committee's request for information that is supported by a valid legislative purpose also must be "reasonably relevant to the [committee's legislative] inquiry," *McPhaul v. United States*, 364 U.S. 372, 381-82 (1960), must be "intended to gather information about a subject on which legislation may be had," *Eastland*, 421 U.S. at 508, and must be authorized by the committee's parent House of Congress, *United States v. Rumely*, 345 U.S. 41, 42-43 (1953). *See generally Mazars II*, 940 F.3d at 722-23, 742. Though the purpose of the 2021 Request is a valid one, the Trump parties nevertheless maintain that it fails to meet these additional requirements. They are wrong.

24

**A. The Presidential Audit Program Is a Subject on Which Valid Legislation May Be Had.**

The Trump parties first appear to suggest that no viable legislation could emerge from the Committee's examination of their tax information, contending that "Congress cannot constitutionally require the IRS to audit a President[,]" or require a President "to disclose particular information or divest from certain business relationships." Am. Cross-Claim ¶¶ 308, 311. Neither the conclusion nor its premises are well taken.

Congress's investigative authority encompasses any subject on which "legislation *may* be had," *Mazars II*, 940 F.3d at 732 (emphasis in original) (quoting *Eastland*, 421 U.S. at 508), that is, any area "in which [Congress] may potentially legislate," *Barenblatt*, 360 U.S. at 111. *See also McGrain*, 273 U.S. at 177. As discussed above, the administration of the Presidential Audit Program, and revisions that legislators may deem necessary to ensure it functions properly, are indisputably subjects on which Congress may legislate under Article I. *See supra* at 16-19. Moreover, the Committee's request contemplates a variety of potential legislative revisions to the Presidential Audit Program that do not involve mandating Presidential audits, disclosures, or divestitures. For example, the Committee is considering the need for greater procedural safeguards to provide assurance that the career IRS revenue agents who conduct examinations of Presidential tax returns are shielded from improper influences by a President or his or her representatives. *See* 2021 Request at 2. Congress could also pass legislation establishing new and more "rigorous" standards, *see id.*, for determining which items on a President's return should be examined, and in what depth, matters now largely left to the discretion of individual audit examiners. *See* Internal Revenue Manual ("IRM") §§ 4.10.2.7.1.1-4.10.2.7.1.5, https://www.irs.gov/irm. In addition, Congress could pass legislation requiring the IRS to submit reports of all Presidential audits to its tax-writing committees, to facilitate oversight of the mandatory audit program.

For their part, the Trump parties overstate the limits on Congress's authority. They assert that "Congress cannot constitutionally require the IRS to audit a President" because "Presidents alone are vested with executive power." Am. Cross-Claim ¶ 308. But while "exclusive authority and absolute discretion" to initiate law-enforcement proceedings against particular individuals lie with the Executive

Branch, *United States v. Nixon*, 418 U.S. 683, 693 (1974); *see also Prosecution for Contempt of Cong. of an Exec. Br. Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 115, 132 (1984) (citing, *inter alia*, *Buckley v. Valeo*, 424 U.S. 1, 138 (1976)), nevertheless "Congress may limit an agency's exercise of enforcement power . . . either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." *Heckler v. Chaney*, 470 U.S. 821, 833-35 (1985); *see also Cook v. FDA*, 733 F.3d 1, 6-9 (D.C. Cir. 2013); *Nat'l Wildlife Found. v. EPA*, 980 F.2d 765, 770-74 (D.C Cir. 1992); Prosecution for Contempt of Cong., 8 Op. O.L.C. at 127.  Thus, at the very least, Congress could by statute establish substantive standards that the IRS must adhere to in deciding whether and how to conduct Presidential audits.

In addition, the D.C. Circuit has rejected the Trump parties' suggestion "that Congress may impose *no* disclosure requirements whatsoever on the President" as manifesting the "'archaic view of the separation of powers'" disavowed in *Nixon v. Administrator of General Services*, 433 U.S. 425, 443 (1977) (hereinafter, "*Nixon v. GSA*").  *Mazars II*, 940 F.3d at 733-37.  Although "some hypothetical statute could go too far," Court of Appeals was emphatic that "Congress *can* require the President to make reasonable financial disclosures without upsetting [the] balance" of powers.  *Id.* at 735, 736 (emphasis added).  That being so, Congress could also address its concerns about presidential tax compliance and accountability by mandating disclosures of a President's tax returns, either to Congress itself, or the public.  Indeed, as noted *supra*, at 18, several pieces of pending legislation seek to do just that.  It cannot correctly be maintained, therefore, that the 2021 Request concerns a subject on which "no valid legislation could be enacted." *Watkins*, 354 U.S. at 194.

### B.  The Committee's 2021 Request Is Reasonably Related to Its Inquiry Concerning the Presidential Audit Program.

The Trump parties next issue a list of reasons why they contend that the Committee's request for their tax information is not reasonably related to its concerns about the Presidential Audit Program. Am. Cross-Claim ¶ 309; *see McPhaul*, 364 U.S. at 381.  None is well taken.

First, the Trump parties complain that the 2021 Request "singles out one President," Am. Cross-Claim ¶¶ 277, 309, but the Request explains at length why it considers the tax information of

President Trump, in particular, to be material to its inquiry.  2021 Request at 3-6; *see also supra* at 11. The reasons include the size and complexity of his returns—reflecting the number and complicated nature of his business relationships—*see* 2021 Request at 4-5, and his public criticism of his treatment by the IRS—both before and during his term in office, *id.* at 4, 5-6.  This combination of circumstances, peculiar to President Trump, *see id.* at 4, has raised questions for the Committee about the extent to which IRS revenue agents can and do substantiate the information reported in returns so complex, and about the capacity of existing safeguards to prevent improper interference in the Presidential audit process.  *See id.* at 2.[12]  It is of no moment, therefore, that the Committee, seeking to understand the current operation of the Presidential Audit Program, has not yet (at least reportedly) sought the nearly 50-year-old returns of President Carter and Vice President Rockefeller, Am. Cross-Claim ¶¶ 280-81, or of other officials whose returns are not subject to mandatory audit, and who do not exercise direct oversight and control of the IRS, *id.* ¶ 279.  The Committee's 2021 Request more than amply explains why the Trump parties' tax information "offers a valid point of departure" for its inquiry.  *Mazars II*, 940 F.3d at 729 (citing *McGrain*, 273 U.S. at 151-52, 179).  No more is required.

The Trump parties next suggest that no useful information can be gleaned from "open [audit] files," Am. Cross-Claim ¶ 309; *see id* ¶ 288, but that notion is unsustainable.  An audit file may include documentation showing, for example, (i) the examiner's initial "risk analysis" performed to identify issues in the return warranting examination, IRM § 4.10.2.7.1.1; (ii) which items on the return, if any, that the examiner assessed at the outset to be "large, unusual, or questionable" items warranting close scrutiny, *id.* §§ 4.10.2.3, 4.10.2.3.1(1); (iii) Information Documents Requests issued to the officeholder, listing the "specific records, information, and documents" initially requested by the examiner, *id.* § 4.10.2.10.1(2), and the officeholder's responses; (iv) summonses, including third-party summonses,

---

[12]  The Trump parties assert that President Trump's criticisms of his treatment by the IRS precede his presidency have not been directed at the Presidential Audit Program.  Am. Cross-Claim ¶ 256.  But the Committee's Request cites reports of statements by and on behalf of President Trump showing otherwise, 2021 Request at 5-6 & nn.12-13, giving the Committee fair grounds for inquiry.  *See Eastland*, 421 U.S. at 506.  The Trump parties also contend that President Trump's complaints about the IRS are not unique, pointing to criticism of the IRS, and the tax system, by past Presidents, candidates, and other government officials; but none is alleged to have complained, as has President Trump, about the IRS's examination of his or her own returns.  Am. Cross-Claim ¶¶ 257-62.

issued by the examiner for additional documents and records needed to complete the audit, *id.* § 25.5., and the responses thereto; (v) interviews conducted by the examiner with the officeholder, or third parties, *id.* § 4.10.3.3, 4.10.3.3.1; and (vi) analyses furnished by IRS specialists, such as economists, actuaries, or financial transactions experts, that the examiner may have consulted, *id.* § 4.10.2.7.5.1(2). It is thus more than reasonable of the Committee to expect that audit files may exhibit the scope, depth, and objectivity even of ongoing examinations—just as a lawyer's handling of a case may be assessed from the record even if the case remains undecided.

The Trump parties' related assertions that the Committee's request "is not aimed at answering procedural questions," Am. Cross-Claim ¶ 309, and that the only way to discover answers to the Committee's questions about the audit process is "to ask the IRS[,]" *id.* ¶ 285, also fail to account for the likely contents of an audit file, the activities they will document, and the information they will reveal. It cannot be denied that the presence, or absence, of documentation such as that described above—particularly over the course of several years' examinations—may provide a basis for assessing whether and to what extent the foregoing procedures are followed, and inquiries made. Moreover, the Committee could explore its concerns about the Presidential Audit Program in a more informed fashion by questioning the IRS about them *after* reviewing the audit files.

For much the same reasons, it also makes perfect sense for the Committee to "seek[ ] tax returns themselves." Am. Cross-Claim ¶ 309. The Committee cannot be expected to evaluate the thoroughness and objectivity of an audit process, or to assess whether the scope and depth of an examination were appropriate, without opportunity to review the returns being audited. It is also no answer to complain that the Committee has requested "pre-President files,"*id.*, documenting audits of returns that President Trump filed prior to assuming office. Under the IRM, the mandatory audit requirement applies to the returns a President files while in office. IRM § 3.28.3.5(1). Thus, the requirement applied to the returns that President Trump filed in 2017-2020, respectively, for tax years 2016-2019. The Committee's 2021 Request, seeking information for tax years 2015-2020, covers only one tax year's filings prior to President Trump's term in office. That request is reasonable, because

the scope of a mandatory presidential audit can be expanded to include prior year and related returns if risk protocols warrant.  IRM § 4.2.1.15(6), 4.10.2.7.1.5.

In short, the Trump parties' "pertinence" objection to the 2021 Request should be rejected.

### C. The Committee's Request Is Also Pertinent to "Other Contemplated Laws," and Within the Committee's Jurisdiction.

Finally, the Trump parties maintain in Amended Cross-Claim III that their tax information is "impertinent" to the "[o]ther contemplated laws" that the Committee alludes to—concerning President Trump's foreign or other "hidden business entanglements" and  "foreign financial influences," 2021 Request at 4—and that such laws would fall outside the Committee's legislative jurisdiction. Am. Cross-Claim ¶ 310.  As a threshold matter, none of the points raised by the Trump parties regarding "other" laws has any bearing on the decision of this case, as the Committee's 2021 Request is more than amply justified by its interest in legislation concerning the Presidential Audit Program.  Nevertheless, none of the Trump parties' contentions about "other" laws is tenable.

The Trump parties allege, for example, without elaboration, that neither tax returns nor audit files would reveal hidden "business entanglements."  Am. Cross-Claim ¶ 310; *see id.* ¶ 284.  Yet taxpayers' returns are required, for example, to report specified foreign assets, report transactions with foreign partnerships, and list foreign corporations controlled by a taxpayer. 26 U.S.C. §§ 6038, 6038B, 6038D, 6046, 6046A. And so far as audit files are concerned, the Trump parties overlook the fact that the essential purpose of an audit is to substantiate information reported on the face of a return through the collection of additional information and documentation about such items as reported sources of income, business deductions (including interest payments on debt) and tax credits claimed.  Insofar as an officeholder's business relationships affect the income, deductions, and credits claimed on his or her return, this additional documentation, gathered through Information Document Requests, summonses, and examiner interviews, *see supra* at 27-28, can reasonably be expected to reveal new details about those relationships.

The assertion that any laws arising from the Committee's examination of the Trump parties' tax information that do not concern the Presidential Audit Program would be beyond the Committee's

legislative jurisdiction, Am. Cross-Claim ¶ 310, can also be readily disposed of on two separate and independent grounds. First, because the Committee seeks the Trump parties' tax information under authority of section 6103(f), it is already acting with authority "to serv[e] as the representative[e] of [its] parent assembly in collecting [that] information." *Watkins*, 354 U.S. at 200-01; *see also* 2021 OLC Op. at 36. Second, if the requested returns and audit papers disclosed unknown business relationships, including foreign relationships, that in the judgment of legislators give rise to conflicts of interest that could affect a President's performance in office, then, as noted, the Committee could recommend and Congress could consider legislation requiring disclosure of presidential returns, audit files, and/or audit reports to Congress, or the public, to illuminate those conflicts. Laws of that kind would be well within the legislative jurisdiction conferred on the Committee by the House, which extends to all matters concerning U.S. revenue laws, and the desirability of new or additional laws related thereto. H. Rep. Rule X, cl. 1(t), cl. 2(b)(1)(C), 117th Cong.; House Oversight Plan at 283-84, *supra* at 17.

The Committee's 2021 Request meets all the requirements of a valid congressional request for information. Amended Cross-Claim III should therefore be dismissed.

## III. AMENDED CROSS-CLAIM IV FAILS BECAUSE *MAZARS* DOES NOT APPLY TO THE COMMITTEE'S 2021 REQUEST, AND EVEN IT IF DID, ANY REVIEW UNDER *MAZARS* IS SATISFIED.

In Amended Cross-Claim IV, the Trump parties assert that even if the 2021 Request is valid under the general legal framework set forth in cases such as *Watkins* and *Barenblatt*, it does not comport with the heightened standard of inquiry articulated in *Mazars*, which governs congressional requests for the personal information of a President. Am. Cross-Claim ¶¶ 312-317. This theory fails as well.

### A. *Mazars* Is Inapplicable on Its Terms.

The *Mazars* standard for evaluating congressional requests for an incumbent President's personal information does not apply to this lawsuit. The Supreme Court in *Mazars* articulated four non-exhaustive factors that should be considered when evaluating a subpoena directed at the personal information of a sitting President: (1) "whether the asserted legislative purpose warrants the significant step of involving the President and his papers"; (2) whether the scope of information sought is "reasonably necessary to support Congress's legislative objective"; (3) whether Congress has

provided sufficiently "detailed and substantial" evidence of its legislative purpose; and (4) "the burdens imposed" on the Presidency as a result of the subpoena.  140 S. Ct. at 2035-36.

But these factors were rooted in the Court's assessment that the dispute involved "a clash between rival branches of government," which would "unavoidably pit the political branches against one another," *id.* at 2034, and the Court's concern that two centuries of accommodation among the political branches could "be transformed" by an approach that afforded too much deference to either branch.  *Id.* at 2035; *see also id.* at 2033 (making clear that the factors refer to a request directed at "the President," who has "an ongoing institutional relationship" with Congress).  By contrast, the Request here concerns the tax information of a *former* President as to which there is no conflict between the political branches.  *See Mazars IV*, 2021 WL 3602683, at *13 (because former "President Trump no longer 'alone composes a branch of government,'" the congressional inquiry will not "'intru[de] into the operation of the Office of the President'" or "burden 'the [sitting] President's time and attention'"); 2021 OLC Op. at 28 (noting that the "2021 Request seeks the tax information, not of a sitting President, but of a former President," which "greatly mitigates the Court's concerns about Congress using its investigatory power to exert control over the President" or to intrude "into the operation of the Office of the President'" (quoting *Mazars III*, 140 S. Ct. at 2034, 2036).  Thus, as Judge Mehta observed on remand from the Supreme Court in *Mazars*, President Trump's departure from office affects the basic "foundation[ ]" of the *Mazars* framework and counsels "reduced judicial scrutiny." *Mazars IV*, 2021 WL 3602683, at *13.

To account for this foundational difference, Judge Mehta adopted a less rigorous "*Mazars* lite" standard.  Under that approach, the first *Mazars* factor, which would otherwise require a careful assessment of "the asserted legislative purpose," is less demanding because a legislative inquiry into the personal affairs of a former President is less "significant" than one targeting the incumbent President.  Thus, the inquiry into whether "other sources could reasonably provide Congress the [requested] information" need not be as searching as it would with respect to a sitting President.  *Id.* at *13.  "For the same reason, with respect to the second *Mazars* factor—which requires a court to 'insist on a subpoena no broader than reasonably necessary to support Congress's legislative

objectives'—a court need not 'insist' on as precise a fit when the subpoena is not directed to a sitting President." *Id.* As to the third *Mazars* factor—which instructs that a court must be "attentive to the nature of the evidence offered" to establish a valid legislative purpose, the court remains attentive but "a less 'detailed and substantial' submission to substantiate Congress's claimed legislative purpose may suffice given the circumscribed separation of powers concerns at play." *Id.* And finally, under the fourth factor, which examines the burdens imposed on the President by a congressional inquiry, *Mazars III*, 140 S. Ct. at 2036, the analysis should account for the fact that such burdens are likely to be "greatly diminished" when the President to whom the inquiry relates no longer occupies the office. *Mazars II,* 2021 WL 3602683, at *13.

Assuming a *Mazars*-type analysis applies here at all,[13] Defendants concur with Judge Mehta's application of a more permissive standard in light of President Trump's departure from office. Defendants also respectfully submit that two additional factors warrant an even less rigorous standard for evaluating the Committee's 2021 Request. First, unlike the subpoena in *Mazars*, the Request here was made pursuant to a statute enacted with bicameralism and presentment, which reflects "the long-standing judgment of the political branches . . . that the tax committees are best situated to determine when Congress ought to have access to tax information, notwithstanding the confidentiality rules that govern in other contexts." 2021 OLC Op. at 19. Thus, unlike a subpoena—which is typically issued by a congressional committee acting alone—the Executive Branch participated in the legislative process that gave rise to section 6103(f). *See Nixon v. GSA*, 433 U.S. at 441 (noting that separation-of-powers concerns were mitigated because "[t]he Executive Branch became a party to the Act's regulation when President Ford signed the Act into law"). Second, and relatedly, under the statutory framework established by section 6103(f), Defendants act as the "gatekeepers of federal tax information." *Tax Analysts*, 117 F.3d at 613. The Executive Branch (through OLC) therefore has had the opportunity to review the 2021 Request and assess any burdens on the Executive Branch prior to

---

[13]  OLC did not "understand *Mazars* to alter the legal framework for reviewing" the 2021 Request both because it pertained to a former President and because, unlike the subpoena at issue in *Mazars*, it was made "pursuant to a statute that embodies the considered judgment of the political branches" that the tax committees should have access to tax information.  2021 OLC Op. at 28.

releasing the requested tax information.  *Cf. Nixon v. GSA*, 433 U.S. at 443 (finding it "highly relevant" for separation-of-powers purposes that the Executive Branch acted as custodian of information relating to a President).  These factors further diminish any separation-of-powers concerns and support a more permissive review than Judge Mehta applied in *Mazars IV*.[14]

**B. The 2021 Request Does Not Violate *Mazars*.**

Even if this Court were to apply some version of a *Mazars* or "*Mazars*-lite" analysis, the 2021 Request does not unduly implicate the separation-of-powers concerns reflected in that analysis.

**1. The Committee's Investigation Warrants the Step of Seeking President Trump's Tax Returns.**

The first factor asks whether the Committee's asserted legislative purpose warrants the "significant step" of inquiring into the President's personal papers.  *Mazars III*, 140 S. Ct. at 2035.  As noted above, this "step" is less "significant" than it was in *Mazars III*, because the fact that President Trump is no longer in office "greatly mitigates [any] concerns about Congress using its investigatory power to exert control over the President," 2021 OLC Op. at 28; *see also Mazars IV*, 2021 WL 3602683, at *13 ("When Congress subpoenas a former President, the step remains 'significant' but less so than when a sitting President is involved.").

On the other side of the ledger, and as discussed *supra* at 11, the Committee could not review the functioning, capacity, and resilience of the Presidential Audit Program under the challenges presented by President Trump, as it seeks to do, without examining tax information that concerns President Trump.  Were the Committee to investigate the returns and audits of individuals who are known to have similarly complex financial dealings or who are similarly critical of the IRS, but did not serve as President, such investigation would not reveal the audit process in the same political context that exists where the taxpayer is the President, and thus would not help the Committee understand

---

[14]  Defendants agree with the Committee that it would also be possible to apply the "pragmatic, flexible" approach adopted in *Nixon v. GSA*, under which the separation-of-powers analysis would focus "on the extent to which [the 2021 Request] prevents the Executive Branch from accomplishing its constitutionally assigned functions" and "whether [any] impact is justified by an overriding need to promote objectives within the constitutional authority of Congress." 433 U.S. at 442-43.  However, because those inquiries are subsumed by the four *Mazars* factors, and (as discussed below) application of that test is satisfied, it is unnecessary to conduct a separate analysis under *Nixon v. GSA*.

"whether IRS agents have been able to operate free from improper interference" in that context.  2021 Request at 3.  Likewise, examining the audits of other prior Presidents would not provide insights into the functioning of the Program under the unique stressors posed by President Trump's audits. President Trump "controlled more than 500 individual business entities" involving both foreign and domestic activities, and has reportedly been in a decade-long battle with the IRS over a $73 million refund since before he entered office.  2021 Request at 4.  And as President, he repeatedly and publicly expressed his frustration with the audit process, thus raising concerns within the Committee about whether the IRS agents involved in his audits were able to operate free from political influence and interference.  *See id.* at 5-6.  Examining the audits of other Presidents whose tax filings were not known to be nearly as large and complex, and who did not openly accuse the IRS of mistreating them, would not permit the Committee to understand how the Program functions "under the exceedingly challenging circumstances presented by former President Trump."  *Id.* at 6; *see also id.* at 3, 5 (explaining that President Trump is "markedly different from other Presidents examined under the IRM's mandatory audit procedures" and uniquely "implicates many of [the Committee's] wide-ranging concerns").  For similar reasons, no other taxpayer's business dealings implicate potential conflicts of interest or foreign entanglements affecting the Presidency to the same extent as those of President Trump, and therefore those filings would not inform the Committee's consideration of such matters.

Nor does the Committee's focus on President Trump suggest that it is improperly using a President as a "case study" for "generally applicable legislation."  *Mazars III*, 140 S. Ct. at 2036.  The Committee is contemplating legislation that would specifically relate to a taxpayer President, not legislation that is "generally applicable."  Moreover, the Committee is particularly concerned that "IRS employees in any way involved in a President's audit are protected in the course of their work and do not feel intimidated," and thus seeks to understand not simply how the Presidential Audit Program works on paper but whether "IRS agents have been able to act objectively" in carrying out the program.  2021 Request at 2-3.  As to that objective, and as discussed above, the unique set of institutional stressors with which the Committee is concerned are ones that, by all appearances, only the audits of President Trump have involved.  The request is therefore appropriately concerned with

the information of the former President that uniquely implicates the focus of the legislative inquiry. *See* 2021 OLC Op. at 29 ("[T]he Committee's interests here are not about 'general' topics distinct from the presidency, but about an auditing program specific to the presidency and oversight concerns particular to President Trump."). The Committee's investigation thus warrants the "step" of seeking the tax information of the former President as a "point of departure," *Mazars II*, 940 F.3d at 729, while remaining properly focused on how that information implicates the functioning of the tax laws.

### 2. The Request Is Not Broader than Necessary.

The second *Mazars* factor—whether a request is no "broader than reasonably necessary to support [the Committee's] objectives," *Mazars III*, 140 S. Ct. at 2036—is also satisfied. Requesting the tax information not only of President Trump but also of eight affiliated entities is appropriate because the Committee seeks to understand whether, in the course of a presidential audit, IRS agents review "underlying business activities, especially activities involving many interrelated entities and income from . . . foreign sources." 2021 Request at 3. That breadth is necessary because President Trump holds interests in hundreds of business entities, and his individual returns necessarily incorporated and/or were based upon the tax filings of those entities. Examining only President Trump's individual returns, without those of the business interests that underlie and give substance to the returns, would give the Committee only limited and superficial insight into the scope of the audit.

As discussed above, at 28-29, the time frame for the Request—tax years 2015-2020—is also appropriate. Under the IRM, the Presidential Audit Program applies to returns filed while a President is in office. *See* 2021 OLC Op. at 32; IRM § 3.28.3.5(1) (providing instructions for processing returns "of the President and Vice President of the United States *in office at the time of filing*" (emphasis added)). For President Trump, who took office in 2017 and departed in January 2021, that time period would include tax years 2016-2019, filed in 2017-2020, respectively. The Request thus covers the returns that President Trump and his affiliated business entities presumptively filed during his four years in office, as well as one year on either side. That one-year cushion is appropriate because the scope of a mandatory presidential audit can be expanded to include prior year and related returns if risk protocols warrant. IRM § 4.2.1.15(6), 4.10.2.7.1.5; *see also* 2021 OLC Op. at 32. The Committee therefore could

reasonably believe that audits of President Trump's returns might involve examination of returns filed before he took office or after he departed.  And even if that assessment turned out to be factually incorrect, it would not render the scope of the 2021 Request unreasonable, because "[t]he very nature of the investigative function—like any research—is that it takes the searchers up some 'blind alleys' and into nonproductive enterprises." *Eastland*, 421 U.S. at 509.

### 3.  The Committee Has Provided Detailed and Substantial Evidence of Its Needs.

The third *Mazars* factor is also satisfied because the 2021 Request provides a detailed explanation of the Committee's need for the tax information at issue.  *See Mazars III*, 140 S. Ct. at 2036 (Congress should "adequately identif[y] its aims and explain[ ] why the President's information will advance its consideration of the possible legislation").

The 2021 Request describes ways in which the audit system did not function appropriately as to President Nixon, 2021 Request at 1, and the Committee's reasons for concluding that the system also may not have sufficient safeguards for President Trump's "ongoing audits, hundreds of business entities, and inordinately complex returns."  *Id.* at 2.  The Committee pointed to specific aspects of former President Trump's tax profile—including hundreds of affiliated business entities, use of a revocable trust to control those entities while in office, and a decade-long battle over a $73 million refund—that make him unique among Presidents in testing the resilience of the Presidential Audit Program.  *Id.* at 4-5.  The Committee also cited specific public statements of the former President that give rise to reasonable concerns about undue influence in the audit process.  *Id.* at 5 ("As a Presidential candidate, he expressed his belief that it was 'very unfair' that he was 'always audited'" and "[a]larmingly, once he became President, this sentiment was explicitly extended to the automatic, mandatory audit described in the IRM.").  The Committee also explained why alternative information, such as written materials or a briefing about the Program, would not be adequate, namely, that some practices reflected in the IRM appear outdated; that the IRM confers extensive discretion on individual auditors; and that the Committee's primary concern is understanding how the audit program functions in practice, rather than on paper or in theory.  *See* 2021 Request at 3 ("At its core, what the Committee seeks to understand is how the IRM provisions have been applied *in practice* and whether IRS agents

have been able to act objectively[.]" (emphasis in original)).  The 2021 Request's focus on tax years for which President Trump served in office, and surrounding years that might be encompassed by a Presidential audit, is well-tailored to these legislative objectives.

### 4. The Committee's Legislative Purposes Are Not Outweighed by Executive Branch Interests.

Finally, the fourth *Mazars* factor similarly weighs in favor of disclosure because the unique circumstances of the 2021 Request present only minimal, if any, burdens on the Presidency.  *See Mazars III*, 140 S. Ct. at 2036 ("courts should be careful to assess the burdens imposed on the President by a" congressional inquiry).  The Executive Branch has decided that the disclosure here would not have a material, let alone a significant, impact on the ability of Presidents to perform their constitutional responsibilities.  There is no occasion for the Trump parties to assert interests on behalf of the Executive Branch, and the Trump parties have not even attempted to do so, instead asserting burdens on their own private interests in avoiding alleged interference "with ongoing examinations," disclosure of "sensitive financial information," and "taxpayer privacy."  Am. Cross-Claim ¶ 317.  So it is dispositive that the Executive Branch has determined that the 2021 Request presents no meaningful burdens on the Presidency.

Indeed, as a general matter, the passage of section 6103(f) with the concurrence of the President mitigates concerns about congressional aggrandizement that might otherwise exist in the context of an informational request pursued solely through a subpoena.  *See* 2021 OLC Op. at 23-24. The "political branches have repeatedly determined over the course of the last century that the congressional tax committees should have a statutorily unlimited right of access to tax information— an authority predicated, at least in part, upon the judgment that those committees are uniquely suited to 'assure explicit, deliberate, and responsible congressional attention to the use made by its members and committees of individual tax returns.'"  2021 OLC Op. at 24 (citing *Confidentiality of Tax Return Information: Hearing Before the H. Comm. on Ways and Means*, 94th Cong. 154 (1976)); *see also Nixon v. GSA*, 433 U.S. at 441 (rejecting separation-of-powers challenge to the Presidential Recordings and Materials Preservation Act in part because the "Executive Branch became a party to the Act's regulation when

President Ford signed the Act into law, and the administration of President Carter . . . vigorously supports . . . its constitutionality").  Further, President Trump is no longer in office, thus diminishing any concerns that the 2021 Request will unduly burden Executive Branch interests.  *See id.* at 448 ("only the incumbent is charged with performance of the executive duty under the Constitution" and therefore "a former President is in less need of [protections] than an incumbent").

Nor is this a situation where Congress could exploit the threat of a post-Presidency request for personal information to exert improper influence over a president while in office.  *See Mazars IV*, 2021 WL 3602683, at *13.  Again, the President has not asserted as much, and in any event, the Committee here is focused primarily on the functioning of the IRS and its audit processes, and potential presidential conflicts of interest, under circumstances peculiar to President Trump, not the Presidency *per se*.  That is why the Committee sought not only tax returns but also "[a]ll administrative files" for each requested tax return.  2021 Request at 6.  Such inquiries should not be expected to require regular probing of a president's tax filings or audit histories because no prior President has implicated the same combination of concerns that animate the Committee's inquiry here.  Indeed, there is only one prior example of congressional efforts to review a president's tax returns—President Nixon's returns, fifty years ago—and in that case President Nixon voluntarily disclosed some of his returns for review, consistent with the tradition of elected presidents since, and did not oppose the release of other returns and information under section 6103(f) when the Joint Committee on Taxation sought to broaden the review.  *See* 2021 OLC Op. at 33.  And even if similar concerns were to arise again in relation to a future President, the President is subject to the tax laws, just like any other individual, and the commitment to the fair and impartial administration of the tax laws, which both the Executive and Legislative Branches share, would justify the inquiry.  The interests of the two branches are therefore aligned in this respect.

For all of the above reasons, the Committee's 2021 Request does not significantly implicate any of the considerations identified in *Mazars*.  Amended Cross-Claim IV should be dismissed.

**IV. THE TRUMP PARTIES' CHALLENGES FOCUSED ON 6103(F) IN AMENDED CROSS-CLAIMS I AND V FAIL, BECAUSE SECTION 6103(F) DOES NOT EXCLUDE A FORMER PRESIDENT'S INFORMATION FROM ITS SCOPE, AND BECAUSE SECTION 6103(F) IS PLAINLY CONSITUTIONAL.**

The Trump parties mount two challenges directed at section 6103(f).  First, as part of Amended Cross-Claim I, they argue that the 2021 Request does not satisfy section 6103(f) because "under the canons of statutory construction applicable to statutes that implicate the separation of power," section 6103(f) "cannot be read to cover the information of Presidents or former Presidents." Am. Cross-Claim ¶ 297 (quotation omitted).  Second, in Amended Cross-Claim V, the Trump parties argue that section 6103(f) is facially unconstitutional because it can be read to require the disclosure of confidential tax information even if Congress has no legitimate legislative purpose in seeking it.  *See* Am. Cross-Claim ¶¶ 318–324.  Both arguments are unavailing.

**A. Section 6103(f) Authorizes the Committee's Request.**

The Trump parties' contention that section 6103(f) does not authorize the Committee to request the former President's tax information fails because the plain language of section 6103(f)(1) applies without exception to "*any* return or return information," 26 U.S.C. § 6103(f)(1) (emphasis added).  The Trump parties' argument to the contrary depends upon importing "the canons of construction applicable to statutes that implicate the separation of power[.]" Am. Cross-Claim ¶ 297.  *See Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992) (finding, "[o]ut of respect for the separation of powers and the unique constitutional position of the President . . . that textual silence is not enough to subject the President to the provisions of the APA"); *Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991) (same).  But there is no reason to apply those canons of construction here.

First, any separation-of-powers concerns that may be raised by a congressional request seeking even a current President's information are necessarily addressed by attention to the considerations the Supreme Court identified in *Mazars*, *see supra* Arg. § IV.  Indeed, the entire purpose of the Court's analysis was to "take adequate account of the separation of powers principles at stake" when Congress seeks the personal information of a sitting President, "including both the significant legislative interests of Congress and the unique position of the President."  *Mazars III*, 140 S. Ct. at 2035 (citation

omitted).[15]  Thus, because separation-of-powers concerns implicated by the Committee's request, if any, would be resolved under the *Mazars* analysis discussed in Arg. § IV, *supra*, it is not necessary to apply a specialized construction to section 6103(f) in order to address such concerns.

Moreover, the precedent setting forth the canon upon which the Trump parties rely makes plain that the canon has no application to section 6103(f).  In asserting that "'textual silence' means that § 6103(f) cannot be read to cover the information of Presidents or former Presidents" under "the canons of construction applicable to statutes that implicate the separation of power," Am. Cross-Claim ¶ 297, the Trump parties quote *Armstrong*, 924 F.2d at 289.  There, the D.C. Circuit addressed whether the President could be considered an "agency" subject to the APA, a result that would have been contrary to "longstanding presidential practice," and would have restricted and regulated his actions as President.  *Id.* (noting that "the President has never been thought to have to comply with APA rulemaking procedures when issuing executive orders").  The D.C. Circuit held that textual silence would not support such an interpretation of the statute, reasoning that "[w]hen Congress decides purposefully to enact legislation restricting or regulating presidential action, it must make its intent clear."  *Id.*  During the following year, the Supreme Court, too, held that the President cannot be considered an "agency" under the APA, reasoning "[w]e would require an express statement by Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion."  *Franklin*, 505 U.S. at 800-01.  The concerns in *Franklin* and *Armstrong* that caused the Supreme Court and the D.C. Circuit to require a clear statement of congressional intent to apply the generally applicable statute at issue there to the President are not present here, however.  Section 6103(f) does not regulate "the President's performance of his statutory

---

[15] In *Mazars*, relying on *Franklin* and *Armstrong*, the Trump parties had advocated a similar approach. *Trump v. Mazars*, No. 19-715, 19-760, Pet. Br. at 22, 56–57; *Trump v. Mazars*, No. 19-715, 19-760, Pet. Reply at 3, 31–33.  They had argued that—before even reaching the separation-of-powers considerations addressed in the analysis of the *Mazars* factors—the Court should have demanded a "clear statement" from the full House, in the form of an "express delegation," that it was conferring authority on the Committees specifically to subpoena the personal financial information of the President. *Trump v. Mazars*, Nos. 19-715, 19-760, Pet. Br. at 22, 56–57; *Trump v. Mazars*, Nos. 19-715, 19-760, Pet. Reply at 3, 31–33.  The Supreme Court declined even to address this contention, confirming that the framework set forth in *Mazars* adequately covers any separation-of-powers concerns raised by the Committee's request.

duties," *id..* at 801, or "restrict[] or regulat[e] presidential action" in any way, *Armstrong*, 924 F.2d at 289.  Indeed, section 6103(f) does not touch on the President's official duties at all.

Finally, the *Franklin/Armstrong* canon also has no application here because the 2021 Request seeks tax information of a former President.  Even where a request for a sitting President's information did "implicate special concerns regarding the separation of powers," *Mazars III*, 140 S. Ct. at 2036, the Supreme Court concluded that those concerns did not necessarily preclude Congress from using its subpoena power to obtain such information.  *See supra* Arg. § IV.  It would be anomalous if the Court were to conclude now that separation-of-powers concerns altogether bar Congress from receiving the tax information of a *former* President via the mandatory statutory mechanism under section 6103(f).  Yet that is the result that would follow if the Court were to accept the Trump parties' construction.

For all these reasons, the Court should decline the Trump parties' invitation to import the *Franklin/Armstrong* canon into this setting, and it should reject their strained reading of section 6103(f).  The broad language of the statute includes a former President's tax information, and the canons of statutory construction supply no basis on which to depart from that plain meaning.

**B.  Section 6103(f) is Constitutional.**

The Court likewise should reject the Trump parties' facial challenge to the constitutionality of section 6103(f).  In Amended Cross-Claim V, the Trump parties contend that, because it is possible to imagine an unconstitutional application of section 6103(f), the statute is facially invalid and must be struck down.  Am. Cross-Claim ¶¶ 318–24.  This position gets the law exactly backwards.

Outside the First Amendment "overbreadth" context, to succeed in a facial attack, "the challenger must establish that no set of circumstances exists under which the [statute] would be valid." *Salerno v. United States*, 481 U.S. 739, 745 (1987).  Indeed, the Supreme Court unequivocally rejected the very approach the Trump parties advocate here, holding that "[t]he fact that the [statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid."  *Id.*  Because section 6103(f) can constitutionally be applied in the case of every Congressional request for tax information that is made for a legitimate legislative purpose—and the Trump parties do not argue otherwise, *see*, *generally*, Am. Cross-Claim ¶¶ 318–24—Amended Cross

Claim V plainly fails to "shoulder [the] heavy burden" to demonstrate that the statute is facially invalid. *Salerno*, 481 U.S. at 745.

## V. AMENDED CROSS-CLAIM VI STATES NO ACTIONABLE FIRST AMENDMENT VIOLATION.

Amended Cross-Claim VI asserts that "the Committee's request for President Trump's tax information" and Defendants' intention "to comply with the Committee's request" are both "unlawfully motivated by discrimination, harassment, and retaliation" against President Trump, "in violation of the First Amendment. Am. Cross-Claim ¶¶ 330, 336. This claim fails on both scores. Defendants intend to comply with the Committee's 2021 Request because section 6103(f)(1) compels them to do so, not because of implausibly pled motives of retaliation. Nor do alleged discrimination and retaliation by the Committee based on President Trump's policies, political beliefs, or protected expression—which are also implausibly pled—permit the Court to impugn the Committee's Request.

### A. Amended Cross-Claim VI Fails To State a Claim of First Amendment Discrimination or Retaliation by Defendants—for Lack of Causation, and Otherwise.

Amended Cross-Claim VI does not state a claim of First Amendment discrimination or retaliation by Defendants. This is principally so because section 6103(f)(1), not alleged improper motives harbored by Defendants, is the "but for" cause of Defendants' intended compliance with the Committee's 2021 Request.

"[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quotation omitted). To state a claim for First Amendment retaliation, a litigant must allege "(1) 'that he engaged in protected conduct,' (2) 'that the government took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again,' and (3) 'that there exists a causal link'" between the two. *Scahill v. Dist. of Columbia*, 909 F.3d 1177, 1185 (D.C. Cir. 2018) (quoting *Doe v. Dist. of Columbia*, 796 F.3d 96, 106 (D.C. Cir. 2015)). "To establish the causal link, the constitutional speech must be the but-for cause of the retaliatory action." *Id.* (citing *Doe*, 796 F.3d at 107). Similarly, a claim of First Amendment discrimination requires well pled

allegations of government action taken "for the purpose of discriminating on account of" the plaintiff's protected conduct.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 676-77 (2009).

The Trump parties allege that the 2021 Request "single[s] out President Trump because he is a Republican and the chief political opponent of Committee Democrats," and "w[as] made to retaliate against [him] because of his policy positions, his political beliefs, and his protected speech."  Am. Cross-Claim ¶¶ 331-32, 334.  They suggest that Defendants intend to comply with the 2021 Request because President Biden "is a Democrat" and Trump his "rival."  *Id.* ¶ 337.  As discussed *supra*, however, Arg. §§ I-IV, the Committee's 2021 Request seeks information related to and in furtherance of a legitimate task of Congress, *Watkins*, 354 U.S. at 187, while respecting "the unique position of the President," *Mazars III*, 140 S. Ct. at 2035.  Because the 2021 Request thus constitutes a valid exercise of Congress's investigative authority, the inflexible statutory command of section 6103(f)(1) requires that Defendants produce the tax information that the Committee seeks, regardless of whether or not they are motivated to do so, or why.  Under the terms of the statute, Defendants have no choice in the matter.  Thus, the "but for" cause of the intended disclosure is Defendants' legal obligation under section 6103(f)(1) to comply with the Committee's request.  Their purpose in doing so is to meet that legal obligation.  The Trump parties' claim of retaliation should be rejected, accordingly, for failure to establish the essential element of causation.  *See Hartman v. Moore*, 547 U.S. 250, 260 (2006) ("[A]ction [allegedly] colored by some degree of bad motive does not amount to [First Amendment retaliation] if that action would have been taken anyway."); *Daugherty v. Sheer*, 891 F.3d 386, 391 (D.C. Cir. 2018) ("'[A]n [allegedly] improper motive is not sufficient to establish a constitutional violation—there must also be . . . causation[.]'") (quoting *Crawford-El v. Britton*, 523 U.S. 574, 593 (1998)).

Amended Cross-Claim VI should also be dismissed, however, because it does not contain plausible allegations of retaliatory motive that rise "above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Iqbal*, 556 U.S. at 678.  The allegation that Defendants are "unlawfully motivated by discrimination, harassment and retaliation in violation of the First Amendment," Am. Cross-Claim ¶ 336, is merely a legal conclusion, no different than the "bare assertion" of discriminatory intent at issue in *Iqbal*, 556 U.S. at 681.  As such, is "not entitled to be

assumed true." *Id.* The sole factual support for the Trump parties' claim of retaliation by Defendants is the allegation that their supposed "reversal on the legality of Chairman Neal's request came under President Biden, a Democrat" and alleged Trump "rival" "who made the disclosure of President Trump's tax returns a campaign issue." Am. Cross-Claim ¶ 337.[16] But while the Trump parties may be prepared to ascribe "vindictive motives" to Defendants, *Tenney*, 341 U.S. at 378, based on nothing more than the party affiliation of the current Administration, a court may not do so.

Simply put, the Trump parties have offered no basis on which to plausibly infer a retaliatory or discriminatory motive on Defendants' part. They observe that President Trump belongs to a different political party than President Biden, but differences in party membership are surely not sufficient to create a plausible inference of ill intent. Indeed, if party membership alone supported such an inference, then it could just as plausibly be alleged that the Trump Administration acted for improper purposes when denying the Committee's original request. *See Twombly*, 550 U.S. at 564-69 (no plausible inference of antitrust conspiracy where alleged parallel conduct was just as explainable as independent competitive business strategies).

That is all the more so considering that the difference in the two Administrations' positions turns on details of separation-of-powers doctrine. Specifically, they disagreed on the level of deference that the Executive Branch owes to a congressional committee's stated need for information to pursue a legislative objective. *Compare* 2019 OLC Op. at 17, 20-22 *with* 2021 OLC Op. at 19, 21-23. That is a matter on which reasonable people acting in good faith can easily disagree. *Cf. Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010) (closely divided decision holding that dual for-cause limitation on removal of Board members violated the separation of powers).[17] Without more

---

[16]  Although the Trump parties assert that then-candidate Biden made President Trump's tax returns a "major political issue" during the 2020 presidential election campaign, Am. Cross-Claim ¶ 227, they cite only four isolated remarks, occurring over the course of a year, when then-candidate Biden mentioned the issue, and no evidence that these remarks affected either the Committee's decision to issue its request, or the Executive's decision to honor it.

[17]  The Trump parties allude to a Treasury Office of Inspector General ("OIG") memorandum as support for a claim that Treasury's initial decision to withhold the Trump parties' tax information "was reached in an independent and impartial manner." Am. Cross-Claim ¶ 224. Contrary to the Trump parties' insinuation, the Treasury OIG "did not examine the legal opinions formulating responses to Chairman Neal['s request] nor attempt to identify or interpret the bases for Treasury's

than party affiliation to "nudge" a claim of improper motive "across the line from the conceivable to plausible," *Iqbal*, 556 U.S. at 683, a court cannot ascribe ill intent to members of one Administration, or the other.  For this reason—in addition to the lack of causation—the Trump parties have not stated a claim of First Amendment retaliation or discrimination by Defendants.

### B. Assigning Implausibly Pled Motives of Retaliation and Discrimination to Committee Members Furnishes No Ground on Which to Invalidate the 2021 Request

The Trump parties also claim that the 2021 Request itself violates the First Amendment because its alleged purpose is to expose President Trump's tax information "for political gain" and to "damage him politically because he is a Republican, whose beliefs, agenda, and politics Committee Democrats oppose."  Am. Cross-Claim ¶¶ 331-32, 334.  A court, however, may not take issue with a committee inquiry based on the alleged motives of individual members, even when those motives are said to offend the First Amendment.  In any event, the Trump parties have not plausibly alleged that the Committee's 2021 Request is the product of a retaliatory or discriminatory design.

### 1. The Court may not scrutinize Committee members' motives, even on First Amendment grounds.

As discussed above, "[s]o long as Congress acts in pursuance of its constitutional power," as is the case here, "the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power."  *Barenblatt*, 360 U.S. at 132.  "[M]otives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served."  *Watkins*, 354 U.S. at 200; *see also Eastland*, 421 U.S. at 508 ("[I]n determining the legitimacy of a congressional act we do not look to the motives alleged to have prompted it."); *Wilkinson*, 365 U.S. at 412 (refusing to speculate as to the motives of individual members underlying a subcommittee's decision to summon a witness).

---

decisions to produce, or not produce, records."  *See* Mem. for Richard K. Delmar, Deputy Inspector General from Sally Luttrell, Ass't Inspector General for Investigations (Apr. 8, 2020) at 1-2 (attached as Exh. 1); *see id.* at 3 (OIG "did not examine the legal bases for decisions made by Treasury[.]"  *See also Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015) (on a motion to dismiss "[a] district court may consider a document that a complaint specifically references"); *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 54–55 (D.D.C. 2016) (same).

These precedents make no exception for claims that committee members acted for reasons forbidden by the First Amendment.  In *Wilkinson*, the petitioner was convicted for refusing to answer questions before a subcommittee of the House Un-American Activities Committee.  365 U.S. at 401-07.  He argued that the subcommittee's questioning violated his First Amendment rights of free expression and association, contending that the sole reason for summoning him to testify was to harass and persecute him as a prominent member of a public campaign to abolish the Committee.  *Id.* at 409, 411.  The Supreme Court rejected this argument.  Concluding that the subcommittee had convened and conducted the hearing in pursuit of a valid legislative purpose, *id.* at 410-11, the Court held that "it is not for us to speculate as to the motivations that may have prompted the decision of individual members of the subcommittee to summon the petitioner," *id.* at 412.  In *Watkins*, as noted *supra*, at 20, the Court declined to "test[ ] the motives of committee members" notwithstanding "an impressive array of evidence" that "[t]he sole purpose of the [committee's] inquiry . . . was to bring down upon [the petitioner] and others the violence of public reaction because of their past beliefs, expressions and associations."  354 U.S. at 199-200; *see also Eastland*, 421 U.S. at 505-10 (refusing to entertain arguments that an investigation "related to and in furtherance of a legitimate task of Congress" was intended to expose unpopular opinions and beliefs and to chill the exercise of First Amendment freedoms).  *Mazars* is also instructive in this regard.  There the Court acknowledged that it was not "blind" to the "intense political" nature of the "clash" over President Trump's financial records.  140 S. Ct. at 2034.  Yet its resolution of the dispute focused on Congress's need for the information it had requested to advance its stated legislative purpose, and the burdens imposed on the President, *id.* at 2035-36—neither of which has anything to do with the subjective motives of individual legislators.

The Committee's 2021 Request advances legitimate legislative inquiries and respects the separation-of-powers principles articulated in *Mazars*.  Once that two-fold determination is made, the Supreme Court's precedents leave no room for argument that a court may question the Committee's actions on grounds that the motives of individual members violate the First Amendment.  So far as Amended Cross-Claim VI calls on the Court to undertake that inquiry, it should be dismissed.

**2. Amended Cross-Claim VI does not plausibly allege retaliatory motive by the Committee.**

In addition to their legal untenability, the Trump parties' accusations of retaliation and discrimination by the Committee are deficiently pled. As noted, the Trump parties allege that the Committee's 2021 Request "single[s] out President Trump because he is . . . a political opponent," and "w[as] made to retaliate against [him]" and "damage him politically" "because of his policy positions, his political beliefs, and his protected speech." Am. Cross-Claim ¶¶ 331-32, 334; *see also id.* ¶¶ 2, 13, 21, 85, 234. But these allegations are no more than a "formulaic recitation of the elements" of a First Amendment retaliation or discrimination claim, "disentitle[d]" to a presumption of truth, *Iqbal*, 556 U.S. at 681, unless accompanied by other, well-pleaded facts that plausibly suggest an entitlement to relief.

They are not. Amended Cross-Claim VI does not identify which of former President Trump's policy positions, political beliefs, or protected statements supposedly provoked the Committee's ire; offers no detail as to their content; and does not tell us when former President Trump supposedly took these positions, gave voice to these beliefs, or made these statements. Amended Cross-Claim VI also fails to identify which, or even how many, of the Committee's two dozen Democratic members, *see* https://waysandmeans.house.gov/subcommittees/ways-and-means-117th-congress, supposedly nurtured retaliatory intentions because of former President Trump's unspecified positions, beliefs, and statements; and it advances no reason to suppose that they in fact did so other than their party affiliation. Pleadings that leave a court "in the dark" as to who supposedly harbored retaliatory motives, and which of former President Trump's positions, beliefs, and statements evoked these intentions, are too vague to construct "the requisite plausible scenario that could show [the Trump parties are] entitled to relief." *Patton Boggs LLP v. Chevron Corp.*, 683 F.3d 397, 403-04 (D.C. Cir. 2012) (citation omitted); *see also Hourani v. Mirtchev*, 796 F.3d 1, 11, 16 (D.C. Cir. 2015).

Even more critically, the Trump parties' claims of retaliatory animus are not just unsupported, they are contradicted by the factual matter in their pleadings. They allege a number of statements by Committee members (the lion's share by just six members), by Speaker Pelosi, and by several other Democratic House Members, made over a period of nearly five years, indicating that they wished to obtain President Trump's tax returns because of concerns about possible (i) "Russian connection[s]";

(ii) foreign entanglements and financial conflicts of interest; (iii) Emoluments Clause violations; (iv) tax evasion; and (v) other criminal and/or fraudulent acts committed by former President Trump as a private citizen.[18]  None mentions former President Trump's policies or political beliefs, much less suggests that his protected expression is the "but for" reason for seeking his tax information.  To the contrary, the reasons expressed are unrelated to his political policies, statements, or beliefs.  The Trump parties plead no facts to suggest that these statements reflected anything but genuine concern over a sitting President's potential entanglements with hostile foreign powers, and other conflicts of interest that could affect the performance of his duties.  Far from stating a plausible claim to relief, the Trump parties have pled themselves out of court by alleging facts that render success on their retaliation claim impossible.  *See Nurriddin v. Bolden*, 818 F.3d 751, 757 (D.C. Cir. 2016).

As said in *Tenney*, 341 U.S. at 378, "[i]n times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed.  Courts are not the place for such controversies."  But even if the First Amendment provided a vehicle for conveying such claims into the courtroom, litigants still must arrive with sufficient facts to state a plausible entitlement to relief.  The Trump parties have not done so in Amended Cross-Claim VI.

## VI.  AMENDED CROSS-CLAIM VII IS UNRIPE AND FAILS TO STATE A SEPARATION-OF-POWERS CLAIM.

The Trump parties' next amended claim alleges that Defendants are violating separation-of-powers principles by giving the Committee access to files that are the subject of alleged ongoing IRS examinations.  *See* Am. Cross-Claim ¶ 340.  This claim should be dismissed for two key reasons.

First, as with Amended Cross-Claim VIII, *see infra* Arg. § VII, Amended Cross-Claim VII is unripe because it depends "on contingent future events that may not occur as anticipated, or indeed may not occur at all."  *See Trump v. New York*, 141 S. Ct. 530, 535 (2020) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1999)).  Specifically, the implicit injury on which this claim rests is the assumption that, if given access to the requested materials, the Committee will use those materials to interfere with

---

[18]  *See* Am. Cross-Claim ¶¶ 26-28, 36, 41, 42, 44-47, 49-52, 55-59, 61, 62, 68, 96, 97, 99-102, 104, 106-08, 110-11, 143, 145, 147-49, 151-56, 158-63, 165-66, 171-77, 179-84, 208-10, 212, 240, 241; Cross-Claim ¶¶ 4, 6-9, 13(d), (e), 22(b), 30-37, 40, 41, 53-55, ECF No. 113.

the alleged IRS audits to the detriment of the Trump parties. *See* Am. Cross-Claim ¶¶ 342-44. This assertion is not only speculative, but is also contrary to the four corners of the 2021 Request, which convey the Committee's intent to *safeguard* the presidential audit process from political pressures and to "ensur[e] that the tax laws are administered fully and fairly." *See* 2021 Request at 2. Accordingly, Amended Cross-Claim VII is unripe and should be dismissed.

Second, Amended Cross-Claim VII fails on the merits. The cornerstone of this claim is the erroneous assertion that separation-of-powers principles prohibit the Executive from sharing information with Congress any time the information is the subject of or arises from an ongoing administrative matter—in this case, allegedly, IRS audits. That conclusion, besides being legally incorrect under the standards discussed above, *see supra* Arg. §§ I-IV, is not supported by the authorities cited in the Amended Complaint.

For starters, while congressional requests for Executive Branch information may *implicate* separation-of-powers concerns, those concerns do not categorically bar disclosure in every case. *See, e.g.*, *Schaghticoke Tribal Nation v. Kempthorne*, 587 F. Supp. 2d 389, 410 (D. Conn. 2008) ("Congressional hearings are not inherently improper whenever their inquiry touches on or arises from a pending administrative matter.") (citing *ATX, Inc. v. U.S. Dep't of the Treasury*, 41 F.3d 1522, 1527-28 (D.C. Cir. 1994). In this case, as discussed above, disclosure is proper because section 6103(f) requires it, the Committee has asserted valid legislative purposes, and its request comports with *Mazars III*, 140 S. Ct. at 2036 (assuming a *Mazars*-type analysis applies here in the first place). *See supra* Arg. §§ I-IV.

The OLC opinions cited by the Trump parties, which discuss circumstances in which a President may assert executive privilege, do not bear on the 2021 Request. *See* Am. Cross-Claim ¶ 341 (citing 10 Op. O.L.C. 68, 76 (1986)), ¶ 342 (citing 8 Op. O.L.C. 252, 263 (1984)). In the 1984 opinion, for instance, the Justice Department recommended asserting executive privilege over documents related to a then-ongoing criminal investigation, based in part on the conclusion that disclosure "will substantially interfere with the Department's ongoing criminal investigation in that case." *See* 8 Op. O.L.C. at 254. The opinion further noted that Congress had not articulated its purposes for requesting the information. *Id.* at 268 ("The letters from Senator Proxmire and Senator Grassley did not specify

the purpose for seeking access to an open investigative file."). Here, by contrast, an IRS audit is not a criminal proceeding, and even if it were, the Trump parties do not explain how Congress would inappropriately "partner in" that proceeding merely by reviewing documents relevant to the proceeding. *See* Am. Cross-Claim ¶ 342.[19]

Next, citing a 1986 OLC opinion that addresses executive privilege over information regarding appointment decisions under the Independent Counsel Act, the Trump parties allege that the Executive Branch has "long refused" to provide open law-enforcement files to Congress. *See* Am. Cross-Claim ¶ 341 (citing 10 Op. O.L.C. 68, 76 (1986)). But neither the 1986 OLC opinion nor any of the Trump parties' other cited authority states that the Executive must do so (even in the case of a congressional committee request rather than, as here, pursuant to a statutory mandate). To the contrary, the 1984 opinion discussed above expressly contemplates releasing open law-enforcement files to Congress in extraordinary circumstances, *see* 8 Op. O.L.C. at 267, and in the 1981 OLC opinion cited in support of the Trump parties' due process claim, *see* Am. Am. Cross-Claim ¶ 350, the Department of the Interior released "a large number of the materials" requested by Congress while Interior's decisionmaking process was ongoing, *see* 5 Op. O.L.C. 27, 28 (1981). More than that, here the IRM expressly contemplates that the IRS may disclose to congressional committees materials that relate to an active IRS matter. *See* IRM § 11.3.4.4(13) (allowing IRS to disclose to Congress "[r]ecords relating to cases that are under active investigation" if disclosure will not have a "serious adverse effect on the administration of the tax laws"). All of this together demonstrates the implausibility of the Trump parties' allegations in Amended Cross-Claim VII.

Finally, any separation-of-powers concerns raised in Amended Cross-Claim VII are diminished by section 6103(f). That provision embodies the "long-standing judgment of the political branches" that the congressional "tax committees are best situated to determine when Congress ought

---

[19] The Trump parties no longer rely on 5 Op. O.L.C. 27 (1981) in support of their separation-of-powers claim and instead cite that opinion in support of their due process claim. *See* Am. Cross-Claim VIII ¶ 350. Regardless of which claim it is cited toward, the 1981 OLC opinion does not support the Trump parties' position because, as in the 1984 opinion, the 1981 OLC opinion concluded that disclosure "would seriously interfere with or impede the deliberative process of government," 5 Op. O.L.C. at 29, and that Congress had not sufficiently articulated its need for the requested information, *id.* at 32. There have been no such determinations here.

to have access to tax information." *See* 2021 Op. O.L.C. at 19.  To conclude that the separation-of-powers doctrine prevents the Executive from sharing that information with Congress during an IRS audit would be at loggerheads with section 6103(f) and the inter-branch agreement that brought the law into existence in the first place.  *See, e.g., INS v. Chadha*, 462 U.S. 919, 949 (1983) (bicameralism and presentment demonstrate that a law "has been carefully and fully considered by the Nation's elected officials."); *Nixon v. GSA*, 433 U.S. at 441 ("The Executive Branch became a party to the Act's regulation when President Ford signed the Act into law."); id. at 444-45 (noting "abundant statutory precedent for the regulation and mandatory disclosure of documents in the possession of the Executive Branch," subject to "applicable privilege inherent in that branch," and citing, among other examples, 26 U.S.C. § 6103).

For these reasons, Amended Cross-Claim VII is unripe, and fails to state a viable claim.

## VII.  AMENDED CROSS-CLAIM VIII DOES NOT STATE A VIABLE DUE PROCESS CLAIM.

### A.  The Court Lacks Jurisdiction to Consider Amended Cross-Claim VIII Because It Is Neither Constitutionally Nor Prudentially Ripe.

In Amended Cross-Claim VIII, the Trump parties assert that because "information requested by the Committee is the subject of ongoing examinations by the IRS," Am. Cross-Claim ¶ 346, "[a]llowing the Committee to obtain [that information]" amounts to a violation of their due process rights, *id.* ¶ 351, since "[e]ven the most scrupulous IRS officials could not help but be influenced by the fact that congressional partisans are scrutinizing their work in real time," *id.* ¶ 349, and "looking over [their] shoulders . . . on a theory that they are being too lax on particular taxpayers." *Id.*  This speculative claim about the potential influence of congressional scrutiny on the outcome of alleged ongoing examinations depends upon future events that may not occur as anticipated, or may not occur at all.[20]  Moreover, because the applicable legal framework focuses on the factors that the agency takes into account in reaching its decisions, postponing judicial review until such decisions have actually

---

[20] The discussion herein addresses the Trump parties' allegations, and is not intended to confirm or deny the existence of any IRS audits or the existence of any filed returns by the Trump parties.

been rendered plainly would benefit the Court's analysis.  For these reasons, as explained below, Amended Cross-Claim VIII is not ripe.

"[A]n Article III court cannot entertain the claims of a litigant unless they are 'constitutionally and prudentially ripe.'"  *In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig.*, 720 F.3d 354, 359 (D.C. Cir. 2013) (quoting *Wyoming Outdoor Council v. U.S. Forest Serv.,* 165 F.3d 43, 48 (D.C. Cir. 1999)).  And, a complainant bears the burden of establishing that his claim is currently ripe for review.  *See Renne v. Geary*, 501 U.S. 312, 316 (1991) ("We presume that federal courts lack jurisdiction unless the contrary appears affirmatively from the record.") (citation omitted).  The Trump parties cannot meet this burden as to Amended Cross-Claim VIII.

In  addressing  a  claim  of  congressional  interference  in  the  administrative  process—the allegation at the heart of Amended Cross-Claim VIII—"judicial evaluation of the [alleged] pressure must focus on the *nexus* between the pressure and the actual decision maker."  *ATX, Inc. v. U.S. Dep't of Transp.*, 41 F.3d 1522, 1527 (D.C. Cir. 1994).  "[T]he proper focus is not on the content of congressional  communications  in  the  abstract,  but  rather  upon  the  relation  between  the communications and the adjudicator's decisionmaking process."  *Id.* (citation omitted).  "The test is whether  'extraneous  factors  intruded  into  the  calculus  of  consideration'  of  the  individual decisionmaker."  *Peter Kiewit Sons' Co. v. U.S. Army Corps of Eng'rs*, 714 F.2d 163, 170 (D.C. Cir. 1983) (quotation omitted); *ATX, Inc.*, 41 F.3d at 1528 ("We are concerned when congressional influence shapes the agency's determination of the merits").

Here, the Trump parties aver that alleged IRS examinations of their returns remain "ongoing." Am. Cross-Claim ¶¶ 346, 351.  Thus, according to their allegations, *see id.*, there are, as yet, no decisions the Court could examine to determine whether extraneous factors interfered to such an extent that relief is warranted.  Indeed, even after any alleged initial audit process was complete, the IRS would be required to issue a notice of deficiency, if any, and the taxpayer would have the opportunity to obtain judicial review, either by petitioning the Tax Court prior to paying any deficiency, or paying any deficiency and seeking review in district court or the Court of Federal Claims.  *See* 26 U.S.C. §§ 6211–13; 28 U.S.C. § 1346(a)(1); 26 U.S.C. §§ 6532(a), 7422(a).

Constitutional ripeness "originat[es] in the case-or-controversy requirement of Article III" and requires that a claim not be "dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Trump*, 141 S. Ct. at 535 (quoting *Texas*, 523 U.S. at 300). Here, although the Trump parties assert that IRS officials "could not help but be influenced" by Congress's scrutiny of their work, Am. Cross-Claim ¶ 349, the Trump parties can only speculate as to the outcomes of any alleged ongoing IRS examinations, and whether congressional scrutiny ultimately would play any role at all in those outcomes. Moreover, it is speculation again to suppose—if there were a decision resulting from the ongoing examinations into which "extraneous factors intruded," *Peter Kiewit Sons' Co.*, 714 F.2d at 170—that such a decision would withstand the judicial review to which the Trump parties would be entitled. *See supra* (describing process available to a taxpayer upon completion of an examination). For all these reasons, the Trump parties cannot demonstrate that their due process claim is constitutionally ripe.

Nor can the Trump parties demonstrate prudential ripeness, which requires a court to balance "the fitness of the issues for judicial decision and the hardship to the parties of withholding consideration." *Texas*, 523 U.S. at 301 (quoting *Abbot Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). The "fitness for review" inquiry encompasses considerations similar to those discussed above, and includes, *inter alia*, the Court's "interest in avoiding unnecessary adjudication and in deciding issues in a concrete setting." *AT&T Corp. v. Fed. Commc'ns Comm'n*, 349 F.3d 692, 699 (D.C. Cir. 2003). Under the second or "hardship" prong of the prudential ripeness inquiry, the courts consider the claimant's "interest in immediate review." *Id.* at 700.

In this case, awaiting the completion of the alleged ongoing IRS audits, *see* Am. Cross-Claim ¶¶ 346, 350, and any related proceedings on judicial review, would ensure that the Court avoided "unnecessary adjudication." *AT&T Corp.*, 349 F. 3d at 699. And, if adjudication proved necessary after all, postponing review would significantly advance the court's ability to deal with the legal issues presented. *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003). Indeed, without awaiting completion of any alleged ongoing IRS audits, *see* Am. Cross-Claim ¶¶ 346, 350, it is difficult to discern how the Court could conduct the analysis required under the applicable framework at all,

since that framework expressly excludes any "abstract" inquiry and requires a court to delve into the considerations that actually affected an agency decision. *See supra* at 39. Against these strong reasons for declining to hear the claim now, the Trump parties can point to no undue hardship to them that would result from postponing judicial review pending the results of any alleged ongoing IRS examinations, *see* Am. Cross-Claim ¶¶ 346, 350. As explained above, the IRS can take no action to collect deficiencies (if any) identified during those examinations until the examinations are completed *and* the taxpayer has an opportunity to be heard in court. Accordingly, there is no "immediate and practical" hardship to the Trump parties that can "outweigh[] the competing institutional interest in deferring review." *Askins v. Dist. of Columbia*, 877 F.2d 94, 98 (D.C. Cir. 1989).

For all these reasons, Amended Cross-Claim VIII should be dismissed ad unripe.

**B. Amended Cross-Claim VIII Also Fails Because Precedent Establishes that Congress May Lawfully Examine—and Even Hold Hearings on—the Same Information as that at Issue in an Ongoing Administrative Matter.**

The Court also should dismiss Amended Cross-Claim VIII because "allowing [a congressional] Committee to obtain files that are the subject of ongoing examinations," Am. Cross-Claim ¶ 351, does not approach the conduct that could give rise to a violation of due process-rights.

The Trump parties premise their claim on the contention that "IRS examinations are adjudications." *Id.* ¶ 347. That is not so,[21] but, even in quasi-judicial proceedings, Congress may lawfully examine the same information at issue in an ongoing administrative matter without violating the due-process rights of the subject of that administrative matter. "Congressional hearings are not inherently improper whenever their inquiry touches on or arises from a pending administrative matter. Such hearings, even if contemporaneous with an administrative proceeding, are not unusual." *Schaghticoke Tribal Nation v. Kempthorne*, 587 F. Supp. 2d 389, 410 (D. Conn. 2008) (citing *ATX, Inc.*, 41 F.3d at 1527–28). Indeed, with respect to IRS investigations in particular, the IRM specifically provides that the IRS may disclose to congressional committees materials that relate to an active IRS

---

[21] Adjudication follows after completion of an examination if a deficiency is identified; in that case, the IRS must issue a notice of deficiency, and the taxpayer has the opportunity either to petition the Tax Court or pay any assessment, file a refund claim, and file a refund action, if still necessary, before the district court or Court of Federal Claims. *See supra.*

matter.  *See infra* at 44 (discussing IRM § 11.3.4.4(13)).  Thus, "congressional actions not targeted directly at the decision makers—such as contemporaneous hearings—[will] not invalidate an agency decision" on due-process grounds.  *ATX, Inc.*, 43 F.3d at 1528 (citing *Koniag, Inc. v. Andrys*, 580 F.2d 601, 610 (D.C. Cir. 1978)).  This is so even where members of Congress openly express views on the merits of a pending matter.  *See, e.g.*, *Koniag*, 580 F.2d at 610.[22]

    *Pillsbury Co. v. FTC*, 354 F.2d 952, 964 (5th Cir 1966), the case on which the Trump parties rely, Am. Cross-Claim ¶ 348, demonstrates the kind of "congressional interference," *id.* ¶ 347, that constitutes a violation of due process:  there, the Fifth Circuit "found an impermissible influence stemming from a congressional hearing during which the Chairman of the Federal Trade Commission was subjected to 'a searching examination as to how and why he reached his decision in a case still pending before him, and [criticism] for reaching the 'wrong' decision.'"  *ATX, Inc.*, 41 F.3d at 1529 (quoting *Pillsbury*, 354 F.2d at 964).  The D.C. Circuit has distinguished *Pillsbury* from situations in which congressional hearings did not include appearances by any of the agency decisionmakers. *Koniag*, 580 F.2d at 610 ("we think the *Pillsbury* decision is not controlling here because none of the persons called before the subcommittee was a decisionmaker in these cases"); *see also ATX, Inc.*, 41 F.3d at 1529.  If, as held by the Court of Appeals, these circumstances presented no due-process violation, then *a fortiori* "[a]llowing the Committee to obtain files that are the subject of [alleged] ongoing examinations," Am. Cross-Claim ¶ 351, cannot violate the Trump parties' due-process rights.

## **CONCLUSION**

    For the foregoing reasons, the Trump parties' claims against Defendants should be dismissed.

Dated:  October 12, 2021

---

[22] The Trump parties cite 5 Op. O.L.C. 27 (1981) in support of their position, but as explained above, it is inapposite because that opinion included a determination that disclosure would, in fact, interfere with Executive decisionmaking in the circumstances addressed therein.  *See supra* __.  There has been no such determination in this case.

Respectfully submitted,

BRIAN D. NETTER
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director

ELIZABETH J. SHAPIRO
Deputy Director

 /s/ James J. Gilligan
JAMES J. GILLIGAN
Special Litigation Counsel

SERENA M. ORLOFF
STEVEN A. MYERS
CRISTEN C. HANDLEY
JULIA A. HEIMAN
Attorneys

U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C.  20044
Telephone:      (202) 514-3358
Fax:                 (202) 616-8470
E-mail:             james.gilligan@usdoj.gov

*Counsel for Cross-Defendants*

56

**EXHIBIT A**



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

OFFICE OF
INSPECTOR GENERAL

April 8, 2020

MEMORANDUM FOR RICHARD K. DELMAR
                               DEPUTY INSPECTOR GENERAL

FROM:                Sally Luttrell  /s/
                       Assistant Inspector General for Investigations

SUBJECT:         Inquiry into the U.S. Department of the Treasury Receipt, Handling, and Responses to Chairman Richard E. Neal of the House Ways & Means Committee

                       OIG Inquiry Number: DO-20-0026-I

## Introduction and Background

On September 30, 2019, the U.S. Department of the Treasury (Treasury), Office of Inspector General (OIG), received a letter from Chairman Richard Neal regarding Treasury's actions concerning the mandatory audit program – the mandatory examination by the Internal Revenue Service (IRS) of the President's tax returns. Following correspondence between Treasury OIG and Chairman Neal's office, Treasury OIG clarified its proper role regarding oversight and review of Treasury programs and operations, as well as the scope of its jurisdiction under the Inspector General Act. The Treasury OIG Office of Investigations (TIG) initiated an inquiry into Treasury's receipt, processing, and responses to Chairman Neal's requests to Treasury for U.S. President Donald J. Trump's Federal tax information. Although peripheral to the understanding between Chairman Neal's office and Treasury OIG as to the scope of the inquiry, TIG also reviewed within a limited scope the Treasury's handling of Chairman Neal's later request for records pertaining to 6103(f) and the mandatory audit program.

## Scope of Inquiry and Methodology

The scope of the inquiry: (a) examined the Treasury process for handling Congressional correspondence and requests; (b) identified Treasury officials substantively involved or solicited in connection with Chairman Neal and Treasury's correspondence; (c)asked about any unsolicited input on the correspondence or process; and (d) inquired about the production of records, or lack thereof, to Chairman Neal's office.

The scope of the inquiry did not examine the legal opinions in formulating responses to Chairman Neal, nor attempt to identify or interpret the basis for Treasury's decisions to

produce, or not produce, records.  It is our understanding that the underlying issue regarding production is currently in litigation.[1]

Initially, TIG obtained pertinent documents from Chairman Neal's office in addition to a Treasury official's email records. TIG conducted targeted queries of the email records and identified Treasury officials who appeared to be substantively involved in the receipt, processing, and responses from Treasury to Chairman Neal's office. Interviews were conducted of those key individuals, many of whom were, or still are, within the Treasury Office of General Counsel (OGC). Other Treasury officials who received or sent emails relating to Chairman Neal's correspondence, for example, those within Treasury Public Affairs, were not interviewed as there was no evidence those individuals had any substantive involvement in the process.

In total, TIG interviewed eight Treasury officials: one in the Office of Legislative Affairs (OLA) and seven in the OGC. A second OLA official assisted with some research on the matter and an eighth OGC official received, sent, or was copied, on related emails. Neither of those officials still work for Treasury and there was no indication either significantly influenced Treasury's actions.

TIG interviews determined of the seven OGC officials a) four worked on the review, processing, and responses b) one was involved in connection with Chairman Neal's requests for records and subpoena and c) two had limited involvement in the process and primarily assisted with compiling information for various appendices attached to Treasury's responses.

Factual Findings of the Inquiry

1. The Treasury Process for Handling Congressional Correspondence and Requests

TIG interviews of OLA and OGC officials determined there is a general, but undocumented, process, in which the OLA primarily receives Congressional correspondence.

Upon receipt of Congressional correspondence, the Deputy Assistant Secretary (DAS) for OLA notifies their counterparts in OGC, ExecSec, and the Office of Public Affairs (Public Affairs). OLA works with OGC to ensure the information provided by Treasury is legally correct and sufficient and within the appropriate scope. OLA consults OGC when anything other than a policy position is conveyed in response to Congressional correspondence. One Treasury official noted when a Congressional request only addresses policy, but is significant enough to reach the levels of a DAS to an Under Secretary, OGC will also review the matter.

The Treasury office responsible for drafting responses to Congress varies on the nature of the matter. The OLA opines on legislative matters and the OGC makes a final determination regarding to legal issues or questions that arise. As referenced, this process is not formally

---

[1] *Committee on Ways and Means, United States House of Representatives v. United States Department of the Treasury, et al.* 1:19-cv-01974-TNM (D.D.C.)

documented, however, OLA reported Treasury Directive 28-02 provides the legal requirements for legislative matters. Treasury Directive 28-02, titled "Legislative Procedures", establishes, in part:

> …procedures and assigned responsibilities that govern Departmental review and coordination of the following documents and transmittals that express official legislative views of the Department of the Treasury…

The specified list of "documents and transmittals" include "congressional correspondence" and "congressional testimony."

2. The Treasury Process for Handling Chairman Neal's Requests for Presidential Tax Records

The TIG inquiry determined Treasury's receipt, handling, and responses to Chairman Neal's letters and requests followed the general process with the occasional change in Treasury officials involved. TIG found these changes expected based on statements made by OLA and OGC employees, the transition of Chairman Neal's requests for records into his subpoena to compel production of the records, the scope of the records requested and subpoenaed, and the addition or departure of officials in the OLA and OGC.

The OGC collaboratively reviewed and processed Chairman Neal's letters, requests, and subpoena to Treasury. On occasion, an OGC official would assume a lead role but as an OGC official stated, "no matter is handled by one person in the OGC." A number of OGC officials similarly reported a collaborative process. The General Counsel for OGC maintains the authority to make final legal decisions.

3. The Treasury Decision to Consult the U.S. Department of Justice, Office of Legal Counsel

Upon receipt and review of Chairman Neal's requests for Presidential tax returns, the OGC, in consultation with Secretary Steven Mnuchin, decided to consult the DOJ OLC. OGC officials stated DOJ OLC is the counsel for the Executive Branch of the government.[2] The TIG inquiry did not examine the legal bases for decisions made by Treasury or OGC, however, one OGC official said DOJ OLC was consulted due to the legality of Chairman Neal's request. TIG notes the specific reasons for OGC consulting DOJ OLC were provided in letters from Secretary Mnuchin to Chairman Neal dated April 10, 2019 and April 23, 2019.

---

[2] 28 U.S.C. 512

4.  The Treasury Decision to Rely on DOJ OLC's Legal Opinion

In order for OGC to submit a timely response to Chairman Neal, the DOJ OLC provided OGC with a legal opinion on the matter prior to publicly publishing the opinion. One OGC official stated it is routine for DOJ OLC to do so.  The DOJ OLC opinion given to Treasury was to deny Chairman Neal's request for the President's tax information. Notwithstanding the language of 26 U.S.C. § 6103(f), OLC opined that Chairman Neal's request lacked a legitimate legislative purpose and absent the legitimate purpose, 26 U.S.C. § 6103(a) barred Treasury from disclosing the President's tax information in response to Chairman Neal's requests or his subpoena.

An OGC official stated Secretary Mnuchin, informed by legal advice from OGC, made the final decision to rely on DOJ OLC's opinion. The same official said the DOJ OLC opinion is "binding" because, as described, DOJ OLC is the counsel for the Executive branch. A second OGC official specified it was a matter of "complying with the law" in respect to Treasury's actions to rely DOJ OLC's opinion.

5.  Unsolicited Opinions and Effect on Treasury's Decision

The OGC received an unsolicited letter from the President's attorney, William Consovoy, regarding Chairman Neal's requests for the President's tax information. OGC leadership stated the letter did not affect Treasury or OGC in any manner. In addition, all of the OGC officials we asked about, or who were aware of the letter, stated it had no effect on Treasury or OGC's processing, decisions, or responses. Treasury produced a copy of this letter from Consovoy in response to one of Chairman Neal's requests for records.

Upon conclusion of the OGC and OLA interviews, we conducted a broader review of the referenced Treasury official's email records, and located two additional and presumed unsolicited contacts to Treasury regarding Chairman Neal's requests for the President's tax information. The two contacts were of opposite opinions regarding Treasury complying with Chairman Neal's request.

On April 3, 2019, a letter was sent from Representative Kevin Brady of the House Ways and Means Committee to Secretary Mnuchin. Representative Brady detailed his concerns with Chairman Neal's requests for the President's tax returns and relayed appreciation of Treasury's consideration of his concerns.

On May 14, 2019, a letter was sent from Senator Ron Wyden, Ranking Member, Senate Finance Committee, expressing Senator Wyden's concerns with Treasury not producing the President's tax return information to Chairman Neal. The letter asked a number of questions and requested documentation from Treasury.

Outside of the unsolicited letter received by Treasury from William Consovoy and the letters from Representative Brady and Senator Wyden, there was no indication from the interviews

we conducted, or from our review of emails, of any other unsolicited opinions or attempts to influence the process.

TIG notes that notwithstanding these contacts, the apparent fundamental basis for Treasury to consult and rely on DOJ OLC appears to have originated from within OGC. For example, TIG located an email from an official in OGC leadership distributed to OGC and OLA in which the legal concerns for consulting DOJ OLC were specified in detail. The supporting appendix attached to the letter also appears to have been prepared by the OGC. The final draft of this letter and appendix was sent from Secretary Mnuchin to Chairman Neal on April 23, 2019.

6. Chairman Neal's Request to Treasury for 6103(f) Information

As described, TIG conducted a limited scope inquiry into the Treasury handling of Chairman Neal's request for records pertaining to 6103(f) and the mandatory audit program. In connection with Chairman Neal's request, the OGC contacted the appropriate Treasury individuals. One OGC official stated most of the documents produced in response to Chairman Neal's request were generated by Treasury as a result of previous requests made by Chairman Neal.

Conclusions of the Inquiry

Based on the interviews conducted and review of relevant emails, TIG found Treasury's receipt, processing, and responses to Chairman Neal's requests for records and subpoenas to be consistent with Treasury's general process for handling Congressional correspondence and requests to include Secretary Mnuchin supervising the matter. OGC reported that matters arise to various levels in Treasury dependent upon the significance of the request.

Ultimately, Treasury consulted with, and relied on, the legal opinion of DOJ OLC to withhold the President's tax records. OGC reported that Secretary Mnuchin made the decision to rely on DOJ OLC's legal opinion, however, it was a matter of "complying with the law" in deciding to adhere to the opinion.