**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON WAYS AND MEANS,
UNITED STATES HOUSE OF REPRESENT-
ATIVES,

               Plaintiff-Counterdefendant,

   v.

UNITED STATES DEPARTMENT OF
THE TREASURY; et al.,

               Defendants-Crossdefendants,

and

DONALD J. TRUMP; et al.,

            Intervenors-Counterclaimants-
                    Crossclaimants.

No. 1:19-cv-1974-TNM

**ORAL HEARING SCHEDULED
NOVEMBER 16, 2021**

**INTERVENORS' COMBINED OPPOSITION
TO THE MOTIONS TO DISMISS**

# TABLE OF CONTENTS

Table of Authorities ............................................................................................... ii

Introduction .......................................................................................................... 1

Background ........................................................................................................... 2

Legal Standard .................................................................................................... 12

Argument ............................................................................................................ 18

   I.  Treasury cannot comply with the Committee's request because 26 U.S.C. §6103(f)(1) is unconstitutional. (V) ................................................................ 18

  II.  Intervenors plausibly allege that the Committee's request lacks a legitimate legislative purpose. ................................................................................................. 24

     A.  The request cannot survive the heightened scrutiny that governs congressional demands for a President's information. (IV) .............................. 24

        i.  *Mazars* applies here. .................................................................... 25

        ii.  This Court should reject the Committee's "balancing" test ............. 33

        iii.  The Committee's request fails any heightened standard. ................ 37

     B.  The request's primary purpose is not legislative. ...................................... 51

        i.  The request's purpose is exposure for the sake of exposure. (I) ......... 58

        ii.  The request's purpose is law enforcement. (II) .............................. 64

     C.  The request is not pertinent to constitutional legislation within the Committee's jurisdiction. (III) .................................................................................. 67

 III.  Intervenors plausibly allege that the request violates other constitutional rights. ........... 73

     A.  The request violates the First Amendment. (VI) ...................................... 73

     B.  The request violates the separation of powers. (VII) ................................ 82

     C.  The request violates due process. (VIII) .................................................. 86

Conclusion .......................................................................................................... 89

Certificate of Service .......................................................................................... 90

# TABLE OF AUTHORITIES

**Cases**

*ACLJ v. U.S. Dep't of State*, 2018 WL 784054 (D.D.C. Feb. 8) .................................................. 13

*Action All. of Senior Citizens of Greater Philadelphia v. Sullivan*, 930 F.2d 77 (D.C. Cir. 1991) ................................................................................................................................. 17

*Allen-Brown v. D.C.*, 174 F. Supp. 3d 463 (D.D.C. 2016) ....................................................... 60

*Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573 (7th Cir. 2003) ........................ 60

*ATX, Inc. v. U.S. Dep't of Transp.*, 41 F.3d 1522 (D.C. Cir. 1994) ....................................... 87, 88

*Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289 (1979) ............................................. 83

*Babych v. Psychiatric Solutions, Inc.*, 2010 WL 3547981 (N.D. Ill. 2010) ................................ 82

*Banneker Ventures, LLC v. Graham*, 798 F.3d 1119 (D.C. Cir. 2015) .......................... 13, 16, 78

*Barenblatt v. United States*, 360 U.S. 109 (1959). .............................................. 56, 57, 65, 73, 84

*Bauchman ex rel. Bauchman v. W. High Sch.*, 132 F.3d 542 (10th Cir. 1997) .......................... 52

*BEG Investments, LLC v. Alberti,* 144 F. Supp. 3d 16 (D.D.C. 2015) ....................................... 75

*Black Lives Matter D.C. v. Trump*, 2021 WL 2530722 (D.D.C.  2021) ..................................... 82

*Blumenthal v. Trump*, 373 F. Supp. 3d 191 (D.D.C.), *vacated*, 949 F.3d 14 (D.C. Cir. 2020) ... 39, 40

*Bonds v. D.C.*, 93 F.3d 801 (D.C. Cir. 1996) ............................................................................. 17

*Bowsher v. Synar*, 478 U.S. 714 (1986) ............................................................................... 83, 86

*Bruni v. City of Pittsburgh*, 824 F.3d 353 (3d Cir. 2016) ......................................................... 21

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ......................................... 32

*Burns v. Tex. City Ref., Inc.*, 890 F.2d 747 (5th Cir. 1989) ....................................................... 61

*Burns v. United States*, 542 F. App'x 461 (6th Cir. 2013) ....................................................... 16

*Calif. Cattlemen's Ass'n v. U.S. Fish & Wildlife Serv.*, 315 F. Supp. 3d 282 (D.D.C. 2018) 12, 13

*Campbell v. Davidson*, 233 F.3d 1229 (10th Cir. 2000) ............................................................ 70

*Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367 (2004) ........................................................... 44

*Church of Scientology of Calif. v. United States*, 506 U.S. 9 (1992) ......................................... 43

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) ...................... 62

*City of L.A. v. Patel*, 576 U.S. 409 (2015) ................................................................................ 21

*Chief authority

*City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750 (1988) .............................................. 23

*Clapper v. Amnesty Int'l, USA*, 568 U.S. 398 (2013) ............................................................ 83, 87

*Clark v. Martinez*, 543 U.S. 371 (2005) ........................................................................... 20

*Clinton v. City of New York*, 524 U.S. 417 (1998) ................................................................. 86

*Collins v. Yellen*, 141 S. Ct. 1761 (2021) ................................................................. 17, 19, 86

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936 (9th Cir. 2011)
 (en banc) ..................................................................................................... 23

*Comm. on Judiciary of U.S. House of Representatives v. Miers*, 542 F.3d 909 (D.C. Cir. 2008) 30

*Cruise-Gulyas v. Minard*, 918 F.3d 494 (6th Cir. 2019) ........................................................ 74

*Curry v. Sunbelt Insulation Co., Inc.*, 2009 WL 10703989 (N.D. Ala. Apr. 29) ......................... 57

*Daskalea v. Wash. Humane Soc'y*, 480 F. Supp. 2d 16 (D.D.C. 2007) ..................................... 21

*DeMasi v. Weiss*, 669 F.2d 114 (3d Cir. 1982) ................................................................... 42

*Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019) ................................................. 52, 54

*Dobruck v. Borders*, 2016 WL 7157557 (M.D. Fla. Dec. 8) ................................................... 55

*Dodge v. Woolsey*, 59 U.S. 331 (1855) ............................................................................ 41

*Doe v. City of Albuquerque*, 667 F.3d 1111 (10th Cir. 2012) .................................................. 21

*Doe v. D.C.*, 796 F.3d 96 (D.C. Cir. 2015) ............................................................... 74, 75, 76

*Doe v. McMillan*, 412 U.S. 306 (1973) ....................................................................... 50, 58

*Doe v. McMillan*, 566 F.2d 713 (D.C. Cir. 1977) ................................................................ 53

*Durning v. Citibank, N.A.*, 950 F.2d 1419 (9th Cir. 1991) ..................................................... 17

*Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491 (1975) .................................................... 79

*EPIC v. IRS*, 910 F.3d 1232 (D.C. Cir. 2018) .................................................................. 18

*EPIC v. Nat'l Sec. Comm'n on A.I.*, 419 F. Supp. 3d 82 (D.D.C. 2019) ............................... 14, 20

*Erickson v. Pardus*, 551 U.S. 89 (2007) .......................................................................... 13

*Ervin and Assocs., Inc. v. Dunlap*, 33 F.Supp.2d 1 (D.D.C. 1997) ......................................... 82

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ......................................................... 21

*Faith Action for Cmty. Equity v. Hawaii*, 2014 WL 1691622 (D. Haw. Apr. 28) ................... 59, 64

*Free Enter. Fund v. PCAOB*, 561 U.S. 477 (2010) ........................................................ 30, 45

*Fuentes-Fernandez & Co., PSC v. The Corvus Grp., Inc.*, 174 F. Supp. 3d 378 (D.D.C. 2016) . 15

*Gagliardi v. Village of Pawling*, 18 F.3d 188 (2d Cir. 1994) .................................................. 82

*Glob. Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150 (2d Cir. 2006) ........................ 15, 16

*Gordon v. United States*, 117 U.S. 697 (1864) ...................................................... 69

*Hamilton v. Geithner*, 666 F.3d 1344 (D.C. Cir. 2012) ............................................. 61

*Hartman v. Moore*, 547 U.S. 250 (2006) .............................................................. 76

*Hentoff v. Ichord*, 318 F. Supp. 1175 (D.D.C. 1970) ................................................ 53

*Hurd v. D.C.*, 864 F.3d 671 (D.C. Cir. 2017) ......................................................... 14

*Hutcheson v. United States*, 369 U.S. 599 (1962) ................................................ 65, 67

*Hutchinson v. Proxmire*, 443 U.S. 111 (1979) ....................................................... 58

*In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46 (D.D.C. 2016) .................... 15

*In re Sealed Case No. 98-3077*, 151 F.3d 1059 (D.C. Cir. 1998) ................................... 84

*Jennings v. Rodriguez*, 138 S. Ct. 830 (2018) ........................................................ 19

*Jewish War Veterans of USA, Inc. v. Gates*, 506 F. Supp. 2d 30 (D.D.C. 2007) ................ 52, 80

*Johnson v. City of Shelby*, 574 U.S. 10 (2014) ..................................................... 13, 14

*Johnson v. United States*, 576 U.S. 591 (2015) ...................................................... 21

*Kaspersky Lab, Inc. v. DHS*, 909 F.3d 446 (D.C. Cir. 2018) ........................................ 15

*Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524 (1838) .................................................. 70

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018) .............................. 16

*Kilbourn v. Thompson*, 103 U.S. 168 (1880) ............................................. 54, 57, 66, 78

*Koniag, Inc., Vill. of Uyak v. Andrus*, 580 F.2d 601 (D.C. Cir. 1978) ............................. 88

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993) ...................... 21

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ...................... 83

*Lozman v. City of Riviera Beach*, 138 S.Ct. 1945 (2018) ............................................ 74

*Maniar v. Wolf*, 2020 WL 1821113 (D.D.C. Apr. 10) .................................................. 14

*McCreary Cty. v. ACLU of Ky.*, 545 U.S. 844 (2005) .................................................. 33

*McDonough v. Anoka Cty.*, 799 F.3d 931 (8th Cir. 2015) ............................................ 56

*McGrain v. Daugherty*, 273 U.S. 135 (1927) .......................................................... 57

*McLaughlin v. Mont. State Legislature*, 493 P.3d 980 (Mont. 2021) ............................... 25

*McLeod-Sillah v. D.C.*, 2020 WL 6060313 (D.D.C. Oct. 14) ......................................... 59

*McSurely v. McClellan*, 521 F.2d 1024 (D.C. Cir. 1975) ............................................. 65

*McSurely v. McClellan*, 553 F.2d 1277 (D.C. Cir. 1976) ............................................. 58

*Menoken v. Dhillon*, 975 F.3d 1 (D.C. Cir. 2020) .................................................... 16

*Miller v. Transamerican Press, Inc.*, 709 F.2d 524 (9th Cir. 1983) ............................ 58

*Morrison v. Olson*, 487 U.S. 654 (1988) ............................................................... 55

*Nat'l League of Cities v. Usery*, 426 U.S. 833 (1976) .................................... 30

*New York v. United States*, 505 U.S. 144 (1992) ............................................. 30

*Nielsen v. Preap*, 139 S. Ct. 954 (2019) ........................................................... 20

*Nixon v. Fitzgerald*, 457 U.S. 731 (1982) ........................................................ 35

*Nixon v. GSA*, 433 U.S. 425 (1977) ................................................... 26, 27, 35

*NTEU v. FLRA*, 791 F.2d 183 (D.C. Cir. 1986) ............................................. 43

*O'Connor v. Donaldson*, 422 U.S. 563 (1975) ................................................ 17

*Oneida Cty. v. Oneida Indian Nation of N.Y.*, 470 U.S. 226 (1985) ............. 33

*Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680 (1991) ............................... 29

*Perry v. Sindermann*, 408 U.S. 593 (1972) ...................................................... 74

*Person v. Horizon Health Corp.*, 2011 WL 6339708 (D. Utah Dec. 19) ........ 61

*PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*, 2021 WL 1199363 (S.D.N.Y. Mar. 30) .................................................................. 64

*Pillsbury Co. v. FTC*, 354 F.2d 952 (5th Cir. 1966) .................................. 86, 87

*Powell v. McCormack*, 395 U.S. 486 (1969) ................................................... 39

*Pub. Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6 (D.D.C. 2018) ....................... 59

*Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133 (2000) .................. 60

*Reno v. ACLU*, 521 U.S. 844 (1997) ................................................................ 23

*Republican Party of Minn. v. White*, 536 U.S. 765 (2002) ............................. 62

*Ruiz v. Millennium Square Residential Ass'n*, 466 F. Supp. 3d 162 (D.D.C. 2020) ................... 13

*Rumely v. United States*, 197 F.2d 166 (D.C. Cir. 1952) ................................ 48

*Rutan v. Republican Party of Ill.*, 497 U.S. 62 (1990) .................................... 74

*Salerno v. United States*, 481 U.S. 739 (1987) ............................................... 20

*Schaefer v. Townsend*, 215 F.3d 1031 (9th Cir. 2000) .................................... 70

*Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020) ............................. 19, 70, 84

*Senate Select Cmte. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974) (en banc) ................................................ 33, 35, 40, 67

*Sessions v. Morales-Santana*, 137 S. Ct. 1678 (2017) ................................... 33

*Shelton v. United States*, 327 F.2d 601 (D.C. Cir. 1963) ........................... 31, 53

*Shelton v. United States*, 404 F.2d 1292 (D.C. Cir. 1968) ................ 53, 56, 65, 67

*Siddiqui v. Cissna*, 356 F. Supp. 3d 772 (S.D. Ind. 2018) ............................................ 56

*Singletary v. D.C.*, 351 F.3d 519 (D.C. Cir. 2005) ...................................................... 75

*Sira v. Morton*, 380 F.3d 57 (2d Cir. 2004) ................................................................ 15

*Smith v. De Novo Legal*, LLC, 905 F. Supp. 2d 99 (D.D.C. 2012) ............................ 75

*Smith v. Mosley*, 532 F.3d 1270 (11th Cir. 2008) ...................................................... 75

*Stansberry v. Uhlich Children's Home*, 264 F.Supp.2d 681 (N.D.Ill. 2003) .............. 82

*Stockdale v. Hansard* (9 Ad. & E. 1) ......................................................................... 78

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ............................................. 14, 55

*Texas v. United States*, 523 U.S. 296 (1998) .............................................................. 83

*Thomas v. Union Carbide Agr. Prod. Co.*, 473 U.S. 568 (1985) ........................... 83, 84

*Tran v. Gonzales*, 411 F. Supp. 2d 658 (W.D. La. 2006), *aff'd*, 515 F.3d 478 (5th Cir. 2008) ... 20

*Trump v. Cmte. on Oversight and Reform of U.S. House of Representatives (Mazars I)*, 380 F. Supp. 3d 76 (D.D.C. 2019) ................................................................. 39

*Trump v. Comm. on Ways & Means* (*State Tax Returns Case*), 415 F. Supp. 3d 38 (D.D.C. 2019) ...................................................................................... 1, 29, 52, 58

*Trump v. Deutsche Bank AG*, 943 F.3d 627 (2d Cir. 2019), *vacated by Mazars III*, 140 S. Ct. 2019 ........................................................................................................... 53, 54

*Trump v. Mazars USA, LLP (Mazars II)*, 940 F.3d 710 (D.C. Cir. 2019) ... 39, 40, 45, 53, 55, 65, 66, 70

*Trump v. Mazars USA, LLP* (*Mazars III* or *Mazars*), 140 S. Ct. 2019 (2020) .... 1, 17, 18, 19, 24, 25, 26, 27, 28, 29, 30, 32, 33, 34, 35, 36, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 49, 50, 51, 53, 54, 55, 58, 64, 65, 66, 67, 73

*Trump v. Mazars USA, LLP (Mazars IV)*, 2021 WL 3602683 (D.D.C. Aug. 11) ... 18, 27, 30, 34, 39, 40, 41, 42, 44, 53

*Trump v. Mazars USA, LLP*, 832 F. App'x 6 (D.C. Cir. 2020) .................................... 17

*Trump v. Mazars USA, LLP*, Nos. 21-5176, 21-5177 (D.C. Cir.) ............................... 12

*Trump v. Vance*, 140 S. Ct. 2412 (2020) .................................................................... 31

*United States ex rel. Bid Solve, Inc. v. CWS Mktg. Grp., Inc.*, 2021 WL 4819899 (D.D.C. Oct. 15) ........................................................................................................ 13

*United States v, Brewster*, 408 U.S. 502 (1972) ........................................................ 80

*United States v. Bonds*, 12 F.3d 540 (6th Cir. 1993) ................................................. 14

*United States v. Booker*, 543 U.S. 220 (2005) ...................................................... 22, 23

*United States v. City of New Orleans*, 2012 WL 6085081 (E.D. La. Dec. 6) .............. 64

*United States v. Claes*, 747 F.2d 491 (8th Cir. 1984) ................................................. 33

*United States v. Cross*, 170 F. Supp. 303 (D.D.C 1959) .................................................. 53, 56, 65

*United States v. Grainger*, 346 U.S. 235 (1953) ................................................................. 33

*United States v. Icardi*, 140 F. Supp. 383 (D.D.C 1956) ........................................... 53, 57, 65, 66

*United States v. Latney*, 108 F.3d 1446 (D.C. Cir. 1997) ..................................................... 17

*United States v. Lopez*, 514 U.S. 549 (1995) .............................................................. 21, 22

*United States v. Morrison*, 529 U.S. 598 (2000) .......................................................... 22, 54

*United States v. Nixon*, 418 U.S. 683 (1974) .................................................................... 85

*United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483 (2001) ................................. 19

*United States v. Poindexter*, 727 F. Supp. 1501 (D.D.C. 1989) ............................................. 26

*United States v. Rumely*, 345 U.S. 41 (1953) ........................................................ 31, 32, 45, 54

*United States v. Stevens*, 559 U.S. 460 (2010) ................................................................. 23

*United States v. Supreme Ct. of N.M.*, 839 F.3d 888 (10th Cir. 2016) ..................................... 21

*Van Straaten v. Shell Oil Prods. Co. LLC*, 678 F.3d 486 (7th Cir. 2012) ................................... 17

*Vantage Commodities Fin. Servs. I, LLC v. Assured Risk Transfer PCC, LLC*, 2019 WL 1877097 (D.D.C. Apr. 26) .......................................................................................... 13, 14, 15

*Ware v. U.S. Fed. Highway Admin.*, 2005 WL 2416667 (S.D. Tex. Sept. 30), *aff'd*, 255 F. App'x 838 (5th Cir. 2007) ......................................................................................... 55

*Watkins v. United States*, 354 U.S. 178 (1957) .............................. 31, 32, 42, 56, 58, 65, 73, 79

*Weisberg v. Webster*, 749 F.2d 864 (D.C. Cir. 1984) ......................................................... 17

*Welch v. Theodorides-Bustle*, 677 F. Supp. 2d 1283 (N.D. Fla. 2010) ...................................... 57

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) ..................................................... 23

*Wilkinson v. United States*, 365 U.S. 399 (1961) .............................................................. 66

*Wiseman v. New Breed Logistics, Inc.*, 72 F. Supp. 3d 672 (N.D. Miss. 2014) ........................... 58

*Zaidan v. Trump*, 317 F. Supp. 3d 8 (D.D.C. 2018) .......................................................... 13

## Statutes

18 U.S.C. §202(c) ........................................................................................... 45

2 U.S.C. §192 ................................................................................................ 30

26 U.S.C. §6103 ....................................................................................... 18, 19, 29

5 U.S.C. §7342(a) ........................................................................................... 43

## Other Authorities

10 Op. O.L.C. 68 (1986) ..................................................................................... 84

2011 Year-End Report on the Federal Judiciary 3-4, 6, bit.ly/2Ku5ZvM ................................... 70

40 Op. Att'y Gen. 45 (1941) ................................................................................................. 85

6 O.L.C. Op. 156 (1982) ...................................................................................................... 43

8 Op. O.L.C. 252 (1984) ...................................................................................................... 85

H. Rep. No. 29-684 (1846) ................................................................................................... 51

*Memo. from Deputy Att'y Gen. Silberman to Burress* 5 (Aug. 28, 1974), bit.ly/31k3rql ............ 45

**Rules**

Fed. R. Civ. P. 8(d)(2)(3) ..................................................................................................... 82

Fed. R. Civ. P. 9(b) .............................................................................................................. 81

**Constitutional Provisions**

U.S. Const. art. II, §1, cl. 1 .................................................................................................. 84

U.S. Const., Art. I, §8 ........................................................................................................... 18

## INTRODUCTION

No one believes that Chairman Neal requested President Trump's tax returns so he can study legislation about IRS audits. No one. Chairman Neal admits that this justification was a mere litigation strategy. His fellow Committee-Members don't buy it either. And for two years, the official position of the United States Government was that Chairman Neal's rationale "'blinks reality.'" Am. Counterclaims & Cross-Claims (ACCC) (Doc. 129) ¶220. Anyone who's paid even minimal attention to American politics understands what's happening here: President Trump did not voluntarily disclose his tax returns during the campaign, his political opponents assume the information would damage him, and so his opponents want to force the disclosure. ¶2.

What everyone knows to be true is certainly *plausible*. In their pleading, Intervenors explain what everyone knows to be true, the relevant events leading up to it, and the mountain of evidence that the Committee's request has an improper purpose. The Committee and the Government understand that these allegations are sufficient. In their motions to dismiss, they are left arguing that the law somehow *forbids* this Court from even considering Intervenors' evidence.

Far from forbidding it, the law "clear[ly]" requires this Court to consider whether the Committee's request for Intervenors' tax information serves a "legitimate legislative purpose." *Trump v. Comm. on Ways & Means* (*State Tax Returns*), 415 F. Supp. 3d 38, 45-46 (D.D.C. 2019). And determining whether the request has a legitimate legislative *purpose* requires this Court to, well, determine the request's purpose. The Supreme Court recently rejected the notion that courts should "blind" themselves to "what all others can see and understand" about Congress's informational demands. *Trump v. Mazars USA, LLP* (*Mazars III* or *Mazars*), 140 S. Ct. 2019, 2034 (2020). And it reminded courts that it's their job to ensure these requests do not infringe the separation of powers or violate individual rights. *See id.* at 2035, 2032.

Intervenors have plausibly alleged that the Committee's request is facially unconstitutional, pursues invalid and non-legislative purposes, implicates the separation of powers, and violates their constitutional rights. If the Government or the Committee disagree with Intervenors' view of the record or have evidence of their own to submit, they can do so at summary judgment—where *Mazars* was decided. For now, what matters is that Intervenors have provided fair notice of their plausible claims. This Court should deny the motions to dismiss.

## BACKGROUND

President Trump's tax returns have long been "Democrats' white whale." ACCC ¶61. Elected Democrats, and the House especially, have been on a multi-year crusade to obtain and release his information to the public. This history, which is fully documented in Intervenors' pleading, is briefly summarized below.

**2016 Election**: Then-Candidate Trump declined to release his tax returns during the 2016 presidential campaign, citing ongoing IRS examinations. ¶¶6-7. This decision became one of the biggest political issues of the campaign, dividing the country along partisan lines. ¶¶9-10. President Trump's opponent summed up the general Democratic sentiment: "A lot of us were wondering, 'What is he hiding? It must be really terrible." ¶13. "Maybe he's not as rich as he says he is…. [M]aybe he's not as charitable as he says he is. [Maybe] we don't know all of his business dealings …. Or maybe he doesn't want the American people ... to know that he's paid nothing in federal taxes.... It must be something really important, even terrible, that he's trying to hide." ¶14. Then-Vice President Joe Biden similarly accused Trump of not paying his "fair share" of taxes and playing the American people "for suckers." ¶15.

**115th Congress**: After Trump won the 2016 election, he became President and Republicans commanded majorities in Congress. ¶20. Led by Minority Leader Nancy Pelosi and Ranking Member of the House Ways and Means Committee Richard Neal, congressional Democrats

continued to pursue the President's tax information. ¶21. Because they were in the minority, they knew their attempts would likely fail—and thus never need to be defended in court. So they spoke more candidly about their purposes, admitting that their aim was to release President Trump's tax information to the public. The IRS's presidential audit program never came up once. ¶22.

For example, one resolution would require the Treasury Department to provide the President's tax information to the House, which Ranking Member Neal and every other Committee Democrat cosponsored. ¶25. Committee-Member Bill Pascrell (D-NJ), far from voicing an interest in the IRS Presidential Audit Program, insisted that §6103 allows requests that are "not related to tax administration" and vehemently denied that "tax administration is the sole purpose of the disclosure." ¶26. The Committee rejected this resolution, correcting noting it was outside its jurisdiction and would be an unprecedented request of "disclosure of confidential personal tax return information for purposes of embarrassing or attacking political figures of another party." ¶28.

Undeterred, Committee Democrats pledged to "remain steadfast in [their] pursuit to have [President Trump's] individual tax returns disclosed to the public." ¶29. During their quest, House Democrats made countless statements offering reasons for the request, with two constants: insistence on public exposure for exposure's sake, and total silence as to any legislative study of the IRS Presidential Audit Program. ¶32. Minority Leader Pelosi, for example, speculated that the President's tax returns would help investigate "what … the Russians have on Donald Trump politically, personally, and financially." ¶36.

Other House Democrats, most prominently on the Committee, followed Pelosi's lead. In September 2017, Ranking Member Neal said that the tax returns would "provide the clearest picture of a president's financial health, including how much he earns, how much tax he pays, his sources of income (e.g., capital gains, dividend income, and certain business income), the size of

his deductions, whether he makes charitable contributions, and whether he uses tax shelters, loop-holes, or other special-interest provisions to his advantage." ¶41. Committee-Member Pascrell put it bluntly: "We must see Trump's tax returns to know just far and how deep the crimes go." He went on, "Americans have a right to know if their President is a crook." ¶42. Pascrell even specu-lated that the President's tax returns would reveal that he "consorted [with] mafia figures." ¶44. Committee-Member Lloyd Doggett (D-TX) demanded disclosure because "Trump's ongoing threats to the Mueller investigation make the need ever more urgent to see what he may be hiding." He speculated that the President's tax information would reveal a concealed "Russian connection" and history of "tax dodging." ¶¶49-50. Many other Democratic congressmen, especially members of the Ways and Means Committee, repeatedly voiced similar reasons to expose the President's tax returns to the public. ¶¶53-73.

**116th Congress**: House Democrats again made the President's tax returns an issue in the 2018 mid-term elections. Minority Leader Pelosi promised voters that, if Democrats won a House majority, then obtaining and releasing President Trump's tax returns "is one of the first things we'd do." "[T]hat's the easiest thing in the world. That's nothing." ¶75. Committee-Member Doggett declared that "a New Congress" would be able to "review [President Trump's] returns" to "know whether or not the[] President is a crook." ¶50. Doggett promised that, if Democrats took back the House in 2018, the Committee would not "even need a subpoena" to "obtain his tax returns," and reiterated that the returns would show a "Russian connection" and whether President Trump and his family benefited from the tax reform passed in December 2017. ¶52. Chairman Neal likewise affirmed in the run-up to the elections that Democrats would force disclosure of President Trump's tax returns if they won a House majority. ¶76.

4

Once in the majority, House Democrats began constructing a case for demanding the President's tax information from Treasury. Despite her earlier statement that obtaining the President's tax returns would be the "easiest thing in the world" with a House majority, Speaker Pelosi began to lower expectations after the election. She announced the House Ways and Means Committee would "take the first steps," but cautioned that securing the returns is "a little more challenging than you might think." ¶78. Nevertheless, Speaker Pelosi continued to promise efforts to expose the information to the public, saying, "I think overwhelmingly the public wants to see the president's tax returns…. They want to know the truth, they want to know the facts and that he has nothing to hide." ¶81.

The Committee took up the task of fabricating a plausible legal rationale. Chairman Neal confirmed in October 2018 that he would "get the documents" but warned that "[t]his has never happened before, so you want to be very meticulous." ¶79. A spokesperson for Chairman Neal, while agreeing that exposing the returns was a Democratic priority, cautioned that the Chairman "wants to lay out a case about why presidents should be disclosing their tax returns before he formally forces [President Trump] to do it." ¶82. Neal said in January 2019, "I plan to do it," and the Committee was "now in the midst of putting together the case. It will be a long and grinding legal case." ¶87.

In the months of early 2019, Neal consulted with the House's lawyers, Committee Democrats, and others to construct a case for obtaining President Trump's tax information that would stand up in court. In February, he said he was proceeding "quite judiciously," and that "the idea here is to…make sure that the product stands up under critical analysis." ¶89. Later that month, Neal confirmed his staff was preparing a case, and that the goal was "to figure out what is the most efficient way to make a request" that would hold up in court. ¶90. He again warned that he and

other Democrats had to "resist the impulse to say or do something that clouds the case," and that

he planned to proceed on "a better or more deliberative case base[d] on the advice of counsel." *Id.*

In March, Neal's spokesperson stated that the Chairman was then "currently in the process

of consulting with the counsel of the U.S. House of Representatives and the Joint Committee on

Taxation to determine the appropriate legal steps to go forward with this unprecedented request."

¶91. That same month, Chairman Neal told the press that "[w]e continue to work with counsel and

I continue to limit my comments because of counsel's advice." ¶93. Committee-Member Kildee,

meanwhile, more or less openly admitted that the Committee was working up a pretextual basis

for demanding the President's tax information: "[w]hat we need to do, and what the speaker said,

and what Chairman Neal is absolutely doing" is "laying a legal foundation" and "mak[ing] the

justification to use this rarely used authority." ¶94.

But while this case was under construction, House and Committee Democrats continued to

make their true purposes plain. For example, Speaker Pelosi's spokeswoman told the press in

March 2019 that "all roads lead[] back" to President Trump's tax returns, which would show his

"improprieties," "potential tax evasion," and "violations of the Constitution." ¶96. In February

2019, Committee-Member Pascrell said that "Congress must see [President Trump's] tax records"

to determine whether he had engaged in "criminal" behavior. Later that month, Pascrell repeated

that the returns needed to be released because they "would likely reveal evidence of criminal con-

duct by Donald Trump." ¶97. Pascrell maintained a "Trump Tax Returns" website documenting

his continual attempts to obtain them in Congress. Under the heading "Why Is This So Im-

portant?", he made no mention of the IRS Presidential Audit Program. Instead, he wrote, "it is

imperative for the public to know and understand [President Trump's] 564 financial positions in

domestic and foreign companies, and his self-reported net worth of more than $10 billion."

Committee-Member Doggett, for his part, said in March 2019 that the Committee needed to obtain President Trump's returns to uncover "a potential criminal enterprise." ¶106. Many other Committee Members echoed these calls for exposure of Trump's tax information to the American people. ¶¶109-115. Committee-Member Gomez put it succinctly in March 2019, "The only thing that matters is evidence of wrongdoing." ¶108.

Chairman Neal finally made the request on April 3, 2019. ¶123. Invoking §6103(f), Chairman Neal requested the following information for tax years 2013 through 2018:

1. The Federal individual income tax returns of Donald J. Trump.

2. For each Federal individual income tax return requested above, a statement specifying (a) whether such return is or was ever under any type of examination or audit; (b) the length of such examination or audit; (c) the applicable statute of limitations on such examination or audit; (d) the issue(s) under examination or audit; (e) the reason(s) the return was selected for examination or audit; and (f) the present status of such examination or audit (to include the date and description of the most recent return or return information activity).

3. All administrative files (workpapers, affidavits, etc.) for each Federal individual income tax return requested above.

4. The Federal income tax returns of the following entities:

- The Donald J. Trump Revocable Trust;
- DJT Holdings LLC;
- DJT Holdings Managing Member LLC;
- DTTM Operations LLC;
- DTTM Operations Managing Member Corp;
- LFB Acquisition Member Corp;
- LFB Acquisition LLC; and
- Lamington Farm Club, LLC d/b/a Trump National Golf Club—Bedminster.

5. For each Federal income tax return of each entity listed above, a statement specifying: (a) whether such return is or was ever under any type of examination or audit; (b) the length of such examination or audit; (c) the applicable statute of limitations on such examination or audit; (d) the issue(s) under examination or audit; (e) the reason(s) the return was selected for examination or audit; and (f) the present status of such examination or audit (to include the date and description of the most recent return or return information activity).

6. All administrative files (workpapers, affidavits, etc.) for each Federal income tax return of each entity listed above.

7. If no return was filed for the tax year requested, a statement that the entity or individual did not file a return for such tax year.

¶123. The Committee's request specified only one ostensible legislative purpose: studying "the extent to which the IRS audit and enforces the Federal tax laws against a President" under the "mandatory examination" process specified in the "Internal Revenue Manual." Specifically, the Committee sought to determine "the scope of any such examination and whether it includes a review of underlying business activities required to be reported on the individual income tax return." ¶124.

Chairman Neal openly admitted the pretextual nature of this rationale. The next day, he admitted he had "constructed" a "case" for obtaining President Trump's tax information. Because this dispute "is likely to wind its way through the federal court system," he said that the Committee "wanted to make sure" the constructed case "was in fact one that would stand up under the critical scrutiny of the federal courts." ¶127. The next day, he admitted that the Committee's "intent is to test" §6103(f), using the rationale most likely to "stand[] up" in court "under the magnifying glass." ¶128. Committee-Member Pascrell described the rationale as "chosen according to counsel" as "the best way" to "make sure we got the tax returns." ¶130. Indeed, in three years of calls for the President's tax information, Chairman Neal's request was the first time that anyone on the Committee had mentioned the IRS Presidential Audit Program as a purpose for disclosure. ¶131. In a series of letters, attorneys for the President and Treasury Department challenged Chairman Neal's newly-minted rationale as illegitimate. In response, the Chairman did not dispute that his new rationale was pretextual; he merely insisted that no one could "question or second guess the motivations of the Committee." ¶141.

For all their counsel and preparation, the Committee Members have repeatedly contradicted their stated purpose since the April 3 request. They often described their request in terms of exposing President Trump's tax information to "the public," even though public disclosure is a wholly separate step under the tax code and has nothing to do with helping the Committee study legislation. To the extent they discussed the IRS's audit process, they did so in law-enforcement terms, expressing their desire to audit President Trump's returns themselves and to uncover evidence of illegal conduct. For example, in a press release issued on the same day as the request, Chairman Neal said that the request would help the Committee determine whether President Trump is "complying with" the tax laws. ¶143. That same day, Committee-Member Pascrell expressed gratitude that President Trump's "tax records" would "finally" be exposed to "sunlight" and that President Trump would face "accountability." ¶146.

Throughout 2019 and 2020, Pascrell and other Committee Members continued to say that the Committee needed to see Trump's tax information to see "how far his crimes go" and otherwise expose his tax information to the American public. ¶¶147-187. Many House Democrats, including Committee Members, even lamented publicly that the information was unlikely to be exposed in time for the 2020 presidential election. ¶187.

On May 6, 2019, Treasury informed the Committee it could not comply with the request, citing the lack of a legitimate legislative purpose. ¶216. After compiling and reviewing over 40 pages of Democrats' public statements, Treasury observed that the request asserts a "purpose that is at odds with what you and many others have repeatedly said is the request's intent: to publicly release the President's tax returns." The Committee's April 3 request was instead "the culmination of a long-running, well-documented effort to expose the President's tax returns for the sake of exposure," disclosure for mere "political purposes." ¶217.

Treasury also highlighted the "objective" mismatch between the Committee's audit ra-

tionale and "the terms of [its] request." The request "does not inquire about the IRS's procedures

for presidential audits," ask for "additional information about those policies," ask "whether [they]

have changed over time," or ask about "the extensive protections that ensure such audits are con-

ducted with extreme confidentiality and without improper interference." The request also focuses

on one President, even though most of the requested categories of information have "never been

publicly released with respect to any President." And it seeks files concerning audits that are still

"ongoing," which would not allow the Committee to genuinely assess any audit because the Com-

mittee would not know "the outcome." ¶218.

The Justice Department agreed with Treasury's decision. In a memorandum of June 13,

2019, OLC found that "[n]o one could seriously believe that the Committee seeks six years of

President Trump's tax returns because of a newly discovered interest in legislating on the presi-

dential-audit process…. Recognizing that the Committee may not pursue exposure for exposure's

sake, however, the Committee has devised an alternative reason for the request." ¶220. OLC

agreed with Treasury that "the Committee's request does not objectively 'fit' [its] stated purpose."

"[M]any of the requested documents are barely relevant" to the audit process, including the tax

returns themselves, which are filed before that process begins. ¶221. Instead, OLC found the re-

quest "perfectly tailored to accomplish the Committee's long-standing and avowed goal" of ex-

posing the President's tax returns. ¶222.

**2020 Election**: President Trump's tax information was once again an issue in the 2020

presidential election. ¶¶227-32. For example, at a presidential debate, Vice President Joe Biden

said of President Trump in November 2019, "You have not released a single solitary year of your

tax returns. What are you hiding?" He further mused that the President's tax information would

show that "foreign countries are paying you a lot. Russia's paying you a lot. China's paying you a lot." ¶232.

**117th Congress**: Even after President Biden was sworn in, House Democrats continued their quest to obtain and release Intervenors' tax information. Their request and the purposes behind it, as they have repeatedly explained, are the same in the 117th Congress as they were in the 116th and 115th Congresses. They still believe this information will damage President Trump politically. And they are still motivated to release it because President Trump remains the most high-profile Republican and their top political rival. As a report described the prevailing Democratic sentiment in June, Democrats felt it "important" to "keep pursuing" their pending cases against President Trump—including this one—because "the information they obtain could be relevant politically." ¶234.

 Shortly after taking office, the Biden Administration decided to reverse the previous position of the Departments of Justice and the Treasury and comply with the Committee's request. On July 30, the Government revealed a new opinion from the Office of Legal Counsel arguing that Treasury *could* turn over President Trump's tax information. ¶265. Without disputing OLC's previous conclusion that the Committee's stated purpose was entirely pretextual, this opinion concluded that Treasury was bound to accept the Committee's stated purpose at face value. ¶265.

As soon as this new opinion was published, House Democrats immediately praised it and once again expressed their true purpose behind the request: exposure for political advantage and law enforcement. Speaker Pelosi said that "[t]he American people" would now "know the facts" about President Trump. ¶270. Committee-Member Doggett said that with the "evidence" from President Trump's tax returns, the Committee could now uncover "his tax evasion." ¶271. Committee-Member Pascrell expressed approval of OLC's opinion, called President Trump a "corrupt

11

private citizen" and connected "[t]his case" to "Donald Trump's crimes." ¶272. With the executive branch now on its side, the Committee dropped all but the thinnest patina of the pretext for its request.

**This Litigation**: In July 2019, the Committee sued the Government defendants, seeking a court order to produce the requested documents. Doc. 1. Intervenors joined the suit as defendants. Doc. 14. This Court then stayed this case in light of the *McGahn* litigation. After an election, a series of status reports, and a reversal of position by the Government, the Committee voluntarily dismissed its claims in August 2021. Earlier that day, Intervenors had filed an answer with counterclaims and cross-claims against both the Committee and the Government. Doc. 113. Intervenors amended as of right on September 28, and the Committee and the Government have moved to dismiss Intervenors' amended counterclaims and cross-claims.

For the Court's information, the D.C. Circuit is currently considering many of the same issues in *Mazars*. The parties finished their appellate briefing yesterday, and the D.C. Circuit will hear oral argument on December 13. The disputed issues on appeal include how to evaluate congressional requests that were first issued while President Trump was in office (*Mazars*, *Mazars* lite, or the Committee's balancing test), how to apply that standard to a request for President Trump's financial information, how to assess whether a request pursues invalid purposes (such as law enforcement and exposure), and how much authority Congress has to impose disclosure and conflict-of-interest requirements on Presidents. *See generally Trump v. Mazars USA, LLP*, Nos. 21-5176, 21-5177 (D.C. Cir.).

## LEGAL STANDARD

Rule 12(b)(6) tests whether claimants have satisfied Rule 8, which in turn requires only a "short and plain statement" of the claim. This standard is "forgiving." *Calif. Cattlemen's Ass'n v. U.S. Fish & Wildlife Serv.*, 315 F. Supp. 3d 282, 288 (D.D.C. 2018). The claimant's factual

allegations must be accepted as true. *Id.* If those allegations create "reasonable factual inferences," then the court must accept those inferences as true too. *Vantage Commodities Fin. Servs. I, LLC v. Assured Risk Transfer PCC, LLC*, 2019 WL 1877097, at *1 (D.D.C. Apr. 26). If the factual allegations are "'general,'" then the court must treat them as though they contain any "'specific facts'" that are needed. *Calif. Cattlemen's Ass'n*, 315 F. Supp. 3d at 288; *e.g.*, *Ruiz v. Millennium Square Residential Ass'n*, 466 F. Supp. 3d 162, 168-69 (D.D.C. 2020). And throughout, the court must construe everything "in the light most favorable" to the claimant. *Vantage Commodities*, 2019 WL 1877097, at *1.

After all that construing, the court must decide whether the claim is "'plausible.'" *ACLJ v. U.S. Dep't of State*, 2018 WL 784054, at *1 (D.D.C. Feb. 8). Plausible means a "'reasonable inference that the defendant is liable.'" *Id.* It does not mean that liability is "probable." *See United States ex rel. Bid Solve, Inc. v. CWS Mktg. Grp., Inc.*, 2021 WL 4819899, at *10 (D.D.C. Oct. 15). And it does not mean that liability is the "*most* plausible" inference, or even the "more plausible" inference. *Zaidan v. Trump*, 317 F. Supp. 3d 8, 20 (D.D.C. 2018). A claim survives dismissal "even if there are two alternative explanations, … both of which are plausible." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (cleaned up). Plausibility simply requires "'more than a sheer possibility'" of liability, even if the judge believes the claimant's chance of winning is "'very remote and unlikely.'" *Vantage Commodities*, 2019 WL 1877097, at *1, *3. The point of the federal pleading standard, after all, is simply to provide "fair notice of what the claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (cleaned up); *accord Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (reiterating that Rule 8 is "'designed to discourage battles over mere form'" and "'to avoid civil cases turning on technicalities'").

The notion that either the Committee or the Government lacks "fair notice" of Intervenors' claims here is not serious. Intervenors have laid out, in meticulous detail, the events that led up to this dispute and the reasons why they think the Committee's request, among other flaws, has an impermissible purpose. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002) (explaining that nothing more is required to satisfy notice pleading). "Having informed the [parties] of the factual basis for their" claims, Intervenors "were required to do no more to stave off threshold dismissal." *Johnson*, 574 U.S. at 12; *accord EPIC v. Nat'l Sec. Comm'n on A.I.*, 419 F. Supp. 3d 82, 95 (D.D.C. 2019) (denying a motion to dismiss because the claimant "strung together enough allegations … to pass the plausibility threshold"). Three additional points about the legal standard are important here.

*First*, when assessing whether a claim is plausible, courts generally cannot consult "outside" materials. *Vantage Commodities*, 2019 WL 1877097, at *3 n.5. While the Committee is right that courts can consider outside materials that qualify for "judicial notice," Cmte.-MTD (Doc. 133) 15, the Committee is wrong about what taking judicial notice means here. Courts can judicially notice facts only if they are "'not subject to reasonable dispute'" because they "'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Maniar v. Wolf*, 2020 WL 1821113, at *4 (D.D.C. Apr. 10) (quoting Fed. R. Evid. 20(b)). While Intervenors do not dispute the *existence* of the various "Legislative and Executive materials" that the Committee wants to cite, Cmte.-MTD 15, Intervenors heavily dispute their accuracy, truthfulness, significance, and completeness. That's what this case is about. "[A]cquiescing to the authenticity of documents" is "a far cry from agreeing that those documents present a full or fair picture of a matter a party has a right to dispute." *Hurd v. D.C.*, 864 F.3d 671, 686 (D.C. Cir. 2017); *accord United States v. Bonds*, 12 F.3d 540, 553 (6th Cir. 1993) (denying judicial notice where "[t]here is

no dispute that the [report] exists, but there is considerable dispute over the significance of its

contents"). This Court can take judicial notice of official documents "not for [their] truth, but for

[their] existence"—for "'what was said,'" not for "'the truth of the matter asserted.'" *Kaspersky*

*Lab, Inc. v. DHS*, 909 F.3d 446, 464 (D.C. Cir. 2018) (quoting *Hurd*, 864 F.3d at 686).

Even in terms of "what was said," this Court cannot use judicial notice to do what the

Committee asks: "draw an inference in *its* favor," "contrary to [Intervenors'] factual allegations."

*Fuentes-Fernandez & Co., PSC v. The Corvus Grp., Inc.*, 174 F. Supp. 3d 378, 385 n.10 (D.D.C.

2016); *see* Cmte.-MTD 24, 8 n.5. After "taking judicial notice," this Court is "still bound to con-

sider *all* facts in the light most favorable" to Intervenors. *Id.* The Committee's suggestion to the

contrary "turns Rule 12(b)(6) on its head." *Fuentes-Fernandez*, 174 F. Supp. 3d at 385 n.10; *ac-*

*cord In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 71 (D.D.C. 2016) (refusing

judicial notice where "Defendants provide the documents in order to present new factual allega-

tions to counter the factual allegations underlying Plaintiffs' claim as set forth in the Complaint");

*Glob. Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156 (2d Cir. 2006) (reversing the

district court for using judicial notice to "make a finding of fact" on a contested issue "that *con-*

*troverted* the plaintiff's own factual assertions set out in its complaint").

**Second**, the Committee and the Government make a similar error when they discuss out-

side materials that are supposedly "'integral'" to Intervenors' pleading. Cmte.-MTD 14-15; Gov't-

MTD (Doc. 135-1) 44 n.17. While district courts have "discretion" to consult these extraneous

materials, *Vantage Commodities*, 2019 WL 1877097, at *3 n.5, the standard for deeming some-

thing "integral" to the complaint is demanding. Materials that are "merely cited" to support "cer-

tain factual allegations" are not integral. *Domestic Airline*, 221 F. Supp. 3d at 71; *accord Sira v.*

*Morton*, 380 F.3d 57, 67 (2d Cir. 2004) ("Limited quotation from or reference to documents that

may constitute relevant evidence" does not make the documents integral.). A document is not integral unless the pleading "'relies *heavily* on its terms and effect,'" like "a contract or other legal document containing obligations upon which the [claim] standards or falls." *Glob. Network*, 458 F.3d at 156-57; *accord Banneker Ventures*, 798 F.3d at 1133 (explaining that the prototypical "integral" document is "a legally operative document that is a necessary element of the claim"). Here, for example, the Committee's request for Intervenors' tax information is integral to their pleading, but the quotations from various actors are not. *Contra* Cmte.-MTD 18-19, 24 & n.11.

Even for documents that are integral, this Court cannot do what the Committee and the Government ask: It cannot track down the document, credit parts that Intervenors dispute or consider parts that Intervenors didn't cite, and use them to make findings or draw inferences *against* Intervenors. *See Menoken v. Dhillon*, 975 F.3d 1, 8 (D.C. Cir. 2020) (integral documents cannot override the duty to "accept a plaintiff's factual allegations as true and draw all reasonable inferences in a plaintiff's favor"); *Banneker Ventures*, 798 F.3d at 1133 (parts that aren't cited cannot be integral); *Burns v. United States*, 542 F. App'x 461, 466 (6th Cir. 2013) ("disputed" materials cannot be integral). Integral documents cannot be used to "resolve factual disputes against the [claimant's] well-pled allegations" or to "override the fundamental rule that courts must interpret the allegations and factual disputes in favor of the [claimant] at the pleading stage." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1014 (9th Cir. 2018).

**Third**, a word about the *Mazars* litigation. For consistency, Intervenors will use the Government's nomenclature for these cases: "*Mazars I*," "*Mazars II*," "*Mazars III*," and "*Mazars IV*." But technically there are only two *Mazars* opinions: the Supreme Court's opinion in *Mazars III* and the district court's remand opinion in *Mazars IV*. The D.C. Circuit's opinion in *Mazars II* was vacated in full by the Supreme Court, and the district court's opinion in *Mazars I* was vacated in

full by the D.C. Circuit. *See* 140 S. Ct. at 2036; 832 F. App'x 6, 7 (D.C. Cir. 2020). The Supreme

Court could have affirmed parts of the D.C. Circuit's opinion. *E.g.*, *Collins v. Yellen*, 141 S. Ct.

1761, 1789 (2021) ("The judgment of the Court of Appeals is affirmed in part, reversed in part,

and vacated in part"). But it chose to vacate in full. "Of necessity," the Supreme Court's "decision

vacating the judgment of the Court of Appeals deprives that court's opinion of precedential effect."

*O'Connor v. Donaldson*, 422 U.S. 563, 577 n.12 (1975); *accord United States v. Latney*, 108 F.3d

1446, 1449 (D.C. Cir. 1997) (Supreme Court's vacatur "deprive[s] the opinion of any precedential

effect"); *Bonds v. D.C.*, 93 F.3d 801, 809 n.14 (D.C. Cir. 1996) (vacated decision "lacks preceden-

tial effect"); *Weisberg v. Webster*, 749 F.2d 864, 870 (D.C. Cir. 1984) (vacated decision "cannot

be considered authoritative law of this circuit").

No part of the D.C. Circuit's opinion in *Mazars II* binds this Court. The whole "point of

vacatur is to ensure that a decision carries no precedential force." *Van Straaten v. Shell Oil Prods.

Co. LLC*, 678 F.3d 486, 491 (7th Cir. 2012). As Judge O'Scannlain put it, "[a] decision may be

*reversed* on other grounds, but a decision that has been *vacated* has no precedential authority what-

soever." *Durning v. Citibank, N.A.*, 950 F.2d 1419, 1424 n.2 (9th Cir. 1991). The Committee cites

the D.C. Circuit's decision in *Action Alliance* for the proposition that unaddressed portions of va-

cated opinions "'continue to have precedential weight.'" Cmte.-MTD 25 n.12. But "precedential

weight," *Action Alliance* explains in the next sentence, means that the unaddressed portions can

serve as "persuasive precedent" or "'guidance.'" *Action All. of Senior Citizens of Greater Phila.

v. Sullivan*, 930 F.2d 77, 83 (D.C. Cir. 1991). Intervenors agree that some parts of the D.C. Cir-

cuit's opinion are persuasive. But if this Court follows any part of *Mazars II*, it is doing so by

choice, not as a matter of binding precedent. And importantly, none of the four *Mazars* opinions

were decided at the motion-to-dismiss stage. *See Mazars III*, 140 S. Ct. at 2028 (motions for

summary judgment and a preliminary injunction); *Mazars IV*, 2021 WL 3602683, at *1 (motions for summary judgment).

## ARGUMENT

The Committee's request for Intervenors' tax information suffers from three major flaws. The statute that supposedly authorizes it, 26 U.S.C. §6103(f), exceeds Congress's authority under Article I of the Constitution (cross-claim V). The request, too, violates Article I because it lacks a legitimate legislative purpose (counterclaims & cross-claims I-IV). And it violates other constitutional provisions as well, including the First Amendment, the Due Process Clause, and the separation of powers protected by Articles I and II (cross-claims VI-VIII). While the Committee and the Government think they will ultimately disprove Intervenors' claims, most of their arguments present factual disputes that must be resolved at a later stage. Intervenors' claims are clearly plausible—in fact, some were once the official position of the United States. This Court should deny the motions to dismiss.

## I.      Treasury cannot comply with the Committee's request because 26 U.S.C. §6103(f)(1) is unconstitutional. (V)

The Committee requests Intervenors' tax information only under §6103(f)(1). No subpoena for Intervenors' information currently exists, and no other law authorizes the Committee's request. *See* ACCC ¶¶319, 296; Cmte.-MTD 3, 32 (stressing that this case does *not* involve "a Congressional subpoena"). As for §6103(f)(1), that statute is an exception to the "[g]eneral rule" in §6103(a), which broadly forbids the disclosure of tax information. *See EPIC v. IRS*, 910 F.3d 1232, 1237 (D.C. Cir. 2018). So if §6103(f)(1) is unconstitutional, then the general rule controls and Treasury cannot comply with the Committee's request. *See* ACCC ¶320.

Section 6103(f)(1) can be sustained only as an exercise of Congress's "power to obtain information." *Mazars III*, 140 S. Ct. at 2031. That power is not enumerated in the Constitution. *See* U.S. Const., Art. I, §8. Because Congress "has no enumerated constitutional power to conduct

investigations," its compulsory "'power of inquiry'" is justified only as an "'auxiliary'" to its enumerated legislative powers. *Mazars III*, 140 S. Ct. at 2031. The power is thus "subject to several limitations." *Id.* The "[m]ost importan[t]" is that Congress's requests "must serve a 'valid legislative purpose.'" *Id.* In other words, Article I of the Constitution gives Congress no authority to request someone's tax information unless that request serves a legitimate legislative purpose.

Though congressional inquiries are unconstitutional unless they serve a legitimate legislative purpose, that constraint appears nowhere in the text of §6103(f)(1). The statute commands that, after receiving the Committee's written request, Treasury "*shall* furnish" the requested tax information. (Emphasis added.) That language is "'unmistakably mandatory,'" revealing "an absence of discretion." *Am. Bankers Ass'n v. NCUA*, 38 F. Supp. 2d 114, 136 (D.D.C. 1999); *accord Murphy v. Smith*, 138 S. Ct. 784, 787 (2018) ("[T]he word 'shall' usually creates a mandate, not a liberty."). Section 6103(f)(1) has no preconditions other than a "written request," and the word "purpose" never even appears. Notably, other provisions of §6103 *do* require requests for tax information to be made for specific purposes. *E.g.*, §§6103(d)(1), (h)(1), (h)(2), (h)(3)(B). That Congress required a purpose in those neighboring provisions, but omitted it from §6103(f)(1), means that §6103(f)(1) affirmatively eschews any such requirement. *See Collins*, 141 S. Ct. at 1782.

Section 6103(f)(1) thus exceeds Congress's authority under Article I. The statute needs a legitimate-legislative-purpose requirement, but that requirement cannot be "read … into" the statute via constitutional avoidance. *Jennings v. Rodriguez*, 138 S. Ct. 830, 843 (2018). Avoidance "is not a license to rewrite Congress's work to say whatever the Constitution needs it to say." *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2207 (2020). That canon "has no application" absent "statutory ambiguity." *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 494 (2001). It "'comes into play only when, after the application of ordinary textual analysis, the statute is found

to be susceptible of more than one construction.'" *EPIC*, 419 F. Supp. 3d at 89 (quoting *Nielsen v. Preap*, 139 S. Ct. 954, 972 (2019)). As just explained, §6103(f)(1) is not ambiguous. Injecting a legitimate-legislative-purpose requirement into it "would 'invent a statute rather than interpret one.'" *Tran v. Gonzales*, 411 F. Supp. 2d 658, 665 (W.D. La. 2006) (quoting *Clark v. Martinez*, 543 U.S. 371, 378 (2005)), *aff'd*, 515 F.3d 478 (5th Cir. 2008).)), *aff'd*, 515 F.3d 478 (5th Cir. 2008).

The Government agrees with most of this analysis. It does not dispute that, if §6103(f)(1) is declared unconstitutional, then Treasury cannot comply with the Committee's request. The Government concedes that §6103(f)(1) must be an exercise of Congress's power of inquiry, and that the Constitution requires these requests to serve a "legitimate legislative purpose." 2021 OLC (Doc. 133-2) 21. The Government also seems to agree that the text of §6103(f)(1) cannot be read to require a legitimate legislative purpose. *See* 2021 OLC 18 ("The command of section 6103(f)(1) is unambiguous"); 2021 OLC 9-10 & nn.10-12 (section 6103(f)(1) does not require the Committee to have or state any purpose). And the Committee, for its part, has long insisted that §6103(f)(1) unambiguously forecloses that interpretation. *See, e.g.*, ACCC ¶322; Doc. 1-11 at 2 (arguing that "[s]ection 6103 has long been regarded as clear and unambiguous" and that "[c]ompliance is not discretionary under any circumstance"); Doc. 1-5 at 2 (arguing that "the statutory language of section 6103(f) is unambiguous," raises "no complicated legal issues," and creates "'an obligation impervious to judicial discretion'").

Instead of rebutting these points, the Government makes only one argument and cites only one case: *Salerno v. United States*, it argues, requires Intervenors to prove that "'no set of circumstances exists under which [§6103(f)(1)] would be valid.'" Gov't-MTD 41 (quoting 481 U.S. 739, 745 (1987)). While §6103(f)(1) does not require a legitimate legislative purpose, the Government

contends that circumstances exist where the statute would be constitutional—namely, where Congress's request *happens to have* a legitimate legislative purpose. Gov't-MTD 41-42.[1]

The Government misstates what the law requires of Intervenors. As the Government has convinced other courts, "*Salerno*'s no-set-of-circumstances language" is not the "'*test* for facial challenges'" but the "'*result* of a facial challenge in which a statute fails to satisfy the appropriate constitutional standard.'" *United States v. Supreme Ct. of N.M.*, 839 F.3d 888, 917 (10th Cir. 2016) (quoting *Doe v. City of Albuquerque*, 667 F.3d 1111, 1127 (10th Cir. 2012)); *accord Johnson v. United States*, 576 U.S. 591, 602-03 (2015) (explaining that, despite "statements in some of our opinions," the notion that a statute must be unconstitutional "in all applications" is "not a requirement"). A facial challenge is simply "an attack on a statute itself." *City of L.A. v. Patel*, 576 U.S. 409, 415 (2015). It asks the court to "'measur[e]'" the statute's text "'against the applicable substantive constitutional doctrine.'" *Ezell v. City of Chicago*, 651 F.3d 684, 698 (7th Cir. 2011). When the statute's "'terms state an invalid rule of law,'" then the statute "'can no longer be constitutionally applied to anyone'"—i.e., the statute is invalid "in *all* its applications, as *Salerno* requires." *Supreme Ct. of N.M.*, 839 F.3d at 917; *Ezell*, 651 F.3d at 698-99; *accord Bruni v. City of Pittsburgh*, 824 F.3d 353, 363 (3d Cir. 2016); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 393 n.6 (1993); *Daskalea v. Wash. Humane Soc'y*, 480 F. Supp. 2d 16, 36 n.22 (D.D.C. 2007).

Consider *United States v. Lopez*, for example. That case involved the constitutionality of the Gun-Free School Zones Act, which criminalized gun possession in any "'school zone.'" 514 U.S. 549, 551 (1995). The Supreme Court "h[e]ld that *the Act* exceeds" Congress's authority under

---

[1] Intervenors are not raising an "overbreadth" claim. *Cf.* Gov't-MTD 41. They contend that §6103(f)(1) violates Article I both on its face, *see* ACCC ¶¶318-24, and as applied to Intervenors here, *see* ACCC ¶¶290-317.

the Commerce Clause—in other words, that the Act is facially unconstitutional under Article I of the Constitution. *Id.* (emphasis added). The Court reached that conclusion by examining the Act's text, including the fact that it "ha[d] no express jurisdictional element" requiring the gun possession to be connected to "interstate commerce." *Id.* at 562. Lopez's conviction was thus reversed, as the Act contained "no requirement that his possession of the firearm have any concrete tie to interstate commerce." *Id.* at 567. The Court did not try to read that missing requirement into the Act, or suggest that the Act could still be applied in cases where the gun possession happened to satisfy it. The Court conducted the same analysis in *United States v. Morrison*: It "struck down" a civil remedy under the Commerce Clause based on its text, without asking whether circumstances existed where the remedy would be constitutional because the missing commerce element would be satisfied. *See* 529 U.S. 598, 602, 608-19 (2000).

Or consider *United States v. Booker*. There, the Supreme Court held that the mandatory sentencing guidelines violated the Sixth Amendment because they required judges to enhance sentences based on facts not found by the jury. 543 U.S. 220, 226-27 (2005). The Court evaluated "[t]he Guidelines as written" and determined that they were unconstitutional because "they are mandatory and binding on all judges." *Id.* at 233. The Court thus invalidated, for "all cases," the "statute that makes the Guidelines mandatory." *Id.* at 268, 245. Dissenting, Justice Stevens charged the Court with violating "the standard for … a facial challenge." *Id.* at 275 (Stevens, J., dissenting in part). He noted that the mandatory guidelines were constitutional in the "vast majority" of cases, including cases where the jury found the necessary facts. *Id.* at 276-80. Justice Stevens would have sustained the mandatory guidelines as written, and either construed them to require jury fact-finding or let defendants raise as-applied challenges. *See id.* at 284-91. But the Court disagreed. It could not apply constitutional avoidance because "the statute's language" was unambiguous. *Id.*

at 250 (majority op.). And it had to facially invalidate the statute because the constitutional defect would "affect every case." *Id.* at 248.

So too here. Section 6103(f)(1) states an invalid rule of law: It allows Congress to request, and requires Treasury to disclose, information without a legitimate legislative purpose. The entire statute thus exceeds Congress's authority under Article I of the Constitution. This constitutional defect is apparent from the text, cannot be cured through constitutional avoidance, and affects every application of the statute.

Even if Treasury *chooses* to apply the legitimate-legislative-purpose requirement when it receives requests under §6103(f)(1), that unilateral decision cannot solve the statute's *facial* invalidity. *See Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 946-47 (9th Cir. 2011) (en banc). Section 6103(f)(1) is not "'readily susceptible'" to that interpretation, as explained above, and this Court cannot assume that Treasury will "adhere to standards absent from the [statute's] face." *Reno v. ACLU*, 521 U.S. 844, 884 (1997); *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 770 (1988). A court "would not uphold an unconstitutional statute merely because the Government promised to use it responsibly." *United States v. Stevens*, 559 U.S. 460, 480 (2010) (citing *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 473 (2001)). And the Government has *not* promised to use §6103(f)(1) responsibly. Treasury pledges to grant requests under §6103(f)(1) even if the Committee states *no* legislative purpose. 2021 OLC 9-10, 19. And it pledges to accept *any* legislative purpose that the Committee asserts, unless maybe the asserted purpose "'blinks reality'"—an exception that, if not satisfied here, never could be. Gov't-MTD 12; 2021 OLC 26.

For all these reasons, §6103(f)(1) is facially unconstitutional. Accepting that conclusion will have little effect on Congress's power to *legislate*: If a committee really needed someone's

tax information to study legislation, then it could always issue a subpoena. (Or Congress could pass a new version of §6103(f)(1) that adopts the constitutional standard.) But the invalidity of §6103(f)(1) matters a great deal for the separation of powers and individual rights. A subpoena would unquestionably require a legitimate legislative purpose. *Mazars III*, 140 S. Ct. at 2031. That requirement, in turn, is what ensures that Congress's power of inquiry remains limited and that its requests are directed only at valid ends. *See id.* at 2031-32.

## II.     Intervenors plausibly allege that the Committee's request lacks a legitimate legislative purpose.

Even under the Government's approach to §6103(f)(1), the Committee must have a legitimate legislative purpose for *this* request. *See* Gov't-MTD 41, 16. The Committee lacks one—or more precisely, Intervenors have plausibly alleged that the Committee lacks one. Because the Committee's request targets a President, it implicates the separation of powers and must survive heightened scrutiny, a standard it cannot possibly satisfy. Even under normal scrutiny, the primary purpose of the subpoena is not legislation, but exposing President Trump's tax information and uncovering alleged wrongdoing. And the legislation that the Committee claims to be studying is either not pertinent to its request, outside of its jurisdiction, or unconstitutional.

### A.     The request cannot survive the heightened scrutiny that governs congressional demands for a President's information. (IV)

The parties dispute the test that governs whether the Committee's request serves a legitimate legislative purpose. Intervenors would apply the test from the Supreme Court's decision in *Mazars*. Judge Mehta created a new test on remand in *Mazars* that he called "*Mazars* lite," which the Government seems to prefer. And the Committee proposes yet another test that would loosely balance the parties' interests.

Intervenors have the better of this dispute. Instead of creating a new test, this Court should apply *Mazars*, since the Committee's request implicates the same separation-of-powers concerns

that underlie that standard. This Court should at least apply *Mazars* lite, rather than the Committee's unmoored balancing test. And regardless, all three tests would subject the Committee's request to some form of heightened scrutiny. That's all Intervenors need because, accepting their allegations and inferences as true and construing everything in Intervenors' favor, the Committee's request easily fails any meaningful form of review.

### i. *Mazars* applies here.

In *Mazars*, the Supreme Court articulated circumstances where Congress's "information requests" must satisfy a heightened standard. 140 S. Ct. at 2034. That standard applies here for two main reasons. First, *Mazars* applies when congressional requests implicate the separation of powers, and all agree that this request does that. Second, the Committee's request *is* effectively a request to a sitting President: It was issued while President Trump was in office, was continuously pursued, and has always been tied to his status as President.

By asserting that *Mazars* turned entirely on the presence of a sitting President, the Committee and the Government stress *Mazars*' facts but ignore *Mazars*' reasoning. When *Mazars* was decided, one of the plaintiffs was, in fact, the sitting President. But the Supreme Court did not impose the *Mazars* standard because the subpoenas targeted a sitting President per se. It imposed the *Mazars* standard because the subpoenas implicated the separation of powers. *See Mazars III*, 140 S. Ct. at 2035 (announcing the test because it "takes adequate account of the separation of powers principles at stake"); *id*. (articulating the test because it "accounts for these concerns" regarding "the separation of powers"). If a legislative subpoena implicated the separation of powers in other ways, then the *Mazars* standard would govern that subpoena too. *E.g.*, *McLaughlin v. Mont. State Legislature*, 493 P.3d 980, 988 (Mont. 2021) (explaining that *Mazars* "extends logically to subpoenas to the judicial branch").

When explaining why the subpoenas in *Mazars* implicated the separation of powers, the Supreme Court gave both general and specific reasons. Congressional subpoenas for presidential papers *generally* implicate the separation of powers, the Court explained, because they pit "'opposite and rival' political branches" against each other. 140 S. Ct. at 2033-34. And those specific subpoenas "fully" implicated "these separation of powers concerns," the Court continued, because they sought President Trump's private financial information—"records of intense political interest for all involved." *Id*. at 2034. The subpoenas in *Mazars* were "not … a run-of-the-mill legislative effort," but "a clash between rival branches" over papers that have "such great consequence" precisely because of their "personal" nature. *Id*. at 2034-35.

Both sets of reasons fully apply here, even assuming that the Committee's request implicates only a former President. As a category, congressional requests for a former President's personal financial information implicate the separation of powers. Given "the dignity and stature" of the office, requests for a former President's documents still invite "a conflict between the branches." *United States v. Poindexter*, 727 F. Supp. 1501, 1505 (D.D.C. 1989). The protection that a President—and, in turn, "'the Republic'"—needs from congressional demands for his private papers "'cannot be measured by the few months or years between the submission of the [request] and the end of the President's tenure.'" *Nixon v. GSA*, 433 U.S. 425, 449 (1977). If former Presidents lacked *Mazars*-level protection from these demands, Congress could "declare open season" on a former President's personal papers. *Mazars III*, 140 S. Ct. at 2034-35. Congress could then use that threat to influence Presidents' conduct while in office. And Congress could use that power to affect who could *be* President—either by limiting who can run or by punishing those who could run again. The resulting dynamic would give Congress a new "institutional advantage" over its chief political rival. *Id*. at 2036. Notably, the Government, the Committee, and Judge Mehta all

concede that this separation-of-powers concern exists (though they assign it different weights). *See Mazars IV*, 2021 WL 3602683, at \*13; Cmte.-MTD 32-33; Gov't-MTD 32-33.

This threat is not merely theoretical. The Committee has used *this very request* to gain an advantage over President Trump while he was in office, to punish him after he left office, and to limit him (and his party) moving forward. *See* ACCC ¶¶334, 332. This threat is not "more attenuated" because some Presidents and candidates have decided to voluntarily disclose their tax returns. *Cf.* Cmte.-MTD 36. That practice is entirely voluntary and inconsistently followed. *See* ACCC ¶12. Nor are these disclosures ever complete. ¶12. Congress could still threaten to disclose additional years of tax returns, including from years before a President was in office or even a candidate. And Congress could still threaten to disclose audit files, which no President has ever disclosed, including while the audits were ongoing.[2]

The Supreme Court's specific reasons why the *Mazars* subpoenas implicated the separation of powers also apply here. *Mazars* deemed the House's requests for President Trump's accounting and banking records to be a "clash" between rivals over "records of intense political interest." 140 S. Ct. at 2034-35. That observation is even more true about President Trump's tax returns—"the holy grail" that elected Democrats have relentlessly tried to obtain and expose for years. ACCC ¶206. True, for former Presidents, the separation-of-powers concerns presented by congressional requests are "subject to erosion over time." *Nixon v. GSA*, 433 U.S. at 451. But no time has passed here. The Committee requested President Trump's tax information *while he was in office* and pursued it, without break, both before and after he left. And President Trump remains House

---

[2] The Committee claims that, since President Nixon, "every elected President other than Mr. Trump has voluntarily released his returns." Cmte.-MTD 36. It uses the word "elected" to gloss over President Ford, who did not release his tax returns to the public. President Ford, who was elected to be Vice President, was still a President.

Democrats' top political rival. ACCC ¶¶234, 244, 337. The Committee also admits that it wants his information only because he served as President. *See Mazars III*, 140 S. Ct. at 2036 (stressing that courts must be "particularly" attentive to a subpoena that "contemplates legislation … concerning the Presidency"). In these circumstances, the separation-of-powers concerns that accompany congressional requests to sitting Presidents remain intact.

These separation-of-powers concerns are not diminished by the fact that the Government is (now) taking the Committee's side in this case. *Cf.* Cmte.-MTD 35-36; Gov't-MTD 32-33. For starters, the Government does not appear to agree with the Committee about what test applies to congressional requests directed at former Presidents. To the extent it takes a position, it "concur[s]" with Judge Mehta's decision to apply *Mazars* lite. Gov't-MTD 32. All the Government will say about the Committee's balancing test is that such a test would be "possible to apply"—a truism that could be said of virtually any test. Gov't-MTD 33.

On the actual legality of the Committee's request, the Government has taken inconsistent positions. Treasury and OLC concluded in 2019 that the Committee's request was unconstitutional and then concluded the opposite in 2021, literally switching sides in this case. This flip-flop cannot be reconciled by the fact that President Trump left office. OLC's 2019 opinion concluded that the Committee's request lacks a legitimate legislative purpose because it seeks exposure for the sake of exposure—a conclusion that would bar a request to even a purely private citizen. 2019 OLC 3, 18, 29-31. That's why OLC's 2021 opinion did not try to distinguish its 2019 opinion, but instead had to expressly reject it. *E.g.*, 2021 OLC 18 ("our mode of analysis differs from the analysis in the 2019 Opinion"); 2021 OLC 19 (2019 opinion "erred"); 2021 OLC 25 (2019 opinion "mistaken"); 2021 OLC 35 (2019 opinion "misplaced"); 2021 OLC 37 (2019 opinion had "problems"). So even if courts should defer to the incumbent executive, they have no basis to choose one

incumbent's position over another incumbent's position. *See Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 698 (1991) ("[T]he case for judicial deference is less compelling with respect to agency positions that are inconsistent with previously held views.").

Nor should this Court entertain the suggestion that *Mazars* applies to subpoenas, but not to requests under §6103(f). *Cf.* Cmte.-MTD 3, 32. Both subpoenas and §6103(f) requests are exercises of Congress's power to obtain information through compulsory process. That's why the Government concedes that, just like subpoenas, requests under §6103(f) must serve a legitimate legislative purpose. *See* Gov't-MTD 16; 2021 OLC 21. But the *Mazars* test is an *application* of the legitimate-legislative-purpose test; it requires courts to consider certain criteria "in assessing whether a subpoena directed at the President's personal information is 'related to, and in furtherance of, a legitimate task of the Congress'"—i.e., in assessing whether it "serve[s] a 'valid legislative purpose.'" 140 S. Ct. at 2035, 2031. While *Mazars* happened to be a case about subpoenas, the opinion makes clear that its analysis applies to all exercises of Congress's power to demand information. *See, e.g.*, *id.* at 2030 ("congressional demands"); *id.* at 2031 ("congressional power to obtain information"); *id.* ("'power of inquiry'"); *id.* at 2034 ("information requests"); *id.* ("congressional demands"); *id.* at 2035 ("[c]ongressional demands"); *id.* ("information disputes"); *see also State Tax Returns*, 415 F. Supp. 3d at 45-46 (explaining that the "legitimate legislative purpose" requirement applies "in the context of investigations" and "congressional efforts to gather information").

The Committee cites no constitutionally relevant difference between subpoenas and requests under §6103(f). True, §6103(f) is a statute that went through bicameralism and presentment. *Cf.* Cmte.-MTD 17. But so did the criminal-contempt statute that backs up congressional subpoenas (a statute that is much older than §6103(f)). *See* Act of Jan. 24, 1857, ch. 19, §1 (now codified

at 2 U.S.C. §192). More broadly, the Supreme Court has never been impressed with the argument that, because a statute was "signed by the President" who "was able to protect His own interests," the judiciary should be less willing to vindicate the separation of powers. *Nat'l League of Cities v. Usery*, 426 U.S. 833, 841 n.12 (1976). The "constitutional authority of Congress cannot be expanded by the 'consent' of the governmental unit whose domain is thereby narrowed." *New York v. United States*, 505 U.S. 144, 182 (1992); *accord Free Enter. Fund v. PCAOB*, 561 U.S. 477, 497 (2010) ("the separation of powers does not depend on the views of individual Presidents").[3]

Because the Committee's request presents separation-of-powers concerns on par with the subpoenas in *Mazars*, this Court should apply the *Mazars* test. It should not apply what Judge Mehta called "*Mazars* lite," a new test that "alter[ed]" the Supreme Court's framework "in important ways." *Mazars IV*, 2021 WL 3602683, at *13. This "reduced judicial scrutiny" was appropriate, according to Judge Mehta, because the subpoena in that case was now directed at a "former President." *Id.* But again, even if the Committee's request here should be viewed as a request to a former President, the separation-of-powers concerns that it presents have not dissipated enough to warrant any alteration to the Supreme Court's test.

Independently, *Mazars* applies here because, effectively, the Committee's request is a request to a *sitting* President. Judge Mehta reached the opposite conclusion in *Mazars* because he thought that the original subpoena had "expired along with the 116th Congress" and that the committee had "reissued" a different subpoena "a month after President Trump left office." *Id.* at *8, *11; *see Comm. on Judiciary of U.S. House of Reps. v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008)

---

[3] The Committee's assertion that subpoenas have some talismanic significance would lead to absurd results. Instead of "subpoenas," Congress could pass a statute that lets it make compulsory "requests." Under the Committee's view, these requests would not be subject to *Mazars*, even though they are functionally equivalent to subpoenas. "The Constitution," however, "does not tolerate such ready evasion; it 'deals with substance, not shadows.'" *Mazars III*, 140 S. Ct. at 2035.

(stating that when one "Congress ends," the prior "House of Representatives will cease to exist as a legal entity, and the subpoenas it has issued will expire"). But requests under §6103(f) are different, according to the Committee. They do not expire with Congress's adjournment, but "carry over from one Congress to the next." ACCC ¶¶238, 315. Accordingly, when Chairman Neal wrote another letter to Treasury in June 2021, that letter was not a new request under §6103(f)(1). As the letter explains, it was merely an "accommodation" to support the Committee's "continue[d]" request—the same request that "remains in active litigation." ¶253. So even if *Mazars* involved two separate subpoenas, Intervenors have plausibly alleged (and the Committee has conceded) that only one request was ever made here.

That the Committee's request in April 2019 is still the operative request is important. Under the governing law, the legality of congressional demands for information must be evaluated "upon objection." *Watkins v. United States*, 354 U.S. 178, 214-15 (1957); *see United States v. Rumely*, 345 U.S. 41, 48 (1953) ("duty to answer must be judged as of the time of [the] refusal"); *Shelton v. United States*, 327 F.2d 601, 607 (D.C. Cir. 1963) ("when the subpoena was issued"). The Committee's request was "functionally … issued" to Intervenors, *Trump v. Vance*, 140 S. Ct. 2412, 2425 n.5 (2020), and Intervenors objected to it in 2019, when President Trump was still President. *See* Doc. 1-3. If the request was invalid in 2019 because it failed the *Mazars* test, then it is invalid now.

This timing rule was first articulated in criminal cases, but it applies here as well. As the Government put it in *Mazars*, the "concerns" behind this timing rule are "no less important when congressional subpoenas threaten the separation of powers than when they threaten due process." Gov't-*Mazars*-Br. 17, Doc. #1860386, *Trump v. Mazars USA, LLP*, No. 19-5142 (D.C. Cir. Sept. 8, 2020). Even in civil cases seeking prospective relief, separation-of-powers concerns sometimes

prompt courts to look backward and judge the legality of governmental action at the time it oc-

curred. *E.g.*, *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962) (*Chenery*

doctrine). Congressional demands that implicate the separation of powers should be treated no

differently. Notably, in *Mazars*, the Supreme Court cited *Watkins* (a criminal case) for the propo-

sition that Congress must "adequately identif[y] its aims and explain[] why the President's infor-

mation will advance its consideration of the possible legislation." 140 S. Ct. at 2036 (citing *Wat-*

*kins*, 354 U.S. at 201, 205-06, 214-15). The cited portions of *Watkins* explain that "[o]nly the

legislative assembly *initiating* an investigation can assay the relative necessity of specific disclo-

sures." 354 U.S. at 205-06 (emphasis added). And the "time" when Congress "must describe what

the topic under inquiry is and the connective reasoning whereby the precise questions asked relate

to it" is "upon objection" by the target. *Id*. at 214-15.

　　The Supreme Court's decision to incorporate the timing rules from *Watkins* was deliberate.

Throughout its opinion, the Court stressed the importance of keeping these informational disputes

out of court by fostering accommodation and compromise. *E.g.*, *Mazars III*, 140 S. Ct. at 2029-31,

2034, 2035. Evaluating these demands as of the time they are made helps do that by forcing Con-

gress to build its case and narrow its requests *before* it makes them. As the Government put it in

*Mazars*, the "requirement for [committees] to support [informational demands] when they issue is

one of the basic 'procedures which prevent the separation of power from responsibility.'" Gov't-

*Mazars*-Br. 16 (quoting *Watkins*, 354 U.S. at 215). Allowing a committee to come up with "'ret-

roactive rationalization[s]'" after litigation begins would widen "the 'gulf between the responsi-

bility for the use of investigative power and the actual exercise of that power.'" Gov't-*Mazars*-Br.

16-17 (quoting *Watkins*, 354 U.S. at 204-05; citing *Rumely*, 345 U.S. at 46).

The D.C. Circuit's decision in *Senate Select* does not suggest a different rule. *Cf.* Cmte.-MTD 34-35. In that case, President Nixon challenged a congressional subpoena based on executive privilege. *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 727 (D.C. Cir. 1974). Executive privilege requires Congress to make a "strong showing of need" that outweighs "the public interest served by nondisclosure." *Id.* at 730-31. In assessing Congress's "need" for the President's information, *Senate Select* accounted for subsequent developments that made the documents less essential. *See id.* at 732-33.

But *Mazars* held that executive-privilege cases are not a good fit here. *See* 140 S. Ct. at 2032-33. The question here is not whether the Committee *needs* Intervenors' tax information, but whether its request serves a legitimate legislative *purpose*. *Id.* at 2035, 2031. While need changes over time, purpose is judged at the outset. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1696-97 (2017); *United States v. Claes*, 747 F.2d 491, 495 (8th Cir. 1984). And purpose does not reset simply because a document is reissued with minimal changes. *See United States v. Grainger*, 346 U.S. 235, 248 (1953); *McCreary Cty. v. ACLU of Ky.*, 545 U.S. 844, 873-74 (2005). So even if the June 2021 request were technically new, it would be "'entirely correct to say that the new [request] should be construed as a continuation of the old.'" *Oneida Cty. v. Oneida Indian Nation of N.Y.*, 470 U.S. 226, 246 n.18 (1985).

In sum, no matter how this Court views the Committee's request, the Committee should have to satisfy the one test that the Supreme Court has articulated in this area: *Mazars*. Intervenors have plausibly alleged that, under the *Mazars* test, the Committee's request falls far short of what is needed to demand a President's tax information. *See infra* II.A.iii.

      **ii.**     **This Court should reject the Committee's "balancing" test.**

Like the committee in *Mazars*, the Committee here asks this Court to subject its request to a loose "balancing test." Cmte.-MTD 32. The Committee's test would be more stringent than the

test that governs ordinary private citizens—which, again, reflects the Committee's concession that requests for the information of a former President are special because they implicate the separation of powers. But the Committee's test would be more lenient than *Mazars* or *Mazars* lite, which is why the Committee is pressing it here (and insisting that Judge Mehta "erred" by applying *Mazars* lite). *See* Cmte.-MTD 33. Though the Committee is murky about what it wants this Court to balance, its test would apparently balance Congress's "'interests'" in the requested information against the separation-of-powers harm that the request would impose on the executive branch. *See* Cmte.-MTD 32. Judge Mehta was right to reject this approach. *See* 2021 WL 3602683, at *13.

The Committee's balancing test is improper because *Mazars* already explains how to evaluate legislative demands that present separation-of-powers concerns. Because those concerns have not diminished in this case, the *Mazars* test should apply as written. But even if those concerns had diminished, the Committee provides no persuasive reason to ditch the Supreme Court's test. As Judge Mehta recognized, the Committee's test would have courts needlessly "eschew" two requirements from *Mazars*: that requests be "'reasonably necessary,'" and that Congress demonstrate its purpose with specific "'evidence.'" *Id.* But those requirements are important. They avoid "'constitutional confrontation'" and ensure that judicial review isn't "'impossible.'" 140 S. Ct. at 2035-36. The Committee does not explain why those concerns are not important here. Nor does it explain why demanding information from a former President is not a "significant step." *Id*. at 2035.

The Committee cites no case where a court evaluated the legality of a congressional request for information by balancing Congress's legislative need against the separation-of-powers harm to a former President. Its characterization of *Nixon v. GSA* as a case where a "'congressional request was made pursuant to an actual statute'" badly misreads that precedent. Cmte.-MTD 32. In *Nixon v. GSA*, former President Nixon challenged the constitutionality of a statute that required the

34

executive branch to take and screen his official papers. 433 U.S. at 429. Not only did the case involve the constitutionality of a statute, rather than a "congressional request" for information, but the Supreme Court emphasized that the statute in question did "'*not* make the presidential materials available to the Congress.'" *Id.* at 444. The Court deemed it "highly relevant" that the statute put "the Executive Branch" in "full control of the Presidential materials," noting "it is clearly less intrusive to place custody and screening of the materials within the Executive Branch itself than to have Congress … perform the screening function." *Id.* at 443-44. The Court thus rejected former President Nixon's facial challenge to the statute because it was not "unduly disruptive of the Executive Branch." *Id.* at 445. The Court applied the framework from Justice Jackson's concurrence in the *Steel Seizure Case*, not anything resembling the Committee's balancing test. *See id.* at 441-43. While *Nixon v. GSA* helpfully holds that former Presidents can still raise separation-of-powers challenges, *see id.* at 439, 448-49, the decision has no further relevance here.

Courts do employ a kind of balancing test when congressional requests implicate executive privilege. *See Senate Select*, 498 F.2d at 730-31. But that test would be far more "demanding" than the one the Committee proposes now, a point stressed by the committee in *Mazars*. Agreeing, *Mazars* refused to adopt the balancing test from the executive-privilege cases, so the Committee's attempt to analogize to those cases now is unpersuasive. 140 S. Ct. at 2032-33.

Outside of executive privilege, separation-of-powers cases are not usually resolved through case-by-case balancing. When the Supreme Court balances the branches' interests, it balances them in order to *ascertain* the governing rule; balancing is not the rule itself. For example, in *Nixon v. Fitzgerald*, the Court balanced the relative interests to determine that sitting Presidents are absolutely immune from civil suit for official acts. 457 U.S. 731, 754 (1982). The Court did not deem President Nixon immune because the balance favored him in that particular suit. The Court

declared all Presidents immune from *all* such suits because the balance of interests categorically favored a rule of absolute immunity.

The Court did the same thing in *Mazars*. It weighed the relative interests of the legislative and executive branches in formulating the *Mazars* test—a "balanced approach" with four criteria. 140 S. Ct. at 2035-36. Those four criteria are *requirements* that Congress must follow, not nondispositive factors to be balanced against each other. A subpoena that is "broader than reasonably necessary," for example, could not be sustained simply because Congress has no "other sources" for the information. *Id.* at 2035-36. And a subpoena that imposed unacceptable "burdens" on a President could not be sustained because Congress submitted "detailed and substantial" evidence of its legislative purpose. *Id.* at 2036. Balancing went into the creation of the *Mazars* test; *Mazars* is not itself a balancing test.

A court that applied the categorical-balancing approach from *Fitzgerald* and *Mazars* here—weighing the branches' relative interests to ascertain the test that will govern informational demands to former Presidents—would not land on the Committee's proposal. The Committee would have courts balance, in every case, Congress's specific need for the requested materials against the intrusion on the Presidency. But the Committee admits that this test is a fait accompli.

The Committee fixes its test by giving the presidential side of the balance a fixed weight of zero. Requests to former Presidents cannot burden the current President, the Committee notes, because any production will be done by the former President. Cmte.-MTD 35. And the only separation-of-powers concerns raised by demands to former Presidents, it says, are "negligible" or nonexistent. Cmte.-MTD 30, 4, 35. So unless a committee can articulate *no* legislative need for the requested materials—a case that would fail even the ordinary standard for requests to private citizens—Congress's stated needs will always outweigh the former President's burdens. In other

words, under the Committee's test, Congress always wins. The Committee's test would thus "leav[e] essentially no limits on the congressional [subpoena] power"—an unacceptable outcome in a context that all agree presents separation-of-powers concerns. *Mazars III*, 140 S. Ct. at 2034. *Mazars* (and even *Mazars* lite) does a much better job of calibrating the competing concerns.

Regardless, the Committee's request fails even its own balancing test, at least once its dice-loading assumptions are removed. This request is incredibly burdensome on Intervenors, given the sheer amount of sensitive information that the Committee is requesting and promising to expose. *See infra* II.A.iii; ACCC ¶¶317, 289. And the burden on Intervenors matters: The more painful the request, the greater Congress's power to use these requests to harass and coerce Presidents. On the flip side, the Committee doesn't need troves of Intervenors' financial information to study vague proposals or broad reforms to the IRS's procedures. *See infra* II.A.iii; ACCC ¶317. Any fair-minded balancing of the parties' relative interests would strongly favor Intervenors.

### iii.    The Committee's request fails any heightened standard.

In their briefs, the Government and the Committee identify three buckets of legislation that they think can justify the Committee's request: laws regulating presidential financial disclosures, laws regulating presidential conflicts of interest, and laws requiring the IRS to audit Presidents. Only the mandatory-audit rationale appears in Chairman Neal's April 2019 request. The conflict-of-interests rationale only arguably appears in his June 2021 letter. And the financial-disclosure rationale appears only in the parties' briefs (and, even then, the parties can't agree on what the rationale even is). Accepting Intervenors' factual allegations and reasonable inferences as true and construing everything in their favor, these rationales plausibly fail heightened scrutiny.

**Financial Disclosures**: Both parties loosely gesture at financial-disclosure laws that the Committee might study with Intervenors' information. The Committee, but not the Government, claims that Congress could pass legislation requiring Presidents to disclose "foreign

emolument[s]." Cmte.-MTD 38. The Government, but not the Committee, claims that Congress could pass legislation requiring Presidents to disclose their tax information. Gov't-MTD 18. Neither type of legislation can justify the Committee's request.

First, the financial-disclosure rationale does not even *appear* in Chairman Neal's April 2019 request (or his June 2021 letter, for that matter). Its generic reference to "tax laws" doesn't cut it. *See Mazars III*, 140 S. Ct. at 2036 (rejecting "'vague' and 'loosely worded' evidence of Congress's purpose"). The Committee has presented no "evidence" to support this rationale, let alone "detailed and substantial" evidence. *Id.* Nor has it made any attempt to "adequately identif[y] its aims" or "explai[n] why" Intervenors' information "will advance its consideration of the possible legislation." *Id.* Although a brief filed in litigation would be too late to do the necessary explaining, the Committee's brief also fails to substantiate the financial-disclosure rationale. (And its complaint and summary-judgment motion don't even use the word "emolument." Doc. 1; Doc. 29-2.) It is thus "'impossible'" for this rationale to satisfy heightened scrutiny. 140 S. Ct. at 2036.

Substantiation is needed here because the referenced disclosure laws would "concer[n] the Presidency." *Id.* All laws that regulate Presidents "rais[e] sensitive constitutional issues." *Id.*; *see infra* II.C. As even the D.C. Circuit agreed in *Mazars II*, disclosure laws can "go too far" and "begin to 'prevent the Executive Branch from accomplishing its constitutionally assigned functions.'" *Trump v. Mazars USA, LLP* (*Mazars II*), 940 F.3d 710, 735 (D.C. Cir. 2019) (cleaned up), *vacated and remanded*, 140 S. Ct. 2019 (2020). Similarly, when California tried to force President Trump to disclose his tax returns to get on the ballot in 2020, a federal court held that the law likely violated the Qualifications Clause, Art. II, §1, cl. 5. *See Griffin v. Padilla*, 408 F. Supp. 3d 1169, 1177-81 (E.D. Cal. 2019), *vacated*, 2020 WL 1442091. Its reasoning would also apply to Congress.

*U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995); *Powell v. McCormack*, 395 U.S. 486 (1969).).

A disclosure law aimed at emoluments would also have to target actual "emoluments"—a term that House Democrats incorrectly define to include virtually all business transactions. *Blumenthal v. Trump*, 373 F. Supp. 3d 191, 195 (D.D.C.), *vacated*, 949 F.3d 14 (D.C. Cir. 2020); *see, e.g.*, H.R. 5314, 117th Cong., §302 (defining "emolument" to include "commercial transactions at fair market value"). As the Government has persuasively argued, the Foreign Emoluments Clause "prohibits only compensation accepted from a foreign government for services rendered by an officer in either an official capacity or employment-type relationship," and "[t]he broader interpretation advanced by the Members … covering any profit or gain" violates common "indicia of constitutional meaning and would lead to absurd results." Appellant's Br. 39, *Blumenthal*, No. 19-5237, 2019 WL 4857260 (D.C. Cir. Oct. 1). Yet despite all these constitutional landmines, the Committee provides no details about the legislation it's considering, leaving this Court unable to ensure that the request "advances a valid legislative purpose." *Mazars III*, 140 S. Ct. at 2036.

Second, the financial-disclosure rationale cannot justify the "significant step" of subpoenaing a President's papers. *Id.* at 2035. Congress has passed "extensive" disclosure laws before, including disclosure laws for Presidents, without ever once requesting a President's tax information. *Mazars IV*, 2021 WL 3602683, at *16; *e.g.*, *Mazars II*, 940 F.3d at 734-35 (citing examples); *Mazars I*, 380 F. Supp. 3d at 102-03 (same); 5 U.S.C. §7342 (foreign gifts and decorations); H.R. 5314 §§301-07 (draft emoluments law). Logically, the *content* of one specific President's tax returns and audit files has nothing to do with the *policy* judgment that emoluments or tax returns should be disclosed. Disclosure laws rest on "'Congress' general belief that public disclosure … is desirable.'" *Mazars II*, 940 F.3d at 730 (emphasis added). Any new disclosure law would apply

to all Presidents (no matter who they are) and would require the disclosure of all specified information (no matter the contents). The key questions for legislative study, then, are "predictive policy judgments"—balancing the benefits of greater disclosure against the risks of inundating the public with too much information or discouraging certain people from seeking public office. 140 S. Ct. at 2036.

The Committee's request is especially unjustified given what the Committee already claims to know. Again, House Democrats (incorrectly) define "emolument" to mean any profit, gain, or advantage that a government gives to the President or his businesses. Given President Trump's "'vast business holdings,'" there is no doubt in their minds that he "accepted … Emoluments." *Blumenthal*, 373 F. Supp. 3d at 194-95. By the Committee's logic, President Trump received massive quantities of "emoluments" every day. The Committee does not need a line-by-line breakdown of each payment to decide whether it wants to require Presidents to disclose such payments to the public. While a court or jury might want a "'full disclosure of all the facts'" or "every scrap of potentially relevant evidence," there is "no comparable need in the legislative process." *Mazars III*, 140 S. Ct. at 2036; *Senate Select*, 498 F.2d at 732. More importantly, Intervenors' tax returns simply wouldn't contain the kind of transaction-by-transaction detail that the Committee would need to uncover "emoluments." *See* ACCC ¶¶284, 27.

The Committee is similarly convinced already that Presidents and presidential candidates should be forced to disclose their tax returns. *E.g.*, ACCC ¶¶22-26, 28-30. As the Government points out, the Committee has already drafted several bills to that effect. Gov't-MTD 18. And one of those bills, H.R. 1, was "already considered and passed" by the House before the Committee even requested Intervenors' information. *Mazars IV*, 2021 WL 3602683, at *16; *Mazars II*, 940 F.3d at 731. The notion that Intervenors' information "could convince the Senate that the House's

proposed reforms are necessary" is overly speculative, is not something courts can evaluate, and would render the limits on Congress's authority "entirely toothless." *Mazars IV*, 2021 WL 3602683, at *16; *see also Dodge v. Woolsey*, 59 U.S. 331, 355 (1855) ("The senate and house of representatives of the United States exercise their legislative powers independently of each other").

Nor do the Committee and the Government "adequately explain why other sources of information … could not 'reasonably provide Congress the information it needs in light of its particular legislative objective.'" *Mazars IV*, 2021 WL 3602683, at *15 (quoting *Mazars III*, 140 S. Ct. at 2035-36). Far more relevant than the tax information of one individual, a committee that wanted to craft disclosure laws should be speaking to experts on disclosure and government ethics, accountants and other experts on complex finances, lawyers, and staff. *See id.* at *16. If the Committee needed presidential tax returns, it could look at the returns of "every elected President" since Nixon. Cmte.-MTD 36. And it already has President Trump's far more detailed financial disclosure forms. ACCC ¶284; *Mazars IV*, 2021 WL 3602683, at *16.

If the Committee somehow needed still more tax information, it would be "just as informed by investigating the [tax information] of other, non-presidential officials with similar complex interests." *Mazars IV*, 2021 WL 3602683, at *16. After all, the Committee does not claim to be considering retroactive legislation about what *President Trump* should have disclosed in the past; it claims to be considering prospective legislation about what *future Presidents* will have to disclose. And the number of people who could serve as future Presidents is endless. In fact, President Trump's information is uniquely *ir*relevant. According to the Committee, his circumstances are unprecedented and rare. No rational Congress would craft laws that will apply to all future officials by focusing on a singularly unrepresentative official.

Third, the Committee's request is "broader than reasonably necessary" to study financial-disclosure laws. *Mazars III*, 140 S. Ct. at 2036. The Committee never provides "the connective reasoning" between financial-disclosure laws and the requests it made here. *Watkins*, 354 U.S. at 215. Even under the Committee's flawed definition, an emolument is a payment that a President receives from a government *while he is in office*. But the Committee's request (even after its accommodation to Treasury) covers one year from before President Trump was in office and one year from after he left. Gov't-MTD 35; *see Mazars IV*, 2021 WL 3602683, at *26 (narrowing a subpoena because the emoluments rationale could not justify pre-presidential disclosures). And the Committee's request is not limited to "emoluments" or even to payments by governments. Nor does the Committee explain why it needs six years' worth of information to study disclosure laws: If it's trying to get a sense of what kinds of information should be forcibly disclosed, a one-year sample should be plenty. The "incremental" benefit of seeing additional years "cannot justify" the burden. *Mazars IV*, 2021 WL 3602683, at *17.

And the "burdens imposed" by the Committee's request, fourth and finally, are too high to survive heightened scrutiny. 140 S. Ct. at 2036. The burdens do not stem from the *production* of Intervenors' tax information; requests under §6103(f) are directed to Treasury, not taxpayers. The relevant burdens instead stem from the *disclosure* of Intervenors' sensitive financial information. And those burdens are massive. The Committee's request seeks six years of tax information concerning President Trump and his businesses—a dragnet that the Committee expects will sweep in an "inordinately large and complex" amount of information revealing "sprawling domestic and international business activities." Cmte.-MTD 38. It can "scarcely be denied that the public exposure of one's wallet" is an "invasion of privacy." *DeMasi v. Weiss*, 669 F.2d 114, 119 (3d Cir. 1982). "Income tax returns," in particular, "are highly sensitive documents." *Nat. Gas Pipeline*

*Co. of Am. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1411 (5th Cir. 1993). So much so that taxpayer privacy "merit[s] constitutional protection." *Church of Scientology of Calif. v. United States*, 506 U.S. 9, 13 (1992). As then-Judge Ginsburg put it, the "general ban on disclosure" of tax returns and audit files "provides essential protection for the taxpayer" by protecting the "sensitive or otherwise personal information in a return." *NTEU v. FLRA*, 791 F.2d 183, 184 (D.C. Cir. 1986).

The Committee's lack of "specificity" is itself an "'unnecessary intrusion.'" *Mazars III*, 140 S. Ct. at 2036. But even worse, the Committee is requesting tax returns and audit files for years where the IRS's examinations are still *open*. ACCC ¶¶340, 309, 346. As Commissioner Rettig once explained, no experienced tax lawyer would advise her client to publicly release his tax returns during an ongoing audit. ¶8. By trying to force that precise result, the Committee's request threatens to compromise Intervenors' rights vis-à-vis the IRS.

This substantial burden on Intervenors, in turn, burdens the Presidency. As the breadth and sensitivity of the requested information increases, so does Congress's power to use subpoenas to harass and coerce Presidents. The more painful the request, the bigger the threat. The resulting "impact on the institutional balance between Congress and the President" is precisely the sort of "burden" that *Mazars* says "courts must consider." DOJ-*Mazars*-Br. 14.

This Court also must consider the long-term consequences from the precedent it would set by upholding the Committee's request. *Mazars III*, 140 S. Ct. at 2036. According to Congress, the Emoluments Clauses apply to the President and millions of federal employees, 5 U.S.C. §7342(a); 6 O.L.C. Op. 156 (1982), and the definition of "emoluments" is incredibly broad. The Committee's emoluments rationale thus would allow Congress to request the tax returns and audit files of any President or executive-branch employee. The Committee needs to see everyone's tax information, it would say, to determine whether they are receiving emoluments and whether Congress should

consent or pass new disclosure laws. That readymade rationale would create a powerful "institutional advantage" for Congress vis-à-vis the executive branch. *Mazars III*, 140 S. Ct. at 2036.

Even more troubling is the Government's argument that the Committee has a right to obtain President Trump's tax information to help it study whether Presidents should be forced to disclose their tax returns. As Judge Mehta recognized, this rationale is circular: Congress could "always" say that it needs a President to disclose certain information because it wants to study legislation that would require Presidents to disclose that information. *Mazars IV*, 2021 WL 3602683, at *20. This rationale is also unfalsifiable: Whatever reason Congress wants to see *this President's* information will be a reason that the public should see it too. And in a pinch, Congress can always fall back on the argument that it cannot know what it will find in the President's information until it gets the chance to look. The Government had it right in *Mazars*: This rationale is indefensible because it would allow committees to get "'all the disclosure to which they would be entitled in the event' they had already successfully enacted [the disclosure] legislation, 'and much more besides.'" Gov't-*Mazars*-Br. 25 (quoting *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 388 (2004)).

**Conflicts of Interest**: The Committee next claims that Intervenors' tax information could help it study "legislation to prevent conflicts of interest." Cmte.-MTD 19. It's not clear whether this rationale is separate from its financial-disclosure rationale, since foreign emoluments are the only concrete thing that the Committee or the Government mentions in their briefs. Cmte.-MTD 19-20; Gov't-MTD 18-19. Either way, this rationale suffers from the same flaws as the last one.

As with the financial-disclosure rationale, the Committee has not "adequately identifie[d]" the legislation that it is considering or "explain[ed] why" that legislation requires President Trump's papers. *Mazars III*, 140 S. Ct. at 2036. Chairman Neal does not even *mention* this

rationale in his April 2019 request. *See* ACCC ¶¶23, 24, 26, 28, 32, 131. That should end the matter, since congressional requests must be assessed at the time they are made, *supra* II.A.i, and Chairman Neal's June 2021 letter has "the usual infirmity of post litem motam, self-serving declarations," *Rumely*, 345 U.S. at 48. Even in the June 2021 letter, Chairman Neal mentions this rationale in only the most conclusory terms: He speculates that President Trump's tax returns "*could* reveal hidden business entanglements" and "*might* also show foreign financial influences," and that this information "*could* inform relevant congressional legislation." Doc. 133-3 at 5 (emphases added). This "'vague' and 'loosely worded' evidence" cannot satisfy heightened scrutiny. *Mazars III*, 140 S. Ct. at 2036.

Again, details are important because, as the D.C. Circuit recognized in *Mazars II*, "laws that 'impose conflict-of-interest restrictions on the President' … raise difficult constitutional questions." 940 F.3d at 733. The conflict-of-interest statutes on the books deliberately exempt the President. *See* 18 U.S.C. §202(c). For good reason. Congress cannot add to or alter the constitutional qualifications for being President. *Term Limits*, 514 U.S. at 798, 803-04. And Article II "'makes a single President responsible for the actions of the Executive Branch'"; "[i]t is *his* responsibility to take care that the laws be faithfully executed." *Free Enter. Fund*, 561 U.S. at 496-97, 493. Thus, as now-Judge Silberman explained, imposing conflict-of-interest laws on the President would either "disempower him from performing some of the functions" prescribed to him by Article II or would "establish a qualification for his serving as President (to wit, elimination of financial conflicts)" beyond those contained in the Qualifications Clause. *Memo. from Deputy Att'y Gen. Silberman to Burress* 5 (Aug. 28, 1974), bit.ly/31k3rql. Intervenors submit that no such law would ever be constitutional. But at the very least, the Committee would need a "particularly" detailed

explanation of what legislation it is contemplating that could overcome these "sensitive constitutional issues." *Mazars III*, 140 S. Ct. at 2036. It comes nowhere close.

All the other flaws with the financial-disclosure rationale also apply here. Conflict-of-interest laws do not justify the significant step of demanding a President's information because the relevant judgments are policy questions that can be decided on the existing record, without specific tax information, or through other sources. In fact, according to the Committee and the two most recent IRS commissioners, Intervenors' tax forms are not a useful way to uncover "foreign ties" or "unknown business relationships." ACCC ¶¶27, 284. The Committee cannot contradict Intervenors' plausible allegations on this point with extraneous evidence, *cf.* Cmte.-MTD 41, and the extraneous evidence it cites only proves that these forms do not contain the kind of granular detail that the Committee claims to need. The Committee's request is also broader than reasonably necessary because it is not limited to documents that would show potential conflicts and goes beyond President Trump's tenure in office without a logical justification. And the burdens on Intervenors, the Presidency, and the long-term institutional balance are just as high.

**Presidential Audits**: The only legislative purpose that Chairman Neal identified in his April 2019 request was the Committee's supposed desire to study the IRS's mandatory audit process for Presidents. As explained below, Intervenors plausibly allege that this pretextual rationale fails ordinary scrutiny, *see infra* II.B, so it cannot possibly satisfy heightened scrutiny, *see Mazars III*, 140 S. Ct. at 2035-36. But even if this rationale were sincere, Intervenors have plausibly alleged that the rationale fails on its own terms.

First, the Committee's evidence for this rationale is mostly "'vague' and 'loosely worded.'" *Id.* at 2036. The Committee's vacuous statement that it "is considering legislative proposals and conducting oversight related to our tax laws" is plainly insufficient. Doc. 133-1 at 2; Doc. 133-3

46

at 2. In the operative request from April 2019, Chairman Neal identifies only one arguably concrete proposal: a statute "codif[ying]" the IRS's mandatory audit process for Presidents. Doc. 133-1 at 2. The Committee also has some questions about "the scope" of the IRS's current audits, Doc. 133-1 at 2, but those curiosities about existing policy are not themselves legislation. They matter only insofar as the Committee wants to use the answers to craft legislation that would require the IRS to audit Presidents a certain way. *See Mazars III*, 140 S. Ct. at 2031 (the House's "power 'to secure needed information'" is "'justified solely as an adjunct to the legislative process'").

Second, laws that would codify the mandatory audit process cannot justify the "significant step" of subpoenaing a President's papers. *Id.* at 2035. The Committee is not starting on a blank slate: As the Government notes, the IRS's presidential audit process is written down, with significant detail, in the Manual. *See* Gov't-MTD 10; ACCC ¶287. The Committee says that some of those provisions "are outdated and no longer followed," Doc. 133-3 at 3, but it never says which ones, suggesting that whatever it's referring to is insubstantial or immaterial. If the Committee has additional questions about the details of the presidential-audit process, then those questions can be answered by talking to the IRS. ACCC ¶¶285-86. Only the IRS can authoritatively explain "the scope" of the examination, "whether it includes a review of underlying business activities," "what happens to the mandatory audit if it is not closed before a President leaves office," and the like. Doc. 133-1 at 2; Doc. 133-3 at 7. Once it's exhausted the IRS's knowledge, the Committee can make the "predictive policy judgments" needed to craft and evaluate reforms. 140 S. Ct. at 2036.

Looking at Intervenors' files, by contrast, would answer its questions only indirectly and anecdotally (if at all). An individual file could not reveal an "[un]written" procedure, for example, but talking to an IRS agent would. Cmte.-MTD 8. And the Committee's request is particularly useless as applied to Intervenors, since their audits are still *open*. If the Committee wants to know

whether the IRS is properly auditing Presidents, inserting itself into the process before the audit is complete will create atypical facts and poison the data. ACCC ¶288. To paraphrase the Government, until files are closed, the Committee "can only speculate as to the outcomes and whether [presidential interference] ultimately [will] play any role." Gov't-MTD 53. And while the files are open, the Committee's request is substantially more burdensome for Intervenors.

While the Committee says it wants to look at "an actual audit" of "an actual taxpayer," Doc. 133-3 at 4, it never explains why it needs that to study the audit *process*. The closest it gets is the suggestion that an individual file might show "improper interference by a President or his representatives." Doc. 133-3 at 4. That kind of interference likely *wouldn't* show up in a file, but it *could be* disclosed to the Committee in confidential conversations with IRS agents. The Committee should at least exhaust the IRS's available knowledge before it requests a President's information.

The Committee's explanation for why it needs President Trump's information to legislate is highly unpersuasive. The Committee keeps adding conditions until it's eliminated everyone but President Trump: For example, it needs a President, who owns "hundreds of business entities," who has "inordinately complex returns," who "had ongoing audits" when he entered office, and who "routinely criticized the IRS for auditing him." Doc. 133-3 at 4-7. The Committee might as well throw in "who has blonde hair" and "was born in Queens." The Committee's logic forgets that congressional inquiries must be tailored "to a subject matter properly under inquiry, not … to the person under interrogation." *Rumely v. United States*, 197 F.2d 166, 177 (D.C. Cir. 1952).[4]

---

[4] The Committee continues to mischaracterize President Trump's complaints about being audited when he was a private businessman as criticisms of the mandatory presidential audit process. In the two extraneous articles that the Committee cites, the speakers are clearly discussing the audits that then-citizen Trump complained about on the campaign trail. *See* Cmte.-MTD 18-

The Committee does not need all these conditions satisfied. The Committee's legislation would govern all "*future* President-taxpayers," so it's neither wise nor necessary to focus on the information of one admitted outlier. Doc. 133-3 at 7. If these conditions were somehow important to legislation, the Committee could draw on the vast pool of non-presidential taxpayers who satisfy them. *E.g.*, ACCC ¶¶279-80. The pool of *future* Presidents is endless, after all; and once they start, presidential audits do not proceed differently than other audits. ¶287. Even if Presidents somehow mattered, other Presidents were subject to the mandatory audit process and satisfy the Committee's conditions. ¶¶278, 281. Those officials might cooperate, if they've already disclosed their returns.

Next, the Committee's request is "broader than reasonably necessary" and places excessive "burdens" on Intervenors. 140 S. Ct. at 2036. As explained, the burdens of public disclosure are substantial, and the request causes more acute burdens because Intervenors' files remain open. The Committee could also study the IRS's processes by reviewing the audit files alone; the tax returns add little to the Committee's *legislative* goals (though they add a lot to the Committee's invalid, non-legislative goals). ACCC ¶310.

The parties also give no coherent explanation for requesting two years when President Trump wasn't in office. The Government claims that the Committee sought an extra "year on either side" of his presidency because audits are sometimes "expanded to include prior year and related returns." Gov't-MTD 35. But consulting "prior year" returns does not explain the year *after* President Trump left office; and regardless, requesting extra years is premature until the Committee has some basis to think such an expansion happened here. *See Mazars IV*, 2021 WL 3602683, at

---

19. As Intervenors explained, the IRS routinely audits wealthy individuals like President Trump; President Trump felt like he was "always" and "automatically" under audit because of his political views; the IRS was auditing him before, during, and after his first campaign; and those ongoing audits were the reason he would not voluntarily disclose his tax returns. *See* ACCC ¶¶256, 6-8.

*26 (rejecting such "speculation without any limiting principle"). Unlike the Government, the Committee says that it sought "returns for the two tax years *preceding* Mr. Trump's presidency." Cmte.-MTD 41 (emphasis added). Even if the Committee had those dates right, nonpresidential years have nothing to do the process for auditing *Presidents*, and would provide no information that the Committee needs to consider broad reforms.

Finally, the Committee's request is broader and more burdensome than reasonably necessary because it promises no confidentiality. The Committee does not deny that, if it receives a favorable ruling in this case, it will quickly publish Intervenors' information. *Cf.* Cmte.-MTD 26. But the Supreme Court rejects "the proposition that in order to perform its legislative function Congress not only must at times consider and use actionable material but also must be free to disseminate it to the public at large." *Doe v. McMillan*, 412 U.S. 306, 316 (1973). The Committee can intelligently craft and study reforms to the IRS's audit process without exposing Intervenors' tax information to the entire world. Crafting legislation might require *knowledge* or *temporary possession*, but it shouldn't require permanent relinquishment or public disclosure. Study is not meaningfully hindered by confidentiality; only invalid, nonlegislative goals are.

This Court should thus decline to enforce the Committee's request until it guarantees Intervenors protection from public disclosure. This approach is supported by *Mazars*. The Supreme Court not only held that Congress cannot subpoena a President unless its request is "reasonably necessary" and not overly "burden[some]." 140 S. Ct. at 2036. But it actually cited an example of an accommodation between the President and Congress where "documents were made available, but only for one day with no photocopying, minimal notetaking, and no participation by non-Members." *Id.* at 2030. Section 6103(f) likewise requires committees to review tax information while they are in a "closed executive session." And Congress guaranteed confidentiality the only

other time it subpoenaed former Presidents—when it sought the testimony of former Presidents Tyler and Adams concerning the possible impeachment of Daniel Webster. *See* H. Rep. No. 29-684, at 4 (1846). The Court should take a "'considerable impression'" from this "'practice of the government'" and require the same protection here. *Mazars III*, 140 S. Ct. at 2035.

### B.   The request's primary purpose is not legislative.

Congressional demands for information "must serve a 'valid legislative purpose.'" *Mazars III*, 140 S. Ct. at 2031. By its terms, this legitimate-legislative-purpose test requires courts to ascertain a request's "purpose" and then assess whether that purpose is "legislative" and "valid." Because Congress's "power to obtain information" is "'justified solely as an adjunct to the legislative process,'" any request that serves a *non*-legislative purpose is necessarily invalid. *Id.* The Supreme Court has identified two common examples of invalid, nonlegislative purposes, which it made a point to reiterate in *Mazars*: "'law enforcement'" and "'expos[ure] for the sake of exposure.'" *Id.* at 2032. Congress cannot issue requests "for the purpose of 'law enforcement,' because 'those powers are assigned under our Constitution to the Executive and the Judiciary.'" *Id.* And Congress cannot issue requests "'to expose for the sake of exposure'" because the Constitution gives it "no 'general' power to inquire into private affairs and compel disclosures." *Id.*

Intervenors contend that the Committee's request pursues one or more of these invalid, non-legislative purposes. Although *Mazars* blessed this exact sort of challenge, the Committee and the Government think it's nearly impossible to bring. They insist that courts must accept Congress's formal statement of purpose, and they characterize any attempt to consult other objective evidence of purpose as an impermissible inquiry into "motive." Cmte-MTD 16, 20-22; Gov't-MTD 1, 19-22. The Committee and the Government argue that this approach is required by the "presumption of regularity," though they concede that a court could invalidate a congressional request in "'exceptional circumstances,'" in "'obvious'" cases, or in cases where the request could

not "'fairly be deemed'" legislative. Gov't-MTD 12, 20; Cmte.-MTD 22. Respectfully, the Committee and the Government misread the caselaw and misstate the standard.

Contra the Committee and the Government, Intervenors' purpose-based claims do not turn on "motive"—a term that neither the Committee nor the Government bothers to define. Purpose and motive are "not the same." *State Tax Returns*, 415 F. Supp. 3d at 47. Purpose is the Committee's "intended outcome," based on "what" it is doing and what it has said publicly. *Jewish War Veterans of USA, Inc. v. Gates*, 506 F. Supp. 2d 30, 60 (D.D.C. 2007). Motive is "why" the Committee is acting—its "unexpressed or psychological" desires. *Id.*; *Bauchman ex rel. Bauchman v. W. High Sch.*, 132 F.3d 542, 560 (10th Cir. 1997). Motive is "why an individual Member sponsored or supported an [action]," and purpose is "what that [action] was designed to accomplish." *Jewish War Veterans*, 506 F. Supp. 2d at 60.

As Judge Bates has explained, the distinction between purpose and motive is "admittedly a fine one," but "is nevertheless a distinction that finds support in the case law and hence must be respected." *Id.* (cleaned up); *e.g.*, *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573, 2575-76 (2019) (explaining that courts normally cannot inquire into the "'motivation'" or "unstated reasons" of "another branch of Government," but must "scrutinize[]" another branch's "reasons" by examining "the record" and "viewing the evidence as a whole."). While litigants cannot sue Congress for illegitimate motives, they can sue Congress for illegitimate purposes—after all, the governing standard is called the "legitimate legislative *purpose*" test. To gauge purpose without delving into motive, courts "must focus … on objectively discernible conduct or communication that is temporally connected to the challenged activity." *Bauchman*, 132 F.3d at 560; *see, e.g.*,

*Mazars II*, 940 F.3d at 767-71 (Rao, J., dissenting) (consulting the objective evidence to conclude that a subpoena's purpose was nonlegislative).[5]

When assessing this objective evidence of a committee's purpose, courts do not limit themselves to one particular document, such as the request itself. They assess "all the evidence" of purpose and consider requests "in their entire setting." *United States v. Icardi*, 140 F. Supp. 383, 388 (D.D.C 1956); *United States v. Cross*, 170 F. Supp. 303, 306 (D.D.C 1959). "Each situation must be analyzed on its own special facts," *Hentoff v. Ichord*, 318 F. Supp. 1175, 1182 (D.D.C. 1970), and "several sources are available in aid of ascertaining" Congress's purpose, *Shelton*, 404 F.2d at 1297. Relevant evidence includes "documents," "resolutions," "hearings," "letter[s]," "report[s]," "testimony," "statement[s] of the Chairman," "statements of the members of the committee," the requests themselves, and all other "things said and done by [the committee's] chairman, counsel, and members." *Icardi*, 140 F. Supp. at 388; *Shelton v. United States*, 404 F.2d 1292, 1297 (D.C. Cir. 1968); *Cross*, 170 F. Supp. at 308-09. In short, "'the District Court must take evidence and determine for itself whether or not [the challenged action] was within the 'legitimate legislative needs of Congress.'" *Doe v. McMillan*, 566 F.2d 713, 717 (D.C. Cir. 1977).

---

[5] The plaintiffs in *Mazars* also raised a purpose-based challenge to that subpoena. Contrary to the Government's suggestion, *see* Gov't-MTD 15, no court in that litigation rejected Intervenors' distinction between purpose and motive. The D.C. Circuit assumed it existed and found it a useful way to decide the case. *See Mazars II*, 940 F.3d at 726. Judge Rao accepted the distinction. *Id.* at 767-68, 751 (Rao, J., dissenting). The Supreme Court did not address the plaintiffs' purpose-based challenges, but it agreed that those kinds of challenges are legitimate. *See Mazars III*, 140 S. Ct. at 2032. And Judge Mehta assumed that purpose and motive are distinct, though he thought the distinction was "ill defined." *See Mazars IV*, 2021 WL 3602683, at *10. In the related *Deutsche Bank* litigation, the Second Circuit likewise accepted "the distinction between motive, *i.e.*, the reason for acting, and purpose, *i.e.*, the result sought." *Trump v. Deutsche Bank AG*, 943 F.3d 627, 664 (2d Cir. 2019), *vacated sub nom. by Mazars III*, 140 S. Ct. 2019; *accord id.* at 689 (Livingston, J., concurring in part and dissenting in part).

Relatedly, courts do not automatically accept a committee's formal statement of purpose, if that statement is contradicted by the other objective evidence. As the Supreme Court has stressed from the beginning, "'The house of representatives is not the final judge of its own power'"; "'the legality of its action may be examined and determined by this court.'" *Kilbourn v. Thompson*, 103 U.S. 168, 199 (1880). And as the Supreme Court reiterated in *Mazars*, courts cannot refuse "to see what all others can see and understand" about why Congress is demanding certain information. 140 S. Ct. at 2034 (cleaned up; quoting *Rumely*, 345 U.S. at 44); *accord Dep't of Commerce*, 139 S. Ct. at 2575 ("[Courts] are 'not required to exhibit a naiveté from which ordinary citizens are free.'"); *Deutsche Bank*, 943 F.3d at 664 (plaintiffs can prove the illegality of congressional requests where "the valid legislative purposes that the Committees have identified" are "artificial pretexts").[6]

The legitimate-legislative-purpose test is not a paperwork requirement; it's the essential check that ensures Congress stays "limited to the exercise of the powers appropriate to its own department and no other." *Kilbourn*, 103 U.S. at 191. And Congress's powers must remain limited "to ensure the protection of 'our fundamental liberties.'" *Morrison*, 529 U.S. at 616 n.7. If courts "simply assume[d] … that every congressional investigation is justified," then they would "abdicate the responsibility placed by the Constitution upon the judiciary to insure that the Congress does not unjustifiably encroach upon" individual rights. *Watkins*, 354 U.S. at 198. Blind

---

[6] Both the Committee and the Government stress language in *Mazars* instructing courts to evaluate "'the *asserted* legislative purpose'" and "'the evidence *offered* by Congress.'" Cmte.-MTD 21; Gov't-MTD 21. Their italics are unhelpful because they only raise the question *how* Congress "assert[s]" its purposes and "offer[s]" its evidence. Nothing in *Mazars* supports the notion that courts should ignore reliable, objective evidence of congressional purpose in favor of Congress's mere say-so. *Cf.* 140 S. Ct. at 2035 ("courts must perform a careful analysis"); *id.* ("carefully assess"); *id.* at 2036 ("be attentive"); *id.* ("be careful to assess"); *id.* ("should be carefully scrutinized"); *id.* at 2035 (the Constitution "'deals with substance, not shadows'").

acceptance of Congress's asserted purpose would "leav[e] essentially no limits" on Congress's authority to demand information—"just as the Framers feared"—because "*any* type of information" has "some relation to potential legislation." *Mazars III*, 140 S. Ct. at 2034.

The "presumption of regularity" does not alter this analysis. *Cf.* Cmte.-MTD 17; Gov't-MTD 12. For starters, that presumption doesn't apply here. Although the D.C. Circuit's decision in *Mazars II* "did not take adequate account" of the separation of powers, *Mazars III*, 130 S. Ct. at 2036, even *that* decision refused to "deferential[ly] presum[e]" that Congress had a legitimate legislative purpose. *Mazars II*, 940 F.3d at 725. The D.C. Circuit assumed that Congress received "no deference" because its subpoena targeted a President and, thus, "separation-of-powers concerns … linger in the air." *Id.* Separation-of-powers concerns do more than linger here; the parties *concede* that they are present. Deferential presumptions thus have no place. *See Morrison v. Olson*, 487 U.S. 654, 704-05 (1988) (Scalia, J., dissenting) (noting that the majority opinion was right not to give "deference to Congress's view" because, when "the issue pertains to separation of powers" and the political branches disagree, "neither can be presumed correct").

The presumption of regularity also plays a minimal role at the pleading stage. The presumption goes to a claimant's burden of *proof*, not pleading. *See Ware v. U.S. Fed. Highway Admin.*, 2005 WL 2416667, at *5 (S.D. Tex. Sept. 30) (stressing that whether the plaintiff could "overcome the presumption of legality" goes "to the merits" of the case and "cannot rest on the pleadings"), *aff'd*, 255 F. App'x 838 (5th Cir. 2007); *Dobruck v. Borders*, 2016 WL 7157557, at *3 (M.D. Fla. Dec. 8) (similar). The presumption cannot be used to create a heightened pleading standard. *See Swierkiewicz*, 534 U.S. at 513. To the extent that it applies to the pleading stage at all, it would merely require a claimant to allege facts that if proven would plausibly rebut the

presumption—something Intervenors easily did here. *See McDonough v. Anoka Cty.*, 799 F.3d 931, 948 (8th Cir. 2015).

When "determining this motion to dismiss" in particular, the Court should "decline[] to apply" the "presumption of regularity" because the presumption "would cut both ways." *Siddiqui v. Cissna*, 356 F. Supp. 3d 772, 776 (S.D. Ind. 2018). This Court would also have to give a presumption of regularity to the Government's prior conclusion that the Committee's request serves no legitimate legislative purpose, *see* ACCC ¶¶216-22; to the views of other legislators that the Committee's request serves no legitimate legislative purpose, *e.g.*, ¶¶1, 137-38, 225, 275-76, and to the Committee's conclusion in the 115th Congress that requests for President Trump's tax information serve no legitimate legislative purpose, *e.g.*, ACCC ¶27.

Even where the presumption of regularity applies, it is not nearly as strong as the Committee suggests. The legality of congressional demands must be "judged in the concrete, not on the basis of abstractions." *Barenblatt v. United States*, 360 U.S. 109, 112 (1959). Courts can give Congress "every *reasonable* indulgence of legality," but their "deference" cannot be "unnecessary" or "unreasonable." *Watkins*, 354 U.S. at 204 (emphasis added). Courts cannot simply ask whether "there is any legislative purpose which might have been furthered" by the request. *Id.* Nor will Congress's "mere assertion of a need to consider 'remedial legislation'" suffice. *Shelton*, 404 F.2d at 1297. Courts must look at all the "available" evidence, "examin[e]" the "particular inquiry in question," and determine whether the presumption of regularity has been "controverted by adequate evidence to the contrary." *Id.*; *Cross*, 170 F. Supp. at 306.

The relevant precedents all engage in this record-based review, no matter whether they affirm or reject the congressional demand. In *Icardi*, for example, this Court did not simply defer to the committee's stated legislative goals; it consulted "all the evidence" and concluded that the

committee was impermissibly pursuing law enforcement. *See* 140 F. Supp. at 386-88. This Court did the same thing in *Cross*. *See* 170 F. Supp. at 305-10 (finding an invalid purpose based on "a realistic construction" of "the record as a whole"). Likewise, in *Kilbourn*, the Supreme Court determined that a congressional investigation was pursuing law enforcement, not legislation, after reviewing "the *gravamen* of the whole proceeding." 103 U.S. at 195. While the Court found in *Barenblatt* that "'the primary purposes of the inquiry'" were "legislative,'" it did so only after it had "scrutinized the record," including the opening "statement" of the committee chair, the hearing "testimony," and "the Committee's report." 360 U.S. at 130-33 & n.33. Similarly, in *McGrain v. Daugherty*, the Court found insufficient evidence that legislation was not the Senate's "real object," but it noted that the answer would have been different "if an inadmissible or unlawful object were affirmatively and definitely avowed." 273 U.S. 135, 178-80 (1927); *see also* 2019 OLC 23-24 (reading the caselaw and reaching similar conclusions).

Here, Intervenors have alleged that the "primary purpose," "gravamen," and "real object" of the Committee's request is non-legislative. Instead of studying legislation, the Committee seeks to expose President Trump's tax information for the sake of exposure or to conduct a form of law enforcement. Under any standard, Intervenors' claims are sufficient to raise a plausible inference of liability. *See Curry v. Sunbelt Insulation Co., Inc.*, 2009 WL 10703989, at *4-5 (N.D. Ala. Apr. 29) (explaining that, "for purposes of [a] Rule 12 motion," it had to accept the counterclaimant's "factual allegation" that the challenged actions "were not undertaken for [permissible] purposes," "[w]hether or not this allegation ultimately squares with the evidence"); *Welch v. Theodorides-Bustle*, 677 F. Supp. 2d 1283, 1287 (N.D. Fla. 2010) ("*Twombly* and *Iqbal* do not require useless details… [A]lleging generally that there was no proper purpose … is enough.").

### i.       The request's purpose is exposure for the sake of exposure. (I)

One impermissible purpose for congressional demands, the Supreme Court made a point

to reiterate in *Mazars*, is "'expos[ure] for the sake of exposure.'" 140 S. Ct. at 2032. This purpose

is impermissible because disclosure by itself is "not … legislative." *Hutchinson v. Proxmire*, 443

U.S. 111, 133 (1979). Congress has "no general power to inquire into private affairs and compel

disclosures." *Mazars III*, 140 S. Ct. at 2032 (cleaned up). While much of Congress's work happens

in public view, it cannot disclose information to the public without a "legislative purpose," *McMil-

lan*, 412 U.S. at 317; *McSurely v. McClellan*, 553 F.2d 1277, 1286 (D.C. Cir. 1976); *accord Miller

v. Transamerican Press, Inc.*, 709 F.2d 524, 531 (9th Cir. 1983) ("The 'informing function' of

Congress is that of informing itself about subjects susceptible to legislation, not that of informing

the public."). And it cannot make requests "where the predominant result can only be an invasion

of the private rights of individuals." *Watkins*, 354 U.S. at 200. As Judge Nichols put it, the purpose

of "publish[ing President Trump's] tax returns publicly" is "wholly non-legislative." *State Tax

Returns*, 415 F. Supp. 3d at 45.

Intervenors have plausibly alleged that the "primary purpose" of the Committee's request

is precisely that—exposing President Trump's tax information to the public for nonlegislative rea-

sons. The Treasury and Justice Departments *found* that the Committee actually had that purpose,

so of course Intervenors have *plausibly alleged* it. The executive branch reached that conclusion—

under the threat of *contempt*—after examining the request, conducting a comprehensive review of

the record, and relying on its expertise on tax matters and its experience fielding congressional

requests. ACCC ¶¶217-22. An independent inspector general found no irregularities in the execu-

tive branch's decision-making process. ¶¶224-25, 276. And when the executive branch changed

its legal position in 2021, it notably did not dispute the factual record that it had previously com-

piled. ¶265; *see Wiseman v. New Breed Logistics, Inc.*, 72 F. Supp. 3d 672, 684 (N.D. Miss. 2014)

(explaining that "shifting explanations" suggest an improper purpose, especially when the shift is away from a rationale that's supported by the facts to one that isn't).

When deciding whether Intervenors plausibly alleged an impermissible purpose, this Court need look no further than the fact that the "'gatekeepers of federal tax information'" in the executive branch once drew that very conclusion. Gov't-MTD 32; *cf. Pub. Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6, 28 (D.D.C. 2018) (deeming a claim plausible in part because "statements from Executive Branch officials corroborate Plaintiffs' theory"). If that weren't enough, other members of Congress with first-hand knowledge of the Committee's decision-making process and legislative needs also drew the same conclusion. ACCC ¶¶1, 137-38, 225, 275-76. As did many reasonable observers, even ones who shared the Committee's goal of exposing President Trump's tax information. *E.g.*, ¶¶133-36, 139-40.

Everyone understood that the Committee's primary purpose was exposure because, as Intervenors allege in painstaking detail, the key actors openly admitted that purpose in numerous public statements. *See McLeod-Sillah v. D.C.*, 2020 WL 6060313, at *3 (D.D.C. Oct. 14) (explaining that statements from decisionmakers can "clea[r] the 'low bar'" of plausibility, even if they are open to multiple interpretations); *Faith Action for Cmty. Equity v. Hawaii*, 2014 WL 1691622, at *14 (D. Haw. Apr. 28) (explaining that "comments" are "direct evidence" of improper purpose). Over and over, Committee members described their goal as "releas[ing]" or "expos[ing]" President Trump's tax information to "the public" or "the American people." *E.g.*, ACCC ¶¶24, 26, 28-29, 35-40, 47, 60-61, 64, 68-69, 109, 116, 167-72, 176, 178, 270. The speakers described disclosure as an end in itself, not as a means to study legislation; and they often admitted that their goal was to undo President Trump's decision not to voluntarily disclose his returns during the campaign. *E.g.*, ¶¶11, 28, 38-39, 67, 70, 170, 175. Candidates, of course, do not release their returns to help

Congress study legislation. And Committee members openly admitted that they wanted exposure for *non*-legislative goals: examining President Trump's net worth, checking how much he gave to charity, and more. *E.g.*, ¶¶40-41, 45, 58, 102, 145, 147, 156, 160, 163, 171-72, 174, 241. And they wanted to do so before the November 2020 election, a date that had political but not legislative significance. ¶¶187, 85, 142.

If these smoking guns weren't enough, Intervenors also allege voluminous circumstantial evidence of the Committee's improper purpose. For example, the reasons that Committee members gave for wanting President Trump's tax information were inconsistent and constantly changing. *E.g.*, ¶¶28, 32, 36, 95, 142, 255. In the (rare) instances where they gave policy-based reasons, they latched onto the most convenient topic du jour: They wanted President Trump's tax information to show a "Russia connection" during the Mueller investigation, to show his family's tax rate during debates over tax reform, and to prove criminal wrongdoing during impeachment. *E.g.*, ¶¶26, 52, 159, 186. While legislative goals can theoretically change over time, *cf.* Cmte.-MTD 24, a fact-finder could plausibly infer that these "shifting rationales" were "cover for something else": a desire to expose President Trump's information for improper purposes, by any means necessary. *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 581 (7th Cir. 2003); *accord Allen-Brown v. D.C.*, 174 F. Supp. 3d 463, 474 (D.D.C. 2016).

Similarly, when the Committee did articulate a formal legislative purpose, its stated rationale was obviously pretextual. *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000) (that the "'proffered explanation is unworthy of credence'" suggests an improper purpose). The assertion that the Committee wanted to use Intervenors' information to study the IRS's mandatory audit process came out of nowhere: No members had mentioned this interest in the first two years of President Trump's tenure, and the members soon abandoned it. ACCC ¶¶32, 131, 26,

142; *see Hamilton v. Geithner*, 666 F.3d 1344, 1355-56 (D.C. Cir. 2012) (absence of "contempo-raneous" support for a "proffered explanation" could "lead a reasonable jury to doubt [it]"). When this litigation was stayed, for example, Committee members wanted to request President Trump's *state* tax returns—a move that would help them expose President Trump's information but not help them study IRS audits. ACCC ¶¶188-98. The Committee's decision to choose an ill-fitting, never-before-articulated rationale made sense little sense in terms of legislating, but made perfect sense in terms of achieving its true goal of exposure. By sticking to tax-specific legislation, House Democrats could let Ways and Means make the request—the only committee that can both obtain tax returns and disclose them to the public. *See* ACCC ¶215.

Chairman Neal admitted that his audit rationale was created by the Committee's attorneys as a litigation strategy. ACCC ¶¶86-94, 126-31; *see Person v. Horizon Health Corp.*, 2011 WL 6339708, at *3 (D. Utah Dec. 19) ("documents prepared in anticipation of litigation raise an infer-ence of pretext"). While it's always good to get legal advice, *cf.* Cmte.-MTD 24, that's not what Chairman Neal said he was doing. He said the Committee had "constructed" a "product" that gave the Committee the best chance to win in court and "g[e]t the tax returns"; and he instructed his fellow Committee members to watch what they say in public—in other words, to not say why they *really* wanted Intervenors' information. ACCC ¶¶88, 90. While "Defendants are rarely courteous enough to admit in some documented form that an asserted rationale … is really a pretext," *Burns v. Tex. City Ref., Inc.*, 890 F.2d 747, 751 (5th Cir. 1989), Chairman Neal did that here.

Even considering the Committee's request in a vacuum, Intervenors have plausibly alleged an improper purpose. A committee that was genuinely interested in the presidential audit process would want audit files for *several* Presidents: It would at least want the current President's files (to see the most up-to-date procedures), files from a good sample of other Presidents (to determine

baselines and trends), and more than just President Trump's admittedly unusual files (to ensure its legislation makes sense for a wide range of future Presidents). ACCC ¶¶277, 221. Yet the Committee requested only one President's information. Its gross "underinclusiveness diminishes the credibility of [its] rationale." *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002) (cleaned up). That President Trump presents supposedly unique circumstances is *more* reason to cast a broad net, not less. And it's not remotely accurate: Others who were subject to the mandatory audit process had complex finances, noncomplete divestment, allegedly aggressive tax strategies, and a critical stance toward the IRS and voluntary disclosures. ACCC ¶¶259-61, 278-81. In all events, the Committee's long list of things that supposedly make President Trump an indispensable case study is itself evidence of an impermissible purpose, as it's apparently gerrymandered to cover President Trump and no one else. *Cf. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535 (1993).

The Committee's reasoning also lacks internal logic. It has a list of questions that it supposedly wants answered about *how* the IRS's mandatory audit process works. *See* Cmte.-MTD 39-40. But the only way to get those questions answered is to *ask the IRS*. ACCC ¶¶285. If a review of one former President's files revealed the IRS's policies at all, it would do so by happenstance and only anecdotally. Yet the Committee showed no real interest in Treasury's offers to answer its questions about the mandatory audit process. ¶286. The Committee's stated concern, moreover, is that Presidents might interfere with these audits and prevent the IRS from doing them accurately. But the Committee's request is not limited to closed audit files. While open audit files might reveal information about the taxpayer, *cf.* Gov't-MTD 27-28, they cannot reveal information about the fairness of *the audit*, since the audit isn't over yet. ACCC ¶288. And the Committee's request for open audit files is itself a form of interference that corrupts the data and makes its study impossible.

¶288. While the Committee won't appreciate being told how to legislate, its nonsensical and self-defeating actions reveal that legislating is not what it's after.

The Committee discounts some of Intervenors' allegations by insisting that only Chairman Neal's statements count, since only he is empowered to make §6103(f)(1) requests—an odd assertion since it was the Committee, not Chairman Neal, who filed this suit alleging injuries *to itself*. But even if the Committee were right, Intervenors' allegations about Chairman Neal alone cross the plausibility threshold. He issued the formal request, which reveals improper purposes on its face. He's the one who admitted that the Committee's rationale was pretextual, a "case" constructed by lawyers to hold up in court because the real purpose wouldn't. ¶¶86-94, 126-31. Chairman Neal also made many statements during the 115th Congress, when he could speak "more candidly," about his purpose of publicly exposing President Trump's tax returns. ¶22. He issued similar statements as Chairman, once it became clear that this case would not be decided by the November 2020 election. ¶¶143-45. He also authored several reports and cosponsored several resolutions about exposing President Trump's tax information to the public. ¶¶23, 25, 28-29, 37-41.

In all events, the Committee is incorrect: This Court is not limited to Chairman Neal's statements, given Intervenors' other plausible allegations. Intervenors explained how Committee Democrats worked as a unit in the 115th Congress to pursue President Trump's tax returns. ¶31. They similarly worked together in the 116th Congress. ¶113. When Committee Democrats spoke about the purposes behind Chairman Neal's request, they were speaking from first-hand knowledge because they were parties to, and had input on, the request. *E.g.*, ¶¶80, 86, 94, 113. Speaker Pelosi's statements are also relevant because she was consulted on, and had to approve, Chairman Neal's request. ¶¶74-75, 113, 122, 203, 78-79, 81, 96, 235. Other members of the House Democratic leadership were likewise consulted. ¶¶113, 203, 34-35, 23. Further, Intervenors cite

the 2016 campaign and the broader sentiment of the Democratic party to show how the exposure of President Trump's tax information—for its own sake—became a major priority for parts of the Democratic base. ¶¶9-19, 83-85 The base and other members, in turn, constantly pressured Chairman Neal and others to obtain and release President Trump's tax returns once they gained power. ¶¶84-85, 121. As the Government well knows, this "'history'" and "'pressure'" plausibly suggest that the Committee's request had an impermissible purpose. *United States v. City of New Orleans*, 2012 WL 6085081, at *9 (E.D. La. Dec. 6).

Lastly, the Government and the Committee criticize the voluminous statements that Intervenors have collected as "cherry-picked," "paraphrased," "decontextualiz[ed]," and "distort[ed]." Gov't-MTD 19; Cmte.-MTD 24. Usually when someone makes that charge, they provide the missing context or quote the statements going the other way. But the Committee and the Government don't—because they can't. The statements are voluminous, openly confess non-legislative goals, and cannot even be spun as legislative. Equally telling, Chairman Neal's audit rationale was *never* mentioned until Chairman Neal announced it. Perhaps the Committee and the Government will be able to weave together a "benign" interpretation of this web of incriminating, contradictory statements; but that "is a matter not amenable to resolution on the pleadings." *Faith Action*, 2014 WL 1691622, at *14; *accord PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*, 2021 WL 1199363, at *10 n.10 (S.D.N.Y. Mar. 30) (rejecting the defendants' contrary "framing" of their conduct "[a]t the motion to dismiss stage" because the plaintiff "alleges [it] is 'pretextual'").

### ii.      The request's purpose is law enforcement. (II)

If exposure was the Committee's primary purpose, then law enforcement was secondary. Both purposes are non-legislative and, thus, impermissible. As the Supreme Court stressed in *Mazars*, Congress cannot request information "for the purpose of 'law enforcement.'" *Mazars III*, 140 S. Ct. at 2032. The question, again, is purpose. Congress can violate this separation-of-powers

principle without "'try[ing] someone before a committee for [a] crime or wrongdoing.'" *Cf.* Cmte.-MTD 27. A committee also cannot use the investigation *itself* as a means "to 'punish' those investigated." *Mazars III*, 140 S. Ct. at 2032 (quoting *Watkins*, 354 U.S. at 187). And "[l]acking the judicial power given to the Judiciary" or the executive power given to "the Executive," Congress simply "cannot inquire into matters which are within the exclusive province of one of the other branches"—or otherwise "trench upon Executive or judicial prerogatives." *Barenblatt*, 360 U.S. at 111-12; *accord McSurely v. McClellan*, 521 F.2d 1024, 1038 (D.C. Cir. 1975).

Of course, congressional investigations must be evaluated ex ante, so an otherwise "legitimate legislative investigation need not grind to a halt whenever … crime or wrongdoing is disclosed." *Hutcheson v. United States*, 369 U.S. 599, 618 (1962). But a legislative investigation is not "legitimate" in the first place if its primary purpose is law enforcement. *See Watkins*, 354 U.S. at 187; *Cross*, 170 F. Supp. at 309. And Congress cannot rescue a law-enforcement investigation by arguing, in circular fashion, that it will use whatever violations it finds to reform the underlying laws. *See Shelton*, 404 F.2d at 1297 (explaining that Congress must provide "references to specific problems" it would fix with legislation, not vaguely assert "a need to consider 'remedial legislation'"); *Icardi*, 140 F. Supp. at 387-88 (holding that subcommittee could not "cure the invalidity" of its law-enforcement investigation by tacking on a professed interest in investigating "'whether the Federal statutes were inadequate in any respect or had been improperly administered'").

The Court should be especially suspicious of an impermissible purpose here. The Committee cites the D.C. Circuit's statement in *Mazars II* that "'an interest in past illegality can be wholly consistent with an intent to enact remedial legislation.'" Cmte.-MTD 25-26 (quoting *Mazars II*, 940 F.3d at 728). The D.C. Circuit found it "not at all suspicious" that the committee there was focusing on "the sitting President's" finances. *Mazars II*, 940 F.3d at 729. But the Supreme Court

disagreed. It said that, by requesting the personal finances of a President, the subpoena did "not represent a run-of-the-mill legislative effort" and had a "less evident connection to a legislative task." *Mazars III*, 140 S. Ct. at 2034-35. The Court would not overlook the fact that President Trump's finances were "records of intense political interest." *Id.* at 2034. It did not cite this "political" backdrop as an inevitable or uneventful reality of congressional investigations. *Contra* Cmte.-MTD 27. It cited it as a reason why the subpoena posed "a heightened risk of … impermissible purposes." *Mazars III*, 140 S. Ct. at 2034-35.

That risk, as Intervenors plausibly allege, has fully materialized here. Over and over, Committee members confessed that they wanted to see Intervenors' tax information to determine whether President Trump committed fraud, illegally underpaid taxes, or committed other financial crimes. *E.g.*, ACCC ¶¶42, 46, 59, 99-102, 106-08, 147, 153-54, 177, 181, 240, 272. Most of these statements were not even plausibly legislative because the "crimes" that the members referred to would have been violations of *state and local* law, not something within the Committee's jurisdiction. *E.g.*, ¶¶212, 101-02. The aim, as Speaker Pelosi put it, was to "see him in prison." ACCC ¶144. And this would not be the first time that a House committee "has explicitly and consistently avowed the purpose of investigating alleged illegal activities of [this] President" through an ostensibly legislative request. *Mazars II*, 940 F.3d at 770 (Rao, J., dissenting).

The request's law-enforcement bent is evident from the face of the request. It has the hallmarks of executive or judicial power, rather than legislation: The request is laser-focused on the businesses and finances of one person. *Kilbourn*, 103 U.S. at 195; *Icardi*, 140 F. Supp. at 387. And for that one person, the request is an "indiscriminate dragnet" that seeks large swaths of his private information. *Wilkinson v. United States*, 365 U.S. 399, 412 (1961). It seeks a "precise reconstruction of past events" rather than the policy judgments that accompany legislating. *Senate Select*,

498 F.2d at 732; *accord Hutcheson*, 369 U.S. at 617 (explaining that a congressional investigation would not be legislative if it tried to determine "whether petitioner had in fact defrauded the State of Indiana").

Apart from proving supposedly illegal conduct in the past, the Committee admits that its request is aimed at double-checking "the President's tax compliance." Doc. 133-3 at 3. It needs Intervenor's actual tax returns and audit files so it can conduct its *own* audit. *See, e.g.*, ACCC ¶¶52, 77 (promising that the Committee will "put a staff of CPAs to work looking and digging into [Intervenors'] returns"). The Committee is worried that the IRS was insufficiently "thorough" with President Trump, given his office and his past criticisms of the agency, and it wants to look into his supposedly "aggressive tax positions." Doc. 133-3 at 2-7. But investigating, examining, and adjudicating tax compliance are powers that belong to the executive branch, not Congress. And the Committee cannot justify its desire to play junior IRS with "the mere assertion of a need to consider 'remedial legislation'" if it turns out that the IRS missed something. *Shelton*, 404 F.2d at 1297. Legislation cannot be the gravamen here given the nature of these documents, *see Mazars III*, 140 S. Ct. at 2034-35, and the obvious pretext explained above.

### C.     The request is not pertinent to constitutional legislation within the Committee's jurisdiction. (III)

Even if the Committee were pursuing legislation, its request fails the governing standard for another reason: The request seeks information that is either not pertinent to valid legislation or that is pertinent to invalid legislation.

Congressional requests must be "'related to, and in furtherance of,'" legislation. *Id.* at 2031. This "pertinency" requirement is "jurisdictional" for committees. *Watkins*, 354 U.S. at 206. It means that the requests must be "reasonably relevant" to the Committee's legislative aims. *Mazars II*, 940 F.3d at 740. If a committee could "subpoena information irrelevant to its legislative

purpose, then the Constitution would in practice impose no real limit on congressional investiga-

tions." *Id.* at 739-40. And because the power to investigate can be "justified solely as an adjunct

to the legislative process," *Watkins*, 354 U.S. at 197, committees can only investigate legislation

within their jurisdiction. Courts "narrowly" "construe" a committee's jurisdiction to "obviate the

necessity of passing" on "serious constitutional questions." *Tobin v. United States*, 306 F.2d 270,

275-76 (D.C. Cir. 1962); *accord Exxon Corp. v. FTC*, 589 F.2d 582, 592 (D.C. Cir. 1978).

Establishing pertinency is not enough. Subpoenas "must concern a subject on which legis-

lation could be had"—meaning legislation that would be constitutional. *Mazars III*, 140 S. Ct. at

2031 (cleaned up). Courts must "consider whether Congress could constitutionally enact" the stat-

utes it claims to be considering, *Mazars II*, 940 F.3d at 732, because Congress's power to investi-

gate comes from its power to legislate—a power that is itself "defined, and limited." *Marbury*, 5

U.S. at 176.

In terms of pertinency, the Committee's request falls short. Intervenors plausibly allege

that their tax information will not reveal relevant information concerning emoluments or conflicts

of interest. *Supra* II.A.iii. The Committee said so in the 115th Congress, and both Commissioner

Rettig and former Commissioner agree. ACCC ¶¶27, 284. Not only are these the kinds of people

who would know, but their conclusions make sense. Tax returns require broad disclosures about

sources of income. They do not concern themselves with identifying or unraveling complex busi-

ness relationships, or do the kind of transaction-by-transaction breakdown that would be needed

to determine whether something truly is an "emolument." And besides, the Committee's requests

do not ask about "emoluments" or limit themselves to the parts of the tax returns and files that the

Committee thinks has the business-revealing information.

The presidential-audit rationale suffers from the same flaws. As explained, *supra* II.A.iii, Intervenors' specific tax information will not tell the Committee what the IRS's policies *are*. Even if it were reasonable for the Committee to learn the IRS's policies indirectly by looking at audit files (instead of asking the IRS directly), the tax returns have no reasonable relevance to that goal. They simply contain Intervenors' raw financial information. Worst of all, the Committee's request targets open audit files, which by definition cannot tell the Committee how the IRS *audited* (past tense) anyone. *Supra* II.A.iii.

The Committee's request is only possibly pertinent, moreover, to laws that would regulate Presidents. As the D.C. Circuit explained in *Mazars II*, requests for the financial information of a President "would produce no relevant information about laws that apply to ordinary Executive Branch employees" or laws that apply to the general public. *Mazars II*, 940 F.3d at 733. The Committee and the Government seem to agree, as they mostly focus on *presidential* financial-disclosures laws, *presidential* conflict-of-interest laws, and *presidential* audits. They do not argue that President Trump's tax information would help the Committee pass generic legislation—for example, increasing the IRS's budget by $10 million. That focus helps the Committee on pertinency, but it hurts the Committee on validity because laws that directly regulate the Presidency "rais[e] sensitive constitutional issues." *Mazars III*, 140 S. Ct. at 2036.

More than raise them, the laws the Committee claims to be considering would be unconstitutional. Intervenors have already explained why presidential conflict-of-interest laws are unconstitutional. *Supra* II.A.iii. But presidential financial-disclosure laws suffer the same flaws. Unlike other executive agencies and offices created by Congress, the Presidency is "created by the Constitution." *Gordon v. United States*, 117 U.S. 697, 699 (1864). Because the President is "one of the three great" branches and "independent" of the other two, *id.*, Congress cannot coerce him

to make disclosures against his will. *See Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524, 610 (1838). The President is like the Supreme Court in this way, *id.*, and the Chief Justice has flagged Congress's power to impose financial-disclosure requirements as a serious constitutional question. *See 2011 Year-End Report on the Federal Judiciary* 3-4, 6, bit.ly/2Ku5ZvM. This formal view of the separation of powers is not "'archaic.'" *Mazars II*, 940 F.3d at 736. It is the law. *Compare id.* at 733-34 (calling for a "'pragmatic, flexible approach'" to the separation of powers), *with Seila Law*, 140 S. Ct. at 2207 (rejecting calls for a "pragmatic, flexible approach" because our system of separated powers was "not chosen" for its "flexibility").

Beyond the separation of powers, presidential-disclosure laws would violate the Qualifications Clause. Congress cannot amend or add to the constitutional qualifications for President. *See Term Limits*, 514 U.S. at 827; *id.* at 861-62 (Thomas, J., dissenting). But presidential-disclosure laws with enforcement mechanisms would do just that. Although anyone who makes the required disclosure can still be President, *Mazars II*, 940 F.3d at 736, the Qualifications Clause does not turn on whether a requirement imposes a prior restraint. Constitutional rules "would be of little value if they could be indirectly denied." *Term Limits*, 514 U.S. at 829 (cleaned up). That's why the Constitution outlaws not only absolute bars, but also requirements with "the likely effect of handicapping a class of candidates." *Id.* at 836; *see Griffin*, 408 F. Supp. 3d at 1179; *Campbell v. Davidson*, 233 F.3d 1229, 1236 (10th Cir. 2000); *Schaefer v. Townsend*, 215 F.3d 1031, 1039 (9th Cir. 2000). Indeed, California tried to force President Trump to disclose his tax returns as a condition of appearing on the ballot for President, and a federal court rightly deemed that law an impermissible qualification. *See Griffin*, 408 F. Supp. 3d at 1179.2000).

Even more clearly unconstitutional would be a congressional statute that ordered the IRS to audit a sitting President (or that insulated an IRS agent from the President's control). The IRS's

presidential audit process is currently governed by Treasury regulations, *see* IRM §3.28.3 (2020), for good reason. That way, control over the executive function of enforcing the tax laws stays within the executive branch and under its head, the President. Congress has no authority to wrest that power away from the President and, contrary to his wishes, order an organ of the executive branch to apply the executive power against its head. *See Seila Law*, 140 S. Ct. at 2191 ("Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'").

Congress also lacks authority to usurp the President's directive control of the executive branch by mandating specific investigations of specific officers by subordinate executive officers. The Constitution vests the President with "abundant supervisory and disciplinary powers" over the executive branch, *Newman v. United States*, 382 F.2d 479, 482 (D.C. Cir. 1967), which includes the undivided "power to decide when to investigate, and when to prosecute," *Cmty. for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986). Congress cannot circumvent this "carefully calibrated system" designed to preserve "'the chain of dependence'" between the people and the government by vesting all exercise of the executive power under the "ongoing supervision and control of the elected President." *Seila Law*, 140 S. Ct. at 2203. But the Committee's contemplated legislation would do that by removing the "IRS's conduct of audits" from the President's control. Doc. 133 at 29. The administration of audits, including the "power to decide when to investigate ... lies at the core of the Executive's duty to see to the faithful execution of the laws." *Cmty. for Creative Non-Violence*, 786 F.2d at 1201; *see also Smith v. United States*, 375 F.2d 243, 248 (5th Cir. 1967) ("decisions … made during the investigation ... of offenses" are part of core

executive powers). The President, not Congress, controls the scope and frequency of the core executive power of investigation.[7]

The Committee also fundamentally misunderstands the restrictions on legislative power when they assert that legislation regarding the "IRS's audit of Presidents' tax returns would relate to the Executive Branch's administration of laws [] that apply equally to all taxpayers ... not laws that apply to Presidents as constitutional officers." As an initial matter, this attempt to distinguish the man from the office has frequently been rejected. *Mazars III*, 140 S. Ct. at 2034; *see also Mazars II*, 940 F.3d at 725-26 (Rao, J., dissenting) ("[T]he constitutional authority assigned to the Office of the President can be exercised only by the flesh-and-blood human occupying that office, so as a practical matter, a restriction on the person might constrain the branch of government."); *In re Lindsey*, 158 F.3d 1263, 1286 (D.C. Cir. 1998) (Tatel, J., concurring in part and dissenting in part) (same). And separately, Congress cannot single out *any* individual—Presidents included— for investigation or prosecution through use of its legislative powers. *See, e.g.*, *United States v. Brown*, 381 U.S. 437, 442 (1965) ("[T]he Bill of Attainder Clause was intended not as a narrow, technical ... prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply—trial by legislature."); *see also* 8 Op. O.L.C. 101, 115 (1984) (Congress may not direct the executive branch to target "particular individuals").

The Government's citation to *Heckler v. Chaney* misses the point. *See* Gov't-MTD 26. Congress can of course "limit an agency's exercise of enforcement power" as a general matter.

---

[7] These requirements of Presidential control apply equally to criminal and administrative enforcement. *See, e.g.*, *In re Aiken Cty.*, 725 F.3d 255, 264 n.9 (D.C. Cir. 2013) (Kavanaugh, J.) ("Because they are to some extent analogous to criminal prosecution decisions and stem from similar Article II roots, such civil enforcement decisions brought by the Federal Government are presumptively an exclusive Executive power.").

470 U.S. 821, 833 (1985). But it cannot *require* enforcement *against the President*. Obviously *Heckler* does not say otherwise: It interprets the Administrative Procedure Act, not the Constitution's separation of powers. Its holding on the power of Congress to "circumscribe[e] an agency's power" does not reach this weighty constitutional issue. Nor does *Heckler* insinuate that Congress could constitutionally target a particular individual for investigation. No statute can require law-enforcement or disclosure actions insulated from presidential control and targeted at the President himself, and Congress cannot circumvent this fundamental separation-of-powers constraint by disguising one as ordinary regulation of an agency's enforcement priorities.

## III.   Intervenors plausibly allege that the request violates other constitutional rights.

As the parties seem to concede, the Committee's request is "functionally" a request to Intervenors, not Treasury. *Vance*, 140 S. Ct. at 2425 n.5 ; *accord Mazars III*, 140 S. Ct. at 2035 (refusing to treat "congressional demands" for information that the plaintiffs "entrusted to a third party" as demands to the third party, rather than the plaintiffs)*. The Committee's "investigation" thus cannot violate Intervenors' "constitutional rights." *Mazars III*, 140 S. Ct. at 2032 (citing *Watkins*, 354 U.S. at 188, 198). Yet Intervenors plausibly allege that it does: It violates the First Amendment by discriminating and retaliating against Intervenors, the separation of powers by interfering with the executive branch, and due process by interfering with an audit.

### A.   The request violates the First Amendment. (VI)

"[T]he provisions of the First Amendment … of course reach and limit congressional investigations." *Barenblatt*, 360 U.S. at 126. Intervenors have stated a plausible claim for First Amendment discrimination and retaliation against the Government defendants. As they allege, following the election of President Biden—President Trump's opponent in the 2020 election and his chief political rival today—the Government agreed to comply with the Committee's request on flimsy legal grounds, without disputing its prior factual determination about the request's true

purpose. ACCC ¶¶219-25; 331-37. Intervenors also allege numerous statements by the head of the executive branch, as well as his allies in and out of Congress, supporting an inference that improper political motives underlay the Government's decision. ¶¶244-52, 266-68. These and Intervenors' other allegations are more than sufficient at the pleading stage.

The Government moves to dismiss on four grounds. It disputes Intervenors' allegations concerning causation, quibbles with Intervenors' allegations concerning motive, tries to invoke the Speech or Debate Clause, and accuses Intervenors of not alleging retaliation with specificity. These arguments all fail.

*First*, Intervenors adequately pleaded causation. The First Amendment prohibits the government from discriminating, harassing, or retaliating on the basis of political party, association, or speech. *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75 (1990); *Lozman v. City of Riviera Beach*, 138 S.Ct. 1945, 1949 (2018). The government violates the First Amendment when the target's speech or politics motivated its actions "at least in part." *Cruise-Gulyas v. Minard*, 918 F.3d 494, 497 (6th Cir. 2019). Even when the government could legitimately act "for any number of reasons, there are some reasons upon which the government may not rely"—including "constitutionally protected speech or associations." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

A plaintiff in a First Amendment retaliation case must allege and prove: "(1) that he engaged in protected conduct, (2) that the government 'took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again;' and (3) that there exists 'a causal link between the exercise of a constitutional right and the adverse action taken against him.'" *Doe v. D.C.*, 796 F.3d 96, 106 (D.C. Cir. 2015). To plead causation, "'a plaintiff must allege that his or her constitutional speech was the 'but for' cause of the defendants' retaliatory action." *Id.* This inquiry asks about the defendants' "subjectiv[e]" motive. *Smith v. Mosley*,

532 F.3d 1270, 1278 (11th Cir. 2008); *see Doe v. D.C.*, 796 F.3d at 1278 ("the First Amendment retaliation inquiry is a subjective one"). Because causation is subjective, the burden of alleging it is not heavy. Indeed, causation may be "inferred—especially at the pleading stage." *Smith v. De Novo Legal, LLC*, 905 F. Supp. 2d 99, 104 (D.D.C. 2012). "[T]he D.C. Circuit 'has held that a close temporal relationship may *alone* establish the required causal connection.'" *BEG Investments, LLC v. Alberti,* 144 F. Supp. 3d 16, 22 (D.D.C. 2015) (citing *Singletary v. D.C.*, 351 F.3d 519, 525 (D.C. Cir. 2005)).

Here, Intervenors have alleged causation sufficiently. There was temporal proximity between the protected conduct—President Trump's campaign for office and related statements—and the Government's reversal of position shortly after President Biden took office. AAAC ¶¶238-243, 247-251, 264. There is "no 'hard-and-fast rule' regarding the temporal proximity that must exist between protected activity and the adverse action.'" *Manuel v. Potter*, 685 F. Supp. 2d 46, 68 (D.D.C. 2010); *see also BEG Investments*, 144 F. Supp. 3d at 22 (collecting cases). That the Government switched positions shortly after President Biden took office, and thus gained the power to disclose Intervenors' information under §6103, is sufficient to raise a plausible inference. So is the request's gerrymandered focus on only one President, and the fact that the Government reversed position in this very case following consultations with the Committee and other political allies, as well as public pressure. ¶¶245-253, 264-68. This reversal and pressure also create an "inference" that the Government's actions were motivated by a desire to politically harm President Trump. *Smith*, 905 F. Supp. 2d at 104.

The Government's only argument on causation is a naked assertion that its decision was based entirely upon "the inflexible statutory command of section 6103(f)(1)." Gov't-MTD 43. But this is the pleading stage. The Court cannot just simply accept the assertion that the Government

acted under statutory compulsion—especially when the Government rejected that interpretation of the statute for years prior to its decision. *See Kohutka v. Town of Hempstead*, 2012 WL 13109880, at *8 (E.D.N.Y. Mar. 20) ("Defendants cannot prevail at the motion to dismiss stage by merely alluding to possible non-retaliatory reasons for their conduct, which may ultimately be shown to be pretext."); *Aref v. Holder*, 953 F. Supp. 2d 133, 146 (D.D.C. 2013) ("At the motion to dismiss stage, the Court must accept, so long as it is plausible, [the plaintiff's] claim that the [defendant's proffered] reasons … were pretextual and that" the real reason was "retaliation for his … political speech.").

It's telling that the Government's cases on this point were all decided on summary judgment, after discovery. *See Hartman v. Moore*, 547 U.S. 250, 255 (2006); *Doe v. D.C.*, 796 F.3d at 100.[8] *Hartman*, in particular, addressed the fact that a malicious-prosecution plaintiff must "plea[d] and prov[e]" probably cause. *Id.* at 265-66. No such requirement applies here. The other case, *Daugherty v. Sheer*, 891 F.3d 386 (D.C. Cir. 2018), is inapt. Unlike there, Intervenors do not rely on statements indicating animus that post-date the wrongful action. And Intervenors have relied on specific facts—numerous statements, the timing of the actions, and the change in political control of the executive branch—rather than a single "conclusory allegation" of causation. *Id.* at 392.

**Second**, Intervenors' allegations of improper motives are not speculative. The Government contends they are "based on nothing more than the party affiliation of the current Administration." Gov't-MTD 43-44. But this grossly mischaracterizes Intervenors' allegations, all of which must be "taken as true." *Ashcroft v. Iqbal*, 556 U.S. 662, 666 (2009), and viewed "in the light most favorable" to Intervenors, *Ruiz*, 466 F. Supp. 3d at 168-69. Rather than party affiliation alone,

---

Intervenors allege a number of specific facts that plausibly suggest an improper political motive by the Government defendants:

- Numerous statements that President Biden made before, during, and after his campaign about President Trump, including that "the American people deserve to know what he's hiding in his tax returns" and that he needed to "release his tax returns." ACCC ¶¶15, 227-32, 244.[9]

- Assurances in the press from the Speaker and Committee members that, once President Biden got in office, Defendant Yellen would change positions and give the Committee the tax returns that they had long sought. ¶¶236, 247.

- Pressure campaigns from aligned interest groups and others to convince the Government defendants to change positions and produce the returns. ¶¶245-46.

- The fact that President Trump remains the leader of the opposition party and a political threat to President Biden. ¶¶234-44.

- Close communications—many of which have yet to be produced—between the House, the Government defendants, and their attorneys in the run-up to the Government's change of position. ¶¶250-53, 264-68.

The Government is thus wrong to claim that Intervenors "have offered no basis on which to plausibly infer a retaliatory or discriminatory motive on Defendants' part." Gov't-MTD 44. To the contrary, they have offered a litany of statements, actions, and other allegations that are more than sufficient to "nudge" their retaliation claim "across the line from the conceivable to plausible," *Iqbal*, 556 U.S. at 683. Unlike the plaintiff in *Iqbal*, Intervenors have provided dozens of factual allegations "sufficient to plausibly suggest" the Government defendants' retaliatory "state of mind." *Id.* And although the Government is entitled to rebut these inferences with evidence at

---

[9] The Government tries to minimize these statements in a footnote, Gov't-MTD 44 n.16, both underplaying their frequency and quibbling that they were not "a major campaign issue"—despite the fact that President Biden raised the issue in the highly promoted and time-limited Presidential debates. In any event, the Government cannot debate the facts on a motion to dismiss; it can make its record-based arguments at summary judgment.

summary judgment or trial, this Court cannot simply assume—at the pleading stage—that the Government will do so and grant it judgment now. *See Banneker Ventures,* 798 F.3d at 1129.

*Third*, the Speech or Debate Clause does not shield the executive branch from liability. Relying on the long line of cases delineating the boundaries of the Speech or Debate Clause, the Government contends that the Court "may not take issue with a committee inquiry based on the alleged motives of individual members, even when those motives are said to offend the First Amendment." Gov't-MTD 45. But this argument ignores that Intervenors brought their First Amendment claim only against the Government defendants, who are members of the executive branch. Intervenors are entitled to allege (and receive discovery about) the retaliatory motives of *those* defendants. Nothing in the Speech or Debate Clause limits the kind of allegations they can make against non-congressional defendants.

As a threshold matter, the Government cannot contend that the Speech or Debate Clause prohibits liability for non-legislators who act appurtenant to some protected legislative activity. More than a century ago, the Supreme Court held that the Sergeant-of-Arms, who executed an illegal arrest ordered by the House, could not rely upon the Speech or Debate Clause as a defense. *Kilbourn,* 103 U.S. at 205. In doing so, the Court noted that however broad the Clause was in protecting legislators, it did not extend to others who act outside a legislative function. Thus, if legislators' *"*calumnious or inflammatory speeches should be reported and published, the law will attach responsibility on the publisher." *Id.* 202. And "if the speaker by authority of the House order an illegal act, though that authority shall exempt him from question, his order shall no more justify the person who executed it than King Charles's warrant for levying ship-money could justify his revenue officer." *Id.* (citing *Stockdale v. Hansard* (9 Ad. & E. 1)).

*Eastland v. U.S. Servicemen's Fund* does not hold otherwise. That case involved a direct challenge to a committee subpoena, not the motives underlying decisions by the executive branch. *Eastland* itself notes that broader protection is warranted when the Speech or Debate Clause is raised "by Congress." 421 U.S. 491, 509 n.16 (1975). Indeed, once Congress involves the other branches in carrying out or enforcing its objectives, the panoply of constitutional protections, including the "First Amendment freedoms" of "speech," "political belief," and "association," apply. *Watkins*, 354 U.S. at 188; *see also Eastland*, 421 U.S. at 509 n.16 (noting that when "Congress was seeking the aid of the Judiciary to enforce its will" courts "properly scrutinize[] the predicates of criminal prosecution" (citing *Watkins*, 354 U.S. at 216)).[10]).

Here, Intervenors' First Amendment claim requires the Court to inquire into the retaliatory motives of the Government defendants, who are all executive branch officials. It will *not* require inquiry into the secret motives of the Committee members themselves. Discovery will properly focus on the executive officials and the process they followed in reversing positions to determine whether they acted in good faith (as the Government contends) or out of retaliation against a political opponent (as Intervenors have sufficiently alleged).

In conducting that inquiry, however, Intervenors are allowed to explore the effect of various statements that Committee members made in the press or to the executive branch. *See* AAAC ¶¶236, 247, 250-53, 264-68, 335. Members' statements to the press and to the executive branch fall outside the scope of the Speech or Debate Clause. *Hutchinson*, 443 U.S. at 133; *Gravel*, 408 U.S. at 625-627. Indeed, the most recent OLC opinion acknowledges that, in assessing the

---

[10] Unlike claims that arise under the legitimate-legislative-purpose requirement, First Amendment claims do turn on motive, rather than purpose. That's why Intervenors brought a First Amendment claim against only the Government defendants. But as *Eastland* makes clear, Intervenors' claims against the Committee are perfectly legitimate because they challenge "whether a legitimate legislative purpose is present." 421 U.S. at 501 n.14.

legislative purpose of a congressional request, the executive branch need not accept justifications that "blin[k] reality." 2021 OLC 26.

On this point, Judge Bates' decision in *Jewish War Veterans* is instructive. There, as here, the plaintiffs sued an executive official alleging that his enforcement of a congressional act violated the First Amendment (specifically, the Establishment Clause). 506 F. Supp. 2d at 33-34. In discovery, the plaintiffs sought a variety of documents from members of Congress that were relevant to proving the anti-establishment claim. *Id.* at 37. The documents included those "concerning or relating to" the Members' "contacts, communications, discussions, or interactions with any news organization or reporter," as well as "with persons in the Executive Branch" regarding the administration or implementation "of the challenged legislative act." *Id.* Although the Members objected to other discovery requests on Speech or Debate grounds, they conceded that *these* categories were permissible. The Members did "not raise the Clause as a bar to producing documents responsive to" those requests, *id.* at 53, no doubt recognizing that some activities are "political in nature rather than legislative" and "thus are beyond the coverage of the Speech and Debate Clause." *Id.* 53-54 (quoting *United States v. Brewster*, 408 U.S. 502, 512 (1972)). The discoverable documents included). These include statements in "newsletters and press releases," contacts with "an executive agency in order to influence its conduct," and "attempt[s] to influence the Department of Justice." *Id.* at 54 (collecting cases). As a result, Judge Bates concluded that these and other "[d]ocuments that reflect a Member's efforts to use existing statutory authority" must be produced. *Id.* at 54-55.

If the Speech or Debate Clause does not prohibit *discovery* of Members' statements to the press or their attempts to influence executive action, then the Clause certainly doesn't prohibit *consideration* of this evidence in evaluating the plausibility of Intervenors' claim. And as this case

progresses, Intervenors will be entitled to discovery of those types of documents. OLC's recent memo confirms that these documents exist, but the other parties have not yet disclosed them to the public or Intervenors. *See* ACCC ¶268.[11]

Even if the Court were barred from considering the non-legislative statements of Members to determine the motives of the executive branch, Intervenors still state a claim. Their pleading identifies a number of statements and other evidence of political motive on behalf of the executive branch itself, ACCC ¶¶15, 227-232, 244; non-congressional allies ¶¶245-46; and of course the temporal circumstances of its complete reversal of position, ¶¶250-53, 264-68. That's sufficient for notice pleading. *Cf. Rice v. Reading for Educ., LLC*, 2019 WL 4933420, at *3 (E.D. Wis. Oct. 7) ("[A]t the pleading stage, [the court] must accept [the plaintiff's] allegation of intent as true.").

*Fourth*, the Government's final argument—that Intervenors have not plausibly alleged a retaliatory motive—need not delay the Court long. There is no merit to the suggestion that Intervenors, in their 200+ paragraphs of factual allegations about the Democratic Party's years-long campaign to expose President Trump's tax records for political gain, have failed to identify precisely "which of former President Trump's policy positions, political beliefs, or protected statements supposedly provoked the Committee's ire." Gov't-MTD 48. It is beyond serious dispute that the executive branch, Committee Democrats, and the Democratic Party writ large oppose just about every policy and position taken by President Trump. "Fair notice" simply does not require anything near the level of specificity the Government contends is necessary here. *See* Fed. R. Civ. P. 9(b) (noting that "conditions of a person's mind may be alleged generally"); *Gagliardi v. Village*

---

[11] Intervenors recognize that there are limits on discovery, as Judge Bates explained. *See* 506 F. Supp. 2d at 55-60. But this Court need not settle the scope of permissible discovery in deciding the motions to dismiss. It is sufficient to note that some discovery on the First Amendment claims will likely be permissible, and may further bolster the Intervenors' allegations that the Government's reversal was motivated by President Trump's political affiliation and statements.

*of Pawling*, 18 F.3d 188, 195 (2d Cir. 1994) ("it is sufficient to allege facts from which a retaliatory intent on the part of the defendants reasonably may be inferred"); *Ervin and Assocs., Inc. v. Dunlap*, 33 F. Supp. 2d 1, 7 (D.D.C. 1997) (citing *Gagliardi* and rejecting government's "demand" that a retaliation claim "meet a pleading standard that is higher than required at the motion to dismiss").

The Government makes up no ground by contending that the litany of improper purposes identified by Committee Democrats over the years somehow defeat the retaliation claim. To begin, Rule 8 permits pleading in the alternative, even if the claims are inconsistent, Fed. R. Civ. P. 8(d)(2)(3). This includes alternative motives in retaliation cases. *See, e.g.*, *Babych v. Psychiatric Solutions, Inc.*, 2010 WL 3547981, at *2 (N.D. Ill. 2010) (rejecting "the proposition that because plaintiff has alleged a claim of discrimination based on age, she cannot plead retaliation under any other theory"); *Stansberry v. Uhlich Children's Home*, 264 F. Supp. 2d 681, 691 (N.D. Ill. 2003) (allowing claims for multiple retaliatory motives). Moreover, the fact that a committee's members offer shifting explanations for their action permits an inference that those reasons are *not* sincere. *Black Lives Matter D.C. v. Trump*, 2021 WL 2530722, at *18 (D.D.C. Aug. 25) (holding that "shifting explanations for" challenged governmental action, "at this early stage" support "plausibl[e] alleg[ations] that the defendants did not have a non-retaliatory motive").

### B.    The request violates the separation of powers. (VII)

The information requested by the Committee is the subject of ongoing examinations by the IRS, and its confiscation or disclosure would therefore violate the separation of powers. ACCC ¶¶340, 344. The Government argues that this claim is unripe and meritless. Gov't-MTD 48-51. The Government is wrong, twice over.

Intervenors' separation-of-powers claim is ripe. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at

all." *Texas v. United States*, 523 U.S. 296, 300 (1998). But "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164-64 (2014). That requirement is met here: An unconstitutional confiscation is "certainly impending" absent judicial intervention.

The Government argues this claim is unripe because it depends on speculation as to what Congress might do next *after* the unconstitutional confiscation: whether, for example, it will go on to intrude further upon ongoing examinations by the IRS. Gov't-MTD 48-49. This argument mis-understands Intervenors' claim. The impending confiscation would *itself* violate the separation of powers. Thus, the claim in no way depends on any "speculative chain of possibilities." *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 414 (2013). While subsequent events might bring additional violation of the separation of powers, the Government's impending disclosure gives rise to a claim now. *Cf. Bowsher v. Synar*, 478 U.S. 714, 728 n.5 (1986) (holding separation-of-powers claim against as-yet unused removal provision to be ripe because of executive officer's "here-and-now subservience to another branch").

The doctrine of "prudential ripeness" is no impediment to review here either. *See SBA List*, 573 U.S. at 167. Prudential ripeness should only rarely prevent a case from going forward, as "a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (internal quota-tion marks omitted). Moreover, the two criteria for prudential ripeness—"the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration"—both confirm justiciability here. *Thomas v. Union Carbide Agr. Prod. Co.*, 473 U.S. 568, 581 (1985). As to the first, the constitutionality of confiscating pending investigation files "is purely legal, and

will not be clarified by further factual development." *Id.* As to the second, any delay would defer

consideration until *after* the Government disclosed the information to the Committee, irreparably

harming Intervenors' interest in both the confidentiality of their tax information and the fairness

and impartiality of ongoing examinations. *Cf. In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1065

(D.C. Cir. 1998) (holding immediate harm of involuntary disclosure "render[ed] appeal after final

judgment an inadequate means to relief").

Intervenors have plausibly stated a claim to relief. History shows that separation of powers

requires the executive branch to refuse congressional requests for open enforcement files. "[T]he

policy of the Executive Branch throughout our Nation's history has generally been to decline to

provide committees of Congress with access to, or copies of, open law enforcement files except in

extraordinary circumstances." 10 Op. O.L.C. 68, 76 (1986). Nondisclosure prevents Congressional

intrusion into "matters which are within the exclusive province" of the executive branch, namely

enforcement of the law. *Barenblatt*, 360 U.S. at 112; *see also Seila Law*, 140 S. Ct. at 2191 ("Under

our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care

that the Laws be faithfully executed.'" (quoting U.S. Const. art. II, §1, cl. 1).

Nondisclosure of pending enforcement files has been the executive branch's constant prac-

tice. "This policy with respect to Executive Branch investigations was first expressed by President

Washington and has been reaffirmed by or on behalf of most of our Presidents, including Presi-

dents Jefferson, Jackson, Lincoln, Theodore Roosevelt, Franklin Roosevelt, and Eisenhower." 10

Op. O.L.C. at 76; *accord* 6 Op. O.L.C. 751 (1982) (more history). Nor has this practice been lim-

ited to presidential invocations of executive privilege. As one example, in 1955 the SEC refused

to disclose investigative files in two pending matters. As the Chairman explained, "It has been the

consistent policy of the Commission not to release its pending investigation files. It has been our

belief that such release might impair the integrity of the Commission's investigative process and seriously interfere with the Commission's responsibility of appropriate enforcement action, in case this becomes necessary." 6 Op. O.L.C. 782, 806-07 (1982). Or as then–Attorney General Robert Jackson explained, "[A]ll investigative reports are confidential documents of the executive department of the Government, to aid in the duty laid upon the President by the Constitution to 'take care that the Laws be faithfully executed,' and … congressional or public access to them would not be in the public interest." 40 Op. Att'y Gen. 45, 46 (1941).

This rule of nondisclosure serves important purposes. "[T]he Executive cannot effectively investigate if Congress is, in a sense, a partner in the investigation. If a congressional committee is fully apprised of all details of an investigation as the investigation proceeds, there is a substantial danger that congressional pressures will influence the course of the investigation." 10 Op. O.L.C. at 76. Nondisclosure protects the candor and integrity of the executive branch in the underlying matter, as well as in future matters. "Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *United States v. Nixon*, 418 U.S. 683, 705 (1974).

The Government's arguments against this doctrine are unpersuasive. Focusing on the relevant OLC opinions, the Government contends that they support only a waivable executive privilege, with no obligation on the executive branch to protect open law-enforcement files. Gov't MTD 49-50. But while questions of disclosure have often arisen in the executive-privilege context, *e.g.*, 8 Op. O.L.C. 252 (1984), the historical evidence, as quoted above, is not so limited. The best the Government can say is that the OLC opinions contemplate release of open files "in extraordinary circumstances." *Id.* at 50. Far from an argument for dismissal, though, that concession is

enough to make Intervenors' claim plausible. No extraordinary circumstances warranting premature disclosure exist here.[12]

The Government suggests that §6103(f) "diminishe[s]" any separation-of-powers concerns here. Gov't-MTD 50-51. But as explained before, *supra* II.A.i, statutes can raise constitutional issues, but they rarely resolve them. Courts routinely hold that statutes (or their applications) violate the separation of powers, even when the encroached upon branch is on the opposite side of the "v." *E.g.*, *Bowsher*, 478 U.S. 714; *Clinton v. City of New York*, 524 U.S. 417 (1998); *Collins*, 141 S. Ct. 1761. That a President signed §6103(f) at some point at time does not mean that he approved the precise application here, that he had the right to bind his successors to that view, or that he had a right to waive the important individual liberties that the separation of powers is designed to protect.

### C.     The request violates due process. (VIII)

The Committee's request also violates due process by interfering with an ongoing examination. When a congressional investigation focuses on a "pending" adjudication, it violates "the right of private litigants to a fair trial and, equally important, with their right to the appearance of impartiality"—the "sine qua non of American judicial justice." *Pillsbury Co. v. FTC*, 354 F.2d 952, 964 (5th Cir. 1966).

The Government first argues that this claim is unripe for the same reasons as the separation-of-powers claim, discussed above. Like the separation-of-powers claim, this claim rests on the certainly impending threat of disclosure to Congress, without resort to any "speculative chain of

---

[12] The Government also cites a district-court opinion noting that congressional hearings while an administrative matter is still pending are "not inherently improper." Gov't-MTD 49. This line, however, came in the context of due-process concerns with contemporaneous hearings, *see infra* III.C, not the separation-of-powers problem presented by the confiscation of pending enforcement files.

possibilities," *Clapper*, 568 U.S. at 414, or "conjecture" about the choices of independent actors, *Trump v. New York*, 141 S. Ct. 530, 535 (2020). President Trump's tax returns are not just any document. His political opponents have been pursuing them for years. There is little doubt—and it is at least plausible at this stage—that their disclosure will deprive Intervenors of a fair examination and the appearance of impartiality.

In particular, there is no need to await a final ruling from the agency on the underlying tax filings. As discussed, a claimant can successfully state a due-process violation "even without showing" that the improper influence of Congress "had actually influenced the [agency's] decision." *D.C. Fed'n of Civic Assocs. v. Volpe*, 459 F.2d 1231, 1246 (D.C. Cir. 1971). Because the "appearance of bias or pressure may be no less objectionable than the reality," *id.* at 1246-47, Intervenors' claim is ripe regardless of the potential for additional injury in the form of adverse agency rulings. Intervenors' will be injured upon disclosure, and disclosure is something this Court can stop now.

A litigant is deprived of due process when Congress so intrudes upon an administrative proceeding as to remove the appearance of impartiality. *ATX, Inc. v. U.S. Dep't of Transp.*, 41 F.3d 1522, 1527 (D.C. Cir. 1994). Applying this rule, the Fifth Circuit in *Pillsbury* vacated the order of an administrative tribunal "that was importuned by members of the United States Senate … to arrive at the ultimate conclusion which they did reach." 354 F.2d at 963. In that case, Senators had subjected the relevant agency commissioner to a "barrage of questioning," urging a view of the Clayton Act unfavorable to a private respondent in ongoing proceedings before the agency. *Id.* at 955-56. Although the commissioner then disqualified himself from the case, *id.* at 956, the Fifth Circuit held the damage was done, and the proceeding compromised, by the senators' intrusion. Likewise, the D.C. Circuit found a due-process violation in *Koniag* where a Congressman wrote a

letter to an agency just before an eligibility decision regarding certain Native American villages. The court found that, although "[t]he letter did not specify any particular villages," it nevertheless "compromised the appearance of the Secretary's impartiality." *Koniag, Inc., Vill. of Uyak v. Andrus*, 580 F.2d 601, 610 (D.C. Cir. 1978).

Intervenors' cross-claim alleges much more intrusive congressional behavior than either *Pillsbury* or *Koniag*. The Committee's members and partisan allies have continually demanded access to the requested documents for over five years. They have repeatedly claimed that Intervenors' tax information—currently under examination by the IRS—would reveal civil and criminal liabilities. *E.g.*, ACCC ¶¶42, 96, 272. Under these circumstances, the threatened disclosure would violate Intervenors' rights to due process. It would invite into the ongoing adjudication Members who have a longstanding partisan interest in seeing the proceeding reach a conclusion adverse to Intervenors. *Pillsbury* and *Koniag* found violations based on comparatively mild congressional behavior. Their holdings therefore dictate the same outcome in these more extreme circumstances.

To oppose this claim, the Government relies principally on *ATX*, but that case involved a much lower level of congressional intrusion. There, members of Congress sent a single letter opposing an application and later offered testimony at an ALJ hearing where anyone was allowed to participate. 41 F.3d at 370-71. Even so, the D.C. Circuit found those actions "substantial enough to warrant close examination." *Id*. at 372. The case also involved a much looser "nexus between the pressure and the actual decision maker." *Id.* at 372. The Secretary answered Congress with a form letter and assurances of a fair and searching adjudication of ATX's application.

Here, by contrast, the executive branch has abruptly reversed its position once it was controlled by the Committee's partisan allies—and in the face of the Committee's renewed vows to expose the requested documents. *ATX* is clear that such circumstances can create an appearance of

impartiality. *See id*. at 374 ("If the decision maker were suddenly to reverse course or reach a weakly-supported determination, by contrast, we might infer that pressure did influence the final decision."). The agency in *ATX* also "insulated [its] own decisionmaking process from congressional interference." *Id*. at 373. But here, Intervenors have plausibly pleaded that the Government reversed its prior position and wants to disclose Intervenors' confidential documents to the Committee—thereby making Congress "a partner in the investigation," 10 Op. O.L.C. at 76. That would violate Intervenors' right to due process.

## CONCLUSION

The motions to dismiss should be denied.

Respectfully submitted,

Dated: October 26, 2021      */s/ Patrick Strawbridge*
Patrick Strawbridge (pro hac vice)
CONSOVOY MCCARTHY PLLC
Ten Post Office Square, 8th Floor
South PMB #706
Boston, MA 02109
(617) 227-0548
patrick@consovoymccarthy.com

William S. Consovoy (D.C. Bar #493423)
Cameron T. Norris
James P. McGlone*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com
cam@consovoymccarthy.com
jim@consovoymccarthy.com

*Barred in MA, but not yet VA.
Work supervised by principals of the firm.

**CERTIFICATE OF SERVICE**

I filed this opposition with the Court via ECF, which will email everyone requiring notice.

Dated: October 26, 2021                    _/s/ Patrick Strawbridge_____