# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMMITTEE ON WAYS AND MEANS,
UNITED STATES HOUSE OF
REPRESENTATIVES,

        *Plaintiff–Counterdefendant*,

   v.

UNITED STATES DEPARTMENT OF THE
TREASURY, ET AL.,

        *Defendants–Crossdefendants*,

DONALD J. TRUMP, ET AL.,

        *Intervenors–
Counterclaimants–
Crossclaimants*.

Case No. 19-cv-01974-TNM

## REPLY MEMORANDUM IN SUPPORT OF
## <u>COUNTERDEFENDANT'S MOTION TO DISMISS</u>

# TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................................1

ARGUMENT ...........................................................................................................2

I.      Mr. Trump's Claims Are Appropriately Resolved On A Motion To Dismiss ...................2

II.     The Committee's Request Advances Valid Congressional Purposes.................................5

       A.      Mr. Trump's Assertions Of Impermissible Purpose Are Legally
              Insufficient And, In Any Event, Unsupported by Plausible Allegations...............5

       B.      The Request Is Relevant To Legislation That May Be Had ..................................14

III.    The Request Complies With The Separation Of Powers Under Any Standard................16

       A.      Under Any Standard, Mr. Trump's Status Fundamentally Affects The
              Analysis And The Request Is Valid.....................................................................16

       B.      The Committee's Request Pertains To A *Former* President .................................16

       C.      All Four *Mazars* Factors Strongly Favor The Committee ....................................19

             1.      The Request Does Not Burden The Office Of The President...................19

             2.      The Committee's Legislative And Oversight Purposes Warrant
                   Seeking Mr. Trump's Tax Information.......................................................20

              3.      The Committee Has Amply Justified Its Significant Need For The
                   Requested Information...............................................................................21

              4.      The Request Is Not Overly Broad.............................................................22

IV.    Section 6103(f)(1) Is Constitutional ...........................................................................23

CONCLUSION.......................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Americans for Prosperity Foundation v. Bonta,*
141 S. Ct. 2373 (2021)................................................................................................24

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)....................................................................................................3

*Badwal v. Board of Trustees of the University of the District of Columbia,*
139 F. Supp. 3d 295 (D.D.C. 2015) ..........................................................................13

*Barenblatt v. United States,*
240 F.2d 875 (D.C. Cir. 1957) .....................................................................................7

*Barenblatt v. United States,*
354 U.S. 930 (1957).....................................................................................................7

*Barenblatt v. United States,*
360 U.S. 109 (1959)................................................................................................7, 25

*Bauchman ex rel. Bauchman v. West High School,*
132 F.3d 542 (10th Cir. 1997) ................................................................................8, 11

*Brown & Williamson Tobacco Corp. v. Williams,*
62 F.3d 408 (D.C. Cir. 1995) .......................................................................................4

*City of Los Angeles v. Patel,*
576 U.S. 409 (2015)...................................................................................................24

*Clinton v. Jones,*
520 U.S. 681 (1997)...................................................................................................15

*Department of Commerce v. New York,*
139 S. Ct. 2551 (2019)................................................................................................8

*\*Eastland v. U.S. Servicemen's Fund,*
421 U.S. 491 (1975)..........................................................................................2, 3, 7, 9

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Building and Construction
Trades Council,* 485 U.S. 568 (1988) ......................................................................25

*Edwards v. Aguillard,*
482 U.S. 578 (1987)......................................................................................................6

*Federal Communications Commission v. Beach Communications, Inc.,*
508 U.S. 307 (1993)......................................................................................................3

*Griffin v. Padilla*,
   408 F. Supp. 3d 1169 (E.D. Cal. 2019)................................................................16

*Gundy v. United States*,
   139 S. Ct. 2116 (2019).........................................................................................25

*Jewish War Veterans of USA, Inc. v. Gates*,
   506 F. Supp. 2d 30 (D.D.C. 2007).........................................................................6

*Johnson v. United States*,
   576 U.S. 591 (2015)..............................................................................................24

*Kilbourn v. Thompson*,
   103 U.S. 168 (1880)................................................................................................8

*Lincoln v. Vigil*,
   508 U.S. 182 (1993)..............................................................................................15

*McGrain v. Daugherty*,
   273 U.S. 135 (1927)....................................................................................... *passim*

*Miller v. French*,
   530 U.S. 327 (2000)..............................................................................................25

*Nixon v. Administrator of General Services*,
   433 U.S. 425 (1977)..............................................................................................15

*Nixon v. Fitzgerald*,
   457 U.S. 731 (1982)..............................................................................................15

*Senate Select Committee on Presidential Campaign Activities v. Nixon*,
   498 F.2d 725 (D.C. Cir. 1974) (en banc)..............................................................17

*Shelton v. United States*,
   327 F.2d 601 (D.C. Cir. 1963)..............................................................................18

*Shelton v. United States*,
   404 F.2d 1292 (D.C. Cir. 1968).................................................................5, 14, 18

*Tenney v. Brandhove*,
   341 U.S. 367 (1951)..................................................................................2, 4, 8, 9

*Trump v. Committee on Oversight and Reform of the U.S. House of
   Representatives*, 380 F. Supp. 3d 76 (D.D.C. 2019)............................................4, 5

*Trump v. Mazars USA, LLP*,
   140 S. Ct. 2019 (2020).................................................................................. *passim*

*Trump v. Mazars USA, LLP,*
    940 F.3d 710 (D.C. Cir. 2019) ...................................................................... *passim*

*Trump v. Mazars USA LLP,*
    2021 WL 3602683 (D.D.C. Aug. 11, 2021) ................................................ *passim*

*U.S. Term Limits, Inc. v. Thornton,*
    514 U.S. 779 (1995) ......................................................................................16

*United States v. Booker,*
    543 U.S. 220 (2005) ......................................................................................25

*United States v. Lopez,*
    514 U.S. 549 (1995) ......................................................................................24

*United States v. Morrison,*
    529 U.S. 598 (2000) ......................................................................................24

*United States v. O'Brien,*
    391 U.S. 367 (1968) ........................................................................................9

*United States v. Poindexter,*
    727 F. Supp. 1501 (D.D.C. 1989) ................................................................17

*United States v. Rumely,*
    345 U.S. 41 (1953) ........................................................................................18

*United States v. Salerno,*
    481 U.S. 739 (1987) ................................................................................23, 24

*Wallace v. Jaffree,*
    472 U.S. 38 (1985) ..........................................................................................8

*Watkins v. United States,*
    354 U.S. 178 (1957) ..................................................................7, 13, 15, 18

## CONSTITUTIONS, STATUTES, RULES, AND REGULATIONS

U.S. Const. amend. XX ...........................................................................................23

U.S. Const. art. II, § 1, cl. 5 ...................................................................................16

2 U.S.C. § 192 .........................................................................................................25

26 U.S.C. § 6103(f) .....................................................................................4, 9, 23, 24

Fed. R. Civ. Proc. 12(b)(6) .......................................................................................3

Fed. R. Evid. 201(b)(2) .............................................................................................4

## LEGISLATIVE MATERIALS

*Hearing on Taxpayer Fairness*, 116th Cong. (Oct. 13, 2020),
https://waysandmeans.house.gov/legislation/hearings/taxpayer-fairness ............................... 21

## OTHER AUTHORITIES

Dan Alexander, Chase Peterson-Withorn, and Michela Tindera, *The Net Worth of
Every 2020 Presidential Candidate*, Forbes (Aug. 14, 2019),
https://www.forbes.com/sites/danalexander/2019/08/14 ....................................................... 22

Gerald R. Ford Presidential Library & Museum, *Timeline of President Ford's Life
and Career* (Jan. 11, 2011),
https://www.fordlibrarymuseum.gov/grf/timeline.asp ............................................................ 19

Ian Pickus, *Suing To See Them, Rep. Neal "Not Surprised" By President's Tax
Returns*, WAMC News (Sept. 28, 2020, 2:51 PM),
https://www.wamc.org/wamc-news/2020-09-28/suing-to-see-them-rep-neal-
not-surprised-by-presidents-tax-returns .................................................................................. 12

Jim Sciutto, *CNN Newsroom with Poppy Harlow and Jim Sciutto*, Internet
Archive (Apr. 4, 2019, 7:00 AM-8:00 AM),
https://archive.org/details/CNNW_20190404_140000_CNN_Newsroom_with
_Poppy_Harlow_and_Jim_Sciutto/start/480/end/540 ........................................................... 10

Nancy Cook, *The Plan to Keep Trump's Taxes Hidden*, Politico (Feb. 5, 2019,
5:02 AM), https://www.politico.com/story/2019/02/05/trump-tax-returns-
congress-strategy-1145767 .................................................................................................... 10

Press Release, Ways & Means Committee, Chairman Richard Neal, Neal
Statement on Requesting Trump's Tax Returns (Apr. 3, 2019),
https://waysandmeans.house.gov/media-center/press-releases/neal-statement-
requesting-president-trump-s-tax-returns ............................................................................... 12

## INTRODUCTION

This case presents a challenge to Congress's ability to conduct a vital inquiry at the core of its Article I power: an investigation into whether a federal agency is capable of enforcing federal tax law adequately against a President like Mr. Trump, and into whether federal law is adequate to ascertain whether a President is vulnerable to conflicts of interest that could impair his ability to perform his constitutional duties.  The Committee's correspondence with the Treasury Department carefully explained how Mr. Trump's Presidency presented these serious challenges and why the Committee needed access to his tax returns and related audit files to evaluate whether additional legislation is needed.  The heart of Mr. Trump's response is that "everyone knows" that the Committee seeks his tax returns to damage him politically.  Opp. 1. That speculation is neither a fact assumed to be true for purposes of this motion nor legally relevant.  Under Supreme Court precedent, this Court must presume that the Committee's request serves its stated purposes.

Mr. Trump suggests that the sheer volume of supposedly factual detail in his pleading saves it from dismissal.  The Court need not and should not accept his many legal conclusions couched as facts, fanciful inferences, or assertions that contradict the public record.  But regardless, Mr. Trump's pleading fails not because it lacks factual detail but because those details are insufficient to impugn the validity of the request.  It does not matter what Mr. Trump believes Chairman Neal's subjective motives were, or what other Members of Congress expressed about their hopes for obtaining Mr. Trump's tax returns, or (even if it were true) that the request *also* furthered law-enforcement or exposure purposes in addition to the stated legitimate purposes; what matters is that, acting for the Committee, Chairman Neal articulated purposes that plainly are within the scope of Congress's Article I powers.

Moreover, the request reflects an appropriately tailored response to the challenges raised

1

by Mr. Trump's Presidency and the well-founded desire to address those challenges in the future—under any of the legal standards invoked by the parties.  Mr. Trump's effort to impugn the legitimacy of the Committee's legislative aims boils down to the distressing proposition that a President's actions are categorically beyond Congress's purview—that Congress cannot legislate, for example, to ensure that the IRS treats Presidents like all other taxpayers under the law, or to mandate that Presidents avoid or at least reveal conflicts of interest that could impair their ability to faithfully perform their duties.  Arguments like these have been rejected repeatedly by the courts and are fundamentally at odds with our system of government.

## ARGUMENT

### I.    MR. TRUMP'S CLAIMS ARE APPROPRIATELY RESOLVED ON A MOTION TO DISMISS

Contrary to Mr. Trump's bid to push this case to summary judgment, this case can and should be resolved on a motion to dismiss.  That is the posture in which the Supreme Court rejected similar challenges in other cases.  *See Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 494 (1975); *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951).  In doing so, the Court explained that a Congressional motion "to dismiss" a legislative-purpose claim must "be given the most expeditious treatment … because one branch of Government is being asked to halt the functions of a coordinate branch."  *Eastland,* 421 U.S. at 511 n.17.  The same is true here.

That approach, moreover, aligns with the substantive constitutional standard.  The legitimate-purpose inquiry is a question of law, not of fact.  Mr. Trump's suggestion that courts must engage in summary judgment or trial factfinding regarding the supposed true "purpose" for Congressional requests finds no support in precedent.  Instead, the relevant question is whether the complainant's alleged facts can show that the Congressional request is not even "capable of being … construed" as advancing a "legitimate object."  *McGrain v. Daugherty*, 273 U.S. 135, 178 (1927); *see Eastland,* 421 U.S. at 511 & n.17.  This deferential approach is analogous to the

deference courts show Congress in other contexts where its basis or purpose for legislating is challenged.  For example, under rational-basis review, the court's "inquiry is at an end" if "there are plausible reasons for Congress' action."  *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313-314 (1993) (quotation cleaned).  Consequently, "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation."  *Id.* at 315.

Mr. Trump fundamentally misunderstands this standard.  Although his claims attempt to thwart an investigation by a Congressional committee, he asserts (at 13-14) that they should survive a motion to dismiss so long as the facts he alleges are "plausible."  But Rule 12(b)(6), even in an ordinary case, requires more.  A claim survives a motion to dismiss only if the plausible facts alleged actually entitle the claimant to relief under the applicable legal standard.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678-679, 683 (2009).  Further, the established rule that legal conclusions and naked assertions are not to be credited, *see* MTD 14, knocks out points critical to Mr. Trump's claims.  He asserts (at 1-2, 57) that he has "plausibly alleged" that "the Committee's request has an improper purpose," that the "'real object' of the Committee's request is non-legislative" and that "[i]nstead of studying legislation, the Committee seeks to expose President Trump's tax information for the sake of exposure."  Those are bald conclusions, unsupported by the "factual content" in his pleading, *Iqbal*, 556 U.S. at 678; the actual facts he has alleged—even accepted as true—do not call into question the request's stated, facially legitimate purposes, *infra* pp. 5-14, or establish that compliance with the request will unduly interfere with the separation of powers, *infra* pp. 16-23.

Mr. Trump is also wrong (at 2) that if the Committee disagrees with his "view of the record," it "can do so at summary judgment."  Again, the only questions before the Court—whether the request serves a legitimate Congressional purpose, whether the request accords with

the separation of powers, and whether Section 6103(f)(1) is constitutional—are purely legal.

And the Court has before it ample publicly available information from an undisputed

documentary record to adjudicate those questions.  Thus, the current record is as it would be on

cross-motions for summary judgment.  *See Trump v. Committee on Oversight & Reform of U.S.*

*House of Representatives*, 380 F. Supp. 3d 76, 88-90 (D.D.C. 2019), *aff'd sub nom. Trump v.*

*Mazars USA, LLP*, 940 F.3d 710 (D.C. Cir. 2019), *vacated and remanded on other grounds*, 140

S. Ct. 2019 (2020) (converting preliminary injunction briefing on legislative-purpose and

separation-of-powers claims to cross-motions for summary judgment based on conclusion that

"[t]he legal issues presented do not require the court to resolve any fact contests because the

material facts are not in dispute").  Indeed, it is unclear what further proceedings Mr. Trump

envisions or what further facts he seeks to discover.  The Speech or Debate Clause's testimonial

privilege would bar discovery to probe Committee Members' internal communication or

intentions, *see Tenney*, 341 U.S. at 377-378; *Brown & Williamson Tobacco Corp. v. Williams*, 62

F.3d 408, 418 (D.C. Cir. 1995), and in any event legislators' *motives* are legally irrelevant and

therefore could not be the subject of discovery or factfinding.  *See infra* pp. 5, 9-10; *Trump*, 380

F. Supp. 3d. at 88-90 & n.21.

Even if the factual issues were subject to ordinary judicial factfinding, there would be no

need to defer consideration of the extra-pleading material cited by the Committee until summary

judgment.  Those materials—which consist of the full text of Committee's letters to Treasury,

the full text of the articles and other public records cited or quoted in Mr. Trump's pleading (with

or without citation), and other public information sources whose "accuracy cannot reasonably be

questioned," Fed. R. Evid. 201(b)(2)—are, as the Committee explained (at 8 n.5, 14-15, 24),

properly the subject of judicial notice.  Mr. Trump asserts (at 14-16) that the Court cannot

consider public news reports regarding his statements or even portions of reports and statements on which he himself relies.  But the facts that these reports were published and that some of them are cited in the request are appropriate subjects for judicial notice; they provide relevant information about the purpose of Congress's request without any need to determine the veracity of the reports' contents.  The D.C. Circuit has recognized that this type of evidence from the Committee's own request and public sources are proper bases on which to determine whether Congress acted in its legislative capacity.  *Shelton v. United States*, 404 F.2d 1292, 1297 (D.C. Cir. 1968); *see Trump*, 380 F. Supp. 3d. at 88-90.

These civil procedure principles are informed by significant separation-of-powers concerns:  Were it sufficient to simply allege that a Congressional committee acted for political or other purposes while ignoring the Committee's expressed rationale, protracted litigation could ensue every time Congress issued a subpoena or request.  That would allow complainants to compel the judiciary to undertake intrusive factfinding that would impair Congress's investigative powers and damage Congress's ability to carry out its constitutional duties.  *See Trump v. Mazars USA, LLP,* 140 S. Ct. 2019, 2033 (2020) (rejecting standard that would "risk seriously impeding Congress in carrying out its responsibilities").

## II.    THE COMMITTEE'S REQUEST ADVANCES VALID CONGRESSIONAL PURPOSES

### A.    Mr. Trump's Assertions Of Impermissible Purpose Are Legally Insufficient And, In Any Event, Unsupported by Plausible Allegations

As the Committee explained (at 15-20), the request here satisfies Article I because it is "related to, and in furtherance of," multiple valid Congressional purposes—that is, "subject[s] on which legislation could be had."  *Mazars*, 140 S. Ct. at 2031.  Mr. Trump responds (at 51, 56-57) that he has plausibly alleged that the "primary purpose" of the request is to expose for the sake of exposure or to conduct law enforcement.  That argument fails for several reasons.

1.      In hopes of avoiding the admitted bar on judicial inquiry into Congressional

motives, Mr. Trump deems (at 52-53) the legislator statements he relies on as relating to

"purpose" instead.  But the distinction between motive and purpose is "a fine one that may

disappear in practice." *Jewish War Veterans of USA, Inc. v. Gates*, 506 F. Supp. 2d 30, 60

(D.D.C. 2007).  Indeed, the Supreme Court "has recognized from Chief Justice Marshall" to the

present "that determining the subjective intent of legislators is a perilous enterprise," for both

"judges" and "legislators." *Edwards v. Aguillard*, 482 U.S. 578, 637-639 (1987) (Scalia, J.,

dissenting).  Additionally, Congress "is composed of elected members who stand for re-

election," so it is "neither unusual nor illegitimate for partisan or other political considerations to

factor into Congress's work."  2021 OLC Op. at 26.  Consequently, courts prudently avoid Mr.

Trump's game and sustain Congressional action when the legislative body's statements evince a

valid purpose. *Trump v. Mazars USA LLP*, No. 19-cv-01136, 2021 WL 3602683, at *10 (D.D.C.

Aug. 11, 2021), *appeal docketed*, No. 21-5176 (D.C. Cir. Aug. 16, 2021) (finding no basis to

invalidate subpoena "on improper purpose grounds" when "facially valid legislative purposes"

were present); *cf. Jewish War Veterans*, 506 F. Supp. 2d at 62 (declining to police line between

purpose and motive, given practical difficulties and "sensitive constitutional interests").  That

accords with the dictate that courts are "bound to presume that the action of the legislative body

was with a legitimate object, if it is capable of being so construed." *McGrain*, 273 U.S. at 178.

However, even if Mr. Trump's assertions involved purpose rather than motive (and even

if they were supported by plausible factual allegations), they would still be legally insufficient

because the face of the request demonstrates that it would *also* further multiple valid legislative

purposes. *See* MTD 15-20.  And Article I requires only the *presence* of a legitimate legislative

purpose—not the *absence* of any alleged improper purpose.  Even if Mr. Trump's assertions

were true, the Supreme Court has said an impermissible purpose (such as exposure for the sake

of exposure) "would not vitiate an investigation which had been instituted by a House of

Congress if that assembly's legislative purpose is being served." *Watkins v. United States*, 354

U.S. 178, 200 (1957); s*ee* MTD 17-20.  Any other rule of law would severely constrain

Congress's "broad and indispensable" constitutional authority "to obtain information." *Mazars*,

140 S. Ct. at 2031 (quotation cleaned).  Asking courts to divine and rank all the supposed

purposes driving a legislative act asks the impossible.  In light of this constitutional reality,

"courts should not go beyond the narrow confines of determining that a committee's inquiry may

fairly be deemed within its province." *Eastland*, 421 U.S. at 506 (quotation cleaned).

 These tenets are *supported* by the precedent Mr. Trump cites.  For example, in upholding

the legality of a Congressional investigation, *Barenblatt v. United States* reiterated that "[s]o

long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to

intervene." 360 U.S. 109, 132 (1959).  The Court referred to the Congressional inquiry's

"primary purpose" only descriptively, not to prescribe an Article I requirement. *Id.* at 133.

Indeed, in a decision later endorsed in substance by the Supreme Court, the D.C. Circuit had

concluded that because a statement showing a purpose to expose did "not negate the presence of

other, … legitimate[] purposes of the inquiry, the presumption of valid purposes is still operative

and unrebutted." *Barenblatt v. United States*, 240 F.2d 875, 881 (D.C. Cir. 1957), *vacated on

other grounds*, 354 U.S. 930 (1957) (per curiam).  Similarly, the Supreme Court in *McGrain* did

not probe any "evidence" to attempt to identify the Senate's "real object"; it "*presum[ed]*" the

Senate's "real object" was legitimate, in the absence of any "express avowal of the object."  273

U.S. at 178 (emphasis added).  The Court declared "wrong" the lower court's determination that

the Senate's "contemplation … of taking action other than legislation … invalidated the entire

7

proceeding." *Id.* at 176-177 (quotation cleaned).  And *Kilbourn v. Thompson* used the word "gravamen" not to approve a searching judicial inquiry into the primary purpose but merely to summarize the nature of the Congressional investigation.  103 U.S. 168, 195 (1880).  The Court invalidated the investigation only upon finding "that it could result in *no valid legislation* on the subject to which the inquiry referred."  *Id.* (emphasis added).[1]

Mr. Trump quotes (at 1) the Supreme Court's remark in *Mazars* that it need not "blind" itself "to see what all others can see and understand," 140 S. Ct. at 2034 (quotation cleaned).  But neither *Mazars* nor the cases it was quoting made that statement to authorize judicial piercing of Congress's stated purpose to determine its supposedly *real* purpose.  *Mazars*, for example, meant only that the subpoenas at issue did in fact "implicate[]" weighty "separation of powers concerns" even though they were served on private entities.  *Id.*  As the Committee explained (at 22), the presumption that Congress's expressed purpose is valid can be overcome only if it is "obvious" that "a committee's investigation has exceeded the bounds of legislative power," *Tenney*, 341 U.S. at 378—perhaps if the stated purpose is entirely disconnected from or contrary to the request, *see Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) ("we cannot ignore the disconnect between the decision made and the explanation given").

Finally, Mr. Trump argues (at 55) that none of the above analysis applies here because the presumption of regularity is inapplicable at the pleading stage.  That is nonsense.  As noted *supra* p. 2, the Supreme Court has repeatedly resolved the legislative-purpose issue on motions to dismiss, and in each of those cases the presumption applied with full force.  Dismissal was at

---

[1] Mr. Trump's Establishment Clause precedent (Opp. 52) also supports the Committee because those decisions show that the presence of an illegitimate purpose will not vitiate an act that *also* serves a legitimate one.  *See Bauchman ex rel. Bauchman v. West High School*, 132 F.3d 542, 560 (10th Cir. 1997); *accord Wallace v. Jaffree*, 472 U.S. 38, 56 (1985); *Sherman ex rel. Sherman*, 623 F.3d 501, 507 (7th Cir. 2010).

issue in *Tenney*.  The Court stressed that a Congressional committee's investigation would be invalidated only if it *obviously* exceeded Congress's power (as just quoted), despite the plaintiff's "claim of an unworthy purpose," because "courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province." 341 U.S. at 377-378.  *Eastland* too involved review of a dismissal, and the Court there followed the same approach, reiterating that "the scope of [the] inquiry is narrow," even though the plaintiffs had alleged that "the 'sole purpose' of the investigation" was "'public disclosure.'" 421 U.S. at 506-508.  Mr. Trump's argument relies exclusively on out-of-circuit cases that, without exception, did not involve review of a Congressional investigation's legislative purpose. *See* Opp. 55-56.  That case law has no relevance here.

2.  In any event, Mr. Trump's claims fail as a matter of law under his own framework.  Even if the presence of an improper purpose could negate the request's facially legitimate Article I objectives, the only "objective evidence" (Opp. 53) relevant to the purpose inquiry would be Chairman Neal's statements.  As previously explained (MTD 22), only the Committee Chair is authorized under 26 U.S.C. § 6103(f) to issue a request, only the Chair is empowered to issue a subpoena under House Rules, and indeed there was no Committee vote on the matter.  Mr. Trump calls (at 63) this argument "odd" because "it was the Committee, not Chairman Neal, who filed this suit."  Not at all; the Chair acted for the Committee in issuing the requests, and the Committee then sued to protect its institutional interests.  It cannot be that a challenger can cherry-pick statements by individual legislators to defeat an action taken by a legislative body or a different legislator duly authorized to act on the body's behalf.  *See United States v. O'Brien*, 391 U.S. 367, 384 (1968) ("What motivates one legislator … is not necessarily what motivates scores of others.").  Mr. Trump also argues (at 63) that the Court is not limited to

Chairman Neal's statements because Mr. Trump has plausibly alleged that "Democrats worked as a unit." But as Mr. Trump correctly acknowledges, individual legislators' reasons for wanting to see his tax returns go to their *motives*, not the Committee's *purpose*, *see* Opp. 52 ("Motive is why an individual Member sponsored or supported an action." (quotation cleaned)), and again, courts cannot invalidate a Congressional request based on *motive*. Indeed, whether other Members influenced Chairman Neal could be determined only through an impermissible inquiry into his "unexpressed" reasons for issuing the request—*i.e.*, his motives. *See id.*; *supra* p. 4.[2]

Mr. Trump barely attempts to argue that Chairman Neal's statements evidence improper purpose. Without quoting or citing any text, Mr. Trump asserts (at 63) that "the formal request … reveals improper purposes on its face." A perusal of Chairman Neal's letters shows that to be false. *See* MTD 16-20. Mr. Trump then contends (at 61, 63) that Chairman Neal admitted he "'constructed' a 'product' that gave the Committee the best chance to win in court." That contention misleadingly combines two separate statements. In one, Chairman Neal said, "I think the idea here is to avoid the emotion of the moment and make sure that the product stands up under critical analysis."[3] In the other, he said, "This is likely to wind its way through the federal court system, and we wanted to make sure that the case that we constructed was in fact one that would stand up under critical scrutiny of the federal courts."[4] As the Committee explained (at 8, 24-25), such statements show merely that Chairman Neal was appropriately mindful of applicable law; they do not plausibly indicate that Chairman Neal's statements of purpose were

---

[2] Mr. Trump's unsupported allegation (at 63) that the Speaker "had to approve Chairman Neal's request" is false.

[3] https://www.politico.com/story/2019/02/05/trump-tax-returns-congress-strategy-1145767; *compare* Am. Counterclaims/Cross-claims ¶ 90.

[4] https://archive.org/details/CNNW_20190404_140000_CNN_Newsroom_with_Poppy_Harlow_and_Jim_Sciutto/start/480/end/540; *compare* Am. Counterclaims/Cross-claims ¶ 127.

pretextual.  Otherwise, any public acknowledgement of such a deliberative process could be used to invalidate any Congressional action.

Mr. Trump argues (at 63) that "Chairman Neal also made many statements during the 115th Congress … about his purpose of publicly exposing President Trump's tax returns," but as Mr. Trump's own case citations demonstrate, those statements do not provide evidence of purpose—even on a motion to dismiss—because they are not "temporally connected" to the challenged government action.  *See Bauchman ex rel. Bauchman v. West High School*, 132 F.3d 542, 560 (10th Cir. 1997) (finding "allegations regarding … past conduct" insufficient to state claim of religious purpose).  That is particularly true insofar as the alleged statements evidence the goal of winning back the majority in the House, since even the 2019 Request post-dated that election.

Mr. Trump asserts (at 63) that Chairman Neal "made similar statements as Chairman," but his only allegations to support that contention are illustrative of his pleading's tendency to decontextualize and distort Chairman Neal's words.  His pleading alleges, for example, that Chairman Neal "said that unraveling President Trump's 'sophisticated tax avoidance' is a 'reason for the president to release his tax forms.'"  Am. Counterclaims/Cross-claims ¶ 145.  But that quoted statement actually called for voluntary release based on the complexity of Mr. Trump's tax circumstances—which is entirely consistent with the request's stated objectives.  During the same interview, Chairman Neal said, "The basis of our [request] was, how is a president's tax forms audited by the Internal Revenue Service?"[5]

Similarly, Mr. Trump alleges that "in a press release issued on the same day as the [2019]

---

[5] https://www.wamc.org/wamc-news/2020-09-28/suing-to-see-them-rep-neal-not-surprised-by-presidents-tax-returns.

request, Chairman Neal said that the request would help the Committee determine whether President Trump is 'complying with' the tax laws."  Am. Counterclaims/Cross-claims ¶ 143. But this again decontextualizes the Chairman's full statement.  The *actual* press release said (consistent with the request's text):  "The Ways and Means Committee in particular has a responsibility to conduct oversight of our voluntary Federal tax system and determine how Americans—including those elected to our highest office—are complying with those laws.  It is also our duty to evaluate the operation of the Internal Revenue Service in its administration and enforcement of the tax laws."[6]  The Chairman's full statement clearly is in line with the request's legislative purposes, and does not support Mr. Trump's argument that the Committee's real purpose is public exposure or law enforcement.

Nor does the request's focus "on the business and finances of one person" (Opp. 66) transform it into law enforcement.  In *McGrain*, the subpoena focused on one person, yet the Supreme Court discerned no impermissible intent to "try [him] before [the] committee for any crime or wrongdoing."  273 U.S. at 179; *see also Mazars*, 140 S. Ct. at 2032.  "[A]n investigation may properly focus on one individual if that individual's conduct offers a valid point of departure for remedial legislation."  *Trump v. Mazars USA, LLP*, 940 F.3d 710, 729 (D.C. Cir. 2019).  Here, Mr. Trump is a "logical starting point" because of the unprecedented concerns his Presidency raised.  *Id.*; *see* MTD 37-38; *infra* p. 22.

3.      Finally, even if the statements of individual Committee Members were relevant to the purpose inquiry, the statements Mr. Trump cites would not vitiate the request because they do not evidence impermissible purpose, putting aside the fact that most predate even the 2019

---

[6] https://waysandmeans.house.gov/media-center/press-releases/neal-statement-requesting-president-trump-s-tax-returns.

Request and thus are temporally irrelevant, *see* Am. Counterclaims/Cross-claims ¶¶ 24, 26, 28-29, 35-40, 47, 60-61, 64, 68-69, *see supra* p. 11.  Mr. Trump never responds to the Committee's argument (at 26) that the pleading's repeated references to concerns over his "tax evasion," self-dealing, "foreign entanglements," "corrupt[ion]," "fraud," and "crimes," Am. Counterclaims/Cross-Claims ¶¶ 45-46, 51, 59, 96, 100-101, 143-145, 147, 164, 169, 177, 271-272, *belie* any reasonable inference that the request is driven by exposure *solely* for the sake of exposure.  Those allegations show, at most, that Members of Congress had "interest in past illegality," and were considering "possible remedial legislation" to address that illegal conduct, *Mazars*, 940 F.3d at 728, such that any resulting exposure would be informing "the public … concerning the workings of its government" and possible "corruption, maladministration, or inefficiency," *Watkins*, 354 U.S. at 200 & n.33; *see also Badwal v. Board of Trs. of Univ. of D.C.*, 139 F. Supp. 3d 295, 311 (D.D.C. 2015) ("[I]n spite of the requirement that the Court draw all reasonable inferences in the plaintiff's favor, some factual allegations will render certain inferences unreasonable.").  That is firmly within Congress's power.

Mr. Trump's remaining "smoking guns" (Opp. 60) are nothing of the kind.  The pleading's only reference to "examining President Trump's net worth" (*id.*) is based on statements regarding his "financial positions in domestic and foreign companies," *i.e.*, conflicts of interest, Am. Counterclaims/Cross-claims ¶ 104.  And the 2021 Request was issued *after* the 2020 election, *see* Am. Counterclaims/Cross-claims ¶ 252, so its purpose cannot have been to harm Mr. Trump's 2020 campaign (Opp. 60).  Nor is Mr. Trump correct (at 60) that Committee Members' supposed changing of position provides "circumstantial evidence of … improper purpose."  That conception of the law does not reflect legislative reality and is unsupported by any precedent involving Congressional investigations.

Also wrong is Mr. Trump's argument (at 64-67) that the request constitutes impermissible law enforcement.  That Members "referred to" conduct that "would have been violations of state and local law" (Opp. 66) misses the point because the request concerns conduct that "could be the subjects of appropriate [federal] legislation."  *Shelton*, 404 F.2d at 1297.  And, with respect to Mr. Trump's assertion (at 67) that the Committee intended to "double-check[] [Mr. Trump's] tax compliance," that would not constitute an encroachment on the Executive Branch, any more than other ordinary oversight, given that the Committee's review could not lead to Congressional *enforcement* against Mr. Trump.

### B.  The Request Is Relevant To Legislation That May Be Had

Both parts of Mr. Trump's contention (at 67) that the request "seeks information that is either not pertinent to valid legislation or that is pertinent to invalid legislation" are incorrect.

First, Mr. Trump contends (at 68-69) that the request "will not reveal relevant information concerning emoluments or conflicts of interest."  But as the Committee previously explained (at 17-18, 29-30, 38-41) and elaborates below (*infra* pp. 20-21), its request could indeed reveal useful information on these issues.

Second, Mr. Trump's argument (at 69-73) that any contemplated laws "would be unconstitutional" is wrong.  His admitted burden at this stage is substantial:  he must show that the request "could result in *no* valid legislation."  *Mazars*, 940 F.3d at 736; *see* MTD 29.  He comes nowhere close.  His contentions reflect the absurd view that a President, even when acting in his personal capacity, is categorically beyond Congress's purview.  As the Supreme Court has explained, "separation of powers does not mean that the branches 'ought to have no *partial agency* in, or no *controul*, over, the acts of each other.'"  *Clinton v. Jones*, 520 U.S. 681, 702-703 (1997) (quoting *The Federalist* No. 47, at 325-326 (J. Cooke ed., 1961)).

Congress could clearly pass valid legislation governing the IRS's audit of Presidential tax

returns because "Congress may always circumscribe agency discretion … by putting restrictions in the operative statutes." *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993).  Mr. Trump protests (at 72) that such legislation would impermissibly target the Presidency because there is no distinction between the Office of the President and its occupant.  But that contention has been roundly rejected by the Supreme Court.  *See Mazars*, 140 S. Ct at 2032-2033 (distinguishing between "confidential deliberations withing the Executive Branch" and "non-privileged, private information"); *Clinton*, 520 U.S. at 694 (The Court has "never suggested that the President, or any other official, has an immunity that extends beyond the scope of any action takes in an official capacity."); *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982).  As the Committee explained (at 28), what matters is whether the legislation would interfere with the President's ability to perform his constitutional duties; Mr. Trump has identified no basis for concluding that *any* contemplated laws concerning Presidential tax audits would do that.

Nor is Congress categorically prohibited from passing legislation concerning Presidential conflicts of interests.  Even accepting Mr. Trump's definition of "emolument" (at 39-40), the Committee is well within its prerogative to "inquire into" whether he received and reported any. *See Watkins*, 354 U.S. at 200 n.33 (recognizing Congress's power to investigate governmental "corruption, maladministration or inefficiency"); MTD 19-20.  Further, Mr. Trump's argument that "Congress may impose *no* disclosure requirements whatsoever on the President … is not the law." *Mazars*, 940 F.3d at 736; *see Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 443 (1977) (describing similar argument as reflecting "an archaic view of the separation of powers").  Mr. Trump's assertion (at 70) that any contemplated legislation about the Presidency would violate the Qualifications Clause, U.S. Const. art. II, § 1, cl. 5, is incorrect.  The primary authority on which he relies, *U.S. Term Limits, Inc. v. Thornton*, held only that the Qualifications

Clause prohibits legislation that "has the likely effect of handicapping a class of candidates *and* has the sole purpose of creating additional qualifications indirectly."  514 U.S. 779, 836 (1995) (emphasis added).  He has no basis for presuming that the likely effect or sole purpose (let alone both) of any contemplated legislation would be to create a new qualification for office.[7]

## III.   THE REQUEST COMPLIES WITH THE SEPARATION OF POWERS UNDER ANY STANDARD

### A.   Under Any Standard, Mr. Trump's Status Fundamentally Affects The Analysis And The Request Is Valid

Mr. Trump contends (at 25) that *Mazars* applies because the request "implicate[s] the separation of powers."  Of course, the *Nixon v. GSA* test accounts for that (as does the "*Mazars* lite" test).  The pivotal question is *how* the separation of powers is implicated.  Because Mr. Trump is not the President, the answer is *not much*, and the analysis should reflect that.  What made the *Mazars* request a "'clash between rival branches of government,'" Opp. 26 (quoting *Mazars*, 140 S. Ct. at 2034), was that, *at that time*, Mr. Trump was the President; that clash is not "implicate[d]" by the Committee's request, *Mazars*, 2021 WL 3602683, at *13; *see* MTD 33.  In any event, that fact, combined with the facts that the request was made pursuant to a duly enacted statute and that the Executive Branch has agreed to furnish the requested material, fundamentally affect the analysis *regardless* of which standard—the *Mazars* standard, the *Mazars* lite standard, or the *Nixon v. GSA* standard—governs.  Properly analyzed, the request comports with even the full *Mazars* test, and thus also satisfies the other, less-demanding tests.

### B.   The Committee's Request Pertains To A *Former* President

Mr. Trump urges this Court to decide this case as if he were still the President.  But as the Committee previously explained (at 34), he was already out of office when the 2021 Request

---

[7] For the same reasons, Mr. Trump's reliance on the now-vacated decision in *Griffin v. Padilla*, 408 F. Supp. 3d 1169, 1171-1181 (E.D. Cal. 2019), *vacated*, No. 2:19-cv-01477, 2020 WL 1442091 (E.D. Cal. Jan. 13, 2020), is misplaced.

issued, and even if the 2021 Request were just a continuation of the 2019 Request, he is not the President now, when the request would be enforced.  Mr. Trump's responses are flawed.

Mr. Trump acknowledges (at 33) that *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 732-733 (D.C. Cir. 1974) (en banc), held that courts should consider "subsequent developments" when deciding whether to enforce a Congressional information request, but he brushes that aside (at 33) on the ground that "*Mazars* held that executive-privilege cases are not a good fit here."  Mr. Trump paints too broadly.  As *Mazars* recognized, the standards for privileged information are *more* "demanding" than those adopted by the Court for "nonprivileged, private information."  140 S. Ct. at 2032-2033.  Moreover, the Court's rejection of the executive-privilege standards had nothing to do with whether the validity of the request must account for the circumstances at the time of enforcement.  *See id.*

In fact, Mr. Trump has it backwards.  Despite trying to argue that executive-privilege standards are irrelevant here and that the Court should therefore disregard *Senate Select Committee*, he embraces *United States v. Poindexter*, 727 F. Supp. 1501 (D.D.C. 1989)—which involved potentially privileged materials of a former President—as affirming the "'conflict between the branches.'"  Opp. 26 (quoting *Poindexter*, 727 F. Supp. at 1505).  *Poindexter* and *Mazars* actually show the opposite of what Mr. Trump thinks:  at issue here is a request not for privileged material, but for *personal* information, which, as in *Mazars*, implicates the separation of powers only insofar as the request "'intrudes into the operation of the Office of the President.'"  *Mazars*, 2021 WL 3602683, at *13 (quoting *Mazars*, 140 S. Ct. at 2036).  Because Mr. Trump is no longer President, any such intrusion is negligible at most.  Mr. Trump's assertion (at 27) that the Committee "has used *this very request* to gain an advantage over" him during and after his Presidency is unsupported by the factual content of his pleading.  *See* Am.

Counterclaims/Cross-Claims ¶¶ 332, 334.  More fundamentally, Mr. Trump does not allege that

the request, or the threat of compliance, affected his performance of his constitutional duties or

the current President's performance—which is the only potentially cognizable effect.

Mr. Trump's argument (at 31) that the legality of Congressional demands must be

evaluated "upon objection" misunderstands the precedents he cites.  The supposed "timing rule"

(at 31) found in *Watkins*, *Rumely*, and *Shelton* has no purchase here because it relates to a

criminal contempt proceeding and serves a fundamentally different constitutional interest.  In

criminal contempt, the inquiry is whether the witness's refusal to answer a past question was

illegal, and the legality of that failure turns on the validity and clarity of the Congressional

request at the time the witness failed to comply, including upon the witness's objection to the

request.  *See Watkins*, 354 U.S. at 214-215; *United States v. Rumely*, 345 U.S. 41, 48 (1953);

*Shelton v. United States*, 327 F.2d 601, 607 (D.C. Cir. 1963).  Due process forbids the

punishment of a person who could not reasonably know his legal obligations at the time of his

conduct.  *Watkins*, 354 U.S. at 215.  That has nothing to do with whether compliance with a

Congressional information request will harm the separation of powers in the future; that is a

prospective inquiry by nature and thus should be evaluated in view of the circumstances at the

time of compliance.

*Watkins*'s reference to "the legislative assembly initiating an investigation," 354 U.S. at

206, does not indicate otherwise; the word "initiating" merely identifies which governmental

entity can determine the legislative need for the information, *id.* at 205-206.  Surely, Mr. Trump

would not concede that the request may be valid even if the Committee's original purpose had

dissipated.  In fact, he undermines his own position by consistently relying on alleged facts that

post-date his 2019 "objection" when he thinks they favor him.  *See, e.g.*, Opps. 9-11, 59-61, 63,

66. Of course, he cannot cherry-pick the record while ignoring the most important statements—the 2021 Request and (if the 2019 Request is relevant) Chairman Neal's statements in his follow-up letters to the 2019 Request—just because they do not fit his narrative. *See supra* pp. 4-5.

## C.   All Four *Mazars* Factors Strongly Favor The Committee

Many of Mr. Trump's scattershot arguments that the Committee's request fails under the full *Mazars* test were answered in the Committee's opening brief. For those reasons and the reasons discussed below, all of his arguments are wrong.

### 1.   The Request Does Not Burden The Office Of The President

Mr. Trump has not plausibly alleged that compliance with the request would burden the Presidency. He maintains (at 26) that Congress could use the threat of a post-Presidency request for tax information "to influence Presidents' conduct while in office" and thereby obtain an "'institutional advantage' over its chief political rival." But as the Committee has already explained (at 36), such risk is at best "remote," *Mazars*, 2021 WL 3602683, at *13, and is further diminished by the facts that (as just noted) Mr. Trump has not alleged that such effects have come to pass and that every prior elected President since President Nixon voluntarily released his returns, showing that the disclosure of tax returns is not ordinarily threatening to the President's ability to perform his constitutional duties.[8] Mr. Trump's rank speculation (at 39) that Congress could threaten to disclose tax returns from additional years from before a President was in Office or threaten to disclose an open audit file contradicts the presumption of good faith due to Congress. And, in any event, that hypothetical risk is disconnected from *this* request. Moreover, it is implausible that the Committee made its request to burden a President (Biden) whose

---

[8] Contrary to Mr. Trump's statement (at 27 n.2), Gerald Ford was never "elected to be Vice President." Gerald R. Ford Presidential Library & Museum, *Timeline of President Ford's Life and Career* (Jan. 11, 2011), https://www.fordlibrarymuseum.gov/grf/timeline.asp.

administration seeks to *comply* with the request.

Mr. Trump's protestation (at 37) that the request is burdensome "given the sheer amount of sensitive information that the Committee is requesting and promising to expose" is also meritless given the narrowly tailored nature of the request.  *See* MTD 39-41.[9]

Finally, Mr. Trump complains (at 36) that in assessing the burden on the Presidency, the Committee impermissibly zeroes out the Executive interest.  Not so.  The Committee's proposal to apply the *Nixon v. GSA* test recognizes that requests for a former President's personal information could potentially infringe on the Executive Branch's interests.  The flaw here is that Mr. Trump's identified interests are exceptionally weak.

### 2.   The Committee's Legislative And Oversight Purposes Warrant Seeking Mr. Trump's Tax Information

Mr. Trump puts forward various arguments contending that the Committee's legislative and oversight purposes do not warrant seeking his information.  None is persuasive.

Mr. Trump protests (at 46-47) that the Committee's request is unwarranted because the Committee could rely "on the existing record, without specific tax information, or … other sources," such as through review of the Manual, conversations with IRS officials, and consultation with experts.   The Committee has already plumbed (at 7) these alternative sources. It has thoroughly examined the Manual, but the Manual does not address the many aspects of the audit process that are left to the auditor's discretion or identify which of its provisions are still applied.  The Committee has also met with IRS officials, but those conversations did not even come close to filling in the gaps in the Committee's understanding.  *See* Vaughan Decl. ¶¶ 44-48, 55, Ex. N, Dkt. 44-3; Supp. Vaughan Decl. ¶¶ 7-13, Exs. C & D, Dkt. 47.  More fundamentally, asking the IRS about its processes could never be an adequate substitute for reviewing Mr.

---

[9] The Committee has not "promis[ed] to expose" such information.  Opp. 37.

Trump's tax returns and audit files to see whether the IRS audited his returns adequately and independently.  As the Committee explained (at 5-6), the IRS may be institutionally incentivized to incorrectly defend an audit as adequate, as happened with President Nixon.  To counteract this potential institutional bias, the Committee needs an objective paper record to form an independent judgment.  Mr. Trump's contention (at 47) that improper influence would not be apparent from an audit file is speculative as to both what the Committee seeks and what an audit file would show.  Finally, the Committee previously consulted with experts, who *confirmed* that the Committee needed to examine the requested documents to determine whether adequate safeguards were in place.  *See* MTD 8, 42-43; *Hearing on Taxpayer Fairness*, 116th Cong. (Oct. 13, 2020).[10]

### 3. The Committee Has Amply Justified Its Significant Need For The Requested Information

Despite Mr. Trump's strained arguments to the contrary, the Committee has thoroughly substantiated its need for precisely the information sought.

Mr. Trump's repeated criticism (at 39, 44-46) of the "vague" and "loosely worded" description of the request and the potential legislation reflects a mistaken view of when a Congressional information request is appropriate, and would create a Catch-22 for Congress.  If the Committee knew whether and how the IRS audited Mr. Trump during his Presidency, it likely would not need the requested documents.  The Committee cannot be faulted for not knowing how nonpublic audits have been performed.  And if the Committee had a fully developed legislative proposal, the request might be deemed unnecessary on that basis, as (wrongly) happened in *Mazars*.  2021 WL 3602683, at *17 (because the House had already "craft[ed] enhanced financial disclosure legislation, the legislative objectives the Committee

---

[10] https://waysandmeans.house.gov/legislation/hearings/taxpayer-fairness.

identifies … present only a limited need for President Trump's financial records"). At bottom, Mr. Trump disregards the obvious: that the Committee *suspects* there is a need for Congressional action, but requires additional information to determine whether and how Congress should act. *See Mazars*, 940 F.3d at 730-731 ("Congress's … preferred path forward may shift as members educate themselves on the relevant facts and circumstances.").

Finally, Mr. Trump contends (at 41, 49) that it is irrational for Congress to "craft laws that will apply to all future officials by focusing on a singularly unrepresentative official," and that Congress would be better served by reviewing the tax information of non-Presidents. The Committee has already explained (at 41-43) that it seeks Mr. Trump's information because of the unprecedented and substantial challenges he posed to the IRS's ability to audit a President's tax returns and the risks of conflicts of interest his Presidency presented. Although he appears to be an outlier today, there could be future Presidents with a similarly complex tax profile, with similarly risky international business operations, or with a similar hostility toward the IRS. If existing safeguards are inadequate yet such inadequacy cannot be discovered and remedied by Congress, such a future President could exploit those weaknesses, to the country's detriment.[11]

### 4. The Request Is Not Overly Broad

The Committee has already explained how its request is properly tailored and why it is necessary for the Committee to review tax returns from before Mr. Trump was President.[12]

---

[11] Besides Mr. Trump, the 2020 Presidential race included two billionaire candidates and ten multi-millionaire candidates. Alexander et al., *The Net Worth Of Every 2020 Presidential Candidate*, Forbes (Aug. 14, 2019), https://www.forbes.com/sites/danalexander/2019/08/14/heres-the-net-worth-of-every-2020-presidential-candidate/?sh=672f19d237c5.

[12] Mr. Trump is incorrect (at 49-50) in claiming that the Committee has its "dates" wrong when it says the request covered his four years as President and the two preceding years. The request seeks tax returns for 2015-2020. 2021 Request at 6. He became President in January 2017, *see* U.S. Const. Amend. XX, and therefore, the Committee presumes that tax returns for

MTD 39-41.  Only one additional point is needed here.

Mr. Trump errs in arguing (at 50-51) that the request cannot be complied with because, under *Mazars*, the Committee has not "guarantee[d] Intervenors protection from public disclosure."  Such disclosure would already be prohibited except as provided in Section 6103(f) and Rules of the Committee and the House.  Moreover, *Mazars* does *not* require that the requested material be kept confidential.  *See* 140 S. Ct. at 2033.

## IV.   SECTION 6103(f)(1) IS CONSTITUTIONAL

Perhaps recognizing that the Committee's request is constitutionally valid, Mr. Trump refocuses his case on the statute, arguing (at 19-20) that Section 6103(f)(1) is unconstitutional because it does not expressly condition mandatory disclosure on the presence of a legitimate Congressional purpose.  This argument "fail[s] to shoulder [Mr. Trump's] heavy burden to demonstrate that [section 6103(f)(1)] is 'facially' unconstitutional," which requires that he "establish that no set of circumstances exists under which the Act would be valid."  *United States v. Salerno*, 481 U.S. 739, 745 (1987).  Here, Treasury's furnishing of tax information to the Committee is valid whenever the Committee has a legitimate legislative purpose, so Section 6103(f)(1) cannot be facially unconstitutional.

Contrary to Mr. Trump's contention (at 21), *Salerno* provides the test for facial challenges.  Just last Term, the Supreme Court explained that outside the First Amendment context, "a plaintiff bringing a facial challenge must 'establish that no set of circumstances exists under which the [law] would be valid,' or show that the law lacks 'a plainly legitimate sweep.'" *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021) (quoting *Salerno*, 481 U.S. at 745, and *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442,

---

tax years 2016-2019 were filed while Mr. Trump was in office and would be part of the mandatory audit program.

449 (2008)).  Despite what Mr. Trump argues, *City of Los Angeles v. Patel* reaffirmed *Salerno*'s

test, while simply clarifying that it addresses "only applications of the statute in which it actually

authorizes or prohibits conduct," 576 U.S. 409, 417-418 (2015)—which means only instances

where the Committee actually invokes Section 6103(f)(1), as opposed to some other means of

obtaining information.  And *Johnson v. United States* did not purport to overrule *Salerno*, which

the majority did not even cite, but explained the application of facial challenges in the vagueness

context, 576 U.S. 591, 602-603 (2015)—which is irrelevant here.

      Even if Mr. Trump were correct that this Court should only "measure the statute's text

against the applicable substantive constitutional doctrine," Opp. 21 (quotation cleaned), his

argument would still fail."  Although Section 6103(f) does not explicitly require proof of a valid

legislative purpose, the requirement, as both Congress and the Executive Branch acknowledge,

2021 OLC Op. at 18; 2019 OLC Op. at 16, exists implicitly and is consistent with the well-

established presumption that Congress acts consistent with its constitutional powers.

      Citing cases invalidating statutes under the Commerce Clause for lacking an "express

jurisdictional element," Mr. Trump argues that the constitutional constraint must be express in

the statute.  Opp. 21-23 (citing *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v.

Morrison*, 529 U.S. 598 (2000)).  But the constitutional standards governing laws regulating

large swaths of private conduct are understandably different from those governing a law

directing the Executive Branch to comply with a Congressional request that is presumptively

within its Article I authority.  *See McGrain*, 273 U.S. at 178.  Mr. Trump identifies no instance

where a court struck down a statutory directive to an administrative agency because the statute

failed to make clear that any future action taken under the statute must not be done if it would

exceed Congress's authority to require.  Notably, the contempt-of-Congress statute does not

expressly require recitation of a legitimate Congressional purpose, *see* 2 U.S.C. § 192, yet the Supreme Court has never questioned its validity on that ground, *see Barenblatt*, 360 U.S. at 134. On the contrary, the Court has declared that "an express avowal of the object" of a subpoena is "not indispensable" to convict for contempt. *McGrain*, 273 U.S. at 178.

Moreover, implying the requirement of a legitimate Congressional purpose accords with the cardinal rule of statutory construction that "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality," *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988), as long as the construction is "not plainly contrary to the intent of Congress," *Miller v. French*, 530 U.S. 327, 341 (2000) (citation omitted); *see also Gundy v. United States*, 139 S. Ct. 2116, 2126 (2019).[13] "This approach … recognizes that Congress … is bound by and swears an oath to uphold the Constitution." *DeBartolo Corp.*, 485 U.S. at 575.

## CONCLUSION

The Court should expeditiously grant the Committee's motion to dismiss.

---

[13] Thus, *United States v. Booker*, does not support Mr. Trump's argument because there, the express statutory text (mandatory) was directly contrary to the constitutional requirement (advisory).  543 U.S. 220, 233, 250 (2005), *cited in* Opp. 22-23.

November 2, 2021

Respectfully submitted,

/s/ Douglas N. Letter

SETH P. WAXMAN (D.C. Bar No. 257337)
KELLY P. DUNBAR (D.C. Bar No. 500038)
DAVID M. LEHN (D.C. Bar No. 496847)
ANDRES C. SALINAS (D.C. Bar No. 156118)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 663-6000
seth.waxman@wilmerhale.com

KATHERINE V. KELSH (*pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

DOUGLAS N. LETTER (D.C. Bar No. 253492)
   *General Counsel*
TODD B. TATELMAN (VA Bar No. 66008)
ERIC R. COLUMBUS (D.C. Bar No. 487736)
STACIE M. FAHSEL (D.C. Bar. No. 1034314)
OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, DC  20515
(202) 225-9700
douglas.letter@mail.house.gov

*Counsel for Plaintiff–Counterdefendant
Committee on Ways and Means, United States
House of Representatives*