**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| COMMITTEE ON WAYS & MEANS, UNITED STATES HOUSE OF REPRESENTATIVES, <br><br> *Plaintiff-Counterdefendant*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF THE TREASURY, *et. al.*, <br><br> *Defendants-Crossdefendants*, <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br> *Intervenor-Defendants-Counterclaimants-Crossclaimants*. | No. 1:19-cv-1974 (TNM) |

**REPLY IN SUPPORT OF CROSS-DEFENDANTS' MOTION TO
DISMISS INTERVENOR-DEFENDANTS' AMENDED CROSS-CLAIMS**

Date:  November 4, 2021

BRIAN D. NETTER
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director

ELIZABETH J. SHAPIRO
Deputy Director

JAMES J. GILLIGAN
SERENA M. ORLOFF
CRISTEN C. HANDLEY
JULIA A HEIMAN
Attorneys

U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C.  20044
Telephone: (202) 514-3358
E-mail:      james.gilligan@usdoj.gov

*Counsel for Defendants-Crossdefendants*

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................1

I.  THE COMMITTEE'S 2021 REQUEST IS A VALID EXERCISE OF CONGRESS'S
    POWER OF INQUIRY. ............................................................................................1

  A.  The Trump Parties Fail To State a Claim of Improper Legislative Purpose...................1

    1.  The Committee's stated legislative purposes of the 2021 Request are valid...........1

    2.  The Trump parties' claim that the purpose of the 2021 Request is "exposure
        for exposure's sake" fails as a matter of law ..................................................2

    3.  The Trump parties' counter-arguments lack merit. ....................................................3

    4.  The purpose of the 2021 Request is not law enforcement......................................8

  B.  The Committee's 2021 Request Is Reasonably Related to Subjects on Which Valid
      Legislation Could Be Had...............................................................................................9

  C.  The 2021 Request Does Not Offend *Mazars.* ...........................................................11

    1.  The *Mazars* standard is inapplicable...........................................................................11

      a.  The reasoning of *Mazars* centered around then-President Trump's
          status as sitting President...................................................................................11

      b.   Mr. Trump is not "effectively" a sitting President........................................15

    2.  The Committee's 2021 Request passes muster under the *Mazars* rubric..............16

II. THE TRUMP PARTIES' ADDITIONAL CLAIMS FAIL AS A MATTER OF LAW.........20

  A.  The Court Should Reject the Trump Parties' Challenge to Section 6103(f)..................20

  B.  The Trump Parties' First Amendment Claim Fails as a Matter of Law..........................22

  C.  The Trump Parties' Remaining Constitutional Claims Also Fail.....................................24

CONCLUSION....................................................................................................................25

i

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Ams. for Prosperity Found. v. Bonta,*
  141 S. Ct. 2373 (2021)..................................................................................................20

*\*Barenblatt v. United States,*
  360 U.S. 109 (1959)...................................................................................................*passim*

*Bauchman ex rel. Bauchman v. W. High Sch.,*
  132 F.3d 542 (10th Cir. 1997).........................................................................................4

*Bond v. United States,*
  131 S. Ct. 2355 (2011)..................................................................................................24

*Bowsher v. Synar,*
  478 U.S. 714 (1986)......................................................................................................24

*Clinton v. Jones,*
  520 U.S. 681 (1997).................................................................................................14, 15

*Crawford-el v. Britton,*
  523 U.S. 574 (1998)......................................................................................................23

*D.C. Federation of Civic Associates v. Volpe,*
  459 F.2d 1231 (D.C. Cir. 1971).......................................................................................25

*Dellums v. Powell,*
  561 F.2d 242 (D.C. Cir. 1977) .......................................................................................12

*Dep't of Commerce v. New York,*
  139 S. Ct. 2551 (2019)....................................................................................................4

*Delbrück v. Borders,*
  2016 WL 7157557 (M.D. Fla. Dec. 8, 2016)....................................................................6

*Doe v. McMillan,*
  566 F.2d 713 (D.C. Cir. 1977) .......................................................................................7

*\*Eastland v. U.S. Servicemen's Fund,*
  421 U.S. 491 (1975)...................................................................................................*passim*

*Gordon v. Holder,*
  721 F.3d 638 (D.C. Cir. 2013).......................................................................................21

*Hartman v. Moore,*
  547 U.S. 250 (2006)......................................................................................................23

*Hentoff v. Ichord,*
  318 F. Supp. 1175..........................................................................................................7

PAGE(S)

*Hodge v. Talkin,*
    799 F.3d 1145 (D.C. Cir. 2015) .................................................................. 20, 22

*Hutcheson v. United States,*
    369 U.S. 599 (1962) ........................................................................................... 7

*In re Sealed Case,*
    936 F.3d 582 (D.C. Cir. 2019) .......................................................................... 21

*Jewish War Veterans of USA, Inc. v. Gates,*
    506 F. Supp. 2d 30 (D.D.C. 2007) ............................................................. 3, 4, 5

*Johnson v. United States,*
    576 U.S. 591 (2015) ......................................................................................... 21

*Koniag Inc. Vill. of Uyak v. Andrus,*
    580 F.2d 601 (D.C. Cir. 1978) .......................................................................... 25

*McGrain v. Daugherty,*
    273 U.S. 135 (1927) .................................................................................... 5, 8, 9

*McLaughlin v. Mont. State Legislature,*
    493 P.3d 980 (Mont. 2021) ............................................................................... 13

*Morrison v. Olson,*
    487 U.S. 654 (1988) ........................................................................................... 5

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,*
    429 U.S. 274 (1977) ......................................................................................... 23

*Nebraska v. EPA,*
    331 F.3d 995 (D.C. Cir. 2003) .......................................................................... 21

*Nixon v. Admin. of Gene. Servs.,*
    433 U.S. 425 (1977) ............................................................................. 11, 13, 14

*Pillbury Co. v. Fed. Trade Comm'n ,*
    354 F.2d 952 (1966) ......................................................................................... 25

*Rancho Viejo, LLC v. Norton,*
    323 F.3d 1062 (D.C. Cir. 2003) .................................................................. 21, 22

*Salerno v. United States,*
    481 U.S. 739 (1987) .................................................................................... 20, 21

*Seila Law, LLC v. Consumer Financial Protection Bureau,*
    140 S. Ct. 2183 (2020) ..................................................................................... 10

*Senate Select Committee on Presidential Campaign Activities v. Nixon,*
    498 F.2d 725 (D.C. Cir. 1974) ..................................................................... 9, 13

PAGE(S)

*Shelton v. United States,*
    404 F.2d 1292 (D.C. Cir. 1968) ................................................................................6

*Sinclair v. United States,*
    279 U.S. 263 (1929) ................................................................................................8

*Tenney v. Brandlove,*
    341 U.S. 367 (1981) ..........................................................................................6, 24

*Trump v. Committee on Ways and Means,*
    415 F. Supp. 3d 38 (D.D.C. 2019) ......................................................................4, 8

*Trump v. Deutshe Bank AG,*
    943 F.3d 627 (2d Cir. 2020) ..................................................................................5

*\*Trump v. Mazars USA, LLP,*
    940 F.3d 710 (D.C. Cir. 2019) .......................................................................passim

*\*Trump v. Mazars USA, LLP,*
    2021 WL 3602683 (D.D.C. Aug. 11, 2021) ....................................................passim

*\*Trump v. Mazars USA, LLP,*
    140 S. Ct. 2019 (2020) ...................................................................................passim

*United States v. Icardi,*
    140 F. Supp. 383 (D.D.C. 1959) ...........................................................................6

*U.S. Term Limits, Inc. v. Thornton,*
    514 U.S. 779 (1995) ..............................................................................................11

*United States v. Booker,*
    543 U.S. 220 (2005) ..............................................................................................22

*United States v. Cross,*
    170 F. Supp. 303 (D.D.C. 1959) ...........................................................................7

*United States v. Icardi,*
    170 F. Supp. 383 (D.D.C. 1956) ...........................................................................6

*United States v. Lopez,*
    514 U.S. 549 (1995) ..............................................................................................21

*United States v. Morrison,*
    529 U.S. 598 (2000) ..............................................................................................21

*United States v. Moore,*
    41 F.3d 370 (8th Cir. 1994) ..................................................................................25

*United States v. Nixon,*
    418 U.S. 683 (1974) ..............................................................................................13

**PAGE(S)**

*United States v. Poindexter,*
727 F. Supp. 1501 (D.D.C. 2015) ........................................................................................14

*United States v. Rumely,*
345 U.S. 41 (1953) ...............................................................................................................15

*Ware v. U.S. Fed. Highway Admin.,*
2005 WL 2416667 (S.D. Tex. Sept. 30, 2005) .......................................................................6

*Wash. State Grange v. Wash. State Republican Party,*
552 U.S. 442 (2008) ................................................................................................20, 21, 22

*\*Watkins v. United States,*
354 U.S. 178 (1957) ....................................................................................................*passim*

*Wilkinson v. United States,*
365 U.S. 399 (1961) ........................................................................................................7, 23

## INTRODUCTION

The Trump parties[1] misperceive the Court's role in this matter.  The Court is not sitting here as a trier of fact to pass judgment on the individual intentions of the Ways and Means Committee's more than two dozen Democratic members, or of "Democrats" writ large, concerning the Trump parties' tax information.  So long as that information is pertinent to a subject on which Congress is empowered by the Constitution to legislate, and the Committee is authorized to request it, a federal court may not disturb the Committee's conduct of its business based on the alleged improper motives, purposes, or intentions of individual members.  The Trump parties' arguments to the contrary run headlong into decades of unbroken Supreme Court precedent, and have been rejected in every case where they have been raised, at all levels of the Federal Judiciary.  They should be rejected here, too.

Also misplaced is the Trump parties' reliance on *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020).  Under a *Mazars III* analysis acknowledging that Mr. Trump is no longer the President, the Committee's request presents no overriding separation-of-powers concerns.  The Trump parties' facial challenge to the constitutionality of section 6103(f) is foreclosed by a slew of Supreme Court and D.C. Circuit precedent that they do not acknowledge in their opposition, which also fails to rehabilitate their First Amendment, separation-of-powers, or Due Process claims.  The Trump parties' cross-claims should be dismissed.

## ARGUMENT

## I.  THE COMMITTEE'S 2021 REQUEST IS A VALID EXERCISE OF CONGRESS'S POWER OF INQUIRY.

### A.  The Trump Parties Fail To State a Claim of Improper Legislative Purpose.

#### 1.  The Committee's stated legislative purposes of the 2021 Request are valid.

A congressional committee's inquiry is valid "if it is 'related to, and in furtherance of, a legitimate task of the Congress.'"  *Mazars III*, 140 S. Ct. at 2031-32 (quoting *Watkins v. United States*, 354 U.S. 178, 187 (1957)).  The question, in essence, is whether the committee, acting in pursuit of

---

[1] Specialized terms used but not otherwise defined herein shall have the same meanings as in the Memorandum of Points and Authorities in Support of Cross-Defendants' Motion to Dismiss Intervenor-Defendants' Amended Cross-Claims (ECF No. 135-1) ("Defs.' Mem.").  Intervenors' Combined Opposition to the Motions to Dismiss (ECF No. 140) is cited herein as "Cross-Pls.' Opp."

its inquiry, is acting "in pursuance of,"—that is to say, exercising—Congress's constitutional power." *Barenblatt v. United States*, 360 U.S. 109, 132 (1959). The Committee's 2021 Request explains that it is "considering legislative proposals" related to U.S. tax laws, and that its inquiry includes "the extent to which the IRS audits and enforces [those] laws against a President," because of concern that the Presidential Audit Program may not adequately ensure the "full and fair administration of the tax laws with respect to a President." 2021 Request at 1-2. The Committee explained that these concerns are particularly acute in the case of President Trump, whose control over hundreds of businesses, inordinately large and complicated returns, and criticisms of his treatment by the IRS, raise questions about the extent to which the IRS can and does substantiate information in presidential returns so complex, without improper interference. *Id.* at 2, 4-6. The Committee also seeks to investigate unknown "business entanglements," "conflicts of interest," and "foreign financial influences" that may have affected the former President's performance of his duties in office. *Id.* at 4.

These are all matters "[o]n which [Congress] may potentially legislate," and inquire. *Barenblatt*, 360 U.S. at 111; *see* Defs.' Mem. at 16-19. The 2021 Request thus serves a valid legislative purpose.

### 2. The Trump parties' claim that the purpose of the 2021 Request is "exposure for the sake of exposure" fails as a matter of law.

Repeating arguments they have raised in multiple fora, but which "no court has accepted," *Trump Mazars*, 2021 WL 3602683, at *9 (D.D.C. Aug. 11, 2021), *appeal filed*, Nos. 21-5176 & 21-5177 (D.C. Cir. Aug. 16, 2021), the Trump parties insist that the principal objective of the Committee's request is to publicly expose their tax information for political gain, and that the Committee's stated purposes are mere pretext. Cross-Pls.' Opp. at 51, 56. They would have the Court so conclude by reference to alleged public statements by various Democratic Committee members and other Democratic elected officials, scattered over a period of nearly five years. *Id.* at 58-64.

It is that proposal, not the Committee's request, that is legally impermissible under the Supreme Court's precedents. *See* Defs.' Mem. at 20-22. Rather, the rule, as stated in *Barenblatt*—involving a conviction for contempt of Congress—is that "[s]o long as Congress acts in pursuance of its constitutional power, *the Judiciary lacks authority* to intervene on the basis of the motives which

spurred the exercise of that power."  360 U.S. at 132 (emphasis added) (rejecting the petitioner's contention that "the true objective of the Committee . . . was purely exposure").  For example, the petitioner in *Watkins*, also convicted for contempt of Congress, argued that the "sole purpose" of his interrogation by the committee was to "bring down upon himself and others the violence of public reaction because of their past beliefs, expressions[,] and associations."  354 U.S. at 199.  Despite "an impressive array of evidence" found in the committee's own official reports that "[e]xposure" of Communist organizations and their members "in a systematic way" was its "real purpose," *id.* at 199 & n.32, the Supreme Court refused to accept the proposition that an investigation instituted by a House of Congress could be "vitiate[d]" by "testing the motives of committee members" so long as "that assembly's legislative purpose is being served," *id.* at 200.  *See also Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 508 (1975) ("Our cases make clear that in determining the legitimacy of a congressional [inquiry] [courts] do not look to the motives alleged to have prompted it."); *Trump v. Mazars USA, LLP*, 940 F.3d 710, 724-25 (D.C. Cir. 2019).

Contrary to the Trump parties' remark that *Mazars III* "blessed" the sort of challenge they seek to mount here, Cross-Pls.' Opp. at 51, *Mazars III* reinforces the principles on which the decisions in *Barenblatt*, *Watkins*, and *Eastland* are all based.  The Supreme Court appreciated that the separation-of-powers dispute before it had arisen from "a clash between rival branches of government over records of intense political interest[.]"  *Mazars III*, 140 S. Ct. at 2034.  Yet far from licensing an inquiry into the motives of the legislators who supported the subpoenas at issue, the Supreme Court instructed the lower courts on remand to resolve the matter by balancing the importance of the President's personal papers to Congress's "*asserted* legislative purpose," and the evidence "offered by Congress" that the President's information "advances [that] purpose," against the burdens of compliance with the Committee's subpoenas on the Presidency.  *Id.* at 2035-36 (emphasis added).  The inquiry directed by the Court did not include scrutinizing the subjective intentions of individual legislators.

### 3.  The Trump parties' counter-arguments lack merit.

The Trump parties' response is threefold, and in each respect unavailing.  First, confronted by the precedent foreclosing inquiries into the motives of individual legislators, the Trump parties insist

that they may use fragments of legislators' statements plucked from the larger public record of the last five years to show the Committee's true "purpose." Cross-Pls.' Opp. at 52. But these labels have no legal import here; by whatever name, evidence of legislators' intentions is irrelevant.

Indeed, the pertinent Supreme Court precedents use "purpose" and "motive" interchangeably. In *Watkins*, as noted, the petitioner argued there was no "public *purpose* . . . in his interrogation," and that the "sole *purpose* of the inquiry" was exposure. 354 U.S. at 199 (emphasis added). The Supreme Court responded that the solution to the constitutional difficulties presented by Watkins's case could not "be found in testing the *motives* of committee members[.]" 354 U.S. at 200 (emphasis added); *see also Mazars IV*, 2021 WL 3602683, at *10 (quoting same). Likewise in *Eastland*, when presented with the argument that the "sole *purpose* of the [committee's] investigation" "[wa]s to force public disclosure of [unpopular] beliefs," the Supreme Court declined to "look to the *motives* alleged to have prompted the investigation." 421 U.S. at 508 (emphasis added). And in *Barenblatt*, the Court rejected arguments that the committee had no "legislative *purpose*," and that its "*objective* was purely exposure," holding that "the Judiciary lacks authority to intervene on the basis of [legislators'] *motives*," "[s]o long as Congress acts in pursuance of its constitutional power." 360 U.S. at 132 (emphasis added). It makes sense that the Supreme Court would draw no distinction between "motive" and "purpose" in this context, because the gravamen of the inquiry is *whether* a committee is exercising Congress's power of inquiry regarding matters on which it may legislate, not *why* individual legislators chose to do so.

Thus, the Trump parties' effort to draw a lucid distinction between "motive" and "purpose," Cross-Pls.' Opp. at 52, is beside the point, and fruitless. In *Jewish War Veterans of USA, Inc. v. Gates*, 506 F. Supp. 2d 30, 60 (D.D.C. 2007), the court observed that any distinction between these two terms "is a fine one that may disappear in practice," as it does in this context. *See supra* at 2-3. Judge Mehta observed in *Mazars IV* that any distinction between "purpose" and "motive" is "ill-defined at best," and refused to rely on the supposed difference to question the legitimacy of the committee's inquiry in that case. 2021 WL 3602683, at *10. Similarly, the Second Circuit in *Trump v. Deutsche Bank AG* observed that any distinction between "purpose" and "motive" "becomes somewhat blurred" in this context, and—like the D.C. Circuit in *Mazars II*, *see* 940 F.3d at 724-25—refused to delve into

4

proffered evidence intended to demonstrate the "purposes" of individual legislators who authorized the subpoenas there.  943 F.3d 627, 664 & n.70 (2d Cir. 2019), *vacated and remanded sub nom. Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020).  Whether described as "purpose" or "motive," or both, *see Barenblatt*, 360 U.S. at 132, controlling precedent makes plain that such evidence purporting to show individuals' intentions can play no role in evaluating whether a committee is exerting Congress's power of inquiry on a subject authorized by the Constitution.[2]

Second, despite nearly a century of Supreme Court precedent requiring courts to presume that a committee investigation is intended "to aid [the committee] in legislating," *McGrain v. Daugherty*, 273 U.S. 135, 178 (1927); *see also Watkins*, 354 U.S. at 204, the Trump parties urge the Court to conclude that no such deference applies here, at least not at the pleading stage.  *See* Cross-Pls.' Opp. at 55.  But the separation-of-powers concerns identified in *Mazars*, upon which the Trump parties rely, do not overcome that presumption here.  That is so because the Committee seeks the tax information not of a sitting President, as in *Mazars*, but of a former President.  *See Mazars IV*, 2021 WL 3602683, at *13.  Because former President Trump has left office, he no longer "composes a branch of government," such that a congressional request for his tax information necessarily "implicate[s] the relationship between the branches."  *See Mazars III*, 140 S. Ct. at 2034.  Indeed, unlike the situation in *Mazars III*, here the "two coordinate branches of government" before the Court *agree* that Treasury is required to comply with the Committee's request.[3]  *See Mazars II*, 940 F.3d at 725.  In any event, as noted *supra* at 3, *Mazars III* does not suggest that a court may probe the intentions of individual committee members, even where the personal records of a sitting President are sought.  140 S. Ct. at 2035-36.

---

[2] The Trump parties' reliance on *Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019), Cross-Pls.' Opp. at 52, is misplaced.  That case turned on principles of review of agency action, 139 S. Ct. at 2573, which play no role here, and the case did not address the difference, if any, between "motive" and "purpose."  *Trump v. Committee on Ways and Means*, 415 F. Supp. 3d 38 (D.D.C. 2019), recognized that the inquiry regarding legislative purpose is a "narrow" one—"whether the investigative activity concerns matters on which legislation could be had," *id.* at 47 (quotation omitted; cleaned up).

[3] For the same reason, the Trump parties' citation to Justice Scalia's dissent in *Morrison v. Olson* is misplaced.  *See* Cross-Pls.' Opp. at 55 (citing *Morrison v. Olson*, 487 U.S. 654, 704-05 (1988) (Scalia, J., dissenting)).  There, Justice Scalia concluded that a presumption of constitutionality does not apply when "the issue pertains to separation of powers, and the political branches are . . . in disagreement."  487 U.S. 654, 704-05 (Scalia, J., dissenting).  The political branches are not in disagreement here.

The Trump parties are also incorrect that the presumption of a legislative purpose does not apply at the pleading stage. *See* Cross-Pls.' Opp. at 55-56. Indeed, the argument is misguided in its inception. The presumption is not a rule about allocating litigants' burdens of proof, as the Trump parties suggest, but is a rule of law that arises from the deference owed to Congress as a coordinate branch of government. *Watkins*, 354 U.S. at 204. Thus, as the Committee points out, the Supreme Court has applied the presumption on motions to dismiss to resolve questions of legislative purpose. *See* Counter-Defs.' Reply at 2 (citing *Eastland*, 421 U.S. at 494; and *Tenney v. Brandlove*, 341 U.S. 367, 378 (1981)). Nor do the out-of-circuit decisions relied on by the Trump parties even arguably implicate the same congressional interests that are at stake in this case. *Ware v. U.S. Fed. Highway Admin.*, for instance, addressed the presumption of administrative regularity in a pro se challenge to a highway construction project. 2005 WL 2416667, at *5 (S.D. Tex. Sept. 30, 2005). *Dobruck v. Borders* involved an invasion of privacy claim against county law-enforcement officers. 2016 WL 7157557, at *1-2 (M.D. Fla. Dec. 8, 2016). Those cases did not involve a legal presumption that disposes of a claim on its face, as this case does, and provide no basis upon which to deny the "indulgence of legality [owed] to the actions of a coordinate branch of our Government." *Watkins*, 354 U.S. at 204.

Third, the Trump parties contend that, when assessing the purpose of a committee request, courts "do not limit themselves" to the statement of purpose in the request, Cross-Pls.' Opp. at 53, but engage in a "record-based review" that includes "all the evidence," *id.* at 56-57. Yet, in none of the cases they cite for this proposition did the court probe the intentions of individual legislators in the manner, prohibited by *Eastland*, *Barenblatt*, and *Watkins*, that they ask of this Court. Rather, the "record" on which these courts adjudged the purpose of a committee's inquiry was the official record of the committee's origin and activities, such as the resolution establishing the committee, its function, and powers; official committee correspondence; transcripts of committee proceedings; transcripts of witnesses' testimony; and committee reports. *See Shelton v. United States*, 404 F.2d 1292, 1296-98 (D.C. Cir. 1968); *United States v. Icardi*, 170 F. Supp. 383, 386-87 (D.D.C. 1956).[4]

---

[4] The court in *United States v. Icardi* also considered trial testimony by the committee chairman. 140 F. Supp. 383, 386, 388 (1956). *Icardi* was a perjury prosecution, in which the burden was placed on the Government to prove beyond a reasonable doubt that the questions answered by the defendant

Even in the rare cases where courts found that a committee's inquiry was not supported by a legitimate legislative purpose, they came to that conclusion based on a review of official committee records, such as committee reports and resolutions. *Hentoff v. Ichord*, 318 F. Supp. 1175, 1176, 1178, 1181-82 (D.D.C. 1970); *United States v. Cross*, 170 F. Supp. 303, 304-10 (D.D.C. 1959). Indeed, the scope of review undertaken in all the cases cited by the Trump parties is consistent with the limits of the "record" review observed by the Supreme Court. *See Hutcheson v. United States*, 369 U.S. 599, 614-18 (1962) (finding ample evidence of a valid legislative purpose in the "resolution which gave birth to [the] [c]ommittee," the testimony before it, the reports it issued, and its questioning of the petitioner, and no evidence in that "record" of a purpose to "expose" him); *Wilkinson v. United States*, 365 U.S. 399, 410-12 (1961) (relying on a committee resolution, the chairman's opening statement at the hearing, and the staff director's remarks, as sufficient evidence of a valid legislative purpose, while rejecting the petitioner's invitation to "speculate as to the motivations that may have prompted . . . individual [committee] members . . . to summon the petitioner").[5]

In short, no case cited by the Trump parties uses extraneous statements by individual legislators to find that a committee lacked a legitimate legislative purpose, or sought to compel information solely for the sake of exposure. The law is that courts "lack[ ] authority" to second-guess the legislative purpose of a facially valid committee inquiry based on the alleged motives, purposes, or intentions of individual legislators who supported it. *Barenblatt*, 360 U.S. at 132. The Trump parties' challenge to the legitimacy of the Committee's legislative purpose therefore must fail.[6]

---

had been posed by the committee in pursuit of a legitimate legislative purpose. *See id.* at 384, 386. Whether or not the circumstances of *Icardi* justified taking testimony from the committee chairman, no similar justification is presented here for the judicial inquiry that the Trump parties seek to launch.

[5] The Trump parties also cite *Doe v. McMillan*, 566 F.2d 713, 717 (D.C. Cir. 1977), Cross-Pls.' Opp. at 53, but that case has no bearing here. The matter on which the district court was directed to consider evidence there was not the subjective intentions of individual legislators, but the extent to which an allegedly libelous committee report had been publicly distributed. *Id.* at 716-17.

[6] The Trump parties also contend that "[e]ven considering the Committee's request in a vacuum, [they] have plausibly alleged an improper purpose." Cross-Pls.' Opp. at 61. In support, they point out that the Committee has not sought the tax information of other Presidents (so far as is publicly known); that it has not "asked the IRS" for the answers to its questions about the Presidential Audit Program; and that it has sought allegedly open audit files. *Id.* at 61-62. These are by now familiar complaints, that Defendants have already addressed, *see* Defs.' Mem. at 26-28, and address again below, *infra* §§ I.B, I.C.2, at 10, 18-19. They contribute nothing to sustain the Trump parties' claims.

### 4.  The purpose of the 2021 Request is not law enforcement.

The Trump parties fare no better with their secondary argument that the Committee's purpose is to conduct law enforcement.  Cross-Pls.' Opp. at 64-67.  As previously explained, "no court has accepted" this theory, *see* Defs.' Mem. at 15 (quoting *Mazars IV*, 2021 WL 3602683, at *9), and the D.C. Circuit and Supreme Court have rejected nearly identical arguments.  *See id.* at 23-24 (discussing *McGrain*, 273 U.S. at 177; *Sinclair*, 279 U.S. at 289; and *Mazars II*, 940 F.3d at 724, 728).

Notwithstanding these authorities, the Trump parties claim that "[t]he Court should be especially suspicious of an impermissible [law-enforcement] purpose here," *see* Cross-Pls.' Opp. at 65, because of the "intense political interest" in former President Trump's finances.  *See id.* at 66 (quoting *Mazars III*, 140 S. Ct. at 2034).  As the 2021 OLC opinion pointed out, however, if political interest alone could "disqualify a congressional request, the effect would be to deny Congress its authority to seek information—a result that is incompatible with the Constitution."  2021 OLC Op. at 26.  And, while the Trump parties continue to rely on cherry-picked, paraphrased public statements of Committee members, *see* Cross-Pls.' Opp. at 66, it bears repeating that a court cannot probe the subjective intentions of Committee members to assess legislative purpose.  "[T]hose motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served."  *See Mazars II*, 940 F.3d at 725 (quoting *Watkins*, 354 U.S. at 200); *see also Eastland*, 421 U.S. at 508 (similar).  Here, the Committee's legislative purpose is served for the reasons already explained, and that purpose is not transformed into a law-enforcement purpose merely because the investigation could uncover evidence of criminal activity.  *See Watkins*, 354 U.S. at 199.

The Trump parties next argue that the 2021 Request "has the hallmarks of executive or judicial power, rather than legislation."  Cross-Pls.' Opp. at 66.  These supposed "hallmarks" include a "laser-focus[ ]" on the information of just one person and an interest in reconstructing past events.  *See id.* As to the former, that argument is foreclosed by *McGrain*, where the Supreme Court rejected the lower court's conclusion that a congressional investigation improperly focused on the Attorney General.  *See* 273 U.S. at 151-52, 177.  The Court found that Congress had a legitimate need for the information because it would "materially aid[ ]" the actual subject of the investigation—"the functions of the

Department of Justice, the powers and duties of the Attorney General, and the duties of his assistants," all topics "on which legislation could be had." *Id.* at 177-78. Here too, for reasons the 2021 Request explains, the Trump parties' tax information will aid the Committee's inquiry into the application of the tax laws to Presidents. *See Mazars II*, 940 F.3d at 729 ("[A]n investigation may properly focus on one individual if that individual's conduct offers a valid point of departure for remedial legislation.").

The Committee is also not seeking "a precise reconstruction of past events" such that it is operating more like a grand jury than a legislative body, as in *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 732 (D.C. Cir. 1974). *See* Cross-Pls.' Opp. at 66. The materials it seeks are pertinent to its inquiry regarding the effectiveness of current tax laws and the potential need for new legislation. The Committee therefore is not "play[ing] junior IRS." *See id.* at 67. It is performing an oversight task concerning federal tax administration that it is constitutionally entitled to undertake. *See, e.g.*, *Scope of Congressional Oversight and Investigative Power With Respect to the Executive Branch*, 9 Op. O.L.C. 60, 60 (Mar. 22, 1985) ("It is beyond dispute that Congress may . . . obtain facts pertinent to possible legislation and . . . to evaluate the effectiveness of current laws.").

### B. The Committee's 2021 Request Is Reasonably Related to Subjects on Which Valid Legislation Could Be Had.

Defendants have shown that the Committee's request not only serves a legitimate legislative purpose, but also meets the dual requirement of (1) pertinence (that is, reasonable relevance) to a legislative inquiry (2) on a subject concerning which legislation may be had. Defs.' Mem. at 24-30. The Trump parties attempt, but fail, to show otherwise. *See* Cross-Pls.' Opp. at 67-73.

Regarding pertinence, Defendants explained in detail how the likely contents of audit files, considered in juxtaposition with the corresponding tax returns, can be expected to reveal the scope, depth, and objectivity of presidential examinations. Defs.' Mem. at 27-29. And because the purpose of an audit is to substantiate information reported on the face of a return through the collection of additional details and documentation, audit files may also reveal conflicts of interest, potentially affecting a President's performance of his or her duties, due to previously unknown business entanglements or foreign financial influences. *Id.* at 29. The Trump parties argue that tax returns—

alone—will not reveal information about the IRS's audit policies, and that open audit files will not tell the Committee how the IRS has audited Presidents in the past. Cross-Pls.' Opp. at 69. But they do not contest that the contents of audit files, even open files, when considered together with the returns under review, can reveal the extent to which IRS audit policies are followed in practice—particularly when documentation for several years' examinations is reviewed. Defs.' Mem. at 27-28. Likewise the Trump parties argue that tax returns—alone—will not reveal information concerning conflicts of interest, Cross-Pls.' Opp. at 68 (citing Am. Cross-Claim ¶¶ 27, 284), but do not contest the fact that returns and audit files, considered in tandem, can be expected to do so. Defs.' Mem. at 27-28

The Trump parties next contend that the 2021 Request does not concern a subject on which valid legislation could be had, because, they maintain, financial disclosure requirements and conflict-of-interest divestiture laws "that would regulate Presidents," and mandatory presidential audits, would violate the separation of powers. Cross-Pls.' Opp. at 69-73. This line of argument also fails.

First, quite simply, it ignores other patently constitutional legislation that Congress could adopt to ensure the rigor, objectivity, and independence of presidential audits. Defs.' Mem. at 25.

Second, the Trump parties fail to show that no legislation "*may* be had" even on the subject of presidential financial disclosures. *Mazars II*, 940 F.3d at 732 (quoting *Eastland*, 421 U.S. at 508). The D.C. Circuit in *Mazars* found no basis for concluding that financial disclosure laws would so interfere with the performance of a President's constitutionally assigned functions as to necessarily violate the separation of powers. 940 F.3d at 733-34. To the contrary, it found support for the constitutionality of presidential financial disclosure requirements in the Domestic Emoluments Clause, and in statutes, such as the Ethics in Government Act, and the STOCK Act, pertaining to Presidential finances, *id.* at 734-35.[7]

---

[7] The Trump parties contend that *Seila Law, LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183, 2207 (2020), rejected the "pragmatic, flexible approach" to separation-of-powers analysis that the Court of Appeals followed in reaching that conclusion, *see Mazars II*, 940 F.3d at 733-37 (citing, *inter alia, Nixon v. Admin. of Gen. Servs.*, 433 U.S. 425, 441-45 (1977)). Cross-Pls.' Opp. at 70. That is incorrect. *Seila Law* refused to accept pragmatism and flexibility as sufficient reasons to extend previously sanctioned restrictions on the President's Article II power to remove Executive Branch officials. 140 S. Ct. at 2191-92, 2211. But it did not overrule its prior precedents, or endorse the vision of a "complete division of authority between the three branches" rejected in *Nixon*, 433 U.S. at 443-44, and other precedents. Hence, the D.C. Circuit's analysis in *Mazars II* remains sound.

The Trump parties argue alternatively that presidential disclosure laws would violate the Qualifications Clause, which prohibits Congress and the States from directly or indirectly adding to the constitutionally prescribed qualifications for service in federal office. Cross-Pls.' Opp. at 70; *see U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 828-31 (1995). But the authorities they cite for this proposition all concerned additional qualifications that States attempted to impose on federal candidates before their names could appear on the ballot, "mak[ing] it significantly more difficult for [certain] candidate[s] to win the election." *Id.* at 831, 836. The Trump parties do not explain how financial disclosure rules applicable only to federal office *holders* would have that effect. "[L]aws requiring disclosure [after election to office] exclude precisely zero individuals from running for or serving as President[.]" *Mazars II*, 940 F.3d at 736-37. Because there is "no inherent constitutional flaw in laws requiring Presidents to publicly disclose certain financial information," they represent a subject on which legislation "may be had." *Id.* at 737 (quoting *Eastland*, 421 U.S. at 508).

Third, the Trump parties' contention that laws mandating audits of all sitting Presidents would impermissibly infringe on the Executive's exclusive authority and discretion to initiate law-enforcement proceedings against particular individuals, Cross-Pls.' Opp. at 71-73, takes issue with a proposal that Defendants have not made. Defendants explained, instead, that Congress could pass valid legislation establishing standards for the IRS to apply when deciding whether and how to conduct presidential audits. Defs.' Mem. at 25-26. The Trump parties make no argument to the contrary.

### C. The 2021 Request Does Not Offend *Mazars.*

#### 1. The *Mazars* standard is inapplicable.

##### a. The reasoning of *Mazars* centered around then-President Trump's status as a sitting President.

The Trump parties next err in contending that the "reasoning" of *Mazars* supports application of its four-factor analysis to this case because the case "implicate[s]" the separation of powers. Cross-Pls.' Opp. at 25. The *Mazars* Court did not rest its holding on the fact that separation-of-powers concerns were merely "implicate[d]" but instead on the "significant" and "weighty" degree to which those concerns were present. 140 S. Ct. at 2033, 2035. And, as discussed above, the Court's

separation-of-powers concerns revolved entirely around then-President Trump's status as a sitting President. The Court emphasized that the President "alone composes a branch of government," *id.* at 2034, and possesses an "*ongoing* institutional relationship" with Congress as an "'opposite and rival' political branch[ ]," *id.* at 2033-34 (emphasis added), so that subpoenas for his personal information "unavoidably pit the political branches against one another," *id.* at 2034; *see id.* at 2035.

The Court further reasoned that, "[w]ithout limits on its subpoena powers, Congress could 'exert an imperious controul' over the Executive Branch and aggrandize itself at the President's expense," *id.* at 2034, and perhaps most importantly, "a limitless subpoena power would transform the 'established practice' of the political branches" of resolving their informational disputes themselves because "[i]nstead of negotiating over information requests, Congress could simply walk away from the bargaining table and compel compliance in court." *Id.* at 2034. It was the threat of that latter outcome—Congress "walk[ing] away from the bargaining table"—that animated the Court's concern that its decision "not needlessly disturb 'the compromises and working arrangements'" that the political branches "themselves have reached" over the past two centuries. *Id.* at 2031, 2034.

The same is not true here. As discussed, President Trump is no longer the President and does not "alone" (or at all) compose a branch of government. *See Dellums v. Powell*, 561 F.2d 242, 247 (D.C. Cir. 1977) (holding that it was "of cardinal significance" in evaluating separation-of-powers concerns that a claim to avoid disclosure was "being urged solely by a former president" without support from the incumbent). For that reason, he has no "ongoing institutional relationship" with Congress, *Mazars II*, 140 S. Ct. at 2033, so that there is little concern about Congress exerting an "'imperious controul' over the Executive Branch" through a request for his tax information, *id.* at 2034. Relatedly, there is little concern here about Congress "walk[ing] away from the bargaining table," *id.* at 2031, because the Executive Branch does not dispute Congress's authority to request the information. *Cf. Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 441 (1977) (*Nixon v. GSA*) (finding it relevant to separation-of-powers violation urged by former President Nixon that "[n]either President Ford nor President Carter supports this claim"). Given the Branches' agreement, application of the *Mazars* test here would

"disturb"—rather than promote—the "working arrangements" of the elected branches.  *Mazars III*, 140 S. Ct. at 2031.[8]

The Trump parties' insistence on a categorical application of *Mazars* is, moreover, similar to an argument the Supreme Court rejected in *Mazars* itself.  Former President Trump and the Executive Branch there argued that the Court should adopt a categorical rule and apply the "demonstrated, specific need" and "demonstrably critical" standards articulated, respectively, in *United States v. Nixon*, 418 U.S. 683, 685 (1974) and *Senate Select Committee*, 498 F.2d at 731.  The Court "disagree[d] that these demanding standards apply here" and "decline[d] to transplant" those stringent standards—applicable to Oval Office communications over which a claim of executive privilege had been asserted—"root and branch to cases involving nonprivileged, private information," because "apply[ing] the same exacting standards to *all* subpoenas for the President's information, without recognizing distinctions between privileged and nonprivileged information, between official and personal information, or between various legislative objectives . . . would represent a significant departure from the longstanding way of doing business between the branches[.]"  *Mazars III*, 140 S. Ct. at 2032-33.  So too here, the Court should decline to transplant the *Mazars* standard "root and branch" to a case involving a request for tax information of a former President, pursuant to a statute that authorizes such a request, in the absence of any dispute between the political branches that the request is proper.  *Id.* at 2033.  Among other things, doing so would fail to recognize significant differences between a sitting and former President in evaluating separation-of-powers concerns.  *See Clinton v. Jones*, 520 U.S. 681, 694, 706 (1997) (in evaluating separation-of-powers issues, courts should apply "a functional approach," rather than a "categorical" one).

The Trump parties also are wrong to contend that the distinctions between the third-party subpoenas in *Mazars* and a statutory request to the Executive Branch are immaterial.  Cross-Pls.' Opp. at 29.  Where a committee acts pursuant to subpoena, it does so as a single committee on the authority of one House of Congress.  But where a committee acts pursuant to statute, it is invoking power that

_____

[8] For the same reason, the Trump parties' reliance on *McLaughlin v. Mont. State Legislature*, 493 P.3d 980, 988 (Mont. 2021), Cross-Pls.' Opp. at 25, is inapposite.  That case involved a dispute between two branches of government; this one does not.

both Houses of Congress, with the concurrence of the Executive Branch, have recognized is generally appropriate to the committee's legislative function. *See Nixon v. GSA*, 433 U.S. at 441 (rejecting separation-of-powers challenge urged by former President where "[t]he Executive Branch became a party to the Act's regulation when President Ford signed the Act into law, and the administration of President Carter . . . vigorously support[ed] . . . its constitutionality"). And in a hypothetical case in which the Executive Branch believed that a tax committee's request was of questionable validity, the Executive Branch could engage with the committee through the constitutional accommodation process in order to be sure the request complies with the statute and the Constitution.[9]

The Trump parties' remaining attempts to liken the instant case to *Mazars* likewise fail. They contend, for example, that "[g]iven the 'dignity and stature' of the office, requests for a former President's documents still invite a 'conflict between the branches.'" Cross-Pls.' Opp. at 26. But the case on which they rely, *United States v. Poindexter*, 727 F. Supp. 1501 (D.D.C. 2015), involved an actual conflict between the branches, because the case involved official presidential records, which were presumptively privileged, and the incumbent President in that case concurred that their disclosure would harm the interests of the Executive Branch. *See* 727 F. Supp. at 1503. Here, there are no official presidential records at issue, and the incumbent President—who represents the interests of the Executive Branch—has not objected to the records' disclosure.

The Trump parties' argument that absent *Mazars*-level protection, "Congress could 'declare open season' on a former President's personal papers" and "affect who could *be* President," Cross-Pls.' Opp. at 26, is similarly ill-founded. The concern that Congress would wish to declare "open

---

[9] The Trump parties contend that the Court should not defer to the Executive Branch's conclusions "[o]n the actual legality of the Committee's request" because "the Government has taken inconsistent positions" on that issue. Cross-Pls.' Opp. at 28. But the deference due here on the "actual legality" of the request is to the Committee, not to the Executive Branch. *See supra* at 5. On that issue, the 2019 and 2021 OLC Opinions differ only as to the deference owed by the *Executive Branch*, not by a court. *See* 2021 OLC Op. at 17 (disagreeing with the 2019 opinion's conclusion that the "same limitations [applicable to judicial review of a congressional inquiry] do not apply to the Executive Branch[.]"). As to the applicability of the *Mazars* standard, the analysis in the 2021 opinion was based, in large part, on the fact that President Trump has now departed office, which was not the case when the 2019 OLC Opinion issued. *See id.* at 19 (noting that "[t]his distinction greatly mitigates [*Mazars III*'s] concerns about Congress using its investigatory power to exert control over the President"). Further, deference or not, the 2021 OLC Opinion is indisputably relevant to whether there is a "clash" among the branches that would warrant heightened scrutiny of the request.

season" on a former President to assert imperial control over him "finds little support in either history or the relatively narrow compass of the issues raised in this particular case." *Jones*, 520 U.S. at 702. Defendants have explained why former President Trump's tax information is unique and why its disclosure in response to the request would not materially affect the ability of sitting Presidents—the majority of whom since the 1970s have voluntarily released their tax returns to the public—to perform their constitutional duties. *See* Defs.' Mem. at 34-35, 37-38.  It therefore "seems unlikely that a deluge of such [inquiries] will ever engulf" former Presidents in such a way as to affect the Presidency itself. *Jones*, 502 U.S. at 702.  As to the Trump parties' contention that this request will "affect who can be President," it is implausible.  A congressional inquiry—even if intrusive—does not plausibly prevent a candidate from running for office.  And even if a congressional inquiry might have political repercussions, that fact alone does not violate the separation of powers.  Indeed, in *Mazars III*, the Supreme Court reiterated that "[i]t is the proper duty of a representative body to look diligently into every affair of government and to talk much about what it sees[,]" 140 S. Ct. at 2033 (quoting *United States v. Rumely*, 345 U.S. 41, 43 (1953)), a power that necessarily implies political ramifications.  But for separation-of-powers purposes, what matters is whether Congress's activities encroach on or impair the powers of the Executive Branch.  *See Jones*, 520 U.S. at 701.  Here, they do not.

### b. Mr. Trump is not "effectively" a sitting President.

The Trump parties next contend that the Court must apply *Mazars* here because the Committee's request is "effectively" directed "to a *sitting* President."  Cross-Pls.' Opp. at 30.  It is not. The Trump parties reach this counterfactual conclusion by conflating the Committee's 2019 Request and its 2021 Request, *see id.* at 30-31, and stitching together snippets from the latter to create the appearance that it was a mere continuation of the former, *see id.* at 31.  But the 2021 Request makes plain that is not so.  Expressly stating a new, independent request, Chairman Neal wrote:  "as Chairman of the Committee and pursuant to the authority provided by Section 6103(f) of the Code, I request the following tax returns and return information for the tax years 2015 through 2020 . . . [enumerating categories of information requested]"  2021 Request at 6.  And while the Trump parties claim, without citation, that "the Committee has conceded[ ] that only one request was ever made here," Cross-Pls.'

Opp. at 31, the record shows just the opposite.  In the 2021 Request itself, and its submissions to the Court, the Committee has been clear that its two requests are distinct, and that the 2021 Request is currently operative.  *See, e.g.*, ECF No. 123 at 18; ECF No. 133 at 1; *id.* at 9-10.

Notably, in *Mazars IV*, Judge Mehta rejected an analogous effort by the Trump parties to conflate a subpoena issued after President Trump left office with one that had been issued during his term.  *See* 2021 WL 3602683, at *11 (D.D.C. Aug. 11, 2021).  Rejecting that approach, the Court observed that the later subpoena "was a new demand for records" that the Committee had separately served.  *Id.*  So, too, here.[10]  And having found that the later-issued subpoena was, in fact, a separate instrument, Judge Mehta quickly disposed of the Trump parties' arguments—also advanced here, *see* Cross-Pls.' Opp. at 31–32—that the subpoena at issue should be assessed as though directed at a sitting President because the duty to answer must be assessed "upon objection."  *Mazars IV*, 2021 WL 3602683, at *11–12.  Noting that this argument depended on treating the earlier issued subpoena as operative, Judge Mehta found that the Trump parties had objected to the actually operative, later-issued subpoena after it had been served, by which time President Trump had already completed his term.  *Id.* at *12.  The same is true here; since the 2021 Request and the Trump parties' objection thereto both occurred well after President Trump had left office, judging the 2021 Request "upon objection" means assessing the operative request as directed at the information of a former President.

### 2.  The Committee's 2021 Request passes muster under the *Mazars* rubric.

Even assuming that *Mazars* applies here at all, Defendants have also shown that the Committee's 2021 Request easily stands up under a *Mazars*-like analysis that takes into account, first, that Mr. Trump is no longer President, and second that, as a result, "reduced judicial scrutiny" is appropriate to ensure that separation-of-powers concerns are accounted for.  *Mazars IV*, 2021 WL 3602683, at *13; *see* Defs.' Mem. at 33-38.  The Trump parties do not show otherwise.

So far as the first *Mazars* factor is concerned, 140 S. Ct at 2035-36, seeking the Trump parties' tax information is a less "significant step" now than it might have been before, because Mr. Trump

---

[10] The Court noted that the prior subpoena had expired, 2021 WL 3602683, at *10, but that was not the sole determining factor in its analysis, as the Trump parties suggest.  Cross-Pls.' Opp. at 30.

no longer occupies the office of President, and the risk of inter-branch confrontation that concerned the Supreme Court is thus "mitigated." *Mazars IV*, 2021 WL 3602683, at *11, *13. Indeed, there is no inter-branch conflict here; both Congress and the Executive Branch agree that the IRS should comply with the Committee's request. Accordingly, the Court's inquiry about alternative sources of the information that the Committee needs, *see Mazars III*, 140 S. Ct. at 2035-36, "should be less rigorous." *Mazars IV*, 2021 WL 3602683, at *13.

As discussed in Defendants' earlier submission, the audits of President Trump's returns involve a unique combination of size, complexity, and the specter of undue interference. The Committee has explained that it could not explore its concerns about the performance, capacity, and independence of the Presidential Audit Program under these challenging circumstances by reviewing the tax information of other individuals whose tax filings are not known to be so large or complex, who did not exhibit the same hostility toward the IRS, or who did not wield the same authority over the agency. Defs.' Mem. at 33-35. The Trump parties respond that the Committee "could draw on the vast pool of non-presidential taxpayers," or review the tax information of other past Presidents, who satisfy "the Committee's conditions." Cross-Pls.' Opp. at 48-49. But that answer ignores the Committee's concerns, for as Defendants also previously observed, there are no "non-presidential taxpayers," or other past Presidents, that placed the same set of stresses on the IRS audit process as did President Trump. Defs.' Mem. at 27.

The Trump parties also contend that the Committee should talk to the IRS to obtain the additional details about the Presidential Audit Program that it seeks, Cross-Pls.' Opp. at 47, but they ignore the fact that the IRS already provided the Committee an oral briefing on the Program, in June 2019, that the Committee concluded did not meet its needs for information. *See* 2021 OLC Op. at 15. And regardless, it is reasonable of the Committee to seek actual returns and audit files in advance, so it may thereafter explore its concerns with the IRS on a more informed basis, just as civil litigants ordinarily take document discovery before conducting depositions. *See* Defs.' Mem. at 28. And while reviewing a single audit file might not reveal unwritten IRS practices, Cross-Pls.' Opp. at 47, the Committee reasonably could expect that reviewing several years' files could do so, or reveal evidence

of favoritism, or improper influence, *see id.* at 48, if certain procedures prescribed by the Internal Revenue Manual are not followed during presidential audits, *see* Defs.' Mem. at 28.

Finally, the Trump parties suggest that a desire to enact statutory improvements to the Presidential Audit Program simply does not justify a request to review their tax information, Cross-Pls.' Opp. at 47, but, as discussed, the Internal Revenue Manual leaves much discretion to examiners to determine which items reported on a presidential return to examine, and to what extent. It is both reasonable and permissible of the Committee to investigate whether more rigorous and objective criteria are called for to ensure the thoroughness and objectivity of presidential audits. *See* Defs.' Mem. at 25. In any event, the first *Mazars* factor does not call upon courts to make ad hoc judgments about the relative importance of Congress's asserted legislative interests, only to query whether alternative sources of information could reasonably meet a committee's legislative needs. *See Mazars III*, 140 S. Ct. at 2035-36. Here the Trump parties have suggested none.

As to the third *Mazars* factor—the detail with which Congress explains its legislative objectives and why a President's personal information will advance its consideration of potential legislation—140 S. Ct. at 2036—the Trump parties criticize the Committee's explanation in the *2019* Request as "vague" and "loosely worded." Cross-Pls.' Opp. at 46-47. But, as shown above, what matters for purposes of the Court's analysis is the 2021 Request. *See supra* § I.C.1.b at 15-16. As Defendants have discussed, Defs.' Mem. at 10-11, 36-37, the 2021 Request explains the basis for the Committee's concerns that legislation may be required to ensure that the Presidential Audit Program is capable in practice of fully and fairly auditing a President like President Trump, with "hundreds of business[es]" and "inordinately complex returns," and "whose disdain for IRS audits is widely known." 2021 Request at 1-2, 5. The Committee also explained in the 2021 Request the importance of the information sought to its consideration of legislative action—that is, to understanding how the Program functions in practice, and to assessing whether it is "sufficiently robust" to function as intended under the trying circumstances presented by a taxpayer with the profile of former President Trump. *Id.* at 3-6. Especially "given the circumscribed separation of powers concerns at play," *Mazars IV*, 2021 WL 3602683 at *13, the 2021 Request is more than adequately detailed to make its legislative

objectives apparent and to convey why consideration of the Trump parties' information will advance them. The Trump parties offer no argument to the contrary.

Finally, directing their attention simultaneously to the second and fourth *Mazars* factors, the Trump parties argue that the Committee's request is "broader than reasonably necessary" and "places excessive burdens" on them, Cross-Pls.' Opp. at 49-50 (citation omitted). Defendants have already shown, however, that the Committee's request for the tax information of President Trump and his businesses is no broader than reasonably necessary, because the Committee seeks to discover whether IRS auditors examine the "underlying business activities" of a presidential taxpayer, and because the temporal scope of the request is focused predominantly on the tax years for which President Trump filed returns while in office. Defs.' Mem. at 35-36. The Trump parties complain that Defendants have not offered a specific justification to explain the request for tax year 2020. Cross-Pls.' Opp. at 49. But because separation-of-powers concerns are mitigated when Congress seeks information from a former President, a "precise . . . fit" is not required here. *Mazars IV*, 2021 WL 3602683, at *13.

Most importantly for the separation of powers, the burdens the 2021 Request places on the Presidency are minimal at best, and highly conjectural. The principal burden with which *Mazars III* was concerned are the demands "on the President's time and attention" that compliance with a request for his personal information would entail. 140 S. Ct. at 2036. Where the demand is made, as here, of an individual who is no longer in office, these burdens "are greatly diminished, if not eliminated." *Mazars IV*, 2021 WL 3602683 at *13. The Trump parties do not suggest otherwise. They argue instead that the "burden" stemming from the disclosure of personal financial information will allow Congress to exploit the threat of post-presidency subpoenas to unduly influence the performance of sitting Presidents. Cross-Pls.' Opp. at 42-43. As recognized in *Mazars IV*, however, the risk this hypothetical scenario poses to the independence of the Presidency is "remote," 2021 WL 3602683, at *13, and it is all the more so here. Congressional inquiries focused on the IRS's presidential audit processes have been few and far between, as Defendants have observed; they cannot be expected to serve as vehicles for routine demands to produce the tax information of former Presidents. Defs.' Mem. at 38. Once more, the Trump parties make no argument to the contrary.

Thus, the Committee's 2021 Request easily withstands review under a *Mazars* analysis that is suited to requests for the personal information of past Presidents.

## II. THE TRUMP PARTIES' ADDITIONAL CLAIMS FAIL AS A MATTER OF LAW.

### A. The Court Should Reject the Trump Parties' Challenge to Section 6103(f).

In response to the Trump parties' claim that section 6103(f) does not authorize requests for a former President's information, Defendants explained that the statute's plain language encompasses "*any* return or return information," without exception. Defs.' Mem. at 39. Although the Trump parties asserted that canons of construction nonetheless required the exclusion of a former President's information from the statute's coverage, *see* Am. Cross-Claim ¶ 297, they have now abandoned that argument and rely solely on their facial challenge to section 6103(f). *See* Cross-Pls.' Opp. at 18-24.

Defendants described the operative test for such a challenge: A plaintiff must show that "no set of circumstances exists under which the statute would be valid." Defs.' Mem. at 41 (quoting *Salerno v. United States*, 481 U.S. 739, 745 (1987)). The Trump parties object that "*Salerno*'s no-set-of-circumstances language is not the test for facial challenges" but merely "the *result* of a facial challenge." Cross-Pls.' Opp. at 21 (citation omitted). They are wrong.

Just this year, the Supreme Court reiterated: "Normally, a plaintiff bringing a facial challenge must 'establish that no set of circumstances exists under which the law would be valid,'" *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021) (quoting *Salerno*, 481 U.S. at 745), "or show that the law lacks 'a plainly legitimate sweep.'" *Id.* (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)). Indeed, "[t]he Supreme Court often cautions that a facial challenge can succeed only if "'no set of circumstances exists under which the [statute] would be valid,' *i.e.*, that the law is unconstitutional in all of its applications." *Hodge v. Talkin*, 799 F.3d 1145, 1156 (D.C. Cir. 2015) (quoting *Wash. State Grange,* 552 U.S. at 449 (quoting *Salerno*, 481 U.S. at 745)). While "the standard for facial invalidity may be less stringent in some situations," the alternative test focuses on "whether the statute lacks any 'plainly legitimate sweep.'" *Id.* (quoting *Wash. State Grange*, 552 U.S. at 449); *see also In re Sealed Case*, 936 F.3d 582, 588-89 (D.C. Cir. 2019) ("[a]lthough there has been some debate [about] whether *every* facial challenge must meet the *Salerno* standard, *all* agree that a facial

challenge must fail where the statute has a plainly legitimate sweep.") (citation omitted) (emphasis added).  But although the less stringent test may apply "in some situations," *id.*, the D.C. Circuit "has repeatedly invoked *Salerno*'s no-set-of-circumstances test to reject facial constitutional challenges." *Rancho Viejo, LLC v. Norton*, 323 F.3d 1062, 1078 n.21 (D.C. Cir. 2003) (quotation omitted).

Tellingly, the Trump parties' argument against the application of *Salerno* disregards D.C. Circuit precedent altogether, fashioning a standard largely constructed of partial quotations from other jurisdictions.  *See* Cross-Pls.' Opp. at 21.  And, although they contend that the Supreme Court has dismissed the *Salerno* standard as "not a requirement," *id.* (quoting *Johnson v. United States*, 576 U.S. 591, 602-03 (2015)), the Supreme Court in *Johnson*, in fact, applied the *Salerno* test.  *Johnson*, 576 U.S. at 603. Addressing a claim that a statute was unconstitutionally vague, the dissent had argued that "a statute is void for vagueness only if it is vague in all its applications."  *Id.*  The majority responded:  "It seems to us that the dissent's supposed requirement of vagueness in all applications is not a requirement at all, but a tautology:  If we hold a statute to be vague, it is vague in all its applications[.]"  *Id.* at 603.

*United States v. Lopez*, 514 U.S. 549 (1995) and *United States v. Morrison*, 529 U.S. 598 (2000), the Commerce Clause cases on which the Trump parties rely, likewise were consistent with *Salerno*.  *See* Cross-Pls.' Opp. at 21–22.  The crux of those holdings was that Congress lacked a constitutional basis to regulate the activity targeted by the challenged statutes at all; Congress's lack of jurisdiction to reach the conduct at issue meant that no instance of the statutes' application would have been constitutional. Thus, the D.C. Circuit assessed:  "Although the Court in *Lopez* did not cite the *Salerno* no-set-of-circumstances test," its reasoning was consistent with *Salerno*.  *Nebraska v. EPA*, 331 F.3d 995, 998 n.2 (D.C. Cir. 2003).[11]  The D.C. Circuit explained:  "After *Lopez* we therefore have continued to invoke the *Salerno* test in response to a facial challenge based on the Commerce Clause."  *Id.*[12]  *See also Rancho*

---

[11]  In *Gordon v. Holder*, the D.C. Circuit reasoned that such statutes have a "plainly legitimate sweep" notwithstanding Congress's lack of jurisdiction to promulgate the legislation in the first instance.  721 F.3d 638, 654-55 (D.C. Cir. 2013).  Defendants, however, are aware of no case applying that facet of *Gordon*.  To the contrary, the weight of the precedent recognizes that the decision in *Lopez* is consistent with *Salerno*, and therefore continues to apply the *Salerno* test.  *See supra* at 20-21.

[12]  Nor does *United States v. Booker*, 543 U.S. 220 (2005), *see* Cross-Pls.' Opp. at 22-23, support the Trump parties' position.  *Booker* made the Federal Sentencing Guidelines discretionary instead of mandatory, and the remedy turned on severability principles—examining legislative intent, the Supreme Court focused on "what Congress would have intended in light of the Court's constitutional

*Viejo*, 323 F.3d at 1077-78 (rejecting "artificially constructed 'facial' challenge" where "[plaintiff's] own case" was "a 'set of circumstances' under which the [statute] [could] be constitutionally applied").

Nor would the Trump parties' facial challenge fare better if measured against the "less stringent . . . standard for facial invalidity" applicable "in some situations." *Hodge*, 799 F.3d at 1156 (quotation omitted). Section 6103(f) plainly has a broad "legitimate sweep," *Wash. State Grange*, 552 U.S. at 449—every congressional request issued with a valid legislative purpose.

In sum, the Trump parties' facial attack on section 6103(f) finds no support in precedent.

### B. The Trump Parties' First Amendment Claim Fails as a Matter of Law.

Defendants have shown that the Trump parties' First Amendment retaliation claim states no viable basis for relief. Defs.' Mem. at 42-48. First, it is legally deficient for lack of causation. Defendants intend to comply with the Committee's 2021 Request because section 6103(f) requires them to do so, not because of alleged, politically illicit motives. *Id.* at 42-43. Similarly, under an unbroken line of Supreme Court precedent, the Committee's request may not be questioned based on alleged unlawful motives of individual legislators, even on First Amendment grounds. *Id.* at 45-46. In addition, the Trump parties' allegations of improper motives are implausibly pled. *Id.* at 43-44, 47-48.

As to causation, the Trump parties argue that their burden is not "heavy," because the inquiry asks about a defendant's "subjective motive" for taking an allegedly retaliatory action, and because causation may in some cases be inferred from temporal proximity between the protected conduct and the alleged retaliatory act. Cross-Pls.' Opp. at 74-76. These principles may apply in cases such as the Trump parties cite, *see id.*, where the defendants took adverse actions that they were authorized but not compelled to take, concerning employment, prison discipline, and the like. Here, however, section 6103(f) gives Defendants no discretion when presented with a valid request: compliance is mandatory.

Hence, the controlling principle is as stated in *Hartman v. Moore*, 547 U.S. 250, 260 (2006), that government action, even if allegedly (no matter how implausibly) "colored by some degree of bad motive[,] does not amount to [retaliation] if that action would have been taken anyway." That is so

---

holding." 543 U.S. at 246. Applying that approach here, plainly, Congress would intend that the Court allow requests under section 6103(f) for which Congress has asserted a valid legislative purpose.

because the causation requirement is not meant to "place [a complainant] in a better position as a result of . . . constitutionally protected conduct than he would have occupied had he done nothing." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285 (1977); *see also Crawford-el v. Britton*, 523 U.S. 574, 593 (1998).  That principle is decisive here.  Defendants' decision to provide the Trump parties' tax information to the Committee "would have been taken anyway," *Hartman*, 547 U.S. at 260, regardless of President Trump's First Amendment activity, because section 6103(f) requires them to do so.  The statute's mandate thus severs any causal connection between the intended release of the Trump parties' information and any retaliatory motives Defendants allegedly harbor.[13]

Turning next to the Committee's motivation, the Trump parties, confronted by the precedents Defendants have cited, Defs.' Mem. at 45-46, abandon their claim that the Committee's allegedly improper motives render its otherwise proper request invalid.  *Compare* Am. Cross-Claim ¶¶ 330-34 *with* Cross-Pls.' Opp. at 78-79.  Instead, they assert that Defendants cannot claim Speech or Debate immunity "for non-legislators[.]"  Cross-Pls.' Opp. at 78-81.  Defendants have made no such claim, nor one that even distantly resembles it.  Defendants have shown that under decisions such as *Wilkinson*, 365 U.S. at 409-12; *Watkins*, 354 U.S at 199-200; and *Eastland*, 421 U.S. at 505-10, a valid committee inquiry may not be questioned on grounds that the motives of individual committee members violate the First Amendment.  Defs.' Mem. at 46.  The Trump parties have no answer.

Given these legal deficiencies, whether the Trump parties have plausibly alleged retaliatory motives on the part of Defendants or the Committee is not legally relevant; regardless, they have failed to do so.  They insist that their allegations of Defendants' improper motives rest on more than party affiliation.  Cross-Pls.' Opp. at 77; *see* Defs.' Mem. at 43-44.  But at best they allege no more than the usual political hubbub that attends the business of representative government—charges and counter-charges that must be resolved in the political realm, not in federal court.  *Tenney*, 341 U.S. at 378.  In

---

[13] The Trump parties contend that the Court should not simply accept "that the [Defendants] [are] act[ing] under statutory compulsion" when they supposedly "rejected that interpretation of [section 6103(f)]" before President Biden took office.  Cross-Pls.' Opp. at 75-76.  But the statute's text is clear; and the Trump parties misread the record.  The Biden and Trump Administrations agree about the mandatory nature of section 6103(f); they disagreed only regarding the deference owed by the Executive Branch (as opposed to the Judiciary) to a committee's stated purpose in seeking particular information.  *See* 2021 OLC Op. at 5, 17, 19-22; 2019 OLC Op. at 18-19, 21-23.

support of their vague, conclusory, and self-contradictory allegations that unidentified members of the Committee decided to issue the 2021 Request in retaliation for unspecified political positions and beliefs held by former President Trump, *see* Defs.' Mem. at 47-48, the Trump parties state only that "[i]it is beyond serious dispute that the executive branch, Committee Democrats, and the Democratic Party writ large oppose just about every policy and position taken by President Trump."  Cross-Pls.' Opp. at 81.  But they cannot compensate for the deficiencies in their conclusory allegations of motive with equally conclusory assertions in their opposition brief, or expect a court to accept mere differences of political opinion as a basis for the wholesale imputation of vindictive motives to dozens of individual legislators.  *See Tenney*, 341 U.S. at 378.

## C.  The Trump Parties' Remaining Constitutional Claims Also Fail.

Finally, the Trump parties' stand-alone separation-of-powers claim, and their Due Process claim, also should be dismissed for lack of ripeness, or, alternatively, on the merits.

As to ripeness, the Trump parties argue that their separation-of-powers claim presents a "here-and-now" injury.  Cross-Pls.' Opp. at 83.  This position derives entirely from a footnote in *Bowsher v. Synar* addressing an argument that a challenge to a statutory removal provision would not be ripe until Congress actually removed the executive officer pursuant to that provision.  *See* 478 U.S. 714, 727 n.5 (1986).  The Supreme Court disagreed, explaining that the threat of congressional removal "creates the here-and-now subservience to another branch that raises separation-of-powers problems."  *Id.* (citation omitted).  The Trump parties' expansion of this footnote to create a novel form of Article III injury should be rejected.  *Cf. Bond v. United States*, 131 S. Ct. 2355, 2365 (2011) ("If the constitutional structure of our Government that protects individual liberty is compromised, individuals *who suffer otherwise justiciable injury* may object." (emphasis added)).  Moreover, merely reviewing documents relevant to an alleged IRS audit does not rise to the level of "here-and-now subservience" to Congress.  Accordingly, the separation-of-powers claim is unripe.

The Due Process claim is also unripe.  The Trump parties argue that, under *D.C. Federation of Civic Associates v. Volpe*, 459 F.2d 1231, 1246 (D.C. Cir. 1971), they need not demonstrate interference with the outcome of the alleged IRS audit in order for the claim to ripen.  *See* Cross-Pls.' Opp. at 87.

*Volpe*, however, did not address ripeness, and indeed the plaintiff there "conten[ded] that the repeated and public threats by a few Congressional voices *did have an impact* on the Secretary's decisions." 459 F.2d at 1245 (emphasis added). *Volpe* is therefore inapposite to the ripeness question here.

Both the separation-of-powers and Due Process claims also fail on their merits. Contrary to the Trump parties' assertion, there is no "require[ment]" that "the executive branch . . . refuse congressional requests for open enforcement files." *See* Cross-Pls.' Opp. at 84. To be sure, the Executive Branch routinely, and correctly, determines that congressional access to such files would substantially interfere with Executive activities. That is illustrated, among elsewhere, in the OLC opinions cited by the Trump parties. But, critically, there has been no such determination here.

As to the Due Process claim, the Trump parties argue that disclosure will compromise IRS auditors' appearance of impartiality by "invit[ing] into the ongoing adjudication Members who have a longstanding partisan interest in seeing the proceeding reach a conclusion adverse to Intervenors." *See id.* at 87-88. That is distinctly *not* one of the improper motives the Trump parties have attributed to the Committee. Further, the act of merely reviewing records that IRS auditors also happen to be reviewing in connection with alleged ongoing examinations cannot seriously be equated with Senators launching a "barrage of questioning" at an agency decisionmaker, or with members of Congress directly inserting their opinions into the agency's decisionmaking process. *See id.* (discussing *Pillbury Co. v. FTC*, 354 F.2d 952, 955-56 (5th Cir. 1966); *Koniag Inc. v. Vill. Of Uyak v. Andrus*, 580 F.2d 601, 610 (D.C. Cir. 1978); and *United States v. Moore*, 41 F.3d 370, 370-71 (8th Cir. 1994)). The Trump parties' attempt to portray Defendants' decision to disclose their tax information to the Committee as evidence of congressional interference in the audit process, *see id.* at 88-89, falls of its own weight. That Defendants now conclude they must provide the Trump parties' information to the Committee to aid in its consideration of legislation proves neither that the Committee intends to insert itself into the audit process, nor that Defendants would permit it to do so.

## CONCLUSION

For the foregoing reasons, and those stated in Defendants' earlier memorandum, the Trump parties' cross-claims against Defendants should be dismissed.

Dated:  November 4, 2021

Respectfully submitted,

BRIAN D. NETTER
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director

ELIZABETH J. SHAPIRO
Deputy Director

 _/s/ James J. Gilligan_
JAMES J. GILLIGAN
Special Litigation Counsel

SERENA M. ORLOFF
CRISTEN C. HANDLEY
JULIA A. HEIMAN
Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C.  20044
Telephone:      (202) 514-3358
Fax:              (202) 616-8470
E-mail:          james.gilligan@usdoj.gov

*Counsel for Defendants-Crossdefendants*