# Exhibit A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **DONALD J. TRUMP**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 21-cv-2769 (TSC) |
| | ) | |
| | ) | |
| **BENNIE G. THOMPSON**, *in his official* | ) | |
| *capacity as Chairman of the United States* | ) | |
| *House Select Committee to Investigate the* | ) | |
| *January 6th Attack on the United States* | ) | |
| *Capitol, et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

On January 6, 2021, hundreds of rioters converged on the U.S. Capitol. They scaled

walls, demolished barricades, and smashed windows in a violent attempt to gain control of the

building and stop the certification of the 2020 presidential election results. This unprecedented

attempt to prevent the lawful transfer of power from one administration to the next caused

property damage, injuries, and death, and for the first time since the election of 1860, the transfer

of executive power was distinctly not peaceful.

The question of how that day's events came about and who was responsible for them is

not before the court. Instead, the present dispute involves purely legal questions that, though

difficult and important to our government's functioning, are comparatively narrow in scope.

Plaintiff—former President Donald J. Trump—challenges the legality of a U.S. House of

Representatives Select Committee's requests for certain records maintained by the National

Archives and Records Administration ("NARA") pursuant to the Presidential Records Act. Plaintiff argues that the Committee's requests are impermissible because at least some of the records sought are shielded by executive privilege and because the requests exceed Congress' constitutional power. He seeks an injunction prohibiting Defendants—the House Select Committee, the Chairman of the House Select Committee, NARA, and the Archivist of NARA—from enforcing or complying with the Committee's requests. For the reasons explained below, the court will deny Plaintiff's requested relief.

## I.  BACKGROUND

### A.  <u>The 2020 Presidential Election and January 6, 2021</u>

While not material to the outcome, some factual background on the events leading up to and including January 6, 2021, offers context for the legal dispute here. In the months preceding the 2020 presidential election, Plaintiff declared that the only way he could lose would be if the election were "rigged." *See, e.g.*, Donald J. Trump, Speech at Republican National Convention Nomination Vote at 22:08 (Aug. 24, 2020) *in* C-SPAN, https://www.c-span.org/video/?475000-103/president-trump-speaks-2020-republican-national-convention-vote. In the months after losing the election, he repeatedly claimed that the election was rigged, stolen, and fraudulent. For example, in a December 2 speech, he alleged "tremendous voter fraud and irregularities" resulting from a late-night "massive dump" of votes. *See* President Donald J. Trump, Statement on 2020 Election Results at 0:39, 7:26 (Dec. 2, 2020) *in* C-SPAN, https://www.c-span.org/video/?506975-1/president-trump-statement-2020-election-results. He also claimed that certain votes were "counted in foreign countries," that "millions of votes were cast illegally

in the swing states alone," and that it was "statistically impossible" he lost.  *Id.* at 12:00, 14:22, 19:00.

After losing the election, Plaintiff and his supporters filed a plethora of unsuccessful lawsuits seeking to overturn the results.  *See, e.g.*, *Current Litigation*, AMERICAN BAR ASSOCIATION: STANDING COMMITTEE ON ELECTION LAW, Apr. 30, 2021, https://www.americanbar.org/groups/public_interest/election_law/litigation/.  The United States Supreme Court also denied numerous emergency applications aimed at overturning the results. *Id.*  In response, Plaintiff tweeted that the Court was "totally incompetent and weak on the massive Election Fraud that took place in the 2020 Presidential Election."  Donald J. Trump (@realDonaldTrump), TWITTER (Dec. 26, 2020, 1:51 PM), https://www.presidency.ucsb.edu /documents/tweets-december-26-2020.[1]  He continued his claim that "We won the Presidential Election, by a lot," and implored Republicans to "FIGHT FOR IT. Don't let them take it away." *Id.* (Dec. 18, 2020, 2:14 PM), https://www.presidency.ucsb.edu/documents/tweets-december-18-2020.

A Joint Session of Congress was scheduled to convene on January 6, 2021, to count the electoral votes of the 2020 presidential election and to officially announce the elected President, as required by the Twelfth Amendment to the U.S. Constitution and the Electoral Count Act, 3

---

[1] Plaintiff was permanently suspended from Twitter on January 8, 2021.  *See* Press Release, Twitter, Inc., Permanent Suspension of @realDonaldTrump (Jan. 8, 2021), https://blog. twitter.com/en_us/topics/company/2020/suspension.  As a result, Plaintiff's tweets are permanently unavailable in their original form.  *See* Quint Forgey, *National Archives can't resurrect Trump's tweets, Twitter says*, POLITICO (Apr. 7, 2021), https://www.politico.com /news/2021/04/07/twitter-national-archives-realdonaldtrump-479743.  The court has relied on the University of California, Santa Barbara's *The American Presidency Project* for archived tweets. *See* John Wolley & Gerhard Peters, THE AMERICAN PRESIDENCY PROJECT, https://www.presidency.ucsb.edu/.

U.S.C. § 15.  In the days leading up to January 6, Plaintiff began promoting a protest rally to take place hours before the Joint Session convened.  On December 19, 2020, he tweeted "Statistically impossible to have lost the 2020 Election. Big protest in D.C. on January 6th.  Be there, will be wild!"  Donald J. Trump (@realDonaldTrump), TWITTER (December 19, 2020, 6:42am), https://www.presidency.ucsb.edu/documents/tweets-december-19-2020.  During a rally, he warned that "Democrats are trying to steal the White House . . . you can't let that happen. You can't let it happen," and promised that "[w]e're going to fight like hell, I'll tell you right now." *See* Donald J. Trump, Remarks at Georgia U.S. Senate Campaign Event at 8:40, 14:19 (Jan. 4, 2021) *in Campaign 2020*, C-SPAN, https://www.c-span.org/video/?507634-1/president-trump-campaigns-republican-senate-candidates-georgia.

On January 6, Plaintiff spoke at the rally at the Ellipse, during which he (1) repeated claims, rejected by numerous courts, that the election was "rigged" and "stolen"; (2) urged then-Vice President Pence, who was preparing to convene Congress to tally the electoral votes, "to do the right thing" by rejecting certain states' electors and declining to certify the election for President Joseph R. Biden; and (3) told protesters to "walk down to the Capitol" to "give them the kind of pride and boldness that they need to take back our country," "we fight. We fight like hell.  And if you don't fight like hell, you're not going to have a country anymore," and "you'll never take back our country with weakness."  *See* Donald J. Trump, Rally on Electoral College Vote Certification at 3:33:04, 3:33:36, 3:37:20, 3:47:02, 3:47:22, 4:42:26, 4:41:27 (Jan. 6, 2021) *in Campaign 2020*, C-SPAN, https://www.c-span.org/video/?507744-1/rally-electoral-college-vote-certification.

Shortly thereafter, the crowds surged from the rally, marched along Constitution Avenue, and commenced their siege of the Capitol.

**B.  The Select Committee and its Presidential Records Act Request**

On June 30, 2021, the U.S. House of Representatives passed House Resolution 503, creating the Select Committee.  ECF No. 5, Pl. Mot., Ex. 3, H.R. 503, § 3, 117th Cong. (2021). H.R. 503 empowers the Select Committee to (1) "investigate the facts, circumstances, and causes relating to" the January 6 attack; (2) "identify, review, and evaluate the causes of and the lessons learned from" the attack; and (3) "issue a final report to the House containing such findings, conclusions, and recommendations for corrective measures . . . as it may deem necessary."  *Id.* § 4(a).  Such corrective measures may include:

> [C]hanges in law, policy, procedures, rules, or regulations that could be taken—
> (1) to prevent future acts of violence, domestic terrorism, and domestic violent extremism, including acts targeted at American democratic institutions; (2) to improve the security posture of the United States Capitol Complex while preserving accessibility of the Capitol Complex for all Americans; and (3) to strengthen the security and resilience of the United States and American democratic institutions against violence, domestic terrorism, and domestic violent extremism.

*Id.* § 4(c).  The resolution also authorizes the Select Committee to publish interim reports, which may include "legislative recommendations as it may deem advisable."  *Id.* § 4(b).

The Select Committee is authorized "to require, by subpoena or otherwise, the attendance and testimony of such witnesses and the production of books, records, correspondence, memoranda, papers, and documents as it considers necessary."  47 Rule XI.2(m)(1)(B), Rules of the U.S. House of Rep., 117th Cong. (2021) ("House Rules"); *see also* H.R. 503, § 5(c) (unless otherwise specified, Rule XI applies to the Select Committee).  Under House Rule XI:

> Subpoenas for documents or testimony may be issued to any person or entity, whether governmental, public, or private, within the United States, including, but

not limited to, the President, and the Vice President, whether current or former, in a personal or official capacity, as well as the White House, the Office of the President, the Executive Office of the President, and any individual currently or formerly employed in the White House, Office of the President, or Executive Office of the President.

House Rule XI.2(m)(3)(D).

On August 25, 2021, pursuant to section 2205(2)(C) of the Presidential Records Act ("PRA"), the Committee issued a document request to NARA seeking several categories of records from the Executive Office of the President and the Office of the Vice President. Compl., Ex. 1. Specifically, the Select Committee sought written communications, calendar entries, videos, photographs, or other media relating to Plaintiff's January 6 speech, the January 6 rally and subsequent march, the violence at the Capitol, and the response within the White House. *See id.* at 2-4. The Committee also requested materials from specific time periods relating to any planning by the White House and others regarding the January 6 electoral count, *id.* at 4-7; preparations for rallies leading up to the January 6 violence, *id.* at 7-8; information Plaintiff received regarding the election outcome, *id.* at 9-10; Plaintiff's public remarks regarding the election outcome and the validity of the election system more broadly, *id.*; and for a specified timeframe surrounding the 2020 election, documents and communications of the Plaintiff and certain of his advisors relating to the transfer of power and obligation to follow the rule of law, including with respect to actual or potential changes in personnel at certain executive branch agencies, and relating to foreign influence in that election, *id.* at 10-12. These requests are the subject of this lawsuit.

### C. **Presidential Records in the Nixon Era**

In the wake of its investigation of presidential wrongdoing in the Watergate scandal, Congress passed two laws relating to presidential records. The first was the Presidential Recordings and Materials Preservation Act of 1974 ("PRMPA"), enacted after former President Richard Nixon indicated that he intended to destroy certain tape recordings of his conversations while in office.

Four years later, after the Supreme Court's ruling in *Nixon v. Adm'r of Gen. Servs.* (*Nixon v. GSA*), 433 U.S. 425, 448 (1977),[2] Congress passed the PRA, which changed the legal ownership of the President's official records from private to public, and established a new statutory scheme under which Presidents, and NARA, must manage the records of their Administrations. In passing the PRA, Congress sought a balance between, on the one hand, "encourag[ing] the free flow of ideas within the executive branch" by allowing a President to restrict access to their Presidential records for up to twelve years after their tenure ends, and on the other hand, permitting Congress to access any records it needs to conduct its business before the twelve-year clock runs. *See, e.g.*, 95 Cong. Rec. H34895 (daily ed. Oct. 10, 1978) (statement of Rep. Brademas); *see also* 95 Cong. Rec. S36845 (daily ed. Oct. 13, 1978) (statement of Sen. Nelson) (explaining that the legislation was "carefully drawn" to strike a balance between the confidentiality of the President's decision-making process and the public interest in preservation of the records).

The PRA defines "Presidential records" as records reflecting "the activities, deliberations, decisions, and policies" of the Presidency. 44 U.S.C. § 2203(a). Under the Act, when a

---

[2] *See* discussion *infra* at § III.A.1.ii.a.

President leaves office, the Archivist "assume[s] responsibility for the custody, control, and preservation of, and access to" the Presidential records of the departing administration. *Id.* § 2203(g)(1). The Archivist must make Presidential records available to the public under the Freedom of Information Act five years after the President leaves office. *Id.* § 2204(b)(2), (c)(1); *see also* 36 C.F.R. § 1270.38. However, the outgoing President can restrict access to especially sensitive materials for a period of up to 12 years. 44 U.S.C. § 2204(a); *see also* 36 C.F.R. § 1270.40(a). One exception is that "Presidential records shall be made available . . . to either House of Congress, or, to the extent of matter within its jurisdiction, to any committee or subcommittee thereof if such records contain information that is needed for the conduct of its business and that is not otherwise available." 44 U.S.C. § 2205(2)(C).

The PRA gives the Archivist the power to promulgate regulations to administer the statute. 44 U.S.C. § 2206. Pursuant to those regulations, the Archivist must promptly notify both the former President as well as the incumbent President of a request for the former President's records. *See* 36 C.F.R. § 1270.44(c). Either the former or incumbent President "may assert a claim of constitutionally based privilege" against disclosure within thirty calendar days after the date of the Archivist's notice. *Id.* § 1270.44(d). If a former President asserts the claim, the Archivist consults with the incumbent President as soon as practicable and within 30 calendar days from the date that the Archivist receives notice of the claim to determine whether the incumbent President will uphold the claim. *Id.* § 1270.44(f)(1). If the incumbent President does not uphold the former President's claim, the Archivist must disclose the Presidential records 60 calendar days after receiving notification of the claim unless a federal court order directs the Archivist to withhold the records. *Id.* § 1270.44(f)(3); *see also* Exec. Order No. 13489, § 4(b)

(providing that the Archivist shall abide by the incumbent President's determination as to a privilege assertion by a former President unless otherwise directed by a final court order). The Archivist may also "adjust any time period or deadline . . . to accommodate records requested." 36 C.F.R. § 1270.44(g).

**D. <u>Response to Select Committee's Request</u>**

On August 30, 2021, after receiving the Select Committee's requests, the Archivist notified Plaintiff that NARA intended to produce a first tranche of approximately 136 pages of records responsive to the Committee's requests. ECF No. 21, NARA Br. at 11.

On October 8, 2021, White House Counsel notified the Archivist that President Biden would not be asserting executive privilege over the first tranche of Presidential records because doing so "is not in the best interests of the United States." Pl. Mot., Ex. 4 at 1. Counsel further explained the President's position:

> Congress has a compelling need in service of its legislative functions to understand the circumstances that led to these horrific events. . . . The Documents shed light on events within the White House on and about January 6 and bear on the Select Committee's need to understand the facts underlying the most serious attack on the operations of the Federal Government since the Civil War. These are unique and extraordinary circumstances. . . . The constitutional protections of executive privilege should not be used to shield, from Congress or the public, information that reflects a clear and apparent effort to subvert the Constitution itself.

*Id.* at 1-2.

That same day, Plaintiff notified the Archivist that he was asserting executive privilege with respect to thirty-nine pages of records in the first tranche, and seven pages of records that were subsequently withdrawn from the first tranche as non-responsive. NARA Br. at 11. Plaintiff also made a "protective assertion of constitutionally based privilege with respect to all additional records following the First Tranche." Pl. Mot., Ex. 5 at 2.

Page **9** of **39**

White House Counsel then notified the Archivist that President Biden "does not uphold the former President's assertion of privilege." Pl. Mot., Ex. 6. Counsel further instructed the Archivist to turn the requested records over to the Committee thirty days after the Archivist notified Plaintiff, absent an intervening court order, "in light of the urgency of the Select Committee's need" for the requested records. *Id.*

On October 13, 2021, the Archivist notified Plaintiff that, "[a]fter consultation with Counsel to the President and the Acting Assistant Attorney General for the Office of Legal Counsel, and as instructed by President Biden," the Archivist "determined to disclose to the Select Committee," on November 12, 2021, all responsive records that President Trump determined were subject to executive privilege, absent an intervening court order. *Id.*, Ex. 7.[3]

The review and submission process for additional tranches of records is proceeding on staggered timelines. Regarding the second and third tranches of records, NARA notified Plaintiff and President Biden on September 9 and 16 that it was planning to disclose 888 pages of additional records, three of which NARA later withdrew because they were not Presidential records. NARA Br. at 11-12. Plaintiff asserted privilege over 724 pages. *Id.* at 12. President Biden again responded that he would not uphold the privilege. *Id.* NARA notified Plaintiff and President Biden that it would turn over the 724 pages to the Committee on November 26 absent an intervening court order. *Id.* On October 15, NARA sent notification of its intent to disclose a fourth tranche of 551 pages of responsive records. *Id.* The review period for the fourth tranche

---

[3] On the same date, the Archivist produced to the Select Committee the ninety pages of records in the first tranche that were both responsive to the Committee's requests and not subject to Plaintiff's assertions of privilege. NARA Br., Laster Decl. ¶ 20.

is ongoing, and NARA anticipates that it will identify additional tranches of responsive records on a rolling basis. *Id.*

### E. Procedural History

On October 18, Plaintiff filed this action, seeking a declaratory judgment that the Select Committee's requests are invalid and unenforceable, an injunction against the Congressional Defendants' enforcement of the requests or use of any information obtained via the requests, and an injunction preventing the Archivist and NARA's production of the requested information. *See* ECF No. 1, Compl. at 25-26. The following day, Plaintiff moved for a preliminary injunction "prohibiting Defendants from enforcing or complying with the Committee's request." Pl. Mot. at 3. At the parties' request, the court set an accelerated briefing schedule and heard argument on the motion on November 4, 2021. *See* Min. Order (Oct. 22, 2021).

On November 8, 2021, Plaintiff filed a preemptive emergency motion requesting an injunction pending appeal, or an administrative injunction, "should the court refuse" to grant his requested relief. ECF No. 34, at 1. The court denied Plaintiff's emergency motion without prejudice as premature and stated that the court would consider a motion for a stay from the non-prevailing party following its ruling. *See* Min. Order (Nov. 9, 2021) (citing Fed. R. Civ. P. 62(d)).

## II. LEGAL STANDARD

A preliminary injunction is an "extraordinary" remedy that "should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). To prevail on a motion for preliminary injunction, the movant bears the burden of showing that: (1) "he is likely to succeed on the merits"; (2) "he

is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of

equities tips in his favor"; and (4) "an injunction is in the public interest." *Winter v. Nat. Res.*

*Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where the federal government is the opposing party,

the balance of equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435

(2009). In the past, courts in this jurisdiction have evaluated the four preliminary injunction

factors on a "sliding scale"— a particularly strong showing in one factor could outweigh

weakness in another. *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011). However, it is

unclear if this approach has survived the Supreme Court's decision in *Winter*. *See, e.g.*, *Banks v.*

*Booth*, 459 F. Supp. 3d 143, 149-50 (D.D.C. 2020) (citing *Sherley*, 644 F.3d at 393 (D.C. Cir.

2011)). Despite this uncertainty, each factor must still be present. Thus, if a party makes no

showing of irreparable injury, the court may deny the motion for injunctive relief on that basis

alone. *See Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112 (D.D.C.

2015) (citing *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir.

1995)).

### III.     ANALYSIS

**A.  Likelihood of Success on the Merits**

1.  Executive Privilege

This case presents the first instance since enactment of the PRA in which a former

President asserts executive privilege over records for which the sitting President has refused to

assert executive privilege. Plaintiff argues that at least some of the requested records reflect his

decision-making and deliberations, as well as the decision-making of executive officials

generally, and that those records should remain confidential. Specifically, Plaintiff claims such

records fall within two constitutionally recognized categories of executive privilege—the presidential communications privilege and deliberative process privilege—and that he can prevent their disclosure. He argues that his power to do so extends beyond his tenure in Office, in perpetuity, and that his assertion of privilege is binding on the current executive branch. Plaintiff also argues that to the extent the PRA constrains his ability to assert executive privilege, the Act is unconstitutional. In the alternative, he contends that when a former President and current President disagree about whether to assert privilege, a court must examine each disputed document and decide whether it is privileged.

Defendants acknowledge that executive privilege may extend beyond a President's tenure in office, but they emphasize that the privilege exists to protect the executive branch, not an individual. Therefore, they argue, the incumbent President—not a former President—is best positioned to evaluate the long-term interests of the executive branch and to balance the benefits of disclosure against any effect on the on the ability of future executive branch advisors to provide full and frank advice. The court agrees.

### i. *The Executive Power and the Origins of Executive Privilege*

The Constitution vests all "executive Power" in the President, who "must 'take Care that the Laws be faithfully executed.'" *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2191 (2020) (quoting U.S. Const. art. II, § 1, cl. 1 & § 3)). Only the "incumbent is charged with performance of the executive duty under the Constitution." *Nixon v. GSA*, 433 U.S. at 448. It is the incumbent President who is best situated to protect executive branch interests; the incumbent has "the information and attendant duty of executing the laws in the light of current facts and circumstances." *Dellums v. Powell*, 561 F.2d 242, 247 (D.C. Cir. 1977). And

only the incumbent remains subject to "political checks against . . . abuse" of that power. *Nixon v. GSA*, 433 U.S. at 448.

The Constitution does not expressly define a President's right to confidential communications. The executive privilege "derives from the supremacy of the Executive Branch within its assigned area of constitutional responsibility." *Id.* at 447. Indeed, as far back as George Washington's presidency, it has been established that Presidents may "exercise a discretion" over disclosures to Congress, "communicat[ing] such papers as the public good would permit" and "refus[ing]" the rest. *Trump v. Mazars USA, LLP* (*Mazars*), 140 S. Ct. 2019, 2029-30 (2020) (quoting 1 Writings of Thomas Jefferson 189-90 (P. Ford ed. 1892)). The notion of executive privilege is "inextricably rooted in the separation of powers under the Constitution," and is meant to protect the President's ability to have full and unfettered discussions with advisors, liberated by the veil of confidentiality. *United States v. Nixon*, 418 U.S. 683, 708 (1974). The privilege "belongs to the Government and must be asserted by it: it can neither be claimed nor waived by a private party." *United States v. Reynolds*, 345 U.S. 1, 7 (1953).

Presidential conversations are presumptively privileged, but the privilege is not absolute. *Nixon v. GSA*, 433 U.S. at 447. It exists for the benefit of the Republic, not any individual, and accordingly, the presumption can be overcome by an appropriate showing of public need by the judicial or legislative branch. *See, e.g.*, *Nixon v. GSA*, 433 U.S. at 447, 449; *Nixon*, 418 U.S. at 707; *Senate Select Committee on Presidential Campaign Activities v. Nixon* (*Senate Select Committee*), 498 F.2d 725, 730 (D.C. Cir. 1974).

### a) Senate Select Committee

In 1973, a special committee of the Senate was formed to investigate "illegal, improper or unethical activities" occurring in connection with then-President Nixon's presidential campaign and election of 1972. *Senate Select Comm.*, 498 F.2d at 726. The committee issued a subpoena to Nixon for tape recordings of his conversations with White House Counsel; in response, Nixon invoked executive privilege. *See id.* at 727. The D.C. Circuit noted that presidential conversations are presumptively privileged, and that the "presumption can be overcome only by an appropriate showing of public need." *Id.* at 730. Weighing these two principles, the court held that the committee had not overcome the presumption of privilege because it had not shown that the tapes were "demonstrably critical" to its investigation. *Id.* at 731. The court explained that because the House Committee on the Judiciary already had access to copies of the tapes, the special committee's stated interest was "merely cumulative" and not sufficient to overcome the presumption favoring confidentiality. *Id.* at 732.

### ii. *Former President's Ability to Assert Privilege*

### a) *Nixon v. GSA*

In 1974, shortly after he resigned from office, former President Nixon indicated that he intended to destroy tape recordings he made during his presidency. *See Nixon v. GSA*, 433 U.S. at 432. The legislative and executive branches, recognizing the public interest in such materials, intervened. Congress enacted, and President Ford signed, the PRMPA, to give custody of Nixon's records to the National Archives and to prohibit the destruction of the tapes or any other presidential materials. *See* H.R. Rep. No. 95-1487 at 5 (1978). Nixon sued, arguing that the PRMPA violated the separation of powers, presidential privilege, and several personal rights.

*Nixon v. GSA*, 433 U.S. at 439-55.  The Supreme Court rejected each of his arguments, holding that the PRMPA was constitutional on its face.  As to the separation of powers, the Court noted that the "Executive Branch became a party to the Act's regulation when President Ford signed the Act into law, and the administration of President Carter . . . vigorously supports . . . sustaining its constitutionality." *Id.* at 441.  The Court further explained that "in determining whether the Act disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions." *Id.* at 443 (citing *Nixon*, 418 U.S. at 711-12).

The Supreme Court also examined whether Nixon could assert privilege over his presidential records and prevent their disclosure to the Archivist.  It found, as a threshold matter, that the privilege survives the end of a President's tenure in office. *Id.* at 449.  The Court explained that the basis for the privilege—to allow the President and his advisors the assurance of confidentiality in order to have full and frank discussions—"cannot be measured by the few months or years between the submission of the information and the end of the President's tenure." *Id.*  It concluded that the privilege exists for the benefit of the Republic and is not tied to any one individual, and therefore survives the end of a President's term. *Id.*

But the Court also found that "to the extent that the privilege serves as a shield for executive officials against burdensome requests for information which might interfere with the proper performance of their duties, . . . a former President is in less need of it than an incumbent." *Id.* at 448.  Consequently, the fact that neither former President Ford nor then-President Carter supported Nixon's contention that the PRMPA undermined the presidential communications privilege "detract[ed] from the weight" of Nixon's argument. *Id.* at 449.  The

Court found that while the privilege may extend beyond the term of any one President, "the incumbent President is . . . vitally concerned with and in the best position to assess the present and future needs of the executive branch, and to support invocation of the privilege accordingly." *Id.*

The Court further held that Nixon's claim of privilege was outweighed by Congress' intent in enacting the PRMPA, noting that Congress had "substantial public interests" in enacting the statue, including Congress' "need to understand how [the] political processes [leading to former President Nixon's resignation] had in fact operated in order to gauge the necessity for remedial legislation." *Id.* at 453. The Court also observed that the "expectation of the confidentiality of executive communications . . . has always been limited and subject to erosion over time after an administration leaves office." *Id.* at 451.

> b) *The Presidential Records Act*

In the aftermath of *Nixon v. GSA*, Congress and the Executive established a framework under which a former President can assert privilege over Presidential records. As explained above, the Act permits an outgoing President to shield certain Presidential records for up to twelve years, with an exception for records that a House or Senate committee or subcommittee needs "for the conduct of its business and that is not otherwise available." 44 U.S.C. § 2205(2)(C).

> iii. <u>President Biden's Privilege Determination Outweighs that of Plaintiff</u>

At bottom, this is a dispute between a former and incumbent President. And the Supreme Court has already made clear that in such circumstances, the incumbent's view is accorded greater weight. This principle is grounded in "the fact that the privilege is seen as inhering in the

institution of the Presidency, and not in the President personally." *Dellums*, 561 F.2d at 247 n.14 (citing *Nixon v. Adm'r of Gen. Servs.*, 408 F. Supp. 321, 343 (D.D.C. 1976), *aff'd*, 433 U.S. 425 (1977)). Only "the incumbent is charged with performance of the executive duty under the Constitution." *Nixon v. GSA*, 433 U.S. at 448. And it is the incumbent who is "in the best position to assess the present and future needs of the Executive Branch, and to support invocation of the privilege accordingly." *Id.* at 449.

Plaintiff does not acknowledge the deference owed to the incumbent President's judgment. His position that he may override the express will of the executive branch appears to be premised on the notion that his executive power "exists in perpetuity." Hearing Tr. at 19:21-22. But Presidents are not kings, and Plaintiff is not President. He retains the right to assert that his records are privileged, but the incumbent President "is not constitutionally obliged to honor" that assertion. *Public Citizen v. Burke*, 843 F.2d 1473, 1479 (D.C. Cir. 1988).[4] That is because

---

[4] Plaintiff also retains the right to assert his own personal "rights or privileges," if any. 44 U.S.C. § 2204; *see also Nixon v. GSA*, 433 U.S. at 455-83 (analyzing former President Nixon's assertion of personal rights, including privacy and First Amendment associational rights). Plaintiff, however, does not do so here. He makes conclusory assertions of attorney-client privilege and attorney work product, but he appears to do so as a species of executive privilege. *See, e.g.*, Pl.'s Mot. at 3 (referring indiscriminately to "various privileges," including "conversations with (or about) foreign leaders, attorney work product, the most sensitive national security secrets, along with a litany of privileged communications among a pool of potentially hundreds of people"); *id.* at 5 (referring without elaboration to "executive privilege and attorney-client privilege"); *id.* at 30 (referring to deliberative process privilege and attorney-client privilege in the same discussion relating to "the President").

In any event, Plaintiff does not elaborate on these claims with sufficient detail for this court to assess them, nor would any such claim be convincing, because the records maintained by the Archivist, by definition, only include those records reflecting the "activities, deliberations, decisions, and policies" of the Presidency, 44 U.S.C. § 2203(a), and not private communications. Plaintiff offers no evidence that the records contain anything of a personal nature; in fact, he concedes that the responsive records do not involve private conversations between him and a personal attorney. *See* Hearing Tr. at 60:21-61:6. The court need not credit Plaintiff's concern

Plaintiff is no longer situated to protect executive branch interests with "the information and attendant duty of executing the laws in the light of current facts and circumstances." *Dellums*, 561 F.2d at 247.  And he no longer remains subject to political checks against potential abuse of that power.  *Nixon v. GSA*, 433 U.S. at 448.

Moreover, contrary to Plaintiff's assertion that President Biden's decision not to invoke executive privilege is "unprecedented," Pl. Mot. at 2, history is replete with examples of past Presidents declining to assert the privilege.  From President Nixon permitting the unrestricted congressional testimony of present and former White House staff members,[5] to President Ronald Reagan's decision to authorize testimony and the production of documents related to the Iran-Contra affair, including information about his communications and decision-making process,[6] to President George W. Bush's decision to sit for an interview with the 9/11 Commission to answer questions about his decision-making process in the wake of the attack,[7] past Presidents have balanced the executive branch's interest in maintaining confidential communications against the public's interest in the requested information.  The Supreme Court noted that this tradition of

---

in the abstract.  *See Barenblatt v. United States*, 360 U.S. 109, 112 (1959) (the congressional "power [of inquiry] and the right of resistance to it are to be judged in the concrete, not on the basis of abstractions.").

[5] *See* Letter Responding to the Senate Select Committee on Presidential Campaign Activities Request for Presidential Testimony and Access to Presidential Papers (July 7, 1973), *Pub. Papers of Pres. Richard Nixon* 636, 637 (1973).

[6] *See* Report of the Congressional Committees Investigating the Iran-Contra Affair, H.R. Rep. No. 100-433, S. Rep. No. 100-216, at xvi (1987).

[7] *See* Philip Shenon & David E. Sanger, *Bush and Cheney Tell 9/11 Panel of '01 Warnings*, N.Y. TIMES, Apr. 30, 2004, at A1, https://www.nytimes.com/2004/04/30/us/threats-responses-investigation-bush-cheney-tell-9-11-panel-01-warnings.html.

negotiation and compromise between the legislative and executive branches extends back to the administrations of Washington and Jefferson. *See Mazars*, 140 S. Ct. at 2029-31. President Biden's decision not to assert executive privilege because "Congress has a compelling need in service of its legislative functions to understand the circumstances" surrounding the events of January 6, *see* Pl. Mot., Exs. 4, 6, is consistent with historical practice and his constitutional power.

Plaintiff appears to view the dispute as resulting in some sort of equipoise, and asks the court to act as a tiebreaker, reviewing each disputed record *in camera*. The court, however, is not best situated to determine executive branch interests, and declines to intrude upon the executive function in this manner. It must presume that the incumbent is best suited to make those decisions on behalf of the executive branch. *See Nixon v. GSA*, 433 U.S. at 449. As the Supreme Court noted in *Mazars*, decisions about whether to accommodate congressional requests for information are best "hashed out in the 'hurly-burly, the give-and-take of the political process between the legislative and the executive.'" *Mazars*, 140 S. Ct. at 2029 (quoting Hearings on S. 2170 et al. before the Subcommittee on Intergovernmental Relations of the Senate Committee on Government Operations, 94th Cong., 1st Sess., 87 (1975) (A. Scalia, Assistant Attorney General, Office of Legal Counsel). When the legislative and executive branches agree that the nation's interest is best served by a disclosure to Congress, as they do here, then the court has a "duty of care to ensure that [it] does not needlessly disturb 'the compromises and working arrangements that [those] branches . . . themselves have reached." *Mazars*, 140 S. Ct. at 2031 (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 524-26 (2014)). Plaintiff has pointed to no legal authority mandating a different outcome.

The court therefore holds that Plaintiff's assertion of privilege is outweighed by President

Biden's decision not to uphold the privilege, and the court will not second guess that decision by

undertaking a document-by-document review that would require it to engage in a function

reserved squarely for the Executive.

      *iv.*   <u>*Plaintiff's Constitutional Challenge to the Presidential Records Act*</u>

Plaintiff's argument that the PRA strips him of his constitutional rights is unavailing.

The Act establishes a framework under which a former President may assert executive privilege,

subject to the incumbent's decision on whether to uphold the privilege, which is consistent with

the constitutional principle explained by the Court in *Nixon v. GSA*. *Compare Nixon v. GSA*, 433

U.S. at 449 (explaining that the incumbent President is best positioned "to assess the present and

future needs of the Executive Branch, and to support invocation of the privilege accordingly"),

*with* 44 U.S.C. § 2208(c)(1) (establishing that when a former President makes a privilege

assertion, the Archivist shall then "determine whether the incumbent President will uphold the

claim asserted by the former President"). And because the PRA applies only to "Presidential

records," defined as records reflecting "the activities, deliberations, decisions, and policies" of

the Presidency, Plaintiff's personal records, such as those reflecting conversations with a

personal attorney or campaign staff, would not be subject to preservation or disclosure by the

PRA. 44 U.S.C. § 2203(a); *see also* Hearing Tr. at 57:1-13 (counsel for NARA explaining that

records relating to the president's own election, campaign activity, or strictly personal matters

are not "Presidential records" and are thus sorted out during an accommodation process).

Accordingly, the concerns at issue in *Mazars*, that Congress may attempt "to harass" the

President about matters of a personal nature, are plainly not present here, where the records to be

produced are confined to Plaintiff's activities, deliberations, and decision making in his capacity as President.  *Mazars*, 140 S. Ct. at 2034.

Nor does the Act disrupt the balance between the branches of government.  "Congress and the President have an ongoing institutional relationship as the 'opposite and rival' political branches."  *Mazars*, 140 S. Ct. at 2033 (quoting THE FEDERALIST NO. 51, at 349 (James Madison)).  It is assumed that these two branches, guided by ambition, will act in furtherance and preservation of their own constitutional power, helping to ensure a balance of power between them.  *See* THE FEDERALIST NO. 51, at 349.  The executive branch became a party to the PRA's regulations over forty years ago when President Carter signed the Act into law.  As President Carter said at the time, the PRA was enacted to "make the Presidency a more open institution," and to "ensure that Presidential papers remain public property after the expiration of a President's term."  Presidential Statement on Signing the Presidential Records Act of 1978, 14 Weekly Comp. Pres. Doc. 39, 1965 (Nov. 6, 1978).  President Carter's decision to sign the Act into law, and each subsequent President's—including Plaintiff's—acquiescence to its framework, demonstrates that the PRA does not prevent the executive branch from accomplishing its constitutionally assigned functions.  Each "branch of Government has the duty initially to interpret the Constitution for itself, and that interpretation of its powers is due great respect from the other branches."  *Nixon v. GSA*, 433 U.S. at 442-43 (citing *Nixon*, 418 U.S. at 708).  *Cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-637 (1952) (Jackson, J., concurring) ("When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate. . . . If his act is held unconstitutional under these

circumstances, it usually means that the Federal Government as an undivided whole lacks

power.") (footnote omitted).  And finally, by interpreting the PRA's framework as consistent

with *Nixon v. GSA*'s constitutional principle, the court adheres to the canon of constitutional

avoidance.  *See Close v. Glenwood Cemetery*, 107 U.S. 466, 475 (1883) ("Every legislative act is

to be presumed to be a constitutional exercise of legislative power until the contrary is clearly

established.").

     Applying these principles, the court rejects Plaintiff's constitutional challenge to the

PRA.

     1.  <u>Congress' Power to Request Presidential Records</u>

     Plaintiff argues that the Select Committee has ventured beyond its constitutionally

allotted "legislative Powers" by requesting records that are unrelated to the events of January 6,

and by failing to articulate any valid legislative purpose that could be served by its requests.  *See*

Pl. Mot. at 15-19.  He further argues that the court must scrutinize the Select Committee's

requests either by using the D.C. Circuit's balancing test in *Senate Select Committee*, 498 F.2d

725 (D.C. Cir. 1974), or the four-factor evaluation articulated by the Supreme Court in *Trump v.

Mazars*, 140 S. Ct. 2019 (2020), and that the Committee's requests, having no valid legislative

purpose, cannot survive such scrutiny.

     Defendants counter that the Select Committee's legislative purpose is legitimate and

compelling.  Specifically, they contend that the Select Committee is investigating the facts,

circumstances, and causes of the events of January 6, 2021, and that the requests are intended to

support remedial legislation.  *See* ECF No. 19, Comm. Br. at 18-22; NARA Br. at 15-27.

Defendants also maintain that neither the *Senate Select Committee* balancing test nor the four-factor *Mazars* test apply.

        *i.*    <u>*Legislative Powers*</u>

Article I of the Constitution grants Congress all "legislative Powers," U.S. Const. art. I, § 1, encompassed in which is the power to secure "needed information." *McGrain v. Daugherty*, 273 U.S. 135, 161 (1927). Indeed, the power to secure "needed information" is deeply rooted in the nation's history: "It was so regarded in the British Parliament and in the colonial Legislatures before the American Revolution, and a like view has prevailed and been carried into effect in both houses of Congress and in most of the state Legislatures." *Id.* While the powers of the British Parliament and Congress are clearly not the same, there is "no doubt as to the power of Congress, by itself or through its committees, to investigate matters and conditions relating to contemplated legislation." *Quinn v. United States*, 349 U.S. 155, 160 (1955).

That power permits "Congress to inquire into and publicize corruption, maladministration or inefficiency in agencies of the Government." *Watkins v. United States*, 354 U.S. 178, 200 n.33 (1957). "From the earliest times in its history, the Congress has assiduously performed an 'informing function' of this nature." *Id.* (citing James M. Landis, *Constitutional Limitations on the Congressional Power of Investigation*, 40 HARV. L. REV. 153, 168–194 (1926)). In the words of one former President—words later adopted by the Supreme Court:

> It is the proper duty of a representative body to look diligently into every affair of government and to talk much about what it sees. It is meant to be the eyes and the voice, and to embody the wisdom and will of its constituents. Unless Congress have and use every means of acquainting itself with the acts and the disposition of the administrative agents of the government, the country must be helpless to learn how it is being served; and unless Congress both scrutinize these things and sift them by every form of discussion, the country must remain in embarrassing, crippling ignorance of the very affairs which it is most important that it should understand

and direct. The informing function of Congress should be preferred even to its
legislative function.

*United States v. Rumely*, 345 U.S. 41, 43 (1953) (quoting Woodrow Wilson, *Congressional
Government: A Study in American Politics*, 303 (1913)).  Thus, the "power of inquiry—with
process to enforce it—is an essential and appropriate auxiliary to the legislative function."
*Mazars*, 140 S. Ct. at 2031 (quoting *McGrain*, 273 U.S. at 161).  It is a "critical responsibility
uniquely granted to Congress under Article I."  *Trump v. Comm. on Oversight and Reform*, 380
F. Supp. 3d 76, 91 (D.D.C. 2019).  To ensure that Congress is able to properly carry out that
critical responsibility, its power to obtain information is necessarily "'broad' and
'indispensable.'"  *Mazars*, 140 S. Ct. at 2031 (quoting *Watkins*, 354 U.S. at 187).  It
"encompasses inquiries into the administration of existing laws, studies of proposed laws, and
'surveys of defects in our social, economic or political system for the purpose of enabling the
Congress to remedy them.'"  *Id.*  In short, "[t]he scope of the power of inquiry . . . is as
penetrating and far-reaching as the potential power to enact and appropriate under the
Constitution."  *Barenblatt*, 360 U.S. at 111.

Congress' power to obtain information, however, is not without limit.  A congressional
subpoena "must serve a valid legislative purpose; it must concern a subject on which legislation
could be had."  *Mazars*, 140 S. Ct. at 2031 (cleaned up).  Consequently, a congressional request
for information that extends "to an area in which Congress is forbidden to legislate," is out of
bounds.  For example, "Congress may not use subpoenas to try someone before a committee for
any crime or wrongdoing," because "such powers are assigned under our Constitution to the
Executive and Judiciary."  *Id.* (cleaned up).  Nor is there a "congressional power to expose for
the sake of exposure."  *Watkins*, 354 U.S. at 200.  "Investigations conducted solely for the

personal aggrandizement of the investigators or to 'punish' those investigated are indefensible."
*Id.* at 187. On the other hand, an inquiry is not illegitimate simply because it calls for
information that is private or confidential, might be embarrassing, or could have law
enforcement implications. *See, e.g.*, *id.* at 198; *Townsend v. United States*, 95 F.2d 352, 361
(D.C. Cir. 1938) (the fact that a congressional inquiry might seem "incompetent, irrelevant,"
"embarrass[ing]," or even "impertinent" is generally immaterial).

When a court is asked to decide whether Congress has used its investigative power
improperly, its analysis must be highly deferential to the legislative branch. Courts "are bound
to presume that the action of the legislative body was with a legitimate object, if it is capable of
being so construed." *McGrain*, 273 U.S. at 178. *See also Barry v. U.S. ex rel. Cunningham*, 279
U.S. 597, 619 (1929) (holding that "the proceedings of the houses of Congress, when acting
upon matters within their constitutional authority" are entitled to a "presumption in favor of
regularity"). Moreover, the Supreme Court has repeatedly held that courts may not "test[ ] the
motives of committee members" to negate an otherwise facially valid legislative purpose.
*Watkins*, 354 U.S. at 200; *see also Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 508
(1975) ("Our cases make clear that in determining the legitimacy of a congressional act we do
not look to the motives alleged to have prompted it."). Accordingly, it is not this court's role to
decide whether Congress is motivated to aid legislation or exact political retribution; rather, the
key factor is whether there is some discernable legislative purpose. *See Watkins*, 354 U.S. at
200.

ii.    *The Select Committee's Requests Serve a Valid Legislative Purpose*

The Supreme Court considers congressional resolutions a primary source from which to determine whether information "was sought . . . in aid of the legislative function." *McGrain*, 273 U.S. at 176; *see also Shelton v. United States*, 404 F.2d 1292, 1297 (D.C. Cir. 1968) (observing that relevant sources of evidence to "ascertain whether [an inquiry] is within the broad investigative authority of Congress" include "the resolution authorizing the inquiry"). Accordingly, the court begins its inquiry with the resolution stating the Select Committee's intended purpose.  H.R. 503, which established the Select Committee and the subject matter within its purview, outlines several purposes and functions of the Select Committee, including:

- Obtaining information and reporting on (1) "the facts, circumstances, and causes relating to" the January 6 attack and "the interference with the peaceful transfer of power"; (2) the "activities of intelligence agencies, law enforcement agencies, and the Armed Forces, . . . with respect to intelligence collection, analysis, and dissemination" surrounding the attack; and (3) the "influencing factors that contributed to the" attack, including how "online platforms, financing, and . . . campaigns may have factored into [its] motivation, organization, and execution," *id.* §§ 3, 4(a)(1);

- Identifying, reviewing, and evaluating "the causes of and the lessons learned from the" January 6 attack, including as to "the command, control, and communications of" law enforcement and the coordination and planning of the Federal Government, *id.* § 4(a)(2); and

- Issuing "a final report to the House" with "recommendations for . . . changes in law, policy, [or] procedures . . . that could be taken[ ] to prevent future acts of violence, domestic terrorism, and domestic violent extremism, including acts targeted at American democratic institutions" . . . and "strengthen the security and resilience of" American democratic institutions, *id.* § 4(a)(3), (c).

Defendants argue that, as set forth in H.R. 503, the Select Committee's August 25 requests are in furtherance of an effort to understand the facts and circumstances that led to the events of January 6, inform its final report, and make recommendations for legislative changes. The Committee Defendants contend that they have questions and concerns about election

**Page 27 of 39**

integrity, coordination of law enforcement, use of executive resources to pressure Department of Justice and state officials regarding the election outcome, and building safety, and that their investigation into these areas for legislative purposes is legitimate.  *See id.*

Plaintiff concedes that the statements in H.R. 503 concerning "safety and election integrity are topics on which legislation theoretically 'could be had.'"  Pl. Mot. at 19.  He argues however, that the Committee does not "explain with any specificity how this information will in fact assist the Committee in evaluating the proposed legislation" and that the requested information is not "reasonably related" to its investigation.  *Id.* at 17, 19.

Plaintiff contends that the Select Committee "fails to identify a single piece of legislation [] the Committee is considering."  This claim is a straw man.  Congress need not (and usually does not) identify specific legislation within the context of a request for documents or testimony, nor must it do so when establishing a select committee or when that committee requests documents.  For instance, the Supreme Court has upheld the validity of a select committee subpoena even though the Senate's "resolution directing the investigation d[id] not in terms avow that it is intended to be in aid of legislation."  *McGrain*, 273 U.S. at 177; *see also In re Chapman*, 166 U.S. 661, 669-70 (1897) ("[I]t was certainly not necessary that the resolutions should declare in advance what the [S]enate meditated doing when the investigation was concluded.").  The Court found the subpoena valid because the investigation's subject "was one on which legislation *could be had* and would be materially aided by the information which the investigation was calculated to elicit."  *McGrain*, 273 U.S. at 177 (emphasis added).

The court has no difficulty discerning multiple subjects on which legislation "could be had" from the Select Committee's requests.  *Id.* at 177.  Some examples include enacting or

amending criminal laws to deter and punish violent conduct targeted at the institutions of democracy, enacting measures for future executive enforcement of Section 3 of the Fourteenth Amendment against any Member of Congress or Officer of the United States who engaged in "insurrection or rebellion," or gave "aid or comfort to the enemies thereof," U.S. Const. amend. XIV, § 3, imposing structural reforms on executive branch agencies to prevent their abuse for antidemocratic ends, amending the Electoral Count Act, and reallocating resources and modifying processes for intelligence sharing by federal agencies charged with detecting, and interdicting, foreign and domestic threats to the security and integrity of our electoral processes. *See* Comm. Br. at 20; NARA Br. at 18; ECF No. 25, Amicus Br. by Former Members of Congress at 7. These are just a few examples of potential reforms that Congress might, as a result of the Select Committee's work, conclude are necessary or appropriate to securing democratic processes, deterring violent extremism, protecting fair elections, and ensuring the peaceful transition of power. Of course, other forms of legislation not currently imagined may also follow. The critical fact is that Congress reasonably might consider the requested records in deciding whether to legislate in a host of legitimate areas.

To be sure, the Committee has cast a wide net. While some of the requests pertain to Plaintiff's communications and actions, the former Vice President, and other former executive officials on January 6, 2021, other requests more broadly seek information regarding events leading up to January 6, including communications concerning the election, conversations between Plaintiff and Department of Justice and state government officials regarding Plaintiff's allegations that the election was "rigged," records relating to the recruitment, planning, and preparation for rallies leading up to and including January 6, and conversations regarding the

process for transferring power to the incumbent. For example, one of the Committee's requests is for all documents and communications from April 1, 2020, through January 20, 2021, related to the 2020 presidential election, including forecasting, polling, or results, which were authored or presented by, or relate in any way to one of five specific individuals who the Committee presumably believes were involved in strategies to delay, halt, or otherwise impede the electoral count. Pl. Mot., Ex. 1 at 5. Another similarly broad request seeks all documents and communications concerning the 2020 election and relating to any of one of forty named individuals who the Committee presumably believes participated in the recruitment, planning, and preparations for rallies on days leading up to and including January 6. *Id.* at 7-8.

While broad, these requests, and each of the other requests made by the Committee, do not exceed the Committee's legislative powers. Three facts undergird this conclusion.

First, the court again notes that the Committee's requests pertain only to "Presidential records," which by statute are limited to records reflecting "the activities, deliberations, decisions, and policies" of the Presidency. 44 U.S.C. § 2203(a). Accordingly, there is a natural, statutory limit on the types of records that will ultimately be maintained in the Archives and produced to the Select Committee in response to its requests. For example, although the Select Committee has requested certain records, such as polling data, concerning the 2020 election dating back to April 2020, those records, by their very nature, are not Presidential records under the statute, and would not be included in any responsive document tranches sent to the Committee. The same goes for any personal papers or communications.

Second, while some of the Select Committee's requests are indeed broad, so too is Congress' power to obtain information. *See Watkins*, 354 U.S. at 187. The Select Committee

appears to be operating under the theory that January 6 did not take place in a vacuum, and instead was the result of a months-long groundswell. *See* Hearing Tr. at 41:4-7; 42:22-23. Defendants argue that to identify effective reforms, Congress must first understand the circumstances leading up to January 6 and how the actions of Plaintiff, his advisors, and other government officials contributed or responded to that groundswell. NARA Br. at 18. The court notes that the Select Committee reasonably could find it necessary to investigate the extent to which the January 6 attack on the Capitol may have been an outgrowth of a sustained effort to overturn the 2020 election results, involving individuals both in and outside government. But the "very nature of the investigative function—like any research—is that it takes the searchers up some 'blind alleys' and into nonproductive enterprises. To be a valid legislative inquiry there need be no predictable end result." *Eastland*, 421 U.S. at 509. In fact, the Committee need not enact any legislation at all. *Trump v. Mazars USA, LLP*, 940 F.3d 710, 727 (D.C. Cir. 2019) (explaining that the "House is under no obligation to enact legislation after every investigation"). Nor is it problematic that some requests might ultimately return records that are "irrelevant," or "impertinent" to its stated goals. *Townsend*, 95 F.2d at 361. It is not for this court to decide whether the Select Committee's objective is prudent or their motives pure. *See Watkins*, 354 U.S. at 200; *Eastland*, 421 U.S. at 508. Instead, the pertinent question is whether Congress could legitimately legislate in these areas, and, as explained above, it can.

Third, President Biden's decision not to assert the privilege alleviates any remaining concern that the requests are overly broad. In cases such as *Mazars*, which involved separation of powers concerns, limitations on the breadth of a congressional inquiries serve as "important safeguards against unnecessary intrusion into the operation of the Office of the President."

*Mazars*, 140 S. Ct. at 2036. Plaintiff argues that the requests at issue here are burdensome because they are "unbelievably broad" and that their breadth is "striking" because they could "be read to include every single e-mail sent in the White House" on January 6. *See* Pl. Mot. at 21-24. But upon whom is the burden imposed? President Biden has determined that the requests are not so intrusive or burdensome on the Office of the President as to outweigh Congress' "compelling need in service of its legislative functions." Pl. Mot., Ex. 4 at 1-2. Unlike the circumstances presented in *Mazars*, here, the legislative and executive branches are in harmony and agree that the requests are not unduly intrusive, thus extinguishing any lingering concerns about the breadth of the requests.

### iii. The Alternative Mazars Standard Results in the Same Outcome

Plaintiff urges the court to apply either the balancing test from *Senate Select Committee*, 498 F.2d 725 (1974), or the four-factor standard from *Trump v. Mazars*, 140 S. Ct. 2019 (2020). In the alternative, Plaintiff argues that the court could apply a "*Mazars* lite" test by applying the four *Mazars* factors, but using "reduced judicial scrutiny," "cognizant of the fact that this case now involves a subpoena directed at a former President." *Trump v. Mazars, USA, LLP*, No. 19-cv-01136, 2021 WL 3602683, at *13 (D.D.C. Aug. 11, 2021), *appeal pending*, No. 21-5176 (D.C. Cir.).

Defendants argue that neither the *Senate Select Committee* or *Mazars* standards apply because both cases involved Congressional requests for information from a sitting President, and therefore presented separation of powers concerns arising from a "clash between rival branches of government." *Mazars*, 140 S. Ct. at 2034. Defendants contend that the "*Mazars* lite" approach is inappropriate because, unlike the situation when *Mazars* was decided on remand,

"the executive branch has agreed to provide the requested documents under the PRA, and compulsory process is not at issue." NARA Br. at 23.

The court agrees that the stringent balancing test of *Senate Select Committee* does not apply because, for reasons already stated, the requested records are not privileged. Indeed, at oral argument, Plaintiff's counsel did not mention this test and instead asserted only that the *Mazars* four-factor test is appropriate. *See* Hearing Tr. at 8:12-16. The court also agrees with Defendants that Plaintiff's status as a former President, and the fact that the legislative and executive branches agree that the records should be produced, reduces the import of the *Mazars* test. Each of Plaintiff's arguments about why *Mazars* is applicable assumes separation of powers concerns that have little, if any, force here. Nonetheless, because this is a matter of first impression, the court will apply the four *Mazars* factors, conscious of the fact that Plaintiff is a former President.

Under the first *Mazars* factor, "the asserted legislative purpose" must warrant "the significant step of involving the President and his papers." *Id.* at 2035. "Congress may not rely on the President's information if other sources could reasonably provide" the information Congress needs in light of its legislative objective. *Id.* at 2035–36. The court starts with the obvious: the concerns raised by the "significant step" in *Mazars* are plainly not present here, where Plaintiff is no longer President, and the incumbent President has decided that Congress' legislative purpose warrants production. *See* Pl. Mot., Ex. 4. Moreover, the Select Committee has demonstrated that its asserted legislative purpose is indeed significant. It seeks to learn about what, if anything, Plaintiff, his advisors, other government officials, and those close to him knew about efforts to obfuscate or reverse the results of the 2020 election, recruitment, planning, and

coordination of the January 6 rally, the likelihood of the protest turning violent, and what actions they took in response. *See* Pl. Mot., Ex. 1. Plaintiff has not identified any source from which the Select Committee could gain answers to these questions other than the Presidential records they seek. *See* Pl. Mot. at 19 (offering only the conclusory statement that the Select Committee "could obtain any and all of the information it seeks" from non-privileged sources); Hearing Tr. at 16:10-13 (suggesting without evidence or explanation that non-privilege documents should be sufficient). Accordingly, the Select Committee clears the first hurdle.

Second, under *Mazars*, the congressional inquiry should be "no broader than reasonably necessary to support Congress' legislative objective." *Id.* This limitation is necessary, the Court explained, to "safeguard against unnecessary intrusion into the operation of the Office of the President." *Id.* (cleaned up); *see also Nixon v. GSA*, 433 U.S. at 443 (explaining that "the proper inquiry" for courts is to consider the extent to which a congressional act "prevents the Executive Branch from accomplishing its constitutionally assigned functions"). Here, President Biden has not objected to any of the requests as being overly broad or unnecessarily intrusive. His counsel has reviewed the first three tranches of responsive records and stated that President Biden supports their production because of Congress' compelling interest in them. *See* Pl. Mot., Exs. 4, 6. Plaintiff's argument to the contrary, that the Select Committee's "broad" requests are overly intrusive into the operations of an office he no longer occupies, is therefore unpersuasive.

Third, "courts should be attentive to the nature of the evidence offered by Congress to establish that a subpoena advances a valid legislative purpose." *Mazars*, 140 S. Ct. at 2036. "[U]nless Congress adequately identifies its aims and explains why the President's information will advance its consideration of possible legislation," "it is impossible to conclude that a

subpoena is designed to advance a valid legislative purpose." *Id.* The Select Committee has adequately identified its aims and indicated why the requested records may support a valid legislative purpose. As noted above, the Select Committee was created to investigate the facts and circumstances of the January 6 attack, including "influencing factors that contributed to the attack." H.R. 503 § 4(a)(1)(B). Defendants tie this aim to the Committee's Presidential records requests by pointing to Plaintiff's statements claiming the election was "rigged," promoting the January 6 rally, and calling on his supporters to "walk down to the Capitol" to "take back our country," Comm. Br. at 7, public reports regarding Plaintiff's efforts to pressure Department of Justice and state officials to reverse the election results, *id.* at 5-7, and the Committee's findings about the effort of Plaintiff's former aides to stop or delay the counting of election results, H.R. Rep. No. 117-152, at 6 (Oct. 19, 2021). The Committee could reasonably expect the requested records to shed light on any White House planning and strategies concerning public messaging about the election, any efforts to halt or delay the electoral count, and preparations for and responses to the January 6 rally and attack. *See* Pl. Mot., Ex. 1 at 4, 7-9. Such information would be plainly material to the Select Committee's mandate to discover and report on "the facts, circumstances, and causes relating to the January 6 [attack]," H.R. 503, § 3(1), and to pass remedial legislation in any number of previously identified areas within their legislative purview.

Fourth, courts should "assess the burdens imposed on the President by [the] subpoena" because "[the burdens] stem from a rival political branch that has an ongoing relationship with the President and incentives to use subpoenas for institutional advantage." *Mazars*, 140 S. Ct. at 2036. Defendants satisfy this factor as well, because the "burdens imposed on the President" by the Committee's request are of considerably less significance when the Presidential records

sought pertain to a former President and when the incumbent President favors the production. *Mazars*, 2021 WL 3602683, at *13. Moreover, unlike the compulsory nature of the subpoena in *Mazars*, here, the Select Committee made its request pursuant to a statutory framework to which the executive branch is a party and has long acquiesced. This fact, too, undermines any notion that the office of the President is unduly burdened by the requests.

Having found that all four *Mazars* factors weigh against Plaintiff's position, the court concludes that the Select Committee's requests are a valid use of legislative power and refuses to enjoin what the legislative and executive branches agree is a vitally important endeavor.

## B. **Irreparable Harm**

A party seeking preliminary injunctive relief must show an imminent threat of irreparable harm by the challenged action or inaction. The "injury must be both certain and great, actual and not theoretical, beyond remediation, and of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (cleaned up).

Plaintiff fails to show that any irreparable injury is likely to occur. First, to the extent Plaintiff argues that he, as a private citizen, will suffer injury, he has not identified any personal interest that is threatened by the production of Presidential records. He claims no personal interest in the records or the information they contain, and he identifies no cognizable injury to privacy, property, or otherwise that he personally will suffer if the records are produced, much less a harm that is "both certain and great," *id.*, 787 F.3d at 555, if injunctive relief is denied.

Second, Plaintiff's argument that the executive branch will suffer injury is similarly unavailing. Plaintiff invokes the executive privilege protecting presidential communications,

contending that compliance with the Select Committee's requests "will undoubtedly cause sustainable injury and irreparable harm" to future Presidents because releasing confidential communications between him and his advisors concerning his duties and responsibilities as President to a "rival branch of government" will "chill[ ] advice given by presidential aides[.]" Pl.'s Mot. at 6-7, 36.  That privilege, however, is not for the benefit of any "individual, but for the benefit of the Republic."  *Nixon v. GSA*, 433 U.S. at 449.  Moreover, the notion that the contemplated disclosure will gravely undermine the functioning of the executive branch is refuted by the incumbent President's direction to the Archivist to produce the requested records, and by the actions of past Presidents who similarly decided to waive executive privilege when dealing with matters of grave public importance, such as the Watergate scandal, the Iran-Contra affair, and 9/11.  Plaintiff therefore has made no showing of imminent irreparable harm to any interests protected by executive privilege that compels an immediate halt to compliance with the Select Committee's requests.

Plaintiff also contends that an injunction is needed to protect against a risk of inadvertent disclosure of privileged documents, allegedly due to the "short time periods" provided under the PRA for review of potentially large volumes of records whose sensitivity may not be apparent if their authors or custodians cannot be readily ascertained.  *See* Pl.'s Mot. at 37.  This too is not a convincing injury.  Thus far, Plaintiff's PRA representatives have successfully reviewed the records in the first three tranches, and Plaintiff has invoked privilege over many of them. Moreover, NARA routinely accommodates requests from former Presidents for additional time to complete their reviews when the volume or complexity of records requires.  NARA Br., Laster Decl. ¶ 11.  NARA maintains the records in the same order and manner of organization as they

were transmitted by the outgoing administration. *Id.* ¶ 6. To the extent practicable and necessary, NARA informs the PRA representatives where the responsive records came from, such as from a staff member's office files. *Id.* And when asked, NARA also assists former Presidents in identifying records' authors and custodians. *Id.* ¶ 11. These accommodations are sufficient to mitigate any claim by Plaintiff that he is prejudiced by the PRA statutory process.

### C. Balance of the Equities and the Public Interest

The legislative and executive branches believe the balance of equities and public interest are well served by the Select Committee's inquiry. The court will not second guess the two branches of government that have historically negotiated their own solutions to congressional requests for presidential documents. *See Mazars*, 140 S. Ct. 2029-31.

Defendants contend that discovering and coming to terms with the causes underlying the January 6 attack is a matter of unsurpassed public importance because such information relates to our core democratic institutions and the public's confidence in them. NARA Br. at 41. The court agrees. As the Supreme Court has explained, "the American people's ability to reconstruct and come to terms" with their history must not be "truncated by an analysis of Presidential privilege that focuses only on the needs of the present." *Nixon v. GSA*, 433 U.S. at 452-53. The desire to restore public confidence in our political process, through information, education, and remedial legislation, is of substantial public interest. *See id.*

Plaintiff argues that the public interest favors enjoining production of the records because the executive branch's interests are best served by confidentiality and Defendants are not harmed by delaying or enjoining the production. Neither argument holds water. First, the incumbent President has already spoken to the compelling public interest in ensuring that the Select

Committee has access to the information necessary to complete its investigation. And second, the court will not give such short shrift to the consequences of "halt[ing] the functions of a coordinate branch." *Eastland*, 421 U.S. at 511 n.17. Binding precedent counsels that judicially imposed delays on the conduct of legislative business are often contrary to the public interest. *See id.*; *see also Exxon Corp. v. F.T.C.*, 589 F.2d 582, 589 (D.C. Cir. 1978) (describing *Eastland* as emphasizing "the necessity for courts to refrain from interfering with or delaying the investigatory functions of Congress").

Accordingly, the court holds that the public interest lies in permitting—not enjoining— the combined will of the legislative and executive branches to study the events that led to and occurred on January 6, and to consider legislation to prevent such events from ever occurring again.

## IV.    CONCLUSION

For reasons explained above, the court will deny Plaintiff's request to enjoin Defendants from enforcing or complying with the Select Committee's August 25, 2021, requests because Plaintiff is unlikely to succeed on the merits of his claims or suffer irreparable harm, and because a balance of the equities and public interest bear against granting his requested relief.

Date:  November 9, 2021

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge