```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
----------------------------X

COMMITTEE ON WAYS AND MEANS,
UNITED STATES HOUSE OF
REPRESENTATIVES,                      Civil Case No. 19-1974

            Plaintiff,

                  v.                  Washington, D.C.
                                      Tuesday, November 16, 2021
U.S. DEPT. OF TREASURY, et al.,       2:05 p.m.

            Defendants.

----------------------------x

                   TRANSCRIPT OF MOTION HEARING
              BEFORE THE HONORABLE TREVOR N. MCFADDEN
                   UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Counter-Defendants: Douglas N. Letter, Esquire
                        Stacie Fausel, Esquire
                        U.S. HOUSE OF REPRESENTATIVES
                        Office of General Counsel
                        219 Canon House Office Building
                        Washington, DC 20515
                        (202) 225-9700

                        Seth Paul Waxman, Esq.
                        David Lane, Esq.
                        WILMER CUTLER PICKERING HALE & DORR LLP
                        1875 Pennsylvania Avenue NW
                        Washington, DC 20006
                        (202) 663-6000

For Fed. Defendants:    James J. Gilligan, Esquire
                        Elizabeth Shapiro, Esquire
                        Steven A. Myers, Esquire
                        U.S. DEPT. of JUSTICE
                        Federal Programs Branch
                        1100 L Street, NW
                        Washington, DC 20005
```

```
For the Intervenors:      Patrick N. Strawbridge, Esquire
(Cross-claim, counter-    CONSOVOY MCCARTHY PLLC
claim plaintiffs)         Ten Post Office Square
                          8th Floor South PMB #706
                          Boston, MA 02109



For the Intervenor        Cameron T. Norris, Esquire
Defendants:               CONSOVOY MCCARTHY PLLC
                          1600 Wilson Blvd.
                          Suite 700
                          Arlington, VA 22209



Court Reporter:     Lisa Walker Griffith, RPR
                    U.S. District Courthouse
                    Room 6507
                    Washington, D.C.  20001
                    (202) 354-3247
```

```
 1                      P R O C E E D I N G S

 2              THE COURTROOM DEPUTY:  This is civil action

 3      19-1974.  Committee on Ways and Means, United States House

 4      of Representatives versus United States Department of

 5      Treasury, et al.

 6              Counsel, please come forward to identify

 7      yourselves for the record, starting with the plaintiff.

 8              MR. LETTER:  Good morning, Your Honor.  I'm

 9      Douglas Letter from the General Counsel of the U.S. House of

10      Representatives.  With me today is Stacie Fausel, who is an

11      associate counsel, and then Seth Waxman and David Lane from

12      the Wilmer law firm who are working with us.  And in the

13      corner there is Isabella Moore, who is from the Committee on

14      Ways and Means.

15              THE COURT:  Good afternoon, folks.

16              MR. GILLIGAN:  Good afternoon, Your Honor.  James

17      Gilligan from the Department of Justice representing the

18      Treasury and IRS defendants in the case.  And with me at

19      counsel table are Elizabeth Shapiro and Steven Myers also

20      from DOJ.

21              THE COURT:  Good afternoon, folks.

22              MR. STRAWBRIDGE:  Good afternoon, Your Honor.

23      Patrick Strawbridge on behalf of the intervenors, who are

24      the cross-claim and counter-claim plaintiffs, which explains

25      the seating arrangement in the courtroom.  And then with me
```

1  are Cam Norris and Jim McGlone.

2          THE COURT:  Good afternoon, gentlemen.

3          All right, we're here for a motion hearing on the

4  motion to dismiss.

5          I think my clerk had mentioned our hope that the

6  federal parties will have kind of divided-up arguments.

7          Mr. Letter, did you want to start?

8          MR. LETTER:  Thank you, Your Honor.  And just to

9  let you know, Mr. Gilligan and I have divided subjects up,

10 but any time -- and so I'll speak first and then

11 Mr. Gilligan.  Any time though that you want to ask about a

12 particular subject, if it's the other of us, we're happy to

13 play jack-in-the-box and get up, so whatever you want is

14 fine with us.

15         In general, the way we've done this is I will

16 cover issues concerning the proper scope of judicial review,

17 in other words, what you're doing here.  The, whether the

18 Ways and Means Committee had valid legislative purpose and

19 the application of the Mazars case.  Mr. Gilligan then will

20 be talking about the various constitutional issues and the

21 other claims on which we are not actually a defendant.

22         THE COURT:  Okay.

23         MR. LETTER:  But I repeat, whenever you have a

24 question, please don't hesitate.

25         THE COURT:  Thanks.

1          MR. LETTER:  Your Honor, I wanted to just start by

2     asking you to keep in mind what we think are several

3     essential points here.  The first is there is no clash of

4     branches here.  This case now involves the Executive Branch

5     and the Legislative Branch on the exact same side in full

6     agreement with each other.

7          THE COURT:  And Mr. Strawbridge looks pretty

8     lonely over there.

9          MR. LETTER:  I think he's doing all right.

10    Mr. Strawbridge's client, as you know, is former President

11    Trump, Mr. Trump, who is now a private citizen.  So, as I

12    said, we do not have a clash of branches here.

13          In addition, we're dealing with a request by a

14    committee that was made under a statute and pursuant to

15    specific statutory language passed by Congress and signed by

16    the President, and that statute specifically refers to

17    powers held by the Chairman of the Ways and Means Committee.

18          And last, I'm sure you won't be surprised that I

19    ask you to please expeditiously rule on this matter and to

20    grant the motions to dismiss so that the Treasury Department

21    can go forward with the decision that it has made to make

22    disclosures pursuant to the request made by the Chairman of

23    the Ways and Means Committee.

24          So, starting out, as I suspect you've read all of

25    the cases that we've cited to you, but I do feel like I very

1   much want to emphasize the limited role of the courts here,

2   which has been established in any number of Supreme Court

3   decisions.  Much of the brief filed by Mr. Trump expects

4   this Court to take what we consider an improper and very

5   different role.

6         The courts have made clear, for instance, if I'll

7   just quote very briefly from the Barenblatt case, "So long

8   as Congress acts in pursuance of its constitutional power,

9   the judiciary lacks authority to intervene on the basis of

10  the motives which spurred the exercise of that power."

11        So, issues about the motives of the Committee are

12  clearly just not relevant here.  What you're looking at is

13  what, the stated purposes, stated by the Chairman while he

14  was Chairmen.  So, discussions about things he might have

15  said when he was the ranking member, things that other

16  members of Congress might have said, things that Hillary

17  Clinton said, et cetera, these have no relevance.

18        THE COURT:  So, maybe we could dig into that a

19  little bit, Mr. Letter.

20        So, I can think of various hypotheticals, like

21  what if Chairman Neal right now gave a press conference and

22  said, my lawyers in court are claiming that I'm doing X, but

23  of course we all know I'm doing it for Y reason.  Is that

24  something that I could pay attention to?

25        MR. LETTER:  Yes, Your Honor.  I am not going to

1   stand up here and take a ridiculous position.  In the main,

2   however, what you are looking at are the official statements

3   of the Chairman.  So, you said a press conference.  But

4   again, I'm not going to quibble with you and say oh no, no,

5   no, you have to have blinders on and pretend that none of

6   that ever happened.  As we know, it has not happened here.

7            What you could be looking at though are, if there

8   were a situation where the Chairman was self-contradicting

9   in some sort of official way, I repeat, I'm not going to

10  tell you that, oh no, you have to pretend that that didn't

11  happen, but that's not what happened here.

12           THE COURT:  Yeah, and so, I guess I'm struggling

13  with this because the Trump parties have amassed a lot of

14  statements.  I hear you, most of them not from Chairman

15  Neal, but some from Chairman Neal from earlier that, even

16  from him, I think you could certainly take to suggest that

17  there is something else going on.

18           And especially, I mean, one of the issues here is

19  obviously we're at motion to dismiss stage, and so trying to

20  think about all of this evidence and, even if I agree with

21  you that a random congressman might have said doesn't matter

22  much.  We have his statements.  We have Speaker Pelosi's

23  statements, the cross-claims claim that she had to approve

24  this.  I don't know if that's true or not, but my sense is,

25  as a factual matter, maybe I have to credit it right now at

1    the 12(b)(6) stage.  What do I do with all that?

2          MR. LETTER:  Several responses, Your Honor.  First

3    of all, again, I'm sure you read it, but the McGrain case,

4    the Supreme Court made absolutely clear, yes, there's going

5    to be a lot of political chatter.  That's not surprising.

6    We're dealing with political bodies, and the Supreme Court

7    made quite clear there that's not relevant.

8          Second, you said at a motion to dismiss stage, and

9    you're absolutely right about that obviously, but,

10   nevertheless, these are not factual issues.  These are

11   issues of law.  The issue being is, the test the Supreme

12   Court has made clear is, is this something on which

13   legislation may be had.  Is there a valid reason on which

14   legislation may be had?  That's, I think, sort of a quote

15   from McGrain and various cases.

16         We submit that, if you look at the best piece of

17   evidence here, which is the letter from Chairman Neal to the

18   Treasury Secretary in June of '21, that is, by far, the best

19   evidence of what the purpose of the Committee was and the

20   purpose of the Chairman.

21         And statements by the Chairman before he was

22   Chairman, I don't think that those, I'm not sure, I think I

23   would say they have no relevance.  So, we're here with a

24   very clear purpose was stated.

25         In addition, the Supreme Court has made clear

1    that, even if there are other motives or things that might

2    give you pause, the key is, is there a valid purpose.  If

3    there is a valid purpose, then you're done as far as this

4    inquiry goes.

5          THE COURT:  So, I mean, you see my issue here

6    that, let's say -- you know, and I'm inclined to agree with

7    you.  The letter is the best evidence of his purpose.

8    That's where I start from.  But you agree that there are at

9    least some circumstances in which I could consider extrinsic

10   evidence.  You say none of those apply here.  But

11   nonetheless, we have all of this evidence, extrinsic

12   evidence, that may well not win the day but doesn't get them

13   past 12(b)(6).

14         MR. LETTER:  Not at all, Your Honor, because

15   again, the Supreme Court case law here is absolutely in our

16   favor.  And I'll say it one more time.  Remember, McGrain

17   talks about that there was all sorts of, I'll call it

18   political chatter, but screaming and yelling, et cetera,

19   about what was going on and how important it was to do this

20   and that and the various cases, and talking about putting

21   people in jail, et cetera.

22         Again, these are political bodies, but the Supreme

23   Court recognized that and said that's not the test.  So

24   everything, and I know Mr. Strawbridge has pulled together

25   all sorts of interesting material, and page after page, it's

1    interesting.  But you're a judge looking at legal questions.

2    If that's legally irrelevant, then it's not for, it doesn't

3    go to the issues, and therefore, it should not in any way

4    cause you to think that we need to do more.

5              In addition, Your Honor, remember, what is the

6    more?  So, you've been given those statements.  As I said,

7    we argue they're all irrelevant.  What else is there to be

8    done?  Are we talking about trying to take -- remember I

9    said that overwhelmingly what matters under the statute is

10   the Chairman.  I don't see that Mr. Strawbridge has said he

11   wants to take the deposition of Chairman Neal.

12             THE COURT:  I bet he would.

13             MR. LETTER:  I don't think he has said that in his

14   briefs, and I'm fairly sure you would not allow that under

15   the Constitution.  So, he could come up with twice as much

16   stuff with lots of exclamation points.  And as a matter of

17   law, it still would not be relevant to your inquiry.

18             So, the fact that there's a lot of it just is

19   legally irrelevant here, because we think there is no doubt

20   that you've been presented with, not just one but several

21   legislative purposes.  But let's stick with the main one.

22   There is no way that anybody can dispute that the Ways and

23   Means Committee has a totally valid reason to look into the

24   IRS Presidential Audit Program and decide whether it should

25   be made into a statute, to decide --

1          THE COURT:  Before we get to that --

2          MR. LETTER:  Yes.

3          THE COURT:  Can I just ask you, is the Chairman

4    disclaiming any interest in the 2019 letter, the document, I

5    mean, that there are two letters, right, the 2019 and the

6    2021.  Is the 2019 one dead?

7          MR. LETTER:  I don't want to say it's dead, but it

8    is not particularly relevant.  The 2021 letter is the key

9    thing before you because that's from this Congress.  Now, it

10   gets a little complicated, because Congress has a rule that

11   provides that, if a subpoena were issued in a prior Congress

12   and it's subject to litigation, that subpoena can be renewed

13   with just the Chairman so litigation can keep going.  But

14   first of all, we don't have a subpoena here.  But the two

15   letters work together but, by far overwhelmingly, it's the

16   2021 letter.

17         THE COURT:  Okay.  So, I mean, 2019 asks I think

18   for 2013.  Is the Chairman still asking for 2013?

19         MR. LETTER:  I'm sorry, Your Honor.  You were

20   asking a specific question, and I flubbed it.  No, as far as

21   that goes, we're asking only for the tax years covered by

22   the 2021 letter, Your Honor.

23         THE COURT:  Okay.  And so, what relevance, if any,

24   do you believe that the 2019 letter still has?

25         MR. LETTER:  I think I am going to say that almost

1    none to the extent maybe it helps inform the 2021 letter.  I

2    don't actually remember.  I think maybe in it Mr. Neal

3    refers to the 2019 letter, but overwhelmingly, I don't think

4    there is anything of immense interest that is not already

5    there in the 2021 letter and whatever formal statements

6    Mr. Neal made.

7            I feel like you're, that you have in mind that

8    there is something important in the 2019 letter that is not

9    in 2021 besides the change in years.

10           THE COURT:  Well, it's mostly, Mr. Strawbridge

11   suggests that I should be considering Mr. Trump still as

12   President in some ways.

13           MR. LETTER:  Okay.

14           THE COURT:  In part because of the 2019 letter

15   that, as you say, it is a continuing or apparently a

16   continuing request unlike a subpoena that dies.

17           MR. LETTER:  Right.  But yes, it -- had no 2021

18   letter been issued, we would say that you still have before

19   you and the Treasury Department would still have had an

20   existing request.  But overwhelmingly, it was superseded by

21   the 2021 letter.  And, as we know, when that letter was

22   issued and today, Mr. Trump is not the President and all of

23   the ways that that matters, the extremely important ways

24   that that matters for this case.

25           As you know, Mr. Strawbridge argues that, well, in

1    other cases, the Supreme Court was looking at what the

2    initial subpoena.  And that's because those are criminal

3    cases.  So obviously, there, you need to know what was

4    presented to the potential witness.

5            But this is, one, it's not a subpoena.  Two, it's

6    not a criminal matter.  So, what is in front of you is the

7    2021 request made when Mr. Trump is no longer the President.

8            THE COURT:  Okay.  I think that covers my

9    questions on that.

10           Moving to the kind of legitimate legislative

11   purpose, I do want to talk about the purposes that Chairman

12   Neal lays out in his letter.  But what showing would

13   Mr. Strawbridge have to make to rebut the presumption of

14   regularity here and that we've kind of discussed earlier?

15           MR. LETTER:  The, and I feel sort of like I'm

16   betting against myself, but you've asked me to do it.  As we

17   know, the Supreme Court has said the Congressional

18   Committees can't do law enforcement.  So hypothetically, if

19   Chairman Neal said, I know, I know, but I really want to

20   prosecute, we're going to criminally prosecute him in front

21   of the House of Representatives.  Just watch.  We're going

22   to do it.  I think you could take that into account, and

23   that would show that there was an invalid request.

24           THE COURT:  By that, you mean either in the

25   letter, like looking to the letter, if the letter itself had

1   a, said we're interested in prosecuting him or we want to

2   expose him.

3       MR. LETTER:  Right.  In a hearing, an official

4   hearing, somewhere along those lines, certainly not things

5   that Chairman Neal said when he was ranking member or

6   anything like that or when he was, if he was running for

7   reelection or something.

8       THE COURT:  And help me think through that.  Why

9   is that different than, kind of why temporally or the

10  location?  Why does that make a difference at this stage?

11      MR. LETTER:  Because it would seem that what is

12  important for you is what is asserted for the Committee, or

13  in this case, because of the statute, what is asserted by

14  the Chairman officially.  It just, there may be

15  circumstances where it would be appropriate for you to rely

16  on off-hand statements, et cetera.

17      But in the main, we would not consider those

18  things that would be valid for undermining what the Chairman

19  is doing.  And here, I don't think, I'm fairly sure there is

20  nothing that Mr. Strawbridge has come up with in the

21  official statements of Chairman Neal that would in any way

22  undermine what he has said in the letter.

23      Now, one of the things I think is fascinating to

24  me is, you know, Mr. Strawbridge has said, well, Chairman

25  Neal said that he's getting advice of counsel because he

1  wants to do this right and he wants to do it in a way that

2  will be upheld by the courts.  I'm baffled.  I have no idea

3  why that possibly shows any kind of improper purpose or

4  anything.  What that means is that Chairman Neal wants to

5  follow the law, and so he's consulting with attorneys in

6  order to do that.  So, I'm baffled by that one.

7            So, if we look at what Chairman Neal has said in

8  his formal letter to the Secretary of the Treasury, there is

9  plainly a valid purpose there.  We look, as I say, if we

10  need a batch of them, I can give those.  But the

11  Presidential Audit Program, that is something where Congress

12  would be regulating an Executive Branch agency, the IRS.

13  Congress would be imposing on the IRS a requirement of, one,

14  should it do that, how should it fund it, how should it set

15  it up.

16            So, for example, as we point out, under the,

17  apparently under the IRS program that is not in the statute,

18  the White House and the President have the name of the

19  auditor.  But that name is, the knowledge of that name is

20  limited within the agency.  Does that make sense?  Would

21  Congress maybe want to set up a program that doesn't permit

22  that, that has the auditor is somebody who is anonymous?

23            What would be done with that audit?  By statute,

24  it could provide for that the audit would be automatically

25  given to certain members of Congress.  By the way, that

1   raises what, to me, is a very interesting point.  The

2   original statute that set up the program whereby the

3   Congress had the IRS doing certain kinds of things in their

4   audits provided that there would be, that these, the tax

5   return information was available to the public.

6          This is in the Constitutional Accountability

7   Center brief.  They go through this.  Now, Congress later

8   decided to change that, which Congress can do.  But if

9   Congress can think about, all right, do we want -- as part

10  of the financial disclosure laws, do we want to make a

11  President or certain high level Executive Branch officials

12  have their financial information be available to the public

13  so that the public and Congress know about possible foreign

14  entanglements, conflicts of interest, et cetera?

15         THE COURT:  So, Mr. Strawbridge raises concerns

16  about codifying the Presidential Audit Program.

17         MR. LETTER:  Yeah.

18         THE COURT:  That I have not thought about this as

19  much as you all have but certainly strikes me that, you

20  know, I thought he raised some good points that should

21  Congress really be mandating inferior officers to be

22  investigating the President and is there a separation of

23  powers issue there.

24         So, I guess that made me think.  We would have to

25  be a bit more careful.  Typically, Congress has pretty vast

1    areas in which it can legislate and have a lot of discretion

2    there.  But this Presidential Audit Program, can certainly

3    understand why Congress would be concerned about it.  But it

4    seems there are -- I was inclined to agree with him that it

5    would be potentially problematic for Congress to require IRS

6    to do what it has been doing as a matter of practice.

7            Do you agree, are there kind of land mines there,

8    and, if so, have you navigated them?

9            MR. LETTER:  There are definitely land mines.

10   There is absolutely no doubt about that.  But are you

11   prepared to rule now that that would be unconstitutional?  I

12   think you can't, because part of your job, it's clear, the

13   Supreme Court has said, is there is a presumption of

14   regularity in statutes also.

15           So, you want to know exactly what statute Congress

16   passes, what there might be all sorts of discussion that you

17   would find very illuminating in the Congressional debates

18   about what members of Congress think is or isn't

19   constitutional and why then they make certain choices.  And

20   you would be taking all of that into account, as you and I,

21   the judiciary, federal judiciary, in determining whether

22   this ultimately was constitutional or not.

23           There are all sorts of factors that you would be

24   taking into account that you can't possibly know now,

25   especially because there is no statute yet.  So, it seems

1    like a serious problem of asking you to issue an advisory

2    opinion in the context of this request under the Section

3    6103.

4            Now, in addition --

5            THE COURT:  I hear you.  But I guess it is a bit

6    of a chicken and the egg problem, right.  Like, if this

7    valid legislative purpose is to have any teeth, it must mean

8    that you can't be planning to legislate something that is

9    unconstitutional, right?

10           MR. LETTER:  Correct.

11           THE COURT:  And so --

12           MR. LETTER:  No doubt.  So, if we said, if there

13   is some statute saying we were going to assign executive --

14   well, no, that actually would be unconstitutional.  It's

15   something that would be patently unconstitutional, of

16   course.  But this would be something that would be very,

17   would require, again, you have to know exactly what Congress

18   passed.

19           And suppose Congress said, you know what, that is

20   at least problematic, at least raises questions.  So

21   instead, we're going to have a special group of the

22   committee, the Joint Committee on Taxation.  They will do

23   the audit.  That maybe you'd say, oh, they can't do that

24   because they're legislative.  But all they would be doing is

25   making an audit and a report.  So, maybe that's something

1   that could be taken care of.

2          THE COURT:  Tell me again.  You mentioned earlier

3   this concern that the President is aware of his auditor.

4   So, I guess you're suggesting that, within this, other than

5   necessarily requiring or codifying the Presidential Audit

6   Program, there could be statutory tweaks to it, such as

7   funding potentially for it or this idea of anonymizing the

8   auditor.

9          MR. LETTER:  Yeah.

10          THE COURT:  Those are, you can think of kind of

11   sub areas that would be definitely not constitutionally

12   problematic?

13          MR. LETTER:  Right.  And again trying to decide if

14   it would be, the results of it would be made public.  As I

15   mentioned, the initial statute made people's tax returns

16   public.  I don't know any reason why that would be

17   unconstitutional.  And maybe it would be unconstitutional if

18   it's only a particular named President, something like that.

19   But I don't see any reason why it would be unconstitutional

20   for Congress to say tax returns of Presidents will be made

21   public.

22          As we know, for instance, the SEC, all sorts of

23   corporations are required to report all sorts of what we

24   otherwise might call private financial information.  They

25   are required to submit it to the government, and it is then

1   public.  So, Congress could, there are any number of things

2   Congress could do.

3          As I've been reminded by my colleagues, you'd have

4   to find no constitutionally valid legislation could be

5   passed here by Congress.  And I just, I don't know how you

6   would possibly be able to reach that conclusion.  Indeed, it

7   would probably raise all sorts of separation of powers

8   questions if you were to do that, because, as I said, as you

9   well know, you don't issue advisory opinions.  So, imagine

10   if you were to say, there's just no possible way Congress

11   could ever legislate in this area.  It would be a stunning

12   kind of decision for a judge to make and go all the way to

13   the Supreme Court.

14          I did want to go back to further answer your

15   question before about what things might not be valid.  The

16   Watkins case itself, now remember that's a criminal case.

17          THE COURT:  Yes.

18          MR. LETTER:  But there ultimately, if I recall

19   correctly, it was written by Chief Justice Warren, what he

20   concluded at the end of the day was the investigation was

21   clearly no good because the Committee said that it was

22   investigating, as I recall, labor racketeering or something

23   like that.  And toward the end of the opinion, as I recall,

24   the Court said the investigation was invalid because they

25   weren't actually looking into that and that the witnesses

1   who were planned weren't acknowledgeable.  That's my memory

2   of the case.

3           So, I suppose, the Supreme Court has given us an

4   example, again, that clearly is not at all the situation

5   here.  If we're looking at the Presidential Audit Program,

6   clearly it's appropriate to look at what is IRS doing now.

7   So, the very first thing is an oversight investigation

8   that's tied to a legislative, a possible legislative

9   investigation.

10          We don't even know what the IRS is doing or has

11  done with presidential audits.  That is tax return

12  information, and so it has not been disclosed.  In addition,

13  as we pointed out, and this melds into the merits, but if

14  there's going to be some sort of argument that, if

15  Presidential Audit Programs are mandated, that would so

16  interfere with the presidency that it can't operate, well,

17  that is a major problem there because every elected

18  President since Nixon has made their tax returns public.

19  Yet, a whole batch of the administration seemed to be able

20  to function despite the fact that they have provided their

21  tax returns to the public.

22          THE COURT:  Isn't that very different, that kind

23  of a voluntary disclosure versus Congress requiring it?

24          MR. LETTER:  Definitely different, but I think the

25  point is the same.  And it's the same point that has come up

1    in other circumstances.  If you're going to argue that

2    certain things, if the test is does this have an impact on

3    the ability of the presidency to carry out its functions, I

4    don't see how you can say the fact that having your tax

5    returns revealed to the public means that the presidency

6    can't function.

7           And that gets exactly to, remember the question

8    here is what is the impact on the presidency.  Because if

9    it's the impact on the President, there is only one

10   President, and President Biden has disclosed his returns.

11   We're not interested now on what impact this would have on

12   citizen Trump now, because that's not a separation of powers

13   issue.

14          THE COURT:  Are you, you're advocating for Nixon

15   versus GSA?  Is that the test that you think would apply

16   here?

17          MR. LETTER:  Yes, Your Honor.  And if I might, I

18   just want to add, because if there's some argument that, oh,

19   Nixon versus GSA was a different kind of issue or something

20   like that, it's not that the Supreme Court applied that test

21   in just that case.

22          I was just looking at a case that I actually was

23   very heavily involved in the litigation.  Somewhere in the

24   back of my mind I remembered, in the Mistretta case, if you

25   look at the opinion there of the Court, Justice Blackmun

writing for nearly all of the justices, he describes in

considerable detail, the Nixon versus GSA test and why it is

appropriate there and actually applies that test.  So, it's

not just some isolated case.  I'm fairly sure there are

others where the Supreme Court has used that test.  But

long-winded answer is yes.  That is the test.

Now, as you know, Mr. Strawbridge has said, no,

the test is Mazars, but that can't be right.  And Mr.

Strawbridge criticizes us.  He says, well, we're only

looking at the result in Mazars not at the reasoning.  But

no, let's look at the reasoning.  The Supreme Court delved

into great depth about talking about how it's a clash

between branches.  I think I --

THE COURT:  So, is that the main -- I've read that

of course.

MR. LETTER:  Right.

THE COURT:  But do you think about kind of it

seems like you did not like Judge Mehta's test.  You

basically think it's either Mazars or Nixon.  Mazars with a

current President.  Nixon with a former President.  Is that

the dichotomy that you see?

MR. LETTER:  No, we think it is a GSA test and

Mistretta test.  But if it's Mazars Lite or if it's full

Mazars, I can't think of a catchy signed phrase for that

one, but any of those we win anyway.

1          THE COURT:  I understand.  But I just would like

2    to get the test right.

3          MR. LETTER:  Yes, yes.

4          THE COURT:  Your Executive Branch colleagues have

5    been very vague about what they think is happening.  I

6    thought you at least were staking out a pretty clear

7    position that GSA would apply.

8          MR. LETTER:  We are, and I won't try to speak for

9    Mr. Gilligan.  I'll let him address that.

10          If they're not applying it, they're coming very,

11    very close.  I think that's -- sure, but again, I'm not

12    going to talk for him.

13          THE COURT:  But you think it's GSA and do you

14    think it's that because, solely because we no longer have

15    this clash of the branches?

16          MR. LETTER:  GSA certainly shows that it's very

17    different.  Yes, is the answer, because we don't have a

18    clash between branches.  And tied in with that, we have, the

19    current President, the only President, saying that this is

20    fine.  The Office of Legal Counsel giving Treasury the law

21    and saying here's what it is, and that's the reflection of

22    the current administration.  Just as, in GSA, it was, the

23    Supreme Court noted, President Ford signed the Bill and,

24    more importantly, President Carter was defending it in

25    court.

1          THE COURT:  Right.

2          MR. LETTER:  But I repeat --

3          THE COURT:  Go ahead.

4          MR. LETTER:  I'm sorry.  I just wanted to

5    emphasize again that that's not just an isolated separation

6    of powers case.  In addition, the other thing why Mazars is

7    not applicable is that this isn't a subpoena case.  This is

8    a request under statute.  My memory –

9          THE COURT:  Why does it feel like that makes much

10   of a difference though, does it?  I don't know.  Just

11   reading it -- like if President Trump was still President,

12   I'd be very skeptical I think about an argument that there's

13   something special.  I mean, obviously, earlier in this case,

14   we had both a subpoena and a --

15         MR. LETTER:  You specifically asked me about that.

16   Now you're telling me it didn't matter?

17         THE COURT:  I invited you to drop some of your

18   counts.  We could be back home at this point.

19         MR. LETTER:  I wouldn't do it if you recall.

20         Your Honor, it matters only I think for certain

21   arguments.  So, I think arguments have been made about, one,

22   statements by Committee members, or, two, is this actually,

23   the subpoena that was issued, was it fully authorized?  And

24   was it authorized to go after presidential records?  The

25   statute means that we don't have to look at what the rest of

1   the Committee might think or what the rest of the Congress

2   might think.

3           THE COURT:  Fair.

4           MR. LETTER:  In addition, the one thing that I

5   absolutely have to say matters is the language of the

6   statute, the plain text.  And the Office of Legal Counsel

7   focused on this.  The plain text says shall.  So, you could

8   maybe get around that by arguing 6103 is unconstitutional.

9   Mr. Gilligan is going explain why that argument doesn't go

10  anywhere.  But that's a pretty bold argument that

11  Mr. Strawbridge has to make because of the statute.

12          THE COURT:  So, if we're doing Nixon balancing

13  test, again, that feels like a summary judgment stage

14  decision.  I mean, do I do balancing tests right now?

15          MR. LETTER:  I don't think that would be, that you

16  could only do it on summary judgment because I think that's

17  a legal determination.  Also remember that the, in the

18  Eastland case, and I'm forgetting which other one it is, at

19  least two of the Supreme Court cases were before the Court

20  on motions to dismiss.

21          If Your Honor wants to convert this, like Judge

22  Mehta did in Mazars, if Your Honor wants to convert this to

23  summary judgment, we're totally fine with that, because, as

24  I've been arguing, the record isn't going to be any

25  different.  The legal issues are going to be exactly the

1    same.  So, that actually may be a very wise thing for you to

2    do if there is any concern that, at a motion to dismiss

3    stage, somehow it's a little different.

4         But again, what test to apply and how to do the

5    balancing, those are all questions of law for you, not

6    something that there would be any kind of factual

7    development on that might come out in a Motion for Summary

8    Judgment.

9         THE COURT:  Nixon talks about a potential for

10   disruption to the Executive Branch kind of, too.  I think,

11   even to get to that balancing, you have this kind of initial

12   question, is there a potential for disruption to the

13   Executive Branch.  Do you agree that I've got to get to

14   that, I get over that initial hump that the intervenors have

15   shown that there is a potential for disruption and therefore

16   I've got to do the Nixon balancing?

17        MR. LETTER:  Your Honor, as you can tell, I'm

18   pausing whether that, because you're looking at a -- I'm

19   thinking out loud, which is probably not a great thing

20   normally to do in court, but I'm going to give it a try.

21   We're looking at a statute.  The statute is clear.  So, I

22   suppose the issue you've raised would be relevant if you

23   were going to consider whether 6103 is unconstitutional.

24        But all of the other points that I'm making, I

25   don't think it would have any relevance to those, whether it

1    is a valid legislative purpose.  Again, there clearly is.

2    Whether under the, whether the Mazars test applies or not, I

3    don't see why that would affect this.

4          THE COURT:  Just to remind you, Nixon says, only

5    where the potential for disruption of the Executive Branch's

6    constitutionality or constitutionally assigned functions is

7    present, must we then determine whether that impact is

8    justified by an overriding need to promote objectives within

9    the constitutional authority of Congress.

10          MR. LETTER:  Right.  And if we know, I guess I'm

11    jumping right to trying to answer it instead, which is we

12    know there is no effect on the presidency because the

13    President has told us that there isn't.  There is no effect

14    on this that is in any way relevant on Mr. Trump.  Citizen

15    Trump, he may be unhappy.  He may think that this statute

16    shouldn't be applied to him any more.  I don't know.  But

17    none of those go to the presidency.

18          THE COURT:  But that can't be right?  I mean that

19    was true in Nixon as well.  As you point out, the current

20    President was just fine with Nixon's documents going over.

21    Nonetheless, the Supreme Court did the balancing.

22          MR. LETTER:  I think there's a slight difference,

23    Your Honor, which is remember that, at the time, President

24    Nixon said, those records are mine, and the statute by which

25    they were taken away from me is unconstitutional.  And if

1   you remember, indeed, I'm fairly sure that President Nixon

2   actually won on that argument later, in later litigation.

3          I believe he got compensation because Congress was

4   at that time changing the system that had been in place up

5   until then where presidential papers belonged to the

6   Presidents, and so that statute changed that.  We don't have

7   anything like that here at all, because what we have are tax

8   records, I have, as I have mentioned for a while were

9   public, since then have always been subject to disclosure

10  under 6103 to limited entities.

11         So, no change by this request, it's not like,

12  exactly like Nixon versus GSA.  Here, it's impossible to see

13  how President, Mr. Trump at this point, can raise any

14  arguments for the presidency, because the records don't

15  belong to him.  These are the IRS' records.

16         THE COURT:  Yeah, I understand that.  But I guess

17  I'm just -- clearly the Supreme Court thought Mr. Nixon

18  could raise separation of powers concerns that had been

19  disclaimed by the Executive Branch.

20         MR. LETTER:  Right.

21         THE COURT:  Little surprising, but they said you

22  can.

23         MR. LETTER:  Right.

24         THE COURT:  Indeed I guess they found that there

25  was potential for disruption of the Executive Branch.

1          MR. LETTER:  Right.  Now, here what we also have,

2   remember, is I think the balancing has already been done for

3   you, unlike in Nixon where it had not yet.  Here, remember,

4   the Supreme Court has, in any number of cases, said that the

5   Congress has this immense interest in doing investigations

6   and has therefore said that the, if the investigation, if

7   the investigative purpose, as very broadly defined in cases

8   like McGrain, is valid, then this is within Congress' power.

9          Again, since there is no clash between the

10  branches here, it's hard to see how Mr. Trump could ever win

11  this balancing argument.  If it had any effect on him now,

12  which it shouldn't, there's no burden on him, that he's not

13  the President any more, so it has no effect on that.  We

14  know it doesn't have any effect on the current President.

15  We know it has had apparently no effect on every elected

16  President since Nixon.  So, I think that the Supreme Court

17  has given you enough so that there this is not a difficult

18  issue, the balancing.

19          THE COURT:  It almost feels like you've whisked

20  the test away.  What work is Nixon versus GSA doing at all

21  in your analysis?

22          MR. LETTER:  Your Honor, fair enough.  That's a

23  good question that we're facing in various cases where

24  Mr. Trump is saying, oh, then the balancing is meaningless.

25  It's not meaningless because we can come up with some weird

1    hypotheticals, I suspect you probably already have, when

2    maybe what is being done currently has some sort of impact

3    on a former President.  We have had very grave difficulty

4    coming up with hypotheticals, but maybe there are some.

5         So, it's not -- Nixon is there.  Nixon made that

6    statement.  But again, I think a part of that is because of

7    what was going on in Nixon, that his papers were being

8    shifted from the control, from him to the people of the

9    United States.

10        THE COURT:  Yeah.  I mean, okay, I'll tell you

11   honestly, I think my instinct is that Mazars is a bad fit

12   for this, given that the President Trump is no longer

13   President, but I'm also struggling with the alternative.

14   The Executive Branch hasn't been very helpful there so far.

15   And then this alternative, I don't really see how it works.

16        The Supreme Court allowed the former President

17   Nixon to raise separation of powers concerns, despite the

18   fact that the Solicitor General was arguing against him,

19   right?  I think that's correct.  He was defending the GSA.

20        MR. LETTER:  Yes.  Yes.  So again, we're not, we

21   are not saying here that Mr. Trump can't raise the concerns,

22   but, just as in Nixon, I'm saying -- I think here the

23   balancing for you is a very easy one because of all these

24   Supreme Court decisions upholding Congress' authority to

25   investigate, in addition to which there is a statute that

1    says that these three committees can do this, so there's a

2    Congressional judgment signed by the President.

3           So, under those circumstances, there apparently is

4    a balancing to be done.  GSA says that.  But there's not,

5    there is virtually nothing on Mr. Trump's side as far as

6    this balance goes, just as Mr. Nixon, who I think at least

7    had some arguments to make, and he did not prevail there.

8           THE COURT:  But there, I mean, as I recall at that

9    stage, the question was just can the archivist go through

10   the records, which was an Executive Branch official.  I mean

11   in some ways it feels like Mr. Trump has a stronger argument

12   in that, right now, we're talking about documents going from

13   the Executive Branch to the legislature.  That was not what

14   was happening there in Nixon.

15          MR. LETTER:  I think it was more than that, as

16   I've been saying, because remember, President Nixon's

17   argument was those materials are mine.  And in fact, many of

18   my predecessors have destroyed those very materials, burned

19   them, and you know, Congress is now afraid that I'm going to

20   do something that is my right to do under history and the

21   separation of powers, the powers of the President.

22          So, he was, it seems to me, raising a serious

23   separation of powers issue, but ultimately he lost.  Again,

24   I can't see that there is any even serious separation of

25   powers issues here, because how does it affect the

1    presidency that the one President who hasn't turned over his

2    returns is now going to have his returns as a private

3    citizen released to the Chairman under the statute?  And to

4    give even more emphasis to this, remember, again I want to

5    look at the reasoning of Mazars.  The Supreme Court said

6    that this gives Congress some sort of power over the then

7    current President.

8         Here, all that could happen is Congress has some

9    sort of power over Mr. Trump at most.  But since Mr. Trump

10   is not the President, why does that make any difference at

11   all as far as separation of powers?  Again, I can understand

12   if Mr. Trump says, I'm really unhappy about this.  I wish

13   you weren't focusing on me as a private citizen, but that's

14   not a separation of powers issue.

15        THE COURT:  Doesn't he raise concerns though that

16   this will now be a stick over future Presidents that you

17   better play nicely with Congress or Congress will expose

18   your tax returns, the tax returns of your family or what

19   have you?  I mean, it does seem like that is some burden

20   here on the Executive Branch as the Executive Branch.

21        MR. LETTER:  And again, it seems to me, that

22   burden has to be minimal, given that all of the other

23   Presidents apparently don't think this is a burden or

24   anything to be worried about.  In addition, it seems to me

25   that what the courts have to do is take these cases,

1   separation of powers cases one at a time and see, all right,

2   is there some reason why, if this were done in the future,

3   a President could at that point say no, no, you're violating

4   separation of powers because, and we would know exactly what

5   the contours are of that dispute.

6          Here, we know what the contours are of this

7   dispute, and this dispute just cannot have any effect on the

8   presidency or at least the most amazingly minimal effect on

9   the presidency, wholly aside from the fact, again, that the

10  current President has said this is fine.  This is not a

11  problem.

12         So, one more time, the Nixon versus GSA did come

13  out the way it did, and I don't know that there are any more

14  facts that you would need to make that decision.  The

15  arguments here are as they were in Nixon versus GSA.  So,

16  it's all before you with Mr. Trump having almost nothing on

17  the scale to give you.

18         THE COURT:  Wasn't Nixon versus GSA, I thought

19  there had been a trial there.  Was that a 12(b)(6) case?

20         MR. LETTER:  We're all looking with puzzled looks,

21  and you've got the book in front of you.

22         THE COURT:  Yeah.  I believe that was after a

23  trial, but --

24         MR. LETTER:  Even if it -- well, I'll wait.  I'm

25  sorry, Your Honor.  I'll wait.

1          THE COURT:  Maybe it wasn't.  There was a three

2     judge court.  Maybe I was confusing that with --

3          MR. LETTER:  Your Honor, let's assume, even if it

4     were, had there had been a trial, looking at the Supreme

5     Court's reasoning, there's nothing in that reasoning that

6     would indicate that any facts came out at trial that would

7     be important.  The Supreme Court looked at the current, the

8     two Presidents after Nixon.  It looked at what the statute

9     provided as far as actual, who was going to see the return,

10    the presidential records.  I think it delved into some

11    history maybe.  But again, there was nothing --

12         THE COURT:  I think that's wrong.  I think there

13    was a dismissal.

14         MR. LETTER:  Okay.

15         THE COURT:  All right, anything else you wanted to

16    say, Mr. Letter?  I'd like to do a --

17         MR. LETTER:  I think I've covered everything.

18    Would you just give me one moment, Your Honor?

19         THE COURT:  Sure.

20         (There was a pause in the proceedings.)

21         MR. LETTER:  I think that's it, Your Honor, for

22    now.  Thank you.

23         THE COURT:  Thank you, Mr. Letter.

24         Mr. Gilligan?

25         MR. GILLIGAN:  Thank you, Your Honor.

1            Your Honor, with the Court's indulgence, I'd just

2    like to make a few points of emphasis in addition to what

3    Mr. Letter has said regarding legislative purpose in Mazars,

4    try to help the Court out on my thinking regarding Mazars.

5            THE COURT:  Good.

6            MR. GILLIGAN:  Regarding legislative purpose, I

7    would draw the Court's attention in particular to two cases.

8    The first of those cases is the Watkins case and the nature

9    of the analysis there.  Mr. Watkins there had been convicted

10   for contempt of Congress for refusing to answer questions

11   before a Congressional committee that was investigating

12   communist infiltration of organized labor.

13           And Mr. Watkins argued on appeal to the Supreme

14   Court that the purpose of questioning him was exposure for

15   exposure's sake and that basically the Committee was trying

16   to expose him to public hostility on the basis of his

17   political beliefs and associations.  In support of that

18   argument, Mr. Watkins advanced what the Court said was an

19   impressive array of evidence.

20           That evidence is set forth in Footnote 32 at page

21   199 of the Court's opinion.  And that evidence was a number

22   of official Committee reports and other official Committee

23   publications stating, quite straightforwardly, that the real

24   purpose of the Committee's work was to expose in a systemic

25   way communist party members and communist party activities.

 1          Still, the Court said that, because the

 2    investigation into communist party infiltration of organized

 3    labor was a matter on which, it was a subject on which

 4    Congress clearly could legislate, that didn't matter.  It

 5    was not going to vitiate or invalidate the Court's inquiry

 6    on the basis of the motives of individual Committee members.

 7    That's what was said in response to citations to official

 8    Committee reports on the subject.

 9          So, if straightforward statements like that in an

10    official committee report were legally insufficient or a

11    legally insufficient basis on which to invalidate an

12    otherwise legitimate Congressional inquiry, then surely a

13    fortiori, the snippets of alleged statements by individual

14    legislators plucked from the public record of over five

15    years or so is also legally insufficient as well.

16          THE COURT:  So ultimately, Mr. Watkins won though.

17    You're saying that that was, they rely instead on --

18          MR. GILLIGAN:  The due process rationale.  That

19    the question that he ultimately underwent, its purpose was

20    not sufficiently clear at the time of his questioning to

21    permit him to be convicted.  So, yes, he ultimately won on

22    that ground, but the Court could not have been clearer that

23    the principal argument he raised that basically the

24    Committee had admitted in its own reports that the purpose

25    of the whole investigation was exposure for exposure's sake.

1        The Court said, we're not going to look at that.

2   On the face of it, the Committee is investigating and

3   legitimately pursuing about communist party infiltration of

4   organized labor.  And so, we're not going to look at the

5   motives that may have prompted legislators on that Committee

6   to pursue that investigation.

7        THE COURT:  But on page 209, the Court said there

8   are several sources that can outline the question under

9   inquiry in such a way that the rules against vagueness are

10  satisfied.  The authorizing resolution, the remarks of the

11  Chairman or members of the Committee or even the nature of

12  the proceedings themselves might sometimes make these topics

13  clearer, and then they cite at length from the, I think the

14  opening statement.

15       MR. GILLIGAN:  Correct, Your Honor.  I think the

16  case law in general and the Supreme Court, Hutchinson comes

17  to mind as well, cases that are cited in the Trump parties'

18  briefing and in our reply where the lower courts have looked

19  to those sorts of official sources, the authorizing

20  resolutions, transcripts of hearings, Committee reports,

21  statements made by Committee Chairmen and others during

22  official Committee proceedings.

23       Those are the sources that the courts have looked

24  to ascertain whether a Committee's investigation is, it

25  concerns a subject on which Congress may validly legislate.

1    And then whether, in the actual questioning of particular

2    witnesses, the actual questions are focused on that subject.

3         THE COURT:  So, do you agree with Mr. Letter, what

4    I understood from him basically, the letter is by far the

5    most important document for me to understand the purpose but

6    I can look to official statements of the Chairman here,

7    since it's under 6103 and it's the Chairman's authority?

8         MR. GILLIGAN:  Well, I think that you can look to

9    Chairman, the statements of the Chairman when he is speaking

10   as the Chairman in an official proceeding during a hearing

11   or when he is sending an official piece of correspondence,

12   such as the request, which obviously has legal consequences

13   attached to it.

14        But I think, you know, plucking statements out of

15   the political hubbub and chatter that accompany the business

16   of representative government is not what the Supreme Court

17   has ever authorized the federal courts to do.  The other

18   example I would direct the Court's particular attention to

19   is the Barenblatt case.  Mr. Barenblatt, much like

20   Mr. Watkins, was convicted for contempt of Congress because

21   he refused to answer questions at a hearing regarding

22   communist party infiltration of higher education, I believe

23   it was.

24        And he argued again that the Committee's true

25   objectives in questioning him was exposure for its own sake.

1    But the Court, once it determined that the subject of the

2    Committee's investigation was one on which Congress could

3    legitimately legislate, it refused then to accept the notion

4    that a Court could interfere with the investigation based on

5    allegations about Committee members.

6         In fact, it held, as Mr. Letter said earlier, that

7    federal courts had no authority to do that.  And the Court

8    couldn't have been clearer, it seems to me, that in his

9    statement on pages 132 and 33 of the opinion, where the

10   Court acknowledged that, if courts lack authority to

11   restrain lawful exercises of power by the other branches

12   when they act with a wrong motive or purpose, and I ask the

13   Court to note the Supreme Court's equivalence of those two

14   terms there, if the courts lack authority to restrain lawful

15   exercises of the other branch's power, even when they act

16   with the wrong motive or purpose, the power may be abused.

17        The Court there acknowledged that that was a

18   possibility, but the Court said the remedy did not lie in

19   abuse of judicial power, that the remedy lied with the

20   people and their ultimate control over their elected

21   representatives.

22        So, it seems to me that, as Mr. Letter said, once

23   the Court determines that the information the Committee is

24   seeking is pertinent to a subject of inquiry upon which

25   Congress may validly legislate, that is the end of the

1    inquiry so far as legislative purpose is concerned.

2              THE COURT:  But then we have this additional hump

3    where it involves the President or a former President.

4              MR. GILLIGAN:  Former President, yes.  So, I'll

5    try to clarify our position on Mazars.  And perhaps any lack

6    of clarity in our briefing on this subject represents the

7    frontier of the law is where we find ourselves.

8              THE COURT:  Yes.  Well --

9              MR. GILLIGAN:  But I think that --

10             THE COURT:  It's both.

11             MR. GILLIGAN:  I think you could say we use, at

12   most, some sort of a Mazars Lite Test to be the appropriate

13   test here.  But I think how the test applies is best

14   understood when we take the four factors one at a time and

15   look at the underlying rationale for each one of them.

16             THE COURT:  So, you don't think Nixon is the right

17   test.  Is that what I'm hearing?

18             MR. GILLIGAN:  Well, here's where it may be, maybe

19   we, our thinking is a little blurred for you.  We're not so

20   sure that they're two different animals.  Maybe the Mazars

21   is a species of the kind of Nixon versus GSA balancing

22   because, when you think about the factors that the Supreme

23   Court outlined in Mazars, they are the kind of things you

24   would look at to ascertain whether something Congress is

25   doing is going to disrupt the functions of the Executive

1    Branch.

2          THE COURT:  I don't think, did the Chief Justice

3    cite Nixon at all?

4          MR. GILLIGAN:  I don't, certainly not finally, I

5    will allow, but I think that's the upshot.  Let me start

6    from the top.  The first factor asks if there are other

7    sources of information that could reasonably provide

8    Congress the information it's looking for.  And the Court

9    said that the purpose of this inquiry is to avoid

10   constitutional confrontation between the branches.

11         Well, as Mr. Letter said, we have no confrontation

12   between the branches here.  Mr. Trump no longer personifies

13   the Executive Branch and the Executive Branch, as he said

14   and I will confirm, does not believe that there's any, we

15   believe that the Committee's request should be indeed

16   legally must be complied with.

17         THE COURT:  Can we just talk more theoretically

18   for a moment before going through them?  Because, as I

19   suggested to Mr. Letter, I'm kind of inclined to think he is

20   right that Mazars is about a clash of branches, and that's

21   not what we have here.

22         MR. GILLIGAN:  Correct.

23         THE COURT:  So, he's arguing that this is the

24   wrong test for this situation.  But you're telling me I

25   should still go through this.

1          MR. GILLIGAN:  Well certainly --

2          THE COURT:  Certainly, Mr. Strawbridge, I

3    understand his position.  I'm having hard time with your

4    position.

5          MR. GILLIGAN:  Well, you know, I think you'll see,

6    when I come to the end of it that our position is that, when

7    you look at each of these factors, there is no confrontation

8    that really triggers the first factor.  The second factor is

9    the request should be no broader than necessary so as to

10   narrow any confrontation.  Well, there isn't one to begin

11   with.  So, that really doesn't weigh in.

12          The fourth factor, the burden posed on the time

13   and attention of the President, that doesn't really weigh in

14   here because Mr. Trump is no longer the sitting President.

15   That just leaves you with the third factor, you know, the

16   detail with which Congress has described its legislative

17   purpose and how the President's information would advance

18   its consideration of the issue.

19          We think, in light of how little weight should be

20   accorded the other three factors that the bar here shouldn't

21   be that high under a Mazars Lite analysis, particularly when

22   you consider that, in the ordinary case, as set in McGrain,

23   Congress doesn't have to explain itself at all really.  It

24   doesn't have to state a legislative purpose when it requests

25   information.  It doesn't have to give a lengthy explanation

1    of why it believes the information is pertinent.

2            But here, Congress has done so we think in all

3    necessary detail, more than all necessary detail, just to

4    satisfy any application of Mazars here in light of how

5    little weight should be given the other three factors,

6    considering that Mr. Trump is no longer President.

7            THE COURT:  All right.  Maybe I didn't ask this

8    well, but I've got Nixon versus GSA.

9            MR. GILLIGAN:  Right.

10           THE COURT:  A test to apply, that was applied to a

11   former President and somewhat surprisingly allows this

12   former President to raise separation of powers concerns,

13   which is what Mr. Trump is trying to do here.  Why isn't

14   that the right test?

15           MR. GILLIGAN:  Correct.  Because in Nixon versus

16   GSA, this was the point I was going to come to, Your Honor,

17   so thank you.  Nixon versus GSA involved official government

18   records, presidential records, records of presidential

19   communications to which Executive Branch confidentiality

20   interests still attached.

21           THE COURT:  But it also included his private

22   papers.  I mean that was very much, it was a significant

23   part of the discussion.  They say that these private papers,

24   his letters with his doctor and his spiritual adviser are

25   intermixed with all of these official papers.

1          MR. GILLIGAN:  Correct, but that so, and that the

2    Court said those papers are going to be, that they're going

3    to be, you know, to the extent they are intermixed with the

4    official government records, the archivists who are going to

5    go through them are going to pull those out, and they were

6    going to be returned to Mr. Nixon.

7          THE COURT:  But nonetheless, he was objecting to

8    anybody rifling through these personal papers.

9          MR. GILLIGAN:  But those were his individual

10   privacy interests.  That issue was not one that sounded in

11   the separation of powers.

12          THE COURT:  Okay.  Fair.

13          MR. GILLIGAN:  So far as the Trump parties'

14   privacy interests go, the Court has said time and again, if

15   the information Congress is seeking is information that's

16   pertinent to a valid legislative inquiry, then it doesn't

17   matter that it's personal or private information or even

18   embarrassing or what have you.

19          There are a number of cases in the D.C. Circuit

20   where Congress has sought confidential business information

21   of particular companies and businesses, and the D.C. Circuit

22   has said again and again, and this is one of those cases is

23   cited in our opening brief, has said again and again it

24   doesn't matter that this is confidential business

25   information.  If it serves a legitimate legislative purpose,

1    then Congress is entitled to it.

2            THE COURT:  So you see kind of Nixon versus GSA as

3    being less a case about a former President than a case about

4    presidential papers?

5            MR. GILLIGAN:  Correct, Your Honor.  I think that,

6    it seems to us, is the big difference between this case and

7    Nixon versus GSA.

8            Unless Your Honor has anything else on legislative

9    purpose or Mazars, I would be prepared to move on.

10           THE COURT:  Yes, please do.  Let me ask you, as

11   you're preparing to move on, do you agree with

12   Mr. Strawbridge that there would be a separation of powers

13   issue for the IRS, or for Congress to require the IRS to

14   audit every incoming President and Vice President?

15           MR. GILLIGAN:  That's a really interesting issue,

16   Your Honor, that I wouldn't mind briefing one day, just to

17   speak from a personal perspective as a professional lawyer.

18   But the Court need not decide that issue because, as Mr.

19   Letter said, there are any number of pieces of legislative

20   that Congress could enact here that fall short of anything

21   like that.  A number of them are discussed in our opening

22   brief.

23           For example, as we discuss, I think it's on pages

24   25 and 26 of our opening brief, Congress, it seems clear to

25   us based on the authorities that are cited in that portion

of our brief, short of mandating audits of all Presidents,

could establish new and more rigorous standards than are

currently set forth in the Internal Revenue manual for

deciding whether a particular President's return needs to be

audited, whether and to what extent certain items of

reported income or deductions, what have you, need to be

audited.

Congress has power.  Congress can't tell the

Executive Branch take some sort of enforcement action

against a particular individual, but what it can do is

establish, by statute standards, that the Executive Branch

must take into consideration when deciding whether or not

particular individuals should be subjects of enforcement

action.

THE COURT:  But what if that particular individual

is the executive?  Surely the Administration is concerned

about that, right, that that would raise separation of

powers concerns for Congress to be legislating how the

executive investigates the executive?

MR. GILLIGAN:  I understand the point, Your Honor.

And I have to say it's not, I suppose you could come up with

hypothetical situations in which that would be a problem.

But, as reflected in our brief, at the very least the

current Administration has not come to the conclusion that

there is nothing that Congress could legislate along those

 1    lines.

 2              But even setting that aside, there are, again as I

 3    believe Mr. Letter mentioned, procedural safeguards that

 4    could be added to the program to help make sure that

 5    examiners are insulated from any possible form of improper

 6    influence or interference by a sitting President or his or

 7    her representatives during the auditing process.

 8              And we do believe that also, to facilitate

 9    oversight, it would be completely unremarkable of Congress

10    to say to the IRS, if you perform an audit on the President,

11    we want some sort of report of that audit delivered to the

12    tax committees and to facilitate oversight of how that

13    program is operating, because ultimately what the IRS does,

14    it does under the authority of Congress pursuant to the

15    statutes they've created.

16              There's also the area of financial disclosure,

17    Your Honor, coming to the other purposes of the inquiry that

18    are stated in the Chairman's 2021 request.  As the D.C.

19    Circuit has said in what we refer to as Mazars Two, it is

20    certainly, it's not clear at all that there are no

21    reasonable mandatory financial disclosures for a President

22    that Congress can enact.

23              And the Court of Appeals referred to the Evarts

24    and Government Act and the Stock Act as examples of

25    financial disclosure requirements that do apply to

1  Presidents that don't seem to have had any disruptive effect

2  on the functioning of the Executive Branch, and therefore,

3  again, we can hypothesize perhaps certain kinds of

4  legislation that would go to too far.  But looking at the

5  precedence and the practice that we have available to us

6  now, that the D.C. Circuit was very clear that conceivable

7  financial disclosure legislation is within the realm of

8  Congress' legislative purpose.

9      THE COURT:  Can we talk about the intervenors'

10 facial challenge to 6103?

11     MR. GILLIGAN:  Yes, Your Honor.  That is where I

12 was going to turn to next.  The facial constitutional

13 challenge of 6103 fails because, in order to succeed, the

14 intervenors would have to show that there was no set of

15 circumstances under which the statute could constitutionally

16 be applied, and they cannot make that showing because, in

17 the great majority of cases where it is applied, the statute

18 is perfectly constitutional because there would be no

19 question that Congress has a legitimate legislative purpose

20 in requesting the information that we submit is the case

21 here as well.

22     The counter argument raised in the intervenors'

23 opposition is that Solano's no set of circumstances language

24 was not the test, and the support for that proposition was a

25 cite to the Lopez case, which was decided as I recall in

1    1995.  You had only four months ago, in July 2021, the

2    Supreme Court, in the I believe it was Americans for

3    Prosperity case, yes, cited in our reply, written by the

4    Chief Justice, as I recall, cited the Salerno test for the

5    proposition that, at least outside the First Amendment

6    context, a plaintiff bringing a facial challenge must either

7    establish that there is no set of circumstances under which

8    the statute can be validly applied or at least show that it

9    lacks a plainly legitimate sweep.

10          So, even if you take into consideration as

11   something of a (unintelligible) experiment, a situation

12   where Congress has submitted a request to a 6103(f) request

13   to the IRS, that is not supported by any kind of a valid

14   legislative purpose, that kind of situation is going to be

15   the great exception.  And it's clear that the statute has a

16   plainly legitimate sweep in most of its applications.

17          Lopez is not to the contrary for the following

18   reasons.  Lopez struck down a firearms possession statute

19   because, as the Court explained, mere possession of a

20   firearm is not itself an economic activity that Congress

21   would have power to regulate under the commerce clause.

22   Congress had no power at all, the Court held, to regulate

23   the activity designated in the statute.

24          So, as the D.C. Circuit explained in Nebraska

25   versus EPA cited in our reply, although Lopez did not cite

1   the Salerno test, its analysis is consistent with the

2   Salerno test.  And so, the Court said in Nebraska versus

3   EPA, that it would continue to apply the Salerno no set of

4   circumstances test and did so as recently as 2019 in the In

5   Re sealed case with which we have cited to the Court.

6          THE COURT:  Couldn't, I mean couldn't we come up

7   with a hypothetical where that I think the Gun Free School

8   Zone Act was constitutional and involved somebody crossing

9   state lines and therefore on its backs would have been

10  constitutional?  Isn't that kind of what you're doing here,

11  suggesting or the opposite of what you are doing here?  You

12  can come up with some hypothetical that would make a

13  potentially unconstitutional act constitutional and

14  therefore there is no facial problem.

15         MR. GILLIGAN:  Right.  And what the Court said

16  along those lines was, is that, if the firearm statute

17  there, the School Zone Firearms Possession statute, if

18  Congress had passed the statute that applied to just some

19  subset of firearms possessions that had some sort of

20  explicit relationship to interstate commerce, then a statute

21  like that with a limitation like that might have been

22  constitutional.

23         But we don't need that here because it's kind of,

24  they're kind of mirror images of each other.  Firearms

25  possession, mere firearms possession was something that

1    presumptively Congress did not have authority to regulate

2    under the commerce clause.  So, some sort of limitations,

3    some sort of linkage to interstate commerce needed to be

4    included in the statute there.

5         But here, the statute, unlike the firearms

6    possession statute, 6103(f) has a plainly legitimate sweep.

7    The number of occasions on which Congress' requests for

8    information from the Executive Branch have been found to

9    lack a valid legislative purpose are very few.  And it's the

10   exception rather than the norm.

11        So here, where the activity plainly, or the power

12   that Congress is trying to exert clearly can be exerted in

13   the great run of cases, sort of the presumption switches and

14   you don't need any kind of express limitation on Congress'

15   exercise of that authority in order to have a statute that

16   would at least pass muster under the no set of circumstances

17   test.

18        If the Court has nothing further on that claim?

19        THE COURT:  No.  And you think this would be

20   appropriate to decide at the motion to dismiss stage?

21        MR. GILLIGAN:  That's true of any of the eight

22   claims that have been raised that Your Honor could point to.

23        THE COURT:  Can we go back to the then this

24   legislative purpose test --

25        MR. GILLIGAN:  Sure.

1          THE COURT:  -- and all of the evidence that

2   Mr. Strawbridge brings to suggest that there is some sort

3   of, well, that the audit program is not really what the

4   Chairman is focused on, and that there is some interest in

5   exposure for the sake of exposure.  Why isn't that best

6   handled at summary judgment?

7          MR. GILLIGAN:  Because all of those pages and

8   pages and pages of allegations about what individual

9   legislators said in various circumstances and at various

10  times are legally irrelevant, Your Honor.  We have a request

11  that, on its face, with the Chairman's, I believe it was,

12  June 2021 letter, that sets forth an inquiry that the

13  Committee is conducting that concerns a subject on which

14  Congress may legislate.  That is the end of the inquiry

15  under cases such as Watkins and Barenblatt.  That issue can

16  be decided on a motion to dismiss.

17          I think, the analogy that came to mind regarding

18  all the allegations about legislators' statements, it seemed

19  to me it's like having 100-mile-an-hour fast ball.  You can

20  have a 100-mile-an-hour fast ball, but if you don't hit the

21  strike zone, then all you've got is, it's still a ball.  No

22  matter how fast you can throw it.  And none of these

23  allegations about what various legislators have said at

24  various times and people running for members of Congress are

25  not hitting the strike zone here.

1          THE COURT:  But it points to statements from

2  Chairman Neal.

3          MR. GILLIGAN:  I think that they're, but they're

4  not statements, as Mr. Letter said, when you look at those

5  statements and understand what the real import is, they

6  don't support the intervenors' case.  But they're not

7  statements that the Chairman made in exercise of his power

8  as Chairman.  It's not a statement he made as Chairman

9  sitting on the dais in a committee room conducting a

10  hearing.  It is not a statement in a committee report.

11          So, it seems to me that, even though they are

12  statements by the Chairman, they, too, belong in the realm

13  of the political hubbub, political chatter, that the Supreme

14  Court has said it will not look to in the face of an

15  assertion of a valid legislative purpose for the inquiry.

16  The case law I think is very cut and dry in this respect,

17  which is why this case can be decided on a motion to

18  dismiss.

19          THE COURT:  I was struck by how deferential the

20  2021 OLC opinion is to Congress.  OLC is not known for being

21  terribly deferential to anybody other than the President.

22  And I have a hard time imagining that you're really going to

23  keep that view for anything other than this one request.  I

24  mean, if Congress changes hands in a couple years here and a

25  Republican Chairman of the Ways and Means Committee asks for

1    Hunter Biden's tax returns, are we just going to say, oh

2    sure.  You know, we've got to defer to Congress.  They've

3    said they're interested in legislating on presidential

4    family.  Therefore, we've got to turn them over.  Is that

5    going to be the Administration's position?

6                MR. GILLIGAN:  I'm just a career DOJ attorney,

7    Your Honor.  I don't speak for the Administration.

8                THE COURT:  You speak for the United States

9    though, sir.

10               MR. GILLIGAN:  I speak for the United States.

11               THE COURT:  And the Secretary of the Treasury.

12               MR. GILLIGAN:  Correct, Your Honor.  And that's a

13   hypothetical situation that I think, if they were standing

14   here themselves, they would tell you we would look at that

15   request at the time it came in, perhaps consult OLC and

16   decide whether or not it is a request that the Constitution

17   requires that the Executive Branch comply with.

18               But I will say this about the OLC opinion, Your

19   Honor, about both of them.  They concern an issue and differ

20   on an issue that is not presented by this case.  The issue

21   that they grappled with and, yes, came to different

22   conclusions on because it concerns a fine point of

23   separation of powers doctrine, the issue that divided those

24   two opinions was the deference that the Executive Branch

25   owes to a request from Congress for information and

1    Congress' explanation of its reasons for seeking that

2    information.

3           The issue in this case now is the deference that

4    the federal courts owe to that request.  And the answer to

5    that question and the resolution of that issue lies in cases

6    such as Watkins and Barenblatt, which make it very clear

7    that, because the Chairman's request states a purpose of

8    investigating a subject on which Congress may legislate,

9    that it satisfies the requirement of an inquiry being

10   undertaken for a valid legislative purpose.

11          THE COURT:  I'm not even sure that you all were

12   consistent on that a couple of years ago, I believe.  You or

13   your colleagues, when you were, had a very different view

14   about this request, had, were much more kind of cautious

15   about taking a Chairman's word for the legislative purpose

16   in the face of a lot of evidence to the contrary.

17          MR. GILLIGAN:  Well, I think the thrust of our

18   briefing in 2019 and perhaps early 2020, I have to go back

19   and check the docket, we were concerned then with Congress'

20   attempts to enforce the request and the accompanying

21   subpoena in Court.  And certainly that's a position that has

22   been fairly consistent from Administration to Administration

23   of both parties and an issue that is no longer one we have

24   to grapple with now that people's positions have changed in

25   light of the new request from the --

1          THE COURT:  Primarily your position has changed

2    though.  Everybody else has been consistent.

3          MR. GILLIGAN:  Your Honor, we never -- Mr. Letter

4    filed a motion for summary judgment that would have required

5    briefing from the Department of Justice on the merits to

6    respond to.  On the request of everybody who was then called

7    the defendants, Your Honor set aside that motion and decided

8    we were just going to focus on the procedural issues.  So,

9    we never had to take a position on the merits of the

10   request, in particular the 2019 request, at the time we were

11   doing briefing before the change of the Administrations.

12         THE COURT:  Can we talk about cross-claim 7?  I

13   believe that's the concern about -- you allege that that is

14   not ripe yet because it's unclear whether Congress will use

15   President Trump's tax information to interfere with the

16   ongoing IRS audits.

17         Isn't it going to be too late once the, I mean it

18   seems like everybody is very clear what's going to happen.

19   If these documents go over, Congress will publish them and

20   the damage is done.  When is the appropriate time for the

21   intervenors to raise this issue?

22         MR. GILLIGAN:  Well, the separation of powers

23   claim, I assume that's, I believe it's the separation of

24   powers claim Your Honor is talking about, the feared harm

25   there is that Congress will, the Committee will take the

1    documents and then will somehow, with the documents in hand,

2    try to interfere with the conduct of the audits.  That is

3    the claimed harm here.  And it seems to us that that is, you

4    know, that Congress would do anything to interfere with the

5    actual conduct of the audits is completely speculative and

6    hypothetical.

7         Your Honor, Congress has not said we want to look

8    at these documents so we can weigh in on how these audits

9    should be conducted.  They have said we want to examine how

10   the audit process works, not to direct the outcome of any

11   particular audit.

12        So, it seems to us that the feared harm that's

13   asserted in cross-claim 7 is far, far too speculative and

14   conjectural to support Article 3 jurisdiction at this time.

15   If and when the audits are completed, and if they come out

16   in such a way as to be adverse to the interest of any of the

17   Trump parties, they could at that time raise a claim, as

18   others have done, of Congressional interference in the

19   administrative process.

20        But at this point, they're asking Your Honor to

21   address a claim on the basis of a completely hypothetical

22   injury.  The same is true of the due process claim.

23        THE COURT:  What about, is that your same position

24   on, I think it's cross-claim 8, violation of due process?

25        MR. LETTER:  Due process, yes.  They're both

1    unripe for basically the same reason.  Now, the counter

2    argument from the intervenors is that, well, wait a minute,

3    the violation will occur.  Both the separation of powers

4    violation and the due process violation will occur, the

5    minute that the Committee gets custody of the files, the

6    returns of the files.

7            We don't think that's right as a matter of law,

8    but as far as the ripeness issue goes, it's a non sequitur,

9    because they're arguing about when the alleged legal

10   violation will occur, but the ripeness inquiry asks when

11   will the injury occur.

12           And even at the point where the files are given to

13   the Ways and Means Committee, the feared injury will still

14   remain a matter of complete speculation and one, if it ever

15   comes to pass, that the Trump parties can seek to address in

16   litigation once the audit process is complete.

17           THE COURT:  What would that look like?  How would

18   that play out?

19           MR. GILLIGAN:  It's set out in other briefing.

20   The gist of it is I believe that, if the IRS, upon

21   completing the audits, issues a notice of deficiency, I

22   believe that that can be paid and then they can go to claims

23   court and litigate whether the notice of deficiency was

24   appropriate or not or they can choose to ignore it and leave

25   it to the IRS to pursue its remedies in court, and the

1       issues could be litigated in that way.

2               THE COURT:  All right.  So, we often have

3       preliminary injunctions where an injury is imminent.  How is

4       this not imminent here if there's no real question about the

5       documents being turned over to Congress and then published?

6       Isn't the injury foreseeable and imminent here?  And isn't

7       the better course of action to try to stop it before it

8       happens?

9               MR. GILLIGAN:  Even taking for granted that

10      Congress is going to publish any of these records, that's

11      not the injury that is alleged to be underlying either

12      counterclaim 7 or 8.  The injury asserted with respect to

13      essentially both of them is that Congress is, one way or

14      another, going to try to assert itself into the process and

15      apply pressure on IRS examiners or officials in such a way

16      as to make the audits come out more disadvantageously to the

17      Trump parties than they would otherwise.  Even once the

18      records are in the hands of the Ways and Means Committee,

19      Your Honor, that injury remains completely speculative.

20              THE COURT:  Can you talk about the First Amendment

21      now?

22              MR. GILLIGAN:  Yes, yes.  But before I do, does

23      Your Honor have any questions on the merits of either the

24      due process claim or the separation of power?

25              THE COURT:  Not right now.  I'll tell you, I was a

1    little skeptical about the ripeness claims.  Your

2    allegations, it strikes me that you're kind of pushing that

3    and putting the intervenors in an untenable situation where

4    they've got to wait until they are injured for them to seek

5    some sort of relief.

6              MR. GILLIGAN:  Then if the Court would allow me

7    just a few minutes then on the merits of those two claims.

8    As far as the separation of powers claim goes, the

9    intervenors don't cite a single authority that holding that

10   mere disclosure of open audit files specifically or even law

11   enforcement files generally, without objection by the

12   Executive Branch, is inherently problematic under the

13   separation of powers as observed in the Kempthorne case from

14   the District of Connecticut as well as A.T.X. Corporation

15   from the D.C. Circuit.

16             The Congress is frequently conducting hearings and

17   investigations into matters that are also the subject of

18   simultaneous administrative proceedings, and that's never

19   been deemed to be a problem as a matter of the separation of

20   powers or due process.  Instead, the intervenors rely on DOJ

21   policy and practice about sharing law enforcement files with

22   Congress as expressed in various OLC opinions that they cite

23   in their opposition.

24             The principal concern that those opinions raise is

25   the concern that, if the contents of an open prosecution

1    file is made available to Congress, then somehow the

2    information could become known to the defendants and that

3    would prejudice the prosecution.  They do admittedly make

4    reference to the risks of improper Congressional

5    interference with the prosecution and that by withholding

6    the files, it prevents that sort of thing from happening.

7    But nothing in these opinions suggest that simple, that

8    merely making open, information from open prosecution files

9    without the Executive Branch's objection, would itself

10   violate the separation of powers.

11         I think it's also important to keep context in

12   mind here.  We are talking about IRS audit files, not the

13   case files of DOJ criminal prosecutors.  So, we are talking

14   here about information that has been subject and is subject

15   to disclosure to Congress on demand pursuant to what is

16   essentially a century old statute representing a century old

17   consensus between the two branches, perhaps different than

18   it is with law enforcement files, but with respect to these

19   files, the consensus is that certain tax committees of

20   Congress should have a statutory unqualified right of access

21   to these documents.

22         So, to the extent that the intervenors want to

23   rely on the practice, the historical practice of the

24   political branches to support their separation of powers

25   argument, here, that practice with respect to IRS audit

1    files cuts against them.  It does not cut in their favor.

2          THE COURT:  Well, I guess, you are clearly right

3    about the statute, but the practice has been that I think

4    maybe once it's been individual's tax returns have been

5    exposed.

6          MR. GILLIGAN:  Well, perhaps with particular

7    individuals, it doesn't happen that often.  But certainly

8    the policy, the statute applies to return information,

9    returns and return information.  Return information, as I'm

10   sure Your Honor is familiar with, has a very broad

11   definition under 6103.

12         As far as the due process claim goes, again, there

13   is no case holding that simply by providing files to

14   Congress that had something to do with an ongoing

15   administrative proceeding violates due process.  Due process

16   is violated when Congress places pressure on the

17   decision-makers in the administrative proceeding to come out

18   a particular way such that there are extraneous factors, I

19   believe is the term used in A.T.X. Corporation, extraneous

20   factors entered into the decision-making process.

21         Well, simply giving files to the Committee doesn't

22   involve any kind of communications between the Committee and

23   the examiners.  The examiners haven't been called to testify

24   before Congress and to be harangued by members of Congress

25   about how the audit should come out which was kind of the

1    fact pattern in the Pillsbury case that the intervenors

2    cite.

3           In fact, we cannot, there is no way of knowing

4    whether there could possibly be any kind of due process

5    violation until the audits are complete, because we won't

6    know if any pressure applied by Congress to the IRS has

7    entered into the decision-making until we see what the

8    results of the decision-making is.  So, for those reasons,

9    we believe that neither of those claims is meritorious on

10   the merits and should be dismissed.

11          Finally, the First Amendment retaliation claim,

12   Your Honor.  So, the claim there is that that defendants

13   intend to disclose the intervenors' tax information to the

14   IRS in retaliation for former President Trump's political

15   beliefs, his policies as President and his political speech

16   and associations.

17          The claim fails because, as a matter of law, the

18   Trump parties cannot establish the requisite element of

19   causation, which is to say they cannot show that defendant's

20   alleged retaliatory motives are the but-for cause of the

21   intended disclosure of the files.

22          If this Court holds, as we submit it should, that

23   the Committee's request is a valid one, then, under the

24   terms of the statute, Treasury will be legally compelled to

25   provide the requested tax information to the Ways and Means

1   Committee.  They'll have no choice in the matter.  The

2   motives of whoever, the president, the secretary, you name

3   it, won't enter into it one way or another.

4          THE COURT:  How do we think about the fact that

5   obviously the Administration or the Executive Branch

6   disagreed with this view right up until a few months ago?

7          MR. GILLIGAN:  Because the only thing that will

8   matter, Your Honor, is the ultimate decision of the courts.

9   If the courts decide this is a valid request, then the terms

10  of the statute require that the files be disclosed.  If the

11  decision of the courts were to be that the request is

12  invalid, we submit that would not be the correct decision,

13  but if the courts were to decide that this request is

14  invalid, then the request would be a nullity.

15         There would be nothing to trigger 6103(f) and

16  under 6103(a), Treasury would be prohibited from providing

17  the requested files to the Ways and Means Committee.  No

18  matter what the courts decide, well I'll say it differently,

19  what Treasury can or cannot do will be determined not by any

20  differences of opinion between OLC 2019 and OLC 2021.  It

21  will be decided by the courts.

22         And the Court's decision will be determinative of

23  what Treasury does.  So, Treasury's alleged motives here --

24  I won't get into that.  But Treasury's alleged motives

25  simply don't enter into it.  So, under Hartman versus Moore,

 1   the Supreme Court's decision in <u>Hartman versus Moore</u>, the

 2   act of disclosing the returns could not be considered an act

 3   of retaliation at all, because it is an act, as the Court

 4   said there, that would have been taken any way even without

 5   the presence of illicit political motives.  If it's an

 6   action that would be taken any way, even if you wipe the

 7   slate clean of any improper motives, then it's not

 8   retaliation as a matter of law.

 9           So far as allegations regarding the Committee's

10   motives enter into the picture in the First Amendment

11   retaliation claim, we read the intervenors' opposition brief

12   as effectively conceding that the Committee's alleged

13   motives cannot support its First Amendment claim because,

14   under the precedence we cite, <u>Wilkinson</u>, <u>Eastwood</u>, <u>Watkins</u>,

15   <u>Barenblatt</u>, so long as there is a valid request, so long as

16   the Committee is pursuing information on the subject of

17   inquiry as to which Congress may legislate, the member's

18   motives, even motives said to violate the First Amendment,

19   just don't enter into the equation.

20           So, whether you look at the defendant's alleged

21   motives or whether you look at the alleged motives of the

22   Committee in this matter, the First Amendment retaliation

23   claim must fail as a matter of law.

24           THE COURT:  All right.  Thank you, sir.

25           MR. GILLIGAN:  Thank you, Your Honor.

1          THE COURT:  Mr. Strawbridge.

2          MR. STRAWBRIDGE:  Your Honor, I'm happy to get up

3    here and start throwing fastballs.  I wanted to make sure

4    that the court reporter or the Court didn't require a short

5    break before we proceed.

6          THE COURT:  Yeah, why don't we go ahead and take

7    five minutes.  Thank you.

8          (A brief recess was taken.)

9          THE COURT:  All right.  Mr. Strawbridge.

10          MR. STRAWBRIDGE:  Thank you, Your Honor.

11          On the pending motions to dismiss by both the

12    House and the government, the motions themselves, as long as

13    the presentation that you heard today is at war with what

14    the position of the Executive Branch was for more than two

15    years, is at war from the Supreme Court's historic and most

16    recent pronouncements of the standard that applies in

17    evaluating the purpose underlying Congressional subpoenas.

18    It is at war with other District Courts in this district's

19    application of the Supreme Court's most recent analysis even

20    as applied to a former President.

21          In some cases, it is at war with one another.

22    We'll obviously get to that.  But most importantly, it is at

23    war with the standard that applies when you are faced with a

24    motion to dismiss under Rule 12(b)(6).  The issues that are

25    raised in this case no doubt are substantial, weighty, and

1  go to the heart of the limits on Congressional

2  investigations and the separation of powers.

3          But the actual question presented at this stage is

4  not difficult.  The question can be summed up as whether the

5  valid position of the Executive Branch for more than two

6  years is plausible.  That's the question.  That's the

7  standard that applies, and, as I'm sure Your Honor is well

8  aware, that the position of the Executive Branch until very

9  recently was that it was implausible.

10          That was the words that were used in the 2019 OLC

11  memo.  It was implausible to believe that there was a

12  legitimate legislative purpose animating the Committee's

13  request.  Certainly, this case reaches the relatively modest

14  requirement imposed by Rule 12(b)(6).

15          I think I want to start a little bit with Your

16  Honor's question about what standard governs the limited

17  legislative purpose analysis in this case.  Obviously, we

18  disagree.  You have the benefit of our briefing as to what

19  version should apply, but let me explain why I think Mazars,

20  or at a minimum at least Mazars Lite must apply, and that is

21  because that is the Supreme Court's most recent analysis of

22  a subpoena that was directed at the President.

23          And although this subpoena, I'm sorry, this

24  request at this point originated when the President was in

25  office in 2019 and it seeks records that are specific to the

1    presidential audit process, and it claims that its purpose

2    is they need to investigate the presidential audit process

3    and to legislate around the presidential audit process, it

4    is hardly a stretch to suggest that separation of powers

5    concerns underlie this request and have to be taken into

6    account when you analyze them.

7          THE COURT:  So, but, as you know, Nixon versus GSA

8    does that, right?  I read Mazars to be shot through with

9    this idea of this clash between branches that obviously no

10   longer exists.

11         MR. STRAWBRIDGE:  So, I don't think that it's true

12   that it no longer exists, and you don't have to take my word

13   for it.  You can certainly take Judge Mehta's word for it.

14   He specifically applied to Mazars Lite, and he acknowledged

15   that the risk of unnecessary intrusion on the operation of

16   the office of the President doesn't diminish when the

17   President leaves office.  And indeed, the more that Congress

18   can invade the personal spirit of a former President the

19   greater the leverage the Congress would have on a sitting

20   President.

21         The greater the leverage that Congress would have

22   on a sitting President, and that's certainly true here.  In

23   this case, not only did this inquiry arise, and, as you

24   heard Mr. Letter say both at the initial status conference

25   we had this year and in his responses to questions today,

1    the 2019 request can still be considered.  The 2019 request

2    is identical with two words of exception to the request that

3    it was promulgated in 2021.

4            Moreover, the 2021 request itself refers to the

5    ongoing inquiry and to providing an accommodation to the

6    Executive Branch.  So, I think it's very clear that the two

7    requests are tied together, and the Court can consider both

8    the old request and the kinds of statements and other

9    material that might inform legislative purpose that dates

10   back to at least 2019.  We would actually argue they could

11   go further.

12           THE COURT:  They're certainly related.  But Mr.

13   Letter suggests the 2021 request superseded the 2019

14   request.  That feels right to me.  Isn't that?

15           MR. STRAWBRIDGE:  Well, it superseded it, I

16   suppose, only in context of it moved, it adjusted the years

17   of information that were requested.  It is otherwise

18   identical in substance to the request.  And it certainly

19   elaborates upon the alleged reasons or the alleged purpose

20   of the subpoena.

21           Although, I would suggest that the Supreme Court,

22   both in Watkins and in Rumely, long ago suggested that the

23   Court should be wary of post litem rationalizations and

24   retroactive justifications, which is what the 2021 letter

25   feels a lot like.  It certainly expands far more than the

 1     original request does.  And, of course, even the 2021 letter

 2     disavows the need to provide any legislative purpose to

 3     support its request.  It offers it only as an accommodation

 4     to the Executive Branch.  I will say --

 5              THE COURT:  That doesn't matter.  They give an

 6     explanation, whether they give it grudgingly or not.

 7              MR. STRAWBRIDGE:  I'm not suggesting that the

 8     Court completely ignore that explanation, and we've

 9     obviously made our arguments as to why those statements

10     alone are not sufficient.  I'm happy to go through some of

11     them today, but I do think that it is, that it informs the

12     analysis that the Court should use in assessing the purpose.

13              I did want to address one other question that Your

14     Honor had about the standard.  I actually don't think, at

15     least at the 12(b)(6) stage, that it ultimately matters or

16     even requires the Court to decide upon a standard.  I think

17     upon any of the standards, even it is a very loose balancing

18     standard under Nixon v. GSA, we've alleged enough to survive

19     the 12(b)(6) threshold.

20              In fact, if you were actually applying it for a

21     balancing test, I'm not really sure how you could apply that

22     balance, especially if there are questions about effect and

23     the evidence and what steps have been taken to accommodate

24     the Executive Branch's concerns that actually need to be

25     developed in the case.  So, I think that we've satisfied the

1   12(b)(6) standard, even if you assume that it applies.

2           Now, obviously, Judge Mehta applying Mazars Lite,

3   which apparently is the government's preferred test,

4   actually invalidated one of the basis for the subpoena at

5   issue in this case and modified the subpoena in that case

6   otherwise.  So, I think, if anything, that informs the

7   notion that we certainly have at least plausibly alleged a

8   possible violation of the legitimate legislative purpose

9   requirement as well as the Mazars test even in its

10  watered-down form.

11          THE COURT:  So, what about the Eastland footnote

12  about lower courts deciding cases involving the legislative

13  branch expeditiously, and I believe it actually specifically

14  suggests we should be doing it at the 12(b) stage?

15          MR. STRAWBRIDGE:  So, a couple of things about

16  Eastland.  It is actually true that, in Eastland, that case

17  was not decided at the 12(b)(6) stage.  The case involved a

18  preliminary injunction hearing as well as a permanent

19  injunction hearing.

20          THE COURT:  The Supreme Court upbraided the D.C.

21  Circuit and the D.C. District Court for taking as long as it

22  did, right?

23          MR. STRAWBRIDGE:  And perhaps in that case, where

24  the delay had stretched I think over five years in that

25  instance, and it was an Armed Services Committee

investigation.  A subpoena was issued.  There were alleged

concerns of the utmost importance.  Maybe that would have

some weight.  I guess I would respond in a couple of ways.

I don't think that the Committee or the government

in this case are particularly well positioned to claim that

there is an immediate rush right now to decide this case.

As the government pointed out at the beginning of this case,

the Committee delayed a number of months in sending this

request once it took over Congress.  It delayed another

period of weeks before filing a summary judgment motion

moving to expedite the case.

Both parties sought or agreed to stays, some

lasting many, many months during the pendency of this

litigation.  As you know, at the beginning of this year, in

the new administration, there were a number of delays one

month at a time stretching more than six months while the

Committee and the Executive Branch discussed with each other

whether the Executive Branch was going to change its

position.

In no circumstances certainly have we or the Court

I think delayed this action.  I'll also note that nobody

required the Executive Branch or the House of

Representatives to file a 12(b)(6) motion.  Indeed, we

proposed the rather accelerated period with limited

discovery culminating in summary judgment.  I'd suggest we'd

 1   be close to a final decision or at least a hearing on a

 2   final decision in this case at that point in time.

 3          The Executive Branch and the Committee chose to

 4   file a motion to dismiss.  That is their right.  They

 5   absolutely have the right to file that motion.  Having done

 6   so, they are stuck with the 12(b)(6) standard.  They

 7   obviously assumed that they could meet the 12(b)(6) standard

 8   and make that showing.  I do not think that they can.  But

 9   having made that election, the Court cannot ignore that

10   standard and must apply it to each one of our claims.  We

11   satisfied that standard on each one of those claim.

12          THE COURT:  I understand.  But I guess my point

13   was Eastland suggests that this very high and, well,

14   forgiving standard for the legislature should be applied

15   early on, right, and at the 12(b) stage?

16          MR. STRAWBRIDGE:  I think it says that the claim

17   should be resolved expeditiously.  And I guess I don't

18   necessarily think that when you have rather difficult claims

19   that go to the limit of what Congress' powers are to convene

20   an audit committee on the floor of the House of

21   Representatives or to otherwise impose presidential

22   disclosure requirements or publicize tax returns, I don't

23   think that speed should be the only factor that weighs in

24   that.

25          I also note that we are proceeding expeditiously.

1   We filed our amended complaint in a shorter period of time

2   than was required under the rules.  We have always agreed to

3   move this case along quickly.  When, I hope, the motions to

4   dismiss are denied, we will be happy to work expeditiously

5   on developing the case or decision on summary judgment or at

6   a permanent injunction hearing.

7          We do not, we do think that there is some

8   discovery that is warranted in this case.  Think it is very

9   clearly allowed under the Jewish War Veterans case, which I

10  don't think it's a coincidence my friends on the other side

11  failed to discuss today and dismiss in half a sentence in

12  both of their briefs.  So, I think we could do some

13  discovery.  We could be do it relatively quickly, and we

14  could be back in deciding this case in a relatively timely

15  manner.

16         THE COURT:  What counts do you believe discovery

17  would be appropriate for?

18         MR. STRAWBRIDGE:  I think there's appropriate

19  discovery for frankly all of the counts.  I think that the

20  ones that are most necessary are probably counts one through

21  four and count six.  One through four is obviously the

22  legitimate legislative purpose.  I think you've heard some

23  concessions today that we are entitled to look at

24  statements, whether it be limited to official statements or

25  statements on the record, whether it be limited to just the

1    Chairman or to the other Committee members.

2            The parties may have some disputes.  We could

3    obviously resolve those disputes when it got to that point

4    in time.  But I do think that we would be entitled to some

5    additional discovery.  Judge Bates actually does a very

6    detailed job, which is why we cited it in other brief, of

7    not only distinguishing between what's allowed for an

8    inquiry into purpose versus what's impermissible motive but

9    also explaining the categories of documents that can be

10   obtained in discovery when you're looking at establishing a

11   legislative purpose.

12           And I think the most obvious case that that case

13   explicitly allows and which I think would be completely

14   appropriate here is communications between the Executive

15   Branch and the Committee about this accommodation that they

16   reached.  We know there are documents and communications

17   that we have not been privy to.  They're cited in the OLC

18   opinion.

19           Those documents are certainly relevant, not only

20   to determining whether the subpoena is broader than

21   necessary, which is a specific inquiry that Mazars or even

22   the Mazars Lite version requires the Court to undertake.  We

23   also know that that could be relevant to the First Amendment

24   claim.  Judge Bates' decision in Jewish War Veterans says

25   quite plainly that attempts by the legislature to influence

1    the Executive Branch can be relevant to a First Amendment

2    claim.  So, those communications I think are obviously on

3    the table for discovery.

4            I think that there may be some other

5    communications, either official messages sent by the

6    Committee, official statements.  There seems to be some

7    dispute as to whether statements made to the press count as

8    official statements for considering or not.  I would note

9    that a number of them, including the Chairman's statements,

10   are memorialized on his website.  So, that seems more

11   official rather than less official, but there may be other

12   areas.

13           We do not intend to depose any members of

14   Congress.  I don't think, at this point, that that would be

15   warranted.  I think that the parties may have some

16   disagreement on discovery.  But I think that it's all

17   relevant and it goes to all of those claims, except for

18   possibly the facial attack on the statutory provision in

19   question and maybe the due process claims just because I

20   think the due process claims are probably ripe right now,

21   and you don't need a lot more to at least determine whether

22   or not the potential disclosure would run afoul of

23   separation of powers or due process.

24           THE COURT:  What's your strongest claim?  I feel

25   like you've got a lot here that go in a lot of different

1    directions.  What's the one you're feeling most comfortable

2    on?

3         MR. STRAWBRIDGE:  I mean, I obviously think that

4    the Mazars claim is the one that's been applied by other

5    districts, other courts in this district.  And at least, in

6    one case, it narrowed a request and invalidated on a certain

7    legislative purpose on one.  So, if you're asking me where

8    have we stated a claim for relief, we've at least stated a

9    claim there.  That won't deal with the underlying legitimate

10   legislative purpose challenges.  We broke those up into

11   three different asserted purposes.

12        I think that those are very strong, given the fact

13   that the Executive Branch relied on almost, on a subset of

14   those statements to determine that the 2019 request, which

15   is almost identical to this request, lacked a legitimate

16   legislative purpose.

17        I do think that count 6 and count 7 are much

18   stronger than the government seems to think that it is.  I

19   notice with interest your colloquy with Mr. Gilligan on

20   that, because it strikes me as unfathomable that requesting

21   six years of a particular person's tax returns, as well as

22   all of their underlying audit information on an audit that

23   is ongoing would not in some way suggest that there is

24   significant pressure, not only being applied to the

25   Executive Branch's enforcement prerogatives in its own

1   activities, which is the separation of powers claim, but

2   also to the due process rights of the person who's

3   undergoing that audit.

4           You recall that in the A.T.X. decision, which was

5   a due process challenge, the D.C. Circuit found I think much

6   more benign potential interference with ongoing agency

7   proceedings to require a close look.  It basically said that

8   those claims were on the edge.  It ultimately determined

9   that they did not state a due process violation.  I think

10  our claims are stronger.  They're certainly strong enough to

11  survive a 12(b)(6) motion.

12          And I don't want to diminish the First Amendment

13  claim, which I do think is significant.  I think as we

14  notice the arguments that the government has, we don't

15  assert the First Amendment retaliation claim against the

16  House of Representatives or the Committee, which solves the

17  speech and debate issues.  We have asserted it against

18  Executive Branch officials.

19          We know that there was a long exchange of

20  information and communications between the Committee and the

21  Executive Branch officials that resulted in them reversing

22  the position that they had held for more than two years.

23  That is a rather vast reversal of an OLC opinion, as I'm

24  sure Your Honor understands.  And there's recent authority

25  from this Court in the Black Lives Matter case that we cited

1    that says shifting explanations over a short period of time

2    themselves are sufficient to infer retaliatory action, as

3    well as both intent and causation at the motion to dismiss

4    stage.

5          THE COURT:  What about Mr. Gilligan's point that,

6    if he is correct, well, the federal parties are correct,

7    that they're required to turn over this information, it

8    doesn't matter if they're doing it with bad motives or not?

9    They're just following the law.

10         MR. STRAWBRIDGE:  I mean that strikes me as like

11   the quintessential kind of decision that we can't make at a

12   motion to dismiss stage.  It's essentially a request to

13   credit the official explanation for why something was done

14   as opposed to the allegations that go to the fact that there

15   was some sort of pretext or animus underlying the decision.

16         I don't think you'd normally get out of a motion

17   to dismiss on a First Amendment retaliation claim by just

18   simply alleging that you had good intentions and not bad

19   intentions.  We obviously agree with him that, if you

20   resolve the legitimate legislative purpose inquiry at the

21   motion to dismiss stage in our favor, that necessarily

22   defeats the argument that somehow they can rely upon that

23   their reading of the statute to get them out of their First

24   Amendment claim.  So, I do agree that those things are

25   linked together in that way.

1          THE COURT:  But isn't it also linked the other

2    way, that if he's required to turn over the tax returns,

3    that it doesn't matter whether they are doing it for

4    spiteful reasons or not?

5          MR. STRAWBRIDGE:  Yeah, I mean, sure.  Because I

6    just don't understand how, in a case where the Office of

7    Legal Counsel took the position that we take here in our

8    complaint, that there is no such requirement indeed that the

9    legitimate legislative purpose requirement pervades the

10   statute, I don't understand how they could meet that burden

11   at the 12(b)(6) stage.

12         Let me just briefly talk about the facial attack

13   because I know that it came up.  I want to make two points

14   about that.  The first is that I do want to commend the

15   government, having read our 90-page filing in this case,

16   Your Honor might be forgiven if thinking that we had cited

17   every single case ever decided in the federal courts, but we

18   missed one.

19         And the one that we missed appears in Footnote 11

20   in the government's brief.  I would encourage the Court to

21   read the paragraph that is cited in Footnote 11, because it

22   actually establishes that we are one hundred percent correct

23   about Salerno, and the Court's inability to simply assume

24   that because, by happenstance, that's the word the D.C.

25   Circuit used in 2013, by happenstance that some individuals

1    come within the sweep of a statute, that cannot be enough to

2    save it from a facial attack.  That's the best authority,

3    although we certainly cited a number of other cases, both

4    from the Supreme Court and other circuits, that support our

5    argument on facial attack.

6         The second point I would make on the facial

7    challenge is that, obviously Your Honor doesn't need to

8    resolve that at the motion to dismiss stage assuming that it

9    finds that one version of counts one through four survives

10   the 12(b)(6) standard.  At that point, the Court can

11   obviously, doesn't need to address that.  And indeed, it

12   could ultimately conclude that, you know, as applied

13   challenge alleging that there's no legitimate purpose to

14   these requests, it's sufficient to grant us the relief.

15        It may never need to decide the question as to

16   whether the statute itself is unconstitutional.  It would

17   only have to reach that question if it decides we are not

18   entitled to relief, and certainly not entitled, or at least

19   we're going to lose the motions to dismiss, then it would

20   have to reach that question, because it would be necessary

21   to a dismissal of our complaint, at least those counts.

22        I'm not going to stand up here for two hours.  I'm

23   sure everyone will be relieved to hear that.  I just wanted

24   to make a few more notes as I went through here.

25        I talked a little bit about why I think that, when

 1   you're presented with a subpoena that originated -- or not a

 2   subpoena, a statutory request -- that originated when the

 3   President was in office, that targets the presidential audit

 4   process that essentially specifically continues to target

 5   papers that are tied to the term of his presidency, it is

 6   hardly tangible to suggest that there are at least some

 7   separation of powers concerns floating in the air here,

 8   Judge Donato did not have any problem determining that was

 9   true with respect to the subpoena that was directed at the

10   President's financial records.

11         In Mazars, as Your Honor noted, the Nixon cases

12   both Nixon v. GSA and Nixon versus Fitzgerald, acknowledge

13   that former Presidents still have the power to raise some

14   concerns arising from their former office.  And I think that

15   the point is obvious Your Honor made of the Hunter Biden

16   hypothetical that you gave, that there are a lot of ways in

17   which threat of a personal, a personally invasive request or

18   subpoena could affect the current occupant of the office.

19         The fact that this particular occupant at this

20   time does not care to raise those concerns does not defeat

21   our claim.  Parties frequently litigate and win separation

22   of powers concerns when the Executive Branch is not on their

23   side.

24         THE COURT:  Where would I consider that under

25   Mazars with the Executive Branch lining up against you?

1          MR. STRAWBRIDGE:  Where would you consider the

2    separation of powers concerns?

3          THE COURT:  Yeah, well, how does that factor in

4    the potential --

5          MR. STRAWBRIDGE:  So, I think that the Mazars

6    checkpoints, we don't really think of them as factors

7    because that implies balancing, and we don't think that

8    Mazars is held as a balancing test.  We think there are four

9    independent requirements, any one of which can be used to

10   invalidate a subpoena.

11         But I think the question as to whether or not you

12   apply any of those factors, or any of those checkpoints I

13   should say, comes into account once the subpoena implicates

14   the separation of powers.  It does not have to be the

15   sitting President obviously, but that's what the Supreme

16   Court addressed in the text of the opinion because, at the

17   time, that was the only question that was before it.  He was

18   the sitting President at that moment.

19         It does not follow from that that the second he

20   leaves office, all of those concerns diminish.  Judge Mehta

21   correctly held out as to what we quibble with I think how he

22   went about arguably watering down the Mazars test, he still

23   recognized that there were separation of powers concerns

24   there as did the Supreme Court in the Nixon cases.

25         THE COURT:  So, when do you think Mazars applies?

1          MR. STRAWBRIDGE:   I think Mazars applies to any

2    request to a President or a former President at least that

3    is premised on presidential regulation or materials.   I

4    think that would be my answer to this question.   I should

5    note that, throughout the Mazars case, this is not the first

6    time that Mr. Letter and I have shared a lectern.   It's not

7    the first time that he has referred to my client as Mr.

8    Trump instead of President Trump.

9          That was true throughout the entire case, because

10   the argument in that case was that, well, these are a

11   subpoena for his personal records, so we're not actually

12   like subpoenaing presidential records.   So, he's bringing

13   this in his personal capacity.   There are also allegations

14   that Mr. Trump is not his businesses.   Mr. Trump is not his

15   children.

16         There are also claims that separation of powers

17   concerns weren't implicated because the President himself

18   was not going to photocopy and staple and package together

19   the documents that were being sought.   They had relieved him

20   of that obligation by subpoenaing his financial services

21   providers.

22         The Supreme Court went for none of those

23   distinctions.   The Supreme Court made it clear in those

24   cases that separation of powers concerns still applied, that

25   this was an unprecedented request.   And I would suggest that

1    that same logic defeats the suggestion that the day he walks

2    out of the office the separation of powers concerns

3    evaporate, and I think the government recognizes that, and

4    that's why they insist at least on Mazars Lite.

5         THE COURT:  So, I don't think anybody has briefed

6    anything on this, but if I was going to try to take an

7    original of some perspective to the authority of the

8    President and the authority of a former President to raise

9    presidential prerogatives, it strikes me to be in a bad

10   position.  I have a hard time imagining that the founders

11   thought that rights would kind of trail on with you after

12   you were no longer the office holder.  Do you have any

13   reason to disagree with that?

14        MR. STRAWBRIDGE:  I guess I -- so, the answer

15   obviously is nobody has briefed that.  If you want a

16   briefing on it, I'm sure we can provide it.  I guess I would

17   note that the two biggest original analysis of the cases

18   that were done, at least in the Mazars case, obviously had a

19   different point than this by Judge Brown and by Justice

20   Thomas, I think reached positions that were supportive of

21   our position at the time.

22        Whether those decisions would completely go the

23   other way the second that the President left office, I'm not

24   so sure that they would.  I also don't think it would be a

25   surprise that the founders would be concerned about the

House of Representatives hounding former office holders or

threatening to hound them the second they left office with

the kind of invasive personal disclosures that we're talking

about here.

           But I don't have an answer to you because we

haven't been asked to brief it.  We would be happy to do so

in expeditious fashion if Your Honor would like.

           THE COURT:  Okay.  Yeah, so help me think.  You're

going, I think you called them checkpoints.  This first one,

it's looking at the significant step of involving the

President and his papers.  I believe Judge Mehta and the

federal parties think that basically doesn't apply here.

           MR. STRAWBRIDGE:  I still think it's a significant

step in this case, because the investigation or at least the

request in this case originated when he was still the

President and is specifically tied to the presidential audit

process and now specifically to the tax returns that most

reflect upon his time in office.  So, I guess I don't think

that the balancing test would come out the same way in this

case as it may have in other cases that were explicitly for

records that predated his term in office and that were

personal.

           THE COURT:  But he's no longer the President.  The

concern that was motivating this is the clash there, the

parties, of the branches.  I guess this really goes to more

1   of the fourth one but kind of related the burdens imposed on

2   the President.  There are a lot of things that are looking

3   at invoking a coordinate branch that no longer really apply.

4           MR. STRAWBRIDGE:  So, where the Supreme Court has

5   addressed this question with respect to former Presidents,

6   it has acknowledged that those interests often diminish over

7   time.  I don't think we dispute that.  I don't see how that

8   weighs particularly against us, because the time is very

9   fresh in this case.  This is not years later.  This is a

10  very relatively recent vintage.

11          And the request, that the documents that are being

12  sought in this case are being sought for the alleged purpose

13  of regulating the presidential audit process.  It's still

14  tied to the office.  So, I just don't think that it's true

15  that the separation of powers concerns, like I said,

16  evaporate the day that he leaves office.

17          I do think that it does affect the fourth _Mazars_

18  factor.  We're not suggesting that you can't take that into

19  account at all and certainly I don't think we disagree with

20  the concept or the notion that the interference with the

21  office is certainly going to be of even a lesser degree when

22  the President is no longer in office.

23          It does not mean that the weight is zero.  It does

24  not mean that we need to load the dice the way that Mr.

25  Letter, quite candidly, argued that we should with respect

1    to the test that we argued for.

2              If you want to talk about the other Mazars

3    factors, I'm happy to walk through them briefly.

4              THE COURT:  Sure.

5              MR. STRAWBRIDGE:  Explain how we think that they

6    apply in this case.

7              THE COURT:  Please.

8              MR. STRAWBRIDGE:  The first checkpoint is whether

9    or not Congress has demonstrated that other sources could

10   provide that information.  I would just take some of the

11   discussion that we heard in the courtroom today.  One of the

12   information or one of the purposes, I suppose, that was

13   being suggested was that we need to determine whether or not

14   maybe the auditor of the President's files should be

15   anonymous.  It shouldn't be disclosed to the President.

16             It is unfathomable to me why we actually need six

17   years of not only the former President's tax returns but all

18   of his audit files, every scrap of paper anybody may ever

19   have to determine whether or not the individual selected to

20   oversee the presidential audit process should be disclosed

21   or not.  There's a serious mismatch there.

22             We also, like I said, don't know the extent to

23   which information has been already gathered from the

24   Executive Branch.  We have a, I think, a self-serving

25   declaration from the House that still has questions after

1   meeting Secretary Mnuchin and IRS officials, but I don't

2   think that we have the details on what they were told,

3   whether there are any questions that they actually put

4   forward, whether they have made attempts to follow up with

5   additional questions to the IRS.

6          So, I don't think they've demonstrated that at

7   least for their alleged purpose.  They need the specific

8   documents that they're seeking here.

9          Also the concern, the next checkpoint is that it's

10  not over broad.  Again, in this case, we think that the

11  breadth of the request here is quite over broad.  As to

12  Judge Mehta in the Mazars case where, even in places where

13  he found that Congress had articulated a legitimate

14  legislative purpose, he still narrowed those requests

15  finding that some of them were over broad.  And I think that

16  it's at least plausible that the over broad factor would

17  apply or at least limit, if not vitiate, the documents that

18  are being sought here.

19         The nature of the evidence that Congress uses

20  offers to establish its limited legislative purpose, this is

21  where we talk a lot I think about what is it precisely that

22  they say that they want and how, what have they offered.

23  What is the evidence that is available to the Court to show

24  that they actually need this information that the request

25  targets.

1          Don't, I don't think that the House, certainly not

2    the 12(b)(6) stage but I think even on the merits, can meet

3    this.  This is the checkpoint that was fatal to the

4    financial disclosure rationale that the Committee advanced

5    in the Mazars case.

6          I think that, if you look at the subpoenas in

7    those cases and compare them to the statutory request here,

8    that's actually the greatest fit for this request.  Judge

9    Mehta determined that seeking, willing to, in other words,

10   subpoenaing these documents for the purpose of justifying

11   financial disclosure obligations of the President was, ran

12   afoul of the respect duly offered to the office of

13   presidency.

14         Nor could he understand why you need to actually

15   comb through in laser focused detail reams and reams and

16   reams of personal financial documents just to determine

17   whether disclosure was required.  I suggest that's very

18   similar to what the primary purpose that's being alleged

19   here is, which is that the Committee contends that its

20   primary purpose is to study the audit process.

21         You don't need one person and one person to hold

22   these extensive files to legislate around the edges of the

23   discretionary enforcement power that the IRS might undertake

24   or how the audit processes go.  You can inform yourself

25   without that information.  And then, finally, the burden's

1   on the President.  We talked about that.

2          THE COURT:  On the third one, I guess how I've

3   been thinking about it is the Congress has to show a valid

4   legislative purpose kind of as an initial matter before

5   getting to whatever test you get to.  But then here --

6          MR. STRAWBRIDGE:  But well, I guess --

7          THE COURT:  -- over again at a heightened level.

8   Have I been thinking about this the wrong way?

9          MR. STRAWBRIDGE:  Well, I guess I agree with you

10  in that every private citizen still has the right to demand

11  a legitimate legislative purpose for any request for their

12  information.  I think in Mazars, what the Court said was

13  faced with the unprecedented request for that information

14  from the President, himself.

15         Even though it was just his personal papers, we

16  were not going to apply more deferential versions of the

17  tests that had arguably been applied in other cases.  We

18  were going to basically take careful concern to make sure

19  that was the case.  And Judge Mehta I think decided that at

20  least some level of concern was still required again for a

21  subpoena.

22         In that case, actually it's a, there was a

23  stronger argument to not apply any version of the Mazars

24  test because Judge Mehta specifically concluded that he had

25  an entirely new subpoena with an entirely new extensive

1    memorandum that basically completely replaced the prior

2    subpoena.  He still applied his test, and he still initiated

3    that alleged concern, and they did not meet the Mazars Lite

4    version.

5           Here, I don't think that we have as clean a piece

6    of cleavage between the prior request and the current

7    request.  You heard that today.  I think there was a

8    concession on that point.  So, certainly the mismatch

9    between what the request seeks and the rationale that we

10   might require audits or require public disclosure of tax

11   returns sounds a lot closer to the rationale that was

12   invalidated in Judge Mehta's opinion than, for example, the

13   one that was sustained, which is the President is a GSA

14   lessee like any other GSA or lessor.  I always messed that

15   up in law school.  I'm messing it up now, I'm sure.

16          And it was basically not his position as President

17   but simply his position as a leaseholder that justified the

18   inquiry in that case.

19          THE COURT:  So, I think the point that Mr. Letter

20   makes that I thought was pretty persuasive frankly is, in

21   all of these tests, the focus seems very much on what the

22   government has shown, not necessarily in terms of its

23   legislative purpose, why it needs it, not so much the

24   documents that you've cited from various Congressmen saying

25   there are other purposes.  Why isn't he right about that?

1          MR. STRAWBRIDGE:  Well, I guess I don't agree that

2     the case law supports the view that you can only look to the

3     stated purpose.  In fact, I understood Mr. Letter to suggest

4     that it would be an absurd statement to say that you

5     couldn't consider, for example, contemporaneous statements

6     made by Chairman Neal at the time, especially if they were

7     statements that he was disavowing the stated reason as to

8     why he was seeking it because the lawyers told him to do it,

9     which I would suggest is not that different than the actual

10    statement we have in the record which is that he is taking

11    his time to construct a case.

12          Indeed, that was language that the OLC opinion in

13    2019 found very indicative of an improper purpose.  And of

14    course, in any discrimination case, if you had a statement

15    from the defendant that they were working to construct a

16    case to terminate somebody, that would be gold at summary

17    judgment stage, not even at the motion to dismiss stage.

18          So, I reckon to concede that you can consider

19    other information, including the 2019 request.  He obviously

20    downplayed the relevance, but he did not deny that they are

21    part and parcel of one another.  We might find that those --

22          THE COURT:  I think he does.  He says that one

23    supersedes the other, right?

24          MR. STRAWBRIDGE:  I think he said it was hardly

25    relevant, but he acknowledged that the 2021 request is an

accommodation, you know, modification of the 2019 request,
which he has to do.  They're, in substance, virtually word
for word the documents that are being requested.  There's
one adjustment of the years.  That's basically it.

THE COURT:  Does that matter though?  I mean, it's
still one is the operative request, and it's an operative
request for a former President not for a current President.

MR. STRAWBRIDGE:  Well, that's a change in
position.  I think that the position, at least earlier in
this case, was that those requests don't expire and that
they remain operative.  There was an accommodation process,
to which we have not been privy involving non privileged
communications between the Executive Branch and the
Committee which resulted in the reversal of position here.
That's one of the reasons why I think at least someone --

THE COURT:  But it also resulted in them
initiating a new request, which may well be because they
recognized the points that you're making, that the 2019
request was weaker than a new request made while he is no
longer President and for years that are more pertinent to
the stated interest.

MR. STRAWBRIDGE:  Well, I guess, but I believe
it's Rumely and Watkins that specifically warn against
accepting this sort of litigation post litem retroactive
rationalizations, and that's what this also starts to feel

1    like.  Now look, maybe when we get through the whatever fact

2    finding is allowed and we get to the summary judgment stage,

3    they will prevail on that argument.

4           Maybe they will have the better weight of

5    evidence, but I don't think they're thinking weight at the

6    12(b)(6) stage.  We've certainly alleged enough facts in

7    this case.  Indeed, we alleged the facts that the Executive

8    Branch relied on for two years in finding out the legitimate

9    legislative purpose.

10          THE COURT:  All right.

11          MR. STRAWBRIDGE:  I think I made my point

12   regarding 12(b)(6).  The brightness question with respect to

13   the last two counts in the complaint --

14          THE COURT:  Sorry.  Can we go back to the valid

15   legislative purpose?

16          MR. STRAWBRIDGE:  Yes, definitely.

17          THE COURT:  So, is your view that the Court should

18   always consider evidence of motive here?

19          MR. STRAWBRIDGE:  Well, no, we distinguished

20   between motive and purpose.  Motive at least -- the words

21   are synonymous to one another, so you have to look to the

22   cases to get guidance as to what constitutes purpose and

23   what constitutes motive.  It can't simply be that, because

24   the words are synonyms, that means you can't look at other

25   things.  The test is the legitimate legislative purpose

1    test.  So, I think there's a little bit of sophistry on the

2    other side of the case.

3         THE COURT:  Well, but they also point, I think

4    Watkins uses the terms interchangeably, doesn't it?

5         MR. STRAWBRIDGE:  Correct.  But it is the

6    legitimate legislative purpose test, and I think that Judge

7    Bates' opinion in Jewish War Veterans actually does a very

8    good job acknowledging, not only sometimes the difficulty at

9    drawing that line.  But also he goes on to say in the quote

10   that both parties use in their reply briefs, without

11   including this part of it, that although that line can be

12   hard to apply, there's a distinction that is supported by

13   history and by the case law, and it's one that the courts

14   must endeavor to apply.

15        THE COURT:  I hear you.  I have a lot of respect

16   for Judge Bates and Judge Mehta.  But you know that, when

17   this case goes upstairs, let alone across the street, what

18   one of us district judges says doesn't matter very much.

19   And what the Supreme Court says, and using the language

20   interchangeably and motive and purpose matters a lot more.

21        MR. STRAWBRIDGE:  So, again, nothing in Mazars

22   suggests that a legitimate legislative purpose isn't

23   required.  I think we agree with Your Honor's reading of

24   Watkins as to what was actually decided and what is allowed

25   to be considered.  You can include statements from the

legislative records.  You can obviously use statements that

were made at a hearing to question a witness in a perjury

case.  We think that you can -- I think Mr. Letter admitted

that we can use statements that the Chairman himself made,

especially to the extent that they seem to contradict his

status.  It would be absurd to argue otherwise, and we agree

with that.  We actually think that we have --

          THE COURT:  Talk to me about McGrain.  He put a

lot of emphasis on McGrain, which says courts are bound to

presume that the action of a legislative body with which

legitimate object if it is capable of being so construed.

          MR. STRAWBRIDGE:  Setting aside obviously that

Mazars is the most recent enunciation on the standard and--

          THE COURT:  -- ruled McGrain?

          MR. STRAWBRIDGE:  We disagree with Mr. Letter's

reading of McGrain.  Throughout the case, McGrain

specifically says that if you avow an improper purpose, the

result might well be different.  And of course, that is

essentially what we're alleging here.

          THE COURT:  I'm sorry.  Say that again.

          MR. STRAWBRIDGE:  The language in McGrain it is

not as if the legislature avowed an improper purpose.  They

basically say they seem to have a legislative purpose here.

They have not avowed an improper purpose.  We have alleged

plausibly that there is no valid non-legitimate purpose in

1    this case.  So that does require the Court to ultimately

2    make a determination as to what is the gravamen or the

3    primary purpose of the subpoena.

4            THE COURT:  Is that all it takes, though, for a

5    litigant to get past 12 (b)6 and tie up the Congress and

6    discovery and protracted litigation?  I mean, Eastland also

7    postdates McGrain.

8            MR. STRAWBRIDGE:  That is true but nothing

9    postdates Mazars.  So at the end of the day, I still think

10   that's why the other courts have looked to it.  The

11   suggestion here isn't necessarily that the District Court

12   decisions are what is going to stand the test of time when

13   they go across the street but that's the best information we

14   have right now about how this test ought to be applied.  And

15   those applications are more consistent with our view than

16   the other parties, as well as the fact that those were not a

17   motion to dismiss.  At least Judge Mehta's wasn't, that was

18   on summary judgment.

19           But the answer is yes, we disagree that McGrain

20   would basically permit the legislature to simply say:  You

21   know what?  This is a legitimate inquiry into the audit

22   process.  At that, at the end of the day, is the end of

23   inquiry and the Court cannot consider anything else.  The

24   Supreme Court in Rumely and quoted this phase in Mazars,

25   said courts cannot be blind to what others see.  That is

what the other side is asking you to do.  That is why this narrowing scope of information it wants you to look at, they want you to credit the government's proper rationale for why it reversed its position, rather than look at what it previously said, as well as all the other information that we have.

And it wants you to ignore the 12 (b)6 statement. It is asking you across the board to be blind to what others can see.  If this is not an example where there is at least a plausible allegation that this is not the legitimate legislative purpose of this request, it is hard to fathom any case that could ever meet that requirement.

It is a requirement that has always been reiterated throughout case law.  It is a requirement that is applied with heightened scrutiny when there are separation of powers concerns.  It is a requirement that must govern the 12 (b)6 analysis here.

THE COURT:  I mean, you couldn't have -- potentially the chairman could have had no explanation at all.  I think probably part of what you see is Congress learning from the case law that they do need to set down their justifications, even though the 6103 or the subpoena by it terms may not require it, they're trying to create a record and doing that to follow Supreme Court case law.

MR. STRAWBRIDGE:  And there very well may be cases

1    in which that is sufficient, where you don't have the kind

2    of allegations in the record that we have here.  We're not

3    suggesting that this case means that the subpoena recipient

4    could always survive a 12 (b)6 motion.  I think that there

5    is some other accelerated litigation going right now on

6    these questions in which these arguments are maybe not as

7    well pled.  Maybe the court decided, at least at the initial

8    stage, that they're not as well pled.

9         But when you have this particular kind of request

10   and you have the record that we have here, yes, 12 (b)6 is

11   what the applicable standard is when you bring an action in

12   federal court.  No one questions our ability to do that.

13   Supreme Court certainly didn't suggest that somehow we

14   didn't even have the power to raise this case or that the

15   court lacked jurisdiction to decide it.  Even in Eastland,

16   the Court did reach the conclusion, it analyzed whether or

17   not in fact there was a legitimate legislative purpose.

18        THE COURT:  Do you agree with Mr. Letter that, for

19   instance, additional funding for this audit program or a

20   prohibition on sharing the name of the auditor with anyone

21   outside of the unit would be legitimate legislative purpose?

22        MR. STRAWBRIDGE:  I think it is a very tricky

23   question.  I would be more than happy to give Mr. Gilligan

24   the opportunity to brief it at the merits stage as to where

25   the line is on even those kind of impositions upon the

1   Executive Branch's enforcement process.

2            I don't understand that they took a very strong

3   position on that right now.  They've sort of suggested that

4   that might be a legitimate legislative purpose.  I don't

5   think that they avowed those would obviously be

6   constitutional.  Maybe I misunderstand Mr. Gilligan, he can

7   correct it.

8            But even if I were to conceive that it does, and I

9   don't, I think telling the IRS how it has to audit

10  presidents raises Article One problems, not only with

11  respect to--

12           THE COURT:  How about just funding the program?

13           MR. STRAWBRIDGE:  Why do you need to see six years

14  worth of audit files, and particular tax returns in order to

15  decide whether you want to fund an audit program or not?

16  That's the question in Mazars.  That the question that the

17  pertinency requirement that applies to all subpoenas gets

18  at.

19           THE COURT:  That's a different point.  I'm asking

20  you do you think --

21           MR. STRAWBRIDGE:  I guess my point here is that

22  you recognize the obvious tension here because they're

23  directly -- I mean, the stated purpose is to analyze the

24  presidential audit process.  They're in the danger zone,

25  even the D.C. Circuit recognized in its Mazars decision that

1    was ultimately vacated by the Supreme Court.

2          The Supreme Court obviously recognized, once you

3    start treading into areas of presidential regulation, you

4    are on fine ground; we have a heightened requirement,

5    including the requirement to show that these documents are

6    necessary for that particular inquiry.

7          And I can't imagine any scenario where a

8    generalized concern of funding the IRS audit program

9    requires specific records for six years about one person and

10   one person only.  I don't think you can even read that 2021

11   letter to suggest that that was actually what they want to

12   do.  I think what they want to do in the 2021 letter is to

13   regulate, if not mandate, presidential audits.  Obviously we

14   have a number of statements that we've alleged that says the

15   actual goal is to publicize the return information obtained.

16         Unless Your Honor has any other questions, I want

17   to just make one point in closing.

18         THE COURT:  So you might have said this.  As I

19   indicated, I was kind of inclined to think Nixon versus GSA

20   is the correct test.  Do you agree with Mr. Gilligan that

21   it's not the correct test because there is a presidential--

22   that's about presidential privilege materials and that you

23   are supposed to use Mazars if you are talking about private

24   materials or how do I know which test to apply?

25         MR. STRAWBRIDGE:  So obviously our position is

1    that Mazars –– not even Mazars Lite applies, that's our

2    position.  I agree with Mr. Gilligan that Nixon v. GSA is

3    not the proper test.

4              THE COURT:  But why?

5              MR. STRAWBRIDGE:  I think largely for the reasons

6    that he says, with the additional fact that we think you can

7    address the former presidential factor in the fourth

8    checkpoint of Mazars rather than watering down all the

9    factors in Mazars.

10             THE COURT:  Is that what Judge Mehta did?

11             MR. STRAWBRIDGE:  That's how we viewed what Judge

12   Mehta did.   He essentially, basically said that all the

13   factors in Mazars are diminished with respect to a former

14   president, as opposed to just the fourth checkpoint that we

15   see.  That was our case.

16             I guess my point is, to the extent that

17   Mr. Gilligan, or maybe even Your Honor was viewing there not

18   being much difference in how the analysis would operate in

19   practice between Mazars Lite and the balancing test of Nixon

20   v. GSA,  I still think we satisfy the 12(b)6 hurdle at this

21   point.  I still think that there is some inquiry that needs

22   to be made that addresses the concerns about separation of

23   powers.  Once you give any, any weight to separation of

24   powers, even acknowledging the fact that he is a former

25   president, this request is in trouble.

1        We obviously allege that it is in trouble even if

2   you didn't apply Mazars, given the record that we have here.

3   It is not just us, that was the government's position for

4   two years in a very well thought out OLC memo.

5        THE COURT:  All right, thank you. Anything

6   further?

7        MR. STRAWBRIDGE:  Yes.  I just want to make one

8   housekeeping point.  Department of Justice has agreed to

9   withhold sending documents over while we litigate in front

10  of Your Honor.  We would never deprive the opportunity of

11  the parties to litigate a stay.

12       We would hope that in the event that Your Honor

13  dismisses the case, and we're obviously very hopeful that is

14  not the decision that is made given the applicable standard

15  at this time, that we would at least have the ability in an

16  administrative stay that would allow us, if necessary, to

17  present stay argument.

18       THE COURT:  I actually wanted to ask you,

19  Mr. Gilligan, about what we do depending on different

20  outcomes.  Maybe you all can be thinking about that after I

21  hear from Mr. Letter.

22       Thank you, sir.

23       MR. STRAWBRIDGE:  Thank you.

24       MR. LETTER:  Thank you, Your Honor.  I will try

25  not to try your patience and I'll keep it as brief as I can

1     but I do have several points to make.

2            First of all, I want to just emphasize, because we

3     think it is an absolutely crucial point that my colleague,

4     Mr. Gilligan, made that mixed motive is no good, no good

5     meaning that doesn't help Mr. Trump at all.  It is quite

6     clear from the case law that, if there is a valid purpose,

7     then we're done.  So coming up with other purposes that are

8     invalid in various cases, Watkins, McGrain, Rosen,

9     Barenblatt all said that they don't matter.

10           One point about a distinction between this case

11    and Mazars is that in Mazars, on remand, the Executive

12    Branch has been silent.  That it might be possible for Judge

13    Mehta to think that the balance, there might still be a

14    possibility of some sort of clash of the branches.  We don't

15    think there is.  As we've said we think he erred --

16           THE COURT:  Sorry, the Executive Branch is not

17    involved in Mazars anymore.

18           MR. LETTER:  The Mazars on remand, the Executive

19    Branch has done nothing.  And remember that, in Mazars,

20    we're seeking documents from Mazars that are not in

21    possession of the Executive Branch.  In this case, as you

22    well know, the Executive Branch had said precisely there is

23    a legal obligation for these to be turned over.  So I don't

24    think there is -- there is no clash between the branches in

25    Mazars.  But here, there is a definitive agreement between

1    the two branches is my limited point.

2           THE COURT:  Yeah.  It's not immediately obvious to

3    me that that would be the right way to decide Nixon versus

4    GSA versus Mazars, on the other hand.  I hear that the

5    analysis under the test might be different.

6           MR. LETTER:  Your Honor definitely has a point,

7    just pointing out that is a difference as far as the two.

8           I'm concerned here that Mr. Strawbridge may be

9    running with something that I don't think I said, a

10   concession.  I said that we certainly could come up with

11   hypotheticals that, if the chairman announces and it's

12   public, et cetera, you know, everything I said, that is just

13   total garbage, you know, that was what I said.  I don't want

14   to make absurd arguments.

15          Chairman Neal hasn't come anywhere close to

16   anything like that.  And I'm not sure since Mr. Strawbridge

17   said he is not intending to take any discovery of Mr. Neal,

18   I don't understand what he would hope to develop then

19   because I think I heard him say he is not going to seek

20   anything or get anything from Congress.  So I'm not sure.

21   If there were such a statement by Mr. Neal, they haven't

22   found it, they haven't said it.  There is none.  So I'm not

23   really sure what he would do if this were summary judgment

24   as opposed to --

25          THE COURT:  Yeah, on that point, I don't want to

think about what discovery they may or may not be entitled

to.  I don't think that is where I am.  I am trying to think

through the standard under 12(b) rather than summary

judgment.  I think I've heard from both federal parties that

there are official statements that a chairman could make,

whether or not he has made them here, that could be relevant

beyond the text of the letter.

So I am wrestling whether with, if we all agree

that there can be something beyond what the House presents

and says this is our legislative purpose, we all agree that

there are some circumstances in which the private party

could point to additional things, if they have sufficiently

done that here and if so, when do I make that evaluation?

Is this the right stage to do that?

MR. LETTER:  I hear you, Your Honor.  The only

thing I want to do is make sure the record is straight.  If

there was a valid legislative purpose that was stated and

then Chairman Neal said, you know what, that's not by

purpose; I completely change my mind, that is not my

purpose, that's one thing.  It's different if he says, I've

got all these other purposes or maybe I do, et cetera.  So I

want to be clear on what I apparently was thought to

concede.

By the way, I don't know, maybe he has information

that we don't.  Mr. Strawbridge is saying there is an audit

ongoing.  I believe he said there are audits that are

ongoing.  As far as we are aware, that is taxpayer

information that is covered by Section 6103.  In fact, I may

by wrong, I think he can -- Obviously Mr. Trump can reveal

that if he wishes.  That's part of 6103.

I believe, otherwise, it is a felony for somebody

to be saying, oh yeah, there are audits ongoing.  We don't

know.  And Mr. Trump -- obviously, we guess Mr. Trump knows.

I don't know.  Again, if he wants to voluntarily disclose

things, he can.  But otherwise I think that Mr. Strawbridge

is assuming things that we have no idea.  We do not know.

THE COURT:  Well, I'm sure you are much more

familiar with the presidential audit program than I am.  But

I thought that was a matter of course.

MR. LETTER:  No, that's what the audit program

says is their policy when we met with -- "we" meaning the

committee folks, met with the IRS folks, that's the exact

kind of thing they wouldn't disclose.  They wouldn't say, oh

yes, we did audit President Clinton or we are now auditing

Mr. Trump.  So that's part of problem here.

I think this went to a key question you asked.  As

far as legislative purpose, you said would it be legislative

purpose for us to find out do they need more money to do

audits.  We don't even know if they're doing any audits of

presidents.  We don't know if they have done the last three.

1    We simply do not know.

2            THE COURT:  I understand.  But I think at this

3    point, it's fair to take, at least for Mr. Strawbridge to

4    assume that the Treasury does what they say they do.  Right?

5            MR. LETTER:  Right.  If there is any question

6    about the presumption of irregularities applying at the

7    motion to dismiss stage, I just want to remind you we dealt

8    with that in pages eight and nine of our reply brief.  It

9    certainly does.

10           So Mr. Strawbridge said the Office of Legal

11   Counsel issued an opinion and then it issued an opinion that

12   was severely critical of that and came out differently.  I'm

13   not certain, but I think he was indicating maybe they want

14   to probe that and provide that as part of a summary

15   judgment.  I'm not really sure what he was saying.

16           As we know, the prior OLC opinion was issued when

17   Mr. Trump was the boss of OLC.  The current OLC opinion, Mr.

18   Trump is not the boss.  And President Biden has said this

19   disclosure is not a problem.  And it is, in fact, provided

20   for -- required by law.  So, I'm just, again, I'm not really

21   sure what Mr. Strawbridge is envisioning.  He is going to

22   take discovery from the Office of Legal Counsel.  Is he

23   going to call in Steve Engel, who was then head of OLC and

24   say did anybody in the White House influence your opinion?

25   I'm just baffled what discovery is going reveal.

1          THE COURT:  I understand.  I don't want to -- I'll

2    let that go tonight.  As I said, I'm trying to figure out

3    what the right -- when is the right time to make these

4    decisions.  But the discovery point is about for another day

5    if we ever get there.

6          MR. LETTER:  I will never say those words again in

7    this hearing.

8          The Mazars factor three says that evidence offered

9    by Congress and asserted legislative purpose, is what it

10   talks about.  It doesn't say anything about probing for the

11   real purpose.  And even though that was our argued in the

12   Supreme Court that it should be, but the Supreme Court

13   didn't accept that.

14         The Jewish War Veterans case is not a case about

15   separation of powers and a clash or agreement between the

16   Executive Branch and the Legislative Branch.

17         Your Honor, you probed on the question of, you

18   know, as far as how far GSA applies and why.  I did want to

19   note there, the Supreme Court said only when the potential

20   for disruption is present, must we then determine whether

21   that impact is justified by an overriding need to promote

22   objectives within the constitutional authority of Congress.

23         So I wanted to emphasize the word "only."  So

24   here, what we have argued to you is there isn't a potential

25   for disruption under these circumstances given that Mr.

1    Trump is no longer the president.

2         THE COURT:  Yeah.  What I was trying to say was

3    apparently former President Nixon got over that hurdle, even

4    saying that documents -- that he didn't want documents to be

5    reviewed by the Executive Branch.  And even though there was

6    no kind of passing of documents from one branch to another

7    at that time, they still as I read it, tell me if you

8    disagree, but as I read it, they found that he had cleared

9    that bar and had proceeded to do the balancing.

10        MR. LETTER:  You are absolutely right, Your Honor.

11   Again, I think that that had a considerable amount to do

12   with the fact that, up until then, up until that statute

13   passed, it was assumed and clear that the materials at issue

14   belonged to the president and indeed, as I mentioned,

15   President Nixon later actually won.  So in that case,

16   President Nixon was saying you have seized my documents.

17        THE COURT:  Yeah.  I guess I'm struggling to see

18   how that creates a burden on the Executive Branch.  That

19   creates a burden on the former presidents.  But my

20   inclination sounds like yours, is that former presidents

21   shouldn't count very much in that separation of powers

22   analysis, nonetheless.

23        MR. LETTER:  Yes.  As Mr. Strawbridge said, that

24   case was decided a while ago.  You certainly can overrule

25   it, it sounds like.

1          I think there, though, President Nixon didn't get

2     over the hurdle for separation of powers purposes, if

3     reading the opinion very carefully, I think it only did it

4     for privilege balances.  In other words, remember executive

5     privilege required certain balances and the Supreme Court

6     got into the balance there.  But I don't think it was for

7     separation of powers purposes.

8          If you will give me one more moment,  I'm sure you

9     will be happy to hear,  I may very well be done.

10          Your Honor, I don't think I have anything else.

11          THE COURT:  All right.  Thank you, Mr. Letter.

12          MR. LETTER:  Thank you for your patience.

13          THE COURT:  Mr. Gilligan.

14          MR. GILLIGAN:  Thank you, Your Honor.  I believe I

15     will take even less of the Court's time than Mr. Letter did.

16     I just want to make a few discreet points.

17          First regarding the 12(b)6 standard.  As was said

18     in Iqbal, Twombley or both perhaps, before a plaintiff can

19     open the doors to discovery, they must, not only allege

20     plausible facts, they must allege facts that plausibly give

21     rise to a claim for relief, is actually a point I must

22     credit to the Committee's reply brief.  It is not enough

23     simply to plausibly allege facts, those facts must plausibly

24     give rise to a claim for relief.  And facts alleged as part

25     of the amended counterclaims do not do that.

1      And we submit, picking up on Your Honor's point

2  about Eastland, that Eastman's admonition (unintelligible)

3  gave to the D.C. Circuit for kind of stalling the

4  committee's inquiry in that case tells us that the 12 (b)6

5  standard should be applied fairly vigorously here and that

6  the door shouldn't be open to discovery unless there is

7  definitely a showing of a plausible claim for legal relief

8  and we don't believe that standard has been satisfied here

9  under the understanding of the valid legislative purpose

10  test that is articulated particularly in Watkins and

11  Barenblatt.

12      I did not hear Mr. Strawbridge articulate how he

13  was going to find gold, to use his term, to shine brighter

14  than the gold that Mr. Watkins had in the committee's own

15  official reports.  So it seems that the line is drawn in

16  cases like Watkins and Barenblatt, there is a bright line.

17  Once the committee has stated legitimate legislative

18  purpose, then that is the end of the inquiry.

19      And let me focus for a moment on that term,

20  legitimate or valid, if you will, legislative purpose.  I

21  don't think we can get hung up on the Supreme Court's use of

22  the term "purpose" in that particular phrase.  As Your Honor

23  recognizes, and as we have discussed, the Supreme Court in

24  this context uses the two terms interchangeably, regardless

25  of what distinction you may need to draw in the First

1    Amendment context, here, the Supreme Court sees no

2    difference between the two.  And the way we need to

3    understand legitimate legislative purpose when we read what

4    the Supreme Court's analysis is in the case is it simply

5    asks whether the request for information at issue is

6    reasonably related to a subject of inquiry on which Congress

7    may constitutionally legislate, and is the case here we

8    submit.

9           Briefly regarding Mr. Strawbridge's discussion of

10   the various Mazars factors, discussed ways in which he

11   thought there were more appropriate sources of information

12   for Congress to look at, ways in which he thought the

13   request was overbroad.

14          He did not grapple with the point that we were

15   discussing when I first stood at the podium here, Your

16   Honor, which is what is the purpose of those factors in the

17   Mazars analysis.  The purpose is to avoid enter-branch

18   conflict.  And there is none here in this case.  The two

19   branches are in agreement; and therefore, the kind of

20   searching analysis that Mr. Strawbridge was suggesting with

21   respect to those two factors and other Mazars factors, there

22   is simply no justification for that here.

23          THE COURT:  Yeah, I guess that is kind of why I'm

24   surprised that you, what I think you are doing is advocating

25   for Mazars or at least some sort of watered down version of

1   Mazars.

2          MR. GILLIGAN:  Mazars is the only lone star we

3   have at the moment in sort of a new and developing area of

4   the law.  And we agree that a version of Mazars, which you

5   could call Mazars Lite, I don't think we would necessarily

6   agree that it's the version that Judge Mehta applied in

7   Mazars Four.

8          But Mazars is the guidance we have.  Taking that

9   guidance in light of the fact that we're now dealing with a

10  former president rather than a sitting president, we apply

11  those factors taking that critical fact into mind.  As I've

12  discussed, we think that those factors weigh very little in

13  the situation where we have a former president's records

14  rather than a sitting president's records.

15         Finally the point about how a Court shouldn't be

16  blind to what all others can see.  The Supreme Court said

17  the same thing or maybe said it in a somewhat different way

18  but made the same point in Mazars.  The Supreme Court, in

19  Mazars, acknowledged the politically charged nature of the

20  dispute there.

21         But nevertheless, the Court did not license the

22  kind of inquiry that the intervenors want the Court to

23  embark upon here.  It did not license an inquiry into

24  legislator's individual motives or purposes or objectives,

25  whatever you want to call it.

1          It said look at the detail with which Congress has

2     explained its legislative purpose.  And why it's, therefore,

3     interested in the president's records.  Look at the extent

4     to which there is a burden on the Office of the Presidency.

5     Look at whether there are alternative sources of

6     information.  Various things to look at, factors that, as we

7     say, have much less weight here.

8          But the point is the Court did not authorize the

9     inquiry that the Trump Party -- excuse me -- the intervenors

10    wish to engage in here and we see no reason for such an

11    inquiry in this case either.  Therefore, request that our

12    motions to dismiss be granted.

13         THE COURT:  Thank you, Mr. Gilligan.  Can you tell

14    me -- so I'm going to work quickly on this.  I expect to

15    have something out within the next two to three weeks.  I'm

16    not sure when it's going to be.  I think as you suggested,

17    Mr. Gilligan, we're kind of a bit in unchartered territory

18    here with kind of what to do with a suit like this from a

19    former president.

20         I don't have any order or anything out really

21    right now other than what you've agreed to on the behalf of

22    the Executive Branch.  I would like to avoid a situation

23    that whatever I decide, if we're triggering some sort of

24    emergency litigation about a stay or, I forget exactly what

25    you've agreed to now but it occurs to me that even if I --

1    we have a situation where I deny, at least in part, your

2    motion to dismiss, do you agree that you are not going to go

3    and release the documents during the pendency of the

4    litigation in front of me?

5           MR. GILLIGAN:  Your Honor, we're not looking to

6    jam any parties, to jam any Courts, either Your Honor or the

7    Court of Appeals.  We're not looking to create any races to

8    the courthouse while we're racing to Capitol Hill with

9    documents.  That is not the kind of business we're looking

10   to engage in.  So I think that we have agreed that we would

11   give the intervenors counsel 72 hours notice before

12   providing the requested tax return information to the

13   committee.  And I think that we would be perfectly prepared

14   to work out whatever reasonable arrangements would be

15   appropriate in light of Your Honor's ruling to make sure

16   that nobody's interests are improperly prejudiced.

17          THE COURT:  Okay.  Specifically, if I grant your

18   motion to dismiss, I guess, have you thought about what that

19   would look like?  I'm quite sure, regardless what I say, it

20   will not be the final word on this topic and, as you

21   suggested, I think would be quite inappropriate to moot out

22   this by sending something over before the intervenors have a

23   chance to raise it with the Court of Appeals.

24          MR. GILLIGAN:  I don't think anybody in the

25   Executive Branch is envisioning a situation where we would

1    try to moot out an appeal by, as I said, while they're

2    trying to get to the courthouse, we beat them to the Capitol

3    Hill with the documents.  That, I don't believe anybody in

4    DOJ or the Department of Treasury is something that they

5    envision.

6           Exactly what would be the appropriate arrangements

7    that appropriately balances everybody's interest in light of

8    whatever ruling Your Honor makes, I haven't had sufficient

9    discussion with my principals at the department or certainly

10   with my clients in order to be more definitive than that,

11   except to say that we're not looking to cut anybody off at

12   the pass and moot out the case before somebody has a

13   reasonable opportunity to expeditiously seek review in Court

14   of Appeals.

15          THE COURT:  All right.  Thank you.

16          Anything further for the Executive Branch,

17   Mr. Gilligan?

18          MR. GILLIGAN:  No, Your Honor.

19          THE COURT:  Thank you.

20          Mr. Letter, anything further for the committee?

21          MR. LETTER:  No, Your Honor.

22          THE COURT:  All right.  Mr. Strawbridge?

23          MR. STRAWBRIDGE:  No, Your Honor.

24          THE COURT:  Thank you, gentlemen.  I really

25   appreciate all of the briefing and arguments today.  It's

1    very helpful.  I will take this under advisement and get

2    back to you as quickly as I can.

3              (Whereupon, at 5:21 p.m., the hearing adjourned.)

4                              oo0oo

5

6                    CERTIFICATE OF REPORTER

7               I, Lisa Walker Griffith, certify that the

8    foregoing is a correct transcript from the record of

9    proceedings in the above-entitled matter.

10

11

12

13

14   _____     _____

     Lisa Walker Griffith, RPR                        Date
15

16

17

18

19

20

21

22

23

24

25